## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.

RYAN BRESLOW, ALEX FINE, and JON
GORDON,

      Plaintiffs,

vs.

MARK PHILLIPS and BENJAMIN REED,

      Defendants.

_____/

# REDACTED COPY

### DECLARATION OF RYAN BRESLOW

      I, Ryan Breslow, make the following declaration based on my personal knowledge:

      1.     My name is Ryan Breslow. I am over the age of 18, competent to testify, and have person knowledge of the matters stated herein.

      2.     I am a resident of the United States Virgin Islands.

      3.     In 2021, Jon Gordon, Alex Fine, and myself (collectively, the "Plaintiffs") created a new cryptocurrency platform called the Movement DAO ("DAO" or "Movement DAO").

      4.     We intended for the Movement DAO to function as an online community, with community members investing capital into the DAO endowment.  That endowment would then be invested, and the proceeds from the investment returns would be used to fund DAO community projects.

DocuSign Envelope ID: 86E2473C-3204-4835-9F23-710472070565

5.      As of February 7, 2022, the DAO endowment Gnosis account contained over $16,000,000.   The DAO endowment's Gnosis safe account has the blockchain address: 0x143cC0A996De329C1C5723Ee4F15D2a40c1203c6.    A true and correct copy of the Etherscan.org account statement and transaction history of the DAO Endowment Gnosis account as of February 22, 2023 is attached as **Exhibit 1**.  That transaction history shows deposits valued over $16,000,000 entering into the DAO endowment Gnosis account in February 2022.

6.      Jon Gordon, Alex Fine, and I collectively invested over $16 million into the DAO endowment Gnosis account, over 97% of its total assets.  The amount invested by all other DAO community members is less than $300,000.   A true and correct copy of the Etherscan.org transaction records reflecting the transfer of approximately $16 million from accounts that acted as custodians for those assets are attached hereto as **Exhibits 50–52, 54–56**.

    a.   **Exhibit 50** shows a transfer of $3,000,000 in DAI cryptocurrency was made from 0xD78368092Cb1079e3DdaE7f192F5dCdE53949CCD, a blockchain wallet that acted as a custodian for Plaintiff Fine's funds, to the DAO endowment Gnosis account on February 2, 2022.

    b.   **Exhibit 51** shows a transfer of $9,786,795 in DAI cryptocurrency was made from  0x752515a3A1091b9f1c04416CF79D1F14d2340085,  a blockchain wallet that acted as a custodian for my funds, to the DAO endowment Gnosis account on February 2, 2022.

    c.   **Exhibit 52** shows a transfer of $1,200,000 in DAI cryptocurrency was made from 0x58F09dd6DF8dFCe8c209A00BaE4348002BACac1d, a blockchain wallet that acted as a custodian for my funds, to the DAO endowment Gnosis account on February 2, 2022.

DocuSign Envelope ID: 86E2473C-3294-4835-9F23-710472070565

    d.   **Exhibit 53** shows a transfer of $200,000 in DAI cryptocurrency was made from 0xDe10F01e3f9bF288eF7A91cb4744B4AF3F2797F0, a blockchain wallet controlled by Plaintiff Fine, to the DAO endowment Gnosis account on February 7, 2022.

    e.   **Exhibit 55** shows a transfer of 79.93 in ETH cryptocurrency (valued at the time as approximately $214,000) was made from 0xfE021e62637Cf8B880a76b09E94904693D38256A, a blockchain wallet that acted as a custodian for the funds of Plaintiff Gordon, to the DAO endowment Gnosis account on February 2, 2022.

    f.   **Exhibit 56** shows a transfer of 687.47 in ETH cryptocurrency (valued at the time as approximately $1,842,302) was made from 0x58F09dd6DF8dFCe8c209A00BaE4348002BACac1d, a blockchain wallet that acted as a custodian for my funds, to the DAO endowment Gnosis account on February 2, 2022

7.    The Plaintiffs described the DAO concept in a white paper called the "Gitbook" published online on February 2, 2022.  A true and correct copy of the Gitbook is attached hereto as **Exhibit 2**.

8.    The Gitbook states that no monies from the DAO Endowment would ever be spent; only the proceeds from the endowment's investment returns would be used to fund projects or support the DAO's operating expenses.  **Exhibit 2** at 20 ("Money in the endowment cannot be spent.").

9.    Defendant Phillips created the DAO endowment's Gnosis account.  The account had seven signatories.  **Exhibit 2** at 7.

10.     Plaintiffs were three of the signatories on the DAO endowment's Gnosis account. Two other signatories on the DAO endowment's Gnosis account were Defendant Phillips and what I now understand to be a sham entity called Dao-lawfirm.eth that was controlled by Defendant Phillips.  **Exhibit 2** at 7 .

11.     The Gitbook described the unique, decentralized governance structure of the DAO. Once the DAO launched, decisions relating to governance, funding, and a variety of other subjects would be made by a community vote: a member would submit a proposal to the entire DAO community, and the DAO community would vote to determine whether the proposal was adopted or defeated.  **Exhibit 2** at 11, 27.

12.     According to the Gitbook, the number of votes a community member could exercise would be determined based on the amount of capital they contributed to the DAO endowment. **Exhibit 2** at 9.

13.     The more money a community member invested into the DAO endowment, the more votes they were able to cast on a proposal.  Proposals would be posted and votes would be cast on an online platform called Snapshot.org, which would display proposals and record vote tallies.  The Beta version of the DAO's Snapshot.org voting platform is available to view at https://snapshot.org/#/snapshot.movedao.eth.

14.     DAO community members would be issued "voting tokens"—called MOVE tokens—and would deploy those tokens to vote on proposals. **Exhibit 2** at 8.

15.     The concepts described in Paragraphs 11 through 14 were to take effect upon the launch of the DAO.  But due to Defendant Phillips's conduct, the DAO never launched.

DocuSign Envelope ID: 86E2473C-3204-4335-9F23-710472070565

16.     In July 2021, Plaintiffs were looking to hire a code developer who could construct the DAO's systems architecture.  Plaintiff Gordon and I interviewed Phillips, who represented he had experience as a coding engineer and had worked for the Securities and Exchange Commission.

17.     Plaintiff Gordon and I were impressed with Phillips's experience with the SEC because we wanted to be sensitive to regulatory compliance issues in the cryptocurrency space.

18.     Based on Phillips's representations about his professional experience, we hired him.  At no point during the hiring process did Phillips disclose that he had been previously convicted of federal wire fraud, mail fraud, and money laundering in connection with a startup technology company.  A true and correct copy of an FBI press release relating to Phillips's conviction is attached hereto as **Exhibit 3**.

19.



20.

21.

22.

23.     Based on Phillips's prior criminal convictions, I now understand that Phillips █████

████████████████████████████████

24.     In October 2021, I brought Plaintiff Alex Fine in as head of the DAO project. Together, Plaintiff Fine and Phillips worked together to author the Gitbook.  A true and correct copy of a text exchange reflecting this work is attached hereto as **Exhibit 44**.

25.     During the Gitbook's creation and after its publication, Plaintiffs Fine, Gordon, and I directed Phillips to construct the DAO in accordance with the Gitbook, and Phillips, at least initially, acted accordingly.  For example, Phillips established the DAO endowment's Gnosis account, as described in the Gitbook.  In early 2022, Plaintiffs Gordon, Fine, and I contributed over $16 million to that account. The DAO endowment's Gnosis safe account has the blockchain address: 0x143cC0A996De329C1C5723Ee4F15D2a40c1203c6.  *See* **Exhibit 2** at 7.

26.      Phillips issued authorization tokens for the DAO endowment's Gnosis account to himself and his accomplices, including a sham law firm called Dao-lawfirm.eth, which I understand Phillips controls.

27.     Phillips then induced me and Plaintiff Fine to entrust him with our authorization tokens for the DAO endowment's Gnosis account by repeatedly assuring us he was trustworthy, including by representing he had heightened ethical obligations because of his affiliation with a law firm and because he had a security clearance with the SEC.  Plaintiff Fine and I trusted Phillips based on those representations, which made us comfortable making him custodian of our authorization tokens for the DAO endowment's Gnosis account.

28.     Phillips created a Beta version of the Snapshot—the platform that would enable DAO community members to post proposals and hold votes on them, as described in the Gitbook.

See **Exhibit 2** at 27. As part of that process, Phillips represented to Plaintiffs that he created voting tokens based on the contributions that DAO community members made to the DAO endowment.

29.     Because Plaintiffs Gordon, Fine, and I contributed over $16 million to the DAO endowment, we should have held over 97% of the voting tokens—and thus an overwhelming amount of the voting power—in the DAO community.

30.     I contributed the majority of the over $16 million investment into the DAO endowment, so I should have held well over 50% of the voting tokens.  However, Phillips induced me to entrust him to be custodian of my voting tokens through repeated assurances that he would vote my tokens as I directed him and that he was trustworthy.

31.     Plaintiff Fine similarly agreed to let Phillips act as custodian for some, but not all, of his voting tokens.

32.     Although the voting machinery was being created and tested in 2022, the DAO had not launched and the governing mechanisms that Phillips had created had no authority.

33.     ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

34.     ███████████████████████████ Phillips took direction from Plaintiffs and kept Plaintiffs informed of his activities—at least for a time.  Phillips hired Defendant Benjamin Reed as a developer for the DAO project.

35.     The DAO launch did not occur in January 2022, as scheduled.  At that point, Phillips had the most comprehensive knowledge of the DAO's architecture of any member of the project.

36.     Defendant Phillips fostered a hostile working relationship with Plaintiff Fine. Phillips seemed to regularly criticize and admonish him.  At the same time, Phillips never missed an opportunity to highlight his own experience, skill set, and competency as someone who should take over the DAO.  For example, the 1,000+ hours of code that Plaintiff Alex had spent creating for the DAO was discarded because Phillips claimed it was "low quality" and that he should rewrite it all.  Plaintiff Gordon and I were duped by his posturing.  In February 2022, Plaintiff Fine decided to step away from day-to-day oversight of the project.  As Plaintiff Fine withdrew, Phillips filled the vacuum and assumed the primary leadership role of the project ███████████████████ ███████████████████

37.     By August 2022, Phillips began advocating to myself and Plaintiff Gordin that all spending on the DAO project should be exclusively dedicated to development.  Phillips also advocated that $1.75 million from the DAO endowment should be transferred to a DAO-affiliated account he controlled to pay for "development-related" expenses.  The account that Phillips wanted the assets transferred into was known as the DAO Developer Multisig.

38.     Plaintiffs ultimately agreed to authorize the transfer on the condition that Phillips would complete and launch the DAO by January 2023.  Plaintiffs did not discuss or approve any other authorizations or grants of authority to Phillips.

39.     On August 30, 2022, $1.75 million was transferred from the DAO endowment account to the DAO Developer Multisig account.  The blockchain address for the DAO Developer Multisig account is: 0x2187e6a7c765777d50213346F0Fe519fCA706fbD.  A true and correct copy of the Etherscan.org transaction record reflecting this transaction is attached hereto as **Exhibit 45**.

40.     On August 22, 2022, Phillips for the very first time, both through aliases and accomplices, posted proposals to the Snapshot.org page.  A true and correct copy of these Snapshot proposals is attached hereto as **Exhibits 5-12**.

41.     Proposal MIP-0003 purported to authorize the transfer of $1.75 million in DAI cryptocurrency from the DAO endowment into the DAO Developer Multisig account – the same amount that Plaintiff Gordon and myself authorized days earlier.  A true and correct copy of this proposal is attached hereto as **Exhibit 8.**

42.     Proposal MIP-0000 purported to create formal entities to faciliate DAO operations and to excuse Phillips from maintaining any record or accounting of costs, fees, or other expenses associated with the DAO.  A true and correct copy of this proposal is attached hereto as **Exhibit 5**.  Plaintiffs never authorized this proposal.

43.     Proposal MIP-0004 purported to authorize the advance of funds to Phillips and other "Certain Members" (i.e., Phillips's accomplices) under the auspices of indemnification for potential legal actions in the future.  A true and correct copy of this proposal is attached hereto as **Exhibit 9**.  Plaintiffs never authorized this proposal.

44.     Proposal MIP-0000 also purported to appoint Phillips, the sham law firm dao-lawfirm.eth, Defendant Benjamin Reed, and his other accomplices as "Service Providers," which would purportedly entitle them to fees from the DAO.  Plaintiffs never authorized this proposal.

45.     MIP-0007 purported to give Phillips and his fellow "Service Providers" discretion to deposit "funds of the DAO" into entities created by him as they deem 'necessary or advisable." A true and correct copy of this proposal is attached hereto as **Exhibit 12**.  Plaintiffs never authorized this proposal.

DocuSign Envelope ID: 86E2473C-7294-4235-9F32-710472070565

46.     MIP-0007 also purported to retroactively ratify as authorized "every action that has been taken, authorized, unauthorized, and with respect to the DAO by the Service Providers, including…the transfer of cryptocurrency to and from Gnosis [accounts]."

47.     These proposals were inconsistent with the original vision laid out in the Gitbook. More fundamentally, the proposals did not have any binding effect, as the Snapshot.org platform would only govern the DAO after the DAO had launched.

48.     During this time, Phillips told Plaintiffs that development was proceeding according to plan and that he was doing what needed to be done to get the DAO up and running. He did not provide copies of the August 22, 2022 proposals to me or Plaintiffs Gordon and Fine, he did not make us aware of the powers and authorizations he sought in the proposals, and we never voted on the proposals.  Instead, Phillips induced us to pay no mind to what he was doing in the Beta environment of the DAO community's Snapshot.org space.

49.     For example, when we questioned Phillips about his proposal-posting activity, he assured us that he did not believe the proposals had any authority by stating that no one reads them anyway.

50.     Despite being the founders of the DAO and possession over 97% of the voting power in the DAO community, Plaintiffs did not vote on Phillips's August 2022 proposals. The only members of the DAO community that voted on these proposals were Phillips and/or his aliases and accomplices.

51.     Although Plaintiffs Gordon, Fine, and I had been induced to overlook Phillips's scheming on SnapShot.org (a Beta environment that had no authority in any event), Plaintiff Fine was concerned about the $1.75 million transferred from the DAO endowment Gnosis account,

which spurred him to consult with me and Plaintiff Gordon in September 2022 about what exactly Phillips was up to.

52.     Over the next two months, we attempted to obtain explanations for Phillips's actions. Unsatisfied with the justifications he gave us, in October and November 2022 Plaintiff Fine entered into discussions with myself and Plaintiff Gordon about the viability of the DAO and whether Plaintiffs should unwind their money from the DAO endowment.

53.     By December 2022, Plaintiffs Gordon, Fine, and I concluded that the best course was to unwind the DAO endowment entirely and refund all DAO endowment assets to all members of the DAO community to make each of them whole.  I referred to this as the redemption offer.

54.     Because the DAO had incurred substantial costs at that point, I, as the principal investor in the project, agreed to absorb those losses out of my own share of the DAO endowment.

55.     I asked Phillips to announce to the DAO community that each community member's investment into the DAO endowment would be redeemed and their assets returned. Phillips did not make that announcement to the DAO community.

56.     Phillips told us that he would need to consult with the sham law firm, Dao-lawfirm.eth to make sure the unwinding of the project was done completely above board.

57.     After this conversation, Phillips became distant and slowed his communications with us.  By the end of December 2022, Phillips had still not presented the redemption offer to the DAO community, despite our repeated instructions for him to do so.

58.      On January 2, 2023, Phillips, through both aliases and accomplices, including Defendant Benjamin Reed, introduced two proposals on Snapshot.org—MIP-0011 and MIP-0012. In the proposal titled "MIP-0011 Pay Deferred Legal Fees from 2022," Defendants Phillips and Reed proposed that the DAO endowment should pay DAO-lawfirm.eth $58,831.02 in DAI

DocuSign Envelope ID: 86E2473C-7294-422F-9F32-710472070565

cryptocurrency for legal services the "law firm" rendered in 2022. This proposal falsely represented that Plaintiff Gordon's Snapshot.org alias—jimmyethworld.eth—reviewed and "confirmed that this proposal accords with the DAO's agreement with the Service Provider, dao-lawfirm.eth." A true and correct copy of MIP-0011 is attached hereto as **Exhibit 13**.

59.     In fact, Plaintiffs Gordon and Fine voted against the proposal. Plaintiff Gordon even posted the following statement along with his vote: "This proposal should be removed for making false claims. This was not approved by me, nor should that have been stated." **Exhibit 13** at 9.

60.     In Defendants' other fraudulent proposal titled "MIP-0012 Pay Deferred Service Provider Fees From 2022," Defendants sought authorization to transfer $334,487 in DAI cryptocurrency from the DAO endowment to an account controlled by Phillips. That account has the blockchain address: 0x752515a3A1091b9f1c04416CF79D1F14d2340085. That account is associated with the following aliases:  *service-provider.eth and dao-lawfirm.eth. A true and correct copy of MIP-0012 is attached hereto as **Exhibit 14**.

61.     Plaintiffs Gordon, Fine, and I understood MIP-0011 and MIP-0012 to be fraudulent because we understood that funds in the DAO endowment Gnosis account were not to be touched without our explicit authorization.

62.     During the course of Phillips's work on the DAO, he purported to work with a law firm described in his proposals as "Dao-lawfirm.eth." For example, in a proposal titled "MIP-0020 Proposal for Payout of Deferred Legal Expenses," Defendants stated that "in addition to acting as the DAO's service provider, dao-lawfirm.eth also provided legal services." A true and correct copy of MIP-0020 is attached hereto as **Exhibit 15**.

63.     Phillips presented the Dao-lawfirm.eth to me and the other Plaintiffs as the Law Firm of Reed Yurchak and Stephen Hay.

64.     On February 6, 2023, attorney Reed Yurchak wrote an email to me explaining that "the last payment my office received was for a March 2022 invoice" and that there had been no outstanding invoices since March 2022.  A true and correct copy of the email chain containing this communication is attached hereto as **Exhibit 16.**

65.     On January 6, 2023, I wrote to Phillips and demanded that he provide an explanation for the fraudulent conduct relating to the January 2, 2023 proposals MIP-0011 and MIP-0012.  A true and correct copy of an email chain containing this communication is attached hereto as **Exhibit 17**.

66.     After receiving no response to my January 6, 2023 email, I wrote to Phillips again on January 29, 2023, alerting him of the grave nature of his actions to attempt to prevent the unwinding of the DAO and the redemption of each community member's investment.  A true and correct copy of an email chain containing this communication is attached hereto as **Exhibit 17**.

67.     On February 2, 2023, Defendants Phillips and Reed, through aliases and accomplices, introduced several proposals on Snapshot.org—MIP-0009, MIP-0010, and MIP-0014–0021.  But before doing so, Phillips disabled the voting tokens assigned to me, Plaintiff Gordon, and Plaintiff Fine to ensure that we could not vote against the proposals.

68.     Proposal MIP-0014 purported to disable the authorization tokens to the DAO endowment Gnosis account assigned to me, Plaintiff Gordon, and Plaintiff Fine and replace  as authorized signatories on that account.  A true and correct copy of MIP-0014 is attached hereto as **Exhibit 18**.

69.     Proposal MIP-0015 purported to ratify the termination of our ability to vote in the DAO community based on the pretext that our conduct was inconsistent with the values of the DAO.  A true and correct copy of MIP-0015 is attached hereto as **Exhibit 19**.

70.     Proposal MIP-0016 purported to reallocate the distribution of voting power now that we had been terminated from the DAO community.  A true and correct copy of MIP-0016 is attached hereto as **Exhibit 20**.

71.     Proposal MIP-0009 purported to authorize the transfer of 10 Ethereum and $12,200 DAI from the DAO endowment Gnosis account to an account controlled by Phillips for the "Launch of DAOLabs Beta Services."  A true and correct copy of Proposal MIP-0009 is attached hereto as **Exhibit 21**.

72.     Proposal MIP-0010 purported to transfer $50,000 DAI from the DAO endowment Gnosis account to the DAO Developer Multisig account—an account controlled by Phillips—for the purpose of "retaining counsel."  A true and correct copy of Proposal MIP-0010 is attached hereto as **Exhibit 22**.

73.     Proposal MIP-0017 purported to authorize the transfer of $511,794 DAI and 41,007 Ethereum from the DAO endowment Gnosis to the DAO Developer Multisig account—an account controlled by Phillips—for "Outstanding Operational Expense Payouts."  A true and correct copy of MIP-0017 is attached hereto as **Exhibit 23**.

74.     Proposal MIP-0018 purported to transfer $349,035 DAI from the DAO endowment Gnosis account to the DAO Developer Multisig account—an account controlled by Phillips—for "Deferred 2022 Developer Payouts."  A true and correct copy of MIP-0018 is attached hereto as **Exhibit 24**.

75.     Proposal MIP-0019 purported to authorize the transfer of $334,487 DAI from the DAO endowment Gnosis account to the DAO Developer Multisig account—an account controlled by Phillips—to be held "in escrow" until Phillip sand his accomplices decide to dedicate those funds to a new service provider and/or attorneys.  A true and correct copy of MIP-0019 is attached hereto as **Exhibit 25**.

76.     Proposal MIP-0021 purported to authorize the transfer of $5,354,433 DAI from the DAO endowment Gnosis account to the DAO Developer Multisig account—an account controlled by Phillips for the "DAO's 2023 Operational Budget."  A true and correct copy of MIP-0021 is attached hereto as **Exhibit 27**.

77.     Proposal MIP-0020 purported to authorize the transfer of $2,558,831 DAI from the DAO endowment Gnosis account to the Dao-lawfirm.eth—an entity controlled by Phillips for "Deferred Legal and Indemnification Expenses."  A true and correct copy of MIP-0020 is attached hereto as **Exhibit 26**.

78.     On information and belief, the only members of the DAO community that voted on these proposals were Defendants, their accomplices, and a handful of individual DAO community members who had been duped by Defendants' fraudulent scheme.  These proposals all passed with no votes against.

79.     On February 2, 2023, two large transfers were made out of the DAO endowment Gnosis account to the DAO Developer Multisig account controlled by Phillips in the following amounts:  (1) $7,500,000 in DAI ($7,500,000 in USD); and (2) over 800 Ethereum ($1,367,408 in USD).  A true and correct copy of the Etherscan.org transaction records reflecting these transaction is attached hereto as **Exhibits 28–29**.

80.    On February 2, 2023, Defendants caused the following transfers to be made from the DAO Developer Multisig to accounts believed to be under the control of Defendants: (1) $20,000 in DAI; (2) $100,000 in DAI; (3) $15,000 in DAI; (4) $592,000 in DAI; (5) $250,000 in DAI; (6) $500,000 in DAI; (7) 39.53 in Ethereum; (8) $1,058,000 in DAI; (9) $322,034.67 in DAI; and (10) $50,000 in DAI.  A true and correct copy of the Etherscan.org transaction records reflecting these transactions are attached hereto as **Exhibits 30-39**.

81.    We have reason to believe that the assets identified in Paragraph 80 ended up in accounts controlled by Defendants and their accomplices.  For example, Phillips transferred $1,058,000 directly to an account tied to his known Snapshot alias @tankbottoms.eth.  *See* **Exhibit 37**.  The blockchain address for the account that received the above-referenced transfer is: 0x5d95baEBB8412AD827287240A5c281E3bB30d27E.    @tankbottoms.eth is an alias for Defendant Phillips.  He used this alias to identify himself in the Gitbook.  *See* **Exhibit 2** at 7.

82.    Three of the transfers identified in Paragraph 80 (totaling $1,164,034.67) were made directly to the account of Phillips's accomplice, Defendant Reed.  *See* Exs. 33, 34, 38 . The blockchain address for the account that received the above-referenced transfer is: 0xA4e6C2B6264652444B3F0cc1bB37496AE916931c.  That account is associated with the alias Benreed.eth.

83.    The rest of the assets identified in Paragraph 80 were sent to accounts that Plaintiffs Fine, Gordon, and I reasonably believe are owned or controlled by Defendants.  None of the recipient accounts have presented the DAO with invoices to establish they are legitimate vendors or service providers to the DAO.

84.    Plaintiffs first discovered the unauthorized transfers identified in Paragraph 80 on February 4, 2023 and immediately attempted to contact Phillips for an explanation.

85.     By February 6, 2023, Plaintiffs demanded the return of the Gnosis account authorization keys and an accounting of all DAO expenditures to date.  A true and correct copy of an email chain containing that communication is attached hereto as **Exhibit 17**.

86.     In response to Plaintiffs' February 6, 2023 email, Phillips refused, claiming that he was under no obligation to provide any accounting to Plaintiffs.  A true and correct copy of an email chain containing this communication is attached hereto as **Exhibit 17**.

87.     On February 6, 2023, Plaintiffs first discovered that Phillips had been convicted of federal wire fraud, mail fraud, and money laundering in connection with his involvement in a technology startup in 2011.  A true and correct copy of an FBI Press Release about his conviction is attached hereto as **Exhibit 3**.

88.     Blockchain ledgers are public and a number of third-party tools allow for a review the blockchain transactions associated with a specific wallet, including Etherscan.org.  Based upon my review of the blockchain transaction history of the DAO endowment and DAO Developer Multisig accounts, it appears that Defendants currently are moving misappropriated DAO assets out of cryptocurrency and into dollars.

89.     On February 13, Defendant Reed caused 86 ETH to be transferred from benreed.eth to an unknown cryptocurrency holding wallet with the address: 0x64d6A4C28868d9dD9eA650c37F7d0090986aC1CE.   A true and correct copy of the Etherscan.org transaction record reflecting this transaction is attached hereto as **Exhibit 40**.

90.     On February 13, Defendant Phillips, operating under the alias *service-rovider.eth, caused to be transferred $250,000 in DAI from the DAO Developer Multisig account to benreed.eth.  A true and correct copy of the Etherscan.org transaction record reflecting this transaction is attached hereto as **Exhibit 41** .

DocuSign Envelope ID: 86E2473C-7294-4235-9F32-71047207056F

91.     On February 15, "unknown" persons transferred 86 ETH from the blockchain address 0x64d6A4C28868d9dD9eA650c37F7d0090986aC1CE—the same address Defendant Reed transferred 86 ETH in Exhibit 40—to the blockchain address 0xa26e73C8E9507D50bF808B7A2CA9D5dE4fcC4A04, which I have reason to believe is a Robin Hood cryptocurrency exchange account.  Robin Hood maintains a cryptocurrency exchange that enables you to convert cryptocurrency into US dollars. A true and correct copy of the Etherscan.org transaction record reflecting this transaction is attached hereto as **Exhibit 42**.

92.     Phillips still has complete control over the DAO endowment Gnosis account, nearly all of whose assets belong to Plaintiffs.  He also has complete control over the DAO Developer Multisig account, to which he is transferring assets from the DAO endowment account.

93.     Phillips is a sophisticated operator, well-versed in blockchain technology, who is capable of moving funds to and through various levels of anonymous cryptocurrency wallets. Once Phillips moves funds out of the Gnosis SAFE Account, it will be difficult (if not impossible) to ever track down and recover those funds.

94.     I have completed an analysis of the transaction histories of various blockchain addresses to determine where the assets from the DAO endowment and other DAO-affiliated accounts have been transferred.

95.     On February 2, 2023, a $100,000 transfer of DAI cryptocurrency was made from the DAO Developer Multisig account 0x2187e6a7c765777d50213346F0Fe519fCA706fbD to the blockchain address 0x91898f9103cDBA1546DE834F6E26f019E09A0d4B, which I believe is under the control of Defendant Phillips.  A true and correct copy of the Etherscan.org transaction record reflecting the above-referenced transaction is attached as **Exhibit 31**.

DocuSign Envelope ID: 86E2473C-7294-4235-9F32-710472070565

⑦ **ERC-20 Tokens Transferred:**

▸ **From** 0x2187e6...CA706fbD **To** 0x91898f...E09A0d4B **For** 100,000   **$99,985.40**

🪙 Dai Stableco... (DAI...)

96.    On February 2, 2023, a $15,000 transfer of DAI cryptocurrency was made from the DAO Developer Multisig account 0x2187e6a7c765777d50213346F0Fe519fCA706fbD to the blockchain address 0x57a16a385e86cd215deF121E6887D23Be8080d37, which is associated with the alias cookieslayer.eth and I believe to be under the control of Defendant Phillips.  A true and correct copy of the Etherscan.org transaction record reflecting the above-referenced transaction is attached as **Exhibit 32.**

⑦ **ERC-20 Tokens Transferred:**

▸ **From** 0x2187e6...CA706fbD **To** 0x57a16a...e8080d37 **For** 15,000   **$14,997.81**   🪙 Dai Stableco... (DAI...)

97.    On February 2, 2023, a $592,000 transfer of DAI cryptocurrency was made from the DAO Developer Multisig account 0x2187e6a7c765777d50213346F0Fe519fCA706fbD to the blockchain address 0xA4e6C2B6264652444B3F0cc1bB37496AE916931c, which is associated with the alias benreed.eth and is under the control of Defendant Reed (as the alias suggests).  A true and correct copy of the Etherscan.org transaction record reflecting the above-referenced transaction is attached as **Exhibit 33.**

⑦ **ERC-20 Tokens Transferred:**

▸ **From** 0x2187e6...CA706fbD **To** 0xA4e6C2...E916931c **For** 592,000   **$591,913.57**

🪙 Dai Stableco... (DAI...)

98.    On February 2, 2023, a $1,058,000 transfer of DAI cryptocurrency was made from the DAO Developer Multisig account 0x2187e6a7c765777d50213346F0Fe519fCA706fbD to the

blockchain address 0x5d95baEBB8412AD827287240A5c281E3bB30d27E, which is associated with the alias tankbottoms.eth and is under the control of Defendant Phillips. *See* paragraph 81 *supra*. A true and correct copy of the Etherscan.org transaction record reflecting the above-referenced transaction is attached as **Exhibit 37**.

⑦ **ERC-20 Tokens Transferred:**

▸ From 0x2187e6...CA706fbD To 0x5d95ba...bB30d27E For 1,058,000   **$1,057,845.53**

🪙 Dai Stableco... (DAI...)

99. **Exhibit 41** shows that on February 13, 2023, a $250,000 transfer of DAI cryptocurrency was made from the DAO Developer Multisig account 0x2187e6a7c765777d50213346F0Fe519fCA706fbD to the blockchain address 0xA4e6C2B6264652444B3F0cc1bB37496AE916931c, which is associated with the alias benreed.eth and is under the control of Defendant Reed. **Exhibit 40** shows a transfer of 86 ETH (valued at approximately $140,000 USD) was made on February 15, 2023 from the blockchain address 0xA4e6C2B6264652444B3F0cc1bB37496AE916931c, which is associated with the alias benreed.eth, to an unknown cryptocurrency holding wallet with the blockchain address 0x64d6A4C28868d9dD9eA650c37F7d0090986aC1CE, which I have reason to believe is under the control of Defendants.



100. On February 10, 2023, a $3877.50 transfer of DAI cryptocurrency was made from the DAO Developer Multisig account 0x2187e6a7c765777d50213346F0Fe519fCA706fbD to the

blockchain address 0x752515a3A1091b9f1c04416CF79D1F14d2340085, which is associated with the alias of the sham law firm Dao-lawfirm.eth and the alias *service-provider.eth, which is under the control of Defendant Phillips.  A true and correct copy of the Etherscan.org transaction record reflecting the above-referenced transaction is attached as **Exhibit 48**.

▶ From 0x2187e6...CA706fbD To 0x752515...d2340085 For 3,877.5  **$3,870.43**  🪙 Dai Stableco... (DAI...)

101.    On February 2, 2023, a $500,000 transfer of DAI cryptocurrency was made from the DAO Developer Multisig account 0x2187e6a7c765777d50213346F0Fe519fCA706fbD to an unknown cryptocurrency holding wallet with the blockchain address 0x607d56643673649bd25AA47325A7a6AFeffc3B4a, which I have reason to believe is under the control of Defendants.  A true and correct copy of the Etherscan.org transaction record reflecting the above-referenced transaction is attached as **Exhibit 49**.

ⓘ ERC-20 Tokens Transferred:        ▶ From 0x2187e6...CA706fbD To 0x607d56...effc3B4a For 500,000  **$500,000.00**  🪙 Dai Stableco...(DAI...)

102.    As the foregoing examples go, Defendants are utilizing numerous blockchain wallets to dissipate assets from the DAO Develop Multisig account, which itself improperly received approximately $8.5 million in DAO endowment assets on February 2, 2023.

103.    If Defendants are not immediately enjoined from dissipating the remaining funds from the DAO endowment's Gnosis account, Plaintiffs will suffer irreparable injury, as Defendants will continue to dissipate funds from that account and other DAO-affiliated accounts, like the DAO Developer Multisig account.  When Plaintiffs Gordon, Fine, and I invested in this project, we placed over $16 million in the DAO endowment Gnosis account.  Today, that account only has $5,514,405.32 remaining.  *See* **Exhibit 1** at 1.

104.    Plaintiff Fine is a citizen of California.

105.    Plaintiff Gordon is a citizen of Texas.

106.    On information and belief, Defendant Phillips is a citizen of Florida and Defendant Reed is a citizen of Washington.

107.    A substantial portion of Phillips's conduct occurred in Miami, Florida, where he undertook efforts to develop the DAO's system architecture and from where he executed his fraudulent scheme.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 23rd day of February 2023.

DocuSigned by:

*Ryan Breslow*

B80596C4C546486...

Ryan Breslow

# Exhibit 1



## Token Holdings 0x143cC0A996De329C1C5723Ee4F15D2a40c1203c6

Movement DAO: Presale

### Overview

NET WORTH IN USD
$5,514,405.32

NET WORTH IN ETH
3417.137298

TOTAL BALANCE CHANGE (24H)
2.77%

Hide $0.00 assets

Show/Hide value in ETH

Assets in Wallet (9)
$5,514,405.32

NFT Assets (0)
-

Liquidity Pool Assets in Wallet (0)
-

### Assets in Wallet (9)

$5,514,405.32

Search Token Name / Address

| Asset | Symbol | Contract Address | Quantity | Price | Change (24H) | Value | |
|---|---|---|---|---|---|---|---|
| Ethereum | ETH | - | 704.643624861579488... | $1,613.75 | 1.74% | $1,137,118.65 | More |
| Dai Stableco... | DAI | 0x6B1754...95271d0F | 4379850 | $0.999414 | 0.33% | $4,377,283.41 | More |
| BlueSparrowT... | BlueSp... | 0x24cCeD...e5a46FdE | 50 | $0.065144 | 6.72% | $3.26 | More |
| Tokenize Emb... | TKX | 0x667102...9E480a88 | 0.0000054 | $6.4181 | 0.9% | ≈$0.00 | More |
| ERC-20 TOKEN... | - | 0x14D1b2...1e9EF082 | 32 | - | -- | - | More |
| ERC-20 TOKEN... | - | 0xe397ef...3e18c5Ec | 7000 | - | -- | - | More |
| ERC-20 TOKEN... | - | 0xbadb41...bB4000EE | 150 | - | -- | - | More |
| ERC-20 TOKEN... | - | 0x106Eeb...765f64f8 | 475 | - | -- | - | More |
| posercoin | posc | 0x9D1188...a259de5e | 15000 | - | -- | - | More |

Show rows: 10

First < Page 1 of 1 > Last

This website uses cookies to improve your experience. By continuing to use this website, you agree to its Terms and Privacy Policy. Got it!

2/22/23, 1:47 PM    Case 1:23-cv-20727-RKA    Ethereum Token Holdings 0x143cc0a996de329c1c5723ee4f15d2a40c1203c6 | Etherscan    Page 25 of 653

Document 24-1    Entered on FLSD Docket 03/01/2023

NFT Assets (0)



No NFT found for this address.

Liquidity Pool Assets in Wallet (0)

| Asset ⬍ | Dex | Contract Address | Quantity ⬍ |
|---------|-----|------------------|-----------|

No LP found for this address.

⚙ The token holding page lists token assets owned by an address. Assets displayed include ERC-20, NFT and Liquidity Pool tokens. Learn more about this page in our Knowledge Base.

🍪 This website uses cookies to improve your experience. By continuing to use this website, you agree to its Terms and Privacy Policy.

## Token Transfers (ERC-20)

For 0x143cc0a996de329c1c5723ee4f15d2a40c1203c6

Sponsored: ⓧ Metawin: Click Here to claim your FREE Entry to MetaWin's 20 ETH give away! Ends soon



ⓘTransactions involving tokens marked as suspicious, unsafe, spam or brand infringement are currently hidden. To display them, go to Token Ignore List.

A total of 56 txns found

First ‹ Page 1 of 1 › Last

| ⓘ | Txn Hash | Age | From | | To | Value | Token |
|---|---|---|---|---|---|---|---|
| 👁 | 0xd3da22c14836abc82f8... | 20 days 10 hrs ago | 🗋 Movement DAO: Presale 🗍 | OUT | 🗋 0x2187e6...CA706fbD 🗍 | 7,500,000 | 🟡 Dai Stableco... (DAI) |
| 👁 ⚠️ | 0x0fc08344c49b8c1d... | 87 days 18 hrs ago | 🗋 1inch: Treasury 🗍 | IN | 🗋 Movement DAO: Presale 🗍 | 9 | ERC-20 TOKEN* ⚠️ |
| 👁 ⚠️ | 0x997b38f6ad4e1554... | 100 days 10 hrs ago | 🗋 Maker: Dai Stablecoin 🗍 | IN | 🗋 Movement DAO: Presale 🗍 | 7,000 | ERC-20 TOKEN* ⚠️ |
| 👁 | 0x38cdd2e57b2645e8f1e... | 116 days 11 hrs ago | 0x49F5D5...63613B6b 🗍 | IN | 🗋 Movement DAO: Presale 🗍 | 95,038,800 | (atuns.org) (Invita...) |
| 👁 | 0x84796a40ec0221b226... | 119 days 15 hrs ago | 0x902bC2...13f68eE3 🗍 | IN | 🗋 Movement DAO: Presale 🗍 | 0.0000054 | 🔶 Tokenize Emb... (TKX) |
| 👁 | 0x24b584bdbd9b121efe0... | 122 days 8 hrs ago | 🗋 Bulksender.app 🗍 | IN | 🗋 Movement DAO: Presale 🗍 | 50 | 🔷 BlueSparrowT... (BlueSp...) |
| 👁 | 0xfb0eafccdbd2ae8f894b... | 140 days 15 hrs ago | 0x552cfe...4Ff9D004 🗍 | IN | 🗋 Movement DAO: Presale 🗍 | 83,158,950 | (aatu.site) (This t...) |
| 👁 ⚠️ | 0x8a75a0f19098c6e4... | 147 days 9 hrs ago | Null Address: 0x000...000 🗍 | IN | 🗋 Movement DAO: Presale 🗍 | 32 | ERC-20 TOKEN* ⚠️ |
| 👁 ⚠️ | 0xf96a2455f12046ebf... | 152 days 23 hrs ago | 0xB85A67...3B96586E 🗍 | IN | 🗋 Movement DAO: Presale 🗍 | 83,158,950 | ERC-20 TOKEN* ⚠️ |
| 👁 ⚠️ | 0x7d72a40f523c9b8f8... | 153 days 21 hrs ago | 0xeC5EE3...604284e2 🗍 | IN | 🗋 Movement DAO: Presale 🗍 | 150,964 | ERC-20 TOKEN* ⚠️ |
| 👁 | 0xbb89229d6df34dc91d... | 155 days 23 hrs ago | 🗋 Uniswap V2: posc 🗍 | IN | 🗋 Movement DAO: Presale 🗍 | 15,000 | ⬤ posercoin (posc) |
| 👁 | 0x2ee7aaf40019a416538... | 156 days 5 hrs ago | 🗋 Movement DAO: Presale 🗍 | OUT | 🗋 Uniswap V3: DAI 2 🗍 | 10,000 | 🟡 Dai Stableco... (DAI) |
| 👁 | 0x2ee7aaf40019a416538... | 156 days 5 hrs ago | 🗋 Movement DAO: Presale | | Uniswap V3: DAI 2 | 20,000 | 🟡 Dai Stableco... (DAI) |

🍪 This website uses cookies to improve your experience. By continuing to use this website, you agree to its Terms and Privacy Policy.    Got it!

| | Txn Hash | Age | From | | To | | Value | Token |
|---|---|---|---|---|---|---|---|---|
| 👁 | 0x9cb87b8a4f5477a53b5... | 159 days 12 hrs ago | 0xa27F25...6f2A494F 📋 | IN | 🏛 Movement DAO: Presale 📋 | | 143,758,200 | 🔵 mdai.io (mdai.i...) |
| 👁 | 0x3a2e0e4257af96fbb5f... | 162 days 15 hrs ago | 🏛 Movement DAO: Presale 📋 | OUT | 0xB500cd...A910cc79 📋 | | 116.245059715 | ⬣ Wrapped Ethe... (WETH) |
| 👁 | 0x7fce5b4a02facd6b714... | 162 days 15 hrs ago | 🏛 CoW Protocol: GPv2Settl... 📋 | IN | 🏛 Movement DAO: Presale 📋 | | 116.245059715 | ⬣ Wrapped Ethe... (WETH) |
| 👁 | 0x7fce5b4a02facd6b714... | 162 days 15 hrs ago | 🏛 Movement DAO: Presale 📋 | OUT | 🏛 CoW Protocol: GPv2Settl... 📋 | | 200,000 | 🟡 Dai Stableco... (DAI) |
| 👁 ⚠️ | 0x1fbd4d205a689c8c... | 169 days 23 hrs ago | 🏛 Maker: Dai Stablecoin 📋 | IN | 🏛 Movement DAO: Presale 📋 | | 475 | 🔵 ERC-20 TOKEN* ⚠️ |
| 👁 ⚠️ | 0xc65b8c5a3d0cbbfd... | 175 days 3 hrs ago | 🏛 Maker: Dai Stablecoin 📋 | IN | 🏛 Movement DAO: Presale 📋 | | 150 | 🔵 ERC-20 TOKEN* ⚠️ |
| 👁 | 0x86332db3a76c48c597... | 176 days 9 hrs ago | 🏛 Movement DAO: Presale 📋 | OUT | 🏛 0x2187e6...CA706fbD 📋 | | 1,750,000 | 🟡 Dai Stableco... (DAI) |
| 👁 | 0x655706998e03400ec8... | 226 days 9 hrs ago | 0x7C05C4...C0F048cE 📋 | IN | 🏛 Movement DAO: Presale 📋 | | 0 | 🟡 Dai Stableco... (DAI) |
| 👁 | 0x238c8382ee0bf1bca90... | 237 days 1 hr ago | 🏛 Movement DAO: Presale 📋 | OUT | Uniswap V3: DAI-USDC 4 📋 | | 50,000 | 🟡 Dai Stableco... (DAI) |
| 👁 | 0xf620fca9109f1d526f68... | 237 days 10 hrs ago | 🏛 Movement DAO: Presale 📋 | OUT | Uniswap V3: DAI-USDC 4 📋 | | 100,000 | 🟡 Dai Stableco... (DAI) |
| 👁 | 0x9220f2803481949c3cb... | 238 days 2 hrs ago | 🏛 Movement DAO: Presale 📋 | OUT | Uniswap V3: DAI-USDC 4 📋 | | 50,000 | 🟡 Dai Stableco... (DAI) |
| 👁 | 0x6b177130f75ddf8bf43... | 249 days 1 hr ago | 🏛 Movement DAO: Presale 📋 | OUT | Uniswap V3: DAI-USDC 4 📋 | | 50,000 | 🟡 Dai Stableco... (DAI) |
| 👁 | 0x8beaec7c3ed1ac55ae2... | 249 days 5 hrs ago | 🏛 Movement DAO: Presale 📋 | OUT | Uniswap V3: DAI-USDC 4 📋 | | 100,000 | 🟡 Dai Stableco... (DAI) |
| 👁 | 0xafe47fe9f127f4427f1fa... | 249 days 7 hrs ago | 🏛 Movement DAO: Presale 📋 | OUT | Uniswap V3: DAI 📋 | | 55,000 | 🟡 Dai Stableco... (DAI) |
| 👁 | 0xafe47fe9f127f4427f1fa... | 249 days 7 hrs ago | 🏛 Movement DAO: Presale 📋 | OUT | Uniswap V3: DAI 2 📋 | | 10,000 | 🟡 Dai Stableco... (DAI) |
| 👁 | 0xafe47fe9f127f4427f1fa... | 249 days 7 hrs ago | 🏛 Movement DAO: Presale 📋 | OUT | Uniswap V2: DAI 📋 | | 5,000 | 🟡 Dai Stableco... (DAI) |
| 👁 | 0xafe47fe9f127f4427f1fa... | 249 days 7 hrs ago | 🏛 Movement DAO: Presale 📋 | OUT | Uniswap V3: DAI-USDC 4 📋 | | 30,000 | 🟡 Dai Stableco... (DAI) |
| 👁 | 0xd6c1d1bb116564faced... | 307 days 12 hrs ago | ⟨⟩ webvc.eth 📋 | IN | 🏛 Movement DAO: Presale 📋 | | 150 | 🟡 Dai Stableco... (DAI) |
| 👁 | 0x79c77c684... | | | IN | 🏛 Movement DAO: Presale 📋 | | | ai Stableco... (DAI) |

🍪 This website uses cookies to improve your experience. By continuing to use this website, you agree to its Terms and Privacy Policy.

| | Txn Hash | Age | From | | To | | Value | Token |
|---|---|---|---|---|---|---|---|---|
| 👁 | 0x8dea92888016e34ce9... | 325 days 20 hrs ago | 0xA1b27b...2Eb6637b 📋 | IN | 📄 Movement DAO: Presale 📋 | | 50 | 🪙 Dai Stableco... (DAI) |
| 👁 | 0xaea415350c003ace2e... | 344 days 19 hrs ago | 0xe4918B...9B523763 📋 | IN | 📄 Movement DAO: Presale 📋 | | 500 | 🪙 Dai Stableco... (DAI) |
| 👁 | 0xea429bb30f45b0061a9... | 347 days 2 hrs ago | 📄 0xD78368...53949CCD 📋 | IN | 📄 Movement DAO: Presale 📋 | | 100,000 | 🪙 Dai Stableco... (DAI) |
| 👁 | 0x0ecaabda5ba7917f678... | 362 days 18 hrs ago | 0x14817c...Fff0dd31 📋 | IN | 📄 Movement DAO: Presale 📋 | | 685 | 🪙 Dai Stableco... (DAI) |
| 👁 | 0x629edd81e51d770fb1f... | 363 days 19 hrs ago | 0x58E12A...A0359984 📋 | IN | 📄 Movement DAO: Presale 📋 | | 4,000 | 🪙 Dai Stableco... (DAI) |
| 👁 | 0x6339904075ec608e12... | 363 days 19 hrs ago | 0x58E12A...A0359984 📋 | IN | 📄 Movement DAO: Presale 📋 | | 1,000 | 🪙 Dai Stableco... (DAI) |
| 👁 | 0x3265c58705abe8365e... | 363 days 19 hrs ago | 0x58E12A...A0359984 📋 | IN | 📄 Movement DAO: Presale 📋 | | 2,000 | 🪙 Dai Stableco... (DAI) |
| 👁 | 0xb88c753d6cdbff74e49... | 363 days 19 hrs ago | 0x58E12A...A0359984 📋 | IN | 📄 Movement DAO: Presale 📋 | | 3,000 | 🪙 Dai Stableco... (DAI) |
| 👁 | 0x87de5aa5437fd73da00... | 368 days 9 hrs ago | ⟨⟩ linrui.eth 📋 | IN | 📄 Movement DAO: Presale 📋 | | 500 | 🪙 Dai Stableco... (DAI) |
| 👁 | 0xf2c3877e85c121496d6... | 372 days 20 hrs ago | 0x58E12A...A0359984 📋 | IN | 📄 Movement DAO: Presale 📋 | | 50 | 🪙 Dai Stableco... (DAI) |
| 👁 | 0xea665bb5658b0db47... | 372 days 20 hrs ago | 0x58E12A...A0359984 📋 | IN | 📄 Movement DAO: Presale 📋 | | 50 | 🪙 Dai Stableco... (DAI) |
| 👁 | 0x3f4c724dddaedffb5be... | 380 days 17 hrs ago | 0xDe10F0...3F2797F0 📋 | IN | 📄 Movement DAO: Presale 📋 | | 200,000 | 🪙 Dai Stableco... (DAI) |
| 👁 | 0x210614f9f5c95e40a96... | 383 days 23 hrs ago | ⟨⟩ jamesbarrie.eth 📋 | IN | 📄 Movement DAO: Presale 📋 | | 1,000 | 🪙 Dai Stableco... (DAI) |
| 👁 | 0xa5ef0b4edd588dc3b78... | 383 days 23 hrs ago | ⟨⟩ jamesbarrie.eth 📋 | IN | 📄 Movement DAO: Presale 📋 | | 80,000 | 🪙 Dai Stableco... (DAI) |
| 👁 | 0x8912ddc0ddc57c5e2f5... | 383 days 23 hrs ago | ⟨⟩ jamesbarrie.eth 📋 | IN | 📄 Movement DAO: Presale 📋 | | 20 | 🪙 Dai Stableco... (DAI) |
| 👁 | 0x233834c33ad4a6e120... | 384 days 22 hrs ago | 📄 0xD78368...53949CCD 📋 | IN | 📄 Movement DAO: Presale 📋 | | 3,000,000 | 🪙 Dai Stableco... (DAI) |
| 👁 | 0x7b918b7cd3c66d6bfc8... | 384 days 23 hrs ago | ⟨⟩ *service-provider.eth 📋 | IN | 📄 Movement DAO: Presale 📋 | | 9,786,795 | 🪙 Dai Stableco... (DAI) |
| 👁 | 0xaeb8614064e3bae801... | 384 days 23 hrs ago | 📄 0x58F09d...2BACac1d 📋 | IN | 📄 Movement DAO: Presale 📋 | | 1,200,000 | 🪙 Dai Stableco... (DAI) |
| 👁 | 0x3e3b2ab0f... | | | | | | | Dai Stableco... (DAI) |

🍪 This website uses cookies to improve your experience. By continuing to use this website, you agree to its Terms and Privacy Policy.

| | Txn Hash | Age | From | | To | Value | Token |
|---|---|---|---|---|---|---|---|
| 👁 | 0xf844f8e007c5989f7aa... | 385 days 1 hr ago | 0x4Ab54c...7305dB0c ⧉ | IN | 📄 Movement DAO: Presale ⧉ | 1 | 🪙 Dai Stableco... (DAI) |
| 👁 | 0x3fe11699d89fa8052c3... | 385 days 3 hrs ago | 0x4Ab54c...7305dB0c ⧉ | IN | 📄 Movement DAO: Presale ⧉ | 15 | 🪙 Dai Stableco... (DAI) |
| 👁 | 0x186582298b7ad8b731... | 387 days 2 hrs ago | 📄 Movement DAO: Presale ⧉ | OUT | 0x2187e6...CA706fbD ⧉ | 51 | 🪙 Dai Stableco... (DAI) |
| 👁 | 0x7ff7f949be56e9a501a... | 387 days 22 hrs ago | 0x4Ab54c...7305dB0c ⧉ | IN | 📄 Movement DAO: Presale ⧉ | 1 | 🪙 Dai Stableco... (DAI) |
| 👁 | 0x78c6c8f39e93a7663a3... | 387 days 22 hrs ago | 0x4Ab54c...7305dB0c ⧉ | IN | 📄 Movement DAO: Presale ⧉ | 50 | 🪙 Dai Stableco... (DAI) |

Show: 100 Records

First  ‹  Page 1 of 1  ›  Last

[ Download: CSV Export ⬇ ]

🍪 This website uses cookies to improve your experience. By continuing to use this website, you agree to its Terms and Privacy Policy.

## Transactions

For 0x143cc0a996de329c1c5723ee4f15d2a40c1203c6    Movement DAO: Presale

**Sponsored:** Ⓜ Metawin: Click Here to claim your FREE Entry to MetaWin's 20 ETH give away! Ends soon

A total of 140 transactions found

First  ‹  Page 1 of 2  ›  Last  ▽▾

| ? | Txn Hash | Method ? | Block | Age | From | | To | | Value |
|---|----------|----------|-------|-----|------|---|----|----|-------|
| 👁 | 0x2892b44b8e68a9bd07... | Exec Transact... | 16541505 | 20 days 7 hrs ago | ‹› *service-provider.eth ⧉ | IN | 🗎 Movement DAO: Presale ⧉ | | 0 ETH |
| 👁 | 0x490561b89e91b50147... | Exec Transact... | 16540924 | 20 days 9 hrs ago | 0x0087F6...582868aD ⧉ | IN | 🗎 Movement DAO: Presale ⧉ | | 0 ETH |
| 👁 | 0x323dcee96dfd18b9552... | Exec Transact... | 16540888 | 20 days 10 hrs ago | 0x0087F6...582868aD ⧉ | IN | 🗎 Movement DAO: Presale ⧉ | | 0 ETH |
| 👁 | 0xd3da22c14836abc82f8... | Exec Transact... | 16540876 | 20 days 10 hrs ago | 0x0087F6...582868aD ⧉ | IN | 🗎 Movement DAO: Presale ⧉ | | 0 ETH |
| 👁 | 0x7b1786fc249e00b17e5... | Exec Transact... | 16540860 | 20 days 10 hrs ago | ‹› *service-provider.eth ⧉ | IN | 🗎 Movement DAO: Presale ⧉ | | 0 ETH |
| 👁 | 0x5b2c1d1baa69f6152c8... | Exec Transact... | 16540840 | 20 days 10 hrs ago | 0xDbE76F...18aB2b57 ⧉ | IN | 🗎 Movement DAO: Presale ⧉ | | 0 ETH |
| 👁 | 0x5a1f3ae42150afd6e4d... | Exec Transact... | 16540354 | 20 days 11 hrs ago | 0xDbE76F...18aB2b57 ⧉ | IN | 🗎 Movement DAO: Presale ⧉ | | 0 ETH |
| 👁 | 0x9496ad4c40f884ee744... | Exec Transact... | 16540326 | 20 days 11 hrs ago | 0xDbE76F...18aB2b57 ⧉ | IN | 🗎 Movement DAO: Presale ⧉ | | 0 ETH |
| 👁 | 0xedb3ed5b2ab8aecab0... | Exec Transact... | 16540316 | 20 days 11 hrs ago | 0xDbE76F...18aB2b57 ⧉ | IN | 🗎 Movement DAO: Presale ⧉ | | 0 ETH |
| 👁 | 0x47c39d0845abdd51c2f... | Exec Transact... | 16540310 | 20 days 11 hrs ago | 0xDbE76F...18aB2b57 ⧉ | IN | 🗎 Movement DAO: Presale ⧉ | | 0 ETH |
| 👁 | 0x80e77364cdd172de93... | Exec Transact... | 16540283 | 20 days 12 hrs ago | 0xDbE76F...18aB2b57 ⧉ | IN | 🗎 Movement DAO: Presale ⧉ | | 0 ETH |
| 👁 | 0x21c5fdeb66cf33c731b... | Exec Transact... | 16540279 | 20 days 12 hrs ago | 0xDbE76F...18aB2b57 ⧉ | IN | 🗎 Movement DAO: Presale ⧉ | | 0 ETH |
| 👁 | 0xa03f950329c60de22b0... | Exec Transact... | 16540247 | 20 days 12 hrs ago | ‹› beef69.eth ⧉ | IN | 🗎 Movement DAO: Presale ⧉ | | 0 ETH |
| 👁 | 0x33aace853ae9c60253 | Exec Transact... | 16537002 | 20 days 23 hrs ago | ‹› *service-provider.eth ⧉ | IN | 🗎 Movement DAO: Presale ⧉ | | 0 ETH |
| 👁 | 0x58837be6... | | | | | | | | 0.005 ETH |

🍪 This website uses cookies to improve your experience. By continuing to use this website, you agree to its Terms and Privacy Policy.   Got it!

| | Txn Hash | Method | Block | Age | From | | To | Value |
|---|---|---|---|---|---|---|---|---|
| 👁 | 0x2ee7aaf40019a416538... | Exec Transaction | 15568644 | 156 days 5 hrs ago | *service-provider.eth | IN | Movement DAO: Presale | 0 ETH |
| 👁 | 0xa3ec2b8052299f60158... | Transfer | 15543726 | 159 days 17 hrs ago | 0xB500cd...A910cc79 | IN | Movement DAO: Presale | 1,434.871214796 ETH |
| 👁 | 0x40e7334fc38b1401f2c... | Transfer | 15543718 | 159 days 17 hrs ago | 0xB500cd...A910cc79 | IN | Movement DAO: Presale | 0.125 ETH |
| 👁 | 0x3a2e0e4257af96fbb5f... | Exec Transaction | 15525277 | 162 days 15 hrs ago | 0xDbE76F...18aB2b57 | IN | Movement DAO: Presale | 0 ETH |
| 👁 | 0xa7ae687de1d39f37452... | Exec Transaction | 15525253 | 162 days 16 hrs ago | *service-provider.eth | IN | Movement DAO: Presale | 0 ETH |
| 👁 | 0x8ddf048b3be0542fbc9... | Exec Transaction | 15525040 | 162 days 16 hrs ago | *service-provider.eth | IN | Movement DAO: Presale | 0 ETH |
| 👁 | 0x86332db3a76c48c597... | Exec Transaction | 15440402 | 176 days 9 hrs ago | *service-provider.eth | IN | Movement DAO: Presale | 0 ETH |
| 👁 | 0x4178936e95e14fab49d... | Transfer | 15366274 | 188 days 4 hrs ago | coryfeco.eth | IN | Movement DAO: Presale | 0.075 ETH |
| 👁 | 0x9878c12fd3f4d336161... | Exec Transaction | 15123800 | 226 days 10 mins ago | 0x550bD0...5D61d410 | IN | Movement DAO: Presale | 0 ETH |
| 👁 | 0x02107d93e48e48dab3... | Transfer | 15096831 | 230 days 4 hrs ago | raeez.eth | IN | Movement DAO: Presale | 0.08 ETH |
| 👁 | 0x238c8382ee0bf1bca90... | Exec Transaction | 15052336 | 237 days 1 hr ago | *service-provider.eth | IN | Movement DAO: Presale | 0 ETH |
| 👁 | 0x6f493c11023e4692e4e... | Exec Transaction | 15052292 | 237 days 1 hr ago | 0xDbE76F...18aB2b57 | IN | Movement DAO: Presale | 0 ETH |
| 👁 | 0xf620fca9109f1d526f68... | Exec Transaction | 15049997 | 237 days 10 hrs ago | *service-provider.eth | IN | Movement DAO: Presale | 0 ETH |
| 👁 | 0x9220f2803481949c3cb... | Exec Transaction | 15046576 | 238 days 2 hrs ago | *service-provider.eth | IN | Movement DAO: Presale | 0 ETH |
| 👁 | 0x6b177130f75ddf8bf43... | Exec Transaction | 14986965 | 249 days 1 hr ago | *service-provider.eth | IN | Movement DAO: Presale | 0 ETH |
| 👁 | 0x67c9a92d6a0791f26af... | Exec Transaction | 14986926 | 249 days 1 hr ago | *service-provider.eth | IN | Movement DAO: Presale | 0 ETH |
| 👁 | 0xeee92ac52ea3b97c0ec... | Exec Transaction | 14986505 | 249 days 3 hrs ago | *service-provider.eth | IN | Movement DAO: Presale | 0 ETH |
| 👁 | 0x8beaec7c3ed1ac55ae2... | Exec Transaction | 14985820 | 249 days 5 hrs ago | *service-provider.eth | IN | Movement DAO: Presale | 0 ETH |
| 👁 | 0x1a4b5432... | | | | | | | 0 ETH |

🍪 This website uses cookies to improve your experience. By continuing to use this website, you agree to its Terms and Privacy Policy.

| | Txn Hash | Method ⓘ | Block | Age | From | | To | | Value |
|---|---|---|---|---|---|---|---|---|---|
| 👁 | ⛔ 0x2b9e1c63c2469df0773... | Exec Transact... | 14985650 | 249 days 6 hrs ago | ⟨⟩ *service-provider.eth ⧉ | IN | 🖹 Movement DAO: Presale ⧉ | 0 ETH |
| 👁 | 0xafe47fe9f127f4427f1fa... | Exec Transact... | 14985408 | 249 days 7 hrs ago | ⟨⟩ *service-provider.eth ⧉ | IN | 🖹 Movement DAO: Presale ⧉ | 0 ETH |
| 👁 | 0x132ac8755efc92b1ef5... | Exec Transact... | 14969686 | 252 days 17 mins ago | ⟨⟩ *service-provider.eth ⧉ | IN | 🖹 Movement DAO: Presale ⧉ | 0 ETH |
| 👁 | 0xad1517b8ea9508c286... | Transfer | 14840371 | 273 days 15 hrs ago | 0x58C3C3...6aE1d013 ⧉ | IN | 🖹 Movement DAO: Presale ⧉ | 0.05 ETH |
| 👁 | 0x4e1b71a719d7290e88... | Transfer | 14826321 | 275 days 21 hrs ago | ⟨⟩ sal1y.eth ⧉ | IN | 🖹 Movement DAO: Presale ⧉ | 0.02 ETH |
| 👁 | 0x0ceaf28353e84a34446... | Transfer | 14696403 | 296 days 16 hrs ago | 0xd11B2C...7d3a7d97 ⧉ | IN | 🖹 Movement DAO: Presale ⧉ | 0.3901603 ETH |
| 👁 | 0x3d4298fe34e8b765316... | Transfer | 14682236 | 298 days 21 hrs ago | ⟨⟩ vip789.eth ⧉ | IN | 🖹 Movement DAO: Presale ⧉ | 0.7 ETH |
| 👁 | 0x6367aa16ef3922cc2de... | Transfer | 14680914 | 299 days 2 hrs ago | ⟨⟩ coinboot.eth ⧉ | IN | 🖹 Movement DAO: Presale ⧉ | 0.1 ETH |
| 👁 | 0xa02e44a61f00476deb5... | Transfer | 14674519 | 300 days 2 hrs ago | ⟨⟩ epowell101.eth ⧉ | IN | 🖹 Movement DAO: Presale ⧉ | 0.05 ETH |
| 👁 | 0x5310ead1de480a9874... | Transfer | 14589945 | 313 days 9 hrs ago | ⟨⟩ thefinest.eth ⧉ | IN | 🖹 Movement DAO: Presale ⧉ | 0.006753 ETH |
| 👁 | 0x8e516a90ef560270ca3... | Transfer | 14532273 | 322 days 9 hrs ago | 0xDab5f4...E63737c3 ⧉ | IN | 🖹 Movement DAO: Presale ⧉ | 0.01 ETH |
| 👁 | 0xb9ca9cdb75d381cb45... | Transfer | 14516791 | 324 days 19 hrs ago | 0x5b2b4B...CAb7548f ⧉ | IN | 🖹 Movement DAO: Presale ⧉ | 0.05553 ETH |
| 👁 | 0x1f9194c39298832d3d... | Exec Transact... | 14515277 | 325 days 1 hr ago | ⟨⟩ beef69.eth ⧉ | IN | 🖹 Movement DAO: Presale ⧉ | 0 ETH |
| 👁 | 0x29b091885a4ea577dc... | Transfer | 14434437 | 337 days 15 hrs ago | 0x54F0E1...1Db45584 ⧉ | IN | 🖹 Movement DAO: Presale ⧉ | 0.333 ETH |
| 👁 | 0x70df12c6070d4cd9166... | Transfer | 14406341 | 342 days 34 mins ago | 0x23d592...69dc570E ⧉ | IN | 🖹 Movement DAO: Presale ⧉ | 0.1 ETH |
| 👁 | 0xf98fa12d0cc993c8d92... | Exec Transact... | 14404183 | 342 days 8 hrs ago | ⟨⟩ beef69.eth ⧉ | IN | 🖹 Movement DAO: Presale ⧉ | 0 ETH |
| 👁 | 0xe9e291d5ec57aae987... | Transfer | 14403268 | 342 days 12 hrs ago | ⟨⟩ bobek.eth ⧉ | IN | 🖹 Movement DAO: Presale ⧉ | 0.1 ETH |
| 👁 | 0x3083d5bc64dfaea5b61... | Transfer | 14403227 | 342 days 12 hrs ago | ⟨⟩ bobek.eth ⧉ | IN | 🖹 Movement DAO: Presale ⧉ | 0.07 ETH |
| 👁 | 0xa56172d4l... | | | | | | | 0.14 ETH |

🍪 This website uses cookies to improve your experience. By continuing to use this website, you agree to its Terms and Privacy Policy.

| | Txn Hash | Method | Block | Age | From | | To | | Value |
|---|---|---|---|---|---|---|---|---|---|
| 👁 | 0x7ee78853790ea04a53... | Transfer | 14388113 | 344 days 20 hrs ago | 0xC36A37...75a1e17C | IN | 📄 Movement DAO: Presale | | 0.02 ETH |
| 👁 | 0x18dc4bb7b32b93721d... | Transfer | 14373027 | 347 days 5 hrs ago | 0x252279...52064220 | IN | 📄 Movement DAO: Presale | | 0.0775 ETH |
| 👁 | 0x81f3e989d1b206d1d0... | Transfer | 14369882 | 347 days 17 hrs ago | 0x620F9F...9B4775d0 | IN | 📄 Movement DAO: Presale | | 0.001 ETH |
| 👁 | 0x7b88db7125f4d961be... | Transfer | 14353456 | 350 days 6 hrs ago | 0x58Ba37...67dE1650 | IN | 📄 Movement DAO: Presale | | 2.541779 ETH |
| 👁 | 0xe350a09ab74aff0462f... | Transfer | 14343365 | 351 days 19 hrs ago | 0x1ebe61...8D67b852 | IN | 📄 Movement DAO: Presale | | 0.186819 ETH |
| 👁 | 0x3a7b48a063cb21209b... | Transfer | 14311560 | 356 days 18 hrs ago | 0xa7d317...eEC69b50 | IN | 📄 Movement DAO: Presale | | 0.033 ETH |
| 👁 | 0xa694edc35418b316b6... | Transfer | 14311125 | 356 days 20 hrs ago | ⟨⟩ angyts.eth | IN | 📄 Movement DAO: Presale | | 0.1 ETH |
| 👁 | 0xcadeb5aaa49d4e1183... | Transfer | 14311068 | 356 days 20 hrs ago | 0x17d880...554e829b | IN | 📄 Movement DAO: Presale | | 0.02 ETH |
| 👁 | 0x757ff4c6fabe13c254a... | Transfer | 14299044 | 358 days 16 hrs ago | 0x9f7bD4...1b1B52C8 | IN | 📄 Movement DAO: Presale | | 0.07 ETH |
| 👁 | 0xe7620b29958daafea76... | Transfer | 14297832 | 358 days 21 hrs ago | 0x13b841...0ceD7b42 | IN | 📄 Movement DAO: Presale | | 0.1 ETH |
| 👁 | 0x6c282de5e1c542b775... | Transfer | 14285500 | 360 days 19 hrs ago | 0x1ebe61...8D67b852 | IN | 📄 Movement DAO: Presale | | 0.032753 ETH |
| 👁 | 0x76ccf423ccd3fca7db4... | Transfer | 14261813 | 364 days 11 hrs ago | ⟨⟩ welovecolors.eth | IN | 📄 Movement DAO: Presale | | 0.3 ETH |
| 👁 | 0xac173e9a93c9ac9536... | Transfer | 14258694 | 364 days 22 hrs ago | 0xb30051...43349949 | IN | 📄 Movement DAO: Presale | | 0.02 ETH |
| 👁 | 0xa3debb27f05c4ada0b7... | Transfer | 14258407 | 364 days 23 hrs ago | 0xC9f6e3...D77b39FE | IN | 📄 Movement DAO: Presale | | 0.09 ETH |
| 👁 | 0x1160c91d9051c147aa... | Transfer | 14244607 | 367 days 2 hrs ago | 0x511E06...f585fa52 | IN | 📄 Movement DAO: Presale | | 0.124903 ETH |
| 👁 | 0x024424e2e8d32151ba... | Transfer | 14239603 | 367 days 21 hrs ago | ⟨⟩ dside.eth | IN | 📄 Movement DAO: Presale | | 0.1 ETH |
| 👁 | 0x692b16a6311837987b... | Transfer | 14238604 | 368 days 1 hr ago | 0xb30051...43349949 | IN | 📄 Movement DAO: Presale | | 0.05 ETH |
| 👁 | 0x2f7eede6ff525bc4c0bb... | Transfer | 14225844 | 370 days 1 hr ago | 0xB159DE...317D9EC6 | IN | 📄 Movement DAO: Presale | | 3 ETH |
| 👁 | 0x7008190e... | | | | | | | | 0.3 ETH |

🍪 This website uses cookies to improve your experience. By continuing to use this website, you agree to its Terms and Privacy Policy.

| | Txn Hash | Method | Block | Age | From | | To | Value |
|---|---|---|---|---|---|---|---|---|
| 👁 | 0x839891cf296aab33460... | Transfer | 14220119 | 370 days 22 hrs ago | 0x616001...dBBC4739 | IN | 🗎 Movement DAO: Presale | 0.013 ETH |
| 👁 | 0x146b99996008b39475... | Transfer | 14214409 | 371 days 19 hrs ago | 0x8269CA...15BF6929 | IN | 🗎 Movement DAO: Presale | 0.03 ETH |
| 👁 | 0xd466a6c110862431bb... | Transfer | 14212724 | 372 days 1 hr ago | 0xab5d30...5a8e05Ee | IN | 🗎 Movement DAO: Presale | 0.06 ETH |
| 👁 | 0x55e293d21569bde9d6... | Transfer | 14210414 | 372 days 10 hrs ago | ⟨⟩ dinizbr.eth | IN | 🗎 Movement DAO: Presale | 0.15 ETH |
| 👁 | 0xfd7880dae5dc4687cf8... | Transfer | 14209771 | 372 days 12 hrs ago | 0x9AB301...aBd2f9E9 | IN | 🗎 Movement DAO: Presale | 0.1 ETH |
| 👁 | 0x05ac15a2ffa6658944c... | Transfer | 14209580 | 372 days 13 hrs ago | 0x0F9D72...A1Cff110 | IN | 🗎 Movement DAO: Presale | 0.01 ETH |
| 👁 | 0xf67632df56e5ee65f2f1... | Transfer | 14207304 | 372 days 21 hrs ago | ⟨⟩ benreed.eth | IN | 🗎 Movement DAO: Presale | 0.34 ETH |
| 👁 | 0xe27cc82181be50647f5... | Transfer | 14205312 | 373 days 5 hrs ago | ⟨⟩ aminta.eth | IN | 🗎 Movement DAO: Presale | 0.15 ETH |
| 👁 | 0x9de0262481d2ce58d7... | Transfer | 14197580 | 374 days 10 hrs ago | 0xdbbF74...c5c9a05D | IN | 🗎 Movement DAO: Presale | 0.34 ETH |
| 👁 | 0x1aa89d53ecb9d3ab41... | Transfer | 14196704 | 374 days 13 hrs ago | 0x9dEBaE...c0D5326b | IN | 🗎 Movement DAO: Presale | 0.1 ETH |
| 👁 | 0x212b1670ebfbeece670... | Transfer | 14196297 | 374 days 14 hrs ago | 0x277073...4e71fC63 | IN | 🗎 Movement DAO: Presale | 0.0965 ETH |
| 👁 | 0x0f2e35361e3f2246372... | Transfer | 14187197 | 376 days 19 mins ago | 0xc9284a...85f0A296 | IN | 🗎 Movement DAO: Presale | 0.009 ETH |
| 👁 | 0x29f830dfa6721d23376... | Transfer | 14183177 | 376 days 15 hrs ago | ⟨⟩ ecocarcafe.eth | IN | 🗎 Movement DAO: Presale | 0.325 ETH |
| 👁 | 0xd7bd7fde4d3f7f38f353... | Transfer | 14183128 | 376 days 15 hrs ago | 0x4eeD0f...c78fe32B | IN | 🗎 Movement DAO: Presale | 0.32 ETH |
| 👁 | 0x76e064ab94356e1614... | Transfer | 14175863 | 377 days 18 hrs ago | 0xb44A14...2Cb88461 | IN | 🗎 Movement DAO: Presale | 6.26 ETH |
| 👁 | 0xd607a0d67d46da93a4... | Transfer | 14175125 | 377 days 21 hrs ago | 0xda94DA...3cE15fBC | IN | 🗎 Movement DAO: Presale | 0.016 ETH |
| 👁 | 0x661ea7857a4f886aef9... | Transfer | 14172647 | 378 days 6 hrs ago | 0x1561c3...D257e5a3 | IN | 🗎 Movement DAO: Presale | 0.05 ETH |
| 👁 | 0x86be8434a0bf7e3e2b2... | Transfer | 14167114 | 379 days 2 hrs ago | ⟨⟩ jimmyethworld.eth | IN | 🗎 Movement DAO: Presale | 0.05 ETH |
| 👁 | 0xbe544ef32... | | | | | | | 0.075 ETH |

🍪 This website uses cookies to improve your experience. By continuing to use this website, you agree to its Terms and Privacy Policy.

| 👁 | Txn Hash | Method ⓘ | Block | Age | From | | To | | Value |
|---|---|---|---|---|---|---|---|---|---|
| 👁 | 0x0beba2d7ff73f1f7cc22... | Transfer | 14164147 | 379 days 14 hrs ago | ◇ *natasha-pankina.eth 🗐 | IN | 📄 Movement DAO: Presale 🗐 | | 0.06 ETH |
| 👁 | 0x9408ac726f47d82da20... | Transfer | 14164138 | 379 days 14 hrs ago | ◇ bryankingsley.eth 🗐 | IN | 📄 Movement DAO: Presale 🗐 | | 0.0125 ETH |
| 👁 | 0xb87c54a3c0a9e6c233... | Transfer | 14164133 | 379 days 14 hrs ago | ◇ pillowfightclub.eth 🗐 | IN | 📄 Movement DAO: Presale 🗐 | | 0.0125 ETH |
| 👁 | 0x383143c3fc7e331b72b... | Transfer | 14164131 | 379 days 14 hrs ago | ◇ partypants.eth 🗐 | IN | 📄 Movement DAO: Presale 🗐 | | 0.0125 ETH |
| 👁 | 0x3738306ef3657b34f8f... | Transfer | 14162213 | 379 days 21 hrs ago | 0x715796...Ec01744e 🗐 | IN | 📄 Movement DAO: Presale 🗐 | | 0.75 ETH |
| 👁 | 0x25e56c650fdf8b563d6... | Transfer | 14159620 | 380 days 6 hrs ago | 0xb44A14...2Cb88461 🗐 | IN | 📄 Movement DAO: Presale 🗐 | | 0.06 ETH |
| 👁 | 0x8d668190c53e81edbd... | Transfer | 14159399 | 380 days 7 hrs ago | 0xb44A14...2Cb88461 🗐 | IN | 📄 Movement DAO: Presale 🗐 | | 0.1 ETH |
| 👁 | 0x014a98bb4633a6d6db... | Transfer | 14157139 | 380 days 16 hrs ago | ◇ benreed.eth 🗐 | IN | 📄 Movement DAO: Presale 🗐 | | 0.374358 ETH |
| 👁 | 0x1b443d8bb741261240... | Transfer | 14156241 | 380 days 19 hrs ago | 0x580756...C5c53a54 🗐 | IN | 📄 Movement DAO: Presale 🗐 | | 1 ETH |

Show: 100    Records

First  ‹  Page 1 of 2  ›  Last

[ Download: CSV Export ⬇ ]

⚙ A transaction is a cryptographically signed instruction that changes the blockchain state. Block explorers track the details of all transactions in the network. Learn more about transactions in our Knowledge Base.

🍪 This website uses cookies to improve your experience. By continuing to use this website, you agree to its Terms and Privacy Policy.

## Transactions

For 0x143cc0a996de329c1c5723ee4f15d2a40c1203c6    Movement DAO: Presale

**Sponsored:** ⓧ Metawin: Click Here to claim your FREE Entry to MetaWin's 20 ETH give away! Ends soon

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| A total of 140 transactions found | | | | First ‹ Page 2 of 2 › Last ▽ ⌄ | | | |
| ⓘ | Txn Hash | Method ⓘ | Block | Age | From | To | Value | Txn Fee |
| 👁 | 0xae4f17c74bef89c91ba... | Transfer | 14155304 | 380 days 22 hrs ago | 0xDb88DB...4733Fc70 ⧉ | IN | 🖹 Movement DAO: Presale ⧉ | 2.1 ETH | 0.00336146 |
| 👁 | 0xbe1c8cec4249f5d9a46... | Transfer | 14150232 | 381 days 17 hrs ago | 0xc9284a...85f0A296 ⧉ | IN | 🖹 Movement DAO: Presale ⧉ | 0.03 ETH | 0.0030346 |
| 👁 | 0x6a917c0733aa32f5c15... | Transfer | 14147056 | 382 days 5 hrs ago | 0xb44A14...2Cb88461 ⧉ | IN | 🖹 Movement DAO: Presale ⧉ | 0.191 ETH | 0.00308135 |
| 👁 | 0x0a5168901f1274351e2... | Transfer | 14146784 | 382 days 6 hrs ago | 0x6C0822...856Aeb54 ⧉ | IN | 🖹 Movement DAO: Presale ⧉ | 2.222222222 ETH | 0.00237068 |
| 👁 | 0x5c105589e581e0418af... | Transfer | 14141972 | 383 days 27 mins ago | 0x1F736b...9E0Ab82f ⧉ | IN | 🖹 Movement DAO: Presale ⧉ | 0.09 ETH | 0.0036084 |
| 👁 | 0x8eb1e08e1a3367d030... | Transfer | 14141432 | 383 days 2 hrs ago | 0x3c7eA1...2d9f2539 ⧉ | IN | 🖹 Movement DAO: Presale ⧉ | 0.278 ETH | 0.00612025 |
| 👁 | 0x5417ea96f4ea887e099... | Transfer | 14141237 | 383 days 2 hrs ago | 0x1F736b...9E0Ab82f ⧉ | IN | 🖹 Movement DAO: Presale ⧉ | 0.3 ETH | 0.00572795 |
| 👁 | 0x3fd3cde7bfecced47ac... | Transfer | 14140684 | 383 days 5 hrs ago | 0x8B4Ca0...6771bccA ⧉ | IN | 🖹 Movement DAO: Presale ⧉ | 0.105 ETH | 0.00745211 |
| 👁 | 0xccce2242340a16deaac... | Transfer | 14140674 | 383 days 5 hrs ago | 0xb44A14...2Cb88461 ⧉ | IN | 🖹 Movement DAO: Presale ⧉ | 0.6 ETH | 0.00518052 |
| 👁 | 0xcbe7da38c824543439f... | Transfer | 14139128 | 383 days 10 hrs ago | ‹› nicholasgpadilla.eth ⧉ | IN | 🖹 Movement DAO: Presale ⧉ | 0.0015 ETH | 0.00171026 |
| 👁 | 0x01bb029c5afb6367eff... | Transfer | 14139044 | 383 days 10 hrs ago | ‹› kyson.eth ⧉ | IN | 🖹 Movement DAO: Presale ⧉ | 0.001 ETH | 0.00144852 |
| 👁 | 0x9b017edccfc4b7a1286... | Transfer | 14137774 | 383 days 15 hrs ago | 0x58Ba37...67dE1650 ⧉ | IN | 🖹 Movement DAO: Presale ⧉ | 0.77 ETH | 0.00381174 |
| 👁 | 0x6bd063ae5aaea75282... | Transfer | 14136565 | 383 days 20 hrs ago | 0xDfd89a...4Cb1d397 ⧉ | IN | 🖹 Movement DAO: Presale ⧉ | 0 ETH | 0.00418367 |
| 👁 | 0xf5c2c7a839f440a0864... | Transfer | 14136520 | 383 days 20 hrs ago | 0x3D4C86...80f4f4C6 ⧉ | IN | 🖹 Movement DAO: Presale ⧉ | 0.38 ETH | 0.006035 |
| 👁 | 0xe56b97f41fa614ac5e0... | Transfer | 14136349 | 383 days 20 hrs ago | 0x8ffd0b...FFf0d338 ⧉ | IN | 🖹 Movement DAO: Presale ⧉ | 2.45 ETH | 0.00327948 |
| 👁 | 0x790c66823111c... | | | | | | 333333 ETH | 0.00900097 |

🍪 This website uses cookies to improve your experience. By continuing to use this website, you agree to its Terms and Privacy Policy. Got it!

| | Txn Hash | Method ⓘ | Block | Age | From | | To | Value | Txn Fee |
|---|---|---|---|---|---|---|---|---|---|
| 👁 | 0xd698d9dcb05e4bfc1c0... | Transfer | 14135618 | 383 days 23 hrs ago | jamesbarrie.eth ⧉ | IN | Movement DAO: Presale | 1 ETH | 0.00390363 |
| 👁 | 0x8674b136eea82e3d0f0... | Transfer | 14135395 | 384 days 28 mins ago | 0x74F230...164C0704 ⧉ | IN | Movement DAO: Presale | 3 ETH | 0.00429065 |
| 👁 | 0x103c0efcfa74a8d07e4... | Transfer | 14134221 | 384 days 4 hrs ago | 0x872C95...E4Caea97 ⧉ | IN | Movement DAO: Presale | 1.12 ETH | 0.00566083 |
| 👁 | 0xf5f554317f37b92a27d... | Transfer | 14134186 | 384 days 4 hrs ago | 0x58Ba37...67dE1650 ⧉ | IN | Movement DAO: Presale | 0.1 ETH | 0.00904719 |
| 👁 | 0xdac48a46cfd018b251d... | Transfer | 14133937 | 384 days 5 hrs ago | 0x2843b4...Aed0d0A2 ⧉ | IN | Movement DAO: Presale | 0.11433 ETH | 0.0073 |
| 👁 | 0x5873fdc9ac407f65707... | Transfer | 14133719 | 384 days 6 hrs ago | doramina11.eth ⧉ | IN | Movement DAO: Presale | 1.5 ETH | 0.00457493 |
| 👁 | 0xbecf50051b1b9a6bedc... | Transfer | 14133548 | 384 days 7 hrs ago | obstacker.eth ⧉ | IN | Movement DAO: Presale | 0.766923 ETH | 0.00500539 |
| 👁 | 0xd28846471bd4b82b77... | Transfer | 14133509 | 384 days 7 hrs ago | 0xdeFD0d...16906e1c ⧉ | IN | Movement DAO: Presale | 1.2 ETH | 0.00430286 |
| 👁 | 0x233b39b936a1c3069e... | Transfer | 14130555 | 384 days 18 hrs ago | 0xb44A14...2Cb88461 ⧉ | IN | Movement DAO: Presale | 0.364 ETH | 0.00533736 |
| 👁 | 0x47a5db31d03cb723b3... | Transfer | 14129978 | 384 days 20 hrs ago | 0xb44A14...2Cb88461 ⧉ | IN | Movement DAO: Presale | 0.96297 ETH | 0.00438317 |
| 👁 | 0xcf9d97c827fae088002... | Transfer | 14129789 | 384 days 21 hrs ago | 0xe4918B...9B523763 ⧉ | IN | Movement DAO: Presale | 0.4 ETH | 0.00550059 |
| 👁 | 0x4eb5579dcfe0478bccb... | Transfer | 14129326 | 384 days 23 hrs ago | 0xB66426...2F532DD0 ⧉ | IN | Movement DAO: Presale | 57.325246818 ETH | 0.00792541 |
| 👁 | 0x3e3b2ab0ff5fc8893d5f... | Exec Transact... | 14129129 | 384 days 23 hrs ago | ⟨⟩ *service-provider.eth ⧉ | IN | Movement DAO: Presale | 0 ETH | 0.01003392 |
| 👁 | 0x64c0017c2d0de375c8... | Transfer | 14128924 | 385 days 40 mins ago | 0x580756...C5c53a54 ⧉ | IN | Movement DAO: Presale | 0.3 ETH | 0.01174594 |
| 👁 | 0x2eca37bf012c1ef9ec0... | Transfer | 14128830 | 385 days 1 hr ago | 0x4Ab54c...7305dB0c ⧉ | IN | Movement DAO: Presale | 0.001 ETH | 0.00485421 |
| 👁 | 0x22ef59ef9b5579ef744f... | Transfer | 14128502 | 385 days 2 hrs ago | 0xdeFD0d...16906e1c ⧉ | IN | Movement DAO: Presale | 1.2 ETH | 0.01598615 |
| 👁 | 0x2f0e4ad847389e5c56a... | Transfer | 14128498 | 385 days 2 hrs ago | 0x2843b4...Aed0d0A2 ⧉ | IN | Movement DAO: Presale | 0.11067 ETH | 0.01705362 |
| 👁 | 0xc8a1a9fe03cd82346ef... | Transfer | 14128488 | 385 days 2 hrs ago | doramina11.eth ⧉ | IN | Movement DAO: Presale | 1.5 ETH | 0.01331027 |
| 👁 | 0x69a640c24a8d45014a... | Transfer | 14128487 | 385 days 2 hrs ago | obstacker.eth ⧉ | IN | Movement DAO: Presale | 0.78 ETH | 0.01331027 |
| 👁 | 0xf731af4510de85... | | | | | | | TH | 0.0058154 |

🍪 This website uses cookies to improve your experience. By continuing to use this website, you agree to its Terms and Privacy Policy.



|  | Txn Hash | Method ⓘ | Block | Age | From | | To | Value | Txn Fee |
|---|---|---|---|---|---|---|---|---|---|
| 👁 | 0x6371362f112ea5610c0... | Transfer | 14124492 | 385 days 17 hrs ago | 0x4Ab54c...7305dB0c ⧉ | IN | ▣ Movement DAO: Presale | 0.015 ETH | 0.00323079 |
| 👁 | 0x186582298b7ad8b731... | Exec Transact... | 14115501 | 387 days 2 hrs ago | ⟨⟩ beef69.eth ⧉ | IN | ▣ Movement DAO: Presale | 0 ETH | 0.01570418 |
| 👁 | 0xc4bc25f20a19a135d34... | Transfer | 14110042 | 387 days 22 hrs ago | 0x4Ab54c...7305dB0c ⧉ | IN | ▣ Movement DAO: Presale | 0.001 ETH | 0.00287199 |
| 👁 | 0xb206f2ff77b0963c4ba... | Transfer | 14013047 | 402 days 22 hrs ago | 0x4Ab54c...7305dB0c ⧉ | IN | ▣ Movement DAO: Presale | 0.001 ETH | 0.00356155 |

Show: 100 Records

First ‹ Page 2 of 2 › Last

[ Download: CSV Export ⬇ ]

⚙ A transaction is a cryptographically signed instruction that changes the blockchain state. Block explorers track the details of all transactions in the network. Learn more about transactions in our **Knowledge Base**.

🍪 This website **uses cookies to improve your experience**. By continuing to use this website, you agree to its **Terms** and **Privacy Policy**.

# Exhibit 2

# Movement DAO (branch deployed)

# Let's start a movement

2/2/22 2:22pm PST

Today, a Movement begins.

## Vision: Unleash our collective potential

MOVE believes that we already have the passion, intelligence, and resources to solve the world's greatest problems. What's missing is the right incentive design.

**MOVE is an experimental platform to promote social, public good and environmental change.**

Solving societal problems is an age-old challenge with few solutions. These solutions are built upon legacy infrastructure and bureaucratic processes. The more dollars spent, the more inefficient, ineffective, and corrupt our systems become. The people, who's hard-earned dollars have been siphoned into these black holes, are only left with broken promises. The result: with every $1 contributed, $0.90 goes to the void, and $0.10 goes to impact.

MOVE introduces a radical new approach to collective problem solving. We hope that MOVE makes our imagination the only limitation to societal change.

## How it Works

Web 2.0 movements live on Twitter, Facebook and GoFundMe. Web 3.0 Movements will live on DAOs.

Web 3.0 Movements are owned by their token holders. They have trustless funding that aligns incentives. And their leaders are held accountable by the community.

MOVE is building a better way for Movements to organize. The platform is currently under development and conducting a token presale to fund its endowment.

Learn more about the vision for movements on Movement DAO.

## MOVE Token System

1. The **$MOVE token** governs the platform. These token holders are responsible for growing the endowment and deploying capital into movements.
2. **$(Movement) tokens** govern individual movements. These token holders are responsible for funding & supporting their communities' projects. Movements have their own token (ie. $BLM).

```
Web: https://move.xyz
ENS: movedao.eth
IPFS: https://ipfs.move.xyz
GitHub: https://github.com/themovementdao
Discord: https://discord.gg/movexyz
Instagram: https://www.instagram.com/movedao.eth/
Twitter: https://twitter.com/move_xyz
Snapshot: https://snapshot.org/#/movedao.eth
```

# 🖨 Official links

```
Web: https://move.xyz
ENS: movedao.eth
IPFS: https://ipfs.move.xyz
GitHub: https://github.com/themovementdao
Discord: https://discord.gg/movexyz
Instagram: https://www.instagram.com/movedao.eth/
Twitter: https://twitter.com/movedotxyz
```

**Alternates DNS**

*The following were acquired to minimize spoofing and catfishing activities, use the official links above.*

```
https://movement.xyz
https://mvmtdao.xyz
https://movementdao.org/
https://movementdao.wtf
https://movementdao.xyz
https://themovementdao.xyz
```

**Alternate ES**

*This space is intentionally blank.*

# Introduction

# Overview

 Movement DAO is under constant development, and the code has not been officially audited.

**General**

This GitBook is the community repository about the Movement DAO. Community pull requests are welcome.

For an overview of the Movement DAO start here.

To learn about what is involved in creating a Movement start here.

Developers are welcome to start here.

Boring legal documents are waiting for you here.

## Gnosis Safes

The **Movement DAO Gnosis Safe** address is `0x143cC0A996De329C1C5723Ee4F15D2a40c1203c6and` has the following signers:

| ENS | Ξ | Twitter |
|---|---|---|
| dao-lawfirm.eth | 0x752515a3A1091b9f1c04416CF79D1F14d2340085 | |
| adridadou.eth | 0xDe6ab16a4015c680daab58021815D09ddB57db8E | @bmalaus |
| — | 0xDbE76F6ae97dFD5bdd1D7DAD8972740d18aB2b57 | |
| *tankbottoms.eth* | 0x468f178672C86bFA02e5E1B0413C3ccf55A37409 | *@tankbottoms.eth* |
| — | 0x550bD0F03580B9a687931af4d837F8e45D61d410 | |
| — | 0x746cf650d4E5431474E8D4E2d5B6Bbe53772b498 | |
| fredymontero.eth | 0x67A5A5136ba1725359bfdf204Cbbb1c809Cc5490 | @_fredymontero |

The dao-lawfirm.eth is acting as the initial Service Provider for the DAO.

Movement DAO **Pre-Movement Contribution Gnosis Safe** address is `0x46D65c64E883f70371A6fcAcB124FB5dd68c9918` with the same above signers.

Movement DAO **Movement, Actions Fee Gnosis Safe** address is `0x589e5fDC62838d70169B9FD1368f41C7d42c6D5b` again with the same above signers.

## $MOVE Governance tokens

The Movement DAO is governed by its staked token holders. **$MOVE** tokens represent the power to influence change to governance, economics, and incentives in the Movement DAO.

Benefits to **$MOVE** token holders include voting on matters relating to:

- Movement leaders, senators to represent the community
- Endowment management from operational expenses to DeFi protocols

> ⚠️ *$MOVE Governance tokens are not to be deemed or interpreted to be representative of any kind of:*
>   - *Currency, legal tender, money or deposit*
>   - *Investment (whether secured or unsecured), equity interest, proprietary interest and economic rights*
>   - *Equity, debt or hybrid instrument, security collective investment scheme managed fund, financial derivative, futures contract, deposit, commercial paper, negotiable instrument, investment contract, note, bond, warrant, certificate or instrument entitling the holder to interest, dividends or any kind of return, nor any other financial instrument; or...*
>   - *Right, title, interest or benefit whatsoever in whole or in part, in any person or property, or any assets*
>
> *$MOVE Governance tokens are not guaranteed or secured by any person, asset or entity in any way. The team is not under any obligation to issue replacement tokens if they are lost, stolen, destroyed, or otherwise inaccessible for any reason.*

> ⚠️ ***$MOVE*** *Governance tokens are not guaranteed or secured by any person, asset or entity in any way. The team is not under any obligation to issue replacement tokens if they are lost, stolen, destroyed, or otherwise inaccessible for any reason.*

## Individual $Movement tokens

Movement token holders are responsible for voting on the leadership of their movements, along with determining economic design and governance aspects of the movements. $(Movement) tokens have their own unique ticker symbols ($ABC, for example). Most importantly, the movement token holder communities collaborate and vote on which leaders to elect. These leaders choose the actions they wish to fund.

Benefits to **$(Movement)** token holders

- Governance of the Movement and governance proposals
- Launch movement actions
- Elect movement leaders

> ⚠️ *$Movement tokens are not to be deemed or interpreted to be representative of any kind of:*
>
> - *Currency, legal tender, money or deposit*
> - *Investment (whether secured or unsecured), equity interest, proprietary interest and economic rights*
> - *Equity, debt or hybrid instrument, security collective investment scheme managed fund, financial derivative, futures contract, deposit, commercial paper, negotiable instrument, investment contract, note, bond, warrant, certificate or instrument entitling the holder to interest, dividends or any kind of return, nor any other financial instrument; or...*
> - *right, title, interest or benefit whatsoever in whole or in part, in any person or property, or any assets*
>
> *$Movement tokens are not guaranteed or secured by any person, asset or entity in any way. The team is not under any obligation to issue replacement tokens if they are lost, stolen, destroyed, or otherwise inaccessible for any reason.*

## Token Distribution

$MOVE tokens and $(Movement) tokens are distributed via a bonding curve, a systematic formula that determines the price at which each incremental token is minted based on total supply. Details of this mechanism are explained here and here, and here.

After the initial $MOVE Distribution via contributions to the endowment and via a community Merkle distributor airdrop, the community will manage the remaining treasury through Snapshot.

A break down of the token distribution and allocation can be found here.

> ℹ️ A bonding curve describes **the relationship between the price and supply of an asset**. It is a mathematical concept modeling the idea that the price of an asset (with a limited quantity) increases slightly for subsequent buyers with each purchase. source

## Movement DAO Endowment

A number of platforms exist which enabled communities to raise funds, notably, Juicebox. Movement DAO includes an endowment which it will use the DeFi earned Yield to fund additional tooling for funded projects to deploy liquidity pools (LPs), and navigate more complex blockchain applications and tooling.

The Movement DAO's initial endowment is at the Gnosis Safe `0x46D65c64E883f70371A6fcAcB124FB5dd68c9918` is intended to be the catalyst for additional endowment contributions and individuals interesting in forming their own DAOs around a movement subject.

Each of the Gnosis Safe contributors during the Seeding period are provided the $MOVE token.

**Movement DAO Endowment Funding** comes from:

- Gnosis Safe ETH (Ξ) or DAI contributions between February 2nd, 2022 2:22:22 and May, 2022 (exact date TBD).
- Movement submission tributes to Movement DAO.
- Tributes associated with any vesting or staking mechanics decided by the community.

**Ongoing Endowment Growth** comes from:

1. Endowment and Treasury management with a DeFi protocol.
2. Liquidity Pools for $MOVE and ETH Ξ, or DAI.
3. Successfully funded $(Movements).
4. Providing liquidity in liquidity pools for $MOVE, and $(Movement).

Proceeds of endowment earnings are deployed by the community.

# Communities

Movement DAO envisions a world where decentralized communities organize & operate with the efficiency of a startup.

## How DAOs organize on Movement DAO

Movements include a few key features to help their communities organize.

### Leaders

All movements have discrete leadership positions, define election cycles, define compensation, and then elect those leaders. Movement leaders choose which motions are funded. The first leaders for a movement can either be *hardcoded*, or voted on by the community. Movement leaders are a dynamic feature that can enable many different types of communities to effectively organize.

### Actions

All movements include Actions. Actions are a request for capital submitted by an individual, to a movement. This request describes the use of funds, milestones to release capital, official roles, and an ability for the submitter to verify their public identity through twitter integration.

Milestones enable a trustless system for deploying capital in stages for a large project.

Actions are submitted as a Motion. After a Motion has been approved it becomes a live Action.

Motions can include:

- Access to a service provider who can convert crypto into USD
- Discrete roles with their own descriptions, salaries, and durations
- Complex voting mechanisms, such as conviction voting, quadratic voting, delegate voting, whitelist voting, and others.

> ⓘ **Bill Nye Motion Example**
>
> Assume Bill Nye the science guy wanted money to organize free science lessons for the community in Washington Square Park. He could submit an Action which describes multiple key milestones, such as getting started, securing a city permit, paying volunteers, purchasing supplies and finally giving the community lessons.
>
> Now assume Bill Nye needs $10,000 to fully complete his Action. And he gets $2,000 upon successful completion of each milestone. Because Bill Nye is only compensated on a milestone basis, if the city were to deny his permit, the movement would have only paid Bill Nye $2,000, instead of the total $10,000. These milestones help to create a trustless system for deploying capital.
>
> Milestone completion is verified and voted on by the community.
>
> Actions also feature identity verification to reduce fraud. For example, when Bill Nye submits his Action he can prove that he is in fact the real Bill Nye, instead of the nefarious Nill Bye. He proves his identity by linking his twitter account to the movement.

> ⚠ All Actions have a 24 hour veto period before funds are moved. If the community suspects fraud they can flag the Action. Select community members possess veto power over all funds that exit Movement DAO. This process adds an extra layer of security for the Movement DAO community.

**Future Innovation**

Movement DAO is built with a modular architecture and is designed to benefit from future innovations to enable community collaboration. For example:

1. Movements can use "Gelato" (in development by Open Law) to enable gasless voting.
2. Interface improvements. The best interface for a DAO is a challenging problem that will require continuous innovation.
3. Actions can be infinitely deployed. For example, assume a movement wants to create a $1,000 reward for every 1,000 trees that someone plants. It can create this actions once and anyone can claim the reward forever.

## Roles

*"How can I get involved?"*

1. **As a movement leader** - Submit a proposal for a new movement or get involved in a new movement community. Movement leaders are often those who are proposing new movements, however communities may find more influential leaders that can grow their communities better over time. Additionally, leaders can choose to have delegates who they allocate a portion of their rewards to increase the scope of the network and its influence.
2. **As a developer** - Join our Discord and stay active within the Developer channel. We encourage a collaborative developer community to help make the platform the best it can be.

3. **As a community organizer** - Decentralized communities require community members that take on leadership roles to help organize and mobilize their respective communities to take action and work together. Communities will naturally identify skillful leaders and create incentives to keep them engaged in these important roles.

## Movement DAO Membership

In addition to participating in the community to brainstorm, weed out, and distill the very best $(Movements), $MOVE members are responsible for proposing and voting on the following:

1. How the endowment, long term, and short term funds are allocated,

2. Scoping out and executing upon the mission and vision of the DAO,

3. Engage and foster community in both as a steward of the endowment but in the tooling in which the DAO invests its time and energy to enable its members.

Movement DAO membership is required by the communities which use its platform to create $Movements, is given to individuals who are stewarding it mission and goals, and is available to people who choose to help fund its treasury directly during the initial endowment seed or by acquiring its token on the secondary market.

## What is a Movement?

 Movements are fundamentally communities with a common purpose or goal formed with capital in order to take actions. The benefit of forming such a community in Movement DAO is to take advantage of the economies of scale and the intrinsic benefit of the financial tooling and capital enabled by its endowment.

While some community coordination may occur prior to the submission of a movement on Movement DAO, we believe Discord and other social media outlets may play significant part in the collaboration between parties to arrive at a consensus to the appropriate initialization parameters. To that end, Movement DAO intends to facilitate environments fertile for engagement.

## What is an Action?

A community project with predefined funding requirements.

Actions are the mechanisms for how movements fund & monitor real world projects. Learn more about initiatives in the communities section.

## How are Movements created?

1. Submit a movement on move.xyz.

2. Seed the first 500 DAI (this tribute is non-refundable).

3. Rally community & raise 50,000 DAI.

## How does Movement governance work?

The community token holders and movement leaders govern the project. Because Movement DAO holds a large number of tokens, the Movement DAO collective is able to vote on individual movement initiative.

Movement DAO also has veto powers on any movements or initiatives that break the community guidelines.

# Capital

Movement DAO seeks to equip movements with the best in DeFi by enabling them to benefit from a fully featured token built into their DAO.

**How movements raise capital on Movement DAO**

Movements are automatically created with a DeFi token ready to be listed on major DEX exchanges. This token includes key features to assist stable growth.

**Endowment Basics**

The purpose of the endowment is to earn via various DeFi protocols in order to produce a yield for the DAO which will be used for further blockchain development of tooling for its communities. The following are a few strategies which will be researched and employed with this goal.

> ⚠ Movement DAO is embracing a model where community members with focus and expertise are delegated authority to act on role based proposals.

Movement endowments generate ongoing revenue through:

1. Yield farming using the operations budget and the endowment
2. Deploying liquidity pools to earn fees
3. Deploying liquidity pools between $MOVE and $(Movement)s with various strategies to earn fees
4. $(Movement) Tributes, application submissions, and other Tribute based governance
5. Tribute's related to $MOVE transaction (selling or buying, during or prior to a vesting schedule)
6. DeFi protocols beyond Yearn, Curve, Convex which may employ esoteric strategies
7. The $MOVE endowment holds ~50% of tokens in all $(Movement)s
8. Profits from any revenue generating initiatives such as purchasing, fractionalizing and creating derivative NFT project

**Backed Endowments**

Backing an endowment allows movements to support their token price. Because token holders can always sell back to the contract for their pro-rata share of the endowment an implicit price floor is created.

> ⓘ **How it Works**
>
> Assume a movement has 1 million tokens and 10 million DAI in its endowment. Because this DAI is locked it implicitly backs each token at 10 DAI. More importantly, the endowment model sets up the infrastructure for explicitly backed tokens, a feature in the DAO roadmap.
>
> Explicitly backed tokens can be sold back to the movement contract for their backed price. For example, assume a movement has 1 million tokens, 10 million DAI in its endowment, and 1 million DAI in its budget. A token could be sold back to the movement contract for 11 DAI. The movement will then burn this token.

Backed endowments enable:

- Democratized access to DAO creation.
  - Today, communities have few tools to guarantee that a new DAO is legitimate. This lack of trust has an unintended side effect. Major established players (groups we do love & respect) in the DAO community have an unfair advantage. Trustless financing through an endowment enables anyone to create a movement while protecting their community's contributions.
- Dead or unsuccessful movements to be equitably unwound.
  - If a movement raises money for an unsuccessful cause ( Ken Griffin) and spends little to no money, community members have confidence that they can redeem their tokens.
- Reduced fraud.
  - Endowments minimize the capital that a bad actors could remove from a community at one time.

**Customized Funding Mechanisms**

The movement budget is funded through custom funding mechanisms. These funding mechanisms are defined by the movement and can include entry tributes, exit tributes, endowment deflation and vesting penalties.

Customized funding mechanisms enables communities with diverse goals to effectively raise capital.

>  **Ocean Cleanup Example**
>
> The ocean cleanup movement has long term goals, and therefore might not set an entry or exit tribute and instead all capital would live in their endowment. Their budget would be funded through a low predefined deflation on the endowment. Therefore, community members have confidence in a predictable & sustainable community budget.

>  **Natural Disaster Example**
>
> A community could rapidly organize to support victims of a natural disaster. They would set a 100% entry tribute and quickly deploy all funds raised.

> ⓘ **Viral Movement Example**
>
> A movement that's popular in the media ($ROSS) could implement a long vesting period to dissuade pump and dump activity. This vesting period ensures that community members join the movement for the right reasons and provides long term funding from short term excitement.

**Future Innovation**

Movement funding mechanisms are fully modular and the project is still in its early stages. Movement DAO was designed for the community to build on further features. These can include:

1. Customized and complex bonding curve shapes. These choices will enable movements to further align their financing with their values.
2. Implementing direct token backing. As discussed above, direct token backing helps to democratize DAOs.
3. Exploring the cutting edge in DeFi and giving movements the option to implement similar contracts.
4. Sophisticated price discovery for LPs.
5. Enabling movements the option to add continuous funding.
6. Enable an individual to seed a movement with ERC-20 tokens.

⚠️ ***TERMS AND CONDITIONS OF TOKEN SALE AND USE***

*PLEASE READ THESE TERMS AND CONDITIONS OF TOKEN SALE AND USE CAREFULLY BEFORE ACCESSING THE WEBSITE LOCATED AT HTTPS://move.xyz (THE "WEBSITE") OR THE Movement DAO (DEFINED BELOW) OR PURCHASING TOKENS. THE LAW OFFICE OF REED YURCHAK (THE "COMPANY") WILL ACT AS THE SERVICE PROVIDER FOR THE Movement DAO. YOU ACKNOWLEDGE THAT THERE ARE CERTAIN RISKS ASSOCIATED WITH PURCHASING THE TOKENS DESCRIBED HEREIN AND AGREE TO ASSUME SUCH RISKS UPON ANY PURCHASE OF TOKENS. IN ADDITION, NOTE THAT THESE TERMS CONTAIN A BINDING CLASS ACTION WAIVER, WHICH, IF APPLICABLE TO YOU, AFFECT YOUR LEGAL RIGHTS. IF YOU DO NOT AGREE TO THESE TERMS, DO NOT PURCHASE THE TOKENS DESCRIBED HEREIN.*

*Prior to purchasing Tokens, you should carefully consider these Terms and, to the extent necessary, consult a lawyer, accountant, and/or tax professional, as applicable.*

*Purchases of Tokens should be undertaken only by individuals or companies that have significant experience with, and understanding of, the usage and intricacies of cryptographic tokens, including Ethereum-based tokens and blockchain-based software systems. Purchasers should have an expert understanding of the storage and transmission mechanisms associated with cryptographic tokens. While the Company will be available to assist the Purchaser of Tokens during the Token Sale, the Company will not be responsible in any way for loss of any cryptocurrency, including Tokens, resulting from actions taken by, or omitted by Purchaser. If you do not have such experience or expertise, then you should not purchase Tokens or participate in the Token Sale. Your participation in the Token Sale is deemed to be your understanding and acknowledgment that you satisfy the requirements mentioned in this paragraph.*

*As further described herein, by purchasing Tokens, and to the extent permitted by law, you agree to not hold the Company or its respective past, present, and future employees, officers, directors, contractors, consultants, equity holders, suppliers, vendors, service providers, parent companies, subsidiaries, affiliates, agents, representatives, predecessors, successors and/or designees liable for any losses or any special, incidental, or consequential damages arising from, or in any way connected, to the sale of Tokens, including losses associated with these Terms.*

*You acknowledge, understand and agree that:-*

*You are subject to and bound by these Terms by virtue of purchasing the Tokens.*

*The Tokens have no rights, intended uses or attributes outside of use with the Kinesis Platform or as otherwise expressly referred to in these Terms.*

*A purchase of Tokens is non-refundable and cannot be cancelled.*

*A purchase of Tokens involves many, varied risks which can result in the loss of all amounts paid.*

*The Company reserves the right to refuse or cancel Token purchase requests at any time in its sole and absolute discretion.*

*The Tokens are not backed by any physical bullion or other assets which a Purchaser would have any rights or access to.*

*Other Token purchasers who made their purchase at a different time may receive more Tokens from the DAO for the same amount paid. In an effort to be completely transparent the tokens are priced on a bonding curve which is a function of the number of tokens voted by the community at*

*any point in time and the token price is not due to any action by the DAO or any member of the community.*

*These Terms limit the liability of the DAO and its Associated Parties (defined below) in connection with the sale of Tokens.*

**Right to review information of the Movement DAO**

*You have reviewed to your satisfaction all supporting documents and collateral sources concerning the risks associate with purchasing Tokens.*

*NOTHING IN THESE TERMS SHALL BE DEEMED TO CONSTITUTE A PROSPECTUS OF ANY SORT, A SOLICITATION FOR INVESTMENT OR INVESTMENT ADVICE NOR DOES IT IN ANY WAY PERTAIN TO AN OFFERING OR A SOLICITATION OF AN OFFER TO BUY ANY SECURITIES IN ANY JURISDICTION. TO THE MAXIMUM AMOUNT PERMITTED BY APPLICABLE LAW, EACH OF THE COMPANY AND KINESIS FOUNDATION (COLLECTIVELY, THE "ASSOCIATED PARTIES" AND EACH AN "ASSOCIATED PARTY") EXPRESSLY DISCLAIM AND SHALL NOT BE LIABLE FOR ANY AND ALL RESPONSIBILITY FOR ANY DIRECT OR ANY INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL OR OTHER LOSSES OF ANY KIND, IN TORT, CONTRACT OR OTHERWISE (INCLUDING BUT NOT LIMITED TO LOSS OF REVENUE, INCOME OR PROFITS, AND LOSS OF USE OR DATA), ARISING OUT OF OR IN CONNECTION WITH (I) THE PURCHASER'S ACCEPTANCE OF OR RELIANCE ON ANY INFORMATION CONTAINED IN THESE TERMS OR THE WHITEPAPER, (II) ANY ERROR, OMISSION OR INACCURACY IN ANY SUCH INFORMATION OR (III) ANY ACTION RESULTING THEREFROM.*

*Purchaser agrees to buy, and DAO agrees to sell, Tokens in accordance with the following terms:*

*Acceptance of Confidential Offering Memorandum, Whitepaper and Terms*

# Compound Giving

Movement DAO manages a platform wide endowment which generates continuous revenue. This revenue creates sustainable movementing funding.

**How the Movement DAO endowment works**

Movement DAO tokens holders are responsible for effectively deploying revenue generated from the endowment. They can deploy this revenue into any of the following:

1. Compensating community members
2. Funding platform development
3. Purchasing movement tokens to be held in the Movement DAO endowment
4. Funding movement budget's directly
5. Funding movement endowments directly
6. Funding movement actions directly
7. Re-investing directly into the Movement DAO endowment
8. Funding giveaways to grow the platform

Movement DAO token holders also govern how the endowment manages its assets. These decisions include:

1. What tokens, and in what proportions, the endowment should hold
2. How tokens should be priced (Movement DAO controls a large amount of the liquidity and therefore controls the LP)
3. How to set an optimal platform tribute amount for movements and actions (submitting movements and actions require a platform tribute)

Movement DAO is fully managed by its token holders.

## How does an endowment work logistically?

Movement DAO has a pool of capital called an endowment. Money in the endowment cannot be spent. The endowment's yield funds the platform.

The endowment capital also backs the tokens. Token holds will be able to sell their tokens back to the endowment for a pro-rata share of the entire endowment.

The endowment use an Unagii vault to yield farm assets.

## Community Seeding

The Movement DAO Community Seeding phase are funds which are transferred to the Gnosis Safe between **February 2, 2022 2:22pm** and **May, 2022 (exact date TBD)**

 Any ETH (Ξ) or tokens transferred **prior to** and **after the aforementioned time** will be considered donations to the Movement DAO.

 Any Ξ or DAI transferred from a CEX (Coinbase, Gemini, or otherwise) will need to send the a. screenshot of your CEX transaction, b. Etherscan link to your transaction, c. Wallet address that you own, where you want the tokens dropped/claimed. Failure to provide the above will result in the loss of your tokens. The aforementioned information needs to be sent to Movement DAO Discord channel Super Admin, *TBD*.

 After you provide your CEX proof and replacement wallet information, it is your responsibility to verify this snapshot replacement with the csv updates provided to the Discord announcement channel.

After the contribution period, contribution snapshots will be sent to the announcement channel of Discord, for the community to verify contributions.

A contribution snapshot will be used to compute via a linear bonding curve the number of tokens to be issued.

 The Community Seeding is effectively the same as transferring ETH (Ξ) or DAI to the Gnosis Safe. Which can be done without the use of our website tool. Your mileage may vary when it comes to using the CEX wallets to interact with our site.

## What are the underlying assets in the endowment?

Movement DAO's initial endowment holds $MOVE, $DAI and some $ETH. When movements are created Movement DAO will hold movement tokens in its endowment. It will use these tokens to provide liquidity. Movement DAO's endowment will earn LP fees.

The community retains the voting power to re-allocate capital.

## How does the endowment earn money?

1. Yield farming the budget pool
2. Yield farming assets in the endowment
3. Owning a half of all movement tokens, for each movement (these tokens are used to provide liquidity for token holders) (the endowment will grow proportionally to the ecosystem)
4. Network tributes when submitting movements

5. Tribute when selling vested tokens early

6. LP fees for providing liquidity on movement tokens

7. Profits from any revenue generating initiatives

# Token Release

## How it works

The following is the current plan for the token distribution of $MOVE.

**Phase 1. The Seeder's Endowment Contribution**

The Movement DAO's Seed will occur **February 2, 2022, 2:20am**, and will total **Ξ n and n DAI**.

**Phase 2. Community Seeding of the Endowment**

The Community public seeding period opens on **February 2, 2022, 2:22pm.** Contributions to the Gnosis Safe will be recorded via Github repository Bonding-Curve-Snapshot.

**May, 2022 (exact date TBD)** - Snapshot of the Gnosis Safe contributions

> ⓘ **Post Token Snapshot (May),** The following phases will occur when the total token allocation can be properly computed.

**Phase 3. Airdrop to the Community**

The Movement DAO team values the cryptocurrency community at large, specific individuals who have contributed to DAO governance, and teams who have worked tirelessly to benefit the community and who's work we have forked, extended, and learned from. Additionally, the DAO sought to be as inclusive as possible and invite as many potential community members into our Discord to contribute to a movement or start one for themselves. The following communities reflect our appreciation.

- the top 1111 individuals who have created or voted on a proposal in a DAO, source.

- the members of Tribute Lab's DAOs, source.

- the developers of Tribute Lab's, source.

- any individual who has contributed to the JuiceBox DAO, source.

- any ENS owner, at the time of their airdrop, source.

- any individual who has transacted with OpenSea, source.

> ⓘ The Seeder's Endowment, Community Seeding, and Airdrop to the Community each are a collection of Ethereum addresses which will be used to generate a Merkle root for the Merkle distributor - enabling the claiming of each of the tokens. Technical details of the Merkle distributor maybe found here. A friendly explanation of an airdrop via Merkle distributor is found here.

## How are my total tokens calculated?

Tokens will be priced in accordance with a linear bonding curve.

It is possible that presale tokens will be subject to partial vesting in order to discourage pump and dump activity. Any vesting will be transparent and voted on by the community in discord beforehand.

## How do I receive my purchased tokens?

- Go to our claim page
- Just hookup your wallet, pay gas, and press claim!

## When do I receive my tokens?

May, 2022 (exact date TBD)

## How do I know the token launch is fair?

The community will have 72 hours to audit the token airdrop list before it is released.

Learn more.

## Token Allocation

Tokens plan to be distributed as follows:



Movement DAO controls the treasury and LP pool tokens.

The 10% of tokens dedicated to staking rewards will serve as the rewards for the first ~30 days. After this time the community will vote on how many new tokens to mint to continue rewards.

## Rationale

> ⚠ The above is subject to change depending on the final contribution amount to the Gnosis Safe. The final method and token computation will be shared within the Movement DAO's Discord.

The Seeder's endowment is intended to kickstart the Movement DAO. After the Community Seeding phase completes, the Gnosis Safe contributions will be computed on a linear bonding curve in order to compute the token allocation. The tokens computed will determine the total additional tokens in each of the above allocations to be minted.

# Movement DAO

# ♂ Governance Voting

## Snapshot Voting

> ⓘ Snapshot ⚡ hub will be employed initially, however, our mono-repo includes a hosted off-chain voting adapter which is under active development.

> ⓘ Snapshot voting strategies during the Movement DAO will employ a governance token available to individuals who stake $MOVE. However, during the bootstrapping phase of the DAO community contributors and based on participation will be granted a MAPE-1420 NFT which will be employed for initial governance. Details to follow.

**Proposal format**

The following is a high-level outline of what Movement governance will entail.

Standard Governance Process

Proposal should be comprehensive, specific, and easily readable. Proposals should be as brief as possible while being clear.

The following are the components which are expected to make up a proposal.

**Summary.** A short summary of your proposal.

**Abstract.** A paragraph summary. It should convey the gist of the proposal without any further reading. It should be human readable version of the specification section.

**Motivation.** State clearly why the proposal exists.

**Risks.** Implications relevant to the proposed change, relevant information includes change in any financial balances, security implications, harm to any party or property.

**Specification.** The rationale which fleshes out the specification by describing what motivated the design and why this particular design decisions were made. Alternate approaches, and other relevant facts to the implementation should be included here. If any consensus occurred within the community, reference to such would be appropriate. Any objections or opposition to the proposal would also be relevant to state.

**Timeframe.** Should include a start and end date for all actions within the proposal.

**Copyright Disclaimer.** All proposals must be in the public domain, and not include any profanity, or overly explicit descriptions of nudity.

## $sMOVE tokens in a Snapshot strategy

The $MOVE tokens must be staked in order to receive $sMOVE, however, you may choose to use either in your $Movement or DAO.

1. Choose "contract-call"

2. Insert this

```
{
        "symbol": "sMOVE", // TODO: REPLACE WITH YOUR TOKEN SYMBOL.
        "address": "sMOVEDAO TOKEN ADDRESS HERE",
        "decimals": 18,
        "methodABI": {
        "name": "balanceOf",
        "type": "function",
        "inputs": [
                {
                        "name": "",
                        "type": "address",
                        "internalType": "address"
                },
                {
                        "name": "",
                        "type": "uint256",
                        "internalType": "uint256"
                }
        ],
        "outputs": [
                {
                        "name": "",
                        "type": "uint256",
                        "internalType": "uint256"
                }
        ],
        "stateMutability": "view"
        }
}
```

Additional information about Snapshot and custom strategies maybe found here.

# Aping in

## Bored Ape Yacht Club No. 1420 aka "420"



**The BAYC-1420 award**

Movement DAO's commitment to growing our community starts with paying homage to the BAYC community. Therefore, the DAO acquired No. 1420 and the DAO will announce the terms of the Aping-in-to-Movement terms where one Movement will own this Ape. Meanwhile, the DAO has created the Movement BAYC-1420 derivative collection.Examples from the MAPE-1420 collection



**The MAPE-1420 derivative collection**

The Movement *Bored* Ape *Yacht Club No.* 1420 derivative, or MAPE-1420, community badges are a generative collection of which 4444 MAPES exist. The MAPE-1420, which were designed solely to award contributors to the Movement DAO. Individual selection is based on past and present active contributions to DAO governance, proposals, and voting and whose social media has been used to further DAOs in any form. The airdrop isn't simply rewarding these individuals for their past contributions but also their guidance and involvement going forward. *Additional details will be released concurrent with the MAPE-1420 NFT airdrop.*

**Ongoing community contribution assessment, Coordinape**

The founders strongly believe in directly rewarding the community members who make Movement DAO possible. To this end, Movement DAO will be onboarding community members to Coordinape in an effort to reward community contributors. Details on which token, circle composition, and epoch schedule to be forthcoming.

# Coordinape

During the bootstrap phase of Movement DAO it maybe difficult to find a rhythm in contributing to the DAO, however a few guidelines may help when it comes to your path to compensation. The previous section outlined different roles with in the community which are available.

To start collaborating, setting up a common workspace for tasks, documents, how-to, and an index of movements and parameters contemplated by the community is as good of a start as any. The following Movement DAO Notion has been set up for this purpose.

Alternatively, reaching out to a Discord moderator to including you in a Coordinape circle preferably on a topic you feel you can contribute.

# 🐢 Security Precautions

How has the DAO ensured its smart contracts are secure?

> ⚠️  Movement DAO is new technology, and no amount of testing or security audits completely eliminate risks. Please don't supply assets you can't afford to lose.
>
> TLDR, at launch we are employing a Gnosis Multi-signature Safe to manage the DAO funds, Community Discord to coordinate discussions, and Snapshot (after the token distribution) for voting until the OpenLaw Tribute DAO Framework audit is complete and we have merged changes.

### 🐢 Slow Start

Until Movement DAO is able to operate with confidence for some time, the following safe guards were put into place until the community deems them unnecessary. The safe guards are encoded into the adapters and extension smart contracts.

1. Financial transactions are handled after any votes by an IRL law firm acting as a service provider.
2. DAO founders may elect to operate with a Vetoer role which may veto any pending proposal.
3. A number of Movement DAO's Gnosis Safe signers are publicly known individuals.

## Smart Contract Audit

### Auditors

Github user @t4sk is currently reviewing the existing repository and contracts and is providing the development team with a recommendations report. This work is specifically targeted at the adapters and extensions as they relate to the **Unagi Vault, Sushi and UniSwap liquidity deployments and the bonding curve contracts**. Additionally, `OpenLaw` ( also referred to as Tribute Labs and author of the Tribute DAO Framework) are currently engaged with SigmaPrime to audit their contracts. We are closely monitoring the recommendations and updates from this audit and will merge updates as they are reported.

We have contacted SigmaPrime and notified them of our intent to hire them to do the formal audit when we are feature complete. They asked that we do not use their name on our materials until we have signed an agreement with them. We have set aside a budget to bill against when we are closer to feature complete.

### Scope

Movement DAO's core premise is to enable a community by seeding it with Ethereum/DAI to create any Movement and Actions they deem worthwhile, entrusting the collective wisdom of the community and their appointed leaders to accomplish that which has remained generally opaque to the individual - charity organizations as they operate today. Movement DAO's core is a collection of smart contracts which govern managing a pool of assets on behalf of Movement and its sub-movements, the Endowment bank. Given each Movement has its own property and funds which are managed by Movement, and adapters and extensions which govern how the funds are collected, distributed, and managed are all areas which require extensive design, analysis, and audit before it is deployed on Ethereum Mainnet.

**Unagii Vaults**

## Vault Security

The security of Unagii Vaults is of utmost important to us. We make considerable efforts in ensuring that Unagii Vaults are deployed with best practices and risk mitigations in mind.

Movements

# Movement Glossary

## Complete Movement Gloassary

### Title

Your movement name.

*string. under 50 characters.*

### Mission

A short description for your movement.

*string. under 280 characters.*

### Token Symbol

A ticker symbol, like $BLM, $BTC, $MOVE, etc.

*string. under 6 characters.*

### Action Voting Period

Days required to vote on initiatives.

*number.*

### Movement Icon

An icon associated with your movement. This icon will be used for your token and appear on DEX next to your token.

*image. 600px x 600px.*

### Movement Color

Customize the look and feel of your movement with a movement color. The movement color is often overlayed against your movement image.

*hex color.*

### Movement Image

An image to showcase your movement. For best results, the movement image should be monochromatic and the same color as your movement color.

*image. 1920px x 1080px.*

**Movement Leaders**

Enable individuals to lead your movement. These individuals can have increased voting rights, compensation, and are elected by the community. Learn more here.

**Role Name**

Name of this position.

*string. 20 characters.*

**Election Cycle**

How often does the community vote for this role (measured in days).

*number.*

**Compensation**

What percent of the total movement tokens will this leader be rewarded per election cycle.

*percent. cannot exceed 50%.*

**Nominated Leader**

Movements can optionally appoint someone to a leadership position for their first election cycle. They will be up for election at the end of their election cycle.

*twitter handle.*

**Description**

Describe your movement in markdown. This description is your only opportunity to "pitch" your movement.

Why do you exist?

Why should community members care?

What projects will you fund?

Include photos and videos to add color to your description.

*string.*

**Endowment Goal**

The endowment funding requirements for your movement to exist. Learn more about the endowment here.

*number.*

**Budget Goal**

The budget funding requirements for your movement to exist. Learn more about how budgets work here.

*number*.

**Token Giveaways**

Communities can elect for certain public people or eth addresses to receive tokens in the event of a successful movement.

*twitter or ETH address. And number.*

**Entry Tribute**

Fixed amount of every token purchase that funds the budget. A high entry tribute creates less price stability, but will provide more immediate funding.

*percent.*

**Exit Tribute**

Fixed amount of every token sale that funds the budget. A high exit tribute dissuades pump and dump, but could also ward off potential community members.

*percent.*

**Annualized Deflation**

A percent of the endowment automatically converted into a spendable budget. *Currently in beta.*

**Vesting Period**

A predefined time period where token holders cannot access their entire purchased tokens. Vesting reduces vote fraud and pump and dump schemes. Movement DAO recommends vesting periods for most use cases. *Currently in beta.*

**Vesting Penalty**

The penalty for selling vested tokens early. The vesting penalty decreases linearly from the specified penalty amount to zero over the course of the vesting period. *Currently in beta.*

**Movement DAO Tribute**

Newly submitted movements have a tribute to movement DAO. This tribute helps to prevent spam movements and further support the movement DAO ecosystem.

## Actions Glossary

**Name**

Name of your initiative.

**Image**

Background image for your initiative.

**Description**

Clearly describe your initiative.

**Milestones**

How much funding do you need and when should you receive that money.

**Milestone Title**

Title for milestone.

**Date**

When your milestone needs to be completed. The community will verify your milestone against this date. If you miss this date it will be up to the community to award all, some, or none of the milestone funding.

**Funding**

How much do you receive for successfully completing your milestone.

**Description**

Describe your milestone in detail.

What will you accomplish?

How will the community verify? Will you post a photo of your work on twitter? Write an initial whitepaper? Etc.

**Roles**

Create a team for your motion

**Role Name**

Name your role.

**Role Duration**

How long will this role exist? The full duration of your motion? Only part of it?

**Role Description**

Describe in detail what is expected from this role. What are their responsibilities?

**Gross Token Salary**

Total amount that this individual will earn in tokens, transferred bi-weekly.

**Gross DAI Salary**

Total amount of DAI that this individual will earn, transferred bi-weekly.

**Nominated Role**

Add the individual in this role by their twitter handle or eth address.

**About You Paragraph**

Why are you well prepared to accomplish this project.

**Twitter Handle**

Verify your identity.

**ETH Address**

If your funds will be dispersed via ETH, enter that address here. Without an ETH address the service provider will fund your project directly.

## How to join a movement

1. Purchase tokens for that movement.
2. Join movement discord.

# Tokens

# ✅ Get Tokens

$MOVE tokens are now available for pre-sale.

## Token allocation

The token allocations are computed on a bonding curve and will be snapshotted from the Gnosis multi-signature daily after May, 2022 (exact date TBD) and published in Discord. After which the Merkle root will be computed for the Merkle distributor claim.

## How does the token launch work?

1. Tokens are released for pre-sale

2. Tokens will be available for pre-sale until May, 2022 (exact date TBD).

3. Tokens purchased during this time period will be priced on a linear bonding curve.

4. A final token giveaway list will be released in May for the community to review. Learn why.

5. Pre-sale tokens can be claimed starting in May.

6. Pre-sale tokens never expire. They can always be claimed.

7. After token claiming starts, tokens will only be available for swapping on major exchanges.

Movement DAO will ensure that there is sufficient liquidity for tokens.

> ⓘ *The Movement DAO will conduct a "pre-sale" to qualified investors to help seed the community and identify those community members who are passionate about movements who will sponsor, lead and shape the first movements in the DAO*

## How do I get tokens?

First, make sure you have an Ethereum wallet setup. Two popular options are Rainbow and Metamask. Second, get those tokens.

**1)** Navigate to the token pre-sale page.

**2)** Select your base currency. You can purchase $MOVE in ETH or DAI.

**3)** Connect your wallet.

**4)** Approve transaction in wallet.

**5)** Party



## How do I send tokens from a centralized exchange (ie. Coinbase, Gemini, etc.)

Major exchanges (such as Coinbase & Gemini) do not support wallet connect and therefore cannot be used to purchase presale tokens.

These users face two options:

**Option 1**

1. Setup an Ethereum wallet
2. Transfer tokens to the wallet
3. Then simply use your new wallet

You can use any compatible Ethereum wallet.

Or

1. Send tokens from your Coinbase account to movedao.eth
2. Share a screenshot of your transaction in discord
3. Specify the ERC-20 compatible wallet address you'd like to receive tokens

We do not recommend this method as it will add extra work for our community, and is prone to error. We recommend setting up a proper Ethereum wallet.

## How are my total tokens calculated?

Token prices for tokens purchased during the pre-sale are calculated at the end of the token release. Tokens will be distributed via a Merkel Airdrop. Token prices are not calculated in real time for a few reasons:

1. Lower gas fees. Anyone who purchases tokens in the pre-sale will pay notably lower gas fees than those who swapped.
2. Dynamically set pricing. Because exponential curves can quickly grow out of control it is important to calculate exact coefficients after-the-fact.
3. Most importantly, the community should have a voice in how the bonding curve is priced.

The target discount for the last bonding curve purchase to the listed LP price is ~20%.

## How do I claim my tokens?

**1)** Go to the claim token page

**2)** Connect your wallet (for twitter connect see here)

**3)** Pay gas fees and claim token

## How do I know the token launch is fair?

Movement DAO cares deeply about building healthy communities. Therefore, an ethical token release is core to our mission. Movement DAO is taking the following steps to ensure a transparent, equitable, and community oriented launch:

1. When transferring tokens from the bonding curve wallet into the movement vault, the community has the right to veto the destination address. Therefore, community funds cannot be moved without community approval.
2. A registered law firm acts as a signatory on the funds wallet. They **therefore owe a fiduciary duty to the movement and will employ their expertise to ensure that no funds are moved in violation of the movement rules and no requests for funding would be indicative of fraudulent activity.**
3. Tokens will not be distributed without community approval. The community will have 72 hours to review the Merkel airdrop list.
4. Funds raised from the movement bonding curve go into an endowment as opposed to a liquid spending pool. This endowment helps to preserve long term funding for the project.

# ♀ Community Funding

Community, Community, Community

## Overview

The founders strongly believe in directly rewarding the community members who make Movement DAO possible.

Movement DAO will choose the most impactful Movement DAO community members to receive a steady salary in tokens for supporting Movement DAO.

For the first 18 months of the project, at the end of every month, the community will vote on who had the biggest impact. Movement DAO will use Coordinape to facilitate this community giveaway.

**Movement DAO has earmarked 5% of tokens for the community and will distribute over $1,000,000 in tokens over the first year directly for community contributions.**

## Staking

The Movement DAO is currently allocating a percentage of its treasury for staking rewards. It is currently planned that at the time of the token claim, users will have to option to stake immediately.

Only staked $MOVE holders will be able to participate in Snapshot governance.

## Liquidity Pools

Shortly after the Airdrop via Merkle distributor for $MOVE and deployment of the staking contract, Movement DAO has allocated a portion of its treasury for liquidity pools to earn fees as well as provide liquidity for the community. The exact amount, as well as which DEX to use will be decided via the DAO governance process.

# Community

# Vision

## The Vision

Today, society is increasingly demanding engagement, transparency, expediency and a seat at the table when solving problems. Our vision is for Movement DAO to become the platform that humanity turns to to make the most meaningful impact in the world.

## Movement Ideas

### Social Justice

Movements like Black Lives Matter have been profoundly effective at organizing large groups to promote real change. However, because BLM is exceedingly decentralized, the community had poor tools to effectively raise money. BLM can use Movement DAO to:

1. Organize the community with leaders.
2. Raise money in a way that financially aligns supporters.
3. Transparently spend money through initiatives.

The 2017 Women's March faced similar challenges. With Movement DAO however, future movements could use an endowment model to transform a tidal wave of excitement over a short perif time into long lasting & sustained funding.

The next wave of social justice movements should organize & raise capital on Movement DAO.

### Public Arts

The public arts are often neglected by local governments. When projects are created, they are bogged down by bureaucracy and often highly political. Rarely do they represent the whims of the people.

Movement DAO enables a small & passionate community to create truly eye catching public art.

Imagine a DAO funded dog park (DOAG park) on the water in South Beach. This dog park could  feature a 20ft tall DOGE head and be prominently featured with the DAO's token symbol (hopefully $DOAG).

Movement DAO is well equipped to promote public arts.

### Prison Reform

Projects like Free Ross DAO serve as an inspiration for the impact that DAOs can have. Future movements that fight for prison reform can use the tools on Movement DAO  to take their communities further.

### Controversial Research

Today the process to receive grants for research at top academic institutions is highly politicized & bureaucratic. Often good ideas are left unfunded if they attack the status quo. A movement to democratize independent research could push science forward. Leaders

**Union Movement**

Union workers organize to support a common goal and often pay dues to support their efforts. However, unions are can be plauged with corruption and don't always represent the will of their members.

Unions could organize as a movement, with due's being paid to the movement itself.

Union members can elect leaders and have transparency into how all money is spent.

**Environmental Cleanup (Save Sea Turtles   )**

Everyone loves sea turtles. And everyone hates plastic. Start a movement to save our environment!

# Mission

Society already has the collective compassion, knowledge and resources to solve the world's problems. The missing piece is a technology to bring it all together. Movement DAO uses proven applications of blockchain to align economic incentives within communities and empower them to solve problems as a collective.

Movement DAO's mission is to change the world for the better and become the launchpad for the world's most impactful movements!

Movement DAO enables communities to run programmable and community funded treasuries by providing tooling and a seeded endowment.

# ☻ Building Community

## Values

**We are stewards**. We respect with humility the opportunity to help build on the open internet together, and are dedicated to using our capabilities for good.

**We are self-starters.** The decision to make the world a better place doesn't start with expecting someone else to solve a problem. We have to prioritize this for ourselves and enable those around us.

**We are focused.** We have been entrusted with a large sum of capital by our community. We must be focused on how to efficiently and effectively use these resources to drive towards our goals. This means balancing short-term benefits to our community with longer-term impact to the global community.

**We are builders.** The company we keep are individuals who prioritize building, and do so with pride. We build with humility and to make the world a better place.

**We are honest.** With each other and most of all, to ourselves. We share ideas, feelings, concerns and exchange everything in between openly and respectfully to each other.

## Movement DAO Community

Movement DAO is designed for expression, empowerment, and engagement. We are keenly focused on empowering communities and encouraging them to consider this powerful new way of solving problems. The Movement DAO creators share the passion and compassion of each of its movement communities and have built an environment dedicated to their collaboration and harmonizing around movements.

## Leadership

Movement Leaders provide an opportunity for movements to increase momentum. Leaders are compensated by movements on a regular basis for promoting the movement to the world. Movement communities will elect these leaders (who are likely individuals with large social followings already) upon the minting of new movements. Leaders are compensated in Movement Tokens that are unlocked if they adequately fulfill the community's goals. Leader's responsibilities can include promoting their movements, engaging communities, and fostering a collaborative ethos. Initiatives – Initiatives are projects proposed by the movement community. Token holders vote on which initiatives receive funding. Funding is provided by the reserve pool & direct tributes. Funding is distributed incrementally when predetermined milestones are achieved. Initiatives are proposed with those milestones. Funding Initiatives - Each movement is its own DAO that accumulates reserves over time to fund initiatives. . Reserves are funded by a variety of "tribute" (activity based contribution) mechanisms specified by their communities. These can include: Transaction tributes associated with the minting and burning of movement tokens Tributes from selling vested tokens early Direct tributes to initiatives through staking (with boosted voting rights)

Movements are designed to become sustainable communities with continuous funding. However, movements cannot sustain without leadership, coordination and engagement. Below are some key considerations for how communities remain healthy and impactful.

## TOKEN GIVEAWAYS

Movement DAO & its Movements can use giveaways to strategically bring new people into their ecosystem. A giveaway has three key phases: The community selects a strategic person who should be financially aligned with the movement. They identify this person via their Twitter account. They decide how many coins to give this person. The individual can then claim up to half their coins. In order to claim tokens they need to nominate via twitter two or more people. The other half of their coins are then distributed to whoever they nominated. A flywheel persists of people claiming coins and nominating other people until the gas fees to claim coins are higher than the value of the coins. After a set amount of time unclaimed coins will go back to the endowment. Communities can also decide to lock their coins or vest their coins in giveaways. Locked coins can't be sold for a set amount of time. Vested coins incur a tribute on early sale.

⚠ All members should review and adopt Movement DAO community pledge.

# Charities

Movement DAO works in harmony with charitable organizations in a variety of ways.

- **Charities launching movements** - Charities may decide to launch their own movements to raise money and procure help in this new and exciting way!  Charities can be the recipient of funds through this platform and can offer tokens or NFTs to its community as a reward. Instead of offering t-shirts and prizes like many non-profits do, they can now offer a reward system to incentivize recurring donations from their community (similar to airline miles).

- **Charities as direct investors** – Organizations such as Foundations and Endowments can elect a portion of their investment portfolios to directly invest in Movement Tokens. Instead of their investment portfolios having passive allocations to ESG stocks, they become active voting members of the community.

- **Charities as beneficiaries** – Charities that join Movement communities can earn token awards from Movement Evangelists by offering their time and expertise in Movement communities

# ☸ Community Pledge

At Movement DAO, our collective success relies on our ability to work together in harmony. We ask that all community members adhere to our eightfold pledge for building and maintaining communities in the right way.

1. **Right view** – Right view means that community members are aligned in their values and goals for global impact. Each community will become the product of our collective spirit, optimism and hard work in developing sustainable communities for positive impact.

2. **Right intention** – This platform is designed for real world impact. While other blockchain projects are designed for boosting economic status, we are here to turn this economic potential into changing the world. While the potential for comping EARNING is substantial, community members should consider this platform as a means to compound GIVING.

3. **Right speech** – Unlike social media platforms that are plagued with divisiveness and inflammatory discourse, this platform is designed for people to mobilize, collaborate and make impact together. We have no time to waste with distractions like divisive speech, abuse, or unrelated chatter.

4. **Right action** – Community members should be fully aligned with their intentions in both the physical world and the digital world. Community members should not use this platform to influence or manipulate the real world in a malignant way. Everyone should feel safe to express their opinions and contributions free from any malicious reaction. The community should engage in non-violent communication and conflict resolution. The community must build and maintain a level of trust by quickly highlighting any instances of fraudulent or malicious activity.

5. **Right livelihood** – It is possible for community members to grow their earn and make impact. There are several other platforms for those seeking lambos. We ask that community members don't let their earning potential detract from their giving potential.

6. **Right effort** – Each community member has a duty to prevent, mitigate, and resolve conflict on the platform.

7. **Right mindfulness** – Mindfulness means that community members are consciously aware of their own biases, preconceptions, and judgements. These tendencies can become blockages of new information and can lead to further misunderstanding and miscommunication. Community members should listen to others completely and practice mindful non-violent communication.

8. **Right concentration** – Community members should dedicate time to tasks within their communities instead of trying to multi-task. Problem solving is a dedicated effort and the communities need your focused wisdom and effort.

Developers

# DevCommunity

Development of the Movement DAO has occurred primarily following fronts

- Feature specific smart contract and Typescript stand-alone cli application
- Implemented as part of the Tribute Labs DAO Framework

The system requirements spanning on-boarding a community with tokens, an interface for governance, and the range of adapters contemplated for communities is expansive. Complicating matters is the constant evolution of tooling and deployment options. Nonetheless, our goal is to enable individuals and communities with the best tools to bootstrap their treasury and follow through until they have a token with liquidity.

To that end we have partnered when possible with existing Open Source teams and contributed code to extend the development experience.

**Movement DAO is actively looking to work with talented web3 developers who are excited to revolutionize how communities manage their treasuries!**

All developer coordination happens on our Discord – we recommend connecting directly with the community driven development team there.

Join our discord to get started!

## Audits

The Movement DAO smart contracts have been reviewed by Tasuku Nakamura, the blockchain engineer behind Unagii Vault.

# Github

What Github Repositories does Movement DAO use?

The Movement DAO benefited from the thousands of hours of open source work from a number of communities. To that end, the team reviewed a number of existing successful Open Source projects in order to extend the features which were important in furthering the community endowment model.

**Forking**

> "Forking is the highest form of flattery," said @tankbottoms.

Juicebox, has the most thoughtful community defined programmable funded treasury which is enjoying success with the Shark DAO and Constitution DAO from the funding to raw awareness. Relatively short amount of time since launch, JBX-Protocol has a significant treasury and tremendous success with the community. But we think it could do more.

Additionally, the Tribute Labs team behind Tribute DAO Framework, formerly Open Law *"have deployed nearly ten DAOs (with one or two coming every month) together have over $150m and have supported over 150 projects"*. Source. We saw TributeLab's DAO Framework as game changing and sought to expand the universe of adapters and extensions on their platform.

Movement DAO cares deeply in making our UX an engaging and intuitive. Combining each of the above mechanics, protocols in an easy to convey manner is hard. We think hard means it's worth working towards.

Movement DAO added a number of adapters and extensions relating to the management of movements and the treasuries the communities funded. The following Movement DAO Github Organization is where we invite capable developer contributors to seek us out, or in the Discord developer channels.

1. Movement DAO
2. JuiceBox
3. OpenLaw Tribute Contracts
4. OpenLaw Snapshot Hub
5. Twitter OAuth
6. Unagii-Vault-v2
7. Uniswap's Sybil-list, Sybil-interface

**Solution**

We think the solution is not a developer focused application or SDK, but reduces the barrier to entry.

**Known Bugs**

ⓘ **Wallet Connect Bug**

When a wallet is connected via Wallet Connect and has a DAI transaction that transaction may appear denominated in ETH.

For example, assume you want to purchase 1000 DAI worth of $MOVE. The transaction in your wallet will confirm if you're ready to transfer 1000 ETH, otherwise 3.0 million worth of ETH. This transaction will be approved, because Wallet Connect is still processing it as a DAI transaction.



# Smart Contracts

What smart contracts have been deployed to date?

> ⚠ While we have developed within the Tribute DAO Framework, and deployed on Rinkeby and Mainnet, we are not yet active within this framework for a number of reasons including waiting for the conclusion of the current Tribute-contracts security audit.

Below you will find each of the contract addresses under their respective network. The contracts were also verified on Etherscan. A log of the deployment and the verification is also provided.

**Rinkeby**

The following DAO contract addresses are provided for development and test interaction purposes. Active development is currently underway to widen the types of token voting and staking economics we would like to support. Deployment and verification log.

Deployment output

```
Compiling 148 files with 0.8.4
Compilation finished successfully
```

| Contract Name | Size (KB) |
|---|---|
| Address | 0.086 |
| AddressUpgradeable | 0.086 |
| Arrays | 0.086 |
| BancorFormula | 3.858 |
| BankAdapterContract | 2.948 |
| BankExtension | 12.719 |
| BankFactory | 1.630 |
| BatchVotingContract | 11.841 |
| BondingCurve | 24.048 |
| BondingCurveFactory | 1.466 |
| BondingCurveToken | 1.449 |
| BondingCurveVault | 3.207 |
| CloneFactory | 0.063 |
| ConfigurationContract | 5.548 |
| Counters | 0.086 |
| CouponOnboardingContract | 7.588 |
| DaoArtifacts | 2.397 |
| DaoFactory | 17.329 |
| DaoHelper | 0.086 |
| DaoRegistry | 23.162 |
| DaoRegistryAdapterContract | 2.567 |
| DistributeContract | 10.293 |
| ECDSA | 0.086 |

| Endowment | · | 9.816 |
| EnumerableSet | · | 0.086 |
| ERC1155 | · | 5.505 |
| ERC1155AdapterContract | · | 1.944 |
| ERC1155TestToken | · | 9.512 |
| ERC1155TokenExtension | · | 7.940 |
| ERC1155TokenExtensionFactory | · | 1.192 |
| ERC1271Extension | · | 2.920 |
| ERC1271ExtensionFactory | · | 1.192 |
| ERC20 | · | 2.438 |
| ERC20Extension | · | 10.629 |
| ERC20MinterContract | · | 2.373 |
| ERC20TokenExtensionFactory | · | 2.227 |
| ERC721 | · | 5.168 |
| ExecutorExtension | · | 2.453 |
| ExecutorExtensionFactory | · | 1.192 |
| FairShareHelper | · | 0.086 |
| FinancingContract | · | 5.885 |
| GuildKickContract | · | 10.036 |
| GuildKickHelper | · | 0.086 |
| IntiativeAdapter | · | 7.132 |
| KickBadReporterAdapter | · | 6.793 |
| ManagingContract | · | 8.386 |
| MerkleProof | · | 0.086 |
| Migrations | · | 0.293 |
| MovementAdapter | · | 8.846 |
| Multicall | · | 1.338 |

| | |
|---|---|
| NFTAdapterContract | 2.715 |
| NFTCollectionFactory | 1.192 |
| NFTExtension | 6.043 |
| OffchainVotingContract | 22.309 |
| OffchainVotingHashContract | 6.418 |
| OLToken | 2.438 |
| OnboardingContract | 12.676 |
| PixelNFT | 6.470 |
| Power | 0.441 |
| ProxTokenContract | 2.798 |
| RagequitContract | 4.842 |
| SafeERC20 | 0.086 |
| SafeMath | 0.086 |
| ServiceProviderAdapter | 5.270 |
| SignatureChecker | 0.086 |
| SignaturesContract | 5.184 |
| SnapshotProposalContract | 4.250 |
| Strings | 0.086 |
| SushiswapAddPoolAdapter | 7.654 |
| SushiswapSubPoolAdapter | 8.468 |
| TestFairShareCalc | 0.568 |
| TestToken1 | 2.438 |
| TestToken2 | 2.438 |
| TributeContract | 9.465 |
| TributeNFTContract | 10.776 |
| UnagiiVaultDepositAdapter | 8.399 |

```
| UnagiiVaultWithdrawAdapter    ·    7.252 |
·····································|···············
| UniswapAddPoolAdapter         ·    7.654 |
·····································|···············
| UniswapSubPoolAdapter         ·    8.468 |
·····································|···············
| UniswapV3AddPoolAdapter       ·    6.686 |
·····································|···············
| UniswapV3SubPoolAdapter       ·    6.331 |
·····································|···············
| VetoerAdapter                 ·    5.270 |
·····································|···············
| VotingContract                ·    7.080 |
·------------------------------|-------------·


Deployment started at: 2022-01-09T09:29:47.980Z
Deploying tribute-contracts to rinkeby network
Creating new DaoArtifacts contract
DaoArtifacts: 0x898ce5557AB7a1811eaB70da7B1Eb4F47cEa8Bf1

    Deploying 'DaoRegistry'
    ---------------------------
    > transaction hash:    0xd0279cf85794f5b481a74b8647381bdb118c8143558e9f71371bc49c1ca5a0a
    > contract address:    0x26F53353E1FD3Bc6A6f35ac67C059F3e831e1261
    > block number:        9960527
    > account:             0x41e923B875aF2Cc72772747E9ef2ed55c8df9D42
    > gas price:           4000000000
    > value sent:          0 ETH
    > gas used:            5050648


    Deploying 'DaoFactory'
    ---------------------------
    > transaction hash:    0x72226735c2957f3a764f9c11734ccb7fb11e1234213d10219d1aa57ffb76f8
    > contract address:    0xe1A3f648c35774c603b8ea5932F3A5Bfc5Cfa933
    > block number:        9960528
    > account:             0x41e923B875aF2Cc72772747E9ef2ed55c8df9D42
    > gas price:           4000000000
    > value sent:          0 ETH
    > gas used:            3811033

DaoFactory:1:1.0.0:0xe1A3f648c35774c603b8ea5932F3A5Bfc5Cfa933 added to DaoArtifacts
deploying or reusing 3 factories...

    Deploying 'BankExtension'
    ---------------------------
    > transaction hash:    0x091fc2ac1dacfcb06caf04d6da47162447cc830fef599e5dccd76aaf225017
    > contract address:    0x3a43aD3BbbB6Ab640eB62B4BE8E1DD5D76432352
    > block number:        9960530
    > account:             0x41e923B875aF2Cc72772747E9ef2ed55c8df9D42
    > gas price:           4000000000
    > value sent:          0 ETH
    > gas used:            2797366
```

```
      Deploying 'BankFactory'
      -------------------------
      > transaction hash:     0xb05aa54f72efdd73e056308fa5b9c4d7824518c8863d3ffbe295c302c73e80
      > contract address:     0xb649CC4426FE89dB904c8Af4e6686c01a9BC9ABd
      > block number:         9960531
      > account:              0x41e923B875aF2Cc72772747E9ef2ed55c8df9D42
      > gas price:            4000000000
      > value sent:           0 ETH
      > gas used:             428247

BankFactory:1:1.0.0:0xb649CC4426FE89dB904c8Af4e6686c01a9BC9ABd added to DaoArtifacts

      Deploying 'ERC20Extension'
      -------------------------
      > transaction hash:     0x1e7b89f8e2f656b99af312497719b9596da950fd4339d85bc5a2cda33af3ef
      > contract address:     0x2112e2c17405CE62D9DE51F86bB84EEdFe9890c6
      > block number:         9960533
      > account:              0x41e923B875aF2Cc72772747E9ef2ed55c8df9D42
      > gas price:            4000000000
      > value sent:           0 ETH
      > gas used:             2346477


      Deploying 'ERC20TokenExtensionFactory'
      -------------------------
      > transaction hash:     0x87f0d2b32ce63ff2606a7d59f2cda05edb2432dcce8911c940c3236df8bc98
      > contract address:     0xD4e68Ac0a2485f5f83F7Bb470d3865897613425E
      > block number:         9960534
      > account:              0x41e923B875aF2Cc72772747E9ef2ed55c8df9D42
      > gas price:            4000000000
      > value sent:           0 ETH
      > gas used:             556033

ERC20TokenExtensionFactory:1:1.0.0:0xD4e68Ac0a2485f5f83F7Bb470d3865897613425E added to DaoArt

      Deploying 'BondingCurve'
      -------------------------
      > transaction hash:     0x1d54a3284756b9030aaa3431dbb24c26eacb80d1ba03193eb3b0e7c5bdda59
      > contract address:     0xE35e723Adb7be08B585E6a4b50B4598FBEa4483c
      > block number:         9960536
      > account:              0x41e923B875aF2Cc72772747E9ef2ed55c8df9D42
      > gas price:            4000000000
      > value sent:           0 ETH
      > gas used:             5317052


      Deploying 'BondingCurveFactory'
      -------------------------
      > transaction hash:     0x204d3dc0495cf725b79e85c9cb33f55f84d4d734d98e1fd3f75c7d9d434b1d
      > contract address:     0xecd8C96b1093f7C023BE78FE83B21bDB41F307B8
      > block number:         9960537
```

```
        > account:              0x41e923B875aF2Cc72772747E9ef2ed55c8df9D42
        > gas price:            4000000000
        > value sent:           0 ETH
        > gas used:             416491


BondingCurveFactory:1:1.0.0:0xecd8C96b1093f7C023BE78FE83B21bDB41F307B8 added to DaoArtifacts
create extensions ...
create extension bankExtFactory
create extension erc20ExtFactory
create extension bondingCurveFactory
deploying or re-using 21 adapters...

        Deploying 'BancorFormula'
        -------------------------
        > transaction hash:     0xd7cead08c2434104040d7aeb5c98f8b19b783d705fcea9152aa565eb1530e9
        > contract address:     0xb022a49b0DED2873eBc5A17e526806B74F011712
        > block number:         9960545
        > account:              0x41e923B875aF2Cc72772747E9ef2ed55c8df9D42
        > gas price:            4000000000
        > value sent:           0 ETH
        > gas used:             3064070


BancorFormula:3:1.0.0:0xb022a49b0DED2873eBc5A17e526806B74F011712 added to DaoArtifacts

        Deploying 'DaoRegistryAdapterContract'
        --------------------------
        > transaction hash:     0xf69e3310b9b4d3da3277c1dc4388d6bfdf92a23704b3c8caf4a9643ed9fbc7
        > contract address:     0xCb7F77982b858067d276Ea51c1f5432C2F6Eb87A
        > block number:         9960546
        > account:              0x41e923B875aF2Cc72772747E9ef2ed55c8df9D42
        > gas price:            4000000000
        > value sent:           0 ETH
        > gas used:             605137


DaoRegistryAdapterContract:3:1.0.0:0xCb7F77982b858067d276Ea51c1f5432C2F6Eb87A added to DaoArt

        Deploying 'BankAdapterContract'
        --------------------------
        > transaction hash:     0x12e38622df252fc3fadbbbd064b886e6468d12317d51af9b44cdacf309ee21
        > contract address:     0x0D4a16d8aB8fa3E4124558344b901977Af26C0aF
        > block number:         9960547
        > account:              0x41e923B875aF2Cc72772747E9ef2ed55c8df9D42
        > gas price:            4000000000
        > value sent:           0 ETH
        > gas used:             687809


BankAdapterContract:3:1.0.0:0x0D4a16d8aB8fa3E4124558344b901977Af26C0aF added to DaoArtifacts

        Deploying 'ConfigurationContract'
        --------------------------
        > transaction hash:     0xf1da26005d7a35ae7a94e17f48c7003a26ce439d2817d9eb13c856985f3708
        > contract address:     0x2d9E449adc41D1a593d8e085dcfEDF8c5fbdD2Ec
        > block number:         9960548
```

```
    > account:          0x41e923B875aF2Cc72772747E9ef2ed55c8df9D42
    > gas price:        4000000000
    > value sent:       0 ETH
    > gas used:         1245918


ConfigurationContract:3:1.0.0:0x2d9E449adc41D1a593d8e085dcfEDF8c5fbdD2Ec added to DaoArtifacts

      Deploying 'ERC1155AdapterContract'
      --------------------------
    > transaction hash:  0x1c1a6773e8f8dae8a3d0d0eb23a2d413798e141b2a9916a7a5351c7860db33l
    > contract address:  0x10A818E3934e2962FA72374Bf04E6b1bf7cEbc48
    > block number:      9960549
    > account:           0x41e923B875aF2Cc72772747E9ef2ed55c8df9D42
    > gas price:         4000000000
    > value sent:        0 ETH
    > gas used:          471896


ERC1155AdapterContract:3:1.0.0:0x10A818E3934e2962FA72374Bf04E6b1bf7cEbc48 added to DaoArtifac

      Deploying 'ManagingContract'
      --------------------------
    > transaction hash:  0xacf184aa88cf4a6b114792ed2c6b2b887053447de7de4b40bd6a98978aff24:
    > contract address:  0xE5A1047d6dbD416F96B10A8135458979e2B8a970
    > block number:      9960550
    > account:           0x41e923B875aF2Cc72772747E9ef2ed55c8df9D42
    > gas price:         4000000000
    > value sent:        0 ETH
    > gas used:          1856884


ManagingContract:3:1.0.0:0xE5A1047d6dbD416F96B10A8135458979e2B8a970 added to DaoArtifacts

      Deploying 'SignaturesContract'
      --------------------------
    > transaction hash:  0xaa08a8b396efc55e3c98945e7885c8a8fb5ac674bc8406d6ee977478d4c8f7!
    > contract address:  0x672c0F57DFc36cF08c7CB0E2ef10c064344C4EBE
    > block number:      9960551
    > account:           0x41e923B875aF2Cc72772747E9ef2ed55c8df9D42
    > gas price:         4000000000
    > value sent:        0 ETH
    > gas used:          1167226


SignaturesContract:3:1.0.0:0x672c0F57DFc36cF08c7CB0E2ef10c064344C4EBE added to DaoArtifacts

      Deploying 'VotingContract'
      --------------------------
    > transaction hash:  0x8da7b08d2f196c6ffe6a20d40ef058eb90d871e5ccf68b979208f8f59c3e31:
    > contract address:  0x1E7027D07391c5e144E5FC883Eb6f70bbDDB67ef
    > block number:      9960552
    > account:           0x41e923B875aF2Cc72772747E9ef2ed55c8df9D42
    > gas price:         4000000000
    > value sent:        0 ETH
    > gas used:          1579087
```

VotingContract:3:1.0.0:0x1E7027D07391c5e144E5FC883Eb6f70bbDDB67ef added to DaoArtifacts

```
       Deploying 'RagequitContract'
       --------------------------
   > transaction hash:    0x98a74e486460a50c88976811e8fff5d2c6afa46ce999355659f3267d7b8e40ϟ
   > contract address:    0xCD2FE2bE07d748bcbD401b053C1408714749d177
   > block number:        9960553
   > account:             0x41e923B875aF2Cc72772747E9ef2ed55c8df9D42
   > gas price:           4000000000
   > value sent:          0 ETH
   > gas used:            1095244
```

RagequitContract:3:1.0.0:0xCD2FE2bE07d748bcbD401b053C1408714749d177 added to DaoArtifacts

```
       Deploying 'GuildKickContract'
       --------------------------
   > transaction hash:    0xd3ce06cfa40dac4adb9648d185cf8e05e8c8d1faeca1e0da5a3a95cacf9be3ϟ
   > contract address:    0x5e3151722939efe3BED996D6736Cc7C7ddEE5B79
   > block number:        9960554
   > account:             0x41e923B875aF2Cc72772747E9ef2ed55c8df9D42
   > gas price:           4000000000
   > value sent:          0 ETH
   > gas used:            2213347
```

GuildKickContract:3:1.0.0:0x5e3151722939efe3BED996D6736Cc7C7ddEE5B79 added to DaoArtifacts

```
       Deploying 'DistributeContract'
       --------------------------
   > transaction hash:    0x9f629ad7a487f88e92d5e618b154dfc69ac866b211a0d5db5f8a2b8c178863ϟ
   > contract address:    0x93a39839F3969619D04C7017a20539936Ded3D75
   > block number:        9960555
   > account:             0x41e923B875aF2Cc72772747E9ef2ed55c8df9D42
   > gas price:           4000000000
   > value sent:          0 ETH
   > gas used:            2268077
```

DistributeContract:3:1.0.0:0x93a39839F3969619D04C7017a20539936Ded3D75 added to DaoArtifacts

```
       Deploying 'FinancingContract'
       --------------------------
   > transaction hash:    0x5299fee99589f2d534f5988db7c8db96e562e123b4c33ade43a73f6410a086ϟ
   > contract address:    0x1957f9414809123E7319165DDdE033F8600ba107
   > block number:        9960556
   > account:             0x41e923B875aF2Cc72772747E9ef2ed55c8df9D42
   > gas price:           4000000000
   > value sent:          0 ETH
   > gas used:            1317697
```

FinancingContract:3:1.0.0:0x1957f9414809123E7319165DDdE033F8600ba107 added to DaoArtifacts

```
       Deploying 'OnboardingContract'
       --------------------------
   > transaction hash:    0x21d0725f15354189ba42ded3bb4d81a46ec555db92fea357151a0724680bb8ϟ
   > contract address:    0x2C94fbe3b6dc412847EFc856e372e8aA8255fD3f
```

```
        > block number:        9960557
        > account:             0x41e923B875aF2Cc72772747E9ef2ed55c8df9D42
        > gas price:           4000000000
        > value sent:          0 ETH
        > gas used:            2780996


OnboardingContract:3:1.0.0:0x2C94fbe3b6dc412847EFc856e372e8aA8255fD3f added to DaoArtifacts

        Deploying 'CouponOnboardingContract'
        --------------------------
        > transaction hash:    0xf618d837a38631413a20eea81a2f1de247154898ccd913fcacd21c961284f1(
        > contract address:    0x3723854156CD6B7c368D332b2628943f0Ef3b2F5
        > block number:        9960558
        > account:             0x41e923B875aF2Cc72772747E9ef2ed55c8df9D42
        > gas price:           4000000000
        > value sent:          0 ETH
        > gas used:            1711802


CouponOnboardingContract:3:1.0.0:0x3723854156CD6B7c368D332b2628943f0Ef3b2F5 added to DaoArtif:

        Deploying 'TributeContract'
        --------------------------
        > transaction hash:    0xe0935f21979282ea1e3b4087d760505e197bc436982fde194d335e035d892b(
        > contract address:    0x2Bc7d436dc4E00344F995f5Bc98A510247094E17
        > block number:        9960559
        > account:             0x41e923B875aF2Cc72772747E9ef2ed55c8df9D42
        > gas price:           4000000000
        > value sent:          0 ETH
        > gas used:            2089066


TributeContract:3:1.0.0:0x2Bc7d436dc4E00344F995f5Bc98A510247094E17 added to DaoArtifacts

        Deploying 'UnagiiVaultDepositAdapter'
        --------------------------
        > transaction hash:    0x2289f62ae7592b6a1edba5df9b81bceaa67cdd64aba9b417e1924f6361900c:
        > contract address:    0x4DD9E1176DB8c3892bB6Aed177fFe2B6d5F7a46d
        > block number:        9960560
        > account:             0x41e923B875aF2Cc72772747E9ef2ed55c8df9D42
        > gas price:           4000000000
        > value sent:          0 ETH
        > gas used:            1859164


UnagiiVaultDepositAdapter:3:1.0.0:0x4DD9E1176DB8c3892bB6Aed177fFe2B6d5F7a46d added to DaoArti:

        Deploying 'UnagiiVaultWithdrawAdapter'
        --------------------------
        > transaction hash:    0x3ffafc80b41b1637e81df198b2054dbd2115679bc0944fa7bc3b126fa1426c(
        > contract address:    0x0EAA7142E881583B1f359035b6821DDe79cddceE
        > block number:        9960561
        > account:             0x41e923B875aF2Cc72772747E9ef2ed55c8df9D42
        > gas price:           4000000000
        > value sent:          0 ETH
        > gas used:            1610969
```

```
UnagiiVaultWithdrawAdapter:3:1.0.0:0x0EAA7142E881583B1f359035b6821DDe79cddceE added to DaoArt

        Deploying 'MovementAdapter'
        --------------------------
        > transaction hash:      0x3ce7587b92ee42000f33fe9756655c6480add2eb9e80ceac3fba90d5761497
        > contract address:      0x91Ac1ebabE3c79d2e300d03a219913e4e1896A42
        > block number:          9960562
        > account:               0x41e923B875aF2Cc72772747E9ef2ed55c8df9D42
        > gas price:             4000000000
        > value sent:            0 ETH
        > gas used:              1957158

MovementAdapter:3:1.0.0:0x91Ac1ebabE3c79d2e300d03a219913e4e1896A42 added to DaoArtifacts

        Deploying 'IntiativeAdapter'
        --------------------------
        > transaction hash:      0x092f639a7bc0b05ac2f12bdad3b310d578465678ba3390679408e485549e8d
        > contract address:      0x3F2546d8Cd1F9e79b75bd4Cb07b44F95d9B2b10F
        > block number:          9960563
        > account:               0x41e923B875aF2Cc72772747E9ef2ed55c8df9D42
        > gas price:             4000000000
        > value sent:            0 ETH
        > gas used:              1586966

IntiativeAdapter:3:1.0.0:0x3F2546d8Cd1F9e79b75bd4Cb07b44F95d9B2b10F added to DaoArtifacts

        Deploying 'VetoerAdapter'
        --------------------------
        > transaction hash:      0x659b2b98bbaac0ff699f4fbe2a94b7cc5e7185a932c7417d796e2c8209387b
        > contract address:      0x5D83308F792ac190Bd89B26C80D50cF62880e65B
        > block number:          9960564
        > account:               0x41e923B875aF2Cc72772747E9ef2ed55c8df9D42
        > gas price:             4000000000
        > value sent:            0 ETH
        > gas used:              1185306

VetoerAdapter:3:1.0.0:0x5D83308F792ac190Bd89B26C80D50cF62880e65B added to DaoArtifacts

        Deploying 'ServiceProviderAdapter'
        --------------------------
        > transaction hash:      0xba6170e0d6d24ab56cebeb4cc9cb8c45dc76c9262f45ccf908f4f32c93b688
        > contract address:      0x8FC1B73af46E3808f5625BE3Ae2159Ca9C265C76
        > block number:          9960565
        > account:               0x41e923B875aF2Cc72772747E9ef2ed55c8df9D42
        > gas price:             4000000000
        > value sent:            0 ETH
        > gas used:              1185306


ServiceProviderAdapter:3:1.0.0:0x8FC1B73af46E3808f5625BE3Ae2159Ca9C265C76 added to DaoArtifact
configure new dao ...
configure adapters ...
configure adapters with access
```

```
configureAdaptersWithDAOAccess =  185
configure adapters ...
adapterList =  187
configure extension access for bankExt
configureExtensionAccess =  187
adapterList =  188
configure extension access for erc20Ext
configure extension access for bondingCurve
adapterList =  189
configure extensions ...
configure extension access for bankExt
configureExtensionAccess =  189
configure extension access for erc20Ext
configure extension access for bondingCurve
adapterList =  192

      Deploying 'SnapshotProposalContract'
      ---------------------------
      > transaction hash:    0x29eb37a1b4418802aaecad38bc2d013f869e22bfd1173ab29ca8223e18367f(
      > contract address:    0xea2c8F3BF8e62dB90460Eb2A5d6d9202f210755f
      > block number:        9960573
      > account:             0x41e923B875aF2Cc72772747E9ef2ed55c8df9D42
      > gas price:           4000000000
      > value sent:          0 ETH
      > gas used:            994492

SnapshotProposalContract:4:1.0.0:0xea2c8F3BF8e62dB90460Eb2A5d6d9202f210755f added to DaoArtifa
adapterList =  196

      Deploying 'OffchainVotingHashContract'
      ---------------------------
      > transaction hash:    0xc498f742328458019d549df97092e5babd117d520111190d4dcc07e0f88cfb(
      > contract address:    0xd14a71e990074c996039c5EB84bCa575e92Ee730
      > block number:        9960574
      > account:             0x41e923B875aF2Cc72772747E9ef2ed55c8df9D42
      > gas price:           4000000000
      > value sent:          0 ETH
      > gas used:            1461699

OffchainVotingHashContract:3:1.0.0:0xd14a71e990074c996039c5EB84bCa575e92Ee730 added to DaoArt
      Deploying 'KickBadReporterAdapter'
      ---------------------------
      > transaction hash:    0x884c77127f9115b2d87984b9d4063bc2a9c9c17a257fcb4201b6e9591f8deb
      > contract address:    0x47Ff53274058B3Fb0B83208eBA2E026a79e5e4aF
      > block number:        9960575
      > account:             0x41e923B875aF2Cc72772747E9ef2ed55c8df9D42
      > gas price:           4000000000
      > value sent:          0 ETH
      > gas used:            1515161

KickBadReporterAdapter:3:1.0.0:0x47Ff53274058B3Fb0B83208eBA2E026a79e5e4aF added to DaoArtifac
198
```

```
adapterList =  201

     Deploying 'OffchainVotingContract'
     --------------------------
     > transaction hash:    0x6e828493bb145345f2c94d67bb3609434818271d8c3bf689714f096f516641
     > contract address:    0xb36d528a154E6ACA1e858Ba58E83587Ad2046618
     > block number:        9960576
     > account:             0x41e923B875aF2Cc72772747E9ef2ed55c8df9D42
     > gas price:           4000000000
     > value sent:          0 ETH
     > gas used:            4988039

OffchainVotingContract:3:1.0.0:0xb36d528a154E6ACA1e858Ba58E83587Ad2046618 added to DaoArtifac
201
203
205

     Deploying 'Multicall'
     --------------------------
     > transaction hash:    0x2ce94b5a338ad6c5f31487d1baf90f29114e3583524909fafc43fa236c5ca8
     > contract address:    0x7a05E2faFAcA0edfc5F064f46584Cd323b532Cd0
     > block number:        9960580
     > account:             0x41e923B875aF2Cc72772747E9ef2ed55c8df9D42
     > gas price:           4000000000
     > value sent:          0 ETH
     > gas used:            342106

Multicall:4:1.0.0:0x7a05E2faFAcA0edfc5F064f46584Cd323b532Cd0 added to DaoArtifacts
*************************************************
DaoOwner: 0x41e923B875aF2Cc72772747E9ef2ed55c8df9D42
DaoRegistry: 0xb91ae63fB6FCe14D2d88FA8Cc05B115D96e2bfE1
BankFactory: 0xb649CC4426FE89dB904c8Af4e6686c01a9BC9ABd
ERC20TokenExtensionFactory: 0xD4e68Ac0a2485f5f83F7Bb470d3865897613425E
BondingCurveFactory: 0xecd8C96b1093f7C023BE78FE83B21bDB41F307B8
DaoFactory: 0xe1A3f648c35774c603b8ea5932F3A5Bfc5Cfa933
BankExtension: 0x16fF90f4F3cB39907E059feb2D18B7679c6bb115
ERC20Extension: 0xf34C03BE5Ca171D4C58F3c00775d50f7983b17dE
BondingCurve: 0x9aA9FE11847B25edB555EF715ab904A05D69782a
BancorFormula: 0xb022a49b0DED2873eBc5A17e526806B74F011712
DaoRegistryAdapterContract: 0xCb7F77982b858067d276Ea51c1f5432C2F6Eb87A
BankAdapterContract: 0x0D4a16d8aB8fa3E4124558344b901977Af26C0aF
ConfigurationContract: 0x2d9E449adc41D1a593d8e085dcfEDF8c5fbdD2Ec
ERC1155AdapterContract: 0x10A818E3934e2962FA72374BF04E6b1bf7cEbc48
ManagingContract: 0xE5A1047d6dbD416F96B10A8135458979e2B8a970
SignaturesContract: 0x672c0F57DFc36cF08c7CB0E2ef10c064344C4EBE
OffchainVotingContract: 0xb36d528a154E6ACA1e858Ba58E83587Ad2046618
RagequitContract: 0xCD2FE2bE07d748bcbD401b053C1408714749d177
GuildKickContract: 0x5e3151722939efe3BED996D6736Cc7C7ddEE5B79
DistributeContract: 0x93a39839F3969619D04C7017a20539936Ded3D75
FinancingContract: 0x1957f9414809123E7319165DDdE033F8600ba107
OnboardingContract: 0x2C94fbe3b6dc412847EFc856e372e8aA8255fD3f
CouponOnboardingContract: 0x3723854156CD6B7c368D332b2628943f0Ef3b2F5
TributeContract: 0x2Bc7d436dc4E00344F995f5Bc98A510247094E17
```

```
UnagiiVaultDepositAdapter: 0x4DD9E1176DB8c3892bB6Aed177fEe2B6d5E7a46d
UnagiiVaultWithdrawAdapter: 0x0EAA7142E881583B1f359035b6821DDe79cddceE
MovementAdapter: 0x91Ac1ebabE3c79d2e300d03a219913e4e1896A42
IntiativeAdapter: 0x3F2546d8Cd1F9e79b75bd4Cb07b44F95d9B2b10F
VetoerAdapter: 0x5D83308F792ac190Bd89B26C80D50cF62880e65B
ServiceProviderAdapter: 0x8FC1B73af46E3808f5625BE3Ae2159Ca9C265C76
Multicall: 0x7a05E2faFAcA0edfc5F064f46584Cd323b532Cd0
************************************************

Deployed contracts: /Users/tankbottoms/Developer/tankbottoms-github/ted-monorepo/packages/con

Deployment completed at: 2022-01-09T09:43:41.383Z
```

| Contract Name | Size (KB) |
|---|---|
| Address | 0.086 |
| AddressUpgradeable | 0.086 |
| Arrays | 0.086 |
| BancorFormula | 3.858 |
| BankAdapterContract | 2.948 |
| BankExtension | 12.719 |
| BankFactory | 1.630 |
| BatchVotingContract | 11.841 |
| BondingCurve | 24.048 |
| BondingCurveFactory | 1.466 |
| BondingCurveToken | 1.449 |
| BondingCurveVault | 3.207 |
| CloneFactory | 0.063 |
| ConfigurationContract | 5.548 |
| Counters | 0.086 |
| CouponOnboardingContract | 7.588 |
| DaoArtifacts | 2.397 |
| DaoFactory | 17.329 |
| DaoHelper | 0.086 |
| DaoRegistry | 23.162 |
| DaoRegistryAdapterContract | 2.567 |
| DistributeContract | 10.293 |
| ECDSA | 0.086 |
| Endowment | 9.816 |

```
| EnumerableSet                  · 0.086  |
| ERC1155                        · 5.505  |
| ERC1155AdapterContract         · 1.944  |
| ERC1155TestToken               · 9.512  |
| ERC1155TokenExtension          · 7.940  |
| ERC1155TokenExtensionFactory   · 1.192  |
| ERC1271Extension               · 2.920  |
| ERC1271ExtensionFactory        · 1.192  |
| ERC20                          · 2.438  |
| ERC20Extension                 · 10.629 |
| ERC20MinterContract            · 2.373  |
| ERC20TokenExtensionFactory     · 2.227  |
| ERC721                         · 5.168  |
| ExecutorExtension              · 2.453  |
| ExecutorExtensionFactory       · 1.192  |
| FairShareHelper                · 0.086  |
| FinancingContract              · 5.885  |
| GuildKickContract              · 10.036 |
| GuildKickHelper                · 0.086  |
| IntiativeAdapter               · 7.132  |
| KickBadReporterAdapter         · 6.793  |
| ManagingContract               · 8.386  |
| MerkleProof                    · 0.086  |
| Migrations                     · 0.293  |
| MovementAdapter                · 8.846  |
| Multicall                      · 1.338  |
| NFTAdapterContract             · 2.715  |
```

| | | |
|---|---|---|
| NFTCollectionFactory | · | 1.192 |
| NFTExtension | · | 6.043 |
| OffchainVotingContract | · | 22.309 |
| OffchainVotingHashContract | · | 6.418 |
| OLToken | · | 2.438 |
| OnboardingContract | · | 12.676 |
| PixelNFT | · | 6.470 |
| Power | · | 0.441 |
| ProxTokenContract | · | 2.798 |
| RagequitContract | · | 4.842 |
| SafeERC20 | · | 0.086 |
| SafeMath | · | 0.086 |
| ServiceProviderAdapter | · | 5.270 |
| SignatureChecker | · | 0.086 |
| SignaturesContract | · | 5.184 |
| SnapshotProposalContract | · | 4.250 |
| Strings | · | 0.086 |
| SushiswapAddPoolAdapter | · | 7.654 |
| SushiswapSubPoolAdapter | · | 8.468 |
| TestFairShareCalc | · | 0.568 |
| TestToken1 | · | 2.438 |
| TestToken2 | · | 2.438 |
| TributeContract | · | 9.465 |
| TributeNFTContract | · | 10.776 |
| UnagiiVaultDepositAdapter | · | 8.399 |
| UnagiiVaultWithdrawAdapter | · | 7.252 |

```
.....................................|.............
|  UniswapAddPoolAdapter            ·       7.654  |
.....................................|.............
|  UniswapSubPoolAdapter            ·       8.468  |
.....................................|.............
|  UniswapV3AddPoolAdapter          ·       6.686  |
.....................................|.............
|  UniswapV3SubPoolAdapter          ·       6.331  |
.....................................|.............
|  VetoerAdapter                    ·       5.270  |
.....................................|.............
|  VotingContract                   ·       7.080  |
.--------------------------------------|--------------.
```

Selected Network: rinkeby
Contract: DaoFactory@0xe1A3f648c35774c603b8ea5932F3A5Bfc5Cfa933
Contract: DaoRegistry@0xb91ae63fB6FCe14D2d88FA8Cc05B115D96e2bfE1
Contract: BankFactory@0xb649CC4426FE89dB904c8Af4e6686c01a9BC9ABd
Contract: ERC20TokenExtensionFactory@0xD4e68Ac0a2485f5f83F7Bb470d3865897613425E
Contract: BondingCurveFactory@0xecd8C96b1093f7C023BE78FE83B21bDB41F307B8
Contract: BankExtension@0x16fF90f4F3cB39907E059feb2D18B7679c6bb115
Contract: ERC20Extension@0xf34C03BE5Ca171D4C58F3c00775d50f7983b17dE
Contract: BondingCurve@0x9aA9FE11847B25edB555EF715ab904A05D69782a
Contract: BancorFormula@0xb022a49b0DED2873eBc5A17e526806B74F011712
Contract: DaoRegistryAdapterContract@0xCb7F77982b858067d276Ea51c1f5432C2F6Eb87A
Contract: BankAdapterContract@0x0D4a16d8aB8fa3E4124558344b901977Af26C0aF
Contract: ConfigurationContract@0x2d9E449adc41D1a593d8e085dcfEDF8c5fbdD2Ec
Contract: ERC1155AdapterContract@0x10A818E3934e2962FA72374Bf04E6b1bf7cEbc48
Contract: ManagingContract@0xE5A1047d6dbD416F96B10A8135458979e2B8a970
Contract: SignaturesContract@0x672c0F57DFc36cF08c7CB0E2ef10c064344C4EBE
Contract: VotingContract@0xb36d528a154E6ACA1e858Ba58E83587Ad2046618
Contract: OffchainVotingContract@0xb36d528a154E6ACA1e858Ba58E83587Ad2046618
Contract: RagequitContract@0xCD2FE2bE07d748bcbD401b053C1408714749d177
Contract: GuildKickContract@0x5e3151722939efe3BED996D6736Cc7C7ddEE5B79
Contract: DistributeContract@0x93a39839F3969619D04C7017a20539936Ded3D75
Contract: FinancingContract@0x1957f9414809123E7319165DDdE033F8600ba107
Contract: OnboardingContract@0x2C94fbe3b6dc412847EFc856e372e8aA8255fD3f
Contract: CouponOnboardingContract@0x3723854156CD6B7c368D332b2628943f0Ef3b2F5
Contract: TributeContract@0x2Bc7d436dc4E00344F995f5Bc98A510247094E17
Contract: UnagiiVaultDepositAdapter@0x4DD9E1176DB8c3892bB6Aed177fFe2B6d5F7a46d
Contract: UnagiiVaultWithdrawAdapter@0x0EAA7142E881583B1f359035b6821DDe79cddceE
Contract: MovementAdapter@0x91Ac1ebabE3c79d2e300d03a219913e4e1896A42
Contract: IntiativeAdapter@0x3F2546d8Cd1F9e79b75bd4Cb07b44F95d9B2b10F

Contract: VetoerAdapter@0x5D83308F792ac190Bd89B26C80D50cF62880e65B
Contract: ServiceProviderAdapter@0x8FC1B73af46E3808f5625BE3Ae2159Ca9C265C76
Contract: DaoArtifacts@0x898ce5557AB7a1811eaB70da7B1Eb4F47cEa8Bf1
Verification process completed with success
```

# Security

How has the DAO ensured its smart contracts are secure?

---

⚠ Movement DAO is new technology, and no amount of testing or security audits completely eliminate risks. Please don't supply assets you can't afford to lose.

TLDR, at launch we are employing a Gnosis Multi-signature Safe to manage the DAO funds, Community Discord to coordinate discussions, and Snapshot, after the token distribution, for voting until the OpenLaw Tribute audit is complete.

---

**Slow Start**

Until Movement DAO is able to operate with confidence for some time, the following safe guards were put into place until the community deems them unnecessary. The safe guards are encoded into the adapters and extension smart contracts.

1. Financial transactions are handled after any votes by a IRL law firm acting as a service provider.
2. DAO founders may elect to operate with a Vetoer role which may veto any pending proposal.
3. A number of Movement DAO's Gnosis Safe signers are publicly known individuals.

**Vetoer**

Until Movement DAO is able to operate with confidence for some time, the following safe guards were put into place until the community deems them unnecessary. The safe guards are encoded into the adapters and extension smart contracts.

1. Financial transactions are handled after any votes by a IRL law firm acting as a service provider.
2. DAO founders may elect to operate with a Vetoer role which may veto any pending proposal.
3. A number of Movement DAO's Gnosis Safe signers are publicly known individuals.

## Smart Contract Audit

**Auditors**

Mr. T. N. or @t4sk is currently reviewing the existing repository and contracts and providing the development team with a recommendations report. This work is specifically targeted at the adapters and extensions as they relate to the Unagi Vault, Sushi and UniSwap liquidity deployments and the bonding curve contracts.

Also underway `OpenLaw` themselves have engaged SigmaPrime to audit the Tribute contracts. We have contacted SigmaPrime and notified them of our intent to hire them to do the formal audit when we are feature complete. They asked that we do not use their name on our materials until we have signed an agreement with them. We have set aside a budget to bill against when we are closer to feature complete.

**Scope**

Movement DAO's core premise is to enabling a community by seeding it with multiple-millions of Ethereum to create any Movement and Actions they deem worthwhile, entrusting the collective wisdom of the community and their appointed leaders to accomplish that which has remained generally opaque to the individual - charity organizations as they operate today.

Movement DAO's core is a collection of smart contracts which govern managing a pool of assets on behalf of Movement and its sub-movements, the Endowment bank. Given each Movement has its own property and funds which are managed by Movement, and adapters and extensions which govern how the funds are collected, distributed, and managed are all areas which require extensive design, analysis, and audit before it is employed on Ethereum Mainnet.

**Unagii Vaults**

## Vault Security

The security of Unagii Vaults is of utmost important to us. We make considerable efforts in ensuring that Unagii Vaults is deployed with best practices and risk mitigations in mind.

## Security Audits

All Unagii smart contracts are rigorously reviewed by top external security firms to identify and eliminate any security vulnerabilities. Unagii Vaults has been specifically been audited by CertiK.

Certik Audit - December 2020

This is a joint report of the two audit rounds conducted on the Unagii Vaults implementation by the Unagii team from Stakewith.us, focusing on the implementation itself and the new investment strategies introduced by the team that add support for a wider gamma of stablecoins including PAX, Binance USD (BUSD) and Gemini (GUSD) respectively.

**Certik Audit - February 2021**\*\*\*\*

This is the third audit conducted on the Unagii Vaults implementation codebase by the Unagii team from Stakewith.us, refactored to support Wrapped Bitcoin (WBTC), Ether (ETH), and the introduction of a set of new strategies handling accrued reward tokens from strategy deposits.

**Certik Audit - May 2021**\*\*\*\*

This is the fourth audit conducted on the Unagii Vaults implementation codebase by the Unagii team from Stakewith.us, with a new v3 approach to the Vaults, and introducing a set of new leveraged based strategies specifically for Compound Finance.

**Certik Audit - July 2021**\*\*\*\*

This is the fifth audit conducted on the Unagii Vaults implementation codebase by the Unagii team from Stakewith.us, adding on new security features to the Vaults, and introducing a set of new strategies specifically for Convex Finance.

Source Unagii Vaults.

# Bounty

Inspired by Gitcoin Movement DAO will pay a bounty for all improvements implemented by the community. Movement DAO will be announcing bounties for security related issues after deployment of *testnet* and *mainnet* contracts. Details to be forthcoming.

**Movement DAO's bug bounties will be enabled after the feature complete milestone has been reached and funds are deposited into the DAO bank.**

# Thank You's!

Standing on the shoulders of giants.

The Movement DAO team was able to leverage thousands of hours of work completed by pioneers in the Open Source community, some of which we would like to thank here. In addition to forking existing repositories each of the development teams below shared many hours with us in helping us shape our initial vision.

We thank you here, and have earmarked tokens for these teams, as a small token of (see what I did here?) appreciation. You guys rock!

JuiceBox Protocol

OpenLaw Tribute

Unagi Vaults

Olympus DAO

Fractionalize Art

Smart Contract Programmer

Learning

# Security

What security precautions did Unagii Vault take, of which Movement DAO relies?

## Vault Security

The security of Unagii Vaults is of utmost important to us. We make considerable efforts in ensuring that Unagii Vaults is deployed with best practices and risk mitigations in mind.

## Security Audits

All Unagii smart contracts are rigorously reviewed by top external security firms to identify and eliminate any security vulnerabilities. Unagii Vaults has been specifically been audited by CertiK.

Certik Audit - December 2020

This is a joint report of the two audit rounds conducted on the Unagii Vaults implementation by the Unagii team from Stakewith.us, focusing on the implementation itself and the new investment strategies introduced by the team that add support for a wider gamma of stablecoins including PAX, Binance USD (BUSD) and Gemini (GUSD) respectively.

**Certik Audit - February 2021**This is the third audit conducted on the Unagii Vaults implementation codebase by the Unagii team from Stakewith.us, refactored to support Wrapped Bitcoin (WBTC), Ether (ETH), and the introduction of a set of new strategies handling accrued reward tokens from strategy deposits.

**Certik Audit - May 2021**This is the fourth audit conducted on the Unagii Vaults implementation codebase by the Unagii team from Stakewith.us, with a new v3 approach to the Vaults, and introducing a set of new leveraged based strategies specifically for Compound Finance.

**Certik Audit - July 2021**This is the fifth audit conducted on the Unagii Vaults implementation codebase by the Unagii team from Stakewith.us, adding on new security features to the Vaults, and introducing a set of new strategies specifically for Convex Finance.

# Yield Farming

Learn How the EnDAOment makes money

Yield Farming is a DeFi earning strategy used to optimize the earning potential of blockchain-based assets. Yield farming strategies can consist of:

- Staking
- Lending
- Liquidity pools

## Unagi Vault

Unagii connects to third-party underlying Ethereum DeFi protocols that earn users high-yields on their crypto asset deposits. The Vaults optimizes yield on incentives earned from providing liquidity to AMMs (automated market makers) and lending pools, and automating the harvesting of LP (Liquidity Provisioning) rewards on a bank of whitelisted Strategies. This allows the Vaults to perform efficiently to provide gas cost-savings on Ethereum network gas fees to users and for Unagi to offer one of the lowest fees in the market.

Currently, Unagii Vaults yield on the Compound Finance and Convex Finance (utilizing Curve Finance as the underlying pool) protocol. We will include additional strategies with other protocols in the future.

## Understanding Vaults

Unagii Vaults has two category groups - Stash and Growth, where users can choose to yield and diversify their assets based on their risk appetite. The Unagii smart contract is designed to allow users to deposit and withdraw the same asset freely at any time.

The Vaults pools users' deposits and automatically invests the pooled assets into a Vault's set Strategy. It then auto-harvests liquidity rewards and sells them into the asset with the highest premium, compounding periodically.

 The Vaults product was created to offer high-performing yields in the most efficient and optimized way possible as the DeFi market continues to explode. Unagii is set to serve amidst the rising complexities of yield opportunities so even retail crypto users have a trusted way to participate in DeFi without worrying about contributing time, effort, cost, and the technical knowledge to monitor and implement yield farming strategies themselves.

**Stash Vaults**

Stash Vaults offers users an excellent way to yield on stablecoins such as DAI, USDC and USDT, earning the highest yields on the best performing stable pools in the market.

Risks here have been abstracted down to stablecoin issuer risks, third-party protocol risks i.e. Compound Finance and Curve Finance (plus any associated platforms included in the strategy), and Unagii Vaults protocol risks.

**Growth Vaults**

Growth Vaults is where we offer opportunities for users to go for growth on non-stable crypto assets like ETH and WBTC. These Vaults yield on alpha strategies that come with greater risks but much higher potential returns.

⚠ Please understand the risks involved in depositing funds in smart contracts and read our audit to learn how the Vaults smart contracts are designed to mitigate those risks.

# How to use Vaults?

**Deposits**

Users can easily start earning yield by depositing their crypto assets into the Vaults. Once a user has connected their Ethereum wallet, a deposit takes 3 simple steps:

1. Select asset to deposit
2. Enter amount to deposit
3. Choose gas fee option (*slow, standard, fast*) to approve and confirm deposit (*ETH gas fee payable*)

*No additional steps required to further stake any tokens to boost yields. The Vaults automates the harvesting and selling of liquidity reward tokens earned in strategy, giving users complete convenience and optimized yields.*

**Withdrawals**

When a user decides to remove their assets from the Vaults, a withdrawal takes 3 simple steps:

1. Select asset to withdraw
2. Enter amount to withdraw
3. Choose gas fee option (*slow, standard, fast*) to confirm withdrawal (*ETH gas fee payable*)

Withdrawals can be done anytime. There is no lock in period, but do take note of the ETH gas fee payable relative to the size of your deposits and earnings.

 **Bonus**
In some instances under a Convex or Curve Finance strategy, deposits/withdrawals may receive some bonus that will be reflected in a user's balance. Bonuses occur when depositing/withdrawing assets with a price premium and/or for an asset with the lowest share to help rebalance a strategy's liquidity pool.

 **Slippage**
Deposits/withdrawals from Convex or Curve Finance strategies may be subjected to some slippage that will be reflected in a user's balance. Slippage occurs from any price volatility and from disrupting a strategy's liquidity pool balance with assets that are less valuable (relative to the pool's other assets).

For deposits, it is recommended to leave your funds in the Vaults for a few days to offset any slippage.

## Fees and Gas Cost-Savings

Unagii as a platform has one of the lowest fee model:

| Deposit Fee | Withdrawal Fee | Management Fee | Performance Fee |
| --- | --- | --- | --- |
| None - 0% | None - 0% | None - 0% | 10% (deducted from earnings) |

 Unagii reserves the right to amend the fees at any point of time. Users will be notified of any fee changes at least one month prior to changes taking effect.

*Unlike Unagii, many other aggregators and DeFi robo-advisors often alienate the average retail yield seeker with high fees at every touchpoint, in addition to gas fees users have to incur (which can be an exorbitant amount during peak congestions on the Ethereum network).*

**Gas Fees**

Gas fees are payable by the user and is required for transactions by any DeFi product on the Ethereum network. The speed or amount of Gwei used affects the price of the payable gas fee and how long a transaction will take to confirm.

> **Higher Gwei = Higher ETH payable = Faster transaction speed**

 Users will need to ensure they have sufficient ETH in their wallet to pay for gas fees upon approval of permission for Unagii smart contract use, upon confirmation of a deposit, and on confirmation of a withdrawal.

**Gas Cost-Savings**

Unagii Vaults helps users with gas cost-savings, especially for heavy DeFi yield farmers and new users curious about liquidity mining. Unagii users will save on not needing to make costly daily transactions to stake, claim, and compound their earnings - that's at least 3 transactions saved over 3 days basis.

 Yield farming directly with a DeFi protocol may require users to manually stake their pool tokens received (that represent their share of ownership in the pool) to mine for governance tokens. For some, users acquire pool tokens on one platform, then harvest on another aggregator. They can then sell off the governance tokens, participate in the DAO, or further boost rewards by locking up the asset (e.g. in the case of CRV vote locking with Curve).

Unagii Vaults helps to automate this yield farming process, providing users with convenience and much needed gas cost-savings.

StrategiesUnagii executes curated Strategies by pooling deposits and supplying liquidity for each Stash and Growth vault into the protocols. All strategies are audited before fund deployment.

# Compound Finance

Compound Finance is the very first lending and borrowing protocol that was launched in September 2018, allowing anyone to earn interest on or borrow crypto assets without a peer. Each lending market has a dynamic borrowing interest rate, which varies as market conditions adjust.

**How is yield earned on Unagii?**

1. 1.Users' deposits are pooled in the Vaults
2. 2.In return, users receive uTokens which represent a claim on their share of deposits with any accrued yield earned over time
3. 3.Pooled assets are auto-deposited into the Compound strategy lending markets several times a day
4. 4.Using the deposits as collateral, the same asset is borrowed and lent out several times to lever up on the $COMP emission yields
5. 5.$COMP earned from lending and borrowing will automatically be sold into the native Vault asset once every 3 days

**Stash Vaults**

- **V1 USDC Vault and V2 USDC Vault - Compound Leveraged strategy** $USDC is a stablecoin issued by regulated financial institutions, backed by fully reserved assets, redeemable on a 1:1 basis for US

dollars, and governed by Centre, a membership-based consortium that sets technical, policy and financial standards for stablecoins. The Compound Leveraged strategy lends out $USDC to Compound Finance, and borrows back $USDC at a safe LTV (loan to value) ratio. This is repeated a few times to lever up the $COMP incentives that are emitted when users lend and borrow assets on Compound Finance. The $COMP tokens are automatically harvested and sold back to $USDC to compound yields. Using the same underlying asset for both lending and borrowing removes oracle pricing risks from the strategy.

- **V1 DAI Vault - Compound Leveraged strategy** $DAI is the native stablecoin issued from MakerDao, a decentralized protocol that allows you to mint the $DAI stablecoin using a variety of whitelisted tokens as collateral. The Compound Leveraged strategy lends out $DAI to Compound Finance, and borrows back $DAI at a safe LTV (loan to value) ratio. This is repeated a few times to lever up the $COMP incentives that are emitted when users lend and borrow assets on Compound Finance. The $COMP tokens are automatically harvested and sold back to $DAI to compound yields. Using the same underlying asset for both lending and borrowing removes oracle pricing risks from the strategy.

## Curve Finance

Curve Finance is one of the earliest automated market maker (AMM), a type of decentralized exchange protocol in the market. It was launched in early January 2020.Curve operates as an exchange liquidity pool on Ethereum designed for (1) efficient stablecoin and crypto asset trading with extremely low slippage (2) low risk, supplemental fee income for liquidity providers, without an opportunity cost.

### Enhancing yield with Convex Finance

Convex allows liquidity providers on Curve to earn trading fees and claim boosted $CRV without locking $CRV themselves. Liquidity providers can receive boosted $CRV and liquidity mining rewards with minimal effort.On top of earning $CRV, liquidity providers also receive liquidity mining rewards in the form of $CVX, hence boosting the yield for Unagii users.

### How is yield earned on Unagii?

1. 1.Users' deposits are pooled in the Vaults
2. 2.In return, users receive uTokens which represent a claim on their share of deposits with any accrued yield earned over time
3. 3.Pooled assets are auto-deposited into the Curve strategy liquidity pool several times a day
4. 4.LP (liquidity provider) tokens are received in return and auto-staked into the Convex staking pool (or Curve staking pool for V1 vaults)
5. 5.$CRV (and $CVX and any other incentive tokens) earned from staking will automatically be sold into the highest premium asset once every 3 days

### Stash Vaults

- **V1 USDT Vault - Curve USDP Metapool strategy** $USDP is the native stablecoin issued from Unit protocol, a decentralized protocol that allows you to mint the stablecoin $USDP using a variety of whitelisted tokens as collateral. Providing liquidity to the $USDP Curve pool will allow Unagii users to

earn trading fees from trades on Curve and $CRV incentives via staking of the LP tokens. Rewards will be sold into the most premium Stablecoin and compounded.

- **V2 USDT Vault and V2 DAI Vault - Convex alUSD Metapool strategy** $alUSD is the synthetic stablecoin issued from Alchemix, a future-yield-backed synthetic asset platform that gives you advances on your yield farming via a synthetic token that represents a fungible claim on any underlying collateral in the Alchemix protocol. For more information on how Alchemix works, kindly visit their documentation. Providing liquidity to the $alUSD Convex pool will allow Unagii users to earn trading fees from trades on Curve, as well as $CRV, $CVX and $ALCX incentives via staking of the LP tokens. Rewards will be sold into the most premium Stablecoin and compounded.

### Growth Vaults

- **V1 WBTC Vault - Curve oBTC Metapool strategy** This Metapool helps further increase the liquidity of Bitcoin on Ethereum and makes it easier for users to swap between different variants of wrapped $BTC. $oBTC is backed by $BTC and created by BoringDAO – a decentralized bridge that allows users to transfer assets across blockchains via a minting tunnel. After Unagii deposits pooled assets in the strategy pool, we'll receive our share of LP tokens which will be staked for $CRV and $BOR in the DAO liquidity gauge. We'll then claim them from the minter gauge and sell them down to the most premium wrapped $BTC compound the earnings. Providing liquidity into this pool will also accrue trading fees from Curve users on the exchange of four different kinds of pegged-BTC tokens (including $oBTC) with low slippage.

- **V1 WBTC Vault - Curve BBTC Metapool strategy** Binance Wrapped BTC is an ERC20 version of BTC that is issued by Binance as part of their BTokens offering.Deposits will be pooled in the strategy pool, where we'll receive our share of LP tokens which will be staked for $CRV in the DAO liquidity gauge. We'll then claim them from the minter gauge and sell them down to the most premium wrapped $BTC and compound the earnings. Providing liquidity into this pool will also accrue trading fees from Curve users on the exchange of four different kinds of pegged-BTC tokens (including $BBTC) with low slippage.

- **V2 WBTC Vault - Convex BBTC Metapool strategy** Essentially the same as V1 WBTC Vault - Curve BBTC Metapool strategy, but with LP tokens staked into Convex pool instead to earn $CVX on top of $CRV.

- **V1 ETH Vault - Curve stETH pool strategy** This pool helps make staked $ETH 2.0 more liquid, so users can retain exposure and earn rewards. $stETH is a tokenised form of staked Ether native to Lido Finance – a staking solution for $ETH 2.0 built and backed by several industry-leading staking providers. By providing liquidity to this pool on behalf of Unagii users, Unagii will earn trading fees from Curve exchange transactions that take place within this pool. On top of that, we'll also receive LP tokens in return which we'll stake into the Curve gauge to receive $LDO and $CRV incentivized rewards. These rewards will then be sold into the most premium Ether and compounded. Users will be able to withdraw from the vault anytime in $ETH or $stETH.

- **V2 ETH Vault - Convex stETH pool strategy** Essentially the same as V1 ETH Vault - Curve stETH pool strategy, but with LP tokens staked into Convex pool instead to earn $CVX on top of $CRV and $LDO.

# V1 Vaults

Unagii Vaults V1 is an Ethereum-based protocol that enables users to passively earn from automated yield farming by depositing single crypto assets into the Vaults executing a specific Strategy in a gas-efficient environment. Unagii integrates with third-party DeFi protocols (i.e. AMMs and lending platforms), enabling support for a wide selection of strategies that are deemed safe and valuable to users. ✎ Unagii Vaults V1 Architecture**NameDescriptionadmin**Admin refers to the Unagii team, managed by a 2 out of 3 team member Gnosis multisig. Admin members are able to set and approve strategies, and execute the `deposit invest harvest skim withdraw exit` functions.**bots**These are Externally Owned Accounts (EOA) that are set to automate transactions at specific time periods to the Controller contract.**controller**The main Unagii governance contract. Only the Admin and Bots are authorized to trigger transactions on the Controller.**defi**DeFi is the acronym for Decentralized Finance, a term describing a variety of blockchain-based financial protocols and applications.**deposit**The function to transfer user funds into Strategy.**exit**The function to claim and sell down rewards, then return all funds in the associated Strategy back into the Vault.**gas token**This is the contract that allows Unagii to tokenize gas on Ethereum. Unagii will store gas when it is cheap to do so, and spend the Gas Token when deployment and transaction costs are high.**gas relayer**This enables the Bots to spend the Gas Token on a transaction that cuts transaction fees.**harvest**The function to claim and sell down rewards into the most premium deposit token, then re-investing the token back into the vault, thereby compounding rewards.**invest**Calls the Deposit function to transfer tokens from the Vault into the Strategy.**skim**The function to update user balances according to the asset balance in the Strategy. It can only be called when the asset balance is more than the debt balance within the Strategy.**strategy**Strategy determines how yield is generated and accrued. Each DeFi protocol has different sets of strategies. Unagii has curated a bank of whitelisted strategies handpicked by the team that will give users the best performing yields on their tokens.**time lock**All new strategy contracts to be launched will be deployed behind a 24 hour time lock. It is currently managed by admin. The time lock will need to be called in order for new strategies to be approved. Users will be able to verify all of such events on-chain.**withdraw**The function to withdraw tokens from the Strategy back into the Vault.

## V2 Vaults

Unagii Vaults V2 is the next iteration of the protocol with a slightly different architecture:

- Vaults are upgradable by default as the Unagii Token contracts and the Vault contracts are separated, making it similar in design with Curve token and Curve pool contract
- Smart contracts can interact (deposit/withdraw) from the vaults, which allows any developer to integrate with Unagii Vaults V2 (there is a block delay)
- Vaults are protected from flash loan attacks as Unagii token tracks the lastest block number of the caller
- Protected from sandwich attack on harvest as profit is vested over a period of time (6 hours for now)
- Vaults are able to invest in multiple strategies, allowing the protocol to maximize returns by optimizing the allocation of funds to each strategy

 Unagii Vaults V2 Architecture

**Unagii Token**

**NameDescriptionmint**mint Unagii shares when user deposits.**burn**burn Unagii shares when user withdraws.**setMinter**set minter to Vault. this makes Unagii V2 upgradable. (only called by TimeLock).

**Vault**

**Name****Description****deposit**user deposit token (DAI, USDC, USDT, ETH, WBTC), receives Unagii token in return.**withdraw**user withdraws token (DAI, USDC, USDT, ETH, WBTC), Unagii token is burnt.**setFundManager**set FundManager used to upgrade FundManager contract (only called by TimeLock).**borrow**borrow user funds from Vault (only FundManager can call).**repay**repay borrowed funds (only FundManager can call).**report**report profit back to Vault.

**Fund Manager**

**Name****Description****setVault**set Vault used to upgrade Vault contract (only TimeLock can call).**approveStrategy**approve new strategy (only TimeLock can call).**addStrategyToQueue**activate strategy (only approved strategy can be activated).**removeStrategyFromQueue**deactivate strategy.**setQueue**reorder activate strategies (order determines which strategy to withdraw from first).**borrowFromVault**borrow user funds from Vault.**repayVault**repay user funds to Vault.**reportToVault**call report on Vault.**withdraw**withdraw user funds from FundManager and activate strategies, back into Vault.

**Strategy**

**Name****Description****borrow**borrow user funds from FundManager.**repay**repay user funds to FundManager.**report**report profit back to FundManager.**withdraw**withdraw user funds back into FundManager.**deposit**borrow from FundManager and invest into external DeFi.**claimRewards / skim / harvest**claim profit.

# ⚠ Understanding the Risks

All users should first understand the risks associated with blockchain, DeFi and Smart Contracts

Since every protocol or application is built with smart contracts interacting with one another in some form, smart contract failure in one of the core components could cause a ripple effect throughout the DeFi ecosystem.

This means that smart contract failure on the lower layers could lead to loss of funds in the protocols or applications that are built at the higher layers.

**Mitigating Smart Contract Risks through Multiple Security Audits**

These smart contracts have been put through multiple security audits like the Compound Protocol from reputable firms like Trail of Bits.

## Risks with Stablecoin Pegs

 **Failure to maintain its desired peg could lead to loss of funds for Stablecoin holders**

Stablecoins are designed to minimize price volatility relative to another asset by pegging to another currency (fiat, crypto) or commodity.

Stablecoins can fail due to collateralization and volatility risk together with flawed mechanism designs to maintain their respective pegs.

However, the main risks are associated with specific collateral types backing these stablecoins. Overcollateralization can help to reduce volatility risk but if the prices of the underlying collateralized asset drops too quickly, liquidation might not be enough to cover the full amount that was borrowed.

That being said, the risks are greatly reduced with a reasonable collateralization ratio and sound collateral types that have a monetary premium and deep liquidity like Ether or Bitcoin.

Losing a desired peg could cause loss of funds for stablecoin holders and that is why at Unagii we have decided only to work with the best, time-tested and widely accepted stablecoins like USDC (which is 1:1 backed by US dollars in a bank account issued by Coinbase) and DAI (decentralized crypto-overcollateralized stablecoin)

## Market Risks

As with all new markets and technologies, other complex risks could exist with new Financial Platforms like Compound. One of these complex risks is Market Risk and better financial models are needed to better analyze these risks.

Platforms like Gauntlet have done thorough Risk Assessments like the one here :
https://gauntlet.network/reports/CompoundMarketRiskAssessment.pdf

> We use a rigorous definition of market risks to construct simulation-based stress tests that evaluate the economic security of the Compound protocol as it scales to underwriting billions of dollars of borrowed assets. These stress tests are trained on historical data and put through a battery of scenarios that represent the expected and worst case economic outcomes for the protocol. Our stress tests are constructed analogously to how transaction-level backtesting is done in high-frequency and algorithmic trading. These techniques are used to estimate the market risk of a systematic trading strategy before it is deployed to the market. As there are over $1 trillion US dollars of assets managed by funds that use these techniques to provide daily actuarial analyses to risk managers, we believe that these are the best methodologies for evaluating market risk. By modifying these techniques to handle the idiosyncrasies of cryptocurrencies, we are able to provide similar statistical power in these actuarial analyses

# ♂ FAQ

## Why does the world need this?

We believe that society already has the collective compassion, knowledge and resources to solve all of the world's problems. We also know that the missing piece is a technology to bring it all together. Therefore we use proven applications of blockchain to connect the people within existing communities and empower them to solve problems together.With this project, we envision a world enDAOment that can provide continuous funding to the movements and initiatives that matter most to the community.

## Our vision for the future

In the future, we believe people will demand engagement, transparency, expediency and collaboration in society, and a seat at the table when solving problems. We believe this platform will be what people turn to first when looking to start and fund movements.

## What is a DAO? And why do we need it?

A DAO is an online community built on the blockchain that introduces powerful tools designed for collaboration, decentralization, and transparency without the need for trust. This combination allows us to quickly mobilize around our most important social movements and take action quickly.

## What is a "Movement"?

Movement DAO supports movements, defined as communities organized around a shared mission. For example, social movements such as racial justice, environmental movements such as saving endangered species, or public goods movements such as art projects. For the first time ever, these movements have the infrastructure to finance their causes with economic alignment. For the first time ever, the infrastructure exists to prevent tragedy of the commons.

## What is an "initiative"?

Initiatives are projects proposed by the movement community. Token holders vote on which initiatives receive funding. Funding is provided by the reserve pool & direct tributes. Funding is distributed incrementally when predetermined milestones are achieved. Initiatives are proposed with those milestones.

## What are the differences between $MOVE and $(Movement) tokens?

MOVE tokens represent the potential to mint new movements and influence how the entire system is governed. In addition, the MOVE token is the native currency used to purchase movement tokens. Given this powerful utility and the inherent demand for $MOVE tokens, this token has the potential to appreciate in value over time as the ecosystem grows. The $MOVE ecosystem also earns movement tokens for each newly minted movement and revenue generated through network activity tributes. Revenue generated through network tribute goes towards the MOVE enDAOment.

## What is a Defi Endowment?

The Defi Endowment is a pool of tokens (both $MOVE and $(Movement) tokens) that are owned by the governance DAO. This pool of assets is used to permanently generate income for funding movements and their initiatives. Income is generated through network activity related to trading and swapping of tokens, as well as yield farming of stablecoin assets.

## What are the benefits for token holders?

Movement tokens have the potential to accrue value over time, as the price is directly tied to the growth of a movement community. Movement communities have the flexibility to set their own economic design including variables such as bonding curves, transaction tributes, vesting, and deflation. Movement tokens also represent voting rights for governance and funding initiatives. Like $MOVE token holders, $(Movement) token holders are incentivized to take action against malicious actors in their communities.

## How are tokens distributed?

Both $MOVE and $(Movement) tokens are distributed via a mechanism called a bonding curve. A bonding curve is an encoded formula that determines the price of each incremental token that is minted (purchased) or burned (sold) based on the total supply. Instead of minting a large supply of tokens at the onset of the project, Movement DAO uses this minting and burning mechanism so that these communities are formed, grow and thrive as decentralized communities from the beginning. The bonding curve is not only ideal for ensuring decentralization, fairness, and stability, it is also an important element used for continuous funding for movements.

## How are initiatives funded?

There are two primary forms of funding for initiatives: Passive and Active. •Passive funding occurs when the movement community uses treasury reserves to fund initiatives. Passive funding takes time and requires continuous growth and activity such as minting, burning, and swapping of tokens. Active funding occurs when community members apply tributes to their votes. Tribute votes combine the signaling of which initiatives the voter wants to fund, and also attaches direct tributes of tokens IF those initiatives are selected. Those who tribute tokens earn a boost in their voting power.

## Why should I trust this platform?

The Merkaba system is built in a way that designs bad behavior out of the system by using carefully designed incentive systems.First, the use of bonding curve token distribution ensures that the project will be decentralized and community owned from the beginning. The founders tokens will be locked for # years from launch, meaning there is no return on investment to the founders until the platform is fully built, operational and successful in its objectives. The system also establishes trust with its community by adopting state of the art mechanism design concepts.We have built this system on the shoulders of giants. Users can rest assured that the underlying code has been audited for functionality and security.

## What are my responsibilities as a community member?

There are various stakeholders and community members in the Movement DAO ecosystem. The primary stakeholders are $MOVE token holders and movement token holders.

1. $MOVE tokens represent voting rights on the platform. Token holders are able to submit proposals and vote for governance changes as well as launch and influence new movements on the platform.

2. $(Movement) tokens represent unique ecosystems designed specifically for supporting movements. Movement token holders are responsible for promoting, collaborating, and voting on how resources are allocated, and to which movement initiatives.

## How do I get involved in the community?

1. **As a movement evangelist** - Submit a proposal for a new movement or get involved in a new movement community. Movement evangelists are often those who are proposing new movements, however communities may find more influential leaders that can grow their communities better over time. Additionally, evangelists can choose to have delegates who they allocate a portion of their rewards to increase the scope of the network and its influence.

2. **As a developer** - Join our Discord and stay active within the Developer channel. We encourage a collaborative developer community to help make the platform the best it can be.

3. **As a community organizer** - Decentralized communities require community members that take on leadership roles to help organize and mobilize their respective communities to take action and work together. Communities will naturally identify skillful leaders and create incentives to keep them engaged in these important roles.

## How do I purchase tokens?

1. Download the Metamask wallet extension for your browser at https://metamask.ioand follow details instructions at https://metamask.io/faqs.html

2. Download the Metamask App for your mobile device

3. Sync both applications with the QR code provided. Add funds with a debit card or Apple Pay

4. Complete your first transaction by buying ETH

5. Link your Metamask wallet to Movement DAO and buy $MOVE

6. Use your $MOVE tokens to start a new movement or to buy existing movement tokens.

# Glossary

Use this space to get up to speed on key terminology

## AUDIT

An audit is a comprehensive review of a system and its design to identify its strengths, weaknesses and potential vulnerability.Audits may be internal or independent and can be informal or formal audits and are meant to be a tool for project stakeholders or developers.

## APY

Annual Percentage Yield are a time-based measurement of the Return On Investment (ROI) on an asset. For example, $100 invested at 5% APY would yield $105 after one year, if there is no compounding of any interest earned on that $100 through the year.

## AMM

An AMM is a decentralized asset trading pool that enables market participants to buy or sell cryptocurrencies. AMMs are non-custodial and permissionless in nature. Most AMMs utilize either a constant product, constant mean, or constant sum market-making formula; however, the most common is a constant product market maker, most notably Uniswap.

## BONDING CURVE

Bonding curves are  token distribution models that automate the relationship between price and supply. The tokens in this model are referred to as Continuous Tokens because their price is continuously calculated. In continuous token models, there is no ICO or token launch. Instead of pre-selling tokens during a launch phase, the tokens are minted continuously over time via an automated market maker contract. Tokens are minted when purchased as needed, in conjunction with demand, and used within the protocol or application when required or desired.

Continuous Tokens have other properties such as instant liquidity and deterministic price. Bonding curves act as an automated market maker such that token buyers and sellers have an instant market. Additionally, bonding curve models don't have central authorities responsible for issuing the tokens. Instead, users can buy a project's token through a smart contract platform. The cost to buy these tokens is determined by the supply of those tokens. Unlike traditional models, the cost of these tokens increases as the supply increases. This price is determined by a pre-existing algorithm, further described below. A fee of 1% is applied per trade with the bonding curve.

## COLLATERAL FOUNDERS

The founding team who contributed the collateral by which the Movement DAOs genesis bonding curve was based. Additional, the founding team contributed the seed engineering funds to establish the DAO and initiative funding workflow.

## COLLATERALIZATION

The borrowing of a deposit asset or assets to seek further business activities such as Yield Farming. Collateralization can amplify gains or losses, and is thus, considered riskier than not borrowing funds.

## COMPOUND INTEREST

Once called the eighth wonder of the world by Einstein, compound interest allows greater interest rates and returns on investments by allowing interest gained to be automatically reinvested back in with the original deposits and accrued interest. This reinvestment period is based on the planned distribution of this interest which may be hourly, weekly, monthly, or an annual interest distribution. With compound interest, the greatest gains are often seen over a certain period in time, with a notably sharp rise in the value of investments seen at longer periods. In general, the longer a deposit benefits from compound interest, the much greater the overall gains when compared to gains made from simple interest.

## CONVICTION VOTING

Conviction voting is a DAO voting mechanism whereby individuals stake their powers to vote on proposals and gather enough votes to pass over time. While this mechanism is new, in theory, the it hinders persons with strong opinions and large stakes from bridling minority voters. Here, it's not a requirement for the majority to achieve consensus on each proposal, but rather, token holders (stakeholders) can concentrate on the proposals they promote/support.

## DAI

A stable coin governed by MakeDAO an organization represented by a set of codified rules, controlled by the organization members and not influenced by a central government. A DAO's financial transaction record and program rules are maintained on a blockchain. "When implemented well, a DAO allows for real-world experiments in decentralized democratic organization and control, with more freedom of action and less regulatory oversight for DAO controlled projects and products when compared to legacy corporate structures and organizations.

## DAO

A DAO (decentralized autonomous organization) is an organization represented by rules encoded as a transparent computer program, controlled by the organization members, and not influenced by a central government. As the rules are embedded into the code, no managers are needed, thus removing any bureaucracy or hierarchy hurdles.

## DAPP

A DApp is an online portal or other interactive software that enables direct interaction between end users and providers (e.g., connecting buyers and sellers in some marketplace, owners and stores in file storage).

## DEFI

Decentralized Finance (DEFI) a set of Smart Contracts running independently on blockchains such as the Ethereum network that aim to enhance the profitability of investors in DeFi through automated smart contracts. DeFi tools seek to maximize returns by providing liquidity to various other protocols. These should be considered risky investments as the infrastructure is quite new and often not fully audited.

## ENDAOMENT

An EnDAOment is a principal pool of capital used as a perpetual source for earning yield via DeFi activity, used to fund various movements and initiatives within the ecosystem.

## ETHEREUM

Ethereum is an open-source decentralized blockchain built for smart contract development. Smart contracts allow for developers to create decentralized applications on the Ethereum infrastructure and to run their own token system on a secure and immutable platform without the need for building a dedicated blockchain.

## ERC-20

A cryptocurrency protocol based on the Ethereum blockchain. An ERC-20 coin, by definition, uses this protocol.

## FLASH LOANS

A type of loan that is only possible in the world of cryptocurrencies where the token is loaned out only for the length of time it takes to complete one transaction block on the blockchain. As long as the loan is paid back before the next transaction block begins there is no interest fee incurred by the borrower. Flash Loans allow for new types of investments that are nearly instantaneous algorithmic scripts to run in Smart Contracts that can be stacked upon one another for innovative yet sometimes risky investments. Flash Loans may also have vulnerabilities that may include systems vulnerabilities that take advantage of approved existing systems but are used in a novel malicious manner.

## GAS FEES

Gas fees are rewards paid to Proof Of Work miners to incentivize them to support the network's transactions which become written to the blockchain. In Ethereum, this gas fee unit amount is expressed in gwei. Withdrawals or transfers to or from CEXs, DEXs Liquidity Pools, and Wallets all incur a gas fee. The amount of this gas fee will vary in cost depending on supply and demand. As currently designed: when demand on Ethereum or an ERC-20 network is at its highest, gas fees are at also their highest.

## GOVERNANCE

Governance refers to the control and use of a Governance coin, token, and/or project through various measures to grow the ecosystem or product and to maximize gains for governance token holders.

## GOVERNANCE TOKEN ($MVMT)

A token is used to govern the operations and influence the direction of a coin, token, and/or project controlled by the Governance Token. Holding these tokens are often profitable through direct price appreciation of popular governance tokens, but may come with other benefits that are only available to governance token holders and voters. Holders of the MOVE token help to shape the future of the Movement DAO ecosystem by voting on governance initiatives.

## HATCH PRICE

The price paid per token by when hatching a new Movement.

## IMPERMANENT LOSS

I Automated Market Makers (AMM) and liquidity providers (LPs) contribute assets for liquidity to market participants. These AMM pools utilize a bonding curve, typically built on a constant function market marker formula. Asset prices are constantly changed by the AMM pool in response to trading activities by participants. This is an effort to ensure that LPs can receive the same amount of assets they deposited when they withdrawal. However, due to the volatility of asset prices and arbitragers, LPs occasionally will not receive the exact amount of assets upon withdrawal. The dollar value of the assets they withdraw would typically be lower than if they had no provided liquidity and just held the assets. This dollar value shortfall is known as impermanent loss. The loss is said to be impermanent because if asset prices return to the level during withdrawal the loss is eliminated.

## INITIATIVES

Initiatives are projects proposed by the movement community. Token holders vote on which initiatives receive funding. Funding is provided by the reserve pool & direct tributes. Funding is distributed incrementally when predetermined milestones are achieved. Initiatives are proposed with those milestones.

## INSTANT LIQUIDITY

Tokens can be bought or sold instantaneously at any time, the bonding curve acting as an automated market maker. A bonding curve contract acts as the counter-party of the transaction and always holds enough ETH in reserve to buy tokens back.

## LIQUIDITY

A measure of how much available circulating supply there is of an asset or currency, and the activity of that asset or currency in an exchange, economy, or network. A currency with low supply and/or circulation is said to be illiquid.

## LIQUIDITY MINING

An energy-efficient form of cryptocurrency mining that supports work and transactions on a blockchain usually without expensive application or hardware-specific equipment required by older forms of cryptocurrency mining.Rewards are provided to liquidity providers as a means to incentivize liquidity mining providers, in addition to growing and supporting a blockchain's user base.

## LIQUIDITY POOL

An LP, or Liquidity Pool, is a pool of deposited funds meant to provide liquidity to a currency, network, or Smart Contract. Liquidity is considered the lifeblood of any physical or digital currency, exchange, or financial network, so there will be designed rewards or incentives given to those who provide liquidity to LPs.s.Liquidity Providers-In the realm of cryptocurrency and DeFi, this refers to investors who deposit an asset to provide liquidity on an exchange and/or network(s) to gain an ROI on their investment. Investors deposit one or more of their digital assets into decentralized Liquidity Pools (LPs) to provide liquid capital to exchanges and smart contracts. Liquidity Providers often provide two or more types of assets, in which Impermanent Loss is sometimes seen.

## LOCK AMOUNT

The minimum amount of the configured token that must be locked in order to submit a proposal.

## LOCK DURATION

The minimum amount of time the configured token will be locked for in order to submit a proposal.

## MAKERDAO

Maker is a decentralized governed financial ecosystem based on a Stablecoin called DAI. DAI is algorithmically pegged to $1 USD, with no volatility. A digital asset with no volatility at all, is sometimes seen as a hedge or safety measure in times of high volatility or during Bear markets.

## MARGIN

An available avenue of borrowed capital that is considered very high risk, as collateral must be provided for a margin loan to secure the loan. It is called margin or a margin loan because a risky loan is being taken on the margins of the investment to hopefully amplify gains for the investor or trader.A margin loan is considered very high risk as the deposited base asset is at risk of liquidation during a margin call.

## MARGIN CALL

The act of implementing a Forced Liquidation or Liquidation Event when an investor or trader cannot meet debt obligations on leveraged trade positions. Margin calls can be triggered by rapidly changing market conditions and high volatility that bring Liquidation Events for some leveraged traders on exchanges and markets.

## MARKET CAPITALIZATION

A measure of the total funds invested in a company or project. This market cap of a coin, company, or project can be calculated by multiplying the asset's unit price by the total number of coins.x.MetaMask-MetaMask is a popular mobile or desktop software cryptocurrency wallet that can hold, transmit or receive Ethereum and ERC-20 compatible coins or tokens.

## MINIMUM APPROVAL %

This is the minimum amount of approval amongst the total membership required for a proposal to be valid, this can be set high if you want to ensure people are actively participating or it can be set to 0% so there is no quorum requirement enforced.

## MINING POOL

A pool of cryptocurrency miners that provides mining services to a cryptocurrency network. Mining Pool operators and contributors are incentivized by a coin or token's programmed mining rewards to support transactions and provide liquidity on a coin's network.

## MOVEMENT

Movements are broadly defined as communities organized around a shared mission. or example, social movements such as racial justice, environmental movements such as saving endangered species, or public goods movements such as art projects. Within the Movement DAO structure, these communities are radically empowered to organize and fund their most important initiatives in a fun, secure and trustless way. For the first time ever, these movements have the infrastructure to finance their causes with economic alignment. For the first time ever, the infrastructure exists to prevent tragedy of the commons.

## MOVEMENT EVANGELISTS

Movement evangelists are nominated by their respective communities to spearhead movement awareness campaigns and to coordinate communities around funding. Movement Evangelists are also responsible for token giveaways.

## MULTISIG WALLET

A multiple signature wallet is a cryptocurrency wallet that controls access and changes to one or more Smart Contracts. Community governed projects like a DAO often require multiple signers to approve a transaction before it will be executed. For community-based efforts, Multisig wallets for DAOs and DeFi projects are often implemented as 6 of 9 wallets, where 6 of 9 community wallet signers must agree to sign a transaction before a Smart Contract can be implemented.

## ORACLE

A feed of data, such as the current market prices of an asset or assets, that provides a high confidence service to users and other services that the source and detail of the oracle's data are timely, accurate, and untampered. Sources of data may be singular or decentralized sources and may be dispersed geographically from one another. All exchanges and markets require accurate and timely information to operate properly at high efficiency. An example of the most well-known oracle protocol is Chainlink (LINK).

## POOL

A smart contract containing shared amounts of assets provided by depositors. Pools are either used in Automated Market Makers (AMMs)for optimized trading purposes, lending aggregation (yPool), or in shared yield farming strategies (yVaults), among other things.cc.Protocol-In High Technology, a protocol is a set of developed rules or specifications. These rules detail definitions, standards, limitations, and potential stipulations of a protocol. Examples of technology protocols include TCP/IP and ERC-20.

## POST-HATCH PRICE

Post-Hatch price - The price per token at the launch of the Movements when the curve is set and anyone can join with the Commons

## RAGE QUIT

"Rage quitting" is a function built into DAO's smart contracts that allows a member to take its unallocated capital contribution and leave the DAO.

## REBALANCE

To make changes to a portfolio or pool of funds for various reasons.An automated or manual tactical change to a yield farming strategy that is meant to nearly instantaneously do one or more of the following actions:Gain profits through arbitrageTake or secure profitsReduce risks to investors or pooled fundsDuring periods of high volatility, the latter is especially the case if margin or leveraged funding is used by the trader, investor, or controller in charge of pooled funds. If an assessment is made that market conditions are a risk to invested funds, mitigation efforts will be implemented either autonomously or through manual intervention to reduce risks to invested funds.

## SMART CONTRACT

A digital contract that is programmed in a language that is considered Turing complete, meaning that with enough processing power and time, a properly programmed Smart Contract should be able to use its code base and logical algorithms to perform almost any digital task or process. Ethereum's programming languages, such as Solidity and Vyper, are Turing complete.ff.Spread-When an order is made on an exchange or market, the disagreement of the difference in price between potential buy and sell offers of an asset is called the spread. A wide spread in price can lead to higher slippage.

## SPAM PENALTY %

Modifies the Lock Amount and Lock Duration depending on the number of currently active locks the proposer has.

## STABLECOIN

In cryptocurrency, it is a digital cryptocurrency equivalent to one (1) Dollar USD. In theory, the price of the stablecoin is pegged to the US Dollar, but in practice, there is some variance to nearly all stablecoins except for coins like DAI, which are designed with no volatility.

## STAKE

The act of depositing a cryptocurrency coin or token into a yield farming project and/or protocol, whether the access to the project is either through CeFi or DeFi methods. Stakers hope to gain interest on their deposits into these yield farming projects and offerings. CeFi is considered safer for several reasons -including strict rules, permitting, and regulations. However, DeFi tends to give much high rewards, while being accompanied with much higher risks, the earlier the investor participates in the project's lifecycle, testing, and development. The act of staking a cryptocurrency deposit to yield farm additional cryptocurrency via CeFi or DeFi staking offerings, programs, or projects.

## TESTNET

A testing network for a new token, project, or product, or for potential improvements to an existing product or offering. Testnets are used to test the viability and vulnerability of new ideas, concepts, code, and processes prior to moving on to a production network or networks of some sort.

## TOKEN

A type of coin, except with much greater functionality. Tokens can also be used as a method of payment like coins, but unlike coins, they can excel at other use cases such as the democratic governance of a protocol or system, or as a means to use underlying coins to make liquidity tokens from these coin deposits. These liquidity tokens could then be used in innovative new strategies elsewhere via delegated funds to amplify gains with little risk to the underlying asset the liquidity token is based upon. An investor could choose this action so that further gains to their assets may be made by using the automated actions of intelligent Smart Contracts to optimize gains.

## TOTAL AVAILABLE CAPITAL

Represents the total deployable capital in treasury reserves that can be used to fun initiatives within a movement. Token holders will vote to determine how to use "Total Available Capital" reserves.

## TOTAL FINANCIAL BACKING

Represents the total "potential" influence of an entire movement community. In crypto terms, one might refer to this value as market capitalization. This number represents the total assets that are collateralized in stable coins on the bonding curve.

## TRAGEDY OF THE COMMONS

An economics problem in which every individual has an incentive to consume a resource, but at the expense of every other individual -- with no way to exclude anyone from consuming. Initially it was formulated by asking what would happen if every shepherd, acting in their own self-interest, allowed their flock to graze on the common field. If everybody does act in their apparent own best interest, it results in harmful over-consumption (all the grass is eaten, to the detriment of everyone).

## TRIBUTE

**Exit Tribute** - The percentage that goes to the Funding Pool when token holders 'sell' by burning their token at the price determined by the ABC. If the Exit Tribute is 10% and the price is 1 DAI/token then, for every token burned, the exiting token holder would get 0.9 Dai and the Funding Pool would get 0.1

**Hatch Tribute** - The percentage of the funds raised during the Hatch that goes directly to Funding Pool to be used to support the Commons' mission, the rest goes to the collateral pool

## TURING COMPLETE

In programming, it refers to a language that is powerful and semi-autonomous, in a way. When a language such as Solidity or Vyper is Turing complete, it means that with enough processing power and time, a properly programmed Smart Contract using a Turing complete language should be able to use its code base and logical algorithms to perform nearly any digital task or process. A Turing complete language can even be programmed to have impacts on real-world activities through electronic means, as these rapidly executed digital commands can trigger actions in the real world through sensors, relays, switches, cameras, alarms, and alerts that can trigger a human and/or automatic response.The concept of a Turing complete programming language was named after the inventor of the idea, Alan Turing. He was an unsung war hero and legendary mathematician. Turing was also a renowned and brilliant computer scientist, cryptanalyst, and forward thinker.

## TVL

Total Value Locked into a Smart Contract or set of Smart Contracts that may be deployed or stored at one or more exchanges or markets. This is used as a measurement of investor deposits. It is the dollar value of all the coins or tokens locked into a platform, protocol, lending program, yield farming program, or insurance liquidity pool.

## YIELD FARMING

Yield farming is the practice of staking or lending crypto assets in order to generate high returns or rewards in the form of additional cryptocurrency. This innovative yet risky and volatile application of decentralized finance (DeFi) has skyrocketed in popularity recently thanks to further innovations like liquidity mining. In short, yield farming protocols incentivize liquidity providers (LP) to stake or lock up their crypto assets in a smart contract-based liquidity pool. These incentives can be a percentage of transaction fees, interest from lenders or a governance token (see liquidity mining below). These returns are expressed as an annual percentage yield (APY). As more investors add funds to the related liquidity pool, the value of the issued returns decrease accordingly.

## VOLATILITY

A statistical measure of the price variation of an asset. Newer early-stage projects in the explosive growth stage tend to see very high volatility in the price of their assets in their early days. Volatile assets are often considered riskier than less volatile assets because the price is expected to be less predictable.

Legal

# 📫 Service Provider

## What are the external costs involved with the DAO?

DAOs are currently not universally recognized as legal entities. Therefore in addition to overseeing the assets of the DAO and how they are distributed by being one of the signers for the Gnosis Safe - dao-lawfirm.eth, the DAO through its members are responsible for the costs associated with its activities. This includes reviewing statements made in this GitBook, what the tokens maybe used for and what Legal Disclaimers and Terms of Use are acceptable given the current laws.

**Fees and Expenses**

Movement DAO developer contemplated the use of a service provider to help facilitate, for example, paying other service providers who may not be strictly anonymous or accepting of Ethereum. Currently an anonymous donor is paying for the fees associated with the service provider until the DAO governance if formed and snapshot votes render the will of its members.

Following other DAOs, with different charters, such as Flamingo DAO, and the fees associated with their activities, we estimate spending 2% of the assets held per year on such legal services.

Upon the formation of the governance for Movement DAO, this will be submitted for the community vote via snapshot.

# Token Sale and Use

What are the terms of the $MOVE token sale?

**TERMS AND CONDITIONS OF TOKEN SALE AND USE**

> ⚠ *PLEASE READ THESE TERMS AND CONDITIONS OF TOKEN SALE AND USE CAREFULLY BEFORE ACCESSING THE WEBSITE LOCATED AT HTTPS://MOVE.XYZ (THE "WEBSITE") OR THE Movement DAO (DEFINED BELOW) OR PURCHASING TOKENS. THE LAW OFFICE OF REED YURCHAK (THE "COMPANY") WILL ACT AS THE SERVICE PROVIDER FOR THE MOVEMENT DAO. YOU ACKNOWLEDGE THAT THERE ARE CERTAIN RISKS ASSOCIATED WITH PURCHASING THE TOKENS DESCRIBED HEREIN AND AGREE TO ASSUME SUCH RISKS UPON ANY PURCHASE OF TOKENS. IN ADDITION, NOTE THAT THESE TERMS CONTAIN A BINDING CLASS ACTION WAIVER, WHICH, IF APPLICABLE TO YOU, AFFECT YOUR LEGAL RIGHTS. IF YOU DO NOT AGREE TO THESE TERMS, DO NOT PURCHASE THE TOKENS DESCRIBED HEREIN.*

*Prior to purchasing Tokens, you should carefully consider these Terms and, to the extent necessary, consult a lawyer, accountant, and/or tax professional, as applicable.*

*Purchases of Tokens should be undertaken only by individuals or companies that have significant experience with, and understanding of, the usage and intricacies of cryptographic tokens, including Ethereum-based tokens and blockchain-based software systems. Purchasers should have an expert understanding of the storage and transmission mechanisms associated with cryptographic tokens. While the Company will be available to assist the Purchaser of Tokens during the Token Sale, the Company will not be responsible in any way for loss of any cryptocurrency, including Tokens, resulting from actions taken by, or omitted by Purchaser. If you do not have such experience or expertise, then you should not purchase Tokens or participate in the Token Sale. Your participation in the Token Sale is deemed to be your understanding and acknowledgment that you satisfy the requirements mentioned in this paragraph.*

*As further described herein, by purchasing Tokens, and to the extent permitted by law, you agree to not hold the Company or its respective past, present, and future employees, officers, directors, contractors, consultants, equity holders, suppliers, vendors, service providers, parent companies, subsidiaries, affiliates, agents, representatives, predecessors, successors and/or designees liable for any losses or any special, incidental, or consequential damages arising from, or in any way connected, to the sale of Tokens, including losses associated with these Terms.*

*You acknowledge, understand and agree that:*

⚠️ *You are subject to and bound by these Terms by virtue of purchasing the Tokens.*

*The Tokens have no rights, intended uses or attributes outside of use with the Kinesis Platform or as otherwise expressly referred to in these Terms.*

*A purchase of Tokens is non-refundable and cannot be cancelled.*

*A purchase of Tokens involves many, varied risks which can result in the loss of all amounts paid.*

*The Company reserves the right to refuse or cancel Token purchase requests at any time in its sole and absolute discretion.*

*The Tokens are not backed by any physical bullion or other assets which a Purchaser would have any rights or access to.*

*Other Token purchasers who made their purchase at a different time may receive more Tokens from the DAO for the same amount paid. In an effort to be completely transparent the tokens are priced on a bonding curve which is a function of the number of tokens voted by the community at any point in time and the token price is not due to any action by the DAO or any member of the community.*

*These Terms limit the liability of the DAO and its Associated Parties (defined below) in connection with the sale of Tokens.*

**Right to review information of the Movement DAO**

*You have reviewed to your satisfaction all supporting documents and collateral sources concerning the risks associate with purchasing Tokens.*

⚠️ *NOTHING IN THESE TERMS SHALL BE DEEMED TO CONSTITUTE A PROSPECTUS OF ANY SORT, A SOLICITATION FOR INVESTMENT OR INVESTMENT ADVICE NOR DOES IT IN ANY WAY PERTAIN TO AN OFFERING OR A SOLICITATION OF AN OFFER TO BUY ANY SECURITIES IN ANY JURISDICTION. TO THE MAXIMUM AMOUNT PERMITTED BY APPLICABLE LAW, EACH OF THE COMPANY AND KINESIS FOUNDATION (COLLECTIVELY, THE "ASSOCIATED PARTIES" AND EACH AN "ASSOCIATED PARTY") EXPRESSLY DISCLAIM AND SHALL NOT BE LIABLE FOR ANY AND ALL RESPONSIBILITY FOR ANY DIRECT OR ANY INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL OR OTHER LOSSES OF ANY KIND, IN TORT, CONTRACT OR OTHERWISE (INCLUDING BUT NOT LIMITED TO LOSS OF REVENUE, INCOME OR PROFITS, AND LOSS OF USE OR DATA), ARISING OUT OF OR IN CONNECTION WITH (I) THE PURCHASER'S ACCEPTANCE OF OR RELIANCE ON ANY INFORMATION CONTAINED IN THESE TERMS OR THE WHITEPAPER, (II) ANY ERROR, OMISSION OR INACCURACY IN ANY SUCH INFORMATION OR (III) ANY ACTION RESULTING THEREFROM.*

*Purchaser agrees to buy, and DAO agrees to sell, Tokens in accordance with the following terms:*

*Acceptance of Confidential Offering Memorandum, Whitepaper and Terms*

# Cookies Policy

**COOKIES POLICY**

We understand that your privacy is important to you and are committed to being transparent about the technologies we use. In the spirit of transparency, this policy provides detailed information about how and when we use cookies on our Site.

**Do we use Cookies?**

Yes. We and our marketing partners, affiliates, and analytics or service providers use cookies, web beacons, or pixels and other technologies to ensure everyone who uses the Site has the best possible experience.

**What is a Cookie?**

A cookie ("Cookie") is a small text file that is placed on your hard drive by a web page server. Cookies contain information that can later be read by a web server in the domain that issued the cookie to you. Some of the cookies will only be used if you use certain features or select certain preferences, and some cookies will always be used. You can find out more about each cookie by viewing our current cookie list below. We update this list periodically, so there may be additional cookies that are not yet listed. Web beacons, tags and scripts may be used in the Site or in emails to help us to deliver cookies, count visits, understand usage and campaign effectiveness and determine whether an email has been opened and acted upon. We may receive reports based on the use of these technologies by our service/analytics providers on an individual and aggregated basis.

**Why do we use Cookies?**

We generally use Cookies for the following purposes:

- To recognize new or past customers.
- To store your password if you are registered on our Site.
- To improve our Site and to better understand your visits on our platforms and Site.
- To serve you with interest-based or targeted advertising.
- To observe your behaviors and browsing activities over time across multiple websites or other platforms.
- To better understand the interests of our customers and our website visitors.

Some Cookies are necessary for certain uses of the Site, and without such Cookies, we would not be able to provide many services that you need to properly use the Site. These Cookies, for example, allow us to operate our Site so you may access it as you have requested and let us recognize that you have created an account and have logged into that account to access Site content. They also include Cookies that enable us to remember your previous actions within the same browsing session and secure our Sites.

We also use functional Cookies and Cookies from third parties for analysis and marketing purposes. Functional Cookies enable certain parts of the site to work properly and your user preferences to remain known. Analysis Cookies, among other things, collect information on how visitors use our Site, the content and products that users view most frequently, and the effectiveness of our third-party advertising. Advertising Cookies assist in delivering ads to relevant audiences and having our ads appear at the top of search results. Cookies are either "session" Cookies which are deleted when you end your browser session, or "persistent," which remain until their deletion by you (discussed below) or the party who served the cookie. Full details on all of the Cookies used on the Site are available at our Cookie Disclosure table below.

If you want to learn more about cookies, or how to control, disable or delete them, please visit http://www.aboutcookies.org for detailed guidance. In addition, certain third-party advertising networks, including Google, permit users to opt out of or customize preferences associated with your internet browsing. To learn more about this feature from Google, https://adssettings.google.com/u/0/authenticated?hl=en

To control flash cookies, which we may use on our Site from time to time, you can go to http://www.macromedia.com/support/documentation/en/flashplayer/help/settings_manager07.html, because Flash cookies cannot be controlled through your browser settings. Please note that if you decline the use of flash Cookies, some functions of the website may be unavailable and we will not be able to present personally tailored content and advertisements to you.

We may link the information collected by Cookies with other information we collect from you pursuant to this Privacy Policy and use the combined information as set forth herein. Similarly, the third parties who serve cookies on our Site may link your name or email address to other information they collect, which may include past purchases made offline or online, or your online usage information. If you are located in the European Economic Area, you have certain rights that are described above under the header "Notice to EU Data Subjects", including the right to inspect and correct or delete the data that we have about you.

# ⚲ Privacy Policy

**Privacy Policy**

Last Updated: January 3, 2022

This privacy policy ("Policy") describes how Movement DAO ("Company", "we", "our", or "us") collects, uses, shares, and stores personal information of users of this website and members (the "Site"). This Policy applies to the Site, membership, services, projects or movements (collectively, "membership") on or in which it is posted, linked, or referenced.

By using the Services, you accept the terms of this Policy and our Terms of Use, and consent to our collection, use, disclosure, and retention of your information as described in this Policy. If you have not done so already, please also review our Terms of Use. The Terms of Use contain provisions that limit our liability to you and require you to resolve any dispute with us on an individual basis and not as part of any class or representative action. IF YOU DO NOT AGREE WITH ANY PART OF THIS PRIVACY POLICY OR OUR TERMS OF USE, THEN PLEASE DO NOT USE ANY OF THE SERVICES.

If you are visiting this site from the European Union (EU), see our Notice to EU Data Subjects below for our legal bases for processing and transfer of your data.

**WHAT WE COLLECT**

We get information about you in a range of ways.

**Information You Give Us.** Information we collect from you includes:

- Identity information, such as your first name, last name, username or similar identifier, title, date of birth and gender identification;
- Contact information, such as your postal address, email address and telephone number;
- Profile information, such as your username and password, interests, preferences, feedback and survey responses;
- Feedback and correspondence, such as the information you provide in your responses to surveys, when you participate in market research activities, report a problem with Service, receive customer support or otherwise correspond with us;
- Usage information, such as information about how you use the Service and interact with us;
- Membership information, such as personal information or financial information.

**Information We Get From Others.** We may get information about you from other third-party sources and we may add this to information we get from your use of the Services. Such information may include:

**Information Automatically Collected.** We may automatically record certain information about how you use our Site (we refer to this information as "Log Data"). Log Data may include information such as a user's Internet Protocol (IP) address, device and browser type, operating system, the pages or features of our Site to which a user browsed and the time spent on those pages or features, the frequency with which the Site is used by a user, search terms, the links on our Site that a user clicked on or used, and other statistics. We use this information to administer the Service and we analyze (and may engage third parties to analyze) this information to improve and enhance the Service by expanding its features and functionality and tailoring it to our users' needs and preferences.

We may use cookies or similar technologies to analyze trends, administer the website, track users' movements around the website, and to gather demographic information about our user base and members as a whole. Users can control the use of cookies at the individual browser level.

We also use Google Analytics to help us offer you an optimized user experience.

Google Analytics: You can find more information about Google Analytics' use of your personal data here: https://www.google.com/analytics/terms/us.html

**Information We Will Never Collect**. We will never ask you to share your private keys or wallet seed. Never trust anyone or any site that asks you to enter your private keys or wallet seed.

**USE OF PERSONAL INFORMATION**

To Provide Our Service

We will use your personal information in the following ways:

- To enable you to access and use the Services and maximize your membership.
- To provide and deliver products and services that you may request.
- To send information, including confirmations, technical notices, updates, security alerts, and support and administrative messages.
- To confirm proposals or suggestions for movements and to confirm your identity on any vote taken on any proposal.

**To Comply With Law**

We use your personal information as we believe necessary or appropriate to comply with applicable laws (including anti-money laundering (AML) laws and know-your-customer (KYC) requirements), lawful requests and legal process, such as to respond to subpoenas or requests from government authorities.

**To Communicate With You**

We use your personal information to communicate about promotions, upcoming events, and other news associated with movements, voting, projects or other matters associated with your membership.

**For Compliance, Fraud Prevention, and Safety**

We may use your personal information to protect, investigate, and deter against fraudulent, unauthorized, or illegal activity, whether from a member or from an outside source seeking to access the member's account.

**SHARING OF PERSONAL INFORMATION**

We do not share or sell the personal information that you provide us with to other organizations without your express consent, except as described in this Privacy Policy. We disclose personal information to third parties under the following circumstances:

- Affiliates. We may disclose your personal information to our subsidiaries and corporate affiliates for purposes consistent with this Privacy Policy.

- Business Transfers. We may share personal information when we do a business deal, or negotiate a business deal, involving the sale or transfer of all or a part of our business or assets. These deals can include any merger, financing, acquisition, or bankruptcy transaction or proceeding.

- Compliance with Laws and Law Enforcement; Protection and Safety. We may share personal information for legal, protection, and safety purposes.

- We may share information to comply with laws, including KYC and AML requirements.

- We may share information to respond to lawful requests and legal processes.

- We may share information to protect the rights and property of the Company, our agents, customers, and others. This includes enforcing our agreements, policies, and terms of use.

- We may share information in an emergency. This includes protecting the safety of our employees and agents, our customers, or any person.

- **Professional Advisors and Service Providers.** We may share information with those who need it to do work for us. These recipients may include third party companies and individuals to administer and provide the Service on our behalf (such as customer support, hosting, email delivery and database management services), as well as lawyers, bankers, auditors, and insurers.

- **Other.** You may permit us to share your personal information with other companies or entities of your choosing. Those uses will be subject to the privacy policies of the recipient entity or entities.

We may also share aggregated and/or anonymized data with others for their own uses.

**HOW INFORMATION IS SECURED**

We retain information we collect as long as it is necessary and relevant to fulfill the purposes outlined in this privacy policy and at least as long as you are a member or involved in Movement DAO, including as long as you own tokens. In addition, we retain personal information to comply with applicable law where required, prevent fraud, resolve disputes, troubleshoot problems, assist with any investigation, enforce our Terms of Use, and other actions permitted by law. To determine the appropriate retention period for personal information, we consider the amount, nature, and sensitivity of the personal information, the potential risk of harm from unauthorized use or disclosure of your personal information, the purposes for which we process your personal information and whether we can achieve those purposes through other means, and the applicable legal requirements.

In some circumstances we may anonymize your personal information (so that it can no longer be associated with you) in which case we may use this information indefinitely without further notice to you for internal purposes specifically related to keeping metrics to promote the most efficient and beneficial use of the Movement DAO.

We employ industry standard security measures designed to protect the security of all information submitted through the Services. However, the security of information transmitted through the internet can never be guaranteed. We are not responsible for any interception or interruption of any communications through the internet or for changes to or losses of data. Users of the Services are responsible for maintaining the security of any password, biometrics, user ID or other form of authentication involved in obtaining access to password protected or secure areas of any of our digital services. In order to protect you and your data, we may suspend your use of any of the Services, without notice, pending an investigation, if any breach of security is suspected.

## INFORMATION CHOICES AND CHANGES

Accessing, Updating, Correcting, and Deleting your Information

You may access information that you have voluntarily provided through your account on the Services, and to review, correct, or delete it by sending a request to https://move.xyz. You can request to change contact choices, opt-out of our sharing with others, and update your personal information and preferences.

**Tracking Technologies Generally**

Regular cookies may generally be disabled or removed by tools available as part of most commercial browsers, and in some instances blocked in the future by selecting certain settings. For more information, please see the section entitled "Cookies Policy" below

## CONTACT INFORMATION

We welcome your comments or questions about this Policy, and you may contact us at: https://move.xyz.

## CHANGES TO THIS PRIVACY POLICY

We may change this Privacy Policy at any time without prior notice to you. We encourage you to periodically review this page for the latest information on our privacy practices. If we make any changes, we will change the Last Updated date above to reflect when those changes were made.

Any modifications to this Privacy Policy will be effective upon our posting of the new terms and/or upon implementation of the changes to the Site (or as otherwise indicated at the time of posting). In all cases, your continued use of the Site or Services after the posting of any modified Privacy Policy indicates your acceptance of the terms of the modified Privacy Policy.

## NOTICE TO CALIFORNIA RESIDENTS

Under California Civil Code Section 1789.3, California users are entitled to the following consumer rights notice: California residents may reach the Complaint Assistance Unit of the Division of Consumer Services of the California Department of Consumer Affairs by mail at 1625 North Market Blvd., Sacramento, CA 95834, or by telephone at (916) 445-1254 or (800) 952-5210.

This section provides additional details about the personal information we collect about California consumers and the rights afforded to them under the California Consumer Privacy Act or "CCPA."

For more details about the personal information we collect from you, please see the "What We Collect" section above. We collect this information for the business and commercial purposes described in the "Use of Personal Information" section above. We share this information with the categories of third parties described in the "Sharing of Personal Information" section above. We do not sell (as such term is defined in the CCPA) the personal information we collect (and will not sell it without providing a right to opt out). Please refer to our Cookie Policy below for more information regarding the types of third-party cookies, if any, that we use.

Subject to certain limitations, the CCPA provides California consumers the right to request to know more details about the categories or specific pieces of personal information we collect (including how we use and disclose this information), to delete their personal information, to opt out of any "sales" that may be occurring, and to not be discriminated against for exercising these rights.

California consumers may make a request pursuant to their rights under the CCPA by contacting us at legal@consensys.net. Please note that you must verify your identity and request before further action is taken. As a part of this process, government identification may be required. Consistent with California law, you may designate an authorized agent to make a request on your behalf. In order to designate an authorized agent to make a request on your behalf, you must provide a valid power of attorney, the requester's valid government issued identification, and the authorized agent's valid government issued identification.

### NOTICE TO EU DATA SUBJECTS

### Personal Information

With respect to EU data subjects, "personal information," as used in this Privacy Policy, is equivalent to "personal data" as defined in the European Union General Data Protection Regulation (GDPR).

### Sensitive Data

Some of the information you provide us may constitute sensitive data as defined in the GDPR (also referred to as special categories of personal data), including identification of your race or ethnicity on government-issued identification documents.

### Legal Bases for Processing

We only use your personal information as permitted by law. We are required to inform you of the legal bases of our processing of your personal information. If you have questions about the legal bases under which we process your personal information, contact us at https://move.xyz.

### Use for New Purposes

We may use your personal information for reasons not described in this Privacy Policy, where we are permitted by law to do so and where the reason is compatible with the purpose for which we collected it. If we need to use your personal information for an unrelated purpose, we will notify you and explain the applicable legal basis for that use. If we have relied upon your consent for a particular use of your personal information, we will seek your consent for any unrelated purpose.

### Your Rights

Under the GDPR, you have certain rights regarding your personal information. You may ask us to take the following actions in relation to your personal information that we hold:

- Opt-out. Stop sending you direct marketing communications which you have previously consented to receive. We may continue to send you Service-related and other non-marketing communications.
- Access. Provide you with information about our processing of your personal information and give you access to your personal information.
- Correct. Update or correct inaccuracies in your personal information.
- Delete. Delete your personal information.
- Transfer. Transfer a machine-readable copy of your personal information to you or a third party of your choice.
- Restrict. Restrict the processing of your personal information.
- Object. Object to our reliance on our legitimate interests as the basis of our processing of your personal information that impacts your rights.

You can submit these requests by email to https://move.xyz. We may request specific information from you to help us confirm your identity and process your request. Applicable law may require or permit us to decline your request. If we decline your request, we will tell you why, subject to legal restrictions. If you would like to submit a complaint about our use of your personal information or response to your requests regarding your personal information, you may contact us at https://move.xyz or submit a complaint to the data protection regulator in your jurisdiction. You can find your data protection regulator here.

**Cross-Border Data Transfer**

Please be aware that your personal data will be transferred to, processed, and stored in the United States. Data protection laws in the United States may be different from those in your country of residence. You consent to the transfer of your information, including personal information, to the United States as set forth in this Privacy Policy by visiting our site or using our service.

Whenever we transfer your personal information out of the EEA to the United States or countries not deemed by the European Commission to provide an adequate level of personal information protection, the transfer will be based on a data transfer mechanism recognized by the European Commission as providing adequate protection for personal information.

Please contact us if you want further information on the specific mechanism used by us when transferring your personal information out of the EEA.

# Terms of Use

Movement DAO takes the law very seriously. All individuals who engage with the Movment DAO platform should understand the legal disclaimers. Have fun.

**Disclaimer**

*Movement DAO seeks to be as diligent as possible in compiling and updating the information on its website. However, there is no guarantee of the correctness and completeness of the information provided herein. Equally, the DAO does not guarantee that this information is always up-to-date and such information is subject qualify to change without prior notice.*

*Certain capitalized terms are described in the Glossary and above in the FAQ. The FAQs is a summary based on the information found on this site or provided to the members by the DAO. Members should consult his or her own tax, financial, and legal advisors prior to making any investment in the DAO. Nothing in these FAQs shall be considered to be tax, financial, or legal advice to any member purchasing tokens or otherwise contributing to the DAO. For questions, please reach out to https://move.xyz.*

**Terms of Use**

Effective Date: January 3, 2022

Welcome to Movement DAO! Please read these Terms of Use (the "Agreement" or "Terms") carefully, along with any other policies or notices and our Privacy Policy (defined below) located at https://move.xyz, as they lay out the rules, terms, and guidelines for you to follow when using and accessing our website or participating in the DAO.  This Agreement governs your use of Movement DAO and constitutes a legally binding agreement between each user ("you," "your," or "User") and Movement DAO ("we," "us," or "our")

We may revise these Terms at any time without notice to you. If you have any questions about these Terms, please contact us at https://move.xyz.

In order to be a contributor to Movement DAO or purchase tokens on the DAO, you must register for and maintain an active personal user Services account ("Account"). You must be at least eighteen (18) years of age, or the age of legal majority in your jurisdiction (if different than 18) to obtain an Account, unless a specific Service permits otherwise.

**Overview**

This section is a brief summary of the highlights of the terms of use of the DAO's website or services.  We know that many terms of services can be long and full of confusing language so we have done our best to summarize the Terms in language that you will understand.  When you accept this Agreement, you are accepting all of our Terms and not just this section. Simply by browsing the Site, you are agreeing to our Terms, so please read carefully.

Movement DAO is an experimental, novel approach to nonprofits devoted to performing good works and encouraging social justice in today's contemporary society.  The DAO is a blockchain-based organization that raises funds through the purchase of tokens that entitles the purchaser, or member, to champion specific nonprofit works or projects and seek additional funding from like-minded individuals.  Movement DAO hosts blockchain software as a backend service for customers who set up their own accounts and purchase tokens.

Movement DAO is neither designed to be, nor is it set up to be, an investment vehicle and no jurisdiction has deemed any token produced by Movement DAO to be a "security" as defined by the 1933 Securities and Exchange Act ("The Act").  Movement DAO is specifically designed to take advantage of the benefits of the blockchain and cryptocurrencies to ensure that contributions to nonprofit works will have a larger impact based upon larger financial backing than traditional nonprofit corporations or charities.

How You Accept These Terms

By accessing our site or setting up an account in any manner, you acknowledge that you have read, understood, and agree to these Terms, as well as the accompanying privacy policy ("Privacy Policy"), which is accessible at https://move.xyz.

Note that we reserve the right to modify the Terms at any time in our sole discretion. Any changes to the Terms will be posted on our website at https://move.xyz and will become effective immediately upon posting. It is your responsibility to check for updates to these Terms periodically.

**Eligibility**

You must be at least eighteen (18) years of age, or the age of legal majority in your jurisdiction (if different than eighteen (18) years of age), to contribute to Movement DAO or purchase tokens. In addition the purchase of tokens at this point is limited to those who qualify as "accredited" investors under the Act.

You can only participate in and enjoy the benefits of membership to the extent the laws of your jurisdiction or the laws of the United States do not bar you from doing so. Please make sure these Terms are in compliance with all laws, rules, and regulations that apply to you.

By contributing to Movement DAO or becoming a member of our community, you represent and warrant that you meet all eligibility requirements we outline in these Terms. We always reserve the right to exercise our discretion as we see fit to refuse to allow certain individuals to contribute or become members of the DAO and further we may also change our eligibility criteria at any time.

Your Account With Movement DAO

In order to become a member of our community, you will need to create an Account to be able to purchase tokens as outlined above.  In order to create an Account, you will need to provide us with your your full name, organization, email address, phone number, billing address and account login information. In addition, we may collect information regarding other accounts you choose to link with Movement DAO (e.g., Metamask, Google, etc.).

By creating an Account, here are a few common sense rules and acknowledgements that we ask you comply with and understand:

**Be honest with us**. Provide accurate information about yourself. It is not copacetic to use false information or impersonate another person or company through your Account. Any failure to provide complete and accurate information can lead to the immediate termination of your Account -- and we do not want to do that!

**You are responsible for your Account**. You are solely responsible for any activity on your Account or any actions undertaken by your membership in a community. If you are sharing an Account with other people (e.g., if you are representing a business entity or trust), then you will ultimately be responsible for all activity. If you are registering as a business entity, you personally guarantee that you have the authority to agree to the Terms on behalf of the business and must notify us that you are purchasing the tokens on behalf of a business which membership shall be managed by you. Your Account is not transferable. You are solely responsible for any activity on your Account, so it is important to keep your Account password secure. In case of a dispute over the identity of the user, the authorized account holder of the Movement DAO or purchaser of the tokens will be deemed to be the user. "Authorized account holder" of an account is defined as the natural person assigned to the email address associated with the Account.

**Be clear about our relationship**. Creating an account and purchasing tokens from Movement DAO does not create an agency, partnership, joint venture, employment, or franchisee relationship with the DAO. No confidential, fiduciary, contractually implied, or other relationship is created with the DAO other than pursuant to these Terms.  You will become a member of the community and enjoy all of the rights and benefits of membership as outlined above.

**Passwords**. You are responsible for safeguarding the password that you use to access Movement DAO or any wallet designed to hold any tokens purchased through the DAO.  We encourage you to use "strong" passwords with your Account.

**Emails**. By creating an Account, you agree that you may receive communications from Movement DAO, such as newsletters, special offers, and account reminders and updates. You will also receive emails or communications designed to update you on any project or movement that you have indicated interests you and in which you wish to participate.

**Impersonation**. If someone has created an account in which he or she pretends to be you, and you send us a request to take down that account, please be sure that you have included the email address of the fake account. You agree to: (a) immediately notify us upon becoming aware of any unauthorized use of your password or Account or any other breach of security; and (b) ensure that you exit from your Account at the end of each session when using Movement DAO.

We will not be liable for any loss or damage arising from your failure to comply with this section of the Terms.

**Intellectual Property**

Movement DAO contains material, trademarks, and other proprietary information, including but not limited to text, software, photos, and graphics, and may in the future include video, graphics, music, and sound ("Content"), which is protected by copyright law, unregistered trademarks, database rights, and other intellectual property rights. Unless otherwise provided, we exclusively own the Content and your membership in a community of the DAO does not grant you any right, title, or interest in or to the Content.

**Your Use of Our Services**

You are responsible for all of your activity in connection with Movement DAO and for any use of your Movement DAO Account or use of the tokens. When using your membership in accordance with these Terms, we grant you a limited, personal, non-commercial, non-exclusive, non-transferable, non-assignable, and revocable license to use Movement DAO and its name, resources and services. When using the rights of your membership, we ask that you abide by some common sense ground rules:

**Don't Use Your Membership to Break the Law or Sponsor Movements that are Illegal**. You agree that you will not violate any laws when associated with Movement DAO. This includes any local, provincial, state, federal, national, or international laws or regulations that may apply to you.

**Don't Try To Harm Our System**. You agree not to distribute any virus, worm, Trojan horse, or other harmful computer virus or malicious code through Movement DAO. You also agree to not take any action that may impose an unreasonable or disproportionately large load on our infrastructure.

**Don't Attempt to Circumvent Our Security**. You agree not to bypass, circumvent, or attempt to bypass or circumvent any measures we may use to prevent or restrict access to Movement DAO, including without limitation other accounts, computer systems, or networks or virtual networks connected to Movement DAO.

**Respect our Service**. Do not take any action that: (i) interferes or attempts to interfere with the proper working of Movement DAO; (ii) circumvents any security-related features of Movement DAO; (iii) recruits or otherwise solicits any member of Movement DAO to participate in or fund projects promoted by or recommended by the DAO; or, (iv) use your membership in any way that harms the reputation or goals of Movement DAO.

**Use of Cryptocurrency**. You represent and warrant that any cryptocurrency transfer that you make through Movement DAO is legal in your jurisdiction. We will not be held liable for any loss or damages due to your non-compliance. All cryptocurrency transfers are made voluntarily and at your sole discretion, and you realize all risks of using cryptocurrency and blockchain technology, which are generally understood and recognized in accordance with the warnings of the financial regulators of countries across the world, as well as the risks specified in this Agreement. Movement DAO is not responsible for any cryptocurrency that may be lost through the process of smart contract execution or due to the volatility of cryptocurrencies on the market.

Any use of Movement DAO, its resources or tokens, other than as specifically authorized in these Terms, without our prior written permission, is strictly prohibited and will terminate your right to membership or continued participation in Movement DAO.

**License You Grant to Us Over Member Content**.  Any content that you produce or provide to Movement DAO or its movements, including any recommendation for movements or projects, advertising or promotion of any project, will be owned by you. We do not own any of your content. However, by providing content to us, you implicitly give permission and grant us a license to use it as we deem necessary to support any project or to the benefit of the community.

When you submit code, post, or otherwise direct communications to Movement DAO (through the use of the Site, or via a phone call, email, Discord, Slack message, etc., with us) you give us a worldwide, non-exclusive, royalty-free license to modify, use, adapt, copy, reproduce, modify and publish your User Content. You agree that this license includes the right for us to use your User Content for promotion or advertising purposes and to improve the Site. You agree that the User Content is non-confidential and that we have the right to unrestricted use for any purpose, commercial or otherwise, without acknowledgment or compensation to you.

In uploading any work through our Services as User Content, you authorize other members who have access to that Service to make personal and customary use of the work and acknowledge that it may not be protected by copyright.

**Permission to Use Your Content.** You retain all ownership rights (to the extent there is any) in any User Content that you provide to Movement DAO to submit, post, or display on or through the Movement DAO. However, by submitting any User Content, you hereby grant us a universal, irrevocable, perpetual, non-exclusive, transferable, royalty-free license to use, view, copy, adapt, modify, distribute, license (including under an open source license), sell, transfer, publicly display, publicly perform, transmit, stream, broadcast, access, view, and otherwise exploit such User Content, in full or in part, in connection with Movement DAO or its projects or movements, subject to the terms of our Privacy Policy. Note that this means that we may use any published listings for commercial means and may sell or exchange information (except personal information pursuant to our Privacy Policy) with third parties.

**Responsibility for Your Content**. You should only provide Content that you have the right to share and are comfortable sharing with others under this Agreement.  You are proscribed from uploading, posting, or otherwise transmitting any User Content to, or through, Movement DAO including the suggestion of any project or movement or content in support of a project or movement that infringes, misappropriates, or otherwise violates any copyright, trademark, or other intellectual property right, right of privacy, right of publicity, or any other right of any entity or person, or that is unlawful, threatening, libelous, defamatory, obscene, scandalous, inflammatory, pornographic, or profane, or that could constitute or encourage conduct that would be considered a criminal offense, give rise to civil liability, or otherwise violate any law or Movement DAO rule or policy. If you do so, we reserve the right to remove any and all of your User Content from our site or material provided to our members at any time in our sole discretion.  Moreover, you warrant that you have all rights, licenses, consents, permissions and authority necessary to grant the rights granted herein for any Content submitted or posted on the Movement DAO. You specifically represent and warrant that such Content will not contain material subject to copyright or other proprietary rights, unless you possess legal entitlement to that material and the authority to grant the license described above.

**Approval of Content**. We do not verify or pre-approve any posted User Content, and material in the form of opinions and we specifically state that any opinion published or otherwise provided by a member is not adopted by the DAO nor the opinion of Movement DAO.

**Warranty & Limitation of Liability (or The Things You Cannot Sue Us For)**

**Limitation of Liability**

TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN NO EVENT WILL WE OR ANY OF OUR OFFICERS, DIRECTORS, REPRESENTATIVES, AGENTS, SERVANTS, COUNSEL, EMPLOYEES, CONSULTANTS, LAWYERS, AND OTHER PERSONNEL AUTHORIZED TO ACT, ACTING, OR PURPORTING TO ACT ON OUR BEHALF (COLLECTIVELY THE "MOVEMENT DAO") BE LIABLE TO YOU UNDER CONTRACT, TORT, STRICT LIABILITY, NEGLIGENCE, OR ANY OTHER LEGAL OR EQUITABLE THEORY, FOR: (A) ANY LOST PROFITS, DATA LOSS, COST OF PROCUREMENT OF SUBSTITUTE GOODS OR SERVICES, OR DIRECT, INDIRECT, INCIDENTAL, SPECIAL, PUNITIVE, COMPENSATORY, OR CONSEQUENTIAL DAMAGES (INCLUDING ATTORNEYS' FEES AND ALL RELATED COSTS AND EXPENSES OF LITIGATION AND ARBITRATION, OR AT TRIAL OR ON APPEAL, IF ANY, WHETHER OR NOT LITIGATION OR ARBITRATION IS INSTITUTED) OF ANY KIND WHATSOEVER RESULTING FROM: (I) YOUR MEMBERSHIP IN MOVEMENT DAO; (II) ANY MONETARY LOSS YOU ASSOCIATE WITH THE PURCHASE OF ANY TOKENS ASSOCIATED WITH MOVEMENT DOA; (III) ANY LOSS YOU ASSOCIATE WITH A PROJECT OR MOVEMENT IN WHICH YOU PARTICIPATE OR CONTRIBUTE THE BACKING OF YOUR TOKENS.

THESE LIMITATIONS APPLY REGARDLESS OF LEGAL THEORY, WHETHER BASED ON TORT, STRICT LIABILITY, BREACH OF CONTRACT, BREACH OF WARRANTY, OR ANY OTHER LEGAL THEORY, AND WHETHER OR NOT WE WERE ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OR LIMITATION OF LIABILITY FOR CONSEQUENTIAL OR INCIDENTAL DAMAGES, SO THE ABOVE LIMITATION MAY NOT APPLY TO YOU.

**Warranty Disclaimer**

MOVEMENT DAO MAKES NO WARRANTY OF SUCCESS OF ANY PROJECT OR MOVEMENT NOR DOES IT MAKE REPRESENTATION OR WARRANTY REGARDING THE WORTH OR VALUE OF ANY TOKEN PURCHASED IN SUPPORT OF A PROJECT OR MOVEMENT.  THE MEMBER AGREES THAT HE OR SHE ACCEPTS ALL RISK OF LOSS FOR ANY TOKEN PURCHASED THROUGH MOVEMENT DAO AND THAT NO REPRESENTATION REGARDING THE FUTURE VALUE OF ANY TOKEN HAS BEEN PROVIDED TO ANY MEMBER OF THE DAO.

SOME STATES DO NOT ALLOW THE DISCLAIMER OF IMPLIED WARRANTIES, SO THE FOREGOING DISCLAIMERS MAY NOT APPLY TO YOU. THIS PARAGRAPH GIVES YOU SPECIFIC LEGAL RIGHTS AND YOU MAY ALSO HAVE OTHER LEGAL RIGHTS THAT VARY FROM STATE TO STATE.

**Indemnification (or What Happens If You Get Us Sued)**

To the extent permitted by applicable law, you agree to defend, indemnify, and hold harmless the Movement DAO from and against any and all claims, damages, obligations, losses, liabilities, costs or debt, and expenses (including but not limited to attorneys' fees) arising from: (i) any action taken by you while a member that causes harm; (ii) any User Content you post, program, upload, use, distribute, store, or otherwise transmit through the Site or in conjunction with any project or movement associated with Movement DAO; (iii) your violation of any term of this Agreement; or, (iv) your violation of any law, rule, or regulation, or the rights of any third party.

**Time Limitation on Claims**

You agree that any claim you may have arising out of or related to your relationship with us must be filed within one (1) year after such claim arose where, for purposes of this section, the time that the injury or harm occurred – not when it was discovered thereafter – is where it arose; otherwise, your claim is permanently barred.

**Governing Law**

No matter where you are located, the laws of the State of Florida will govern these Terms and the parties' relationship as if you signed these Terms in Florida, without regard to Florida state's conflicts of laws rules. If any provisions of these Terms are inconsistent with any applicable law, those provisions will be superseded or modified only to the extent such provisions are inconsistent. The parties agree to submit to the federal or state courts in Miami Dade County, Florida, for exclusive jurisdiction of any dispute arising out of or related to your use of the Services or your breach of these Terms.  You waive any objection based on lack of personal jurisdiction, place of residence, improper venue, or *forum non conveniens* in any such action.

Our failure to enforce any right or provision of these Terms will not be considered a waiver of those rights. If any provision of these Terms is held to be invalid or unenforceable by a court, the remaining provisions of these Terms will remain in effect.

**Note to International Users**

Movement DAO is based in the United States, but will have international reach. If you are a user accessing the Site from the European Union, Asia, or any other region with laws or regulations governing personal data collection, use, and disclosure that differ from United States laws, please be advised that through your continued use of the Site, which is governed by United States law, you are transferring your personal information to the United States and you consent to that transfer.

**Termination**

We reserve the right to terminate your membership for misconduct or conduct detrimental to the community upon vote by the community.  Termination of membership removes the right to vote on any action of any movement, suggest movements, make recommendations or suggestions to any movement, but it does not deprive the member of his or her tokens.  That member shall still be allowed to sell the tokens, at his or her discretion, on the bonding curve, as outlined above.

**No Waiver**

Our failure to exercise, or delay in exercising, any right, power, or privilege under this Agreement shall not operate as a waiver; nor shall any single or partial exercise of any right, power, or privilege preclude any other or further exercise thereof.

**Severability**

If it turns out that any term or provision of this Agreement is invalid, void, or, for any reason, unenforceable, such term or provision will be deemed severable and limited or eliminated to the minimum extent necessary. The limitation or elimination of this term or provision will not affect any other terms of this Agreement.

**Mandatory Arbitration & Waiver of Right to Class Action**

The parties agree to mandatory arbitration to resolve any dispute arising from this Agreement or your membership or association with Movement DAO. ARBITRATION PREVENTS YOU FROM SUING IN COURT OR FROM HAVING A JURY TRIAL. THE PARTIES HEREBY EXPRESSLY WAIVE TRIAL BY JURY. The parties agree that: (i) any arbitration will occur in Miami, FL; and, (ii) the arbitration will be conducted confidentially by a single arbitrator in accordance with the rules of American Arbitration Association for arbitration of consumer-related disputes, in the English language, and with limited discovery. At your request, hearings may be conducted in person or virtually or telephonically and the arbitrator may provide for submitting and determining motions on briefs, without oral hearings. Other than class procedures and remedies discussed below, the arbitrator has the authority to grant any remedy that would otherwise be available to a court or other tribunal. THE PREVAILING PARTY IN ANY ACTION OR PROCEEDING TO ENFORCE THESE TERMS SHALL BE ENTITLED TO COSTS AND ATTORNEYS' FEES. THE ARBITRATION DECISION MAY BE ENFORCED IN ANY COURT. WHETHER THE DISPUTE IS HEARD IN ARBITRATION OR IN COURT, YOU AND MOVEMENT DAO WILL NOT PARTICIPATE IN OR COMMENCE A CLASS ACTION LAWSUIT, CLASS ARBITRATION, OR OTHER SIMILAR REPRESENTATIVE ACTION OR PROCEEDINGS.  YOU SPECFICALLY ACKNOWLEDGE THAT BY BECOMING A MEMBER OF MOVEMENT DAO YOU VOLUTARILY GIVE UP THESE RIGHTS.

**Force Majeure**

We shall not be held liable for any delays, failure in performance, or interruptions of service which result directly or indirectly from any cause or condition beyond our reasonable control, including but not limited to: any delay or failure due to any act of God, act of civil or military authorities, act of terrorism, civil disturbance, war, strike or other labor dispute, fire, interruption in telecommunications or Internet services or network provider services, failure of equipment and/or software, other catastrophe, or any other occurrence which is beyond our reasonable control and shall not affect the validity and enforceability of any remaining provisions.  This would include any delay in providing funding to a movement or other delay associated with a project of Movement DAO due to an act described above.

**Entire Agreement**

This Agreement sets forth the entire understanding and agreement as to the subject matter hereof including membership in Movement DAO or the purchase of any tokens associated with Movement DAO and supersedes any and all prior discussions, agreements, and understandings of any kind (including without limitation any prior versions of this Agreement) and every nature between us. Except as provided for above, any modification to this Agreement must be in writing and must be signed by both parties.

**Questions or Comments**

We welcome comments, questions, concerns, and suggestions.  Please send us a message at https://move.xyz.

# Exhibit 3

2/17/23, 1:27 PM   FBI — Co-Founder of High-Tech Company Sentenced to Prison for Wire Fraud, Mail Fraud, and Money Laundering

Case 1:23-cv-20727-RKA Document 24-3 Entered on FLSD Docket 08/04/2023 Page 164 of 653

 

**FEDERAL BUREAU OF INVESTIGATION**

## Seattle Division

Home • Seattle • Press Releases • 2011 • Co-Founder of High-Tech Company Sentenced to Prison for Wire Fraud, Mail Fraud, and Money Laundering

## Co-Founder of High-Tech Company Sentenced to Prison for Wire Fraud, Mail Fraud, and Money Laundering

*Former CEO Transferred Company Money to Girlfriend to Pay for Personal Luxuries*

**U.S. Attorney's Office**
July 15, 2011

**Western District of Washington**
(206) 553-7970

### Seattle Division Links

**Seattle Home**

**Contact Us**
- Overview
- Territory/Jurisdiction

**News and Outreach** 
- Press Room | Stories
- In Your Community
- Multimedia: Podcasts | Videos

**About Us**
- Our People & Capabilities
- What We Investigate
- Our Partnerships
- Seattle History

**Wanted by the FBI - Seattle**

**FBI Jobs**

MARK E. PHILLIPS, 36, of Seattle, Washington, was sentenced today in U.S. District Court in Seattle to 48 months in prison, three years of supervised release, and a fine of $15,000 for four counts of wire fraud, one count of mail fraud, and two counts of money laundering. PHILLIPS was convicted March 2, 2011, following a two-week jury trial. PHILLIPS, the founder and former CEO of MOD Systems, Incorporated, has been in custody since his pretrial release was revoked in August 2010. PHILLIPS was first charged and arrested in March 2010. At sentencing U.S. District Judge John C. Coughenour told him, "America is the place to come if you have an idea...to invest in the idea...to see that idea grow and change the world...that is all in jeopardy when people's greed and lies elude the system of laws."

According to filings in the case and testimony at trial, PHILLIPS is a co-founder of MOD and served as a director and chief executive officer of MOD from its founding in 2005, until March 27, 2009. MOD is a start-up technology company engaged in the business of developing music and video downloading technology for retail kiosks. The company notified federal investigators of suspected embezzlement of corporate funds by PHILLIPS on March 16, 2010, which caused federal investigators to examine a series of wire transfers made out of the company's account. Records indicate that PHILLIPS caused company money to be transferred to a bank account controlled by his then-girlfriend. The money was supposed to be used to pay for services provided by the woman's company, but she never invoiced the company for any services or kept any of the money transferred into her account. Instead, the money was controlled by PHILLIPS, and he directed her to pay for luxuries for himself, including an expensive watch and a personal investment in another start-up company. Additionally, PHILLIPS had transferred $1.5 million out of the company to his personal account in April 2008, as a down payment for a $2.3 million penthouse. PHILLIPS lied to the MOD financial vice-president, claiming the board had approved the transfer. PHILLIPS was forced to repay the money.

In asking for a lengthy sentence, prosecutors wrote to the court that PHILLIPS' fraud tore the trust of the entrepreneurial community. "Phillips not only put MOD's ideas—the innovative products that MOD was developing—at risk, but he put its shareholders, and its employees' livelihoods at risk. These small companies have no chance at success if their officers and directors do not follow and adhere to these basic principles. A significant sentence is appropriate in this case because it will send a clear signal to the community that this type of fraud, looting, and embezzlement by corporate officers and directors trusted to build companies, not destroy them, is not tolerated."

The case was investigated by the FBI, the Internal Revenue Service Criminal Investigation (IRS-CI) and the U.S. Postal Inspection Service (USPIS). The case was prosecuted by Assistant United States Attorneys Aravind Swaminathan and Matthew Diggs.

For additional information please contact Emily Langlie, Public Affairs Officer for the United States Attorney's Office, at (206) 553-4110 or Emily.Langlie@USDOJ.gov.

This content has been reproduced from its original source.

Accessibility | eRulemaking | Freedom of Information Act | Legal Notices | Legal Policies and Disclaimers | Links | Privacy Policy | USA.gov | White House
FBI.gov is an official site of the U.S. government, U.S. Department of Justice

Close

Case 1:23-cv-20727-RKA Document 24-1 Entered on FLSD Docket 08/01/2023 Page 165 of 653

# Exhibit 4

## Filed Under Seal

# Exhibit 5



**snapshot**


Connect wallet





← Back

# MIP-0000: Adopt the Guiding Principles, Terms of Service, and Code of Conduct

Closed      Movement DAO: Consensus Space by filipv.eth    ···

*Adopt the DAO's Guiding Principles, Terms of Service, and Code of Conduct.*

# View Proposal →

1. Exhibit A
2. Exhibit B
3. Exhibit C
4. Exhibit D
5. Exhibit E

*PDF Download │ IPFS Mirror*

Votes  8                                                                    ⬇

servic...  [Core]                 For                        10M MOVE  𝓃

0x58Ba...1650                     For                        9.5K MOVE  𝓃

2/21/23, 2:07 PM    MoveDAO RKA Consensus Space proposal: Entered Adopt The Building Principles, Procedures, and Code of Conduct
Case 1:23-CV-20727-RKA   Document 24-5   Entered on FLSD Docket 03/01/2023   Page 169 of
653

| | | | |
|---|---|---|---|
| 🟢 obstacker.eth | | For | 4.2K MOVE 〰 |
| ⚪ rice$cr... (Core) | | For | 2.2K MOVE 〰 |
| 🟠 natasha-pan... | | For | 187 MOVE 〰 |
| 🔴 pillowfightcl... | | For | 39 MOVE 〰 |
| 🟤 partypants.eth | | For | 39 MOVE 〰 |
| 🔵 tankbo... (Core) | | For | 0 MOVE 〰 |

## Information

| | |
|---|---|
| **Strategie(s)** | 🔵🔴 |
| **IPFS** | #bafkrei |
| **Voting system** | Basic voting |
| **Start date** | Aug 23, 2022, 12:00 AM |
| **End date** | Aug 30, 2022, 12:00 AM |
| **Snapshot** | 15,399,566 |

## Results

| | | |
|---|---|---|
| For | 10M MOVE | 100% |
| Against | 0 MOVE | 0% |

2/21/23, 2:46 PM    Movement DAO Consensus Space proposal: Entered Adopt the Building Principles, Ethos and Code of Conduct

Case 1:23-cv-20727-RKA   Document 24   Entered on FLSD Docket 03/01/2023   Page 170 of
653

I voted POAP



Vote to get this POAP



Mint

2/21/23, 2:20 PM MoveDAO Consensus Space proposal: Enforced Adopt the Building Principles, Focus of Service, and Code of Conduct

Case 1:23-cv-20727-RKA Document 24 Entered on FLSD Docket 03/01/2023 Page 171 of 653

 Founding Proposals      Adopt the Guiding Principles, Terms of Service, and Code of Conduct

# Adopt the Guiding Principles, Terms of Service, and Code of Conduct

> Authors: tankbottoms.eth, filipv.eth
> Date: 2022-08-23

## Thesis

The name of the DAO is **Movement DAO** or ("Move", or "mDAO", "DAO"), which was formed as a Delaware Unincorporated Nonprofit Association.

Adopt the DAO's Guiding Principles, Terms of Service, and Code of Conduct, attached hereto as Exhibits B, C, and D. Appoint **Benjamin Reed** (**benreed.eth**) to act as the DAO's Secretary, **Authorized Member**, and to file the necessary federal application for the DAO IRS EIN Number Application, as well as to research and prepare the required documents for the DAO affiliate entities, including DAOLABS, in order to comply with applicable law.

- Guiding Principles: Establish the DAO as an Unincorporated Nonprofit Association pursuant to the Delaware Unincorporated Nonprofit Association Act.
- Terms of Service: An agreement between the DAO and parties who use the DAO's services or resources.
- Code of Conduct: Defines community Member standards and community enforcement guidelines.

## Motivation

The DAO seeks clarity with regards to legal structure and the relationship between its Members and non-Members alike. These agreements contribute to a healthy, transparent and well functioning organization while addressing the lack of clear legal guidance regarding "DAOs".

The Community Conduct Guidelines establish expectations for all Members' conduct. The Terms of Service establishes the agreement between the DAO and users of the DAO's decentralized

application.

The appointment of an **Authorized Member** will enable the DAO to properly structure the product entities, non-profit entities, and account for each cost center properly. In an overall effort to move to transparent operations managing payouts from the appropriate legal entity, including the management of cryptocurrency on-ramp and off-ramp solutions, and the protection and management of intellectual property concerns via DAO affiliates such as DAOLABS. Prepare future proposal mip-0003 in which to seek budget and funding to deploy the DAO affiliates. The Service Providers will prepare these affiliate entities, governance, and develop processes for ongoing governance, of while some portion of the above budget will be used for reimbursements of expenses, legal fees, and other costs.

# Specification

Ratify and adopt the DAO's Guiding Principles, Terms of Service, and Code of Conduct.

Update the DAO's Discord server, docs, and other relevant resources to reflect these changes.

# Rationale

Ratifying the Guiding Principles establishes an Unincorporated Nonprofit Association, which, in turn, will:

- recognize the DAO's legal standing as an entity;
- allow the DAO to hold accounts, property, and enter into agreements;
- clarify Membership processes, e.g. define duties owed to each other;
- adopt the Unincorporated Nonprofit Association model act language, where appropriate;
- establish and adopt unique and specific terms with regards to the DAO's structure, operations, and ownership of property;
- adopt the role of the Service Provider and the activities authorized; and
- remove ambiguity generally, i.e. regarding its intellectual property.

The Terms of Service will clarify the DAO's:

- requirement for parties interacting with the DAO's application and resources to take full responsibility;

- unambiguous position on the DAO's adherence to state and federal statues;

- risks associated with reliance and deference to the technology employed in the DAO's operation;

- conditions of use, demand for compliance with all applicable laws and regulations (including U.S. Securities law, Office of Foreign Assets Control compliance, etc.);

- explicit prohibited activities (including activities which are illegal or harmful to the DAO or its Members);

- limitations in liability, and disclaimers by the DAO;

- requirement for indemnification by the user under certain circumstances;

- requirement for the user to promise not to sue the DAO, or its Members;

- language regarding arbitration, and processes for dispute resolution;

- process on computation of damages, attorney fee's, and notice via Blockscan;

- privacy policy, including a verbose general warning on blockchain usage;

- risks associated with DAO's online resources; and

- users' legal, financial, and ethical responsibilities when using the DAO's resources.

The Code of Conduct will state the DAO's position with regards to:

- requirements for Members to unequivocally be honest;

- community standards emphasizing honesty, inclusion, and respect; and

- enforcement guidelines for Members who violate these standards.

The DAO's Unincorporated nonprofit association requires an authorized Secretary and Member to file the necessary federal application for the DAO's IRS EIN Number Application.

# Risks

- By forming an Unincorporated Nonprofit Association, the DAO may incur taxes.

- These documents may not adequately address DAO's legal concerns.

- These documents are long and may be difficult to read.

# Timeline

Case 1:23-cv-20727-RKA   Document 84-1   Entered on FLSD Docket 03/01/2026   Page 175 of
653

These documents should be implemented once this proposal is ratified, only to be removed when superseded or amended by another proposal seeking to do the same.

# Snapshot Consensus by the DAO Members

Whereas the DAO through its Members voted to adopt the following actions via Snapshot and resolved as follows:

**RESOLVED:** That the **Guiding Principles** are hereby adopted as the Guiding Principles;

**RESOLVED FURTHER:** that the **Code of Conduct** is hereby adopted as the Code of Conduct;

**RESOLVED FURTHER:** that the **Terms of Service** is hereby adopted as the Terms of Service;

**RESOLVED FURTHER:** that Member **benreed.eth** shall serve as the **DAO's Authorized Member** and its **Secretary**, to serve until his respective successor is duly elected and qualified.

**RESOLVED FURTHER:** that Member **tankbottoms.eth** shall serve as an **Authorized Member** to serve until his respective successor is duly elected and qualified.

The Authorized Member, **benreed.eth**, **tankbottoms.eth** and the Service Provider are hereafter referred to together as the **Service Providers.**

**RESOLVED FURTHER:** that the Certificate of Adoption of the DAO Organizational Documents, labelled Exhibit A, by **benreed.eth**, the DAO's Secretary, and submitted to Snapshot Consensus is hereby approved.

**RESOLVED FURTHER:** that, in accordance with the powers of the Members specified in the Guiding Principals, the Service Providers of the DAO are authorized to execute and deliver any agreement in the name of the DAO and to otherwise obligate the DAO with respect to the purpose of the DAO, within general guidelines and budgets approved by the Members; however, the Members, or the Service Providers, may adopt from time to time specific limitations on the authority of such an **Authorized Member**.

**RESOLVED FURTHER:** That the **Authorized Member** of the DAO in consultation with the Service Providers are authorized and directed to execute, verify and file all documents, and to take whatever actions, that are necessary or advisable to comply with all state and federal laws.

**RESOLVED FURTHER:** That the Service Providers are authorized to apply for a federal employer identification number on Form SS-4 for any contemplated DAO affiliate entities.

**RESOLVED FURTHER:** That the Service Providers are authorized to direct the responsible attorneys, paralegals and, or assistants or consultants of dao-lawfirm.eth, or counsel for the DAO, to submit on behalf of the DAO, and any affiliate entities, an online application for a federal employer identification number on Form SS-4.

**RESOLVED FURTHER:** That the **Service Providers** of the DAO are each authorized and empowered to take any and all such further action, to execute and deliver any and all such further agreements, instruments, documents and certificates and to pay such expenses, in the name and on behalf of the DAO, as any of each of the **Service Providers** may deem necessary or advisable to effectuate the purposes and intent of the resolutions hereby adopted, the taking of such actions, the execution and delivery of such agreements, instruments, documents and certificates and the payment of such expenses by any such **Service Providers** to be conclusive evidence of his or her authorization hereunder and the approval thereof.

**RESOLVED FURTHER:** That any and all actions taken by the **Service Providers** of the DAO to carry out the purposes and intent of the foregoing resolutions prior to their adoption are approved, ratified and confirmed. As used in this document, the words "herein," "hereof," "hereby" and "hereunder" shall refer to this document as a whole, and not to any particular section, provision, or subdivision of this document.

This action by the DAO Member by Snapshot vote shall be effective as of the date the DAO Entities receives the consent of the DAO at the end of the Snapshot vote. This action by the DAO Members consent may be executed in any number of counterparts, each of which shall constitute an original and all of which together shall constitute one action.

## Authors

1. 0x30670D81E487c80b9EDc54370e6EaF943B6EAB39
2. 0x5d95baEBB8412AD827287240A5c281E3bB30d27E

✏️ Edit this page

# Adopt the Guiding Principles, Terms of Service, and Code of Conduct

Authors: tankbottoms.eth, filipv.eth
Date: 2022-08-23

## Thesis

The name of the DAO is **Movement DAO** or ("Move", or "mDAO", "DAO"), which was formed as a Delaware Unincorporated Nonprofit Association.

Adopt the DAO's Guiding Principles, Terms of Service, and Code of Conduct, attached hereto as Exhibits B, C, and D. Appoint **Benjamin Reed** (**benreed.eth**) to act as the DAO's Secretary, **Authorized Member**, and to file the necessary federal application for the DAO IRS EIN Number Application, as well as to research and prepare the required documents for the DAO affiliate entities, including DAOLABS, in order to comply with applicable law.

- Guiding Principles: Establish the DAO as an Unincorporated Nonprofit Association pursuant to the Delaware Unincorporated Nonprofit Association Act.
- Terms of Service: An agreement between the DAO and parties who use the DAO's services or resources.
- Code of Conduct: Defines community Member standards and community enforcement guidelines.

## Motivation

The DAO seeks clarity with regards to legal structure and the relationship between its Members and non-Members alike. These agreements contribute to a healthy, transparent and well functioning organization while addressing the lack of clear legal guidance regarding "DAOs".

The Community Conduct Guidelines establish expectations for all Members' conduct. The Terms of Service establishes the agreement between the DAO and users of the DAO's decentralized application.

The appointment of an **Authorized Member** will enable the DAO to properly structure the product entities, non-profit entities, and account for each cost center properly. In an overall effort to move to transparent operations managing payouts from the appropriate legal entity, including the management of cryptocurrency on-ramp and off-ramp solutions, and the protection and management of intellectual property concerns via DAO affiliates such as DAOLABS. Prepare future proposal mip-0003 in which to seek budget and funding to deploy the DAO affiliates. The Service Providers will prepare these affiliate entities, governance, and develop processes for ongoing governance, of while some portion of the above budget will be used for reimbursements of expenses, legal fees, and other costs.

1

## Specification

Ratify and adopt the DAO's Guiding Principles, Terms of Service, and Code of Conduct.

Update the DAO's Discord server, docs, and other relevant resources to reflect these changes.

## Rationale

Ratifying the Guiding Principles establishes an Unincorporated Nonprofit Association, which, in turn, will:

- recognize the DAO's legal standing as an entity;
- allow the DAO to hold accounts, property, and enter into agreements;
- clarify Membership processes, e.g. define duties owed to each other;
- adopt the Unincorporated Nonprofit Association model act language, where appropriate;
- establish and adopt unique and specific terms with regards to the DAO's structure, operations, and ownership of property;
- adopt the role of the Service Provider and the activities authorized; and
- remove ambiguity generally, i.e. regarding its intellectual property.

The Terms of Service will clarify the DAO's:

- requirement for parties interacting with the DAO's application and resources to take full responsibility;
- unambiguous position on the DAO's adherence to state and federal statues;
- risks associated with reliance and deference to the technology employed in the DAO's operation;
- conditions of use, demand for compliance with all applicable laws and regulations (including U.S. Securities law, Office of Foreign Assets Control compliance, etc.);
- explicit prohibited activities (including activities which are illegal or harmful to the DAO or its Members);
- limitations in liability, and disclaimers by the DAO;
- requirement for indemnification by the user under certain circumstances;
- requirement for the user to promise not to sue the DAO, or its Members;
- language regarding arbitration, and processes for dispute resolution;
- process on computation of damages, attorney fee's, and notice via Blockscan;
- privacy policy, including a verbose general warning on blockchain usage;
- risks associated with DAO's online resources; and
- users' legal, financial, and ethical responsibilities when using the DAO's resources.

The Code of Conduct will state the DAO's position with regards to:

- requirements for Members to unequivocally be honest;

- community standards emphasizing honesty, inclusion, and respect; and
- enforcement guidelines for Members who violate these standards.

The DAO's Unincorporated nonprofit association requires an authorized Secretary and Member to file the necessary federal application for the DAO's IRS EIN Number Application.

## Risks

- By forming an Unincorporated Nonprofit Association, the DAO may incur taxes.
- These documents may not adequately address DAO's legal concerns.
- These documents are long and may be difficult to read.

## Timeline

These documents should be implemented once this proposal is ratified, only to be removed when superseded or amended by another proposal seeking to do the same.

---

## Snapshot Consensus by the DAO Members

Whereas the DAO through its Members voted to adopt the following actions via Snapshot and resolved as follows:

**RESOLVED:** That the **Guiding Principles** are hereby adopted as the Guiding Principles;

**RESOLVED FURTHER:** that the **Code of Conduct** is hereby adopted as the Code of Conduct;

**RESOLVED FURTHER:** that the **Terms of Service** is hereby adopted as the Terms of Service;

**RESOLVED FURTHER:** that Member **benreed.eth** shall serve as the **DAO's Authorized Member** and its **Secretary**, to serve until his respective successor is duly elected and qualified.

**RESOLVED FURTHER:** that Member **tankbottoms.eth** shall serve as an **Authorized Member** to serve until his respective successor is duly elected and qualified.

The Authorized Member, **benreed.eth**, **tankbottoms.eth** and the Service Provider are hereafter referred to together as the **Service Providers.**

**RESOLVED FURTHER:** that the Certificate of Adoption of the DAO Organizational Documents, labelled Exhibit A, by **benreed.eth**, the DAO's Secretary, and submitted to Snapshot Consensus is hereby approved.

**RESOLVED FURTHER:** that, in accordance with the powers of the Members specified in the Guiding Principals, the Service Providers of the DAO are authorized to execute and deliver any agreement in the name of the DAO and to otherwise obligate the DAO with respect to the purpose of the DAO, within general guidelines and budgets approved by the Members; however, the Members, or the Service Providers, may adopt from time to time specific limitations on the authority of such an **Authorized Member**.

**RESOLVED FURTHER:** That the **Authorized Member** of the DAO in consultation with the Service Providers are authorized and directed to execute, verify and file all documents, and to take whatever actions, that are necessary or advisable to comply with all state and federal laws.

**RESOLVED FURTHER:** That the Service Providers are authorized to apply for a federal employer identification number on Form SS-4 for any contemplated DAO affiliate entities.

**RESOLVED FURTHER:** That the Service Providers are authorized to direct the responsible attorneys, paralegals and, or assistants or consultants of dao-lawfirm.eth, or counsel for the DAO, to submit on behalf of the DAO, and any affiliate entities, an online application for a federal employer identification number on Form SS-4.

**RESOLVED FURTHER:** That the **Service Providers** of the DAO are each authorized and empowered to take any and all such further action, to execute and deliver any and all such further agreements, instruments, documents and certificates and to pay such expenses, in the name and on behalf of the DAO, as any of each of the **Service Providers** may deem necessary or advisable to effectuate the purposes and intent of the resolutions hereby adopted, the taking of such actions, the execution and delivery of such agreements, instruments, documents and certificates and the payment of such expenses by any such **Service Providers** to be conclusive evidence of his or her authorization hereunder and the approval thereof.

**RESOLVED FURTHER:** That any and all actions taken by the **Service Providers** of the DAO to carry out the purposes and intent of the foregoing resolutions prior to their adoption are approved, ratified and confirmed. As used in this document, the words "herein," "hereof," "hereby" and "hereunder" shall refer to this document as a whole, and not to any particular section, provision, or subdivision of this document.

This action by the DAO Member by Snapshot vote shall be effective as of the date the DAO Entities receives the consent of the DAO at the end of the Snapshot vote. This action by the DAO Members consent may be executed in any number of counterparts, each of which shall constitute an original and all of which together shall constitute one action.

---

**Authors**

1. 0x30670D81E487c80b9EDc54370e6EaF943B6EAB39
2. 0x5d95baEBB8412AD827287240A5c281E3bB30d27E

# Exhibit A

**EXHIBIT A**

**CERTIFICATE OF ADOPTION OF THE ORGANIZATIONAL DOCUMENTS**

The Snapshot Consensus by the Members of the DAO certifies the formation of a Delaware Unincorporated Nonprofit Association (the "DAO"), and that the foregoing **Guiding Principals**, the **Terms of Service**, and the DAO's **Code of Conduct** were resolved and adopted as the DAO's **Guiding Principals**, **Terms of Service**, and **Code of Conduct** on or about August 31, 2022. The certification is made by the undersigned in their individual capacity as an Authorized Member, as a result of the DAO Snapshot Consensus operated by its Members.

The undersigned has submitted this certificate for the Snapshot Consensus by the Members of the DAO on or about August 23, 2022.

---

Snapshot Consensus by the DAO Members
Submitted by **benreed.eth**

1

# Exhibit B

2/21/23, 9:34 PM
Guiding Principles | move.xyz
Case 1:23-cv-20727-RKA    Document 24-1    Entered on FLSD Docket 03/01/2023    Page 185 of 653

 **Legal**    **Guiding Principles**

# Guiding Principles

*The following Guiding Principles are provided to set forth the terms of Membership, governance, and agreement between Members of the DAO. The "DAO" refers to Movement DAO, Move DAO, its affiliates DAOLABS, non-profit and for-profit organizations, and individuals involved initially as its Members, developers, and operators of any associated traditional software, web services, Multi-signature wallets, or Ethereum Cryptographic Smart Contracts.*

## Definitions.

- The definitions section of the associated document is included in its entirety herein. Any terms which are defined herein supersede any definition contained in the associated document.

- **"Service Provider"** means the Person or Persons appointed by the DAO to perform administrative services, responsibilities, and duties to carry on the DAO's operations. The initial Service Provider shall be dao-lawfirm.eth, including its predecessor entities, any future entity of dao-lawfirm.eth, and dao-lawfirm.xyz, and their vendors, consultants, and affiliates, as well as dao-lawfirm.eth's affiliates Meows, LLC. and tankbottoms.eth, and their vendors, consultants, and affiliates. For the purpose of any electronic communications (including notice) the following addresses: 0x752515a3A1091b9f1c04416CF79D1F14d2340085@ethmail.cc and 0x5d95baEBB8412AD827287240A5c281E3bB30d27E@ethmail.cc are sufficient.

## Introduction.

These guiding principles constitute an Agreement (hereinafter the "Agreement") and are entered into by and amongst Members of DAO, also known as Move (hereinafter "DAO"), an unincorporated nonprofit association organized under the **laws of the State of Delaware**.

The following terms apply when you click to view or access DAO's Dapp, DAO's online services or any of DAO's sites, contribute or transfer cryptocurrencies such as Ethereum, or transfer one or more ERC-20s ("Tokens"), ERC-721s ("NFTs"), or other digital assets (collectively, "Cryptographic Currencies") to the DAO, become a Member of DAO, receive DAO Governance Tokens, hold Governance Rights for the DAO, interact with or access the DAO's smart contracts in any way,

provide services to the DAO, donate or transfer any property to the DAO, or otherwise interact with or access any other of the DAO's services. DAO's governance may occur on Snapshot; for the purpose of this agreement we refer to this as part of the DAO Dapp.

**By doing any of the above, you signify your agreement to these terms. If you do not agree to be bound by the Agreement in its entirety, you may not access, interact with, or use the DAO Dapp or online services.**

Capitalized terms used herein have the meanings ascribed to them in the Definitions. Any terms which are defined herein supersede any definition contained in the associated document.

# 1. Organization.

**(a) Formation.** The DAO was formed on *February 1, 2022.* The obligations of Members of the DAO shall be determined pursuant to the Delaware Uniform Unincorporated Nonprofit Association Act, Del. Code Ann. Tit. 6, §§ 1901-1916 inclusive (the "Act"), and this Agreement.

**(b) Purpose.** The primary purpose of the DAO is to develop programmable, community-focused Ethereum (**"Cryptocurrency"**) treasury applications which can operate openly on the blockchain at any scale. The DAO additionally develops tooling to interact with existing financial infrastructure (including fiat), digital asset creation (e.g. NFTs), and marketplace applications to enable communities to participate in any type of lawful activity native to or related to Cryptocurrency. The purpose of the DAO is scoped to non-profit and charitable purposes and purposes outside of this scope are not permitted. The companion purpose section of this document is included in its entirety herein. Any terms which are contained herein supersede any definition contained in the associated document.

The DAO is an unincorporated association of individuals, corporations, statutory trusts, business trusts, estates, trusts, partnerships, limited liability companies, associations, joint ventures, and other legal or commercial entities, many of whom, if not all of whom, agree to join together for a common, nonprofit purpose. For the DAO, that purpose is encapsulated in its mission statement.

**The DAO is not intended to be or become an entity required to register as an "investment company" as defined in Section 3(a)(1)(A) of the Investment Company Act of 1940, as amended.**

# 2. Membership; Governance Rights and Tokens; Limitations.

**(a) Governance Rights.** Governance Rights in the DAO are represented by Project Tokens, with each Token representing a fractional part of the Governance Rights of all Members (or assignees, as the case may be) equal to the quotient of one (1) divided by the total number of Tokens claimed at any time. Member's Governance Rights are subject to DAO Governance.

**(b) Tokens.** As of the date hereof, there shall be an allowance of up to the max of $2^{(256-1)}$[1] tokens authorized to represent Membership interests in the DAO, unless otherwise agreed to by the Members via a vote occurring through the Dapp. Membership in the DAO, as defined by Del. Code Ann. Tit. 6, § 1901, shall be voluntary and open to any individual whose purpose or presumed intent is to contribute to the DAO and is willing to accept responsibilities and terms of Membership. The DAO shall grant the initial Member's governance voting tokens proportional to contributions to the DAO's Gnosis Multi-signature wallet.[2]

Notwithstanding the foregoing or any other provision of this Agreement, the DAO may provide initial Members Tokens for their role in conceiving and supporting the DAO.

**(c) Limitation to the DAO Protocol Configuration.** The DAO shall not configure its Juicebox Treasury with an undefined Reserved Rate, a Reserved Rate of 0%, a Redemption Rate of 100%, or a Discount Rate other than 0%. **The DAO shall not configure its Juicebox Treasury with any parameters that would cause the capital value of Token Redemptions via the Redemption Rate to exceed the cost basis required to issue those Tokens from the DAO's Juicebox Treasury.**

**(d) Admission.** The DAO is a decentralized network of Members and may admit or deny individuals for any arbitrary purpose or lack of purpose.

> **(i) Initialization.** On February 1, 2022, the DAO initiated a distribution of the DAO's NFT Collection to the top one-thousand (1500) addresses on Snapshot via a total usage count of Membership DAOs, authored proposals, and votes cast. The purpose of the NFT distribution was to foster a fair and equitable distribution of the governance NFT, to initialize the DAO community, garner interest in directing the DAO development efforts. The DAO did not require any Membership contributions or fees to participate in this distribution. Contributions to the DAO's Gnosis Multi-signature wallet were separate. Contributions to the DAO's Multi-signature wallet represents the token distributions based on a computation of Cryptocurrency contributions to Project Tokens.

**(ii) Distribution of Member Tokens.** All of the DAO's governing Members shall have their Membership determined upon receipt of voting tokens acquired on a public blockchain via contributions to the DAO's **Gnosis Multi-Signature Wallet (Etherscan Mainnet)** `0x143cC0A996De329C1C5723Ee4F15D2a40c1203c6`. The tokens are to be distributed on a bonding curve. DAO will operate as a Member Project which will issue Project Tokens to both Gnosis contributors and Member Projects, at rates yet to be determined. **("Cryptographic Units", and holders, "Members")**. Cryptographic Units are used for participating in and improving the governance of the DAO through affirmative votes effectuated via the Designated Smart Contract (defined herein) or more commonly, Snapshot, the popular off-chain voting protocol **("Snapshot") (such processes are "Cryptographic Consensus")**. Once the DAO admission requirements are met, a prospective Member's admission may be put up for a vote held among DAO Members. The DAO will consistently review admissions, and if necessary, Members may make adjustments to the DAO admission requirements based on their evolving needs and as registered by Cryptographic Consensus. Notwithstanding, the DAO may admit all individuals who hold the DAO token by capturing an inventory of all current holders and ratifying the Membership at Governance intervals from time to time as registered by Cryptographic Consensus.

The DAO may have more than one Member Tokens which has Membership purpose, such as the Governance NFT available at 0xdd407a053fa45172079916431d06E8e07f655042. The DAO shall authorize or discontinue the use of Member Tokens from any Cryptographic Units at any time, or use a Member Token for a duration before migrating to another. The DAO shall defer to the Service Provider in the fair and equitable distribution of Member Tokens, and/or the service of other governance tokens. The DAO shall, at its discretion, by the advice of the Service Provider, or by the majority vote of the DAO, retire governance tokens, including discontinuing Membership by Members holding the DAO governance token without any further notice.

**(iii) Development of the DAO application** Notwithstanding the aforementioned governance between the DAO NFTs and the DAO's weighted whitelist Members, the combined parties are Members and language within this agreement pertaining to the future anticipated governance on additional DAO applications are provided as a notice to Members of the eventual transitioning of governance tooling and computation. The DAO is developing a governance application which it intends to use and provide all aspects of to Member Projects before the end of 2022.

**(e) Token Liquidity Pools.** The DAO shall not create any Liquidity Pools.

**(f) Governance Rights and Token Limitations.** *Governance Rights and the governance Tokens provide no possibility of profits and losses, no rights to distributions and dividends, and no rights to ownership or management of the DAO. Each Member (or assign, as the case may be) that receives or holds governance Tokens expressly and unequivocally agrees that the Tokens provide no rights to profits and/or losses, that the Tokens do not entitle their holder to distributions or dividends, and that the Tokens do not make their holder an owner or manager of the DAO.* Members who provide their Cryptographic Signature upon use of the Dapp shall agree with this section 2(f) explicitly and unequivocally, and will be deemed as to have read, understood, and sought counsel with regard to this section.

**(g) Token Reserved Rate.** Notwithstanding the foregoing or any other provision of this Agreement, contributors to the DAO shall be entitled to receive Reserved Rate Tokens by a vote of the Members, via the Reserved Tokens list, as defined by the DAO's Juicebox Protocol configuration. Each Member expressly and unequivocally agrees to 2(f) above.

**(h) Responsibilities.** As of the date hereof, Members are not required to submit to any dues or Membership fees. However, in the event the Members agree otherwise via a vote occurring through the Dapp or Snapshot, each Member shall keep reasonably current in payment of any dues or Membership fees and other financial obligations of Membership, if applicable and determined by the DAO. Each Member shall notify the DAO of a Discord, Twitter, or other acceptable communication channel by which that Member may receive written or electronic materials required or permitted by this document, or shall notify the DAO that such Member lacks the standard acceptable addresses and designate a mutually acceptable form of communication.

If you have received any Tokens or are otherwise a Member, you consent and agree to become legally bound by this Agreement as both a participant in the DAO and more specifically a DAO "Member".

**(i) Information Rights.** Members shall have access to all information concerning operational and financial affairs of the DAO via

- **The Gnosis Multi-Signature Wallet**
  - `0x143cC0A996De329C1C5723Ee4F15D2a40c1203c6`,
- **Etherscan and other Ethereum Block Explorers**
  - `https://etherscan.io/address/0x143cC0A996De329C1C5723Ee4F15D2a40c1203c6`, and
- **Snapshot**
  - `https://snapshot.org/#/movedao.eth`.

Otherwise, the DAO is not entitled to keep any records concerning legal, accounting, or other affairs, and aside from the above public information, the DAO shall not be required to maintain any additional records. Notwithstanding the foregoing, the DAO may engage with third parties to provide legal structures, accounting, and records in order to comply with any legal obligations.

# 3. Liability.

**(a) No Member Liability.** Except as otherwise provided in this Agreement or the Act, no Member (or former Member) shall be personally liable for the obligations of the DAO, including any obligations owed by any such Member in connection with any breach of this Agreement. A debt, obligation, or other liability of the DAO is solely the debt, obligation, or other liability of the DAO. Members (or former Members) are not personally liable, directly or indirectly, by way of contribution or otherwise, for a debt, obligation, or other liability of the DAO solely by reason of being or acting as a Member or acting on behalf of the DAO. The failure of the DAO to observe formalities relating to the exercise of its powers or management of its activities and affairs is not grounds for imposing liability on a Member of the DAO for a debt, obligation, or other liability of the DAO.

**(b) Member Limitations.** No Member shall have the right or power:

> **(i)** to cause the dissolution and winding up of the DAO; or

> **(ii)** to demand or receive property, including any Cryptographic Currency or ERC-20 or ERC-721 Tokens ("Cryptocurrency Assets") contributed or otherwise transferred to the DAO, except as agreed to by the Members or otherwise provided herein.

# 4. Admission of Additional Members.

**(a)** Subject to the provisions of this Agreement, the Members are authorized to accept additional donations from one or more Members, and to admit other Persons to the DAO as additional Members (each such additional Member and such existing Member is an "Additional Member"). Unless otherwise determined by the Members, any such Additional Members shall be admitted to the DAO only if such Member or Additional Member makes a donation or contribution via the Dapp.

**(b) Accession to Agreement.** Each Person who is to be admitted as an Additional Member pursuant to this Agreement shall agree to be bound by all of the terms of this Agreement as if they were a Member from the inception of the DAO.

# 5. Management.

**(a)** Except as otherwise expressly required in this Agreement, the affairs of the DAO shall be carried on and managed exclusively by the Members, who shall have sole and absolute discretion with respect thereto. No Member shall be a manager, as defined under the Act.

**(b)** Whenever any action, including any approval, consent, decision, determination, or resolution is to be taken or given by the Members or the DAO under this Agreement or under the Act, it shall be authorized by a vote of the Members via the Dapp or the DAO's Snapshot Spaces, unless otherwise provided herein. Such an authorization may be evidenced by a vote facilitated via the Dapp or the DAO's Snapshot Spaces and one or more smart contracts, or by a written consent, in accordance with this Agreement. The Members intend that any action (which has been duly approved in accordance with this Agreement) taken by the DAO via a Dapp, a smart contract, or the blockchain shall be a valid action of the Members or the DAO, as applicable, and no Member shall challenge the authority or validity of any such action based solely on such a fact.

**(c)** Except as otherwise expressly required in this Agreement or in the Act, no single Member (in their capacity as a Member) shall have authority to bind the DAO in any way or to enter into any agreement or contract obligating the DAO in any way unless approved via a vote occurring through the Dapp.

**(d)** To the extent that the Members have approved a document in accordance with the terms of this Agreement and the Act, any Member can hereby be expressly authorized to execute and deliver such a document on behalf of the DAO.

**(e)** Members may appoint a proxy to vote or otherwise act for the Member with regards to the DAO pursuant to the Dapp.

**(f)** The DAO has the right to delegate certain technical or administrative responsibilities to third parties and provide them with reasonable compensation.

**(g) Reliance by Third Parties.** Persons dealing with the DAO are entitled to only rely conclusively upon the power and authority of the Members (and any Person to whom the Members have delegated any such power and authority pursuant to this Agreement) by an explicit governance ratification of such power and authority. Therefore, any acknowledgement that such Member or assign is authorized to act on behalf of the DAO and may bind the DAO or otherwise enter into a binding contract may only be relied upon as evidenced by the DAO governance process as defined by Dapp proposals.

**(h) Other Activities.** Each Member acknowledges and agrees that in addition to transactions specifically contemplated by this Agreement, and subject to applicable law, certain Members within the DAO and their respective Affiliates and Representatives are each hereby authorized to obtain property or obtain services from, to provide property or provide services to, or otherwise enter into any transaction with certain Members, or any Affiliate or Representative of any of the foregoing Persons, pursuant to clear approval via the Dapp and DAO governance.

# 6. Withdrawal Rights; Compulsory Withdrawal; Non-Disparagement.

**(a) Limited Right to Withdraw.** A Member may withdraw at any time by transferring its Tokens to a third party. Such a withdrawal shall be facilitated and executed, in part, using one or more smart contracts, and shall be effective as of the date of transfer. Any withdrawal is irrevocable. Alternatively, a Member may redeem the entirety of the Tokens held by submitting the tokens to via the Juicebox Protocol and burning them, thereby reducing the total Project Token supply. In return, the Member may receive **some portion** of their initial or cumulative DAO Membership holdings in Ethereum (or other Cryptographic Currency). A Member who burns the entirety of their token holdings shall be deemed to have withdrawn from the DAO. The DAO shall not be obligated to pay any interest or other compensation to a Member who redeems or withdraws its Tokens.

**(b) Compulsory Withdrawal.** Not in limitation of Section 6(a), the Members acting by vote via the Dapp may cause a Member to be compulsorily withdrawn from the DAO to the extent that such Members, in their reasonable discretion, determine it to be necessary, desirable, or appropriate, including without limitation to comply with applicable law or regulations, or to avoid a material adverse effect on the DAO or the other Members. For the avoidance of doubt–the Member proposed to be compulsorily withdrawn shall be entitled to vote with respect to any vote of the Members regarding that Members' compulsory withdrawal.

**(c) Emergency Immediate Compulsory Withdrawal For Cause.** Not in limitation of Section 6(a), 6(b), the Service Provider, in their reasonable discretion, is expressly authorized to remove a Member without notice or vote of the Members if the Service Provider determines such a removal to be necessary, desirable, or appropriate, including, without limitation, to comply with applicable law or regulations, or to avoid a material adverse effect on the DAO. For the avoidance of doubt–the Member to be compulsorily withdrawn shall be entitled to vote with respect to any vote of the Members regarding such compulsory withdrawal, unless the Member is deemed to be in violation of the Code of Conduct and Community Enforcement Guidelines.

**(d) Non-Disparagement** Not in limitation of Section 6(a), 6(b), 6(c) and 6(d). During the term of the DAO Membership, and thereafter, the Member shall not make any disparaging remarks, or any remarks that could reasonably be construed as disparaging regarding the DAO, its Members, its affiliates, or its agents. The DAO shall, except to the extent otherwise required by applicable laws, rules, or regulations, or as appropriate in the exercise of the Community Enforcement Guidelines and the Terms of Service, exercise reasonable efforts to cause the following individual(s) to refrain from making any disparaging statements, orally or in writing, regarding the DAO, its Members, or agents during and after the Membership period.

# 7. Fees and Expenses.

**(a) Organizational Expenses.** The DAO shall bear all of its organizational expenses and costs, and may amortize these expenses for accounting and/or tax purposes.

**(b) Operating Expenses.**

**(i)** The DAO shall bear all costs and expenses relating to its activities, maintenance, and operations, including, without limitation, all fees, expenses, and costs associated (directly or indirectly) with the acquiring, holding, monitoring, and commissioning of artwork, identifying DAO opportunities to fulfil its purpose and any extraordinary expenses (including, without limitation, litigation-related and indemnification expenses), legal, regulatory, research, consulting, compliance, auditing, accounting, and other professional fees and expenses, the costs of any administrator, the costs of any reporting to Members, expenses of any administrative proceedings undertaken by the applicable Member in its capacity, expenses incurred in connection with the dissolution, liquidation, and termination of the DAO, and other expenses related to the DAO as determined by the Members by a vote via the Dapp (collectively, and together with organizational expenses, the **"DAO Expenses"**).

**(ii)** DAO Expenses shall be allocated to and funded by the DAO.

# 8. Distributions; Dividends; Compensation.

**(a)** The DAO shall not make any distributions of any kind and it will not pay dividends of any kind to any Member or director/officer or other person who may have an ownership interest in the DAO.

**(b)** The DAO may pay reasonable compensation or reimburse reasonable expenses to a Member or third-party for services rendered, confer benefits on a Member or third party in conformity with its

nonprofit purposes, repurchase a Membership and repay a contribution made by a Member to the extent authorized by this Agreement, or make distributions of property to Members upon winding up and termination to the extent permitted by this Agreement.

# 9. Dissolution.

**(a) General.** The DAO shall be dissolved and its affairs shall be wound up upon the earliest to occur of:

> **(i)** a determination of the Members by Majority Vote; or

> **(ii)** the entry of a decree of judicial dissolution pursuant to the Act.

**(b)** Upon the dissolution of the DAO, assets shall be distributed for one or more exempt purposes which are within the meaning of section 501(c)(3) of the Internal Revenue Code or the corresponding section of any future federal tax code and which are consistent with the goals and purpose of the DAO, or the assets shall be distributed to the federal government, or to a state or local government, for a public purpose. Any such assets not so disposed of shall be disposed of by a court of competent jurisdiction of the county in which the principal office of the DAO is then located, exclusively for such purposes or to such organization or organizations, as said Court shall determine, which are organized and operated exclusively for such purposes.

# 10. Limitations on Transfers.

**(a) Transfers.** Governance Rights and Tokens are not transferable, except to other Members. Members may vote to allow or disallow the ability of Members to transfer their Governance Rights and/or Tokens by a vote facilitated via the Dapp. Tokens may become freely transferable to Ethereum addresses outside of the DAO ("External Addresses") by a vote of the Members. In the event the Tokens become freely transferable to External Addresses, you agree that holders of External Address which Tokens are transferred to shall automatically be granted Membership rights, subject to this Agreement.

**(b) Admission of Substituted Members.** If the transferee is not already a Member, any transferee of Tokens transferred in accordance with the provisions of this Section shall be admitted as a Member. The DAO shall not for any purpose recognize any purported transfer of all or any part of a Member's interest or Tokens in the DAO, and no purchaser, assign, transferee, or other recipient of all or any part of such Tokens shall become a Member hereunder unless:

**(i)** The transferee of Tokens transferred pursuant to this Section that is admitted to the DAO as a transferee Member shall succeed to the rights and liabilities of the transferor Member with respect to such transferred Tokens.

**(ii)** Effect of Death, Dissolution, or Bankruptcy. Upon the death, incompetence, bankruptcy, insolvency, liquidation, or dissolution of a Member, the rights and obligations of that Member under this Agreement shall accrue to that Member's successor(s), estate, or legal representative, and each such Person shall be treated as an unadmitted transferee of that Member's Tokens, as described in the Act.

# 11. Books and Records; Accounting and Tax Matters.

**The DAO shall not be obligated to keep any books or records beyond what is made available via the Dapp or available via the Ethereum blockchain.**

# 12. Waiver of Fiduciary Duties.

**(a)** Except as expressly set forth in this Section, in the event that any Member initiates any Proceeding against the DAO and a judgment or order not subject to further appeal or discretionary review is rendered in respect of such Proceeding, as the case may be, that Member shall be solely liable for all costs and expenses related to the Proceeding.

**(b)** Limitation by Law. No provision of this Agreement shall be construed to provide for the indemnification for any liability to the extent (but only to the extent) that such indemnification would be in violation of applicable law, but instead shall be construed so as to effectuate the provisions thereof to the fullest extent permitted by law.

**(c)** Waiver of Fiduciary Duties. To the fullest extent permitted by applicable law, notwithstanding any other provision of this Agreement or otherwise of applicable law, including any in equity or at law, no Member shall have any fiduciary duty to the DAO or to any Member by reason of this Agreement or in its capacity as a Member, except that the Members shall be subject to the implied contractual covenant of good faith and fair dealing and the terms and provisions of this Agreement. The provisions of this Agreement, to the extent that they restrict or eliminate the duties and liabilities of the Members otherwise existing at law or in equity, are agreed by the parties hereto to replace such other duties and liabilities of the Members. Members will exercise any rights under this Agreement consistent with this Agreement.

# 13. Intellectual Property Rights.

**(a) Grant of Rights.** Members that join the DAO **grant to the DAO, and its affiliate DAOLABS, LLC**, a perpetual, non-exclusive, royalty-free license and right, and all ancillary and subsidiary rights therein and thereto, throughout the world, to use, edit, modify, include, incorporate, adapt, record, reproduce, display, and archive any copyrightable work associated with any written copy, source code, illustrations, and artwork (the **"Work"**) in any manner whatsoever, in or out of context, by any and all means and/or devices and in any and all media now or known hereafter–all in connection with the production, exhibition, distribution, exploitation, advertising, marketing, publicity, and promotion of the DAO and its Purpose. The term of this license begins whenever a contribution is made through the Site by a Person entering into this Agreement as a Member or is subsequently admitted as a Member pursuant to the terms of this Agreement (i.e., any and all Members). "Site" includes the DAO, its affiliate DAOLABS, LLC, the decentralized application(s), Github, Discord, and/or any other means of written or oral communication made to the DAO or its Members.

Contributors to the DAO, with regards to development of its application, with compensation, will execute any agreement for consulting or assignment, along with any innovations via written agreement with the DAO or its affiliate, DAOLABS, LLC[3] from which the DAO licenses its Dapp and operating applications.

**(b) Reservation of Rights.** All rights in any copyrightable works not specifically granted to the DAO are reserved by the Member. Specifically, the DAO acknowledges that its use of the Work will not affect the Member's continued and separate copyright ownership in the Work, and that the Member may use and license others to use the Work otherwise and elsewhere.

**(c) Representations and Warranties, Indemnification.** The Member represents and warrants that it is the owner of the entirety of the rights in and to the Work and that the Member has the full authorization and authority to enter into this Agreement and grant the licenses herein. No other rights, permissions, or consents are necessary for the DAO to use the Work in accordance with the licenses granted herein, and no fees, royalties, or use payments of any kind are due to the Member or third parties in connection with the exercise of the licenses granted herein. The Member guarantees that the Work does not infringe any copyright or trademark, and that the Work does not violate any privacy, personal, proprietary, or common law, or statutory right, of any Person. Licensor shall indemnify and hold Licensee (and its agents, Affiliates, assigns, heirs, or other successors in interest) harmless from any claim, loss, liability, damage, or expense (including reasonable attorneys' fees) arising out of any claim, lawsuit, or demand which is inconsistent with or arises out of warranties or representations in this Section.

**(d) Limited Field of Use.** Notwithstanding the preceding provisions, the DAO shall not use Members' Work for any purposes other those defined in the Grant of Rights 13.(a), which includes use by the DAO within its field of use as defined in its Purpose, in *1. Organization.*, including for any for-profit endeavors, with the exception, however, of the purposes of any derivative rights by the DAO which it is obligated to grant to DAOLABS, or its affiliates for use of or within the licensed Dapp, and any contributions to the DAO where the DAO compensates the Member for the Work.

# 14. Derivative Matters.

**(a) No Derivative Actions.** No Member shall have the right to bring any action or proceeding in any court or before any arbitrator or other tribunal against the DAO or any other Member on account of any alleged or actual breach of this Agreement or any other agreement or instrument to which the DAO is a party or by which it is bound, or for any other purpose whatsoever, except as expressly provided in this Agreement.

# 15. Amendments.

**(a)** Except as otherwise provided herein, the terms and provisions of this Agreement may be amended only with the prior consent of Members acting by a vote via the Dapp.

**(b)** Amendments to this Agreement shall be made available via the Dapp.

# 16. Service Providers.

**(a) Appointment and Compensation of Service Providers.** The DAO shall have the right to appoint Service Providers to perform administrative services, responsibilities, and duties to carry on the DAO's operations, including maintenance of the Dapp and smart contracts. The DAO shall have the right to provide Service Providers with reasonable compensation.

**(b) Limitation of Liability.** Notwithstanding anything contained in this Agreement to the contrary, any Service Provider of DAO shall not be liable for any error of judgment, mistake of law, or for any loss suffered by the DAO, its Members, Persons affiliated with the DAO or its Members, or third parties in connection with the matters to which this Agreement relates or for any services provided by a Service Provider, except for a loss resulting from a Service Provider's willful misfeasance, gross negligence, or reckless disregard in the performance of its duties under this Agreement. Furthermore, Service Providers shall not be liable for:

**(i)** any action taken or omitted in accordance with or in reliance upon written or oral instructions, advice, data, documents, or information (without investigation or verification) received by Service Providers from any Person;

**(ii)** any liability arising from the transfer or use of any Governance Rights or Tokens, including with respect to matters arising under applicable laws or private rights of action; or

**(iii)** any action taken or omitted by the DAO, its Members, any affiliated Persons of the DAO or its Members, or any third party.

**(c) Indemnification.** The DAO shall indemnify and hold harmless the Service Provider, their affiliates, employees, and agents, from and against any and all losses, damages, liabilities, costs, and expenses (including reasonable attorneys' fees) arising out of or in connection with any claim, lawsuit, or demand which arises out of any activities during the period of service to the DAO and from the conclusion of services until the statute of limitations have run for any known or unknown claims. The DAO, its Members, and any contributors to the DAO via the Dapp, the Gnosis Multi-signature Wallet, the purchase of NFT, or the receipt of any governance rights from any party or parties shall agree to the indemnification obligation set forth in the attached Agreement as the DAO, on one hand, and the Service Provider, including its affiliates, employees, and agents, on the other hand.

**(d) Initial Service Provider.** The initial Service Provider shall be the dao-lawfirm.eth, and its affiliates.

# 17. General Provisions.

**(a) Notices.** Subject to Section 5, all notices required to be delivered under this Agreement shall be effective only if sent via **Discord, Twitter, or another acceptable communication channel**. In computing the period of time for the giving of any notice, the day on which the notice is given shall be excluded, and the day on which the matter noticed is to occur shall be included. If notice is given via electronic means, by dao-lawfirm.eth, it shall be deemed given when sent, provided that the sending party does not have reason to believe that such notice was not delivered.

**(b) Further Assurance. Each Member agrees to perform all further acts and to execute, acknowledge, and deliver any document (including tax forms and information) that may reasonably be necessary to carry out the provisions of this Agreement.**

**(c) Interpretation.** Unless otherwise indicated to the contrary herein by the context or use thereof the words, "herein," "hereto," "hereof," and words of similar import refer to this Agreement as a whole and not to any particular section or paragraph hereof; words importing the masculine gender shall include the feminine and neutral genders, and vice versa; and words importing the singular shall include the plural, and vice versa; plural forms of singular defined terms shall have corresponding meanings and singular forms of plural defined terms shall have corresponding meanings; the section headings contained in this Agreement are for reference purposes only and shall not affect the interpretation of this Agreement; references to statutes or regulations include amendments and successor or replacement statutes or regulations.

**(d) Severability.** If any term or provision of this Agreement or any application of this Agreement shall be declared or held invalid, illegal, or unenforceable, in whole or in part, whether generally or in any particular jurisdiction, such provision shall be deemed amended to the extent, but only to the extent, necessary to cure such an invalidity, illegality, or unenforceability, and the validity, legality, and enforceability of the remaining provisions, both generally and in every other jurisdiction, shall not in any way be affected or impaired thereby.

**(e) Binding Agreement.** This Agreement shall be binding upon and inure to the benefit of the parties and their respective heirs, executors, administrators, successors, permitted assigns, trustees, and legal representatives.

**(f) Creditors.** None of the provisions of this Agreement shall be for the benefit of, or enforceable by, any creditor of any Member or of the DAO. No creditor who makes a loan to the DAO may have or acquire, as a result of making the loan, any direct or indirect interest in the DAO's property.

**(g) Waiver.** Any term or condition of this Agreement may be waived at any time by the party or parties entitled to the benefit thereof, but only by a writing signed by the party or parties waiving such term or condition. No waiver of any provision of this Agreement or of any right or benefit arising hereunder shall be deemed to constitute or shall constitute a waiver of any other provision of this Agreement (whether similar or not), nor shall any such waiver constitute a continuing waiver, unless otherwise expressly so provided in writing.

**(h) Waiver of Partition; No Bill for DAO Accounting.** Each Member hereby irrevocably waives any and all rights that it may have to maintain an action for partition of any of the DAO's property. Each Member covenants that it shall not file a bill for DAO accounting.

**(i) Limitation of Liability.** Except for any remedies that cannot be excluded or limited by law, no party, or its agent, Affiliate, assigns, heirs, or other successors in interest, will be liable under this

Agreement to another party, or that party's agent, Affiliate, assigns, heirs, or other successors in interest, or other third party, for any special, reliance, punitive, indirect, incidental, or consequential damages or lost or imputed profits, lost data, lost property, or any costs and fees. This limitation of liability may not be valid in some jurisdictions. Parties to this Agreement may have rights that cannot be waived under some laws. The DAO and its Members do not seek to limit the DAO's or Members' warranties or remedies to any extent not permitted by law.

YOU UNDERSTAND AND AGREE THAT, TO THE FULLEST EXTENT PROVIDED BY LAW, IN NO EVENT SHALL THE DAO OR ITS MEMBERS BE LIABLE FOR ANY LOSS OF PROFITS, REVENUE OR DATA, INDIRECT, INCIDENTAL, SPECIAL, OR CONSEQUENTIAL DAMAGES, OR DAMAGES OR COSTS DUE TO LOSS OF PRODUCTION OR USE, BUSINESS INTERRUPTION, OR PROCUREMENT OF SUBSTITUTE GOODS OR SERVICES, IN EACH CASE WHETHER OR NOT THE DAO OR ITS MEMBERS HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, ARISING OUT OF OR IN CONNECTION WITH THE AGREEMENT OR ANY COMMUNICATIONS, INTERACTIONS OR MEETINGS WITH OTHER USERS OF THE DAO, ON ANY THEORY OF LIABILITY, RESULTING FROM: (a) THE USE OR INABILITY TO USE THE DAO DAPP; (b) THE COST OF PROCUREMENT OF SUBSTITUTE GOODS OR SERVICES RESULTING FROM ANY GOODS, DATA, INFORMATION OR SERVICES PURCHASED OR OBTAINED; OR MESSAGES RECEIVED FOR TRANSACTIONS ENTERED INTO THROUGH THE DAO DAPP; (c) UNAUTHORIZED ACCESS TO OR ALTERATION OF YOUR TRANSMISSIONS OR DATA; (d) STATEMENTS OR CONDUCT OF ANY THIRD PARTY IN THE DAO; OR (e) ANY OTHER MATTER RELATED TO THE DAO DAPP, WHETHER BASED ON WARRANTY, COPYRIGHT, CONTRACT, TORT (INCLUDING NEGLIGENCE), PRODUCT LIABILITY OR ANY OTHER LEGAL THEORY.

**(j) Governing Law; Jurisdiction; Venue.** Notwithstanding the place where this Agreement may be executed by any of the parties hereto, the parties expressly agree that all of the terms and provisions hereof shall be construed in accordance with and governed by the laws of the State of Delaware, without giving effect to the principles of choice or conflicts of laws thereof that would require that this Agreement be governed by the laws of another state. Each of the parties hereto consents and agrees to the exclusive personal jurisdiction of any state or federal court sitting in Delaware, and waives any objection based on venue or forum non conveniens with respect to any action instituted therein, and agrees that any dispute concerning the conduct of any party in connection with this Agreement shall be heard only in the courts described above.

**(k) Arbitration.** In consideration of the promises in this agreement, the parties agree that any and all controversies, claims, or disputes with anyone (including the DAO and any employee, officer, director, shareholder or benefit plan of the company in their capacity as such or otherwise) arising out of, relating to, or resulting from this Agreement, shall be subject to binding arbitration under

the arbitration rules set forth in Delaware law and thereby agrees to waive any right to a trial by jury, include any statutory claims under state or federal law, including, but not limited to, claims under Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act of 1990, the Age Discrimination in Employment Act of 1967, the Older Workers Benefit Protection Act, the Worker Adjustment and Retraining Notification Act, discrimination or wrongful termination and any statutory claims. The parties further understand that this Agreement to Arbitrate also applies to any disputes that the DAO may have with a Member.

**(l) Procedure.** The parties agree that any arbitration will be administered by the American Arbitration Association ("AAA") and that the neutral arbitrator will be selected in a manner consistent with its national rules for the resolution of employment disputes. The parties agree that the Arbitrator shall have the power to decide any motions brought by any party to the arbitration, including motions for summary judgment and/or adjudication and motions to dismiss and demurrers, prior to any arbitration hearing. The parties also agree that the arbitrator shall have the power to award any remedies, including attorneys' fees and costs, available under applicable law. The parties understand that they shall share equally in paying for the administrative or hearing fees charged by the arbitrator or AAA. The parties agree that the Arbitrator shall administer and conduct any arbitration in a manner consistent with the rules and that to the extent that the AAA's national rules for the resolution of employment disputes conflict with the rules, the rules shall take precedence. The parties agree that the decision of the Arbitrator shall be in writing.

**(m) Covenant Not to Sue."** The Members hereby agree and understand that by signing this agreement they hereby waive any right to sue other Members or the DAO for any reason and at any time. In the event that a Member attempts to file suit against either another Member or the DAO, that Member's ownership interest shall be cancelled and he shall be refunded any money or other assets he personally contributed to the DAO, but shall not be entitled to any increase in value or other profit earned by the DAO. Solely the Service Provider shall be empowered to determine if a Member is entitled to any other remuneration upon the cancellation of his ownership interest. Consistent with Section 6, the Service Provider is solely authorized and empowered to make such a determination, and there is no right of appeal or other objection to the determination of the Service Provider. The DAO, Members and the Service Provider covenant that under no conditions will any party or any affiliate file any action against the other (except requests for injunctive or other equitable relief only) in any forum, but instead agree to resolve any disagreement regarding the implementation of the Agreement or an alleged breach by a party by mandatory arbitration. The parties further choose to use Washington Arbitration and Mediation Services ("**WAMS**") in Seattle, Washington, as the agreed arbitrator in this matter. Each party may request arbitration of any dispute by sending notice to the other party, in writing, of the demand for arbitration.

In the event of any arbitration of a dispute between the parties, the DAO agrees to pre-pay, after notice of arbitration has been sent, $500,000.00 (half-million, $500,000.00 USD) to the Service Provider or to the affiliate's choice. Following arbitration, the arbitrator may award attorney's fees to the prevailing party, including the reimbursement of any attorney's fees that were pre-paid in the dispute.

**(n) Entire Agreement.** This Agreement (including the exhibits hereto) supersedes any and all other understandings and agreements, either oral or in writing, among the parties with respect to the subject matter hereof and constitutes the sole agreement among the parties with respect thereto, including but not limited to the Original Agreement.

**(o) Amendment.** This Agreement may not be amended, modified, or revoked, in whole or in part, nor may any provisions be waived, except via a vote occurring through the Dapp.

**(p) Securities Laws Matters. THE TOKENS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, STATE SECURITIES LAWS, OR THE LAWS OF ANY COUNTRY OUTSIDE THE UNITED STATES. THEY PROVIDE NO RIGHT TO ANY PROFITS OR LOSSES OF THE DAO, NOR IS THERE A REASONABLE EXPECTATION OF PROFIT FROM BUYING OR RECEIVING THE TOKENS. THE TOKENS ONLY PROVIDE THE HOLDER WITH GOVERNANCE RIGHTS THAT ARE SPECIFICALLY LIMITED IN THIS AGREEMENT.**

**(q) Communication by Electronic Means.** Unless otherwise required by law or by agreement, any notice, vote, consent, petition, or other oral or written communication required or permitted can be delivered by electronic means, provided that, in the case where such communication expressly or impliedly requires the signature of the person submitting the communication, means are in place to reasonably assure the authenticity of the signature, including Cryptographic signatures. For the purposes of notice or any communications pertaining to this Agreement, Members may deliver electronic correspondence, *in addition, to other means,* to 0x5d95baEBB8412AD827287240A5c281E3bB30d27E@ethmail.cc or 0x752515a3A1091b9f1c04416CF79D1F14d2340085@ethmail.cc.

1. The maximum number of 115792089237316195423570985008687907853269984665640564039457584007913129639935 .
2. Gnosis Multi-Signature Wallet, 0x143cC0A996De329C1C5723Ee4F15D2a40c1203c6 .

3. The DAO is an unincorporated nonprofit association in the State of Delaware. The DAO has been granted a perpetual, non-exclusive, royalty-free license to source code from DAOLABS, LLC. under specific field of use, DAO operations for non-profit Cryptographic governance. ↩

✏️ Edit this page

# Exhibit C

    Legal    Terms of Service

# Terms of Service

Last Updated: August 21st, 2022

PLEASE READ THIS TERMS OF SERVICE AGREEMENT (THE "TERMS OF SERVICE") CAREFULLY. THIS SITE AND ANY OTHER WEBSITES OF THE DAO ("DAO"), ITS AFFILIATES OR AGENTS (COLLECTIVELY, THE "SITE") IS CONTROLLED BY THE DAO. THESE TERMS OF USE GOVERN THE USE OF THE SITE AND APPLY TO ALL INTERNET USERS VISITING THE SITE. BY ACCESSING OR USING THE SITE IN ANY WAY, INCLUDING USING THE SERVICES AND RESOURCES AVAILABLE OR ENABLED VIA THE SITE (EACH A "SERVICE" AND COLLECTIVELY, THE "SERVICES"). BY CLICKING ON THE "I ACCEPT" BUTTON, COMPLETING THE REGISTRATION PROCESS, AND/OR BROWSING THE SITE, YOU REPRESENT THAT (1) YOU HAVE READ, UNDERSTAND, AND AGREE TO BE BOUND BY THE TERMS OF SERVICE, (2) YOU ARE OF LEGAL AGE TO FORM A BINDING CONTRACT WITH THE DAO, AND (3) YOU HAVE THE AUTHORITY TO ENTER INTO THE TERMS OF USE PERSONALLY OR ON BEHALF OF THE ENTITY YOU HAVE NAMED AS THE USER, AND TO BIND THAT ENTITY TO THE TERMS OF SERVICE. THE TERM "YOU" REFERS TO THE INDIVIDUAL OR LEGAL ENTITY, AS APPLICABLE, IDENTIFIED AS THE USER WHEN YOU REGISTERED ON THE SITE. IF YOU DO NOT AGREE TO BE BOUND BY THE TERMS OF SERVICE, YOU MAY NOT ACCESS OR USE THIS SITE OR THE SERVICES.

PLEASE BE AWARE THAT SECTION 15 (ARBITRATION, OUR DISPUTE RESOLUTION PROCESS) OF THIS AGREEMENT, BELOW, CONTAINS PROVISIONS GOVERNING HOW DISPUTES THAT YOU AND WE HAVE AGAINST EACH OTHER ARE RESOLVED, INCLUDING, WITHOUT LIMITATION, ANY DISPUTES THAT AROSE OR WERE ASSERTED PRIOR TO THE EFFECTIVE DATE OF THIS AGREEMENT. IN PARTICULAR, IT CONTAINS AN ARBITRATION AGREEMENT WHICH WILL, WITH LIMITED EXCEPTIONS, REQUIRE DISPUTES BETWEEN US TO BE SUBMITTED TO BINDING AND FINAL ARBITRATION. UNLESS YOU OPT OUT OF THE ARBITRATION AGREEMENT: (1) YOU WILL ONLY BE PERMITTED TO PURSUE DISPUTES OR CLAIMS AND SEEK RELIEF AGAINST US ON AN INDIVIDUAL BASIS, NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION OR PROCEEDING; AND (2) YOU ARE WAIVING YOUR RIGHT TO PURSUE DISPUTES OR CLAIMS AND SEEK RELIEF IN A COURT OF LAW AND TO HAVE A JURY TRIAL.

## Decentralized, Centralized Applications.

DAO applications may be accessed at the following URLs: daolabs.wtf, dao-lawfirm.xyz, movement.xyz, juicebox.wtf, treasury.wtf, tiles.wtf and any services used by the DAO, such as

Discord, Twitter, Instagram and Github.[1]

## Parties, Notice addresses.

The parties to this agreement are **you** (user of the DAO's decentralized application) and **the DAO**. For the purpose of electronic communication or other electronic notice you may contact the DAO via its Service Provider at dao-lawfirm.xyz or by email at 0x752515a3A1091b9f1c04416CF79D1F14d2340085@ethmail.cc or 0x5d95baEBB8412AD827287240A5c281E3bB30d27E@ethmail.cc.

## Introduction.

Please read these terms of service ("Terms") carefully. These Terms are between you and the DAO (the "DAO," "we," "us," or "our") concerning your use of the **DAO's decentralized application ("DAPP") or websites**, including the sites listed above, other DAO websites, and other websites maintained by the DAO (together the "Site" or "Sites") which may interact with and operate on the Juicebox protocol (the "Juicebox DAO Protocol") currently available on Ethereum via smart contracts ("Smart Contracts").

These Terms apply to you (**"you,"** or **"User"**) as a user of the Site information made available on the Site.

## 1. By using the Site, you agree to these Terms.

Certain features on the site may be offered while still in "beta" form (**"Services"**). By accepting these Terms or using the Services, You understand and acknowledge that the Services are being provided as a version and made available on an "As Is" or "As Available" basis. The Services may contain bugs, errors, and other problems.

You assume all risks and all costs associated with your use of the DAO services, including, without limitation, any internet access fees, back-up expenses, costs incurred for the use of your device and peripherals, and any damage to any equipment, software, information, or data. In addition, we are not obligated to provide any maintenance, technical support, or other support for the Services.

None of the information, services, or materials offered on the Sites constitute, or are intended to constitute, legal, financial, tax, investment, or other advice, and you should not act or refrain from acting based on any information, services, or materials provided on the Sites. All content on the Sites is information of a general nature and does not address the unique circumstances of any

particular user. You are strongly urged to consult with your own legal, financial, tax, investment, and other advisors as to all legal, financial, tax, and investment-related questions you have.

You must be able to form a legally binding contract online either as an individual or on behalf of a legal entity. You represent that as a User, you have the legal authority to bind the company or other legal entity on the behalf of which you are acting to these Terms, you are at least 18 years old or the age of majority where you reside, whichever is older, you can form a legally binding contract online, and you have the full right, power, and authority to enter into and to comply with the obligations under these Terms on your own behalf, or on behalf of the company or other legal entity on the behalf of which you are acting.

PLEASE NOTE THAT THE AGREEMENT IS SUBJECT TO CHANGE BY THE DAO IN ITS SOLE DISCRETION AT ANY TIME. When changes are made, the DAO will make a new copy of the Terms of Service Agreement available at the Site and any new Supplemental Terms will be made available from within, or through, the affected Service on the Site. We will also update the "Last Updated" date at the top of the Terms of Service Agreement. The DAO may require you to provide consent to the updated Agreement in a specified manner before further use of the Site and/ or the Services is permitted. If you do not agree to any change(s) after receiving a notice of such change(s), you shall stop using the Site and/or the Services. Otherwise, your continued use of the Site and/or Services constitutes your acceptance of such change(s). PLEASE REGULARLY CHECK THE SITE TO VIEW THE THEN-CURRENT TERMS.

As a User, you agree to be bound by any changes, variations, or modifications to our terms of service and your continued use of the Site shall constitute acceptance of any such changes, variations, or modifications.

## 2. Information of a Legal, Accounting, or Tax Matters.

Any legal, financial, or tax comments within the Sites are provided for informational and illustrative purposes only, and are not intended to constitute legal, financial, tax, or other advice. You should not act or refrain from acting based on any information gleaned from any documents, comments, or instructions within the Sites. The DAO does not endorse or make any representation as to the capabilities of any legal or tax professional or advisors within our Sites (or the Internet), and the provision of contact information is not a recommendation that you hire any such person. Please check with your legal and tax advisors to make the best decisions for your specific circumstances.

## 3. Risks Involved in the Use of the Smart Contracts.

The DAO protocol runs entirely on publicly accessible smart contracts explained in detail throughout the Juicebox DAO's online documents, currently available at https://info.juicebox.money. The Juicebox DAO's protocol is public infrastructure running well-known code. All consequences from interacting with networks running the protocol are borne by the entities who sign each transaction. The protocol works according to the specifications outlined in these docs to the extent the code is written and deployed correctly, which is a collective responsibility and is not guaranteed. There are major risks that the code is not written and deployed correctly. **Please do your own research.**

## 4. Source Code Repositories.

No Warranties. The DAO's source code Repository is only a presentation of information regarding certain view points and technologies. The statements contained in the Repository do not provide any advice, representation, warranty, certification, guarantee or promise relating to these technologies, any uses thereof or any of the other matters discussed in the Repository, nor does the Repository provide an offer or agreement to make such technologies available, maintain or update such technologies, or sell or buy any asset or enter into any transaction. You should not rely on the Repository as a basis for making any financial or other decision.

## 5. Intellectual Property.

The rights granted to you in the Agreement are subject to the following restrictions: (a) you shall not license, sell, rent, lease, transfer, assign, reproduce, distribute, host or otherwise commercially exploit the DAO's Properties or any portion of the DAO's Properties, including the Site; (b) you shall not frame or utilize framing techniques to enclose any trademark, logo, or other DAO Properties (including images, text, page layout or form) of the DAO; (c) you shall not use any metatags or other "hidden text" using the DAO's name or trademarks; (d) you shall not modify, translate, adapt, merge, make derivative works of, disassemble, decompile, reverse compile or reverse engineer any part of the DAO's Properties except to the extent the foregoing restrictions are expressly prohibited by applicable law; (e) you shall not use any manual or automated software, devices or other processes (including but not limited to spiders, robots, scrapers, crawlers, avatars, data mining tools or the like) to "scrape" or download data from any web pages contained in the Site (except that we grant the operators of public search engines revocable permission to use spiders to copy materials from the Site for the sole purpose of and solely to the extent necessary for creating publicly available searchable indices of the materials, but not caches or archives of such materials); (f) except as expressly stated herein, no part of the DAO's Properties may be copied, reproduced, distributed, republished, downloaded, displayed, posted or transmitted in any form or by any means; and (h) you shall not remove or destroy any copyright notices or other proprietary markings contained on

or in the DAO's Properties. Any future release, update or other addition to the DAO's Properties shall be subject to the Agreement. The DAO, its suppliers and Service Providers reserve all rights not granted in the Agreement. Any unauthorized use of any the DAO's Property terminates the licenses granted by the DAO pursuant to the Agreement.

**1. The DAO Properties.** Except with respect to Your Content and User Content, you agree that the DAO and its suppliers own all rights, title and interest in the DAO Properties. You will not remove, alter or obscure any copyright, trademark, service mark, or other proprietary rights notices incorporated in or accompanying any of the DAO Properties.

**2. Your Content.** The DAO does not claim ownership of Your Content. However, when you as a Registered User post or publish Your Content on or in the DAO Properties, you represent that you own and/or have a royalty-free, perpetual, irrevocable, worldwide, non-exclusive right (including any moral rights) and license to use, license, reproduce, modify, adapt, publish, translate, create derivative works from, distribute, derive revenue or other remuneration from, and communicate to the public, perform and display Your Content (in whole or in part) worldwide and/or to incorporate it in other works in any form, media or technology now known or later developed, for the full term of any worldwide intellectual property right that may exist in Your Content.

**3. License to Your Content.** Subject to any applicable account settings that you select, you grant the DAO a fully paid, royalty-free, perpetual, irrevocable, worldwide, royalty-free, non-exclusive and fully sublicensable right (including any moral rights) and license to use, license, distribute, reproduce, modify, adapt, publicly perform, and publicly display Your Content (in whole or in part) for the purposes of operating and providing the DAO Properties to you and to our other Registered Users. Please remember that other Registered Users may search for, see, use, modify and reproduce any of Your Content that you submit to any "public" area of the DAO Properties. You warrant that the holder of any worldwide intellectual property right, including moral rights, in Your Content, has completely and effectively waived all such rights and validly and irrevocably granted to you the right to grant the license stated above. You agree that you, not the DAO, are responsible for all of Your Content that you Make Available on or in the DAO Properties. Any Content posted by you in your profile may not contain nudity, violence, sexually explicit, or offensive subject matter as determined by the DAO in its sole discretion. You may not post or submit for print services a photograph of another person without that person's permission.

# 6. The Decentralized Application.

The DAO provides access to a DAPP, a decentralized finance application, (**"Application"**) on the Ethereum blockchain that allows individuals to contribute Ethereum assets including Ethereum, ERC-

20, ERC-721, and other Ethereum-based assets ("**Cryptocurrency Assets**") to the DAO Treasury as contributions. The Application may be configured as to emit project tokens (**"Project Tokens"**) which may or may not have utility. The Application spans a front-end application, middleware (including Interplanetary File System metadata, Graph indexers, Blocknative API functions, Infura services, Cloud Functions, etc.) and an array of Ethereum smart contracts - the user is required to authorize the execution of the Smart Contracts when interacting with their wallet at all times.

Using the DAO protocol may require that you pay a fee, such as gas fees on the Ethereum network, to perform a transaction. You acknowledge and agree that the DAO has no control over any transactions among Users over the DAO's protocol, or the method of payment of any such transactions or any actual payments of such transactions. Accordingly, you must ensure that you have a sufficient balance of the applicable cryptocurrency tokens stored at your DAO protocol-compatible wallet address ("**Cryptocurrency Wallet**") to complete any such transaction on the DAO protocol or the Ethereum network before initiating such a transaction.

## 7. Access to the DAO Application.

Access to the Site is provided on an "AS IS" and "as available" basis only. We do not guarantee that the Site, or any content on it, will always be available or uninterrupted. From time to time, access may be interrupted, suspended, or restricted, including because of a fault, an error, or unforeseen circumstances, or because we are carrying out planned maintenance. With regards to the Sites; We reserve the right to limit the availability of the Site to any person, geographic area or jurisdiction we so desire and/or to terminate your access to and use of the Site, at any time and in our sole and absolute discretion. We may remove or amend the content of the Site at any time. Some of the Site content may be out of date at any given time and we are under no obligation to update it. We do not guarantee that the Site, or any content on it, will be free from errors or omissions.

We will not be liable to you for any loss or damage you may suffer as a result of the Site being unavailable at any time for any reason. You will comply with all applicable domestic and international laws, statutes, ordinances and regulations applicable to your use of the Site.

**Registering Your Account.** In order to access certain features of the DAO's Properties you may be required to become a Member. For purposes of the Agreement, a Member is also a "Registered User", which is a user who has registered an account on the Site ("Account"), and has a valid account on a third party service through which the user has connected to the Site (each such account, a "Third-Party Account").

**As a condition to accessing or using the Site, you will:**

2/21/23, 2:59 PM    Case 1:23-cv-20727-RKA    Document 24-1    Entered on FLSD Docket 03/01/2023    Page 211 of
653
Terms of service | Move Docs

1. only use the Site in accordance with these Terms;

2. ensure that all information that you provide on the Site is current, complete, and accurate;

3. ensure compliance with all U.S. Securities laws; and

4. maintain the security and confidentiality of access to your Cryptocurrency Wallet address.

You acknowledge that all Content, including DAO Properties, is the sole responsibility of the party from whom such Content originated. This means that you, and not the DAO, are entirely responsible for all Content that **you upload, post, e-mail, transmit or otherwise make available ("Make Available")** through the DAO Properties ("Your Content"), and that you and other Registered Users of DAO Properties, and not DAO, are similarly responsible for all Content that you and they Make Available through the DAO Properties ("User Content").

You acknowledge that the DAO has no obligation to pre-screen Content (including, but not limited to, User Content), although the DAO reserves the right in its sole discretion to pre-screen, refuse or remove any Content. By entering into the Agreement, you hereby provide your irrevocable consent to such monitoring. You acknowledge and agree that you have no expectation of privacy concerning the transmission of Your Content, including without limitation chat, text, or voice communications. In the event that the DAO pre-screens, refuses or removes any Content, you acknowledge that the DAO will do so for the DAO's benefit, not yours. Without limiting the foregoing, The DAO shall have the right to remove any Content that violates the Agreement or is otherwise objectionable.

**As a condition to accessing or using the Site, you will not:**

1. violate any applicable law, including, without limitation, any relevant and applicable anti-money laundering and anti-terrorist financing laws as well as any relevant and applicable privacy and data collection laws, in each case as may be amended;

2. export, reexport, or transfer, directly or indirectly, any DAO technology in violation of applicable export laws or regulations;

3. infringe on or misappropriate any contract, intellectual property or other third-party right, or commit a tort while using the Site;

4. make commercial use of the Site or any of its content without our express written permission;

5. misrepresent the truthfulness, sourcing or reliability of any content on the Site;

6. use the Site or its content to simulate communications from us or another service or entity in order to collect identity information, authentication credentials, or other information (known as 'phishing');

7. use the Site in any manner that could interfere with, disrupt, negatively affect, or inhibit other users from fully enjoying the Site or the DAO protocol, or that could damage, disable, overburden, or impair the functioning of the Site or the DAO protocol in any manner;

8. attempt to circumvent any content filtering techniques or security measures that DAO employs on the Site, or attempt to access any service or area of the Site that you are not authorized to access;

9. use any robot, spider, crawler, scraper, or other automated means or interface not provided by us, to access the Site to extract data;

10. introduce any malware, virus, Trojan horse, worm, logic bomb, drop-dead device, backdoor, shutdown mechanism or other harmful material into the Site;

11. **post content or communications on the Site that are, in our sole and absolute discretion, libelous, defamatory, profane, obscene, pornographic, sexually explicit, indecent, lewd, vulgar, suggestive, harassing, hateful, threatening, offensive, discriminatory, bigoted, abusive, inflammatory, fraudulent, deceptive, or otherwise objectionable;**

12. post content on the Site containing unsolicited promotions, commercial messages, or any chain messages or user content designed to deceive or trick the user of the Site; or

13. encourage or induce any third party to engage in any of the activities prohibited under these Terms.

**You acknowledge that the Site and your use of the Site contain certain risks, including, without limitation, the following risks:**

1. that any Smart Contracts you interact with are entirely your own responsibility and liability;

2. that at any time, your access to your Cryptocurrency Assets may be suspended or terminated or there may be a delay in your access or use of your Cryptocurrency Assets which may result in the Cryptocurrency Assets diminishing in value or you being unable to complete a transaction or interact with a Smart Contract; and

3. That the Site and/or application may be suspended or terminated for any or no reason, which may limit your access to your Cryptocurrency Assets.

**Accordingly, you expressly agree that:**

1. you assume all risks in connection with your access and use of the Site, the DAO Application and the Smart Contracts; and

2. you expressly release the DAO and our contributors, Members, and affiliates, and hold them harmless from and against any and all liability, claims, causes of action, losses, expenses, or damages (whether arising in law or equity, including but not limited to special, consequential,

indirect, punitive, and exemplary damages, and including but not limited to economic loss, business disruption, and/or attorney's fees) arising from or in any way related to the Site, the Application, and/or the Smart Contracts. You expressly waive all such claims against the Releases.

**Feedback.** You agree that submission of any ideas, suggestions, documents, and/or proposals to the DAO through its suggestion, feedback, wiki, forums (e.g. Discord or Snapshot), or similar pages ("Feedback") is at your own risk and that the DAO has no obligations (including without limitation obligations of confidentiality) with respect to such Feedback. You represent and warrant that you have all rights necessary to submit the Feedback. You hereby grant to the DAO a fully paid, royalty-free, perpetual, irrevocable, worldwide, non-exclusive, and fully sublicensable right and license to use, reproduce, perform, display, distribute, adapt, modify, re-format, create derivative works of, and otherwise commercially or non-commercially exploit in any manner, any and all Feedback, and to sublicense the foregoing rights in connection with the operation and maintenance of the DAO Properties and/or the DAO's purpose.

**Export control.** You may not use, export, import, or transfer the DAO DAPP except as authorized under U.S. law and the laws of the jurisdiction in which you obtained the DAO property (DAPP or Site), and any other applicable laws. In particular, but without limitation, the DAO properties may not be exported or re-exported (a) into any United States embargoed countries, or (b) to anyone on the U.S. Treasury Department's list of Specially Designated Nationals or the U.S. Department of Commerce's Denied Person's List or Entity List. By using the DAO DAPP, you represent and warrant that (i) you are not located in a country that is subject to a U.S. Government embargo, or that has been designated by the U.S. Government as a "terrorist supporting" country and (ii) you are not listed on any U.S. Government list of prohibited or restricted parties. You also will not use the DAO DAPP for any purpose prohibited by U.S. law, including the development, design, manufacture or production of missiles, nuclear, chemical or biological weapons. You acknowledge and agree that products, services or technology provided by the DAO are subject to the export control laws and regulations of the United States. You shall comply with these laws and regulations and shall not, without prior U.S. government authorization, export, re-export, or transfer DAO DAPP products, services or technology, either directly or indirectly, to any country in violation of such laws and regulations.

## 8. Securities Law Matters.

ANY GOVERNANCE TOKENS RECEIVED BY MEMBERS HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION, ANY STATE

SECURITIES COMMISSION, OR OTHER REGULATORY AUTHORITY, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON THE MERITS OF THIS OFFERING OR UPON THE ACCURACY OR ADEQUACY OF THIS AGREEMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THIS DOCUMENT DOES NOT CONSTITUTE AN OFFER OR SOLICITATION TO ANYONE IN ANY JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

ANY GOVERNANCE TOKENS THAT YOU MAY ACQUIRE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT, STATE SECURITIES LAWS, OR THE LAWS OF ANY COUNTRY OUTSIDE THE UNITED STATES. THE DAO'S POSITION IS THAT THE DAO'S GOVERNANCE TOKENS SHOULD NOT BE CONSIDERED OR REGARDED AS SECURITIES AS THE PURPOSE OF THE DAO IS TO PROVIDE A BLOCKCHAIN NATIVE TREASURY MANAGEMENT APPLICATION AND THE DAO TOKENS PROVIDE NO RIGHTS TO ANY DISTRIBUTION OR PROFITS, AND ARE NON-TRANSFERABLE AS DETAILED IN THE TERMS OF USE.

**"Not an Invitation to Invest or Purchase."**

The information contained on the DAO Properties is not an invitation or solicitation to invest in or purchase any cryptocurrency or NFTs or to invest in the shares or other products or services or otherwise deal in these or enter into a contract with the DAO, any cryptocurrency marketplace or any other company. The information provided herein should not be relied upon in connection with any investment decision. No reliance should be placed on any statements, rankings or ratings on the DAO Properties, whether for investment purposes or otherwise.

## 9. OFAC Compliance.

The U.S. Department of Treasury, through the Office of Foreign Assets Control ("OFAC"), prohibits U.S. companies from engaging in all or certain commercial activities with certain sanctioned countries (each a "Sanctioned Country") and certain individuals, organizations, or entities, including, without limitation, certain "Specially Designated Nationals" ("SDN") listed by OFAC. **If you use the Site, you expressly represent that you are not located in a Sanctioned Country and are not listed as an SDN. If the DAO determines that the Site is being used by prohibited persons, it will take any and all actions to terminate that User's access to the Site.**

## 10. Third Party Links.

The Site may contain hyperlinks or references to third party websites. Any such hyperlinks or references are provided for your information and convenience only. We have no control over third party websites and accept no legal responsibility for any content, material, or information contained

in them. The display of any hyperlink and reference to any third-party website does not mean that
we endorse that third party's website, products, or services. Your use of a third-party site may be
governed by the terms and conditions of that third-party site.

## 11. Privacy Policy.

Certain areas of the Site or Application, including any and all interactions with the Ethereum
blockchain, record your Cryptocurrency address and details of the transactions you authorize. You
understand that transactions, including parties you transact with, specific Cryptocurrency Assets you
hold, including unique ENS domain NFTs, third-party NFTs, the Cryptocurrency address, metadata
associated with any Smart Contract such as the executing function, its arguments (or parameters)
will contain in aggregate information which *may* identify you personally.

The Ethereum blockchain transactions are not temporary or transient, but are permanently and
permissionlessly accessible. The DAO, its contributors, and its affiliates are not engaged in profiling
activities whatsoever; however, *any other* third party, including government agencies and/or foreign
adversaries, will have unfettered access to all of your transactions on the blockchain forever.

Your authorization of transactions with your Cryptocurrency address, using Cryptocurrency Tokens,
will result in the indelible dissemination of information to the Ethereum blockchain.
Notwithstanding, the Application, handles as little personal information as possible, only your
Cryptographic address. With regards to transaction with the Application, including any payments or
transfer of funds, any information you provide to the payment vendors we do not retain, have
access to or control; your authorization of any payment or execution of transactions you provide to
the site is voluntary, and final.

Additionally, the Sites may employ Fathom Analytics for website traffic analytics, which doesn't use
cookies and complies with the GDPR, ePrivacy (including PECR), COPPA and CCPA. The decision to
potentially use this privacy-friendly analytics software, was in large part to ensure your IP address is
only briefly processed by this 3rd party, and the DAO and the Site have no way of identifying you
(aside from the aforementioned indelible entire history of Cryptographic transactions). As per the
CCPA, your personal information is de-identified.

The purpose of the DAO potentially using Fathom Analytics is to understand the Application website
traffic in the most privacy-friendly way possible so that the DAO can continually improve the
Application. The lawful basis as per the GDPR is "Article 6(1)(f); where our legitimate interests are to
improve our website and business continually." Additionally, the DAO and its contributors have no
interest in collecting this information.

## 12. Disclaimers; Limitation of Liability.

YOU EXPRESSLY AGREE THAT ACCESS TO AND USE OF THE SITE IS AT YOUR SOLE RISK AND IS PROVIDED ON AN "AS IS" AND "AS AVAILABLE" BASIS WITHOUT WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, WARRANTIES OF TITLE OR IMPLIED WARRANTIES OF NON-INFRINGEMENT, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE (EXCEPT ONLY TO THE EXTENT PROHIBITED UNDER THE LAWS APPLICABLE TO TERMS OF SERVICE WITH ANY LEGALLY REQUIRED WARRANTY PERIOD TO THE SHORTER OF THIRTY DAYS FROM FIRST USE OR THE MINIMUM PERIOD REQUIRED). WITHOUT LIMITING THE FOREGOING, NEITHER THE DAO NOR ITS AFFILIATES OR SUBSIDIARIES, OR ANY OF THEIR DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS, AGENTS, ATTORNEYS, THIRD-PARTY PROVIDERS, DISTRIBUTORS, LICENSEES, LICENSORS, SUCCESSORS, OR ASSIGNS (COLLECTIVELY, "DAO PARTIES") WARRANT THAT THE SITE WILL BE UNINTERRUPTED, BUG-FREE, OR ERROR-FREE, AND NONE OF THE DAO PARTIES WARRANT THAT SMART CONTRACTS ARE MERCHANTABLE, FIT FOR ANY PARTICULAR PURPOSE, AND/OR RECOGNIZED BY ANY PARTICULAR JURISDICTION(S).

TO THE FULLEST EXTENT PERMITTED BY LAW, THE DISCLAIMERS OF LIABILITY CONTAINED HEREIN APPLY TO ANY AND ALL DAMAGES, LOSSES AND/OR INJURY WHATSOEVER CAUSED BY OR RELATED TO USE OF, OR INABILITY TO USE, THE SERVICES UNDER ANY CAUSE OR ACTION WHATSOEVER OF ANY JURISDICTION, INCLUDING, WITHOUT LIMITATION, ACTIONS FOR BREACH OF WARRANTY, BREACH OF CONTRACT AND/OR TORT (INCLUDING NEGLIGENCE). THE DAO PARTIES SHALL NOT BE LIABLE FOR ANY DIRECT, INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE AND/OR CONSEQUENTIAL DAMAGES IN ANY WAY WHATSOEVER ARISING OUT OF THE USE OF, OR INABILITY TO USE, THE SITE. YOU FURTHER SPECIFICALLY ACKNOWLEDGE THAT THE DAO PARTIES ARE NOT LIABLE, AND YOU AGREE NOT TO SEEK TO HOLD THE DAO PARTIES LIABLE, FOR THE CONDUCT OF THIRD PARTIES, INCLUDING OTHER USERS OF THE SITE AND OPERATORS OF EXTERNAL WEBSITES, AND THAT THE RISK OF THE SITE AND EXTERNAL WEBSITES AND OF INJURY FROM THE FOREGOING RESTS ENTIRELY WITH YOU.

IN THE EVENT THAT A COURT AND/OR ARBITRATOR(S) OF COMPETENT JURISDICTION HOLDS THAT ANY DAO PARTY IS LIABLE TO YOU (FOR EXAMPLE AND WITHOUT LIMITATION, BECAUSE ANY RELEASE OR WAIVER HEREUNDER IS FOUND TO BE VOID OR OTHERWISE UNENFORCEABLE, OR BECAUSE ANY CLAIMS ARE FOUND TO BE OUTSIDE THE SCOPE OF ANY SUCH RELEASE OR WAIVER), UNDER NO CIRCUMSTANCES WILL ANY OF THE DAO PARTIES BE LIABLE TO YOU IN THE AGGREGATE FOR MORE THAN THE AMOUNT YOU HAVE PAID THE **DAO DIRECTLY ARISING FROM YOUR CONTRIBUTION TO THE DAO** IN THE THIRTY (30) DAYS IMMEDIATELY PRECEDING THE DATE ON WHICH YOU FIRST ASSERT ANY SUCH CLAIM, WHETHER SUCH LIABILITY IS BASED ON

BREACH OF WARRANTY, BREACH OF CONTRACT OR TORT (INCLUDING NEGLIGENCE) OR OTHERWISE.

We do not guarantee that the Site will be secure or free from bugs or viruses.

You are responsible for configuring your information technology, computer programs and platform in order to access the Site. You should use your own virus protection software.

We cannot promise that the use of the Site, or any content taken from the Site, will not infringe the rights of any third party.

Certain content and materials available on the Site are for informational purposes only and are not intended to address your particular requirements. In particular, the content and materials available on the Site do not constitute any form of advice or recommendation by us, should not be regarded as an offer, solicitation, invitation or recommendation to buy or sell investments, securities or any other financial services and are not intended to be relied upon by you in making any specific investment or other decisions. We recommend that you seek independent advice from your own financial advisors and legal counsel before making any such decision.

Nothing included in the Site constitutes an offer or solicitation to sell, or distribution of, investments and related services by the DAO to anyone in any jurisdiction.

You may only participate with Smart Contracts on the Site by linking your Cryptocurrency Wallet on supported bridge extensions such as MetaMask (currently available at https://metamask.io/). MetaMask is an electronic wallet that allows you to purchase, store, and engage in transactions using Ethereum cryptocurrency. Before putting your Cryptocurrency Asset into a Smart Contract, you will be required to download a supported electronic wallet extension and connect and unlock your Cryptocurrency Wallet with that extension.

ALL TRANSACTIONS INITIATED THROUGH OUR SERVICE ARE FACILITATED AND RUN BY THIRD-PARTY ELECTRONIC WALLET EXTENSIONS, AND BY USING OUR SERVICES YOU AGREE THAT YOU ARE GOVERNED BY THE TERMS OF SERVICE AND PRIVACY POLICY FOR THE APPLICABLE EXTENSIONS. FOR METAMASK, THOSE TERMS ARE AVAILABLE AT https://metamask.io/terms.html AND https://metamask.io/privacy.html.

## 13. Indemnification.

You agree to indemnify and hold the DAO and its parents, subsidiaries, affiliates, officers, employees, agents, partners, suppliers, and licensors (each, a "DAO Party" and collectively, the "DAO Parties") harmless from any losses, costs, liabilities, and expenses (including reasonable attorneys' fees) relating to or arising out of any and all of the following: (a) Your Content; (b) your use of, or inability to use, any DAO Property; (c) your violation of the Agreement; (d) your violation of any rights of another party, including any Registered Users; or (e) your violation of any applicable laws, rules, or regulations. The DAO reserves the right, at its own cost, to assume the exclusive defense and control of any matter otherwise subject to indemnification by you, in which event you will fully cooperate with the DAO in asserting any available defenses. This provision does not require you to indemnify any of the DAO Parties for any unconscionable commercial practice by such party or for such party's fraud, deception, false promise, misrepresentation, or concealment, or suppression or omission of any material fact in connection with the Website or any Services provided hereunder. You agree that the provisions in this section will survive any termination of your Account, the Agreement, and/or your access to the DAO Properties.

## 14. Arbitration.

**Informal Negotiations.** To expedite resolution and control the cost of any dispute, controversy or claim arising under or related to your account, the DAO protocol or Application, the Site, these Terms, or any other transaction involving you and the DAO, whether in contract, warranty, misrepresentation, fraud, tort, intentional tort, statute, regulation, ordinance, or any other legal or equitable basis (or the breach, termination, enforcement, interpretation or validity thereof) (**"Dispute"**), you and the DAO agree to first attempt to negotiate any Dispute (except those Disputes expressly provided below) informally for at least ninety (90) days before initiating any arbitration. Such informal negotiations commence upon written notice from one person to the other. You should send your notice in an appropriate Discord channel via https://discord.gg/movexyz or via a message on https://chat.blockscan.com addressed to the DAO Gnosis multi-signature address 0x143cC0A996De329C1C5723Ee4F15D2a40c1203c6 (**"Notice Address"**). The DAO will send its notice to you by the Discord handle provided by you in connection with the aforementioned notice or to the Cryptographic address used in connection with the Application via the aforementioned https://chat.blockscan.com/.

**Binding Arbitration.** If you and the DAO are unable to resolve a Dispute through informal negotiations, either you or the DAO may elect to have the Dispute (except those Disputes expressly excluded below) finally and exclusively resolved by confidential binding arbitration, and not in a class, representative or consolidated action or proceeding. In such event, these Terms memorialize a transaction in interstate commerce; (i) the Federal Arbitration Act (9 U.S.C. § 1, et seq.) governs the

interpretation and enforcement of this Section; and (ii) this Section shall survive termination of these Terms.

Any election to arbitrate by one party shall be final and binding on the other, and your grounds for appeal are limited. YOU UNDERSTAND THAT ABSENT THIS PROVISION, YOU WOULD HAVE THE RIGHT TO SUE IN COURT AND HAVE A JURY TRIAL. The arbitrator may award you the same damages and relief as a court sitting in proper jurisdiction could, and may award declaratory or injunctive relief. In addition, in some instances, the costs of arbitration could exceed the costs of litigation and the right to discovery may be more limited in arbitration than in court. The arbitration shall be commenced and conducted under the Commercial Arbitration Rules of the American Arbitration Association ("AAA") and, where appropriate, the AAA's Supplementary Procedures for Consumer Related Disputes ("AAA Consumer Rules"), both of which are available at the AAA website. The determination of whether a Dispute is subject to arbitration shall be governed by the Federal Arbitration Act. The parties agree that the arbitrator shall have exclusive authority to decide all issues relating to the interpretation, applicability, enforceability and scope of this arbitration agreement. Your arbitration fees and your share of arbitrator compensation shall be governed by the AAA Rules and, where appropriate, limited by the AAA Consumer Rules. If such costs are determined by the arbitrator to be excessive, you will pay all arbitration fees and expenses. The arbitration may be conducted, at the option of the claimant, either in person or by video conference. The arbitrator will make a decision in writing, but need not provide a statement of reasons unless requested by a party. The arbitrator must follow applicable law, and any award may be challenged within a reasonable period of time (not to exceed 30 days) if the arbitrator fails to do so. Except as otherwise provided in this Agreement, you and the DAO may litigate in court to compel arbitration, stay proceedings pending arbitration or to confirm, modify, vacate or enter judgment on the award entered by the arbitrator. Judgment upon any award rendered by the arbitrator(s) may be entered and enforcement obtained thereon in any court having jurisdiction. All arbitration proceedings shall be closed to the public and confidential and all records relating thereto shall be permanently sealed, except as necessary to obtain court confirmation of the arbitration award. Each party shall have the right to participate by video conference in order to minimize travel and expense burdens. Subject to the terms and conditions of these Terms, the arbitrator shall have authority to grant any form of appropriate relief, whether legal or equitable in nature, including specific performance.

**Restrictions/No Class Actions.** You and the DAO agree that any claim brought in connection with a Dispute, whether resolved through arbitration or not, will be brought between the DAO and you individually, and that you may not assert any such claim against the DAO as plaintiff or class Member in any purported class or representative proceeding. To the fullest extent permitted by law, (1) no arbitration shall be joined with any other; (2) no Dispute between you and the DAO is to be

arbitrated on a class-action basis or will utilize class action procedures; and (3) you may not bring any Dispute in a purported representative capacity on behalf of the general public, other Users of the Site or any other persons. If this specific provision is determined to be unenforceable, then the entirety of this Arbitration section will be null and void.

**Exceptions to Informal Negotiations and Arbitration.** You and the DAO agree that the following Disputes are not subject to the above provisions concerning informal negotiations and binding arbitration:

(1) any Disputes seeking to enforce or protect, or concerning the validity of, any of your or the DAO's intellectual property rights; and (2) any claim for injunctive relief.

**Effect of Changes on Arbitration.** Notwithstanding the provisions of these Terms, if the DAO changes any of the terms of this Arbitration section after the date you first accepted these Terms (or accepted any subsequent changes to these Terms), you may reject any such change by sending us written notice (including by electronic mail to the aforementioned Notice Address via https://chat.blockscan.com/) within 30 days of the date such change became effective, as indicated in the "Last Updated" date above or in the date of the DAO's email to you notifying you of such change (whichever is earlier). By rejecting any change, you are agreeing that you will arbitrate any Dispute between you and the DAO in accordance with the terms of this Arbitration section as of the date you first accepted these Terms (or accepted any subsequent changes to these Terms).

**Small Claims Court.** Notwithstanding the foregoing, you may bring an individual action in the small claims court of your state or municipality if the action is within that court's jurisdiction and is pending only in that court.

**Release.** You hereby release the DAO, affiliates, Service Provider, and their successors from claims, demands, any and all losses, damages, rights, and actions of any kind, including personal injuries, death, and property damage, that is either directly or indirectly related to or arises from your use of the DAO DAPP, including but not limited to, any use of any information, ratings, rankings, scores, tips, or advice Made Available via the DAO DAPP and any reliance thereon, of any kind arising in connection with or as a result of the Agreement or your use of the DAO DAPP. If you are a California resident, you hereby waive California Civil Code Section 1542, which states, "A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party." The foregoing release does not apply to any claims, demands, or any losses, damages, rights, and actions of any kind, including personal injuries, death, or property damage for any unconscionable commercial practice

by a DAO Party or for such party's fraud, deception, falsehood, promise, misrepresentation, or concealment, suppression, or omission of any material fact in connection with the DAPP or the DAO Site or any Services provided hereunder.

## 15. Governing Law.

These Terms and all aspects of your use of the Site shall be governed by and construed in accordance with the internal laws of the *United States and the State of Delaware* governing contracts entered into and to be fully performed in *Delaware* (i.e., without regard to conflict of law's provisions) regardless of your location except that the Arbitration section above shall be governed by the Federal Arbitration Act. For the purpose of any judicial proceeding to enforce an arbitration award or incidental to such arbitration or to compel arbitration, or if for any reason a claim proceeds in court rather than in arbitration, you hereby submit to the non-exclusive jurisdiction of the state and Federal courts sitting in *Georgetown, Delaware*, and agree that service of process in such arbitration or court proceedings shall be satisfactorily made upon a party if sent by certified, express or registered mail addressed to it at the address set forth in the books and records of the DAO, or if no such address has been provided, by email to the email address, or by notice via Discord, or by the aforementioned chat to the Notice Address provided by the relevant party to the DAO in connection with its use of the Site. With respect to any Disputes not subject to informal dispute resolution or arbitration (as set forth above), you agree not to commence or prosecute any action in connection therewith other than in the state and Federal courts located in *Georgetown, Delaware*, and you hereby consent to, and waive all defenses of lack of personal jurisdiction and forum non conveniens with respect to, venue and jurisdiction in the state and Federal courts located in *Georgetown, Delaware*. To the extent non-U.S. laws mandate a different approach with respect to governing law, venue, statute of limitation, and dispute resolution method with respect to certain non-U.S. persons, each such required standard shall be applied, but all other provisions under this section shall remain in full force.

## 16. General.

If any clause or part of any clause of these Terms is found to be void, unenforceable or invalid, then it will be severed from these Terms, leaving the remainder in full force and effect, provided that the severance has not altered the basic nature of these Terms.

No single or partial exercise, or failure or delay in exercising any right, power or remedy by us shall constitute a waiver by us of, or impair or preclude any further exercise of, that or any right, power or remedy arising under these terms and conditions or otherwise.

If any of the provisions in these Terms are found to be illegal, invalid or unenforceable by any court of competent jurisdiction, the remainder shall continue in full force and effect.

The DAO shall not be liable for any unforeseeable event beyond its reasonable control not caused by its fault or negligence (each, a "force majeure event"), which causes the DAO to be unable to perform its obligations under these Terms, and which it has been unable to overcome by the exercise of its due diligence, provided that the DAO shall use reasonable efforts to avoid or remove such causes of nonperformance, shall suspend performance only for such period of time as is necessary as a result of such force majeure event and shall resume performance as quickly as reasonably possible.

All disclaimers, indemnities and exclusions in these Terms shall survive termination of the Terms and shall continue to apply during any suspension or any period during which the Site is not available for you to use for any reason whatsoever.

These Terms and the documents referred to in them set out the entire agreement between you and us with respect to your use of the Site, the DAO and the services provided via the Site and supersede any and all prior or contemporaneous representations, communications or agreements (written or oral) made between you or us.

## 17. Contacting Us.

Should you have any question about these Terms, or wish to contact us for any reason whatsoever, please do so by sending a message to the DAO's Discord public channels, or by sending a message via https://chat.blockscan.com/ addressed to the Notice Address eth:0x143cC0A996De329C1C5723Ee4F15D2a40c1203c6, which has been provided for convenience, or to the above referenced Service Provider notice address.

[1]: Additional domains include: *dao-advice.xyz, dao-advisors.xyz, move.xyz, movementdao.org, movementdao.xyz, movementdao.wtf, mvmtdao.xyz, themovementdao.xyz, bannymart.xyz, bannyverse.xyz, juicebox.beer, juicebox.builders, juicebox.cafe, juicebox.cash, juicebox.click, juicebox.cash, juicebox.coffee, juicebox.cool, juicebox.directory, juicebox.domains, juicebox.engineering, juicebox.fund, juicebox.fyi, juicebox.lol, juicebox.miami, juicebox.monster, juicebox.name, juicebox.page, juicebox.plus, juicebox.wtf, treasury.wtf, treasuries.wtf, tiles.wtf*

✏️ Edit this page

# Exhibit D

  Resources    Code of Conduct

# Code of Conduct

This is the Code of Conduct for DAO and its Community. Some terms used in this document have specific meanings, and are defined in the Definitions.

## Community.

Before being admitted as a DAO Member, each individual must accept the DAO's Code of Conduct, the DAO's Community Enforcement Guidelines, the DAO's Guiding Principals, and the DAO's Terms of Service.

In the event of a breach of the Code of Conduct, or a breach of any applicable terms and conditions, the DAO reserves the right to remove the associated DAO Member(s) without notice.

Views, statements and opinions expressed by a DAO Member do not necessarily reflect the opinions of the DAO Association or any of its affiliated entities, and shall be considered individual and personal statements of that DAO Member. The DAO shall not in any case be held responsible for any views, statements or opinions of any kind expressed by the DAO Member.

Every Member must act and interact in ways that contribute to an open, welcoming, diverse, and inclusive Community. By participating in the Community, every Member agrees to make our Community a harassment-free experience for everyone regardless of age, body size, visible or invisible disability, ethnicity, sex, gender identity and expression, level of experience, education, socio-economic status, nationality, personal appearance, race, religion, or sexual identity and orientation. Any behavior contrary to this spirit of tolerance is unacceptable, and those acting in such a way will be immediately excluded from the Dapp, and prevented from any and all privileges granted to DAO Members.

## Community Standards.

**Examples of behavior that contributes to a positive environment for our Community include:**

- Honesty.

- Prioritizing education; learning by doing.

- Demonstrating empathy and kindness.

- Being respectful.

- Giving and accepting feedback.

- Accepting responsibility. Owning mistakes, and learning from them.

- Focusing on what is best for the Community.

- Stewards of the Community and its wishes.

We are committed to Personal Integrity, Excellence, Teamwork, Inspiration to the Community Members. We are Responsible to our Community Members, Ourselves, Each Other, and to our Partners, Colleagues, and the Community we serve.

**Examples of unacceptable behavior include:**

- The use of sexualized language or imagery, and sexual attention or advances of any kind.

- Trolling, insults, derogatory comments, and personal or political attacks.

- Harassment.

- Publishing others' private information (NCC and/or PII) without their explicit consent.

- Giving any type of financial advice.

- Other conduct which could reasonably be considered inappropriate in a professional setting.

- Unauthorized use of the DAO's Cryptographic keys to sign any transaction which has not been ratified by the DAO's governance process.

# Community Enforcement Guidelines.

DAO Members will follow the Community Impact and Enforcement Guidelines listed below in determining the consequences for any action they deem to be in violation of the Code of Conduct:

## 1. Correction.

**Transgression:** The use of inappropriate language or other unprofessional or unwelcome behavior.

**Consequence:** Deletion or removal of the content in question, along with a communication of which rule was violated and how to avoid such violations in the future.

## 2. Warning.

**Transgression:** A violation of the DAO's Code of Conduct, either through a single incident or a series of actions.

**Consequence:** A warning describing the consequences for continued inappropriate behavior. No interaction shall take place with the people involved (including unsolicited interaction with those enforcing the Code of Conduct) for 72 hours. This includes interactions in Community spaces, as well as interactions through external channels like Telegram, Discord, Reddit, a Community Forum, or another platform. Violating these terms may lead to a temporary or permanent ban.

## 3. Temporary Ban.

**Transgression:** A serious violation of Community standards, including sustained inappropriate behavior.

**Consequence:** A temporary ban from any sort of interaction or communication with the Community for 168 hours. No interaction shall take place with the people involved (including unsolicited interaction with those enforcing the Code of Conduct) during this period. Violating these terms may lead to a permanent ban.

## 4. Permanent Ban.

**Transgression:** Demonstrating a pattern of violating Community standards, including sustained inappropriate behavior, harassment, aggression, or disparagement towards individuals or classes of individuals.

**Consequence:** Permanent removal from any sort of interaction or public communication with the Community for an indefinite period of time. If an individual has alternate accounts, those may be removed as well. No public or private interaction with the people involved (including unsolicited interaction with those enforcing the Code of Conduct) shall take place during this period.

## 5. Compulsory Withdrawal.

**Transgression:** A violation of the DAO's Code of Conduct, the DAO's Community Impact and Enforcement Guidelines, or the DAO's Guiding Principals § 6(d): *Withdrawal Rights; Compulsory Withdrawal; Non-Disparagement* shall result in a permanent ban.

**Consequence:** The DAO Member shall be removed from the Dapp and prevented from any and all privileges granted to Members. Referral to the DAO's Service Provider to initiate the Guiding Principal's Compulsory Withdrawal § 6(b) proceedings.

# Other.

Notwithstanding the above Community standards and enforcement guidelines, the DAO and its Service Provider reserve the right to exclude any participant of the Dapp in case of breach of the Code of Conduct or any applicable terms and conditions.

✏️ Edit this page

# Exhibit E

   Legal    Definitions

# Definitions

A **"51% attack"** is a type of attack on a decentralized network whereby a group gains control of the majority of nodes. A 51% attack would such a group to defraud the blockchain by reversing transactions and "double spending" Ether and other tokens.

An **"Account"** is an object containing an address, balance, nonce, and optional storage and code. An account can be a contract account or an externally owned account (EOA).

**"Act" or "The Act"** refers to the Delaware Uniform Unincorporated Nonprofit Association Act, Del. Code Ann. Tit. 6, §§ 1901-1916 inclusive.

**"Address"** most generally, represents an EOA or contract that can receive ("destination address") or send ("source address") transactions on the blockchain. More specifically, it is the rightmost 160 bits of a Keccak hash of an ECDSA public key.

**"Affiliate"** means, with respect to any Person, any other Person controlling, controlled by, or under common control with such Person; in such context, "control" means the possession, directly or indirectly, of the power to direct the management or policies of another, whether through the ownership of voting securities, by contract, or otherwise.

**"Agreement" or "The Agreement"** refers to the Guiding Principles Agreement of the DAO.

**"Allow Minting Tokens", "Allow Changing Tokens", "Allow Setting Terminals", "Allow Setting the Controller", "Allow Terminal Migrations", and "Allow Controller Migration"** each refer to different Juicebox protocol functions which Juicebox Projects can enable or disable each Funding Cycle. By default, these functions are disabled.

**"Amendments"** conveys that any provision of this Charter may be amended, waived or modified only upon a vote in favor of such amendment, waiver or modification by the DAO Members through the Designated Smart Contract.

**"Application Binary Interface (ABI)"** is the standard way to interact with contracts in the Ethereum ecosystem, both from outside the blockchain and for contract-to-contract interactions.

**"Audit"** refers to a testing process for potential security improvements or other improvements to a new token, project, product, or offering, or for potential improvements to an existing token, project, product, or offering. Testing networks ("Testnets" or "Test nets") can be used to test the viability and vulnerability of new ideas, concepts, code, and processes before those ideas, concepts, code, or processes are deployed to other networks.

**"Ballot" or "Reconfiguration Ballot"** refers to Ethereum Smart Contracts which adhere to `IJBFundingCycleBallot`. Ballots specify the conditions that must be met for any proposed funding cycle reconfiguration to take effect. A Ballot can be written to incorporate strict community voting requirements in order to make funding cycle changes, or to simply add a required buffer period between when a change is proposed and when it can take effect.

**"Ballot Redemption Rate"** refers to a custom Redemption Rate (See Redemption Rate) which overrides the typical Redemption Rate if a Reconfiguration Ballot is currently active.

**"Claim"** means any past, present, or future dispute, claim, controversy, demand, right, obligation, liability, action, or cause of action of any kind or nature.

**"Consensus Attack"** refers to an attack that: (i) is undertaken by or on behalf of a block producer who controls, or a group of cooperating block producers who collectively control a preponderance of the means of block production on the Designated Blockchain Network; and (ii) has the actual or intended effect of: (A) reversing any transaction made to or by the Designated Smart Contract after Confirmation of such a transaction, including any "double spend" attack having or intended to have such effect; or (B) preventing inclusion in blocks or Confirmation of any transaction made to or by the Designated Smart Contract, including any "censorship attack," "transaction withholding attack" or "block withholding attack" having or intended to have such effect.

**"Consensus Rules"** means the rules for transaction validity, block validity, and determination of the canonical blockchain that are embodied in the Designated Client.

**"Confirmation"** of a transaction shall be deemed to have occurred if and only if such transaction has been recorded in accordance with the Consensus Rules in a valid block whose hashed header is referenced by at least 30 subsequent valid blocks on the Designated Blockchain.

**"Construction":** Any rule of construction to the effect that ambiguities are to be resolved against the drafter shall not be applied in the construction or interpretation of this Charter. This Charter constitutes the entire agreement among the DAO Members with respect to the subject matter

hereof and supersedes all prior agreements and understandings, both written and oral, among the DAO Members with respect to the subject matter hereof.

**"Contract"** means any: (i) written, oral, implied by course of performance or otherwise or other agreement, contract, understanding, arrangement, settlement, instrument, warranty, license, insurance policy, benefit plan or legally binding commitment or undertaking; or (ii) any representation, statement, promise, commitment, undertaking, right or obligation that may be enforceable, or become subject to an Order directing performance thereof, based on equitable principles or doctrines such as estoppel, reliance, or quasi-contract.

**"DAO"** means Decentralized Autonomous Organization. "DAO" or "The DAO" may refer to Movement DAO, a Delaware Unincorporated Nonprofit Association. The DAO may choose to follow the Unincorporated Nonprofit Association Act under Nevada, Delaware, Washington or another state where the Uniform Unincorporated Nonprofit Association Act of 2008 was adopted.

**"DAO Expenses"** refers to costs and expenses related to the activities, maintenance and operation of the DAO. *See Section 7(b)(i) of The Agreement.*.

**"DAO Property"** means any Token or other asset, right or property licensed to or on deposit with or owned, held, custodied, controlled or possessed by or on behalf of the DAO, including any Token on deposit with or held, controlled, possessed by or on deposit with the Designated Smart Contract.

**"Dapp"** refers to online portals or other interactive software used by the DAO, individuals, and any other entities to create, manage, contribute to, or otherwise interact with Juicebox Treasuries, the Juicebox Protocol, or any other DAO services. Governance activities performed within the DAO's Snapshot Spaces on Snapshot.org or other Snapshot servers are also considered to be Dapp activities.

**"Data Source"** refers to Ethereum Smart Contracts which adhere to `IJBFundingCycleDataSource`. A Data Source can customize what happens when a payment to a Juicebox Project is attempted during a Funding Cycle, and what happens when a Token redemption is attempted during a Funding Cycle.

**"Discount Rate"** refers to the percent by which to automatically decrease the subsequent cycle's Weight from the current cycle's Weight. The Discount Rate is not applied during funding cycles where the Weight is explicitly reconfigured.

**"Disputes"; "Mandatory Arbitration".** Any Legal Proceeding, Claim or other dispute or controversy arising out of or relating to this Agreement, its enforcement, or the breach thereof shall

be finally resolved by binding arbitration in accordance with the Arbitration Procedures; provided, however, that any DAO Member may seek injunctive relief in aid of arbitration in order to prevent irreparable harm or preserve the status quo. EACH DAO MEMBER HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS CHARTER, THE DESIGNATED SMART CONTRACT, THE DAO MATTERS OR THE ACTIONS OF THE DAO MEMBERS IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE AND ENFORCEMENT OF THIS AGREEMENT.

**"Distribution Limit" and "Funding Target"** refer to the amount of tokens that a Juicebox Project can distribute per Funding Cycle, and the currency which that amount is denominated in.

**"Designated Blockchain"** refers to, at any given time, the version of the digital blockchain ledger that at least a majority of nodes running the Designated Client on the Designated Blockchain Network recognize as canonical as of such time in accordance with the Consensus Rules. For the avoidance of doubt, the "Designated Blockchain" does not refer to e.g. Ethereum Classic or any digital blockchain ledger commonly known as a "testnet".

**"Designated Blockchain Network"** means the Ethereum mainnet (networkID:1, chainID:1), as recognized by the Designated Client.

**"Designated Client"** means the Official Go Ethereum client available at https://github.com/ethereum/go-ethereum, Infura, Alchemy, or other providers, as long as it is compatible with the aforementioned Designated Blockchain Network.

**"Designated Smart Contract"** means the smart contracts referenced in contract addresses on the Designated Blockchain.

**"Distributed DAO Property"** means any asset, right or property that was once DAO Property and has been distributed to a DAO Member.

**"Established Practices"** refers to the practices used by an unincorporated nonprofit association without material change during the most recent five years of its existence, or if it has existed for less than five years, during its entire existence.

**"Externally Owned Accounts (EOAs)"** are accounts that are controlled by users who control the private keys for an account, typically generated using a seed phrase. Externally owned accounts are accounts without any code associated with them. Typically these accounts are used with a wallet.

**"Fraud Proof"** is a security model for certain layer 2 solutions where, to increase speed, transactions are rolled up into batches and submitted to Ethereum in a single transaction. They are assumed valid but can be challenged if fraud is suspected. A Fraud Proof will then run the transaction to see if fraud took place. This method increases the amount of transactions possible while maintaining security. Some rollups use validity proofs.

**"Funding Cycle Duration"** is how long each funding cycle lasts (specified in seconds). All funding cycle properties are unchangeable while that cycle is in progress. In other words, any proposed reconfigurations can only take effect during a subsequent cycle. If no reconfigurations were submitted by the project owner, or if the proposed changes fail the current funding cycle's Ballot, a copy of the latest funding cycle will automatically start once the current one ends. Funding cycle changes pursuant to a Discount Rate or other certain onchain parameters will still take effect in such a funding cycle. A cycle with no duration lasts indefinitely, and reconfigurations can start a new funding cycle with the proposed changes right away.

**"Funding Cycle"** and **"Cycle"** refer to the time-locked rules according to which a Juicebox Project wishes to operate. Funding Cycles are typically represented as a `JBFundingCycle` data structure, and are usually managed by the `JBFundingCycleStore` contract. Funding Cycle duration can be specified in seconds ("Funding Cycle Duration"). Funding Cycle properties are unchangeable while the cycle is in progress. In other words, any proposed reconfigurations can only take effect during the subsequent cycle. If no reconfigurations were submitted by the Project Owner, or if proposed changes fail the current cycle's Ballot, a copy of the latest Funding Cycle will automatically start once the current one ends. Funding cycle changes pursuant to a Discount Rate or other certain onchain parameters will still take effect in such a funding cycle. A Funding Cycle with no duration lasts indefinitely; valid reconfigurations to Funding Cycles with no duration immediately start a new Funding Cycle with the proposed changes once approved by a Reconfiguration Ballot if necessary.

**"Gas"** A virtual fuel used in Ethereum to execute smart contracts. The EVM (i.e. the Ethereum Virtual Machine) uses an accounting mechanism to measure the consumption of gas and limit the consumption of computing resources (see Turing complete).

**"Governing Principles"** refers to the agreements, whether oral, in a record, or implied from established practices, or in any combination thereof, which govern the purpose or operation of an unincorporated nonprofit association and the rights and obligations of its Members and managers. The term includes any amendment or restatement of the agreements constituting the Governing Principles.

**"Governance Rights"** are the entire interest of a Member in the DAO, as measured by a Member's Tokens, including, without limitation, all rights and obligations contemplated or agreed to under this Agreement, and any right to vote on, consent to, or otherwise participate in any decision or action of or by the Members granted by this Agreement or the Act. Member's Governance Rights are subject to DAO Governance.

**"Gnosis Safe"** refers to the Gnosis Safe Multisig Wallet, a smart contract which allows multiple Ethereum addresses to manage a single Ethereum address. The Gnosis Safe is used to manage the DAO's treasury.

**"Gwei"** is short for gigawei, a denomination of ether, commonly utilized to convey gas prices. 1 gwei = 109 wei. 109 gwei = 1 Ether.

**"HD Wallet Seed"** is a value used to generate the master private key and master chain code for an HD wallet. The wallet seed can be represented by mnemonic words, making it easier for humans to copy, back up, and restore private keys.

**"Hold Fees"** refers to the fee holding process: by default, Protocol Fees are paid automatically when funds are distributed from a Juicebox Treasury to an Ethereum address. During Funding Cycles configured to hold fees, this fee amount is set aside instead of being immediately processed. Projects can reclaim their held fees by adding funds to their Treasury equal to the amount of funds distributed to Ethereum addresses while fees were being held. Otherwise, Juicebox DAO or the project can process these held fees at any point to issue Juicebox Governance Token ("JBX") at the current rate. This allows a project to withdraw funds and later add them back into their the DAO treasury without incurring fees. This applies to both Distributions from the Distribution Limit and from the Overflow Allowance.

**"Legal Order"** means any restraining order, preliminary or permanent injunction, stay or other order, writ, injunction, judgment or decree that either: (i) is issued by a court of competent jurisdiction, or (ii) arises by operation of applicable law as if issued by a court of competent jurisdiction, including, in the case of clause "(ii)" an automatic stay imposed by applicable law upon the filing of a petition for bankruptcy.

**"Legal Proceeding"** means any private or governmental action, suit, litigation, arbitration, claim, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), hearing, inquiry, audit, examination or investigation commenced, brought, conducted or heard by or before, or otherwise involving, any court or other governmental entity or any arbitrator or arbitration panel.

**"Liability"** means any debt, obligation, duty or liability of any nature (including any unknown, undisclosed, unmatured, unaccrued, unasserted, contingent, indirect, conditional, implied, vicarious, inchoate derivative, joint, several or secondary liability), regardless of whether such debt, obligation, duty or liability would be required to be disclosed on a balance sheet prepared in accordance with generally accepted accounting principles and regardless of whether such debt, obligation, duty or liability is immediately due and payable. To be "Liable" means to have, suffer, incur, be obligated for or be subject to a Liability.

**"Lien"** means any lien, pledge, hypothecation, charge, mortgage, security interest, encumbrance, other possessory interest, conditional sale or other title retention agreement, intangible property right, claim, infringement, option, right of first refusal, preemptive right, exclusive license of intellectual property, community property interest or restriction of any nature including any restriction on the voting of any security or restriction on the transfer, use or ownership of any security or other asset.

A **"Manager"** is a person that is responsible, alone or in concert with others, for the management of an unincorporated nonprofit association.

**"Majority Vote"** means the approval of Members holding at least a majority-in-interest of applicable DAO voting Tokens.

**"Material Adverse Exception Event"** means that one or more of the following has occurred, is occurring or would reasonably be expected to occur:

(i) a Consensus Attack adversely affecting the results or operations of the Designated Smart Contract;

(ii) the Designated Smart Contract having become inoperable, inaccessible or unusable, including as the result of any code library or repository incorporated by reference into the Designated Smart Contract or any other smart contract or oracle on which the Designated Smart Contract depends having become inoperable, inaccessible or unusable or having itself suffered a Material Adverse Exception Event, *mutatis mutandis*;

(iii) a material and adverse effect on the use, functionality or performance of the Designated Smart Contract as the result of any bug, defect or error in the Designated Smart Contract or the triggering, use or exploitation (whether intentional or unintentional) thereof (it being understood that for purposes of this clause "(iii)", a bug, defect or error will be deemed material

only if it results in a loss to a DAO Member or the DAO of at least **50%** of such DAO Member's distributable interest in the DAO Property and/or **50%** of the DAO Property);

**(iv)** any unauthorized use of an administrative function or privilege of the Designated Smart Contract, including: (A) any use of any administrative credential, key, password, account or address by a Person who has misappropriated or gained unauthorized access to such administrative credential, key, password, account or address or (B) any unauthorized use of an administrative function or privilege by a DAO Member or a representative of a DAO Member; or

**(v)** the Designated Smart Contract, any of the DAO Members or the DAO Property is subject to a Legal Order that prohibits the Designated Smart Contract (or that, if the Designated Smart Contract were a Person, would prohibit the Designated Smart Contract) from executing any function or operation it would otherwise reasonably be expected to execute.

**"Member"** means each Person entering into this Agreement as a Member or subsequently admitted as a Member pursuant to the terms of this Agreement, but does not include any Person that has ceased to be a Member of the DAO. If at any time there is only one Member, then all references to "Members" shall be deemed to mean "Member."

A **"Multi-Signature Wallet"** is a smart contract wallet on the Designated Blockchain Network that requires a minimum number of people to approve a transaction before it can occur (M-of-N).

**"Non-Fungible Tokens", "NFT", or "NFTs"** means a cryptographic token based on the Ethereum ERC-721 standard, the ERC-1155 standard, or a similar standard or other blockchain-based asset.

**"Overflow"** refers to funds in a Juicebox Treasury in excess of that Treasury's current Distribution Limit. A Project's Overflow can be reclaimed by redeeming that Project's Tokens, subject to a Project's Redemption Rate and other Project configurations.

**"Overflow Allowance"** The amount of treasury funds that the Project Owner can distribute on-demand. This allowance does not reset each Funding Cycle. Instead, it lasts until the Project Owner explicitly proposes a reconfiguration with a new allowance. The protocol charges a Protocol Fee on funds withdrawn from the network. Overflow allowances can be specified in any currency that the `JBPrices` contract has a price feed for.

**"Payouts", "Distributions", and "Payout Splits"** refer to the distribution of Treasury assets from a Juicebox Project Treasury to other Juicebox Projects or to external Ethereum addresses, or addresses on other blockchains. Payouts to Ethereum addresses invoke fees, the payment of which issues JBX Tokens in accordance with Juicebox DAO's Treasury configurations ("Fees" or "Protocol Fee").

Protocol Fees can range from 0% to 5% of Payout amounts to Ethereum addresses. As of August 4th 2022, Protocol Fees are equal to 2.5% of Payout amounts to Ethereum addresses.

**"Pause Payments", "Pause Distributions", "Pause Redemptions", and "Pause Burn"** each refer to Treasury functions which Project Owners can pause in a Funding Cycle. These functions are not paused by default.

**"Person"** means an individual, corporation, association, partnership, joint venture, limited liability company, estate, trust, or any other legal entity.

**"Proceeding"** means any action, claim, suit, investigation, or proceeding by or before any court, arbitrator, governmental body, self-regulatory agency, or other agency.

**"Project", "Juicebox Project", "Treasury", and "Member Project"** refer to projects deployed using the Juicebox-compatible protocol including any administrative NFTs, Project configurations, Protocol extensions, digital assets, and tokens associated with those projects.

**"Project Owner" and "Project Owners"** refer to the individual or individuals with administrative access to configure one or more Juicebox Project(s). This includes individuals with access to Ethereum addresses holding one or more administrative ERC-721s issued by a Smart Contract which adheres to `IJBProjects`, as well as individuals with access to Ethereum addresses which have been granted permissions to take specific indexed actions via a Smart Contract which adheres to `IJBOperatorStore`.

**"Project Token" and "Token"** refer to tokens and token balances stored in a Smart Contract which adheres to `IJBTokenStore` or tokens which adhere to `IJBToken`, including tokens issued by the Juicebox Protocol.

**"Property"** means all property, whether real, personal, or mixed or tangible or intangible, or any right or interest therein.

**"Protocol", "Juicebox Protocol", and "Juicebox v2"** refer to the Smart Contracts built and maintained by Juicebox DAO, as well as other ancillary Smart Contracts ("Protocol Extensions" or "Extensions"). This includes deployed Ethereum mainnet and Rinkeby testnet Smart Contracts with addresses listed at https://info.juicebox.money/dev/resources/addresses, as well as other Smart Contracts with source code copied or modified from the Smart Contracts currently and/or previously available at https://github.com/jbx-protocol.

**Record**, used as a noun, means information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form.

**"Redemption Rate", "Redemption Curve", or "Bonding Curve"** refers to a bonding curve along which Juicebox Protocol calculates redemption from a Treasury. The Redemption Rate can be configured by a Project Owner each funding cycle. A rate of 100% suggests a linear proportion, meaning X% of treasury overflow can be reclaimed by redeeming X% of the token supply.

**"Representative"** means a Member, manager, officer, director, partner, employee, or agent.

**"Reserved Rate" or "Reserved Tokens"** refers to the percentage of newly minted tokens that a project wishes to withhold for custom distributions. The Project Owner can pre-program a list of addresses, other Projects, and contracts that adhere to `IJBSplitAllocator` to split reserved tokens between.

**"Service Provider"** means the Person appointed by the DAO to perform administrative services, responsibilities, and duties to carry on the DAO's operations. The initial Service Provider shall be decided by the DAO.

**"Severability"** signifies: in the event that one or more of the provisions of this Charter is for any reason held to be invalid, illegal or unenforceable, in whole or in part or in any respect, or in the event that any one or more of the provisions of this Charter operate or would prospectively operate to invalidate this Charter, then and in any such event, such provisions) only will be deemed null and void and will not affect any other provision of this Charter and the remaining provisions of this Charter will remain operative and in full force and effect and will not be affected, prejudiced, or disturbed thereby.

**"Sign"** means, with present intent to authenticate or adopt a record:

> (a) to execute or adopt a tangible symbol; or (b) to attach to or logically associate with the record an electronic symbol, sound, or process.

**"Smart Contract"** refers to computer programs stored on the Designated Blockchain or other blockchains.

**"Smart multisignature escrow":** Bitcoin allows multisignature transaction contracts where, for example, three out of a given five keys are needed to spend the funds in that contract. Ethereum allows for more granularity; for example, four out of five given keys can spend everything in a contract, three out of five keys can be used to spend up to 10% of that contract's funds per day, and

two out of five keys can be used to spend up to 0.5% of that contract's funds per day. Additionally, Ethereum multisigs can be asynchronous - two parties can register their signatures on the blockchain at different times, and the last signature will automatically send the transaction.

**"Start Timestamp"** refers to the time at which a funding cycle is considered active. Projects can configure the start time of their first funding cycle to be in the future and can ensure reconfigurations don't take effect before a specified time. Once a funding cycle ends, a new one automatically starts right away. If there's an approved reconfiguration queued to start at this time, it will be used. Otherwise, a copy of the current funding cycle will be used.

**"State"** means a state of the United States, the District of Columbia, Puerto Rico, the United States Virgin Islands, or any territory or insular possession subject to the jurisdiction of the United States.

**"Token"** means a digital unit that is recognized by the Designated Client on the Designated Blockchain Network as capable of: (i) being uniquely associated with or "owned" by a particular public-key address on the Designated Blockchain Network at each particular block height; and (ii) having Transfers of such digital unit recorded on the Designated Blockchain.

**"Total Available Capital"** represents the total deployable capital in treasury reserves that can be used to fund DAO initiatives. Token holders will vote to determine how to use "Total Available Capital" reserves.

**"Transfer"** includes:

> (a) an assignment; (b) a conveyance; (c) a sale; (d) a lease; (e) an encumbrance, including a mortgage or security interest; (f) a gift; and/or (g) a transfer by operation of law. (h) of a Token to a given address (the "Receiving Address") on the Designated Blockchain Network will be deemed to have occurred if and only if it is recognized by the Designated Client on the Designated Blockchain Network that: (i) there has been duly transmitted to the Designated Blockchain Network a new transfer function transaction that:(A) provides for the reassociation of the Designated Token with the Receiving Address; and (B) is signed by a private key that is (or a group of private keys that together are) sufficient to authorize the execution of such transfer function; and (ii) such transaction has been Confirmed.

**"Total Value Lock" or "TVL"** refers to the total value locked into a Smart Contract or set of Smart Contracts that may be deployed or stored at one or more exchanges or markets. This is used as a measurement of investor deposits. It is the dollar value of all the coins or tokens locked into a platform, protocol, lending program, yield farming program, or insurance liquidity pool.

**"Unincorporated Nonprofit Association"** means an unincorporated organization consisting of *two* or more Members joined under an agreement that is oral, in a record, or implied from conduct, for one or more common, nonprofit purposes. The term does not include:

> (a) a trust; (b) a marriage, domestic partnership, common law domestic relationship, civil union, or other domestic living arrangement; (c) an organization formed under any other statute that governs the organization and operation of unincorporated associations; (d) a joint tenancy, tenancy in common, or tenancy by the entireties even if the co-owners share use of the property for a nonprofit purpose; or (e) a relationship under an agreement in a record that expressly provides that the relationship between the parties does not create an unincorporated nonprofit association.

**Volatility** A statistical measure of the price variation of an asset. Newer early-stage projects in the explosive growth stage tend to see very high volatility in the price of their assets in their early days. Volatile assets are often considered riskier than less volatile assets because the price is expected to be less predictable.

**"Weight"** is a number used to determine how many project tokens should be minted and transferred when payments are received during a Funding Cycle. In other words, Weight is the exchange rate between the project token and a currency (defined by a `JBPayoutRedemptionPaymentTerminal`) during a Funding Cycle. Project owners can configure this directly or allow it to be automatically derived from the previous funding cycle's Weight and Discount Rate.

**"Web3"** is an idea for a new iteration of the World Wide Web which incorporates concepts such as decentralization, blockchain technologies, and token-based economics.

**"Web3 tools":** The key characteristics of Web3 tools may include personal assistance learning, artificial intelligence, multimedia information, interoperability, and semantic nature. Tools used for the governance, tokenization, Membership, voting and operation of a DAO.

**"Yield farming"** is the practice of staking or lending crypto assets in order to generate returns or rewards in the form of additional cryptocurrency. This application of decentralized finance (DeFi) has skyrocketed in popularity recently thanks to innovations like liquidity mining. In short, yield farming protocols incentivize liquidity providers (LP) to stake or lock up their crypto assets in a smart contract-based liquidity pool. These incentives can be a percentage of transaction fees, interest from lenders, or a governance token (see liquidity mining). These returns are expressed as an annual

percentage yield (APY). As more investors add funds to the related liquidity pool, the value of the issued returns decrease accordingly.

✏️ Edit this page

# Exhibit 6



snapshot

<button>Connect wallet</button>





← Back

# MIP-0001: Adopt the Governance and Multisig Processes

Closed  Movement DAO: Consensus Space by *filipv.eth* ↑ •••

*Adopt the DAO's Governance Process and the DAO Multisig Process, attached hereto as Exhibits A and B.*

## View Proposal →

1. Exhibit A
2. Exhibit B

*PDF Download | IPFS Mirror*

---

Votes  8                                                      ↓

| | | | |
|---|---|---|---|
| 🥑 servic... [Core] | | For | 10M MOVE 〰 |
| 🔵 0x58Ba...1650 | | For | 9.5K MOVE 〰 |
| 🌈 obstacker.eth | | For | 4.2K MOVE 〰 |
| 🐀 rice$cr... [Core] | | For | 2.2K MOVE 〰 |

|  natasha-pan... | | For | 187 MOVE 🖋 |
| pillowfightcl... | | For | 39 MOVE 🖋 |
| partypants.eth | | For | 39 MOVE 🖋 |
| tankbo... (Core) | | For | 0 MOVE 🖋 |

## Information

| | |
|---|---|
| **Strategie(s)** | 🎨 🎨 |
| **IPFS** | #bafkrei |
| **Voting system** | Basic voting |
| **Start date** | Aug 23, 2022, 12:00 AM |
| **End date** | Aug 30, 2022, 12:00 AM |
| **Snapshot** | 15,399,591 |

## Results

| | | |
|---|---|---|
| For | 10M MOVE | 100% |
| Against | 0 MOVE | 0% |

## I voted POAP



Movement DAO Consensus Space proposal MIP 0501 - Proposal DAO Governance and multisig Processes

Vote to get this POAP



Mint

Adopt the Governance and Multisig Processes | gov.move.xyz docs

🏠    Founding Proposals    Adopt the Governance and Multisig Processes

# Adopt the Governance and Multisig Processes

```
Author: tankbottoms.eth, filipv.eth
Date: 2022-08-23
```

## Thesis

Adopt the DAO's Governance Process and the DAO Multisig Process, attached hereto as Exhibits A and B.

## Motivation

The DAO requires formal initialization; adopting these processes will:

- establish an agreement between the DAO's Members;
- enable governance utility for the DAO's NFTs;
- grant contributors a voice in the DAO's decision making processes;
- formalize the DAO's ratification of proposals;
- remove all information asymmetry; and,
- serve as a lightning rod with regards to the DAO's legal status, treasury management, budgeting, and more.

Perhaps most importantly, this adoption will bootstrap the development of the DAO's vision.

## Specification

Ratify and adopt the DAO Governance Process and the DAO Multisig Process.

Update the DAO's Snapshot spaces, docs, Discord server, and other relevant resources to reflect these changes.

# Rationale

The Governance Process:

- is simple, unambiguous, and inclusive, inviting wide participation;

- takes place in public. The antithesis of information asymmetry fostering accountability;

- leaves complexity to individual proposals, allowing the DAO to be adaptable. The process can be amended to meet the DAO's needs over time;

- lays the groundwork for expanding the Multisig; and,

- accelerates the DAO's community towards onchain governance.

The Multisig Process:

- is technically superior, cost effective and robust versus non-blockchain corollaries;

- promotes the DAO's deference towards code and smart contracts;

- decentralizes accounting control, traditionally under a single individual's purview, i.e. chief financial officer;

- immune from meatspace accounting shenanigans e.g. See Exhibit A;

- prioritizes community and contributors participation; and,

- requires continual evaluation of expansion and succession planning by Multisig participants.

Both processes individually and in tandem are superior to traditional inefficiencies with meatspace governance, in addition to cronyism, nepotism, and forms of information asymmetry without sacrificing safety, security, or efficiency. Instead, the above processes are dispassionate and seek to reduce trust between the parties. The Service Provider, dao-lawfirm.eth, will ensure the DAO's interests remain prophylactic.

# Risks

- These processes rely on the sound distribution of NFTs, as well as diverse Multisig Membership.

- Poor decision making, non-constructive feedback, bad proposals, and lopsided participation could lead to poor outcomes.

- Proposals may take several weeks to pass, meaning the DAO must delegate day-to-day complexities.

- While purposeful, the proposal process has high thresholds, meaning only well-liked proposals will pass.

- Errors in decision making and coordinated malicious behavior by Multisig Members could yield catastrophic outcomes.

- Both processes inherits known weaknesses in democracy, herd mentality, illogical emotional behaviors, financial motivations fueled by greed, vote trading and other governance fragmentation risks.

- Unforeseen complexities with diametrically opposed views, interests, and motivations between the DAO's diverse or concentrated Membership.

- Numerous force majeure or geopolitical events, systemic existential crisis, widespread health and economic calamities each could further destabilize the DAO's governance and Multisig processes.

## Timeline

After this proposal is ratified via Snapshot vote in the DAO's Consensus Space, it should be remain in effect, only to be removed when superseded or amended by another proposal.

## Snapshot Consensus by the DAO Members

Whereas the DAO through its Members voted to adopt the following actions via Snapshot and resolves as follows:

**RESOLVED:** That the Governance Process is hereby adopted.

**RESOLVED FURTHER:** That the Multisig Process is hereby adopted.

**RESOLVED FURTHER:** That the DAO's Snapshot Spaces and other resources must be updated to reflect these changes.

**RESOLVED FURTHER:** That the **Service Providers** of the DAO are each authorized and empowered to take any and all such further action, to execute and deliver any and all such further agreements, instruments, documents and certificates and to pay such expenses, in the name and on behalf of the DAO, as any of each of the **Service Providers** may deem necessary or advisable to effectuate the purposes and intent of the resolutions hereby adopted, the taking of such actions, the execution

and delivery of such agreements, instruments, documents and certificates and the payment of such expenses by any such **Service Providers** to be conclusive evidence of his or her authorization hereunder and the approval thereof.

**RESOLVED FURTHER:** That any and all actions taken by the **Service Providers** of the DAO to carry out the purposes and intent of the foregoing resolutions prior to their adoption are approved, ratified and confirmed. As used in this document, the words "herein," "hereof," "hereby" and "hereunder" shall refer to this document as a whole, and not to any particular section, provision, or subdivision of this document.

This action by the DAO Member by Snapshot vote shall be effective as of the date the DAO Entities receives the consent of the DAO at the end of the Snapshot vote. This action by the DAO Members consent may be executed in any number of counterparts, each of which shall constitute an original and all of which together shall constitute one action.

## Authors

1. 0x30670D81E487c80b9EDc54370e6EaF943B6EAB39
2. 0x5d95baEBB8412AD827287240A5c281E3bB30d27E

🖉 Edit this page

# Adopt the Governance and Multisig Processes

Author: tankbottoms.eth, filipv.eth
Date: 2022-08-23

## Thesis

Adopt the DAO's Governance Process and the DAO Multisig Process, attached hereto as Exhibits A and B.

## Motivation

The DAO requires formal initialization; adopting these processes will:

- establish an agreement between the DAO's Members;
- enable governance utility for the DAO's NFTs;
- grant contributors a voice in the DAO's decision making processes;
- formalize the DAO's ratification of proposals;
- remove all information asymmetry; and,
- serve as a lightning rod with regards to the DAO's legal status, treasury management, budgeting, and more.

Perhaps most importantly, this adoption will bootstrap the development of the DAO's vision.

## Specification

Ratify and adopt the DAO Governance Process and the DAO Multisig Process.

Update the DAO's Snapshot spaces, docs, Discord server, and other relevant resources to reflect these changes.

## Rationale

The Governance Process:

- is simple, unambiguous, and inclusive, inviting wide participation;
- takes place in public. The antithesis of information asymmetry fostering accountability;
- leaves complexity to individual proposals, allowing the DAO to be adaptable. The process can be amended to meet the DAO's needs over time;
- lays the groundwork for expanding the Multisig; and,
- accelerates the DAO's community towards onchain governance.

The Multisig Process:

- is technically superior, cost effective and robust versus non-blockchain corollaries;
- promotes the DAO's deference towards code and smart contracts;

1

- decentralizes accounting control, traditionally under a single individual's purview, i.e. chief financial officer;
- immune from meatspace accounting shenanigans e.g. See Exhibit A;
- prioritizes community and contributors participation; and,
- requires continual evaluation of expansion and succession planning by Multisig participants.

Both processes individually and in tandem are superior to traditional inefficiencies with meatspace governance, in addition to cronyism, nepotism, and forms of information asymmetry without sacrificing safety, security, or efficiency. Instead, the above processes are dispassionate and seek to reduce trust between the parties. The Service Provider, dao-lawfirm.eth, will ensure the DAO's interests remain prophylactic.

## Risks

- These processes rely on the sound distribution of NFTs, as well as diverse Multisig Membership.
- Poor decision making, non-constructive feedback, bad proposals, and lopsided participation could lead to poor outcomes.
- Proposals may take several weeks to pass, meaning the DAO must delegate day-to-day complexities.
- While purposeful, the proposal process has high thresholds, meaning only well-liked proposals will pass.
- Errors in decision making and coordinated malicious behavior by Multisig Members could yield catastrophic outcomes.
- Both processes inherits known weaknesses in democracy, herd mentality, illogical emotional behaviors, financial motivations fueled by greed, vote trading and other governance fragmentation risks.
- Unforeseen complexities with diametrically opposed views, interests, and motivations between the DAO's diverse or concentrated Membership.
- Numerous force majeure or geopolitical events, systemic existential crisis, widespread health and economic calamities each could further destabilize the DAO's governance and Multisig processes.

## Timeline

After this proposal is ratified via Snapshot vote in the DAO's Consensus Space, it should be remain in effect, only to be removed when superseded or amended by another proposal.

---

## Snapshot Consensus by the DAO Members

Whereas the DAO through its Members voted to adopt the following actions via Snapshot and resolves as follows:

**RESOLVED:** That the Governance Process is hereby adopted.

**RESOLVED FURTHER:** That the Multisig Process is hereby adopted.

**RESOLVED FURTHER:** That the DAO's Snapshot Spaces and other resources must be updated to reflect these changes.

**RESOLVED FURTHER:** That the **Service Providers** of the DAO are each authorized and empowered to take any and all such further action, to execute and deliver any and all such further agreements, instruments, documents and certificates and to pay such expenses, in the name and on behalf of the DAO, as any of each of the **Service Providers** may deem necessary or advisable to effectuate the purposes and intent of the resolutions hereby adopted, the taking of such actions, the execution and delivery of such agreements, instruments, documents and certificates and the payment of such expenses by any such **Service Providers** to be conclusive evidence of his or her authorization hereunder and the approval thereof.

**RESOLVED FURTHER:** That any and all actions taken by the **Service Providers** of the DAO to carry out the purposes and intent of the foregoing resolutions prior to their adoption are approved, ratified and confirmed. As used in this document, the words "herein," "hereof," "hereby" and "hereunder" shall refer to this document as a whole, and not to any particular section, provision, or subdivision of this document.

This action by the DAO Member by Snapshot vote shall be effective as of the date the DAO Entities receives the consent of the DAO at the end of the Snapshot vote. This action by the DAO Members consent may be executed in any number of counterparts, each of which shall constitute an original and all of which together shall constitute one action.

———————————————————

**Authors**

1. 0x30670D81E487c80b9EDc54370e6EaF943B6EAB39
2. 0x5d95baEBB8412AD827287240A5c281E3bB30d27E

# Exhibit A

    Governance    Governance Process

# Governance Process

The DAO is governed by its community, as expressed through MAPE NFT voting.[1]

Multi-sig transactions and signatures, as well as updates to DAO processes, must be ratified by this process prior to their implementation.

## Phase 0: Discussion.

Authors are encouraged to create a proposal discussion thread in the `#proposal-workshop` channel of the DAO Discord to receive the community's feedback.

>  **TIP**
>
> You can use the proposal template as a starting point. When writing your proposal, try to be as detailed as possible in your specification. Only include what is necessary—short, specific proposals are best.

## Phase 1: Temperature Check.

Once finalized, authors can submit their proposals to the DAO's Temperature Check Space. The Temperature Check Space grants addresses one vote per MAPE NFT.

As the DAO's Service Provider, dao-lawfirm.eth maintains the right to revoke Temperature Check proposals which are malicious, exploitative, or otherwise in bad faith.

Proposals in the Temperature Check Space will be archived after fifty-six (56) days.

>  **TIP**
>
> If you need help uploading a proposal to Snapshot, tag a contributor in Discord.

## Phase 2: Consensus.

Every 28 days, proposals with at least 30 "For" votes in the Temperature Check Space are moved to the DAO's Consensus Space for seven (7) days of voting.

In the Consensus Space, addresses receive one vote per dollar contributed to the Multi-sig from February-July 2022 inclusive.

As the DAO's Service Provider, dao-lawfirm.eth maintains the right to revoke Consensus proposals which are malicious, exploitative, or otherwise in bad faith.

## Phase 3: Execution.

Once voting closes, proposals with at least 66% approval are queued for execution by the Multi-sig. "Abstain" votes are not included in this calculation.

## Emergency Governance.

In an emergency scenario, the Multi-sig can take onchain actions if explicit public approval from 80 percent or more of Multi-sig signers and explicit public approval from dao-lawfirm.eth are received.

**dao-lawfirm.eth must provide a summary and an explanation of any such action(s) within 72 hours of its execution.**

1. mainnet: `0xdd407a053fa45172079916431d06E8e07f655042`

✏️ Edit this page

# Exhibit B

 Governance    Multi-signature

# Multi-signature

The DAO multi-signature wallet, or the "Multi-sig", is a Gnosis Safe contract deployed at `0x143cC0A996De329C1C5723Ee4F15D2a40c1203c6`. The Multi-sig transaction history is available on gnosis-safe.io.

The Multi-sig Signers (the "Signers") are responsible for custody of the treasury and the execution of certain on-chain and off-chain actions described in governance proposals.

## Agreement

Signers must agree to abide by the following principles:

1. To act in accordance with the will of the DAO, as expressed through the DAO's governance process.

2. To maintain a Multi-sig Safe threshold equal to or greater than 60 percent of the number of Signers.

3. To execute all Multi-sig transactions in accordance with the DAO governance process.

Signers in violation of these principles are to be removed from the Multi-sig, at the discretion of dao-lawfirm.eth.

✏️ Edit this page

# Exhibit 7



snapshot

Connect wallet





← Back

# MIP-0002: Initial Treasury Diversification

Closed     Movement DAO: Consensus Space by filipv.eth  •••

*The DAO Multisig at* `0x143cC0A996De329C1C5723Ee4F15D2a40c1203c6` *shall swap 1,000,000 DAI for ETH, swap 10,000,000 DAI for cDAI, and swap 1,000 ETH for Lido stETH.*

## View Proposal →

*PDF Download | IPFS Mirror*

Votes  7                                                                ⬇

| service... | Core | For | 10M MOVE 〰 |
| 0x58Ba...1650 | | For | 9.5K MOVE 〰 |
| obstacker.eth | | Abstain | 4.2K MOVE 〰 |
| rice$cr... | Core | For | 2.2K MOVE 〰 |
| natasha-pan... | | For | 187 MOVE 〰 |
| partypants.eth | | For | 39 MOVE 〰 |

| 🧑 tankbo... ( Core ) | For | 0 MOVE ⌇ |
| --- | --- | --- |

## Information

| | |
| --- | --- |
| **Strategie(s)** | 🔵 🔴 |
| **IPFS** | #bafkrei |
| **Voting system** | Basic voting |
| **Start date** | Aug 23, 2022, 12:00 AM |
| **End date** | Aug 30, 2022, 12:00 AM |
| **Snapshot** | 15,399,597 |

## Results

| | |
| --- | --- |
| For | 10M MOVE  100% |
| Against | 0 MOVE  0% |

## I voted POAP



Vote to get this POAP



Case 1:23-cv-20727-RKA Document 24-1 Entered on FLSD Docket 03/01/2023 Page 262 of 653

Mint

 **Founding Proposals**    Initial Treasury Diversification

# Initial Treasury Diversification

Authors: tankbottoms.eth, filipv.eth
Date: 2022-08-23

## Thesis

The DAO Multisig at `0x143cC0A996De329C1C5723Ee4F15D2a40c1203c6` shall:

- Swap 1,000,000 DAI[1] for ETH[2];
- Swap 10,000,000 DAI for cDAI[3]; and,
- Swap 1,000 ETH for Lido stETH[4].

## Abstract

On August 9, 2022, ETH was worth 1,775.348 USD.[5]

The DAO treasury holds the following assets:

| Asset | Amount | Amount in USD | Percentage of Total |
|-------|--------|---------------|---------------------|
| DAI | 13,929,850 | ~$13,909,166 | 85.58% |
| ETH | 1,318.5573 | ~$2,341,991 | 14.41% |

Prior to June 18, 2022, the DAO had ~869 ETH, acquired at an average price of 2,875 USD. Between June 18, 2022 and June 30, 2022, the DAO acquired 450,000 USD worth of ETH at a price of ~$900-~$1030 per ETH, acquiring a total of ~448 ETH, currently worth ~$798,259, bringing the average cost per ETH to ~$2,122. The DAO is invested in the long term success of the Ethereum ecosystem and is willing to hold ETH over the long term.

The contributions to the Gnosis were recorded by Ethereum and are available in markdown here.

## Sheets

These and future treasury actions will be documented in the DAO Google Sheets, which will be updated with the token allocations by address. Sheets of expenses will be updated with as they are submitted.

The DAO made steps to diversify its treasury in MIP-001 - Emergency Proposal to Convert 550k DAI into ETH via Uniswap, Curve or 0x. Further treasury information and documentation of expenses incurred can be found in the DAO's Accounting Spreadsheets.

# Motivation

The DAO could earn interest on its assets by investing in ETH, cDAI, and stETH. The DAO has held the vast majority of its assets since February, 2022 and has not earned any interest to date. At a minimum, the DAO should provide assets to non-controversial protocols which have been mainstays of the Ethereum ecosystem while also staking in preparation for Ethereum 2.0.

# Specification

The Multisig may make reasonable modifications to this specification.

## Lido stETH

The DAO Multisig to:

- Wrap 1,000 ETH (exchange 1,000 ETH for 1,000 Wrapped ETH at `0xC02aaA39b223FE8D0A0e5C4F27eAD9083C756Cc2`).
- Create a limit order (using the 0x Protocol via matcha.xyz) to buy up to 200 wETH worth of stETH with a 7-day expiry. The limit price should be the 24-hour moving average wETH price of stETH at the time of the transaction's queuing. Repeat this step until the DAO has swapped 1,000 ETH for stETH, exchanging a maximum of 200 ETH within any given 7 day period.

## Compound cDAI

The DAO Multisig to:

- Create a limit order (using the 0x Protocol via matcha.xyz) to buy up to 1,000,000 DAI worth of cDAI with a 7-day expiry. The limit price should be the 24-hour moving average DAI price of cDAI at the time of the transaction's queuing. Repeat this step until the DAO has swapped 10,000,000 DAI for cDAI, exchanging a maximum of 1,000,000 DAI within any given 7 day period.

## ETH

The DAO Multisig to:

- Create a limit order (using the 0x Protocol via matcha.xyz) to buy up to 200,000 DAI worth of wETH with a 7-day expiry. The limit price should be the 24-hour moving average DAI price of wETH at the time of the transaction's queuing. Repeat this step until the DAO has swapped 1,000,000 DAI for ETH, exchanging a maximum of 100,000 DAI within any given 7 day period.
- Unwrap the ETH (exchange Wrapped ETH for ETH).

# Rationale

- ETH, Lido stETH, and Compound cDAI are all established and well-tested assets.
- By holding yield-bearing assets, the DAO will extend its runway.
- Using the 0x Protocol will minimize slippage and gas fees associated with exchanges of this size.
- A "DCA" strategy minimizes risk from market fluctuations and reduces slippage.
- Multisig discretion allows the Multisig to respond in the event of severe market shifts.
- Limit orders mitigate risk from short-term price fluctuations.

# Risks

The DAO assets will be exposed to:

- Market fluctuations affecting ETH, wETH, stETH, and cDAI.
- Institutional risks affecting the Ethereum Foundation, Compound Finance and Lido DAO.
- Smart contract risk affecting cDAI and stETH.
- Slashing risks associated with stETH.
- Risk associated with coordinated oracle attacks.

- Risks inherent to the Ethereum ecosystem and the consensus layer merge, including bugs and a failure to reach required merge adoption levels.

# Timeline

The DAO Multisig is authorized to execute the specification for one-hundred (100) days after this proposal has passed. The DAO Multisig may not extend this period beyond 100 days, without passing a new proposal.

# Snapshot Consensus by the DAO Members

Whereas the DAO through its Members voted to adopt the following actions via Snapshot and resolves as follows:

**RESOLVED:** That DAO Multisig at `0x143cC0A996De329C1C5723Ee4F15D2a40c1203c6` shall swap **1,000,000 DAI** for ETH, swap **10,000,000 DAI** for cDAI, and swap **1,000 ETH** for Lido stETH in accordance with the specification of this proposal.

**RESOLVED FURTHER:** That the **Service Providers** of the DAO are each authorized and empowered to take any and all such further action, to execute and deliver any and all such further agreements, instruments, documents and certificates and to pay such expenses, in the name and on behalf of the DAO, as any of each of the **Service Providers** may deem necessary or advisable to effectuate the purposes and intent of the resolutions hereby adopted, the taking of such actions, the execution and delivery of such agreements, instruments, documents and certificates and the payment of such expenses by any such **Service Providers** to be conclusive evidence of his or her authorization hereunder and the approval thereof.

**RESOLVED FURTHER:** That any and all actions taken by the **Service Providers** of the DAO to carry out the purposes and intent of the foregoing resolutions prior to their adoption are approved, ratified and confirmed. As used in this document, the words "herein," "hereof," "hereby" and "hereunder" shall refer to this document as a whole, and not to any particular section, provision, or subdivision of this document.

This action by the DAO Member by Snapshot vote shall be effective as of the date the DAO Entities receives the consent of the DAO at the end of the Snapshot vote. This action by the DAO Members

consent may be executed in any number of counterparts, each of which shall constitute an original and all of which together shall constitute one action.

## Authors

1. 0x30670D81E487c80b9EDc54370e6EaF943B6EAB39
2. 0x5d95baEBB8412AD827287240A5c281E3bB30d27E

<br>

1. MakerDAO's DAI, on the Ethereum Mainnet at
   `0x6B175474E89094C44Da98b954EedeAC495271d0F` .
2. Ether, on the Ethereum Mainnet.
3. Compound Finance's Compound DAI (cDAI), on the Ethereum Mainnet at
   `0x5d3a536E4D6DbD6114cc1Ead35777bAB948E3643` .
4. Lido DAO's Lido Staked ETH (stETH), on the Ethereum Mainnet at
   `0xae7ab96520DE3A18E5e111B5EaAb095312D7fE84` .
5. United States Dollar.

✏️ Edit this page

# Initial Treasury Diversification

Authors: tankbottoms.eth, filipv.eth
Date: 2022-08-23

## Thesis

The DAO Multisig at `0x143cC0A996De329C1C5723Ee4F15D2a40c1203c6` shall:

- Swap 1,000,000 DAI[1] for ETH[2];
- Swap 10,000,000 DAI for cDAI[3]; and,
- Swap 1,000 ETH for Lido stETH[4].

## Abstract

On August 9, 2022, ETH was worth 1,775.348 USD.[5]

The DAO treasury holds the following assets:

| Asset | Amount | Amount in USD | Percentage of Total |
|-------|--------|---------------|---------------------|
| DAI | 13,929,850 | ~$13,909,166 | 85.58% |
| ETH | 1,318.5573 | ~$2,341,991 | 14.41% |

Prior to June 18, 2022, the DAO had ~869 ETH, acquired at an average price of 2,875 USD. Between June 18, 2022 and June 30, 2022, the DAO acquired 450,000 USD worth of ETH at a price of $_{900}$-$1030 per ETH, acquiring a total of ~448 ETH, currently worth ~$798,259, bringing the average cost per ETH to ~$2,122. The DAO is invested in the long term success of the Ethereum ecosystem and is willing to hold ETH over the long term.

The contributions to the Gnosis were recorded by Ethereum and are available in markdown here.

## Sheets

These and future treasury actions will be documented in the DAO Google Sheets, which will be updated with the token allocations by address. Sheets of expenses will be updated with as they are submitted.

The DAO made steps to diversify its treasury in MIP-001 - *Emergency Proposal to Convert 550k DAI into ETH via Uniswap, Curve or 0x*. Further treasury

---

[1] MakerDAO's DAI, on the Ethereum Mainnet at `0x6B175474E89094C44Da98b954EedeAC495271d0F`.
[2] Ether, on the Ethereum Mainnet.
[3] Compound Finance's Compound DAI (cDAI), on the Ethereum Mainnet at `0x5d3a536E4D6DbD6114cc1Ead35777bAB948E3643`.
[4] Lido DAO's Lido Staked ETH (stETH), on the Ethereum Mainnet at `0xae7ab96520DE3A18E5e111B5EaAb095312D7fE84`.
[5] United States Dollar.

information and documentation of expenses incurred can be found in the DAO's Accounting Spreadsheets.

## Motivation

The DAO could earn interest on its assets by investing in ETH, cDAI, and stETH. The DAO has held the vast majority of its assets since February, 2022 and has not earned any interest to date. At a minimum, the DAO should provide assets to non-controversial protocols which have been mainstays of the Ethereum ecosystem while also staking in preparation for Ethereum 2.0.

## Specification

The Multisig may make reasonable modifications to this specification.

### Lido stETH

The DAO Multisig to:

- Wrap 1,000 ETH (exchange 1,000 ETH for 1,000 Wrapped ETH at 0xC02aaA39b223FE8D0A0e5C4F27eAD9083C756Cc2).
- Create a limit order (using the 0x Protocol via matcha.xyz) to buy up to 200 wETH worth of stETH with a 7-day expiry. The limit price should be the 24-hour moving average wETH price of stETH at the time of the transaction's queuing. Repeat this step until the DAO has swapped 1,000 ETH for stETH, exchanging a maximum of 200 ETH within any given 7 day period.

### Compound cDAI

The DAO Multisig to:

- Create a limit order (using the 0x Protocol via matcha.xyz) to buy up to 1,000,000 DAI worth of cDAI with a 7-day expiry. The limit price should be the 24-hour moving average DAI price of cDAI at the time of the transaction's queuing. Repeat this step until the DAO has swapped 10,000,000 DAI for cDAI, exchanging a maximum of 1,000,000 DAI within any given 7 day period.

### ETH

The DAO Multisig to:

- Create a limit order (using the 0x Protocol via matcha.xyz) to buy up to 200,000 DAI worth of wETH with a 7-day expiry. The limit price should be the 24-hour moving average DAI price of wETH at the time of the transaction's queuing. Repeat this step until the DAO has swapped

1,000,000 DAI for ETH, exchanging a maximum of 100,000 DAI within any given 7 day period.
- Unwrap the ETH (exchange Wrapped ETH for ETH).

## Rationale

- ETH, Lido stETH, and Compound cDAI are all established and well-tested assets.
- By holding yield-bearing assets, the DAO will extend its runway.
- Using the 0x Protocol will minimize slippage and gas fees associated with exchanges of this size.
- A "DCA" strategy minimizes risk from market fluctuations and reduces slippage.
- Multisig discretion allows the Multisig to respond in the event of severe market shifts.
- Limit orders mitigate risk from short-term price fluctuations.

## Risks

The DAO assets will be exposed to:

- Market fluctuations affecting ETH, wETH, stETH, and cDAI.
- Institutional risks affecting the Ethereum Foundation, Compound Finance and Lido DAO.
- Smart contract risk affecting cDAI and stETH.
- Slashing risks associated with stETH.
- Risk associated with coordinated oracle attacks.
- Risks inherent to the Ethereum ecosystem and the consensus layer merge, including bugs and a failure to reach required merge adoption levels.

## Timeline

The DAO Multisig is authorized to execute the specification for one-hundred (100) days after this proposal has passed. The DAO Multisig may not extend this period beyond 100 days, without passing a new proposal.

---

## Snapshot Consensus by the DAO Members

Whereas the DAO through its Members voted to adopt the following actions via Snapshot and resolves as follows:

**RESOLVED:** That DAO Multisig at 0x143cC0A996De329C1C5723Ee4F15D2a40c1203c6 shall swap **1,000,000 DAI** for ETH, swap **10,000,000 DAI** for cDAI, and swap **1,000 ETH** for Lido stETH in accordance with the specification of this proposal.

3

**RESOLVED FURTHER:** That the **Service Providers** of the DAO are each authorized and empowered to take any and all such further action, to execute and deliver any and all such further agreements, instruments, documents and certificates and to pay such expenses, in the name and on behalf of the DAO, as any of each of the **Service Providers** may deem necessary or advisable to effectuate the purposes and intent of the resolutions hereby adopted, the taking of such actions, the execution and delivery of such agreements, instruments, documents and certificates and the payment of such expenses by any such **Service Providers** to be conclusive evidence of his or her authorization hereunder and the approval thereof.

**RESOLVED FURTHER:** That any and all actions taken by the **Service Providers** of the DAO to carry out the purposes and intent of the foregoing resolutions prior to their adoption are approved, ratified and confirmed. As used in this document, the words "herein," "hereof," "hereby" and "hereunder" shall refer to this document as a whole, and not to any particular section, provision, or subdivision of this document.

This action by the DAO Member by Snapshot vote shall be effective as of the date the DAO Entities receives the consent of the DAO at the end of the Snapshot vote. This action by the DAO Members consent may be executed in any number of counterparts, each of which shall constitute an original and all of which together shall constitute one action.

———————————————

**Authors**

1. 0x30670D81E487c80b9EDc54370e6EaF943B6EAB39
2. 0x5d95baEBB8412AD827287240A5c281E3bB30d27E

4

# Exhibit 8

Case 1:23-cv-20727-RKA   Document 24-4   Entered on FLSD Docket 08/01/2023   Page 274 of 653



# snapshot

Connect wallet





← Back

# MIP-0003: Bootstrap Product Development

Closed    Movement DAO: Consensus Space by filipv.eth ⬆ •••

*Transfer* `1,750,000 DAI` *from the DAO Multisig[^1] to the Developer Multisig to bootstrap product development, funding 4 months of product development and operations.*

## View Proposal →

**1.** Exhibit A

*PDF Download* | *IPFS Mirror*

---

Votes  7                                                          ⬇

| | | |
|---|---|---|
| 🦊 servic...  ( Core ) | For | 10M MOVE 〜 |
| 🌐 obstacker.eth | Abstain | 4.2K MOVE 〜 |
| 🐱 rice$cr...  ( Core ) | For | 2.2K MOVE 〜 |
| 🐱 natasha-pan... | For | 187 MOVE 〜 |
| 🐱 partypants.eth | For | 39 MOVE 〜 |

| 🐱 pillowfightcl... | | For | 39 MOVE ∿ |
| 🙂 tankbo... (Core) | | For | 0 MOVE ∿ |

## Information

| | |
|---|---|
| **Strategie(s)** | 🔴🔴 |
| **IPFS** | #bafkrei |
| **Voting system** | Basic voting |
| **Start date** | Aug 23, 2022, 12:00 AM |
| **End date** | Aug 30, 2022, 12:00 AM |
| **Snapshot** | 15,399,605 |

## Results

| For | 10M MOVE 100% |
|---|---|
| Against | 0 MOVE 0% |

## I voted POAP



Vote to get this POAP



Mint

---

 Founding Proposals    <span style="color:orange">Bootstrap Product Development</span>

# Bootstrap Product Development

```
Authors: tankbottoms.eth, filipv.eth
Date: 2022-08-23
```

## Thesis

Transfer `1,750,000 DAI` from the DAO Multisig[1] to the Developer Multisig[2] to bootstrap product development, funding 4 months of product development and minimal operations including:

- product development and development expenses;
- tooling, documentation, and operational structures;
- recruiting costs for a product program manager and meatspace entity management;
- legal and accounting services;
- community-building resources; and,
- branding and design work.

1. This payout includes retroactive reimbursements and covering expenses borne by **dao-lawfirm.eth**, **tankbottoms.eth**, and **ryan-breslow.eth**.
2. This payout includes retroactive compensation to **tankbottoms.eth** and a number of development individuals.
3. This payout includes up to *$250,000.00* to opportunistically purchase Juicebox Governance (JBX).
4. This payout includes ongoing expenses borne by **dao-lawfirm.eth** and **tankbottoms.eth** such as subscription services, hosting providers, Web3 providers, Fleek and other online services.

## Motivation

Currently, payouts are primarily managed by **tankbottoms.eth**, his private company Meow, and **dao-lawfirm.eth**, sometimes via advances from **ryan-breslow.eth**. This process is time consuming, cumbersome, and difficult to manage.

# Specification

## Multisig

The DAO Multisig shall transfer 1,750,000 DAI to developer.movedao.eth
(0x2187e6a7c765777d50213346F0Fe519fCA706fbD), a Gnosis Safe which has the following five
signers:

1. 0x752515a3A1091b9f1c04416CF79D1F14d2340085 *(dao-lawfirm.eth)*
2. 0x468f178672C86bFA02e5E1B0413C3ccf55A37409
3. 0x550bD0F03580B9a687931af4d837F8e45D61d410
4. 0xDbE76F6ae97dFD5bdd1D7DAD8972740d18aB2b57
5. 0x746cf650d4E5431474E8D4E2d5B6Bbe53772b498

## Proposed Budget

See the Proposed Budget, attached hereto as Exhibit A, and the Google Sheets. This documents are
high-level overviews and are subject to change.

## Utilization

Both the developer and business development budgets shall be utilized at the discretion of
**tankbottoms.eth** and **jimmyethworld.eth**, with oversight from the Service Providers, including
**dao-lawfirm.eth**. Additional signers will be added after a probationary period of ~30-90 days to
ensure that the DAO's interests are being represented.

Business development and Operations will be managed by the development team. DAOLABS
entities will be established to operate the DAO affiliates as to ensure that effective governance,
accounting regulations, and property agreements are in place and enforced.

## Entities

The DAO and its advisors have agreed to utilize multiple partnered legal entities:

1. The DAO will fulfill non-profit functions, provide public goods, and have non-exclusive rights to
   intellectual property associated with the product. This implementation will be branded
   Movement DAO.

2. DAOLABS, LLC will retain intellectual property developed to date and engage with development staff.

3. This intellectual property will be licensed to DAOLABS, Inc: a for-profit corporation which will fulfill for-profit functions of the product. This includes collaborating with payment processor providers, cryptocurrency on-ramp and off-ramp providers, and other data services. DAOLABS, Inc will distribute options to individual contributors and stock to financial contributors, including potential future investors.

The Service Providers will create these entities, governance, and develop processes for ongoing governance, of while some portion of the above budget will be used for reimbursements of expenses, legal fees, and other costs. Upon completion of the entity formation the Service Providers will staff the entities with advisors, and board Members in order to establish proper governance.

# Rationale

The development team will be funded by this proposal have already created multiple dapps with feature sets relevant to the DAO platform:

## Core features

- The Treasury Juicebox Multisignature Wallet. This frontend and backend constitute a complete re-implementation of the Peel developed Juicebox frontend. Not only does it feature several experimental features built from scratch—it also compiles to a fraction of the Peel frontend's size, and is implemented from the ground up as Svelte components. Due to Peel's structure, it would be impossible to secure agreements with all the contributors of the existing code base and thus DAOLABS would be unable to apply any copyright, or dictate terms of use, including CC0.

- The Identity Juicebox Multisignature features an expansive identification feature set. It allows users to connect with multiple Ethereum Cryptocurrency wallets, Phone based SMS authentication, Google, custom e-mail, Facebook, GitHub, Twitter, or to connect anonymously. By adding multiple authentication services, users can generate simplify the need to understand Cryptographic keys and instead default into a custodial Cryptocurrency account. This Dapp also employs multi-party computation to secure a wallet's seed phrase and private keys, transmits shards to two restoration services, and integrations to connect existing Gnosis Safes or to deploy new ones, each from a single Wallet provider. Additionally, this frontend provides Cryptocurrency on-ramps and off-ramps through credit cards, debit cards, and ACH transfers;

Bolt payments was used for the credit/debit card integrations, as well as Wyre for fiat to Cryptocurrency transfers.

- **Membership NFT, Juicebox DAO** is a Juicebox frontend tailored towards creating treasuries funded by customizable tiered Membership NFTs. This frontend builds upon earlier work at nft.juicebox.wtf. This demonstrates focused onboarding scenarios and experiences for users, in attempts to simplify the onboarding process and thus the technical complexities of token system.

- **Bleeding-Edge** is a Juicebox Protocol frontend featuring customizable user pages and multiple no-code NFT collection creation workflows. This highlights tooling for DAOs and individuals to quickly and easily create content and deploy assets by which revenue may stream through a number of avenues: wallet, split contracts, and treasuries.

- **Staging Juicebox** features further experimental features, such as a scrolling homepage and a project category selection menu. Usually this is the testing environment for juicebox.wtf and fully tested features.

## Additional Experiments

- **tiles.wtf** is a re-implementation of tiles.art, which was an infinite generative NFT art project. tiles.wtf improves upon tiles.art by creating the art entirely on the Ethereum blockchain as SVG files (as opposed to using an API service), and also implementing a Juicebox treasury dashboard and donations page.

- **Juicebox Matic** is a re-implementation of juicebox.money on the Polygon blockchain.

These prototype dapps demonstrate the domain-specific expertise and skill of the prospective development team.

# Risks

- Transparent operation of the DAO is not certain or guaranteed.

- A Juicebox Protocol DAI terminal has not been deployed to mainnet, meaning these funds must be managed by Multisig wallets.

- These funds may not be ideally distributed.

- These funds may be more useful later on.

- The DAO is delegating major responsibility by approving a budget for 3 months.

# Snapshot Consensus by the DAO Members

Whereas the DAO through its Members voted to adopt the following actions via Snapshot and resolves as follows:

**RESOLVED:** That the DAO Multisig transfer of 1,750,000 DAI to the Developer Multisig (hereinafter, "Bootstrap Payment") is hereby adopted and approved;

**FURTHER RESOLVED:** That the Service Providers are authorized to pay and reimburse past expenses associated with incorporation, organization, development, engineering compensation, subscriptions, and other expenses of the DAO and the DAO's affiliate entities, including without limitation expenses incurred prior to the formation and/or incorporation of the entities.

**RESOLVED FURTHER:** That each Service Provider, Authorized Member, and agent of the DAO is hereby jointly and severally authorized to do any act, matter, or thing, and to execute and deliver any other document as he or she may deem necessary, advisable, or incidental, in connection with the preceding specification, and other sections herein, or any related documents, and to perform or resolve the obligations of the DAO, or its affiliates.

**RESOLVED FURTHER:** That the Service Providers (including Authorized Member and Secretary **benreed.eth**), in accordance with commensurate powers, are authorized to execute and deliver any agreement in the name of the DAO and to otherwise obligate the DAO with respect to the purpose of the DAO, within general guidelines and budgets approved by the Members; however, Actions by the DAO Snapshot Consensus by the Members may enact specific limitations on the authority of the Service Provider from time to time.

**RESOLVED FURTHER:** That a portion of the Bootstrap Payment will be used to reimburse DAO expenses or past obligations paid by **dao-lawfirm.eth**, **tankbottoms.eth**, and **ryan-breslow.eth**, is hereby adopted;

**RESOLVED FURTHER:** That the Authorized Members are authorized to determine whether to elect to apply Section 248(a) of the Internal Revenue Code with respect to any organizational expenditures.

**RESOLVED FURTHER:** That the Service Providers are authorized to consult with their bookkeepers, auditors and attorneys in order to be fully informed as to, and to collect and pay promptly when due, all withholding taxes for which the Service Providers, Authorized Members, the DAO, or affiliate entities may now be (or hereafter become) liable.

**RESOLVED FURTHER:** That the Service Providers are authorized to take any and all actions that they deem necessary or appropriate to qualify the DAO, and its affiliate entities to do business as a foreign corporation in each state that the **Authorized Members** determine such qualification to be necessary or appropriate.

**RESOLVED FURTHER:** That the Service Providers are authorized to apply for a federal employer identification number on Form SS-4.

**RESOLVED FURTHER:** That the Service Provider are authorized to direct the responsible attorneys, paralegals and, or assistants or consultants of dao-lawfirm.eth, or counsel for the DAO, to submit on behalf of the DAO, and any affiliate entities, an online application for a federal employer identification number on Form SS-4.

**RESOLVED FURTHER:** That the Service Providers are authorized and directed to solicit the consent of the Members to the adoption of equity incentive plans and to file the appropriate notices with the applicable state and federal securities authorities in connection with the issuance of options, at such time as such actions may be necessary or advisable in order to comply with applicable law.

**RESOLVED FURTHER:** That the Service Providers be, and each of them hereby is, authorized and empowered to take any and all such further action, to execute and deliver any and all such further agreements, instruments, documents and certificates and to pay such expenses, in the name and on behalf of the DAO, existing affiliates entities, contemplated affiliate entities, or such an Authorized Member, as any such Authorized Member may deem necessary or advisable to effectuate the purposes and intent of the resolutions hereby adopted, the taking of such actions, the execution and delivery of such agreements, instruments, documents and certificates and the payment of such expenses by any such Authorized Member to be conclusive evidence of his or her authorization hereunder and the approval thereof.

**RESOLVED FURTHER: That any and all actions taken by the Service Providers to carry out the purposes and intent of the foregoing resolutions prior to their adoption are approved, ratified and confirmed.**

This action by the DAO Member by Snapshot vote shall be effective as of the date the DAO Entities receives the consent of the DAO at the end of the Snapshot vote. This action by the DAO Members consent may be executed in any number of counterparts, each of which shall constitute an original and all of which together shall constitute one action.

## Authors

1. 0x30670D81E487c80b9EDc54370e6EaF943B6EAB39
2. 0x5d95baEBB8412AD827287240A5c281E3bB30d27E

1. The DAO Multisig is a Gnosis Safe at `0x143cC0A996De329C1C5723Ee4F15D2a40c1203c6` on the Ethereum Mainnet. ⮌
2. The Developer Multisig is a Gnosis Safe at `0x2187e6a7c765777d50213346F0Fe519fCA706fbD` on the Ethereum Mainnet. ⮌

✏️ Edit this page

# Bootstrap Product Development

Authors: tankbottoms.eth, filipv.eth
Date: 2022-08-23

## Thesis

Transfer 1,750,000 DAI from the DAO Multisig[1] to the Developer Multisig[2] to bootstrap product development, funding 4 months of product development and minimal operations including:

- product development and development expenses;
- tooling, documentation, and operational structures;
- recruiting costs for a product program manager and meatspace entity management;
- legal and accounting services;
- community-building resources; and,
- branding and design work.

1. This payout includes retroactive reimbursements and covering expenses borne by **dao-lawfirm.eth**, **tankbottoms.eth**, and **ryan-breslow.eth**.
2. This payout includes retroactive compensation to **tankbottoms.eth** and a number of development individuals.
3. This payout includes up to *$250,000.00* to opportunistically purchase Juicebox Governance (JBX).
4. This payout includes ongoing expenses borne by **dao-lawfirm.eth** and **tankbottoms.eth** such as subscription services, hosting providers, Web3 providers, Fleek and other online services.

## Motivation

Currently, payouts are primarily managed by **tankbottoms.eth**, his private company Meow, and **dao-lawfirm.eth**, sometimes via advances from **ryan-breslow.eth**. This process is time consuming, cumbersome, and difficult to manage.

## Specification

### Multisig

The DAO Multisig shall transfer 1,750,000 DAI to developer.movedao.eth (0x2187e6a7c765777d50213346F0Fe519fCA706fbD), a Gnosis Safe which has the following five signers:

---

[1]The DAO Multisig is a Gnosis Safe at 0x143cC0A996De329C1C5723Ee4F15D2a40c1203c6 on the Ethereum Mainnet.

[2]The Developer Multisig is a Gnosis Safe at 0x2187e6a7c765777d50213346F0Fe519fCA706fbD on the Ethereum Mainnet.

1. 0x752515a3A1091b9f1c04416CF79D1F14d2340085 *(dao-lawfirm.eth)*
2. 0x468f178672C86bFA02e5E1B0413C3ccf55A37409
3. 0x550bD0F03580B9a687931af4d837F8e45D61d410
4. 0xDbE76F6ae97dFD5bdd1D7DAD8972740d18aB2b57
5. 0x746cf650d4E5431474E8D4E2d5B6Bbe53772b498

**Proposed Budget**

See the Proposed Budget, attached hereto as Exhibit A, and the Google Sheets. This documents are high-level overviews and are subject to change.

**Utilization**

Both the developer and business development budgets shall be utilized at the discretion of **tankbottoms.eth** and **jimmyethworld.eth**, with oversight from the Service Providers, including **dao-lawfirm.eth**. Additional signers will be added after a probationary period of ~30-90 days to ensure that the DAO's interests are being represented.

Business development and Operations will be managed by the development team. DAOLABS entities will be established to operate the DAO affiliates as to ensure that effective governance, accounting regulations, and property agreements are in place and enforced.

**Entities**

The DAO and its advisors have agreed to utilize multiple partnered legal entities:

1. The DAO will fulfill non-profit functions, provide public goods, and have non-exclusive rights to intellectual property associated with the product. This implementation will be branded Movement DAO.
2. DAOLABS, LLC will retain intellectual property developed to date and engage with development staff.
3. This intellectual property will be licensed to DAOLABS, Inc: a for-profit corporation which will fulfill for-profit functions of the product. This includes collaborating with payment processor providers, cryptocurrency on-ramp and off-ramp providers, and other data services. DAOLABS, Inc will distribute options to individual contributors and stock to financial contributors, including potential future investors.

The Service Providers will create these entities, governance, and develop processes for ongoing governance, of while some portion of the above budget will be used for reimbursements of expenses, legal fees, and other costs. Upon completion of the entity formation the Service Providers will staff the entities with advisors, and board Members in order to establish proper governance.

## Rationale

The development team will be funded by this proposal have already created multiple dapps with feature sets relevant to the DAO platform:

### Core features

- The Treasury Juicebox Multisignature Wallet. This frontend and backend constitute a complete re-implementation of the Peel developed Juicebox frontend. Not only does it feature several experimental features built from scratch—it also compiles to a fraction of the Peel frontend's size, and is implemented from the ground up as Svelte components. Due to Peel's structure, it would be impossible to secure agreements with all the contributors of the existing code base and thus DAOLABS would be unable to apply any copyright, or dictate terms of use, including CC0.
- The Identity Juicebox Multisignature features an expansive identification feature set. It allows users to connect with multiple Ethereum Cryptocurrency wallets, Phone based SMS authentication, Google, custom e-mail, Facebook, GitHub, Twitter, or to connect anonymously. By adding multiple authentication services, users can generate simplify the need to understand Cryptographic keys and instead default into a custodial Cryptocurrency account. This Dapp also employs multi-party computation to secure a wallet's seed phrase and private keys, transmits shards to two restoration services, and integrations to connect existing Gnosis Safes or to deploy new ones, each from a single Wallet provider. Additionally, this frontend provides Cryptocurrency on-ramps and off-ramps through credit cards, debit cards, and ACH transfers; Bolt payments was used for the credit/debit card integrations, as well as Wyre for fiat to Cryptocurrency transfers.
- Membership NFT, Juicebox DAO is a Juicebox frontend tailored towards creating treasuries funded by customizable tiered Membership NFTs. This frontend builds upon earlier work at nft.juicebox.wtf. This demonstrates focused onboarding scenarios and experiences for users, in attempts to simplify the onboarding process and thus the technical complexities of token system.
- Bleeding-Edge is a Juicebox Protocol frontend featuring customizable user pages and multiple no-code NFT collection creation workflows. This highlights tooling for DAOs and individuals to quickly and easily create content and deploy assets by which revenue may stream through a number of avenues: wallet, split contracts, and treasuries.
- Staging Juicebox features further experimental features, such as a scrolling homepage and a project category selection menu. Usually this is the testing environment for juicebox.wtf and fully tested features.

### Additional Experiments

- tiles.wtf is a re-implementation of tiles.art, which was an infinite generative

3

NFT art project. tiles.wtf improves upon tiles.art by creating the art entirely on the Ethereum blockchain as SVG files (as opposed to using an API service), and also implementing a Juicebox treasury dashboard and donations page.

- Juicebox Matic is a re-implementation of juicebox.money on the Polygon blockchain.

These prototype dapps demonstrate the domain-specific expertise and skill of the prospective development team.

## Risks

- Transparent operation of the DAO is not certain or guaranteed.
- A Juicebox Protocol DAI terminal has not been deployed to mainnet, meaning these funds must be managed by Multisig wallets.
- These funds may not be ideally distributed.
- These funds may be more useful later on.
- The DAO is delegating major responsibility by approving a budget for 3 months.

---

## Snapshot Consensus by the DAO Members

Whereas the DAO through its Members voted to adopt the following actions via Snapshot and resolves as follows:

**RESOLVED:** That the DAO Multisig transfer of 1,750,000 DAI to the Developer Multisig (hereinafter, "Bootstrap Payment") is hereby adopted and approved;

**FURTHER RESOLVED:** That the Service Providers are authorized to pay and reimburse past expenses associated with incorporation, organization, development, engineering compensation, subscriptions, and other expenses of the DAO and the DAO's affiliate entities, including without limitation expenses incurred prior to the formation and/or incorporation of the entities.

**RESOLVED FURTHER:** That each Service Provider, Authorized Member, and agent of the DAO is hereby jointly and severally authorized to do any act, matter, or thing, and to execute and deliver any other document as he or she may deem necessary, advisable, or incidental, in connection with the preceding specification, and other sections herein, or any related documents, and to perform or resolve the obligations of the DAO, or its affiliates.

**RESOLVED FURTHER:** That the Service Providers (including Authorized Member and Secretary **benreed.eth**), in accordance with commensurate powers, are authorized to execute and deliver any agreement in the name of the DAO and to otherwise obligate the DAO with respect to the purpose of the DAO, within general guidelines and budgets approved by the Members; however, Actions by

4

the DAO Snapshot Consensus by the Members may enact specific limitations on the authority of the Service Provider from time to time.

**RESOLVED FURTHER:** That a portion of the Bootstrap Payment will be used to reimburse DAO expenses or past obligations paid by **dao-lawfirm.eth**, **tankbottoms.eth**, and **ryan-breslow.eth**, is hereby adopted;

**RESOLVED FURTHER:** That the Authorized Members are authorized to determine whether to elect to apply Section 248(a) of the Internal Revenue Code with respect to any organizational expenditures.

**RESOLVED FURTHER:** That the Service Providers are authorized to consult with their bookkeepers, auditors and attorneys in order to be fully informed as to, and to collect and pay promptly when due, all withholding taxes for which the Service Providers, Authorized Members, the DAO, or affiliate entities may now be (or hereafter become) liable.

**RESOLVED FURTHER:** That the Service Providers are authorized to take any and all actions that they deem necessary or appropriate to qualify the DAO, and its affiliate entities to do business as a foreign corporation in each state that the **Authorized Members** determine such qualification to be necessary or appropriate.

**RESOLVED FURTHER:** That the Service Providers are authorized to apply for a federal employer identification number on Form SS-4.

**RESOLVED FURTHER:** That the Service Provider are authorized to direct the responsible attorneys, paralegals and, or assistants or consultants of dao-lawfirm.eth, or counsel for the DAO, to submit on behalf of the DAO, and any affiliate entities, an online application for a federal employer identification number on Form SS-4.

**RESOLVED FURTHER:** That the Service Providers are authorized and directed to solicit the consent of the Members to the adoption of equity incentive plans and to file the appropriate notices with the applicable state and federal securities authorities in connection with the issuance of options, at such time as such actions may be necessary or advisable in order to comply with applicable law.

**RESOLVED FURTHER:** That the Service Providers be, and each of them hereby is, authorized and empowered to take any and all such further action, to execute and deliver any and all such further agreements, instruments, documents and certificates and to pay such expenses, in the name and on behalf of the DAO, existing affiliates entities, contemplated affiliate entities, or such an Authorized Member, as any such Authorized Member may deem necessary or advisable to effectuate the purposes and intent of the resolutions hereby adopted, the taking of such actions, the execution and delivery of such agreements, instruments, documents and certificates and the payment of such expenses by any such Authorized Member to be conclusive evidence of his or her authorization hereunder and the approval thereof.

**RESOLVED FURTHER: That any and all actions taken by the Service Providers to carry out the purposes and intent of the foregoing resolutions prior to their adoption are approved, ratified and confirmed.**

This action by the DAO Member by Snapshot vote shall be effective as of the date the DAO Entities receives the consent of the DAO at the end of the Snapshot vote. This action by the DAO Members consent may be executed in any number of counterparts, each of which shall constitute an original and all of which together shall constitute one action.

––––––––––––––––––––––––––

**Authors**

1. 0x30670D81E487c80b9EDc54370e6EaF943B6EAB39
2. 0x5d95baEBB8412AD827287240A5c281E3bB30d27E

––––––––––––––––––––––––––

6

# Exhibit A

daolabs.dao initialization budget(s)

2080   Hourly computation per year

| | Count | Role | Monthly | FC | Hourly | Annualize | Onetime | gTOKENs | Notes | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| developers | 1 | Application Block/Architect | $ 88,000.00 | $44,000.00 | $ 507.69 | $1,056,000.00 | $ - | | 1 | UX, smart contracts, cloud functions, legal, cheerleader |
| | 2 | UX Illustrator Figma | $ 15,000.00 | $ 7,500.00 | $ 86.54 | $ 180,000.00 | $ - | 100,000 | 2 | UX designer, PFP illustrator designer |
| | 3 | UX Front-end Typescript | $ 30,000.00 | $15,000.00 | $ 173.08 | $ 360,000.00 | $ - | 100,000 | 3 | UX, Svelte front-end |
| | 4 | Typescript/Solidity | $ 20,000.00 | $10,000.00 | $ 115.38 | $ 240,000.00 | $ - | 100,000 | 4 | Full-stack, smart contracts |
| | 5 | Typescript/Solidity | $ 12,000.00 | $ 6,000.00 | $ 69.23 | $ 144,000.00 | $20,000.00 | | 5 | Account-custodial smart contract, front-end |
| | 6 | Typescript/UX/Svelte | $ 12,000.00 | $ 6,000.00 | $ 69.23 | $ 144,000.00 | $20,000.00 | | 6 | UX, Svelte front-end |
| | 7 | Blockchain Architect | $ 46,000.00 | $23,000.00 | $ 265.38 | $ 552,000.00 | $30,000.00 | 100,000 | 7 | Delegate, blockchain architect, tezos |
| | 8 | Typescript, CSS | $ 15,000.00 | $ 7,500.00 | $ 86.54 | $ 180,000.00 | $ - | | 8 | TBD |
| | 9 | Typescript, CSS | $ 15,000.00 | $ 7,500.00 | $ 86.54 | $ 180,000.00 | $ - | | 9 | TBD |
| | 10 | Typescript, CSS | $ 15,000.00 | $ 7,500.00 | $ 86.54 | $ 180,000.00 | $ - | | 10 | TBD |
| | 11 | Program Management | $ 15,000.00 | $ 7,500.00 | $ 86.54 | $ 180,000.00 | $20,000.00 | | 11 | Documentation, Legal, Github Issues, Sprint prioritization |
| | 12 | Application Block/Architect | $ 7,500.00 | $ 3,750.00 | $ 43.27 | $ 90,000.00 | | 100,000 | 12 | Architect OG of the Juicebox protocol |
| | | sub-total | $ 290,500 | $ 145,250 | | $ 3,486,000 | $ 90,000.00 | | | |
| business development | 13 | Community, marketing | $ 10,000.00 | $ 5,000.00 | $ 57.69 | $ 120,000.00 | $ - | 100,000 | 13 | Discontinue |
| | 14 | Governance & documentation | $ 7,500.00 | $ 3,750.00 | $ 43.27 | $ 90,000.00 | $ - | 100,000 | 14 | Discontinue |
| | 15 | Marketing, copy & documentation | $ 5,000.00 | $ 2,500.00 | $ 28.85 | $ 60,000.00 | $ - | 100,000 | 15 | Discontinue |
| | 16 | Marketing, business develop | $ 10,000.00 | $ 5,000.00 | $ 57.69 | $ 120,000.00 | $ - | 100,000 | 16 | Discontinue |
| | 17 | Onboarding workflow | $ 7,500.00 | $ 3,750.00 | $ 43.27 | $ 90,000.00 | $ - | 100,000 | 17 | Discontinue |
| | 18 | Onboarding business dev | $ 7,500.00 | $ 3,750.00 | $ 43.27 | $ 90,000.00 | $ - | 100,000 | 18 | Discontinue |
| | 19 | Community, documentation | $ 10,000.00 | $ 5,000.00 | $ 57.69 | $ 120,000.00 | $ - | | 19 | Discontinue |
| | 20 | Infrastructure, Subscription Expenses | $ 5,000.00 | $ 2,500.00 | $ 28.85 | $ 60,000.00 | $ - | | 20 | Fleek, Firebase, Github, Graph, Alchemy, Tenderly, Namespace, ens.domains, Filing fees, BVI structure |
| | 21 | Legal, Accounting | $ 7,500.00 | $ 3,750.00 | $ 43.27 | $ 90,000.00 | $ - | | 21 | Terms of Service, Privacy Policy, EULA, Articles of Incorporation, By-laws, for parent and for generated DAOs and tokens |
| | 22 | Bolt, Wyre Integration | $ - | $ - | $ - | $ - | $ 15,000 | | 22 | Bolt credit card payment, Wyre, omnibus wallet management system, integration and segmented provider |
| | 23 | Branding, Design | $ - | $ - | $ - | $ - | $ 100,000 | | 23 | RFQ Complete |
| | | sub-total | $ 70,000 | $ 35,000 | | $ 840,000 | $ 115,000 | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| $ 360,500 | | | $ 4,326,000 | $ 205,000 | | expenses to date for r&d and previous consultants interviews, recruiting |
| $1,442,000.00 | | | $2,163,000.00 | $ 205,000 | | rough budget may include conversion fees or on-off ramp incurred by 3rd parties |

# Exhibit 9



**snapshot**



Connect wallet



← Back

# MIP-0004: Adopt Actions

Closed     Movement DAO: Consensus Space by filipv.eth ↥    •••

*Ratify and approve the indemnification of certain individuals who have acted on behalf of the DAO in various capacities.*

## View Proposal →

1. Exhibit A
2. Exhibit B

*PDF Download │ IPFS Mirror*

---

Votes  7                                                                    ↧

| | | |
|---|---|---|
| servic... `Core` | For | 10M MOVE  |
| 0x58Ba...1650 | For | 9.5K MOVE |
| obstacker.eth | For | 4.2K MOVE |
| rice$cr... `Core` | For | 2.2K MOVE |
| natasha-pan... | For | 187 MOVE |

| 🧑 partypants.eth | For | 39 MOVE 〰 |
| 🧑 tankbo... (Core) | For | 0 MOVE 〰 |

## Information

| | |
|---|---|
| **Strategie(s)** | 🎨🎨 |
| **IPFS** | #bafkrei |
| **Voting system** | Basic voting |
| **Start date** | Aug 23, 2022, 12:00 AM |
| **End date** | Aug 30, 2022, 12:00 AM |
| **Snapshot** | 15,399,630 |

## Results

| | |
|---|---|
| For | 10M MOVE  100% |
| Against | 0 MOVE  0% |

## I voted POAP



Vote to get this POAP



Mint

 Founding Proposals  **Adopt Actions**

# Adopt Actions

```
Author: tankbottoms.eth, filipv.eth
Creation Date: 2022-08-23
```

## 1. Thesis

At the behest of the DAO's concern, and in concurrence with the views of **dao-lawfirm.eth**, the Service Provider is responsible for aiding the DAO in initializing the Delaware Unincorporated Nonprofit Association, the intellectual property licensing entity, DAOLABS, LLC., and the for-profit entity, DAOLABS, Inc.

The DAO Members hereby ratify and approve all activities by the Service Provider taken in the furtherance of organizational and governance construction of the DAO and DAO affiliate entities, including the processing and execution of documents between shareholders, consultants, third parties, and directors. The DAO Members hereby ratify and approve all Service Provider actions and intentions for prior activities and for future activities and expenses related to these entities, their organization, and their governance.

## 2. DAOLABS Group

The DAO hereby ratifies the establishment of the following affiliates: **DAOLABS, LLC.**, **DAOLABS, INC.** and any permutations thereof, as well as the establishment of **PeaceDAO Unincorporated Nonprofit Association**, and **Movement DAO**.

This proposal ratifies the actions of the Service Provider, insofar as to formalize the entities as either a Washington or Delaware entity, to establish the DAO's banking account, the employment agreements of these entities, and to establish the licensing relationship and consulting agreements between the entities, including **DAOLABS, LLC**, **DAOLABS, Inc.**, Movement DAO, and Peace Dao, and any permutations thereof, together which are referred to herein as the **"DAO Group"** or **"DAO affiliates"**. The Unincorporated Nonprofit Association structure is sufficient for the purposes of PeaceDAO and Movement DAO.

# 3. Abstract

The DAO Members should ratify the indemnification of certain individuals who have acted on behalf of the DAO in various capacities: legal and accounting, including the disbursing of funds at the behest of other Members and the community and for the benefit of the DAO.

# 4. Authorization of "Meatspace" Activities

Authorize **tankbottoms.eth**, **benreed.eth**, **jimmyethworld.eth**,[1] and the individuals, entities, addresses, and contracts mentioned in the Guiding Principals § 7. *Clarification* to act on the DAO Group's behest, ratified by the DAO Members, with all matters related to establishing legal entities, financial registration, and registration with any regulatory bodies or financial institutions, and fully authorize the aforementioned Members in all matters in furtherance of these activities. Furthermore, the DAO Group requires onboarding and accounting relationships with third party Cryptocurrency processor companies, intellectual property matters, and other matters related to the inter-group relationship with financing, intellectual property licensing, copyright and registration, and regulatory activities associated with any significant fundraising activities. Future issuance of tokens, options, and stock are also authorized.

It is anticipated that the entities within the DAO Group will be registered in various jurisdictions including the States of Washington, Florida, and Delaware, as well as the British Virgin Islands. Nonetheless, the individuals referenced above are further authorized to take any action in furtherance of establishing banking relationships with various parties.

# 5. Indemnification of the DAO Service Provider and Certain Individuals

Pursuant to the needs of the DAO in meatspace, aka IRL, with regards to the aforementioned: The DAO will indemnify the above individuals for any and all costs, fees, expenses, and liabilities incurred in the performance of their duties as a DAO Member, and/or DAO Service Provider, and/or DAO Affiliate.

Service Providers, DAO Members, and agents shall not be liable to the DAO, and shall be indemnified and held harmless for any loss or damage resulting from any act or omission performed or omitted in good faith, including gross negligence or willful misconduct, in pursuance of the authority granted to pursue the purpose and interests of the DAO. Moreover, no authorized

individual shall be liable to the DAO because any taxing authorities disallows or adjusts any deductions or credits in the DAO tax returns. The Service Provider may authorize the DAO to pay expenses incurred by, or to satisfy a judgment or fine rendered or levied against that Member, any liquidating trustee or any present or former employee of the DAO, in an action brought by a third party against such person (whether or not the DAO is joined as a party defendant) to impose a liability or penalty on such person for an act alleged to have been committed by such person while a Member, liquidating trustee or employee of the DAO, provided the person to be indemnified was acting in good faith within what he reasonably believed to be the scope of his employment or authority and for a purpose which he reasonably believed to be in furtherance of the purpose and best interests of the DAO. Payments authorized by this paragraph include amounts paid and expenses incurred in settling such an action or threatened action. The indemnification authorized by this paragraph shall be made from the assets of the DAO and no Member shall be personally liable to an indemnitee. This paragraph shall inure to the benefit of the Member and any future employees and agents of the DAO (including any liquidating trustee) and their respective Members, agents, successors and assignees.

## 6. Ratifications of Prior Disbursements

The DAO and its Members do hereby ratify and affirm each and every action undertaken by the Service Provider on behalf of the DAO wherein said DAO has full knowledge of said act and wherein the act has been fully and accurately stated and explained to the DAO. The DAO and its Members are fully aware of every transaction and contemporaneous events and circumstances and

## 7. Clarification

BY RATIFYING THIS PROPOSAL, YOU ARE AFFIRMING THAT THE DAO WILL INDEMNIFY THE FOLLOWING INDIVIDUALS, ENTITIES, CONTRACTS, AND ADDRESSES, AS WELL AS ANY ASSOCIATED SIGNERS, ADDRESSES, CONTRACTS, INDIVIDUALS, OR ENTITIES FOR ANY AND ALL COSTS, FEES, EXPENSES, AND LIABILITIES INCURRED AS A DAO MEMBER, AND/OR DAO SERVICE PROVIDER, AND/OR DAO AFFILIATE:

| Address |
| --- |
| 0x143cC0A996De329C1C5723Ee4F15D2a40c1203c6 [2] |

| Address |
| --- |
| 0x752515a3a1091b9f1c04416cf79d1f14d2340085 [3] |
| 0x5d95baebb8412ad827287240a5c281e3bb30d27e [4] |
| 0xf8042c55fe4dff9df82c0f8435fbcdc32fe60a69 |
| 0xE41188926607921763D25392475f1156AC5f9033 |
| 0x468f178672C86bFA02e5E1B0413C3ccf55A37409 |
| 0x550bD0F03580B9a687931af4d837F8e45D61d410 |
| 0xDbE76F6ae97dFD5bdd1D7DAD8972740d18aB2b57 |
| 0x746cf650d4E5431474E8D4E2d5B6Bbe53772b498 |
| 0xD2427c0e44D28Ea74c0504E072c6073d135569B2 |
| 0x8C00f41676Ce4670ae9FcBBF297a24736dc23cc3 |

By ratifying this proposal, you attest that you have familiarized yourself with pertinent on-chain and off-chain transactions, contract-transactions, internal transactions, swaps, and the activities and expenses carried out by those individuals and addresses mentioned above.

You also agree that any actions taken by the above listed individuals, accounts, Multisig contracts, in each case for itself or on behalf of the DAO, in connection with the development of cryptocurrency tooling, recruiting, cryptocurrency experimentation, supporting the purpose of the DAO or its Members, interacting with exchanges, contributing to protocols, swapping tokens, purchasing or selling NFTs, deploying contracts, the utilization of meatspace bank accounts, the depositing of monies into such accounts, the obtaining of accounts or Membership licenses on behalf of the DAO (e.g. Hosting services, Fleek, Notion, Cloudflare, Digital Ocean, Google, Apple), and any actions related thereto are hereby confirmed and ratified in all respects, and that the Service Provider and their affiliates (e.g. **tankbottoms.eth**) and the DAO's agents, (e.g. **tankbottoms.eth**) shall be entitled to indemnity with respect to such actions.

# 8. Ratification of Future Disbursements

The DAO, by its Members hereby ratifies and approves a $100,000.00 spending threshold for the Service Providers, including dao-lawfirm.eth and tankbottoms.eth, whereby prior verbal approval, initial signer, or governance approval is not necessary to spend up to 100,000 USD's worth of funds and cryptographic assets; however, notwithstanding any of the above, any such expenses must be accounted for separately.

# 9. Timeline

These processes should be implemented once this proposal is ratified, only to be removed when superseded or amended by another proposal.

# Snapshot Consensus by the DAO Members

**dao-lawfirm.eth** of the **Law Offices of Reed Yurchak**, **tankbottoms.eth**, **benreed.eth**, and **cptspacecadet.eth** will hereafter be collectively referred to as the **"Service Providers"**.

## Ratification of Prior Expenses

**RESOLVED:** The DAO hereby adopts all prior acts related to agreements, and payments by the Service Providers.

**FURTHER RESOLVED:** That **"Snapshot Consensus"** by the DAO Members hereby ratifies all prior acts related to payments from the DAO or any Member wallet for the DAO or its Members, using fiat, Ethereum, or Stablecoins such as DAI, and through the Service Providers' Cryptocurrency accounts, through personal accounts, or through assigned Multisignature contracts, on behalf the DAO's Members or the DAO, for any and all expenses, including software development, research, or consulting services, at the behest of DAO Members whether to satisfy agreements, letters of intent, or contracts, as well as all other actions heretofore undertaken and performed on behalf of the DAO by the Service Providers, or Authorized Members, or by any agent **are hereby ratified, approved and confirmed in their entirety**. Members have been given all information, regarding each and every transaction from every account and Multisignature wallets below, including all transactions personal, DAO related, or otherwise to any other Cryptocurrency account.

**FURTHER RESOLVED:** The DAO by its Members, individually and collectively, have been provided with all pertinent records, via Etherscan, associated with all the Ethereum addresses with which the DAO, or its Service Providers, operated or were involved in any transactions. The DAO, by its Members, hereby approve all transactions between the DAO, its Service Providers, to or from any address owned by the Service Providers. The DAO, by its Members, hereby ratify and affirm each and every transaction on behalf of the DAO, and have full knowledge of each transaction and the transactions were made fully and accurately as stated and explained in the records.

**FURTHER RESOLVED:** The DAO, by its Members, hereby ratify and approve ongoing reimbursements to the Service Providers for all reoccurring expenses which have continued to accrue since March or April of 2022, including software licenses, cloud computing resources, blockchain resources, consulting services, and other engineering expenses. The DAO hereby authorizes the Service Providers to convert fiat into Cryptocurrency and vice versa in the present, the future, and in the past, which may have incurred tax liabilities. The DAO has determined it is in the best interest of its Members to provide accounting services or reimbursements for accounting services to offset the complexity, overhead, and incurred expenses by the Service Providers.

**FURTHER RESOLVED:** That the DAO, through its Service Provider, is authorized to make payments to itself, dao-lawfirm.eth, and tankbottoms.eth for Cryptocurrency reimbursements associated with ongoing expenses which have continued to date, such as software subscriptions, development services, and individual and/or associated compensation.

**FURTHER RESOLVED:** All actions by the Service Providers from January 1, 2022 have been duly presented to the Members in their entirety by way of the Ethereum address records below. The DAO, by its Members ratify and affirm all actions by the Service Providers.

| ENS | ETH Address |
| --- | --- |
| developer.movedao.eth | 0x2187e6a7c765777d50213346F0Fe519fCA706fbD |
| peace.movedao.eth | 0xD2427c0e44D28Ea74c0504E072c6073d135569B2 |
| gnosis.dao-lawfirm.eth | 0x607d56643673649bd25AA47325A7a6AFeffc3B4a |
| - | 0x46D65c64E883f70371A6fcAcB124FB5dd68c9918 |
| - | 0x143cC0A996De329C1C5723Ee4F15D2a40c1203c6 |

| ENS | ETH Address |
|---|---|
| - | 0x1932494517F20EB03D652BfDCbABb42018337436 |
| - | 0x41e923B875aF2Cc72772747E9ef2ed55c8df9D42 |
| - | 0x8C00f41676Ce4670ae9FcBBF297a24736dc23cc3 |
| - | 0x8a97426C1a720a45B8d69E974631f01f1168232B |
| dao-lawfirm.eth | 0x30670D81E487c80b9EDc54370e6EaF943B6EAB39 |
| tankbottoms.eth | 0x5d95baEBB8412AD827287240A5c281E3bB30d27E |

**FURTHER RESOLVED:** That the Service Providers of this DAO are, and each acting alone is, hereby authorized to do and perform any and all acts, including execution of any and all documents and certificates, as said Service Provider(s) shall deem necessary or advisable to carry out the purposes of the resolutions herein.

## Further Indemnification

**FURTHER RESOLVED:** The DAO, by its Members, hereby ratifies and approve that the DAO will provide the Service Providers indemnification, including advances of expenses arising out of any activities subject of the civil, criminal, administrative or investigative action, suit, or proceeding for which indemnification or advancement of expenses is sought. That the DAO, through its Service Providers, determines that it is in the best interest of the DAO, its affiliates, and its Members for the DAO to enter into indemnification agreements with its current and future Service Providers in substantially the form attached hereto: DAOLABS Form Indemnification Agreement. That the Service Providers or Authorized Members are authorized to execute and deliver an indemnification agreement with each of the DAO's current Service Providers, and with any future Service Providers of the DAO. That the Service Providers of the DAO are authorized to make modifications to such agreements in order to comply with applicable law.

**RESOLVED FURTHER:** That the Authorized Members are authorized to determine whether to elect to apply Section 248(a) of the Internal Revenue Code with respect to any organizational expenditures.

**RESOLVED FURTHER**: That the Service Providers are authorized to consult with bookkeepers, auditors and attorneys in order to be fully informed as to, and to collect and pay promptly when due, all withholding taxes for which the DAO and its affiliate entities may now be (or hereafter become) liable.

**RESOLVED FURTHER:** That the Service Providers are authorized and directed to solicit the consent of the eligible Members information related to the adoption of legal equity incentive plans and to file the appropriate notices with the applicable state and federal securities authorities in connection with the issuance of options, at such time as such actions may be necessary or advisable in order to comply with applicable law.

**RESOLVED FURTHER:** That, in accordance with the Guiding Principals, the **Authorized Member**, together with the Service Provider, are authorized to execute and deliver any agreement in the name of the DAO and to otherwise obligate the DAO with respect to the purpose of the DAO, within general guidelines and budgets approved by the Members; however, the Members may adopt from time to time specific limitations on the authority of Authorized Members or Service Providers.

**RESOLVED FURTHER:** That the Service Providers are authorized to execute and deliver any form of work product, draft board minutes, by instruction to legal counsel or other authorized representative to determine the size of the common stock pool, rate of issuance, and the terms of the adoption of the plan for the DAO affiliate entity. That Service Provider is authorized to deliver in any form the parameters of the common stock allocation, option pool, and investment allocation for the DAO affiliate entity.

**RESOLVED FURTHER:** That the "**Service Providers**" of the DAO are each authorized and empowered to take any and all further action to execute and deliver any and all such further agreements in the organization and governance between the DAO affiliate entities and the DAO, with regards to the inter-company licensing agreements.

## Omnibus Resolutions

**RESOLVED FURTHER:** That the **Service Providers** of the DAO are each authorized and empowered to take any and all such further action, to execute and deliver any and all such further agreements, instruments, documents and certificates and to pay such expenses, in the name and on behalf of the DAO, as any of each of the **Service Providers** may deem necessary or advisable to effectuate the purposes and intent of the resolutions hereby adopted, the taking of such actions, the execution and delivery of such agreements, instruments, documents and certificates and the payment of such

expenses by any such **Service Providers** to be conclusive evidence of his or her authorization hereunder and the approval thereof.

**RESOLVED FURTHER:** That any and all actions taken by the **Service Providers** of the DAO to carry out the purposes and intent of the foregoing resolutions prior to their adoption are approved, ratified and confirmed. As used in this document, the words "herein," "hereof," "hereby" and "hereunder" shall refer to this document as a whole, and not to any particular section, provision, or subdivision of this document.

This action by the DAO Member by Snapshot vote shall be effective as of the date the DAO Entities receives the consent of the DAO at the end of the Snapshot vote. This action by the DAO Members consent may be executed in any number of counterparts, each of which shall constitute an original and all of which together shall constitute one action.

## Authors

1. 0x30670D81E487c80b9EDc54370e6EaF943B6EAB39
2. 0x5d95baEBB8412AD827287240A5c281E3bB30d27E

<br>

1. Respectively, `0x5d95baEBB8412AD827287240A5c281E3bB30d27E`, `0xf8042c55fE4dff9Df82c0F8435fbcdC32fe60A69`, and `0xE4118892660792176326392475f1156AC5f9033.` ↩
2. tankbottoms.eth, an Authorized Member. ↩
3. dao-lawfirm.eth. ↩
4. The DAO Multisig wallet. ↩

<br>

✏️ Edit this page

# Adopt Actions

Author: tankbottoms.eth, filipv.eth
Creation Date: 2022-08-23

## 1. Thesis

At the behest of the DAO's concern, and in concurrence with the views of **dao-lawfirm.eth**, the Service Provider is responsible for aiding the DAO in initializing the Delaware Unincorporated Nonprofit Association, the intellectual property licensing entity, DAOLABS, LLC., and the for-profit entity, DAOLABS, Inc.

The DAO Members hereby ratify and approve all activities by the Service Provider taken in the furtherance of organizational and governance construction of the DAO and DAO affiliate entities, including the processing and execution of documents between shareholders, consultants, third parties, and directors. The DAO Members hereby ratify and approve all Service Provider actions and intentions for prior activities and for future activities and expenses related to these entities, their organization, and their governance.

## 2. DAOLABS Group

The DAO hereby ratifies the establishment of the following affiliates: **DAO-LABS, LLC.**, **DAOLABS, INC.** and any permutations thereof, as well as the establishment of **PeaceDAO Unincorporated Nonprofit Association**, and **Movement DAO**.

This proposal ratifies the actions of the Service Provider, insofar as to formalize the entities as either a Washington or Delaware entity, to establish the DAO's banking account, the employment agreements of these entities, and to establish the licensing relationship and consulting agreements between the entities, including **DAOLABS, LLC**, **DAOLABS, Inc.**, Movement DAO, and Peace DAO, and any permutations thereof, together which are referred to herein as the **"DAO Group"** or **"DAO affiliates"**. The Unincorporated Nonprofit Association structure is sufficient for the purposes of PeaceDAO and Movement DAO.

## 3. Abstract

The DAO Members should ratify the indemnification of certain individuals who have acted on behalf of the DAO in various capacities: legal and accounting, including the disbursing of funds at the behest of other Members and the community and for the benefit of the DAO.

1

## 4. Authorization of "Meatspace" Activities

Authorize **tankbottoms.eth**, **benreed.eth**, **jimmyethworld.eth**,[1] and the individuals, entities, addresses, and contracts mentioned in the Guiding Principals § 7. *Clarification* to act on the DAO Group's behest, ratified by the DAO Members, with all matters related to establishing legal entities, financial registration, and registration with any regulatory bodies or financial institutions, and fully authorize the aforementioned Members in all matters in furtherance of these activities. Furthermore, the DAO Group requires onboarding and accounting relationships with third party Cryptocurrency processor companies, intellectual property matters, and other matters related to the inter-group relationship with financing, intellectual property licensing, copyright and registration, and regulatory activities associated with any significant fundraising activities. Future issuance of tokens, options, and stock are also authorized.

It is anticipated that the entities within the DAO Group will be registered in various jurisdictions including the States of Washington, Florida, and Delaware, as well as the British Virgin Islands. Nonetheless, the individuals referenced above are further authorized to take any action in furtherance of establishing banking relationships with various parties.

## 5. Indemnification of the DAO Service Provider and Certain Individuals

Pursuant to the needs of the DAO in meatspace, aka IRL, with regards to the aforementioned: The DAO will indemnify the above individuals for any and all costs, fees, expenses, and liabilities incurred in the performance of their duties as a DAO Member, and/or DAO Service Provider, and/or DAO Affiliate.

Service Providers, DAO Members, and agents shall not be liable to the DAO, and shall be indemnified and held harmless for any loss or damage resulting from any act or omission performed or omitted in good faith, including gross negligence or willful misconduct, in pursuance of the authority granted to pursue the purpose and interests of the DAO. Moreover, no authorized individual shall be liable to the DAO because any taxing authorities disallows or adjusts any deductions or credits in the DAO tax returns. The Service Provider may authorize the DAO to pay expenses incurred by, or to satisfy a judgment or fine rendered or levied against that Member, any liquidating trustee or any present or former employee of the DAO, in an action brought by a third party against such person (whether or not the DAO is joined as a party defendant) to impose a liability or penalty on such person for an act alleged to have been committed by such person while a Member, liquidating trustee or employee of the DAO, provided the person to be indemnified was acting in good faith within what he reasonably believed to be the scope of his employment or authority and for a purpose which he reasonably believed to be in furtherance of the purpose and best interests of the DAO.

---

[1]Respectively, 0x5d95baEBB8412AD827287240A5c281E3bB30d27E, 0xf8042c55fE4dff9Df82c0F8435fbcdC32fe60A69, and 0xE41188926607921763D25392475f1156AC5f9033.

Payments authorized by this paragraph include amounts paid and expenses incurred in settling such an action or threatened action. The indemnification authorized by this paragraph shall be made from the assets of the DAO and no Member shall be personally liable to an indemnitee. This paragraph shall inure to the benefit of the Member and any future employees and agents of the DAO (including any liquidating trustee) and their respective Members, agents, successors and assignees.

## 6. Ratifications of Prior Disbursements

The DAO and its Members do hereby ratify and affirm each and every action undertaken by the Service Provider on behalf of the DAO wherein said DAO has full knowledge of said act and wherein the act has been fully and accurately stated and explained to the DAO. The DAO and its Members are fully aware of every transaction and contemporaneous events and circumstances and

## 7. Clarification

BY RATIFYING THIS PROPOSAL, YOU ARE AFFIRMING THAT THE DAO WILL INDEMNIFY THE FOLLOWING INDIVIDUALS, ENTITIES, CONTRACTS, AND ADDRESSES, AS WELL AS ANY ASSOCIATED SIGNERS, ADDRESSES, CONTRACTS, INDIVIDUALS, OR ENTITIES FOR ANY AND ALL COSTS, FEES, EXPENSES, AND LIABILITIES INCURRED AS A DAO MEMBER, AND/OR DAO SERVICE PROVIDER, AND/OR DAO AFFILIATE:

| Address |
| --- |
| 0x143cC0A996De329C1C5723Ee4F15D2a40c1203c6[2] |
| 0x752515a3a1091b9f1c04416cf79d1f14d2340085[3] |
| 0x5d95baebb8412ad827287240a5c281e3bb30d27e[4] |
| 0xf8042c55fe4dff9df82c0f8435fbcdc32fe60a69 |
| 0xE41188926607921763D25392475f1156AC5f9033 |
| 0x468f178672C86bFA02e5E1B0413C3ccf55A37409 |
| 0x550bD0F03580B9a687931af4d837F8e45D61d410 |
| 0xDbE76F6ae97dFD5bdd1D7DAD8972740d18aB2b57 |
| 0x746cf650d4E5431474E8D4E2d5B6Bbe53772b498 |
| 0xD2427c0e44D28Ea74c0504E072c6073d135569B2 |
| 0x8C00f41676Ce4670ae9FcBBF297a24736dc23cc3 |

By ratifying this proposal, you attest that you have familiarized yourself with pertinent on-chain and off-chain transactions, contract-transactions, internal

---

[2] The DAO Multisig wallet.
[3] dao-lawfirm.eth.
[4] tankbottoms.eth, an Authorized Member.

transactions, swaps, and the activities and expenses carried out by those individuals and addresses mentioned above.

You also agree that any actions taken by the above listed individuals, accounts, Multisig contracts, in each case for itself or on behalf of the DAO, in connection with the development of cryptocurrency tooling, recruiting, cryptocurrency experimentation, supporting the purpose of the DAO or its Members, interacting with exchanges, contributing to protocols, swapping tokens, purchasing or selling NFTs, deploying contracts, the utilization of meatspace bank accounts, the depositing of monies into such accounts, the obtaining of accounts or Membership licenses on behalf of the DAO (e.g. Hosting services, Fleek, Notion, Cloudflare, Digital Ocean, Google, Apple), and any actions related thereto are hereby confirmed and ratified in all respects, and that the Service Provider and their affiliates (e.g. **tankbottoms.eth**) and the DAO's agents, (e.g. **tankbottoms.eth**) shall be entitled to indemnity with respect to such actions.

## 8. Ratification of Future Disbursements

The DAO, by its Members hereby ratifies and approves a $100,000.00 spending threshold for the Service Providers, including dao-lawfirm.eth and tankbottoms.eth, whereby prior verbal approval, initial signer, or governance approval is not necessary to spend up to 100,000 USD's worth of funds and cryptographic assets; however, notwithstanding any of the above, any such expenses must be accounted for separately.

## 9. Timeline

These processes should be implemented once this proposal is ratified, only to be removed when superseded or amended by another proposal.

--------

## Snapshot Consensus by the DAO Members

**dao-lawfirm.eth** of the **Law Offices of Reed Yurchak**, **tankbottoms.eth**, **benreed.eth**, and **cptspacecadet.eth** will hereafter be collectively referred to as the **"Service Providers"**.

### Ratification of Prior Expenses

**RESOLVED:** The DAO hereby adopts all prior acts related to agreements, and payments by the Service Providers.

**FURTHER RESOLVED:** That **"Snapshot Consensus"** by the DAO Members hereby ratifies all prior acts related to payments from the DAO or any Member wallet for the DAO or its Members, using fiat, Ethereum, or Stablecoins such as DAI, and through the Service Providers' Cryptocurrency accounts, through personal accounts, or through assigned Multisignature contracts, on

4

behalf the DAO's Members or the DAO, for any and all expenses, including software development, research, or consulting services, at the behest of DAO Members whether to satisfy agreements, letters of intent, or contracts, as well as all other actions heretofore undertaken and performed on behalf of the DAO by the Service Providers, or Authorized Members, or by any agent **are hereby ratified, approved and confirmed in their entirety**. Members have been given all information, regarding each and every transaction from every account and Multisignature wallets below, including all transactions personal, DAO related, or otherwise to any other Cryptocurrency account.

**FURTHER RESOLVED:** The DAO by its Members, individually and collectively, have been provided with all pertinent records, via Etherscan, associated with all the Ethereum addresses with which the DAO, or its Service Providers, operated or were involved in any transactions. The DAO, by its Members, hereby approve all transactions between the DAO, its Service Providers, to or from any address owned by the Service Providers. The DAO, by its Members, hereby ratify and affirm each and every transaction on behalf of the DAO, and have full knowledge of each transaction and the transactions were made fully and accurately as stated and explained in the records.

**FURTHER RESOLVED:** The DAO, by its Members, hereby ratify and approve ongoing reimbursements to the Service Providers for all reoccurring expenses which have continued to accrue since March or April of 2022, including software licenses, cloud computing resources, blockchain resources, consulting services, and other engineering expenses. The DAO hereby authorizes the Service Providers to convert fiat into Cryptocurrency and vice versa in the present, the future, and in the past, which may have incurred tax liabilities. The DAO has determined it is in the best interest of its Members to provide accounting services or reimbursements for accounting services to offset the complexity, overhead, and incurred expenses by the Service Providers.

**FURTHER RESOLVED:** That the DAO, through its Service Provider, is authorized to make payments to itself, dao-lawfirm.eth, and tankbottoms.eth for Cryptocurrency reimbursements associated with ongoing expenses which have continued to date, such as software subscriptions, development services, and individual and/or associated compensation.

**FURTHER RESOLVED:** All actions by the Service Providers from January 1, 2022 have been duly presented to the Members in their entirety by way of the Ethereum address records below. The DAO, by its Members ratify and affirm all actions by the Service Providers.

| ENS | ETH Address |
|---|---|
| developer.movedao.eth | 0x2187e6a7c765777d50213346F0Fe519fCA706fbD |
| peace.movedao.eth | 0xD2427c0e44D28Ea74c0504E072c6073d135569B2 |
| gnosis.dao-lawfirm.eth | 0x607d56643673649bd25AA47325A7a6AFeffc3B4a |

5

| ENS | ETH Address |
|---|---|
| - | 0x46D65c64E883f70371A6fcAcB124FB5dd68c9918 |
| - | 0x143cC0A996De329C1C5723Ee4F15D2a40c1203c6 |
| - | 0x1932494517F20EB03D652BfDCbABb42018337436 |
| - | 0x41e923B875aF2Cc72772747E9ef2ed55c8df9D42 |
| - | 0x8C00f41676Ce4670ae9FcBBF297a24736dc23cc3 |
| - | 0x8a97426C1a720a45B8d69E974631f01f1168232B |
| dao-lawfirm.eth | 0x30670D81E487c80b9EDc54370e6EaF943B6EAB39 |
| tankbottoms.eth | 0x5d95baEBB8412AD827287240A5c281E3bB30d27E |

**FURTHER RESOLVED:** That the Service Providers of this DAO are, and each acting alone is, hereby authorized to do and perform any and all acts, including execution of any and all documents and certificates, as said Service Provider(s) shall deem necessary or advisable to carry out the purposes of the resolutions herein.

### Further Indemnification

**FURTHER RESOLVED:** The DAO, by its Members, hereby ratifies and approve that the DAO will provide the Service Providers indemnification, including advances of expenses arising out of any activities subject of the civil, criminal, administrative or investigative action, suit, or proceeding for which indemnification or advancement of expenses is sought. That the DAO, through its Service Providers, determines that it is in the best interest of the DAO, its affiliates, and its Members for the DAO to enter into indemnification agreements with its current and future Service Providers in substantially the form attached hereto: DAOLABS Form Indemnification Agreement. That the Service Providers or Authorized Members are authorized to execute and deliver an indemnification agreement with each of the DAO's current Service Providers, and with any future Service Providers of the DAO. That the Service Providers of the DAO are authorized to make modifications to such agreements in order to comply with applicable law.

**RESOLVED FURTHER:** That the Authorized Members are authorized to determine whether to elect to apply Section 248(a) of the Internal Revenue Code with respect to any organizational expenditures.

**RESOLVED FURTHER**: That the Service Providers are authorized to consult with bookkeepers, auditors and attorneys in order to be fully informed as to, and to collect and pay promptly when due, all withholding taxes for which the DAO and its affiliate entities may now be (or hereafter become) liable.

**RESOLVED FURTHER:** That the Service Providers are authorized and directed to solicit the consent of the eligible Members information related to the adoption of legal equity incentive plans and to file the appropriate notices with the applicable state and federal securities authorities in connection with the

issuance of options, at such time as such actions may be necessary or advisable in order to comply with applicable law.

**RESOLVED FURTHER:** That, in accordance with the Guiding Principals, the **Authorized Member**, together with the Service Provider, are authorized to execute and deliver any agreement in the name of the DAO and to otherwise obligate the DAO with respect to the purpose of the DAO, within general guidelines and budgets approved by the Members; however, the Members may adopt from time to time specific limitations on the authority of Authorized Members or Service Providers.

**RESOLVED FURTHER:** That the Service Providers are authorized to execute and deliver any form of work product, draft board minutes, by instruction to legal counsel or other authorized representative to determine the size of the common stock pool, rate of issuance, and the terms of the adoption of the plan for the DAO affiliate entity. That Service Provider is authorized to deliver in any form the parameters of the common stock allocation, option pool, and investment allocation for the DAO affiliate entity.

**RESOLVED FURTHER:** That the "**Service Providers**" of the DAO are each authorized and empowered to take any and all further action to execute and deliver any and all such further agreements in the organization and governance between the DAO affiliate entities and the DAO, with regards to the inter-company licensing agreements.

## Omnibus Resolutions

**RESOLVED FURTHER:** That the **Service Providers** of the DAO are each authorized and empowered to take any and all such further action, to execute and deliver any and all such further agreements, instruments, documents and certificates and to pay such expenses, in the name and on behalf of the DAO, as any of each of the **Service Providers** may deem necessary or advisable to effectuate the purposes and intent of the resolutions hereby adopted, the taking of such actions, the execution and delivery of such agreements, instruments, documents and certificates and the payment of such expenses by any such **Service Providers** to be conclusive evidence of his or her authorization hereunder and the approval thereof.

**RESOLVED FURTHER:** That any and all actions taken by the **Service Providers** of the DAO to carry out the purposes and intent of the foregoing resolutions prior to their adoption are approved, ratified and confirmed. As used in this document, the words "herein," "hereof," "hereby" and "hereunder" shall refer to this document as a whole, and not to any particular section, provision, or subdivision of this document.

This action by the DAO Member by Snapshot vote shall be effective as of the date the DAO Entities receives the consent of the DAO at the end of the Snapshot vote. This action by the DAO Members consent may be executed in

any number of counterparts, each of which shall constitute an original and all of which together shall constitute one action.

---

**Authors**

1. 0x30670D81E487c80b9EDc54370e6EaF943B6EAB39
2. 0x5d95baEBB8412AD827287240A5c281E3bB30d27E

# Exhibit A

**DAOLABS, INC.**
**INDEPENDENT CONSULTING AGREEMENT**

This Consulting Agreement (this "***Agreement***") is made and entered into as of August 15th, 2022 (the "***Effective Date***"), by and between DAOLABS, INC., a Washington Limited Liability Company ("***DAOLABS***"), and CONTRACTOR, an individual with his principal place of business at _____ and _____ ("***Consultant***") (each herein referred to individually as a "***Party***," or collectively as the "***Parties***").

DAOLABS desires to retain Consultant as an independent contractor to perform consulting services for DAOLABS, and Consultant is willing to perform such services, on the terms described below. In consideration of the mutual promises contained herein, the Parties agree as follows:

**1.        Services and Compensation**

Consultant shall perform the services described in **Exhibit A** (the "***Services***") for DAOLABS (or its designee), and DAOLABS agrees to pay Consultant the compensation described in **Exhibit A** for Consultant's performance of the Services.

**2.        Applicability to Past Activities**

DAOLABS and Consultant acknowledge that Consultant may have performed work, activities, services or made efforts on behalf of or for the benefit of DAOLABS, or related to the current or prospective business of DAOLABS in anticipation of Consultant's involvement with DAOLABS, that would have been "Services" if performed during the term of this Agreement, for a period of time prior to the date of this Agreement starting on August 12, 2022 (the "***Prior Consulting Period***"). Accordingly, Consultant agrees that if and to the extent that, during the Prior Consulting Period: (i) Consultant received access to any information from or on behalf of DAOLABS that would have been "Confidential Information" (as defined below) if Consultant received access to such information during the term of this Agreement; or (ii) Consultant (a) conceived, created, authored, invented, developed or reduced to practice any item (including any intellectual property rights with respect thereto) on behalf of or for the benefit of DAOLABS, or related to the current or prospective business of DAOLABS in anticipation of Consultant's involvement with DAOLABS, that would have been an "Invention" (as defined below) if conceived, created, authored, invented, developed or reduced to practice during the term of this Agreement; or (b) incorporated into any such item any pre-existing invention, improvement, development, concept, discovery or other proprietary information that would have been a "Prior Invention" (as defined below) if incorporated into such item during the term of this Agreement; then any such information shall be deemed "Confidential Information" hereunder and any such item shall be deemed an "Invention" or "Prior Invention" hereunder, and this Agreement shall apply to such activities, information or item as if disclosed, conceived, created, authored, invented, developed or reduced to practice during the term of this Agreement.

**3.        Confidentiality**

A.        ***Definition of Confidential Information.*** "***Confidential Information***" means any non-public information that relates to the actual or anticipated business and/or products, research or development of DAOLABS, its affiliates or subsidiaries or to DAOLABS's, its affiliates' or subsidiaries' technical data, trade secrets, or know-how, including, but not limited to, research, product plans, or other information regarding DAOLABS's, its affiliates' or subsidiaries' products or services and markets therefor, customer lists and customers (including, but not limited to, customers of DAOLABS on whom Consultant called or with whom Consultant became acquainted during the term of this Agreement), software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances, and other business information disclosed by DAOLABS, its affiliates or subsidiaries, either directly or indirectly, in writing, orally or by drawings or inspection of premises, parts, equipment, or other property of DAOLABS, its affiliates or subsidiaries. Notwithstanding the foregoing, Confidential Information shall not include any such information which Consultant can establish (i) was publicly known or made generally available prior to the time of disclosure to Consultant; (ii) becomes publicly known or made generally available after disclosure to Consultant through no wrongful action or inaction of Consultant; or (iii) is in the rightful possession of Consultant, without confidentiality obligations, at the time of disclosure as shown by Consultant's then-contemporaneous written records.

B.      ***Nonuse and Nondisclosure.*** During and after the term of this Agreement, Consultant will hold in the strictest confidence, and take all reasonable precautions to prevent any unauthorized use or disclosure of Confidential Information, and Consultant will not (i) use the Confidential Information for any purpose whatsoever other than as necessary for the performance of the Services on behalf of DAOLABS, or (ii) disclose the Confidential Information to any third party without the prior written consent of an authorized representative of DAOLABS, except that Consultant may disclose Confidential Information to any third party on a need-to-know basis for the purposes of Consultant performing the Services; provided, however, that such third party is subject to written non-use and non-disclosure obligations at least as protective of DAOLABS and the Confidential Information as this Article 3. Consultant may also disclose Confidential Information to the extent compelled by applicable law; *provided however*, prior to such disclosure, Consultant shall provide prior written notice to DAOLABS and seek a protective order or such similar confidential protection as may be available under applicable law. Consultant agrees that no ownership of Confidential Information is conveyed to the Consultant. Without limiting the foregoing, Consultant shall not use or disclose any DAOLABS property, intellectual property rights, trade secrets or other proprietary know-how of DAOLABS to invent, author, make, develop, design, or otherwise enable others to invent, author, make, develop, or design identical or substantially similar designs as those developed under this Agreement for any third party. Consultant agrees that Consultant's obligations under this Section 3.B shall continue after the termination of this Agreement.

C.      ***Other Client Confidential Information.*** Consultant agrees that Consultant will not improperly use, disclose, or induce DAOLABS to use any proprietary information or trade secrets of any former or concurrent employer of Consultant or other person or entity with which Consultant has an obligation to keep in confidence. Consultant also agrees that Consultant will not bring onto DAOLABS's premises or transfer onto DAOLABS's technology systems any unpublished document, proprietary information, or trade secrets belonging to any third party unless disclosure to, and use by, DAOLABS has been consented to in writing by such third party.

D.      ***Third Party Confidential Information.*** Consultant recognizes that DAOLABS has received and in the future will receive from third parties their confidential or proprietary information subject to a duty on DAOLABS's part to maintain the confidentiality of such information and to use it only for certain limited purposes. Consultant agrees that at all times during the term of this Agreement and thereafter, Consultant owes DAOLABS and such third parties a duty to hold all such confidential or proprietary information in the strictest confidence and not to use it or to disclose it to any person, firm, corporation, or other third party except as necessary in carrying out the Services for DAOLABS consistent with DAOLABS's agreement with such third party.

4.      **Ownership**

A.      ***Assignment of Inventions.*** Consultant agrees that all right, title, and interest in and to any copyrightable material, notes, records, drawings, designs, inventions, improvements, developments, discoveries and trade secrets conceived, discovered, authored, invented, developed or reduced to practice by Consultant, solely or in collaboration with others, during the term of this Agreement and arising out of, or in connection with, performing the Services under this Agreement and any copyrights, patents, trade secrets, mask work rights or other intellectual property rights relating to the foregoing (collectively, "***Inventions***"), are the sole property of DAOLABS. Consultant also agrees to promptly make full written disclosure to DAOLABS of any Inventions and to deliver and assign (or cause to be assigned) and hereby irrevocably assigns fully to DAOLABS all right, title and interest in and to the Inventions.

B.      ***Pre-Existing Material*s.** Subject to Section 4.A, Consultant agrees that if, in the course of performing the Services, Consultant incorporates into any Invention or utilizes in the performance of the Services any pre-existing invention, discovery, original works of authorship, development, improvements, trade secret, concept, or other proprietary information or intellectual property right owned by Consultant or in which Consultant has an interest ("***Prior Inventions***"), (i) Consultant will provide DAOLABS with prior notice and (ii) DAOLABS is hereby granted a nonexclusive, royalty-free, perpetual, irrevocable, transferable, worldwide license (with the right to grant and authorize sublicenses) to make, have made, use, import, offer for sale, sell, reproduce, distribute, modify, adapt, prepare derivative works of, display, perform, and otherwise exploit such Prior Inventions, without restriction, including, without limitation, as part of or in connection with such Invention, and to practice any method related thereto. Consultant will not incorporate any invention, improvement, development, concept, discovery, work of authorship or other proprietary information owned by any third party into any Invention without DAOLABS's prior written permission.

C.     ***Moral Rights.*** Any assignment to DAOLABS of Inventions includes all rights of attribution, paternity, integrity, modification, disclosure and withdrawal, and any other rights throughout the world that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively, "***Moral Rights***"). To the extent that Moral Rights cannot be assigned under applicable law, Consultant hereby waives and agrees not to enforce any and all Moral Rights, including, without limitation, any limitation on subsequent modification, to the extent permitted under applicable law.

D.     ***Maintenance of Records.*** Consultant agrees to keep and maintain adequate, current, accurate, and authentic written records of all Inventions made by Consultant (solely or jointly with others) during the term of this Agreement, and for a period of three (3) years thereafter. The records will be in the form of notes, sketches, drawings, electronic files, reports, or any other format that is customary in the industry and/or otherwise specified by DAOLABS. Such records are and remain the sole property of DAOLABS at all times and upon DAOLABS's request, Consultant shall deliver (or cause to be delivered) the same.

E.     ***Further Assurances.*** Consultant agrees to assist DAOLABS, or its designee, at DAOLABS's expense, in every proper way to secure DAOLABS's rights in Inventions in any and all countries, including the disclosure to DAOLABS of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments and all other instruments that DAOLABS may deem necessary in order to apply for, register, obtain, maintain, defend, and enforce such rights, and in order to deliver, assign and convey to DAOLABS, its successors, assigns and nominees the sole and exclusive right, title, and interest in and to all Inventions and testifying in a suit or other proceeding relating to such Inventions. Consultant further agrees that Consultant's obligations under this Section 4.E shall continue after the termination of this Agreement.

F.     ***Attorney-in-Fact.*** Consultant agrees that, if DAOLABS is unable because of Consultant's unavailability, dissolution, mental or physical incapacity, or for any other reason, to secure Consultant's signature with respect to any Inventions, including, without limitation, for the purpose of applying for or pursuing any application for any United States or foreign patents or mask work or copyright registrations covering the Inventions assigned to DAOLABS in Section 4.A, then Consultant hereby irrevocably designates and appoints DAOLABS and its duly authorized officers and agents as Consultant's agent and attorney-in-fact, to act for and on Consultant's behalf to execute and file any papers and oaths and to do all other lawfully permitted acts with respect to such Inventions to further the prosecution and issuance of patents, copyright and mask work registrations with the same legal force and effect as if executed by Consultant. This power of attorney shall be deemed coupled with an interest, and shall be irrevocable.

**5.     Conflicting Obligations**

A.     Consultant represents and warrants that Consultant has no agreements, relationships, or commitments to any other person or entity that conflict with the provisions of this Agreement, Consultant's obligations to DAOLABS under this Agreement, and/or Consultant's ability to perform the Services. Consultant will not enter into any such conflicting agreement during the term of this Agreement.

B.     Consultant shall require all Consultant's employees, contractors, or other third-parties performing Services under this Agreement to execute a Confidential Information and Assignment Agreement in the form of Exhibit B, and promptly provide a copy of each such executed agreement to DAOLABS.  Consultant's violation of this Article 5 will be considered a material breach under Section 8.B.

**6.     Return of DAOLABS Materials**

Upon the termination of this Agreement, or upon DAOLABS's earlier request, Consultant will immediately deliver to DAOLABS, and will not keep in Consultant's possession, recreate, or deliver to anyone else, any and all DAOLABS property, including, but not limited to, Confidential Information, tangible embodiments of the Inventions, all devices and equipment belonging to DAOLABS, all electronically-stored information and passwords to access such property, those records maintained pursuant to Section 4.D and any reproductions of any of the foregoing items that Consultant may have in Consultant's possession or control.

-3-

7.      **Reports**

Consultant agrees that Consultant will keep DAOLABS advised as to Consultant's progress in performing the Services under this Agreement. Consultant further agrees that Consultant will, as requested by DAOLABS, prepare written reports with respect to such progress. DAOLABS and Consultant agree that the reasonable time expended in preparing such written reports will be considered time devoted to the performance of the Services.

8.      **Term and Termination**

A.      ***Term.*** The term of this Agreement will begin on the Effective Date of this Agreement and will continue until the earlier of (i) final completion of the Services or (ii) termination as provided in Section 8.B.

B.      ***Termination.*** DAOLABS may terminate this Agreement upon giving Consultant fourteen (14) days prior written notice of such termination pursuant to Section 14.G of this Agreement. DAOLABS may terminate this Agreement immediately and without prior notice if Consultant refuses to or is unable to perform the Services or is in breach of any material provision of this Agreement.

C.      ***Survival.*** Upon any termination, all rights and duties of DAOLABS and Consultant toward each other shall cease except:

(1)      DAOLABS will pay, within thirty (45) days after the effective date of termination, all amounts owing to Consultant for Services completed and accepted by DAOLABS prior to the termination date and related reimbursable expenses, if any, submitted in accordance with DAOLABS's policies and in accordance with the provisions of Article 1 of this Agreement; and

(2)      Article 3 (Confidentiality), Article 4 (Ownership), Section 5.B (Conflicting Obligations), Article 6 (Return of DAOLABS Materials), Article 8 (Term and Termination), Article 9 (Independent Contractor Relationship), Article 10 (Indemnification), Article 11 (Noninterference), Article 12 (Limitation of Liability), Article 13 (Arbitration and Equitable Relief), and Article 14 (Miscellaneous) will survive termination or expiration of this Agreement in accordance with their terms.

9.      **Independent Contractor Relationship**

It is the express intention of DAOLABS and Consultant that Consultant performs the Services as an independent contractor to DAOLABS. Nothing in this Agreement shall in any way be construed to constitute Consultant as an agent, employee or representative of DAOLABS. Without limiting the generality of the foregoing, Consultant is not authorized to bind DAOLABS to any liability or obligation or to represent that Consultant has any such authority. Consultant agrees to furnish (or reimburse DAOLABS for) all tools and materials necessary to accomplish this Agreement and shall incur all expenses associated with performance, except as expressly provided in **Exhibit A**. Consultant acknowledges and agrees that Consultant is obligated to report as income all compensation received by Consultant pursuant to this Agreement.

10.      **Indemnification**

Consultant agrees to indemnify and hold harmless DAOLABS and its affiliates and their directors, officers and employees from and against all taxes, losses, damages, liabilities, costs and expenses, including attorneys' fees and other legal expenses, arising directly or indirectly from or in connection with (i) any negligent, reckless or intentionally wrongful act of Consultant or Consultant's assistants, employees, contractors or agents, (ii) any breach by the Consultant or Consultant's assistants, employees, contractors or agents of any of the covenants contained in this Agreement and corresponding Confidential Information and Invention Assignment Agreement, (iii) any failure of Consultant to perform the Services in accordance with all applicable laws, rules and regulations, or (iv) any violation or claimed violation of a third party's rights resulting in whole or in part from DAOLABS's use of the Inventions or other deliverables of Consultant under this Agreement.

11.    **Nonsolicitation**

To the fullest extent permitted under applicable law, from the date of this Agreement until twelve (12) months after the termination of this Agreement for any reason (the "***Restricted Period***"), Consultant will not, without DAOLABS's prior written consent, directly or indirectly, solicit any of DAOLABS's employees to leave their employment, or attempt to solicit employees of DAOLABS, either for Consultant or for any other person or entity. Consultant agrees that nothing in this Article 11 shall affect Consultant's continuing obligations under this Agreement during and after this twelve (12) month period, including, without limitation, Consultant's obligations under Article 3.

12.    **Limitation of Liability**

IN NO EVENT SHALL DAOLABS BE LIABLE TO CONSULTANT OR TO ANY OTHER PARTY FOR ANY INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES, OR DAMAGES FOR LOST PROFITS OR LOSS OF BUSINESS, HOWEVER CAUSED AND UNDER ANY THEORY OF LIABILITY, WHETHER BASED IN CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHER THEORY OF LIABILITY, REGARDLESS OF WHETHER DAOLABS WAS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND NOTWITHSTANDING THE FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY. IN NO EVENT SHALL DAOLABS'S LIABILITY ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT EXCEED THE AMOUNTS PAID BY DAOLABS TO CONSULTANT UNDER THIS AGREEMENT FOR THE SERVICES, DELIVERABLES OR INVENTION GIVING RISE TO SUCH LIABILITY.

13.    **Arbitration and Equitable Relief**

A.    ***Arbitration.*** IN CONSIDERATION OF CONSULTANT'S CONSULTING RELATIONSHIP WITH DAOLABS, ITS PROMISE TO ARBITRATE ALL DISPUTES RELATED TO CONSULTANT'S CONSULTING RELATIONSHIP WITH DAOLABS AND CONSULTANT'S RECEIPT OF THE COMPENSATION AND OTHER BENEFITS PAID TO CONSULTANT BY DAOLABS, AT PRESENT AND IN THE FUTURE, CONSULTANT AGREES THAT ANY AND ALL CONTROVERSIES, CLAIMS, OR DISPUTES WITH ANYONE (INCLUDING DAOLABS AND ANY EMPLOYEE, OFFICER, DIRECTOR, SHAREHOLDER OR BENEFIT PLAN OF DAOLABS IN THEIR CAPACITY AS SUCH OR OTHERWISE), WHETHER BROUGHT ON AN INDIVIDUAL, GROUP, OR CLASS BASIS, ARISING OUT OF, RELATING TO, OR RESULTING FROM CONSULTANT'S CONSULTING RELATIONSHIP WITH DAOLABS OR THE TERMINATION OF CONSULTANT'S CONSULTING RELATIONSHIP WITH DAOLABS, INCLUDING ANY BREACH OF THIS AGREEMENT, SHALL BE SUBJECT TO BINDING ARBITRATION UNDER THE ARBITRATION PROVISIONS PURSUANT TO WASHINGTON LAW, AND SHALL BE BROUGHT IN CONSULTANT'S INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING. THE FEDERAL ARBITRATION ACT SHALL CONTINUE TO APPLY WITH FULL FORCE AND EFFECT NOTWITHSTANDING THE APPLICATION OF PROCEDURAL RULES SET FORTH IN THE ACT. **DISPUTES WHICH CONSULTANT AGREES TO ARBITRATE, AND THEREBY AGREES TO WAIVE ANY RIGHT TO A TRIAL BY JURY, INCLUDE ANY STATUTORY CLAIMS UNDER LOCAL, STATE, OR FEDERAL LAW.** CONSULTANT FURTHER UNDERSTANDS THAT THIS AGREEMENT TO ARBITRATE ALSO APPLIES TO ANY DISPUTES THAT DAOLABS MAY HAVE WITH CONSULTANT.

B.    ***Procedure.*** CONSULTANT AGREES THAT ANY ARBITRATION WILL BE ADMINISTERED BY JUDICIAL ARBITRATION & MEDIATION SERVICES, INC. ("***JAMS***") PURSUANT TO ITS COMMERCIAL ARBITRATION RULES & PROCEDURES (THE "***JAMS RULES***"), WHICH ARE AVAILABLE AT http://www.jamsadr.com/rules-employment-arbitration/ AND FROM HUMAN RESOURCES AND ATTACHED HERETO AS EXHIBIT C. CONSULTANT AGREES THAT THE ARBITRATOR SHALL HAVE THE POWER TO DECIDE ANY MOTIONS BROUGHT BY ANY PARTY TO THE ARBITRATION, INCLUDING MOTIONS FOR SUMMARY JUDGMENT AND/OR ADJUDICATION AND MOTIONS TO DISMISS AND DEMURRERS. CONSULTANT AGREES THAT THE ARBITRATOR SHALL ISSUE A WRITTEN DECISION ON THE MERITS. CONSULTANT ALSO AGREES THAT THE ARBITRATOR SHALL HAVE THE POWER TO AWARD ANY REMEDIES AVAILABLE UNDER APPLICABLE LAW, AND THAT THE ARBITRATOR SHALL AWARD ATTORNEYS' FEES AND COSTS TO DAOLABS WHERE PROVIDED BY APPLICABLE LAW. CONSULTANT AGREES THAT THE DECREE OR AWARD RENDERED BY THE ARBITRATOR MAY BE ENTERED AS A

FINAL AND BINDING JUDGMENT IN ANY COURT HAVING JURISDICTION THEREOF. CONSULTANT AGREES THAT THE ARBITRATOR SHALL ADMINISTER AND CONDUCT ANY ARBITRATION IN ACCORDANCE WITH WASHINGTON LAW, AND THAT THE ARBITRATOR SHALL APPLY SUBSTANTIVE AND PROCEDURAL WASHINGTON LAW TO ANY DISPUTE OR CLAIM, WITHOUT REFERENCE TO RULES OF CONFLICT OF LAW. TO THE EXTENT THAT THE JAMS RULES CONFLICT WITH WASHINGTON LAW, WASHINGTON LAW SHALL TAKE PRECEDENCE. CONSULTANT FURTHER AGREES THAT ANY ARBITRATION UNDER THIS AGREEMENT SHALL BE CONDUCTED IN KING COUNTY, WASHINGTON.

C.     *Remedy.* EXCEPT AS PROVIDED BY THE ACT AND THIS AGREEMENT, ARBITRATION SHALL BE THE SOLE, EXCLUSIVE, AND FINAL REMEDY FOR ANY DISPUTE BETWEEN CONSULTANT AND DAOLABS. ACCORDINGLY, EXCEPT AS PROVIDED FOR BY THE ACT AND THIS AGREEMENT, NEITHER CONSULTANT NOR DAOLABS WILL BE PERMITTED TO PURSUE COURT ACTION REGARDING CLAIMS THAT ARE SUBJECT TO ARBITRATION.

D.     *Availability of Injunctive Relief.* THE PARTIES AGREE THAT ANY PARTY MAY ALSO PETITION THE COURT FOR INJUNCTIVE RELIEF WHERE EITHER PARTY ALLEGES OR CLAIMS A VIOLATION OF ANY AGREEMENT REGARDING INTELLECTUAL PROPERTY, CONFIDENTIAL INFORMATION OR NONINTERFERENCE. IN THE EVENT EITHER PARTY SEEKS INJUNCTIVE RELIEF, DAOLABS SHALL BE ENTITLED TO RECOVER REASONABLE COSTS AND ATTORNEYS' FEES.

E.     *Administrative Relief.* CONSULTANT UNDERSTANDS THAT THIS AGREEMENT DOES NOT PROHIBIT CONSULTANT FROM PURSUING AN ADMINISTRATIVE CLAIM WITH A LOCAL, STATE OR FEDERAL ADMINISTRATIVE BODY OR GOVERNMENT AGENCY SUCH AS THE DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING, THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, THE NATIONAL LABOR RELATIONS BOARD, OR THE WORKERS' COMPENSATION BOARD. THIS AGREEMENT DOES, HOWEVER, PRECLUDE CONSULTANT FROM PURSUING COURT ACTION REGARDING ANY SUCH CLAIM, EXCEPT AS PERMITTED BY LAW.

F.     *Voluntary Nature of Agreement.* CONSULTANT ACKNOWLEDGES AND AGREES THAT IT IS EXECUTING THIS AGREEMENT VOLUNTARILY AND WITHOUT ANY DURESS OR UNDUE INFLUENCE BY DAOLABS OR ANYONE ELSE. CONSULTANT FURTHER ACKNOWLEDGES AND AGREES THAT IT HAS CAREFULLY READ THIS AGREEMENT AND THAT CONSULTANT HAS ASKED ANY QUESTIONS NEEDED FOR CONSULTANT TO UNDERSTAND THE TERMS, CONSEQUENCES AND BINDING EFFECT OF THIS AGREEMENT AND FULLY UNDERSTAND IT, INCLUDING THAT *CONSULTANT IS WAIVING ITS RIGHT TO A JURY TRIAL*. FINALLY, CONSULTANT AGREES THAT IT HAS BEEN PROVIDED AN OPPORTUNITY TO SEEK THE ADVICE OF AN ATTORNEY OF CONSULTANT'S CHOICE BEFORE SIGNING THIS AGREEMENT.

14.     **Miscellaneous**

A.     *Governing Law; Consent to Personal Jurisdiction.* This Agreement shall be governed by the laws of the State of Washington, without regard to the conflicts of law provisions of any jurisdiction.  To the extent that any lawsuit is permitted under this Agreement, the Parties hereby expressly consent to the personal and exclusive jurisdiction and venue of the state and federal courts located in Washington.

B.     *Assignability.* This Agreement will be binding upon Consultant's assigns, administrators, and other legal representatives, and will be for the benefit of DAOLABS, its successors, and its assigns. There are no intended third-party beneficiaries to this Agreement, except as expressly stated. Except as may otherwise be provided in this Agreement, Consultant may not sell, assign or delegate any rights or obligations under this Agreement, by operation of law or otherwise (including by merger, consolidation, reorganization, reincorporation, sale of assets or stock or change of control), and any such attempted assignment, delegation or transfer shall be null and void. Notwithstanding anything to the contrary herein, DAOLABS may assign this Agreement and its rights and obligations under this Agreement to any successor to all or substantially all of DAOLABS's relevant assets, whether by merger, consolidation, reorganization, reincorporation, sale of assets or stock, change of control or otherwise.

C.   ***Entire Agreement.*** This Agreement constitutes the entire agreement and understanding between the Parties with respect to the subject matter herein and supersedes all prior written and oral agreements, discussions, or representations between the Parties. Consultant represents and warrants that it is not relying on any statement or representation not contained in this Agreement.  To the extent any terms set forth in any exhibit or schedule conflict with the terms set forth in this Agreement, the terms of this Agreement shall control unless otherwise expressly agreed by the Parties in such exhibit or schedule.

D.   ***Headings.*** Headings are used in this Agreement for reference only and shall not be considered when interpreting this Agreement.

E.   ***Severability.*** If a court or other body of competent jurisdiction finds, or the Parties mutually believe, any provision of this Agreement, or portion thereof, to be invalid or unenforceable, such provision will be enforced to the maximum extent permissible so as to effect the intent of the Parties, and the remainder of this Agreement will continue in full force and effect.

F.   ***Modification, Waiver.*** No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in a writing signed by the Parties. Waiver by DAOLABS of a breach of any provision of this Agreement will not operate as a waiver of any other or subsequent breach.

G.   ***Notices.*** Any notice or other communication required or permitted by this Agreement to be given to a Party shall be in writing and shall be deemed given (i) if delivered personally or by commercial messenger or courier service, (ii) when sent by confirmed facsimile, or (iii) if mailed by U.S. registered or certified mail (return receipt requested), to the Party at the Party's address written below or at such address as the Party may have previously specified by like notice. If by mail, delivery shall be deemed effective three business days after mailing in accordance with this Section .

H.   ***Attorneys' Fees.*** In any court action at law or equity that is brought by one of the Parties to this Agreement to enforce or interpret the provisions of this Agreement, DAOLABS will be entitled to reasonable attorneys' fees, in addition to any other relief to which DAOLABS may be entitled.

I.   ***Signatures.*** This Agreement may be signed in two counterparts, each of which shall be deemed an original, with the same force and effectiveness as though executed in a single document.

[*signature page follows*]

IN WITNESS WHEREOF, the Parties hereto have executed this Consulting Agreement as of the date first written above.

**CONTRACTOR**                                          **DAOLABS, INC.**


By: _____          By: _____

Name: _____          Name: BENJAMIN REED_____

Title: _____          Title: MANAGER_____


Address for Notice:

_____

_____

_____

**EXHIBIT A**

**SERVICES AND COMPENSATION**

1.    ***Contact.*** Consultant's principal Company contact:

>   DAOLABS, LLC.
>   620 131st AVE NE
>   Bellevue, WA 98005
>   (206) 866-0766
>
>   BLANK
>
>   CONTRACTOR had previous executed a NDA (attached) with DAOLABS, LLC dated August 12th, 2022, such that all communication with _____ will be covered by the agreement.

2.    ***Services.*** The Services shall consist of the following:

>   A.    See Attached Signed Scope of Work dated _____, however, Consultant will …

>   B.    and such other services that DAOLABS may reasonably request from time to time, including but not limited to ....

3.    ***Compensation.***

>   A.    DAOLABS will pay Consultant $100 an hour.

>   B.    DAOLABS will pay Consultant $1,500 30 days after contract signing, and another $1,500 after another 30 days, given that Consultant work at least 15 hours per month.

>   C.    DAOLABS will pay Consultant any overage hours spent from income derived from DAOLABS licensing or in installments of $1,000 after 4.5 months after contracting signing, whichever comes first.  Consultant will keep track of her time and provide a timesheet in excel format of hours worked per week.  Consultant will provide the timesheet to DAOLABS on a bi-monthly schedule for approval and record keeping.

>   D.    DAOLABS will reimburse Consultant, in accordance with DAOLABS policy, for all reasonable expenses incurred by Consultant in performing the Services pursuant to this Agreement, if Consultant receives written consent from an authorized agent of DAOLABS prior to incurring such expenses and submits receipts for such expenses to DAOLABS in accordance with DAOLABS policy.

>   Consultant shall submit to DAOLABS a written invoice for Services and expenses, and such statement shall be subject to the approval of the contact person listed above or other designated agent of DAOLABS.  Consultant shall submit to DAOLABS a written invoice for Services including hours worked and hours deferred that week, and cumulative, or total since contract signing.

This **Exhibit A** is accepted and agreed upon as of August 12, 2022.

**CONTRACTOR**                           **DAOLABS, LLC.**

By: _____              By: _____

Name: _____              Name: BENJAMIN REED_____

Title: _____              Title: MANAGER_____

**SCOPE OF WORKSTATEMENT OF WORK**

Contractor,

If there is a descriptive statement of work you want to include, please do it here.

**CONTRACTOR**                                    **DAOLABS, LLC.**


By: _____        By: _____

Name: _____        Name: BENJAMIN REED_____

# Exhibit B

# DAOLABS TECHNOLOGY LICENSE AGREEMENT

This Technology License Agreement (the **"Agreement"**) is entered into as of August _____ 2022 (the **"Effective Date"**) by and among the DAO (**"Licensor"**), and DAOLABS, LLC., a Washington limited liability corporation (**"Licensee"**) and an authorized individuals appointed by `DAOLABS, LLC`, _____, the authorized representative ("**Authorized Representative**").

## RECITALS

Licensor owns the Technology and desires to grant to the Licensee a license to all substantial rights held by it in and to the Technology. Licensee and Licensor desires to have Authorized Representative approve the termination or assignment of this agreement.

## AGREEMENT

NOW, THEREFORE, for and in consideration of the mutual covenants herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree to the following:

**1. Definitions.**

>   **"Confidential Information"** means all information or materials disclosed or transferred by Licensor to Licensee or Licensee to Licensor pursuant to this Agreement which the transferring party designates as confidential or which by its nature ought to be deemed confidential. Notwithstanding the foregoing, Confidential Information shall not include any information that: (i) is at the time of disclosure or subsequently becomes publicly available without the receiving party's breach of any obligations owed the disclosing party; (ii) became known to the receiving party prior to the disclosing party's disclosure of such information to the receiving party; (iii) became known to the receiving party from a source other than the disclosing party other than by the breach of an obligation of confidentiality owed to the disclosing party; (iv) is independently developed by the receiving party without reference to the Confidential Information or (v) is required by law to be disclosed.

>   **"Technology"** means the technology described on Exhibit A, and any and all improvements or derivatives thereof, and any and all intellectual property rights therein, including all patents of the United States of America and all foreign countries that may be issued for any inventions disclosed in patent applications or claiming a priority deriving from such patent applications, including without limitation all divisions, reissues, continuations, continuations-in-part, certificates

1

of re-examination, patents of addition, extensions and prolongations.

**"Product(s)"** means any and all products or services that can be developed, manufactured, marketed, promoted, distributed, sold, rented, or leased using the Technology.

## 2. Grant of License to the Technology.

Licensor hereby grants Licensee an exclusive, worldwide, sub-licensable license to the Technology to develop, market, promote, rent, lease, distribute, manufacture, use, and sell Product(s) or otherwise exploit and/or to sublicense the same. For the sake of clarity, this license is exclusive even as between the parties such that Licensor retains no right to use or license the Technology during the Term.

## 3. Terms of Payment.

Licensee shall pay Licensor for the conveyance of the rights it receives under this Agreement in the amounts and as described in Exhibit B to this Agreement. Upon termination of this Agreement, any amounts earned through the date of termination shall continue to be payable in accordance with the provisions of this Section 3.

## 4. Transfer of Modifications, Enhancements or Improvements of the Technology.

It is anticipated that Licensee may develop modifications, enhancements or improvements to the Technology. If, and to the extent that, Licensee invents, develops or otherwise creates any enhancement, modification, derivation, or other improvement to the technology and/or inventions disclosed in the Technology, ownership of such enhancement, modification, derivation or improvement shall be transferred to Licensor's ownership of the Technology.

## 5. Patent Marking.

Licensee shall mark the Products and/or any packaging pertaining thereto developed, manufactured, marketed, promoted, distributed, sold, rented, or leased pursuant to the terms of this Agreement in accordance with 35 USC §287 and to indicate patents pending if any applications for patent included in Technology are pending.

## 6. Patent Maintenance and Status.

Licensee shall be solely responsible for and bear all fees, costs and expenses associated with the maintenance, protection and defense of the Technology during the Term, including all patent, trademark, trade name, service marks, and copyright registration, applications, prosecution and the defense of any claims by a third party for infringement or unauthorized use of Technology, except as provided in Section 10.

## 7. Licensor's Warranty.

2

Licensor warrants to Licensee that to the best of Licensor's knowledge (i) Licensee's use as contemplated by this Agreement shall not infringe any third party patents, trademarks, copyrights, trade secrets or other proprietary rights, and that (ii) Licensor is the sole owner of any and all rights in and to the Technology and that no other third party, other than the third party rights disclosed on Exhibit A, possesses any rights in and to the Technology.

## 8. Term & Termination.

This Agreement will continue until terminated (i) by Licensor if an Event of Default (as defined below) occurs and Licensee does not cure such default within twenty-four (24) hours following Licensor's written notice of such failure; or (ii) upon the mutual agreement of the parties; or (iii) upon written notice by an authorized individual appointed by DAOLABs. The authorized individuals appointed by DAOLABs will pay Licensee one ($1) dollar for this termination right. Any one of the following is an "Event of Default":

### 8.1 Payment Default.

If Licensee fails to timely pay the obligations described in Section 3;

### 8.2 Covenant Default.

If Licensee violates any covenant herein or does not perform or observe any other material term, condition or covenant in this Agreement;

### 8.3 Insolvency or Attachment.

If Licensee becomes insolvent or if Licensee begins an Insolvency Proceeding or an Insolvency Proceeding is begun against Borrower and not dismissed or stayed within 30 days. An "Insolvency Proceeding" means the filing by or against the Licensee of any petition in bankruptcy or any petition for relief under the provisions of the Federal Bankruptcy Act, as amended, or any other state or federal law for the relief of debtors and the continuation of such petition without dismissal for a period of twenty (20) days or more; the appointment of a receiver or trustee to take possession of any property or assets of the Company; or the attachment of or execution against any property or assets of the Company, which remains unstayed for a period of ten (10) days.

## 9. Audit Rights.

Licensee agrees to keep adequate, accurate records of the amounts due hereunder and of all underlying transactions. Licensor and Authorized Representative shall have the right to audit all such records of Licensee reasonably related to Licensee's use of the Technology, to ensure that proper records are being kept and to verify all reports and payments due hereunder. The cost of such audit will be borne by Licensee. A discrepancy shall be deemed material if it involves payment or adjustment of more than five percent of reported payment. Any additional payments shown to be due as a result of the audit will be paid promptly by Licensee, along with interest on such amounts from the date originally due, upon conclusion of the audit. An audit may be conducted on Licensor's behalf by an

independent third party auditor or an individual auditor selected by Licensor or the Authorized Representative with a minimum of three (3) days notice during normal business hours no more than once each calendar year. The auditor shall execute an appropriate confidentiality agreement prior to beginning its audit.

### 10. Third-Party Infringement; Notice and Right to Sue.

If, at any time during the period during which Licensee holds a license hereunder, either party shall become aware of any infringement or threatened infringement of any Technology, said party shall forthwith give notice thereof to the other party. Such notice shall include the identification of the third party or parties thought to be the infringers, the product(s), systems or activities thought to constitute the infringement, along with the basis for suspecting the infringement including an analysis giving the legal and factual basis for believing the Technology has been infringed, along with any documentary evidence of such suspected infringement and identification of witnesses with knowledge of such suspected infringement. Within one hundred and eighty (180) days after learning of an alleged infringement, Licensee shall file a lawsuit in its own name or take other similar affirmative legal action against the alleged infringer or shall give written notice to Licensor of Licensee's intent not to take such action.  If no such action is commenced by Licensee within the 180 day time period, or if Licensee provides notice of intent not to take such action, then (as Licensor's sole remedy for such failure to act by Licensee) Licensor shall have the right, but not the obligation, to bring an action at its own expense.  For the purpose of such proceedings, Licensor shall permit, if legally necessary, the use of its name, shall give Licensee reasonable assistance, and shall execute such documents and do such acts as may be reasonably necessary. Any action for infringement of the Technology undertaken by either party hereunder shall be at such party's own expense including any legal fees, costs or other expenses. In the event there is a settlement or a recovery in a claim pursued by either party, any and all recovery shall first be applied to reimburse the parties for the costs each party incurred in the action and the remainder shall be allocated between the Licensor and the Licensee pursuant to the terms of payment set forth in Section 3 as though the amounts received were gross revenue received by Licensee .

### 11. Indemnity.

Licensee will reimburse, indemnify, defend and hold harmless Licensor and Authorized Representative from and against and in respect of any and all damages, losses, deficiencies, liabilities, costs and expenses incurred or suffered by Licensee that result from, relate to or arise out of any third party claim including of actual or alleged infringement of intellectual property rights by the exercise of the rights granted herein to the Technology (a "Claim"). Licensee will advance ten thousand dollars ($10,000) to Licensor and the Authorized Representative in the event of a threatened claim by any party, including by Licensee itself.

### 12. Injunctive Relief.

4

The parties hereto specifically acknowledge and agree that the remedy at law for any breach of the foregoing will be inadequate and that each party, in addition to any other relief available to it, shall be entitled to temporary and permanent injunctive relief without the necessity of proving actual damage. In the event that the provisions of this Section should ever be deemed to exceed the limitation provided by applicable law, then the parties hereto agree that such provisions shall be reformed to set forth the maximum limitations permitted by such law.

## 13. Confidentiality.

Except as expressly provided herein, neither party will use or disclose any Confidential Information of the other party without first securing the prior written consent of the party whose Confidential Information is to be disclosed. Notwithstanding the foregoing, each party may disclose Confidential Information of the other party to their employees, agents, contractors or consultants on a need-to-know basis. In addition, if either party intends to disclose all or portions of this Agreement or any related document in accordance with any judicial order or other federal, state or local governmental statute, rule, regulation or order, where such disclosure would be a disclosure of Confidential Information if it was not pursuant to legal process, the party intending to make such disclosure must give the other party reasonable notice prior to such disclosure; after receipt of such notice, the party so advised shall be solely responsible for asserting and filing any objections to such disclosure, invoking any governmental, judicial or administrative procedures for protecting against such disclosure, and obtaining any applicable protective order or equivalent, and the Licensee shall not be required to delay any timely filings to comply with any judicial order or other federal, state or local governmental statute, rule, regulation or order; except that the party intending to make such disclosure may not disclose such information for which procedures for protecting against such disclosure have been invoked until the conclusion of such procedures. Nothing in this section is to be construed as granting either party the right to disclose Confidential Information over the other party's objection.

## 14. Assignment; Successors and Assigns.

This Agreement will be binding upon and inure to the benefit of each party's respective successors and lawful assigns. Licensor may not assign this Agreement, in whole or in part, without Licensee and the Authorized Representative's prior written approval. The Authorized Representative will provide one ($1) dollar to Licensee in consideration for this right. This Agreement may only be assigned by Licensee, with both the Licensor and Authorized Representative's written approval. Licensee will provide notice to Licensor of any contemplated assignment within thirty (30) days prior. Any assignment prior to such written approval will be void ab initio. For purposes of this Agreement, an assignment includes (a) a merger with another entity and any other transfer by operation of law, (b) the sale or transfer of all or substantially all of a party's assets, (c) an acquisition of a majority of a party's voting stock or other voting interests by a third party, and (d) change in beneficial ownership of a majority of a party's ownership equity.

**15. Notices.**

All notices, authorizations, and requests in connection with this Agreement shall be deemed given (a) on the day they are hand-delivered with signed confirmation of receipt from the party to whom it is addressed, (b) three (3) days after the day they are deposited in the mail, postage prepaid, certified, return receipt requested, or (c) two (2) days after the day they are sent by Federal Express,; and addressed to the signatories of this Agreement (or their successors pursuant to due notice) at the following addresses:

| LICENSOR | LICENSEE |
|---|---|
| DAOLABS, LLC | The DAO, Service Provider |
| Attn: George Petre, Tiberius Law | Attn: George Petre, Tiberius Law |
| Re. Law Offices of Reed Yurchak | Re. Law Offices of Reed Yurchak |
| 601 Brickell Key Drive Suite 701 | 601 Brickell Key Drive Suite 701 |
| Miami, FL 33131 | Miami, FL 33131 |
| | |
| Manager: | c/o Reed Yurchak |
| Attn: George Petre, Tiberius Law | Attn: George Petre, Tiberius Law |
| Re. Law Offices of Reed Yurchak | Re. Law Offices of Reed Yurchak |
| 601 Brickell Key Drive Suite 701 | 601 Brickell Key Drive Suite 701 |
| Miami, FL 33131 | Miami, FL 33131 |
| | |
| | Law Offices of Reed Yurchak |
| | 620 131st Ave NE |
| | Bellevue, WA 98005 |
| | reed@yurchaklaw.com |

_____                    _____

TERMINATION AND
ASSIGNMENT APPROVAL
RIGHTS

_____                    _____
Authorized Representative

**16. Law; Attorneys' Fees.**

Except as specifically preempted by the federal laws of the United States of America, this Agreement shall be construed and interpreted under the laws of the State of Washington without giving effect to the principles of conflict of

laws. The parties submit to the exclusive jurisdiction of and venue in the state or federal courts located in Seattle, Washington. Each party hereby waives all defenses of lack of personal jurisdiction and forum nonconveniens. If court proceedings are required to enforce any provision of this Agreement, the Licensor shall be entitled to an award of reasonable costs and expenses of litigation and any appeal, including reasonable attorneys' fees.

**17. Entire Agreement; Modification; Waiver.**

This Agreement contains the entire agreement between the parties and supersedes and replaces all prior negotiations and agreements between the parties hereto respecting this subject matter. No modification or waiver of this Agreement or any of its provisions shall be binding upon the party against whom enforcement is sought, unless made in writing and signed by an authorized representative of each party. No waiver of any breach of any provision of this Agreement shall constitute a waiver of any prior, concurrent or subsequent breach of the same or any other provisions hereof, and no waiver shall be effective unless made in writing and signed by an authorized representative of the waiving party.

**18. Severability.**

If any provision of this Agreement is held to be invalid, illegal or unenforceable for any reason, such invalidity, illegality or un-enforceability shall not affect any other provisions of this Agreement, which shall remain in full force and effect.

**19. Survival.**

Sections 7, 10-13, 16 and 19 shall survive the termination of this Agreement.

———————————————

DATED as of the date first above written.

| LICENSOR | LICENSEE |
|---|---|
| DAOLABS, LLC | The DAO |
| By: _____ | By: _____ |
| Title: Manager | Title: _____ |
| Name: _____ | Name: _____ |

TERMINATION AND
ASSIGNMENT APPROVAL RIGHT
By: _____
Title: _____
Name: Authorized Representative

**EXHIBIT A**

**The Technology**

7

- (I) Pre-existing technology statement here and there.
- (II) Another pre-existing technology statement here and there.

**Source Code Projects**

- (II) See GitHub Respository

**EXHIBIT B**

**Payment Schedule**

| Id | Ethereum Address | Amount | Year |
|----|------------------|--------|------|
| 1 | 0x0000000000000000000000000000000000000000—$100,000.00 | | 6/1/2022 |
| 2 | 0x0000000000000000000000000000000000000000—$250,000.00 | | 12/1/2022 |
| 3 | 0x0000000000000000000000000000000000000000—$250,000.00 | | 1/1/2023 |
| 4 | 0x0000000000000000000000000000000000000000—$550,000.00 | | 6/1/2023 |
| 5 | 0x0000000000000000000000000000000000000000—$550,000.00 | | 12/1/2023 |

# Exhibit 10



snapshot

Connect wallet



← Back

# MIP-0005: Adopt Banking Relationship Authorizations

Closed  Movement DAO: Consensus Space by filipv.eth  •••

*Establish traditional banking relationships.*

# View Proposal →

**1.** Exhibit A

*PDF Download │ IPFS Mirror*

---

## Votes 8 ⬇

| | | | |
|---|---|---|---|
| 🦊 servic... Core | For | 10M MOVE | ∿ |
| 🔵 0x58Ba...1650 | For | 9.5K MOVE | ∿ |
| 🟢 obstacker.eth | For | 4.2K MOVE | ∿ |
| 🦝 rice$cr... Core | For | 2.2K MOVE | ∿ |
| 🟠 natasha-pan... | For | 187 MOVE | ∿ |

2/21/23, 9:58 PM                    MoveDAO Consensus Space proposal on IPFS | Adopt Marketing Staff | snapshot.moveiDs | author pages
Case 1:23-cv-20727-RKA   Document 24-1   Entered on FLSD Docket 03/01/2023   Page 338 of
                                                                             653

| 🧑 pillowfightcl... | | For | 39 MOVE ⌇ |
| 🧑 partypants.eth | | For | 39 MOVE ⌇ |
| 🧑 tankbo... (Core) | | For | 0 MOVE ⌇ |

## Information

| | |
|---|---|
| **Strategie(s)** | 🔵🔵 |
| **IPFS** | #bafkrei |
| **Voting system** | Basic voting |
| **Start date** | Aug 23, 2022, 12:00 AM |
| **End date** | Aug 30, 2022, 12:00 AM |
| **Snapshot** | 15,399,644 |

## Results

| | | |
|---|---|---|
| For | 10M MOVE | 100% |
| Against | 0 MOVE | 0% |

## I voted POAP



Vote to get this POAP



Mint

 **Founding Proposals**    Adopt Banking Relationship Authorizations

# Adopt Banking Relationship Authorizations

Authors: tankbottoms.eth, filipv.eth
Date: 2022-08-23

## Thesis

The DAO and its affiliates should establish traditional banking relationships so that those services can be integrated into its Dapp via API payment processors, thereby enabling payments in fiat currency; the DAO has integrated Bolt using internally generated API keys and Wyre API keys, both of which require traditional ACH accounts to connect and fulfill online account loading functions. Silicon Valley start-up services such as, **Ramp**, have business models where they offer "full-service" start-up services such as accounting management, including virtual cards by projects for expense management, cap-table, profit and losses, option and stock option turn-key packages and other organizational services normally left to the start-up. In order to be eligible for these types of services, the DAO or DAOLABS must have over $250,000.00 in an ACH account and documentation regarding capital investments. ACH accounts are also required for the DAO to open a Coinbase or Robinhood account which would be necessary for any fiat to crypto currency exchanges.

In order for a financial institution to establish a banking relationship with the **DAO**, the **DAO** must be able to provide traditional documents including board resolution, or shareholder resolution, or the information contained in Exhibit A, "Resolution to Open Bank Account" section.

## Motivation

The DAO's fiat contributions are currently facilitated by the **DAO's Service Providers** including **dao-lawfirm.eth**, via manual funds transfers and conversion from Cryptocurrency to fiat and vice versa using personal Accounts, likely generating gains or unforeseen tax liability which will need to be mitigated.

## Resolution

See Exhibit A. **RESOLUTION TO OPEN A BANK ACCOUNT**

# Snapshot Consensus by the DAO Members

Whereas the DAO through its Members voted to adopt the following actions via Snapshot and resolves as follows:

**RESOLVED:** That the Service Provider, together with **dao-lawfirm.eth**, **tankbottoms.eth**, and **benreed.eth** shall be authorized on behalf of the DAO, and its Members, to establish a banking relationship with Chase Bank and other service providers to facilitate additional payment services required by the DAO.

**RESOLVED FURTHER :** That Service Providers are authorized to:

1. designate one or more banks or similar financial institutions as depositories of the funds of the DAO and its affiliate entities;

2. open, maintain and close general and special accounts with any such depositories;

3. cause to be deposited from time to time in such accounts, funds of the DAO Entities as they deem necessary or advisable, and to designate, or to change or revoke the designation of, the officers or agents of the DAO Entities authorized to make such deposits and to endorse checks, drafts and other instruments for deposit;

4. designate, or to change or revoke the designation of, the Service Provider or agents of the DAO Entities authorized to sign or countersign checks, drafts or other orders for the payment of money of the DAO Entities against any funds deposited in any of such accounts;

5. authorize the use of facsimile signatures for the signing or countersigning of checks, drafts or other orders for the payment of money, and to enter into such agreements as banks and similar financial institutions customarily require as a condition for permitting the use of facsimile signatures; and

6. make such general and special rules and regulations with respect to such accounts as they may deem necessary or advisable, and to complete, execute and certify any customary printed blank signature card forms in order to exercise conveniently the authority granted by this resolution, and any resolutions printed on such cards are deemed adopted as a part of this resolution.

**RESOLVED FURTHER:** That all form resolutions required by any such depository are adopted, and that the Service Provider, and agents are authorized to certify such resolutions as having been adopted by this action by Member vote.

**RESOLVED FURTHER:** That any such depository to which a certified copy of these resolutions has been delivered by the Authorized Member is authorized and entitled to rely upon such resolutions for all purposes until it receives written notice of the revocation or amendment of these resolutions.

**RESOLVED FURTHER**: That the Service Providers are authorized to consult with its bookkeepers, auditors and attorneys in order to be fully informed as to, and to collect and pay promptly when due, all withholding taxes for which the DAO Entities may now be (or hereafter become) liable.

**RESOLVED FURTHER:** That the **Service Providers** of the DAO are each authorized and empowered to take any and all such further action to execute and deliver any and all such further agreements, instruments, documents, and certificates and to pay such expenses in the name and on behalf of the DAO, as any of each of the **Service Providers** may deem necessary or advisable to effectuate the purposes and intent of the resolutions hereby adopted, the taking of such actions, the execution and delivery of such agreements, instruments, documents, and certificates, and the payment of such expenses by any such **Service Providers** to be conclusive evidence of his or her authorization hereunder and the approval thereof.

**RESOLVED FURTHER:** That any and all actions taken by the **Service Providers** of the DAO to carry out the purposes and intent of the foregoing resolutions prior to their adoption are approved, ratified, and confirmed. As used in this document, the words "herein," "hereof," "hereby" and "hereunder" shall refer to this document as a whole, and not to any particular section, provision, or subdivision of this document.

This action by the DAO Member by Snapshot vote shall be effective as of the date the DAO Entities receives the consent of the DAO at the end of the Snapshot vote. This action by the DAO Members consent may be executed in any number of counterparts, each of which shall constitute an original and all of which together shall constitute one action.

## Authors

1. 0x30670D81E487c80b9EDc54370e6EaF943B6EAB39
2. 0x5d95baEBB8412AD827287240A5c281E3bB30d27E

✏️ Edit this page

# Adopt Banking Relationship Authorizations

Authors: tankbottoms.eth, filipv.eth
Date: 2022-08-23

## Thesis

The DAO and its affiliates should establish traditional banking relationships so that those services can be integrated into its Dapp via API payment processors, thereby enabling payments in fiat currency; the DAO has integrated Bolt using internally generated API keys and Wyre API keys, both of which require traditional ACH accounts to connect and fulfill online account loading functions. Silicon Valley start-up services such as, **Ramp**, have business models where they offer "full-service" start-up services such as accounting management, including virtual cards by projects for expense management, cap-table, profit and losses, option and stock option turn-key packages and other organizational services normally left to the start-up. In order to be eligible for these types of services, the DAO or DAOLABS must have over $250,000.00 in an ACH account and documentation regarding capital investments. ACH accounts are also required for the DAO to open a Coinbase or Robinhood account which would be necessary for any fiat to crypto currency exchanges.

In order for a financial institution to establish a banking relationship with the **DAO**, the **DAO** must be able to provide traditional documents including board resolution, or shareholder resolution, or the information contained in Exhibit A, "Resolution to Open Bank Account" section.

## Motivation

The DAO's fiat contributions are currently facilitated by the **DAO's Service Providers** including **dao-lawfirm.eth**, via manual funds transfers and conversion from Cryptocurrency to fiat and vice versa using personal Accounts, likely generating gains or unforeseen tax liability which will need to be mitigated.

## Resolution

See Exhibit A. **RESOLUTION TO OPEN A BANK ACCOUNT**

## Snapshot Consensus by the DAO Members

Whereas the DAO through its Members voted to adopt the following actions via Snapshot and resolves as follows:

**RESOLVED:** That the Service Provider, together with **dao-lawfirm.eth**, **tankbottoms.eth**, and **benreed.eth** shall be authorized on behalf of the DAO, and its Members, to establish a banking relationship with Chase Bank and other service providers to facilitate additional payment services required by the DAO.

1

**RESOLVED FURTHER :** That Service Providers are authorized to:

1. designate one or more banks or similar financial institutions as depositories of the funds of the DAO and its affiliate entities;
2. open, maintain and close general and special accounts with any such depositories;
3. cause to be deposited from time to time in such accounts, funds of the DAO Entities as they deem necessary or advisable, and to designate, or to change or revoke the designation of, the officers or agents of the DAO Entities authorized to make such deposits and to endorse checks, drafts and other instruments for deposit;
4. designate, or to change or revoke the designation of, the Service Provider or agents of the DAO Entities authorized to sign or countersign checks, drafts or other orders for the payment of money of the DAO Entities against any funds deposited in any of such accounts;
5. authorize the use of facsimile signatures for the signing or countersigning of checks, drafts or other orders for the payment of money, and to enter into such agreements as banks and similar financial institutions customarily require as a condition for permitting the use of facsimile signatures; and
6. make such general and special rules and regulations with respect to such accounts as they may deem necessary or advisable, and to complete, execute and certify any customary printed blank signature card forms in order to exercise conveniently the authority granted by this resolution, and any resolutions printed on such cards are deemed adopted as a part of this resolution.

**RESOLVED FURTHER:** That all form resolutions required by any such depository are adopted, and that the Service Provider, and agents are authorized to certify such resolutions as having been adopted by this action by Member vote.

**RESOLVED FURTHER:** That any such depository to which a certified copy of these resolutions has been delivered by the Authorized Member is authorized and entitled to rely upon such resolutions for all purposes until it receives written notice of the revocation or amendment of these resolutions.

**RESOLVED FURTHER**: That the Service Providers are authorized to consult with its bookkeepers, auditors and attorneys in order to be fully informed as to, and to collect and pay promptly when due, all withholding taxes for which the DAO Entities may now be (or hereafter become) liable.

**RESOLVED FURTHER:** That the **Service Providers** of the DAO are each authorized and empowered to take any and all such further action to execute and deliver any and all such further agreements, instruments, documents, and certificates and to pay such expenses in the name and on behalf of the DAO, as any of each of the **Service Providers** may deem necessary or advisable to effectuate the purposes and intent of the resolutions hereby adopted, the taking of such actions, the execution and delivery of such agreements, instruments, doc-

2

uments, and certificates, and the payment of such expenses by any such **Service Providers** to be conclusive evidence of his or her authorization hereunder and the approval thereof.

**RESOLVED FURTHER:** That any and all actions taken by the **Service Providers** of the DAO to carry out the purposes and intent of the foregoing resolutions prior to their adoption are approved, ratified, and confirmed. As used in this document, the words "herein," "hereof," "hereby" and "hereunder" shall refer to this document as a whole, and not to any particular section, provision, or subdivision of this document.

This action by the DAO Member by Snapshot vote shall be effective as of the date the DAO Entities receives the consent of the DAO at the end of the Snapshot vote. This action by the DAO Members consent may be executed in any number of counterparts, each of which shall constitute an original and all of which together shall constitute one action.

———————————————

**Authors**

1. 0x30670D81E487c80b9EDc54370e6EaF943B6EAB39
2. 0x5d95baEBB8412AD827287240A5c281E3bB30d27E

3

# Exhibit A

## Exhibit A

**MOVEMENT DAO**

**Resolution to Open a Bank Account**

Chase Bank Account No.: _____

As the **DAO** Members, we certify that the **DAO** has been organized within the bounds of the State of Delaware as an Unincorporated Nonprofit Association by the DAO's Service Provider, **dao-lawfirm.eth**, who's registered agent's office is located at:

> The name of its registered agent at such address is **Incorporating Services, Ltd.**
>
> > Incorporating Services, Ltd., 3500 South DuPont Highway, Dover, County of Kent, Delaware 19901.
>
> The address of dao-lawfirm.eth is: Attn. George Petre, Tiberius Law, Re. Law Offices of Reed Yurchak, 601 Brickell Key Drive Suite 701, Miami, FL 33131

The **dao-lawfirm.eth**, as the DAO's **Service Provider**, having evaluated the Governance Proposals on Snapshot voted on or about August 22, 2022, having a quorum present the following resolutions are:

**RESOLVED**, that the financial institution named above is designated as a depository for the funds of this DAO, which may be withdrawn on checks, drafts, advices of debit, notes, or other orders for payments bearing any Member of this DAO.

**FURTHER RESOLVED**, that the financial institution will accept and pay on, without further inquiry, any checks or debits drawn against any of the DAO's accounts. The checks or debits will be honored by the financial institution whether the item has been drawn or endorsed to the order of the below signed Member; tendered by the Authorized Member for the purpose of cashing or payment; or for deposit to the Member's personal account. The financial institution will not be required to inquire as to the use of any check or debit signed in accordance with the resolutions contained herein.

**FURTHER RESOLVED** that the authorized below Member may execute other agreements, including, but not limited to, special depository agreements, and arrangements concerning the manner, condition, and/or purposes for which funds, checks, debits, or items of the DAO may be deposited, collected, or withdrawn, as long as these other agreements are not contrary to the provisions contained in this resolution.

**FURTHER RESOLVED** that the power granted to the DAO's appointed Authorized Member will remain in full force and effect until written notice has

1

been delivered and received by the financial institution at each location where an account is maintained. The financial institution will be indemnified and held harmless from any losses suffered or liabilities incurred by continuing to act in accordance with this resolution.

The DAO via the passing of this proposal further attest that the authorized persons named below occupy the stated positions, as indicated by their signatures, and that the resolutions contained in this document are recorded on Snapshot, and these resolutions are in full force and effect and have not been altered in any way.

Authorized Member: _____

Agree to all of the above on this 25th day of August, 2022.

CERTIFIED TO AND ATTESTED BY: _____

# Exhibit 11



# snapshot

Connect wallet 



← Back

# MIP-0006: Appoint a Treasury Committee

Closed  Movement DAO: Consensus Space by filipv.eth ↑ ···

*Appoint a treasury committee to provide the community with monthly recommendations to leverage the DAO's endowment.*

## View Proposal →

*PDF Download | IPFS Mirror*

---

Votes  8                                                          ↓

| | | |
|---|---|---|
| 🐵 servic... Core | For | 10M MOVE  |
| 🔵 0x58Ba...1650 | For | 9.5K MOVE 〰 |
| 🌈 obstacker.eth | Abstain | 4.2K MOVE 〰 |
| 🐰 rice$cr... Core | For | 2.2K MOVE 〰 |
| 😀 natasha-pan... | For | 187 MOVE 〰 |
| 🐱 pillowfightcl... | For | 39 MOVE 〰 |

| 🧑 partypants.eth | For | 39 MOVE 〰 |
| 🧑 tankbo... ( Core ) | For | 0 MOVE 〰 |

## Information

| | |
|---|---|
| **Strategie(s)** | 🌀 🌀 |
| **IPFS** | #bafkrei |
| **Voting system** | Basic voting |
| **Start date** | Aug 23, 2022, 12:00 AM |
| **End date** | Aug 30, 2022, 12:00 AM |
| **Snapshot** | 15,399,646 |

## Results

| | |
|---|---|
| For | 10M MOVE  100% |
| Against | 0 MOVE  0% |

## I voted POAP



Vote to get this POAP



Mint

 **Founding Proposals**    <span style="color:orange">Appoint a Treasury Committee</span>

# Appoint a Treasury Committee

```
Authors: tankbottoms.eth, filipv.eth
Date: 2022-08-23
```

## Thesis

Appoint a treasury committee to provide the community with monthly recommendations to leverage the DAO's endowment. This should instill confidence in the long-term success of the DAO's endowment, by which the DAO will stimulate growth of its ecosystem.

## Motivation

The DAO has not taken advantage of intensive treasury management yet. By leveraging non-controversial investment and diversification strategies, the DAO can expand its runway while minimizing risks.

## Specification

The initial treasury committee Members shall be:

| ENS | ETH Address |
|---|---|
| tankbottoms.eth | 0x5d95baEBB8412AD827287240A5c281E3bB30d27E |
| filipv.eth | 0x30670D81E487c80b9EDc54370e6EaF943B6EAB39 |
| jimmyethworld.eth | 0xE41188926607921763D25392475f1156AC5f9033 |

## Rationale

Designating treasury management recommendations to a small group allows for focused, tightly-scoped discussion. It will also allow these individuals to utilize and to continue building their domain-specific expertise.

## Risks

- As the DAO's assets are diversified, the DAO will inherit risks associated with new assets.
- The DAO may lose out on potential upside to ETH, DAI, or other assets it already holds.
- The treasury committee might make bad recommendations.
- Treasury management may distract from other focuses of the DAO.

## Timeline

The initial treasury committee should provide recommendations within ~30 days of this proposal's ratification.

## Snapshot Consensus by the DAO Members

Whereas the DAO through its Members voted to adopt the following actions via Snapshot and resolves as follows:

**RESOLVED:** That the above referenced persons are hereby elected and designated as **Treasury Committee Members** of the DAO. The Treasury Committee Member designation provides no office.

**RESOLVED FURTHER:** That the **Service Providers** of the DAO are each authorized and empowered to take any and all such further action, to execute and deliver any and all such further agreements, instruments, documents and certificates and to pay such expenses, in the name and on behalf of the DAO, as any of each of the **Service Providers** may deem necessary or advisable to effectuate the purposes and intent of the resolutions hereby adopted, the taking of such actions, the execution and delivery of such agreements, instruments, documents and certificates and the payment of such expenses by any such **Service Providers** to be conclusive evidence of his or her authorization hereunder and the approval thereof.

**RESOLVED FURTHER:** That any and all actions taken by the **Service Providers** of the DAO to carry out the purposes and intent of the foregoing resolutions prior to their adoption are approved,

ratified and confirmed. As used in this document, the words "herein," "hereof," "hereby" and "hereunder" shall refer to this document as a whole, and not to any particular section, provision, or subdivision of this document.

This action by the DAO Member by Snapshot vote shall be effective as of the date the DAO Entities receives the consent of the DAO at the end of the Snapshot vote. This action by the DAO Members consent may be executed in any number of counterparts, each of which shall constitute an original and all of which together shall constitute one action.

## Authors

1. 0x30670D81E487c80b9EDc54370e6EaF943B6EAB39
2. 0x5d95baEBB8412AD827287240A5c281E3bB30d27E

✏️ Edit this page

# Appoint a Treasury Committee

**Authors:** tankbottoms.eth, filipv.eth
**Date:** 2022-08-23

## Thesis

Appoint a treasury committee to provide the community with monthly recommendations to leverage the DAO's endowment. This should instill confidence in the long-term success of the DAO's endowment, by which the DAO will stimulate growth of its ecosystem.

## Motivation

The DAO has not taken advantage of intensive treasury management yet. By leveraging non-controversial investment and diversification strategies, the DAO can expand its runway while minimizing risks.

## Specification

The initial treasury committee Members shall be:

| ENS | ETH Address |
| --- | --- |
| tankbottoms.eth | 0x5d95baEBB8412AD827287240A5c281E3bB30d27E |
| filipv.eth | 0x30670D81E487c80b9EDc54370e6EaF943B6EAB39 |
| jimmyethworld.eth | 0xE41188926607921763D25392475f1156AC5f9033 |

## Rationale

Designating treasury management recommendations to a small group allows for focused, tightly-scoped discussion. It will also allow these individuals to utilize and to continue building their domain-specific expertise.

## Risks

- As the DAO's assets are diversified, the DAO will inherit risks associated with new assets.
- The DAO may lose out on potential upside to ETH, DAI, or other assets it already holds.
- The treasury committee might make bad recommendations.
- Treasury management may distract from other focuses of the DAO.

## Timeline

The initial treasury committee should provide recommendations within ~30 days of this proposal's ratification.

1

---

## Snapshot Consensus by the DAO Members

Whereas the DAO through its Members voted to adopt the following actions via Snapshot and resolves as follows:

**RESOLVED:** That the above referenced persons are hereby elected and designated as **Treasury Committee Members** of the DAO. The Treasury Committee Member designation provides no office.

**RESOLVED FURTHER:** That the **Service Providers** of the DAO are each authorized and empowered to take any and all such further action, to execute and deliver any and all such further agreements, instruments, documents and certificates and to pay such expenses, in the name and on behalf of the DAO, as any of each of the **Service Providers** may deem necessary or advisable to effectuate the purposes and intent of the resolutions hereby adopted, the taking of such actions, the execution and delivery of such agreements, instruments, documents and certificates and the payment of such expenses by any such **Service Providers** to be conclusive evidence of his or her authorization hereunder and the approval thereof.

**RESOLVED FURTHER:** That any and all actions taken by the **Service Providers** of the DAO to carry out the purposes and intent of the foregoing resolutions prior to their adoption are approved, ratified and confirmed. As used in this document, the words "herein," "hereof," "hereby" and "hereunder" shall refer to this document as a whole, and not to any particular section, provision, or subdivision of this document.

This action by the DAO Member by Snapshot vote shall be effective as of the date the DAO Entities receives the consent of the DAO at the end of the Snapshot vote. This action by the DAO Members consent may be executed in any number of counterparts, each of which shall constitute an original and all of which together shall constitute one action.

---

### Authors

1. 0x30670D81E487c80b9EDc54370e6EaF943B6EAB39
2. 0x5d95baEBB8412AD827287240A5c281E3bB30d27E

# Exhibit 12



snapshot



Connect wallet



← Back

# MIP-0007: Snapshot Consent of the Members of the DAO

Closed  Movement DAO: Consensus Space by filipv.eth  ···

*Enact several key resolutions.*

## View Proposal →

**1.** Exhibit A

**2.** Exhibit B

**3.** Exhibit C

**4.** Exhibit D

*PDF Download │ IPFS Mirror*

---

Votes  8                                                                                    ⬇



| | | | |
|---|---|---|---|
| 🧑 servic... `Core` | | For | 10M MOVE 〰 |
| 🔵 0x58Ba...1650 | | For | 9.5K MOVE 〰 |
| 🌈 obstacker.eth | | For | 4.2K MOVE 〰 |

2/21/23, 9:04 PM    Case 1:23-cv-20727-RKA  Document 34-5 Entered on FLSD Docket 03/01/2023  Page 362 of 653
Movement DAO: Governance - Space - proposal 0xfee79071331...Snapshot: Core Members of the Movements at A362
653

| | | |
|---|---|---|
| 🔘 rice$cr... (Core) | For | 2.2K MOVE 〰 |
| 🟠 natasha-pan... | For | 187 MOVE 〰 |
| 🔴 partypants.eth | For | 39 MOVE 〰 |
| 🔴 pillowfightcl... | For | 39 MOVE 〰 |
| 🔵 tankbo... (Core) | For | 0 MOVE 〰 |

## Information

| | |
|---|---|
| **Strategie(s)** | 🌀 🌀 |
| **IPFS** | #bafkrei |
| **Voting system** | Basic voting |
| **Start date** | Aug 23, 2022, 12:00 AM |
| **End date** | Aug 30, 2022, 12:00 AM |
| **Snapshot** | 15,399,663 |

## Results

| | |
|---|---|
| For | 10M MOVE  100% |
| Against | 0 MOVE  0% |

## I voted POAP

2/21/23, 8:54 PM    Case 1:23-cv-20727-RKA    Document 24-5    Entered on FLSD Docket 03/01/2023    Page 363 of 653
Movement DAO Offchain - Space Enters VII MVMT DZ Snapshot Vote and Vote Members of the DAO
653



Vote to get this POAP



┌────────────────────────────────────────────────────┐
│                        Mint                          │
└────────────────────────────────────────────────────┘

2/21/23, 8:09 PM    Case 1:23-cv-20727-RKA    Document 34-1    Entered on FLSD Docket 03/01/2023    Page 365 of
Snapshot Consent of the Members of the DAO | Move Proposals
653

 **Founding Proposals**   Snapshot Consent of the Members of the DAO

# Snapshot Consent of the Members of the DAO

Authors: tankbottoms.eth, filipv.eth
Date: 2022-08-23

*DAO, an Unincorporated Nonprofit Association, a Delaware entity, and DAOLABS, and other proposed DAO Entities*

## Definitions

**Snapshot** is a decentralized voting system which provides flexibility on voting power calculation, various voting types, the creation of proposals, and the off-chain verification of voters via the Ethereum blockchain, which enables easy to verify and hard to contest results enabling robust governance of unincorporated associations with large participation bases. Snapshot thereby enables diverse decentralized decision making, previously only possible through highly coordinated shareholder meetings, without any costs. The DAO and its affiliates entities use Snapshot in order to verify and calculate Membership consensus.

The undersigned, constituting the Members hereby adopt the following resolutions via Snapshot:

## Ratification of Actions of the Service Providers

**RESOLVED:** The **Service Providers**, as defined by the Guiding Principals § 16¶¶ (a)-(d); specifically as dao-lawfirm.eth, Attorney Reed Yurchak of the Law Offices of Reed Yurchak, and forensic blockchain engineer tankbottoms.eth. Every action that has been taken, authorized, unauthorized, and with respect to the DAO by the **Service Providers** including, but not limited to, the transfer of Cryptocurrency to and from Gnosis Multi-Signature Wallets, externally owned wallets, Coinbase, Robinhood, and any other addresses, i.e. Uniswap, Matcha, OpenSea, etc, the appointment of the Authorized Member, and any of their affiliates, together (**"Service Providers"**), authorship of any documents, agreements, documents, the filing of the Guiding Principles, the registering of the DAO's EIN, the establishment of any affiliates (such as any for-profit entities), including DAOLABS, Inc., DAOLABS LLC, Movement DAO, Peace DAO, and Treasury, are hereby ratified.

**RESOLVED FURTHER:** That **Benjamin Reed** (**benreed.eth**) is appointed to serve as the DAO's **Authorized Member**, to serve until his respective successor is duly elected and qualified.

# Election of Additional Authorized Members and their Agents

**RESOLVED FURTHER:** That **Benjamin Reed** (**benreed.eth**), as well as any persons associated with the addresses below, are elected as **Authorized Members** and agents of the DAO, to serve until their respective successors are duly elected and qualified or until any such Member's earlier resignation or removal:

| Address |
| --- |
| 0x143cC0A996De329C1C5723Ee4F15D2a40c1203c6 |
| 0x752515a3a1091b9f1c04416cf79d1f14d2340085 |
| 0x5d95baebb8412ad827287240a5c281e3bb30d27e |
| 0xf8042c55fe4dff9df82c0f8435fbcdc32fe60a69 |
| 0xE41188926607921763D25392475f1156AC5f9033 |
| 0x468f178672C86bFA02e5E1B0413C3ccf55A37409 |
| 0x550bD0F03580B9a687931af4d837F8e45D61d410 |
| 0xDbE76F6ae97dFD5bdd1D7DAD8972740d18aB2b57 |
| 0x746cf650d4E5431474E8D4E2d5B6Bbe53772b498 |
| 0xD2427c0e44D28Ea74c0504E072c6073d135569B2 |
| 0x8C00f41676Ce4670ae9FcBBF297a24736dc23cc3 |

**RESOLVED FURTHER:** That the **Authorized Members** in consultation with the Service Provider or any legal counsel are authorized and directed to execute, verify, and file all documents, and to take

whatever actions, that are necessary or advisable to comply with all state and federal laws, or that are taken on behalf of the DAO or at the behest of other Members.

# Execution of Agreements Generally

**RESOLVED FURTHER:** That the Members determine that it is in the best interest of the DAO to enter into indemnification agreements, independent consulting agreements, innovations and assignments agreements, or a number of other agreements (including offer letters, employee nondisclosure and assignment agreements, confidentiality agreements, mutual confidentiality agreements, confidential materials release forms, and independent contractor services agreements) (together, "Agreements") with its current and future Service Providers, the **Authorized Members**, and agents in substantially in the form respectively attached hereto as Exhibits A, B, C, and D.

**RESOLVED FURTHER:** That the DAO is authorized to execute and deliver Agreements with each individual and with all future **Authorized Members** of the DAO.

**RESOLVED FURTHER:** That the **Authorized Members** are authorized to make modifications to such Agreements in order to comply with applicable law.

# Management of Fiscal Affairs Generally

**RESOLVED FURTHER:** That the **Service Providers** and **Authorized Members** (together **"Service Providers"**) are authorized to:

- designate one or more banks or similar financial institutions as depositories of the funds of the **DAO, DAOLABS, TREASURY, PEACE DAO, MOVEMENT DAO and/or any other DAO affiliates** (together the **"DAO Entities"**);
- open, maintain and close general and special accounts with any such depositories;
- cause to be deposited from time to time in such accounts, funds of the DAO into the DAO Entities as they deem necessary or advisable, and to designate, or to change or revoke the designation of, the officers or agents of the DAO Entities authorized to make such deposits and to endorse checks, drafts and other instruments for deposit;
- designate, or to change or revoke the designation of, the **Service Provider** or agents of the DAO Entities authorized to sign or countersign checks, drafts or other orders for the payment of money of the DAO Entities against any funds deposited in any of such accounts;

- authorize the use of facsimile signatures for the signing or countersigning of checks, drafts or other orders for the payment of money, and to enter into such agreements as banks and similar financial institutions customarily require as a condition for permitting the use of facsimile signatures; and

- make such general and special rules and regulations with respect to such accounts as they may deem necessary or advisable, and to complete, execute, and certify any customary printed blank signature card forms or online forms in order to exercise conveniently the authority granted by this resolution, and any resolutions printed on such cards or available in such online forms are deemed adopted as a part of this resolution.

**RESOLVED FURTHER:** That all form resolutions required by any such depository are adopted, and that the **Service Providers** and agents are authorized to certify such resolutions as having been adopted by this action by Member vote.

**RESOLVED FURTHER:** That any such depository to which a certified copy of these resolutions has been delivered by the **Authorized Member** is authorized and entitled to rely upon such resolutions for all purposes until it receives written notice of the revocation or amendment of these resolutions.

# Expenses Related to the Incorporation and its Organization

**RESOLVED FURTHER:** That the **Service Providers** are authorized to pay and reimburse the expenses of incorporation and organization of the DAO Entities, and their affiliate, including without limitation expenses incurred prior to the incorporation of the DAO Entities.

**RESOLVED FURTHER:** That the **Authorized Members** are authorized to determine whether to elect to apply Section 248(a) of the Internal Revenue Code with respect to any organizational expenditures.

# Withholding Taxes

**RESOLVED FURTHER:** That the **Service Providers** is authorized to consult with its bookkeepers, auditors and attorneys in order to be fully informed as to, and to collect and pay promptly when due, all withholding taxes for which the DAO Entities may now be (or hereafter become) liable.

# Accounting Year

**RESOLVED FURTHER:** That the accounting year of the Company will end on December 31st of each year.

# Qualifications to do Business

**RESOLVED FURTHER:** That the **Service Providers** are authorized to take any and all actions that they deem necessary or appropriate to qualify the DAO and its affiliate entities to do business as a foreign corporation in each state that the officers determine such a qualification to be necessary or appropriate.

# Employer Tax Identification Number

**RESOLVED FURTHER:** That the **Service Providers** are authorized to apply for a federal employer identification number on Form SS-4.

**RESOLVED FURTHER:** That the **Service Providers** are authorized to direct the responsible attorneys, paralegals and corporate assistants of dao-lawfirm.eth or counsel for the DAO, to submit on behalf of the DAO, an online application for a federal employer identification number on Form SS-4.

**RESOLVED FURTHER:** That the **Service Providers** are authorized to prepare an equity incentive plan and agreement for the appropriate DAO affiliate entities, DAOLABS, and to file the appropriate notices with the applicable state and federal securities authorities in connection with the issuance of options, at such time as such actions may be necessary or advisable in order to comply with applicable law.

# Omnibus Resolutions

**RESOLVED FURTHER:** That the **Service Providers** shall be, and hereby is, authorized and empowered to take any and all such further action, to execute and deliver any and all such further agreements, instruments, documents and certificates and to pay such expenses, in the name and on behalf of the DAO, any affiliate entities, or officer, as any such officer may deem necessary or advisable to effectuate the purposes and intent of the resolutions hereby adopted, the taking of such actions, the execution and delivery of such agreements, instruments, documents, and certificates. The payment of such expenses by any such officer or **Service Provider** shall be conclusive evidence of his or her authorization hereunder and the approval thereof.

**RESOLVED FURTHER:** That any and all actions taken by the **Service Providers** to carry out the purposes and intent of the foregoing resolutions prior to their adoption are approved, ratified and confirmed by the DAO Members by way of Snapshot.

# The Collective Snapshot Consent of the Members of the DAO or DAO Member Actions

This action by the DAO Members by Snapshot vote shall be effective as of the date the DAO receives the consent of the DAO at the end of the Snapshot vote. This action by the DAO Members consent may be executed in any number of counterparts, each of which shall constitute an original and all of which together shall constitute one action. Any copy, facsimile, Website, Ethereum blockchain signatures or other reliable verification and reproduction of this action by recorded and written consent may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used. This action by the DAO Members shall be recorded with the next Snapshot vote of the DAO.

## Authors

1. 0x30670D81E487c80b9EDc54370e6EaF943B6EAB39
2. 0x5d95baEBB8412AD827287240A5c281E3bB30d27E

🖉 Edit this page

# Snapshot Consent of the Members of the DAO

Authors: tankbottoms.eth, filipv.eth
Date: 2022-08-23

*DAO, an Unincorporated Nonprofit Association, a Delaware entity, and DAO-LABS, and other proposed DAO Entities*

## Definitions

**Snapshot** is a decentralized voting system which provides flexibility on voting power calculation, various voting types, the creation of proposals, and the off-chain verification of voters via the Ethereum blockchain, which enables easy to verify and hard to contest results enabling robust governance of unincorporated associations with large participation bases. Snapshot thereby enables diverse decentralized decision making, previously only possible through highly coordinated shareholder meetings, without any costs. The DAO and its affiliates entities use Snapshot in order to verify and calculate Membership consensus.

The undersigned, constituting the Members hereby adopt the following resolutions via Snapshot:

## Ratification of Actions of the Service Providers

**RESOLVED:** The **Service Providers**, as defined by the Guiding Principals § 16¶¶ (a)-(d); specifically as dao-lawfirm.eth, Attorney Reed Yurchak of the Law Offices of Reed Yurchak, and forensic blockchain engineer tankbottoms.eth. Every action that has been taken, authorized, unauthorized, and with respect to the DAO by the **Service Providers** including, but not limited to, the transfer of Cryptocurrency to and from Gnosis Multi-Signature Wallets, externally owned wallets, Coinbase, Robinhood, and any other addresses, i.e. Uniswap, Matcha, OpenSea, etc, the appointment of the Authorized Member, and any of their affiliates, together (**"Service Providers"**), authorship of any documents, agreements, documents, the filing of the Guiding Principles, the registering of the DAO's EIN, the establishment of any affiliates (such as any for-profit entities), including DAOLABS, Inc., DAOLABS LLC, Movement DAO, Peace DAO, and Treasury, are hereby ratified.

**RESOLVED FURTHER:** That **Benjamin Reed** (**benreed.eth**) is appointed to serve as the DAO's **Authorized Member**, to serve until his respective successor is duly elected and qualified.

## Election of Additional Authorized Members and their Agents

**RESOLVED FURTHER:** That **Benjamin Reed** (**benreed.eth**), as well as any persons associated with the addresses below, are elected as **Authorized Members** and agents of the DAO, to serve until their respective successors

are duly elected and qualified or until any such Member's earlier resignation or removal:

| Address |
| --- |
| 0x143cC0A996De329C1C5723Ee4F15D2a40c1203c6 |
| 0x752515a3a1091b9f1c04416cf79d1f14d2340085 |
| 0x5d95baebb8412ad827287240a5c281e3bb30d27e |
| 0xf8042c55fe4dff9df82c0f8435fbcdc32fe60a69 |
| 0xE41188926607921763D25392475f1156AC5f9033 |
| 0x468f178672C86bFA02e5E1B0413C3ccf55A37409 |
| 0x550bD0F03580B9a687931af4d837F8e45D61d410 |
| 0xDbE76F6ae97dFD5bdd1D7DAD8972740d18aB2b57 |
| 0x746cf650d4E5431474E8D4E2d5B6Bbe53772b498 |
| 0xD2427c0e44D28Ea74c0504E072c6073d135569B2 |
| 0x8C00f41676Ce4670ae9FcBBF297a24736dc23cc3 |

**RESOLVED FURTHER:** That the **Authorized Members** in consultation with the Service Provider or any legal counsel are authorized and directed to execute, verify, and file all documents, and to take whatever actions, that are necessary or advisable to comply with all state and federal laws, or that are taken on behalf of the DAO or at the behest of other Members.

## Execution of Agreements Generally

**RESOLVED FURTHER:** That the Members determine that it is in the best interest of the DAO to enter into indemnification agreements, independent consulting agreements, innovations and assignments agreements, or a number of other agreements (including offer letters, employee nondisclosure and assignment agreements, confidentiality agreements, mutual confidentiality agreements, confidential materials release forms, and independent contractor services agreements) (together, "Agreements") with its current and future Service Providers, the **Authorized Members**, and agents in substantially in the form respectively attached hereto as Exhibits A, B, C, and D.

**RESOLVED FURTHER:** That the DAO is authorized to execute and deliver Agreements with each individual and with all future **Authorized Members** of the DAO.

**RESOLVED FURTHER:** That the **Authorized Members** are authorized to make modifications to such Agreements in order to comply with applicable law.

## Management of Fiscal Affairs Generally

**RESOLVED FURTHER:** That the **Service Providers** and **Authorized Members** (together **"Service Providers"**) are authorized to:

2

- designate one or more banks or similar financial institutions as depositories of the funds of the **DAO, DAOLABS, TREASURY, PEACE DAO, MOVEMENT DAO and/or any other DAO affiliates** (together the **"DAO Entities"**);
- open, maintain and close general and special accounts with any such depositories;
- cause to be deposited from time to time in such accounts, funds of the DAO into the DAO Entities as they deem necessary or advisable, and to designate, or to change or revoke the designation of, the officers or agents of the DAO Entities authorized to make such deposits and to endorse checks, drafts and other instruments for deposit;
- designate, or to change or revoke the designation of, the **Service Provider** or agents of the DAO Entities authorized to sign or countersign checks, drafts or other orders for the payment of money of the DAO Entities against any funds deposited in any of such accounts;
- authorize the use of facsimile signatures for the signing or countersigning of checks, drafts or other orders for the payment of money, and to enter into such agreements as banks and similar financial institutions customarily require as a condition for permitting the use of facsimile signatures; and
- make such general and special rules and regulations with respect to such accounts as they may deem necessary or advisable, and to complete, execute, and certify any customary printed blank signature card forms or online forms in order to exercise conveniently the authority granted by this resolution, and any resolutions printed on such cards or available in such online forms are deemed adopted as a part of this resolution.

**RESOLVED FURTHER:** That all form resolutions required by any such depository are adopted, and that the **Service Providers** and agents are authorized to certify such resolutions as having been adopted by this action by Member vote.

**RESOLVED FURTHER:** That any such depository to which a certified copy of these resolutions has been delivered by the **Authorized Member** is authorized and entitled to rely upon such resolutions for all purposes until it receives written notice of the revocation or amendment of these resolutions.

## Expenses Related to the Incorporation and its Organization

**RESOLVED FURTHER:** That the **Service Providers** are authorized to pay and reimburse the expenses of incorporation and organization of the DAO Entities, and their affiliate, including without limitation expenses incurred prior to the incorporation of the DAO Entities.

**RESOLVED FURTHER:** That the **Authorized Members** are authorized to determine whether to elect to apply Section 248(a) of the Internal Revenue Code with respect to any organizational expenditures.

3

## Withholding Taxes

**RESOLVED FURTHER:** That the **Service Providers** is authorized to consult with its bookkeepers, auditors and attorneys in order to be fully informed as to, and to collect and pay promptly when due, all withholding taxes for which the DAO Entities may now be (or hereafter become) liable.

## Accounting Year

**RESOLVED FURTHER:** That the accounting year of the Company will end on December 31st of each year.

## Qualifications to do Business

**RESOLVED FURTHER:** That the **Service Providers** are authorized to take any and all actions that they deem necessary or appropriate to qualify the DAO and its affiliate entities to do business as a foreign corporation in each state that the officers determine such a qualification to be necessary or appropriate.

## Employer Tax Identification Number

**RESOLVED FURTHER:** That the **Service Providers** are authorized to apply for a federal employer identification number on Form SS-4.

**RESOLVED FURTHER:** That the **Service Providers** are authorized to direct the responsible attorneys, paralegals and corporate assistants of dao-lawfirm.eth or counsel for the DAO, to submit on behalf of the DAO, an online application for a federal employer identification number on Form SS-4.

**RESOLVED FURTHER:** That the **Service Providers** are authorized to prepare an equity incentive plan and agreement for the appropriate DAO affiliate entities, DAOLABS, and to file the appropriate notices with the applicable state and federal securities authorities in connection with the issuance of options, at such time as such actions may be necessary or advisable in order to comply with applicable law.

## Omnibus Resolutions

**RESOLVED FURTHER:** That the **Service Providers** shall be, and hereby is, authorized and empowered to take any and all such further action, to execute and deliver any and all such further agreements, instruments, documents and certificates and to pay such expenses, in the name and on behalf of the DAO, any affiliate entities, or officer, as any such officer may deem necessary or advisable to effectuate the purposes and intent of the resolutions hereby adopted, the taking of such actions, the execution and delivery of such agreements, instruments, documents, and certificates. The payment of such expenses by any such officer or **Service Provider** shall be conclusive evidence of his or her authorization hereunder and the approval thereof.

4

**RESOLVED FURTHER:** That any and all actions taken by the **Service Providers** to carry out the purposes and intent of the foregoing resolutions prior to their adoption are approved, ratified and confirmed by the DAO Members by way of Snapshot.

## The Collective Snapshot Consent of the Members of the DAO or DAO Member Actions

This action by the DAO Members by Snapshot vote shall be effective as of the date the DAO receives the consent of the DAO at the end of the Snapshot vote. This action by the DAO Members consent may be executed in any number of counterparts, each of which shall constitute an original and all of which together shall constitute one action. Any copy, facsimile, Website, Ethereum blockchain signatures or other reliable verification and reproduction of this action by recorded and written consent may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used. This action by the DAO Members shall be recorded with the next Snapshot vote of the DAO.

---

**Authors**

1. 0x30670D81E487c80b9EDc54370e6EaF943B6EAB39
2. 0x5d95baEBB8412AD827287240A5c281E3bB30d27E

# Exhibit A

## DAOLABS, INC.
## INDEMNIFICATION AGREEMENT

This Indemnification Agreement (this "***Agreement***") is dated as of_____, 2022, and is between DAOLABS IP, INC., a Washington corporation (the "***Company***"), and _____ ("***Indemnitee***").

## RECITALS

A.      Indemnitee's service to the Company substantially benefits the Company.

B.      Individuals are reluctant to serve as directors or officers of corporations or in certain other capacities unless they are provided with adequate protection through insurance or indemnification against the risks of claims and actions against them arising out of such service.

C.      Indemnitee does not regard the protection currently provided by applicable law, the Company's governing documents and any insurance as adequate under the present circumstances, and Indemnitee may not be willing to serve as a director or officer without additional protection.

D.      In order to induce Indemnitee to continue to provide services to the Company, it is reasonable, prudent and necessary for the Company to contractually obligate itself to indemnify, and to advance expenses on behalf of, Indemnitee as permitted by applicable law.

E.      This Agreement is a supplement to and in furtherance of the indemnification provided in the Company's certificate of incorporation and bylaws, and any resolutions adopted pursuant thereto, and this Agreement shall not be deemed a substitute therefor, nor shall this Agreement be deemed to limit, diminish or abrogate any rights of Indemnitee thereunder.

The parties therefore agree as follows:

1.      **Definitions.**

(a)      A "***Change in Control***" shall be deemed to occur upon the earliest to occur after the date of this Agreement of any of the following events:

(i)      *Acquisition of Stock by Third Party.* Any Person (as defined below) is or becomes the Beneficial Owner (as defined below), directly or indirectly, of securities of the Company representing fifteen percent (15%) or more of the combined voting power of the Company's then outstanding securities;

(ii)      *Change in Board Composition.* During any period of two consecutive years (not including any period prior to the execution of this Agreement), individuals who at the beginning of such period constitute the Company's board of directors, and any new directors (other than a director designated by a person who has entered into an agreement with the Company to effect a transaction described in Sections 1(a)(i), 1(a)(iii) or 1(a)(iv)) whose election by the board of directors or nomination for election by the Company's stockholders was approved by a vote of at least two-thirds of the directors then still in office who either were directors at the beginning of the period or whose election or nomination for election was previously so approved, cease for any reason to constitute at least a majority of the members of the Company's board of directors;

(iii)      *Corporate Transactions.* The effective date of a merger or consolidation of the Company with any other entity, other than a merger or consolidation which would result in the voting securities of the Company outstanding immediately prior to such merger or consolidation continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity) more than 50% of the combined voting power of the voting securities of the surviving entity outstanding immediately after such merger or consolidation and with the power to elect at least a majority of the board of directors or other governing body of such surviving entity;

(iv)     *Liquidation.* The approval by the stockholders of the Company of a complete liquidation of the Company or an agreement for the sale or disposition by the Company of all or substantially all of the Company's assets; and

(v)     *Other Events.* Any other event of a nature that would be required to be reported in response to Item 6(e) of Schedule 14A of Regulation 14A (or in response to any similar item on any similar schedule or form) promulgated under the Securities Exchange Act of 1934, as amended, whether or not the Company is then subject to such reporting requirement.

For purposes of this Section 1(a), the following terms shall have the following meanings:

(1)     "***Person***" shall have the meaning as set forth in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended; *provided, however,* that "***Person***" shall exclude (i) the Company, (ii) any trustee or other fiduciary holding securities under an employee benefit plan of the Company, and (iii) any corporation owned, directly or indirectly, by the stockholders of the Company in substantially the same proportions as their ownership of stock of the Company.

(2)     "***Beneficial Owner***" shall have the meaning given to such term in Rule 13d-3 under the Securities Exchange Act of 1934, as amended; *provided, however,* that "***Beneficial Owner***" shall exclude any Person otherwise becoming a Beneficial Owner by reason of (i) the stockholders of the Company approving a merger of the Company with another entity or (ii) the Company's board of directors approving a sale of securities by the Company to such Person.

(b)     "***Corporate Status***" describes the status of a person who is or was a director, trustee, general partner, managing member, officer, employee, agent or fiduciary of the Company or any other Enterprise.

(c)     "***DGCL***" means the General Corporation Law of the State of Washington.

(d)     "***Disinterested Director***" means a director of the Company who is not and was not a party to the Proceeding in respect of which indemnification is sought by Indemnitee.

(e)     "***Enterprise***" means the Company and any other corporation, partnership, limited liability company, joint venture, trust, employee benefit plan or other enterprise of which Indemnitee is or was serving at the request of the Company as a director, trustee, general partner, managing member, officer, employee, agent or fiduciary.

(f)     "***Expenses***" include all reasonable attorneys' fees, retainers, court costs, transcript costs, fees and costs of experts, witness fees, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees, and all other disbursements or expenses of the types customarily incurred in connection with prosecuting, defending, preparing to prosecute or defend, investigating, being or preparing to be a witness in, or otherwise participating in, a Proceeding. Expenses also include (i) Expenses incurred in connection with any appeal resulting from any Proceeding, including without limitation the premium, security for, and other costs relating to any cost bond, supersedeas bond or other appeal bond or their equivalent, and (ii) for purposes of Section 12(d), Expenses incurred by Indemnitee in connection with the interpretation, enforcement or defense of Indemnitee's rights under this Agreement or under any directors' and officers' liability insurance policies maintained by the Company. Expenses, however, shall not include amounts paid in settlement by Indemnitee or the amount of judgments or fines against Indemnitee.

(g)     "***Independent Counsel***" means a law firm, or a partner or member of a law firm, that is experienced in matters of corporation law and neither presently is, nor in the past five years has been, retained to represent (i) the Company or Indemnitee in any matter material to either such party (other than as Independent Counsel with respect to matters concerning Indemnitee under this Agreement, or other indemnitees under similar indemnification agreements), or (ii) any other party to the Proceeding giving rise to a claim for indemnification hereunder. Notwithstanding the foregoing, the term "***Independent Counsel***" shall not include any person who,

2

under the applicable standards of professional conduct then prevailing, would have a conflict of interest in representing either the Company or Indemnitee in an action to determine Indemnitee's rights under this Agreement.

(h)      "***Proceeding***" means any threatened, pending or completed action, suit, arbitration, mediation, alternate dispute resolution mechanism, investigation, inquiry, administrative hearing or proceeding, whether brought in the right of the Company or otherwise and whether of a civil, criminal, administrative or investigative nature, including any appeal therefrom and including without limitation any such Proceeding pending as of the date of this Agreement, in which Indemnitee was, is or will be involved as a party, a potential party, a non-party witness or otherwise by reason of (i) the fact that Indemnitee is or was a director or officer of the Company, (ii) any action taken by Indemnitee or any action or inaction on Indemnitee's part while acting as a director or officer of the Company, or (iii) the fact that he or she is or was serving at the request of the Company as a director, trustee, general partner, managing member, officer, employee, agent or fiduciary of the Company or any other Enterprise, in each case whether or not serving in such capacity at the time any liability or Expense is incurred for which indemnification or advancement of expenses can be provided under this Agreement.

(i)      Reference to "***other enterprises***" shall include employee benefit plans; references to "***fines***" shall include any excise taxes assessed on a person with respect to any employee benefit plan; references to "***serving at the request of the Company***" shall include any service as a director, officer, employee or agent of the Company which imposes duties on, or involves services by, such director, officer, employee or agent with respect to an employee benefit plan, its participants or beneficiaries; and a person who acted in good faith and in a manner he or she reasonably believed to be in the best interests of the participants and beneficiaries of an employee benefit plan shall be deemed to have acted in a manner "***not opposed to the best interests of the Company***" as referred to in this Agreement.

2.      **Indemnity in Third-Party Proceedings.** The Company shall indemnify Indemnitee in accordance with the provisions of this Section 2 if Indemnitee is, or is threatened to be made, a party to or a participant in any Proceeding, other than a Proceeding by or in the right of the Company to procure a judgment in its favor. Pursuant to this Section 2, Indemnitee shall be indemnified to the fullest extent permitted by applicable law against all Expenses, judgments, fines and amounts paid in settlement actually and reasonably incurred by Indemnitee or on his or her behalf in connection with such Proceeding or any claim, issue or matter therein, if Indemnitee acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the Company and, with respect to any criminal action or proceeding, had no reasonable cause to believe that his or her conduct was unlawful.

3.      **Indemnity in Proceedings by or in the Right of the Company.** The Company shall indemnify Indemnitee in accordance with the provisions of this Section 3 if Indemnitee is, or is threatened to be made, a party to or a participant in any Proceeding by or in the right of the Company to procure a judgment in its favor. Pursuant to this Section 3, Indemnitee shall be indemnified to the fullest extent permitted by applicable law against all Expenses actually and reasonably incurred by Indemnitee or on Indemnitee's behalf in connection with such Proceeding or any claim, issue or matter therein, if Indemnitee acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the Company. No indemnification for Expenses shall be made under this Section 3 in respect of any claim, issue or matter as to which Indemnitee shall have been adjudged by a court of competent jurisdiction to be liable to the Company, unless and only to the extent that the Washington Court of Chancery or any court in which the Proceeding was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, Indemnitee is fairly and reasonably entitled to indemnification for such expenses as the Washington Court of Chancery or such other court shall deem proper.

4.      **Indemnification for Expenses of a Party Who is Wholly or Partly Successful.** To the extent that Indemnitee is a party to or a participant in and is successful (on the merits or otherwise) in defense of any Proceeding or any claim, issue or matter therein, the Company shall indemnify Indemnitee against all Expenses actually and reasonably incurred by Indemnitee or on Indemnitee's behalf in connection therewith. To the extent permitted by applicable law, if Indemnitee is not wholly successful in such Proceeding but is successful, on the merits or otherwise, in defense of one or more but less than all claims, issues or matters in such Proceeding, the Company shall indemnify Indemnitee against all Expenses actually and reasonably incurred by Indemnitee or on

Indemnitee's behalf in connection with (a) each successfully resolved claim, issue or matter and (b) any claim, issue or matter related to any such successfully resolved claim, issuer or matter. For purposes of this section, the termination of any claim, issue or matter in such a Proceeding by dismissal, with or without prejudice, shall be deemed to be a successful result as to such claim, issue or matter.

5.      **Indemnification for Expenses of a Witness.** To the extent that Indemnitee is, by reason of his or her Corporate Status, a witness in any Proceeding to which Indemnitee is not a party, Indemnitee shall be indemnified to the extent permitted by applicable law against all Expenses actually and reasonably incurred by Indemnitee or on Indemnitee's behalf in connection therewith.

6.      **Additional Indemnification.**

        (a)      Notwithstanding any limitation in Sections 2, 3 or 4, the Company shall indemnify Indemnitee to the fullest extent permitted by applicable law if Indemnitee is, or is threatened to be made, a party to or a participant in any Proceeding (including a Proceeding by or in the right of the Company to procure a judgment in its favor) against all Expenses, judgments, fines and amounts paid in settlement actually and reasonably incurred by Indemnitee or on his or her behalf in connection with the Proceeding or any claim, issue or matter therein.

        (b)      For purposes of Section 6(a), the meaning of the phrase "***to the fullest extent permitted by applicable law***" shall include, but not be limited to:

            (i)      the fullest extent permitted by the provision of the DGCL that authorizes or contemplates additional indemnification by agreement, or the corresponding provision of any amendment to or replacement of the DGCL; and

            (ii)      the fullest extent authorized or permitted by any amendments to or replacements of the DGCL adopted after the date of this Agreement that increase the extent to which a corporation may indemnify its officers and directors.

7.      **Exclusions.** Notwithstanding any provision in this Agreement, the Company shall not be obligated under this Agreement to make any indemnity in connection with any Proceeding (or any part of any Proceeding):

        (a)      for which payment has actually been made to or on behalf of Indemnitee under any statute, insurance policy, indemnity provision, vote or otherwise, except with respect to any excess beyond the amount paid;

        (b)      for an accounting or disgorgement of profits pursuant to Section 16(b) of the Securities Exchange Act of 1934, as amended, or similar provisions of federal, state or local statutory law or common law, if Indemnitee is held liable therefor (including pursuant to any settlement arrangements);

        (c)      for any reimbursement of the Company by Indemnitee of any bonus or other incentive-based or equity-based compensation or of any profits realized by Indemnitee from the sale of securities of the Company, as required in each case under the Securities Exchange Act of 1934, as amended (including any such reimbursements that arise from an accounting restatement of the Company pursuant to Section 304 of the Sarbanes-Oxley Act of 2002 (the "***Sarbanes-Oxley Act***"), or the payment to the Company of profits arising from the purchase and sale by Indemnitee of securities in violation of Section 306 of the Sarbanes-Oxley Act), if Indemnitee is held liable therefor (including pursuant to any settlement arrangements);

        (d)      initiated by Indemnitee, including any Proceeding (or any part of any Proceeding) initiated by Indemnitee against the Company or its directors, officers, employees, agents or other indemnitees, unless (i) the Company's board of directors authorized the Proceeding (or the relevant part of the Proceeding) prior to its initiation, (ii) the Company provides the indemnification, in its sole discretion, pursuant to the powers vested in the Company under applicable law, (iii) otherwise authorized in Section 12(d) or (iv) otherwise required by applicable law; or

        (e)      if prohibited by applicable law.

4

8.      **Advances of Expenses.** The Company shall advance the Expenses incurred by Indemnitee in connection with any Proceeding, and such advancement shall be made as soon as reasonably practicable, but in any event no later than 60 days, after the receipt by the Company of a written statement or statements requesting such advances from time to time (which shall include invoices received by Indemnitee in connection with such Expenses but, in the case of invoices in connection with legal services, any references to legal work performed or to expenditure made that would cause Indemnitee to waive any privilege accorded by applicable law shall not be included with the invoice). Advances shall be unsecured and interest free and made without regard to Indemnitee's ability to repay such advances. Indemnitee hereby undertakes to repay any advance to the extent that it is ultimately determined that Indemnitee is not entitled to be indemnified by the Company. This Section 8 shall not apply to the extent advancement is prohibited by law and shall not apply to any Proceeding for which indemnity is not permitted under this Agreement, but shall apply to any Proceeding referenced in Section 7(b) or 7(c) prior to a determination that Indemnitee is not entitled to be indemnified by the Company.

9.      **Procedures for Notification and Defense of Claim.**

(a)      Indemnitee shall notify the Company in writing of any matter with respect to which Indemnitee intends to seek indemnification or advancement of Expenses as soon as reasonably practicable following the receipt by Indemnitee of notice thereof. The written notification to the Company shall include, in reasonable detail, a description of the nature of the Proceeding and the facts underlying the Proceeding. The failure by Indemnitee to notify the Company will not relieve the Company from any liability which it may have to Indemnitee hereunder or otherwise than under this Agreement, and any delay in so notifying the Company shall not constitute a waiver by Indemnitee of any rights, except to the extent that such failure or delay materially prejudices the Company.

(b)      If, at the time of the receipt of a notice of a Proceeding pursuant to the terms hereof, the Company has directors' and officers' liability insurance in effect, the Company shall give prompt notice of the commencement of the Proceeding to the insurers in accordance with the procedures set forth in the applicable policies. The Company shall thereafter take all commercially-reasonable action to cause such insurers to pay, on behalf of Indemnitee, all amounts payable as a result of such Proceeding in accordance with the terms of such policies.

(c)      In the event the Company may be obligated to make any indemnity in connection with a Proceeding, the Company shall be entitled to assume the defense of such Proceeding with counsel approved by Indemnitee, which approval shall not be unreasonably withheld, upon the delivery to Indemnitee of written notice of its election to do so. After delivery of such notice, approval of such counsel by Indemnitee and the retention of such counsel by the Company, the Company will not be liable to Indemnitee for any fees or expenses of counsel subsequently incurred by Indemnitee with respect to the same Proceeding. Notwithstanding the Company's assumption of the defense of any such Proceeding, the Company shall be obligated to pay the fees and expenses of Indemnitee's counsel to the extent (i) the employment of counsel by Indemnitee is authorized by the Company, (ii) counsel for the Company or Indemnitee shall have reasonably concluded that there is a conflict of interest between the Company and Indemnitee in the conduct of any such defense such that Indemnitee needs to be separately represented, (iii) the fees and expenses are non-duplicative and reasonably incurred in connection with Indemnitee's role in the Proceeding despite the Company's assumption of the defense, (iv) the Company is not financially or legally able to perform its indemnification obligations or (v) the Company shall not have retained, or shall not continue to retain, such counsel to defend such Proceeding. The Company shall have the right to conduct such defense as it sees fit in its sole discretion. Regardless of any provision in this Agreement, Indemnitee shall have the right to employ counsel in any Proceeding at Indemnitee's personal expense. The Company shall not be entitled, without the consent of Indemnitee, to assume the defense of any claim brought by or in the right of the Company. *or* The Company shall be entitled to participate in the Proceeding at its own expense. Indemnitee agrees to consult with the Company and to consider in good faith the advisability and appropriateness of joint representation in the event that either the Company or other indemnitees in addition to Indemnitee require representation in connection with any Proceeding.

(d)      Indemnitee shall give the Company such information and cooperation in connection with the Proceeding as may be reasonably appropriate.

(e)     The Company shall not be liable to indemnify Indemnitee for any settlement of any Proceeding (or any part thereof) without the Company's prior written consent, which shall not be unreasonably withheld.

(f)     The Company shall have the right to settle any Proceeding (or any part thereof) without the consent of Indemnitee.

10.     **Procedures upon Application for Indemnification.**

(a)     To obtain indemnification, Indemnitee shall submit to the Company a written request, including therein or therewith such documentation and information as is reasonably available to Indemnitee and as is reasonably necessary to determine whether and to what extent Indemnitee is entitled to indemnification following the final disposition of the Proceeding. The Company shall, as soon as reasonably practicable after receipt of such a request for indemnification, advise the board of directors that Indemnitee has requested indemnification. Any delay in providing the request will not relieve the Company from its obligations under this Agreement, except to the extent such failure is prejudicial.

(b)     Upon written request by Indemnitee for indemnification pursuant to Section 10(a), a determination, if required by applicable law, with respect to Indemnitee's entitlement thereto shall be made in the specific case (i) if a Change in Control shall have occurred, by Independent Counsel in a written opinion to the Company's board of directors, a copy of which shall be delivered to Indemnitee or (ii) if a Change in Control shall not have occurred, (A) by a majority vote of the Disinterested Directors, even though less than a quorum of the Company's board of directors, (B) by a committee of Disinterested Directors designated by a majority vote of the Disinterested Directors, even though less than a quorum of the Company's board of directors, (C) if there are no such Disinterested Directors or, if such Disinterested Directors so direct, by Independent Counsel in a written opinion to the Company's board of directors, a copy of which shall be delivered to Indemnitee or (D) if so directed by the Company's board of directors, by the stockholders of the Company. If it is so determined that Indemnitee is entitled to indemnification, payment to Indemnitee shall be made within ten days after such determination. Indemnitee shall cooperate with the person, persons or entity making the determination with respect to Indemnitee's entitlement to indemnification, including providing to such person, persons or entity upon reasonable advance request any documentation or information that is not privileged or otherwise protected from disclosure and that is reasonably available to Indemnitee and reasonably necessary to such determination. Any costs or expenses (including attorneys' fees and disbursements) reasonably incurred by Indemnitee in so cooperating with the person, persons or entity making such determination shall be borne by the Company, to the extent permitted by applicable law.

(c)     In the event the determination of entitlement to indemnification is to be made by Independent Counsel pursuant to Section 10(b), the Independent Counsel shall be selected as provided in this Section 10(c). If a Change in Control shall not have occurred, the Independent Counsel shall be selected by the Company's board of directors, and the Company shall give written notice to Indemnitee advising him or her of the identity of the Independent Counsel so selected. If a Change in Control shall have occurred, the Independent Counsel shall be selected by Indemnitee (unless Indemnitee shall request that such selection be made by the Company's board of directors, in which event the preceding sentence shall apply), and Indemnitee shall give written notice to the Company advising it of the identity of the Independent Counsel so selected. In either event, Indemnitee or the Company, as the case may be, may, within ten days after such written notice of selection shall have been given, deliver to the Company or to Indemnitee, as the case may be, a written objection to such selection; *provided*, *however*, that such objection may be asserted only on the ground that the Independent Counsel so selected does not meet the requirements of "Independent Counsel" as defined in Section 1 of this Agreement, and the objection shall set forth with particularity the factual basis of such assertion. Absent a proper and timely objection, the person so selected shall act as Independent Counsel. If such written objection is so made and substantiated, the Independent Counsel so selected may not serve as Independent Counsel unless and until such objection is withdrawn or a court has determined that such objection is without merit. If, within 20 days after the later of (i) submission by Indemnitee of a written request for indemnification pursuant to Section 10(a) hereof and (ii) the final disposition of the Proceeding, the parties have not agreed upon an Independent Counsel, either the Company or Indemnitee may petition a court of competent jurisdiction for resolution of any objection which shall have been made by the

6

Company or Indemnitee to the other's selection of Independent Counsel and for the appointment as Independent Counsel of a person selected by the court or by such other person as the court shall designate, and the person with respect to whom all objections are so resolved or the person so appointed shall act as Independent Counsel under Section 10(b) hereof. Upon the due commencement of any judicial proceeding or arbitration pursuant to Section 12(a) of this Agreement, the Independent Counsel shall be discharged and relieved of any further responsibility in such capacity (subject to the applicable standards of professional conduct then prevailing).

(d)     The Company agrees to pay the reasonable fees and expenses of any Independent Counsel and to fully indemnify such counsel against any and all Expenses, claims, liabilities and damages arising out of or relating to this Agreement or its engagement pursuant hereto.

11.     **Presumptions and Effect of Certain Proceedings.**

(a)     In making a determination with respect to entitlement to indemnification hereunder, the person, persons or entity making such determination shall, to the fullest extent not prohibited by law, presume that Indemnitee is entitled to indemnification under this Agreement if Indemnitee has submitted a request for indemnification in accordance with Section 10(a) of this Agreement, and the Company shall, to the fullest extent not prohibited by law, have the burden of proof to overcome that presumption in connection with the making by such person, persons or entity of any determination contrary to that presumption.

(b)     The termination of any Proceeding or of any claim, issue or matter therein, by judgment, order, settlement or conviction, or upon a plea of *nolo contendere* or its equivalent, shall not (except as otherwise expressly provided in this Agreement) of itself adversely affect the right of Indemnitee to indemnification or create a presumption that Indemnitee did not act in good faith and in a manner which he or she reasonably believed to be in or not opposed to the best interests of the Company or, with respect to any criminal Proceeding, that Indemnitee had reasonable cause to believe that his or her conduct was unlawful.

(c)     For purposes of any determination of good faith, Indemnitee shall be deemed to have acted in good faith to the extent Indemnitee relied in good faith on (i) the records or books of account of the Enterprise, including financial statements, (ii) information supplied to Indemnitee by the officers of the Enterprise in the course of their duties, (iii) the advice of legal counsel for the Enterprise or its board of directors or counsel selected by any committee of the board of directors or (iv) information or records given or reports made to the Enterprise by an independent certified public accountant, an appraiser, investment banker or other expert selected with reasonable care by the Enterprise or its board of directors or any committee of the board of directors. The provisions of this Section 11(c) shall not be deemed to be exclusive or to limit in any way the other circumstances in which Indemnitee may be deemed to have met the applicable standard of conduct set forth in this Agreement.

(d)     Neither the knowledge, actions nor failure to act of any other director, officer, agent or employee of the Enterprise shall be imputed to Indemnitee for purposes of determining the right to indemnification under this Agreement.

12.     **Remedies of Indemnitee.**

(a)     Subject to Section 12(e), in the event that (i) a determination is made pursuant to Section 10 of this Agreement that Indemnitee is not entitled to indemnification under this Agreement, (ii) advancement of Expenses is not timely made pursuant to Section 8 or 12(d) of this Agreement, (iii) no determination of entitlement to indemnification shall have been made pursuant to Section 10 of this Agreement within 90 days after the later of the receipt by the Company of the request for indemnification or the final disposition of the Proceeding, (iv) payment of indemnification pursuant to this Agreement is not made (A) within ten days after a determination has been made that Indemnitee is entitled to indemnification or (B) with respect to indemnification pursuant to Sections 4, 5 and 12(d) of this Agreement, within 30 days after receipt by the Company of a written request therefor, or (v) the Company or any other person or entity takes or threatens to take any action to declare this Agreement void or unenforceable, or institutes any litigation or other action or proceeding designed to deny, or to recover from, Indemnitee the benefits provided or intended to be provided to Indemnitee hereunder, Indemnitee shall be entitled to an adjudication by a court of competent jurisdiction of his or her entitlement to such indemnification or

advancement of Expenses. Alternatively, Indemnitee, at his or her option, may seek an award in arbitration with respect to his or her entitlement to such indemnification or advancement of Expenses, to be conducted by a single arbitrator pursuant to the Commercial Arbitration Rules of the American Arbitration Association. Indemnitee shall commence such proceeding seeking an adjudication or an award in arbitration within 180 days following the date on which Indemnitee first has the right to commence such proceeding pursuant to this Section 12(a); *provided, however,* that the foregoing clause shall not apply in respect of a proceeding brought by Indemnitee to enforce his or her rights under Section 4 of this Agreement. The Company shall not oppose Indemnitee's right to seek any such adjudication or award in arbitration in accordance with this Agreement.

(b)      Neither (i) the failure of the Company, its board of directors, any committee or subgroup of the board of directors, Independent Counsel or stockholders to have made a determination that indemnification of Indemnitee is proper in the circumstances because Indemnitee has met the applicable standard of conduct, nor (ii) an actual determination by the Company, its board of directors, any committee or subgroup of the board of directors, Independent Counsel or stockholders that Indemnitee has not met the applicable standard of conduct, shall be a defense to the action or create a presumption that Indemnitee has or has not met the applicable standard of conduct. In the event that a determination shall have been made pursuant to Section 10 of this Agreement that Indemnitee is not entitled to indemnification, any judicial proceeding or arbitration commenced pursuant to this Section 12 shall be conducted in all respects as a *de novo* trial, or arbitration, on the merits, and Indemnitee shall not be prejudiced by reason of that adverse determination. In any judicial proceeding or arbitration commenced pursuant to this Section 12, the Company shall, to the fullest extent not prohibited by law, have the burden of proving Indemnitee is not entitled to indemnification or advancement of Expenses, as the case may be.

(c)      To the fullest extent not prohibited by law, the Company shall be precluded from asserting in any judicial proceeding or arbitration commenced pursuant to this Section 12 that the procedures and presumptions of this Agreement are not valid, binding and enforceable and shall stipulate in any such court or before any such arbitrator that the Company is bound by all the provisions of this Agreement. If a determination shall have been made pursuant to Section 10 of this Agreement that Indemnitee is entitled to indemnification, the Company shall be bound by such determination in any judicial proceeding or arbitration commenced pursuant to this Section 12, absent (i) a misstatement by Indemnitee of a material fact, or an omission of a material fact necessary to make Indemnitee's statements not materially misleading, in connection with the request for indemnification, or (ii) a prohibition of such indemnification under applicable law.

(d)      To the extent not prohibited by law, the Company shall indemnify Indemnitee against all Expenses that are incurred by Indemnitee in connection with any action for indemnification or advancement of Expenses from the Company under this Agreement or under any directors' and officers' liability insurance policies maintained by the Company to the extent Indemnitee is successful in such action, and, if requested by Indemnitee, shall (as soon as reasonably practicable, but in any event no later than 60 days, after receipt by the Company of a written request therefor) advance such Expenses to Indemnitee, subject to the provisions of Section 8.

(e)      Notwithstanding anything in this Agreement to the contrary, no determination as to entitlement to indemnification shall be required to be made prior to the final disposition of the Proceeding.

13.      **Contribution.** To the fullest extent permissible under applicable law, if the indemnification provided for in this Agreement is unavailable to Indemnitee, the Company, in lieu of indemnifying Indemnitee, shall contribute to the amounts incurred by Indemnitee, whether for Expenses, judgments, fines or amounts paid or to be paid in settlement, in connection with any claim relating to an indemnifiable event under this Agreement, in such proportion as is deemed fair and reasonable in light of all of the circumstances of such Proceeding in order to reflect (i) the relative benefits received by the Company and Indemnitee as a result of the events and transactions giving rise to such Proceeding; and (ii) the relative fault of Indemnitee and the Company (and its other directors, officers, employees and agents) in connection with such events and transactions.

14.      **Non-exclusivity.** The rights of indemnification and to receive advancement of Expenses as provided by this Agreement shall not be deemed exclusive of any other rights to which Indemnitee may at any time be entitled under applicable law, the Company's certificate of incorporation or bylaws, any agreement, a vote of stockholders or a resolution of directors, or otherwise. To the extent that a change in Washington law, whether by

statute or judicial decision, permits greater indemnification or advancement of Expenses than would be afforded currently under the Company's certificate of incorporation and bylaws and this Agreement, it is the intent of the parties hereto that Indemnitee shall enjoy by this Agreement the greater benefits so afforded by such change, subject to the restrictions expressly set forth herein or therein. Except as expressly set forth herein, no right or remedy herein conferred is intended to be exclusive of any other right or remedy, and every other right and remedy shall be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise. Except as expressly set forth herein, the assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other right or remedy.

15.     **Primary Responsibility.** The Company acknowledges that Indemnitee has certain rights to indemnification and advancement of expenses provided by *insert name of fund* and certain affiliates thereof (collectively, the "***Secondary Indemnitor***"). The Company agrees that, as between the Company and the Secondary Indemnitor, the Company is primarily responsible for amounts required to be indemnified or advanced under the Company's certificate of incorporation or bylaws or this Agreement and any obligation of the Secondary Indemnitors to provide indemnification or advancement for the same amounts is secondary to those Company obligations. To the extent not in contravention of any insurance policy or policies providing liability or other insurance for the Company or any director, trustee, general partner, managing member, officer, employee, agent or fiduciary of the Company or any other Enterprise, the Company waives any right of contribution or subrogation against the Secondary Indemnitor with respect to the liabilities for which the Company is primarily responsible under this Section 15. In the event of any payment by the Secondary Indemnitor of amounts otherwise required to be indemnified or advanced by the Company under the Company's certificate of incorporation or bylaws or this Agreement, the Secondary Indemnitor shall be subrogated to the extent of such payment to all of the rights of recovery of Indemnitee for indemnification or advancement of expenses under the Company's certificate of incorporation or bylaws or this Agreement or, to the extent such subrogation is unavailable and contribution is found to be the applicable remedy, shall have a right of contribution with respect to the amounts paid. The Secondary Indemnitor are is an express third-party beneficiary of the terms of this Section 15.

16.     **No Duplication of Payments.** The Company shall not be liable under this Agreement to make any payment of amounts otherwise indemnifiable hereunder (or for which advancement is provided hereunder) if and to the extent that Indemnitee has otherwise actually received payment for such amounts under any insurance policy, contract, agreement or otherwise.

17.     **Insurance.** To the extent that the Company maintains an insurance policy or policies providing liability insurance for directors, trustees, general partners, managing members, officers, employees, agents or fiduciaries of the Company or any other Enterprise, Indemnitee shall be covered by such policy or policies to the same extent as the most favorably-insured persons under such policy or policies in a comparable position.

18.     **Subrogation.** In the event of any payment under this Agreement, the Company shall be subrogated to the extent of such payment to all of the rights of recovery of Indemnitee, who shall execute all papers required and take all action necessary to secure such rights, including execution of such documents as are necessary to enable the Company to bring suit to enforce such rights.

19.     **Services to the Company.** Indemnitee agrees to serve as a director or officer of the Company or, at the request of the Company, as a director, trustee, general partner, managing member, officer, employee, agent or fiduciary of another Enterprise, for so long as Indemnitee is duly elected or appointed or until Indemnitee tenders his or her resignation or is removed from such position. Indemnitee may at any time and for any reason resign from such position (subject to any other contractual obligation or any obligation imposed by operation of law), in which event the Company shall have no obligation under this Agreement to continue Indemnitee in such position. This Agreement shall not be deemed an employment contract between the Company (or any of its subsidiaries or any Enterprise) and Indemnitee. Indemnitee specifically acknowledges that any employment with the Company (or any of its subsidiaries or any Enterprise) is at will, and Indemnitee may be discharged at any time for any reason, with or without cause, with or without notice, except as may be otherwise expressly provided in any executed, written employment contract between Indemnitee and the Company (or any of its subsidiaries or any Enterprise), any existing formal severance policies adopted by the Company's board of directors or, with respect to service as a

9

director or officer of the Company, the Company's certificate of incorporation or bylaws or the DGCL. No such document shall be subject to any oral modification thereof.

20.    **Duration.** This Agreement shall continue until and terminate upon the later of (a) ten years after the date that Indemnitee shall have ceased to serve as a director or officer of the Company or as a director, trustee, general partner, managing member, officer, employee, agent or fiduciary of any other Enterprise, as applicable; or (b) one year after the final termination of any Proceeding, including any appeal, then pending in respect of which Indemnitee is granted rights of indemnification or advancement of Expenses hereunder and of any proceeding commenced by Indemnitee pursuant to Section 12 of this Agreement relating thereto.

21.    **Successors.** This Agreement shall be binding upon the Company and its successors and assigns, including any direct or indirect successor by purchase, merger, consolidation or otherwise to all or substantially all of the business or assets of the Company, and shall inure to the benefit of Indemnitee and Indemnitee's heirs, executors and administrators. The Company shall require and cause any successor (whether direct or indirect by purchase, merger, consolidation or otherwise) to all or substantially all of the business or assets of the Company, by written agreement, expressly to assume and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform if no such succession had taken place.

22.    **Severability.** Nothing in this Agreement is intended to require or shall be construed as requiring the Company to do or fail to do any act in violation of applicable law. The Company's inability, pursuant to court order or other applicable law, to perform its obligations under this Agreement shall not constitute a breach of this Agreement. If any provision or provisions of this Agreement shall be held to be invalid, illegal or unenforceable for any reason whatsoever: (i) the validity, legality and enforceability of the remaining provisions of this Agreement (including without limitation, each portion of any section of this Agreement containing any such provision held to be invalid, illegal or unenforceable, that is not itself invalid, illegal or unenforceable) shall not in any way be affected or impaired thereby and shall remain enforceable to the fullest extent permitted by law; (ii) such provision or provisions shall be deemed reformed to the extent necessary to conform to applicable law and to give the maximum effect to the intent of the parties hereto; and (iii) to the fullest extent possible, the provisions of this Agreement (including, without limitation, each portion of any section of this Agreement containing any such provision held to be invalid, illegal or unenforceable, that is not itself invalid, illegal or unenforceable) shall be construed so as to give effect to the intent manifested thereby.

23.    **Enforcement.** The Company expressly confirms and agrees that it has entered into this Agreement and assumed the obligations imposed on it hereby in order to induce Indemnitee to serve as a director or officer of the Company, and the Company acknowledges that Indemnitee is relying upon this Agreement in serving as a director or officer of the Company.

24.    **Entire Agreement.** This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral, written and implied, between the parties hereto with respect to the subject matter hereof; *provided*, *however*, that this Agreement is a supplement to and in furtherance of the Company's certificate of incorporation and bylaws and applicable law.

25.    **Modification and Waiver.** No supplement, modification or amendment to this Agreement shall be binding unless executed in writing by the parties hereto. No amendment, alteration or repeal of this Agreement shall adversely affect any right of Indemnitee under this Agreement in respect of any action taken or omitted by such Indemnitee in his or her Corporate Status prior to such amendment, alteration or repeal. No waiver of any of the provisions of this Agreement shall constitute or be deemed a waiver of any other provision of this Agreement nor shall any waiver constitute a continuing waiver.

26.    **Notices.** All notices and other communications required or permitted hereunder shall be in writing and shall be mailed by registered or certified mail, postage prepaid, sent by facsimile or electronic mail or otherwise delivered by hand, messenger or courier service addressed:

(a)      if to Indemnitee, to Indemnitee's address, facsimile number or electronic mail address as shown on the signature page of this Agreement or in the Company's records, as may be updated in accordance with the provisions hereof; or

(b)      if to the Company, to the attention of the President or Chief Executive Officer of the Company at such current address as the Company shall have furnished to Indemnitee, with a copy (which shall not constitute notice) to 620 131st AVE NE, BELLEVUE WA 98005-3345.

Each such notice or other communication shall for all purposes of this Agreement be treated as effective or having been given (i) if delivered by hand, messenger or courier service, when delivered (or if sent *via* a nationally-recognized overnight courier service, freight prepaid, specifying next-business-day delivery, one business day after deposit with the courier), or (ii) if sent *via* mail, at the earlier of its receipt or five days after the same has been deposited in a regularly-maintained receptacle for the deposit of the United States mail, addressed and mailed as aforesaid, or (iii) if sent *via* facsimile, upon confirmation of facsimile transfer or, if sent *via* electronic mail, upon confirmation of delivery when directed to the relevant electronic mail address, if sent during normal business hours of the recipient, or if not sent during normal business hours of the recipient, then on the recipient's next business day.

27.     **Applicable Law and Consent to Jurisdiction.** This Agreement and the legal relations among the parties shall be governed by, and construed and enforced in accordance with, the laws of the State of Washington, without regard to its conflict of laws rules. Except with respect to any arbitration commenced by Indemnitee pursuant to Section 12(a) of this Agreement, the Company and Indemnitee hereby irrevocably and unconditionally (i) agree that any action or proceeding arising out of or in connection with this Agreement shall be brought only in the Washington Court of Chancery, and not in any other state or federal court in the United States of America or any court in any other country, (ii) consent to submit to the exclusive jurisdiction of the Washington Court of Chancery for purposes of any action or proceeding arising out of or in connection with this Agreement, (iii) appoint, to the extent such party is not otherwise subject to service of process in the State of Washington, Incorporating Services, Ltd., Dover, Washington as its agent in the State of Washington as such party's agent for acceptance of legal process in connection with any such action or proceeding against such party with the same legal force and validity as if served upon such party personally within the State of Washington, (iv) waive any objection to the laying of venue of any such action or proceeding in the Washington Court of Chancery, and (v) waive, and agree not to plead or to make, any claim that any such action or proceeding brought in the Washington Court of Chancery has been brought in an improper or inconvenient forum.

28.     **Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall for all purposes be deemed to be an original but all of which together shall constitute one and the same Agreement. This Agreement may also be executed and delivered by facsimile signature and in counterparts, each of which shall for all purposes be deemed to be an original but all of which together shall constitute one and the same Agreement. Only one such counterpart signed by the party against whom enforceability is sought needs to be produced to evidence the existence of this Agreement.

29.     **Captions.** The headings of the paragraphs of this Agreement are inserted for convenience only and shall not be deemed to constitute part of this Agreement or to affect the construction thereof.

*(signature page follows)*

The parties are signing this Indemnification Agreement as of the date stated in the introductory sentence.

**COMPANY:**

**DAOLABS IP, INC.**
a Washington Corporation


_____

Benjamin Reed, Chief Executive Officer


**INDEMNITEE:**


_____


*Address*:

# Exhibit B

**DAOLABS, INC.**
**INDEPENDENT CONSULTING AGREEMENT**

This Consulting Agreement (this "***Agreement***") is made and entered into as of August 15th, 2022 (the "***Effective Date***"), by and between DAOLABS, INC., a Washington Limited Liability Company ("***DAOLABS***"), and CONTRACTOR, an individual with his principal place of business at _____ and _____ ("***Consultant***") (each herein referred to individually as a "***Party***," or collectively as the "***Parties***").

DAOLABS desires to retain Consultant as an independent contractor to perform consulting services for DAOLABS, and Consultant is willing to perform such services, on the terms described below. In consideration of the mutual promises contained herein, the Parties agree as follows:

1. **Services and Compensation**

Consultant shall perform the services described in **Exhibit A** (the "***Services***") for DAOLABS (or its designee), and DAOLABS agrees to pay Consultant the compensation described in **Exhibit A** for Consultant's performance of the Services.

2. **Applicability to Past Activities**

DAOLABS and Consultant acknowledge that Consultant may have performed work, activities, services or made efforts on behalf of or for the benefit of DAOLABS, or related to the current or prospective business of DAOLABS in anticipation of Consultant's involvement with DAOLABS, that would have been "Services" if performed during the term of this Agreement, for a period of time prior to the date of this Agreement starting on <u>August 12, 2022</u> (the "***Prior Consulting Period***"). Accordingly, Consultant agrees that if and to the extent that, during the Prior Consulting Period: (i) Consultant received access to any information from or on behalf of DAOLABS that would have been "Confidential Information" (as defined below) if Consultant received access to such information during the term of this Agreement; or (ii) Consultant (a) conceived, created, authored, invented, developed or reduced to practice any item (including any intellectual property rights with respect thereto) on behalf of or for the benefit of DAOLABS, or related to the current or prospective business of DAOLABS in anticipation of Consultant's involvement with DAOLABS, that would have been an "Invention" (as defined below) if conceived, created, authored, invented, developed or reduced to practice during the term of this Agreement; or (b) incorporated into any such item any pre-existing invention, improvement, development, concept, discovery or other proprietary information that would have been a "Prior Invention" (as defined below) if incorporated into such item during the term of this Agreement; then any such information shall be deemed "Confidential Information" hereunder and any such item shall be deemed an "Invention" or "Prior Invention" hereunder, and this Agreement shall apply to such activities, information or item as if disclosed, conceived, created, authored, invented, developed or reduced to practice during the term of this Agreement.

3. **Confidentiality**

A. ***Definition of Confidential Information.*** "***Confidential Information***" means any non-public information that relates to the actual or anticipated business and/or products, research or development of DAOLABS, its affiliates or subsidiaries or to DAOLABS's, its affiliates' or subsidiaries' technical data, trade secrets, or know-how, including, but not limited to, research, product plans, or other information regarding DAOLABS's, its affiliates' or subsidiaries' products or services and markets therefor, customer lists and customers (including, but not limited to, customers of DAOLABS on whom Consultant called or with whom Consultant became acquainted during the term of this Agreement), software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances, and other business information disclosed by DAOLABS, its affiliates or subsidiaries, either directly or indirectly, in writing, orally or by drawings or inspection of premises, parts, equipment, or other property of DAOLABS, its affiliates or subsidiaries. Notwithstanding the foregoing, Confidential Information shall not include any such information which Consultant can establish (i) was publicly known or made generally available prior to the time of disclosure to Consultant; (ii) becomes publicly known or made generally available after disclosure to Consultant through no wrongful action or inaction of Consultant; or (iii) is in the rightful possession of Consultant, without confidentiality obligations, at the time of disclosure as shown by Consultant's then-contemporaneous written records.

B.      ***Nonuse and Nondisclosure.*** During and after the term of this Agreement, Consultant will hold in the strictest confidence, and take all reasonable precautions to prevent any unauthorized use or disclosure of Confidential Information, and Consultant will not (i) use the Confidential Information for any purpose whatsoever other than as necessary for the performance of the Services on behalf of DAOLABS, or (ii) disclose the Confidential Information to any third party without the prior written consent of an authorized representative of DAOLABS, except that Consultant may disclose Confidential Information to any third party on a need-to-know basis for the purposes of Consultant performing the Services; provided, however, that such third party is subject to written non-use and non-disclosure obligations at least as protective of DAOLABS and the Confidential Information as this Article 3. Consultant may also disclose Confidential Information to the extent compelled by applicable law; *provided however*, prior to such disclosure, Consultant shall provide prior written notice to DAOLABS and seek a protective order or such similar confidential protection as may be available under applicable law. Consultant agrees that no ownership of Confidential Information is conveyed to the Consultant. Without limiting the foregoing, Consultant shall not use or disclose any DAOLABS property, intellectual property rights, trade secrets or other proprietary know-how of DAOLABS to invent, author, make, develop, design, or otherwise enable others to invent, author, make, develop, or design identical or substantially similar designs as those developed under this Agreement for any third party. Consultant agrees that Consultant's obligations under this Section 3.B shall continue after the termination of this Agreement.

C.      ***Other Client Confidential Information.*** Consultant agrees that Consultant will not improperly use, disclose, or induce DAOLABS to use any proprietary information or trade secrets of any former or concurrent employer of Consultant or other person or entity with which Consultant has an obligation to keep in confidence. Consultant also agrees that Consultant will not bring onto DAOLABS's premises or transfer onto DAOLABS's technology systems any unpublished document, proprietary information, or trade secrets belonging to any third party unless disclosure to, and use by, DAOLABS has been consented to in writing by such third party.

D.      ***Third Party Confidential Information.*** Consultant recognizes that DAOLABS has received and in the future will receive from third parties their confidential or proprietary information subject to a duty on DAOLABS's part to maintain the confidentiality of such information and to use it only for certain limited purposes. Consultant agrees that at all times during the term of this Agreement and thereafter, Consultant owes DAOLABS and such third parties a duty to hold all such confidential or proprietary information in the strictest confidence and not to use it or to disclose it to any person, firm, corporation, or other third party except as necessary in carrying out the Services for DAOLABS consistent with DAOLABS's agreement with such third party.

4.      **Ownership**

A.      ***Assignment of Inventions.*** Consultant agrees that all right, title, and interest in and to any copyrightable material, notes, records, drawings, designs, inventions, improvements, developments, discoveries and trade secrets conceived, discovered, authored, invented, developed or reduced to practice by Consultant, solely or in collaboration with others, during the term of this Agreement and arising out of, or in connection with, performing the Services under this Agreement and any copyrights, patents, trade secrets, mask work rights or other intellectual property rights relating to the foregoing (collectively, "***Inventions***"), are the sole property of DAOLABS. Consultant also agrees to promptly make full written disclosure to DAOLABS of any Inventions and to deliver and assign (or cause to be assigned) and hereby irrevocably assigns fully to DAOLABS all right, title and interest in and to the Inventions.

B.      ***Pre-Existing Material*s.** Subject to Section 4.A, Consultant agrees that if, in the course of performing the Services, Consultant incorporates into any Invention or utilizes in the performance of the Services any pre-existing invention, discovery, original works of authorship, development, improvements, trade secret, concept, or other proprietary information or intellectual property right owned by Consultant or in which Consultant has an interest ("***Prior Inventions***"), (i) Consultant will provide DAOLABS with prior notice and (ii) DAOLABS is hereby granted a nonexclusive, royalty-free, perpetual, irrevocable, transferable, worldwide license (with the right to grant and authorize sublicenses) to make, have made, use, import, offer for sale, sell, reproduce, distribute, modify, adapt, prepare derivative works of, display, perform, and otherwise exploit such Prior Inventions, without restriction, including, without limitation, as part of or in connection with such Invention, and to practice any method related thereto. Consultant will not incorporate any invention, improvement, development, concept, discovery, work of authorship or other proprietary information owned by any third party into any Invention without DAOLABS's prior written permission.

C.    *Moral Rights.* Any assignment to DAOLABS of Inventions includes all rights of attribution, paternity, integrity, modification, disclosure and withdrawal, and any other rights throughout the world that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively, "***Moral Rights***"). To the extent that Moral Rights cannot be assigned under applicable law, Consultant hereby waives and agrees not to enforce any and all Moral Rights, including, without limitation, any limitation on subsequent modification, to the extent permitted under applicable law.

D.    *Maintenance of Records.* Consultant agrees to keep and maintain adequate, current, accurate, and authentic written records of all Inventions made by Consultant (solely or jointly with others) during the term of this Agreement, and for a period of three (3) years thereafter. The records will be in the form of notes, sketches, drawings, electronic files, reports, or any other format that is customary in the industry and/or otherwise specified by DAOLABS. Such records are and remain the sole property of DAOLABS at all times and upon DAOLABS's request, Consultant shall deliver (or cause to be delivered) the same.

E.    *Further Assurances.* Consultant agrees to assist DAOLABS, or its designee, at DAOLABS's expense, in every proper way to secure DAOLABS's rights in Inventions in any and all countries, including the disclosure to DAOLABS of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments and all other instruments that DAOLABS may deem necessary in order to apply for, register, obtain, maintain, defend, and enforce such rights, and in order to deliver, assign and convey to DAOLABS, its successors, assigns and nominees the sole and exclusive right, title, and interest in and to all Inventions and testifying in a suit or other proceeding relating to such Inventions. Consultant further agrees that Consultant's obligations under this Section 4.E shall continue after the termination of this Agreement.

F.    *Attorney-in-Fact.* Consultant agrees that, if DAOLABS is unable because of Consultant's unavailability, dissolution, mental or physical incapacity, or for any other reason, to secure Consultant's signature with respect to any Inventions, including, without limitation, for the purpose of applying for or pursuing any application for any United States or foreign patents or mask work or copyright registrations covering the Inventions assigned to DAOLABS in Section 4.A, then Consultant hereby irrevocably designates and appoints DAOLABS and its duly authorized officers and agents as Consultant's agent and attorney-in-fact, to act for and on Consultant's behalf to execute and file any papers and oaths and to do all other lawfully permitted acts with respect to such Inventions to further the prosecution and issuance of patents, copyright and mask work registrations with the same legal force and effect as if executed by Consultant. This power of attorney shall be deemed coupled with an interest, and shall be irrevocable.

**5.    Conflicting Obligations**

A.    Consultant represents and warrants that Consultant has no agreements, relationships, or commitments to any other person or entity that conflict with the provisions of this Agreement, Consultant's obligations to DAOLABS under this Agreement, and/or Consultant's ability to perform the Services. Consultant will not enter into any such conflicting agreement during the term of this Agreement.

B.    Consultant shall require all Consultant's employees, contractors, or other third-parties performing Services under this Agreement to execute a Confidential Information and Assignment Agreement in the form of Exhibit B, and promptly provide a copy of each such executed agreement to DAOLABS. Consultant's violation of this Article 5 will be considered a material breach under Section 8.B.

**6.    Return of DAOLABS Materials**

Upon the termination of this Agreement, or upon DAOLABS's earlier request, Consultant will immediately deliver to DAOLABS, and will not keep in Consultant's possession, recreate, or deliver to anyone else, any and all DAOLABS property, including, but not limited to, Confidential Information, tangible embodiments of the Inventions, all devices and equipment belonging to DAOLABS, all electronically-stored information and passwords to access such property, those records maintained pursuant to Section 4.D and any reproductions of any of the foregoing items that Consultant may have in Consultant's possession or control.

7.      **Reports**

Consultant agrees that Consultant will keep DAOLABS advised as to Consultant's progress in performing the Services under this Agreement. Consultant further agrees that Consultant will, as requested by DAOLABS, prepare written reports with respect to such progress. DAOLABS and Consultant agree that the reasonable time expended in preparing such written reports will be considered time devoted to the performance of the Services.

8.      **Term and Termination**

A.      ***Term.*** The term of this Agreement will begin on the Effective Date of this Agreement and will continue until the earlier of (i) final completion of the Services or (ii) termination as provided in Section 8.B.

B.      ***Termination.*** DAOLABS may terminate this Agreement upon giving Consultant fourteen (14) days prior written notice of such termination pursuant to Section 14.G of this Agreement. DAOLABS may terminate this Agreement immediately and without prior notice if Consultant refuses to or is unable to perform the Services or is in breach of any material provision of this Agreement.

C.      ***Survival.*** Upon any termination, all rights and duties of DAOLABS and Consultant toward each other shall cease except:

(1)      DAOLABS will pay, within thirty (45) days after the effective date of termination, all amounts owing to Consultant for Services completed and accepted by DAOLABS prior to the termination date and related reimbursable expenses, if any, submitted in accordance with DAOLABS's policies and in accordance with the provisions of Article 1 of this Agreement; and

(2)      Article 3 (Confidentiality), Article 4 (Ownership), Section 5.B (Conflicting Obligations), Article 6 (Return of DAOLABS Materials), Article 8 (Term and Termination), Article 9 (Independent Contractor Relationship), Article 10 (Indemnification), Article 11 (Noninterference), Article 12 (Limitation of Liability), Article 13 (Arbitration and Equitable Relief), and Article 14 (Miscellaneous) will survive termination or expiration of this Agreement in accordance with their terms.

9.      **Independent Contractor Relationship**

It is the express intention of DAOLABS and Consultant that Consultant performs the Services as an independent contractor to DAOLABS. Nothing in this Agreement shall in any way be construed to constitute Consultant as an agent, employee or representative of DAOLABS. Without limiting the generality of the foregoing, Consultant is not authorized to bind DAOLABS to any liability or obligation or to represent that Consultant has any such authority. Consultant agrees to furnish (or reimburse DAOLABS for) all tools and materials necessary to accomplish this Agreement and shall incur all expenses associated with performance, except as expressly provided in **Exhibit A**. Consultant acknowledges and agrees that Consultant is obligated to report as income all compensation received by Consultant pursuant to this Agreement.

10.      **Indemnification**

Consultant agrees to indemnify and hold harmless DAOLABS and its affiliates and their directors, officers and employees from and against all taxes, losses, damages, liabilities, costs and expenses, including attorneys' fees and other legal expenses, arising directly or indirectly from or in connection with (i) any negligent, reckless or intentionally wrongful act of Consultant or Consultant's assistants, employees, contractors or agents, (ii) any breach by the Consultant or Consultant's assistants, employees, contractors or agents of any of the covenants contained in this Agreement and corresponding Confidential Information and Invention Assignment Agreement, (iii) any failure of Consultant to perform the Services in accordance with all applicable laws, rules and regulations, or (iv) any violation or claimed violation of a third party's rights resulting in whole or in part from DAOLABS's use of the Inventions or other deliverables of Consultant under this Agreement.

11.     **Nonsolicitation**

To the fullest extent permitted under applicable law, from the date of this Agreement until twelve (12) months after the termination of this Agreement for any reason (the "***Restricted Period***"), Consultant will not, without DAOLABS's prior written consent, directly or indirectly, solicit any of DAOLABS's employees to leave their employment, or attempt to solicit employees of DAOLABS, either for Consultant or for any other person or entity. Consultant agrees that nothing in this Article 11 shall affect Consultant's continuing obligations under this Agreement during and after this twelve (12) month period, including, without limitation, Consultant's obligations under Article 3.

12.     **Limitation of Liability**

IN NO EVENT SHALL DAOLABS BE LIABLE TO CONSULTANT OR TO ANY OTHER PARTY FOR ANY INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES, OR DAMAGES FOR LOST PROFITS OR LOSS OF BUSINESS, HOWEVER CAUSED AND UNDER ANY THEORY OF LIABILITY, WHETHER BASED IN CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHER THEORY OF LIABILITY, REGARDLESS OF WHETHER DAOLABS WAS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND NOTWITHSTANDING THE FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY. IN NO EVENT SHALL DAOLABS'S LIABILITY ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT EXCEED THE AMOUNTS PAID BY DAOLABS TO CONSULTANT UNDER THIS AGREEMENT FOR THE SERVICES, DELIVERABLES OR INVENTION GIVING RISE TO SUCH LIABILITY.

13.     **Arbitration and Equitable Relief**

A.     ***Arbitration.*** IN CONSIDERATION OF CONSULTANT'S CONSULTING RELATIONSHIP WITH DAOLABS, ITS PROMISE TO ARBITRATE ALL DISPUTES RELATED TO CONSULTANT'S CONSULTING RELATIONSHIP WITH DAOLABS AND CONSULTANT'S RECEIPT OF THE COMPENSATION AND OTHER BENEFITS PAID TO CONSULTANT BY DAOLABS, AT PRESENT AND IN THE FUTURE, CONSULTANT AGREES THAT ANY AND ALL CONTROVERSIES, CLAIMS, OR DISPUTES WITH ANYONE (INCLUDING DAOLABS AND ANY EMPLOYEE, OFFICER, DIRECTOR, SHAREHOLDER OR BENEFIT PLAN OF DAOLABS IN THEIR CAPACITY AS SUCH OR OTHERWISE), WHETHER BROUGHT ON AN INDIVIDUAL, GROUP, OR CLASS BASIS, ARISING OUT OF, RELATING TO, OR RESULTING FROM CONSULTANT'S CONSULTING RELATIONSHIP WITH DAOLABS OR THE TERMINATION OF CONSULTANT'S CONSULTING RELATIONSHIP WITH DAOLABS, INCLUDING ANY BREACH OF THIS AGREEMENT, SHALL BE SUBJECT TO BINDING ARBITRATION UNDER THE ARBITRATION PROVISIONS PURSUANT TO WASHINGTON LAW, AND SHALL BE BROUGHT IN CONSULTANT'S INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING. THE FEDERAL ARBITRATION ACT SHALL CONTINUE TO APPLY WITH FULL FORCE AND EFFECT NOTWITHSTANDING THE APPLICATION OF PROCEDURAL RULES SET FORTH IN THE ACT. **DISPUTES WHICH CONSULTANT AGREES TO ARBITRATE, AND THEREBY AGREES TO WAIVE ANY RIGHT TO A TRIAL BY JURY, INCLUDE ANY STATUTORY CLAIMS UNDER LOCAL, STATE, OR FEDERAL LAW.** CONSULTANT FURTHER UNDERSTANDS THAT THIS AGREEMENT TO ARBITRATE ALSO APPLIES TO ANY DISPUTES THAT DAOLABS MAY HAVE WITH CONSULTANT.

B.     ***Procedure.*** CONSULTANT AGREES THAT ANY ARBITRATION WILL BE ADMINISTERED BY JUDICIAL ARBITRATION & MEDIATION SERVICES, INC. ("***JAMS***") PURSUANT TO ITS COMMERCIAL ARBITRATION RULES & PROCEDURES (THE "***JAMS RULES***"), WHICH ARE AVAILABLE AT http://www.jamsadr.com/rules-employment-arbitration/ AND FROM HUMAN RESOURCES AND ATTACHED HERETO AS EXHIBIT C. CONSULTANT AGREES THAT THE ARBITRATOR SHALL HAVE THE POWER TO DECIDE ANY MOTIONS BROUGHT BY ANY PARTY TO THE ARBITRATION, INCLUDING MOTIONS FOR SUMMARY JUDGMENT AND/OR ADJUDICATION AND MOTIONS TO DISMISS AND DEMURRERS. CONSULTANT AGREES THAT THE ARBITRATOR SHALL ISSUE A WRITTEN DECISION ON THE MERITS. CONSULTANT ALSO AGREES THAT THE ARBITRATOR SHALL HAVE THE POWER TO AWARD ANY REMEDIES AVAILABLE UNDER APPLICABLE LAW, AND THAT THE ARBITRATOR SHALL AWARD ATTORNEYS' FEES AND COSTS TO DAOLABS WHERE PROVIDED BY APPLICABLE LAW. CONSULTANT AGREES THAT THE DECREE OR AWARD RENDERED BY THE ARBITRATOR MAY BE ENTERED AS A

FINAL AND BINDING JUDGMENT IN ANY COURT HAVING JURISDICTION THEREOF. CONSULTANT AGREES THAT THE ARBITRATOR SHALL ADMINISTER AND CONDUCT ANY ARBITRATION IN ACCORDANCE WITH WASHINGTON LAW, AND THAT THE ARBITRATOR SHALL APPLY SUBSTANTIVE AND PROCEDURAL WASHINGTON LAW TO ANY DISPUTE OR CLAIM, WITHOUT REFERENCE TO RULES OF CONFLICT OF LAW. TO THE EXTENT THAT THE JAMS RULES CONFLICT WITH WASHINGTON LAW, WASHINGTON LAW SHALL TAKE PRECEDENCE. CONSULTANT FURTHER AGREES THAT ANY ARBITRATION UNDER THIS AGREEMENT SHALL BE CONDUCTED IN KING COUNTY, WASHINGTON.

C.      *Remedy.* EXCEPT AS PROVIDED BY THE ACT AND THIS AGREEMENT, ARBITRATION SHALL BE THE SOLE, EXCLUSIVE, AND FINAL REMEDY FOR ANY DISPUTE BETWEEN CONSULTANT AND DAOLABS. ACCORDINGLY, EXCEPT AS PROVIDED FOR BY THE ACT AND THIS AGREEMENT, NEITHER CONSULTANT NOR DAOLABS WILL BE PERMITTED TO PURSUE COURT ACTION REGARDING CLAIMS THAT ARE SUBJECT TO ARBITRATION.

D.      *Availability of Injunctive Relief.* THE PARTIES AGREE THAT ANY PARTY MAY ALSO PETITION THE COURT FOR INJUNCTIVE RELIEF WHERE EITHER PARTY ALLEGES OR CLAIMS A VIOLATION OF ANY AGREEMENT REGARDING INTELLECTUAL PROPERTY, CONFIDENTIAL INFORMATION OR NONINTERFERENCE. IN THE EVENT EITHER PARTY SEEKS INJUNCTIVE RELIEF, DAOLABS SHALL BE ENTITLED TO RECOVER REASONABLE COSTS AND ATTORNEYS' FEES.

E.      *Administrative Relief.* CONSULTANT UNDERSTANDS THAT THIS AGREEMENT DOES NOT PROHIBIT CONSULTANT FROM PURSUING AN ADMINISTRATIVE CLAIM WITH A LOCAL, STATE OR FEDERAL ADMINISTRATIVE BODY OR GOVERNMENT AGENCY SUCH AS THE DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING, THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, THE NATIONAL LABOR RELATIONS BOARD, OR THE WORKERS' COMPENSATION BOARD. THIS AGREEMENT DOES, HOWEVER, PRECLUDE CONSULTANT FROM PURSUING COURT ACTION REGARDING ANY SUCH CLAIM, EXCEPT AS PERMITTED BY LAW.

F.      *Voluntary Nature of Agreement.* CONSULTANT ACKNOWLEDGES AND AGREES THAT IT IS EXECUTING THIS AGREEMENT VOLUNTARILY AND WITHOUT ANY DURESS OR UNDUE INFLUENCE BY DAOLABS OR ANYONE ELSE. CONSULTANT FURTHER ACKNOWLEDGES AND AGREES THAT IT HAS CAREFULLY READ THIS AGREEMENT AND THAT CONSULTANT HAS ASKED ANY QUESTIONS NEEDED FOR CONSULTANT TO UNDERSTAND THE TERMS, CONSEQUENCES AND BINDING EFFECT OF THIS AGREEMENT AND FULLY UNDERSTAND IT, INCLUDING THAT ***CONSULTANT IS WAIVING ITS RIGHT TO A JURY TRIAL***. FINALLY, CONSULTANT AGREES THAT IT HAS BEEN PROVIDED AN OPPORTUNITY TO SEEK THE ADVICE OF AN ATTORNEY OF CONSULTANT'S CHOICE BEFORE SIGNING THIS AGREEMENT.

14.     **Miscellaneous**

A.      ***Governing Law; Consent to Personal Jurisdiction.*** This Agreement shall be governed by the laws of the State of Washington, without regard to the conflicts of law provisions of any jurisdiction.  To the extent that any lawsuit is permitted under this Agreement, the Parties hereby expressly consent to the personal and exclusive jurisdiction and venue of the state and federal courts located in Washington.

B.      ***Assignability.*** This Agreement will be binding upon Consultant's assigns, administrators, and other legal representatives, and will be for the benefit of DAOLABS, its successors, and its assigns. There are no intended third-party beneficiaries to this Agreement, except as expressly stated. Except as may otherwise be provided in this Agreement, Consultant may not sell, assign or delegate any rights or obligations under this Agreement, by operation of law or otherwise (including by merger, consolidation, reorganization, reincorporation, sale of assets or stock or change of control), and any such attempted assignment, delegation or transfer shall be null and void. Notwithstanding anything to the contrary herein, DAOLABS may assign this Agreement and its rights and obligations under this Agreement to any successor to all or substantially all of DAOLABS's relevant assets, whether by merger, consolidation, reorganization, reincorporation, sale of assets or stock, change of control or otherwise.

C.    ***Entire Agreement.*** This Agreement constitutes the entire agreement and understanding between the Parties with respect to the subject matter herein and supersedes all prior written and oral agreements, discussions, or representations between the Parties. Consultant represents and warrants that it is not relying on any statement or representation not contained in this Agreement.  To the extent any terms set forth in any exhibit or schedule conflict with the terms set forth in this Agreement, the terms of this Agreement shall control unless otherwise expressly agreed by the Parties in such exhibit or schedule.

D.    ***Headings.*** Headings are used in this Agreement for reference only and shall not be considered when interpreting this Agreement.

E.    ***Severability.*** If a court or other body of competent jurisdiction finds, or the Parties mutually believe, any provision of this Agreement, or portion thereof, to be invalid or unenforceable, such provision will be enforced to the maximum extent permissible so as to effect the intent of the Parties, and the remainder of this Agreement will continue in full force and effect.

F.    ***Modification, Waiver.*** No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in a writing signed by the Parties. Waiver by DAOLABS of a breach of any provision of this Agreement will not operate as a waiver of any other or subsequent breach.

G.    ***Notices.*** Any notice or other communication required or permitted by this Agreement to be given to a Party shall be in writing and shall be deemed given (i) if delivered personally or by commercial messenger or courier service, (ii) when sent by confirmed facsimile, or (iii) if mailed by U.S. registered or certified mail (return receipt requested), to the Party at the Party's address written below or at such address as the Party may have previously specified by like notice. If by mail, delivery shall be deemed effective three business days after mailing in accordance with this Section .

H.    ***Attorneys' Fees.*** In any court action at law or equity that is brought by one of the Parties to this Agreement to enforce or interpret the provisions of this Agreement, DAOLABS will be entitled to reasonable attorneys' fees, in addition to any other relief to which DAOLABS may be entitled.

I.    ***Signatures.*** This Agreement may be signed in two counterparts, each of which shall be deemed an original, with the same force and effectiveness as though executed in a single document.

[*signature page follows*]

IN WITNESS WHEREOF, the Parties hereto have executed this Consulting Agreement as of the date first written above.

**CONTRACTOR**                                              **DAOLABS, INC.**


By: _____                    By: _____

Name: _____                   Name: BENJAMIN REED_____

Title: _____                    Title: MANAGER_____


Address for Notice:

_____

_____

_____

**EXHIBIT A**

**SERVICES AND COMPENSATION**

1.     ***Contact.*** Consultant's principal Company contact:

       DAOLABS, LLC.
       620 131st AVE NE
       Bellevue, WA 98005
       (206) 866-0766

       BLANK

       CONTRACTOR had previous executed a NDA (attached) with DAOLABS, LLC dated August 12th, 2022, such that all communication with _____ will be covered by the agreement.

2.     ***Services.*** The Services shall consist of the following:

       A.    See Attached Signed Scope of Work dated _____, however, Consultant will …

       B.    and such other services that DAOLABS may reasonably request from time to time, including but not limited to ....

3.     ***Compensation.***

       A.    DAOLABS will pay Consultant $100 an hour.

       B.    DAOLABS will pay Consultant $1,500 30 days after contract signing, and another $1,500 after another 30 days, given that Consultant work at least 15 hours per month.

       C.    DAOLABS will pay Consultant any overage hours spent from income derived from DAOLABS licensing or in installments of $1,000 after 4.5 months after contracting signing, whichever comes first. Consultant will keep track of her time and provide a timesheet in excel format of hours worked per week. Consultant will provide the timesheet to DAOLABS on a bi-monthly schedule for approval and record keeping.

       D.    DAOLABS will reimburse Consultant, in accordance with DAOLABS policy, for all reasonable expenses incurred by Consultant in performing the Services pursuant to this Agreement, if Consultant receives written consent from an authorized agent of DAOLABS prior to incurring such expenses and submits receipts for such expenses to DAOLABS in accordance with DAOLABS policy.

       Consultant shall submit to DAOLABS a written invoice for Services and expenses, and such statement shall be subject to the approval of the contact person listed above or other designated agent of DAOLABS. Consultant shall submit to DAOLABS a written invoice for Services including hours worked and hours deferred that week, and cumulative, or total since contract signing.

This **Exhibit A** is accepted and agreed upon as of August 12, 2022.

**CONTRACTOR**                                    **DAOLABS, LLC.**

By: _____                    By: _____

Name: _____                    Name: BENJAMIN REED_____

Title: _____                   Title: MANAGER_____

## SCOPE OF WORKSTATEMENT OF WORK

Contractor,

If there is a descriptive statement of work you want to include, please do it here.

**CONTRACTOR**                                    **DAOLABS, LLC.**


By: _____          By: _____

Name: _____          Name: BENJAMIN REED_____

# Exhibit C

DAOLABS, LLC
INNOVATIONS AND ASSIGNMENT AGREEMENT

This Agreement is made and entered into, as of **January 1, 2022** ("Effective Date"), by and between DAOLABS, LLC ("Company"), having a principal place of business at FL, and _____, ("Contractor").

1.      Consideration. This Agreement is signed in conjunction with an Independent Contractor Agreement ("ICA") and is incorporated therein. The parties agree that in performing the work under the ICA and the remuneration identified therein shall be good and reasonable consideration for the duties and obligations found in this Agreement.

2.      "Proprietary Information" Definition. "Proprietary Information" includes (a) any information that is confidential or proprietary, technical or non-technical information of Company, including for example and without limitation, information related to Innovations (as defined in Section 4 below), concepts, techniques, processes, methods, systems, designs, computer programs, source documentation, trade secrets, formulae, development or experimental work, work in progress, forecasts, proposed and future products, marketing plans, financial information, business plans, customers and suppliers and any other nonpublic information that has commercial value or (b) any information Company has received from others that Company is obligated to treat as confidential or proprietary, which may be made known to Contractor by Company, a third party or otherwise that Contractor may learn during my contract with Company.

3.      Ownership and Nondisclosure of Proprietary Information. All Proprietary Information is the sole property of Company, Company's assigns, Company's customers and Company's suppliers, as applicable.  Company, Company's assigns, Company's customers and Company's suppliers, as applicable, are the sole and exclusive owners of all patents, copyrights, mask works, trade secrets and other rights in and to the Proprietary Information.  Contractor will not disclose any Proprietary Information to anyone outside Company, and Contractor will use and disclose Proprietary Information to those inside Company only as may be necessary in the ordinary course of performing its duties as a contractor of Company.  If Contractor has any questions as to whether information constitutes Proprietary Information, or to whom, if anyone, inside Company, any Proprietary Information may be disclosed, Contractor will consult with my manager at Company.

4.      "Innovations" Definition.   In this Agreement, "Innovations" means all discoveries, designs, developments, improvements, inventions (whether or not protectable under patent laws), works of authorship, information fixed in any tangible medium of expression (whether or not protectable under copyright laws), trade secrets, know-how, ideas (whether or not protectable under trade secret laws), mask works, trademarks, service marks, trade names and trade dress.

5.      Disclosure and License of Prior Innovations.  Company has listed on Exhibit A ("Prior Innovations"), attached hereto, all Innovations relating in any way to Company's Business or demonstrably anticipated research and development or business, which were conceived, reduced to practice, created, derived, developed, or made by Contractor prior to the contract with Company (collectively, the "Prior Innovations").  Contractor represents that neither Contractor or any of its employees, agents assigns or other associated with Contractor have no rights in any such Company-related Innovations other than those Innovations listed on Exhibit A.  If nothing is listed on Exhibit A ("Prior Innovations"), Contractor represents that there are no Prior Innovations at the time of signing this Agreement.  Contractor hereby grant to Company and Company's designees a royalty-free, irrevocable, worldwide, fully paid-up license (with rights to sublicense through multiple tiers

of sublicensees) to practice all patent, copyright, moral right, mask work, trade secret and other intellectual property rights relating to any Prior Innovations that Contractor incorporates or permits to be incorporated, in any Innovations that Contractor, solely or jointly with others, conceive, develop or reduce to practice during my contract with Company (the "Company Innovations").  Notwithstanding the foregoing, Contractor will not incorporate, or permit to be incorporated, any Prior Innovations in any Company Innovations without Company's prior written consent.

6.      Future Innovations.    Contractor will disclose promptly in writing to Company all Innovations conceived, reduced to practice, created, derived, developed, or made by Contractor, its employees, agents or assigns during the term of the contract and for three (3) months thereafter, whether or not Contractor believes such Innovations are subject to this Agreement, to permit a determination by Company as to whether or not the Innovations should be considered Company Innovations. Company will receive any such information in confidence.

7.      Disclosure and Assignment of Company Innovations.  Contractor will promptly disclose and describe to Company all Company Innovations.  Contractor hereby does and will specifically assign to Company or Company's designee all rights, title, and interest in and to any and all Company Innovations.  To the extent any of the rights, title and interest in and to Company Innovations cannot be assigned by Contractor to Company, Contractor hereby grants to Company an exclusive, royalty-free, transferable, irrevocable, worldwide license (with rights to sublicense through multiple tiers of sublicensees) to practice such non-assignable rights, title and interest.  To the extent any of the rights, title and interest in and to Company Innovations can neither be assigned nor licensed by Contractor to Company, Contractor hereby irrevocably waives and agrees never to assert such non-assignable and non-licensable rights, title and interest against Company or any of Company's successors in interest. Contractor agrees to provide the names of all employees who will

perform work pursuant to this Agreement (Exhibit "B") and have them sign this agreement to indicate their understanding of their duties of non-disclosure and confidentiality as well as their obligations to disclose any prior innovations and to specifically assign all rights and claims developed under this Agreement.

8.      Exclusion from Assignment.  Contractor understands that its obligation to assign, license or waive a claim with respect to any Innovation must comply with the requirements of RCW 49.44.140.  Pursuant to this Washington statute, Section 7 of this Agreement (Disclosure and Assignment of Company Innovations) does not apply to, and Contractor does not assign its rights to any Innovation (whether a Company Innovation or otherwise) when Contractor or its employees, agents or assigns, can prove that: (a) the Innovation was developed entirely outside of the time covered by this Agreement; (b) Contractor, its employees, agents or assigns did not use Company equipment, supplies, facilities , or trade secret information in its development; (c) the Innovation does not relate (i) directly to the Business of Company, or (ii) to the actual or demonstrably anticipated research or development of Company; and (d) the Innovation does not result from any work performed by Contractor, its employees, agents or assigns for Company.  This Section will be construed to apply to all Innovations with which Contractor is involved from this date forward, as well as all Company Innovations with which Contractor has been involved since the Agreement with Company began.

9.      Restriction on Use of Software. Contractor agrees that neither it, its employees, agents and assigns shall be prohibited and shall not use or deploy any software, programs or other intellectual property owned by Company or developed during the period of Agreement with Company for a period of 18 (eighteen) months after Company publishes  or otherwise makes the software, programs or intellectual property available in open source.    Contractor acknowledges that due to the nature of the Company's Business, there is no restriction on the geographical scope of this prohibition of use to Company and further acknowledges that

Company competes on a worldwide basis and that the geographical scope of these limitations is reasonable and necessary for the protection of Company's trade secrets and other Proprietary Information. Contractor further acknowledges that if a court of competent jurisdiction finds this restriction provision invalid or unenforceable due to unreasonableness in time, geographic scope, or scope of the Business, then such court will interpret and enforce this provision to the maximum extent that such court deems reasonable.

10.    Cooperation in Perfecting Rights to Innovations.   Contractor agrees to perform, during and after the terms of this contract, all acts that Company deems necessary or desirable to permit and assist Company, at its expense, in obtaining and enforcing the full benefits, enjoyment, rights and title throughout the world in the Innovations as provided to Company under this Agreement.  If Company is unable for any reason to secure any necessary signature to any document required to file, prosecute, register or memorialize the assignment of any rights or application or to enforce any right under any Innovations as provided under this Agreement, Contractor hereby irrevocably designates and appoints Company and Company's duly authorized officers and agents as Contractor's agents and attorneys-in-fact to act for and on Contractor's behalf and instead to take all lawfully permitted acts to further the filing, prosecution, registration, memorialization of assignment, issuance, and enforcement of rights under such Innovations, all with the same legal force and effect as if executed by Contractor. The foregoing is deemed a power coupled with an interest and is irrevocable.

11.    Contract at Will.       Contractor acknowledges that the contract will be of finite duration and that either Company or Contractor will be free to terminate the contract at any time with or without cause.     Contractor also acknowledges that any representations to the contrary are unauthorized and void, unless contained in a formal written contract signed by an officer of Company.

12.    Return of Materials.  At any time upon Company's request, and when the contract with Company is over, Contractor will return all materials (including, without limitation, documents, drawings, papers, diskettes and tapes) containing or disclosing any Proprietary Information (including all copies thereof), as well as any keys, pass cards, identification cards, computers, printers, pagers, personal digital assistants or similar items or devices that the Company has provided to me.  Contractor will provide Company with a written certification of its compliance with the obligations under this Section.

13.    Survival.    This Agreement (a) will survive the contract with Company; (b) does not in any way restrict Contractor's right to terminate or the right of Company to terminate the contract at any time, for any reason or for no reason; (c) inures to the benefit of successors and assigns of Company; and (d) is binding upon Contractors heirs and legal representatives.

14.    Non-Disparagement. During the contract with Company and after the termination thereof, Contractor, its employees, agents and assigns will not disparage Company, its products, services, agents or contractors.

15.    Injunctive Relief.  Contractor agrees that if it violates this Agreement, Company will suffer irreparable and continuing damage for which money damages are insufficient, and Company will be entitled to injunctive relief and/or a decree for specific performance, and such other relief as may be proper (including money damages if appropriate).

16.    Notices.     Any notice required or permitted by this Agreement will be in writing and will be delivered as follows, with notice deemed given as indicated: (a) by personal delivery, when actually delivered;  (b) by overnight courier, upon written verification of receipt; (c) by facsimile transmission, upon acknowledgment of receipt of electronic transmission; (d) by certified or registered mail, return receipt requested, upon verification of receipt; (e) or by email to the email address listed below.  Notices to Contractor will be sent to any

address in Company's records or the email address listed below.

17.   Governing Law; Forum.   This Agreement will be governed by the laws of the United States of America and by the laws of the State of Washington, as such laws are applied to agreements entered into and to be performed entirely within Washington between Washington residents.   Company and Contractor each irrevocably consent to the exclusive personal jurisdiction of the federal and state courts located in King County, Washington, as applicable, for any matter arising out of or relating to this Agreement, except that in actions seeking to enforce any order or any judgment of such federal or state courts located in King County, Washington, such personal jurisdiction will be nonexclusive.

18.   Severability.   If a court of law holds any provision of this Agreement to be illegal, invalid or unenforceable, (a) that provision will be deemed amended to provide Company the maximum protection permitted by applicable law and (b) the legality, validity and enforceability of the remaining provisions of this Agreement will not be affected.

19.   Waiver; Modification.   If Company waives any term, provision or breach by Contractor of this Agreement, such waiver will not be effective unless it is in writing and signed by Company.   No waiver will constitute a waiver of any other or subsequent breach by Contractor. This Agreement may be modified only if both Company and Contractor consent in writing.

20.   Entire Agreement.   This Agreement represents the entire understanding with Company with respect to the subject matter of this Agreement and supersedes all previous understandings, written or oral. This Agreement is signed together with an ICA as outlined in Section 1.

        I certify and acknowledge that I have carefully read all of the provisions of this Agreement and that I understand and will fully and faithfully comply with such provisions.

Executed as of the Date listed above.

COMPANY                                             CONTRACTOR

DAOLABS, LLC

By: _____            By: _____
        Reed Yurchak
        Law Offices of Reed Yurchak            Email:
        Bellevue, WA 98005                              *Contractor*
        Email: Reed@yurchaklaw.com
        *Attorney for LLC*

INNOVATIONS, ASSIGNMENT AGREEMENT      4

<u>Exhibit A</u>

PRIOR INNOVATIONS

Check one of the following:

[   ]     NO SUCH PRIOR INNOVATIONS EXIST.

OR

[   ]     YES, SUCH PRIOR INNOVATIONS EXIST AS DESCRIBED BELOW (include basic
description of each Prior Innovation):

EXHIBIT "B"

Executed as of the date of this Agreement.

_____
Employee Name

_____
Signature

_____
Employee Name

_____
Signature

_____
Employee Name

_____
Signature

_____
Employee Name

_____
Signature

_____
Employee Name

_____
Signature

_____
Employee Name

_____
Signature

_____
Employee Name

_____
Signature

_____
Employee Name

_____
Signature

_____
Employee Name

_____
Signature

_____
Employee Name

_____
Signature

# Exhibit D

# DAOLABS CORPORATION

## STARTER KIT

*Please be aware that we have prepared these agreements as a generic starting point for you.  Although each of the documents has a brief description of its intended use, we recommend that before you use any of these documents, you review it carefully and discuss its terms with a qualified attorney.  Using any of these agreements in the wrong situation or without understanding and abiding by its terms may have detrimental and unintended consequences.*

*There are also several places in each document where additional information will be required to customize the document to a given situation, such as providing names and addresses of the parties and selecting one of several alternative provisions; these places have been bracketed ([  ]) and highlighted for your convenience.  Furthermore, these sample forms may not have all the protections you or the other party may need or desire.*

*In summary, these forms are only provided as a starting point for documenting business relationships that you may encounter on a regular basis.  However, we strongly encourage that you consult with legal counsel in order to understand the implications of using any of these documents in a given situation.*

INDEX

1.      SAMPLE OFFER LETTER

2.      EMPLOYEE NONDISCLOSURE AND ASSIGNMENT AGREEMENT

3.      CONFIDENTIALITY AGREEMENT (DISCLOSURES <u>BY</u> DAOLABS IP CORPORATION)

4.      CONFIDENTIALITY AGREEMENT (DISCLOSURES <u>TO</u> DAOLABS IP CORPORATION)

5.      MUTUAL CONFIDENTIALITY AGREEMENT (WITH SUPPLEMENT)

6.      MUTUAL CONFIDENTIALITY AGREEMENT (LONG FORM)

7.      MUTUAL CONFIDENTIALITY AGREEMENT (SHORT FORM)

8.      CONFIDENTIAL MATERIALS RELEASE FORM

9.      INDEPENDENT CONTRACTOR SERVICES AGREEMENT

**OFFER LETTER**

1.   <u>When Used</u>.  Use this letter to offer employment positions to any prospective employee of DAOLABS IP CORPORATION ("Company").  This letter may also be used to offer temporary employment by removing the brackets around "temporary" and completing the employment termination date.  If this letter is being used for ordinary employment positions, the brackets and references to "temporary" should be removed.  ***DO NOT USE THIS AGREEMENT WHEN RETAINING INDEPENDENT CONTRACTORS OR CONSULTANT SERVICES***.

2.   <u>To Be Completed Before Signing</u>.  Enter the position being filled, to whom the employee should report, the date, and the amount of compensation.  Decide upon which employee benefits you wish to list at the end of the second paragraph, and describe commission or bonus plan opportunities, if appropriate.

     The third, fourth and fifth paragraphs should either be completed, by filling in the necessary information or indicated blanks, or deleted as appropriate.

     With respect to the seventh paragraph, decide whether to include the arbitration paragraph and, if this paragraph will be retained, insert the county in which you wish to have disputes arbitrated.  Delete other brackets surrounding proposed text if you wish to retain the text in the letter.  Be sure to have the appropriate Company authority sign the letter before mailing to the prospective employee.

3.   <u>Signature</u>.  To be effective, the prospective employee must return the letter signed and dated to Company and Company must retain a copy in the employee's personnel file.

<u>OFFER LETTER</u>

[On Company Letterhead]

[Date]

[Name]
[Address Line]
[Address Line]

**Re:     [Temporary] Employment Agreement**

Dear [Name]:

On behalf of DAOLABS IP CORPORATION (the "Company"), I am pleased to confirm our verbal offer of [temporary] employment to you for the position of _____, reporting to _____ _____. This letter sets out the terms of your employment with the Company, which will start on [Month] ___, 200__ [; we anticipate that your temporary employment with the Company will terminate on or about [date]].

[You will be paid a base salary of $_____ [every two weeks/semi-monthly] (which equals $_____ per year), less applicable tax and other withholdings.] OR [Your hourly pay rate will be $____, less applicable tax and other withholdings, and you will be paid [every two weeks/semi-monthly] in accordance with the Company's normal payroll procedure.] You will also be eligible to participate in various Company fringe benefit plans, including [list which apply: for example "group health insurance, 401(k), and vacation programs"]. [*Include information concerning commission or bonus plan participation if applicable.*]

[*ADD IF APPLICABLE*] The Company will also assist you in your relocation to the _____ area. [Describe specific relocation benefits being offered. Be sure to place a "cap" on the maximum amount available for each relocation benefit.] If you terminate your employment with the Company for any reason within [two years] after your employment start date, you agree to repay the Company the amount of any relocation benefits paid to you pursuant to this paragraph on the date of your termination.

[*ADD IF APPLICABLE*] The Company will pay you a "signing" bonus of $_____, less applicable tax and other withholdings, after you have successfully completed [90] days employment with the Company. If you terminate your employment with the Company for any reason within [two years] after your employment start date, you agree to repay the Company the amount of your signing bonus on the date of your termination.

[*ADD IF APPLICABLE*] Subject to the approval of the Company's Board of Directors, you will be granted an option to purchase _____ shares of Company common stock under the Company's [incentive] stock option plan at an exercise price equal to the fair market value of that stock on your option grant date. Your option will vest over a period of [four] years, and will be subject to the terms and conditions of the Company's stock option plan and standard form of stock option agreement, which you will be required to sign as a condition of receiving the option.

Your employment with the Company is "at will"; it is for no specified term, and may be terminated by you or the Company at any time, with or without cause or advance notice. As a condition of your employment, you will be required to sign the Company's standard form of employee nondisclosure and

assignment agreement, and to provide the Company with documents establishing your identity and right to work in the United States.  Those documents must be provided to the Company within three days after your employment start date.

[*ADD OR REMOVE AFTER CONSULTING WITH LEGAL COUNSEL*]  In the event of any dispute or claim solely related to or arising out of the termination of your employment with Company for any reason (including, but not limited to, any claims for breach of contract, wrongful termination, or age, sex, race, national origin, disability or other discrimination or harassment), you agree that all such disputes will be fully, finally and exclusively resolved by binding arbitration conducted by the American Arbitration Association in King County, Washington.  You and Company hereby waive your respective rights to have any such disputes or claims tried by a judge or jury.  This section will not apply to any claims for injunctive relief by Company or you, or to any claims by Company or you arising out of or related to proprietary and intellectual property rights.

This agreement and the non-disclosure [and stock option] agreement[s] referred to above constitute the entire agreement between you and the Company regarding the terms and conditions of your employment, and they supersede all prior negotiations, representations or agreements between you and the Company.  The provisions of this agreement regarding "at will" employment [and arbitration] may only be modified by a document signed by you and an authorized representative of the Company.

[Name], we look forward to working with you at the Company.  Please sign and date this letter on the spaces provided below to acknowledge your acceptance of the terms of this agreement.

Sincerely,

DAOLABS IP CORPORATION


By_____
        [Name]
        [Title]

I agree to and accept employment with DAOLABS IP CORPORATION on the terms and conditions set forth in this agreement.


Date:  [Month ]____, 200__                    _____
                                                              [Name]

**EMPLOYEE NONDISCLOSURE AND ASSIGNMENT AGREEMENT**

1.  This agreement is to be signed by employees of DAOLABS IP CORPORATION ("Company") for new or continued employment by Company.  For continued employment, Company should have the employee sign this agreement at the time a bonus, a promotion, or some other new or increased "benefit" is provided to the employee by Company.  This agreement is intended to be used with the enclosed form of offer letter (or other separate employment agreement that does not already contain terms regarding confidentiality and intellectual property ownership). ***DO NOT USE THIS AGREEMENT WHEN RETAINING INDEPENDENT CONTRACTOR OR CONSULTANT SERVICES***.

2.  <u>To Be Completed Before Signing</u>.

    <u>Definition of Company's Business</u>.  Complete the definition of the Company's business in Section 1 of the Agreement.

    <u>Exhibit A</u> ("Prior Innovations") must be completed prior to signing this agreement in accordance with Section 5 ("Disclosure and License of Prior Innovations").  If the employee has no such Prior Innovations, complete the form by checking the box next to "No Such Prior Innovations Exist." *Do not leave <u>Exhibit A</u> incomplete*.

    <u>Non-Competition Clause</u>.  With respect to optional provision 9 of this Agreement, consult with an attorney about whether to include the non-compete provision, and the length of the non-competition obligation, if any, for particular employees.  Where Company wishes an existing employee to agree to a non-competition clause following the start of that employee's employment with Company, Company must provide some consideration, such as a bonus, promotion, or other new or increased "benefit" to the employee.  We recommend that Company consult with a qualified attorney where it wishes to enter into a non-compete clause with a new or an existing employee.

3.  <u>Signature</u>.  Have the employee and an authorized representative of the Company sign and date the signature page.  Company should retain a copy of this Agreement in the employee's personnel file and in Company's records.

<u>EMPLOYEE NONDISCLOSURE AND ASSIGNMENT AGREEMENT</u>

This Agreement formalizes in writing certain understandings and procedures which have been in effect since the time I was initially employed by DAOLABS IP CORPORATION ("Company").

1.    <u>Duties</u>. In return for the compensation now and hereafter paid to me, I will perform such duties for Company as the Company may designate from time to time.   During my employment with Company, I will devote my best efforts to the interests of Company, will not engage in other employment or in any activities that Company determines to be detrimental to its best interests and will otherwise abide by all of Company's policies and procedures. For purposes of this Agreement,   Company's business means [DEFINE THE COMPANY'S BUSINESS] (the "Business").   Furthermore, I will not (a) reveal, disclose or otherwise make available to any person any Company password or key, whether or not the password or key is assigned to me or (b) obtain, possess or use in any manner a Company password or key that is not assigned to me.   I will use my best efforts to prevent the unauthorized use of any laptop or personal computer, peripheral device, software or related technical documentation that the Company issues to me, and I will not input, load or otherwise attempt any unauthorized use of software in any Company computer, whether or not such computer is assigned to me.

2.    <u>"Proprietary Information" Definition</u>. "Proprietary Information" includes (a) any information that is confidential or proprietary, technical or non-technical information of Company, including for example and without limitation, information related to Innovations (as defined in Section 4 below), concepts, techniques, processes, methods, systems, designs, computer programs, source documentation, trade secrets, formulae, development or experimental work, work in progress, forecasts, proposed and future products, marketing plans, financial information, business plans, customers and suppliers and any other nonpublic information that has commercial value

or (b) any information Company has received from others that Company is obligated to treat as confidential or proprietary, which may be made known to me by Company, a third party or otherwise that I may learn during my employment with Company.

3.    <u>Ownership and Nondisclosure of Proprietary Information</u>.    All Proprietary Information is the sole property of Company, Company's assigns, Company's customers and Company's suppliers, as applicable.  Company, Company's assigns, Company's customers and Company's suppliers, as applicable, are the sole and exclusive owners of all patents, copyrights, mask works, trade secrets and other rights in and to the Proprietary Information.  I will not disclose any Proprietary Information to anyone outside Company, and I will use and disclose Proprietary Information to those inside Company only as may be necessary in the ordinary course of performing my duties as an employee of Company.  If I have any questions as to whether information constitutes Proprietary Information, or to whom, if anyone, inside Company, any Proprietary Information may be disclosed, I will consult with my manager at Company.

4.    <u>"Innovations" Definition</u>.    In this Agreement, "Innovations" means all discoveries, designs, developments, improvements, inventions (whether or not protectable under patent laws), works of authorship, information fixed in any tangible medium of expression (whether or not protectable under copyright laws), trade secrets, know-how, ideas (whether or not protectable under trade secret laws), mask works, trademarks, service marks, trade names and trade dress.

5.    <u>Disclosure and License of Prior Innovations</u>.  I have listed on <u>Exhibit A</u> ("Prior Innovations"), attached hereto, all Innovations relating in any way to Company's Business or demonstrably anticipated research and development or business, which were conceived, reduced to practice, created, derived, developed, or made by me prior to my employment with

Company (collectively, the "Prior Innovations"). I represent that I have no rights in any such Company-related Innovations other than those Innovations listed on Exhibit A. If nothing is listed on Exhibit A ("Prior Innovations"), I represent that there are no Prior Innovations at the time of signing this Agreement. I hereby grant to Company and Company's designees a royalty-free, irrevocable, worldwide, fully paid-up license (with rights to sublicense through multiple tiers of sublicensees) to practice all patent, copyright, moral right, mask work, trade secret and other intellectual property rights relating to any Prior Innovations that I incorporate, or permit to be incorporated, in any Innovations that I, solely or jointly with others, conceive, develop or reduce to practice during my employment with Company (the "Company Innovations"). Notwithstanding the foregoing, I will not incorporate, or permit to be incorporated, any Prior Innovations in any Company Innovations without Company's prior written consent.

6.      Future Innovations. I will disclose promptly in writing to Company all Innovations conceived, reduced to practice, created, derived, developed, or made by me during the term of my employment and for three (3) months thereafter, whether or not I believe such Innovations are subject to this Agreement, to permit a determination by Company as to whether or not the Innovations should be considered Company Innovations. Company will receive any such information in confidence.

7.      Disclosure and Assignment of Company Innovations. I will promptly disclose and describe to Company all Company Innovations. I hereby do and will assign to Company or Company's designee all my right, title, and interest in and to any and all Company Innovations. To the extent any of the rights, title and interest in and to Company Innovations cannot be assigned by me to Company, I hereby grant to Company an exclusive, royalty-free, transferable, irrevocable, worldwide license (with rights to sublicense through multiple tiers of sublicensees) to practice such non-assignable rights, title and interest. To the extent any of the rights, title and interest in and to Company

Innovations can neither be assigned nor licensed by me to Company, I hereby irrevocably waive and agree never to assert such non-assignable and non-licensable rights, title and interest against Company or any of Company's successors in interest.

8.      Exclusion from Assignment. I understand that my obligation to assign, license or waive a claim with respect to any Innovation must comply with the requirements of RCW 49.44.140. Pursuant to this Washington statute, Section 7 of this Agreement (Disclosure and Assignment of Company Innovations) does not apply to, and I do not assign my rights to any Innovation (whether a Company Innovation or otherwise) when I can prove that: (a) I developed the Innovation entirely on my own time; (b) I did not use Company equipment, supplies, facilities , or trade secret information in its development; (c) the Innovation does not relate (i) directly to the Business of Company, or (ii) to the actual or demonstrably anticipated research or development of Company; and (d) the Innovation does not result from any work performed by me for Company. This Section will be construed to apply to all Innovations with which I am involved from this date forward, as well as all Company Innovations with which I have been involved since my employment with Company began.

9.      [OPTIONAL] Non-Competition. For a period of [one year] after termination of my employment, I will not directly or indirectly, whether as an owner, director, officer, manager, consultant, agent or employee, accept employment or engage in activities that compete with the Business or with the reasonably anticipated planned product developments of Company as of my termination date. I acknowledge that due to the nature of the Company's Business, there is no restriction on the geographical scope of my non-competition obligations to Company. I acknowledge that Company competes on a worldwide basis and that the geographical scope of these limitations is reasonable and necessary for the protection of Company's trade secrets and other Proprietary Information. I further acknowledge that if a court of competent jurisdiction finds this non-

competition provision invalid or unenforceable due to unreasonableness in time, geographic scope, or scope of the Business, then such court will interpret and enforce this provision to the maximum extent that such court deems reasonable.

10.    Cooperation in Perfecting Rights to Innovations.  I agree to perform, during and after my employment, all acts that Company deems necessary or desirable to permit and assist Company, at its expense, in obtaining and enforcing the full benefits, enjoyment, rights and title throughout the world in the Innovations as provided to Company under this Agreement.  If Company is unable for any reason to secure my signature to any document required to file, prosecute, register or memorialize the assignment of any rights or application or to enforce any right under any Innovations as provided under this Agreement, I hereby irrevocably designate and appoint Company and Company's duly authorized officers and agents as my agents and attorneys-in-fact to act for and on my behalf and instead of me to take all lawfully permitted acts to further the filing, prosecution, registration, memorialization of assignment, issuance, and enforcement of rights under such Innovations, all with the same legal force and effect as if executed by me.  The foregoing is deemed a power coupled with an interest and is irrevocable.

11.    Employment at Will.  I acknowledge that my employment will be of indefinite duration and that either Company or I will be free to terminate my employment at any time with or without cause.    I also acknowledge that any representations to the contrary are unauthorized and void, unless contained in a formal written employment contract signed by an officer of Company.

12.    Return of Materials.  At any time upon Company's request, and when my employment with Company is over, I will return all materials (including, without limitation, documents, drawings, papers, diskettes and tapes) containing or disclosing any Proprietary Information (including all copies thereof), as well as any keys, pass cards, identification cards, computers, printers, pagers, personal digital assistants or

similar items or devices that the Company has provided to me.  I will provide Company with a written certification of my compliance with my obligations under this Section.

13.    No Violation of Rights of Third Parties.  During my employment with Company, I will not (a) breach any agreement to keep in confidence any confidential or proprietary information, knowledge or data acquired by me prior to my employment with Company or (b) disclose to Company, or use or induce Company to use, any confidential or proprietary information or material belonging to any previous employer or any other third party.  I am not currently a party, and will not become a party, to any other agreement that is in conflict, or will prevent me from complying, with this Agreement.

14.    Survival.    This Agreement (a) will survive my employment by Company; (b) does not in any way restrict my right to resign or the right of Company to terminate my employment at any time, for any reason or for no reason; (c) inures to the benefit of successors and assigns of Company; and (d) is binding upon my heirs and legal representatives.

15.    No Solicitation.  During my employment with Company and for one (1) year thereafter, I will not solicit, encourage, or cause others to solicit or encourage any employees of Company to terminate their employment with Company.

16.    No Disparagement.    During my employment with Company and after the termination thereof, I will not disparage Company, its products, services, agents or employees.

17.    Injunctive Relief.  I agree that if I violate this Agreement, Company will suffer irreparable and continuing damage for which money damages are insufficient, and Company will be entitled to injunctive relief and/or a decree for specific performance, and such other relief as may be proper (including money damages if appropriate).

18.    Notices.    Any notice required or permitted by this Agreement will be in writing

and will be delivered as follows, with notice deemed given as indicated: (a) by personal delivery, when actually delivered; (b) by overnight courier, upon written verification of receipt; (c) by facsimile transmission, upon acknowledgment of receipt of electronic transmission; or (d) by certified or registered mail, return receipt requested, upon verification of receipt. Notices to me will be sent to any address in Company's records or such other address as I may provide in writing. Notices to Company will be sent to Company's Human Resources Department or to such other address as Company may specify in writing.

19.     Governing Law; Forum.     This Agreement will be governed by the laws of the United States of America and by the laws of the State of Washington, as such laws are applied to agreements entered into and to be performed entirely within Washington between Washington residents. Company and I each irrevocably consent to the exclusive personal jurisdiction of the federal and state courts located in King County, Washington, as applicable, for any matter arising out of or relating to this Agreement, except that in actions seeking to enforce any order or any judgment of such federal or state courts located in King County, Washington, such personal jurisdiction will be nonexclusive.

20.     Severability.  If a court of law holds any provision of this Agreement to be illegal, invalid or unenforceable, (a) that provision will be deemed amended to provide Company the maximum protection permitted by applicable law and (b) the legality, validity and enforceability of the remaining provisions of this Agreement will not be affected.

21.     Waiver; Modification.     If Company waives any term, provision or breach by me of this Agreement, such waiver will not be effective unless it is in writing and signed by Company. No waiver will constitute a waiver of any other or subsequent breach by me. This Agreement may be modified only if both Company and I consent in writing.

22.     Entire Agreement.     This Agreement represents my entire understanding with Company with respect to the subject matter of this Agreement and supersedes all previous understandings, written or oral.

        I certify and acknowledge that I have carefully read all of the provisions of this Agreement and that I understand and will fully and faithfully comply with such provisions.

COMPANY:                                EMPLOYEE:

DAOLABS IP CORPORATION                  _____

By: _____    By: _____

Title _____    Title _____

Dated: _____    Dated: _____

<u>Exhibit A</u>

PRIOR INNOVATIONS

Check one of the following:

™        NO SUCH PRIOR INNOVATIONS EXIST.

OR

™        YES, SUCH PRIOR INNOVATIONS EXIST AS DESCRIBED BELOW (include basic description of each Prior Innovation):

CONFIDENTIALITY AGREEMENT
(DISCLOSURES **BY** DAOLABS IP CORPORATION)

1.     <u>When Used</u>.  DAOLABS IP CORPORATION ("Company") should use this agreement when it intends to engage in discussions in which Company will be **disclosing** confidential information, **including information that is technical**, to any party.  DO **NOT** USE THIS AGREEMENT IF COMPANY WILL BE **RECEIVING** CONFIDENTIAL INFORMATION OF ANOTHER PARTY; IN SUCH SITUATION, USE ONE OF THE MUTUAL CONFIDENTIALITY AGREEMENTS OR THE CONFIDENTIALITY AGREEMENT FOR DISCLOSURES **TO** COMPANY.

2.     <u>To Be Completed Before Signing</u>.  Fill in the "Effective Date" and the recipient's name and address, and check the appropriate box identifying whether the recipient is an individual, partnership, limited liability partnership, corporation, or limited liability company.

3.     <u>Signature</u>.  Have both parties sign the signature page and describe the purpose for the disclosures following the signature block.  For disclosures by Company of any tangible materials (documents, manuals, diskettes, tapes, cartridges, drawings, sketches, designs, etc.), you may wish to have the recipient complete a Confidential Materials Release Form (a form of which is also provided) before disclosing the materials.

## CONFIDENTIALITY AGREEMENT
### (DISCLOSURES **BY** DAOLABS IP CORPORATION)

This Agreement is made and entered into, as of _____, 200_ ("Effective Date"), by and between DAOLABS IP CORPORATION ("Company"), having a principal place of business at 720 Third Avenue, Suite 1100, Seattle, WA 98104, and [RECIPIENT NAME], a(n) ☐individual, ☐partnership, ☐limited liability partnership, ☐corporation, ☐limited liability company (check the appropriate box) of the state of _____, having a principal place of business at [RECIPIENT ADDRESS] ("Recipient").

1.      Definition of Confidential Information. "Confidential Information" means (a) any technical and non-technical information related to the Company's business and current, future and proposed products and services of Company, including for example and without limitation, information concerning research, development, design details and specifications, financial information, procurement requirements, engineering and manufacturing information, customer lists, business forecasts, sales information, marketing plans and business plans; and (b) any information that may be made known to Recipient and which Company has received from others that Company is obligated to treat as confidential or proprietary, whether or not marked as confidential.

2.      Nondisclosure and Nonuse Obligations. Recipient will not use, disseminate or in any way disclose any Confidential Information to any person, firm or business, except to the extent necessary for the purpose described below the signatures to this Agreement (the "Purpose"). Furthermore, Recipient may not disclose the existence of any negotiations, discussions or consultations in progress between the parties to any form of public media without the prior written approval of Company. Recipient will treat all Confidential Information with the same degree of care as Recipient accords to Recipient's own confidential information, but in no case less than reasonable care. Recipient will disclose Confidential Information only to those of its employees who have a need to know such information to assist Recipient with respect to the Purpose. Recipient certifies that each such employee will have agreed, either as a condition of employment or in order to obtain the Confidential Information, to be bound by terms and conditions substantially similar to those terms and conditions applicable to Recipient under this Agreement. Recipient will immediately give notice to Company of any unauthorized use or disclosure of the Confidential Information. Recipient will assist Company in remedying any such unauthorized use or disclosure of the Confidential Information.

3.      Exclusions from Nondisclosure and Nonuse Obligations. Recipient's obligations under Section 2 (Nondisclosure and Nonuse Obligations) will not apply to any Confidential Information that Recipient can document (a) was in the public domain at or subsequent to the time such Confidential Information was communicated to Recipient by Company through no fault of Recipient; (b) was rightfully in Recipient's possession free of any obligation of confidence at or subsequent to the time such Confidential Information was communicated to Recipient by Company; or (c) was developed by employees, contractors or agents of Recipient independently of and without reference to any Confidential Information. A disclosure of any Confidential Information (i) in response to a valid order by a court or other governmental body or (ii) as otherwise required by law will not be considered to be a breach of this Agreement or a waiver of confidentiality for other purposes; provided, however, that Recipient will provide prompt prior written notice thereof to Company to enable Company to seek a protective order or otherwise prevent such disclosure.

4.      Ownership and Return of Confidential Information and Other Materials. All Confidential Information, and any Derivatives (defined below) thereof, whether created by Company or Recipient, will be the property of Company and no license or other rights to

Confidential Information or Derivatives is granted or implied hereby.  For purposes of this Agreement, "Derivatives" will mean:  (a) for copyrightable or copyrighted material, any translation, abridgment, revision or other form in which an existing work may be recast, transformed or adapted; (b) for patentable or patented material, any improvement thereon; and (c) for material protected by trade secret, any new material derived from such existing trade secret material, including new material that may be protected under copyright, patent and/or trade secret laws.  Recipient hereby does and will assign to Company all of Recipient's rights, title in interest and interest in and to the Derivatives.  All materials (including, without limitation, documents, drawings, papers, diskettes, tapes, models, apparatus, sketches, designs and lists) that Company furnishes to Recipient (whether or not they contain or disclose Confidential Information) are the property of Company.  Within five (5) days after any request by Company, Recipient will destroy or deliver to Company, at Company's option, (i) all such Company-furnished materials and  (ii) all materials in Recipient's possession or control (even if not Company-furnished) that contain or disclose any Confidential Information.  Recipient will provide Company a written certification of Recipient's compliance with Recipient's obligations under this Section.

5.    No Warranty.    All Confidential Information is provided "AS IS" and without any warranty, express, implied or otherwise, regarding such Confidential Information's accuracy or performance.  Recipient acknowledges and agrees that Company is not responsible or liable for any decisions made by Recipient in reliance upon disclosures made pursuant to this Agreement.

6.    No Export.  Recipient will obtain any licenses or approvals the U.S. government or any agency thereof requires prior to exporting, directly or indirectly, any technical data acquired from Company pursuant to this Agreement or any product utilizing any such data.

7.    Term.  This Agreement will govern all communications from Company to Recipient that are made from the Effective Date to the date on which either party receives from the other party written notice that subsequent communications will not be so governed; provided, however, that Recipient's obligations under Section 2 (Nondisclosure and Nonuse Obligations) will continue in perpetuity with respect to Confidential Information of Company that Recipient has previously received unless such obligations no longer apply pursuant to Section 3 (Exclusions from Nondisclosure and Nonuse Obligations).

8.    No Assignment.  Recipient will not assign or transfer any rights or obligations under this Agreement without the prior written consent of Company.

9.    Injunctive Relief.  A breach of this Agreement will cause irreparable and continuing damage to Company for which money damages are insufficient, and Company will be entitled to injunctive relief and/or a decree for specific performance, and such other relief as may be proper (including money damages if appropriate).

10.    Notices.    Any notice required or permitted by this Agreement will be in writing and will be delivered as follows, with notice deemed given as indicated:  (a) by personal delivery, when actually delivered;  (b) by overnight courier, upon written verification of receipt; (c) by facsimile transmission, upon acknowledgment of receipt of electronic transmission; or (d) by certified or registered mail, return receipt requested, upon verification of receipt.  Notice will be sent to the addresses set forth above or to such other address as either party may provide in writing.

11.    Governing Law; Forum; Legal Fees.  This Agreement will be governed in all respects by the laws of the United States of America and by the laws of the State of Washington, as such laws are applied to agreements entered into and to be performed entirely within Washington between Washington residents.  Each of the parties irrevocably consents to the exclusive personal jurisdiction of the federal and state courts located in King County, Washington, as applicable, for any matter arising out of or

relating to this Agreement, except that in actions seeking to enforce any order or any judgment of such federal or state courts located in King County, Washington, such personal jurisdiction will be nonexclusive.   If a proceeding is commenced to resolve any dispute that arises between the parties with respect to the matters covered by this Agreement, the prevailing party in such proceeding will be entitled to receive its reasonable attorneys' fees, expert witness fees and out-of-pocket costs incurred in connection with such proceeding, in addition to any other relief to which such prevailing party may be entitled.

12.     Severability.  If a court of law holds any provision of this Agreement to be illegal, invalid or unenforceable, (a) that provision will be deemed amended to achieve an economic effect that is as near as possible to that provided by the

original provision and (b) the legality, validity and enforceability of the remaining provisions of this Agreement will not be affected.

13.     Waiver; Modification.     If Company waives any term, provision or Recipient's breach of this Agreement, such waiver will not be effective unless it is in writing and signed by Company. No waiver will constitute a waiver of any other or subsequent breach by Recipient. This Agreement may be modified only if authorized representatives of both parties consent in writing.

14.     Entire Agreement.     This Agreement constitutes the entire agreement with respect to the Confidential Information disclosed hereunder and supersedes all prior or contemporaneous agreements concerning such Confidential Information, written or oral.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective Date.

"Company"                                            "Recipient"

DAOLABS IP CORPORATION               [RECIPIENT NAME]

By: _____        By: _____

Name: _____        Name: _____

Title: _____       Title: _____


Purpose: _____

_____

CONFIDENTIALITY AGREEMENT
(DISCLOSURES **TO** DAOLABS IP CORPORATION)

1.     <u>When Used</u>.  DAOLABS IP CORPORATION ("Company") should use this agreement when it intends to engage in discussions with another party in which Company is **<u>receiving</u>** confidential information from the other party (the "Disclosing Party"), **including information that is technical**.  DO **<u>NOT</u>** USE THIS AGREEMENT IF COMPANY WILL **<u>ALSO</u>** BE **<u>DISCLOSING</u>** COMPANY'S CONFIDENTIAL INFORMATION TO DISCLOSING PARTY; IN SUCH SITUATION, USE ONE OF THE MUTUAL CONFIDENTIALITY AGREEMENTS.

2.     <u>To Be Completed Before Signing</u>.  Fill in the "Effective Date" and the discloser's name and address, and check the appropriate box identifying whether Disclosing Party is an individual, partnership, limited liability partnership, corporation, or limited liability company.

3.     <u>Signature</u>.  Have both parties sign the signature page.  For disclosures to Company of any tangible materials (documents, manuals, diskettes, tapes, cartridges, drawings, sketches, designs, etc.), you may wish to have the discloser complete a Confidential Materials Release Form (a form of which is also provided) before the Company receives the materials.

# CONFIDENTIALITY AGREEMENT
## (DISCLOSURES **TO** DAOLABS IP CORPORATION)

This Agreement is made and entered into, as of _____, 200_ ("Effective Date"), by and between DAOLABS IP CORPORATION ("Company"), having a principal place of business at 720 Third Avenue, Suite 1100, Seattle, WA 98104, and [DISCLOSER NAME], a(n) ☐ individual, ☐ partnership, ☐ limited liability partnership, ☐ corporation, ☐ limited liability company (check the appropriate box) of the state of _____, having a principal place of business at [DISCLOSER ADDRESS] ("Disclosing Party").

1.      Definition of Confidential Information. "Confidential Information" means trade secrets, know-how, inventions, techniques, processes, algorithms, software programs, schematics, software source documents, contracts, customer lists, financial information, sales information and marketing plans concerning Disclosing Party's business that is valuable, not generally known to the public and disclosed to Company in written form and marked "Confidential" or, if disclosed orally, summarized in writing where such summary is marked "Confidential" and sent to Company no later than thirty (30) days after such disclosure.

2.      Confidentiality Obligations. Company will use reasonable care to disclose Confidential Information only to those employees or consultants of Company as reasonably necessary for the purpose of evaluating the commercial potential of a business relationship with Disclosing Party and for any other purpose that Disclosing Party may hereafter authorize in writing.

3.      Exclusions from Nondisclosure and Nonuse Obligations. Company's obligations under Section 2 (Confidentiality Obligations) will not apply to any Confidential Information that Company can demonstrate (a) was in the public domain at or subsequent to the time such Confidential Information was communicated to Company by Disclosing Party through no fault of Company; (b) was in Company's possession free

of any obligation of confidence at or subsequent to the time such Confidential Information was communicated to Company by Disclosing Party; (c) was developed by employees, contractors or agents of Company independently of and without reference to any Confidential Information; (d) was known to Company at the time of disclosure; or (e) was approved for release by written authorization of Disclosing Party. A disclosure of any Confidential Information (i) in response to a valid order by a court or other governmental body; (ii) as otherwise required by law; or (iii) necessary to establish the rights of either party under this Agreement will not be considered to be a breach of this Agreement; provided, however, that Company will provide prompt prior written notice thereof to Disclosing Party to enable Disclosing Party to seek a protective order or otherwise prevent such disclosure.

4.      Ownership of Materials. All materials (including, without limitation, documents, drawings, papers, diskettes, tapes, models, apparatus, sketches, designs and lists) that Disclosing Party furnishes to Company, which are designated in writing to be the property of Disclosing Party, are the property of Disclosing Party. Within five (5) days after any written request by Disclosing Party, Company will destroy or deliver to Disclosing Party, at Disclosing Party's option, all materials it received from Disclosing Party (including any copies thereof).

5.      Independent Development. Company may currently or in the future be developing information internally, or receiving information from other parties that may be similar to the Confidential Information. Accordingly, nothing in this Agreement will be construed as a representation or inference that Company will not develop or have developed products or services that, without violation of this Agreement, might compete with the products or systems disclosed by the Confidential Information.

6.      Disclosure of Third Party Information. Disclosing Party will not communicate any information to Company in violation of the proprietary rights of any third party.

7.      Term.  This Agreement will govern all communications from Disclosing Party to Company from the Effective Date and will remain in full force and effect for a period of two (2) years, unless such obligations terminate earlier pursuant to Section 3 (Exclusions from Nondisclosure and Nonuse Obligations).

8.      Notices.      Any notice required or permitted by this Agreement will be in writing and will be delivered as follows, with notice deemed given as indicated:  (a) by personal delivery, when actually delivered;  (b) by overnight courier, upon written verification of receipt; (c) by facsimile transmission, upon acknowledgment of receipt of electronic transmission; or (d) by certified or registered mail, return receipt requested, upon verification of receipt.  Notice will be sent to the addresses set forth above or to such other address as either party may provide in writing.

9.      Governing Law; Forum.     This Agreement will be governed in all respects by the laws of the United States of America and by the laws of the State of Washington, as such laws are applied to agreements entered into and to be performed entirely within Washington between Washington residents.   Each of the parties irrevocably consents to the exclusive personal jurisdiction of the federal and state courts located in King County, Washington, as applicable, for any matter arising out of or relating to this Agreement, except that in actions seeking to enforce any order or any judgment of such federal or state courts located in King County, Washington, such personal jurisdiction will be nonexclusive.

10.     Severability.  If a court of law holds any provision of this Agreement to be illegal, invalid or unenforceable, (a) that provision will be deemed amended to achieve an economic effect that is as near as possible to that provided by the original provision and (b) the legality, validity and enforceability of the remaining provisions of this Agreement will not be affected thereby.

11.     Waiver; Modification. If a party waives any term, provision or a party's breach of this Agreement, such waiver will not be effective unless it is in writing and signed by the party against whom such waiver is asserted.  No waiver by a party of a breach of this Agreement by the other party will constitute a waiver of any other or subsequent breach by such other party.  This Agreement may be modified only if authorized representatives of both parties consent in writing.

12.     Entire Agreement.     This Agreement constitutes the entire agreement with respect to the Confidential Information disclosed hereunder and supersedes all prior or contemporaneous agreements concerning such Confidential Information, written or oral

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective Date.

"Company"                                    "Disclosing Party"

DAOLABS IP CORPORATION           [DISCLOSER NAME]


By: _____           By: _____

Name: _____          Name: _____

Title: _____          Title: _____

MUTUAL CONFIDENTIALITY AGREEMENT WITH SUPPLEMENT

1.      <u>When Used</u>.  DAOLABS IP CORPORATION ("Company") should use this agreement when either Company and another party will **both disclose** confidential information, including technical information, pursuant to a Supplement, the form of which is attached to this agreement, that identifies the specific confidential information that each party proposes to disclose to the other, subject to advance consent by the recipient of the confidential information.

2.      <u>To Be Completed Before Signing</u>.  Fill in the Effective Date, the other party's ("Other Party's") name and address, check the appropriate box identifying whether the Other Party is an individual, partnership, limited liability partnership, corporation, or limited liability company, and complete the Supplement.

3.      <u>Signature</u>.  Have the Other Party sign the signature page.

MUTUAL NON-DISCLOSURE AGREEMENT

This Agreement is made and entered into, as of _____, 200__, ("Effective Date") by and between DAOLABS IP CORPORATION, with a principal place of business at 720 Third Avenue, Suite 1100, Seattle, WA 98104 ("Company"), and _____, a(n) ☐ individual, ☐ partnership, ☐ limited liability partnership, ☐ corporation, ☐ limited liability company (check the appropriate box) of the state of _____, having a principal place of business at [ADDRESS] ("Other Party").

The parties are engaged in discussions that may result in a business relationship or transaction. The parties desire to disclose confidential and proprietary information ("Confidential Information") in order to assist one another in evaluating the possible relationship or transaction. Each party will make the disclosures only if the other party agrees to maintain the confidentiality of its Confidential Information.

1.    <u>Disclosure</u>.  Neither party (a "Disclosing Party") will disclose Confidential Information to the other party (a "Recipient") until the subject matter of such disclosure has been described in a "Supplement" to this Agreement, signed by the parties prior to the disclosure. Each Supplement will contain a description of the Confidential Information to be disclosed and the purpose for such disclosure (the "Project") written in a non-confidential manner. Any additional terms and conditions for the particular disclosure of Confidential Information beyond the terms and conditions contained in this Agreement will be specified in the applicable Supplement pertaining to such additional terms and conditions of the particular disclosure. Each Supplement will be substantially in the form attached hereto as <u>Exhibit A</u>, and will be incorporated into this Agreement by this reference. The parties acknowledge and agree that the amount of Confidential Information to be disclosed resides solely in the discretion of the Disclosing Party and that disclosure of Confidential Information of any nature will not

obligate the Disclosing Party to disclose any further Confidential Information.

2.    <u>Duty of Non-Disclosure</u>.  A Recipient will not use, disseminate, or in any way disclose any Confidential Information of Disclosing Party to any person, firm or business, except to the extent necessary to evaluate the contemplated relationship or transaction. Recipient will treat all Confidential Information of Disclosing Party with the same degree of care as it accords to its own Confidential Information, but in no case less than reasonable care. Recipient will disclose Confidential Information of the Disclosing Party only to those of Recipient's employees who need to know such information, and will not disclose it to any other parties, including subsidiaries or associated companies, without express, written consent of Disclosing Party.  Recipient certifies that Recipient's employees have previously agreed, either as a condition of employment or in order to obtain the Confidential Information of Disclosing Party, to be bound by terms and conditions substantially similar to, but in no case less restrictive than, those terms and conditions applicable to such Recipient under this Agreement. Recipient will employ all reasonable steps to protect the Disclosing Party's Confidential Information from unauthorized or inadvertent disclosure or use, including, without limitation, all steps that it takes to protect its own Confidential Information. In the event Recipient proposes to disclose Confidential Information to an unaffiliated consultant or agent, it will obtain the written consent of Disclosing Party and arrange for the execution by the consultant or agent of a nondisclosure agreement in a form satisfactory to Disclosing Party.

3.    <u>Duty to Mark Confidential Information</u>.  A Disclosing Party will mark all Confidential Information provided in a tangible form to Recipient in a manner that indicates such materials are Confidential Information, and subject to the limited use and non-disclosure obligations provided in this Agreement.  If Disclosing Party provides Confidential

Information orally, then Disclosing Party will summarize such Confidential Information in a writing and mark such summary as "Confidential," and send the marked summary to Recipient no later than thirty (30) days following such oral disclosure.

4. <u>Exceptions</u>. Recipient will have no obligation to keep confidential Confidential Information that (a) is known to Recipient prior to receipt from Disclosing Party, directly or indirectly, from a source other than one having any obligation of confidentiality to Disclosing Party, (b) becomes known (independently of disclosure by Disclosing Party) to Recipient, directly or indirectly, from a source other than one having an obligation of confidentiality to Disclosing Party, (c) becomes publicly known or otherwise ceases to be secret or confidential, except through a breach of this Agreement by Recipient, or (d) Recipient can demonstrate was developed by Recipient independently of and without reference to any Confidential Information disclosed to it by Disclosing Party. A disclosure of any portion of Confidential Information, either (i) in response to a valid order by a court or other governmental body, or (ii) otherwise as required by law, will not be considered to be a breach of this Agreement, <u>provided</u>, <u>however</u>, that Recipient will provide prompt prior written notice thereof to Disclosing Party to enable Disclosing Party to seek a protective order or otherwise prevent such disclosure. Any such disclosure by Recipient of the Confidential Information of Disclosing Party, will, in no way, be deemed to change, affect or diminish the confidential and proprietary status of such Confidential Information.

5. <u>No Warranties</u>. The parties acknowledge and agree that a Disclosing Party supplies Confidential Information on an "AS IS" basis and without express or implied warranties of any kind. The parties further acknowledge and agree that neither party is responsible nor liable for any business decision made by the other in reliance on disclosures made pursuant to this Agreement.

6. <u>Ownership and Return of Confidential Information</u>. Confidential Information will be deemed the property of Disclosing Party and nothing in this Agreement will be construed as conferring any rights upon Recipient, by license or otherwise, in any Confidential Information. Upon request from Disclosing Party at any time, Recipient will, at Disclosing Party's option, return or destroy all Confidential Information to Recipient no later than five (5) days following such a request, and certify such destruction or return in writing to Disclosing Party.

7. <u>Independent Development</u>. Disclosing Party understands that Recipient may currently or in the future be developing information internally, or receiving information from other parties that may be similar to Disclosing Party's Confidential Information. Nothing in this Agreement will be construed as a representation or inference that Recipient will not develop products or services, or have products or services developed for it that, without violation of this Agreement, compete with the products or systems contemplated by Disclosing Party's Confidential Information.

8. <u>Disclosure of Third Party Information</u>. The Disclosing Party will not communicate any information to Company in violation of the proprietary rights of any third party.

9. <u>Injunctive Relief</u>. The parties acknowledge and agree that monetary damages would not be a sufficient remedy for any breach of obligations under this Agreement and that a Disclosing Party will be entitled to injunctive relief as a remedy for any such breach by the Recipient. Such remedy will not be deemed the exclusive remedy for a breach of Recipient's obligations under this Agreement, but will be in addition to all other available legal and equitable remedies.

10. <u>Term</u>. This Agreement will govern all communications between Disclosing Party and Recipient from the Effective Date and remain in full force and effect for five (5) years.

11.     <u>Binding Effect</u>.  This Agreement will benefit and be binding upon the parties and their respective successors and assigns.

12.     <u>Governing Law; Venue</u>.  This Agreement will be governed by, and construed in accordance with the laws of the State of Washington without giving effect to any conflict of laws principles to the contrary.  Venue for any disputes arising under this Agreement will lie exclusively in the state or federal courts located in King County, Washington.  The parties irrevocably waive any right to raise *forum non conveniens* or any other argument that King County, Washington is not the proper venue, and irrevocably consent to personal jurisdiction in the state and federal courts of Washington.

13.     <u>Attorneys Fees</u>.  The prevailing party in any such action will be entitled to recover its reasonable attorney fees and costs in such action and upon any appeals.

14.     <u>Non-Waiver; Modification</u>.  No failure or delay by either party in exercising any right, power, or remedy under this Agreement will operate as a waiver of any such right, power or remedy.  No waiver or modification of any provision of this Agreement will be effective unless in writing and signed by both parties.

15.     <u>Entire Agreement</u>.  This Agreement, together with the Supplements, constitutes the entire agreement with respect to the Confidential Information disclosed hereunder and supersedes all prior or contemporaneous oral or written agreements concerning such Confidential Information.

        IN WITNESS WHEREOF, the parties through their duly authorized representatives have executed this Agreement as of the Effective Date.

| "Company" | "Other Party" |
|---|---|
| DAOLABS IP CORPORATION | [OTHER PARTY] |
| By: _____ | By: _____ |
| Name: _____ | Name: _____ |
| Title: _____ | Title: _____ |

**Exhibit A**

Supplement No. __
To Mutual Non-Disclosure Agreement Between DAOLABS IP CORPORATION and Other Party

**Name and Address of**                          **Name and Address of**
**DAOLABS IP CORPORATION Contact**               **Contact at Other Party**

_____                _____
                                                 _____
720 Third Avenue, Suite 1100                     _____
Seattle, WA 98101

DAOLABS IP CORPORATION                           Other Party

Tel : _____                   Tel: _____
Fax: _____                    Fax: _____
Email: _____                    Email: _____


Effective Date: _____            Ending Date: _____

**1.      Confidential Information**

   (a)  DAOLABS IP CORPORATION may disclose Confidential Information pertaining to:



   (b)  Other Party may disclose Confidential Information pertaining to


**2.      Purpose of Disclosure (the "Project"):**


**3.      Additional Terms and Conditions:**

Accepted by:

DAOLABS IP CORPORATION                            OTHER PARTY


By: _____                     By: _____

Name: _____                     Name: _____

Title: _____                     Title: _____

MUTUAL CONFIDENTIALITY AGREEMENT (LONG FORM)

1.   <u>When Used</u>.  DAOLABS IP CORPORATION ("Company") should use this agreement when Company and another party will **both** **disclose** to the other party any of such disclosing party's confidential information, **including information that is technical**.

2.   <u>To Be Completed Before Signing</u>.  Fill in the "Effective Date" and the other party's name and address, and check the appropriate box identifying whether the other party is an individual, partnership, limited liability partnership, corporation or limited liability company.

3.   <u>Description of "Confidential Information</u>."  Company must select one of three options in Section 1 for describing what constitutes "Confidential Information" based on the Company's role as both a recipient and a discloser of confidential information.  In order for the Company to understand more fully the impact of each of these options, we have provided the options in declining order of protection to Company from the perspective of Company **in the position of a "Recipient" more so than a "Disclosing Party**."  That is, if Company were receiving "Confidential Information," Company would be most protected if the Disclosing Party were required to mark all information that Disclosing Party wanted Company to treat as confidential under this agreement.  On the other hand, Company would have greater obligations (and therefore, less protection) if Disclosing Party's information could be considered confidential simply by the circumstances of disclosure.

4.   <u>Signature</u>.  Have both parties sign the signature page and describe the purpose for the disclosures following the signature block.  For disclosures by or to Company of any tangible materials (documents, manuals, diskettes, tapes, cartridges, drawings, sketches, designs, etc.), each party may wish to have the other complete a Confidential Materials Release Form (a form of which is also provided) before disclosing or receiving (as applicable) the materials.

SE\9066575.1
999850-1

MUTUAL CONFIDENTIALITY AGREEMENT (LONG FORM)

This Agreement is made and entered into, as of _____, 200_ ("Effective Date"), by and between DAOLABS IP CORPORATION ("Company"), having a principal place of business at 720 Third Avenue, Suite 1100, Seattle, WA 98104, and [OTHER PARTY NAME], a(n) ☐individual, ☐partnership, ☐limited liability partnership, ☐corporation, ☐limited liability company (check the appropriate box) of the state of _____, having a principal place of business at [OTHER PARTY ADDRESS] ("Other Party").

1.      Definition of Confidential Information. "Confidential Information" means (a) any technical and non-technical information related to a party's business and current, future and proposed products and services of each of the parties, including for example and without limitation, each party's respective information concerning research, development, design details and specifications, financial information, procurement requirements, engineering and manufacturing information, customer lists, business forecasts, sales information and marketing plans and (b) any information a party has received from others that may be made known to the other party and which such party is obligated to treat as confidential or proprietary; provided, however, that any such information disclosed by a party to this Agreement (the "Disclosing Party") will be considered Confidential Information of Disclosing Party by the other party (the "Recipient"), only if such information **[OPTION 1:**  (i) is provided as information fixed in tangible form or in writing (e.g., paper, disk or electronic mail), is conspicuously designated as "Confidential" (or with some other similar legend) or (ii) if provided orally, is identified as confidential at the time of disclosure and confirmed in writing within thirty (30) days of disclosure**] [OPTION 2:**  is identified at the time of disclosure as "Confidential" (or with some other similar legend)**] [OPTION 3:**  would be considered confidential based on the circumstances surrounding its disclosure by a reasonable person familiar with the Disclosing Party's business and the industry in which Disclosing Party operates**].**

2.      Nondisclosure and Nonuse Obligations. Recipient will not use, disseminate, or in any way disclose any of Disclosing Party's Confidential Information to any person, firm or business, except to the extent necessary for the purpose described below the signatures to this Agreement (the "Purpose").  Furthermore, neither party may disclose the existence of any negotiations, discussions or consultations in progress between the parties to any form of public media without the prior written approval of the other party. Recipient will treat all of Disclosing Party's Confidential Information with the same degree of care as Recipient accords to Recipient's own Confidential Information, but not less than reasonable care.  Recipient will disclose Disclosing Party's Confidential Information only to those of Recipient's employees, consultants and contractors who need to know such information.  Recipient certifies that each such employee, consultant and contractor will have agreed, either as a condition to employment or in order to obtain Disclosing Party's Confidential Information, to be bound by terms and conditions substantially similar to those terms and conditions applicable to Recipient under this Agreement.  Recipient will immediately give notice to Disclosing Party of any unauthorized use or disclosure of Disclosing Party's Confidential Information.  Recipient will assist Disclosing Party in remedying any such unauthorized use or disclosure of Disclosing Party's Confidential Information.

3.      Exclusions from Nondisclosure and Nonuse Obligations.  Recipient's obligations under Section 2 (Nondisclosure and Nonuse Obligations) will not apply to any of Disclosing Party's Confidential Information that Recipient can document:  (a) was in the public domain at or subsequent to the time such Confidential Information was communicated to Recipient by Disclosing Party through no fault of Recipient; (b) was rightfully in Recipient's possession free of any obligation of confidence at or subsequent to the time such Confidential Information was communicated to Recipient by such Disclosing Party; (c) was developed by employees or agents of Recipient independently of and without

reference to any of Disclosing Party's Confidential Information; or (d) was communicated by Disclosing Party to an unaffiliated third party free of any obligation of confidence. A disclosure by Recipient of any of Disclosing Party's Confidential Information (i) in response to a valid order by a court or other governmental body; (ii) as otherwise required by law; or (iii) necessary to establish the rights of either party under this Agreement will not be considered to be a breach of this Agreement by such Recipient; provided, however, such Recipient will provide prompt prior written notice thereof to such Disclosing Party to enable Disclosing Party to seek a protective order or otherwise prevent such disclosure.

4.      <u>Ownership and Return of Confidential Information and Other Materials</u>.      All of Disclosing Party's Confidential Information, and any Derivatives (defined below) thereof, whether created by such Disclosing Party or Recipient, are the property of Disclosing Party and no license or other rights to such Disclosing Party's Confidential Information or Derivatives is granted or implied hereby. For purposes of this Agreement, "Derivatives" will mean: (a) for copyrightable or copyrighted material, any translation, abridgment, revision or other form in which an existing work may be recast, transformed or adapted; (b) for patentable or patented material, any improvement thereon; and (c) for material that is protected by trade secret, any new material derived from such existing trade secret material, including new material which may be protected under copyright, patent and/or trade secret laws. All materials (including, without limitation, documents, drawings, papers, diskettes, tapes, models, apparatus, sketches, designs and lists) furnished by Disclosing Party to Recipient (whether or not they contain or disclose Disclosing Party's Confidential Information) are the property of such Disclosing Party. Within five (5) days after any request by Disclosing Party, Recipient will destroy or deliver to Disclosing Party, at Disclosing Party's option, (i) all such Disclosing Party-furnished materials and (ii) all materials in Recipient's possession or control (even if not Disclosing Party-furnished) that contain or disclose any of such Disclosing Party's Confidential

Information. Recipient will provide Disclosing Party a written certification of Recipient's compliance with Recipient's obligations under this Section.

5.      <u>Independent Development</u>.      Recipient may currently or in the future be developing information internally, or receiving information from other parties that may be similar to such Disclosing Party's Confidential Information. Accordingly, nothing in this Agreement will be construed as a representation or inference that Recipient will not develop or have developed products or services, that, without violation of this Agreement, might compete with the products or systems contemplated by such Disclosing Party's Confidential Information.

6.      <u>Disclosure of Third Party Information</u>. Neither party will communicate any information to the other in violation of the proprietary rights of any third party.

7.      <u>No Warranty</u>.      All Confidential Information is provided by Disclosing Party "AS IS" and without any warranty, express, implied or otherwise, regarding such Confidential Information's accuracy or performance. Recipient acknowledges and agrees that Disclosing Party will not be responsible or liable for any decisions made by Recipient in reliance upon disclosures made pursuant to this Agreement.

8.      <u>No Export</u>.      Recipient will obtain any licenses or approvals the U.S. government or any agency thereof requires prior to exporting, directly or indirectly, any technical data acquired from Disclosing Party pursuant to this Agreement or any product utilizing any such data.

9.      <u>Term</u>.      This Agreement will govern all communications between the parties from the Effective Date and remain in full force and effect for a period of five (5) years; provided, however, that a Recipient's obligations under Section 2 (Nondisclosure and Nonuse Obligations) will continue in perpetuity with respect to the Disclosing Party's Confidential Information that such Recipient has previously received unless such obligations no longer apply pursuant to

Section 3 (Exclusions from Nondisclosure and Nonuse Obligations).

10. <u>No Assignment</u>. Neither party will assign or transfer any rights or obligations under this Agreement without the prior written consent of the other party, which consent will not be unreasonably withheld.

11. <u>Injunctive Relief</u>. A breach by Recipient of this Agreement will cause irreparable and continuing damage to Disclosing Party for which money damages are insufficient, and Disclosing Party will be entitled to injunctive relief and/or a decree for specific performance, and such other relief as may be proper (including money damages if appropriate).

12. <u>Notices</u>. Any notice required or permitted by this Agreement will be in writing and will be delivered as follows, with notice deemed given as indicated: (a) by personal delivery, when delivered personally; (b) by overnight courier, upon written verification of receipt; (c) by or facsimile transmission, upon acknowledgment of receipt of electronic transmission; or (d) by certified or registered mail, return receipt requested, upon verification of receipt. Notice will be sent to the addresses set forth above or to such other address as either party may provide in writing.

13. <u>Governing Law; Forum</u>. This Agreement will be governed in all respects by the laws of the United States of America and by the laws of the State of Washington, as such laws are applied to agreements entered into and to be performed entirely within Washington between

Washington residents. Each of the parties irrevocably consents to the exclusive personal jurisdiction of the federal and state courts located in King County, Washington, as applicable, for any matter arising out of or relating to this Agreement, except that in actions seeking to enforce any order or any judgment of such federal or state courts located in King County, Washington, such personal jurisdiction will be nonexclusive.

14. <u>Severability</u>. If a court of law holds any provision of this Agreement to be illegal, invalid or unenforceable, (a) that provision will be deemed amended to achieve an economic effect that is as near as possible to that provided by the original provision and (b) the legality, validity and enforceability of the remaining provisions of this Agreement will not be affected thereby.

15. <u>Waiver; Modification</u>. If a party waives any term, provision or a party's breach of this Agreement, such waiver will not be effective unless it is in writing and signed by the party against whom such waiver is asserted. No waiver by a party of a breach of this Agreement by the other party will constitute a waiver of any other or subsequent breach by such other party. This Agreement may be modified only if authorized representatives of both parties consent in writing.

16. <u>Entire Agreement</u>. This Agreement constitutes the entire agreement with respect to the Confidential Information disclosed hereunder and supersedes all prior or contemporaneous agreements concerning such Confidential Information, written or oral.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective Date.

"Company"                                                    "Other Party"

DAOLABS IP CORPORATION                      [OTHER PARTY NAME]


By: _____          By: _____

Name: _____          Name: _____

Title: _____          Title: _____



Purpose: _____

_____

## MUTUAL CONFIDENTIALITY AGREEMENT (SHORT FORM)

1. <u>When Used</u>.  DAOLABS IP CORPORATION ("Company") should use this form when either (a) Company and another party will **both disclose** to the other party any of such disclosing party's confidential information **and none of the information to be disclosed is technical**, **or** (b) when Company is **receiving** confidential information from another party who desires Company to sign a confidentiality agreement, and will not accept Company's form titled "Confidentiality Agreement (Disclosures to Company)."

2. <u>To Be Completed Before Signing</u>.  Fill in the "Effective Date" and the other party's name and address, and check the appropriate box identifying whether the other party is an individual, partnership, limited liability partnership, corporation or limited liability company.

3. <u>Signature</u>.  Have both parties sign the signature page.  For disclosures by or to Company of any tangible materials (documents, manuals, diskettes, tapes, cartridges, drawings, sketches, designs, etc.), each party may wish to have the other complete a Confidential Materials Release Form (a form of which is also provided) before disclosing or receiving (as applicable) the materials.

MUTUAL CONFIDENTIALITY (SHORT FORM)

This Agreement is made and entered into, as of _____, 200_ ("Effective Date"), by and between DAOLABS IP CORPORATION ("Company"), having a principal place of business at 720 Third Avenue, Suite 1100, Seattle, WA 98104, and [OTHER PARTY NAME], a(n) ☐ individual, ☐ partnership, ☐ limited liability partnership, ☐ corporation, ☐ limited liability company (check the appropriate box) of the state of _____, having a principal place of business at [OTHER PARTY ADDRESS] ("Other Party")

1.     Definitions.  Company and Other Party recognize that there is a need to disclose to one another certain confidential information of each party for the purposes of evaluating whether to enter into a business relationship, and if they do, in carrying out their rights and obligations under that business relationship (the "Business Purpose"), and to protect such confidential information from unauthorized use and disclosure.  The term "Confidential Information" will mean any confidential, proprietary and trade secret information of the disclosing party which is (a) delivered in a tangible form that bears a "confidential," "proprietary," "secret," or similar legend, and (b) discussions relating to such information, whether those discussions occur concurrent with, or following disclosure of the information.

2.     Obligations of Receiving Party.  For two (2) years following initial disclosure of any Confidential Information, the receiving party ("Recipient") will (a) hold the other party's ("Disclosing Party") Confidential Information in confidence, (b) not disclose the Confidential Information to third parties, and (c) not use any Confidential Information for any purpose except for the Business Purpose.  The Recipient will treat all of Disclosing Party's Confidential Information with at least the same degree of care that it uses to protect its own confidential and proprietary information, but no less than a reasonable degree of care under the circumstances.  The Recipient may disclose the Confidential Information to its employees and contractors with a bona fide need to know in order

to fulfill the Business Purpose, and who have signed a nondisclosure agreement at least as protective of the disclosing party's rights as those terms and conditions applicable to Recipient under this Agreement; provided that it is understood that barring a separate written agreement, access to Disclosing Party's Confidential Information will not restrict Recipient's assignment of any employees or contractors or restrict in any way Recipient's product plans.  The Recipient will not make any copies of the Confidential Information received from Disclosing Party except as necessary for its employees and contractors with a need to know to carry out the Business Purpose.  Any copies which are made will be identified as belonging to the disclosing party and marked "confidential" or with a similar legend.

3.     Exclusions from Obligation of Confidentiality.  The Recipient will not be liable for the use or disclosure of any Confidential Information which: (a) is now, or hereafter becomes, through no act or failure to act on the part of Recipient, generally known or available to the public; (b) is rightfully acquired by Recipient before receiving the information from Disclosing Party and without restriction as to use or disclosure; (c) is hereafter rightfully furnished to Recipient by a third party, without restriction as to use or disclosure; (d) is independently developed by employees of Recipient without reference to Disclosing Party's Confidential Information; or (e) is generally made available to third parties by Disclosing Party without restriction on disclosure.  A disclosure by Recipient in response to either a valid order by a court or other governmental body, or as otherwise required by law, will not be considered to be a breach of this Agreement; provided that Recipient provided Disclosing Party prompt written notice of the intended disclosure sufficient to enable Disclosing Party to seek a protective order or otherwise prevent such disclosure, and provided further that Recipient provides all cooperation to Disclosing Party at Disclosing Party's request and expense to prevent such disclosure.

1

4.     No Obligation of Disclosure.  Neither party has any obligation to disclose Confidential Information to the other. Either party may, at any time: (a) cease giving Confidential Information to the other party without any liability, and/or (b) request in writing the return of all or part of its Confidential Information previously disclosed, and all copies thereof, and Recipient will promptly comply with such request.  Recipient will provide Disclosing Party written certification of Recipient's compliance with Recipient's obligations under this Section within thirty (30) days of such request.

5.     Termination. Either party may terminate this Agreement at any time without cause upon written notice to the other party and Recipient's rights to use or disclose any of Disclosing Party's Confidential Information will terminate; provided that each party's obligations with respect to Confidential Information disclosed during the term of this Agreement will survive any termination or expiration of this Agreement.

6.     Ownership.     All     Confidential Information of each party, as Disclosing Party, will remain the property of such party and no license or other rights to such party's Confidential Information is granted or implied hereby.

7.     Warranty.  All Confidential Information is provided "AS IS" and without any warranty, express, implied or otherwise, regarding such Confidential    Information's    completeness, accuracy   or   performance.     Recipient acknowledges and agrees that Disclosing Party will not be responsible or liable for decisions made by Recipient in reliance upon disclosures made pursuant to this Agreement.

8.     Injunctive Relief.  A breach by Recipient of any of the promises or agreements contained herein may result in irreparable and continuing damage to Disclosing Party for which there will be no adequate remedy at law, and Disclosing Party will be entitled to injunctive relief and/or a decree for specific performance, and such other relief as may be proper (including monetary damages if appropriate).

9.     General.   Neither party will assign or transfer any rights or obligations under this Agreement without the prior written consent of the other party, and any attempted assignment or transfer without such prior written consent will be null and void.  If any provision of this Agreement is held by a court of law to be illegal, invalid or unenforceable that provision will be deemed amended to achieve an economic effect that is as near as possible to that provided by the original provision.  This Agreement will be governed by the laws of the State of Washington without reference to conflict of laws principles.  Each of the parties irrevocably consents to the exclusive personal jurisdiction of the federal and state courts located in King County, Washington, as applicable, for any matter arising out of or relating to this Agreement.  Recipient will obtain any licenses or approvals the U.S. government or any agency thereof requires prior to exporting, directly or indirectly, any technical data acquired from Disclosing Party pursuant to this Agreement or any product utilizing any such data.   This Agreement constitutes the entire agreement with respect to the Confidential Information disclosed hereunder and supersedes any and all prior or contemporaneous oral or written agreements, negotiations, communications, understandings and terms, whether express or implied regarding the Confidential Information.   No subsequent alteration, waiver, amendment, change or addition to this Agreement ("Amendment") will be binding and valid unless in writing and signed by the parties, and then such Amendment will be effective only in the specific instance and for the specific purpose stated.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective Date.

"Company"                                          "Other Party"

DAOLABS IP CORPORATION                   [OTHER PARTY NAME]


By: _____          By: _____

Name: _____          Name: _____

Title: _____          Title: _____

3

### CONFIDENTIAL MATERIALS RELEASE FORM

1.  <u>When Used</u>. DAOLABS IP CORPORATION ("Company") may wish to use this form to **track** all tangible confidential material that Company **discloses to** or **receives from** a third party.  Use this form in conjunction with any Confidentiality Agreement under which Company will be disclosing or receiving confidential information, whether the agreement is provided by Company or provided by the receiving party.  Such a tracking system is useful for determining precisely what information was given to whom.  For example, at the termination of a confidential relationship, most contracts require the return or destruction of all disclosed materials.  This tracking system can help track the accomplishment of that obligation.  In addition, such a system can be useful in future infringement scenarios.

CONFIDENTIAL MATERIALS RELEASE FORM

To:

From:

Date:

Contact Person:

All materials released under this form are covered by the terms and conditions of:

Name of Contract: _____

Date of Contract: _____

Description of Materials Released:

Additional Restrictions and Comments:

Acknowledged and Agreed to by:

DAOLABS IP CORPORATION                    Accepting Party: _____

Date: _____     Date: _____


_____           _____
Signature                                  Signature

_____           _____
Print Name                                 Print Name

Please sign above, print name and date and return to:

DAOLABS IP CORPORATION
720 Third Avenue, Suite 1100
Seattle, WA 98104

SE\9066575.1
999850-1

## INDEPENDENT CONTRACTOR
## SERVICES AGREEMENT

1.      <u>When Used</u>.  This agreement is to be used by DAOLABS IP CORPORATION ("Company") **when contracting to receive services to be performed by a third party**, including technical services.  The services to be performed would be described in the Project Assignments in <u>Exhibit A</u>.

2.      <u>To Be Completed Before Signing</u>.  Fill in the "Effective Date," and the independent contractor's ("Contractor") name and address, and check the appropriate box identifying whether Contractor is an individual, partnership, limited liability partnership, corporation, or limited liability company.  Fill in the date the agreement terminates in Section 9.  Meet with the manager responsible for overseeing Contractor's project and complete the Project Assignment form in <u>Exhibit A</u>.

3.      <u>Signature</u>.  Contractor must sign the signature page and all Project Assignments.

4.      <u>Indemnity</u>.  The agreement does not require Contractor to indemnify Company for intellectual property infringement claims, but there is a limited indemnity in Section 8.  If Company desires to include a provision whereby Contractor would indemnify Company for infringement or any other claims, please contact DLA Piper Rudnick Gray Cary US LLP for further assistance.

5.      <u>Confidentiality</u>.  The agreement contains a confidentiality provision so there is no need to sign a separate confidentiality agreement with the contractor.  If a separate confidentiality agreement has already been signed, the provisions of this agreement, as drafted, will supersede the prior agreement.

INDEPENDENT CONTRACTOR SERVICES AGREEMENT

This Agreement is made and entered into, as of _____, 200_ ("Effective Date"), by and between DAOLABS IP CORPORATION ("Company"), having a principal place of business at 720 Third Avenue, Suite 1100, Seattle, WA 98104, and [CONTRACTOR NAME], a(n) ☐individual, ☐partnership, ☐limited liability partnership, ☐corporation, ☐limited liability company (check the appropriate box) of the state of _____, having a principal place of business at [CONTRACTOR ADDRESS] ("Contractor").

1.      Engagement of Services. Company may issue Project Assignments to Contractor in the form attached to this Agreement as Exhibit A (Project Assignment). A Project Assignment will become binding when both parties have signed it and once signed, Contractor will be obligated to provide the services as specified in such Project Assignment. The terms of this Agreement will govern all Project Assignments and services undertaken by Contractor for Company. Contractor will not subcontract or otherwise delegate performance of any work to third parties ("Subcontractors") without, in each instance, first executing an agreement with each Subcontractor that contains (a) confidentiality provisions substantially similar to Contractor's confidentiality obligations under this Agreement, and (b) intellectual property rights provisions that, among other things, assign all Company Innovations (defined below) resulting from such Subcontractor's work to Contractor. Company will have the right to approve the form of such confidentiality and assignment agreements between Contractor and Subcontractors, or to provide its own form of agreement for execution by Subcontractors. Upon request by Company, Contractor will provide copies of all confidentiality and proprietary rights assignment agreements executed by Subcontractors performing services for Company's benefit.

2.      Compensation; Timing. Company will pay Contractor the fee set forth in each Project Assignment for the services provided as specified in such Project Assignment. If provided for in the Project Assignment, Company will reimburse Contractor's expenses no later than thirty (30) days after Company's receipt of Contractor's invoice, provided that reimbursement for expenses may be delayed until such time as Contractor has furnished reasonable documentation for authorized expenses as Company may reasonably request. Upon termination of this Agreement for any reason, Contractor will be (a) paid fees on the basis stated in the Project Assignment(s) and (b) reimbursed only for expenses that are incurred prior to termination of this Agreement and which are either expressly identified in a Project Assignment or approved in advance in writing by an authorized Company manager.

3.      Independent Contractor Relationship. Contractor's relationship with Company is that of an independent contractor, and nothing in this Agreement is intended to, or will be construed to, create a partnership, agency, joint venture, employment or similar relationship. Contractor will not be entitled to any of the benefits that Company may make available to its employees, including, but not limited to, group health or life insurance, profit-sharing or retirement benefits. Contractor is not authorized to make any representation, contract or commitment on behalf of Company unless specifically requested or authorized in writing to do so by a Company manager. Contractor is solely responsible for, and will file, on a timely basis, all tax returns and payments required to be filed with, or made to, any federal, state or local tax authority with respect to the performance of services and receipt of fees under this Agreement. Contractor is solely responsible for, and must maintain adequate records of, expenses incurred in the course of performing services under this Agreement. No part of Contractor's compensation will be subject to withholding by Company for the payment of any social security, federal, state or any other employee payroll taxes. Company will regularly report amounts paid to Contractor by filing Form 1099-MISC with the Internal Revenue Service as required by law.

4.    Disclosure and Assignment of Work Resulting from Project Assignments.

4.1    "Innovations" and "Company Innovations" Definitions.  "Innovations" means all discoveries, designs, developments, improvements, inventions (whether or not protectable under patent laws), works of authorship, information fixed in any tangible medium of expression (whether or not protectable under copyright laws), trade secrets, know-how, ideas (whether or not protectable under trade secret laws), mask works, trademarks, service marks, trade names and trade dress.  "Company Innovations" means Innovations that Contractor, solely or jointly with others, conceives, develops or reduces to practice related to any Project Assignment.

4.2    Disclosure and Assignment of Company Innovations.  Contractor agrees to maintain adequate and current records of all Company Innovations, which records will be and remain the property of Company.  Contractor agrees to promptly disclose and describe to Company all Company Innovations.  Contractor hereby does and will assign to Company or Company's designee all of Contractor's right, title and interest in and to any and all Company Innovations and all associated records.  To the extent any of the rights, title and interest in and to Company Innovations cannot be assigned by Contractor to Company, Contractor hereby grants to Company an exclusive, royalty-free, transferable, irrevocable, worldwide license (with rights to sublicense through multiple tiers of sublicensees) to practice such non-assignable rights, title and interest.  To the extent any of the rights, title and interest in and to the Company Innovations can neither be assigned nor licensed by Contractor to Company, Contractor hereby irrevocably waives and agrees never to assert such non-assignable and non-licensable rights, title and interest against Company or any of Company's successors in interest.

4.3    Assistance.  Contractor agrees to perform, during and after the term of this Agreement, all acts that Company deems necessary or desirable to permit and assist Company, at its expense, in obtaining, perfecting

and enforcing the full benefits, enjoyment, rights and title throughout the world in the Company Innovations as provided to Company under this Agreement.  If Company is unable for any reason to secure Contractor's signature to any document required to file, prosecute, register or memorialize the assignment of any rights under any Company Innovations as provided under this Agreement, Contractor hereby irrevocably designates and appoints Company and Company's duly authorized officers and agents as Contractor's agents and attorneys-in-fact to act for and on Contractor's behalf and instead of Contractor to take all lawfully permitted acts to further the filing, prosecution, registration, memorialization of assignment, issuance and enforcement of rights under such Company Innovations, all with the same legal force and effect as if executed by Contractor.  The foregoing is deemed a power coupled with an interest and is irrevocable.

4.4    Out-of-Scope Innovations.  If Contractor incorporates or permits to be incorporated any Innovations relating in any way, at the time of conception, reduction to practice, creation, derivation, development or making of such Innovation, to Company's business or actual or demonstrably anticipated research or development but which were conceived, reduced to practice, created, derived, developed or made by Contractor (solely or jointly) either unrelated to Contractor's work for Company under this Agreement or prior to the Effective Date (collectively, the "Out-of-Scope Innovations") into any of the Company Innovations, then Contractor hereby grants to Company and Company's designees a non-exclusive, royalty-free, irrevocable, worldwide, fully paid-up license (with rights to sublicense through multiple tiers of sublicensees) to practice all patent, copyright, moral right, mask work, trade secret and other intellectual property rights relating to such Out-of-Scope Innovations. Notwithstanding the foregoing, Contractor agrees that Contractor will not incorporate, or permit to be incorporated, any Innovations conceived, reduced to practice, created, derived, developed or made by others or any Out-of-Scope Innovations into any Company Innovations without Company's prior written consent.

5.      Confidentiality.

5.1      Definition of Confidential Information. "Confidential Information" means (a) any technical and non-technical information related to the Company's business and current, future and proposed products and services of Company, including for example and without limitation, Company Innovations, Company Property (as defined in Section 6 ("Ownership and Return of Confidential Information and Company Property")), and Company's information concerning research, development, design details and specifications, financial information, procurement requirements, engineering and manufacturing information, customer lists, business forecasts, sales information and marketing plans and (b) any information that may be made known to Contractor and that Company has received from others that Company is obligated to treat as confidential or proprietary.

5.2      Nondisclosure and Nonuse Obligations.  Except as permitted in this Section, Contractor will not use, disseminate or in any way disclose the Confidential Information. Contractor may use the Confidential Information solely to perform Project Assignment(s) for the benefit of Company.  Contractor will treat all Confidential Information with the same degree of care as Contractor accords to Contractor's own confidential information, but in no case will Contractor use less than reasonable care.  If Contractor is not an individual, Contractor will disclose Confidential Information only to those of Contractor's employees who have a need to know such information.  Contractor certifies that each such employee will have agreed, either as a condition of employment or in order to obtain the Confidential Information, to be bound by terms and conditions at least as protective as those terms and conditions applicable to Contractor under this Agreement.  Contractor will immediately give notice to Company of any unauthorized use or disclosure of the Confidential Information. Contractor will assist Company in remedying any such unauthorized use or disclosure of the Confidential Information. Contractor agrees not to communicate any information to Company in violation of the proprietary rights of any third party.

5.3      Exclusions from Nondisclosure and Nonuse Obligations.      Contractor's obligations under Section 5.2 (Nondisclosure and Nonuse Obligations) will not apply to any Confidential Information that Contractor can demonstrate (a) was in the public domain at or subsequent to the time such Confidential Information was communicated to Contractor by Company through no fault of Contractor; (b) was rightfully in Contractor's possession free of any obligation of confidence at or subsequent to the time such Confidential Information was communicated to Contractor by Company; or (c) was developed by employees of Contractor independently of and without reference to any Confidential Information communicated to Contractor by Company.  A disclosure of any Confidential Information by Contractor (i) in response to a valid order by a court or other governmental body or (ii) as otherwise required by law will not be considered to be a breach of this Agreement or a waiver of confidentiality for other purposes; provided, however, that Contractor will provide prompt prior written notice thereof to Company to enable Company to seek a protective order or otherwise prevent such disclosure.

6.      Ownership and Return of Confidential Information and Company Property.      All Confidential Information and any materials (including, without limitation, documents, drawings, papers, diskettes, tapes, models, apparatus, sketches, designs and lists) furnished to Contractor by Company, whether delivered to Contractor by Company or made by Contractor in the performance of services under this Agreement and whether or not they contain or disclose Confidential Information (collectively, the "Company Property"), are the sole and exclusive property of Company or Company's suppliers or customers.      Contractor agrees to keep all Company Property at Contractor's premises unless otherwise permitted in writing by Company. Within five (5) days after any request by Company, Contractor will destroy or deliver to Company, at Company's option, (a) all Company Property and (b) all materials in

Contractor's possession or control that contain or disclose any Confidential Information. Contractor will provide Company a written certification of Contractor's compliance with Contractor's obligations under this Section.

7.  Observance of Company Rules.  At all times while on Company's premises, Contractor will observe Company's rules and regulations with respect to conduct, health, safety and protection of persons and property.

8.  No Conflict of Interest.  During the term of this Agreement, Contractor will not accept work, enter into a contract or accept an obligation inconsistent or incompatible with Contractor's obligations, or the scope of services to be rendered for Company, under this Agreement. Contractor warrants that, to the best of Contractor's knowledge, there is no other existing contract or duty on Contractor's part that conflicts with or is inconsistent with this Agreement.  Contractor agrees to indemnify Company from any and all loss or liability incurred by reason of the alleged breach by Contractor of any services agreement with any third party.

9.  Term and Termination.

9.1  Term.  This Agreement is effective as of the Effective Date set forth above and will terminate on _____ unless terminated earlier as set forth below.

9.2  Termination by Company. Except during the term of a Project Assignment, Company may terminate this Agreement without cause at any time, with termination effective fifteen (15) days after Company's delivery to Contractor of written notice of termination. Company also may terminate this Agreement (a) immediately upon Contractor's breach of Section 4 (Disclosure and Assignment of Work Resulting from Project Assignments), 5 (Confidentiality) or 10 (Noninterference with Business), or (b) immediately for a material breach by Contractor if Contractor's material breach of any other provision under this Agreement or obligation under a Project

Assignment is not cured within ten (10) days after the date of Company's  written notice of breach.

9.3  Termination by Contractor. Contractor may terminate this Agreement without cause at any time, with termination effective fifteen (15) days after Contractor's delivery to Company of written notice of termination.  Contractor also may terminate this Agreement immediately for a material breach by Company if Company's material breach of any provision of this Agreement is not cured within ten (10) days after the date of Contractor's written notice of breach.

9.4  Effect of Expiration or Termination.  Upon expiration or termination of this Agreement, Company will pay Contractor for services performed under this Agreement as set forth in each then pending Project Assignment(s). The definitions contained in this Agreement and the rights and obligations contained in this Section and Sections 4 (Disclosure and Assignment of Work Resulting from Project Assignments), 5 (Confidentiality), 6 (Ownership and Return of Confidential Information and Company Property),  10 (Noninterference with Business) and 11 (General Provisions) will survive any termination or expiration of this Agreement.

10.  Noninterference with Business.  During this Agreement, and for a period of two (2) years immediately following the termination or expiration of this Agreement, Contractor agrees not to solicit or induce any employee or independent contractor to terminate or breach an employment, contractual or other relationship with Company.

11.  General Provisions.

11.1  Successors and Assigns. Contractor may not subcontract or otherwise delegate Contractor's obligations under this Agreement without Company's prior written consent.  Subject to the foregoing, this Agreement will be for the benefit of Company's successors and assigns, and will be binding on Contractor's assignees.

11.2   Injunctive Relief.  Contractor's obligations under this Agreement are of a unique character that gives them particular value; Contractor's breach of any of such obligations will result in irreparable and continuing damage to Company for which money damages are insufficient, and Company will be entitled to injunctive relief and/or a decree for specific performance, and such other relief as may be proper (including money damages if appropriate).

11.3   Notices.  Any notice required or permitted by this Agreement will be in writing and will be delivered as follows, with notice deemed given as indicated:  (a) by personal delivery, when actually delivered;  (b) by overnight courier, upon written verification of receipt;  (c) by facsimile transmission, upon acknowledgment of receipt of electronic transmission;  or (d) by certified or registered mail, return receipt requested, upon verification of receipt.  Notice will be sent to the addresses set forth above or to such other address as either party may provide in writing.

11.4   Governing Law; Forum.  This Agreement will be governed in all respects by the laws of the United States of America and by the laws of the State of Washington, as such laws are applied to agreements entered into and to be performed entirely within Washington between Washington residents.  Each of the parties irrevocably consents to the exclusive personal jurisdiction of the federal and state courts located in King County, Washington, as applicable, for any matter arising out of or relating to this Agreement, except that in actions seeking to enforce any order or any judgment of such federal or state courts located in King County, Washington, such personal jurisdiction will be nonexclusive.

11.5   Severability.  If a court of law holds any provision of this Agreement to be illegal, invalid or unenforceable, (a) that provision will be deemed amended to achieve an economic effect that is as near as possible to that provided by the original provision and (b) the legality, validity and enforceability of the remaining provisions of this Agreement will not be affected thereby.

11.6   Waiver; Modification.  If Company waives any term, provision or Contractor's breach of this Agreement, such waiver will not be effective unless it is in writing and signed by Company.  No waiver by a party of a breach of this Agreement will constitute a waiver of any other or subsequent breach by Contractor.  This Agreement may be modified only by mutual written agreement of authorized representatives of the parties.

11.7   Entire Agreement.  This Agreement constitutes the entire agreement between the parties relating to this subject matter and supersedes all prior or contemporaneous agreements concerning such subject matter, written or oral.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

"Company"                                    "Contractor"

DAOLABS IP CORPORATION          [CONTRACTOR NAME]

By: _____          By: _____

Name: _____          Name: _____

Title: _____          Title: _____

<u>EXHIBIT A</u>

<u>PROJECT ASSIGNMENT</u>

<u>Services</u>                                              <u>Milestones</u>

<u>Acceptance Criteria</u>                              <u>Acceptance Procedure</u>

<u>Payment of Fees</u>.  Fee will be **(CHECK ONE)**:

     ™       a fixed price for completion of $_____

     ™       based on a rate per hour of $_____

     ™       other, as follows **(describe payment)**:

        If either party for any reason terminates this Project Assignment or the Independent Contractor Services Agreement that governs it, fees will be paid based on **(CHECK ONE)**:

     ™       Contractor time spent.

     ™       the proportion of the deliverables furnished Company, as determined by Company.

     ™       other, as follows **(describe payment)**:

<u>Expenses</u>.  Company will reimburse Contractor for the following expenses incurred in connection with this Project Assignment upon receipt of proper documentation of those expenses from Contractor **(describe expenses)**:

<u>NOTE</u>:  This Project Assignment is governed by the terms of an Independent Contractor Services Agreement in effect between Company and Contractor.  Any item in this Project Assignment that is inconsistent with such agreement is invalid.

IN WITNESS WHEREOF, the parties have executed this Project Assignment as of the later date below.

"Company"                                          "Contractor"

DAOLABS IP CORPORATION               [CONTRACTOR NAME]

By: _____          By: _____

Name: _____          Name: _____

Title: _____          Title: _____

Date: _____          Date: _____

# Exhibit 13





snapshot                                    ( Connect wallet )    ( )

← Back

# MIP-0011: Pay Deferred Legal Fees From 2022

Closed     Movement DAO: Consensus Space by *filipv.eth*    ⬆    ⋯

Authors: benreed.eth, filipv.eth
Date: 2023-01-03                                                      

*This Emergency Proposal **has been created to affirm** DAO Multisig*
*Signer support of the changes proposed below. **By voting affirmatively,***
***Signers are explicitly approving the proposed changes.***

## Thesis

Movement DAO's Guiding Principles appointed dao-lawfirm.eth as the
DAO's Service Provider. dao-lawfirm.eth provided legal services to the
Authorized Members and the DAO's affiliates throughout 2022, and, in
good faith, deferred a portion of the commensurate legal fees. Those
fees should be paid in 2023.

## Specification

The DAO Multisig[1] shall transfer 58,831.02 DAI to the Developer
Multisig.[2] The Developer Multisig will then transfer the relevent funds
to dao-lawfirm.eth.

## Deferred Legal Fees

The following represents costs associated with legal services that the Service Provider has provided to the DAO, including (but not limited to):

- Drafting governance documents, including the Terms of Service, Privacy Policies, and several letters;
- drafting documents for the formation of legal entities, and filing those documents;
- providing agreement templates for use in legal.juicebox.wtf, and
- conducting tax estimations and impact assessments.

| Date | Description | Amount Incurred | Amount Deferred |
|------|-------------|-----------------|-----------------|
| 2023-01-02 | Deferred legal fees from Oct-2021 to Feb-2022 | 96,660 DAI | 58,831.02 DAI |

## Utilization

The Authorized Members **benreed.eth** and **jimmyethworld.eth** have reviewed the relevant information and confirmed that this proposal accords with the DAO's agreement with the Service Provider, **dao-lawfirm.eth**.

## Risks

- Frequently invoking Emergency Governance risks alienating DAO members.
- This might not be the most efficient way to accomplish the DAO's goals.

# Snapshot Consensus by the DAO Members

Whereas the DAO through its Members voted to adopt the following actions via Snapshot and resolves as follows:

**RESOLVED:** That the DAO Multisig transfer of 58,831.02 DAI to the Developer Multisig (hereinafter, "Payout of Deferred Legal Fees") is hereby adopted and approved;

**FURTHER RESOLVED:** That the Developer Multisig shall transfer 58,831.02 DAI to the account specified by the Service Provider and that the Authorized Members are authorized to pay and reimburse expenses associated with any additional expenses of the DAO and the DAO's affiliate entities, including without limitation expenses incurred prior to the formation and/or incorporation of the entities.

**RESOLVED FURTHER:** That each Service Provider, Authorized Member, and agent of the DAO is hereby jointly and severally authorized to do any act, matter, or thing, and to execute and deliver any other document as he or she may deem necessary, advisable, or incidental, in connection with the preceding specification, and other sections herein, or any related documents, and to perform or resolve the obligations of the DAO, or its affiliates.

**RESOLVED FURTHER:** That the Authorized Members (including and specifically Member and Secretary **benreed.eth**), in accordance with commensurate powers, are authorized to execute and deliver any agreement in the name of the DAO and to otherwise obligate the DAO with respect to the purpose of the DAO, within general guidelines and budgets approved by the Members; however, Actions by the DAO Snapshot Consensus by the Members may enact specific limitations on the authority of the Service Provider from time to time.

the authority of the Service Provider from time to time.

**RESOLVED FURTHER:** That the Authorized Members be, and each of them hereby is, authorized and empowered to take any and all such further action, to execute and deliver any and all such further agreements, instruments, documents and certificates and to pay such expenses, in the name and on behalf of the DAO, existing affiliates entities, contemplated affiliate entities, or such an Authorized Member, as any such Authorized Member may deem necessary or advisable to effectuate the purposes and intent of the resolutions hereby adopted, the taking of such actions, the execution and delivery of such agreements, instruments, documents and certificates and the payment of such expenses by any such Authorized Member to be conclusive evidence of his or her authorization hereunder and the approval thereof.

**RESOLVED FURTHER: That any and all actions taken by the Authorized Members to carry out the purposes and intent of the foregoing resolutions prior to their adoption are approved, ratified and confirmed.**

This action by the DAO Member by Snapshot vote shall be effective as of the date the DAO Entities receives the consent of the DAO at the end of the Snapshot vote. This action by the DAO Members consent may be executed in any number of counterparts, each of which shall constitute an original and all of which together shall constitute one action.

## Authors

1. 0xA4e6C2B6264652444B3F0cc1bB37496AE916931c
2. 0x30670d81e487c80b9edc54370e6eaf943b6eab39

1. The DAO Multisig is a Gnosis Safe at

2/21/23, 3:46 PM MoveDAO Consensus Space proposal Nft_DID : Doc retrieved from Ipfs.com

1. **The DAO Multisig is a Gnosis Safe at**

   `0x143cC0A996De329C1C5723Ee4F15D2a40c1203c6` **on the Ethereum Mainnet.** 🔄

2. **The Developer Multisig is a Gnosis Safe at**

   `0x2187e6a7c765777d50213346F0Fe519fCA706fbD` **on the Ethereum Mainnet.** 🔄

---

| Votes  4 | | ( Show less ) | ⬇ |
|---|---|---|---|
| 🌐 jamesbarrie.e... | Against | 84K MOVE 〰 | |
| 🐀 rice$cr... ( Core ) | For | 2.2K MOVE 〰 | |
| 🔵 0x4eeD...e32B | For | 937 MOVE 〰 | |
| 🎨 jimmyethworl... | Against | 156 MOVE 〰 💬 | |

---

## Information

| | |
|---|---|
| **Strategie(s)** | 🌐🌐 |
| **IPFS** | #bafkrei |
| **Voting system** | Basic voting |
| **Start date** | Jan 3, 2023, 12:00 AM |
| **End date** | Jan 10, 2023, 12:00 AM |
| **Snapshot** | 16,322,540 |

---

## Results

| | | |
|---|---|---|
| Against | 84K MOVE | 96.42% |
| For | 3.1K MOVE | 3.58% |

I voted POAP



Vote to get this POAP



Mint



# Exhibit 14





snapshot

Connect wallet

← Back

# MIP-0012: Pay Deferred Service Provider Fees From 2022

Closed    Movement DAO: Consensus Space by filipv.eth    •••

Authors: benreed.eth, filipv.eth
Date: 2023-01-03



*This Emergency Proposal has been created to affirm DAO Multisig Signer support of the changes proposed below.* **By voting affirmatively, Signers are explicitly approving the proposed changes.**

## Thesis

dao-lawfirm.eth acted as the DAO's Service Provider throughout 2022, providing legal and custodial services to the DAO. In good faith, dao-lawfirm.eth deferred their Service Provider Fee[1], equal to 2% of assets under management per annum. This fee was originally to be paid on or about February 2nd, 2022.

## Specification

The DAO Multisig[2] shall transfer 334,487 DAI to the Developer Multisig.[3] The Developer Multisig will then transfer the relevent funds to dao-lawfirm.eth.

## Service Provider Fee

The following represents the Service Provider Fee the DAO has agreed to pay dao-lawfirm.eth for treasury oversight, governance, and expense/payout management.

| Date | Description | Amount Incurred | Amount Paid | Amount Deferred | Treasury Balance |
|------|-------------|-----------------|-------------|-----------------|------------------|
| 2022-01-01 | Service Provider Fee | 334,487 DAI | 0 DAI | 334,487 DAI | $16,724,383.92 |

## Utilization

The Authorized Members **benreed.eth** and **jimmyethworld.eth** have reviewed the relevant information and confirmed that this proposal accords with the DAO's agreement with the Service Provider, **dao-lawfirm.eth**.

# Risks

- Frequently invoking Emergency Governance risks alienating DAO members.
- This might not be the most efficient way to accomplish the DAO's goals.

# Snapshot Consensus by the DAO Members

Whereas the DAO through its Members voted to adopt the following actions via Snapshot and resolves as follows:

**RESOLVED:** That the DAO Multisig transfer of 334,487 DAI to the Developer Multisig (hereinafter, "Payout of the Service Provider Fee") is hereby adopted and approved;

**FURTHER RESOLVED:** That the Developer Multisig shall transfer 334,487 DAI to the account specified by the Service Provider and that the Authorized Members are authorized to pay and reimburse expenses associated with any additional expenses of the DAO and the DAO's affiliate entities, including without limitation expenses incurred prior to the formation and/or incorporation of the entities.

**RESOLVED FURTHER:** That Authorized Members and agents of the DAO are hereby jointly and severally authorized to do any act, matter, or thing, and to execute and deliver any other document as they may deem necessary, advisable, or incidental, in connection with the preceding specification, and other sections herein, or any related documents, and to perform or resolve the obligations of the DAO, or its affiliates.

**RESOLVED FURTHER:** That the Authorized Members (including and specifically Member and Secretary **benreed.eth**), in accordance with commensurate powers, are authorized to execute and deliver any agreement in the name of the DAO and to otherwise obligate the DAO with respect to the purpose of the DAO, within general guidelines and budgets approved by the Members; however, Actions by the DAO Snapshot Consensus by the Members may enact specific limitations on the authority of the Service Provider from time to time.

**RESOLVED FURTHER:** That the Authorized Members be, and each of them hereby is, authorized and empowered to take any and all such further action, to execute and deliver any and all such further agreements, instruments, documents and certificates and to pay such expenses, in the name and on behalf of the DAO, existing affiliates

expenses, in the name and on behalf of the DAO, existing affiliates entities, contemplated affiliate entities, or such an Authorized Member,

as any such Authorized Member may deem necessary or advisable to effectuate the purposes and intent of the resolutions hereby adopted, the taking of such actions, the execution and delivery of such agreements, instruments, documents and certificates and the payment of such expenses by any such Authorized Member to be conclusive evidence of his or her authorization hereunder and the approval thereof.

**RESOLVED FURTHER: That any and all actions taken by the Authorized Members to carry out the purposes and intent of the foregoing resolutions prior to their adoption are approved, ratified and confirmed.**

This action by the DAO Member by Snapshot vote shall be effective as of the date the DAO Entities receives the consent of the DAO at the end of the Snapshot vote. This action by the DAO Members consent may be executed in any number of counterparts, each of which shall constitute an original and all of which together shall constitute one action.

## Authors

1. 0xA4e6C2B6264652444B3F0cc1bB37496AE916931c
2. 0x30670d81e487c80b9edc54370e6eaf943b6eab39

1. The Service Provider, Fees and Expenses as outlined in Original Gitbook Policies, Let's start a movement post, dated 2/2/2022. ↩

2. The DAO Multisig is a Gnosis Safe at 0x143cC0A996De329C1C5723Ee4F15D2a40c1203c6 on the Ethereum Mainnet. ↩

3. The Developer Multisig is a Gnosis Safe at

## 3. The Developer Multisig is a Gnosis Safe at

0x2187e6a7c765777d50213346F0Fe519fCA706fbD **on the Ethereum Mainnet.** 🔄

---

| Votes 4 | Show less | ⬇ |
|---|---|---|

| 🌐 jamesbarrie.e... | Against | 84K MOVE 〰 |
| 🐀 rice$cr... Core | For | 2.2K MOVE 〰 |
| 🔵 0x4eeD...e32B | For | 937 MOVE 〰 |
| 🌈 jimmyethworl... | Against | 156 MOVE 〰 💬 |

---

### Information

| | |
|---|---|
| **Strategie(s)** | 🎨🎨 |
| **IPFS** | #bafkrei |
| **Voting system** | Basic voting |
| **Start date** | Jan 3, 2023, 12:00 AM |
| **End date** | Jan 10, 2023, 12:00 AM |
| **Snapshot** | 16,322,547 |

---

### Results

| | | |
|---|---|---|
| Against | 84K MOVE | 96.42% |
| For | 3.1K MOVE | 3.58% |

I voted POAP



Vote to get this POAP



Mint

Case 1:23-cv-20727-RKA Document 24-1 Entered on FLSD Docket 03/01/2023 Page 467 of 653

# Exhibit 15



snapshot

 Connect wallet



← Back

# MIP-0020: Proposal for Payout of Deferred Legal and Indemnification Expenses

Closed   Movement DAO: Consensus Space by rice$cracker  Core   

Authors: benreed.eth
Date: 2023-01-31  

## Thesis

Movement DAO's Guiding Principles appointed dao-lawfirm.eth as the DAO's Service Provider. In addition to acting as the DAO's Service Provider, dao-lawfirm.eth also provided legal services to the Authorized Members and DAO's affiliates throughout 2022 and, in good faith, deferred a portion of the commensurate legal fees. Those fees are to be paid in 2023.

In addition, the Members of the DAO ratified Adopt Actions (MIP-004) which indemnifies the DAO Service Provider and Authorized Members, benreed.eth and tankbottoms.eth, for any and all costs, fees, expenses, and liabilities incurred in the performance of their duties as Authorized Members, and/or DAO Service Provider. In response to recent security concerns by certain member's ("Certain Members) that appeared to be malicious, exploitative, and in bad faith, the Authorized Members have approved disbursement of indemnification funds for tankbottoms.eth

2/21/23, 2:00 AM    Movement RAO Consensus Spend proposal: Enforced Proposal for Payout of Deferred Legal and Indemnification Expenses

Case 1:23-CV-20727-RKA Documents 24 Entered on FLSD Docket 03/01/2023 Page 470 of 653

and benreed.eth, the former Service Provider dao-lawfirm.eth, and core Contributors from hereon referred to as the "Indemnified Members".

# Specification

The DAO Multisig[1] shall transfer `DAI 2,558,831` to the Developer Multisig.[2] The Developer Multisig will transfer and disburse the relevant funds to dao-lawfirm.eth and the above mentioned Indemnified Members.

## Deferred Legal Fees

The following represents costs associated with legal services performed by the Service Provider for the DAO and it's affiliates, including (but not limited to):

- Drafting governance documents such as Terms of Service, Privacy Policies, or Opinion letters;
- Drafting documents for the formation of legal entities, and filing those documents;
- Providing agreement templates for use in legal.juicebox.wtf; and,
- Conducting tax estimations and impact assessments.

| Date | Description | Amount Invoiced | Amount Deferred |
|------|-------------|-----------------|-----------------|
| 2023-01-01 | Deferred legal fees from Oct-2021 to Feb-2022 | DAI 96,660 | DAI 58,831 |

## Advance for Indemnified Members

The following represents the total sum of disbursements for the

Indemnified Members. Each Member has been allocated an advance of

`DAI 500,000` prior to arbitration, until further notice by the Authorized Members.

| Date | Description | Per Member Amount | Total Amount |
|------|-------------|-------------------|--------------|
| 2023-01-23 | Advance for Indemnified Members | DAI 500,000 | DAI 2,500,000 |

## Utilization

The Authorized Members benreed.eth and tankbottoms.eth have reviewed the relevant information and confirmed that this proposal accords with the DAO's agreement with the Service Provider, dao-lawfirm.eth for the payout of deferred legal fees.

The Authorized Members benreed.eth and tankbottoms.eth have reviewed the relevant information and confirmed that this proposal also accords with actions ratified by Members of the DAO MIP-0004 approving indemnification rights to the above mentioned Indemnified Members.

## Risks

- Authorized members may require additional indemnification funds.
- This might not be the most efficient way to accomplish the DAO's goals.
- The funds could be better used somewhere else.

## Snapshot Consensus by the DAO Members

2/21/23, 2:07 PM    Movedao DAO Consensus Snapshot proposal: Interned Proposal for Payout of Deferred Legal Fees and Indemnification Expenses

Case 1:23-cv-20727-RKA   Document 24   Entered on FLSD Docket 03/01/2023   Page 472 of 653

Whereas the DAO through its Members voted to adopt the following actions via Snapshot and resolves as follows:

**RESOLVED:** That the DAO Multisig transfer of `DAI 2,558,831` to the Developer Multisig (hereinafter, "Payout of Deferred Legal Fees and Indemnification Expenses") is hereby adopted and approved;

**FURTHER RESOLVED:** That the Developer Multisig shall transfer `DAI 58,831` to the account specified by the Service Provider, dao-lawfirm.eth, and that the Authorized Members are authorized to pay and reimburse expenses associated with any additional expenses of the DAO and the DAO's affiliate entities, including without limitation expenses incurred prior to the formation and/or incorporation of the entities.

**FURTHER RESOLVED:** That the Authorize Members further authorize, the Developer Multisig to transfer a total sum of `DAI 2,500,000`, a disbursement of `DAI 500,000` to each of the Indemnified Members and the account its choosing as an advance indemnification as approved in Snapshot MIP-0004, however explicitly approved prior to arbitration, until further notice by this Committee is hereby adopted and approved. Any indemnification funds that are not utilized shall be returned to the DAO.

**RESOLVED FURTHER:** That the Authorized Members convened and are hereby jointly and severally authorized to take any and all actions, along with executing or signing any cryptocurrency transactions, and executing and delivering any other documents, agreements, instruments, and/or certificates as he or she may deem necessary, advisable, or incidental, in connection with the preceding resolution, and other resolutions herein, or any related documents. This also includes authorization to perform or resolve the obligations of the DAO, and/or

its affiliates.

**RESOLVED FURTHER: That any and all actions taken by the Authorized Members to carry out the purposes and intent of the foregoing resolutions prior to their adoption are approved, ratified, and confirmed.**

This action by the Authorized Members shall be effective as of the date the DAO receives the consent of its Members via the Snapshot vote. This action by the Authorized Members may be executed in any number of counterparts, each of which shall constitute an original and all of which together shall constitute one action.

## Authors

1. 0xA4e6C2B6264652444B3F0cc1bB37496AE916931c

1. The DAO Multisig is a Gnosis Safe at
   0x143cC0A996De329C1C5723Ee4F15D2a40c1203c6 on the Ethereum
   Mainnet. ↩

2. The Developer Multisig is a Gnosis Safe at
   0x2187e6a7c765777d50213346F0Fe519fCA706fbD on the Ethereum
   Mainnet. ↩



**Votes** 5                        Show less                          ⬇

| 🟣 0x2987...0fE0 | For | 1.9M MOVE 〰 |
| 🟢 0x2770...fC63 | For | 200K MOVE 〰 |

2/21/23, 2:30 PM    MoveDAO Consensus Update #4 - Interior Proposal for Payout of Deferred Legal and Indemnification Expenses

Case 1:23-CV-20727-RKA Documents 24 Entered on FLSD Docket 03/01/2023 Page 474 of
653

| rice$cr... ( Core ) | For | 197K MOVE ♫ |
| 0x4e33...a525 | For | 101K MOVE ♫ |
| 0xc928...A296 | For | 80K MOVE ♫ |

## Information

| | |
|---|---|
| **Strategie(s)** | 🎨 🎨 |
| **IPFS** | #bafkrei |
| **Voting system** | Basic voting |
| **Start date** | Feb 2, 2023, 5:40 AM |
| **End date** | Feb 9, 2023, 5:40 AM |
| **Snapshot** | 16,540,576 |

## Results

| | |
|---|---|
| For | 2.4M MOVE  100% |
| Against | 0 MOVE  0% |

## I voted POAP



Vote to get this POAP



Vote & get this POAP

Mint

Case 1:23-cv-20727-RKA  Document 24  Entered on FLSD Docket 03/01/2023  Page 475 of 653

2/21/23, 2:06 PM Movedao Consultant Space 2 proposal: Limited Proposal for DAO Coverage of Legal and Indemnification Expenses

Case 1:23-CV-20727-RKA Document 24-1 Entered on FLSD Docket 03/01/2023 Page 476 of 653

# Exhibit 16

**Archived:** Tuesday, February 21, 2023 9:19:54 PM
**From:** Jon Gordon
**Sent:** Thursday, February 9, 2023 8:25:05 PM
**To:** Alex Fine   Christopher T. Berg   Eric M. George   Ryan Breslow   Thomas P. O'Brien
**Subject:** Fwd: Some important notes
**Importance:** Normal
**Sensitivity:** None

---

---------- Forwarded message ---------
From: **Ryan Breslow** <ryan@ryanbreslow.com>
Date: Mon, Feb 6, 2023 at 8:13 PM
Subject: Fwd: Some important notes
To: Alex Fine <alex@westvillagecapital.com>, Jon Gordon <jg@ryanbreslow.com>


Fyi

---------- Forwarded message ---------
From: **Law Office of Reed Yurchak** <reed@yurchaklaw.com>
Date: Mon, Feb 6, 2023 at 7:58 PM
Subject: Re: Some important notes
To: Ryan Breslow <ryan@ryanbreslow.com>


Dear Ryan,

I hope this email finds you well.  I have chosen to write back to keep
a clear record of communications, rather than to give you a call.  I
had a brief conversation with Mark about the issues you raised in the
email and was told that he had been game planning with new corporate
counsel out of New York (which I believe is related to your comment
regarding the $50k to the law firm).  I have not been in communication
with the new counsel or any other counsel and am unaware as to their
next steps or plan of action.  I would like to make clear that for any
work I have done on behalf of Movement, the last payment my office
received was for a March 2022 invoice.  I have not received any funds,
payment, or other form of remuneration since that time.  I am hereby
providing notice that my firm is not involved in representation of any
interests of "the project" and there are no outstanding invoices.

In addition I have told Mark that it is my opinion that the firm is
not owed any additional money for any work associated with the service
provider fee for the custodial trust accounts.  The firm has not taken
or received any service provider fee and does not intend to.  To that

end, I am unable to help resolve any dispute about any funds being
held by the project or to provide an opinion on the merits of any
claim regarding the disposition of those funds.  In fact, with respect
to your 8 bullet points, I have no personal knowledge or basis to
provide you with any input or response.   I am hoping that Mark's new
counsel will be able to resolve the disputes between you in the near
future.

Regards,

--
Law Office of Reed Yurchak
620 131st Ave NE
Bellevue, WA 98005
Office Tel: 206-866-0766
Bus. Cell: 425-941-6659
Fax: 425-654-1205

CONFIDENTIAL & PRIVILEGED. This e-mail message may contain legally
privileged and/or confidential information.  If you have received this
e-mail in error, please notify the sender immediately and delete all
copies of this e-mail message and any attachment.

On Sun, Jan 29, 2023 at 6:31 PM Ryan Breslow <ryan@ryanbreslow.com> wrote:
>
> Dear Reed,
>
> Hope you have been well. Please see the emails below. Investors behind the project have serious concerns regarding Mark's
latest actions and decisions. We have made many attempts to contact him without success. Would Monday morning or afternoon
work for a call? Looking forward to speaking.
>
> Ryan
>
> ---------- Forwarded message ---------
> From: Ryan Breslow <ryan@ryanbreslow.com>
> Date: Sun, Jan 29, 2023 at 10:29 PM
> Subject: Re: Some important notes
> To: Mark Phillips <mark.phillips@protonmail.com>
> CC: Alex Fine <alex@westvillagecapital.com>, Jon Gordon <jg@ryanbreslow.com>
>
>
> Mark,

>

> Please note that my offer to 100% redeem each investor in this project expires at the end of this month, 01/31/23. Investors have serious concerns about decisions and actions you have taken to prevent this redemption. Many of these these concerns are previewed in the prior email from Jon, Alex and I.

>

> I am reiterating that I am an open line of communication to you to connect, respond and resolve so we can move forward.

>

> Ryan

>

> On Fri, Jan 6, 2023 at 12:26 PM Ryan Breslow <ryan@ryanbreslow.com> wrote:

>>

>> Mark,

>>

>> There are many issues with actions taken in recent weeks.

>>

>> You have falsely represented to the community that Jon Gordon approved a proposal that he explicitly rejects.

>> You have not notified the community about the limited-time offer to reimburse everyone 1:1 through the end of January, in conjunction with project shutdown, after multiple requests to do so.

>> Instead of notifying the community of this path, you have spent a large portion of your time and paid hours producing proposals and modifying historical docs to get you, the law firm, and other service providers paid more.

>> You have not voted my, Alex, or Jon's tokens to reject your recent proposals, despite being the manager of our keys.

>> Several of your questionnaire questions seem explicitly designed to prevent progress of any redemptions being made.

>> You have changed the historical Gitbook to remove vague language around 2% fees estimates.

>> You have taken no action to notify the community of reducing spend to $0 (outside of your/jon's salaries and $50k to the law firm). Furthermore, you have not paid Jon's approved monthly salary for his time and contributions.

>> When we asked you to send us drafts of the snapshot proposal, you agreed, but instead went and published your own proposals to snapshot immediately, including objectionable and self-serving proposals contained within, without our review.

>>

>> Many of these actions appear to be outright fraud to the three of us. We recommend a swift 180.

>>

>> Ryan

>

> --

> sent via mobile

> --

> sent via mobile

--

sent via mobile

# Exhibit 17

From: Me <mark.phillips@protonmail.com>
Date: Wednesday, February 8 2023 at 8:24 PM PST
Subject: Re: Some important notes
To: Ryan Breslow <ryan@ryanbreslow.com>
Cc: alex@westvillagecapital.com, jg@ryanbreslow.com, shane@ryanbreslow.com

Ryan,

This email is in response to your email sent on February 6, 2023, which contained a few requests.

The first request you made was for "All of [our] keys" to be returned. The seed phrases will be prepared and returned to you via certified mail. Please just provide the address that you would like these to be sent to. Tracking information will be provided once sent.

The second request you made was "By end of the week, detailed documentation of money that has been paid so far to anyone working on the project since its beginning, including developers and service providers." The Confidential Independent Contractor Agreement executed between you and I does not have anything stating that I had or have any duty to you in regard to providing accounting for compensation that has been paid to others on behalf of Movement. Furthermore, Section 2(i) of the Guiding Principles specifically states that "the DAO is not required to keep any records concerning legal, accounting, or other affairs, and aside from the above public information, the DAO shall not be required to maintain any additional records. Notwithstanding the foregoing, the DAO may engage with third parties to provide legal services, accounting services, and any record-keeping in order to comply with any legal obligations." Section 11 of the Guiding Principles also states that "The DAO shall not be obligated to keep any books or records beyond what is made available via the Dapp, the DAO's Snapshot Spaces proposals, or available via the Ethereum blockchain." Therefore, I have no duty or obligation to provide the documentation you requested, and I will not do so.

Regards,
Mark Phillips

This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.

Sent with Proton Mail secure email.

------- Original Message -------
On Monday, February 6th, 2023 at 10:03 AM, Ryan Breslow <ryan@ryanbreslow.com> wrote:

Mark,

Thank you for the quick reply, we look forward to the letter.

While you take the time to formulate your letter, we are requesting before the end of today all of our keys.

By the end of the week, we also request detailed documentation of money that has been paid so far to anyone working on the project since its beginning, including developers and service providers. Hopefully this is readily available.

All the best,
Ryan

On Sat, Feb 4, 2023 at 3:27 PM Me <mark.phillips@protonmail.com> wrote:
> I am still working on my letter and given these responses are absent any acknowledgment to the false claims previously advanced and distributed it's imperative that I reduce everything to a letter and document. Frankly there is nothing in the discussion that is new information from what I have shared previously. I'll continue to work on this letter and notify you when it's time to schedule a call.
>
> Sent from Proton Mail for iOS
>
>
> On Thu, Feb 2, 2023 at 9:37 AM, Ryan Breslow <ryan@ryanbreslow.com> wrote:
>> Mark,
>>
>> Jon and I are available to talk on Tuesday. Shane will propose times.
>>
>> Ryan
>>
>> On Thu, Feb 2, 2023 at 6:19 AM Me <mark.phillips@protonmail.com> wrote:
>>> Ryan,
>>>
>>> If you are available this Friday or following Monday afternoon, I would appreciate your time to discuss an amicable resolution, I'll work on talking points and strive to distribute them prior to your availability.
>>>
>>> I respectfully demand that you immediately retract your spurious allegations which serves no purpose except to be offensively inflammatory and libelous, which undermines our common goal. Distributing this categorically false narrative is disappointing and evaporates goodwill unecessarily. It is this dissembling which leads me to believe that further communication will be unproductive and abusive.
>>>
>>> Regards,
>>> Mark Phillips
>>>
>>> This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received

2

this email in error please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.

Sent with Proton Mail secure email.

------- Original Message -------

On Sunday, January 29th, 2023 at 9:29 PM, Ryan Breslow <ryan@ryanbreslow.com> wrote:

> Mark,
>
> Please note that my offer to 100% redeem each investor in this project expires at the end of this month, 01/31/23. Investors have serious concerns about decisions and actions you have taken to prevent this redemption. Many of these these concerns are previewed in the prior email from Jon, Alex and I.
>
> I am reiterating that I am an open line of communication to you to connect, respond and resolve so we can move forward.
>
> Ryan
>
> On Fri, Jan 6, 2023 at 12:26 PM Ryan Breslow <ryan@ryanbreslow.com> wrote:
>> Mark,
>>
>> There are many issues with actions taken in recent weeks.
>>
>> 1. You have falsely represented to the community that Jon Gordon approved a proposal that he explicitly rejects.
>> 2. You have not notified the community about the limited-time offer to reimburse everyone 1:1 through the end of January, in conjunction with project shutdown, after multiple requests to do so.
>> 3. Instead of notifying the community of this path, you have spent a large portion of your time and paid hours producing proposals and modifying historical docs to get you, the law firm, and other service providers paid more.
>> 4. You have not voted my, Alex, or Jon's tokens to reject your recent proposals, despite being the manager of our keys.
>> 5. Several of your questionnaire questions seem explicitly designed to prevent progress of any redemptions being made.
>> 6. You have changed the historical Gitbook to remove vague language around 2% fees estimates.

7. You have taken no action to notify the community of reducing spend to $0 (outside of your/jon's salaries and $50k to the law firm). Furthermore, you have not paid Jon's approved monthly salary for his time and contributions.

8. When we asked you to send us drafts of the snapshot proposal, you agreed, but instead went and published your own proposals to snapshot immediately, including objectionable and self-serving proposals contained within, without our review.

Many of these actions appear to be outright fraud to the three of us. We recommend a swift 180.

Ryan
--
sent via mobile

--
sent via mobile

--
sent via mobile

# Exhibit 18



snapshot

 Connect wallet



← Back

# MIP-0014: Proposal to Ratify Action to Cycle All Gnosis Keys

Closed  Movement DAO: Consensus Space by rice$cracker ( Core )   ⋯

```
Author: benreed.eth
Date: 2023-01-31
```


This proposal seeks Movement Member's ratification of a recent action of the Authorized Members, benreed.eth and tankbottoms.eth, which was cycling all of the keys of the Gnosis Multi-sig 0x143cC0A996De329C1C5723Ee4F15D2a40c1203c6 due to security concerns.

## Thesis

In response to the recent security issues and threats made against the DAO's treasury's Gnosis signing keys, the Authorized Members met and agreed to cycle all the Gnosis keys. The treasury's Gnosis multi-sig Gnosis 0x143cC0A996De329C1C5723Ee4F15D2a40c1203c6 will immediately be replaced with the following keys.

1. eth:0x818e90cDc2771385d784563173046d7759c8117f
2. eth:0x468f178672C86bFA02e5E1B0413C3ccf55A37409
3. eth:0xA5B70097650FAeC3e87AA9174A76cd78925f7ae0
4. eth:0x752515a3A1091b9f1c04416CF79D1F14d2340085

2/21/23, 9:49 PM    Case 1:23-cv-20727-RKA   Document 34-1   Entered on FLSD Docket 03/01/2023   Page 488 of 653
Movement DAO GoverSnance — Remove and replace multiple MUltis — Governance, Gnosis, All Multi-Keys
653

5. eth:0x5d95baEBB8412AD827287240A5c281E3bB30d27E

6. eth:0x38F83dD64DADFd871BE920422B8Cb5703a1e45a3

7. eth:0x9245D6527462b76638789A78Cec69A4C003f878d

8. eth:0xe588A90B346236fCEc4543a101CD92d01C3fFfD6

9. eth:0x0ca396c41F6548a39D1982077C119eC1479b11bf

10. eth:0x008820F8256F950836775e52571347fFD5309d2b

11. eth:0x0087F67B6b0995D3e7D21f2b94Ef92F4582868aD

12. eth:0x73255155964A09ABb91994fe0EFB8D330f10aDAA

13. eth:0xFeB18aef7a8BB0598A301274777fC9c525Ed9b98

## Motivation

The Gnosis holds a significant amount of treasury assets entrusted to
the DAO and its community in furtherance of its vision. In addition to
unforeseen security concerns such as lost seed phrases, other OpSec
breaches, social engineering or unforeseen motivations by one or more
of the signers who are not adhering in good faith or whose interests are
orthogonal to the DAO, the Gnosis signers shall be cycled from the
original founders and Service Provider to certain Members as
determined by the Authorized Members.

Additionally, as a reminder, all Gnosis Multi-Signature signers are
expected to act in accordance with the DAO Governance Multi-
Signature sub-section.

## Specification

1. Removing the following Signer(s):

- eth:0x550bD0F03580B9a687931af4d837F8e45D61d410;

- eth:0x746cf650d4E5431474E8D4E2d5B6Bbe53772b498; and

- eth:0xDbE76F6ae97dFD5bdd1D7DAD8972740d18aB2b57;

2. Addition of the above listed Signer(s).

## Rationale

- Authorized Members, benreed.eth and tankbottoms.eth, discussed security concerns and agreed that threats to the DAO and community were imminent;

- Current Service Provider, dao-lawfirm.eth, has resigned;

- The Authorized Members convened, reviewed the pertinent facts, and resolved in authorizing this action;

- Given the current crypto-market sentiment, practicing exceptional security precaution is expected and warranted;

- Multi-Signature signer(s) should be comfortable with cryptographic transactions;

## Risks

- Authorized Members may have been compromised;

- The aforementioned individuals may not have the DAO's best interest in mind;

- The new replacement signers may not be trustworthy.

## Snapshot Consensus by the DAO Members

Whereas the DAO through its Authorized Members voted to adopt and resolve the following actions. The Authorized Members now seeks to ratify those actions via a Snapshot Consensus by the DAO Members.

**RESOLVED:** That the cycling of all keys associated with the Movement Gnosis 0x143cC0A996De329C1C5723Ee4F15D2a40c1203c6) is hereby adopted and approved;

**RESOLVED FURTHER:** That the Authorized Members convened and are hereby jointly and severally authorized to take any and all actions, along with executing or signing any cryptocurrency transactions, and executing and delivering any other documents, agreements, instruments, and/or certificates as he or she may deem necessary, advisable, or incidental, in connection with the preceding resolution, and other resolutions herein, or any related documents. This also includes authorization to perform or resolve the obligations of the DAO, and/or its affiliates.

**RESOLVED FURTHER: That any and all actions taken by the Authorized Members to carry out the purposes and intent of the foregoing resolutions prior to their adoption are approved, ratified, and confirmed.**

This action by the Authorized Members shall be effective as of the date the DAO receives the consent of its Members via the Snapshot vote. This action by the Authorized Members may be executed in any number of counterparts, each of which shall constitute an original and all of which together shall constitute one action.

## Authors

1. 0xA4e6C2B6264652444B3F0cc1bB37496AE916931c

---

Votes  6

Show less

| | | |
|---|---|---|
| 🟣 0x2987...0fE0 | For | 1.9M MOVE 𝓃 |

| | | |
|---|---|---|
| 🟢 0x2770...fC63 | For | 200K MOVE 𝓃 |
| 🔘 rice$cr... (Core) | For | 197K MOVE 𝓃 |
| 🟣 0x4e33...a525 | For | 101K MOVE 𝓃 |
| 🟢 0x9189...0d4B | For | 100K MOVE 𝓃 |
| 🟣 0xc928...A296 | For | 80K MOVE 𝓃 |

## Information

| | |
|---|---|
| **Strategie(s)** | 🔴🔴 |
| **IPFS** | #bafkrei |
| **Voting system** | Basic voting |
| **Start date** | Feb 2, 2023, 4:56 AM |
| **End date** | Feb 9, 2023, 4:56 AM |
| **Snapshot** | 16,540,357 |

## Results

| | |
|---|---|
| For | 2.5M MOVE  100% |
| Against | 0 MOVE  0% |

2/21/23, 2:34 PM    Movement DAO consensus space proposal MIP 2-2014 Disposal Security Control Policy, control cycle, All stage Keys

Case 1:23-cv-20727-RKA Document 24-1 Entered on FLSD Docket 03/01/2023 Page 492 of 653

I voted POAP



Vote to get this POAP



Mint

# Exhibit 19



snapshot



Connect wallet



← Back

# MIP-0015: Proposal to Ratify the Termination of Certain Members

Closed  Movement DAO: Consensus Space by rice$cracker Core   ···

Author: benreed.eth
Date: 2023-01-31



This Snapshot proposal has been created to ratify the membership termination actions by the Authorized Members, benreed.eth and tankbottoms.eth.

## Thesis

The Authorized Members were concerned with certain Member's ("Certain Members") activities which were in violation of the DAO's Code of Conduct and/or the DAO's Guiding Principles and/or the DAO's Terms of Service and/or the DAO's Token Terms of Service and/or the DAO's GitBook. The Authorized Members disclosed all material information when they convened and sought independent counsel in order for them to render a fully-informed decision, with the goal of balancing the Service Provider's security concerns, membership privacy, as well as the DAO's need to maintain a healthy and vibrant community. Concerned with the current crypto-market sentiment, the Authorized Members felt the need to practice exceptional security precautions, operate with a

2/21/23, 11:23 AM    Case 1:23-cv-20727-RKA   Document 34-3 Entered on FLSD Docket 03/01/2023   Page 496 of
Movement DAO Consents Space proposal - 0015 - Proposal Regarding the termination of Certain Members
653

high degree of transparency and accountability, and ensure that the DAO's treasury assets are protected.

The Certain Members are associated with the following addresses, who are also signers of the DAO's Gnosis Multi-Signature:

0x550bD0F03580B9a687931af4d837F8e45D61d410

0x746cf650d4E5431474E8D4E2d5B6Bbe53772b498

0xDbE76F6ae97dFD5bdd1D7DAD8972740d18aB2b57

Additionally, these addresses are also associated with the Certain Members:

0x58Ba373d9eE46ED5402a6A15fE9CcADc67dE1650

0x211be2dDC09c482B27Ed780A710b18d8Cb76328E

0xb44A14dEcD9270E34E2dDaff4CD8690a2Cb88461

## Motivation

To protect the DAO community from actions taken by the Certain Members that appeared to be malicious, exploitative, and in bad faith in order to protect the DAO's treasury and assets.

## Specification

1. Terminate any governance, voting, or community participation by the following addresses(s):

0x550bD0F03580B9a687931af4d837F8e45D61d410

0x746cf650d4E5431474E8D4E2d5B6Bbe53772b498

0xDbE76F6ae97dFD5bdd1D7DAD8972740d18aB2b57

0x58Ba373d9eE46ED5402a6A15fE9CcADc67dE1650

0x211be2dDC09c482B27Ed780A710b18d8Cb76328E

0xb44A14dEcD9270E34E2dDaff4CD8690a2Cb88461

2. Remove the above listed addresses from Snapshot, and any position of trust they may hold.

## Rationale

- The Authorized Members convened, reviewed the pertinent facts and resolved authorizing this action;

- dao-lawfirm.eth has resigned as the Service Provider leaving interim DAO oversight to the Authorized Members;

- Given the current crypto-market sentiment, practicing exceptional security precaution is expected and warranted;

- Multi-Signature Signer(s) should be comfortable with cryptographic transactions;

## Risks

- Authorized Members may have been compromised;

- The aforementioned individuals may not have the DAO's best interest in mind;

## Snapshot Consensus by the DAO Members

Whereas the DAO through its Authorized Members voted to adopt and resolve the following actions. The Authorized Members now seeks to ratify those actions taken by a Snapshot Consensus by the DAO Members.

**RESOLVED:** That the Certain Members associated with the above listed addresses are concluded to have acted in bad faith, against the interest

of the DAO, violated the Code of Conduct, its Terms of Service, and their

immediate, irrevocable, membership termination therein is hereby adopted and approved;

**RESOLVED FURTHER:** That the DAO terminates and removes any formal, title, position, function, role, for 0xE41188926607921763D25392475f1156AC5f9033, insofar they were an Authorized Member for "Meat-space" activities as granted in MIP-0004;

**RESOLVED FURTHER:** That the DAO immediately terminates and removes any right to or the participation of governance and vote on community measures for the above listed addresses, and any addresses associated with them each listed above;

**RESOLVED FURTHER:** That the Authorized Members convened and are hereby jointly and severally authorized to take any and all actions, along with executing or signing any cryptocurrency transactions, and executing and delivering any other documents, agreements, instruments, and/or certificates as he or she may deem necessary, advisable, or incidental, in connection with the preceding resolution, and other resolutions herein, or any related documents. This also includes authorization to perform or resolve the obligations of the DAO, and/or its affiliates.

**RESOLVED FURTHER: That any and all actions taken by the Authorized Members to carry out the purposes and intent of the foregoing resolutions prior to their adoption are approved, ratified, and confirmed.**

This action by the Authorized Members shall be effective as of the date the DAO receives the consent of its Members via the Snapshot vote. This action by the Authorized Members may be executed in any number

of counterparts, each of which shall constitute an original and all of which together shall constitute one action.

## Authors

1. 0xA4e6C2B6264652444B3F0cc1bB37496AE916931c

## Votes 6

Show less

| | | |
|---|---|---|
| 0x2987...0fE0 | For | 1.9M MOVE |
| 0x2770...fC63 | For | 200K MOVE |
| rice$cr... Core | For | 197K MOVE |
| 0x4e33...a525 | For | 101K MOVE |
| 0x9189...0d4B | For | 100K MOVE |
| 0xc928...A296 | For | 80K MOVE |

## Information

| | |
|---|---|
| Strategie(s) | |
| IPFS | #bafkrei |
| Voting system | Basic voting |
| Start date | Feb 2, 2023, 5:04 AM |
| End date | Feb 9, 2023, 5:04 AM |
| Snapshot | 16,540,397 |

## Results

For                                                    2.5M MOVE  100%

Against                                                   0 MOVE  0%

---

---

I voted POAP

---



Vote to get this POAP



El riguroso Criptográfico
XV
MVMT
Alex esle

---

| Mint |

---

Case 1:23-cv-20727-RKA Document 34-1 Entered on FLSD Docket 03/01/2023 Page 501 of 653

# Exhibit 20





## snapshot

Connect wallet



← Back

# MIP-0016: Proposal to the Update to the DAO's Snapshot Strategy

Closed    Movement DAO: Consensus Space by rice$cracker   Core      

Authors: benreed.eth
Date: 2023-01-31

## Thesis

The DAO is governed by its community. Multi-sig transactions and signatures, as well as updates to the DAO process, must be ratified by the Governance Process prior to their execution. To support this process the DAO maintains Snapshot Strategies that assign, value, and record Member's voting rights in the Snapshot Consensus Space.

Therefore it is important for the Snapshot Strategies to accurately capture and reflect the correct assignment and value associated to Members. Upon any changes to Member's contributions or rights to participate in governance, due to a lack of good-standing as outlined in the DAO's Terms of Service, Code of Conduct and Policies; the Snapshot Strategies will require reconfiguration in order to incorporate any of these changes.

Authority to make changes to the Snapshot Strategies are outlined in the Governance Process as highlighted under Emergency Governance. It

2/21/23, 2:28 PM                MoveHeat DAO consensus 84-d proposal record on Flopsail DAO update 3.0 – Snapshot Strategy of
Case 1:23-cv-2072-RKA Document 84-1 Entered on FLSD Docket 03/01/2023 Page 504 of
653

states, "the Authorized Members individually, or collectively, they may take any and all on-chain or off-chain actions to protect the DAO's treasury and assets - including interfering with the execution of a proposal, approving a proposal, reconfiguring Snapshot, or reconfiguring the Multi-sig."

The Authorized Members includes the appointed Authorized Members as ratified in MIP-0000, MIP-0004, and MIP-0007.

## Motivation

The Authorized Members recently took action to revoke and terminate membership rights of certain community Members ("Certain Members"), nullifying their right and ability to participate in governance. Therefore the existing Snapshot Strategy and Snapshot Consensus configuration is inaccurate and is in need of updating.

## Specification

The Authorized Members will update the Snapshot Strategies, removing the rights of the Certain Members no longer in good-standing. A detailed explanation of all changes and adjustments to the Snapshot Strategies will be posted online to ensure complete transparency.

## Rationale

The Authorized Members want to ensure the DAO's Governance process and is accurate and trustworthy for all Members of the community.

## Risks

- Transparent operation of the DAO is not certain or guaranteed.

- DAO governance is restricted until the Snapshot Strategies have been updated.
- Updating the Snapshot Strategy takes time and may be error prone.

## Snapshot Consensus by the DAO Members

Whereas the DAO through its Authorized Members voted to adopt and resolve the following actions. The Authorized Members now seeks to ratify those actions taken by a Snapshot Consensus by the DAO Members.

RESOLVED: That a new Snapshot Strategy incorporates the decisions of the Authorized Members to reconfigure the Snapshot Strategy to reflect actions taken by them to remove Certain Members from the community, is hereby adopted and approved;

RESOLVED FURTHER: That the Authorized Members convened and are hereby jointly and severally authorized to take any and all actions, along with executing or signing any cryptocurrency transactions, and executing and delivering any other documents, agreements, instruments, and/or certificates as he or she may deem necessary, advisable, or incidental, in connection with the preceding resolution, and other resolutions herein, or any related documents. This also includes authorization to perform or resolve the obligations of the DAO, and/or its affiliates.

RESOLVED FURTHER: That any and all actions taken by the Authorized Members to carry out the purposes and intent of the foregoing resolutions prior to their adoption are approved, ratified, and confirmed.

This action by the Authorized Members shall be effective as of the date the DAO receives the consent of its Members via the Snapshot vote. This action by the Authorized Members may be executed in any number of counterparts, each of which shall constitute an original and all of which together shall constitute one action.

## Authors

1. 0xA4e6C2B6264652444B3F0cc1bB37496AE916931c

| Votes  5 | Show less | | ⤓ |
|---|---|---|---|
| 0x2987...0fE0 | For | | 1.9M MOVE 〰 |
| 0x2770...fC63 | For | | 200K MOVE 〰 |
| rice$cr...  Core | For | | 197K MOVE 〰 |
| 0x4e33...a525 | For | | 101K MOVE 〰 |
| 0xc928...A296 | For | | 80K MOVE 〰 |

## Information

| | |
|---|---|
| **Strategie(s)** | 🌀 🌀 |
| **IPFS** | #bafkrei |
| **Voting system** | Basic voting |
| **Start date** | Feb 2, 2023, 5:10 AM |
| **End date** | Feb 9, 2023, 5:10 AM |
| **Snapshot** | 16,540,426 |

**Snapshot**

10,546,426

---

## Results

| | |
|---|---|
| For | 2.4M MOVE  100% |
| Against | 0 MOVE  0% |

---

## I voted POAP



Vote to get this POAP



Mint

Case 1:23-cv-20727-RKA Document 34-1 Entered on FLSD Docket 03/01/2023 Page 508 of 653

# Exhibit 21




snapshot

Connect wallet



← Back

# MIP-0009: Approve Launch of DAOLABS Beta Services

Closed    Movement DAO: Consensus Space by *filipv.eth*    •••

Authors: benreed.eth, tankbottoms.eth, filipv.eth
Date: 2023-01-03


*This Emergency Proposal has been created to affirm DAO Multisig Signer support of the changes proposed below. **By voting affirmatively, Signers are explicitly approving the proposed changes.***

## Beta Launch Overview

The tentative proposed multi-stage roll-out of the following product features as follows:

1. Deploy a Juicebox-compatible treasury platform which accepts DAI (details to follow).

2. Create a Juicebox treasury which certain fees will be routed to.

3. Deploy BETA NFT creation tooling for Web3 creators.

4. Deploy BETA DAO-KIT legal resource for DAO builders.

## Motivation

In preparation for the beta launch of the DAOLABS application and services, the development team wants to ensure sufficient resources to launch and continue running the application.

# Background

## Prior Work

Movement DAO was created to build a platform for tokenized communities to govern contributions. So far, Movement DAO has worked towards this goal by:

1. Prototyping a treasury platform using OpenLaw's Tribute Framework.

2. Prototyping a treasury platform using the Juicebox Protocol.

3. Participating in JuiceboxDAO to better understand Web3 dynamics.

4. Researching legal theories and frameworks for DAOs and their treasury management.

5. Prototyping and building expertise within the NFT creation space.

6. Developing a beta DAO-KIT legal resource for community builders.

7. Developing a beta NFT creation tooling for creators.

8. Developing Juicebox Protocol extensions and tooling for use towards Movement DAO's goals.

A great deal of exploratory code has been developed, some of which is available on GitHub:

1. A Juicebox interface implemented in Svelte. Svelte is a compiled user interface framework which we believe is easier to understand and more cost-effective to maintain than alternatives like React —

and more cost-effective to maintain than alternatives like Reddit

its users include Apple Music, Spotify, Ikea, The New York Times, and Brave Search. This code serves as our primary baseline for further UX development: our goal was to quickly build up a tool set of DAO applications and services by expanding the current Juicebox Project management interface.

2. Treasury and NFT Tooling Smart Contracts. These Solidity smart contracts extend the Juicebox protocol, adding support for English/Dutch NFT auctions, creating NFT collections, stablecoin deposits and withdrawals, dynamic on-chain role management, payment processing, token liquidation, vesting schedules, and more.

3. DAO-KIT. These Legal resources guide project creators through the process of incorporating a legal entity, establishing their operating principles, and managing ongoing filing requirements, as well as engagements, settlements, terms of service, and other documents. It automatically generates legal documents using pre-built templates, and includes resources for startups, such as capitalization table and headcount calculators.

4. NFT Creation Tooling. A comprehensive tool for creating NFTs and enriching communities.

5. Wallet Services. A robust Web3 wallet system which (i) manages multiple wallets, (ii) enables logins with Google, Email, and other common services, (iii) integrates with third-party backup services, (iv) integrates with Gnosis Safe, and (v) integrates fiat on-ramp and off-ramp services, among other features.

## Branding

Our Treasury system uses the Juicebox Protocol as a foundation. We have reimplemented its Web3 components in Svelte using Juicebox

branding, but we are not deploying a Juicebox clone. We are currently working on a new brand for Movement DAO via DAOLABS — once our

new brand is developed, we will redesign the UI and remove references to Juicebox (except for noting that we are compatible with the Protocol and that our NFT products natively recognize Juicebox Treasuries). In the meantime, new deployments will continue to use the juicebox.wtf domain and some Juicebox branding.

## Specification

The DAO Multisig[1] shall transfer 10 ETH and 12,200 DAI to the Developer Multisig.[2]

The Developer Multisig shall then transfer:

- 5 ETH to the newly created native Juicebox treasury,
- 5 ETH to the new Beta Juicebox Treasury, and
- 12,200 DAI to the new DAI registry.

These allocations will be administered by **benreed.eth, tankbottoms.eth**, or **jimmyethworld.eth**, with oversight from the DAO's Service Provider, **dao-lawfirm.eth.**

## Risks

- Frequently invoking Emergency Governance risks alienating DAO members.
- A Juicebox Protocol DAI terminal has not been deployed before.
- Software development is a risky endeavor.
- These funds may not be ideally distributed.
- These funds may be more useful later on.
- Market instability in and outside of crypto could continue, or get

- Market instability in and outside of crypto could continue, or get worse.

# Snapshot Consensus by the DAO Members

Whereas the DAO through its Members voted to adopt the following actions via Snapshot and resolves as follows:

**RESOLVED:** That the DAO Multisig transfer of 10 ETH and 12,200 dollars worth of ETH or DAI to the Developer Multisig, to thereafter be respectively distributed to Movement DAO's Native/Beta Juicebox treasuries and DAI registry, is hereby adopted and approved;

**RESOLVED FURTHER:** That each Service Provider, Authorized Member, and agent of the DAO is hereby jointly and severally authorized to do any act, matter, or thing, and to execute and deliver any other document as he or she may deem necessary, advisable, or incidental, in connection with the preceding specification, and other sections herein, or any related documents, and to perform or resolve the obligations of the DAO, or its affiliates.

**RESOLVED FURTHER: That any and all actions taken by the Service Providers to carry out the purposes and intent of the foregoing resolutions prior to their adoption are approved, ratified and confirmed.**

This action by the DAO Member by Snapshot vote shall be effective as of the date the DAO Entities receives the consent of the DAO at the end of the Snapshot vote. This action by the DAO Members consent may be executed in any number of counterparts, each of which shall constitute an original and all of which together shall constitute one action.

# Authors

1. 0x5d95baEBB8412AD827287240A5c281E3bB30d27E

2. 0xA4e6C2B6264652444B3F0cc1bB37496AE916931c

3. 0x30670d81e487c80b9edc54370e6eaf943b6eab39

1. The DAO Multisig is a Gnosis Safe at
   0x143cC0A996De329C1C5723Ee4F15D2a40c1203c6   **on the Ethereum Mainnet.** 

2. The Developer Multisig is a Gnosis Safe at
   0x2187e6a7c765777d50213346F0Fe519fCA706fbD   **on the Ethereum Mainnet.**

---

**Votes** 2                          Show less

| | | | |
|---|---|---|---|
| 🪨 rice$cr... (Core) | For | 2.2K MOVE 〰 |
| 🔵 0x4eeD...e32B | For | 937 MOVE 〰 |

---

**Information**

| | |
|---|---|
| **Strategie(s)** | 🎨🎨 |
| **IPFS** | #bafkrei |
| **Voting system** | Basic voting |
| **Start date** | Jan 3, 2023, 12:00 AM |
| **End date** | Jan 10, 2023, 12:00 AM |
| **Snapshot** | 16,322,512 |

---

**Results**

For                                  3.1K MOVE  100%

2/21/23, 9:01 PM
Movement DAO Governance Space proposal on MR-poll Snapshot identified by its Beta Tag
Case 1:23-cv-20727-RKA Document 34-1 Entered on FLSD Docket 03/04/2023 Page 516 of 653

Against                                                                      0 MOVE  0%

I voted POAP

Vote to get this POAP



Mint

# Exhibit 22





snapshot

Connect wallet

← Back

# MIP-0010: Approve Authorized Members to Retain Further Legal Counsel

Closed    Movement DAO: Consensus Space by filipv.eth    ⋯

Authors: benreed.eth, filipv.eth
Date: 2023-01-03



*This Emergency Proposal has been created to affirm DAO Multisig Signer support of the changes proposed below. By voting affirmatively, Signers are explicitly approving the proposed changes.*

## Thesis

The DAO's Authorized Members and its Service Provider would like to retain legal counsel regarding the DAO's outstanding legal agreements, including the GitBook, the Terms of Service, and several proposed amendments, while also seeking feedback from the community to ensure that the DAO and its members are acting in accordance with the law.

Estimates suggest that a 50,000 DAI budget will be sufficient to retain appropriate legal counsel for this purpose.

## Specification

The DAO Multisig[1] shall transfer 50,000 DAI to the Developer Multisig.
[2]

The Authorized Members and the Service Provider will administer this distribution and have the authority to make relevant decisions when executing this proposal.

## Rationale

Before implementing any operational or structural changes — specifically those which affect the DAO treasury — the Authorized Members would like to receive legal counsel to ensure full compliance with the law while maintaining full transparency.

## Risks

- Frequently invoking Emergency Governance risks alienating DAO members.

- This proposal's specification is open-ended, and relies on the sound judgement of the Authorized Members and the Service Provider.

- These funds may be more useful later on.

- Instability in the crypto and financial markets could continue or get worse.

# Snapshot Consensus by the DAO Members

Whereas the DAO through its Members voted to adopt the following actions via Snapshot and resolves as follows:

**RESOLVED:** That the transfer of 50,000 DAI from the DAO Multisig to the Developer Multisig is hereby adopted and approved;

**RESOLVED FURTHER:** That each Service Provider, Authorized Member, and agent of the DAO is hereby jointly and severally authorized to do any act, matter, or thing, and to execute and deliver any other document as he or she may deem necessary, advisable, or incidental, in connection with the preceding specification, and other sections herein, or any related documents, and to perform or resolve the obligations of the DAO, or its affiliates.

**RESOLVED FURTHER:** That the Service Providers (including Authorized Member and Secretary **benreed.eth**), in accordance with commensurate powers, are authorized to execute and deliver any agreement in the name of the DAO and to otherwise obligate the DAO with respect to the purpose of the DAO, within general guidelines and budgets approved by the Members; however, Actions by the DAO Snapshot Consensus by the Members may enact specific limitations on the authority of the Service Provider from time to time.

**RESOLVED FURTHER:** That the Service Providers be, and each of them hereby is, authorized and empowered to take any and all such further action, to execute and deliver any and all such further agreements, instruments, documents and certificates and to pay such expenses, in the name and on behalf of the DAO, existing affiliates entities, contemplated affiliate entities, or such an Authorized Member, as any such Authorized Member may deem necessary or advisable to effectuate the purposes and intent of the resolutions hereby adopted, the taking of such actions, the execution and delivery of such agreements, instruments, documents and certificates and the payment of such expenses by any such Authorized Member to be conclusive

2/21/23, 8:15 PM    Movement DAO Consensus Space - proposal for DAO Approval: Authorize Members to Retain Funding & Counsel

Case 1:23-cv-20727-RKA Document 24-3 Entered on FLSD Docket 03/01/2023 Page 522 of 653

evidence of his or her authorization hereunder and the approval thereof.

**RESOLVED FURTHER: That any and all actions taken by the Service Providers to carry out the purposes and intent of the foregoing resolutions prior to their adoption are approved, ratified and confirmed.**

This action by the DAO Member by Snapshot vote shall be effective as of the date the DAO Entities receives the consent of the DAO at the end of the Snapshot vote. This action by the DAO Members consent may be executed in any number of counterparts, each of which shall constitute an original and all of which together shall constitute one action.

## Authors

1. 0x5d95baEBB8412AD827287240A5c281E3bB30d27E
2. 0xA4e6C2B6264652444B3F0cc1bB37496AE916931c
3. 0x30670d81e487c80b9edc54370e6eaf943b6eab39

<br>

1. The DAO Multisig is a Gnosis Safe at
   0x143cC0A996De329C1C5723Ee4F15D2a40c1203c6 on the Ethereum Mainnet. ↩

2. The Developer Multisig is a Gnosis Safe at
   0x2187e6a7c765777d50213346F0Fe519fCA706fbD on the Ethereum Mainnet. ↩

---

| Votes  4 | | | |
|---|---|---|---|
| 🦊 servic... (Core) | | For | 10M MOVE 〰 |
| 🪨 rice$cr... (Core) | | For | 2.2K MOVE 〰 |



2/21/23, 7:17 PM MaverinkDAO - Consensus space proposal - Entero on #1 OF 00 - Approve Authorock of members to Retain unfingegab2 counsel

Case 1:23-cv-20727-RKA Document 24-1 Entered on FLSD Docket 03/01/2023 Page 523 of 653

| 🔵 0x4eeD...e32B | For | 937 MOVE 〰 |
| 🟠 tankbo... (Core) | For | 226 MOVE 〰 |

## Information

| | |
|---|---|
| **Strategie(s)** | 🎨🎨 |
| **IPFS** | #bafkrei |
| **Voting system** | Basic voting |
| **Start date** | Jan 3, 2023, 12:00 AM |
| **End date** | Jan 10, 2023, 12:00 AM |
| **Snapshot** | 16,322,534 |

## Results

| | | |
|---|---|---|
| For | 10M MOVE | 100% |
| Against | 0 MOVE | 0% |

## I voted POAP



Vote to get this POAP





MVMT

Mint

2/21/23, 3:50 PM    Case 1:23-cv-20727-RKA   MoveDAO Doc: ument 24-1   Enter Space proposal — Entered on FLSD Docket 03/01/2023 — Approve Autho Page 525 of o retain unmagnlegab counsel

653

# Exhibit 23



snapshot



Connect wallet

← Back

# MIP-0017: Proposal for Outstanding Operational Expense Payouts

Closed  Movement DAO: Consensus Space by rice$cracker Core  •••

Authors: benreed.eth
Date: 2023-01-31



## Thesis

The DAO incurs monthly expenses in the form of developer payouts and operational expenses such as software and hosting services, merchandise, professional services, and other miscellaneous expense. Since December 2022 the DAO has yet to disperse payment for the development team's payouts and has depended on the personal contributions from Authorized Members, benreed.eth and tankbottoms.eth, to cover ongoing operational expenses. To sustain product development and continue to ensure the DAO's IRL business accounts remain in good standing, the DAO needs to disperse funds for outstanding payouts and operational expenses for the months of December 2022 and January 2023.

## Specification

The Gnosis Multi-sig[1] shall transfer `DAI 511,794` and `ETH 41.007` (ETH amount subject to change depending on ETH price at time of transfer).

to the Developer Multisig[2].

The Authorized Members will transfer and distribute the relevant funds to reimburse the appropriate members and banking institutions for settlement of all accounts.

## Outstanding Expenses

The table below outlines payouts required from the DAO for expenses incurred from December 2022 through January 2023:

| Category | Description | Amount (DAI) | Amount (ETH) |
|---|---|---|---|
| Developer Payouts | 2 months of developer payouts | DAI 431,500 | - |
| Software & Hosting Services | Google Domains, AWS, Fleek, etc. | DAI 10,070 | - |
| Merchandise | Supplies, hardware, etc. | DAI 12,393 | - |
| Miscellaneous | Transaction and bank fees, etc. | DAI 2,678 | - |
| Professional Services | Business, Accounting, and Security | DAI 3,738 | - |
| Travel & Expenses | Developer team onsite | DAI 4,415 | - |
| Member Reimbursements | 0x5d95...d27e and 0xa4e6...931c | DAI 47,000 | ETH 41.007 |

The total payout for DAO operations in December 2022 and January

2/21/23, 9:48 PM | MoveDAO - DAO Consensus for a proposal MDIP-007: Proposal to Cover Outstanding Operations Expenses - Snapshot

Case 1:23-cv-20727-RKA Document 84-1 Entered on FLSD Docket 03/01/2023 Page 529 of 653

2023 was `DAI 511,794` and `ETH 41.007` .

## Rationale

Prompt payment for developer payouts and operational expenses ensure that the DAO continues to conduct itself professionally, avoid any potential delay in ongoing development, and prevents the DAO from incurring additional fees and/or debts.

## Risks

- Failure to pay expenses harms the reputation and good standing of the DAO and it Authorized Members.
- Failure to pay expenses has the potential to expose the DAO to additional fees and/or debts.
- These funds may not be ideally distributed.
- These funds may be more useful later on.

## Snapshot Consensus by the DAO Members

Whereas the DAO through its Members voted to adopt the following actions via Snapshot and resolves as follows:

**RESOLVED:** That the DAO Multisig transfer of `DAI 511,794` and `ETH 41.007` to the Developer Multisig (hereinafter, "Payout of Outstanding Expenses") is hereby adopted and approved;

**RESOLVED FURTHER:** That the Developer Multisig shall transfer `DAI 511,794` and `ETH 41.007` to the accounts specified by benreed.eth and tankbottoms.eth, and that the Authorized Members are authorized to pay and reimburse expenses incurred for outstanding developer services and operational expenses incurred by the DAO or the DAO's

services and operational expenses incurred by the DAO or the DAO's affiliate entity during the month of December 2022 and January 2023.

**RESOLVED FURTHER:** That the Authorized Members convened and are hereby jointly and severally authorized to take any and all actions, along with executing or signing any cryptocurrency transactions, and executing and delivering any other documents, agreements, instruments, and/or certificates as he or she may deem necessary, advisable, or incidental, in connection with the preceding resolution, and other resolutions herein, or any related documents. This also includes authorization to perform or resolve the obligations of the DAO, and/or its affiliates.

**RESOLVED FURTHER: That any and all actions taken by the Authorized Members to carry out the purposes and intent of the foregoing resolutions prior to their adoption are approved, ratified, and confirmed.**

This action by the Authorized Members shall be effective as of the date the DAO receives the consent of its Members via the Snapshot vote. This action by the Authorized Members may be executed in any number of counterparts, each of which shall constitute an original and all of which together shall constitute one action.

## Authors

1. 0xA4e6C2B6264652444B3F0cc1bB37496AE916931c

1. The DAO Multisig is a Gnosis Safe at

   0x143cC0A996De329C1C5723Ee4F15D2a40c1203c6 **on the Ethereum Mainnet.** 🔄

## 2. The Developer Multisig is a Gnosis Safe at

0x2187e6a7c765777d50213346F0Fe519fCA706fbD **on the Ethereum Mainnet.** 🔵

| Votes | 5 | ( Show less ) | ⬇ |
|---|---|---|---|
| 🟣 0x2987...0fE0 | For | | 1.9M MOVE ⌁ |
| 🟢 0x2770...fC63 | For | | 200K MOVE ⌁ |
| 🔘 rice$cr... ( Core ) | For | | 197K MOVE ⌁ |
| 🔵 0x4e33...a525 | For | | 101K MOVE ⌁ |
| 🟢 0xc928...A296 | For | | 80K MOVE ⌁ |

## Information

| | |
|---|---|
| **Strategie(s)** | 🔵🔵 |
| **IPFS** | #bafkrei |
| **Voting system** | Basic voting |
| **Start date** | Feb 2, 2023, 5:23 AM |
| **End date** | Feb 9, 2023, 5:23 AM |
| **Snapshot** | 16,540,490 |

## Results

| | | |
|---|---|---|
| For | 2.4M MOVE | 100% |
| Against | 0 MOVE | 0% |

2/21/23, 3:26 PM    Movement DAO Consensus Space proposal: MD-017: Proposal to Understand Operational Expense's - Sna...

Case 1:23-cv-20727-RKA  Document 84-1  Entered on FLSD Docket 03/01/2023  Page 532 of 653

I voted POAP



Vote to get this POAP



Mint

Case 1:23-cv-20727-RKA Document 34-1 Entered on FLSD Docket 03/01/2023 Page 533 of 653

# Exhibit 24





snapshot

Connect wallet

← Back

# MIP-0018: Proposal for Deferred 2022 Developer Payouts

Closed  Movement DAO: Consensus Space by rice$cracker  Core     •••

Authors: benreed.eth
Date: 2023-01-31                                                    

## Thesis

Over the course of 2022, certain developer consultants ("Developers"), listed below, requested the DAO to defer payouts until the upcoming new year. The DAO accepted the request of the Developers and deferred certain payouts. Now that it is the new year, 2023, monies from deferred payouts can now be paid to the Developers.

## Motivation

Attracting and retaining top developer talent is the top priority for the DAO. In an effort to support this priority, the Service Provider and Authorized Members of the DAO, benreed.eth and tankbottoms.eth, agreed to the Developers request to defer payouts. It is in the best interest of the DAO to honor all agreements made with these Developers in order to avoid loss of talent and maintain the DAO's reputation.

## Specification

## Specification

The Gnosis Multi-sig[1] shall transfer  DAI 349,035 , to the Developer Multisig[2].

## Deferred Developer Payout

The following table represents the total amount of deferred 2022 payouts now due to the Developers. The Developers each have agreements with the DAO and are recognized as senior developers within their respective technology areas: Solidity Smart Contract and UX front-end Typescript development.

| Due Date | Developer Consultant | Deferred Amount | Deferred Months | Practice Area |
|---|---|---|---|---|
| 2023-01-01 | 0xF1cf...eD7C | DAI 234,035 | January, October, November | Smart Contracts |
| 2023-01-01 | 0x89Ff...84fF | DAI 85,000 | October, November | UX Typescript |
| 2023-01-01 | 0x57a1...0d37 | DAI 30,000 | October, November | UX Typescript |

The total amount of developer payouts deferred in 2022 was  DAI 349,035 .

## Utilization

The Authorized Members, benreed.eth and tankbottoms.eth, have reviewed and confirm this was the agreement made with the above mentioned Developers.

mentioned Developers.

## Rationale

The DAO is required to abide by it's Guiding Principles and Code of Conduct, requiring its Members to honor agreements made in good faith and follow through with deferred payouts. Additionally the DAO aspires to be an attractive destination for top talent in Web3; therefore, the DAO's Authorized Members want to continue to support requests of the few developers it employs including flexible payout requests.

## Risks

- Delay in the deferred payouts has resulted in loss of trust and goodwill from the Developers.
- Deferred payouts require additional overhead and administrative support to execute.
- Deferred payouts have the potential to distort budget burn rates and complicate accounting.

# Snapshot Consensus by the DAO Members

Whereas the DAO through its Members voted to adopt the following actions via Snapshot and resolves as follows:

**RESOLVED:** That the DAO Multisig transfer of `DAI 349,035` to the Developer Multisig (hereinafter, "Deferred Developer Payout") is hereby adopted and approved;

**FURTHER RESOLVED:** That the Developer Multisig further transfer `DAI 349,035` to the accounts specified by the previously mentioned developers for the deferred 2022 payouts. Account transfers may

developers for the deferred 2023 payouts. Account transfers may include conversion to fiat currency and or other digital assets.

**RESOLVED FURTHER:** That the Authorized Members convened and are hereby jointly and severally authorized to take any and all actions, along with executing or signing any cryptocurrency transactions, and executing and delivering any other documents, agreements, instruments, and/or certificates as he or she may deem necessary, advisable, or incidental, in connection with the preceding resolution, and other resolutions herein, or any related documents. This also includes authorization to perform or resolve the obligations of the DAO, and/or its affiliates.

**RESOLVED FURTHER: That any and all actions taken by the Authorized Members to carry out the purposes and intent of the foregoing resolutions prior to their adoption are approved, ratified, and confirmed.**

This action by the Authorized Members shall be effective as of the date the DAO receives the consent of its Members via the Snapshot vote. This action by the Authorized Members may be executed in any number of counterparts, each of which shall constitute an original and all of which together shall constitute one action.

## Authors

1. 0xA4e6C2B6264652444B3F0cc1bB37496AE916931c


1. The DAO Multisig is a Gnosis Safe at

   0x143cC0A996De329C1C5723Ee4F15D2a40c1203c6  **on the Ethereum Mainnet.** 🔙

2. The Developer Multisig is a Gnosis Safe at

0x2187e6a7c765777d50213346F0Fe519fCA706fbD **on the Ethereum Mainnet.** 🔷

---

| Votes 5 | | Show less | | ⬇ |
|---|---|---|---|---|
| 🟣 0x2987...0fE0 | | For | | 1.9M MOVE 〰 |
| 🟢 0x2770...fC63 | | For | | 200K MOVE 〰 |
| ⚫ rice$cr... (Core) | | For | | 197K MOVE 〰 |
| 🟦 0x4e33...a525 | | For | | 101K MOVE 〰 |
| 🟢 0xc928...A296 | | For | | 80K MOVE 〰 |

---

## Information

| | |
|---|---|
| **Strategie(s)** | 🎨🎨 |
| **IPFS** | #bafkrei |
| **Voting system** | Basic voting |
| **Start date** | Feb 2, 2023, 5:27 AM |
| **End date** | Feb 9, 2023, 5:27 AM |
| **Snapshot** | 16,540,511 |

---

## Results

| | | |
|---|---|---|
| For | | 2.4M MOVE  100% |
| Against | | 0 MOVE  0% |

I voted POAP



Vote to get this POAP



Mint

# Exhibit 25







snapshot                                          Connect wallet

← Back

# MIP-0019: Proposal Regarding the Service Provider Fee Payout From 2022

Closed     Movement DAO: Consensus Space by rice$cracker   Core       •••

Authors: benreed.eth                                           
Date: 2023-01-31

## Thesis

Dao-lawfirm.eth acted as the DAO's Service Provider throughout 2022, providing legal and custodial services to the DAO. In good faith, dao-lawfirm.eth deferred their Service Provider Fee[1], which was equal to 2% of assets under management per annum. This fee was originally to be paid on or around February 2nd, 2022. Now dao-lawfirm.eth, in alignment with their resignation as Service Provider to Movement, has decided to relinquish their rights to the deferred fee that they were owed.

With that said, the core Movement team has found it instrumental to have a Service Provider or attorney engaged to help facilitate the legal and accounting activities, as well as the membership agreements with the Movement application. Furthermore, a Service Provider or attorney(s) will be a great resource in aiding Movement users seeking to streamline entity registration. Juicebox protocol and their community found significant value in the Movement legal tooling forms available

online, and we would like to further refine these forms and better integrate them with Juicebox treasury creation workflows. Therefore, Movement will respect dao-lawfirm.eth's decision to resign, and the Authorized Members along with the Movement community will determine the DAO's next steps in regard to retaining a new Service Provider and/or attorney(s), for the reasons just stated.

# Specification

The DAO Multisig[2] shall transfer `DAI 334,487` to the Developer Multisig.[3] The Developer Multisig will then hold these funds in escrow until the Authorized Members and the community determine the DAO's next steps in regard to retaining a new Service Provider, and the DAO has sufficient grounds for moving these funds.

## Service Provider Fee

The following represents the amount owed by the DAO to dao-lawfirm.eth for the Service Provider fee which included providing services such as: treasury oversight, governance, and expense/payout management.

| Date | Description | Treasury Balance | Amount Incurred | Amount Paid | Amount Deferred |
|------|-------------|------------------|-----------------|-------------|-----------------|
| 2022-01-01 | Service Provider Fee | $16,724,383.92 | DAI 334,487 | DAI 0 | DAI 334,487 |

## Utilization

The Authorized Members, benreed.eth and tankbottoms.eth, have

reviewed the relevant information and confirmed that this proposal

accords with the DAO's agreement with the Service Provider, dao-lawfirm.eth.

## Risks

- Certain members acting in bad faith may continue to damage the DAO's reputation.
- This might not be the most efficient way to accomplish the DAO's goals.

## Snapshot Consensus by the DAO Members

Whereas the DAO through its Members voted to adopt the following actions via Snapshot and resolves as follows:

**RESOLVED:** That the DAO Multisig transfer of `DAI 334,487` to the Developer Multisig (hereinafter, "Payout of the Service Provider Fee") is hereby adopted and approved;

**RESOLVED FURTHER:** That the Developer Multisig shall hold `DAI 334,487` in escrow until the Authorized Members and the community determine the DAO's next steps in regard to retaining a new Service Provider, and the DAO has sufficient grounds for moving these funds. The Authorized Members are authorized to pay and reimburse expenses associated with any additional expenses of the DAO and the DAO's affiliate entities, including without limitation, expenses incurred prior to the formation and/or incorporation of the entities.

**RESOLVED FURTHER:** That the Authorized Members convened and are hereby jointly and severally authorized to take any and all actions, along

with executing or signing any cryptocurrency transactions, and executing and delivering any other documents, agreements,

instruments, and/or certificates as he or she may deem necessary, advisable, or incidental, in connection with the preceding resolution, and other resolutions herein, or any related documents. This also includes authorization to perform or resolve the obligations of the DAO, and/or its affiliates.

**RESOLVED FURTHER: That any and all actions taken by the Authorized Members to carry out the purposes and intent of the foregoing resolutions prior to their adoption are approved, ratified, and confirmed.**

This action by the Authorized Members shall be effective as of the date the DAO receives the consent of its Members via the Snapshot vote. This action by the Authorized Members may be executed in any number of counterparts, each of which shall constitute an original and all of which together shall constitute one action.

## Authors

1. 0xA4e6C2B6264652444B3F0cc1bB37496AE916931c

1. The Service Provider, Fees and Expenses as outlined in Original Gitbook Policies, Let's start a movement post, dated 2/2/2022. ↩

2. The DAO Multisig is a Gnosis Safe at 0x143cC0A996De329C1C5723Ee4F15D2a40c1203c6 on the Ethereum Mainnet. ↩

3. The Developer Multisig is a Gnosis Safe at 0x2187e6a7c765777d50213346F0Fe519fCA706fbD on the Ethereum

Mainnet. 🔄

| Votes 4 | Show less | ⬇ |
|---|---|---|
| 🔵 0x2987...0fE0 | For | 1.9M MOVE 𝓃 |
| 🟢 0x2770...fC63 | For | 200K MOVE 𝓃 |
| 🔵 0x4e33...a525 | For | 101K MOVE 𝓃 |
| 🔵 0xc928...A296 | For | 80K MOVE 𝓃 |

## Information

| | |
|---|---|
| **Strategie(s)** | 🌈🌈 |
| **IPFS** | #bafkrei |
| **Voting system** | Basic voting |
| **Start date** | Feb 2, 2023, 5:31 AM |
| **End date** | Feb 9, 2023, 5:31 AM |
| **Snapshot** | 16,540,532 |

## Results

| For | 2.2M MOVE 100% |
|---|---|
| Against | 0 MOVE 0% |

**I voted POAP**



Vote to get this POAP



Mint

# Exhibit 26



snapshot

 Connect wallet



← Back

# MIP-0020: Proposal for Payout of Deferred Legal and Indemnification Expenses

Closed   Movement DAO: Consensus Space by rice$cracker   Core  ↑ ⋯

Authors: benreed.eth                                    
Date: 2023-01-31

## Thesis

Movement DAO's Guiding Principles appointed dao-lawfirm.eth as the DAO's Service Provider. In addition to acting as the DAO's Service Provider, dao-lawfirm.eth also provided legal services to the Authorized Members and DAO's affiliates throughout 2022 and, in good faith, deferred a portion of the commensurate legal fees. Those fees are to be paid in 2023.

In addition, the Members of the DAO ratified Adopt Actions (MIP-004) which indemnifies the DAO Service Provider and Authorized Members, benreed.eth and tankbottoms.eth, for any and all costs, fees, expenses, and liabilities incurred in the performance of their duties as Authorized Members, and/or DAO Service Provider. In response to recent security concerns by certain member's ("Certain Members) that appeared to be malicious, exploitative, and in bad faith, the Authorized Members have approved disbursement of indemnification funds for tankbottoms.eth

2/21/23, 2:07 PM    Movedao RKA: Consolidated Proposal - Intl. Expansion, Legal Protection, Deferred Legal and Indemnification Expenses

Case 1:23-CV-20727-RKA    Document 24    Entered on FLSD Docket 03/01/2023    Page 552 of 653

and benreed.eth, the former Service Provider dao-lawfirm.eth, and core Contributors from hereon referred to as the "Indemnified Members".

# Specification

The DAO Multisig[1] shall transfer `DAI 2,558,831` to the Developer Multisig.[2] The Developer Multisig will transfer and disburse the relevant funds to dao-lawfirm.eth and the above mentioned Indemnified Members.

## Deferred Legal Fees

The following represents costs associated with legal services performed by the Service Provider for the DAO and it's affiliates, including (but not limited to):

- Drafting governance documents such as Terms of Service, Privacy Policies, or Opinion letters;
- Drafting documents for the formation of legal entities, and filing those documents;
- Providing agreement templates for use in legal.juicebox.wtf; and,
- Conducting tax estimations and impact assessments.

| Date | Description | Amount Invoiced | Amount Deferred |
|------|-------------|-----------------|-----------------|
| 2023-01-01 | Deferred legal fees from Oct-2021 to Feb-2022 | DAI 96,660 | DAI 58,831 |

## Advance for Indemnified Members

The following represents the total sum of disbursements for the

Indemnified Members. Each Member has been allocated an advance of

`DAI 500,000` prior to arbitration, until further notice by the Authorized Members.

| Date | Description | Per Member Amount | Total Amount |
|------|-------------|-------------------|--------------|
| 2023-01-23 | Advance for Indemnified Members | DAI 500,000 | DAI 2,500,000 |

## Utilization

The Authorized Members benreed.eth and tankbottoms.eth have reviewed the relevant information and confirmed that this proposal accords with the DAO's agreement with the Service Provider, dao-lawfirm.eth for the payout of deferred legal fees.

The Authorized Members benreed.eth and tankbottoms.eth have reviewed the relevant information and confirmed that this proposal also accords with actions ratified by Members of the DAO MIP-0004 approving indemnification rights to the above mentioned Indemnified Members.

## Risks

- Authorized members may require additional indemnification funds.
- This might not be the most efficient way to accomplish the DAO's goals.
- The funds could be better used somewhere else.

## Snapshot Consensus by the DAO Members

Whereas the DAO through its Members voted to adopt the following actions via Snapshot and resolves as follows:

**RESOLVED:** That the DAO Multisig transfer of `DAI 2,558,831` to the Developer Multisig (hereinafter, "Payout of Deferred Legal Fees and Indemnification Expenses") is hereby adopted and approved;

**FURTHER RESOLVED:** That the Developer Multisig shall transfer `DAI 58,831` to the account specified by the Service Provider, dao-lawfirm.eth, and that the Authorized Members are authorized to pay and reimburse expenses associated with any additional expenses of the DAO and the DAO's affiliate entities, including without limitation expenses incurred prior to the formation and/or incorporation of the entities.

**FURTHER RESOLVED:** That the Authorize Members further authorize, the Developer Multisig to transfer a total sum of `DAI 2,500,000`, a disbursement of `DAI 500,000` to each of the Indemnified Members and the account its choosing as an advance indemnification as approved in Snapshot MIP-0004, however explicitly approved prior to arbitration, until further notice by this Committee is hereby adopted and approved. Any indemnification funds that are not utilized shall be returned to the DAO.

**RESOLVED FURTHER:** That the Authorized Members convened and are hereby jointly and severally authorized to take any and all actions, along with executing or signing any cryptocurrency transactions, and executing and delivering any other documents, agreements, instruments, and/or certificates as he or she may deem necessary, advisable, or incidental, in connection with the preceding resolution, and other resolutions herein, or any related documents. This also includes authorization to perform or resolve the obligations of the DAO, and/or

2/21/23, 2:06 PM    MoveDAO Consensus: Snapshot Proposal: MOVE02 Proposal for Payment of Deferred Legal and Indemnification Expenses

Case 1:23-CV-20727-RKA Document 24 Entered on FLSD Docket 03/01/2023 Page 555 of 653

its affiliates.

**RESOLVED FURTHER: That any and all actions taken by the Authorized Members to carry out the purposes and intent of the foregoing resolutions prior to their adoption are approved, ratified, and confirmed.**

This action by the Authorized Members shall be effective as of the date the DAO receives the consent of its Members via the Snapshot vote. This action by the Authorized Members may be executed in any number of counterparts, each of which shall constitute an original and all of which together shall constitute one action.

## Authors

1. 0xA4e6C2B6264652444B3F0cc1bB37496AE916931c

1. The DAO Multisig is a Gnosis Safe at
   0x143cC0A996De329C1C5723Ee4F15D2a40c1203c6 on the Ethereum Mainnet. ↩

2. The Developer Multisig is a Gnosis Safe at
   0x2187e6a7c765777d50213346F0Fe519fCA706fbD on the Ethereum Mainnet. ↩



| Votes 5 | Show less | ⬇ |
|---|---|---|
| 🟣 0x2987...0fE0 | For | 1.9M MOVE 〰 |
| 🟢 0x2770...fC63 | For | 200K MOVE 〰 |

2/21/23, 10:07 AM                MoveDAO Consensus Space 4 proposal: Entered Fee Proposal for Payout of Deferred Legal and Indemnification Expenses

Case 1:23-CV-20727-RKA Documents 24-6 entered on FLSD Docket 03/01/2023 Page 556 of 653

| | | |
|---|---|---|
| 🌑 rice$cr... ( Core ) | For | 197K MOVE 〰 |
| 🟣 0x4e33...a525 | For | 101K MOVE 〰 |
| 🟣 0xc928...A296 | For | 80K MOVE 〰 |

## Information

| | |
|---|---|
| **Strategie(s)** | 🌈 🌈 |
| **IPFS** | #bafkrei |
| **Voting system** | Basic voting |
| **Start date** | Feb 2, 2023, 5:40 AM |
| **End date** | Feb 9, 2023, 5:40 AM |
| **Snapshot** | 16,540,576 |

## Results

| | |
|---|---|
| For | 2.4M MOVE  100% |
| Against | 0 MOVE  0% |

## I voted POAP



Vote to get this POAP

Case 1:23-cv-20727-RKA Document 24-4 Entered on FLSD Docket 03/01/2023 Page 557 of 653



Mint

2/21/23, 2:07 PM    MoveDAO Consensus Space 24 proposal: Limit GP Payout for Jury Defense Legal and Indemnification Expenses

Case 1:23-cv-20727-RKA Document 24-1 Entered on FLSD Docket 03/01/2023 Page 558 of 653

# Exhibit 27




snapshot                                    Connect wallet

← Back

# MIP-0021: Proposal for the DAO's 2023 Operational Budget

Closed  Movement DAO: Consensus Space by rice$cracker Core  ...

Authors: tankbottoms.eth, benreed.eth                    
Date: 2023-01-31

## Thesis

Transfer `DAI 5,354,433` from the Gnosis Multisig[1] to the Developer Multisig[2] to extend product development runway of the DAO, funding 12 months of product development and operations including:

- Product development and development expenses;

- Tooling, product documentation;

- Legal and accounting services;

- Branding and design work;

- Community-building, on-boarding, business development, and marketing resources;

- NFT/DAO seed funds and creation of an NFT artist/creator grant; and,

- General reimbursements of operational expenses.

1. This payout includes funds for additional development headcount

to accelerate product development.

2. This payout includes funds to partially hire various headcount to support marketing, business development, and onboarding functions for the DAO.

3. This payout includes ongoing budgeted expenses borne by the DAO and Authorized Members such as travel & lodging, hosting providers, online services and other miscellaneous operational expenses.

4. This payout includes token purchases.

5. This payout includes marketing investment funds to seed the DAO with content from top NFT artist and creators, in addition to supporting the launch and growth of projects on the platform.

## Motivation

The previously approved Bootstrap Product Development, MIP-0003 expired December 31, 2022. This extends the DAO's product development runway for the rest of the year, 2023. By approving 12 months of product development, it avoids the time consuming, cumbersome, and ineffective method of managing operational costs on a month-to-month basis.

The Authorized Members were provided with a contract (between certain prior members), which in turn, they promised to the core contributors certain compensation and benefits, the expenditure of the budget was intentionally throttled to elongate the capital expenditures and ensure that the DAO could recruit and add talent slowly given the larger crypto market; additionally, the development engineering budget was under the Authorized Members' "direct authority" with complete "ownership of all operational decisions", including the allocation of the `DAI 1,000,000` token purchases.

# Specification

## Multisig

The Gnosis Multi-sig shall transfer `DAI 5,354,433` to developer.movedao.eth ( `0x2187e6a7c765777d50213346F0Fe519fCA706fbD` ), a Gnosis Safe, which has 5 of 13 signers including:

1. eth:0x818e90cDc2771385d784563173046d7759c8117f
2. eth:0x468f178672C86bFA02e5E1B0413C3ccf55A37409
3. eth:0xA5B70097650FAeC3e87AA9174A76cd78925f7ae0
4. eth:0x752515a3A1091b9f1c04416CF79D1F14d2340085
5. eth:0x5d95baEBB8412AD827287240A5c281E3bB30d27E
6. eth:0x38F83dD64DADFd871BE920422B8Cb5703a1e45a3
7. eth:0x9245D6527462b76638789A78Cec69A4C003f878d
8. eth:0xe588A90B346236fCEc4543a101CD92d01C3fFfD6
9. eth:0x0ca396c41F6548a39D1982077C119eC1479b11bf
10. eth:0x008820F8256F950836775e52571347fFD5309d2b
11. eth:0x0087F67B6b0995D3e7D21f2b94Ef92F4582868aD
12. eth:0x73255155964A09ABb91994fe0EFB8D330f10aDAA
13. eth:0xFeB18aef7a8BB0598A301274777fC9c525Ed9b98

## Proposed Budget

See the Proposed Budget, attached hereto as Exhibit A. These documents are high-level overviews and are subject to change based on product development needs. The Authorized Members intend to iterate on the budget and continually publish updates to the DAO and its

community.

## Utilization

Both technical development and operations budgets shall be utilized at the discretion of the Authorized Members, benreed.eth and tankbottoms.eth, with oversight from a newly acting interim Service Provider. Newly established marketing, business development, and community functions will also be managed by the development team.

## Rationale

- This proposal provides funding to the development team, enabling them to launch and scale a suite of DAO applications and services, while continuing to ship product and feature enhancements throughout the course of this year, 2023.
- Funding additional business development and marketing headcount will allow the DAO to recruit and secure top Web3 projects and partnerships, NFT artists, and creator talent for the DAO's platform, helping to build momentum and grow the DAO.

## Risks

- Original budget did not include marketing, business development, and community functions.
- Original budget did not include any redemptions which may be made available.
- Certain members or large token holders have reneged on their prior promises.
- The Authorize Members may have to expend DAO resources for litigation and/or arbitration and/or indemnification.

- Transparent operation of the DAO is not certain or guaranteed.

- These funds may not be ideally distributed.

- These funds may be more useful later on.

- Additional funds may be required due to underestimation of costs.

- The DAO is delegating major responsibility by approving a budget for 12 months.

## Snapshot Consensus by the DAO Members

Whereas the DAO through its Members voted to adopt the following actions via Snapshot and resolves as follows:

**RESOLVED:** That the Gnosis Multisig transfer of `DAI 5,354,433` to the Developer Multisig (hereinafter, "Budget") is hereby adopted and approved;

**FURTHER RESOLVED:** That the Authorized Members are authorized to pay and reimburse expenses associated with incorporation, organization, development, engineering compensation, subscriptions, marketing, and other expenses of the DAO and the DAO's affiliate entities, including without limitation, expenses incurred prior to the approval of this budget.

**RESOLVED FURTHER:** That the Authorized Members convened and are hereby jointly and severally authorized to take any and all actions, along with executing or signing any cryptocurrency transactions, and executing and delivering any other documents, agreements, instruments, and/or certificates as he or she may deem necessary, advisable, or incidental, in connection with the preceding resolution, and other resolutions herein, or any related documents. This also includes

authorization to perform or resolve the obligations of the DAO, and/or its affiliates.

**RESOLVED FURTHER: That any and all actions taken by the Authorized Members to carry out the purposes and intent of the foregoing resolutions prior to their adoption are approved, ratified, and confirmed.**

This action by the Authorized Members shall be effective as of the date the DAO receives the consent of its Members via the Snapshot vote. This action by the Authorized Members may be executed in any number of counterparts, each of which shall constitute an original and all of which together shall constitute one action.

Authors

1. 0x5d95baEBB8412AD827287240A5c281E3bB30d27E

2. 0xA4e6C2B6264652444B3F0cc1bB37496AE916931c

1. The DAO Multisig is a Gnosis Safe at 0x143cC0A996De329C1C5723Ee4F15D2a40c1203c6 on the Ethereum Mainnet.

2. The Developer Multisig is a Gnosis Safe at 0x2187e6a7c765777d50213346F0Fe519fCA706fbD on the Ethereum Mainnet.



Votes 7

Show less

tankbo... Core      For      1.1M MOVE

| | | |
|---|---|---|
| 🟣 0x2987...0fE0 | For | 794K MOVE 〜 |
| 🟢 0x2770...fC63 | For | 200K MOVE 〜 |
| 🪨 rice$cr... (Core) | For | 197K MOVE 〜 |
| 🟣 0x4e33...a525 | For | 101K MOVE 〜 |
| 🟣 0xc928...A296 | For | 80K MOVE 〜 |
| 🟡 0x4Ab5...dB0c | Against | 143 MOVE 〜 |

## Information

| | |
|---|---|
| **Strategie(s)** | 🔵🔴 |
| **IPFS** | #bafkrei |
| **Voting system** | Basic voting |
| **Start date** | Feb 2, 2023, 5:45 AM |
| **End date** | Feb 9, 2023, 5:45 AM |
| **Snapshot** | 16,540,603 |

## Results

| | | |
|---|---|---|
| For | 2.4M MOVE | 99.99% |
| Against | 143 MOVE | 0.01% |

I voted POAP



Vote to get this POAP



Mint

# Exhibit 28



## Transaction Details

Exchange Gaming

Sponsored: NanoGames - Start your new journey with NanoGames and claim 10 ETH **Claim Free Spin**

Overview Internal Txns Logs (2) State Comments More

**Transaction Hash:**

0xd3da22c14836abc82f8ee4ff20d5a786b58bed642e18563d747160d183fd02dd

**Status:** Success

**Block:**

16540876 108891 Block Confirmations

**Timestamp:**

15 days 5 hrs ago (Feb-02-2023 11:39:59 AM +UTC) | Confirmed within 48 secs

**Sponsored:**

**From:**

0x0087F67B6b0995D3e7D21f2b94Ef92F4582868aD

**Interacted With (To):**

0x143cC0A996De329C1C5723Ee4F15D2a40c1203c6 (Movement DAO: Presale)

**ERC-20 Tokens Transferred:**

From Movement DAO: Pres... To 0x2187e6...CA706fbD For 7,500,000 $7,498,905.00 Dai Stableco... (DAI...)

**Value:**

0 ETH ($0.00)

**? Transaction Fee:**

0.00114144 ETH   **$1.91**

**? Gas Price:**

15 Gwei (0.000000015 ETH)

**More Details:**                                             + Click to show more

**? Private Note:**

To access the **Private Note** feature, you must be Logged In

? A transaction is a cryptographically signed instruction that changes the blockchain state. Block explorers track the details of all transactions in the network. Learn more about transactions in our Knowledge Base.

# Exhibit 29



# Transaction Details

Exchange Gaming

**Featured:** Curious on Ethereum's hottest 🔥 trading pairs? View top pairs and details with **DEX Trading Pairs!**

Overview Internal Txns Logs (2) State Comments More

**Transaction Hash:**

0x323dcee96dfd18b9552e26b36e54288eb8f8782eb4231cce466a2ef757a66098

**Status:** Success

**Block:**

16540888 108882 Block Confirmations

**Timestamp:**

15 days 5 hrs ago (Feb-02-2023 11:42:23 AM +UTC) | Confirmed within 3 secs

**Sponsored:**

**From:**

0x0087F67B6b0995D3e7D21f2b94Ef92F4582868aD

**To:**

0x143cC0A996De329C1C5723Ee4F15D2a40c1203c6 (Movement DAO: Presale)

∟ Transfer 805 ETH From Movement DAO: Presale To 0x2187e6...CA706fbD

View All Internal Transactions

**Value:**

0 ETH ($0.00)

**Transaction Fee:**

Ethereum Transaction Hash (Txhash) Details | Etherscan

0.001237481 ETH    **$2.07**

⊘ **Gas Price:**

17 Gwei (0.000000017 ETH)

---

**More Details:**                                                   + Click to show more

---

⊘ **Private Note:**

To access the **Private Note** feature, you must be  Logged In

---

⊹ A transaction is a cryptographically signed instruction that changes the blockchain state. Block explorers track the details of all transactions in the network. Learn more about transactions in our  Knowledge Base.

# Exhibit 30



Transaction Details  ‹ ›

Exchange ⌄    Gaming ⌄

**Featured:** Wallet-to-wallet instant messaging via **b** **Blockscan Chat!**

Overview    Internal Txns    Logs (2)    State    Comments

More ⌄

⊘ Transaction Hash:

0x001b6d3efb7d7ea1a4eb69c0b275b9558660df8db36a8962538405982d7b11d2 ⧉

⊘ Status:    ✓ Success

⊘ Block:

✓ 16541051    108750 Block Confirmations

⊘ Timestamp:

🕐 15 days 4 hrs ago (Feb-02-2023 12:15:11 PM +UTC) | ⏱ Confirmed within 30 secs

⊘ Sponsored:

THE BEST CASINO & SPORTS BETTING    WELCOME BONUS UP TO 5 BTC    LUCKY SPIN!    BC.GA    PLAY NOW

⊘ From:

0x0087F67B6b0995D3e7D21f2b94Ef92F4582868aD ⧉

⊘ Interacted With (To):

📄 0x2187e6a7c765777d50213346F0Fe519fCA706fbD ⧉ ✓

⊘ ERC-20 Tokens Transferred:

▸ From 0x2187e6...CA706fbD To 0x57a16a...e8080d37 For 20,000  **$19,997.08**  🪙 Dai Stableco... (DAI...)

⊘ Value:

◆ 0 ETH ($0.00)

⑦ **Transaction Fee:**

0.001341047569259328 ETH   **$2.25**

⑦ **Gas Price:**

17.623101993 Gwei (0.000000017623101993 ETH)

**More Details:**                                    ＋ Click to show more

⑦ **Private Note:**

To access the **Private Note** feature, you must be Logged In

💡 A transaction is a cryptographically signed instruction that changes the blockchain state. Block explorers track the details of all transactions in the network. Learn more about transactions in our Knowledge Base.

# Exhibit 31

## Transaction Details ‹ ›

<button>Exchange ⌄</button> <button>Gaming ⌄</button>

Sponsored:  **XODEX** - XODEX - Zero gas blockchain - High speed and highly secure! **Join Us!**

Overview    Internal Txns    Logs (2)    State    Comments    <button>More ⌄</button>

⊘ **Transaction Hash:**

0x4b7dcb8eb3e393d175de4a784dd6bb5f63ffdb69e19a43bc52e675f8c180ac61 📋

⊘ **Status:**    ✓ Success

⊘ **Block:**

✓ 16541131    108667 Block Confirmations

⊘ **Timestamp:**

🕐 15 days 4 hrs ago (Feb-02-2023 12:31:23 PM +UTC) | ⏱ Confirmed within 12 secs

⊘ **Sponsored:**

THE BEST CASINO & SPORTS BETTING    DEPOSIT BONUS **1000%**    BC.GA    PLAY NOW

⊘ **From:**

📄 0x0087F67B6b0995D3e7D21f2b94Ef92F4582868aD 📋

⊘ **Interacted With (To):**

📄 0x2187e6a7c765777d50213346F0Fe519fCA706fbD 📋 ✓

⊘ **ERC-20 Tokens Transferred:**

▸ **From** 0x2187e6...CA706fbD **To** 0x91898f...E09A0d4B **For** 100,000    **$99,985.40**

🪙 Dai Stableco... (DAI...)

⊘ **Value:**

◆ 0 ETH ($0.00)

Ethereum Transaction Hash (Txhash) Details | Etherscan

2/17/23, 9:09 AM

❓ Transaction Fee:

0.001535631898269888 ETH    **$2.58**

❓ Gas Price:

20.180192103 Gwei (0.000000020180192103 ETH)

---

**More Details:**                                   + Click to show more

---

❓ Private Note:

To access the **Private Note** feature, you must be  Logged In

---

💡 A transaction is a cryptographically signed instruction that changes the blockchain state. Block explorers track the details of all transactions in the network. Learn more about transactions in our  Knowledge Base.

# Exhibit 32

Transaction Details  ‹ ›

**Featured:** Build Precise & Reliable Apps with **Etherscan APIs. Learn More!**

Overview    Internal Txns    Logs (2)    State    Comments              More ⌄

---

⊘ **Transaction Hash:**

0x6f6e5f598b299fe5bdd4964918039d5ef515ca1d773ad3d400b0b4f471aaaf4c 📋

⊘ **Status:**    ✓ Success

⊘ **Block:**

✓ 16541142    108652 Block Confirmations

⊘ **Timestamp:**

🕐 15 days 4 hrs ago (Feb-02-2023 12:33:35 PM +UTC) | ⏱ Confirmed within 30 secs

---

⊘ **Sponsored:**


THE BEST CASINO & SPORTS BETTING  WELCOME BONUS UP TO 5 BTC  LUCKY SPIN  BC.GA  PLAY NOW

---

⊘ **From:**

0x0087F67B6b0995D3e7D21f2b94Ef92F4582868aD 📋

⊘ **Interacted With (To):**

📄 0x2187e6a7c765777d50213346F0Fe519fCA706fbD 📋 ✓

---

⊘ **ERC-20 Tokens Transferred:**

▸ From 0x2187e6...CA706fbD To 0x57a16a...e8080d37 For 15,000  **$14,997.81**  🪙 Dai Stableco... (DAI...)

---

⊘ **Value:**

◆ 0 ETH ($0.00)

ⓘ **Transaction Fee:**

0.001626748408319736 ETH    **$2.73**

ⓘ **Gas Price:**

21.374210442 Gwei (0.000000021374210442 ETH)

**More Details:**                                        ⊕ Click to show more

ⓘ **Private Note:**

To access the **Private Note** feature, you must be Logged In

ⓘ A transaction is a cryptographically signed instruction that changes the blockchain state. Block explorers track the details of all transactions in the network. Learn more about transactions in our Knowledge Base.

# Exhibit 33



# Transaction Details

Exchange Gaming

**Featured:** Bridging tokens between Ethereum, Layer 2 and other chains? Browse through the Blockscan **bridges list.**

Overview Internal Txns Logs (2) State Comments More

**Transaction Hash:**

0x95b93cb328275630337767b1072ee7acba264283d9a5d2a986799531aa3203a2

**Status:** Success

**Block:**

16541206 108586 Block Confirmations

**Timestamp:**

15 days 4 hrs ago (Feb-02-2023 12:46:23 PM +UTC) | Confirmed within 2 secs

**Sponsored:**

**From:**

0x0087F67B6b0995D3e7D21f2b94Ef92F4582868aD

**Interacted With (To):**

0x2187e6a7c765777d50213346F0Fe519fCA706fbD

**ERC-20 Tokens Transferred:**

From 0x2187e6...CA706fbD To 0xA4e6C2...E916931c For 592,000 $591,913.57
Dai Stableco... (DAI...)

**Value:**

♦ 0 ETH ($0.00)

⊙ Transaction Fee:

0.00166574666400644 ETH    **$2.79**

⊙ Gas Price:

17.87358539 Gwei (0.00000001787358539 ETH)

**More Details:**                                                    + Click to show more

⊙ **Private Note:**

To access the **Private Note** feature, you must be    Logged In

💡 A transaction is a cryptographically signed instruction that changes the blockchain state. Block explorers track the details of all transactions in the network. Learn more about transactions in our    Knowledge Base.

# Exhibit 34



## Transaction Details ‹ ›

Exchange ⌄    Gaming ⌄

**Featured:** Wallet-to-wallet instant messaging via **b** **Blockscan Chat!**

Overview    Internal Txns    Logs (2)    State    Comments        More ⌄

⊘ **Transaction Hash:**

0x4293398d61a6cdb58d207da131287f8c9ddadf915046ac6fc955e5b32e21d1e9 ⧉

⊘ **Status:**    ✓ Success

⊘ **Block:**

✓ 16541250    108539 Block Confirmations

⊘ **Timestamp:**

⏱ 15 days 4 hrs ago (Feb-02-2023 12:55:23 PM +UTC) | ⏱ Confirmed within 4 secs

⊘ **Sponsored:**

THE BEST CASINO & SPORTS BETTING    DEPOSIT BONUS 1000%    BC.GA    PLAY NOW

⊘ **From:**

0x0087F67B6b0995D3e7D21f2b94Ef92F4582868aD ⧉

⊘ **Interacted With (To):**

📄 0x2187e6a7c765777d50213346F0Fe519fCA706fbD ⧉ ✓

⊘ **ERC-20 Tokens Transferred:**

▸ From 0x2187e6...CA706fbD To 0xA4e6C2...E916931c For 250,000    **$249,963.50**

🪙 Dai Stableco... (DAI...)

⊘ **Value:**

◆ 0 ETH ($0.00)

https://etherscan.io/tx/0x4293398d61a6cdb58d207da131287f8c9ddadf915046ac6fc955e5b32e21d1e9    1/2

**⊘ Transaction Fee:**

0.001826592 ETH    **$3.06**

**⊘ Gas Price:**

24 Gwei (0.000000024 ETH)

**More Details:**                                        **+ Click to show more**

**⊘ Private Note:**

To access the **Private Note** feature, you must be    Logged In

🔅 A transaction is a cryptographically signed instruction that changes the blockchain state. Block explorers track the details of all transactions in the network. Learn more about transactions in our Knowledge Base.

# Exhibit 35



## Transaction Details

Exchange Gaming

**Featured:** Bridging tokens between Ethereum, Layer 2 and other chains? Browse through the Blockscan **bridges list.**

Overview | Internal Txns | Logs (2) | State | Comments | More

**Transaction Hash:**

0xfe03eed30552fc68ea14d126e832760cd55fd3777abd7574594a583106c2e3de

**Status:** Success

**Block:**

16575883 73903 Block Confirmations

**Timestamp:**

10 days 8 hrs ago (Feb-07-2023 09:02:47 AM +UTC) | Confirmed within 30 secs

**Sponsored:**

**From:**

*service-provider.eth

**Interacted With (To):**

0x607d56643673649bd25AA47325A7a6AFeffc3B4a

**ERC-20 Tokens Transferred:**

**From** 0x607d56...effc3B4a **To** 0x7269eb...237A4F87 **For** 499,950 ($499,877.01) Dai Stableco... (DAI...)

**Value:**

♦ 0 ETH ($0.00)

⑦ Transaction Fee:

0.001564730732390336 ETH    **$2.63**

⑦ Gas Price:

24.371234384 Gwei (0.000000024371234384 ETH)

---

**More Details:**                                    + Click to show more

---

⑦ Private Note:

To access the **Private Note** feature, you must be    Logged In

🔅 A transaction is a cryptographically signed instruction that changes the blockchain state. Block explorers track the details of all transactions in the network. Learn more about transactions in our    Knowledge Base.

# Exhibit 36


## Transaction Details  ‹  ›



**Featured:** Bridging tokens between Ethereum, Layer 2 and other chains? Browse through the Blockscan **bridges list.**

Overview    Internal Txns    Logs (1)    State    Comments      More ⌄

⑦ **Transaction Hash:**

0x12e94f5300264aa6e4a0375c15fb8443255f06b549af5e25b44f2f8e891dffc0 ⧉

⑦ **Status:** ✓ Success

⑦ **Block:**

✓ 16541333   108486 Block Confirmations

⑦ **Timestamp:**

🕐 15 days 3 hrs ago (Feb-02-2023 01:12:11 PM +UTC) | ⧖ Confirmed within 30 secs

⑦ **Sponsored:**



⑦ **From:**

0x0087F67B6b0995D3e7D21f2b94Ef92F4582868aD ⧉

⑦ **To:**

📄 0x2187e6a7c765777d50213346F0Fe519fCA706fbD ⧉ ✓

└ Transfer 39.53 ETH From 0x2187e6...CA706fbD To 0x55dEd4...c904d510

View All Internal Transactions

⑦ **Value:**

◆ 0 ETH ($0.00)

⑦ **Transaction Fee:**

0.002464511656468368 ETH   **$4.17**

⊘ Gas Price:

35.742424534 Gwei (0.000000035742424534 ETH)

**More Details:**                                                              + Click to show more

⊘ **Private Note:**

To access the **Private Note** feature, you must be  Logged In

💡 A transaction is a cryptographically signed instruction that changes the blockchain state. Block explorers track the details of all transactions in the network. Learn more about transactions in our  Knowledge Base.

# Exhibit 37



# Transaction Details

Exchange Gaming

Sponsored: CryptoSlots - Where Crypto Rollers Come to Win. Click for games!

Overview | Internal Txns | Logs (2) | State | Comments | More

**Transaction Hash:**

0xbd678b5760be54890102270f7c86108ad04937c70fc5fa57203603fac67d9118

**Status:** Success

**Block:**

16541356 108427 Block Confirmations

**Timestamp:**

15 days 3 hrs ago (Feb-02-2023 01:16:59 PM +UTC) | Confirmed within 6 secs

**Sponsored:**

**From:**

0x0087F67B6b0995D3e7D21f2b94Ef92F4582868aD

**Interacted With (To):**

0x2187e6a7c765777d50213346F0Fe519fCA706fbD

**ERC-20 Tokens Transferred:**

From 0x2187e6...CA706fbD To 0x5d95ba...bB30d27E For 1,058,000 $1,057,845.53 Dai Stableco... (DAI...)

**Value:**

0 ETH ($0.00)

⑦ **Transaction Fee:**

0.002987727562951128 ETH  **$5.02**

⑦ **Gas Price:**

32.054411241 Gwei (0.000000032054411241 ETH)

**More Details:**                                    + Click to show more

⑦ **Private Note:**

To access the **Private Note** feature, you must be  Logged In

💡 A transaction is a cryptographically signed instruction that changes the blockchain state. Block explorers track the details of all transactions in the network. Learn more about transactions in our  Knowledge Base.

# Exhibit 38



## Transaction Details  ‹  ›

Exchange ⌄    Gaming ⌄

**Featured:** Wallet-to-wallet instant messaging via  **b** **Blockscan Chat!**

Overview    Internal Txns    Logs (2)    State    Comments

More ⌄

⑦ **Transaction Hash:**

0xc69369cedce3e37789b0895d1809d506c50be38e73e48593fc03f7e660a1197f  ⧉

⑦ **Status:**    ✓ Success

⑦ **Block:**

✓ 16542511    107269 Block Confirmations

⑦ **Timestamp:**

🕐 14 days 23 hrs ago (Feb-02-2023 05:09:11 PM +UTC) | ⏱ Confirmed within 2 mins:25 secs

⑦ **Sponsored:**

THE BEST CASINO & SPORTS BETTING    DEPOSIT BONUS 1000%    BC.GA    PLAY NOW

⑦ **From:**

0x0087F67B6b0995D3e7D21f2b94Ef92F4582868aD  ⧉

⑦ **Interacted With (To):**

📄 0x2187e6a7c765777d50213346F0Fe519fCA706fbD  ⧉  ✓

⑦ **ERC-20 Tokens Transferred:**

▸ From 0x2187e6...CA706fbD To 0xA4e6C2...E916931c For 322,034.67    **$321,987.65**

🪙 Dai Stableco... (DAI...)

⑦ **Value:**

◆ 0 ETH ($0.00)

**⊘ Transaction Fee:**

0.004674088230296156 ETH    **$7.84**

**⊘ Gas Price:**

61.413888557 Gwei (0.000000061413888557 ETH)

---

**More Details:**                                    **+ Click to show more**

---

**⊘ Private Note:**

To access the **Private Note** feature, you must be **Logged In**

💡 A transaction is a cryptographically signed instruction that changes the blockchain state. Block explorers track the details of all transactions in the network. Learn more about transactions in our **Knowledge Base**.

# Exhibit 39

Ethereum Transaction Hash (Txhash) Details | Etherscan

## Transaction Details ‹ ›

Exchange ⌄    Gaming ⌄

**Featured:** Build Precise & Reliable Apps with **Etherscan APIs. Learn More!**

Overview    Internal Txns    Logs (2)    State    Comments    More ⌄

⊘ **Transaction Hash:**

0x70fe2e849977c1274dc5bbabcea1ca015f151f8b887c7913f999abc9129c6f0c ⧉

⊘ **Status:**    ✓ Success

⊘ **Block:**

✓ 16543483    106293 Block Confirmations

⊘ **Timestamp:**

🕐 14 days 20 hrs ago (Feb-02-2023 08:25:35 PM +UTC) | ⏱ Confirmed within 30 secs

⊘ **Sponsored:**



⊘ **From:**

0x0087F67B6b0995D3e7D21f2b94Ef92F4582868aD ⧉

⊘ **Interacted With (To):**

▤ 0x2187e6a7c765777d50213346F0Fe519fCA706fbD ⧉ ✓

⊘ **ERC-20 Tokens Transferred:**

▸ From 0x2187e6...CA706fbD To 0x4823e6...059e02A6 For 50,000  **$49,992.70**  ⬙ Dai Stableco... (DAI...)

⊘ **Value:**

◆ 0 ETH ($0.00)

**⑦ Transaction Fee:**

0.002571658395774208 ETH   **$4.30**

**⑦ Gas Price:**

33.794922148 Gwei (0.000000033794922148 ETH)

---

**More Details:**                                         **+ Click to show more**

---

**⑦ Private Note:**

To access the **Private Note** feature, you must be **Logged In**

💡 A transaction is a cryptographically signed instruction that changes the blockchain state. Block explorers track the details of all transactions in the network. Learn more about transactions in our **Knowledge Base**.

# Exhibit 40



# Transaction Details

Exchange Gaming

Sponsored: Ecoterra - Earn cryptocurrency for evey item you recycle! **Buy Now**

Overview | State | Comments | More

| | |
|---|---|
| Transaction Hash: | 0xe75147fdc2d91f8edb7b5366faefcb40366d2719535460f979fc0d0291840d37 |
| Status: | Success |
| Block: | 16622301 61165 Block Confirmations |
| Timestamp: | 8 days 13 hrs ago (Feb-13-2023 08:44:47 PM +UTC) \| Confirmed within 4 secs |

Sponsored: HUNNYPLAY Play Now No KYC · 180% Deposit Bonus · 28% Cashback · Fast Payouts · 24/7 Support

| | |
|---|---|
| From: | benreed.eth |
| To: | 0x64d6A4C28868d9dD9eA650c37F7d0090986aC1CE |
| Value: | 86.080974390183541355 ETH $141,644.52 |
| Transaction Fee: | 0.000497461933794 ETH $0.82 |
| Gas Price: | 23.688663514 Gwei (0.000000023688663514 ETH) |

More Details: + Click to show more

Privat

This website uses cookies to improve your experience. By continuing to use this website, you agree to its Terms and Privacy Policy. Got it!

Ethereum Transaction Hash (Txhash) Details | Etherscan

A transaction is a cryptographically signed instruction that changes the blockchain state. Block explorers track the details of all transactions in the network. Learn more about transactions in our Knowledge Base.

🍪 This website uses cookies to improve your experience. By continuing to use this website, you agree to its Terms and Privacy Policy.

# Exhibit 41



Transaction Details ‹ ›

Exchange ⌄    Gaming ⌄

Sponsored: ⓧ Metawin: Click Here to claim your FREE Entry to MetaWin's 20 ETH give away! Ends soon

| Overview | Internal Txns | Logs (2) | State | Comments | | More ⌄ |

⑦ Transaction Hash:        0xaceac2a066b7cb1885fdbae4c519590a4db7c21011e21f10aa0212b97d7561ce 📋

⑦ Status:        ✓ Success

⑦ Block:        ✓ 16622458    60974 Block Confirmations

⑦ Timestamp:        🕐 8 days 13 hrs ago (Feb-13-2023 09:16:11 PM +UTC) | ⏱ Confirmed within 7 secs

⑦ Sponsored:        🎀 HORNYPLAY    SWEET VALENTINES BONANZA
                    Play Now         Play Exciting    Win Over $100,000
                                     Slot Games       & Free Spins

⑦ From:        ‹› *service-provider.eth 📋

⑦ Interacted With (To):        📄 0x2187e6a7c765777d50213346F0Fe519fCA706fbD 📋 ✓

⑦ ERC-20 Tokens Transferred:        ▸ From 0x2187e6...CA706fbD To 0xA4e6C2...E916931c For 250,000    $249,889.25    🪙 Dai Stableco... (DAI...)

⑦ Value:        ◆ 0 ETH ($0.00)

⑦ Transaction Fee:        0.002097809254385016 ETH    $3.44

⑦ Gas Price:        22.506751077 Gwei (0.000000022506751077 ETH)

More De...    🍪 This website uses cookies to improve your experience. By continuing to use this website, you agree to its Terms and Privacy Policy.    Got it!

Private Note:   To access the **Private Note** feature, you must be Logged In

A transaction is a cryptographically signed instruction that changes the blockchain state. Block explorers track the details of all transactions in the network. Learn more about transactions in our Knowledge Base.

This website uses cookies to improve your experience. By continuing to use this website, you agree to its Terms and Privacy Policy.

# Exhibit 42

## Transaction Details ‹ ›

Exchange ⌄    Gaming ⌄

Sponsored: ⊗ Metawin: Click Here to claim your FREE Entry to MetaWin's 20 ETH give away! Ends soon

Overview    State    Comments                                          More ⌄

| | |
|---|---|
| ⑦ Transaction Hash: | 0x4d45712be53ca9689dc6beaf944e40d06a564415b52e7c0177e05bd129cbb7f5 ⧉ |
| ⑦ Status: | ✓ Success |
| ⑦ Block: | ✓ 16637296   46144 Block Confirmations |
| ⑦ Timestamp: | ⊙ 6 days 11 hrs ago (Feb-15-2023 11:04:23 PM +UTC) | ⏱ Confirmed within 1 sec |

⑦ Sponsored:    
THE BEST CASINO & SPORTS BETTING $50 FREE BET — BC.GAME PLAY NOW

| | |
|---|---|
| ⑦ From: | 0x64d6A4C28868d9dD9eA650c37F7d0090986aC1CE ⧉ |
| ⑦ To: | 0xa26e73C8E9507D50bF808B7A2CA9D5dE4fcC4A04 ⧉ |
| ⑦ Value: | ◆ 86.079637309877496 ETH   $141,373.75 |
| ⑦ Transaction Fee: | 0.000789546863238 ETH   $1.30 |
| ⑦ Gas Price: | 37.597469678 Gwei (0.000000037597469678 ETH) |

| | |
|---|---|
| More Details: | + Click to show more |

🍪 This website uses cookies to improve your experience. By continuing to use this website, you agree to its Terms and Privacy Policy.    Got it!

Ethereum Transaction Hash (Txhash) Details | Etherscan

A transaction is a cryptographically signed instruction that changes the blockchain state. Block explorers track the details of all transactions in the network. Learn more about transactions in our Knowledge Base.

This website uses cookies to improve your experience. By continuing to use this website, you agree to its Terms and Privacy Policy.

# Exhibit 43

## Intentionally Left Blank

# Exhibit 44

5:06  5G E

  Mark Phillips 

Jan 29, 2022

will you be in today? want to sync on some things

also any updates on gitbook?

9:38 AM

Been working on GitBook, needs more work, resting up, eta to be there 2 hours.

10:38 AM

 move-xyz-bloc...-roadmap.docx
20 KB

5:56 PM

Select contract (one of our contracts – an audited contract with the correct stubs, or simply a url with the correct stubs)
"I want to use this contract to deposit these funds"
"Edit __content__ contract:" I want to edit this milestone
"Milestones contract: Pay people on these milestones"
"Role contract: Pay people for the roles"

Message

# Exhibit 45



# Transaction Details

Exchange Gaming

Sponsored: **RenQ Finance** - All In One DeFi Protocol, Presale Stage 1 SOLD OUT, BUY NOW **Join Presale Now**

Overview | Internal Txns | Logs (2) | State | Comments | More

**Transaction Hash:**

0x86332db3a76c48c597e488342e6f7391f24f0dc676194ed1ccbdd6622a895218

**Status:** Success

**Block:**

15440402 1238507 Block Confirmations

**Timestamp:**

175 days 6 hrs ago (Aug-30-2022 12:38:57 PM +UTC) | Confirmed within 1 min

**Sponsored:**

**From:**

*service-provider.eth

**Interacted With (To):**

0x143cC0A996De329C1C5723Ee4F15D2a40c1203c6 (Movement DAO: Presale)

**ERC-20 Tokens Transferred:**

▸ **From** Movement DAO: Pres... **To** 0x2187e6...CA706fbD **For** 1,750,000 **$1,781,500.00**

This website uses cookies to improve your experience. By continuing to use this website, you agree to its Terms and Privacy Policy.

Got it!

⊘ Transaction Fee:

0.00232844602622326 ETH    **$3.90**

⊘ Gas Price:

24.977966383 Gwei (0.000000024977966383 ETH)

**More Details:**    ＋ Click to show more

⊘ **Private Note:**

To access the **Private Note** feature, you must be  Logged In

🔆 A transaction is a cryptographically signed instruction that changes the blockchain state. Block explorers track the details of all transactions in the network. Learn more about transactions in our  Knowledge Base.

🍪 This website  uses cookies to improve your experience. By continuing to use this website, you agree to its  Terms  and  Privacy Policy.

# Exhibit 46

# DAO LAWFIRM ETH

m@dao-lawfirm.xyz

## SERVICES

Crypto Custodial Services, and Multi-Sig Administration; Bespoke Solidity Development, Tokens, Governance; ICOs/STOs, Programmable Treasuries; DAO Orchestration, Service Provider, Registration, Jurisdiction; TributeDAO, JuiceBox/Projects, and Bespoke Frameworks; License Agreements, Protocol Terms of Use, and Privacy Policies.



# Exhibit 47

**List of Wallet Addresses to Be Subject to Temporary Restraining Order**

**0x143cC0A996De329C1C5723Ee4F15D2a40c1203c6** (The DAO endowment Gnosis account. *See* Breslow Decl. ¶¶ 5, 25, Ex. 2 at 6);

**0x2187e6a7c765777d50213346F0Fe519fCA706fbD** (The DAO Developer Multisig Gnosis account. *See* Breslow Decl. ¶¶ 41, 90, 99, 100–105, Exs. 8 at 12, 31, 32, 33, 37, 41, 48, 49)

**0xA4e6C2B6264652444B3F0cc1bB37496AE916931c** (An account controlled by Defendant Reed (Benreed.eth) into which assets traceable to DAO-affiliated accounts were transferred within the last 30 days. *See* Breslow Decl. ¶¶ 82, 101, 103, Exs. 33, 40, 41)

**0x752515a3A1091b9f1c04416CF79D1F14d2340085** (An account controlled by Defendant Phillips (*service-provider.eth) into which assets traceable to DAO-affiliated accounts were transferred within the last 30 days. This account shares the same address as the Dao-lawfirm.eth. *See* Breslow Decl. ¶¶ 60, 104 Exs. 14, 48)

**0x64d6A4C28868d9dD9eA650c37F7d0090986aC1CE** (An account into which assets traceable to DAO-affiliated accounts were transferred within the last 30 days. *See* Breslow Decl. ¶¶ 89, 91, 103, Exs. 40, 42);

**0x607d56643673649bd25AA47325A7a6AFeffc3B4a** (An account into which assets traceable to DAO-affiliated accounts were transferred within the last 30 days. *See* Breslow Decl. ¶ 105, Ex. 49)

**0x91898f9103cDBA1546DE834F6E26f019E09A0d4B** (An account into which assets traceable to DAO-affiliated accounts were transferred within the last 30 days. *See* Breslow Decl. ¶ 99, Ex. 31)

**0x5d95baEBB8412AD827287240A5c281E3bB30d27E** (An account controlled by Defendant Phillips (tankbottoms.eth) into which assets traceable to DAO-affiliated accounts were transferred within the last 30 days.  *See* Breslow Decl. ¶¶ 81, 102 Ex. 37)

**0x57a16a385e86cd215deF121E6887D23Be8080d37** (An account controlled by Defendant Phillips (cookieslayer.eth) into which assets traceable to DAO-affiliated accounts were transferred within the last 30 days  *See* Breslow Decl. ¶ 100, Ex. 32)

# Exhibit 48



## Transaction Details

Exchange Gaming

Sponsored: Metawin: Click Here to claim your FREE Entry to MetaWin's 20 ETH give away! Ends soon

Overview | Internal Txns | Logs (2) | State | Comments | More

Transaction Hash: 0x4fccf9d213dbfdbb4dea011c080127bcb332af9e4c2ae6bb83a491ed3f54cfdc

Status: Success

Block: 16595249 88293 Block Confirmations

Timestamp: 12 days 8 hrs ago (Feb-10-2023 02:03:59 AM +UTC) | Confirmed within 2 secs

Sponsored:

From: benreed.eth

Interacted With (To): 0x2187e6a7c765777d50213346F0Fe519fCA706fbD

ERC-20 Tokens Transferred: From 0x2187e6...CA706fbD To 0x752515...d2340085 For 3,877.5 $3,870.43 Dai Stableco... (DAI...)

Value: 0 ETH ($0.00)

Transaction Fee: 0.003173836672872144 ETH $5.22

Gas Price: 34.055503164 Gwei (0.000000034055503164 ETH)

More De

This website uses cookies to improve your experience. By continuing to use this website, you agree to its Terms and Privacy Policy. Got it!

⊘ Private Note:

To access the **Private Note** feature, you must be Logged In

💡 A transaction is a cryptographically signed instruction that changes the blockchain state. Block explorers track the details of all transactions in the network. Learn more about transactions in our Knowledge Base.

🍪 This website uses cookies to improve your experience. By continuing to use this website, you agree to its Terms and Privacy Policy.

# Exhibit 49

## Transaction Details ‹ ›

Exchange ▾  Gaming ▾

Sponsored: ⓧ Metawin: Click Here to claim your FREE Entry to MetaWin's 20 ETH give away! Ends soon

**Overview**  Internal Txns  Logs (2)  State  Comments                                        More ▾

| | |
|---|---|
| ⑦ Transaction Hash: | 0xb5a098ecb5adf2ab8d95cbb5b2efad853981f1aff6310cf60b4a46ab0014becc ⧉ |
| ⑦ Status: | ✓ Success |
| ⑦ Block: | ✓ 16541305   142306 Block Confirmations |
| ⑦ Timestamp: | 🕐 19 days 22 hrs ago (Feb-02-2023 01:06:35 PM +UTC) \| ⧗ Confirmed within 8 secs |

⑦ Sponsored:   HORNYPLAY   **Play Now**   **SWEET VALENTINES BONANZA** Play Exciting Slot Games  Win Over $100,000 & Free Spins

| | |
|---|---|
| ⑦ From: | 0x0087F67B6b0995D3e7D21f2b94Ef92F4582868aD ⧉ |
| ⑦ Interacted With (To): | 📄 0x2187e6a7c765777d50213346F0Fe519fCA706fbD ⧉ ✓ |
| ⑦ ERC-20 Tokens Transferred: | ▸ From 0x2187e6...CA706fbD To 0x607d56...effc3B4a For 500,000  $500,000.00  🪙 Dai Stableco... (DAI...) |
| ⑦ Value: | ♦ 0 ETH ($0.00) |
| ⑦ Transaction Fee: | 0.002869454080640248 ETH  $4.71 |
| ⑦ Gas Price: | 30.785491381 Gwei (0.000000030785491381 ETH) |

More De...

🍪 This website uses cookies to improve your experience. By continuing to use this website, you agree to its Terms and Privacy Policy.   Got it!

Private Note: To access the **Private Note** feature, you must be Logged In

A transaction is a cryptographically signed instruction that changes the blockchain state. Block explorers track the details of all transactions in the network. Learn more about transactions in our Knowledge Base.

This website uses cookies to improve your experience. By continuing to use this website, you agree to its Terms and Privacy Policy.

# Exhibit 50



# Transaction Details

Exchange Gaming

Sponsored: **bc.game** - Free Bonus Up To 5 BTC Everyday! Live casino + 20k slots **Play Now**

Overview Internal Txns Logs (2) State Comments More

**Transaction Hash:**

0x233834c33ad4a6e120a647b567add893dc1869c1cf04d3c28aa9e23d08500485

**Status:** Success

**Block:**

14129414 2556896 Block Confirmations

**Timestamp:**

384 days 21 hrs ago (Feb-02-2022 10:52:05 PM +UTC) | Confirmed within 59 secs

**Sponsored:**

**From:**

0x550bD0F03580B9a687931af4d837F8e45D61d410

**Interacted With (To):**

0xD78368092Cb1079e3DdaE7f192F5dCdE53949CCD

**ERC-20 Tokens Transferred:**

From 0xD78368...53949CCD To Movement DAO: Pres... For 3,000,000 $2,998,350.00 Dai Stableco... (DAI...)

**Value:**

0 ETH ($0.00)

ⓘ **Transaction Fee:**

0.012644102232948328 ETH **$20.50**

ⓘ **Gas Price:**

146.826399658 Gwei (0.000000146826399658 ETH)

**More Details:** ＋ Click to show more

ⓘ **Private Note:**

To access the **Private Note** feature, you must be Logged In

💡 A transaction is a cryptographically signed instruction that changes the blockchain state. Block explorers track the details of all transactions in the network. Learn more about transactions in our Knowledge Base.

# Exhibit 51

## Transaction Details ‹ ›

[Exchange ⌄]  [Gaming ⌄]

**Featured:** Curious on Ethereum's hottest 🔥 trading pairs? View top pairs and details with **DEX Trading Pairs!**

Overview    **Logs (1)**    State    Comments

[More ⌄]

⊘ **Transaction Hash:**

0x7b918b7cd3c66d6bfc81bc42be6d6d16af265b50cc0e9610837b8a7444f0a2d2 📋

⊘ **Status:**    ✓ Success

⊘ **Block:**

✓ 14129286    2557025 Block Confirmations

⊘ **Timestamp:**

🕐 384 days 21 hrs ago (Feb-02-2022 10:24:07 PM +UTC) | ⏱ Confirmed within 1 min

⊘ **Sponsored:**



⊘ **From:**

‹› *service-provider.eth 📋

⊘ **Interacted With (To):**

📄 0x6B175474E89094C44Da98b954EedeAC495271d0F (Maker: Dai Stablecoin) 📋 ✓

⊘ **ERC-20 Tokens Transferred:**

▸ From 0x752515...d2340085 To Movement DAO: Pres... For 9,786,795    **$9,781,412.26**

🪙 Dai Stableco... (DAI...)

⊘ **Value:**

♦ 0 ETH ($0.00)

⊘ **Transaction Fee:**

0.012635524 ETH    **$20.48**

⊘ **Gas Price:**

422 Gwei (0.000000422 ETH)

---

**More Details:**                                  + Click to show more

---

⊘ **Private Note:**

To access the **Private Note** feature, you must be  Logged In

💡 A transaction is a cryptographically signed instruction that changes the blockchain state. Block explorers track the details of all transactions in the network. Learn more about transactions in our  Knowledge Base.

# Exhibit 52



# Transaction Details

Exchange Gaming

**Sponsored:** **Metawin**: Click Here to claim your FREE Entry to MetaWin's 20 ETH give away! Ends soon

Overview | Internal Txns | Logs (2) | State | Comments | More

**Transaction Hash:**

0xaeb8614064e3bae8011201c426cb75e3371a3d34de3bca63bd4dac1f590a0f05

**Status:** Success

**Block:**

14129278 2557036 Block Confirmations

**Timestamp:**

384 days 21 hrs ago (Feb-02-2022 10:21:27 PM +UTC) | Confirmed within 30 secs

**Sponsored:**

**From:**

*service-provider.eth

**Interacted With (To):**

0x58F09dd6DF8dFCe8c209A00BaE4348002BACac1d

**ERC-20 Tokens Transferred:**

From 0x58F09d...2BACac1d To Movement DAO: Pres... For 1,200,000 $1,199,340.00 Dai Stableco... (DAI...)

**Value:**

0 ETH ($0.00)

**Transaction Fee:**

0.016885714124189344 ETH   **$27.36**

**Gas Price:**

196.053712198 Gwei (0.000000196053712198 ETH)

---

**More Details:**                                                    + Click to show more

---

**Private Note:**

To access the **Private Note** feature, you must be Logged In

A transaction is a cryptographically signed instruction that changes the blockchain state. Block explorers track the details of all transactions in the network. Learn more about transactions in our Knowledge Base.

# Exhibit 53

## Transaction Details  ‹ ›

<span style="float:right">Exchange ⌄   Gaming ⌄</span>

**Sponsored:**  **Metawin:** Click Here to claim your FREE Entry to MetaWin's 20 ETH give away! Ends soon

Overview    Logs (1)    State    Comments

More ⌄



ⓘ **Transaction Hash:**

0x3f4c724dddaedffb5be6d7633992a9021acd129c37536f284348a4fff15a3b27 ⧉

ⓘ **Status:**    ✓ Success

ⓘ **Block:**

✓ 14156771    2530149 Block Confirmations

ⓘ **Timestamp:**

🕐 380 days 18 hrs ago (Feb-07-2022 04:16:48 AM +UTC) | ⏱ Confirmed within 30 secs

ⓘ **Sponsored:**

CRYPTO$LOTS    DOUBLE YOUR CRYPTO    $    PLAY NO

ⓘ **From:**

0xDe10F01e3f9bF288eF7A91cb4744B4AF3F2797F0 ⧉

ⓘ **Interacted With (To):**

📄 0x6B175474E89094C44Da98b954EedeAC495271d0F (Maker: Dai Stablecoin) ⧉ ✓

ⓘ **ERC-20 Tokens Transferred:**

▸ **From** 0xDe10F0...3F2797F0 **To** Movement DAO: Pres... **For** 200,000  **$200,200.00**

🪙 Dai Stableco... (DAI...)

ⓘ **Value:**

◆ 0 ETH ($0.00)

**⊘ Transaction Fee:**

0.004416046285896116 ETH   **$7.18**

**⊘ Gas Price:**

127.197600262 Gwei (0.000000127197600262 ETH)

---

**More Details:**                                    ＋ Click to show more

---

**⊘ Private Note:**

To access the **Private Note** feature, you must be Logged In

🔅 A transaction is a cryptographically signed instruction that changes the blockchain state. Block explorers track the details of all transactions in the network. Learn more about transactions in our Knowledge Base.

# Exhibit 54



# Transaction Details

Exchange Gaming

Sponsored: bc.game - Free Bonus Up To 5 BTC Everyday! Live casino + 20k slots **Play Now**

Overview | Internal Txns | Logs (2) | State | Comments | More

**Transaction Hash:**

0xea429bb30f45b0061a98e1afa7d858ea3281b4caf18367985929fa0ac622f577

**Status:** Success

**Block:**

14373840 2312534 Block Confirmations

**Timestamp:**

347 days 1 hr ago (Mar-12-2022 07:32:49 PM +UTC)

**Sponsored:**

**From:**

*service-provider.eth

**Interacted With (To):**

0xD78368092Cb1079e3DdaE7f192F5dCdE53949CCD

**ERC-20 Tokens Transferred:**

▸ **From** 0xD78368...53949CCD **To** Movement DAO: Pres... **For** 100,000 **$99,991.60** Dai Stableco... (DAI...)

**Value:**

0 ETH ($0.00)

**⊘ Transaction Fee:**

0.00117359993270754 ETH   **$1.89**

**⊘ Gas Price:**

20.52681171 Gwei (0.00000002052681171 ETH)

**More Details:**                                       ＋ Click to show more

**⊘ Private Note:**

To access the **Private Note** feature, you must be Logged In

💡 A transaction is a cryptographically signed instruction that changes the blockchain state. Block explorers track the details of all transactions in the network. Learn more about transactions in our Knowledge Base.

# Exhibit 55



## Transaction Details ‹ ›

Exchange ⌄    Gaming ⌄

**Sponsored:** ⓧ **Metawin:** Click Here to claim your FREE Entry to MetaWin's 20 ETH give away! Ends soon

Overview    Internal Txns    Logs (2)    State    Comments                More ⌄

⑦ Transaction Hash:

0x8bbc858653f31158809e425074cc585faf63e8b088e335a6e12a23ee64f355fd ⧉

⑦ Status:    ✓ Success

⑦ Block:

✓ 14129361    2556942 Block Confirmations

⑦ Timestamp:

🕐 384 days 21 hrs ago (Feb-02-2022 10:41:19 PM +UTC) | ⏱ Confirmed within 6 mins:53 secs

⑦ Sponsored:

cryptomus    Cryptocurrency Payment Service    Start accepting ETH

⑦ From:

‹› *service-provider.eth ⧉

⑦ To:

▤ 0xfE021e62637Cf8B880a76b09E94904693D38256A ⧉ ✓

∟ Transfer 79.93165732598 ETH From 0xfE021e...3D38256A To Movement DAO: Presale
View All Internal Transactions

⑦ Value:

◆ 0 ETH ($0.00)

⑦ Transaction Fee:

0.011926046155049985 ETH   **$19.33**

### ⊙ Gas Price:

181.381973735 Gwei (0.000000181381973735 ETH)

---

**More Details:**                                        + Click to show more

---

### ⊙ Private Note:

To access the **Private Note** feature, you must be  Logged In

---

🔆 A transaction is a cryptographically signed instruction that changes the blockchain state. Block explorers track the details of
all transactions in the network. Learn more about transactions in our  Knowledge Base.

# Exhibit 56



# Transaction Details

Exchange Gaming

**Featured: Etherscan API -** Need higher call rates ? **Sign-up for a dedicated plan today!**

Overview Internal Txns Logs (2) State Comments More

**Transaction Hash:**

0x068ddb3c424b3b9d3c1ef644d7164f0f321a1fb4fe7542a11aee166fa4d93ee8

**Status:** Success

**Block:**

14129466 2556840 Block Confirmations

**Timestamp:**

384 days 21 hrs ago (Feb-02-2022 11:02:36 PM +UTC) | Confirmed within 30 secs

**Sponsored:**

**From:**

0xDbE76F6ae97dFD5bdd1D7DAD8972740d18aB2b57

**To:**

0x58F09dd6DF8dFCe8c209A00BaE4348002BACac1d

Transfer 687.175562 ETH From 0x58F09d...2BACac1d To Movement DAO: Presale

View All Internal Transactions

**Value:**

0 ETH ($0.00)

**Transaction Fee:**

0.007445610398149056 ETH $12.07

⑦ **Gas Price:**

113.218837312 Gwei (0.000000113218837312 ETH)

---

**More Details:**                                                    + Click to show more

---

⑦ **Private Note:**

To access the **Private Note** feature, you must be Logged In

💡 A transaction is a cryptographically signed instruction that changes the blockchain state. Block explorers track the details of all transactions in the network. Learn more about transactions in our Knowledge Base.

## **CERTIFICATE OF SERVICE**

I hereby certify on this 1$^{st}$ day of March, 2023, I electronically filed the foregoing with

the Clerk of the Court using the CM/ECF system:

    1.        [Redacted] Declaration of Ryan Breslow with Exhibits

I also certify that the document referenced above was served via E-Mail on the following

non-CM/ECF participants:

Nitoj P. Singh, Esq.           Attorneys for Defendant Mark
Harmeet Dhillon, Esq.         Phillips
Dhillon Law Group Inc.
177 Post Street, Suite 700
San Francisco, CA 94108

Office: 415-433-1700
Email:  nsingh@dhillonlaw.com
         harmeet@dhillonlaw.com


Defendant Benjamin Reed
8111 206$^{th}$ St SE
Snohomish, WA 98296
Email:  ben.reed@daolabs.wtf

**ELLIS GEORGE CIPOLLONE
O'BRIEN ANNAGUEY LLP**
2121 Avenue of the Stars, 30th Floor
Los Angeles, California 90067
Tel.: (310) 274-7100
Fax: (310) 275-5697
cberg@egcfirm.com
bkussman@egcfirm.com


**SHUBIN & BASS, P.A.**
John K. Shubin, Esquire
Jamie L. Katz, Esquire
46 S.W. First Street, Third Floor
Miami, Florida 33130
Tel.: (305) 381-6060
Fax: (305) 381-9457
jshubin@shubinbass.com
jkatz@shubinbass.com


By: /s/ Jamie Katz_____
       Jamie Katz


*Counsel for Plaintiffs Ryan Breslow, Alex Fine, and Jon Gordon*