UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.  23-cv-20727-ALTMAN

RYAN BRESLOW, *et al.*,

    *Plaintiffs*,

v.

MARK PHILLIPS, *et al.*,

    *Defendants*.

_____/

# PLAINTIFFS' EMERGENCY MOTION TO AMEND TEMPORARY RESTRAINING ORDER AND FOR ORDER TO SHOW CAUSE WHY DEFENDANTS SHOULD NOT BE HELD IN CONTEMPT AND SUPPORTING MEMORANDUM OF LAW

2191580.2

## TABLE OF CONTENTS

**Page**

I. RELEVANT FACTS ........................................................................................................3
II. LEGAL STANDARD......................................................................................................6
III. ARGUMENT...................................................................................................................7
    A. Modification of the TRO is warranted in light of changed circumstances ..............7
    B. Defendants should be held in civil contempt ...........................................................7
        1. The TRO is valid and lawful.........................................................................8
        2. The TRO is clear and unambiguous..............................................................8
        3. Defendants have the ability to comply with the TRO..................................9
            a. Transfers to Defendants' known accounts ......................................10
            b. Transfers to accounts controlled by Defendant Phillips .................11
        4. Defendants violated the TRO......................................................................12
        5. The Court should impose an appropriate sanction......................................13
IV. CONCLUSION..............................................................................................................14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ex parte Robinson*,
    86 U.S. 505 (1873) ........................................................................................................... 6

*F.T.C. v. Leshin*,
    618 F.3d 1221 (11th Cir. 2010) ....................................................................................... 6

*F.T.C. v. RCA Credit Servs., LLC*,
    2012 WL 11406549 (M.D. Fla. Mar. 20, 2012) .............................................................. 6

*Int'l Union, United Mine Workers of Am. v. Bagwell*,
    512 U.S. 821 (1994) ....................................................................................................... 13

*Omaha Indem. Co. v. Wining*,
    949 F.2d 235 (8th Cir.1991) ........................................................................................... 6

*U.S. v. McCorkle*,
    321 F.3d 1292 (11th Cir. 2003) ..................................................................................... 14

**Statutes**

15 U.S.C. § 1116 .................................................................................................................... 8

28 U.S.C. § 1651(a) ............................................................................................................... 8

It has been nearly two weeks since the Court issued a temporary restraining order requiring Defendants to unwind the February transfers made out of the DAO endowment account.[1]  Dkt. No. 18 at 5.  Defendants have not complied with the Court's order, and that contemptuous conduct is imperiling over $3.2 million of DAO endowment assets.  Supplemental relief is required on an emergency basis to mitigate further injury arising from Defendants' actions.

Recent market events have rendered Defendants' contempt especially harmful.  The DAO endowment's assets are stored primarily in a cryptocurrency called DAI.  DAI is known as a "stablecoin"[2] because it is pegged to the dollar, such that one DAI can be redeemed for approximately one dollar at any given time.  On March 10, 2023, the Silicon Valley Bank collapsed.  Declaration of Christopher Berg (March 13, 2023) ("Berg Decl.") ¶ 4, Exhibit A.  That collapse has disrupted cryptocurrency markets, including the value of stablecoins like DAI.  On March 11, 2023, the value of DAI fell as low as 90 cents to the dollar—a 10% drop from its pegged value.  Id. ¶ 5, Exhibit B.  The DAO endowment's assets are also stored in Ethereum, albeit to a lesser extent.  That cryptocurrency also has experienced a significant drop in value in light of the collapse of Silicon Valley Bank.  On March 10, 2023, Ethereum's value dipped 11% from the day before, from $1,534.03 at the market's open on March 9 to $1,378.53, its lowest decline on March 10.  Id. ¶ 6, Exhibit C.  Although DAI and Ethereum have recovered most of their value, id. ¶¶ 5–6, Exhibits B & C, the future value of these cryptocurrencies, especially

---

[1] The DAO endowment account is associated with the following address: 0x143cC0A996De329C1C5723Ee4F15D2a40c1203c6.  Dkt. No. 24-1 ¶ 25.

[2] A stablecoin is a cryptocurrency that is pegged to a "stable" reserve asset like the U.S. dollar or gold.

during the pendency of this litigation, remains uncertain and vulnerable to the shocks currently impacting the market. *Id.* ¶¶ 7–8, Exhibits D & E.

A sustained 10% drop in the value of DAI and Ethereum would have serious negative effects on the value of the DAO endowment's assets. Saturday's drop temporarily reduced the value of the DAO endowment's assets by over $1 million. Declaration of Jon Gordon (March 13, 2023) ("Gordon Decl.") ¶¶ 4–7. In response to a cryptocurrency shock of this nature, Plaintiffs would have taken steps to convert the DAO endowment to dollars to mitigate devaluation risk from fluctuations in Ethereum or DAI. *Id.* ¶ 8. Because Defendants have wrongfully denied Plaintiffs access to the DAO endowment and made unauthorized transfers of over $8.5 million, Plaintiffs were—and continue to be—unable to protect the DAO endowment from these market risks. *Id.* ¶ 9.

To protect the DAO endowment from ongoing market volatility, Plaintiffs ask the Court to modify its February 28, 2023 order (the "TRO") to require Defendants to convert the cryptocurrency in the DAO endowment to dollars and deposit those dollars with the clerk in the Court's registry, to hold in escrow until the Court orders their release. This will insulate the DAO endowment's assets from further devaluation during the litigation and ensure that the status quo is maintained.

The relief Plaintiffs seek would have provided complete protection to the DAO endowment had Defendants complied with the TRO. They have not. Over $3.2 million in DAO endowment assets remain unreturned—and thus subject to further devaluation from volatile market forces. There is no legitimate cause for Defendants' delay, and Defendants have offered none. The result is that Defendants' contempt has exposed DAO endowment assets to further risk of devaluation. Plaintiffs ask the Court to impose an appropriate sanction that will ensure

the status quo is maintained—by ordering Defendants to post a cash bond with the clerk equivalent to the amount of DAO endowment assets that Defendants have failed to return.

## I. RELEVANT FACTS

On February 28, 2023, the Court issued a TRO requiring Defendants to unwind all transfers made out of the DAO endowment account from the last 30 days of the Court's order. Dkt. No. 18 at 5.  The TRO required immediate compliance; it did not set a date in the future for Defendants to unwind the transfers.

The same day, Plaintiffs' counsel served Defendants' counsel with the TRO via email per Defendants' consent.  Dkt. No. 31.  In that communication, Plaintiffs' counsel noted that they were expecting Defendants' prompt compliance with unwinding the transfers covered by the order.  Berg Decl. ¶ 9, Exhibit F.

On March 3, 2023, Defendants wrote to Plaintiffs requesting a continuance of the briefing schedule for the preliminary injunction hearing.  Plaintiffs responded that they would not agree to a continuance unless Defendants returned all transfers out of the DAO endowment account per the terms of the TRO.  *Id.* ¶ 10, Exhibit G.

On March 4, 2023, Defendants rebuffed Plaintiffs, asserting that they were in the process of preparing an accounting of all transfers, that they would not commit to unwinding the transactions "*by any date*," and that some of the transactions resulted in movement to accounts that are not within Defendants' control.  *Id.* (emphasis added).  Defendants' admission regarding funds being moved to accounts not within Defendants' control confirmed Plaintiffs' fears that Defendants had dissipated misappropriated assets.  *See* Dkt. No. 7 ¶ 11.

2191580.2                                                3

The parties held a meet-and-confer call on March 6, 2023. During that call, Plaintiffs pointed out that over $5 million in assets were sitting in the DAO Developer account,[3] that there was no dispute that the Defendants controlled that account, and thus there was no legitimate basis not to transfer those assets back to the DAO endowment account immediately. Plaintiffs demanded that those assets be returned by the end of the day or else Plaintiffs would oppose an extension of the hearing. Berg Decl. ¶ 11. Defendants offered no excuse why those assets had not immediately been returned to the DAO endowment account. However, Defendants stated on the call that they already had converted certain DAO endowment assets into fiat currency. *Id.* Defendants' admission regarding converting DAO endowment assets into dollars confirmed Plaintiffs' fears that Defendants are attempting to obstruct Plaintiffs' ability to trace DAO endowment funds. *See* Dkt. No. 7 ¶ 11.

After Defendants agreed to return a portion of the DAO endowment's assets, Plaintiffs wrote to Defendants confirming the agreement and indicated that Plaintiffs expected the remaining assets—the over $3.2 million in assets that had been transferred out of the DAO Developer account—to be returned by March 10, 2023, or else Defendants would need to provide good cause for why the return of funds was not possible. Berg Decl. ¶ 12, Exhibit G.

On March 9, 2023, Plaintiffs requested Defendants' availability to meet and confer on March 10 regarding Plaintiffs' compliance with the TRO. Defendants did not respond. *Id.* ¶ 13, Exhibit G.

---

[3] The DAO Developer account was the account into which Defendants made the initial unauthorized transfer of over $8.5 million from the DAO endowment on February 2, 2023. Over the next several days, Defendants transferred over $3.2 million from the DAO Developer account to other cryptocurrency wallets. Dkt. No. 24-1 ¶¶ 79–80. The DAO Developer account is associated with the following address: 0x2187e6a7c765777d50213346F0Fe519fCA706fbD. *Id.* ¶ 39.

On March 10, 2023, Defendants neither transferred the remaining assets to the DAO endowment account nor did they provide any explanation why the funds were not transferred. *Id.* ¶ 14. That same day, Silicon Valley Bank collapsed. *Id.* ¶ 4, Exhibit A. The value of Ethereum dropped to $1,378.53. On February 2, 2023, Ethereum was valued at $1643.24. *Id.* ¶ 6, Exhibit C.

On March 11, 2023, the value of DAI dropped to $0.90. On February 2, 2023, the value of DAI was $0.9989. *Id.* ¶ 5, Exhibit B. After learning of the DAI's drop in value, Plaintiffs once again reached out to Defendants to meet and confer. *Id.* ¶ 15.

On March 12, 2023, U.S. Secretary of Treasury Janet Yellen announced that the federal government would not bail out Silicon Valley Bank. *Id.* ¶ 16, Exhibit H.

That same day, the parties met and conferred by telephone regarding Defendants' TRO compliance and the possibility of transferring the DAO endowment assets to an escrow account. Despite Plaintiffs providing notice on March 9 that they wanted to know the status of Defendants' TRO compliance, lead counsel for Defendants was unprepared with this information. He did not know how much money Defendants had converted to fiat currency, and he did not know how many assets had been transferred into accounts that Defendants allegedly do not control—stating only that he would have to check on that information. The only bases Defendants offered for why no additional assets had been returned to the DAO endowment account were that Defendants' lead counsel had been travelling and that Defendants' accounting was still in progress—despite nearly two weeks having passed since the TRO was issued. *Id.* ¶ 17.

News outlets and commentators are reporting that a significant risk of further bank runs and volatility in cryptocurrency markets could arise as soon as Monday, March 13, 2023, when

the Federal Deposit Insurance Corporation makes assets available to Silicon Valley Bank depositors for withdrawal.  *Id.* ¶¶ 18–21, Exhibits I–L.

Plaintiffs requested that Defendants provide their position on modifying the TRO as detailed above by the end of the day on March 12.  Defendants oppose the modification to the TRO because they claim there is no immediate risk to the DAO endowment's assets.  *Id.* ¶ 22, Exhibit G.

Given the exigent circumstances created by the collapse of Silicon Valley Bank and the dramatic fluctuations in DAI and Ethereum prices that occurred over the weekend, Plaintiffs filed this motion with the Court on an emergency basis to protect the DAO endowment from further devaluation.  *Id.* ¶ 23.

## II.    LEGAL STANDARD

"When considering whether to modify a . . . [TRO], a district court is not bound by a strict standard of changed circumstances but is authorized to make any changes in the injunction that are equitable in light of subsequent changes in the facts or the law."  *Omaha Indem. Co. v. Wining*, 949 F.2d 235, 239 (8th Cir.1991) (citations and internal quotation marks omitted).

"The power to punish for contempt is inherent in all courts; its existence is essential to the preservation of order in judicial proceedings, and to the enforcement of the judgments, orders and writs of the courts."  *Ex parte Robinson*, 86 U.S. 505, 510 (1873); *F.T.C. v. RCA Credit Servs., LLC*, 2012 WL 11406549, at *1 (M.D. Fla. Mar. 20, 2012) ("District courts have inherent power to enforce compliance with their orders through civil contempt.").  A finding of civil contempt must be supported by clear and convincing evidence that (1) the allegedly violated order was valid and lawful, (2) the order was clear and unambiguous, (3) the alleged violator had the ability to comply with the order, and (4) the order was violated.  *F.T.C. v. Leshin*, 618 F.3d

1221, 1232 (11th Cir. 2010) (citing *Riccard v. Prudential Ins. Co.*, 307 F.3d 1277, 1296 (11th Cir. 2002)).

### III.    ARGUMENT

#### A.    Modification of the TRO is warranted in light of changed circumstances

At the time the TRO was entered on February 28, DAI and Ethereum were not experiencing significant fluctuations in value. Berg Decl. ¶¶ 5–6. Exhibits B & C. That all changed on March 10, 2023 when Silicon Valley Bank collapsed. Within 24 hours, both currencies experienced dramatic swings in value—including DAI's lowest valuation in its existence. *Id.* ¶¶ 5–6, 8. Exhibits B, C, & E. The consequences of Silicon Valley Bank's collapse are unfolding rapidly, and it is uncertain how much harm will be caused to the value of DAI and Ethereum. What is clear, however, is that values of DAI and Ethereum are sensitive to the developments that will occur in the coming weeks. As a result, DAI and Ethereum are no longer secure stores of value for the DAO endowment. These changed circumstances are good cause to warrant a modification of the TRO to direct Defendants to convert all assets in the DAO endowment account to dollars and deposit those proceeds with the clerk in the Court's registry to hold in escrow until the Court orders their release.

If the Court grants the relief sought by this motion, Plaintiffs request leave to prepare a detailed proposed order to describe the particulars of the conversion of the DAO endowment's assets to fiat currency. Plaintiffs ask that they be permitted to submit the proposed order to the Court two days after the Court grants this motion.

#### B.    Defendants should be held in civil contempt

Defendants are in contempt of the TRO. The only effort they have made to unwind the transfers was when it served their own interest in securing an extension of the preliminary

injunction briefing schedule. The excuse offered for the delay in unwinding the remaining transactions—that they are working on an "accounting" of the transfers—is transparent and baseless. Defendants made the transfers themselves; they obviously are aware of where they moved the assets. No accounting is required—especially one that takes two weeks to prepare. It appears that Defendants are attempting to keep the remaining assets in accounts that are more difficult to trace before the preliminary injunction hearing, in the hopes they can convince the Court to dissolve the injunction. If they returned the remaining assets to accounts that are expressly covered by the TRO, Defendants' ability to further secret those funds would be significantly diminished. Defendants' conduct easily satisfies the standard for civil contempt, and the Court should impose an appropriate sanction.

### 1. The TRO is valid and lawful

The TRO was properly issued pursuant to 15 U.S.C. § 1116, Federal Rule of Civil Procedure 65, the All Writs Act, 28 U.S.C. § 1651(a), and the Court's inherent authority. The Court made proper findings of fact supporting that Plaintiffs are likely to succeed on the merits of their claims, that they were likely to suffer harm absent injunctive relief, that the equities weighed in favor of injunctive relief, and that the public interest weighed in favor of injunctive relief. The Court also properly concluded that it was appropriate to grant the TRO without notice to Defendants because Plaintiffs demonstrated that Defendants have taken steps to dissipate and conceal DAO endowment assets, and notice likely would have led to further dissipation or concealment of those assets. Dkt. No. 18.

### 2. The TRO is clear and unambiguous

The TRO unambiguously ordered Defendants to unwind any transfers made in the last 30 days from the DAO endowment account. Dkt. No. 18 at 5. The TRO did not afford a grace

period; it required Defendants to comply immediately.  Defendants cannot claim they did not understand the directive, as Plaintiffs discussed it with Defendants repeatedly and Defendants did, in fact, transfer over $5 million to the DAO endowment account (when it suited their own interests to do so) on March 6, 2023.  Berg Decl. ¶¶ 9–15, 17; Exhibits F, G.

### 3. Defendants have the ability to comply with the TRO

Defendants have claimed they are unable to comply with the TRO because they are still preparing an accounting and because Defendants made transfers to accounts out of their control, including transfers that purportedly were overdue payments to independent contractors.[4]  *Id.* ¶¶ 10, 11, 17; Exhibit G.  Those excuses are meritless.

As Plaintiffs explained in their TRO application, on February 2, 2023 Defendants transferred over $8.5 million in DAI and Ethereum to the DAO Developer account.  Dkt. No. 24-1 ¶¶ 79–80.  From there, Defendants made transfers from the DAO Developer account to a variety of other accounts.  *Id.*

Plaintiffs have retained crypto-tracing consultant Nicolas Bax from the firm Convex Labs to assist in tracing the unauthorized transfers and to learn who controls the accounts that received DAO endowment funds.  His analysis shows that 18 transfers were made from the DAO Developer account to various other accounts between February 2, 2023 and February 13, 2023.  Declaration of Nicolas Bax (March 13, 2023) ("Bax Decl,") ¶ 8.  Mr. Bax has assumed that four of those transfers were to so-called independent contractors for a total of $72,000 DAI and 29.01 ETH.  Bax Decl. ¶¶ 10–11; *see also infra* note 5.  One transfer was to Plaintiff Jon Gordon for a

---

[4] Defendants also claim to have made an overdue payment to Plaintiff Jon Gordon.  Mr. Gordon's compensation was supposed to be paid from the $1.75 million transfer authorized by Plaintiffs in August 2022, not by the unauthorized transfers from February 2023.  Gordon Decl. ¶ 10.  That transfer is an attempt to make the February transfers appear legitimate.

total of 13.39 ETH.  Bax Decl. ¶ 12; *see also supra* note 4.  Although Plaintiffs have undertaken an analysis to trace the funds moved out of the DAO endowment account, that analysis is incomplete and ongoing.  Nevertheless, what Plaintiffs have learned up to this point demonstrates that Defendants have the ability to comply with the TRO.

The payments to "independent contractors"[5] account for a fraction of the total assets transferred—$72,000 DAI and 18.49 ETH ($30,383.51 by Ethereum's February 2, 2023 value).  Bax Decl. ¶ 11.  The vast majority of the assets transferred from the DAO Developer account in February 2023 were sent to accounts controlled by Defendants.  *See id.* ¶¶ 7, 13–18.  In addition, Defendants have not produced any invoices to show that the transfers to the cryptocurrency accounts of these purported independent contractors are legitimate, rather than simply being accounts controlled by Defendants or their co-conspirators.

The remaining 13 transfers made out of the DAO Developer account in February 2023 were all to accounts controlled by Defendants.

          **a.**    **Transfers to Defendants' known accounts**

Seven of the remaining 13 transfers were made directly to accounts controlled by Defendants.  Four of those remaining transfers were sent directly to Defendant Ben Reed's

---

[5] For the purposes of illustrating that Defendants' excuse of paying independent contractors as a basis for not returning the remaining DAO endowment assets is a farce, Plaintiffs will assume that the following addresses are "independent contractors."

1. Sveltedev.eth: 0x4823e65c10daa3ef320e5e262cfa8d0a059e02a6
2. Jango.eth: 0x823b92d6a4b2aed4b15675c7917c9f922ea8adad
3. filipv.eth: 0x30670d81e487c80b9edc54370e6eaf943b6eab39
4. 0x5044ff7f0ef531f3ace48fc1aff4dda429acde38

Plaintiffs make this assumption because they have not yet determined the likely origin or identity associated with these addresses.  Plaintiffs' investigation is ongoing.

cryptocurrency account, benreed.eth, for a total of $1,414,035 DAI. One of those remaining transfers was sent directly to Defendant Mark Phillips's cryptocurrency account, tankbottoms.eth, for a total of $1,058,000 DAI. Two of the remaining transfers were sent to *service-provider.eth—the cryptocurrency wallet associated with the dao-lawfirm, which Defendant Mark Phillips controls—for a total of $3,877.50 DAI and 10 ETH. *Id.* ¶ 13.

### b. Transfers to accounts controlled by Defendant Phillips

The remaining six transfers were made to accounts that Defendant Mark Phillips likely controls.

Two transactions went to a cryptocurrency account held by cookieslayer.eth for a total of $35,000 DAI. Defendant Phillips likely controls that account because cookieslayer.eth's ENS domain was registered by tankbottoms.eth (Defendant Phillips). *Id.* ¶ 16, Exhibit 2.

The account with address 0x607d56643673649bd25aa47325a7a6afeffc3b4a received one transfer from the DAO Developer account for $500,000 DAI. Defendant Phillips likely controls that account because it was created by tankbottoms.eth (Defendant Phillips). *Id.* ¶ 17, Exhibit 3.

The account with address 0x91898f9103cdba1546de834f6e26f019e09a0d4b received two transfers from the DAO Developer account for a total of $200,000 DAI. Defendant Phillips likely controls that account because it has only ever had three transactions—the two that sent it $200,000 DAI on February 2, 2023 and one other on February 4, 2023. A cryptocurrency account whose activity begins the same day that unauthorized transfers occurred, and whose maiden activity is the receipt of those unauthorized transfers, likely is controlled by the individual who caused the transfers to be made—in this case Defendant Phillips. *Id.* ¶ 15, Exhibit 1.

The account with address 0x55ded454d3aeba95c901dae36568d99fc904d510 received one transfer for 39.53 ETH. Mr. Bax has concluded that this account is a Robinhood deposit account used to convert crytpocurrency into fiat currency. Defendant Phillips likely controls that account because it previously received over a dozen transfers from tankbottoms.eth. An exchange deposit address that frequently receives transfers from the same individual is likely associated with the exchange account of the individual transferring the funds—in this case Defendant Phillips. *Id.* ¶ 18, Exhibit 4.

*   *   *

The foregoing analysis shows Defendants transferred $3,210,912 DAI and 49.53 ETH from the DAO Developer account to their known cryptocurrency accounts and accounts that they otherwise control. *Id.* ¶ 19. Those transfers of over $3.2 million, therefore, were not transfers to pay "independent contractors"; rather, those transfers were made to enrich Defendants themselves. Because those transfers were made to accounts within Defendants' control, they were required to be unwound and returned to the DAO endowment account pursuant to the TRO. Plaintiffs have not completed their analysis of whether Defendants transferred assets to other accounts once they received them from the DAO Developer account. But that subsequent activity, if any did occur, should not shield Defendants from compliance with the TRO. Any subsequent transfer to accounts not in Defendants' control is an act of dissipation and concealment, and that activity should not be countenanced by the Court.

### 4. Defendants violated the TRO

Defendants have violated the TRO by not returning all assets that were transferred from the DAO endowment account in February 2023. On February 2, 2023, Defendants transferred out of the DAO endowment account $7,500,000 DAI and 805 ETH (or $1,322,808.20 based on

the value of Ethereum on February 2, 2023 ($1643.24))—totaling approximately $8.8 million in unauthorized transfers. On March 6, 2023, Defendants returned $4,217,950.97 DAI and 871.22 ETH (or $1,365,550.20 based on the value of Ethereum on March 6, 2023 ($1567.40)). Accordingly, Defendants have failed to return over $3.2 million in DAO endowment assets, despite having nearly two weeks to do so.[6] This is a clear violation of the TRO.

### 5. The Court should impose an appropriate sanction

Defendants' contempt warrants sanctions. "[C]ivil contempt sanctions, or those penalties designed to compel future compliance with a court order, are considered to be coercive and avoidable through obedience, and thus may be imposed in an ordinary civil proceeding upon notice and an opportunity to be heard." *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827 (1994).

The TRO was crafted to ensure that the DAO endowment's assets were preserved until this litigation has run its course. To do that, the Court ordered all assets transferred out of the DAO endowment in February 2023 to be returned for safekeeping. Defendants' refusal to comply with the TRO, and their admitted dissipating and concealing conduct, Berg Decl. ¶¶ 10–11, Exhibit G, has obstructed the Court's goal of maintaining the status quo. As Plaintiffs are only beginning to learn, Defendants have engaged in a complex series of transactions designed to confuse, obscure, and conceal what they have done with DAO endowment assets. Rather than Plaintiffs burdening to codebreak these transactions, the Court should impose a sanction on

---

[6] When the parties reached an agreement about extending the preliminary injunction briefing schedule, and Plaintiffs made their support conditional on the return of some of the DAO endowment's assets, Defendants were able to transfer assets back to the DAO endowment account on the same day the agreement was reached. Berg Decl. ¶ 12.

Defendants that incentivizes them to dismantle their acts of concealment and return the assets subject to the TRO forthwith.

Accordingly, the Court should require Defendants to post a cash bond of $3,292,301.70—the equivalent of the $3,210,912 DAI and 49.53 ETH (or $81,389.68 based on Ethereum's value on February 2, 2023 ($1643.24))—with the clerk until such time as Defendants return the DAO endowment assets that were transferred to the cryptocurrency accounts within their control. *See supra* Part III.B.3.b.; *Cf. U.S. v. McCorkle*, 321 F.3d 1292 (11th Cir. 2003) (court ordered attorney in forfeiture proceedings to deposit money into the court registry or post a bond as a contempt sanction for failing to turn over dissipated assets in violation of a court order). This sanction will ensure that judicial orders are honored and obeyed, as well as ensure that DAO endowment assets are not dissipated.

## IV. CONCLUSION

For the foregoing reasons, the Court should modify the TRO to direct Defendants to convert the DAI and Ethereum in the DAO endowment account to dollars and further direct Defendants to deposit those proceeds with the clerk in the Court's registry to hold in escrow until the Court orders their release. The Court should then direct Plaintiffs to submit a proposed order no later than two days after the granting of this motion that will detail the particulars of how the DAO endowment should be converted to fiat currency. A ruling by March 14, 2023 is necessary given the continued uncertainty and volatility surrounding cryptocurrency markets.

The Court should also issue an order to show cause why Defendants should not be held in civil contempt and, following Defendants' failure to excuse or justify their disobedience of the TRO, the Court should require Defendants to post a cash bond with the clerk for $3,292,301.70

until Defendants return the DAO endowment assets that were transferred to the cryptocurrency accounts within their control.

## CERTIFICATION UNDER LOCAL RULE 7.1(A)(3)

Pursuant to Local Rule 7.1(A)(3), I hereby certify that counsel for Plaintiffs conferred with counsel for Plaintiffs regarding the relief requested herein.  Defendants oppose the relief sought by Plaintiffs.

Dated: March 13, 2023

| | |
|---|---|
| **SHUBIN & BASS, P.A.**<br>46 S.W. First Street, Third Floor<br>Miami, Florida 33130<br>Tel.: (305) 381-6060<br>Fax: (305) 381-9457<br>jshubin@shubinbass.com<br>jkatz@shubinbass.com<br><br>By: /s/ Jamie L. Katz<br>     John K. Shubin, Esquire<br>     Jamie L. Katz, Esquire | **ELLIS GEORGE CIPOLLONE O'BRIEN ANNAGUEY LLP**<br>2121 Avenue of the Stars, 30th Floor<br>Los Angeles, California 90067<br>Tel.: (310) 274-7100<br>Fax: (310) 275-5697<br>cberg@egcfirm.com<br>bkussman@egcfirm.com<br><br>By: _____<br>     Christopher T. Berg (*pro hac vice pending*)<br>     Benjamin J. Kussman (*pro hac vice pending*)<br><br>*Counsel for Plaintiffs Ryan Breslow, Alex Fine, and Jon Gordon* |

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served by the Court's CM/ECF system on March 13, 2023 on all counsel of record.

/s/ Jamie L. Katz
Jamie L. Katz
