UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No.: 1:23-cv-20727-RKA

**RYAN BRESLOW**, *et al.*,

    Plaintiffs,

v.

**MARK PHILLIPS**, *et al.*,

    Defendants.

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' EMERGENCY MOTION TO AMEND TEMPORARY RESTRAINING ORDER AND FOR AN ORDER TO SHOW CAUSE**

**I.   INTRODUCTION**

Plaintiffs' Emergency Motion to Amend, like their underlying Emergency *Ex Parte* Application for a Temporary Restraining Order, relies on obfuscation and omission, to request that the Court issue relief that is not warranted given the facts. For example, Plaintiffs omit that since Defendants were served with the Temporary Restraining Order ("TRO") in this Action, they have not moved any assets associated with MovementDAO, except in compliance with the TRO. They obfuscate that the extremely short-lived volatility concerning MovementDAO's assets is no longer a concern, as the FDIC has ensured that all depositors at Silicon Valley Bank and Signature Bank will not lose a cent, and MakerDAO (the DAO behind the DAI stablecoin, which relied in part on USDC for backing) and Circle Internet Financial, LLC ("Circle") (the entity behind the USDC stablecoin, which held a significant balance at Silicon Valley Bank) have taken significant steps to stabilize their respective stablecoins and bring confidence to the market. The markets agree as the stablecoins have been stable at approximately $1/coin, and Ethereum, another cryptocurrency

held by MovementDAO is up over 20% in the last week. Had MovementDAO liquidated its assets on March 10th, as Plaintiffs appear to argue should have been done, MovementDAO would be in a worse position than it is now.

Plaintiffs' underlying narrative, while purportedly supported by cherry-picked documents and unsubstantiated allegations, is not reality. For example, MovementDAO was a functioning entity with its own IRS EIN, and actually held the assets at issue here, with Defendant Mr. Benjamin Reed serving as its equivalent of an operations manager. That MovementDAO was an operating entity is confirmed in that, *inter alia*, it received philanthropic contributions from the community beyond Plaintiffs; operated DAOLabs, LLC, with its own EIN and contractual obligations, and which launched another DAO—PeaceDAO a DAO championed by Mr. Breslow to bring aid to Ukraine. Plaintiffs brought this Action against the individual Defendants instead of MovementDAO, in an attempt to circumvent MovementDAO's governing agreements.

Similarly, Plaintiffs falsely imply that Mr. Phillips never worked for the SEC (he did), or that Mr. Reed Yurchak never provided legal services to MovementDAO (he did). These allegations, as with Plaintiffs' remaining allegations, fall apart with just a cursory review of the documents that Plaintiffs have thus far failed to share with the Court. Plaintiffs' allegations concerning their being in the dark as to Mr. Yurchak's involvement, and fees due to Mr. Yurchak were particularly egregious, as Plaintiffs themselves knew of Mr. Yurchak's firm since 2021, which led to the fees at issue in January 2023. As such, it is critical that the Court permit Defendants to file their full Opposition to Plaintiffs' Application for a Preliminary Injunction before granting any further relief to Plaintiffs.

Nor is liquidating MovementDAO's assets warranted, or a bond necessary. First, the assets in question belong to MovementDAO, a Delaware unincorporated nonprofit organization.

MovementDAO is a separate entity, with its own IRS EIN, that is not a party to this action. MovementDAO anticipates intervening in this action shortly, but the Court does not yet have jurisdiction over it. Second, Defendants have not moved any of MovementDAO's assets following the TRO, except as permitted by the TRO. Finally, Defendants seek to honor the TRO with respect to the remaining assets, but 1) want to ensure such transactions are properly documented and indexed, 2) seek clarity regarding assets that have been converted to dollars given transactional costs in unwinding transactions; and 3) have engaged a cryptocurrency expert, Dr. Boris Richard, to help guard against any loss of value while unwinding transactions.

Plaintiffs' gameplan is transparent: deprive MovementDAO and Defendants of the funds necessary to defend against this Action, without regard for their agreements with MovementDAO, and take control of MovementDAO's assets for themselves.

For the aforementioned reasons, as set forth more fully below. Defendants respectfully request that Plaintiffs' Emergency Motion to Amend be denied in full, and Defendants be permitted to submit a full Opposition to Plaintiffs' Motion for a Preliminary Injunction before the Court grants any further relief to Plaintiffs.

## II.   BACKGROUND FACTS

### a.  Limited Factual Background

Defendants will provide a full factual background with their Opposition to Plaintiffs' Application for a Preliminary Injunction, but provide a limited factual background here to provide the Court with relevant context.

In July 2021, Mr. Phillips had a meaningful role as a Lead Developer under contract with the Securities and Exchange Commission. Declaration of Mark Phillips ("Phillips Decl."), ¶2. Specifically, Mr. Phillips was employed by InfoTrend Incorporated, a subcontractor to Its Agile,

LLC, which was a prime contractor to the SEC under a solicitation regarding for the provision of "blockchain and digital asset data support[.]" *Id.*, Exs. 1 and 2. In order to obtain a contractor position with SEC and obtain a requisite security clearance, Mr. Phillips completed a Declaration for Federal Employment, an FBI fingerprint search, and an authorization for release of credit information. *Id.*, Exs. 3-5. Mr. Phillips fully disclosed his criminal history to the SEC—even that outside the seven-year reporting period—and was granted employment. *Id.,* ¶2-4. As an expert in the Solidity, Bitcoin Script, and Typescript, coding languages used for blockchain transactions, Mr. Phillips' skills were in high demand, so much so that he was inundated with so many unsolicited employment offers that he deactivated his LinkedIn account. *Id.*, ¶5. Bitcoin was trading at over $60,000 just months prior, and would again trade for over $60,000 in October 2021, and there was still incredible demand for cryptocurrency and blockchain engineers. *Id.*, ¶6.

Plaintiffs, however, were able to lure Mr. Phillips away from his SEC position by offering Mr. Phillips a role at what would become MovementDAO. *Id.*, ¶7. Plaintiffs knew full well that Mr. Phillips had prior run-ins with law enforcement. At least in meetings in August and September 2021, and in January, July, and August 2022, Mr. Phillips disclosed and discussed with Plaintiffs that he had been to jail and prison, including the circumstances related to his imprisonment. *Id.*, ¶8. A further simple Google search would have revealed all the details of Mr. Phillips' criminal background. *Id.* These discussions arose in a variety of circumstances: when the parties were discussing the legality of different types of entities and cryptocurrency pump and dump schemes; a discussion of experiences with drugs; and discussion of experiences with law enforcement. *Id.* Mr. Phillips repeatedly made clear during the discussions that he had been in prison, and had no interest in doing anything that would lead to even the possibility of him running afoul of the law.

*Id.*, ¶9. It would be particularly shameful to Mr. Phillips to be involved in a cryptocurrency fraud given his relationship with his colleagues at the SEC. *Id.*

During these same discussions, Mr. Gordon revealed that he had run-ins with the law on account of repeated acts of reckless driving; and Mr. Fine revealed that he never paid taxes (a common issue in cryptocurrency transactions), and would steal others' license plates to evade parking tickets and citations for illegally parking the van he lived out of. *Id.*, ¶10. Mr. Phillips further learned that Mr. Breslow and Mr. Gordon had met at an ayahuasca ceremony, where Mr. Breslow had a psychedelic-induced epiphany that God was telling them to create what would become MovementDAO. *Id.*

Messrs. Breslow, Fine, and Gordon planned to develop a decentralized autonomous organization (ultimately MovementDAO) to facilitate social and environmental movements, and set of tooling which created other DAOs, in effect, enabling smaller communities to form their own DAOs to promote social movements using MovementDAO's governance structure and technological architecture. *Id.*, ¶11. The primary DAO (ultimately MovementDAO) would provide a set of decentralized finance activities for which it, or a related entity, would receive some fee or benefit (a "tribute"). *Id.* However, Plaintiffs lacked the technical ability to develop and manage the contemplated DAO's creation, and needed Mr. Phillips for the task. *Id.*

Mr. Phillips explained that he would leave SEC to help create MovementDAO on a full-time basis, subject to three non-negotiable conditions: (1) Mr. Phillips would have veto power over decisions relating to the DAO's treasury in order to assuage Mr. Phillips' worry that the project would devolve into a cryptocurrency pump-and-dump scheme; (2) the MovementDAO's founders, including Plaintiffs, would commit to providing substantial funding to the DAO, and agree to lock their contributions for six years so that the project would be sufficiently secure to attract developers

and donors; and (3) the DAO would not engage in conduct tantamount to the unregistered offering of securities, a concern to which Mr. Phillips was especially sensitive given his SEC work. *Id.*, ¶12. Plaintiffs agreed to these terms, and Mr. Phillips left the SEC to focus on building the DAO. *Id.*

On December 6, 2021, following the parties' evolving discussions on MovementDAO's launch and governance, Mr. Breslow and Mr. Phillips entered into a Confidential Independent Contractor Agreement (the "IC Agreement"), under which Mr. Breslow engaged Mr. Phillips to work exclusively on MovementDAO, and to fully develop and launch the DAO on or before January 1, 2022. *Id.*, ¶14, Ex. 6. The parties agreed that Mr. Breslow would deposit $1,000,000 into a trust account and release the funds to Mr. Phillips upon performance of his obligations under the IC Agreement. *Id.* The IC Agreement clarified that Mr. Phillips was an independent contractor and nothing more, and terminated on January 1, 2022. *Id.* The IC Agreement was intended to be a stopgap measure. *Id.* After January 1, 2022, the parties were to come to a new agreement, or Mr. Phillips would be directly compensated by MovementDAO after its launch. *Id.*

On January 2, 2022, Mr. Fine, using his alias "Steve Faffle," sent the following email to Mr. Yurchak: "Hey Reed – wanted to give you the heads up that Mr. M [(Mr. Phillips)] is due to be paid the $1,000,000 contract bonus :) Mr. M crushed it [rocket emoji] Could you work with Mr. M. Directly on dispersing his funds?" *Id.*, Ex. 7. Thanks to Mr. Phillips' many hours of coding, the major technical elements of MovementDAO were in place. *Id.* On January 15, 2022, the parties created the Move Gnosis, which functioned as the virtual safe and bank account for MovementDAO's assets, consisting mainly of Ethereum and DAI cryptocurrency. *Id.*, ¶15.

The Law Office of Reed Yurchak (the "Law Firm") provided the parties with the legal services necessary to build a large, sophisticated DAO, and contributed 100,000 DAI to

MovementDAO. *Id.*, ¶16. Plaintiffs knew full well that the Law Firm had engaged Mr. Phillips as a cryptocurrency and security consultant, and that he created and maintained dao-lawfirm.eth (the Ethereum Name Service (ENS) the Law Firm used) on behalf of the Law Firm. *Id.*, ¶17. The Law Firm did provide legal services regarding cryptocurrency, and was entitled significant fees for that work. *Id.*

Because DAOs are relatively new entities, traditional banking services are not available to them. *Id.*, ¶18. As such, the Law Firm allowed MovementDAO's founders to use the Law Firm's credit card, because MovementDAO could not obtain its own credit cards. *Id.* To pay those charges, Mr. Phillips would transfer cryptocurrency to Mr. Yurchak's Coinbase account, sell the cryptocurrency, and transfer the sales proceeds to the linked bank account controlled by Mr. Yurchak. *Id.* Mr. Phillips also paid for services rendered to MovementDAO by the Law Firm in this same manner. *Id.*

Mr. Fine took charge of preparing the MovementDAO's GitBook, that is, an online documentation tool that set forth MovementDAO's policies, goals, and governance mechanisms. *Id.*, ¶19. Mr. Fine had complete editorial control over the final contents of the GitBook. *Id.* The GitBook's public release on February 2, 2022, marked MovementDAO's official launch as it enabled individuals to join the Movement community, contribute funds, and participate in its governance. *Id.*, ¶20, Ex. 8. Mr. Phillips and Plaintiffs intended for the GitBook to be a public-facing document that would attract developers, contributors, and community members. *Id.* Much like a set of corporate bylaws, the GitBook was intended to function as Movement's initial governing document. *Id.* The following are critical provisions of the GitBook:

7

- Movement would have an endowment funded by contributions invested in cryptocurrency and cryptocurrency-adjacent assets, and the proceeds would be used to fund social movements. *Id.*

- Movement would be governed by Snapshot Voting, under which members may submit proposals, and Movement token holders can then use their tokens to vote for or against a proposal. *Id.* at 13–14.

- The Law Firm would act as Movement's "Service Provider" and handle financial transactions. *Id.* at 15. The Service Provider's legal fees were estimated at 2% of assets held per year. *Id.* at 49.

- Movement's founders (which includes Mr. Phillips) can exercise a veto over pending proposals. *Id.* at 15.

- The Founders' tokens (Plaintiffs' tokens included) will be locked for six years from launch, meaning there would be stability for developers and contributors to join MovementDAO, and that Plaintiffs could not withdraw or redeem their contributions for six years. *Id.* at 40.

- Movement was "neither designed to be, nor is it set up to be, an investment vehicle" and instead closer to a non-profit in that contributions to MovementDAO are charitable in nature. *Id.* at 59.

On February 2, 2022, in addition to publishing the GitBook, Mr. Fine encouraged his Twitter followers contribute to MovementDAO.[1] *Id.*, ¶21.

---

[1] Over the course of Defendants' investigation of this matter, it is clear that Plaintiffs have deleted Tweets, private text messages, and other documents. Defendants have reminded Plaintiffs of their obligations to preserve all evidence.

Many people did contribute to MovementDAO. Nine contributors outside of Plaintiffs account for over $1.7 million in contributions, and there are many more smaller contributors. MovementDAO was a separate entity, with members and obligations beyond the parties to this Action. *Id.*, ¶22.

Neither Plaintiffs, nor Defendants, at any point ever treated MovementDAO's February 2, 2022 launch as just a beta or soft launch, or anything other than a complete and full launch of MovementDAO. Phillips Decl., ¶23; Declaration of Benjamin Reed ("Reed Decl."), ¶2. Mr. Reed and the Law Firm worked together to ensure MovementDAO satisfied all the legal requirements to operate in accordance with its governing documents and purpose. Reed Decl., ¶2. For example, MovementDAO enacted a series of governance improvement proposals ("MIPs"), which led to MovementDAO being categorized as a Delaware unincorporated nonprofit association. Phillips Decl., Exs. 9-11. MIP-0004 and MIP-0007 specifically identified the Law Firm as a Service Provider, and Jon Gordon signed off on those MIPs.[2] Phillips Decl., ¶24. Mr. Yurchak obtained an EIN from the IRS for MovementDAO. *Id.*, Ex. 15.

MovementDAO also adopted a set of Guiding Principles, Terms of Service, and Code of Conduct through MIPs—which were approved by Plaintiffs. Phillips Decl., ¶24; Reed Decl., ¶4. Upon their adoption, MovementDAO's relationship with its members or contributors was governed by, *inter alia,* the GitBook (Phillips Decl., Ex. 8), Guiding Principles (*Id.*, Ex. 12), Terms of Service (*Id.*, Ex. 13), and Code of Conduct (*Id.*, Ex. 14) (collectively, the "Governing Documents")—*all of which were ignored by Plaintiffs in this Action*.

---

[2] Mr. Gordon also served as a fiduciary and agent of Mr. Breslow's Family Office, and acted on behalf of all Plaintiffs.

The Governing Documents allowed a designated "Service Provider," initially Mr. Phillips and Law Firm, and later Mr. Reed, the authority to remove a member without notice or a vote if the Service Provider "determines such a removal to be necessary, desirable, or appropriate[.]" *Id.*, Ex. 12 Guiding Principles at 6. MovementDAO was authorized to pay reasonable compensation, and reimburse reasonable expenses to members and third parties. *Id.* at 7. The Service Provider was authorized to veto any action, proposal, or decision of Movement and its members. *Id.* at 10.

On March 24, 2022, Mr. Fine announced that the PeaceDAO, a DAO formed by MovementDAO, and dedicated to funding projects relating to Ukrainian humanitarian aid, would be launching that day. Phillips Decl., ¶32, Ex. 16; Reed Decl., ¶6. Mr. Breslow, using the moniker "theryanking," responded: "This is going to be EPIC!." *Id.* PeaceDAO did then launch, and collected contributions and funded Ukrainian humanitarian aid efforts. *Id.* PeaceDAO's treasury automatically paid a fee (also referred to as a "tribute") to MovementDAO for services provided. It is unclear how Plaintiffs claim that MovementDAO did not officially launch, when it was launching other DAOs that were collecting and disbursing funds, and paying a fee to MovementDAO.

Plaintiffs were not only aware of, but supportive of Mr. Phillips' efforts. On August 24, 2023, Mr. Phillips asked Mr. Fine if he "s[aw] the recent [MIPs] proposals," told Mr. Fine to read them, and explained that he was "proposing a path to be clearly legal while using the benefits of tokens." *Id.*, Ex. 17. On August 27, 2022, shortly before going "off the grid for a week" for the Burning Man festival, Mr. Breslow wrote to Mr. Phillips: "Thanks for the epic weeks. Things haven't been easy but we're moving in the right direction. So much gratitude for everything you both do." *Id.*, Ex. 18. Mr. Gordon indicated his approval of MIPs 0000, 0001, 0002, 0004, 0005, 0006, 0007, and 0008 by voting for them. Phillips Decl., ¶35; Reed Decl., ¶5. By not voting for

MIP-0003, Mr. Gordon showed that he was reviewing the MIPS, and exercising discretion with respect to his voting.

MIP-0004 authorized MovementDAO for form DAOLabs LLC. *Id.*, Ex. 10. DAOLabs was intended to serve, *inter alia*, MovementDAO's real world needs, including operating bank accounts, credit cards, making payments, and holding assets. Reed Decl., ¶7. The Law Firm helped form DAOLabs LLC, and Mr. Reed is, and has always been, DAOLabs LLC's only member and manager. Reed Decl., ¶7, Ex. 1. Generally, Mr. Reed helped oversee business functions, including working with the Law Firm, for both MovementDAO and DAOLabs LLC. Reed Decl., ¶7. For example, as recently as October 2022, Mr. Reed worked with the Law Firm to review DAOLabs LLC's technology licensing, indemnity, and loan agreements. Reed Decl., ¶9, Ex. 2.[3]

However, when Mr. Yurchak learned of the recent conflict between the parties, he caused the Law Firm to resign as MovementDAO's Service Provider, and apparently disclaimed fees he was due pursuant to the agreements referenced above when contacted by Plaintiffs about this Action. Phillips Decl., ¶36. Separately, since Mr. Yurchak's resigning as counsel, Mr. Phillips retired the dao-lawfirm.eth ENS, and modified the dao-lawfirm.xyz website, to no longer associate the domain with Mr. Yurchak. *Id.*, ¶37. However, Mr. Phillips did previously operate the ENS and domain on behalf of the Law Firm. *Id.*

---

[3] Plaintiffs contend that all services rendered by the Law Firm in relation to MovementDAO or DAOLabs LLC, were not services rendered to MovementDAO or DAOLabs LLC, but instead rendered to Plaintiffs and other entities that have since been abandoned in favor of MovementDAO. Plaintiffs further contend that all communications with the Law Firm are privileged. This is a transparent attempt to shield themselves against their earlier frivolous allegations that the Law Firm's involvement in MovementDAO was unknown to Plaintiffs, and that all claims that fees were due to the Law Firm were a sham and complete fabrications. It is unclear how Plaintiffs can contend that Law Firm services rendered to DAOLabs LLC, via Mr. Reed its sole manager, could possibly be services rendered to Plaintiffs.

Prior to the recent dispute, Plaintiffs have never 1) challenged Mr. Phillips and Mr. Reed's management of MovementDAO's treasury; 2) challenged MovementDAO utilization of the Law Firm; or 3) expressed any sentiment that MovementDAO was not a legal, separately operating entity. Phillips Decl., ¶38; Reed Decl., ¶10. What Plaintiffs have now presented as purported facts, is instead a revisionist history—which Defendants will correct in their forthcoming Opposition to the Motion for Preliminary Injunction.

### b. The Recent, Short-Lived Market Fluctuations

On March 10, 2023, the California Department of Financial Protection and Innovation took possession of Silicon Valley Bank, and appointed the Federal Deposit Insurance Corporation ("FDIC") as receiver of bank. Expert Declaration of Dr. Boris Richard ("Richard Decl."), Ex. 2. As a result of the action, there was uncertainty as to whether depositors at Silicon Valley Bank would be able to recover deposits in excess of $250,000—the standard amount of FDIC deposit insurance. *Id.*, ¶5, Ex. 3. As widely reported, Silicon Valley Bank provided banking services for a significant number of technology companies, including Circle.

On March 10, 2023, Circle announced that approximately $3.3 billion of the $40 billion in reserves it maintains for the USDC stablecoin was deposited at Silicon Valley Bank, and inaccessible. *Id.*, ¶6. USDC is the second-largest stablecoin by market capitalization with a $37.5 billion circulating supply, and over $7 billion in daily traded volume. *Id.*, ¶7. The stablecoin is pegged to the U.S. dollar on a 1:1 basis and is backed through reserves consisting of a mix of cash and short-term U.S. Treasury bonds, and is intended to always be redeemable for U.S. dollars on a 1:1 basis. *Id.*, ¶8. However, as a result of Circle being unable to access its Silicon Valley Bank funds, it briefly depegged from the U.S. Dollar on March 10, 2023. *Id.*

On Saturday, March 11, 2023, Circle said in a blog post that USDC liquidity operations will resume as normal when banks open on Monday morning in the United States. *Id.*, ¶9. According to the blog post, "As a regulated payment token, USDC will remain redeemable 1 for 1 with the U.S. Dollar." *Id.* The cryptocurrency firm said that in the event the Silicon Valley Bank does not return 100% of deposits, Circle would cover any shortfall using corporate resources, involving external capital if necessary. *Id.* Furthermore, on March 12, 2023 Circle announced that an automated USDC minting and redemption would become available through Cross River Bank, effective March 13, 2023, and also said that its expanded relationships include USDC redemptions via BNY Mellon. *Id.*, ¶10. Previously, Circle took action to reduce the bank counterparty risk with respect to 23% of stablecoin reserves held as cash and deposited $5.4 billion with BNY Mellon. *Id.*

As the result of swift stabilization and risk reduction measures by Circle, the USDC de-peg which started on March 10, 2023 at approximately 4 pm UTC, effectively ended on March 13, 2023 at approximately 9 am UTC, when USDC returned to the price of $0.9987. *Id.*, ¶11.

USDC briefly depegging also impacted DAI. *Id.*, ¶12. DAI is a decentralized collateral-backed stablecoin maintained by MakerDAO. *Id.* DAI has a $5.9 billion market capitalization, with $456 million in daily traded volume. *Id.* DAI is softly pegged to the U.S. Dollar in that one DAI is intended to equal one U.S. Dollar. *Id.*, ¶13. As a decentralized algorithmic stablecoin, DAI is collateralized by several other cryptocurrencies which, aside from USDC, include other tokens such as ETH, wrapped BTC, wrapped staked ETH, so-called liquidity provider tokens from Uniswap and Curve Finance trading protocols, reserve-backed stablecoins, such as USDP and GUSD, as well as, increasingly, so-called Real-World Assets (RWAs). *Id.* The multitude of

collateral sources backing DAI reduces idiosyncratic risk exposure to specific crypto assets and increases the stability of the DAI soft peg. *Id.*

Maker's protocol has several built-in stability mechanisms to maintain DAI's soft U.S. dollar peg. *Id.*, ¶14. The most important mechanisms include: (1) over-collateralization, (2) automatic liquidations of undercollateralized collateralized debt positions (CDPs), and (3) arbitrage mechanism which adjusts DAI supply via financial incentive to burn DAI/mint DAI when its price deviates below/above the 1:1 U.S. dollar peg. *Id.* The minimum overcollateralization ratios (Liquidation Ratios) are set individually for each collateral type and may reach as high as 185%. *Id.* Conservatively high overcollateralization ratios effectively serve to reduce the risk of insufficient collateral to back DAI in times of falling collateral values. *Id.*

To ensure that there is always enough collateral in the Maker Protocol to cover the value of all outstanding debt measured as the amount of DAI outstanding valued at 1:1 U.S. dollar parity, any CDP with collateral-to-debt ratio falling below the Liquidation Ratio, and thus deemed too risky, is liquidated through automated Maker Protocol auctions. *Id.*, ¶15. Such automatic liquidation auctions to remove undercollateralized debt positions from the protocol effectively restore the overcollateralization levels to the target levels, hence supporting the U.S. dollar peg of DAI. *Id.*

Currently, collateral locked in the Maker Protocol was valued at $9,535,504,789.39, and it supported $6,477,676,823.36 of DAI, for the overall overcollateralization ratio of 147.2%. *Id.*, ¶16.

The DAI price history shows that depegs for this DAI have been extremely rare events. *Id.*, ¶17. Starting from the beginning of 2020 and prior to the most recent Silicon Valley Bank-induced depeg, DAI value never fell below $0.98 based on daily price closes, and was below this threshold

14

only 10 times (0.86% of all price observations) based on the observed intra-day price lows. *Id.* Moreover, such rare depeg events were very short-lived. For example, even at the depth of crypto panic of March 13, 2020, when Bitcoin crashed to intra-day lows of $3,948.92, DAI depegged only for a few hours to $0.9697 – just to recover to $1.007 by the end of the same day. *Id.*, ¶18.

The most recent depeg of DAI was not caused by its market instability or a protocol design flaw. *Id.*, ¶19. Rather it was solely driven by the sudden insolvency of Silicon Valley Bank (SVB), the fact that the USDC stablecoin represented a substantial portion of the overall collateral backing DAI and the fact that Circle, as the issuer of USDC, held $3.3bn of its cash reserves at Silicon Valley Bank. *Id.*

Nevertheless, even such an unrelated dramatic "black swan" event in the US banking system exerted only a transitory negative impact on the DAI soft dollar peg. *Id.*, ¶20. Specifically, the depeg of DAI started on March 11, 2023 at 12 am UTC, with DAI price falling to $0.9955, and ended on March 13, 2023 at 2 pm UTC, with DAI price rising back to $0.996. *Id.* In other words, the DAI depeg lasted only two and a half days even under such extreme and unexpected circumstances unrelated per se to cryptocurrency markets. *Id.* DAI is again at parity with the U.S. dollar, with market price at $0.9991. *Id.*

The FDIC also stepped in to calm markets. *Id.*, ¶21. On March 12, 2023, the FDIC announced that it would fully protect all depositors at Silicon Valley Bank, and Signature Bank, a New York bank that was heavily invested in the cryptocurrency space. *Id.*, Ex. 4. The announcements brough calm to the markets, and paired with the actions undertaken by Circle and MakerDAO, stability to USDC and DAI. *Id.* Both stablecoins are again pegged to the U.S. Dollar. *Id.* Additionally, Ethereum is currently trading at over $1,700, up from the March 10, 2023 low of $1,378.53.

### III.   ARGUMENT

#### A. This Action Concerns the Assets of MovementDAO, and is Improperly Brought Against Defendants.

Plaintiffs' claims concern their membership and economic interests in MovementDAO, a Delaware unincorporated nonprofit association formed under the Delaware Uniform Unincorporated Nonprofit Association Act. Delaware permits the formation of unincorporated non-profit associations pursuant to its Uniform Unincorporated Nonprofit Association Act. 6 Del. C. § 1901 (the "Act"). Under the Act, a nonprofit association simply means an unincorporated association of two or members, joined by mutual consent, for a common, nonprofit purpose. *Id*. at §1901(2). A nonprofit association may hold assets in its own name, including real property. *Id.* at §§ 1903 and 1904. Critically, the association is a legal entity separate from its members for the purpose of enforcing rights, duties, and liabilities in contract and tort, and its members are not liable for a breach of the association's contracts simply by participating in the management of the association. *Id.* at § 1906. As with a corporation, if an individual has a dispute with the association, the dispute is with the association, not with its members individually. *Id.* Neither the Act, nor any of the cases interpreting the Act, imputes any fiduciary duty upon the members of an unincorporated nonprofit association, be they managers or otherwise. *Id.*

The Act is silent as to whether an association formed under its rules must be governed by any particular type of rule set or structures. Under the Act, a DAO is just as valid as an organization operated according to Robert's Rules of Order. A DAO, or "Decentralized Autonomous Organization," is a member-led entity with no central leadership or authority. It is fully autonomous and transparent given it is built on the blockchain: smart contracts lay the foundational rules, execute the agreed upon decisions, and at any point, proposals, voting, and even the very code itself can be publicly audited. Generally, a DAO is governed entirely by its individual

16

members who collectively make critical decisions about the future of the project, such as technical upgrades and treasury allocations—a modernized and automated version of Robert's Rules of Order.

MovementDAO is such a nonprofit association, joined by mutual consent, for a common, nonprofit purpose. MovementDAO is a separate entity from its members, can hold assets in its own name, and enter into contractual agreements—here the Governing Documents it entered into with its contributors and members.

Given the above, Mr. Phillips and Mr. Reed are not individually liable to Plaintiffs, nor do the assets in question here belong to them, individually, The assets at issue belong to MovementDAO, and Plaintiffs' relationship and rights with respect to the assets and MovementDAO is contractual in nature, as set forth by the Governing Documents. MovementDAO is a separate entity, with its own IRS EIN, with members and contributions allocated to members excluding Plaintiffs worth more than $1.7 million. No contributors to MovementDAO, aside from Plaintiffs, have demanded a liquidation of their assets.

As such, Plaintiffs have not set forth a basis for their right to demand liquidation of the assets, nor does this Court have jurisdiction over MovementDAO such to compel such a liquidation.

### B. MovementDAO's Assets are Safe.

As made clear above, MovementDAO's assets are safe. The FDIC has stepped in to guarantee the deposit accounts of banks that have failed, and has publicly expressed that it will make liquidity available to banks as needed. Plaintiffs' briefing glosses over the fact that the uncertainty concerning DAI was caused by a brief uncertainty as to Circle's access to funds at Silicon Valley Bank. Since then, Circle has been restored full access to its fund, and Circle and

MakerDAO have taken multiple steps to further guard against such price fluctuations. As Dr. Richard submits, DAI is extremely stable, backed by significant reserves and is overcollateralized. The volatility generally present in in cryptocurrencies is not present with DAI, which has been more stable than bank stocks.

Even MovementDAO's Ethereum assets are on an upward trajectory. Over the last week, Ethereum prices are up nearly 20%, trading at over $1,700. The cost basis for MovementDAO's Ethereum holdings is approximately $1,200. This is due to Defendants strategic management of MovementDAO's assets. Had MovementDAO left all of its assets in Ethereum as initially contemplated by Plaintiffs, the approximately $16 million in contributions would only now be worth approximately $4 million. Instead, Defendants strategically maintained MovementDAO's assets in DAI, and buying Ethereum when it was down to diversify its holdings.

It is ironic that Plaintiffs now contend that cryptocurrency is too volatile, when they themselves sought to build this cryptocurrency backed entity when Ethereum was experience annual price gains of over 500%. Had Plaintiffs been able to act on their plans to liquidate all of MovementDAO's assets when they were down, to guard against further declines, they would have lost out on DAI returning to peg, and Ethereum's recent gains.

## C. Defendants Have Honored and Will Continue to Honor the TRO.

Plaintiffs conveniently omit that after being served with the TRO, Defendants have not moved any of the assets of MovementDAO, except as provided for by the TRO. Plaintiffs' arguments about concealment and dissipation are a red herring. The reality is that cryptocurrency transfers are completely transparent. Any movement of the assets is immediately publicly searchable and accessible. Defendants cannot "hide" their cryptocurrency transactions, as Plaintiffs apparently contend. Plaintiffs apparently plead ignorance as to whether any further

moves have been made, claiming their analysis is uncomplete—yet chide Defendants for taking time to complete their analysis and indexing.

Moreover, Defendants cannot fully comply with the TRO as some of the wallets referenced by Plaintiffs, purportedly belonging to Defendants, belong neither to Defendants nor MovementDAO. Defendants do not control these wallets and are unable to unwind those transactions.

Finally, some of the assets in question have been converted from cryptocurrency to U.S. dollars. Converting from cryptocurrency to fiat, incurs both transactional costs and slippage. Reverse those transactions, as well as other transactions, will incur transaction costs and slippage. Defendants have retained Dr. Richard to consult on these issues, but also seek the Court's guidance with respect to whether all such transactions should be reversed given this new information.

### D. No Further Relief or Sanctions are Warranted.

By their Application for a Temporary Restraining Order, Plaintiffs sought to maintain the status quo pending their Motion on Preliminary Injunction. Plaintiffs have received what they sought. Defendants have not further transferred any of MovementDAO's assets, and the assets are safely stored in DAI and Ethereum. The liquidation of MovementDAO's assets is both unwarranted given both the lack of merit of Plaintiffs claims and transactional costs and slippage, and improper given the lack of jurisdiction over MovementDAO, the rightful owner of the assets in question. Nor is the imposition of a bond warranted here given that there have not been any further movement of MovementDAO assets, and the Defendants await further clarification concerning the issues raised above.

## IV.  CONCLUSION

Defendants respectfully request that Plaintiffs' Emergency Motion to Amend be denied in full, and Defendants be permitted to submit a full Opposition to Plaintiffs' Motion for a Preliminary Injunction before the Court grants any further relief to Plaintiffs.

Respectfully submitted,

 /s/ Nitoj P. Singh
Admitted Pro Hac Vice
DHILLON LAW GROUP, INC.
177 Post Street, Suite 700
San Francisco, CA 94108
415.433.1700
nsingh@dhillonlaw.com

Attorneys for Defendants Mark Phillips and Benjamin Reed