**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORDA**
Case No.: 1:23-cv-20727-RKA

**RYAN BRESLOW**, *et al.*,

      Plaintiffs,

v.

**MARK PHILLIPS**, *et al.*,

      Defendants.

---

**DEFENDANTS' OPPOSITION TO PLAINTIFFS'**
**MOTION FOR PRELIMINARY INJUNCTION**

---

## I.      INTRODUCTION

Rather than demonstrate that a preliminary injunction is warranted in this Action, Plaintiffs instead sought to slander defendants, and cherry-pick facts, in an effort to shortcut their way to a preliminary injunction. Their goal is obvious: to cut off Defendants' ability to defend against this action, then take what they want from MovementDAO's treasury—ignoring all the while that MovementDAO is a separate entity, and its contractual relationship with the parties hereto.

The assets in question here belong to MovementDAO, a separate unincorporated nonprofit association. Plaintiffs did make contributions to MovementDAO (not investments), and when they sought to pillage MovementDAO's assets, Defendants took steps to protect MovementDAO and cut off Plaintiffs' voting rights as permitted by MovementDAO's governing documents.

Importantly, a preliminary injunction would cripple MovementDAO, an entity not before the Court. Denying the preliminary injunction would maintain the status quo—with MovementDAO continuing to operate pursuant to its governing documents. That Plaintiffs did not contest these governing documents when they were first issued and adopted some eight months ago alone warrants denying this Motion.

A preliminary injunction is an extraordinary and drastic remedy which should be granted sparingly. It is the exception rather than the rule, and should especially not be granted here, where Plaintiffs belatedly contest MovementDAO's formation and its governing documents, and there are serious concerns regarding Plaintiffs' duty of candor to the Court. Accordingly, Defendants request that this Motion be denied in full.

## II.      FACTUAL BACKGROUND

In July 2021, Mr. Phillips had a meaningful role as a Lead Developer under contract with the Securities and Exchange Commission. Declaration of Mark Phillips ("Phillips Decl."), ¶2.

Specifically, Mr. Phillips was employed by InfoTrend Incorporated, a subcontractor to Its Agile, LLC, which was a prime contractor to the SEC under a solicitation for the provision of "blockchain and digital asset data support[.]" *Id.* ¶¶ 1–2, Exs. 1 and 2. In order to obtain a contractor position with SEC and obtain a requisite security clearance, Mr. Phillips completed, *inter alia*, a Declaration for Federal Employment, an FBI fingerprint search, and an authorization for release of credit information. *Id.* ¶4, Exs. 3-5. Mr. Phillips fully disclosed his criminal history to the SEC— even that outside the seven-year reporting period—and was granted employment. *Id.*, ¶¶2-4. As an expert in the Solidity, Bitcoin Script, and Typescript, coding languages used for blockchain transactions, Mr. Phillips' skills were in high demand, so much so that he was inundated with so many unsolicited employment offers that he had to deactivate his LinkedIn account. *Id.*, ¶5. Ethereum was trading at $3,887.53 on September 3, 2021, and at $4,815.01 on November 9, 2021, the highest it has ever been, and there was incredible demand for cryptocurrency engineers. *Id.*, ¶6.

Plaintiffs, however, were able to lure Mr. Phillips away from his SEC position by offering Mr. Phillips a role at what would become MovementDAO. *Id.*, ¶7. Plaintiffs knew full well that Mr. Phillips had prior run-ins with law enforcement. At least in meetings in August and September 2021, and in January, July, and August 2022, Mr. Phillips disclosed and discussed with Plaintiffs that he had been to jail and prison, including the circumstances related to his imprisonment. *Id.*, ¶8. At a sushi dinner in September 2021, Mr. Phillips disclosed that he had been on both sides of the law, civil and criminal; that he had been in federal prison and jail for contempt; and that he had been nervous about being rejected for security clearance given his prior run-ins with the law. *Id.* A further simple Google search would have revealed all the details of Mr. Phillips' criminal background. *Id.* These discussions arose in a variety of circumstances: when the parties were

discussing the legality of different types of entities and cryptocurrency pump and dump schemes; a discussion of experiences with drugs; and discussion of experiences with law enforcement. *Id.*, ¶10. Mr. Phillips repeatedly made clear during the discussions that he had been in prison, and had no interest in doing anything that was questionable, or would lead to even the possibility of him running afoul of the law. *Id.*, ¶9. It would be particularly embarrassing to Mr. Phillips to be involved in a cryptocurrency fraud given his relationship with his colleagues at the SEC. *Id.* Mr. Phillips experience spoke for himself, and he could just code and get paid. He did not need to engage in any questionable practices.

During these same discussions, Mr. Gordon revealed that he had run-ins with the law on account of repeated acts of reckless driving; and Mr. Fine revealed that he never paid taxes (a common issue in cryptocurrency transactions), and would steal others' license plates to evade parking tickets and citations for illegally parking the van he lived out of. *Id.*, ¶10. Mr. Phillips further learned that Mr. Breslow and Mr. Gordon had met at an ayahuasca ceremony, where Mr. Breslow had a psychedelic-induced epiphany that God was telling them to create what would become MovementDAO. *Id.*

Messrs. Breslow, Fine, and Gordon planned to develop a decentralized autonomous organization (ultimately MovementDAO) to facilitate social and environmental movements, and set of tooling which created other DAOs, in effect, enabling smaller communities to form their own DAOs to promote social movements using MovementDAO's governance structure and technological architecture. *Id.*, ¶11. The primary DAO (ultimately MovementDAO) would provide a set of decentralized finance activities for which it, or a related entity, would receive some fee or benefit (a "tribute"). *Id.* However, Plaintiffs lacked the technical ability to develop and manage the contemplated DAO's creation, and needed Mr. Phillips for the task. *Id.*

Mr. Phillips initially performed work pursuant to a Consulting Agreement with Merkaba, Inc. ("Merkaba"), under which Mr. Phillips agreed to perform blockchain architecture and related services Merkaba for $125 an hour. *Id.*, ¶ 12, Ex. 6. The Agreement initially had a one month term, and was renewable on a monthly basis. *Id.* Between August 2021 and November 2021, Mr. Phillips helped lay the foundation for what would become MovementDAO, analyzing the structure of existing DAOs, reporting on legal entities and models, devising funding and governance models (including the issuance of nonfungible tokens ("NFTs") and users interfaces), and ensuring that the DAO would operate under a regime of trust and legitimacy. *Id.*, ¶13. Between August 2021 and MovementDAO's launch on February 2, 2022, Plaintiffs called the organization various names, including TedDAO, a reference to the comedy show *Curb Your Enthusiasm*, in which the actor Ted Danson made an anonymous donation, but made sure everyone knew he was the donor (similar to Plaintiffs' intentions here). *Id.*, ¶14. As a result of Mr. Phillips' efforts, Mr. Breslow asked Mr. Phillips to assume a more prominent, full-time role in the venture, which would entail Mr. Phillips leaving the SEC. *Id.*, ¶15.

Mr. Phillips explained that he would leave SEC to help create MovementDAO on a full-time basis, subject to three non-negotiable conditions: (1) Mr. Phillips would have veto power over decisions relating to the DAO's treasury in order to assuage Mr. Phillips' worry that the project would devolve into a cryptocurrency pump-and-dump scheme; (2) the MovementDAO's founders, including Plaintiffs, would commit to providing substantial funding to the DAO, and agree to lock their contributions for six years so that the project would be sufficiently secure to attract developers and donors; and (3) the DAO would not engage in conduct tantamount to the unregistered offering of securities, a concern to which Mr. Phillips was especially sensitive given his SEC work. *Id.*,

¶16. Plaintiffs agreed to these terms, and Mr. Phillips left the SEC to focus on building the DAO. *Id.*

On December 6, 2021, following the parties' evolving discussions on MovementDAO's launch and governance, Mr. Breslow and Mr. Phillips entered into a Confidential Independent Contractor Agreement (the "IC Agreement"), under which Mr. Breslow engaged Mr. Phillips to work exclusively on MovementDAO, and to fully develop and launch the DAO on or before January 1, 2022. *Id.*, ¶17, Ex. 7. This IC Agreement superseded and terminated the Consulting Agreement with Merkaba. Mr. Phillips would earn $1 million in cash under the IC Agreement and further approximately $1 million in MovementDAO tokens. *Id.* The IC Agreement clarified that Mr. Phillips was only independent contractor, and terminated on January 1, 2022. *Id.* The IC Agreement was intended to be a stopgap measure, and after January 1, 2022, the parties were to come to a new agreement, or Mr. Phillips would be directly compensated by MovementDAO. *Id.*

After signing the IC Agreement and until the present, Mr. Phillips devoted tremendous time and energy to building MovementDAO. *Id.*, ¶18. Mr. Phillips worked out of an Airbnb Mr. Breslow rented for him outside of Seattle, before setting Mr. Phillips up in a house nearby Mr. Breslow's Miami home, and initially worked out of Mr. Breslow's home. *Id.* At Mr. Breslow's direction, Mr. Phillips would work in shifts of seventy-two hours, taking every fourth day off. *Id.* Mr. Breslow, meanwhile, gave an interview on how his company Bolt was the first company to have a four-day work week. Mr. Phillips was working under such pressure that Breslow expressed dissatisfaction when Mr. Phillips took time off after the death of his younger sister to locate her teenage son. *Id.* Mr. Phillips even put off his own wedding, after Mr. Breslow agreed to cover the costs incurred regarding the original wedding date. It was during this period that Mr. Phillips

recruited Mr. Reed, who then began working on MovementDAO. *Id.*; Declaration of Benjamin Reed ("Reed Decl."), ¶2.

Mr. Phillips fully performed his obligations under the IC Agreement. On January 2, 2022, Mr. Fine, using his alias "Steve Faffle," sent the following email to Mr. Yurchak: "Hey Reed – wanted to give you the heads up that Mr. M [(Mr. Phillips)] is due to be paid the $1,000,000 contract bonus :) Mr. M crushed it [rocket emoji]" Phillips Decl., ¶19, Ex. 8. The IC Agreement also required Mr. Breslow to contribute funds on behalf of Mr. Phillips to MovementDAO, such that Mr. Phillips would be entitled to 10% of tokens issued to its founders. Thanks to Mr. Phillips' many hours of coding, the major technical elements of MovementDAO were in place. *Id.*

Mr. Breslow and Mr. Phillips did not enter into a new contractor agreement on January 1, 2022. Instead, the parties came to an understanding that Mr. Phillips' salary would be paid by MovementDAO, in the amount of $88,000 per month. *Id.*, ¶20/ Mr. Phillips could have received a comparable compensation package in the open market for engineers of his caliber. *Id.*

The Law Office of Reed Yurchak (the "Law Firm") provided the parties with the legal services necessary to build a large, sophisticated DAO, and contributed 100,000 DAI to MovementDAO. *Id.*, ¶21. Plaintiffs knew full well that the Law Firm had engaged Mr. Phillips as a cryptocurrency and security consultant, and that he created and maintained dao-lawfirm.eth (the Ethereum Name Service (ENS) the Law Firm used) on behalf of the Law Firm. *Id.*, ¶22. Indeed, Mr. Phillips worked out of the Law Firm's offices when contracting with the SEC. *Id.* The Law Firm provided legal services regarding cryptocurrency and was entitled to fees for that work. *Id.*

The Law Firm also helped MovementDAO with its banking issues. *Id.*, ¶23. As Mr. Phillips was no longer operating as Mr. Breslow's contractor, and the parties were no longer operating Merkaba, the parties could not use Mr. Breslow's access to banking, or Merkaba's ability to create

a bank account and gain access to a credit card. Because DAOs are relatively new entities, traditional banking services and credit cards are not available to them. *Id.*. As such, the Law Firm allowed MovementDAO's founders to use the Law Firm's credit cards. *Id.* To pay those charges, Mr. Phillips would transfer cryptocurrency to Mr. Yurchak's Coinbase account, sell the cryptocurrency, and transfer the sales proceeds to the linked bank account controlled by Mr. Yurchak. *Id.* Mr. Phillips also paid for services rendered to MovementDAO by the Law Firm in this same manner. *Id.* If Mr. Phillips was truly acting as Mr. Breslow or Merkaba's agent at this point, it is unclear why he would not simply use their credit cards or banking facilities.

On January 15, 2022, Mr. Phillips created the Movement Gnosis under Messrs. Fine and Gordon's supervision, which functioned as the virtual safe for Movement's cryptocurrency. *Id.*, ¶24. While Plaintiffs chose to give Mr. Phillips copies of their "keys" to the Gnosis, Mr. Phillips provided Messrs. Fine and Gordon with physical copies of their own keys. *Id.* Plaintiffs never formally entrusted their keys to Mr. Phillips in any written document. *Id.* Mr. Phillips attempted to provide Mr. Breslow with a copy of his key and suggested that Mr. Gordon, as Mr. Breslow's trustee be given a copy, but Mr. Breslow refused, stating that Movement was his "gift to the world" and that he would never need or exercise his tokens. *Id.*

Mr. Fine took charge of preparing the MovementDAO's GitBook, that is, an online documentation tool that set forth MovementDAO's policies, goals, and governance mechanisms. *Id.*, ¶26. Mr. Fine had complete editorial control over the final contents of the GitBook, making clear that Mr. Phillips' role was limited to providing suggestions. *Id.* The GitBook's public release on February 2, 2022, marked MovementDAO's official launch as it enabled individuals to join the Movement community, contribute funds, and participate in its governance. *Id.*, ¶27, Ex. 9. Mr. Phillips and Plaintiffs intended for the GitBook to be a public-facing document that would attract

developers, contributors, and community members. *Id.* Much like a set of corporate bylaws, the GitBook was intended to function as Movement's initial governing document. *Id.* The following are critical provisions of the GitBook:

- Movement would have an endowment funded by contributions invested in cryptocurrency and cryptocurrency-adjacent assets, and the proceeds would be used to fund social movements. *Id.*

- Movement would be governed by Snapshot Voting, under which members may submit proposals, and Movement token holders can then use their tokens to vote for or against a proposal. *Id.* at 13–14.

- The Law Firm would act as Movement's "Service Provider" and handle financial transactions. *Id.* at 15. The Service Provider's legal fees were estimated at 2% of assets held per year. *Id.* at 49.

- Movement's founders (which includes Mr. Phillips) can exercise a veto over pending proposals. *Id.* at 15.

- The Founders' tokens (Plaintiffs' tokens included) will be locked for six years from launch, meaning there would be stability for developers and contributors to join MovementDAO, and that Plaintiffs could not withdraw or redeem their contributions for six years. *Id.* at 40.

- Movement was "neither designed to be, nor is it set up to be, an investment vehicle" and instead closer to a non-profit in that contributions to MovementDAO are charitable in nature. *Id.* at 59.

On February 2, 2022, in addition to publishing the GitBook, Mr. Fine encouraged his Twitter followers contribute to MovementDAO. *Id.*, ¶28. He also instructed Mr. Phillips to announce the launch via an email blast to an 110,000+ people mailing list curated by Mr. Breslow. *Id.*

Many people did contribute to MovementDAO. Nine contributors outside of Plaintiffs account for over $1.7 million in contributions, and there are many more smaller contributors. MovementDAO was a separate entity, with members and obligations beyond the parties to this Action. *Id.*, ¶22; *see also* Declaration of Evita Stenqvist ("Stenqvist Decl."), ¶5; Declaration of

Mikhail Radin ("Radin Decl."), ¶8; Declaration of Ryan Mallory ("Mallory Decl."), ¶¶3–4, Declaration of Paige Cone ("Cone Decl."), ¶¶5–6, Declaration of Fredy Montero ("Montero Decl."), ¶¶ 3–4.

Neither Plaintiffs, nor Defendants, at any point ever treated MovementDAO's February 2, 2022 launch as anything other than a complete and full launch of MovementDAO. Phillips Decl., ¶30; Reed Decl., ¶3; Cone Decl., ¶4; Mallory Decl. ¶5; Montero Decl. ¶5. Mr. Reed and the Law Firm worked together to ensure MovementDAO satisfied all the legal requirements to operate in accordance with its governing documents and purpose. Reed Decl., ¶3. For example, MovementDAO enacted a series of governance improvement proposals ("MIPs"), which led to MovementDAO being categorized as a Delaware unincorporated nonprofit association. Phillips Decl., ¶34, 45–47, Exs. 13–15. MIP-0007 specifically identified the Law Firm as a Service Provider, and Jon Gordon agreed to this MIP by voting for the proposal on Snapshot.[1] *Id.*, ¶42, Ex. 12. Mr. Yurchak obtained an EIN from the IRS for MovementDAO. *Id.*, ¶48, Ex. 16.

MovementDAO further enacted MIP-0004 with community approval. *Id.*, ¶39. Ex. 11. This MIP, among other things, ratified and approved "ongoing reimbursements to the Service Providers for all reoccurring expenses; stated that "the DAO, through its Service Provider, is authorized to make payments to itself, dao-lawfirm.eth, and tankbottoms.eth [Mr. Phillips] for Cryptocurrency reimbursements associated with ongoing expenses; ratified all actions taken by the Service Provider; and provided that MovementDAO will indemnify the Service Provider. Mr. Gordon, using the ETH address beginning with 0x58, voted for this MIP. *Id.*, ¶39.

---

[1] Mr. Gordon also served as a fiduciary and agent of Mr. Breslow's Family Office, and acted on behalf of all Plaintiffs.

Between February and August of 2022, MovementDAO's governance took place mainly on Discord. *Id.*. ¶31. During this period, Mr. Phillips shepherded the roll-out of online documentation and tooling relating to its treasury and issuance of NFTs so that DAOs that formed under Movement's umbrella had the resources to be legally compliant. *Id.* Until approximately March 2022 (when his attention turned to other projects), Mr. Fine acted as if he was MovementDAO's de facto leader. On June 13, 2022, Mr. Phillips posted on MovementDAO's Discord that a Snapshot proposal regarding the purchasing of ETH (a widely traded cryptocurrency) would be voted on via Snapshot in accordance with the GitBook. *Id.*, ¶32, Ex. 18. Despite the volatility of the cryptocurrency market, Mr. Phillips' farsighted decision to invest the majority of Movement's treasury in DAI (a "stablecoin" that tracked the dollar) rather than the more volatile Ethereum prevented MovementDAO from losing millions of dollars. *Id.* The treasury's present value is approximately $13,000,000—if MovementDAO had invested solely in ETH, it would be worth approximately $4.1 million. *Id.* Despite his around-the-clock efforts to build MovementDAO's technical architecture, Mr. Phillips repeatedly told Plaintiffs that he did not want to be in charge of MovementDAO's governance, and that he wanted to be a programmer running the engineering side of MovementDAO, which is why he brought in Mr. Reed. *Id.*

In August 2022, MovementDAO also adopted a set of Guiding Principles, Terms of Service, and Code of Conduct through MIPs—which were approved by Plaintiffs. *Id.*, ¶34; Reed Decl., ¶4. Upon their adoption, MovementDAO's relationship with its members or contributors was governed by, *inter alia,* the GitBook (Phillips Decl., Ex. 8), Guiding Principles (*Id.*, Ex. 13), Terms of Service (*Id.*, Ex. 14), and Code of Conduct (*Id.*, Ex. 15) (collectively, the "Governing Documents")—*all of which were ignored by Plaintiffs in this Action*.

The Governing Documents allowed a designated "Service Provider," initially Mr. Phillips and Law Firm, and later Mr. Reed, the authority to remove a member without notice or a vote if the Service Provider "determines such a removal to be necessary, desirable, or appropriate[.]" *Id.*, Ex. 13, Guiding Principles at 6. MovementDAO was authorized to pay reasonable compensation, and reimburse reasonable expenses to members and third parties. *Id.* at 7. The Service Provider was authorized to veto any action, proposal, or decision of Movement and its members. *Id.* at 10.

On March 24, 2022, Mr. Fine announced that the PeaceDAO, a DAO formed by MovementDAO, and dedicated to funding Ukrainian humanitarian aid, would be launching that day. Phillips Decl*.,* ¶33, Ex. 19; Reed Decl., ¶7. Mr. Breslow, using the moniker "theryanking," responded: "This is going to be EPIC!." *Id.* PeaceDAO did then launch, and collected contributions and funded Ukrainian humanitarian aid efforts. Phillips Decl*.,* ¶33, Ex. 19. Donations received were sent to the Law Firm to be converted to cryptocurrency. PeaceDAO's treasury automatically paid a fee (also referred to as a "tribute") to MovementDAO for services provided, and PeaceDAO did make such payments. *Id.*, ¶33. It is unclear how Plaintiffs claim that MovementDAO did not officially launch, when it was launching other DAOs that were collecting funds, and paying a fee to MovementDAO.

Plaintiffs were not only aware of, but supportive of Mr. Phillips' efforts. On August 24, 2023, Mr. Phillips asked Mr. Fine if he "s[aw] the recent [MIPs] proposals," told Mr. Fine to read them, and explained that he was "proposing a path to be clearly legal while using the benefits of tokens." *Id.* ¶49, Ex. 20. On August 27, 2022, shortly before going "off the grid for a week" for the Burning Man festival, Mr. Breslow wrote to Mr. Phillips: "Thanks for the epic weeks. Things haven't been easy but we're moving in the right direction. So much gratitude for everything you both do." *Id.* ¶51, Ex. 21. Mr. Gordon indicated his approval of MIPs 0000, 0001, 0002, 0004,

0005, 0006, 0007, and 0008 by voting for them on Snapshot. Phillips Decl., ¶¶35–43; Reed Decl., ¶5. By not voting for MIP-0003, Mr. Gordon showed that he was reviewing the MIPS, and exercising discretion with respect to his voting. When a later proposal, MIP-0011, indicated that Mr. Gordon had approved it, Defendants understood that that approval was based on Mr. Gordon's approval of MIP-0004, which contained consistent provisions regarding the appointment and indemnification of the Service Provider. *Id.*, ¶50.

MIP-0004 authorized MovementDAO to form DAOLabs LLC. *Id.*, Ex. 10. DAOLabs was intended to serve, *inter alia*, MovementDAO's real world needs, including operating bank accounts, credit cards, making payments, and holding assets. Reed Decl., ¶6. The Law Firm helped form DAOLabs LLC, and Mr. Reed is, and has always been, DAOLabs LLC's only member and manager. *Id.* Generally, Mr. Reed helped oversee business functions, including working with the Law Firm, for both MovementDAO and DAOLabs LLC. *Id.* For example, as recently as October 2022, Mr. Reed worked with the Law Firm to review DAOLabs's technology licensing, indemnity, and loan agreements. *Id.*, ¶9. Ex. 30. Reed had further entered into his own retainer agreement with the Law Firm on January 11, 2022. *Id.*, ¶10. Ex. 31.

On August 30, 2022, the first sign of Plaintiffs' intention to "rug" the community emerged. (A "rug" or "rug pull" is a common exit scam in the crypto space where a development team suddenly abandons a project and absconds with investors' funds.) Mr. Breslow, began for the first time, seeking constant updates on the treasury balance in the Gnosis and the development expense budget, indicating that he was more concerned with the present value of the treasury than MovementDAO's long-term success. Phillips Decl., ¶52.

Mr. Phillips prepared a budget for MovementDAO on September 11, 2022, which contains an instructive snapshot of the organization at that time. *Id.*, ¶53, Ex. 22. The budget reflects that

MovementDAO had assets equivalent to $17,189,461.91 in the Gnosis. *Id.* Mr. Gordon (under the alias "Feugo") was identified as being responsible for governance as the community coordinator; Mr. Phillips was identified as the application block/architect ($88,000 per month budgeted); and the Law Firm (dao-lawfirm.eth) had specified responsibilities. *Id.* Recognizing that MovementDAO was spending far too much on non-development functions, Mr. Phillips proposed cutting $57,500 of Movement's $360,500 monthly budget, which included cuts to marketing expenses. *Id.* Nonetheless, as of September 1, 2022, the budget still provided for $12,500 per month to Mr. Gordon (feugo.eth) for "community and marketing." *Id.* Finally, the budget contained a detailed breakdown of the Law Firms services from January 1, 2022, through September 3, 2022. *Id.* Mr. Phillips transmitted this budget and related documents to Messrs. Breslow and Gordon in an email dated September 11, 2021, in which he provided written answers to questions Mr. Breslow had asked him. *Id.*, Ex. 23.

In addition to Mr. Breslow's newfound concern with MovementDAO's expenses, an even larger concern was Mr. Fine's perception of his contribution to MovementDAO as an "investment" that he could yank back from MovementDAO. *Id.*, ¶58. In September 2022, following a decline in the cryptocurrency markets, Mr. Phillips learned from Mr. Breslow that Mr. Fine wanted 20% of Mr. Breslow's contributions and a $1 million redemption. *Id.* On September 15, 2022, Mr. Fine communicated to the parties that he wanted to redeem his entire contribution. *Id.* A redemption by a founding contributor would violate the fundamental terms governing MovementDAO as set forth in the GitBook, as well as assurances Plaintiffs made to Mr. Phillips, as Mr. Phillips advised all parties on multiple occasions. *Id.*, ¶56–57, Ex. 24–25.

Despite Mr. Phillips' memoranda, Mr. Fine and then Mr. Breslow himself continued to press Mr. Phillips regarding a redemption of their contributions to Movement. *Id.* ¶58. The decline

in the cryptocurrency markets, and the value of Bolt in the recent tech selloffs, had caused significant liquidity problems for both Messrs. Fine and Breslow; the latter even had to sell his house in Miami for liquidity. *Id.* Mr. Breslow's liquidity crisis was also induced by a lavish trip to Europe Breslow took with an entourage, in which Mr. Breslow accrued $8 million in expenses, for which Mr. Gordon informed Mr. Phillips that Mr. Breslow was seeking reimbursement from Bolt. *Id.* In conversations between October and December of 2022, Mr. Phillips continued to insist that Messrs. Breslow and Fine could not redeem their contributions to Movement as the GitBook prohibited the same, and others had relied on those representations. *Id.*

On December 27, 2022, Mr. Phillips wrote a memorandum to Mr. Breslow describing their discussions regarding the issue of early redemptions. *Id.* ¶60, Ex. 26.. Mr. Phillips again explained why early redemptions were not allowed. *Id.* at 1–4. Given the pressure Mr. Breslow was placing on him, Mr. Phillips also included a proposed path forward under which all community members would be offered redemption rights; counsel would be retained to amend the terms of service; a schedule of payments would be created for parties, dao-lawfirm.eth, and developers, along with other acts necessary to effect those changes. *Id.* at 4. Mr. Phillips, however, emphasized, "Funds held by the Movement DAO are for its purposed and are no longer the property of the contributors – as stated repeatedly in the disclaimers," along with other challenges that any redemption proposal would pose. *Id.*

On December 28, 2022, Defendants shared their fears with the community in a discussion on the Discord channel. *Id.*, ¶61; Ex. 27. Mr. Breslow, presumably unhappy with Mr. Phillips' unwillingness to allow him to violate MovementDAO's governing documents, wrote the following in an email to Mr. Phillips (with Messrs. Fine and Gordon copied) on December 30, 2023: "Effective immediately, Alex Jon and I vote to stop all spend out of the Move treasury. We are

happy to approve payment of your and Jon Gordon's salaries through January 31st. We will also consider any bare minimum necessary legal spend for the month of January." *Id.*, ¶62; Ex. 28.

When Mr. Yurchak learned of the conflict between the parties, he caused the Law Firm to resign as MovementDAO's Service Provider, and apparently disclaimed fees he was due pursuant to the agreements referenced above when contacted by Plaintiffs about this Action. *Id.*, ¶63. Separately, since Mr. Yurchak's resigning as counsel, Mr. Phillips retired the dao-lawfirm.eth ENS, and modified the dao-lawfirm.xyz website, to no longer associate the domain with Mr. Yurchak. *Id.*, ¶64. However, Mr. Phillips did previously operate the ENS and domain on behalf of the Law Firm. *Id.* Prior to the recent dispute, Plaintiffs have never 1) challenged Mr. Phillips and Mr. Reed's management of MovementDAO's treasury; 2) challenged MovementDAO utilization of the Law Firm; or 3) expressed any sentiment that MovementDAO was not a legal, separately operating entity. *Id.*, ¶ 65.

As Mr. Yurchak resigned, Phillips sought approval from the community to hire new counsel, as well as to transfer 50,000 DAI to Movement's development wallet for the payment of Movement's expenses. *Id.*, ¶66. The community approved this proposal, which was documented in MIP-0010, dated January 3, 2023. Reed Decl., ¶ 12. The community further approved MIP-0011 and MIP-0012, which provided for the transfer of 58,831.02 and 334,487 DAI, which were deferred legal fees Movement owed the Law Firm for drafting governance documents, forming and entities, providing agreement templates, and conducting tax estimations and impact assessments, and for treasury oversight, governance, and expense/payout management, respectively, and that the Law Firm's 2% fee as reflected in the Governing Documents. *Id.*; Exs. 27.2; 8.1, 8.2, 8.3. Following the community's approval, on January 3, 2023, Mr. Breslow wrote to Mr. Phillips: "We've reviewed the recent snapshot proposals and cannot approve any backdated

fees (one being 58k and one 334k). Spending for service providers was done regularly and there was no mention of deferred fees until now. We approve the 50k to the law firm for the upcoming month. But that is all."[2] *Id.*; Ex. 27. In response, Phillips explained: "These are not backdated fees. These are fees which were deferred entirely and are due. The fees are from October through February 2022, additionally the Service Provider fee was stated in the GitBook and in subsequent governance." Phillips Decl., ¶ 62, Ex. 28.

In accordance with his authority under the Gitbook to veto certain decisions made by the MovementDAO community, Mr. Phillips convened an emergency committee regarding MovementDAO's management of the community (the "Committee"). Reed Decl., ¶12. The Committee consisted of Defendants and a representative group of MovementDAO stakeholders, including internal developers, contributors, and independent members of the community. *Id.*

The Committee held meetings on January 9, 13, and 26, 2023, and in each instance, recorded its business with official minutes. *Id.*, ¶¶13; Exs. 32–34. The Committee made recommendations regarding MovementDAO's continued operations, governance and budget, discussing items such as the problems posed by Plaintiffs' attempted rug pull; the importance of maintaining community governance; the appointment of the Committee along with Defendants as MovementDAO's Service Provider; the indemnification of the Authorized Members and Service Provider; continued funding of MovementDAO's operations; and the removal of Plaintiffs as members of MovementDAO due to their violations of the Governing Documents. *See id.*

On January 31, 2023, Mr. Reed proposed, and the community adopted, proposals to carry out the Committee's recommendations, including MIP-0014, MIP-0015, and MIP-0016, which,

---

[2] Mr. Breslow's statement reflects that he understood that MovementDAO governed itself through community voting on Snapshot.

respectively, adjusted the keys associated with MovementDAO's Gnosis to add all Authorized

Members and removed Plaintiffs' voting rights; ratified the termination of Plaintiffs's voting rights

from MovementDAO; and updated MovementDAO's Snapshot to reflect Plaintiffs' termination.

*Id.* ¶14; Exs. 35-37. That same day, Mr. Reed further proposed, and the community adopted, the

following finance-related MIPs (*id.*, ¶15. Exs. 38–42):

- MIP-0017, which authorized itemized payouts for MovementDAO's development expenses in December 2022 and January 2023. These expenses included development-related expenses Reed and Phillips had placed on their credit cards, and the $25,000 retainer Venable required. *Id.*

- MIP-0018, which authorized deferred payouts due to MovementDAO developers for 2022.

- MIP-0019, which authorized the transfer of deferred fees owed to the Law Firm (of which the Law Firm later refused payment) in escrow pending the retention of a new service provider.

- MIP-0020, which authorized the transfer of 2,558,831 to the Movement Developer Gnosis for the dispersal to Authorized Members for payment of legal fees and indemnification expenses (indemnification as originally authorized under MIP-0004 by Mr. Gordon) and $58,831 of deferred legal fees incurred by dao-lawfirm.eth in 2022.

- MIP-0021, which authorized the transfer of 5,354,433 DAI to the Developer Gnosis for Movement's 2023 budget.

Despite Plaintiffs' accusations of wrongdoing associated with payments MovementDAO

made on February 2, 2023, each of transfers were done for a legitimate business purpose and with

proper authority. The transfers at issue include (Reed Decl., ¶¶ 16–17):

- 7,500,000 DAI and 805 ETH from the Movement Gnosis to the Movement Developer Gnosis for the funding of MovementDAO's continued development and operations in accordance with the Authorized Member's authority under MIP-0016. *Id.*

- 20,000 DAI to cookieslayer.eth (Evita Stenqvist, a Senior Developer) as a deferred payout pursuant to MIP-0018. *Id.*; *see also* Declaration of Evita Stenqvist ¶¶ 2–4.

- 100,000 DAI to dsintermedatd.eth (Mikhail Radin, a Senior Developer) as a deferred payout pursuant to MIP-0018. *Id.*

- 15,000 DAI to cookieslayer.eth/Ms. Stenqvist as a deferred payout pursuant to MIP-0018. *Id.*

- 592,000 DAI to Mr. Reed as an advance for indemnification expenses (500,000) along with past due salary from December 2022 and January 2023 and a four-month advance on his salary (92,000) in accordance with MIP-0004, MIP-0017 and MIP-0020. *Id.*

- 250,000 DAI to Mr. Reed for anticipated operational expenses under MIP-0021 (Movement's 2023 Operational Budget). *Id.*

- 500,000 DAI to Mr. Phillips as indemnification for the individuals and entities comprising the Service Provider under MIP-0004 and MIP-0020. *Id.*

- 39.53 ETH for Mr. Gordon's December 2022 salary (13.39 ETH) and reimbursement to Mr. Phillips for expenses (26.14 ETH) under MIP-0017. *Id.*

- 1,058,000 DAI to Mr. Phillips for deferred developer payouts under MIP-0018, reimbursement of outstanding operational expenses under MIP-0017, an indemnification advance under MIP-0017 and a four-month salary advance for Phillips, Ms. Stenqvist/cookieslayer.eth, and Mr. Radin/disintermediated.eth under MIP-0020. *Id.* Phillips converted these funds to fiat money and used $528,000 for developer payroll, i.e., a four-month advance to developers along with payment of December 2022 and January 2023 salaries[3]; $500,000 as an advance for indemnification for himself; and $30,000 toward deferred developer payments. Phillips Decl. ¶67.

- 322,034.67 DAI to Reed so that Reed could make a deferred payout to Mr. Radin/disintermediated.eth under MIP-0018.

- 50,000 DAI as a four-month salary advance for Sameer T, (Sameer Tariq, a Typescript developer) under MIP-0020. *Id.*; *see also* Declaration of Sameer Tariq ¶¶ 2–5.

Every dollar is thus accounted for, and Defendants' transfers were done with proper authority and for the benefit of MovementDAO. This is not just Defendants' opinion, but the opinion of various MovementDAO contributors. *See* Cone Decl. ¶¶ 10–11; Mallory Decl. ¶¶ 7–9; Montero Decl. ¶¶ 8–10; Radin Decl. ¶¶ 10–13; Stenqvist Decl. ¶¶ 7–10; Tariq Decl. ¶¶ 6–8.

---

[3] MovementDAO and DAOLabs LLC's developers were understandably hesitant to continue working for MovementDAO when they hadn't been paid for a couple months, and Mr. Breslow was threating the DAO. A prepayment for services was necessary to keep these developers engaged.

### III.    ARGUMENT

### A.  Plaintiffs Have No Substantial Likelihood of Success on the Merits.

#### 1.   The breach of fiduciary duties claim fails.

Plaintiffs' breach of fiduciary duties claim fails because it is a defective derivative action on behalf of Movement rather than a direct claiming belonging to Plaintiffs. Even if Plaintiffs could establish that Mr. Phillips owed Plaintiffs (rather than Movement itself) fiduciary duties, Plaintiffs have nonetheless failed to establish any breach by Mr. Phillips. The elements for a breach of fiduciary duty claim are (1) the existence of a fiduciary duty; (2) breach of that duty; and (3) damage to the plaintiff caused by the breach. *Gracey v. Eaker,* 837 So.2d 348, 353 (2002).

#### a.  Mr. Phillips does not owe fiduciary duties to Plaintiffs, individually.

In keeping with their efforts to ignore their own (breached) obligations to MovementDAO, Plaintiffs conveniently ignore MovementDAO's existence as a Delaware unincorporated nonprofit association ("DUNA") and pretend that Mr. Phillips acted as their agent, rather than as a member of MovementDAO. MovementDAO's members authorized it to conduct business as a DUNA, and MovementDAO obtained an EIN from the IRS so it could do business as such.

Under both Delaware law and the Federal Rules of Civil Procedure, an unincorporated association has standing to sue and be sued under its own name. *See* Del. Code Ann. tit. 6, § 1906(a) ("A nonprofit association is a legal entity separate from its members for the purposes of determining and enforcing rights, duties and liabilities in contract and tort"); Fed. R.  Civ. P. 17(b)(3)(A) (granting unincorporated associations without the capacity to sue or be sued under state law to bring an action under its own name to enforce substantive rights under federal law). While DAOs are a novel governance structure, courts have treated DAOs as legal persons subject to suit. *See Commodity Futures Trading Comm'n v. Ooki DAO*, No. 3:22-CV-05416-WHO, 2022

WL 17822445, at *4 (N.D. Cal. Dec. 20, 2022) (allowing the CFTC to bring an action against a DAO despite amici's contention that the DAO "is a technology, not an entity or group of persons").

The "breach" at issue is Plaintiffs' allegation that Mr. Phillips "leverage[ed] the access that he was provided to transfer money out of the DAO endowment and into accounts ultimately managed and/or controlled by Defendants." Compl. ¶ 61. To the extent Plaintiffs believe that a single cent in MovementDAO's endowment belongs to them, they are wrong. Plaintiffs, along with other contributors, donated money to MovementDAO in accordance with MovementDAO's charitable purpose. The GitBook makes clear that MovementDAO is "neither designed to be, nor is set up to be an investment vehicle;" instead, MovementDAO "raises funds through the purchase of tokens." Ex. 9 at 59. The GitBook (which Mr. Fine drafted) ensured that the founders' contributions would be locked for six years. *Id.* at 40. MovementDAO's Guiding Principles (enacted through MIP-0000) make clear that MovementDAO is a DUNA. Thus, even taking Plaintiffs' allegation that Mr. Phillips misappropriated funds in MovementDAO's endowment at face value, the proper plaintiff would be MovementDAO, not Plaintiffs, individually.

Plaintiffs' breach of fiduciary duties claim is therefore defective as Plaintiffs brought a direct claim instead of a derivative claim under FRCP 23.1, which expressly covers unincorporated associations. "Rule 23.1 applies 'when one or more shareholders or members of a corporation or an unincorporated association bring a derivative action to enforce a right that the corporation or association may properly assert but has failed to enforce." *Steven Douglas Assocs., Inc. v. Sadovnick*, No. 07-60817-CIV, 2008 WL 11399693, at *2 (S.D. Fla. Oct. 21, 2008) (quoting Fed. R. Civ. P. 23.1).

Under Delaware law (the law under which MovementDAO is organized), the question of whether a claim is derivative or direct "must turn *solely* on the following questions: (1) who

suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?" *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.3d 1031, 1033 (Del. 2004). Plaintiffs' allegation is that Mr. Phillips misappropriated funds in MovementDAO's endowment. If true, the primary victim would be MovementDAO, and Plaintiffs would have suffered no unique harm relative to MovementDAO's member-donors as a whole. If Mr. Phillips were forced to unwind any transfer, the funds would revert to MovementDAO—not to Plaintiffs, individually. Thus, even accepting Plaintiffs' allegations as true, the action is derivative because MovementDAO would have suffered the harm, and MovementDAO would receive the benefit of any recovery. *See Feldman v. Cutaia*, 951 A.2d 727, 733 (Del. 2008) ("Where all of a corporation's stockholders are harmed and would recover *pro rata* in accordance with their ownership of the corporation's stock solely because they are stockholders, then the claim is derivative in nature." (footnote omitted)).

Under Florida law, the failure to name the corporation (and by extension, an unincorporated association) as a party is a jurisdictional defect. *See Nat'l Credit Union Admin. Bd. v. HSBC Bank USA, Nat. Ass'n*, 117 F. Supp. 3d 392, 400 (S.D.N.Y. 2015) (holding that a derivative action on behalf of trusts that are legally unincorporated associations must include the associations as nominal parties). Plaintiffs' failure to join MovementDAO as a party prevents the Court from having jurisdiction over the fiduciary duties claim.

No pre-existing agreements between the parties serve as a basis for a breach of fiduciary duties claim. Until MovementDAO's launch on February 2, 2022, Mr. Phillips acted pursuant to the IC Agreement between Breslow and Phillips. Neither Mr. Fine nor Mr. Gordon were a party to the IC Agreement. *Id.* Section 5 of the IC Agreement made clear that the only relationship

between Mr. Phillips' only relationship to Mr. Breslow was that of an independent contractor. *Id.* at 2. Further, Exhibit A to the IC Agreement, which set forth Mr. Phillips' scope of work made clear Mr. Phillips' obligations consisted of computer programming, and not the stewardship of Mr. Breslow's money or any other function indicative of a fiduciary relationship. *Id.* at 5–6. Mr. Breslow already utilized Mr. Gordon as a fiduciary for Mr. Breslow's family office investments. *Id.*

Nor are Plaintiffs' subjective beliefs that Mr. Phillips was their fiduciary sufficient to create a fiduciary relationship. *Contra* Mot. at 23. Outside of relationships that are by their nature fiduciary, "a duty must be based on either an express arrangement or an implication provided by the relationship between the parties." *Scolieri v. John Hancock Life Ins. Co. (U.S.A.)*, No. 2:16-CV-690-FTM-38CM, 2017 WL 700215, at *4 (M.D. Fla. Feb. 22, 2017) (citation omitted). Plaintiffs do not and cannot point to an agreement in which Mr. Phillips assumed the role of a fiduciary in relation to Plaintiffs. "Where there is no express arrangement, it may be established by implication where there is both an allegation of dependency by one party and a voluntary assumption of a duty by the other party to 'advise, counsel and protect the weaker party.' The analogue to this rule, is that the mere fact that one party places its trust in the other does not create a fiduciary relationship absent some manifestation of recognition, acceptance, or undertaking of fiduciary duties by of the other party." *Id.* (quoting *Watkins v. NCNB Nat. Bank of Florida, N.A.*, 622 So. 2d 1063, 1065 (Fla. 3d DCA 1993)). Mr. Breslow is a sophisticated businessman who engaged Mr. Phillips through an independent contractor agreement, and there is no evidence in the record that Mr. Phillips committed to perform a role *for Plaintiffs* (as opposed to MovementDAO) beyond that of a computer programmer, let alone a relationship where Mr. Phillips would be counseling, advising, or protecting Plaintiffs as the "weaker party."

**b.   Mr. Phillips did not breach any fiduciary duty.**

Even if Plaintiffs had standing to assert a breach of fiduciary duties claim against Mr. Phillips, there was no breach. Plaintiffs argue that Mr. Phillips breached his fiduciary duties by transferring assets from MovementDAO's endowment to personal accounts for his own benefit. This is false. First, Plaintiffs are simply wrong that the endowment funds were not to be used. The GitBook provides that (1) members decide "[h]ow the endowment, long term, and short term funds are allocated; and (2) all actions would be authorized by the community through Snapshot voting. Ex. 9 at 6, 13–14. This is exactly what happened.

After Mr. Breslow attempted to "rug" the community by freezing Movement's funds, Defendants convened the Committee and then exercised business judgment to keep MovementDAO alive and honor its commitments to its developers, vendors, and contributors. As explained above, every transfer at issue was made for MovementDAO's benefit and in accordance with approval from MovementDAO's members following MIPs. These transfers included the following: (1) funds for the retention of new counsel following the Law Firm's resignation (MIP-0010); (2) deferred fees MovementDAO owed the Law Firm for drafting, advice, and counsel (MIP-0011); (3) deferred fees MovementDAO owed the Law Firm for creating and administering various custodial accounts (MIP-0012); (4) payouts for MovementDAO's development-related expenses from December 2022 and January 2023, including expenses Defendants advanced on their credit cards, and a $25,000 retainer for Venable LLP (MIP-0017); (5) deferred payments owed to MovementDAO's developers for 2022 (MIP-0018); (6) deferred fees MovementDAO owed the Law Firm that were placed in escrow pending the retention of a new service provider following the Law Firm's resignation (MIP-0019); (7) a transfer to the developer Gnosis for the payment of Authorized Members' legal fees and indemnification expenses (MIP-0020); (8) a

transfer to the Developer Gnosis for MovementDAO's 2023 budget (MIP-0021); (9) a transfer to the developer Gnosis for MovementDAO's continued development and operations pursuant to the Authorized Member's authority (MIP-0016); and (11) past due salary and salary advances for Messrs. Reed and Gordon (MIP-0017).

Every transfer Defendants initiated was therefore done with proper authority and for a proper business purpose. Even if the Court were to construe MovementDAO's money as Plaintiffs' money (contrary to Delaware law and Movement's governing documents), Plaintiffs have failed to show any transfer by or to Mr. Phillips (or Mr. Reed) that was unauthorized or inconsistent with their obligations to MovementDAO.

### 2. The fraud claim fails.

Plaintiffs' fraud claim fails because Plaintiffs have failed to identify a single intentional misrepresentation on Mr. Phillips' part on which Plaintiffs relied to their detriment. At most, Plaintiffs' fraud claim is a disguised breach of contract claim as almost every "representation" at issue is promissory in nature. But Plaintiffs did not bring a breach of contract claim, aside from Mr. Breslow, because they did not have any contractual relationship with Mr. Phillips, and Plaintiffs agreed that Mr. Phillips fully performed and was paid under the IC Agreement. The elements of fraud are: "(1) a false statement concerning a material fact; (2) knowledge by the person making the statement that the representation is false; (3) the intent by the person making the statement that the representation will induce another to act on it; and (4) reliance on the representation to the injury of the other party." *Nyesa Costa Rica v. Wilson Capital Grp. Holdings, LLC*, No. 11-22036, 2012 WL 1492344, at *3 (S.D. Fla. Apr. 27, 2012) (citation omitted). Plaintiffs cannot meet these elements with respect to a single representation.

First, Plaintiffs claim Mr. Phillips "represented that he would perform his job functions, and create the necessary system architecture for the DAO, consistent with the principles and policies described in the Gitbook, which included a strict ban on withdrawing or transferring DAO endowment funds." Mot. at 25. The GitBook contradicts this argument as it gives MovementDAO's members the authority to determine how the endowment funds are used. Ex. 9 at 6. "[T]his District has clearly held that reliance on fraudulent representations is unreasonable as a matter of law where the alleged misrepresentations contradict the express terms of the ensuing written agreement," which is the case here. *Eclipse Med., Inc. v. Am. Hydro-Surgical Instruments, Inc.*, 262 F. Supp. 2d 1334, 1342 (S.D. Fla. 1999), *aff'd sub nom. Eclipse Med., Inc. v. Am. Hydro-Surgical*, 235 F.3d 1344 (11th Cir. 2000) (citations omitted). Moreover, a promise can only serve as the basis for a fraud claim "if the plaintiff can demonstrate that the person promising future action does so with no intention of performing or with a positive intention not to perform." *Nodus Int'l Bank, Inc. v. Arocha Hernandez*, 511 F. Supp. 3d 1316, 1324 (S.D. Fla. 2021). Plaintiffs have adduced no proof that Mr. Phillips made these promises without a present intent to honor them. Finally, Mr. Phillips *did* honor these promises: he built MovementDAO's architecture and only acted pursuant to authority vested in him by MovementDAO's members through MIPs.

Second, Plaintiffs maintain Mr. Phillips promised "he would hold Plaintiffs' voting tokens in trust and vote them however they directed." Mot. at 25. Once again, this is promissory language, and Plaintiffs have furnished no evidence that Mr. Phillips made this promise without a present intent to honor it. *See Nodus Int'l Bank*, 511 F. Supp. 3d at 1324. In any event, Plaintiffs' presentation of the facts is inaccurate as (1) Plaintiffs maintained copies of their keys and thus could have voted their own tokens; and (2) there is no written agreement or promise in which Mr. Phillips agreed to hold Plaintiffs' voting keys in trust for them.

Third, Plaintiffs state, "Phillips also represented that he would hold Plaintiffs' authorization tokens to the DAO endowment Gnosis account in trust." Mot. at 25. This is again promissory language without evidence of a present intent to breach the contract. *See Nodus Int'l Bank*, 511 F. Supp. 3d at 1324. This purported promise also cannot be the basis for a fraud claim because MovementDAO terminated Plaintiffs' voting rights (but not redemption rights) in MovementDAO and revoked their authorization tokens pursuant to MIP-0014 and MIP-0015 because of Plaintiffs' breach of MovementDAO's governing documents.

Fourth, Plaintiffs state, "Defendants wrote Proposal MIP-0011 that the proposal had been approved by Plaintiff Gordon [sic]." Mot. at 25. Mr. Gordon had in fact voted for MIP-0004, which provided for payment to and indemnification of the Service Provider (i.e., the Law Firm), and the language in MIP-0011 regarding Mr. Gordon's approval referred to this prior approval. Even if the Court disagrees, this statement cannot possibly undergird a fraud claim because Plaintiffs have not alleged (let alone established) that *Plaintiffs* relied on this statement to their detriment.

Fifth, Plaintiffs claim that "[e]very proposal that Defendants authored and presented in January and February 2023 was a false statement, because Defendants knew that the Snapshot.org voting platform did not have any force or effect because the DAO had not launched." Mot. at 25. The MIPS are not factual representations (or misrepresentations)—they are proposals for MovementDAO to take action, which were duly approved by MovementDAO's members. Moreover, Plaintiffs have not shown that they—Plaintiffs—relied on any misstatement of fact in the January and February MIPs to their detriment. And as explained above, MovementDAO *had* launched on February 2, 2022, and MovementDAO's members *had* approved the use of the Snapshot voting system as its governance mechanism in MIP-0001.

Further, the Verified Complaint contains two other purported representations Plaintiffs do

not address in the Motion. First, Plaintiffs allege they relied on Mr. Phillips' statement that he worked for the SEC. Compl. ¶ 74. This representation is not fraudulent as Mr. Phillips did indeed work for the SEC and has proven as much. Second, Plaintiffs allege that Mr. Phillips said that Snapshot voting has no force and effect. This cannot serve as the basis for a fraud claim because it contradicts written assurances in the GitBook, Guiding Principles, and MIP-0001, all of which very much make clear that Snapshot voting is Movement's governance mechanism. *See Eclipse Med., Inc.*, 262 F. Supp. 2d at 1342.

### 3. The civil conspiracy claim fails.

Plaintiffs' civil conspiracy claim fails as a matter of law because Plaintiffs have not established any underlying tort claim and because the intracorporate conspiracy doctrine bars the claim. "A claim for civil conspiracy must consist of the following allegations: 1) a conspiracy between two or more parties; 2) the doing of an unlawful act or a lawful act by unlawful means; 3) the doing of some overt act in pursuance of the conspiracy; and 4) damage to the plaintiff as a result of the acts done under the conspiracy." *Sonnenreich v. Philip Morris Inc.*, 929 F. Supp. 416, 419 (S.D. Fla. 1996) (citation omitted). Civil conspiracy is not an "independent cause of action;" rather, there must be an underlying "illegal act or tort on which conspiracy is based." *Alhassid v. Bank of Am., N.A.*, 60 F. Supp. 3d 1302, 1316 (S.D. Fla. 2014) (citations omitted). As Plaintiffs' breach of fiduciary duties and fraud claims fail, there is no illegal act or tort.

Even if Plaintiffs could establish an underlying illegal act or tort, Defendants cannot, as a matter of law, have conspired with one another. "According to the intracorporate conspiracy doctrine, however, a civil conspiracy claim will not succeed where the only members of the alleged conspiracy are a corporation and/or its officers. . . .  This is because the actions of corporate agents, acting within the scope of their employment, are attributed to the corporation itself, thereby

negating the multiplicity of actors needed for a conspiracy." *HRCC, Ltd. v. Hard Rock Cafe Int'l (USA), Inc.*, 302 F. Supp. 3d 1319, 1325 (M.D. Fla. 2016), *aff'd*, 703 F. App'x 814 (11th Cir. 2017) (citations omitted). Here, Defendants are both members and Authorized Members of MovementDAO, and they took all actions at issue in that capacity. The intracorporate conspiracy doctrine therefore bars the civil conspiracy claim.

### B.  Plaintiffs Cannot Show a Risk of Irreparable Harm.

Plaintiffs cannot satisfy the standard for a preliminary injunction because their prospective harm is monetary in nature. "An injury is 'irreparable' only if it cannot be undone through monetary remedies. . . . Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1285 (11th Cir. 1990) (internal markup omitted). The "core purpose of injunctive relief" is not satisfied where the movant "essentially ask[s] [the] Court to either render the funds idle . . . or to preserve funds which can be traced to calculate damages[.]" *Helix Inv. Mgmt., LP v. Privilege Direct Corp.*, No. 8:18-CV-206-VMC-AEP, 2019 WL 1006099, at *3 (M.D. Fla. Jan. 7, 2019), *report and recommendation adopted*, No. 8:18-CV-206-T-33AEP, 2019 WL 460028 (M.D. Fla. Feb. 6, 2019).

Plaintiffs' theory of the case is that MovementDAO's money is in fact their money, and that Defendants have no right to spend that money in connection with their management of MovementDAO. Even if this were true, the sole harm to Plaintiffs would be the misappropriated funds, which could be remedied in full by an award of damages. The Verified Complaint's prayer for relief confirms as much, as the only purported equitable remedies sought involve injunctions

regarding the transfer of funds. ECF No. 1 at 20–21. In the absence of such relief, any wrongful transfers could be remedied by the payment of money damages.

### C. The Threatened Injury to MovementDAO Outweighs the Threatened Injury to Plaintiffs and the Public Interest Favors Defendants.

The requested injunction would kill Movement as it would prevent Movement from paying its developers and vendors. "[W]here a party produces evidence that it will be put out of business if a preliminary injunction is granted or denied, the balance of harms should weigh in favor of that party[.]" *Unisource Worldwide, Inc. v. S. Cent. Alabama Supply, LLC*, 199 F. Supp. 2d 1194, 1214 (M.D. Ala. 2001). If the Court enjoins Defendants—Movement's Authorized Members— from carrying on Movement's business, Movement will essentially be defunct. Its developers and vendors will not be paid; its contributors' donations will be frozen; its work will cease. Movement is no ordinary business; it is designed to serve the public interest by facilitating the funding and operation of initiatives such as social justice, public arts, prison reform, controversial research, union movement, and environmental cleanup. Ex. 9 at 23–24. Shutting down Movement would thus be inimical to the public interest.

### IV.   THE LAW FIRM AND ATTORNEY CLIENT PRIVILEGE

Under Washington law, an attorney-client relationship is formed when an attorney's advice or assistance is sought and received on legal matters. *In re Disciplinary Proceeding Against Holcomb*, 173 P.3d 898, 906 (Wash. 2007). MovementDAO, and DAOLabs, sought and received counsel from the Law Firm, and formed an attorney-client relationship with the firm. To rebut Plaintiffs' allegations that the Law Firm is a "sham firm" that lacks cryptocurrency experience and did not provide services after March 2022, MovementDAO and DAOLabs were prepared to waive privilege on a limited basis and supply supporting evidence to the Court.

Plaintiffs, after relying heavily on the allegations that they were largely kept in the dark

regarding the "sham" Law Firm, now contend, *inter alia*, that they and Merkaba, Inc. actually retained the Law Firm all along, and that Merkaba operated and managed MovementDAO. Declaration of Nitoj P. Singh, Ex. 1. They further argue that they and Merkaba hold the privilege as to any and all communications between Defendants and the Law Firm, and have threatened Defendants against the release of any allegedly privileged communications. *Id.* This includes DAOLabs LLC, even though Mr. Reed was the sole member and manager of DAOLabs. If this sounds new it is because it is—Merkaba was never mentioned in Plaintiffs' moving papers, and it appears that Plaintiffs now contend Merkaba has standing to bring a suit against Defendants, not Plaintiffs individually. Plaintiffs also conveniently omitted that they had retained the Law Firm in their moving papers, and the Law Firm apparently provided them with the very cryptocurrency services they argued to the Court it could not provide.

While Defendants strongly dispute Plaintiffs' contention, and are prepared to submit further briefing on the issue, this issue raises concerns regarding Plaintiffs' counsels' duty of candor to the Court. All attorneys, as officers of the court, owe duties of complete candor and primary loyalty to the court before which they practice; an attorney's duty to a client can never outweigh his or her responsibility to see that the system of justice functions smoothly. *Bautista v. Star Cruises*, 696 F. Supp. 2d 1274 (S.D. Fla. 2010). Until these issues can be decided the Court, Defendants have voluntarily agreed to limit their use of MovementDAO and DAOLab's privileged communications with the Law Firm in relation to this Opposition.

## V.   CONCLUSION

Defendants respectfully request that Plaintiffs' Motion for a Preliminary Injunction be denied in full and that the temporary restraining order be terminated.

Respectfully submitted,

 /s/ Nitoj P. Singh

DHILLON LAW GROUP INC.
Matthew S. Sarelson (Florida Bar 888281)
MSarelson@dhillonlaw.com
1601 Forum Place, Suite 403
West Palm Beach, FL 33401
305.773.1952

DHILLON LAW GROUP INC.
Nitoj P. Singh (Admitted *pro hac vice*)
NSingh@dhillonlaw.com
Jesse Franklin-Murdock (Admitted *pro hac vice*)
JFranklin-Murdock@dhillonlaw.com
177 Post Street, Suite 700
San Francisco, CA 94108
415.433.1700

Attorneys for Defendants Mark Phillips and Benjamin Reed