UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-cv-20727-ALTMAN

RYAN BRESLOW, *et al.*,

    *Plaintiffs*,

v.

MARK PHILLIPS, *et al.*,

    *Defendants*.

_____/

**REPLY IN SUPPORT OF EMERGENCY MOTION TO AMEND TEMPORARY RESTRAINING ORDER AND FOR ORDER TO SHOW CAUSE WHY DEFENDANTS SHOULD NOT BE HELD IN CONTEMPT**

# TABLE OF CONTENTS

**Page**

I.   Defendants Offer No Justification For Failure To Comply With The TRO ......................... 2

    A.   Defendants Control the Majority of Unreturned Assets ........................................... 2

    B.   Defendants' Transfers to Developers Are Fraudulent ............................................. 2

II.  The TRO Should Be Amended To Safeguard DAO Endowment Assets ........................... 4

    A.   High-Risk Market Conditions for Cryptocurrency Have Not Abated ..................... 4

    B.   Sham Entity MovementDAO Is Subject to the TRO ............................................... 6

    C.   Sham Entity MovementDAO Does Not Own the DAO Endowment Account ........................................................................................................... 7

III. Defendants' Contempt Is An Independent Ground To Amend The TRO .......................... 9

IV.  Conclusion .......................................................................................................................... 10

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ADT LLC v. NorthStar Alarm Servs., LLC*,
    853 F.3d 1348 (11th Cir. 2017) ....................................................................................... 7

*F.T.C. v. Leshin*,
    618 F.3d 1221 (11th Cir. 2010) ....................................................................................... 7

*Phan v. Deutsche Bank Nat. Tr. Co., ex rel. First Franklin Mortg. Loan Tr. 2006-FF11*,
    198 So. 3d 744 (Fla. Dist. Ct. App. 2016) ...................................................................... 8

*State ex rel. Cont'l Distilling Sales Co. v. Vocelle*,
    27 So. 2d 728 (Fla. 1946) ................................................................................................ 6

*Wachovia Bank, N.A. v. Tien*,
    534 F. Supp. 2d 1267 (S.D. Fla. 2007) ........................................................................... 8

**Other Authorities**

Restatement (Second) of Agency § 423 (1958) ..................................................................... 8

Defendants' opposition is a stunning admission of contempt for this Court and the temporary restraining order ("TRO") issued on February 28, 2023. In its emergency motion, Plaintiffs systematically demonstrated how the vast majority of assets transferred from the DAO endowment account were in the control of Defendants. Defendants do not dispute that analysis. The TRO commands Defendants to unwind all transfers made from the DAO endowment account in February 2023. Defendants understand that, as they returned over $5 million in assets on March 6, 2023. Nevertheless, they refuse to return the rest of the assets within their control. They do not claim the TRO is invalid, ambiguous, or that they are unable to comply. And they concede that they have not returned assets that are within their control—offering only that "the assets are safely stored in DAI and Ethereum," Opp. at 19. That is contempt. Defendants should be sanctioned accordingly.

Defendants' argument not to amend the TRO completely misses the mark. Their claim is that markets have normalized and therefore DAI and Ethereum cryptocurrencies are safe and stable. That is wrong. Over the last two weeks three banks that are major players in cryptocurrency have failed. As a result of those failures, the federal government has instituted measures under the FDIC's "systemic risk exception," extraordinary powers that the federal government can deploy when it believes the entire U.S. banking system is at risk. If that does not constitute a change of circumstances that warrants further safeguarding Plaintiffs' assets, it is unclear what qualifies.

Finally, Defendants' arguments about the Court's jurisdiction over MovementDAO are wrong. Defendants' sham entity, the MovementDAO, is clearly subject to the TRO.[1]

---

[1] Defendants' opposition is replete with purported facts that are demonstrably false. Plaintiffs will address those at the appropriate time.

2194315.4

I.      **Defendants Offer No Justification For Failure To Comply With The TRO**

      A.      **Defendants Control the Majority of Unreturned Assets**

Defendants do not contest that the accounts identified in the Motion, Dkt. No. 35 at 10–12, are within Defendants' control. *See* Opp. at 18–20. The TRO required Defendants to return assets transferred into those accounts immediately. Defendants did not obey.

In their opposition papers to Plaintiffs' motion for preliminary injunction, Defendants expressly admit they control the majority of the remaining assets transferred out of the DAO endowment account: Defendant Ben Reed controls $842,000 DAI. Dkt. No. 43-8 ¶ 17(e) & (f) (indemnification expenses, four-month salary advance, and anticipated operational expenses); Defendant Mark Phillips controls $1,000,000 DAI, 26.14 ETH, and $528,000 USD that he converted from DAI he received from the DAO endowment.[2] Dkt. No. 43-8 ¶ 17(h) & (g) (indemnification expenses for sham law firm dao-lawfirm.eth and payment of Defendant Phillips's "expenses"); Dkt. No. 43-9 ¶ 67 (four-month salary advance; "developer payroll"; operational expenses). Thus, Defendants admit they control at least $2,370,000 in funds transferred out of the DAO endowment account. The TRO required Defendants to return those assets immediately. Defendants did not obey.

      B.      **Defendants' Transfers to Developers Are Fraudulent**

Defendants claim that a portion of the assets moved from the DAO endowment account were transferred to developers for "deferred payments" and to provide several developers with a

---

[2] Defendants represent that "cryptocurrency transfers are completely transparent" and "immediately searchable and accessible." Opp. at 18. That is not true, and especially so when Defendants convert $528,000 DAI into cash. *See* Dkt. No. 43-9 ¶ 67. To the extent DAO endowment assets have been converted to cash, Defendants should be ordered to deposit those proceeds with the clerk to be held in escrow.

four-month salary advance.  These are sham payments.  Plaintiffs flagged in their opening brief that if these payments were legitimate, then Defendants should produce invoices to corroborate their legitimacy.  Unsurprisingly, Defendants produced nothing to demonstrate the legitimacy of the transfers to these developers.  In contrast, when Plaintiff Jon Gordon was in charge of developer payments prior to being ousted from the Movement DAO project, he would receive invoices for work done by the developers.  *See* Declaration of Jon Gordon (March 20, 2023) ("Gordon Decl.") ¶ 4, Exhibits A & B.  The amounts that the developers received are plainly fraudulent because they far exceed past invoices they submitted.  For example, Defendants purported to pay developer disintermediated.eth (Mikhail Radin) $100,000 DAI and $322.034.67 DAI in "deferred developer payouts" without producing any contract or invoice to justify that payment.  Dkt. No. 43-8 ¶¶ 16, 17(c).  Those payments are fraudulent because Mr. Radin has submitted invoices before, and those amounts were only for $23,000 (April 2022) and $23,000 (May 2022).  Gordon Decl. ¶ 4, Exhibits A & B (invoices for "Mike Radin" and "MR").

Defendants also claim that they made additional transfers to developers as advances for four months of work.  Dkt. Nos. 43-9 ¶ 67; 43-8(e).  Prior to the February transfers, advance payments were never authorized to developers.  Gordon Decl. ¶ 5.  Again, Defendants presented no invoices or contracts to corroborate the legitimacy of these transfers, as Plaintiffs predicted in their opening motion.  Dkt. No. 35 at 13.

The February transfers to developers constitute fraudulent book entries meant to dissipate and conceal DAO endowment assets to Defendants' allies and co-conspirators.[3]  They are

---

[3] Unsurprisingly, the developers that received these payoffs are declarants in support of Defendants' opposition to the preliminary injunction, several of whom live abroad, outside the subpoena power.  *See* Dkt. Nos. 43-5 (cookieslayer.eth—Sweden); 43-6 (Sameer T—Pakistan); 43-7 (disintermediated.eth—Brooklyn).

intended to conceal DAO endowment assets so that Defendants can claim they no longer have control over them.

Defendants are able to comply with the TRO. To the extent assets are now out of their control, it is because Defendants have purposefully disabled themselves from having that control. This shell game should be intolerable to the Court, which is why the Court should order Defendants to post a cash bond in the amount of the unreturned assets.

## II. The TRO Should Be Amended To Safeguard DAO Endowment Assets

### A. High-Risk Market Conditions for Cryptocurrency Have Not Abated

Defendants contend that the TRO should not be amended because dramatic drops in DAI and Ethereum were a result of a short-lived market fluctuation. Opp. at 12–15. That position ignores the current state of the banking sector and the severe risks that poses to cryptocurrency— i.e., the ability to convert cryptocurrency to dollars. Defendants' actions have divested Plaintiffs of autonomy over their assets and that is why the external market risks should be a significant factor in the Court's decision. Defendants choices should not dictate the fate of Plaintiffs' assets in this high-risk environment.

First, the market that Defendants claim is so placid has experienced three bank failures over the last two weeks. On March 8, 2023, Silvergate Capital announced that it would wind down operations and liquidate. Berg Decl. ¶ 4, Exhibit A. Silvergate was a critical player in cryptocurrency liquidity in part because of its Silvergate Exchange Network (SEN), which provided a widely-used platform for users to convert cryptocurrency into dollars. *Id.* On March 10, 2023, Silicon Valley Bank collapsed. Berg Decl. ¶ 5, Exhibit B. Two days later, Signature Bank collapsed—a legacy institutional player that had over $8 billion in cryptocurrency deposits

and also ran the payment system Signet, which allowed crypto companies to transfer money in and out of cryptocurrency at all times.  Berg Decl. ¶ 6, Exhibit C.

These events set off such a dramatic chain reaction that the FDIC invoked its systemic risk exception to stabilize the banking sector and cover deposits in excess of its typical $250,000 limit.  Berg Decl. ¶ 7, Exhibit D.  The systemic risk exception is designed to enable the FDIC to react to a bank crisis that it determines places the entire U.S. banking system at risk.  *Id.*  That exception has only been used in 2008 after the collapse of Lehman Brothers and in 2009 in connection with Citigroup.  *Id.*  The extraordinary and rarely used powers exercised by the federal government last week were what buoyed cryptocurrency markets, not the restoration of confidence and calm in the marketplace.

The three recently-failed banks played an outsized role as on-off ramps between crypto and traditional currencies.  Berg Decl. ¶ 8, Exhibit E.  It is their demise, not the current price of Ethereum and DAI, that presents an intolerable risk to keeping DAO endowment assets in cryptocurrency.  The departure of these banks increases liquidity risks to unacceptable levels principally because there are unlikely to be new players to enter the cryptocurrency space to replace them.  In January 2023, the federal government issued guidance warning financial institutions of the high risk levels associated with crypto assets.  Berg Decl. ¶ 9, Exhibit F.  The ripple effects from the recent bank collapses continues to imperil the banking sector—UBS just agreed to purchase Credit Suisse, Berg Decl. ¶ 10, Exhibit G. , and First Republic Bank is experiencing a bank run, Berg Decl. ¶ 11, Exhibit H—which will dissuade new players from stepping into the shoes of Silvergate, Silicon Valley Bank, and Signature.

These elements—the demise of key players, federal government pressure on banks not to enter the crypto space, and bank contagion that will limit banks' tolerance for riskier ventures—

means that the outlook for future cryptocurrency liquidity is diminishing, and cryptocurrency markets will therefore be even less likely to absorb another market shock.

There should not be a higher threshold required than to show three major cryptocurrency players collapsing within a week. They are the canaries in the coal mine. Plaintiffs are asking the Court to derisk the DAO endowment while its ownership is being litigated before the full scope of the crisis in the banking sector plays out or another major shock occurs. In the normal case, Plaintiffs would assume the risk of holding assets in cryptocurrency. But bearing that risk assumes Plaintiffs have the autonomy over their funds to react quickly to market conditions as they arise. They are incapable of doing so in this litigation. That lack of control over the DAO endowment dramatically shifts the risk calculus against holding assets in cryptocurrency.

Converting the DAO endowment's assets to dollars would impose a tolerable cost. Plaintiffs have investigated and learned that the cost to make the conversion would be less than $35,000. Gordon Decl. ¶ 6. Given the fluctuations witnessed over the last two weeks, this is an appropriate and reasonable cost to ensure the value of the assets remains stable during the course of the litigation.

The Court should not heed Defendants' implicit position that conversion is only appropriate when the market is spiraling and the value of the DAO endowment has already suffered substantial injury. The Court should amend the TRO at this time because the market is currently in a condition where the Court can still provide meaningful relief.

### B. Sham Entity MovementDAO Is Subject to the TRO

Defendants claim that the Court does not have the power to order the DAO endowment account to be converted into dollars and placed in escrow because the Court does not have jurisdiction over MovementDAO. That is wrong. First, MovementDAO is a sham entity created

by Defendants to wrest control of the DAO endowment account from Plaintiffs.  It is a mere pass-through for Defendants' own actions and therefore is not cognizable as a distinct entity under the law.  *See State ex rel. Cont'l Distilling Sales Co. v. Vocelle*, 27 So. 2d 728, 729 (Fla. 1946) (the corporate form will be disregarded "where the corporation is created for some illegal purpose or to commit an illegal act").

Second, MovementDAO already is subject to the TRO.  A Court's power to issue an injunction extends to non-parties; it is not limited to Defendants.  An injunction "binds those who receive actual notice of it, including the parties, . . . as well as other persons who are in active concert or participation with them.  The injunction not only binds the parties but also those . . . subject to their control."  *F.T.C. v. Leshin*, 618 F.3d 1221, 1235 (11th Cir. 2010) (internal quotation marks and citations omitted); *ADT LLC v. NorthStar Alarm Servs., LLC*, 853 F.3d 1348, 1352 (11th Cir. 2017).  Defendant Ben Reed is an "Authorized Member" of MovementDAO, Dkt No. 24-1, Exhibit 5 (internal Exhibit A), and Defendants Reed and Phillips exercise control over it.  Their receipt of the TRO constituted the MovementDAO receiving actual notice of the TRO, which brings MovementDAO under the TRO's authority.  Moreover, as the purported "owner" of the DAO endowment account, MovementDAO is therefore "in active concert" and "participation with" Defendants.  *Leshin*, 618 F.3d at 1235; *see also* Dkt. No. 18 (extending scope of TRO to anyone "in active concert" and "participation with" Defendants).

### C.     Sham Entity MovementDAO Does Not Own the DAO Endowment Account

Defendants claim that the assets in the DAO endowment account are the property of MovementDAO.  Defendants offer no proof of MovementDAO's ownership.[4]  Defendant

---

[4] The DAO endowment account has the address: 0x143cC0A996De329C1C5723Ee4F15D2a40c1203c6. Dkt. No. 24-1 ¶ 25.

Phillips created the DAO endowment account on January 15, 2022 at the direction of Plaintiff Ryan Breslow, at a time when Defendant Phillips was acting as Mr. Breslow's agent. Dkt. Nos. 43-9 ¶ 24; Dkt. No. 24-1 ¶¶ 9, 19, Exhibit 4 (independent contractor agreement between Plaintiff Breslow and Defendant Phillips formalizing Phillips's agent relationship). Defendant Phillips continued to act and hold himself out to Plaintiffs Breslow and Gordon as Mr. Breslow's agent at least through August 2022. Gordon Decl. ¶ 7, Exhibit C (Defendant Phillips: "I just like executing on your and Ryan's behalf"); *id.* ¶ 8, Exhibit D (Defendant Phillips seeking to "honor Ryan's wishes"). When an agent performs an act pursuant to the direction of a principal, such as creating a bank account, that account is the property of the principal, not the agent. *See* Restatement (Second) of Agency § 423 (1958) ("[A]n agent who holds the title to something for the principal is subject to a duty to . . . act in accordance with the directions of the principal [and] to use it only for the principal's benefit."); *Phan v. Deutsche Bank Nat. Tr. Co., ex rel. First Franklin Mortg. Loan Tr. 2006-FF11*, 198 So. 3d 744, 748 (Fla. Dist. Ct. App. 2016) ("An agent may, in the scope of its agency, hold property on its principal's behalf. In such instances, it is said that the principal [] both owns the property held by the agent and bears authority to direct the agent's actions concerning that property."); *see also Wachovia Bank, N.A. v. Tien*, 534 F. Supp. 2d 1267 (S.D. Fla. 2007) (finding bank accounts to which principals granted agents signing authority were owned by each respective principal, and not by individual agents who were authorized to sign on the accounts). When Defendant Phillips created the DAO endowment account, it was the property of Mr. Breslow; and the assets in that account belonged to individual depositors, including the biggest depositor, Mr. Breslow.

During the period of Defendant Phillips's acknowledged agency, in February 2022, Plaintiffs transferred over $16 million of their money into the DAO endowment account. Dkt.

No. 24-1 ¶ 6, Exhibits 50–52, 54–56. Eight months later, on August 31, 2022, Defendants purported to form their unincorporated nonprofit association MovementDAO via a proposal posted on Snapshot.org. Dkt. No. 24-1, Exhibit 5 (internal Exhibit A). Mr. Breslow did not vote on that proposal. Dkt. No. 24-1 ¶ 48. And he never transferred ownership of his assets in the DAO endowment account or the account itself to the MovementDAO entity. Although Mr. Breslow intended to eventually commit the DAO endowment account to the Movement DAO project, he never did so before Defendants wrested control of the project away from Plaintiffs.

At bottom, Defendants' contention that MovementDAO owns the assets in the DAO endowment account is premised solely on Defendants' say-so. Neither the Defendants nor the voters on Snapshot.org can create ownership rights over property that they do not already own— no matter how many ratified proposals claim they do. The reason Defendant Phillips is able to control the DAO endowment account is because he stole access from Plaintiffs, not because MovementDAO authorized him. Defendants are the proper litigants here; not a sham entity that cannot articulate a colorable claim of title to the DAO endowment account or its assets.

### III.  Defendants' Contempt Is An Independent Ground To Amend The TRO

Defendants' contempt for the TRO raises serious concerns about the security of the assets in the DAO endowment, which is an independent reason to amend the TRO. Plaintiffs are deeply concerned that Defendants will abscond with the DAO endowment assets if their chances of success appear to diminish in this litigation. Several reasons underscore this concern.

The nature of cryptocurrency presents heightened risks if crypto assets are held by individuals who are a flight risk. Bax Decl. ¶ 7. A thief armed with stolen cryptocurrency keys can place themselves outside the jurisdiction of the United States and then safely convert those cryptocurrency assets into cash via accounts hosted by a foreign exchange—far outside the reach

of U.S. law enforcement. Bax Decl. ¶ 8. Here, Defendants have complete control of the DAO endowment. The only thing keeping the DAO endowment assets in that account is Defendants' willingness to abide by orders from this Court. Defendants' significant failure to comply with the TRO shows that the Court cannot trust Defendants to comply with its orders.

Plaintiffs have uncovered evidence that suggests Defendant Phillips is a flight risk. Just days before he transferred over $8.5 million out of the DAO endowment account, Defendant Phillips appears to have placed himself in international waters outside U.S. jurisdiction. Berg Decl. ¶ 12, Exhibit I. It is unclear even now if Defendant Phillips is in the United States. Moreover, during the course of his tracing investigation, Mr. Bax—Plaintiffs' cryptocurrency consultant—discovered that two of the accounts that interacted with DAO endowment funds are exchange accounts operated by an off-shore exchange in Ireland that has indicated it will not comply with the TRO. Bax Decl. ¶ 6. This shows that Defendant Phillips has the means and motive to transfer DAO endowment assets to an exchange beyond the reach of the TRO and convert those assets to fiat currency. The Court should safeguard against that possibility.

## IV. Conclusion

In light of Defendants' noncompliance with the TRO, the heightened risks in the cryptocurrency markets, and the absolute control Defendants have over the DAO endowment assets, the Court should amend the TRO to require all DAO endowment assets converted to dollars and transferred to the clerk. To punish Defendants for their contempt, and ensure that no further assets are dissipated, the Court should order Defendants to post a cash bond with the clerk equivalent to the amount of assets that have not been returned to the DAO endowment account.

Dated: March 20, 2023

| | |
|---|---|
| **SHUBIN & BASS, P.A.**<br>46 S.W. First Street, Third Floor<br>Miami, Florida 33130<br>Tel.: (305) 381-6060<br>Fax: (305) 381-9457<br>jshubin@shubinbass.com<br>jkatz@shubinbass.com<br><br>By: /s/ Jamie L. Katz_____<br>    John K. Shubin, Esquire<br>    Jamie L. Katz, Esquire | **ELLIS GEORGE CIPOLLONE O'BRIEN ANNAGUEY LLP**<br>2121 Avenue of the Stars, 30th Floor<br>Los Angeles, California 90067<br>Tel.: (310) 274-7100<br>Fax: (310) 275-5697<br>cberg@egcfirm.com<br>bkussman@egcfirm.com<br><br>By: /s/ Christopher T. Berg<br>    Christopher T. Berg (*pro hac vice pending*)<br>    Benjamin J. Kussman (*pro hac vice pending*)<br><br>*Counsel for Plaintiffs Ryan Breslow, Alex Fine, and Jon Gordon* |

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served by the Court's CM/ECF system on March 20, 2023 on all counsel of record.

/s/ Jamie L. Katz
Jamie L. Katz

2194315.4