DocuSign Envelope ID: E9BA1C2B-9AEE-4AAC-9242-472E0B942716

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### CASE NO.  23-cv-20727-ALTMAN

RYAN BRESLOW, *et al.*,

      *Plaintiffs*,

v.

MARK PHILLIPS, *et al.*,

      *Defendants*.

_____/

## <u>DECLARATION OF JON GORDON</u>

I, Jon Gordon, make the following declaration based on my personal knowledge:

1.      My name is Jon Gordon. I am over the age of 18, competent to testify, and have personal knowledge of the matters stated herein.

2.      I am a resident of Austin, Texas.

3.      In 2021, Ryan Breslow, Alex Fine, and myself founded a new cryptocurrency platform called the Movement DAO ("DAO" or "Movement DAO").

4.      We intended for the Movement DAO to function as an online community, with community members contributing capital into the DAO endowment.  That endowment would then be invested, and the proceeds from the investment returns would be used to fund DAO community projects.

DocuSign Envelope ID: E9BA1C2B-9AEE-4AAC-9242-472E0B942716

5.      Merkaba, Inc. ("Merkaba") was also a company formed by Ryan Breslow and myself during the incipient stages of the Movement DAO project.  Merkaba was an early project name for the Movement DAO project.  Merkaba facilitated conducting the business necessary to establish the Movement DAO, such as retaining legal representation.  As the Movement DAO project developed, Merkaba's role in the project lessened.

6.      In my role overseeing Defendant Phillips, I was familiar with the developers he retained to work on the Movement DAO project.  Jango.eth, a developer who received a transfer from Defendants on February 2, 2022, never worked on the Movement DAO project.

7.      On multiple occasions, Defendant Phillips represented to me that dao-lawfirm was the Law Office of Reed Yurchak.  Defendant Phillips also represented to me, including prior to February 2022, that Mr. Yurchak's firm was a signatory to the DAO endowment account.

8.      I have learned that Defendant Phillips posed as Mr. Yurchak when sending me email communications.  For instance, I received several emails purporting to be from "Reed Yurchak" in September and October 2022 requesting he sign Movement DAO documents.  Those emails were actually sent by m@dao-lawfirm.xyz.  Attached as Exhibit A is a true and accurate copy of these emails and a snapshot of my email inbox showing the sender purporting to be "Reed Yurchak."

9.      The Movement DAO did not launch on February 2, 2022.  The only thing that occurred on February 2, 2022 was the online publication of the Gitbook white paper and the commencement of the MOVE token presale.  The DAO endowment account's ENS (Ethereum Name Service) name makes it clear that the project was in pre-launch on February 2, 2022 and continues to be so today.  The ENS name associated with the DAO endowment account—

DocuSign Envelope ID: E9BA1C2B-9AEE-4AAC-9242-472E0B942716

0x143cC0A996De329C1C5723Ee4F15D2a40c1203c6—is **Movement DAO:Presale**. *See* Dkt. No. 24-1, Exhibit 1.

10.     It was understood and discussed by myself, Mr. Breslow, Mr. Gordon, and Defendant Phillips that the Movement DAO project would launch only after Mr. Breslow authorized it to launch.  It was also understood and discussed among the four of us that Snapshot proposals would only be binding if passed after the Movement DAO project had launched.

11.     MOVE tokens function as voting power within the Movement DAO community (i.e., one MOVE token is equivalent to one vote).  MOVE tokens are to be used by Movement DAO community members to vote on proposals related to, among other things, the governance of the Movement DAO.  *See* Dkt. No. 24-1, Exhibit 2 at 41 (Docket Page) ("The $MOVE token governs the platform.  These token holders are responsible for growing the endowment and deploying capital into movements.").

12.     Without MOVE tokens, Movement DAO community members do not have authority to pass governance proposals, make decisions regarding finances, or pass any other resolution relating to the Movement DAO project.  Dkt. No. 24-1, Exhibit 2 at 46 (Docket page) ("The Movement DAO is governed by its staked token holders.  $MOVE tokens represent the power to influence change to governance, economics, and incentives in the Movement DAO.").

13.     As described in the Gitbook white paper, the deployment of MOVE tokens was a necessary condition that had to occur before Movement DAO community members would receive the authority to pass binding resolutions via Snapshot concerning the Movement DAO endowment and treasury.  The Gitbook states "[a]fter the initial $MOVE distribution via contributions to the endowment…the community will manage the remaining treasury through Snapshot."  Dkt. No. 24-1, Exhibit 2 at 47 (Docket page).

DocuSign Envelope ID: E9BA1C3B-9AEE-4AAC-9242-472E0B942716

14.     I have never received any MOVE tokens, and MOVE tokens were never created or distributed to contributors to the DAO endowment account.

15.     Because MOVE tokens were never created or distributed, the Movement DAO community never received authorization to pass binding proposals on the Movement DAO project or the DAO endowment account.

16.     The proposals that were passed by the Movement DAO community via Snapshot in August 2022 and February 2023 were non-binding, advisory, and lacking any authority because, among other things, the Movement DAO project had not launched and because votes were not cast using MOVE tokens.

17.     The Movement DAO was created by myself, Mr. Breslow, and Mr. Fine based on several core, fundamental precepts.  One such precept was that the DAO endowment would never be spent.  This principle was expressly stated in the Gitbook white paper.  *See* Dkt. No. 24-1, Exhibit 2 at 58 (Docket Page).  Rather, all operational expenses and funding for social impact projects hosted on the Movement DAO platform were to be financed by the yields earned from the investment of the DAO endowment.

18.     The DAO endowment was never deployed or invested to earn additional proceeds.  This deployment did not occur because the Movement DAO project never launched.

19.     In order for the Movement DAO to function, it necessarily requires a platform with a user interface that a social impact group can access to establish their own DAO.  Without this user interface, the prospective user cannot access or utilize the applications and tools hosted on the Movement DAO platform.  This user interface was contemplated as a public website, with tools available on the platform that enabled social impact groups to create and manage their own DAOs to organize, fundraise, and perform other activities related to its social impact mission.

2199851.1

20.     The Movement DAO never hosted or otherwise launched a user interface to create social impact projects under the Movement DAO.  As a result, the Movement DAO platform has not and currently does not host any social impact projects.

21.     In August 2022, I learned that Defendant Phillips had submitted a number of Movement Improvement Proposals ("MIPs") via the Snapshot platform.  In my discussions with Defendant Phillips, he assured me that their content was necessary to achieve the structure set forth in the Gitbook.  He also assured me that the they had no force or effect since the project had not launched.  Since I did not consider the proposals to be binding (and Defendant Phillips purported to explain them to me), I felt no need to read them.  Only later did I discover that Defendant Phillips misled me about their actual content.

22.     I voted on MIP-000, MIP-001, MIP-002, MIP-004, MIP-005, MIP-006, MIP-007, and MIP-008 and MIP-007 only because, at the time of the voting, one of my principal roles was to foster and support the Movement DAO community.  Although I believed that these symbolic votes had no force or effect, I felt it important to engage in the Movement DAO community's pre-launch discussions and demonstrate my involvement with that community.

23.     Attached as Exhibit B is a true and accurate copy of a screenshot of a post made by Defendant Mark Phillips on the chat platform called Discord on July 4, 2022 and the attachment associated with that post.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 23 day of March 2023.

DocuSigned by:

*Jon Gordon*

C6F72F8AD80249D...

Jon Gordon

DocuSign Envelope ID: E9BA1C2B-9AEE-4AAC-9242-472E0B942716

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served by the

Court's CM/ECF system on March 23, 2023 on all counsel of record.


<u>/s/ Jamie L. Katz</u>
Jamie L. Katz

DocuSign Envelope ID: E9BA1C2B-9AEE-4A4C-9242-472E0B942716

# Exhibit A

DocuSign Envelope ID: E9BA1C2B-DAEE-4A4C-9342-472E0B94271B

≡ Gmail

🔍 m@dao-lawfirm.xyz ✕ ⚙

Mail | Messages | Spaces | From ▾ | Any time ▾ | Has attachment | To ▾ | Is unread | **Advanced search**

1–23 of 23

| | | | | |
|---|---|---|---|---|
| | Reed, me 2 | Inbox | 20220808 DAOLABS-8-Restricted-Stock-Purchase-Agreement-J.G.: Signature Request from Reed Yurchak - m@dao-lawfirm.xyz invited you to sign "20220... | 10:02 PM |
| | Reed, me 2 | Inbox | 20220808 DAOLABS-9-Common Stock Purchase Agreement-D.T.: Signature Request from Reed Yurchak - m@dao-lawfirm.xyz invited you to sign "2022080... | 10:01 PM |
| | Reed, me 2 | Inbox | 20220808 DAOLABS-8-Restricted-Stock-Purchase-Agreement-J.G.-Updated: Signature Request from Reed Yurchak - m@dao-lawfirm.xyz invited you to sig... | 10:01 PM |
| | Reed, me 2 | Inbox | m@dao-lawfirm.xyz Needs Your Signature - m@dao-lawfirm.xyz Needs Your Signature To: You were invited to sign a document [image: signNow logo] [image... | 10:01 PM |
| | Reed, me 2 | Inbox | 20220808 DAOLABS-9-Common Stock Purchase Agreement-D.T: Signature Request from Reed Yurchak - m@dao-lawfirm.xyz invited you to sign "20220808... | 10:01 PM |
| | Reed, me 2 | Inbox | 20220808 New-Member-Endorsement-DAOLABS IP: Signature Request from Reed Yurchak - m@dao-lawfirm.xyz invited you to sign "20220808 New-Memb... | 10:01 PM |
| | Reed, me 2 | Inbox | DAOLABS Onboarding Packet w Referencing Options Copy: Signature Request from Reed Yurchak - m@dao-lawfirm.xyz invited you to sign "DAOLABS Onbo... | 9:59 PM |
| | Reed, me 3 | Inbox | 20211225 DAOLABS IP Living Trust: Signature Request from Reed Yurchak - m@dao-lawfirm.xyz invited you to sign "20211225 DAOLABS IP Living Trust" View ... | 9:59 PM |
| | signNow 2 | Inbox | m@dao-lawfirm.xyz has canceled the document invite - m@dao-lawfirm.xyz. If you have any questions, please contact the sender. Contact Sender: mailto:m... | 12/31/22 |
| | **signNow** | Inbox | **m@dao-lawfirm.xyz has canceled the document invite** - m@dao-lawfirm.xyz. Cancellation Reason: Will provide a new common stock purchase agreeme... | **9/23/22** |
| | signNow 2 | Inbox | m@dao-lawfirm.xyz has canceled the document invite - m@dao-lawfirm.xyz. Cancellation Reason: Will replace with updated stock amount If you have any q... | 9/21/22 |
| | Reed Yurchak | Inbox | DAOLABS Onboarding Packet w Referencing Options: Signature Request from Reed Yurchak - m@dao-lawfirm.xyz invited you to sign "DAOLABS Onboarding... | 9/21/22 |
| | Intern dao-lawfirm. | Inbox | Document Cancelled - DAOLABS IP TRUST Agreements - DAOLABS IP, INC. This is to notify you that your document has been cancelled. DAOLABS IP TRUST | 9/21/22 |
| | Intern dao-lawfirm. | Inbox | Document Cancelled - DAOLABS Onboarding Packet - DAOLABS IP, INC. This is to notify you that your document has been cancelled. DAOLABS Onboarding | 9/21/22 |
| | Intern dao-lawfirm. | Inbox | Reminder - DAOLABS Onboarding Packet - m@dao-lawfirm.xyz) on behalf of DAOLABS IP, INC. Review & Sign You can reply to this email in order to deliver a... | 9/20/22 |
| | Intern dao-lawfirm. | Inbox | Reminder - DAOLABS Onboarding Packet - m@dao-lawfirm.xyz) on behalf of DAOLABS IP, INC. Review & Sign You can reply to this email in order to deliver a... | 9/12/22 |
| | Intern dao-lawfirm. | Inbox | Reminder - DAOLABS IP TRUST Agreements - m@dao-lawfirm.xyz) on behalf of DAOLABS IP, INC. Review & Sign You can reply to this email in order to delive... | 9/12/22 |
| | Intern dao-lawfirm. | Inbox | Reminder - DAOLABS Onboarding Packet - m@dao-lawfirm.xyz) on behalf of DAOLABS IP, INC. Review & Sign You can reply to this email in order to deliver a... | 9/8/22 |

Compose

Mail
Inbox 553
Starred
Snoozed
Sent
Drafts 67
More

Chat

Spaces

Meet

Labels

From: **Reed Yurchak** <mail@signnow.com>
Date: Fri, Sep 23, 2022 at 2:01 AM
Subject: 20220808 DAOLABS-9-Common Stock Purchase Agreement-D.T: Signature
Request from Reed Yurchak
To: <jg@ryanbreslow.com>



## You were invited to review and sign a document

m@dao-lawfirm.xyz invited you to sign "20220808 DAOLABS-9-Common Stock
Purchase Agreement-D.T"

**View Document**

**Did you receive this email by mistake or have any questions?**
You can contact the sender by clicking the button below.

**Contact Sender**

**This invite will expire in 30 days**

This email contains a secure link to signNow designed for the initial recipient. Please do not forward or share this email, link, or access code with others. If you believe this email was sent to you in error, please contact the sender.



Contact Support                    Terms of Service                    Privacy Policy

2022 © airSlate, Inc. All rights reserved.

17 Station Street, 3rd Floor, Brookline, MA 02445

If you no longer wish to receive marketing emails from signNow, please click here.

You will still receive important emails regarding your accounts for billing, security, and support.

From: **Reed Yurchak** <mail@signnow.com>
Date: Fri, Oct 7, 2022 at 5:09 PM
Subject: 20220808 New-Member-Endorsement-DAOLABS IP: Signature Request from Reed
Yurchak
To: <jg@ryanbreslow.com>



## You were invited to review and sign a document

m@dao-lawfirm.xyz invited you to sign "20220808 New-Member-Endorsement-DAOLABS IP"

**View Document**

**Did you receive this email by mistake or have any questions?**
You can contact the sender by clicking the button below.

**Contact Sender**

**This invite will expire in 30 days**

This email contains a secure link to signNow designed for the initial recipient. Please do not forward or share this email, link, or access code with others. If you believe this email was sent to you in error, please contact the sender.



Contact Support                    Terms of Service                    Privacy Policy

2022 © airSlate, Inc. All rights reserved.

17 Station Street, 3rd Floor, Brookline, MA 02445

If you no longer wish to receive marketing emails from signNow, please click here.

You will still receive important emails regarding your accounts for billing, security, and support.

From: **Reed Yurchak** <mail@signnow.com>
Date: Thu, Sep 29, 2022 at 2:25 AM
Subject: DAOLABS Onboarding Packet w Referencing Options Copy: Signature Request from Reed Yurchak
To: <jg@ryanbreslow.com>



## You were invited to review and sign a document

m@dao-lawfirm.xyz invited you to sign "DAOLABS Onboarding Packet w Referencing Options Copy"

**View Document**

**Did you receive this email by mistake or have any questions?**
You can contact the sender by clicking the button below.

Contact Sender

DocuSign Envelope ID: E9BA162B-DAE5-4A4C-9342-472E0B942746

**This invite will expire in 30 days**

This email contains a secure link to signNow designed for the initial recipient. Please do not forward or share this email, link, or access code with others. If you believe this email was sent to you in error, please contact the sender.



Contact Support                Terms of Service                Privacy Policy

2022 © airSlate, Inc. All rights reserved.

17 Station Street, 3rd Floor, Brookline, MA 02445

If you no longer wish to receive marketing emails from signNow, please click here.

You will still receive important emails regarding your accounts for billing, security, and support.

From: **Reed Yurchak** <mail@signnow.com>
Date: Wed, Sep 21, 2022 at 8:05 AM
Subject: 20211225 DAOLABS IP Living Trust: Signature Request from Reed Yurchak
To: <jg@ryanbreslow.com>



## You were invited to review and sign a document

m@dao-lawfirm.xyz invited you to sign "20211225 DAOLABS IP Living Trust"

**View Document**

**Did you receive this email by mistake or have any questions?**
You can contact the sender by clicking the button below.

**Contact Sender**

**This invite will expire in 30 days**

This email contains a secure link to signNow designed for the initial recipient. Please do not forward or share this email, link, or access code with others. If you believe this email was sent to you in error, please contact the sender.



Contact Support          Terms of Service          Privacy Policy

2022 © airSlate, Inc. All rights reserved.

17 Station Street, 3rd Floor, Brookline, MA 02445

If you no longer wish to receive marketing emails from signNow, please click here.

You will still receive important emails regarding your accounts for billing, security, and support.

From: **Reed Yurchak** <mail@signnow.com>
Date: Wed, Sep 21, 2022 at 8:13 AM
Subject: 20220808 DAOLABS-8-Restricted-Stock-Purchase-Agreement-J.G.: Signature Request from Reed Yurchak
To: <jg@ryanbreslow.com>



## You were invited to review and sign a document

m@dao-lawfirm.xyz invited you to sign "20220808 DAOLABS-8-Restricted-Stock-Purchase-Agreement-J.G."

**View Document**

**Did you receive this email by mistake or have any questions?**
You can contact the sender by clicking the button below.

**Contact Sender**

**This invite will expire in 30 days**

This email contains a secure link to signNow designed for the initial recipient. Please do not forward or share this email, link, or access code with others. If you believe this email was sent to you in error, please contact the sender.



Contact Support          Terms of Service          Privacy Policy

2022 © airSlate, Inc. All rights reserved.

17 Station Street, 3rd Floor, Brookline, MA 02445

If you no longer wish to receive marketing emails from signNow, please click here.

You will still receive important emails regarding your accounts for billing, security, and support.

From: **Reed Yurchak** <mail@signnow.com>
Date: Wed, Sep 21, 2022 at 8:46 PM
Subject: 20220808 DAOLABS-8-Restricted-Stock-Purchase-Agreement-J.G.-Updated:
Signature Request from Reed Yurchak
To: <jg@ryanbreslow.com>



## You were invited to review and sign a document

m@dao-lawfirm.xyz invited you to sign "20220808 DAOLABS-8-Restricted-
Stock-Purchase-Agreement-J.G.-Updated"

**View Document**

**Did you receive this email by mistake or have any questions?**
You can contact the sender by clicking the button below.

Contact Sender

**This invite will expire in 30 days**

This email contains a secure link to signNow designed for the initial recipient. Please do not forward or share this email, link, or access code with others. If you believe this email was sent to you in error, please contact the sender.



Contact Support          Terms of Service          Privacy Policy

2022 © airSlate, Inc. All rights reserved.

17 Station Street, 3rd Floor, Brookline, MA 02445

If you no longer wish to receive marketing emails from signNow, please click here.

You will still receive important emails regarding your accounts for billing, security, and support.

DocuSign Envelope ID: E9BA162B-DAE5-4A4C-9342-472E0B942746

From: **Reed Yurchak** <mail@signnow.com>
Date: Wed, Sep 21, 2022 at 8:13 AM
Subject: 20220808 DAOLABS-9-Common Stock Purchase Agreement-D.T.: Signature
Request from Reed Yurchak
To: <jg@ryanbreslow.com>



## You were invited to review and sign a document

m@dao-lawfirm.xyz invited you to sign "20220808 DAOLABS-9-Common Stock
Purchase Agreement-D.T."

**View Document**

**Did you receive this email by mistake or have any questions?**
You can contact the sender by clicking the button below.

**Contact Sender**

**This invite will expire in 30 days**

This email contains a secure link to signNow designed for the initial recipient. Please do not forward or share this email, link, or access code with others. If you believe this email was sent to you in error, please contact the sender.



Contact Support                    Terms of Service                    Privacy Policy

2022 © airSlate, Inc. All rights reserved.

17 Station Street, 3rd Floor, Brookline, MA 02445

If you no longer wish to receive marketing emails from signNow, please click here.
You will still receive important emails regarding your accounts for billing, security, and support.

DocuSign Envelope ID: E9BA162B-DAE5-4A4C-9342-472E0B942746

# Exhibit B



**tankbottoms(** 🦋 **,** 🍑 **)** 07/04/2022 7:52 PM

this is the opinion letter research which reed, marc and i have been working with when figuring out a solid legal strategy with regards to the legal framework

https://docs.google.com/document/d/1zXU0KfCS5ljTSsY0uIlrCWV7q1Mw7nuWZncbWgn7R9c/edit?usp=sharing

Google Docs

**internal-dao-lawfirm-analysis**

Legal Research - Securities and Tokens Notes for dao-lawfirm.eth The regulations and law in the cryptocurrency and blockchain asset space is evolving daily. Although the SEC has taken the blanket position that all DAOs are a "security," we believe a more careful analysis is required in this m...





7:54 PM    its worth a read to get an understanding of the issues, as we have always discussed, the strategy to never misrepresent, do what makes sense, create a foundation off-shore, worse comes to worse, if we are successful, a fine is at stake, however, SEC pinged me again as the stablecoin legislation is heating up, and it may be worth taking the meeting to learn more. but i just don't have bandwidth.

 👍 1

———————————— July 14, 2022 ————————————

The regulations and law in the cryptocurrency and blockchain asset space is evolving daily.  Although the SEC has taken the blanket position that all DAOs are a "security," we believe a more careful analysis is required in this matter.  To that end, the defense raised by the Kik and Kin Foundation to the Commission's enforcement action is instructive.  While [Treasury] and Kik are markedly different in their modus of operations and intent in issuing tokens, some of the basic facts and principles apply to [Treasury].  While there is a general argument that any attempt by the Commission to regulate [Treasury] exceeds its statutory authority[1] , there are also more practical methods that can be deployed to reduce the potential liability or likelihood of an enforcement action by the Commission, BSA or OFAC.

It is important to keep in mind that the baseline for determining the existence of a "security" is still the US Supreme Court's opinion in Howey.  With that in mind we make the following recommendations:

A.          Token Purchasers cannot have an expectation of profits from the efforts of others.

In general, there is no expectation of profits where purchasers are primarily led to expect an item for use or consumption, even in the future. *Forman*, 421 U.S. at 852–53. Nor is there a reasonable expectation of profits merely because the promoter mentions that an item could increase in value or that the purchaser could profit. *See Alunni*, 445 F. App'x at 292 (no investment contract in purchase of condominiums where promotional materials stated that purchasers would receive immediate income and did not have to manage their units); *Revak v. SEC Realty Corp.*, 18 F.3d 81, 84 (2d Cir. 1994) (no investment contract where condominiums were marketed for "the income to be derived from rentals, and the prospect of capital appreciation"); *Hart*, 735 F.2d at 1003 (no investment contract for model home purchases where promotional materials touted "the potential for excellent appreciation in value during the holding period").

Regarding "overflow" amounts in the FAQ portion of the website augmented by the Terms of Use agreement for the project managers and promoters should provide sufficient notice to potential purchasers and participants of the specified use of the tokens.

B.          Even if purchasers can reasonably expect profits, such expectation must be based on the "undeniably significant" entrepreneurial or managerial efforts of the promoter.

In *S.E.C. v. Glenn W. Turner Enters., Inc.*, 474 F.2d 476, 482 (9th Cir. 1973) the court emphasized that even if purchasers expected a profit, that profit must be at the "undeniably significant" entrepreneurial efforts of the promoter. These efforts must be value generating, which excludes foundational efforts, such as building infrastructure. *See, e.g., Terracor*, 574 F.2d at 1025.  Additionally, the Commission cannot consider any profits from resale on any secondary market and would similarly fall outside the scope of *Howey*. Importantly, if the purchaser has complete control over the item or interest purchased, he or she does not expect profits from the efforts of others. *See Alunni*, 445 F. App'x 288.

As the court explained in *Forman*, when a promoter sells an item for consumptive use rather than as a passive investment, the federal securities laws do not apply. *Forman*, 421 U.S. 858. Courts have found no investment contract even where the consumptive use of the item in question is not available at the time of purchase.  *See, e.g., Terracor*, 574 F.2d 1023. This is true even where the seller is the only entity who can create the eventual use. *Id.* In other words, a delay in the ability to "consume" the product after purchase is not determinative.

The Supreme Court's decision in *Forman* is instructive. There, a one-time purchase of shares proportional to the number of rooms in a housing co-op was not an investment contract despite the fact that the co-op was not ready for move-in at the time of the transaction. *Forman*, 421 U.S. 837. Even though purchasers did not hold legal title to the apartments and could not "consume" the product for years until the project was complete, the transactions were not "investment contracts." *Id.*

In addition, the courts have held that where a contract involves a sale of a commodity and expected profits arise primarily from resale on the secondary market, the third prong of *Howey* is not satisfied. *See Noa v. Key Futures, Inc.*, 638 F.2d 77, 79 (9th Cir. 1980) (no expectation of profits from the efforts of others under Howey because, once the commodity was purchased, the profits of the investor depended on market fluctuations, not the managerial efforts of the defendant); *see also S.E.C. v. Belmont Reid & Co., Inc.*, 794 F.2d 1388, 1391 (9th Cir. 1986) (same).

*These cases are instructive as [Treasury] sells no tokens to purchasers and even if it makes them available for sale in the approved projects, makes no representation of profit and makes no significant effort to increase the value of any tokens sold or minted.  The fact that the tokens may increase in value based upon a number*

*of factors, including the bonding curve and any holdbacks or credits identified by the project promoters, are insufficient to satisfy the third prong of Howey.*

          C.          Treasurys should stay sufficiently decentralized to fall outside the scope of federal securities laws.[3]

As noted above, Ethereum has escaped regulatory scrutiny from the Commission and other regulatory agencies due in large part to the efforts of the Ethereum Foundation.  The Ethereum Foundation seeks to "promote and support [the] Ethereum platform and base layer research," including making software available and releasing protocol updates. (See Ethereum Foundation Mission Statement.26) Director Hinman has expressed his view that Ethereum is "sufficiently decentralized" to fall outside the scope of the federal securities laws, meaning that the Ethereum Foundation is not providing essential entrepreneurial or managerial efforts, *despite exerting significant efforts generally*. (*See When Howey Met Gary* (Plastic), (June 14, 2018)).  The Ethereum Foundation is a good model for [Treasury], which should continue to exert "essential entrepreneurial or managerial efforts," but remain "sufficiently decentralized" to arguably avoid the federal regulatory scheme for securities and investment contracts.

*There are many ways in which [Treasury] can promote itself as a platform that will appear "sufficiently decentralized" to avoid running afoul of federal securities regulations: 1) continue its efforts to act as gatekeeper for proposed projects (in fact it will be required to continue to act as gatekeeper, see infra); 2) make its software or access to its DAO available to those promoters who want to propose a project; 3) [4] promote multiple implementations, including the use of multiple smart contracts designed to further automate the process; 4) use multiple interfaces with divergent types of projects; and 5) be clear that in terms of governance that the more automated the process by removing human decision makers will demonstrate [Treasury]'s participation is not significantly managerial or entrepreneurial.  Where governance or decisions need to be made by a board or by vote of members, the more diffuse the authority and more diverse the governing body, the stronger the argument that [Treasury] is sufficiently "decentralized."*

*Additional factors that help in this regard are that projects must be approved by [Treasury], which, after approval, will play no oversight role in the management of the project or decisions made by the project managers. [Treasury] will have some interaction with the project in terms of taking a fee for its services and maintaining funds in the liquidity pool with token values determined by the bonding curve, both of which are covered by smart contracts. [Treasury] should encourage the use of committees in projects as decision-makers and, where possible, encourage the projects to allow all members or token holders to participate in the process.*

          D.          Set up a protocol or system to avoid transactions with citizens of embargoed countries and SDPs and avoid violation of the AML regulations.[5]

We expect that with the instability in the international scene and the increased use of cryptocurrencies, federal regulators will increase scrutiny of cryptocurrency transactions with citizens of embargoes countries as well as with SDPs.  This may be [Treasury]'s most obvious potential liability as donations will pass through its DAO and is obligated to comply with the financial regulations outlined above.  Our recommendation is that [Treasury] set up a protocol and safeguards to ensure that any project promoter or token purchaser is not a resident of an embargo country or an SDP.  While we understand the technical challenge this recommendation poses, a protocol with safeguards would be the best defense for [Treasury] in any enforcement action by any agency.[6]

A purchaser who is a citizen of Iran and seeks to purchase tokens can sufficiently mask his nationality and identity so that you would not be able to set up a protocol or screening mechanism to identify him as a citizen of an embargoed country.  We are aware of the ability of users to completely mask their identity thereby making any protocol or screening service that [Treasury] employs difficult to trace.  If possible, [Treasury] should employ protocols to ensure that the direct purchase of Eth used to buy tokens from an account in an embargoed country be flagged.  Our opinion is not that the well-masked and untraceable transactions would subject [Treasury] to liability, but that the open transaction would demonstrate to OFAC that there are no gatekeeper controls for donations or purchases.

*Similarly, [Treasury] should set up a protocol that would allow it to identify any potential violation of the AML regulations.  The mere purchase of tokens would be insufficient to trigger AML regulations; instead, [Treasury] would need to be able to identify any purchaser who was able to sell the tokens in significant amounts on a secondary market exchanging the tokens for another currency that would allow an easier transfer of funds to a crypto such as Bitcoin or Ethereum. [7]*

In this instance, the identity of the purchaser or his nationality would not be important, rather his use of a project to attempt to "launder funds."  While the use of cryptocurrencies by money launderers has increased, the most common method, by mixing or tumbling, involves persons blending illicit and clean digital assets from several addresses together before redistributing them to a new destination or wallet.  By the time any such funds were used in the purchase of Eth to buy tokens on [Treasury], [Treasury] would have no ability to determine if any such funds were mixed or blended.

Instead, our focus would narrow to any "rug pullers," or promoters or managers who seemed interested only in raising sufficient funds to be able to cash out large sums as soon as possible and with little regard to the project's goals or aims.  In the event [Treasury] notices an increase in "rug pullers" then we should be advised as soon as possible to discuss possible actions and compliance with the regulatory agencies.  Our analysis of [Treasury] does not, at this time, demonstrate any other pattern or methodology that would demonstrate a concerted effort to "launder funds."

E.     Any examination of [Treasury] will be under the rubric of a "security," "investment contract" or "commodity."

*Any regulatory examination of [Treasury] will be under the analysis of whether any product associated with [Treasury] will qualify as a "security," "investment contract" or "commodity."  Regardless of the actions of [Treasury], the analysis will be under these terms.  Any concern that [Treasury] may have in the operation of its "vault" or "treasury" would not subject [Treasury] to scrutiny as a bank or financial institution.  Instead, if the allegation was that [Treasury], in setting up a treasury or vault, was illegally acting as a bank, our analysis is that any regulatory agency would concentrate on the nature of any tokens or other assets related to the treasury or vault, given that the Federal Deposit Insurance Company has authority only over certified institutions.*

The History of the SEC and Cryptocurrencies

The Securities & Exchange Commission's ("SEC" or "Commission") has been slow to adopt clear, reasonable guideline for cryptocurrencies, and their ad hoc efforts in this space highlight the problem.  Cryptocurrencies (including Bitcoin and Ethereum) have grown exponentially the last few years and gained acceptance as a medium of exchange for a wide variety of goods and services.  During the rise of cryptocurrency, the Commission did not provide any meaningful, forward-looking guidance about the application of the federal securities laws to cryptocurrencies, nor did it develop a regulatory structure that would make sense to anyone involved in the space. As cryptocurrency markets increased their use in 2017, the Commission finally issued an opinion on the matter, but failed to provide those in the crypto space with a clear view of how or when the SEC believed the federal securities laws would apply to sales or exchange of cryptocurrencies. The DAO Report, for example, issued in 2017, casually suggested that sales of cryptocurrencies "*may*" involve sales of securities and attempted to apply the *Howey* test to a token offering whose utility and function were dramatically different from the sales of other tokens or even a general token offering. The result is that through the *Munchee* settlement order and a series of public comments by the Chairman, the Commission has essentially created a more aggressive position that impacts the sale or offering of tokens negatively, which position effectively threatens enforcement action against nearly all token offerings regardless of the stated function or use of the tokens.  This is true despite the fact that the Commission has yet to approve of a single registration statement for a cryptocurrency and has failed to approve any secondary markets for trading tokens.

Instead, the Commission has seemed to adopt a "regulation by enforcement" approach, which has had a dramatic and negative impact on the development of blockchain and cryptocurrency technologies in the United States and has had the foreseeable result of forcing innovators to move their activities overseas or they have abandoned the space altogether. (*See* Anna Irrera, Michelle Price, *Cryptocurrency issuers clean up, shun U.S. investors as SEC gets tough*, Reuters, March 21, 2018.) It is long past time for the Commission to adopt a more clear and reasonable approach – one that is within the bounds of the Commission's statutory authority – and provide those innovators in the US clear guidelines that will allow them to continue to innovate and develop in these important technologies that are gaining acceptance world-wide.

We are not aware of any DAO or crypto-related entity petitioning the Commission to change the "law" to accommodate the new technologies and its applications, as Chairman Clayton recently suggested. (*See* Kate Rooney, *SEC Chief Says Agency Won't Change Securities Laws to Cater to Cryptocurrencies*, CNBC, June 8, 2018.) On the contrary, through its failure to provide clear guidance, instead seeking to control the technology by enforcement, in effect, the Commission seeks to change the well-settled definition of "security" and, in particular, the definition of an "investment contract," that the Supreme Court adopted over 70 years ago in *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946) beyond their original meaning and intent. The Commission's apparent attempt to assert regulatory authority over all digital currencies has strayed well beyond the scope of its statutory authority to regulate the "offer and sale of securities."  This ad hoc approach is further evident in the lack of scrutiny given to Bitcoin and Ethereum by the Enforcement Division.  Even more troubling is the Commission's attempt to generalize the *Howey* analysis in an effort to expand the Commission's regulatory authority.  Such an attempt would not presumably stand up to serious judicial scrutiny. The Commission's attempted expansion is revealed in its relatively superficial "investment contract" analysis set forth in the Commission's recent settlement orders in *Airfox* and *Paragon Coin* (as well as the *Munchee* settlement that preceded them) when compared with the much more rigorous analysis by the federal court in which it denied the Commission's motion for a preliminary injunction for its failure to demonstrate that the defendant offered or promised an investment opportunity to token purchasers. *See S.E.C. v. Blockvest, LLC*, 2018 WL 6181408, at n. 5 (S.D. Cal. Nov. 27, 2018).

DocuSign Envelope ID: E9BA162B-DAE5-4A4C-9342-472E0B942746
Case 1:23-cv-20201-RAR   Document 48-6   Entered on FLSD Docket 03/23/2023   Page 28 of 35
SEC v. Kik and Kin Foundation

One of the more current, instructive enforcement actions is found in SEC v. Kik and Kin Foundation, primarily because Kik, rather than settling with the SEC and paying a fine, chose to fight the action, arguing that its sale of tokens was not the sale of a security nor an "investment contract." In addition, Kik argues that the actions by the Commission exceed its statutory authority in the blockchain and cryptocurrency spaces.

Kik argued that the enforcement action will fail any rigorous analysis of whether offers and sales of the Kin token amounted to offers or sales of a "security" within the scope of Section 5 of the '33 Act. Additionally, Kik argues that the Kin token was designed, marketed, and offered as a currency to be used as a medium of exchange within a new, limited digital economy thus, taking it outside the statutory definition of a "security" under the federal securities laws. Instead, Kik argued, the token is designed only for utility or consumptive use that is inconsistent with a token that is purchased as an investment. Kik did not offer or promote the Kin token as a passive investment opportunity since doing so would have doomed the project, which could only succeed if Kin purchasers used Kin as a medium of exchange (rather than simply holding it as a passive investment). Accordingly, Kik marketed Kin not as an investment opportunity, but rather as a way for consumers to access digital products and services in a new way that also allowed for innovative developers and their users to be compensated for the value they provided to the community. The launch of the Kin token was so successful that Kin exceeds Ethereum and Bitcoin in daily blockchain activity, demonstrating Kin's wide acceptance and adoption in the crypto space. (*See* *https://blocktivity.info/*) This use and general adoption undoubtedly triggered the regulators at the SEC.

The terms of the sale of the Kin tokes are inconsistent with the terms normally found in an "investment contract" as Kik transferred ownership of the Kin tokens directly to purchasers, who had full, unfettered control over the tokens with no continuing obligation to Kik. Kik argues that, as such, once the offer and sale had been completed and the token delivered to the purchaser, there was no common enterprise between the parties. In summary, the sale of the Kin tokens did not involve the type of passive investment opportunity that the SEC and courts have normally designated as an "investment contract" and does not meet the definition that the US Supreme Court adopted in *Howey*. More importantly, the Foundation's separate transfers of Kin tokens to app developers and users in the ecosystem after the initial token distribution event ("TDE") are well outside the common definition of an "investment contract" under federal securities laws.

Federal Securities Regulation in General

Securities and financial instruments are defined by a complex web of laws and statutory regulations that apply to their marketing, promotion and sale. There are laws addressing everything from how and where securities can be sold, who can own certain types of securities, and what information must be disclosed to potential investors. As a result, an important threshold question that must be answered by anyone working with crypto assets is which transactions or cryptocurrencies involve a "security."

    A.       *What is a security?*

The definition of a security is "broad and ambiguous," and, thus, it is difficult to layout a bright line rule by which a security can easily be identified and distinguished from a financial instrument that would not qualify as a security. In order to provide a broad definition that would cover large and diverse investments, the courts have designed a flexible test that is intended to "to meet the countless and variable schemes devised by those who seek the use of money of others on the promise of profits." *Howey, supra.* In *Howey* the U.S. Supreme Court outlined a four-part test to determine if an offer or transaction qualifies as a form of a security called an "investment contract." The Court held that an "investment contract" exists when there is, (1) an investment of money (2) in a common enterprise (3) with an expectation of profit (4) to be derived from the efforts of others.

Since *Howey* was decided in 1946, there is a long history of cases in which the courts try to determine if various financial instruments meet the *Howey* definition of a security, including bank certificates of deposits, interests in whiskey barrels and offers to invest in some new product. There are also many other cases analyzing various elements of the *Howey* test, the takeaway being that each case is fact specific as it relates to a financial instrument. To demonstrate the inherent difficulty in providing a clear definition for a "security," there have been numerous courts attempting to apply the *Howey* test to seemingly similar transactions and reaching different, sometimes contradictory results. For example, there are several cases holding that certain real estate leases qualified as securities when offered in a particular manner. Likewise, there are numerous cases addressing when the sale of other products, even something as odd as the sale of beavers, may constitute a securities transaction. The result is that courts seem to place more highly the manner in which a good is sold rather than the nature of the product.

    B.       *Application to the cryptocurrencies and other assets in the industry.*

The clear problem for the courts is applying 1946 laws, regulations, and large body of judicial precedent to current technologies. As is often the case, the law is usually playing catch-up to industry and innovation. As of this opinion letter, very few U.S. courts have addressed the question of how to apply the *Howey* test to cryptocurrencies and other blockchain asset transactions. Thus, it remains unclear what treatment the court will give to cryptocurrencies in distinguishing between securities from non-securities. There are a handful of cases currently pending that may result in decisions that directly address this issue. And inevitably, there will be future cases so long as the sale of cryptocurrencies and other blockchain assets are deployed as a means to promise future profits to third parties. For now, suffice it to say, there is no consensus and a lack of clarity for developers and purchases in this space.

In addition, there is the added issue of cryptocurrencies, tokens and NFTs in the secondary markets, or sales in which the original issuer is not a party. Even among lawyers, there is significant confusion as to how *Howey* should apply to secondary market transactions. Even if an initial sale of a token or NFT had some of the features of a "security," it is unclear whether a subsequent transaction by the token purchaser to another purchaser for a different token would also qualify as a securities transaction. This confusion is the result of the fact that virtually every case applying *Howey* was decided on a transaction in which a seller or promoter is promising the purchaser some form of financial return in the purchase of the cryptocurrency.

The SEC's current position on Secondary Markets

The SEC, the primary regulator of the securities market in the US, has been active in voicing its opinion about certain activities in the crypto asset industry. The SEC's first major foray in the industry came in July 2017 in the form of a report stating that sale of tokens by "The DAO" constituted a sale of securities. The SEC has since reached settlements with several industry participants and also issued several statements about when certain activities within the industry may be subject to securities regulations. Notably, some members of the SEC have said that they believe that the vast majority of tokens sold as part of a fundraising effort (so called "ICOs") were securities offerings.

In March 2019, the SEC's Strategic Hub for Innovation and Financial Technology (aka FinHub) issued a regulatory scheme intended to help those within the crypto asset industry evaluate which assets may be viewed by the SEC as securities. The FinHub regulations identify numerous factors to consider when analyzing whether the sale of a crypto asset meets the final two prongs of the *Howey* test, i.e., whether there is an expectation of profit based on the efforts of a third party. The framework places a strong emphasis on factors used to determine whether an "Active Participant" exists that provides "essential managerial efforts that effect the success of the enterprise, and investors reasonably expect to derive profits from those efforts."

Currently, one of the largest areas of debate relating to the SEC's position on the crypto asset industry is how it plans to apply securities law to the secondary market trading of tokens that may have initially been sold as part of a securities offering. The SEC's own Director of Corporate Finance has opined that "strictly speaking, the token – or coin or whatever the digital information packet is called – all by itself is not a security." The Director, instead, noted that "a careful and fact-sensitive legal analysis" of secondary market trading is necessary, focused on how the token is offered and sold, *including the reasonable expectations of purchasers*. The Director offered one standard for determining when a token does not qualify as a security based on whether the network upon which a token exists is "sufficiently decentralized." This standard was laid out by the Director who also identified several factors that could be considered to determine whether a token is "sufficiently decentralized." The more-recent FinHub framework also addresses this issue, but does not use the term "sufficiently decentralized." Instead, the framework lays out several factors to be analyzed to determine whether the value of the asset is still dependent on the efforts of the "Active Participants" and to what extent the underlying network technology is fully functional.

The conclusion derived from these statements is that the SEC has recognized that a crypto asset previously sold in a securities offering can later be sold on the secondary market in a non-securities transaction under certain circumstances. However, there are still many questions about the standard the SEC will use to distinguish between transactions of crypto assets as a security or non-security. Unfortunately, despite advocating for a nuanced analysis of each token's network to make such a determination, the SEC has not demonstrated it will follow these guidelines in the enforcement actions it has brought against certain industry participants. Instead, the SEC has issued orders in settled cases involving secondary market participants in which it has alleged without further explanation that the tokens themselves are securities, despite the problems outlined above. Therefore, it is unclear exactly what analysis the SEC is currently using as it relates to secondary market transactions of crypto assets.

Federal Commodities and Derivatives Regulation

Historically, "commodities" is a term that has been used to refer to agriculture products like wheat, corn and sugar. However, just like with "securities," US law has evolved to provide a broader definition to include "all services, rights, and interests . . . in which contracts for future delivery are presently or in the future dealt in." As a result, almost anything could qualify as a "commodity" under the definition.

DocuSign Envelope ID: E9BA162B-DAE5-4A4C-9342-472E0B942746

The Commodities Futures Trading Commission (CFTC) is the primary regulator of commodities interests. In its 2020 report to Congress the CFTC took the position that all virtual currencies are commodities and there have already been courts who agree with this position.

The Commission and federal courts have found that virtual currencies are commodities under the CEA [Commodity Exchange Act]. While its regulatory oversight authority over commodity cash markets is limited, the CFTC maintains general anti-fraud and manipulation enforcement authority over virtual currency cash markets as a commodity in interstate commerce. The Commission has not formally defined virtual currency via regulation. The Commission, however, adopted a broad definition of the term "virtual currency" for purposes of its March 2020 <u>Final Interpretive Guidance for Retail Commodity Transactions Involving Certain Digital Assets</u>.

While the CFTC did not "intend" to create a "bright line definition" of a virtual currency given its "evolving nature," it did provide some guidance in its 2020 "Final Interpretive" guide, in which it "referenced" virtual currency as including the following:

· a digital asset that encompasses any digital representation of value or unit of account that is or can be used as a form of currency (i.e., transferred from one party to another as a medium of exchange);
· may be manifested through units, tokens, or coins, among other things; and
· may be distributed by way of digital "smart contracts," among other structures.

It appears the CFTC is taking a clearer approach to the crypto asset industry and does not seem to be actively extending its jurisdiction where the SEC has yet to definitively identify a crypto asset as a security.[1] It is also still possible that the CFTC will identify some limit to the definition of a commodity for assets such as non-fungible tokens and crypto collectibles.

This is important because commodities are regulated differently than securities. A commodity is not subject to the same rules as a security, which has myriad rules about who can purchase them, how they must be offered and what methods can be employed in their promotion.  This is due to the fact that markets for trading commodities have been considerably smaller than the markets for trading derivatives of commodities or other securities. Most people do not trade actual bushels of potatoes for cash.  Rather, most people trade contracts based on the future price of potatoes or other commodities; futures contracts. But with crypto assets, the vast majority of the exchange activity occurs in the spot or current market and are traded immediately.

There are no laws directly regulating spot market transactions for commodities (i.e., transactions that involve the full payment of the purchase price and the immediate delivery of the commodity at the time the transaction is entered by the parties). The CFTC has limited authority to police the spot markets for fraud and manipulation and cannot adopt rules that directly control how spot market participants conduct their transactions.

Historically, the CFTC regulates exchanges rather than individual commodities and a CFTC-regulated transaction can only be conducted over regulated exchanges, which include, depending on the type of transaction, Designated Contract Markets ("DCMs") and Swap Execution Facilities ("SEFs").[2]  There may be exceptions to these strict limitations, but overall these exceptions are only available to certain sophisticated market participants or high-net-worth individuals. Additionally, the CFTC directly regulates all the intermediaries that facilitate CFTC-regulated transactions, including brokers, merchants, swap dealers, commodity pool operators, or commodity trading advisors. The application process to become a DCM, SEF, or regulated intermediary is costly and difficult and regulated exchanges and intermediaries are subject to extensive ongoing regulatory oversight by the CFTC.

The enforcement actions filed by the CFTC, to date, have continued to focus on exchanges and markets.[3]  But it has indicated that it will "embrace innovation" as it assesses the risks and opportunities arising from "21st century commodities."  It has set out its goals in its 2020-2024 Strategic Plan, that lists as its strategic goals not only a continued emphasis on markets, including derivative markets, but also plans to be "tough on those who break rules."[4]

OFAC Sanctions

The US Department of Treasury's Office of Foreign Assets Control (OFAC) maintains a list of people that US persons are not permitted to transact with in any manner. The list can generally be broken down into two categories:

1) People from specific embargoed countries and geographic areas such as Iran, North Korea, and Syria[5]; and

DocuSign Envelope ID: E9BA162B-DAE5-4A4C-9342-472F0B942746

2) people on the Specially Designated Nationals (SDN) list[6], which is comprised of select individuals responsible for particularly bad behavior like human trafficking or government corruption.

Unlike most other US financial laws that use process-based rules that must be followed, OFAC sanctions simply prohibit certain activities - i.e., doing business with people on the sanctions list.  Relatedly, sanctions laws impose strict liability, meaning there is no legal defense for a person or entity who engages in a prohibited transaction, even if the person or entity later tried to do the right thing. Historically, the consequences for those who purposefully evade or ignore sanctions laws are much more severe than for those who attempt to avoid transacting with a sanctioned person. Indeed, consequences can include criminal prosecution and jail time.

Most companies implement risk-based procedures that are tailored to their particular business in order to avoid sanctions violations. The convenience store located in Minnesota faces virtually no risk of violating these rules and engaging in significant business with sanctioned individuals and thus likely does not need a "know your customer" (KYC) program. On the other hand, a US-based or affiliated bank operating in countries that rank high in corruption or are on a prohibited list will likely need to be able to conduct thorough background checks on customers to ensure compliance.

OFAC sanctions are one of the legal regimes that offer clarity when applied to most crypto asset projects. For any US person or entity operating a project in the cryptocurrency or blockchain asset space, that person or entity is potentially liable if a sanctioned individual uses their service. OFAC has included some frequently asked questions about virtual currencies on its website, and, notably states that it may identify certain "prohibited" virtual currency wallet addresses belonging to individuals on the SDN list so that US persons can block transactions with that address.

A person or entity's risk of exposure to sanctioned individuals and countries can vary widely based on the specific project and may be influenced by such variables as the type of assets being offered, the volume of transactions being facilitated, and the areas in which the service is available. There is no one-size-fits-all to OFAC sanctions compliance in cryptocurrencies and blockchain assets, but it is an important issue that each project should consider.

Federal Anti-Money Laundering Regulation

US law requires certain players in the financial system to assist in detecting and preventing money laundering activity and terrorist financing.  For example, the Bank Secrecy Act (BSA) requires certain "financial institutions" to assist the US government by implementing certain anti-money laundering (AML) programs and filing reports with the government when certain transactions, or "suspicious transactions," are identified by those programs.

The BSA covers a wide range of financial institutions including everything from banks to casinos. For developers working with crypto assets, the BSA applies to "money services businesses," a category that is further subdivided to include "money transmitters." The Financial Crimes Enforcement Network (FinCEN), which is the primary federal regulator responsible for enforcing the BSA, has interpreted certain businesses involved in crypto assets to fall under the definition of money transmitters such that they must comply with the BSA.

According to FinCEN, a money transmitter is defined as anyone in a business involved in "the acceptance of currency, funds, or other value that substitutes for currency from one person and the transmission . . .to another location or person by any means." When adopting this language, FinCEN confirmed that the reference to "other value that substitutes for currency" was intended to apply to other value systems that do not involve the transfer of fiat currency. The BSA regulations seek to make the determination of whether someone is a money transmitter specifically based on the "facts and circumstances" of each case, which is a signal to the legal community that the definition is intended to be broad and malleable.

For example, in 2013 FinCEN issued guidance directed in part at the crypto asset industry delineating when FinCEN considered certain crypto businesses to be money transmitters. In general, FinCEN defines convertible virtual currency as a "medium of exchange" that "either has an equivalent value in real currency, or acts as a substitute for real currency."

It should be evident from this broad definition that most of the current tokens and cryptocurrencies widely available on the market likely meet this definition, particularly most ERC-20 tokens.  However, we can also look to the other end of the spectrum and see how a non-fungible token ("NFT") in the form of a crypto-collectible may not meet this definition as it is hard to imagine how we could use something like CryptoPunks as a medium of exchange despite each potentially having some discoverable value in fiat.

BSA has not clearly delineated the line between what is and is not a convertible virtual currency and there have only been a few court cases addressing which tokens meet the definition of a convertible, virtual currency.  In contrast,

DocuSign Envelope ID: E9BA162B-DAE5-4A4C-9342-47E50B942746

there have been a handful of cases have confirmed that Bitcoin is a convertible virtual currency. In another case, Ripple, a self-described currency exchange and settlement system, settled a case brought by the government that was premised on XRP being a convertible virtual currency. However, with respect to the ever-increasing number of tokens and NFTs available on the market, the only source of guidance is the publication statements issued by FinCEN that give some guidance as to how they will interpret the term most broadly to cover many of the tokens on the market.

Our recommendation is to assume that any token meets the definition of a convertible virtual currency according to the FinCEN guidelines. FinCEN has provided guidance regarding certain activities involving convertible virtual currencies that constitute money transmission which include the following categories:

*User* – someone who obtains convertible virtual currency in order to purchase goods or services. FinCEN seems to have broadened this definition to include someone who purchases convertible virtual currency as investment for his/her own, personal account.

*Exchanger* – someone engaged in the business of exchanging virtual currency for real currency, funds, or another virtual currency by either 1) accepting and transmitting a convertible virtual currency or 2) buying and selling a convertible virtual currency for any reason.

*Administrator* – someone engaged as a business in issuing (putting into circulation) a virtual currency, and who has the authority to redeem (to withdraw from circulation) such virtual currency. As most crypto assets are issued without an ability to mandate redemption, this definition is generally not that relevant for our purposes.

Since issuing its initial guidance in 2013, FinCEN has tried to clarify these definitions in subsequent "Administrative Rulings." For example, they wrote that a person who exchanges virtual currency for their own account and not as a business providing service to third parties is considered a user and not an exchanger. In another ruling, FinCEN stated "[t]he production and distribution of software, in and of itself, does not constitute acceptance and transmission of value, even if the purpose of the software is to facilitate the sale of virtual currency."

For developers there is a strong argument that the definition of exchanger does not apply to someone who does not take custody of another person's virtual currency. As explained in this report from *Coin Center (see https://www.coincenter.org)*:

A non-custodial exchange is probably not an exchanger or a money transmitter. If, like Craigslist or any other online classified advertising service, the business merely helps individual buyers and sellers find and communicate with each other, then it is never "accepting and transmitting" tokens or bitcoins for its users, nor is it "buying or selling" tokens or bitcoins. It may be commonly understood as an exchange because it deals in exchange-related information (e.g. order-books, offers, acceptances, communications between buyers and sellers) but it, as a company, is never doing the actual currency conversion or handling the actual tokens or money; that all happens peer-to-peer. Another way to characterize what these companies do is: development of a web-based software tool (e.g. a website) that facilitates peer-to-peer exchange. As we discussed earlier, FinCEN's Software and Investment Ruling describes mere software development and distribution as outside the scope of BSA regulation.

The facts and circumstances of any particular project on the blockchain may impact this analysis.

Relevant Legal Cases

A.      *Enforcement Actions Exceeding the Commission's Statutory Authority*

The Commission's regulatory authority is not unlimited, but rather is bound by the statutes that it is charged with enforcing. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 213 (1976). The Commission may not unilaterally define, much less expand, the scope of its statutory authority. *Business Roundtable v. S.E.C.*, 905 F.2d 406, 408 (D.C. Cir. 1990). The statutes that define the scope of the Commission's authority are to be interpreted by the courts and not the Commission.

As of the date of this letter, the Commission's attempt to regulate cryptocurrencies under the rubric of "investment contracts" has faced only limited judicial scrutiny. There have been a handful of preliminary decisions, all of which involved allegations of fraud, which are treated differently from non-fraud cases. *See, e.g., S.E.C. v. PlexCorps*, 2017 WL 6398722, at *2 (E.D.N.Y. Dec. 14, 2017); *U.S. v. Zaslaviskiy*, 2018 WL 4346339, at *1–9 (E.D.N.Y. Sept. 11, 2018); but see *Blockvest*, 2018 WL 6181408, at *4 (denying preliminary injunction and holding that "[b]ecause they [i.e., the tokens] are not securities, Plaintiff's causes of action fail"). In addition, the Commission has issued a number of statements attempting to define the scope of its authority and has gotten a handful of smaller companies in the crypto space to agree to settled cease-and-desist orders that reflect a similar approach." In trying to structure this regulatory approach to cryptocurrencies, the Commission has relied on an extremely broad application of the Supreme Court's decision in

*Howey* one that would clearly expand the scope of the Commission's authority in this area well beyond its statutory limits. Indeed, in one recent case where the court applied a more rigorous application of the *Howey* test, the court flatly rejected the Commission's claim that a sale of a cryptocurrency amounted to an "investment contract." *See Blockvest*, 2018 WL 6181408, at *4.

B.    A *"Currency" is Exempt from the Definition of a "Security" Under the Federal Securities Laws*

It is well settled that courts have long recognized that the definition of a "security" under the Securities Act and the Exchange Act is distinct from "currency." *See, e.g., Reves v. Ernst & Young*, 494 U.S. 56, 61 (1990); *see also Great Rivers Co-op. of Southeastern Iowa v. Farmland Indus., Inc.*, 198 F.3d 685, 698 (8th Cir. 1999). The definition of "security" in the Securities Act does not include the term "currency" (15 U.S.C. § 77b(a)(1)), and the Exchange Act *expressly excludes* "currency" from the definition of a "security." *See* 15 U.S.C. § 78c(a)(10) ("The term 'security' means . . . *but shall not include currency*" (emphasis added)).

While "Currency" has not been defined under the federal securities laws, the term has long been understood to mean a product of value or a "medium of exchange." (See Black's Law Dictionary (an item that circulates "as a medium of exchange")). Since cryptocurrencies can be used for peer-to-peer transactions, are convertible to other currencies, and have been widely accepted by digital applications and retailers, they likely qualify as currency. (*See* Merriam Webster (cryptocurrency is "any form of currency that only exists digitally, that usually has no central issuing or regulating authority but instead uses a decentralized system to record transactions and manage the issuance of new units")). For purposes of the federal securities laws, "currency" need not be legal tender, or recognized by the United States or any other foreign country to fit within the definition. *See generally Sea Pines of Va., Inc. v. PLD, Ltd.*, 399 F. Supp. 708, 711–12 (M.D. Fla. 1975) (promissory note, as a "cash substitute," was "within the exclusion for currency," and therefore not a security).

Courts and federal agencies, uniformly, have repeatedly characterized cryptocurrencies as "currencies." Earlier this year a federal court explained that "[v]irtual currencies are generally defined as 'digital assets used as a medium of exchange.'" *Commodity Futures Trading Comm'n v. McDonnell*, 287 F. Supp. 3d 213, 218 (E.D.N.Y. 2018); *see also Commodity Futures Trading Comm'n v. My Big Coin Pay, Inc. et al*, 2018 WL 4621727, at *5 (D. Mass. Sept. 26, 2018) (Memorandum of Decision) (*quoting In re BFXNA Inc.*, CFTC Docket 16–19, at 5–6 (June 2, 2016)) ("[V]irtual currencies are . . . properly defined as commodities."). This interpretation is consistent with enforcement actions and guidance issued by FinCEN, the Internal Revenue Service ("IRS"), and OFAC, which describe virtual currencies as "a medium of exchange, a unit of account, and/or a store of value." See FIN-2013-G0001, Application of FinCEN's *Regulations to Persons Administering, Exchanging, or Using Virtual Currencies* (Mar. 18, 2013); IRS Notice 2014-21; FinCen Fines Ripple Labs, Inc. in *First Civil Enforcement Action Against a Currency Exchanger*, FinCEN (May 5, 2015); OFAC Frequently Asked Questions (2018-11-28).

C.    *Any Smart Contracts on the DAO Do Not Constitute "Investment Contracts"*

In *Howey,* the US Supreme Court has defined an "investment contract" as "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." *Howey*, 328 U.S. at 298–99. In determining whether a particular contract or transaction meets this standard, courts consider the specific terms of the contract and the facts and circumstances underlying the transaction, including any promotional materials, promises about investment and the nature of the item purchased. Although courts may consider the purchaser's subjective intent, the court focuses on what purchasers were "offered or promised," irrespective of whether purchasers had a subjective expectation of investment. *See Warfield v. Alaniz*, 569 F.3d 1015, 1021 (9th Cir. 2009) ("[W]hile the subjective intent of the purchasers may have some bearing on the issue of whether they entered into investment contracts, *we must focus our inquiry on what the purchasers were offered or promised*" (emphasis added)).

Other courts have held that the term "investment contract" is not a boundless catch-all that encompasses every transaction the SEC would like to regulate, but instead "has the limited purpose of identifying *unconventional instruments that have the essential properties of a debt or equity security.*" *See Wals v. Fox Hills Dev. Corp.*, 24 F.3d 1016, 1018 (7th Cir. 1994) (emphasis added). The term "investment contract" is supposed to include scenarios where a passive investor entrusts his money to managers of a business venture who agree to exert their entrepreneurial efforts in order to make the investor's money investment increase in value. *See Piaubert v. Sefrioui*, 2000 WL 194149, at *4 (9th Cir. Feb. 17, 2000) (agreeing with the District Court that "[t]o be an investment contract, one of the characteristics is that the investor is passive and relies on others to make money (or not)"); *Steinhardt Group Inc. v. Citicorp*, 126 F.3d 144, 155 (3d Cir. 1997) (finding that because "[defendant] was not a passive investor, we need not consider whether the securitization here constituted a common enterprise").

The regulations and law in the cryptocurrency and blockchain asset space is evolving daily. Although the SEC has taken the blanket position that all DAOs are a "security," we believe a more careful analysis is required in this matter. To that end, the defense raised by Kik and Kin Foundation to the Commission's enforcement action is instructive. While [Treasury] and Kik are markedly different in their modus of operations and intent in issuing tokens, some of the basic facts and principles apply to [Treasury]. While there is a general argument that any attempt by the Commission to regulate [Treasury] exceeds its statutory authority, there are also more practical methods that can be deployed to reduce the potential liability or likelihood of an enforcement action by the Commission, BSA or OFAC.

It is important to keep in mind that the baseline for determining the existence of a "security" is still the US Supreme Court's opinion in Howey. With that in mind we make the following recommendations:

A.       Token Purchasers cannot have an expectation of profits from the efforts of others.

In general, there is no expectation of profits where purchasers are primarily led to expect an item for use or consumption, even in the future. *Forman*, 421 U.S. at 852–53. Nor is there a reasonable expectation of profits merely because the promoter mentions that an item could increase in value or that the purchaser could profit. *See Alunni*, 445 F. App'x at 292 (no investment contract in purchase of condominiums where promotional materials stated that purchasers would receive immediate income and did not have to manage their units); *Revak v. SEC Realty Corp.*, 18 F.3d 81, 84 (2d Cir. 1994) (no investment contract where condominiums were marketed for "the income to be derived from rentals, and the prospect of capital appreciation"); *Hart*, 735 F.2d at 1003 (no investment contract for model home purchases where promotional materials touted "the potential for excellent appreciation in value during the holding period").

[Treasury] provides only a platform to allow others to propose and fund "projects" designed to be for the public good on its platform. It is to [Treasury]'s benefit that no tokens are issued by [Treasury] to project sponsors or participants and that the tokens are limited for purchase by the individual project. It is equally important that the tokens not include any expectation of profit from the efforts of others and that the tokens continue to be marketed and sold as a governance or utility token that will provide voting rights, but no right to profit from participation in the enterprise.

B.       Even if purchasers can reasonably expect profits, such expectation must be based on the "undeniably significant" entrepreneurial or managerial efforts of the promoter.

In *S.E.C. v. Glenn W. Turner Enters., Inc.*, 474 F.2d 476, 482 (9th Cir. 1973) the court emphasized that even if purchasers expected a profit, that profit must be at the "undeniably significant" entrepreneurial efforts of the promoter. These efforts must be value generating, which excludes foundational efforts, such as building infrastructure. *See, e.g., Terracor*, 574 F.2d at 1025. Additionally, the Commission cannot consider any profits from resale on any secondary market and would similarly fall outside the scope of *Howey*. Importantly, if the purchaser has complete control over the item or interest purchased, he or she does not expect profits from the efforts of others. *See Alunni*, 445 F. App'x 288.

As the court explained in *Forman*, when a promoter sells an item for consumptive use rather than as a passive investment, the federal securities laws do not apply. *Forman*, 421 U.S. 858. Courts have found no investment contract even where the consumptive use of the item in question is not available at the time of purchase. *See, e.g, Terracor*, 574 F.2d 1023. This is true even where the seller is the only entity who can create the eventual use. *Id*. In other words, a delay in the ability to "consume" the product after purchase is not determinative.

The Supreme Court's decision in *Forman* is instructive. There, a one-time purchase of shares proportional to the number of rooms in a housing co-op was not an investment contract despite the fact that the co-op was not ready for move-in at the time of the transaction. *Forman*, 421 U.S. 837. Even though purchasers did not hold legal title to the apartments and could not "consume" the product for years until the project was complete, the transactions were not "investment contracts." *Id*.

In addition, the courts have held that where a contract involves a sale of a commodity and expected profits arise primarily from resale on the secondary market, the final prong of *Howey* is not satisfied. *See Noa v. Key Futures, Inc.*, 638 F.2d 77, 79 (9th Cir. 1980) (no expectation of profits from the efforts of others under Howey because, once the commodity was purchased, the profits of the investor depended on market fluctuations, not the managerial efforts of the defendant); *see also S.E.C. v. Belmont Reid & Co., Inc.*, 794 F.2d 1388, 1391 (9th Cir. 1986) (same).

These cases are instructive as [Treasury] sells no tokens to purchasers and even if it makes them available for sale in the approved projects, makes no representation of profit and makes no significant effort to increase the value of any tokens sold or minted. The fact that the tokens may increase in value based upon a number of factors, including

DocuSign Envelope ID: E9BA162B-DAE5-4A4C-9342-472E0B942746

the bonding curve and any holdbacks or credits identified by the project promoters, are insufficient to satisfy the third prong of *Howey*.

        C.      [Treasury] should stay sufficiently decentralized to fall outside the scope of federal securities laws.

As noted above, Ethereum has escaped regulatory scrutiny from the Commission and other regulatory agencies due in large part to the efforts of the Ethereum Foundation. The Ethereum Foundation seeks to "promote and support [the] Ethereum platform and base layer research," including making software available and releasing protocol updates. (See Ethereum Foundation Mission Statement.26) Director Hinman has expressed his view that Ethereum is "sufficiently decentralized" to fall outside the scope of the federal securities laws, meaning that the Ethereum Foundation is not providing essential entrepreneurial or managerial efforts, *despite exerting significant efforts generally*. (*See When Howey Met Gary* (Plastic), (June 14, 2018).) The Ethereum Foundation is a good model for [Treasury], which should continue to exert "essential entrepreneurial or managerial efforts," but remain "sufficiently decentralized" to arguably avoid the federal regulatory scheme for securities and investment contracts.

*Our recommendation is that [Treasury] continue its efforts to act as gatekeeper for proposed projects (in fact it will be required to continue to act as gatekeeper, see infra). It should also feel free to make its software or access to its DAO available to those promoters who want to propose a project without fear of running afoul of federal securities regulations.*

        D.      Set up a protocol or system to avoid transactions with citizens of embargoed countries and SDPs and avoid violation of the AML regulations.

We expect that with the instability in the international scene and the increased use of cryptocurrencies, federal regulators will increase scrutiny of cryptocurrency transactions with citizens of embargoes countries as well as with SDPs. This may be [Treasury]'s most obvious potential liability as donations will pass through its DAO and is obligated to comply with the financial regulations outlined above. Our recommendation is that [Treasury] set up a protocol and safeguards to ensure that any project promoter or token purchaser is not a resident of an embargo country or an SDP. While we understand the technical challenge this recommendation poses, a protocol with safeguards would be the best defense for [Treasury] in any enforcement action by any agency.

Similarly, [Treasury] should set up a protocol that would allow it to identify any potential violation of the AML regulations. The mere purchase of tokens would be insufficient to trigger AML regulations; instead [Treasury] would need to be able to identify any purchaser who was able to sell the tokens in significant amounts on a secondary market exchanging the tokens for another currency that would allow an easier transfer of funds to a crypto such as Bitcoin or Ethereum.