# Exhibit I

# April 27, 2023 Preliminary Injunction Hearing Transcript

# Morning Session

```
1    AUDIO IS EXCELLENT - USING THIS FILE TO SCOPE
2    Today is Thursday, April 27th, 2023  (A.M. SESSION)
3    Preliminary injunction hearing with Judge Reid.
4
5    *** ROUGH *** ROUGH DRAFT *** ROUGH DRAFT *** ROUGH *** ROUGH
6
7            COURTROOM DEPUTY:  *blurb.
8            THE COURT:  Good morning, everyone.  Please be seated.
9            We have a lot of notebooks here and a full day.
10           So, let's start with appearances from counsel, starting
11   with plaintiffs.
12           MR. BERG:  Good morning, Your Honor.
13           Chris Berg on behalf of plaintiffs.
14           MR. KUSSMAN:  Good morning, Your Honor.
15           Benjamin Kussman, also on behalf of plaintiffs.
16           MR. IGLESIAS:  Good morning, Your Honor.
17           Andrew Iglesias, also on behalf of the plaintiff.
18           THE COURT:  Okay.
19           MS. KATZ:  Jamie Katz on behalf of plaintiffs.
20           THE COURT:  Ms. Katz, all right.
21           And defendants?
22           MR. SINGH:  Good morning, Your Honor.
23           Nitoj Singh, here on behalf of the defendants.
24           THE COURT:  Mr. Singh.
25           MR. FRANKLIN-MURDOCK:  Good morning, Your Honor.
```

1    parent.

2    Q.   So the parent would provide some sort of financial

3    assistance --

4    A.   Correct.

5    Q.   -- to cell DAOs?

6    A.   Yes.

7    Q.   You mentioned the endowment being invested for yields.

8         Can you explain what yields means?

9    A.   Yes.  So blockchain has these things called D naive

10   protocols, decentralized finance protocols where you loan your

11   crypto and you generate yield, meaning you just get more crypto

12   back.  It's like earning interest on your crypto.

13   Q.   Did you personally contribute anything to the MOVEMENTDAO

14   endowment?

15   A.   I did, yes.

16   Q.   How much did you contribute?

17   A.   Roughly, 13 million dollars.

18   Q.   Were you the larger contributor to the project?

19   A.   Yes.

20   Q.   What about Alex fine and Jon Gordon, did necessity make

21   contributions?

22   A.   They did.  Alex fine, the second largest, at about three

23   million dollars; and third largest at three hundred thousand

24   dollars.

25   Q.   All combined, approximately, how much did the three of you

1    contribute?

2    A.   A little over 16 million dollars.

3    Q.   Did others contribute to the project?

4    A.   They did.

5    Q.   Excluding you, Mr. Fine and Mr. Gordon, approximately, how

6    many did all the other contributed Torres?

7    A.   About three to 00.

8    Q.   Provide to the endowment?

9    A.   About three hundred thousand dollars in aggregate.

10   Q.   Were you supposed to get anything in exchange for that

11   {audio}?

12   A.   Yes.

13   Q.   What was that?

14   A.   We were supposed to get MOVE tokens.

15   Q.   Are those unique to the MOVEMENTDAO?

16   A.   They are, yes.

17   Q.   What were MOVE tokens supposed to do?

18   A.   MOVE tokens were how governance would work, so depending on

19   how many MOVE tokens you have, you would be able to cast votes

20   on proposals, on which sub movements receive funding, any other

21   governance matters on MOVEMENTDAO.

22   Q.   When you say "governance matters," can you explain what you

23   mean by that?

24   A.   Yes, anything that requires a vote.

25        So, electing officials, voting on which proposals, we would

```
1    invest any governance -- other governance matters on the DAO.
2         Your MOVE tokens on a pro rata basis would weigh your
3    voting power.
4    Q.   And is the dynamic one vote, one MOVE token?
5    A.   Yes.
6    Q.   Can you explain how the MOVEMENTDAO would actually perform
7    the voting function?
8    A.   Yeah, voting would happen in a decentralized way, where you
9    would go to a web page hosted on move Dot XYZ.  You would
10   connect your wallet, which would verify how many MOVE tokens
11   you'd owned; and then you'd be able to click on the interface
12   which votes you wanted to cast, which proposals you wanted to
13   approve, and what other actions that you were in favor of
14   taking.
15   Q.   Is there a platform that MOVEMENTDAO would use or
16   contemplated using to perform these voting actions?
17   A.   MOVEMENTDAO is supposed to have a blockchain-based approach
18   to voting, that was also integrated with snapshot for
19   recordkeeping.  Snapshot is a centralized, basically -- it's a
20   software voting system.
21   Q.   So, as some of the largest contributors to the projects,
22   what was your 16 million dollars supposed to get you once the
23   project launched?
24   A.   Well, it was supposed to get us -- when the project
25   launched, we were supposed to get MOVE tokens.
```

```
1    Q.   And based on your contribution, the size of your
2    contribution, how much voting power would that have given you?
3    A.   We would have a vast majority of voting power, which gave
4    us assurance that they, basically, couldn't get done without
5    us.
6    Q.   Did you ever receive MOVE tokens?
7    A.   No.
8    Q.   What happened instead? Stop*
9         MR. SINGH:   Objection, vague calls for a narrative.
10        THE COURT:   Overruled.
11   A.   I never received MOVE tokens and all -- one day we were
12   told that our money no longer belongs to us and we were no
13   longer in control.
14   Q.   When that happened were you able to participate in the
15   MOVEMENTDAO community from that point forward?
16   A.   We had access to the community discord but we were not able
17   to vote on any proposals or access our funds or anything of the
18   like.
19   Q.   Can you please explain to the Court what discord is?
20   A.   It's a software application that let's users chat with each
21   other. Start*
22   Q.   Who is responsible for locking out the MOVEMENTDAO project?
23   A.   Mark Phillips.
24   Q.   How was Mark Phillips involved with MOVEMENTDAO?
25   A.   We originally hired him as a senior engineer on the
```

1  project.

2  Q.  Overtime, did you put him in a position of authority over

3  the project?

4  A.  Yes, we did.

5  Q.  Did you charge him with implementing the MOVEMENTDAO?

6  A.  Yes, we did.  Stop*

7  Q.  Can you tell me what implementing the MOVEMENTDAO meant?

8  A.  There's very specific requirements for what that meant.  We

9  needed MOVE tokens, we needed a user interface, move Dot XYZ

10  that users could use.

11      We needed users to be able to create their own DAOs.  We

12  needed an electricallized system.  We needed decentralized

13  value and {CH}.

14  Q.  The same core things we talked about earlier {audio}?

15  A.  Correct.  Correct.

16  Q.  Did Mr. Phillips have expertise in structuring and

17  developing a DAO platform?

18  A.  We were -- we believe that he did.

19  Q.  Do you have that expertise?

20  A.  I did not.

21  Q.  Did you rely on him to help move MOVEMENTDAO projects?

22  A.  Yes, almost entirely.

23  Q.  Did he explain to you that you were in control of that

24  project?

25  A.  All the time.

1   Q.   While he was doing that, was he taking steps to help Launch

2   the project?

3   A.   He was telling us, and we believed that he was, yes.

4   Q.   Did that include operationalizing that SnapChat platform we

5   discussed?

6   A.   Yes, that's correct.

7   Q.   Were proposals passed on snapshot through voting?

8   A.   They were.

9   Q.   Were those votes binding on the MOVEMENTDAO project?

10  A.   Not at all.

11  Q.   Why were they not binding?

12  A.   Because we were told that they were not binding and a

13  mechanism to receive feedback and engagement from the

14  community.

15  Q.   Prior to you being locked out of the project, who

16  controlled the project?

17  A.   I did.

18  Q.   Did you pull the team together for the project?

19  A.   I did.

20  Q.   Did you pay the team's salaries?

21  A.   I did.

22  Q.   Would the leader of the project come to you for final

23  approvals?

24  A.   Yes.

25  Q.   Buck stops with you?

1    only have authority over the revenue generated by the

2    endowment; is that correct?

3    A.    Correct.

4    Q.    What would happen if a snapshot proposal purported to

5    authorize the transfer of endowment funds, instead of revenue

6    generated from endowment funds?

7    A.    It would go against the terms.  It's not allowed.

8    Q.    Based on your understanding, was the endowment ever

9    accepted to generate revenue?

10   A.    No.

11   Q.    Does the GIT book when the MOVEMENTDAO community began to

12   exercise control over the endowment {audio}?

13   A.    Yes, it does.

14   Q.    Please turn to Page 54 and please read the second graph

15   under the heading "token distribution."

16   A.    After the initial move distribution by contributions to the

17   endowment and describe a community air drop, the community will

18   manage the remaining treasury through snapshot.

19   Q.    Does the /STKPWEUT book describe when the community's votes

20   on snapshot become binding --

21   A.    Yes, it does.

22   Q.    -- on MOVEMENTDAO?

23        Please turn to page 20 on Exhibit 6.  Tom of the page

24   there, please read the second paragraph on the top of the page.

25   A.    "T L D R which is too long didn't read, at launch we are

1    employing a Moses nut did he signature safe to manage the DAO

2    funds community discord to coordinate discussions and snapshot

3    after the token distribution for voting null the law *tribunal

4    is complete.

5    Q.    Snapshot is the voting /TPHRALT form or discussed earlier

6    correct?

7    A.    Correct.

8    Q.    The tokens referenced in that sends is that reference to

9    MOVE tokens?

10   A.    Correct.

11   Q.    According to the get book when do snapshots votes /KPW-PL

12   binding?

13   A.    After the /TOEPBLS are distributed.

14   Q.    In the front pocket of your binder Mr. /PWREUS low there is

15   a document which is the joint stipulation of facts provided to

16   this Court by the parties.  Can you turn to fact stipulation

17   number 12 and read it into the record?

18   A.    "As of the date of this joint stipulation no MOVE tokens

19   have been crated offer disburse erred go anyone that

20   contributed to the DAO endowment.

21   Q.    Thank you.  Does the get book expressly articulate the role

22   MOVE tokens have on the MOVEMENTDAO platform?

23   A.    Yes.

24   Q.    Please turn to page 478 of Exhibit 6.  Please read the

25   first sends under the heading MOVE tokens system.

1   A.   Yes.

2   Q.   Approximately, when did Mr. Phillips create the DAO

3   endowment account?

4   A.   I believe it was February of '22.

5   Q.   What is the alias at the **top Doe law firm dot Inc.

6        Do you see that?

7   A.   Yes.

8   Q.   Whose alias is that?

9   A.   That's read check's law firm.

10  Q.   What made you think that was read law check's law firm?

11  A.   Mark Phillips told us that was read check's law firm.

12  Q.   Any other reason?

13  A.   Yes it's described in the GIT book.

14  Q.   Let's go to page 63 of Exhibit 6.  Would you please read

15  the fourth line from the top of the page starting from the law

16  office?

17  A.   The law office of read you are check parenthesis the

18  company will act as a service provider for the MOVEMENTDAO.

19  Q.   Now,  please go back to page.  Lead the last sentence

20  /THAOPB inch is acting as is the initial service provideer for

21  the do you?

22  Q.   What does this tell you?

23  A.   This was represented /KWRAOB read law check's firm.

24  Q.   That was to be presented?

25  A.   DAO used at a laboratory.

1   Q.   Why was it used?

2   A.   Because we were storing over 16 million dollars in crypto

3   and we needed to insure maximum security and Mark Phillips

4   suggested that having a law firm as a signatory would increase

5   the protection and security of the multi-signature.

6   Q.   Was the involvement of a law firm important to you?

7   A.   It -- after mark Phillips recommended it I thought it was a

8   good idea and it became important to me yes.

9   Q.   And you believe that law firm was the law office of read

10  check?

11  A.   Why he.

12  Q.   Who was the primary point-contact in /PHR-BG check's firm

13  in connection with the MOVEMENTDAO projects?

14  A.   It was Mark Phillips who I believe works or worked there.

15  Q.   Did Mr. Phillips tell you advice that Mr. Check provided

16  to you about the projects?

17  A.   All the time, yes.

18  Q.   Did you rely on that advice that Mr. Phillips came come

19  from the law firm?

20  A.   Relied deeply on that advice.

21  Q.   Did Mr. Phillips ever say Mr. Check advised to create

22  certain entities to support the MOVEMENTDAO projects?

23  A.   Yes.

24  Q.   What entities were those?

25  A.   He advised that we create unincorporated non-profit entity

1   at the time more secure to have him and the law firm securely

2   hold onto our keys.

3   Q.   Did you ever tell Mr. Phillips that you would never need

4   access to your keys?

5   A.   Not.

6   Q.   The MOVEMENTDAO project make progress after Mr. Fine left

7   and Mr. Philip Morris became the lead?

8   A.   It perceived progress, mark would report all of these

9   progress updates to us but /SKWRAUPBLG and I didn't have the

10  technical prowess to vet how legitimate that project was.

11  Q.   So at this time in February of 2022 how long did he say it

12  would take until the platform launched?

13  A.   Consistently it was a few more months, a few more months.

14  Q.   When you say consistently what do you mean there?

15  A.   A few months would go buy and we would talk to him hand

16  needed another more months we were also very close and the

17  excuse up to that time Alex was getting in the way now that ex

18  excuse was gone and now we thought we would give him some more

19  time.

20  Q.   During this time in whatever of 2022 did you start another

21  Doe?

22  A.   Yes.

23  Q.   What was it called?

24  A.   Piece Doe.

25  Q.   On what platform was it launched?

```
1   A.   Juice box dot money.

2   Q.   Is juice box dot money related to MOVEMENTDAO?

3   A.   No.

4   Q.   Why did you not launch it on MOVEMENTDAO?

5   A.   Because nothing was ready for us to Launch on MOVEMENTDAO.

6   Q.   Did /SKWRAOUT /KPWOBGS platform have an interface to create

7   your Doe?

8   A.   It did it had a full interface to /ER create the DAO.

9   Q.   Had use /TKER.

10       Did the juice box platform operational rises fundraising

11  for peace Doe?

12  A.   Yes.

13  Q.   Had MOVEMENTDAO's platform achieved that functionality?

14  A.   No.

15  Q.   Could piece Doe issue tokens?

16  A.   Yes.

17  Q.   Had MOVEMENTDAO's platform achieved that functionality?

18  A.   No.

19  Q.   Did piece do you in fact use juice box to issue tokens?

20  A.   Yes.

21  Q.   What were those called?

22  A.   Piece tokens.

23  Q.   Piece tokens.  Did the MOVEMENTDAO plats form ever host any

24  social impact groups offer any other Does on its plat form?

25  A.   Not really.  There was abet at that one on Alex's front end
```

1   Q.   By the end of August 2022, did you notice any activity on

2   snapshot?

3   A.   Yes.  There was a flurry of snapshot proposals.

4   Q.   Did you know what the proposals were about?

5   A.   Vaguely.  Mark had represented to me that they were consist

6   can't with our project, that they were merely to inform the

7   community of how the 1.7 million is going to be approved and

8   then spent.

9   Q.   Prior to August 2022, had there been a lot of snapshot

10  proposal activity?

11  A.   Some but not nearly as much.

12  Q.   Were the proposals limited to just the 1.7 million

13  transfer?

14  A.   I believe they were at the time that's what I was told but

15  in reality, they were not.

16  Q.   Did Mr. Phillips suggest to you that you should read the

17  proposals and vote on them?

18  A.   No he suggesteded the contrary that I didn't need to read

19  the proposals that he was working with the law firm that had

20  represented our /SKUGSs and reiterated do you say that very few

21  people read niece anyway.

22  Q.   Are you aware that defendants' I don't know tend that by

23  August 2022 the MOVEMENTDAO launched and these proposals /R-S

24  binding at this time?

25  A.   I am now aware that this is what they were contending.

1   Q.   What was the end result of {audio}?

2   A.   We had some very hard conversations, and we had so /PWHUFRP

3   cost no the project and we still believed Mark at the time we

4   tell gave mark a final chance as location as we were monitoring

5   spinned and progress and this was his final shot no prove that

6   this could be {audio}.

7   Q.   And did  Mr. Phillips provide you with information that

8   would allow you to monetary ex pending on the project?

9   A.   Yes with had a three-hour comprehensive, outlining all of

10  the expenses that were planned for this final push it to launch

11  {audio}.

12  Q.   And that occurred in August/September?

13  A.   Correct.

14  Q.   I would like you to turn to tab 90.  Your Honor, I'd like

15  to move into evidence tab 90 as Exhibit 90.

16       THE COURT:  I'm just double-checking to see if that was

17  one there was no objection, and it appears that it is.  Yes.

18  '90s fine, admitted.

19       (Plaintiff's Exhibit * received into evidence.)

20  BY MR. BERG:

21  Q.   Mr. Breslow, I would like you to take a look through

22  Exhibit 90, are these the materials that Mr. Phillips gave you

23  that August and September time period?

24  A.   Yes.

25  Q.   Did you review these materials with Jon Gordon at the time?

1   A.   Yes.

2   Q.   Did they assure you that that 1.7 him you authorized was

3   being spent appropriately?

4   A.   Yes.

5   Q.   Over the next few months, did the project issue MOVE

6   tokens?

7   A.   No.

8   Q.   Was it user interface created?

9   A.   No.

10  Q.   Had the endowment assets been invested to produce yield?

11  A.   No.

12  Q.   Was this the progress on the project that you had hoped

13  would materialize?

14  A.   Not at all.

15  Q.   As the months went on did your faith in Mr. Phillips begin

16  to Wayne you haven't severally?

17  Q.   What did you decide to do about that?

18  A.   I decided that this was a black hole for our money and

19  where he should shutdown the project.

20  Q.   And how did you go about executeing on that decision?

21  A.   We decided that we needed a peace if you will way out, mark

22  still held onto all of our crypto and we didn't want to make an

23  enemy out of him so I decided to take the hit and make sure

24  everyone could get reimbursed one to one all the other

25  contributors as we shutdown the front.

**April 27, 2023 Preliminary Injunction Hearing Transcript**

**Afternoon Session**

```
1    AUDIO IS EXCELLENT - USING THIS FILE TO SCOPE

2    Today is Thursday, April 27th, 2023  (P.M. SESSION)

3    Preliminary injunction hearing with Judge Reid.

4

5    *** ROUGH *** ROUGH DRAFT *** ROUGH DRAFT *** ROUGH *** ROUGH

6

7    Start*

8              COURTROOM DEPUTY:  Court is back in session.

9              THE COURT:  Good afternoon.  Please be seated.

10             Mr. Berg, call your next witness.

11             MR. BERG:  Mr. Kussman is calling the next witness.

12             MR. KUSSMAN:  Your Honor, plaintiff is calling Jon

13   Gordon.  I also have binders.

14             THE COURT:  I'm glad to hear there are subsets.

15             Betty, if you can hand that to me, please.

16             COURTROOM DEPUTY:  Please raise your right hand.

17             Do you solemnly swear or affirm to tell the truth, the

18   whole truth, and nothing but the truth, so help you God?

19             THE WITNESS:  Yes.

20             COURTROOM DEPUTY:  Please state your name and spell

21   your last name for the record.

22             THE WITNESS:  Jonathan Gordon, G-O-R-D-O-N, Jonathan E

23   cuz cuz.

24   Q.  Good afternoon, Mr. Gordon.  Stop*

25        This morning you heard us talk about something, the
```

1   with my law firm, and that e-mail address is not authorized to

2   send communications on my or my firm's behalf, end quote.

3       Do you see that?

4   A.  Yes.

5   Q.  Let me ask you the question again, Mr. Gordon.

6       Do you now think that those e-mails came from Reed Yurchak

7   or his law office?

8   A.  No.

9   Q.  Now, prior to August 2022, did you have any responsibility

10  for MOVEMENTDAO's business operations or finances?

11  A.  Yes.

12  Q.  And can you briefly describe for me what your role was.

13  A.  My role was operating within the community, approving

14  financial transactions on Ryan's behalf, and really supporting

15  Mark operationally wherever I could.

16  Q.  Okay.  And in that role, did you come to know a developer

17  who goes by the alias *jengo.e?

18  A.  Yes.

19  Q.  And how did you know him?

20  A.  Jengo* is a developer with juicebox.money, and he is

21  someone that I met in person with Mark in Miami.

22  Q.  Mr. Gordon, did *jengo.e ever perform any development work

23  for MOVEMENTDAO?

24  A.  Not to my knowledge.

25  Q.  Did he ever bill MOVEMENTDAO for any development work?

1    A.   No.

2    Q.   Was he ever owed any money from MOVEMENTDAO for development

3    work?

4    A.   No.

5    Q.   How do you know that?

6    A.   Because I spoke with him directly.



1    potential value beyond what we were building at movement Doe,

2    and so there was a general agreement that we needed a home for

3    specific intellectual property that we thought had value.

4    Q.   Do you remember when that conversation took place?

5    A.   I would say late summer of 2022.

6    Q.   Okay.  Now, in addition to DAO Labs, did you discuss or did

7    he discuss with you any other entities?

8    A.   Yes.  There was also the formation of an unincorporated

9    non-profit.  Stop*

10   Q.   Did Mr. Phillips tell you on whose behalf these entities

11   would be formed?

12   A.   On Ryan's behalf.

13   Q.   Now, let's move forward in time a little bit to August

14   2022, do you recall any conversations with Mr. Phillips around

15   that time about development spending?

16   A.   Yes.

17   Q.   And what did he say to you about that?

18   A.   Well, it was in the context of broader spending.  At the

19   time we had begun to pay community members for contributeing.

20        There was some growing from us /STRAEUGS within the

21   community that the product still had not launched and it kept

22   getting delayed.

23        And so, ultimately, conversations were had between

24   partners, between -- and one on ones between Ryan and Mark that

25   we should stop all community spending and focus all efforts on

```
 1        /K*UDZ I can lay the foundation.

 2            MR. FRANKLIN-MURDOCK:  Your Honor, we have an

 3    objection.

 4            THE COURT:  Lay the foundation.

 5    Q.  Did you see this document before?

 6    A.  Yes.

 7    Q.  How did you see it?

 8    A.  Alex Fine showed me in person.

 9    Q.  Just very quickly, do you have a timeline for token launch

10    does that?

11            THE COURT:  Objection overruled.

12    Q.  Tell you token had launched as of August 2022?

13    A.  No, the token had not launched.

14    Q.  Okay.  Now, I want to get back to the 1.7 million talked

15    about.  Was there a Snapshot proposal relating to that?

16    A.  Yes.

17    Q.  What was it?

18    A.  Membership three.

19    Q.  Was there other /PH*EUPS submitted around that time?

20    A.  Yes.

21    Q.  Do you recall how many?

22    A.  Nine.

23    Q.  Did you vote for any of them?

24    A.  Which ones did you vote for?

25    A.  I voted for all but *membership three.
```

1  Q.  Did you ever hire him as a consultant for your firm?

2  A.  I think, yes, there was one matter that came up that

3  required some pretty in did he want computer analysis, some

4  sort of a natural fit so I used him for that one case.

5  Q.  Did you come do relate Mr. Breslow, Mr. Gordon and Mr. Fine

6  in 2021?

7  A.  Yes.

8  Q.  Did you also come to represent a company called Merkaba

9  Inc. In 20721?

10 A.  That's correct, yes.

11 Q.  In the course -- did you ever encounter a document called

12 the Get Book?

13 A.  Yes.

14 Q.  I'd like you to pull up Exhibit 6.

15     For the record, Mr. Yurchak was previously provided with

16 all of the binders of exhibits from plaintiffs and defendants?

17     Do you have that up, Mr. Yurchak?

18 A.  Yes, I do.

19 Q.  Do you know what this document is?

20 A.  It appears to be the Get Book.

21 Q.  What is the date on this document?

22 A.  February 2 of 2022.

23 Q.  If you could please turn to page 63 of the document, and

24 four lines from the top, you can start reading the fourth line

25 "just going with the law office."

1    A.   "The law office of Reed Yurchak the company will act as the

2    service provider for the MOVEMENTDAO."

3    Q.   Did you authorize your firm's name to be included in the

4    Get Book?

5    A.   No, actually, the opposite.

6    Q.   Did your firm act as the service provider for the

7    MOVEMENTDAO?

8    A.   I did not act as a service provider for the MOVEMENTDAO,

9    under my authority anyway.

10   Q.   Were there several *illiterations of the Get Book?

11   A.   There were many.

12   Q.   When you encountered your name in the Get Book, what did

13   you do?

14   A.   So on the edits we would send back would not include my

15   name or the law office, and then I recall very well in around

16   April of 2022 an issue was brought to our attention and in our

17   review of the Get Book we noticed again, there's my name and we

18   have written correspondence stating that it should be scrubbed"

19   was the term, should be removed.

20   Q.   Did you tell anyone that you did not want your law firm's

21   name in the Get Book?

22   A.   Yes, I think that e-mail correspondence certainly slices in

23   that regard.

24   Q.   Who do you tell?

25   A.   It would be mark Phillips.

1   Q.   After you told him that was it your understanding that your

2   name and the name of your firm had been he moved from the

3   Get Book?

4   A.   I believe that it had.

5   Q.   I would like you to go to page 52 of Exhibit 6.

6

7   A.   I'm here.

8   Q.   At the bottom page can you read that last sentence?

9   A.   The Doe law firm is acting as the initial service provider

10   for the Doe.  {Ch}.

11   Q.   Do you control the alias Doe law firm dot eat

12   /TPHOFRPBLGTS, I do not?

13   Q.   Does your firm control the alias dial law firm dot he?

14   A.   It never did, no.

15   Q.   Further up the page there is a /TKABL of crypto currency

16   addresses; do you see that?

17   A.   Yeah.

18   Q.   The top entry it says Doe law firm Dot eat and then lists

19   an address ending in 0085.  Do you see that?

20   A.   Yes.

21   Q.   In February of 2022 by that time had you encountered this

22   crypto currency address?

23   A.   Yes.

24   Q.   Do you know how to create a crypto currency address?

25   A.   No, I don't personally, no.

1   Q.   Do you know how to use a crypto currency address?

2   A.   I do not and was never instructed.

3   Q.   Have you ever executed a crypto currency transaction with

4   the address ending in 0085?

5   A.   I have never executed any action with that address, or was

6   aware of any actions used with that address, or authorized any

7   actions used by that address.

8   Q.   Have you ever executed a crypto currency transaction with

9   any crypto crypto currency address?

10  A.   No.

11  Q.   Was this address created for you?

12  A.   It was created as a part process of setting up the

13  multi--safe wallets and security keys, in the course of my

14  representation for my clients.

15  Q.   And was the idea that you would hold on -- that this

16  address I can't say created for you?

17  A.   Yes.

18  Q.   Who created it?

19  A.   Mark Phillips, he was -- the technical ex /TPER tease for

20  the project and was relied upon for these functions.

21  Q.   Were you given a copy of the keys to this crypto currency

22  account?

23  A.   I believe that I was, yes.

24  Q.   Did mark Phillips also have access to The Keys for the

25  /KREUPB toe currency address ending in 0085?

```
1   A.   No.

2   Q.   Page 01795?

3   A.   Okay.

4   Q.   Do you see the entry at the bottom of the page labeled

5   entry 36?

6   A.   Read the ren center?

7   Q.   No, I'm sorry, I'm asking if you have identified the entry,

8   entry 36?

9   A.   Oh, yeah.

10  Q.   And besides the number 36 in the green highlighted field,

11  it says /PH-FPB sent," do you see that?

12  A.   Yes.

13  Q.   And /PWHROEFR that sent text it says sent 7.5 million dye

14  to an address ending in 6 F B D, do you see that?

15  A.   Yeah, I do.

16  Q.   And on the right-hand side of the entry under the heading

17  confirmations is address ending in 0085.  Do you see that

18  listed there?

19  A.   I see it there.

20  Q.   Did you confirm this transaction to send 7.5 million die?

21  A.   No did just says with the prior transmission I was not

22  authorize /ORS aware {ch}.

23  Q.   To confirm this transaction did you authorize anyone to

24  {ch}?

25  A.   I did not.
```

1    Q.   I'd like you to go to the entry immediately above that.  It

2    spills over onto the previous page?

3    A.   Okay.

4    Q.   On page 1794, entry 37, in the green highlighted field

5    there's an entry that says "sent," do you see that?

6    A.   Yes, I do.

7    Q.   And besides it to the right of it it says 805 /*EZ, do you

8    see that?

9    A.   Yes, I do.

10   Q.   On the next page, 1795 there's an address that says 6 F B

11   D; do you see that?

12   A.   Yes I do.

13   Q.   Do you understand this to be an entry entering the transfer

14   of 6 F B D, /*EZ {ch}?

15   A.   Yes that's what it would afternoon to be.

16   Q.   On the right happened side of the headings confirmations

17   there's an address listed 8055 listed there.  Do you see that?

18   A.   Yes I do.

19   Q.   Did you author lies this transaction to send 805 /*EZ?

20   A.   I did not.

21   Q.   To confirm this /TKRAPBS action, did you had anyone to

22   {ch}?

23   A.   I did not.  I can further state.

24   Q.   I'm sorry, Mr. Yurchak what were you saying?

25   A.   I further state conversation some high degree of confidence

1    that there would be no communications or written record

2    regarding these transactions with me.

3    Q.   Did you ever use Mr. Breslow or Mr. Fine's keys to the Doe

4    endowment account?

5    A.   Never.

6    Q.   Did you ever direct anyone to access Mr. Breslow or

7    Mr. Fine or Mr. Gordon's keys to the Doe endowment account?

8    A.   Never.

9    Q.   Did you ever direct anyone to transfer as settle /OEULT are

10   R out of the Doe endowment account?

11   A.   Never.

12   Q.   I'd like you to turn to Exhibit  12.

13        Your Honor, I'd like to admit Exhibit  12 into evidence.

14           THE COURT:  Admitted.

15           (Plaintiffs' Exhibit * received into evidence.)

16   BY MR. BERG:

17   Q.   Mr. Yurchak is coach of a proposal as I understand it nip

18   4.  Do you see that?

19   A.   Yes.

20   Q.   Would you please /THURPB to exhibit page 298 of Exhibit

21    12?

22   A.   Okay.

23   Q.   Who is listed as the ought /STHOR of the proposal?

24   A.   Tank both items and Phillip B.

25   Q.   Who's tank Broward County /TOPLS?

 1   A.   That's the handled for mark Phillips.

 2   Q.   And what was the date of this document?

 3   A.   August 23 of 2022.

 4   Q.   Bless turn to page 302 of Exhibit  12.  Under the heading

 5   Snapshot consensus by the Doe members, can you please read the

 6   sentence beneath that?

 7   A.   "Doe /*ESZ of the law firm Jury tank but /TOFPBS Ben Reid N

 8   CB it S spaces /KA tell after here will be collectively

 9   referred to as the service providers.  Check.

10   Q.   Did you ever act under the alias Doe law firm?

11   A.   No.

12   Q.   Has your firm ever acted as the second provider for the

13   MOVEMENTDAO?

14   A.   No.

15   Q.   Was the name of your law firm inserted into this proposal

16   without your authorization?

17   A.   That is correct.

18   Q.   Further down the page?

19   Q.   I would like to introduce tab 15 into evidence as

20   Exhibit 15?

21        THE COURT:  Admitted.

22        (Plaintiffs' Exhibit * received into evidence.)

23   BY MR. BERG:

24   Q.   Let me know when you're there Mr. Yurchak?

25   A.   I'm there.

1   Q.  It's a copy of a proposal called membership seven Snapshot

2   members of the something of the Doe.  Do you see that {ch}?

3   A.  Yes.

4   Q.  Please turn to page 365 of Exhibit 15?

5   A.  Okay.

6   Q.  Let's back up one minute, Mr. Yurchak.  Please go to 362?

7   A.  Okay.

8   Q.  Who are the /AUTS authorize of this document?

9   A.  Tanning both /TOPLS and Phillip me.

10   Q.  And then under the heading ratification of actions of the

11   service providers, can you please road that first sentence up

12   through -- yes, just that first sentence?

13   A.  The service providers as defined by the guiding principles

14   in paragraph sixteen A, specifically as Doe law firm /*EZ

15   attorney Reed Yurchak law offices of blockchain engineer

16   tanning but /TOPLS {ch}.

17   Q.  Were you the service provider to MOVEMENTDAO?

18   A.  No.

19   Q.  Did you vote to authorize this proposal?

20   A.  No.

21   Q.  And your name is inserted into this document without your

22   authorization as well; is that right?

23   A.  I would definitely agree.

24   Q.  Did you ever review or a /RAOFL any proposals that were on

25   Snapshot in the conclusion with MOVEMENTDAO?

```
1    Q.   Turn to fact stipulation number 19?

2    A.   Okay.

3    Q.   Please read that into the record?

4    A.   Service provider eat cast over 10 million votes on each of

5    the /TPOBLG programs posted on Snapshot /AO*EG owe do below

6    eight {ch}.

7    Q.   Did you cast any of those votes cast by the second

8    provider?

9    A.   I had not.

10   Q.   Did you authorize anyone to cast those votes on your

11   behalf?

12   A.   No, I wasn't even aware this was happening.

13   Q.   I'd like you to turn to Exhibit 3, Your Honor, I'd like to

14   introduce tab 3 as Exhibit 3 in evidence e ?

15        THE COURT:  Admitted.

16        (Plaintiffs' Exhibit * received into evidence.)

17 BY MR. BERG:

18   Q.   Please let me know when you're there, Mr. Yurchak?

19   A.   I am there.

20   Q.   Exhibit 3 is a web page from the internet web archive

21   showing the web page with associated e-mail address

22   dao.lawfirm.xyz.  Do you see that?

23   A.   Yes.

24   Q.   To the left of -- on the left-hand column of the page, what

25   is listed there in bold letters?
```