# Movement GitBook

| | |
|---|---|
| From | mark.phillips@protonmail.com <mark.phillips@protonmail.com> |
| To | Law Office of Reed Yurchak<reed@yurchaklaw.com> |
| Date | Saturday, October 1st, 2022 at 4:22 AM |

I am attaching the relevant portions of the GItbook but in effect, its pretty clear there are no refunds, that this is not an investment and that the funds are basically only allowed to be spent by the team to build the platform and community.

Its kinda of worse that Alex and Ryan were in charge when it was written and made public and funds were contributed. But anyway, I am still doing the right thing by papering a clear way for profiting, organizing the expenses, the memo will be sometime later.

I've also attached a draft of the updated engagement letter, and per your statement of what does the firm do, i review and get approvals for every transaction and handle the dao-lawifrm keys so at least with the custodial accounts we do a bunch of stuff all the time.

While the terms of service and contribution disclaimers state that tokens will be issued, it does allow me as a founder and dao-lawfirm veto actions if we deem them a security risk, and I did distribute all individuals who contributed NFTs to participate in governance and another 1500 individuals to further decentralized control.

Regards,
Mark Phillips

This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.

Sent with [Proton Mail](#) secure email.

**206.25 KB**   5 files attached

- 20211208 MOU.docx 33.24 KB
- Engagement-DAOLABS.docx 62.39 KB
- Movement Token Sale.docx 28.44 KB
- Terms-of-Service.pdf 80.46 KB
- publickey - mark.phillips@protonmail.com - 0x49631D56.asc 1.73 KB



620 131st Ave. NE
Bellevue, WA 98005
Tel: (206) 866-0766
Fax: (425) 654-1205
Business Cell: (425) 941-6659
Email: reed@yurchaklaw.com

October 1, 2022

**ATTORNEY-CLIENT PRIVILEGED**

**Re:    Engagement Letter**

Dear Ben Reed:

This engagement letter will clarify and confirm the attorney-client relationship between you (the "Client") and Law Office of Reed Yurchak (the "Firm").  In this letter, the words "you" and "your" refer to the Client and the words "we," "us," and "our" refer to the Firm.

To avoid misunderstandings, we need to be clear about the scope and terms of our engagement as confirmed by this letter and the enclosure ("Information for Clients"). Please read them both and then sign and return this letter to us for our records. Even if you do not sign and return the letter to us, these writings will confirm the basis on which the Firm has agreed to represent you.

1. **SCOPE OF ENGAGEMENT.**

We hereby undertake the legal representation of Client as follows: (a) prepare certain entity formation documents and agreements; (b) advise any authorized individuals of the aforementioned entities; (c) serve as secretary of the above entities; (d) perform all other legal work necessary to maintain the security of the assets of the cryptocurrency managed by the entities, and (d) provide advice for any legal matters as they arise. In general, our professional services may include analysis for legal issues and the preparation of memos; research and analysis of legal and factual issues, analysis of applicable law, and drafting and preparation of corporate agreements.

In the event questions or issues arise that are related to the governance of the corporations, relationships to DAOs, or other matters we have experience in, we will be happy to answer those questions or address those issues without additional charge, up to an additional 40 (forty) hours of professional time.  In the event you ask us to perform additional or other services beyond the engagement described above, we may need to clear potential conflicts of interest and we may need to enter into a separate engagement letter with you. If we undertake additional or other services and do not ask you to sign a new engagement letter, this engagement agreement will apply.

2. **LIMITATION ON SCOPE OF ENGAGEMENT.**

**2.1**    Our engagement is expressly limited, as set forth in Paragraph 1 above, unless we expressly agree otherwise. You are our only client in this matter, and we will not

**000512**

represent anyone else in this engagement without your consent in a separate letter agreement.

**2.2** We will represent you and the other founders as long as your interests do not conflict. The firm will not and cannot represent your individual interests as they relate to any conflict or claim against any other founder. Potential conflicts always exist between or among founders or managers, and the founders should consider engaging independent counsel in case of any internal dispute.

**2.3** If any situation arises that we feel creates a conflict, we will attempt to identify it and seek a satisfactory resolution. We will, of course, be prepared to discuss any issues that might arise between the founders. If any founder wants to retain personal counsel, we would be happy to provide names of competent lawyers that any founder might consider hiring as independent counsel.

3. PROGRESS AND REPORTING.

We will communicate information and advice to you, provide you with significant documents and keep you apprised of significant developments. Unless you instruct us otherwise, we will direct our oral and written communications *only to you*.

4. FLAT FEE PAYMENT.

Our firm has been retained to create certain trusts, unincorporated non-profit associations, corporations, and limited liability companies with operating agreements and articles to be filed with the Washington, Delaware, and Florida Secretary of State. Our corporate formation services will be offered to you for a flat fee of $100,000.00 (one hundred thousand dollars), which includes the formation starter kit agreements which we have waived the $25,000.00 (twenty-five thousand dollars) fee.

5. SERVICE PROVIDER FEE.

Our firm has been retained to (a) prepare a custodial trust account designed to secure and hold crypto currencies and/or other investments related to the blockchain, (b) engage an online security consultant and create a wallet(s) specific to your trust to hold your crypto currency that is/are protected by a minimum of 3 (three) security keys, (c) provide updates on a yearly basis or on a schedule of the client's choosing, (d) take all necessary steps to ensure the confidentiality of the trust and its assets as well as the security of the assets, (e) perform all other legal work necessary to maintain the confidentiality and security of the assets of the trust, and (f) accept transfers of money into the Firm's IOLTA trust account to assist Client in setting up the trust and transferring funds to brokers or others employed in the purchase of the Trust assets.

| Year | Service Provider Annual Fee | | |
|---|---|---|---|
| | $1 - $999,999m* | $10m to 49,999,999 | $50m+ |
| 1 | 3% | 2.5% | 2% |
| 2 | 2.472% | 2.108% | 1.6807% |
| 3 | 2.1.08% | 1.6807% | 1.375% |
| 4 | 1.6807% | 1.375% | 1.0610% |
| 5+ | 1.375% | 1.06120% | 0.7491% |

000513

The Firm will charge the first quarter's, annual service fee (25% of yearly fee) upon deposit and initiation of the Trust which will cover all fees and costs to set up the trust except for the surcharge fee listed below.

The Firm charges a surcharge fee of 0.025% (one quarter of one percent) of any transaction to convert or liquidate any crypto currency. This surcharge is waived if the liquidation is used to pay the Firm's quarterly fees.

6. **BASIS FOR FEES AND COSTS.**

In the event you want to engage the firm for legal work or professional services that are unrelated to the flat fee scope of work outlined above, the Firm has established an hourly rate for each attorney and paralegal. These hourly rates are based on a variety of factors including the experience of each individual. Our rates for all those who may work on or be involved in the work are as follows:

|    | Individual    | Role      | Hourly rate |
|----|---------------|-----------|-------------|
| 1. | Reed Yurchak  | Attorney  | $500.00     |
| 2. | Mark Phillips | Expert    | $500.00     |
| 3. | Katie Sliva   | Paralegal | $350.00     |

Reed Yurchak will be the attorney primarily responsible for the work on your file and to assure your satisfaction with our professional relationship, but he may rely on others in the office to be able to give you prompt, timely service.

Specifically, the technical resource of the firm Mr. Phillips will evaluate each of the various cryptocurrency protocols, defi, DAO related mechanics and provide subject matter expertise, in cases other where Reed Yurchak is not available or whether the subject matter includes both technical and legal details. Additionally, Mr. Phillips is available to serve as secretary on behalf of the firm and may prepare corporate agreements for the firm to finalize.

7. **BILLING PROCEDURES.**

**7.1** We review and adjust our billing rates and fixed fees from time to time, generally as of January 1st of each year. Any rate adjustments will be reflected in your invoice. The specific basis on which fees, costs and expenses are computed, our practice in sending invoices, and how we handle past due accounts are set forth in detail in the enclosure ("Information For Clients").

**7.2** We will review the Firm's time records before we prepare monthly billing statements. Based on that review, we may adjust the amount to be billed, where appropriate in our judgment. For example, the amount may be adjusted downward for duplication of effort, for training time beyond the normal adjustments for attorney experience already factored into our hourly rates, or in other situations where we believe it would not be appropriate to charge you for the full time spent on the project.

8. **ARBITRATION OF DISPUTES.**

We anticipate a harmonious and satisfactory attorney-client relationship. If any disputes arise between us, we shall submit to binding arbitration as described in the enclosure. If you do not wish to agree to arbitrate any disputes with us, you should not sign this letter. Your agreement to arbitrate is not necessarily a condition of our agreement to represent you, and upon request, we will consider deleting the arbitration provision.

We look forward to working with you, and we are pleased to serve you and protect your interests.

Sincerely yours,

**LAW OFFICE OF REED YURCHAK**

Reed Yurchak

APPROVED AND ACCEPTED:

By: Ben Reed
Email: ben.reed@daolabs.wtf
Phone: +1 (206) 604-8885
Role: President and Director

## INFORMATION FOR CLIENTS

We are delighted you have chosen the Law Office of Reed Yurchak ("the Firm") and we appreciate the opportunity to serve you. The Firm is a boutique practitioner that specializes in limited areas of the law.

This enclosure provides information about the Firm's standard client-service practices, and it will clarify and confirm certain terms of our engagement. Please review this enclosure along with the accompanying engagement letter; together they will constitute the written agreement between you and the Firm. The arrangements described here will apply to your account, effective immediately upon execution of the accompanying engagement letter, which we ask you to sign and return to us promptly.

1. **PERSONNEL AND STAFFING**

The engagement letter identifies the attorney primarily responsible for your matter. Others, of course, may assist from time to time. We assign lawyers and other personnel to matters based on their experience and expertise, the nature of the matter, the issues involved, and any time or cost constraints that may apply. We are sensitive to your need for cost-effective legal services and, depending on the circumstances, we might assign additional people to help with the matter, and we might replace others who have worked on it.

2. **BASIS FOR FEES**

Our fees for a particular matter may be based on a variety of factors depending on the nature of the representation. Such factors may include the time spent on the matter; the novelty and difficulty of the questions involved; the experience, reputation, and abilities of the lawyers rendering the services; the amount at issue; the results obtained; time limitations imposed by you or by the circumstances; and whether work on this matter will preclude the Firm from rendering services to other clients. We are guided, but not controlled in setting fees by customary hourly rates of our lawyers and legal assistants working on comparable matters. Our current hourly rates set forth in the engagement letter may be adjusted periodically. We will, of course, provide you with regular invoices showing detailed descriptions of services and the basis for all charges. If you ask us to prepare a routine "audit response letter" on your behalf, we will follow our rigorous procedures and charge you a flat, fixed fee of $750 per audit response letter plus $250 for any follow-up audit request during the year. If these audit responses are not routine, but rather complicated, we will charge our standard hourly rates instead of the flat fee that applies for routine responses.

3. **COSTS AND EXPENSES**

We do not charge clients for long distance telephone calls or faxes. However, we do pass along certain other out-of-pocket costs, such as court filing fees, deposition or transcript fees, consulting or expert witness fees and expenses, title company reports, photocopying, computerized printing, computerized legal research, travel expenses, overnight delivery charges, messenger services, etc. We try to serve all clients with the most effective support systems available, and we allocate certain costs of some of those systems to the clients who use them. When we receive bills from vendors relating to your matter, we may forward them to you for direct payment. For administrative ease, we may advance costs with the understanding that you

will promptly reimburse us. We try to include costs in invoices relating to the month in which such costs are incurred, but sometimes we cannot do that and must include them in later invoices. In any event, you will be responsible for costs we incur or pay relating to your matter.

4. **MONTHLY INVOICES**

We send invoices on a monthly basis. Payment of any amount not covered by the retainer is due upon receipt and in any event within 30 days after we email the invoice. Ordinarily, our statements reflect time expended approximately 15 to 45 days prior to the date on the invoice, so we will appreciate and expect prompt payment. We will provide you with a Statement of Account if your account becomes delinquent.

5. **DELINQUENT ACCOUNTS**

Like other businesses, we have substantial cash demands that require us to borrow money if accounts are not paid promptly. In the event an account becomes delinquent, we employ the same prudent collection procedures used by other businesses to ensure that Firm clients who pay their bills promptly are not penalized for the additional costs associated with delinquent accounts. We reserve the right to assess and collect late-payment charges of 1.5% per month on past due accounts. If your account becomes delinquent and if the Firm resorts to collection proceedings, you will be responsible for the Firm's attorneys' fees and costs incurred in those proceedings.

6. **TERMINATION OF SERVICES**

We may cease performing services and terminate representation if you fail to pay our invoices when due, or otherwise breach our agreement, or if we believe termination is called for under applicable law, including legal-ethics rules. In the unlikely event we must withdraw, we will, of course, take reasonable steps to avoid any foreseeable prejudice to your rights.

7. **CONFLICTS OF INTEREST**

We have attempted to rule out any conflict of interest by checking in our client-matter database all names and other information you have provided to us. Please inform us immediately if you use other names or have affiliated companies that you want entered into our database, or if you become aware of any additional parties that have an interest in or may be substantially affected by resolution of this matter.

8. **ARBITRATION**

If a dispute ever arises between you and the Firm that we cannot resolve informally, rather than either of us taking the other to court, we propose to submit the matter to binding arbitration, a process we believe is well suited to resolving lawyer-client disputes. There are important differences between litigation and arbitration. Law and public policy favor arbitration as a method of resolving disputes, and we believe arbitration has considerable advantages for both lawyers and clients.

Arbitration is normally quicker, less expensive and more efficient than court proceedings, enabling both sides to avoid considerable attorneys' fees and costs. In arbitration, each side would present evidence and arguments to a panel of arbitrators, usually retired judges or other persons

with relevant experience, and each side would agree to abide by the decision of the arbitrators as the final determination of all legal and factual issues. The parties would get to select the arbitrators, and hearings could be scheduled more promptly and on a date certain. Arbitration is less acrimonious, and it is private, protecting confidential client information. Arbitrators have broad discretion and are not bound by strict rules of evidence and procedure, so the process is relatively informal, more flexible and more relaxed.

Arbitration does have some disadvantages: fees must be paid to the arbitrators, and arbitration limits freedom of choice in how we might pursue claims and remedies against each other. In arbitration, there are limits on discovery, on the ability to compel production of witnesses and documents, and on the kinds of relief available. An arbitration agreement waives the right to a jury trial, there is no public forum, and there is virtually no appeal. Thus, arbitration tends to be relatively quick, simple, inexpensive, private and final.

On balance, we believe arbitration is the best way to resolve lawyer-client disputes. So, unless we both agree otherwise in writing, your signature on the engagement letter will confirm our agreement to arbitrate under the following arbitration provision.

The Client and the Firm expressly agree to resolve, by binding arbitration, any controversy or claim arising out of or relating to this engagement. Such claims or controversies include any dispute relating to this agreement, our relationship, the quality or scope of our services, the fees charged, the appropriateness of actions taken or not taken, or any other matter relating to the representation, including any claim of legal malpractice. The arbitration will be conducted under the Commercial Arbitration Rules of the American Arbitration Association (i.e., the version of those rules in effect as of the date shown at the top of the accompanying Engagement Letter), before a panel of three arbitrators, selected from the AAA's panel for large complex cases. The parties shall be entitled to full discovery in accordance with the Federal Rules of Civil Procedure for a period of ninety days after service of the demand for arbitration. The Chair of the arbitration panel will resolve any discovery disputes. Unless the arbitrators decide otherwise, each party will bear its own attorney's fees and share equally in the payment of the arbitrators' fees and costs. The arbitrators shall follow the law and not re-write the agreement of the parties. Judgment on the arbitration award may be entered in any court having jurisdiction thereof.

9. **CHOICE OF LAW AND FORUM**

The laws of the State of Washington shall apply in interpreting or enforcing this agreement. Any proceedings relating to this agreement shall be filed and heard in that state and specifically in King County.

10. **RECORD RETENTION AND DESTRUCTION**

At the conclusion of your matter, the Firm will return to you any valuable property you have entrusted to us, and we will dispose of any and all superfluous documents consistent with maintaining their confidentiality. Unless you request otherwise, we will then store the entire balance of the file, at the Firm's expense, for five years. After that five-year period, unless you make other arrangements and pick up the file, we will dispose of it in the regular course of business at the Firm's expense, consistent with maintaining confidentiality.

## 11. QUESTIONS

We strive to provide high quality, cost effective legal services and to provide you with accurate, understandable invoices. If you are ever dissatisfied with our services, our invoices, or any aspect of our relationship, please let us know immediately so that we can address your concerns. With good communication, we should be able to resolve amicably and informally any problem that might arise.

# MEMORANDUM OF UNDERSTANDING

This Memorandum of Understanding ("MOU") is entered into as of the date the parties execute this document below and constitutes the parties' understanding regarding the continued creation and development of the Solve decentralized autonomous organization ("∑ DAO") and Solve Token ("Token") (the "Project").  The parties to this MOU are the founders of the ∑ DAO and this MOU seeks to clarify the relationship and obligations between the founders, Ryan Breslow ("Breslow"), Alex Fine ("Fine"), Jon Gordon ("Gordon") and Mark Phillips ("Phillips").  Specifically this MOU is designed to clarify the compensation for Phillips as well as to detail the authority granted to him to operate an engineering entity that will accomplish the goals of the founders.

1. **Preamble.**

    (a) <u>The Project</u>.    The Project is the common goal of the parties to create a decentralized autonomous organization ("DAO") which will enable individuals to pool financial resources to be invested in cryptocurrency enabled decentralized finance applications ("DeFi") to earn yield by which other individuals participate in its distribution by way of governance. The mechanics of the DAO and its participants is to be solely governed by the Ethereum blockchain and a decentralized application ("dApp"). The organization is an effort to harness the collective wisdom and resources of sophisticated investors that will allow them, through the blockchain, to plan and participate in acts of public good.

Each party to this MOU is responsible for an aspect of the development and creation of the decentralized software and this MOU is designed to outline the parameters and expectations of the parties. The development of the ∑ DAO substantially is segmented into two phases; pre-January 1, 2022 and post-January 1, 2022 through January 23, 2023, with the relevance of each phase detailed below.

    (b) <u>The Founders' Duties</u>. The Founders shall develop the DAO, including implementation of specific mechanics by which the DAO organization may take form and any corrective oversight governance until the community and its participants are fully engaged.  The Founders are responsible for the project vision and all marketing.  The Founders shall also be responsible for funding operations, development, engineering, and expenses for all aspects of the DAO until the launch of the DAO on January 1, 2022, at which point responsibility for funding all engineering and development shall reside with Phillips.  The Founders agree that any unforeseen expenses shall be negotiated separately, and all agree to continue to be available for specific tasks including recruiting or marketing in furtherance of the success of the Project.  The Founders will provide communications and interactions with the governing participants and with the DAO's service providers including the development team as well as contributing user experience, community memberships and ensuring each party is fully supported in reaching their objectives.

    (c) <u>Phillips' services and benefits to DAO</u>. The Parties agree and understand that the MOU provides the Founders and Project with Phillips' services and ensures that Phillips shall provide 100% of his best efforts to the Project.  The Founders understand that Phillips will no

longer divide his time and attention substantially among the other employers or clients with whom he is currently working and will be focused unilaterally on the Project. The MOU is designed to properly compensate Phillips for his services and provide him with the peace of mind necessary to devote the next 36 months, full time, to the success of the Project.

In addition, the Parties understand that they are also paying for the unique expertise of Phillips which includes his prior work with the Securities and Exchange Commission, his security clearance and access to those at the SEC who would help resolve any future issue that may arise as a result of the Project or the launch of the DAO.

The funds above the $6,000,000 (six million) development budget will be allocated to marketing, endowment, and DAO growth. Additionally, the Parties agree that the funds submitted to the multi-signature are no longer the property of the contributor and that Phillips's development efforts will ensure that the governance tokens and the DAO are launched within the most conservative sense, including but not limited in creating the appropriate governance.

(d) <u>Release of Funds</u>. That Parties agree that $6,000,000.00 (six million) in funds shall be paid to the Law Office of Reed Yurchak and/or will be held in its trust account and distributed to Phillips as follows:

(i) $2,000,000.00 (two million dollars) shall be paid upon the execution of this document.
(ii) $2,000,000.00 (two million dollars) shall be paid upon reaching milestone 1, the launch of the DAO, on January 1, 2022.
(iii) $1,000,000.00 (one million dollars) shall be paid upon reaching milestone 2 on April 1, 2022.
(iv) $1,000,000.00 (one million dollars) shall be paid upon reaching milestone 3 on July 1, 2022.

(e) <u>The Bonding Curve</u>. The DAO will use a bonding curve to distribute and price the DAO tokens, as well as a pre-determined distribution to governance participants.

The Parties understand and agree that at this time that it is anticipated the Token emission will have the following values (all values are within $10^{18}$):

| Protocol | 1,000,000,000,000,000,000[1] | 100% |
|---|---|---|
| Bonding curve | 800,000,000,000,000,000 | 80% |
| Founder's allocation | 200,000,000,000,000,000 | 20% |
|  | 194,000,000,000,000,000 | 19.40% |
| Multi-Signature 1 (Approx.) | 97,000,000,000,000,000 | 9.70% |
| Multi-Signature 2 (Approx.) | 48,500,000,000,000,000 | 4.85% |
| Multi-Signature 3 (Approx.) | 48,500,000,000,000,000 | 4.85% |
| Multi-Signature 4 (Phillips) | 6,000,000,000,000 | 0.06% |

---

[1] One quadrillion is the largest number possible to create on the Ethereum blockchain and is the normal baseline calculation for the total token amount. The final token emission will be computed with this consideration.

The DAO will initialize or the bonding curve will convert into the final token balance of 1,000,000,000,000,000,000 or an approximation thereof, of which the founding team will be provided with **20%** of the final bonding emissions, in our example 200,000,000,000,000,000. The Founder's allocation will be distributed to the Founders' multi-signature wallets as follows:

    (i)    194,000,000,000,000,000 distributed between Breslow, Gordon and Fine as determined by Breslow, and
    (ii)    6,000,000,000,000 to Phillips.

The parties are to provide Phillips with the multi-signature Gnosis Safe addresses to be used with their percentages or token allocations. The remaining 800,000,000,000,000,000 will be assigned to and locked by the DAO protocol along with **$5,000,000.00** in DAI, ETH, or other token of commensurate value as determined by Phillips, such that the collateralization of the Bonding Curve, is verifiable on the Ethereum blockchain. After which, the Bonding Curve will allow for to-be-determined windows of purchasing, or claiming, as determined by the parties.

The DAO agrees to contribute the above protocol liquidity of **$5,000,000.00** (five million dollars) and any additional marketing, community, and operational expenses as well as all development and engineering costs and expenses up until the date of launch, January 1, 2022. After launch of the DAO all engineering, development and other expenses shall be paid from the money identified in this MOU and shall be the sole responsibility of Phillips until the end of the MOU, January 23, 2023. This $5,000,000.00 (five million dollar) payment by Breslow does not include the additional **$1,000,000.00** (one million dollars) in tokens that will be used to compensate and reward the development team.[2]

    (iii)    **$1,000,000.00 (one million dollar) initial bonding curve token claim.** The Parties agree that Breslow shall provide $1,000,000.00 (one million dollar) purchase of tokens on the initial bonding curve or the equivalent of $1,000,000.00 (one million dollars) to a developer bonus airdrop smart contract fund which function is to acquire tokens from the DAO in order to fund and pay for a developer bonus plan. The Parties further agree that Phillips shall have the sole discretion on the disbursement of the tokens and/or money in the bonus plan in order to reward any developer/contractor or assure the necessary work in furtherance of the development goals.

**2.     Phillips' Compensation (pre January 1, 2022).**

Phillips will be compensated in three forms: a share of the founder tokens, a base salary and a launch bonus.

(a) <u>Founder tokens share</u>.  As outlined above Phillips shall receive 0.06% (three percent) of the Founders allocation of tokens.

---

[2] There are periods where the bonding curve may be paused or a "cool down period" is enabled, or times when no liquidity pool is available meaning the tokens are not immediately tradeable on any market. The Parties agree that such pauses or liquidity or token availability shall be at the sole discretion of Phillips who will provide notice to the Founders of any such occurrence.

(b) <u>Annual salary</u>.  Phillips will continue to receive an annual salary of $500,000.00 (five hundred fifty thousand dollars) payable every two weeks (bi-monthly).

(c) <u>Launch bonus</u>.  Phillips shall be paid a launch bonus upon successful launch, with the specified features, outlined below, of $500,000.00 (five hundred thousand dollars).  The launch bonus shall be payable upon deployment of the DAO.

3. **Phillips Compensation (January 1, 2022 to January 23, 2023)**.

(a) <u>Annual Salary</u>.  Phillips shall receive $480,000.00 (four hundred eighty thousand dollars) in direct salary;
(b) <u>Cash bonus</u>.  Phillips shall receive $620,000.00 (six hundred twenty thousand dollars) in cash bonuses; and
(c) <u>Tokens</u>.  Phillips shall be entitled to receive $200,000.00 (two hundred thousand dollars) and an additional cash bonus; or in tokens from the above bonding curve grant.

4. **Engineering Team.**

Phillips shall be provided the resources he deems necessary to be able to create and develop the DAO and Tokens. Phillips shall use the funds and is specifically authorized to use the funds to hire an engineering team and then maintain the Project, including the DAO and Tokens, for one year.  The capital provided to Phillips is designed to fund the Project creation and development as well as Project maintenance through January 1, 2023. At Phillips' option he may extend this development effort to January 1, 2024, in order to ensure the success of the project.  This MOU is designed to provide Phillips with the funds to pay some expenses, not just salaries, including overhead and various associated expenses of the Project.  Phillips will have direct authority on how to deploy the capital provided to him and is specifically authorized to utilize the capital and make decisions that he deems necessary to accomplish the goals of the Founders and complete the Project.

5. **Funding.**

Parties agree that the structure of the development team may not be a traditional company. Therefore, obligations incurred by Phillips require the entire funding to be available on hand, such that Phillips or the development vehicle can enter into agreement without contingencies. Therefore, Phillips through a trust, shall be funded with the entirety of the estimated costs and salaries, **$6,000,000.00** (six million dollars) at the signing of this MOU and the funds shall be deposited into the attorney trust account.

(a) <u>Estimated budget</u>.    The parties have determined the total funding necessary for the success of the parties is based upon the following estimated budget:

- **$1,000,000.00** (one million dollars) for Phillips' total compensation;
- **$500,000.00** (five hundred thousand dollars) for misc. expenses;
    - Legal

4

000523

    - Office costs and expenses
    - Servers and computer equipment
  - **$3,000,000.00** (three million dollars) for 5 blockchain engineers;
  - **$500,000.00** (five hundred thousand dollars) for non-blockchain engineers.

  (b) <u>Milestones</u>. The MOU anticipates the following milestones.  Each party to this MOU shall have the right to consent to the milestone.  The Parties agree that they shall not unreasonably withhold their consent to the milestones.  The Parties will approve the milestone for the Solve DAO launch via the testnet deployment, at this stage.

    (i) **Milestone 1**. January 1, 2022
     a. Launch of the Solve DAO;
     b. Token offering, capable of being staked;
     c. $\Sigma$ DAO's Movements & Initiatives capable;
     f. Movement assets are held in the $\Sigma$ DAO;
     d. Function $\Sigma$ governance, landing page;
     g. $\Sigma$ treasury to hold at least 10% outstanding tokens;
     h. Movements may hold NFTs and can fractionalize them;
     i. Modular architecture for future adapters.

    (ii) **Milestone 2**. April 1, 2022
     a. Movement functionality update.
     b. Additional voting schemes
      - Conviction voting
      - Quadratic voting
      - Signaling voting

    (iii) **Milestone 3**. July 1, 2022 – Scalability update.
     a. All key channels created automatically after movement creation
      - Discords
      - IPFS
      - $\Sigma$ DAO backend interfacing w/ discord
      - ENS domains
     b. Automatic twitter linking
     c. Enable users to stake SOLVE for higher yield
     d. Movements to create their own unique NFTs

    (iv) **Completion of Agreement**. January 23, 2023 – Security update.
     a. 100% decentralized database for all SOLVE & movement data

  (c) <u>No Guarantee of Success and Phillips' Best Efforts.</u> Phillips agrees to use his best efforts in order to successfully complete the Project, but the parties agree and understand that there is no guarantee that the Project will succeed despite Phillips' and the others' best efforts.

    (d)    <u>Liability and Indemnification</u>.   Phillips on behalf of the parties will take the necessary precautions with regards to any potential legal issues with any of the DAO activities including the creation of any and all agreements to be made to individuals involved with the DAO.  However, Phillips offers no opinion as to the legality of any aspect of the Project and makes no guarantees to any changes in the law or alterations in strategy by any governmental enforcement agency in its interpretation treatment of DAOs as they relate to "investment pools." The Parties specifically authorize Phillips to allocate any portion of the development funds he deems, in his sole discretion, as necessary, for any legal purpose or the investigation of any potential claims or liability.  The Parties further agree that the DAO shall indemnify Phillips, his employees, contractors, and/or assigns from any claim of liability in the creation and launch of the DAO or any work performed in furtherance of the Project and shall hold harmless Phillips, his employees, contractors and/or assigns for any action taken in further of the Project.

**6.**    **Miscellaneous.**

    (a)    <u>Intellectual property</u>.  Any IP developed by Phillips or the engineering team not owned by the DAO will be assigned to an entity to be determined.  However, the Parties agree that Phillips shall be consulted on any issue involving any IP including what, if any, IP will be protected and how. The Parties further understand that the money considered and paid in this MOU does not include any funds necessary for any costs associated with perfecting and filing a claim of intellectual property including any professional legal fees and costs.  However, any costs or professional fees associated with a copyright shall be included in the funding contemplated in this MOU.

    (b)    The Parties specifically agree and enter into this MOU to affirm that all operational decisions shall be the sole province of Phillips including the hiring of talent, dismissal of employees, termination of contractors, and allocation of resources.  Parties commit to making themselves available in any recruiting efforts.

    (c)    The Parties agree that no person is authorized, nor shall any such person disclose the names or identities of any of the Founders or parties to this MOU nor the existence of the DAO at any time to any third party or uninterested party without the express, written permission of all Parties. This prohibition specifically does not include the disclosure of all necessary and relevant information in order to recruit talent or contractors whose work in deemed necessary to complete the Project.

    (d)    <u>Jurisdiction</u>.  This Agreement will be governed in all respects by the laws of the United States of America and by the laws of the State of Washington with jurisdiction in King County.

    (f)    This MOU may be executed in separate parts and at different times.

***[Signature Page to Follow]***

000525

Executed this \_\_\_\_\_ day of November, 2021.

_____
Ryan Breslow

Executed this \_\_\_\_\_ day of November, 2021.

_____
Alex Fine

Executed this \_\_\_\_\_ day of November, 2021.

_____
Jon Gordon

Executed this \_\_\_\_\_ day of November, 2021.

_____
Mark Phillips

7

000526

TERMS AND CONDITIONS OF TOKEN SALE AND USE

PLEASE READ THESE TERMS AND CONDITIONS OF TOKEN SALE AND USE CAREFULLY BEFORE ACCESSING THE WEBSITE LOCATED AT HTTPS://move.xyz (THE "WEBSITE") OR THE Movement DAO (DEFINED BELOW) OR PURCHASING TOKENS. THE LAW OFFICE OF REED YURCHAK (THE "COMPANY") WILL ACT AS THE SERVICE PROVIDER FOR THE Movement DAO. YOU ACKNOWLEDGE THAT THERE ARE CERTAIN RISKS ASSOCIATED WITH PURCHASING THE TOKENS DESCRIBED HEREIN AND AGREE TO ASSUME SUCH RISKS UPON ANY PURCHASE OF TOKENS. IN ADDITION, NOTE THAT THESE TERMS CONTAIN A BINDING CLASS ACTION WAIVER, WHICH, IF APPLICABLE TO YOU, AFFECT YOUR LEGAL RIGHTS. IF YOU DO NOT AGREE TO THESE TERMS, DO NOT PURCHASE THE TOKENS DESCRIBED HEREIN.

Prior to purchasing Tokens, you should carefully consider these Terms and, to the extent necessary, consult a lawyer, accountant, and/or tax professional, as applicable.

Purchases of Tokens should be undertaken only by individuals or companies that have significant experience with, and understanding of, the usage and intricacies of cryptographic tokens, including Ethereum-based tokens and blockchain-based software systems. Purchasers should have an expert understanding of the storage and transmission mechanisms associated with cryptographic tokens. While the Company will be available to assist the Purchaser of Tokens during the Token Sale, the Company will not be responsible in any way for loss of any cryptocurrency, including Tokens, resulting from actions taken by, or omitted by Purchaser. If you do not have such experience or expertise, then you should not purchase Tokens or participate in the Token Sale. Your participation in the Token Sale is deemed to be your understanding and acknowledgment that you satisfy the requirements mentioned in this paragraph.

As further described herein, by purchasing Tokens, and to the extent permitted by law, you agree to not hold the Company or its respective past, present, and future employees, officers, directors, contractors, consultants, equity holders, suppliers, vendors, service providers, parent companies, subsidiaries, affiliates, agents, representatives, predecessors, successors and/or designees liable for any losses or any special, incidental, or consequential damages arising from, or in any way connected, to the sale of Tokens, including losses associated with these Terms.
You acknowledge, understand and agree that:

You are subject to and bound by these Terms by virtue of purchasing the Tokens.

The Tokens have no rights, intended uses or attributes outside of use with the Kinesis Platform or as otherwise expressly referred to in these Terms.

A purchase of Tokens is non-refundable and cannot be cancelled.
A purchase of Tokens involves many, varied risks which can result in the loss of all amounts paid.
The Company reserves the right to refuse or cancel Token purchase requests at any time in its sole and absolute discretion.
The Tokens are not backed by any physical bullion or other assets which a Purchaser would have any rights or access to.
Other Token purchasers who made their purchase at a different time may receive more Tokens from the DAO for the same amount paid. In an effort to be completely transparent the tokens are priced on a bonding curve which is a function of the number of tokens voted by the community at any point in time and the token price is not due to any action by the DAO or any member of the community.
These Terms limit the liability of the DAO and its Associated Parties (defined below) in connection with the sale of Tokens.

Right to review information of the Movement DAO
You have reviewed to your satisfaction all supporting documents and collateral sources concerning the risks associate with purchasing Tokens.

NOTHING IN THESE TERMS SHALL BE DEEMED TO CONSTITUTE A PROSPECTUS OF ANY SORT, A SOLICITATION FOR INVESTMENT OR INVESTMENT ADVICE NOR DOES IT IN ANY WAY PERTAIN TO AN OFFERING OR A SOLICITATION OF AN OFFER TO BUY ANY SECURITIES IN ANY JURISDICTION. TO THE MAXIMUM AMOUNT PERMITTED BY APPLICABLE LAW, EACH OF THE COMPANY AND KINESIS FOUNDATION (COLLECTIVELY, THE "ASSOCIATED PARTIES" AND EACH AN "ASSOCIATED PARTY") EXPRESSLY DISCLAIM AND SHALL NOT BE LIABLE FOR ANY AND ALL RESPONSIBILITY FOR ANY DIRECT OR ANY INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL OR OTHER LOSSES OF ANY KIND, IN TORT, CONTRACT OR OTHERWISE (INCLUDING BUT NOT LIMITED TO LOSS OF REVENUE, INCOME OR PROFITS, AND LOSS OF USE OR DATA), ARISING OUT OF OR IN CONNECTION WITH (I) THE PURCHASER'S ACCEPTANCE OF OR RELIANCE ON ANY INFORMATION CONTAINED IN THESE TERMS OR THE WHITEPAPER, (II) ANY ERROR, OMISSION OR INACCURACY IN ANY SUCH INFORMATION OR (III) ANY ACTION RESULTING THEREFROM.

Purchaser agrees to buy, and DAO agrees to sell, Tokens in accordance with the following terms:
Acceptance of Confidential Offering Memorandum, Whitepaper and Terms

Additional Disclaimers

$MOVE Governance tokens are not guaranteed or secured by any person, asset or entity in any way. The team is not under any obligation to issue replacement tokens if they are lost, stolen, destroyed, or otherwise inaccessible for any reason.

$MOVE Governance tokens are not to be deemed or interpreted to be representative of any kind of:

Currency, legal tender, money or deposit
Investment (whether secured or unsecured), equity interest, proprietary interest and economic rights
Equity, debt or hybrid instrument, security collective investment scheme managed fund, financial derivative, futures contract, deposit, commercial paper, negotiable instrument, investment contract, note, bond, warrant, certificate or instrument entitling the holder to interest, dividends or any kind of return, nor any other financial instrument; or...
Right, title, interest or benefit whatsoever in whole or in part, in any person or property, or any assets

$MOVE Governance tokens are not guaranteed or secured by any person, asset or entity in any way. The team is not under any obligation to issue replacement tokens if they are lost, stolen, destroyed, or otherwise inaccessible for any reason.

How the Movement DAO endowment works (Compound Giving)

Movement DAO tokens holders are responsible for effectively deploying revenue generated from the endowment. They can deploy this revenue into any of the following:
Compensating community members
Funding platform development
Purchasing movement tokens to be held in the Movement DAO endowment
Funding movement budget's directly
Funding movement endowments directly
Funding movement actions directly
Re-investing directly into the Movement DAO endowment
Funding giveaways to grow the platform


Governance Voting

Snapshot voting strategies during the Movement DAO will employ a governance token available to individuals who stake $MOVE. However, during the bootstrapping phase of the DAO community contributors and based on participation will be granted a MAPE-1420 NFT which will be employed for initial governance. Details to follow.

Slow Start

Until Movement DAO is able to operate with confidence for some time, the following safe guards were put into place until the community deems them unnecessary. The safe guards are encoded into the adapters and extension smart contracts.
	Financial transactions are handled after any votes by an IRL law firm acting as a service provider.
	DAO founders may elect to operate with a Vetoer role which may veto any pending proposal.
	A number of Movement DAO's Gnosis Safe signers are publicly known individuals.


How do I know the token launch is fair?

Movement DAO cares deeply about building healthy communities. Therefore, an ethical token release is core to our mission. Movement DAO is taking the following steps to ensure a transparent, equitable, and community oriented launch:

When transferring tokens from the bonding curve wallet into the movement vault, the community has the right to veto the destination address. Therefore, community funds cannot be moved without community approval.

A registered law firm acts as a signatory on the funds wallet. They therefore owe a fiduciary duty to the movement and will employ their expertise to ensure that no funds are moved in violation of the movement rules and no requests for funding would be indicative of fraudulent activity.

Service Provider
What are the external costs involved with the DAO?

DAOs are currently not universally recognized as legal entities. Therefore in addition to overseeing the assets of the DAO and how they are distributed by being one of the signers for the Gnosis Safe – dao-lawfirm.eth, the DAO through its members are responsible for the costs associated with its activities. This includes reviewing statements made in this GitBook, what the tokens maybe used for and what Legal Disclaimers and Terms of Use are acceptable given the current laws.

Fees and Expenses

Movement DAO developer contemplated the use of a service provider to help facilitate, for example, paying other service providers who may not be strictly anonymous or accepting of Ethereum. Currently an anonymous donor is paying for the fees associated with the service provider until the DAO governance if formed and snapshot votes render the will of its members.
Following other DAOs, with different charters, such as Flamingo DAO, and the fees associated with their activities, we estimate spending 2% of the assets held per year on such legal services.

Upon the formation of the governance for Movement DAO, this will be submitted for the community vote via snapshot.

Token Sale and Use

What are the terms of the $MOVE token sale?

TERMS AND CONDITIONS OF TOKEN SALE AND USE

PLEASE READ THESE TERMS AND CONDITIONS OF TOKEN SALE AND USE CAREFULLY BEFORE ACCESSING THE WEBSITE LOCATED AT HTTPS://MOVE.XYZ (THE "WEBSITE") OR THE Movement DAO (DEFINED BELOW) OR PURCHASING TOKENS. THE LAW OFFICE OF REED YURCHAK (THE "COMPANY") WILL ACT AS THE SERVICE PROVIDER FOR THE MOVEMENT DAO. YOU ACKNOWLEDGE THAT THERE ARE CERTAIN RISKS ASSOCIATED WITH PURCHASING THE TOKENS DESCRIBED HEREIN AND AGREE TO ASSUME SUCH RISKS UPON ANY PURCHASE OF TOKENS. IN ADDITION, NOTE THAT THESE TERMS CONTAIN A BINDING CLASS ACTION

WAIVER, WHICH, IF APPLICABLE TO YOU, AFFECT YOUR LEGAL RIGHTS. IF YOU DO NOT AGREE TO THESE TERMS, DO NOT PURCHASE THE TOKENS DESCRIBED HEREIN.

Prior to purchasing Tokens, you should carefully consider these Terms and, to the extent necessary, consult a lawyer, accountant, and/or tax professional, as applicable.

Purchases of Tokens should be undertaken only by individuals or companies that have significant experience with, and understanding of, the usage and intricacies of cryptographic tokens, including Ethereum-based tokens and blockchain-based software systems. Purchasers should have an expert understanding of the storage and transmission mechanisms associated with cryptographic tokens. While the Company will be available to assist the Purchaser of Tokens during the Token Sale, the Company will not be responsible in any way for loss of any cryptocurrency, including Tokens, resulting from actions taken by, or omitted by Purchaser. If you do not have such experience or expertise, then you should not purchase Tokens or participate in the Token Sale. Your participation in the Token Sale is deemed to be your understanding and acknowledgment that you satisfy the requirements mentioned in this paragraph.

As further described herein, by purchasing Tokens, and to the extent permitted by law, you agree to not hold the Company or its respective past, present, and future employees, officers, directors, contractors, consultants, equity holders, suppliers, vendors, service providers, parent companies, subsidiaries, affiliates, agents, representatives, predecessors, successors and/or designees liable for any losses or any special, incidental, or consequential damages arising from, or in any way connected, to the sale of Tokens, including losses associated with these Terms.

You acknowledge, understand and agree that:

You are subject to and bound by these Terms by virtue of purchasing the Tokens.
The Tokens have no rights, intended uses or attributes outside of use with the Kinesis Platform or as otherwise expressly referred to in these Terms.

A purchase of Tokens is non-refundable and cannot be cancelled.
A purchase of Tokens involves many, varied risks which can result in the loss of all amounts paid.
The Company reserves the right to refuse or cancel Token purchase requests at any time in its sole and absolute discretion.
The Tokens are not backed by any physical bullion or other assets which a Purchaser would have any rights or access to.
Other Token purchasers who made their purchase at a different time may receive more Tokens from the DAO for the same amount paid. In an effort to be completely transparent the tokens are priced on a bonding curve which is a function of the number of tokens voted by the community at any point in time and the token price is not due to any action by the DAO or any member of the community.
These Terms limit the liability of the DAO and its Associated Parties (defined below) in connection with the sale of Tokens.
Right to review information of the Movement DAO

You have reviewed to your satisfaction all supporting documents and collateral sources concerning the risks associate with purchasing Tokens.

NOTHING IN THESE TERMS SHALL BE DEEMED TO CONSTITUTE A PROSPECTUS OF ANY SORT, A SOLICITATION FOR INVESTMENT OR INVESTMENT ADVICE NOR DOES IT IN ANY WAY PERTAIN TO AN OFFERING OR A SOLICITATION OF AN OFFER TO BUY ANY SECURITIES IN ANY JURISDICTION. TO THE MAXIMUM AMOUNT PERMITTED BY APPLICABLE LAW, EACH OF THE COMPANY AND KINESIS FOUNDATION (COLLECTIVELY, THE "ASSOCIATED PARTIES" AND EACH AN "ASSOCIATED PARTY") EXPRESSLY DISCLAIM AND SHALL NOT BE LIABLE FOR ANY AND ALL RESPONSIBILITY FOR ANY DIRECT OR ANY INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL OR OTHER LOSSES OF ANY KIND, IN TORT, CONTRACT OR OTHERWISE (INCLUDING BUT NOT LIMITED TO LOSS OF REVENUE, INCOME OR PROFITS, AND LOSS OF USE OR DATA), ARISING OUT OF OR IN CONNECTION WITH (I) THE PURCHASER'S ACCEPTANCE OF OR RELIANCE ON ANY INFORMATION CONTAINED IN THESE TERMS OR THE WHITEPAPER, (II) ANY ERROR, OMISSION OR INACCURACY IN ANY SUCH INFORMATION OR (III) ANY ACTION RESULTING THEREFROM.

Purchaser agrees to buy, and DAO agrees to sell, Tokens in accordance with the following terms:
Acceptance of Confidential Offering Memorandum, Whitepaper and Terms