snapshot 

← Back

# MIP-0007: Snapshot Consent of the Members of the DAO

Closed    Movement DAO: Consensus Space by filipv.eth  •••

*Enact several key resolutions.*

## View Proposal →

1. Exhibit A
2. Exhibit B
3. Exhibit C
4. Exhibit D

*PDF Download* | *IPFS Mirror*

---

Votes 8                                                                      ⤓

---

🐾 servic...  ( Core )                    For                    10M MOVE 🐾

---

⬤ 0x58Ba...1650                           For                    9.5K MOVE 🐾

---

🐾 obstacker.eth                          For                    4.2K MOVE 🐾

---

**EXHIBIT 015**                                                    **PLAINTIFF0000358**

| riceScr... Core | For | 2.2K MOVE 𝓃 |
| natasha-pan... | For | 187 MOVE 𝓃 |
| partypants.eth | For | 39 MOVE 𝓃 |
| pillowfightcl... | For | 39 MOVE 𝓃 |
| tankbo... Core | For | 0 MOVE 𝓃 |

## Information

| | |
|---|---|
| **Strategie(s)** | |
| **IPFS** | #bafkrei |
| **Voting system** | Basic voting |
| **Start date** | Aug 23, 2022, 12:00 AM |
| **End date** | Aug 30, 2022, 12:00 AM |
| **Snapshot** | 15,399,663 |

## Results

| | |
|---|---|
| For | 10M MOVE  100% |
| Against | 0 MOVE  0% |

## I voted POAP

PLAINTIFF0000359



Vote to get this POAP



<div style="text-align: center; border: 1px solid; border-radius: 30px; padding: 10px;">Mint</div>

PLAINTIFF0000360

PLAINTIFF0000361

 **Founding Proposals**  Snapshot Consent of the Members of the DAO

# Snapshot Consent of the Members of the DAO

```
Authors: tankbottoms.eth, filipv.eth
Date: 2022-08-23
```

*DAO, an Unincorporated Nonprofit Association, a Delaware entity, and DAOLABS, and other proposed DAO Entities*

## Definitions

**Snapshot** is a decentralized voting system which provides flexibility on voting power calculation, various voting types, the creation of proposals, and the off-chain verification of voters via the Ethereum blockchain, which enables easy to verify and hard to contest results enabling robust governance of unincorporated associations with large participation bases. Snapshot thereby enables diverse decentralized decision making, previously only possible through highly coordinated shareholder meetings, without any costs. The DAO and its affiliates entities use Snapshot in order to verify and calculate Membership consensus.

The undersigned, constituting the Members hereby adopt the following resolutions via Snapshot:

## Ratification of Actions of the Service Providers

**RESOLVED:** The **Service Providers**, as defined by the Guiding Principals § 16¶¶ (a)-(d); specifically as dao-lawfirm.eth, Attorney Reed Yurchak of the Law Offices of Reed Yurchak, and forensic blockchain engineer tankbottoms.eth. Every action that has been taken, authorized, unauthorized, and with respect to the DAO by the **Service Providers** including, but not limited to, the transfer of Cryptocurrency to and from Gnosis Multi-Signature Wallets, externally owned wallets, Coinbase, Robinhood, and any other addresses, i.e. Uniswap, Matcha, OpenSea, etc, the appointment of the Authorized Member, and any of their affiliates, together (**"Service Providers"**), authorship of any documents, agreements, documents, the filing of the Guiding Principles, the registering of the DAO's EIN, the establishment of any affiliates (such as any for-profit entities), including DAOLABS, Inc., DAOLABS LLC, Movement DAO, Peace DAO, and Treasury, are hereby ratified.

**PLAINTIFF0000362**

**RESOLVED FURTHER:** That **Benjamin Reed (benreed.eth)** is appointed to serve as the DAO's **Authorized Member**, to serve until his respective successor is duly elected and qualified.

# Election of Additional Authorized Members and their Agents

**RESOLVED FURTHER:** That **Benjamin Reed (benreed.eth)**, as well as any persons associated with the addresses below, are elected as **Authorized Members** and agents of the DAO, to serve until their respective successors are duly elected and qualified or until any such Member's earlier resignation or removal:

| Address |
| --- |
| 0x143cC0A996De329C1C5723Ee4F15D2a40c1203c6 |
| 0x752515a3a1091b9f1c04416cf79d1f14d2340085 |
| 0x5d95baebb8412ad827287240a5c281e3bb30d27e |
| 0xf8042c55fe4dff9df82c0f8435fbcdc32fe60a69 |
| 0xE41188926607921763D25392475f1156AC5f9033 |
| 0x468f178672C86bFA02e5E1B0413C3ccf55A37409 |
| 0x550bD0F03580B9a687931af4d837F8e45D61d410 |
| 0xDbE76F6ae97dFD5bdd1D7DAD8972740d18aB2b57 |
| 0x746cf650d4E5431474E8D4E2d5B6Bbe53772b498 |
| 0xD2427c0e44D28Ea74c0504E072c6073d135569B2 |
| 0x8C00f41676Ce4670ae9FcBBF297a24736dc23cc3 |

**RESOLVED FURTHER:** That the **Authorized Members** in consultation with the Service Provider or any legal counsel are authorized and directed to execute, verify, and file all documents, and to take

PLAINTIFF0000363

whatever actions, that are necessary or advisable to comply with all state and federal laws, or that are taken on behalf of the DAO or at the behest of other Members.

# Execution of Agreements Generally

**RESOLVED FURTHER:** That the Members determine that it is in the best interest of the DAO to enter into indemnification agreements, independent consulting agreements, innovations and assignments agreements, or a number of other agreements (including offer letters, employee nondisclosure and assignment agreements, confidentiality agreements, mutual confidentiality agreements, confidential materials release forms, and independent contractor services agreements) (together, "Agreements") with its current and future Service Providers, the **Authorized Members**, and agents in substantially in the form respectively attached hereto as Exhibits A, B, C, and D.

**RESOLVED FURTHER:** That the DAO is authorized to execute and deliver Agreements with each individual and with all future **Authorized Members** of the DAO.

**RESOLVED FURTHER:** That the **Authorized Members** are authorized to make modifications to such Agreements in order to comply with applicable law.

# Management of Fiscal Affairs Generally

**RESOLVED FURTHER:** That the **Service Providers** and **Authorized Members** (together **"Service Providers"**) are authorized to:

- designate one or more banks or similar financial institutions as depositories of the funds of the **DAO, DAOLABS, TREASURY, PEACE DAO, MOVEMENT DAO and/or any other DAO affiliates** (together the **"DAO Entities"**);
- open, maintain and close general and special accounts with any such depositories;
- cause to be deposited from time to time in such accounts, funds of the DAO into the DAO Entities as they deem necessary or advisable, and to designate, or to change or revoke the designation of, the officers or agents of the DAO Entities authorized to make such deposits and to endorse checks, drafts and other instruments for deposit;
- designate, or to change or revoke the designation of, the **Service Provider** or agents of the DAO Entities authorized to sign or countersign checks, drafts or other orders for the payment of money of the DAO Entities against any funds deposited in any of such accounts;

**PLAINTIFF0000364**

- authorize the use of facsimile signatures for the signing or countersigning of checks, drafts or other orders for the payment of money, and to enter into such agreements as banks and similar financial institutions customarily require as a condition for permitting the use of facsimile signatures; and

- make such general and special rules and regulations with respect to such accounts as they may deem necessary or advisable, and to complete, execute, and certify any customary printed blank signature card forms or online forms in order to exercise conveniently the authority granted by this resolution, and any resolutions printed on such cards or available in such online forms are deemed adopted as a part of this resolution.

**RESOLVED FURTHER:** That all form resolutions required by any such depository are adopted, and that the **Service Providers** and agents are authorized to certify such resolutions as having been adopted by this action by Member vote.

**RESOLVED FURTHER:** That any such depository to which a certified copy of these resolutions has been delivered by the **Authorized Member** is authorized and entitled to rely upon such resolutions for all purposes until it receives written notice of the revocation or amendment of these resolutions.

# Expenses Related to the Incorporation and its Organization

**RESOLVED FURTHER:** That the **Service Providers** are authorized to pay and reimburse the expenses of incorporation and organization of the DAO Entities, and their affiliate, including without limitation expenses incurred prior to the incorporation of the DAO Entities.

**RESOLVED FURTHER:** That the **Authorized Members** are authorized to determine whether to elect to apply Section 248(a) of the Internal Revenue Code with respect to any organizational expenditures.

# Withholding Taxes

**RESOLVED FURTHER:** That the **Service Providers** is authorized to consult with its bookkeepers, auditors and attorneys in order to be fully informed as to, and to collect and pay promptly when due, all withholding taxes for which the DAO Entities may now be (or hereafter become) liable.

# Accounting Year

PLAINTIFF0000365

**RESOLVED FURTHER:** That the accounting year of the Company will end on December 31st of each year.

# Qualifications to do Business

**RESOLVED FURTHER:** That the **Service Providers** are authorized to take any and all actions that they deem necessary or appropriate to qualify the DAO and its affiliate entities to do business as a foreign corporation in each state that the officers determine such a qualification to be necessary or appropriate.

# Employer Tax Identification Number

**RESOLVED FURTHER:** That the **Service Providers** are authorized to apply for a federal employer identification number on Form SS-4.

**RESOLVED FURTHER:** That the **Service Providers** are authorized to direct the responsible attorneys, paralegals and corporate assistants of dao-lawfirm.eth or counsel for the DAO, to submit on behalf of the DAO, an online application for a federal employer identification number on Form SS-4.

**RESOLVED FURTHER:** That the **Service Providers** are authorized to prepare an equity incentive plan and agreement for the appropriate DAO affiliate entities, DAOLABS, and to file the appropriate notices with the applicable state and federal securities authorities in connection with the issuance of options, at such time as such actions may be necessary or advisable in order to comply with applicable law.

# Omnibus Resolutions

**RESOLVED FURTHER:** That the **Service Providers** shall be, and hereby is, authorized and empowered to take any and all such further action, to execute and deliver any and all such further agreements, instruments, documents and certificates and to pay such expenses, in the name and on behalf of the DAO, any affiliate entities, or officer, as any such officer may deem necessary or advisable to effectuate the purposes and intent of the resolutions hereby adopted, the taking of such actions, the execution and delivery of such agreements, instruments, documents, and certificates. The payment of such expenses by any such officer or **Service Provider** shall be conclusive evidence of his or her authorization hereunder and the approval thereof.

PLAINTIFF0000366

**RESOLVED FURTHER:** That any and all actions taken by the **Service Providers** to carry out the purposes and intent of the foregoing resolutions prior to their adoption are approved, ratified and confirmed by the DAO Members by way of Snapshot.

# The Collective Snapshot Consent of the Members of the DAO or DAO Member Actions

This action by the DAO Members by Snapshot vote shall be effective as of the date the DAO receives the consent of the DAO at the end of the Snapshot vote. This action by the DAO Members consent may be executed in any number of counterparts, each of which shall constitute an original and all of which together shall constitute one action. Any copy, facsimile, Website, Ethereum blockchain signatures or other reliable verification and reproduction of this action by recorded and written consent may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used. This action by the DAO Members shall be recorded with the next Snapshot vote of the DAO.

## Authors

1. 0x30670D81E487c80b9EDc54370e6EaF943B6EAB39
2. 0x5d95baEBB8412AD827287240A5c281E3bB30d27E

✏️ Edit this page

PLAINTIFF0000367

# Snapshot Consent of the Members of the DAO

Authors: tankbottoms.eth, filipv.eth
Date: 2022-08-23

*DAO, an Unincorporated Nonprofit Association, a Delaware entity, and DAO-LABS, and other proposed DAO Entities*

## Definitions

**Snapshot** is a decentralized voting system which provides flexibility on voting power calculation, various voting types, the creation of proposals, and the off-chain verification of voters via the Ethereum blockchain, which enables easy to verify and hard to contest results enabling robust governance of unincorporated associations with large participation bases. Snapshot thereby enables diverse decentralized decision making, previously only possible through highly coordinated shareholder meetings, without any costs. The DAO and its affiliates entities use Snapshot in order to verify and calculate Membership consensus.

The undersigned, constituting the Members hereby adopt the following resolutions via Snapshot:

## Ratification of Actions of the Service Providers

**RESOLVED:** The **Service Providers**, as defined by the Guiding Principals § 16¶¶ (a)-(d); specifically as dao-lawfirm.eth, Attorney Reed Yurchak of the Law Offices of Reed Yurchak, and forensic blockchain engineer tankbottoms.eth. Every action that has been taken, authorized, unauthorized, and with respect to the DAO by the **Service Providers** including, but not limited to, the transfer of Cryptocurrency to and from Gnosis Multi-Signature Wallets, externally owned wallets, Coinbase, Robinhood, and any other addresses, i.e. Uniswap, Matcha, OpenSea, etc, the appointment of the Authorized Member, and any of their affiliates, together (**"Service Providers"**), authorship of any documents, agreements, documents, the filing of the Guiding Principles, the registering of the DAO's EIN, the establishment of any affiliates (such as any for-profit entities), including DAOLABS, Inc., DAOLABS LLC, Movement DAO, Peace DAO, and Treasury, are hereby ratified.

**RESOLVED FURTHER:** That **Benjamin Reed** (**benreed.eth**) is appointed to serve as the DAO's **Authorized Member**, to serve until his respective successor is duly elected and qualified.

## Election of Additional Authorized Members and their Agents

**RESOLVED FURTHER:** That **Benjamin Reed** (**benreed.eth**), as well as any persons associated with the addresses below, are elected as **Authorized Members** and agents of the DAO, to serve until their respective successors

1

PLAINTIFF0000368

are duly elected and qualified or until any such Member's earlier resignation or removal:

| Address |
| --- |
| 0x143cC0A996De329C1C5723Ee4F15D2a40c1203c6 |
| 0x752515a3a1091b9f1c04416cf79d1f14d2340085 |
| 0x5d95baebb8412ad827287240a5c281e3bb30d27e |
| 0xf8042c55fe4dff9df82c0f8435fbcdc32fe60a69 |
| 0xE41188926607921763D25392475f1156AC5f9033 |
| 0x468f178672C86bFA02e5E1B0413C3ccf55A37409 |
| 0x550bD0F03580B9a687931af4d837F8e45D61d410 |
| 0xDbE76F6ae97dFD5bdd1D7DAD8972740d18aB2b57 |
| 0x746cf650d4E5431474E8D4E2d5B6Bbe53772b498 |
| 0xD2427c0e44D28Ea74c0504E072c6073d135569B2 |
| 0x8C00f41676Ce4670ae9FcBBF297a24736dc23cc3 |

**RESOLVED FURTHER:** That the **Authorized Members** in consultation with the Service Provider or any legal counsel are authorized and directed to execute, verify, and file all documents, and to take whatever actions, that are necessary or advisable to comply with all state and federal laws, or that are taken on behalf of the DAO or at the behest of other Members.

## Execution of Agreements Generally

**RESOLVED FURTHER:** That the Members determine that it is in the best interest of the DAO to enter into indemnification agreements, independent consulting agreements, innovations and assignments agreements, or a number of other agreements (including offer letters, employee nondisclosure and assignment agreements, confidentiality agreements, mutual confidentiality agreements, confidential materials release forms, and independent contractor services agreements) (together, "Agreements") with its current and future Service Providers, the **Authorized Members**, and agents in substantially in the form respectively attached hereto as Exhibits A, B, C, and D.

**RESOLVED FURTHER:** That the DAO is authorized to execute and deliver Agreements with each individual and with all future **Authorized Members** of the DAO.

**RESOLVED FURTHER:** That the **Authorized Members** are authorized to make modifications to such Agreements in order to comply with applicable law.

## Management of Fiscal Affairs Generally

**RESOLVED FURTHER:** That the **Service Providers** and **Authorized Members** (together **"Service Providers"**) are authorized to:

2

PLAINTIFF0000369

- designate one or more banks or similar financial institutions as depositories of the funds of the **DAO, DAOLABS, TREASURY, PEACE DAO, MOVEMENT DAO and/or any other DAO affiliates** (together the **"DAO Entities"**);
- open, maintain and close general and special accounts with any such depositories;
- cause to be deposited from time to time in such accounts, funds of the DAO into the DAO Entities as they deem necessary or advisable, and to designate, or to change or revoke the designation of, the officers or agents of the DAO Entities authorized to make such deposits and to endorse checks, drafts and other instruments for deposit;
- designate, or to change or revoke the designation of, the **Service Provider** or agents of the DAO Entities authorized to sign or countersign checks, drafts or other orders for the payment of money of the DAO Entities against any funds deposited in any of such accounts;
- authorize the use of facsimile signatures for the signing or countersigning of checks, drafts or other orders for the payment of money, and to enter into such agreements as banks and similar financial institutions customarily require as a condition for permitting the use of facsimile signatures; and
- make such general and special rules and regulations with respect to such accounts as they may deem necessary or advisable, and to complete, execute, and certify any customary printed blank signature card forms or online forms in order to exercise conveniently the authority granted by this resolution, and any resolutions printed on such cards or available in such online forms are deemed adopted as a part of this resolution.

**RESOLVED FURTHER:** That all form resolutions required by any such depository are adopted, and that the **Service Providers** and agents are authorized to certify such resolutions as having been adopted by this action by Member vote.

**RESOLVED FURTHER:** That any such depository to which a certified copy of these resolutions has been delivered by the **Authorized Member** is authorized and entitled to rely upon such resolutions for all purposes until it receives written notice of the revocation or amendment of these resolutions.

## Expenses Related to the Incorporation and its Organization

**RESOLVED FURTHER:** That the **Service Providers** are authorized to pay and reimburse the expenses of incorporation and organization of the DAO Entities, and their affiliate, including without limitation expenses incurred prior to the incorporation of the DAO Entities.

**RESOLVED FURTHER:** That the **Authorized Members** are authorized to determine whether to elect to apply Section 248(a) of the Internal Revenue Code with respect to any organizational expenditures.

PLAINTIFF0000370

## Withholding Taxes

**RESOLVED FURTHER:** That the **Service Providers** is authorized to consult with its bookkeepers, auditors and attorneys in order to be fully informed as to, and to collect and pay promptly when due, all withholding taxes for which the DAO Entities may now be (or hereafter become) liable.

## Accounting Year

**RESOLVED FURTHER:** That the accounting year of the Company will end on December 31st of each year.

## Qualifications to do Business

**RESOLVED FURTHER:** That the **Service Providers** are authorized to take any and all actions that they deem necessary or appropriate to qualify the DAO and its affiliate entities to do business as a foreign corporation in each state that the officers determine such a qualification to be necessary or appropriate.

## Employer Tax Identification Number

**RESOLVED FURTHER:** That the **Service Providers** are authorized to apply for a federal employer identification number on Form SS-4.

**RESOLVED FURTHER:** That the **Service Providers** are authorized to direct the responsible attorneys, paralegals and corporate assistants of dao-lawfirm.eth or counsel for the DAO, to submit on behalf of the DAO, an online application for a federal employer identification number on Form SS-4.

**RESOLVED FURTHER:** That the **Service Providers** are authorized to prepare an equity incentive plan and agreement for the appropriate DAO affiliate entities, DAOLABS, and to file the appropriate notices with the applicable state and federal securities authorities in connection with the issuance of options, at such time as such actions may be necessary or advisable in order to comply with applicable law.

## Omnibus Resolutions

**RESOLVED FURTHER:** That the **Service Providers** shall be, and hereby is, authorized and empowered to take any and all such further action, to execute and deliver any and all such further agreements, instruments, documents and certificates and to pay such expenses, in the name and on behalf of the DAO, any affiliate entities, or officer, as any such officer may deem necessary or advisable to effectuate the purposes and intent of the resolutions hereby adopted, the taking of such actions, the execution and delivery of such agreements, instruments, documents, and certificates. The payment of such expenses by any such officer or **Service Provider** shall be conclusive evidence of his or her authorization hereunder and the approval thereof.

4

PLAINTIFF0000371

**RESOLVED FURTHER:** That any and all actions taken by the **Service Providers** to carry out the purposes and intent of the foregoing resolutions prior to their adoption are approved, ratified and confirmed by the DAO Members by way of Snapshot.

## The Collective Snapshot Consent of the Members of the DAO or DAO Member Actions

This action by the DAO Members by Snapshot vote shall be effective as of the date the DAO receives the consent of the DAO at the end of the Snapshot vote. This action by the DAO Members consent may be executed in any number of counterparts, each of which shall constitute an original and all of which together shall constitute one action. Any copy, facsimile, Website, Ethereum blockchain signatures or other reliable verification and reproduction of this action by recorded and written consent may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used. This action by the DAO Members shall be recorded with the next Snapshot vote of the DAO.

———————————————————

**Authors**

1. 0x30670D81E487c80b9EDc54370e6EaF943B6EAB39
2. 0x5d95baEBB8412AD827287240A5c281E3bB30d27E

PLAINTIFF0000372

# Exhibit A

PLAINTIFF0000373

**DAOLABS, INC.**
**INDEMNIFICATION AGREEMENT**

This Indemnification Agreement (this "***Agreement***") is dated as of_____, 2022, and is between DAOLABS IP, INC., a Washington corporation (the "***Company***"), and _____ ("***Indemnitee***").

### RECITALS

A.      Indemnitee's service to the Company substantially benefits the Company.

B.      Individuals are reluctant to serve as directors or officers of corporations or in certain other capacities unless they are provided with adequate protection through insurance or indemnification against the risks of claims and actions against them arising out of such service.

C.      Indemnitee does not regard the protection currently provided by applicable law, the Company's governing documents and any insurance as adequate under the present circumstances, and Indemnitee may not be willing to serve as a director or officer without additional protection.

D.      In order to induce Indemnitee to continue to provide services to the Company, it is reasonable, prudent and necessary for the Company to contractually obligate itself to indemnify, and to advance expenses on behalf of, Indemnitee as permitted by applicable law.

E.      This Agreement is a supplement to and in furtherance of the indemnification provided in the Company's certificate of incorporation and bylaws, and any resolutions adopted pursuant thereto, and this Agreement shall not be deemed a substitute therefor, nor shall this Agreement be deemed to limit, diminish or abrogate any rights of Indemnitee thereunder.

The parties therefore agree as follows:

1.      **Definitions.**

(a)      A "***Change in Control***" shall be deemed to occur upon the earliest to occur after the date of this Agreement of any of the following events:

(i)      *Acquisition of Stock by Third Party.* Any Person (as defined below) is or becomes the Beneficial Owner (as defined below), directly or indirectly, of securities of the Company representing fifteen percent (15%) or more of the combined voting power of the Company's then outstanding securities;

(ii)      *Change in Board Composition.* During any period of two consecutive years (not including any period prior to the execution of this Agreement), individuals who at the beginning of such period constitute the Company's board of directors, and any new directors (other than a director designated by a person who has entered into an agreement with the Company to effect a transaction described in Sections 1(a)(i), 1(a)(iii) or 1(a)(iv)) whose election by the board of directors or nomination for election by the Company's stockholders was approved by a vote of at least two-thirds of the directors then still in office who either were directors at the beginning of the period or whose election or nomination for election was previously so approved, cease for any reason to constitute at least a majority of the members of the Company's board of directors;

(iii)      *Corporate Transactions.* The effective date of a merger or consolidation of the Company with any other entity, other than a merger or consolidation which would result in the voting securities of the Company outstanding immediately prior to such merger or consolidation continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity) more than 50% of the combined voting power of the voting securities of the surviving entity outstanding immediately after such merger or consolidation and with the power to elect at least a majority of the board of directors or other governing body of such surviving entity;

PLAINTIFF0000374

(iv) *Liquidation.* The approval by the stockholders of the Company of a complete liquidation of the Company or an agreement for the sale or disposition by the Company of all or substantially all of the Company's assets; and

(v) *Other Events.* Any other event of a nature that would be required to be reported in response to Item 6(e) of Schedule 14A of Regulation 14A (or in response to any similar item on any similar schedule or form) promulgated under the Securities Exchange Act of 1934, as amended, whether or not the Company is then subject to such reporting requirement.

For purposes of this Section 1(a), the following terms shall have the following meanings:

(1) "***Person***" shall have the meaning as set forth in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended; *provided, however,* that "***Person***" shall exclude (i) the Company, (ii) any trustee or other fiduciary holding securities under an employee benefit plan of the Company, and (iii) any corporation owned, directly or indirectly, by the stockholders of the Company in substantially the same proportions as their ownership of stock of the Company.

(2) "***Beneficial Owner***" shall have the meaning given to such term in Rule 13d-3 under the Securities Exchange Act of 1934, as amended; *provided, however,* that "***Beneficial Owner***" shall exclude any Person otherwise becoming a Beneficial Owner by reason of (i) the stockholders of the Company approving a merger of the Company with another entity or (ii) the Company's board of directors approving a sale of securities by the Company to such Person.

(b) "***Corporate Status***" describes the status of a person who is or was a director, trustee, general partner, managing member, officer, employee, agent or fiduciary of the Company or any other Enterprise.

(c) "***DGCL***" means the General Corporation Law of the State of Washington.

(d) "***Disinterested Director***" means a director of the Company who is not and was not a party to the Proceeding in respect of which indemnification is sought by Indemnitee.

(e) "***Enterprise***" means the Company and any other corporation, partnership, limited liability company, joint venture, trust, employee benefit plan or other enterprise of which Indemnitee is or was serving at the request of the Company as a director, trustee, general partner, managing member, officer, employee, agent or fiduciary.

(f) "***Expenses***" include all reasonable attorneys' fees, retainers, court costs, transcript costs, fees and costs of experts, witness fees, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees, and all other disbursements or expenses of the types customarily incurred in connection with prosecuting, defending, preparing to prosecute or defend, investigating, being or preparing to be a witness in, or otherwise participating in, a Proceeding. Expenses also include (i) Expenses incurred in connection with any appeal resulting from any Proceeding, including without limitation the premium, security for, and other costs relating to any cost bond, supersedeas bond or other appeal bond or their equivalent, and (ii) for purposes of Section 12(d), Expenses incurred by Indemnitee in connection with the interpretation, enforcement or defense of Indemnitee's rights under this Agreement or under any directors' and officers' liability insurance policies maintained by the Company. Expenses, however, shall not include amounts paid in settlement by Indemnitee or the amount of judgments or fines against Indemnitee.

(g) "***Independent Counsel***" means a law firm, or a partner or member of a law firm, that is experienced in matters of corporation law and neither presently is, nor in the past five years has been, retained to represent (i) the Company or Indemnitee in any matter material to either such party (other than as Independent Counsel with respect to matters concerning Indemnitee under this Agreement, or other indemnitees under similar indemnification agreements), or (ii) any other party to the Proceeding giving rise to a claim for indemnification hereunder. Notwithstanding the foregoing, the term "***Independent Counsel***" shall not include any person who,

2

PLAINTIFF0000375

under the applicable standards of professional conduct then prevailing, would have a conflict of interest in representing either the Company or Indemnitee in an action to determine Indemnitee's rights under this Agreement.

(h)   "*Proceeding*" means any threatened, pending or completed action, suit, arbitration, mediation, alternate dispute resolution mechanism, investigation, inquiry, administrative hearing or proceeding, whether brought in the right of the Company or otherwise and whether of a civil, criminal, administrative or investigative nature, including any appeal therefrom and including without limitation any such Proceeding pending as of the date of this Agreement, in which Indemnitee was, is or will be involved as a party, a potential party, a non-party witness or otherwise by reason of (i) the fact that Indemnitee is or was a director or officer of the Company, (ii) any action taken by Indemnitee or any action or inaction on Indemnitee's part while acting as a director or officer of the Company, or (iii) the fact that he or she is or was serving at the request of the Company as a director, trustee, general partner, managing member, officer, employee, agent or fiduciary of the Company or any other Enterprise, in each case whether or not serving in such capacity at the time any liability or Expense is incurred for which indemnification or advancement of expenses can be provided under this Agreement.

(i)   Reference to "*other enterprises*" shall include employee benefit plans; references to "*fines*" shall include any excise taxes assessed on a person with respect to any employee benefit plan; references to "*serving at the request of the Company*" shall include any service as a director, officer, employee or agent of the Company which imposes duties on, or involves services by, such director, officer, employee or agent with respect to an employee benefit plan, its participants or beneficiaries; and a person who acted in good faith and in a manner he or she reasonably believed to be in the best interests of the participants and beneficiaries of an employee benefit plan shall be deemed to have acted in a manner "*not opposed to the best interests of the Company*" as referred to in this Agreement.

2.   **Indemnity in Third-Party Proceedings.** The Company shall indemnify Indemnitee in accordance with the provisions of this Section 2 if Indemnitee is, or is threatened to be made, a party to or a participant in any Proceeding, other than a Proceeding by or in the right of the Company to procure a judgment in its favor. Pursuant to this Section 2, Indemnitee shall be indemnified to the fullest extent permitted by applicable law against all Expenses, judgments, fines and amounts paid in settlement actually and reasonably incurred by Indemnitee or on his or her behalf in connection with such Proceeding or any claim, issue or matter therein, if Indemnitee acted in good faith and in a manner he or she reasonably believed was to be in or not opposed to the best interests of the Company and, with respect to any criminal action or proceeding, had no reasonable cause to believe that his or her conduct was unlawful.

3.   **Indemnity in Proceedings by or in the Right of the Company.** The Company shall indemnify Indemnitee in accordance with the provisions of this Section 3 if Indemnitee is, or is threatened to be made, a party to or a participant in any Proceeding by or in the right of the Company to procure a judgment in its favor. Pursuant to this Section 3, Indemnitee shall be indemnified to the fullest extent permitted by applicable law against all Expenses actually and reasonably incurred by Indemnitee or on Indemnitee's behalf in connection with such Proceeding or any claim, issue or matter therein, if Indemnitee acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the Company. No indemnification for Expenses shall be made under this Section 3 in respect of any claim, issue or matter as to which Indemnitee shall have been adjudged by a court of competent jurisdiction to be liable to the Company, unless and only to the extent that the Washington Court of Chancery or any court in which the Proceeding was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, Indemnitee is fairly and reasonably entitled to indemnification for such expenses as the Washington Court of Chancery or such other court shall deem proper.

4.   **Indemnification for Expenses of a Party Who is Wholly or Partly Successful.** To the extent that Indemnitee is a party to or a participant in and is successful (on the merits or otherwise) in defense of any Proceeding or any claim, issue or matter therein, the Company shall indemnify Indemnitee against all Expenses actually and reasonably incurred by Indemnitee or on Indemnitee's behalf in connection therewith. To the extent permitted by applicable law, if Indemnitee is not wholly successful in such Proceeding but is successful, on the merits or otherwise, in defense of one or more but less than all claims, issues or matters in such Proceeding, the Company shall indemnify Indemnitee against all Expenses actually and reasonably incurred by Indemnitee or on

3

PLAINTIFF0000376

Indemnitee's behalf in connection with (a) each successfully resolved claim, issue or matter and (b) any claim, issue or matter related to any such successfully resolved claim, issuer or matter. For purposes of this section, the termination of any claim, issue or matter in such a Proceeding by dismissal, with or without prejudice, shall be deemed to be a successful result as to such claim, issue or matter.

5. **Indemnification for Expenses of a Witness.** To the extent that Indemnitee is, by reason of his or her Corporate Status, a witness in any Proceeding to which Indemnitee is not a party, Indemnitee shall be indemnified to the extent permitted by applicable law against all Expenses actually and reasonably incurred by Indemnitee or on Indemnitee's behalf in connection therewith.

6. **Additional Indemnification.**

(a) Notwithstanding any limitation in Sections 2, 3 or 4, the Company shall indemnify Indemnitee to the fullest extent permitted by applicable law if Indemnitee is, or is threatened to be made, a party to or a participant in any Proceeding (including a Proceeding by or in the right of the Company to procure a judgment in its favor) against all Expenses, judgments, fines and amounts paid in settlement actually and reasonably incurred by Indemnitee or on his or her behalf in connection with the Proceeding or any claim, issue or matter therein.

(b) For purposes of Section 6(a), the meaning of the phrase "***to the fullest extent permitted by applicable law***" shall include, but not be limited to:

(i) the fullest extent permitted by the provision of the DGCL that authorizes or contemplates additional indemnification by agreement, or the corresponding provision of any amendment to or replacement of the DGCL; and

(ii) the fullest extent authorized or permitted by any amendments to or replacements of the DGCL adopted after the date of this Agreement that increase the extent to which a corporation may indemnify its officers and directors.

7. **Exclusions.** Notwithstanding any provision in this Agreement, the Company shall not be obligated under this Agreement to make any indemnity in connection with any Proceeding (or any part of any Proceeding):

(a) for which payment has actually been made to or on behalf of Indemnitee under any statute, insurance policy, indemnity provision, vote or otherwise, except with respect to any excess beyond the amount paid;

(b) for an accounting or disgorgement of profits pursuant to Section 16(b) of the Securities Exchange Act of 1934, as amended, or similar provisions of federal, state or local statutory law or common law, if Indemnitee is held liable therefor (including pursuant to any settlement arrangements);

(c) for any reimbursement of the Company by Indemnitee of any bonus or other incentive-based or equity-based compensation or of any profits realized by Indemnitee from the sale of securities of the Company, as required in each case under the Securities Exchange Act of 1934, as amended (including any such reimbursements that arise from an accounting restatement of the Company pursuant to Section 304 of the Sarbanes-Oxley Act of 2002 (the "***Sarbanes-Oxley Act***"), or the payment to the Company of profits arising from the purchase and sale by Indemnitee of securities in violation of Section 306 of the Sarbanes-Oxley Act), if Indemnitee is held liable therefor (including pursuant to any settlement arrangements);

(d) initiated by Indemnitee, including any Proceeding (or any part of any Proceeding) initiated by Indemnitee against the Company or its directors, officers, employees, agents or other indemnitees, unless (i) the Company's board of directors authorized the Proceeding (or the relevant part of the Proceeding) prior to its initiation, (ii) the Company provides the indemnification, in its sole discretion, pursuant to the powers vested in the Company under applicable law, (iii) otherwise authorized in Section 12(d) or (iv) otherwise required by applicable law; or

(e) if prohibited by applicable law.

4

PLAINTIFF0000377

8. **Advances of Expenses.** The Company shall advance the Expenses incurred by Indemnitee in connection with any Proceeding, and such advancement shall be made as soon as reasonably practicable, but in any event no later than 60 days, after the receipt by the Company of a written statement or statements requesting such advances from time to time (which shall include invoices received by Indemnitee in connection with such Expenses but, in the case of invoices in connection with legal services, any references to legal work performed or to expenditure made that would cause Indemnitee to waive any privilege accorded by applicable law shall not be included with the invoice). Advances shall be unsecured and interest free and made without regard to Indemnitee's ability to repay such advances. Indemnitee hereby undertakes to repay any advance to the extent that it is ultimately determined that Indemnitee is not entitled to be indemnified by the Company. This Section 8 shall not apply to the extent advancement is prohibited by law and shall not apply to any Proceeding for which indemnity is not permitted under this Agreement, but shall apply to any Proceeding referenced in Section 7(b) or 7(c) prior to a determination that Indemnitee is not entitled to be indemnified by the Company.

9. **Procedures for Notification and Defense of Claim.**

(a)    Indemnitee shall notify the Company in writing of any matter with respect to which Indemnitee intends to seek indemnification or advancement of Expenses as soon as reasonably practicable following the receipt by Indemnitee of notice thereof. The written notification to the Company shall include, in reasonable detail, a description of the nature of the Proceeding and the facts underlying the Proceeding. The failure by Indemnitee to notify the Company will not relieve the Company from any liability which it may have to Indemnitee hereunder or otherwise than under this Agreement, and any delay in so notifying the Company shall not constitute a waiver by Indemnitee of any rights, except to the extent that such failure or delay materially prejudices the Company.

(b)    If, at the time of the receipt of a notice of a Proceeding pursuant to the terms hereof, the Company has directors' and officers' liability insurance in effect, the Company shall give prompt notice of the commencement of the Proceeding to the insurers in accordance with the procedures set forth in the applicable policies. The Company shall thereafter take all commercially-reasonable action to cause such insurers to pay, on behalf of Indemnitee, all amounts payable as a result of such Proceeding in accordance with the terms of such policies.

(c)    In the event the Company may be obligated to make any indemnity in connection with a Proceeding, the Company shall be entitled to assume the defense of such Proceeding with counsel approved by Indemnitee, which approval shall not be unreasonably withheld, upon the delivery to Indemnitee of written notice of its election to do so. After delivery of such notice, approval of such counsel by Indemnitee and the retention of such counsel by the Company, the Company will not be liable to Indemnitee for any fees or expenses of counsel subsequently incurred by Indemnitee with respect to the same Proceeding. Notwithstanding the Company's assumption of the defense of any such Proceeding, the Company shall be obligated to pay the fees and expenses of Indemnitee's counsel to the extent (i) the employment of counsel by Indemnitee is authorized by the Company, (ii) counsel for the Company or Indemnitee shall have reasonably concluded that there is a conflict of interest between the Company and Indemnitee in the conduct of any such defense such that Indemnitee needs to be separately represented, (iii) the fees and expenses are non-duplicative and reasonably incurred in connection with Indemnitee's role in the Proceeding despite the Company's assumption of the defense, (iv) the Company is not financially or legally able to perform its indemnification obligations or (v) the Company shall not have retained, or shall not continue to retain, such counsel to defend such Proceeding. The Company shall have the right to conduct such defense as it sees fit in its sole discretion. Regardless of any provision in this Agreement, Indemnitee shall have the right to employ counsel in any Proceeding at Indemnitee's personal expense. The Company shall not be entitled, without the consent of Indemnitee, to assume the defense of any claim brought by or in the right of the Company. *or* The Company shall be entitled to participate in the Proceeding at its own expense. Indemnitee agrees to consult with the Company and to consider in good faith the advisability and appropriateness of joint representation in the event that either the Company or other indemnitees in addition to Indemnitee require representation in connection with any Proceeding.

(d)    Indemnitee shall give the Company such information and cooperation in connection with the Proceeding as may be reasonably appropriate.

5

PLAINTIFF0000378

(e)      The Company shall not be liable to indemnify Indemnitee for any settlement of any Proceeding (or any part thereof) without the Company's prior written consent, which shall not be unreasonably withheld.

(f)      The Company shall have the right to settle any Proceeding (or any part thereof) without the consent of Indemnitee.

10.      **Procedures upon Application for Indemnification.**

(a)      To obtain indemnification, Indemnitee shall submit to the Company a written request, including therein or therewith such documentation and information as is reasonably available to Indemnitee and as is reasonably necessary to determine whether and to what extent Indemnitee is entitled to indemnification following the final disposition of the Proceeding. The Company shall, as soon as reasonably practicable after receipt of such a request for indemnification, advise the board of directors that Indemnitee has requested indemnification. Any delay in providing the request will not relieve the Company from its obligations under this Agreement, except to the extent such failure is prejudicial.

(b)      Upon written request by Indemnitee for indemnification pursuant to Section 10(a), a determination, if required by applicable law, with respect to Indemnitee's entitlement thereto shall be made in the specific case (i) if a Change in Control shall have occurred, by Independent Counsel in a written opinion to the Company's board of directors, a copy of which shall be delivered to Indemnitee or (ii) if a Change in Control shall not have occurred, (A) by a majority vote of the Disinterested Directors, even though less than a quorum of the Company's board of directors, (B) by a committee of Disinterested Directors designated by a majority vote of the Disinterested Directors, even though less than a quorum of the Company's board of directors, (C) if there are no such Disinterested Directors or, if such Disinterested Directors so direct, by Independent Counsel in a written opinion to the Company's board of directors, a copy of which shall be delivered to Indemnitee or (D) if so directed by the Company's board of directors, by the stockholders of the Company. If it is so determined that Indemnitee is entitled to indemnification, payment to Indemnitee shall be made within ten days after such determination. Indemnitee shall cooperate with the person, persons or entity making the determination with respect to Indemnitee's entitlement to indemnification, including providing to such person, persons or entity upon reasonable advance request any documentation or information that is not privileged or otherwise protected from disclosure and that is reasonably available to Indemnitee and reasonably necessary to such determination. Any costs or expenses (including attorneys' fees and disbursements) reasonably incurred by Indemnitee in so cooperating with the person, persons or entity making such determination shall be borne by the Company, to the extent permitted by applicable law.

(c)      In the event the determination of entitlement to indemnification is to be made by Independent Counsel pursuant to Section 10(b), the Independent Counsel shall be selected as provided in this Section 10(c). If a Change in Control shall not have occurred, the Independent Counsel shall be selected by the Company's board of directors, and the Company shall give written notice to Indemnitee advising him or her of the identity of the Independent Counsel so selected. If a Change in Control shall have occurred, the Independent Counsel shall be selected by Indemnitee (unless Indemnitee shall request that such selection be made by the Company's board of directors, in which event the preceding sentence shall apply), and Indemnitee shall give written notice to the Company advising it of the identity of the Independent Counsel so selected. In either event, Indemnitee or the Company, as the case may be, may, within ten days after such written notice of selection shall have been given, deliver to the Company or to Indemnitee, as the case may be, a written objection to such selection; *provided*, *however*, that such objection may be asserted only on the ground that the Independent Counsel so selected does not meet the requirements of "Independent Counsel" as defined in Section 1 of this Agreement, and the objection shall set forth with particularity the factual basis of such assertion. Absent a proper and timely objection, the person so selected shall act as Independent Counsel. If such written objection is so made and substantiated, the Independent Counsel so selected may not serve as Independent Counsel unless and until such objection is withdrawn or a court has determined that such objection is without merit. If, within 20 days after the later of (i) submission by Indemnitee of a written request for indemnification pursuant to Section 10(a) hereof and (ii) the final disposition of the Proceeding, the parties have not agreed upon an Independent Counsel, either the Company or Indemnitee may petition a court of competent jurisdiction for resolution of any objection which shall have been made by the

6

PLAINTIFF0000379

Company or Indemnitee to the other's selection of Independent Counsel and for the appointment as Independent Counsel of a person selected by the court or by such other person as the court shall designate, and the person with respect to whom all objections are so resolved or the person so appointed shall act as Independent Counsel under Section 10(b) hereof. Upon the due commencement of any judicial proceeding or arbitration pursuant to Section 12(a) of this Agreement, the Independent Counsel shall be discharged and relieved of any further responsibility in such capacity (subject to the applicable standards of professional conduct then prevailing).

(d)     The Company agrees to pay the reasonable fees and expenses of any Independent Counsel and to fully indemnify such counsel against any and all Expenses, claims, liabilities and damages arising out of or relating to this Agreement or its engagement pursuant hereto.

11.     **Presumptions and Effect of Certain Proceedings.**

(a)     In making a determination with respect to entitlement to indemnification hereunder, the person, persons or entity making such determination shall, to the fullest extent not prohibited by law, presume that Indemnitee is entitled to indemnification under this Agreement if Indemnitee has submitted a request for indemnification in accordance with Section 10(a) of this Agreement, and the Company shall, to the fullest extent not prohibited by law, have the burden of proof to overcome that presumption in connection with the making by such person, persons or entity of any determination contrary to that presumption.

(b)     The termination of any Proceeding or of any claim, issue or matter therein, by judgment, order, settlement or conviction, or upon a plea of *nolo contendere* or its equivalent, shall not (except as otherwise expressly provided in this Agreement) of itself adversely affect the right of Indemnitee to indemnification or create a presumption that Indemnitee did not act in good faith and in a manner which he or she reasonably believed to be in or not opposed to the best interests of the Company or, with respect to any criminal Proceeding, that Indemnitee had reasonable cause to believe that his or her conduct was unlawful.

(c)     For purposes of any determination of good faith, Indemnitee shall be deemed to have acted in good faith to the extent Indemnitee relied in good faith on (i) the records or books of account of the Enterprise, including financial statements, (ii) information supplied to Indemnitee by the officers of the Enterprise in the course of their duties, (iii) the advice of legal counsel for the Enterprise or its board of directors or counsel selected by any committee of the board of directors or (iv) information or records given or reports made to the Enterprise by an independent certified public accountant, an appraiser, investment banker or other expert selected with reasonable care by the Enterprise or its board of directors or any committee of the board of directors. The provisions of this Section 11(c) shall not be deemed to be exclusive or to limit in any way the other circumstances in which Indemnitee may be deemed to have met the applicable standard of conduct set forth in this Agreement.

(d)     Neither the knowledge, actions nor failure to act of any other director, officer, agent or employee of the Enterprise shall be imputed to Indemnitee for purposes of determining the right to indemnification under this Agreement.

12.     **Remedies of Indemnitee.**

(a)     Subject to Section 12(e), in the event that (i) a determination is made pursuant to Section 10 of this Agreement that Indemnitee is not entitled to indemnification under this Agreement, (ii) advancement of Expenses is not timely made pursuant to Section 8 or 12(d) of this Agreement, (iii) no determination of entitlement to indemnification shall have been made pursuant to Section 10 of this Agreement within 90 days after the later of the receipt by the Company of the request for indemnification or the final disposition of the Proceeding, (iv) payment of indemnification pursuant to this Agreement is not made (A) within ten days after a determination has been made that Indemnitee is entitled to indemnification or (B) with respect to indemnification pursuant to Sections 4, 5 and 12(d) of this Agreement, within 30 days after receipt by the Company of a written request therefor, or (v) the Company or any other person or entity takes or threatens to take any action to declare this Agreement void or unenforceable, or institutes any litigation or other action or proceeding designed to deny, or to recover from, Indemnitee the benefits provided or intended to be provided to Indemnitee hereunder, Indemnitee shall be entitled to an adjudication by a court of competent jurisdiction of his or her entitlement to such indemnification or

PLAINTIFF0000380

advancement of Expenses. Alternatively, Indemnitee, at his or her option, may seek an award in arbitration with respect to his or her entitlement to such indemnification or advancement of Expenses, to be conducted by a single arbitrator pursuant to the Commercial Arbitration Rules of the American Arbitration Association. Indemnitee shall commence such proceeding seeking an adjudication or an award in arbitration within 180 days following the date on which Indemnitee first has the right to commence such proceeding pursuant to this Section 12(a); *provided, however,* that the foregoing clause shall not apply in respect of a proceeding brought by Indemnitee to enforce his or her rights under Section 4 of this Agreement. The Company shall not oppose Indemnitee's right to seek any such adjudication or award in arbitration in accordance with this Agreement.

(b) Neither (i) the failure of the Company, its board of directors, any committee or subgroup of the board of directors, Independent Counsel or stockholders to have made a determination that indemnification of Indemnitee is proper in the circumstances because Indemnitee has met the applicable standard of conduct, nor (ii) an actual determination by the Company, its board of directors, any committee or subgroup of the board of directors, Independent Counsel or stockholders that Indemnitee has not met the applicable standard of conduct, shall be a defense to the action or create a presumption that Indemnitee has or has not met the applicable standard of conduct. In the event that a determination shall have been made pursuant to Section 10 of this Agreement that Indemnitee is not entitled to indemnification, any judicial proceeding or arbitration commenced pursuant to this Section 12 shall be conducted in all respects as a *de novo* trial, or arbitration, on the merits, and Indemnitee shall not be prejudiced by reason of that adverse determination. In any judicial proceeding or arbitration commenced pursuant to this Section 12, the Company shall, to the fullest extent not prohibited by law, have the burden of proving Indemnitee is not entitled to indemnification or advancement of Expenses, as the case may be.

(c) To the fullest extent not prohibited by law, the Company shall be precluded from asserting in any judicial proceeding or arbitration commenced pursuant to this Section 12 that the procedures and presumptions of this Agreement are not valid, binding and enforceable and shall stipulate in any such court or before any such arbitrator that the Company is bound by all the provisions of this Agreement. If a determination shall have been made pursuant to Section 10 of this Agreement that Indemnitee is entitled to indemnification, the Company shall be bound by such determination in any judicial proceeding or arbitration commenced pursuant to this Section 12, absent (i) a misstatement by Indemnitee of a material fact, or an omission of a material fact necessary to make Indemnitee's statements not materially misleading, in connection with the request for indemnification, or (ii) a prohibition of such indemnification under applicable law.

(d) To the extent not prohibited by law, the Company shall indemnify Indemnitee against all Expenses that are incurred by Indemnitee in connection with any action for indemnification or advancement of Expenses from the Company under this Agreement or under any directors' and officers' liability insurance policies maintained by the Company to the extent Indemnitee is successful in such action, and, if requested by Indemnitee, shall (as soon as reasonably practicable, but in any event no later than 60 days, after receipt by the Company of a written request therefor) advance such Expenses to Indemnitee, subject to the provisions of Section 8.

(e) Notwithstanding anything in this Agreement to the contrary, no determination as to entitlement to indemnification shall be required to be made prior to the final disposition of the Proceeding.

13. **Contribution.** To the fullest extent permissible under applicable law, if the indemnification provided for in this Agreement is unavailable to Indemnitee, the Company, in lieu of indemnifying Indemnitee, shall contribute to the amounts incurred by Indemnitee, whether for Expenses, judgments, fines or amounts paid or to be paid in settlement, in connection with any claim relating to an indemnifiable event under this Agreement, in such proportion as is deemed fair and reasonable in light of all of the circumstances of such Proceeding in order to reflect (i) the relative benefits received by the Company and Indemnitee as a result of the events and transactions giving rise to such Proceeding; and (ii) the relative fault of Indemnitee and the Company (and its other directors, officers, employees and agents) in connection with such events and transactions.

14. **Non-exclusivity.** The rights of indemnification and to receive advancement of Expenses as provided by this Agreement shall not be deemed exclusive of any other rights to which Indemnitee may at any time be entitled under applicable law, the Company's certificate of incorporation or bylaws, any agreement, a vote of stockholders or a resolution of directors, or otherwise. To the extent that a change in Washington law, whether by

8

PLAINTIFF0000381

statute or judicial decision, permits greater indemnification or advancement of Expenses than would be afforded currently under the Company's certificate of incorporation and bylaws and this Agreement, it is the intent of the parties hereto that Indemnitee shall enjoy by this Agreement the greater benefits so afforded by such change, subject to the restrictions expressly set forth herein or therein. Except as expressly set forth herein, no right or remedy herein conferred is intended to be exclusive of any other right or remedy, and every other right and remedy shall be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise. Except as expressly set forth herein, the assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other right or remedy.

15.     **Primary Responsibility.** The Company acknowledges that Indemnitee has certain rights to indemnification and advancement of expenses provided by *insert name of fund* and certain affiliates thereof (collectively, the "***Secondary Indemnitor***"). The Company agrees that, as between the Company and the Secondary Indemnitor, the Company is primarily responsible for amounts required to be indemnified or advanced under the Company's certificate of incorporation or bylaws or this Agreement and any obligation of the Secondary Indemnitors to provide indemnification or advancement for the same amounts is secondary to those Company obligations. To the extent not in contravention of any insurance policy or policies providing liability or other insurance for the Company or any director, trustee, general partner, managing member, officer, employee, agent or fiduciary of the Company or any other Enterprise, the Company waives any right of contribution or subrogation against the Secondary Indemnitor with respect to the liabilities for which the Company is primarily responsible under this Section 15. In the event of any payment by the Secondary Indemnitor of amounts otherwise required to be indemnified or advanced by the Company under the Company's certificate of incorporation or bylaws or this Agreement, the Secondary Indemnitor shall be subrogated to the extent of such payment to all of the rights of recovery of Indemnitee for indemnification or advancement of expenses under the Company's certificate of incorporation or bylaws or this Agreement or, to the extent such subrogation is unavailable and contribution is found to be the applicable remedy, shall have a right of contribution with respect to the amounts paid. The Secondary Indemnitor are is an express third-party beneficiary of the terms of this Section 15.

16.     **No Duplication of Payments.** The Company shall not be liable under this Agreement to make any payment of amounts otherwise indemnifiable hereunder (or for which advancement is provided hereunder) if and to the extent that Indemnitee has otherwise actually received payment for such amounts under any insurance policy, contract, agreement or otherwise.

17.     **Insurance.** To the extent that the Company maintains an insurance policy or policies providing liability insurance for directors, trustees, general partners, managing members, officers, employees, agents or fiduciaries of the Company or any other Enterprise, Indemnitee shall be covered by such policy or policies to the same extent as the most favorably-insured persons under such policy or policies in a comparable position.

18.     **Subrogation.** In the event of any payment under this Agreement, the Company shall be subrogated to the extent of such payment to all of the rights of recovery of Indemnitee, who shall execute all papers required and take all action necessary to secure such rights, including execution of such documents as are necessary to enable the Company to bring suit to enforce such rights.

19.     **Services to the Company.** Indemnitee agrees to serve as a director or officer of the Company or, at the request of the Company, as a director, trustee, general partner, managing member, officer, employee, agent or fiduciary of another Enterprise, for so long as Indemnitee is duly elected or appointed or until Indemnitee tenders his or her resignation or is removed from such position. Indemnitee may at any time and for any reason resign from such position (subject to any other contractual obligation or any obligation imposed by operation of law), in which event the Company shall have no obligation under this Agreement to continue Indemnitee in such position. This Agreement shall not be deemed an employment contract between the Company (or any of its subsidiaries or any Enterprise) and Indemnitee. Indemnitee specifically acknowledges that any employment with the Company (or any of its subsidiaries or any Enterprise) is at will, and Indemnitee may be discharged at any time for any reason, with or without cause, with or without notice, except as may be otherwise expressly provided in any executed, written employment contract between Indemnitee and the Company (or any of its subsidiaries or any Enterprise), any existing formal severance policies adopted by the Company's board of directors or, with respect to service as a

PLAINTIFF0000382

director or officer of the Company, the Company's certificate of incorporation or bylaws or the DGCL. No such document shall be subject to any oral modification thereof.

20. **Duration.** This Agreement shall continue until and terminate upon the later of (a) ten years after the date that Indemnitee shall have ceased to serve as a director or as a director, trustee, general partner, managing member, officer, employee, agent or fiduciary of any other Enterprise, as applicable; or (b) one year after the final termination of any Proceeding, including any appeal, then pending in respect of which Indemnitee is granted rights of indemnification or advancement of Expenses hereunder and of any proceeding commenced by Indemnitee pursuant to Section 12 of this Agreement relating thereto.

21. **Successors.** This Agreement shall be binding upon the Company and its successors and assigns, including any direct or indirect successor by purchase, merger, consolidation or otherwise to all or substantially all of the business or assets of the Company, and shall inure to the benefit of Indemnitee and Indemnitee's heirs, executors and administrators. The Company shall require and cause any successor (whether direct or indirect by purchase, merger, consolidation or otherwise) to all or substantially all of the business or assets of the Company, by written agreement, expressly to assume and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform if no such succession had taken place.

22. **Severability.** Nothing in this Agreement is intended to require or shall be construed as requiring the Company to do or fail to do any act in violation of applicable law. The Company's inability, pursuant to court order or other applicable law, to perform its obligations under this Agreement shall not constitute a breach of this Agreement. If any provision or provisions of this Agreement shall be held to be invalid, illegal or unenforceable for any reason whatsoever: (i) the validity, legality and enforceability of the remaining provisions of this Agreement (including without limitation, each portion of any section of this Agreement containing any such provision held to be invalid, illegal or unenforceable, that is not itself invalid, illegal or unenforceable) shall not in any way be affected or impaired thereby and shall remain enforceable to the fullest extent permitted by law; (ii) such provision or provisions shall be deemed reformed to the extent necessary to conform to applicable law and to give the maximum effect to the intent of the parties hereto; and (iii) to the fullest extent possible, the provisions of this Agreement (including, without limitation, each portion of any section of this Agreement containing any such provision held to be invalid, illegal or unenforceable, that is not itself invalid, illegal or unenforceable) shall be construed so as to give effect to the intent manifested thereby.

23. **Enforcement.** The Company expressly confirms and agrees that it has entered into this Agreement and assumed the obligations imposed on it hereby in order to induce Indemnitee to serve as a director or officer of the Company, and the Company acknowledges that Indemnitee is relying upon this Agreement in serving as a director or officer of the Company.

24. **Entire Agreement.** This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral, written and implied, between the parties hereto with respect to the subject matter hereof; *provided*, *however*, that this Agreement is a supplement to and in furtherance of the Company's certificate of incorporation and bylaws and applicable law.

25. **Modification and Waiver.** No supplement, modification or amendment to this Agreement shall be binding unless executed in writing by the parties hereto. No amendment, alteration or repeal of this Agreement shall adversely affect any right of Indemnitee under this Agreement in respect of any action taken or omitted by such Indemnitee in his or her Corporate Status prior to such amendment, alteration or repeal. No waiver of any of the provisions of this Agreement shall constitute or be deemed a waiver of any other provision of this Agreement nor shall any waiver constitute a continuing waiver.

26. **Notices.** All notices and other communications required or permitted hereunder shall be in writing and shall be mailed by registered or certified mail, postage prepaid, sent by facsimile or electronic mail or otherwise delivered by hand, messenger or courier service addressed:

PLAINTIFF0000383

(a)     if to Indemnitee, to Indemnitee's address, facsimile number or electronic mail address as shown on the signature page of this Agreement or in the Company's records, as may be updated in accordance with the provisions hereof; or

(b)     if to the Company, to the attention of the President or Chief Executive Officer of the Company at such current address as the Company shall have furnished to Indemnitee, with a copy (which shall not constitute notice) to <u>620 131st AVE NE, BELLEVUE WA 98005-3345</u>.

Each such notice or other communication shall for all purposes of this Agreement be treated as effective or having been given (i) if delivered by hand, messenger or courier service, when delivered (or if sent *via* a nationally-recognized overnight courier service, freight prepaid, specifying next-business-day delivery, one business day after deposit with the courier), or (ii) if sent *via* mail, at the earlier of its receipt or five days after the same has been deposited in a regularly-maintained receptacle for the deposit of the United States mail, addressed and mailed as aforesaid, or (iii) if sent *via* facsimile, upon confirmation of facsimile transfer or, if sent *via* electronic mail, upon confirmation of delivery when directed to the relevant electronic mail address, if sent during normal business hours of the recipient, or if not sent during normal business hours of the recipient, then on the recipient's next business day.

27.     **Applicable Law and Consent to Jurisdiction.** This Agreement and the legal relations among the parties shall be governed by, and construed and enforced in accordance with, the laws of the State of Washington, without regard to its conflict of laws rules. Except with respect to any arbitration commenced by Indemnitee pursuant to Section 12(a) of this Agreement, the Company and Indemnitee hereby irrevocably and unconditionally (i) agree that any action or proceeding arising out of or in connection with this Agreement shall be brought only in the Washington Court of Chancery, and not in any other state or federal court in the United States of America or any court in any other country, (ii) consent to submit to the exclusive jurisdiction of the Washington Court of Chancery for purposes of any action or proceeding arising out of or in connection with this Agreement, (iii) appoint, to the extent such party is not otherwise subject to service of process in the State of Washington, Incorporating Services, Ltd., Dover, Washington as its agent in the State of Washington as such party's agent for acceptance of legal process in connection with any such action or proceeding against such party with the same legal force and validity as if served upon such party personally within the State of Washington, (iv) waive any objection to the laying of venue of any such action or proceeding in the Washington Court of Chancery, and (v) waive, and agree not to plead or to make, any claim that any such action or proceeding brought in the Washington Court of Chancery has been brought in an improper or inconvenient forum.

28.     **Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall for all purposes be deemed to be an original but all of which together shall constitute one and the same Agreement. This Agreement may also be executed and delivered by facsimile signature and in counterparts, each of which shall for all purposes be deemed to be an original but all of which together shall constitute one and the same Agreement. Only one such counterpart signed by the party against whom enforceability is sought needs to be produced to evidence the existence of this Agreement.

29.     **Captions.** The headings of the paragraphs of this Agreement are inserted for convenience only and shall not be deemed to constitute part of this Agreement or to affect the construction thereof.

*(signature page follows)*

PLAINTIFF0000384

The parties are signing this Indemnification Agreement as of the date stated in the introductory sentence.

**COMPANY:**

**DAOLABS IP, INC.**
a Washington Corporation


_____

Benjamin Reed, Chief Executive Officer


**INDEMNITEE:**


_____


*Address*:

PLAINTIFF0000385

# Exhibit B

PLAINTIFF0000386

## DAOLABS, INC.
## INDEPENDENT CONSULTING AGREEMENT

This Consulting Agreement (this "***Agreement***") is made and entered into as of August 15th, 2022 (the "***Effective Date***"), by and between DAOLABS, INC., a Washington Limited Liability Company ("***DAOLABS***"), and CONTRACTOR, an individual with his principal place of business at _____ and _____ ("***Consultant***") (each herein referred to individually as a "***Party***," or collectively as the "***Parties***").

DAOLABS desires to retain Consultant as an independent contractor to perform consulting services for DAOLABS, and Consultant is willing to perform such services, on the terms described below. In consideration of the mutual promises contained herein, the Parties agree as follows:

**1.      Services and Compensation**

Consultant shall perform the services described in **Exhibit A** (the "***Services***") for DAOLABS (or its designee), and DAOLABS agrees to pay Consultant the compensation described in **Exhibit A** for Consultant's performance of the Services.

**2.      Applicability to Past Activities**

DAOLABS and Consultant acknowledge that Consultant may have performed work, activities, services or made efforts on behalf of or for the benefit of DAOLABS, or related to the current or prospective business of DAOLABS in anticipation of Consultant's involvement with DAOLABS, that would have been "Services" if performed during the term of this Agreement, for a period of time prior to the date of this Agreement starting on August 12, 2022 (the "***Prior Consulting Period***"). Accordingly, Consultant agrees that if and to the extent that, during the Prior Consulting Period: (i) Consultant received access to any information from or on behalf of DAOLABS that would have been "Confidential Information" (as defined below) if Consultant received access to such information during the term of this Agreement; or (ii) Consultant (a) conceived, created, authored, invented, developed or reduced to practice any item (including any intellectual property rights with respect thereto) on behalf of or for the benefit of DAOLABS, or related to the current or prospective business of DAOLABS in anticipation of Consultant's involvement with DAOLABS, that would have been an "Invention" (as defined below) if conceived, created, authored, invented, developed or reduced to practice during the term of this Agreement; or (b) incorporated into any such item any pre-existing invention, improvement, development, concept, discovery or other proprietary information that would have been a "Prior Invention" (as defined below) if incorporated into such item during the term of this Agreement; then any such information shall be deemed "Confidential Information" hereunder and any such item shall be deemed an "Invention" or "Prior Invention" hereunder, and this Agreement shall apply to such activities, information or item as if disclosed, conceived, created, authored, invented, developed or reduced to practice during the term of this Agreement.

**3.      Confidentiality**

        A.      ***Definition of Confidential Information***. "***Confidential Information***" means any non-public information that relates to the actual or anticipated business and/or products, research or development of DAOLABS, its affiliates or subsidiaries or to DAOLABS's, its affiliates' or subsidiaries' technical data, trade secrets, or know-how, including, but not limited to, research, product plans, or other information regarding DAOLABS's, its affiliates' or subsidiaries' products or services and markets therefor, customer lists and customers (including, but not limited to, customers of DAOLABS on whom Consultant called or with whom Consultant became acquainted during the term of this Agreement), software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances, and other business information disclosed by DAOLABS, its affiliates or subsidiaries, either directly or indirectly, in writing, orally or by drawings or inspection of premises, parts, equipment, or other property of DAOLABS, its affiliates or subsidiaries. Notwithstanding the foregoing, Confidential Information shall not include any such information which Consultant can establish (i) was publicly known or made generally available prior to the time of disclosure to Consultant; (ii) becomes publicly known or made generally available after disclosure to Consultant through no wrongful action or inaction of Consultant; or (iii) is in the rightful possession of Consultant, without confidentiality obligations, at the time of disclosure as shown by Consultant's then-contemporaneous written records.

PLAINTIFF0000387

B.        ***Nonuse and Nondisclosure.*** During and after the term of this Agreement, Consultant will hold in the strictest confidence, and take all reasonable precautions to prevent any unauthorized use or disclosure of Confidential Information, and Consultant will not (i) use the Confidential Information for any purpose whatsoever other than as necessary for the performance of the Services on behalf of DAOLABS, or (ii) disclose the Confidential Information to any third party without the prior written consent of an authorized representative of DAOLABS, except that Consultant may disclose Confidential Information to any third party on a need-to-know basis for the purposes of Consultant performing the Services; provided, however, that such third party is subject to written non-use and non-disclosure obligations at least as protective of DAOLABS and the Confidential Information as this Article 3. Consultant may also disclose Confidential Information to the extent compelled by applicable law; *provided however*, prior to such disclosure, Consultant shall provide prior written notice to DAOLABS and seek a protective order or such similar confidential protection as may be available under applicable law. Consultant agrees that no ownership of Confidential Information is conveyed to the Consultant. Without limiting the foregoing, Consultant shall not use or disclose any DAOLABS property, intellectual property rights, trade secrets or other proprietary know-how of DAOLABS to invent, author, make, develop, design, or otherwise enable others to invent, author, make, develop, or design identical or substantially similar designs as those developed under this Agreement for any third party. Consultant agrees that Consultant's obligations under this Section 3.B shall continue after the termination of this Agreement.

C.        ***Other Client Confidential Information.*** Consultant agrees that Consultant will not improperly use, disclose, or induce DAOLABS to use any proprietary information or trade secrets of any former or concurrent employer of Consultant or other person or entity with which Consultant has an obligation to keep in confidence. Consultant also agrees that Consultant will not bring onto DAOLABS's premises or transfer onto DAOLABS's technology systems any unpublished document, proprietary information, or trade secrets belonging to any third party unless disclosure to, and use by, DAOLABS has been consented to in writing by such third party.

D.        ***Third Party Confidential Information.*** Consultant recognizes that DAOLABS has received and in the future will receive from third parties their confidential or proprietary information subject to a duty on DAOLABS's part to maintain the confidentiality of such information and to use it only for certain limited purposes. Consultant agrees that at all times during the term of this Agreement and thereafter, Consultant owes DAOLABS and such third parties a duty to hold all such confidential or proprietary information in the strictest confidence and not to use it or to disclose it to any person, firm, corporation, or other third party except as necessary in carrying out the Services for DAOLABS consistent with DAOLABS's agreement with such third party.

4.        **Ownership**

A.        ***Assignment of Inventions.*** Consultant agrees that all right, title, and interest in and to any copyrightable material, notes, records, drawings, designs, inventions, improvements, developments, discoveries and trade secrets conceived, discovered, authored, invented, developed or reduced to practice by Consultant, solely or in collaboration with others, during the term of this Agreement and arising out of, or in connection with, performing the Services under this Agreement and any copyrights, patents, trade secrets, mask work rights or other intellectual property rights relating to the foregoing (collectively, "***Inventions***"), are the sole property of DAOLABS. Consultant also agrees to promptly make full written disclosure to DAOLABS of any Inventions and to deliver and assign (or cause to be assigned) and hereby irrevocably assigns fully to DAOLABS all right, title and interest in and to the Inventions.

B.        ***Pre-Existing Material***s. Subject to Section 4.A, Consultant agrees that if, in the course of performing the Services, Consultant incorporates into any Invention or utilizes in the performance of the Services any pre-existing invention, discovery, original works of authorship, development, improvements, trade secret, concept, or other proprietary information or intellectual property right owned by Consultant or in which Consultant has an interest ("***Prior Inventions***"), (i) Consultant will provide DAOLABS with prior written notice and (ii) DAOLABS is hereby granted a nonexclusive, royalty-free, perpetual, irrevocable, transferable, worldwide license (with the right to grant and authorize sublicenses) to make, have made, use, import, offer for sale, sell, reproduce, distribute, modify, adapt, prepare derivative works of, display, perform, and otherwise exploit such Prior Inventions, without restriction, including, without limitation, as part of or in connection with such Invention, and to practice any method related thereto. Consultant will not incorporate any invention, improvement, development, concept, discovery, work of authorship or other proprietary information owned by any third party into any Invention without DAOLABS's prior written permission.

-2-

PLAINTIFF0000388

C.     ***Moral Rights.*** Any assignment to DAOLABS of Inventions includes all rights of attribution, paternity, integrity, modification, disclosure and withdrawal, and any other rights throughout the world that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively, "***Moral Rights***"). To the extent that Moral Rights cannot be assigned under applicable law, Consultant hereby waives and agrees not to enforce any and all Moral Rights, including, without limitation, any limitation on subsequent modification, to the extent permitted under applicable law.

D.     ***Maintenance of Records.*** Consultant agrees to keep and maintain adequate, current, accurate, and authentic written records of all Inventions made by Consultant (solely or jointly with others) during the term of this Agreement, and for a period of three (3) years thereafter. The records will be in the form of notes, sketches, drawings, electronic files, reports, or any other format that is customary in the industry and/or otherwise specified by DAOLABS. Such records are and remain the sole property of DAOLABS at all times and upon DAOLABS's request, Consultant shall deliver (or cause to be delivered) the same.

E.     ***Further Assurances.*** Consultant agrees to assist DAOLABS, or its designee, at DAOLABS's expense, in every proper way to secure DAOLABS's rights in Inventions in any and all countries, including the disclosure to DAOLABS of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments and all other instruments that DAOLABS may deem necessary in order to apply for, register, obtain, maintain, defend, and enforce such rights, and in order to deliver, assign and convey to DAOLABS, its successors, assigns and nominees the sole and exclusive right, title, and interest in and to all Inventions and testifying in a suit or other proceeding relating to such Inventions. Consultant further agrees that Consultant's obligations under this Section 4.E shall continue after the termination of this Agreement.

F.     ***Attorney-in-Fact.*** Consultant agrees that, if DAOLABS is unable because of Consultant's unavailability, dissolution, mental or physical incapacity, or for any other reason, to secure Consultant's signature with respect to any Inventions, including, without limitation, for the purpose of applying for or pursuing any application for any United States or foreign patents or mask work or copyright registrations covering the Inventions assigned to DAOLABS in Section 4.A, then Consultant hereby irrevocably designates and appoints DAOLABS and its duly authorized officers and agents as Consultant's agent and attorney-in-fact, to act for and on Consultant's behalf to execute and file any papers and oaths and to do all other lawfully permitted acts with respect to such Inventions to further the prosecution and issuance of patents, copyright and mask work registrations with the same legal force and effect as if executed by Consultant. This power of attorney shall be deemed coupled with an interest, and shall be irrevocable.

**5.      Conflicting Obligations**

A.     Consultant represents and warrants that Consultant has no agreements, relationships, or commitments to any other person or entity that conflict with the provisions of this Agreement, Consultant's obligations to DAOLABS under this Agreement, and/or Consultant's ability to perform the Services. Consultant will not enter into any such conflicting agreement during the term of this Agreement.

B.     Consultant shall require all Consultant's employees, contractors, or other third-parties performing Services under this Agreement to execute a Confidential Information and Assignment Agreement in the form of Exhibit B, and promptly provide a copy of each such executed agreement to DAOLABS.  Consultant's violation of this Article 5 will be considered a material breach under Section 8.B.

**6.      Return of DAOLABS Materials**

Upon the termination of this Agreement, or upon DAOLABS's earlier request, Consultant will immediately deliver to DAOLABS, and will not keep in Consultant's possession, recreate, or deliver to anyone else, any and all DAOLABS property, including, but not limited to, Confidential Information, tangible embodiments of the Inventions, all devices and equipment belonging to DAOLABS, all electronically-stored information and passwords to access such property, those records maintained pursuant to Section 4.D and any reproductions of any of the foregoing items that Consultant may have in Consultant's possession or control.

PLAINTIFF0000389

7. **Reports**

Consultant agrees that Consultant will keep DAOLABS advised as to Consultant's progress in performing the Services under this Agreement. Consultant further agrees that Consultant will, as requested by DAOLABS, prepare written reports with respect to such progress. DAOLABS and Consultant agree that the reasonable time expended in preparing such written reports will be considered time devoted to the performance of the Services.

8. **Term and Termination**

A. ***Term.*** The term of this Agreement will begin on the Effective Date of this Agreement and will continue until the earlier of (i) final completion of the Services or (ii) termination as provided in Section 8.B.

B. ***Termination.*** DAOLABS may terminate this Agreement upon giving Consultant fourteen (14) days prior written notice of such termination pursuant to Section 14.G of this Agreement. DAOLABS may terminate this Agreement immediately and without prior notice if Consultant refuses to or is unable to perform the Services or is in breach of any material provision of this Agreement.

C. ***Survival.*** Upon any termination, all rights and duties of DAOLABS and Consultant toward each other shall cease except:

(1) DAOLABS will pay, within thirty (45) days after the effective date of termination, all amounts owing to Consultant for Services completed and accepted by DAOLABS prior to the termination date and related reimbursable expenses, if any, submitted in accordance with DAOLABS's policies and in accordance with the provisions of Article 1 of this Agreement; and

(2) Article 3 (Confidentiality), Article 4 (Ownership), Section 5.B (Conflicting Obligations), Article 6 (Return of DAOLABS Materials), Article 8 (Term and Termination), Article 9 (Independent Contractor Relationship), Article 10 (Indemnification), Article 11 (Noninterference), Article 12 (Limitation of Liability), Article 13 (Arbitration and Equitable Relief), and Article 14 (Miscellaneous) will survive termination or expiration of this Agreement in accordance with their terms.

9. **Independent Contractor Relationship**

It is the express intention of DAOLABS and Consultant that Consultant performs the Services as an independent contractor to DAOLABS. Nothing in this Agreement shall in any way be construed to constitute Consultant as an agent, employee or representative of DAOLABS. Without limiting the generality of the foregoing, Consultant is not authorized to bind DAOLABS to any liability or obligation or to represent that Consultant has any such authority. Consultant agrees to furnish (or reimburse DAOLABS for) all tools and materials necessary to accomplish this Agreement and shall incur all expenses associated with performance, except as expressly provided in **Exhibit A**. Consultant acknowledges and agrees that Consultant is obligated to report as income all compensation received by Consultant pursuant to this Agreement.

10. **Indemnification**

Consultant agrees to indemnify and hold harmless DAOLABS and its affiliates and their directors, officers and employees from and against all taxes, losses, damages, liabilities, costs and expenses, including attorneys' fees and other legal expenses, arising directly or indirectly from or in connection with (i) any negligent, reckless or intentionally wrongful act of Consultant or Consultant's assistants, employees, contractors or agents, (ii) any breach by the Consultant or Consultant's assistants, employees, contractors or agents of any of the covenants contained in this Agreement and corresponding Confidential Information and Invention Assignment Agreement, (iii) any failure of Consultant to perform the Services in accordance with all applicable laws, rules and regulations, or (iv) any violation or claimed violation of a third party's rights resulting in whole or in part from DAOLABS's use of the Inventions or other deliverables of Consultant under this Agreement.

-4-

PLAINTIFF0000390

**11.     Nonsolicitation**

To the fullest extent permitted under applicable law, from the date of this Agreement until twelve (12) months after the termination of this Agreement for any reason (the "*Restricted Period*"), Consultant will not, without DAOLABS's prior written consent, directly or indirectly, solicit any of DAOLABS's employees to leave their employment, or attempt to solicit employees of DAOLABS, either for Consultant or for any other person or entity. Consultant agrees that nothing in this Article 11 shall affect Consultant's continuing obligations under this Agreement during and after this twelve (12) month period, including, without limitation, Consultant's obligations under Article 3.

**12.     Limitation of Liability**

IN NO EVENT SHALL DAOLABS BE LIABLE TO CONSULTANT OR TO ANY OTHER PARTY FOR ANY INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES, OR DAMAGES FOR LOST PROFITS OR LOSS OF BUSINESS, HOWEVER CAUSED AND UNDER ANY THEORY OF LIABILITY, WHETHER BASED IN CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHER THEORY OF LIABILITY, REGARDLESS OF WHETHER DAOLABS WAS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND NOTWITHSTANDING THE FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY. IN NO EVENT SHALL DAOLABS'S LIABILITY ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT EXCEED THE AMOUNTS PAID BY DAOLABS TO CONSULTANT UNDER THIS AGREEMENT FOR THE SERVICES, DELIVERABLES OR INVENTION GIVING RISE TO SUCH LIABILITY.

**13.     Arbitration and Equitable Relief**

A.     *Arbitration.* IN CONSIDERATION OF CONSULTANT'S CONSULTING RELATIONSHIP WITH DAOLABS, ITS PROMISE TO ARBITRATE ALL DISPUTES RELATED TO CONSULTANT'S CONSULTING RELATIONSHIP WITH DAOLABS AND CONSULTANT'S RECEIPT OF THE COMPENSATION AND OTHER BENEFITS PAID TO CONSULTANT BY DAOLABS, AT PRESENT AND IN THE FUTURE, CONSULTANT AGREES THAT ANY AND ALL CONTROVERSIES, CLAIMS, OR DISPUTES WITH ANYONE (INCLUDING DAOLABS AND ANY EMPLOYEE, OFFICER, DIRECTOR, SHAREHOLDER OR BENEFIT PLAN OF DAOLABS IN THEIR CAPACITY AS SUCH OR OTHERWISE), WHETHER BROUGHT ON AN INDIVIDUAL, GROUP, OR CLASS BASIS, ARISING OUT OF, RELATING TO, OR RESULTING FROM CONSULTANT'S CONSULTING RELATIONSHIP WITH DAOLABS OR THE TERMINATION OF CONSULTANT'S CONSULTING RELATIONSHIP WITH DAOLABS, INCLUDING ANY BREACH OF THIS AGREEMENT, SHALL BE SUBJECT TO BINDING ARBITRATION UNDER THE ARBITRATION PROVISIONS PURSUANT TO WASHINGTON LAW, AND SHALL BE BROUGHT IN CONSULTANT'S INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING. THE FEDERAL ARBITRATION ACT SHALL CONTINUE TO APPLY WITH FULL FORCE AND EFFECT NOTWITHSTANDING THE APPLICATION OF PROCEDURAL RULES SET FORTH IN THE ACT. **DISPUTES WHICH CONSULTANT AGREES TO ARBITRATE, AND THEREBY AGREES TO WAIVE ANY RIGHT TO A TRIAL BY JURY, INCLUDE ANY STATUTORY CLAIMS UNDER LOCAL, STATE, OR FEDERAL LAW.** CONSULTANT FURTHER UNDERSTANDS THAT THIS AGREEMENT TO ARBITRATE ALSO APPLIES TO ANY DISPUTES THAT DAOLABS MAY HAVE WITH CONSULTANT.

B.     *Procedure.* CONSULTANT AGREES THAT ANY ARBITRATION WILL BE ADMINISTERED BY JUDICIAL ARBITRATION & MEDIATION SERVICES, INC. ("*JAMS*") PURSUANT TO ITS COMMERCIAL ARBITRATION RULES & PROCEDURES (THE "*JAMS RULES*"), WHICH ARE AVAILABLE AT http://www.jamsadr.com/rules-employment-arbitration/ AND FROM HUMAN RESOURCES AND ATTACHED HERETO AS EXHIBIT C. CONSULTANT AGREES THAT THE ARBITRATOR SHALL HAVE THE POWER TO DECIDE ANY MOTIONS BROUGHT BY ANY PARTY TO THE ARBITRATION, INCLUDING MOTIONS FOR SUMMARY JUDGMENT AND/OR ADJUDICATION AND MOTIONS TO DISMISS AND DEMURRERS. CONSULTANT AGREES THAT THE ARBITRATOR SHALL ISSUE A WRITTEN DECISION ON THE MERITS. CONSULTANT ALSO AGREES THAT THE ARBITRATOR SHALL HAVE THE POWER TO AWARD ANY REMEDIES AVAILABLE UNDER APPLICABLE LAW, AND THAT THE ARBITRATOR SHALL AWARD ATTORNEYS' FEES AND COSTS TO DAOLABS WHERE PROVIDED BY APPLICABLE LAW. CONSULTANT AGREES THAT THE DECREE OR AWARD RENDERED BY THE ARBITRATOR MAY BE ENTERED AS A

PLAINTIFF0000391

FINAL AND BINDING JUDGMENT IN ANY COURT HAVING JURISDICTION THEREOF. CONSULTANT AGREES THAT THE ARBITRATOR SHALL ADMINISTER AND CONDUCT ANY ARBITRATION IN ACCORDANCE WITH WASHINGTON LAW, AND THAT THE ARBITRATOR SHALL APPLY SUBSTANTIVE AND PROCEDURAL WASHINGTON LAW TO ANY DISPUTE OR CLAIM, WITHOUT REFERENCE TO RULES OF CONFLICT OF LAW. TO THE EXTENT THAT THE JAMS RULES CONFLICT WITH WASHINGTON LAW, WASHINGTON LAW SHALL TAKE PRECEDENCE. CONSULTANT FURTHER AGREES THAT ANY ARBITRATION UNDER THIS AGREEMENT SHALL BE CONDUCTED IN KING COUNTY, WASHINGTON.

C. *Remedy.* EXCEPT AS PROVIDED BY THE ACT AND THIS AGREEMENT, ARBITRATION SHALL BE THE SOLE, EXCLUSIVE, AND FINAL REMEDY FOR ANY DISPUTE BETWEEN CONSULTANT AND DAOLABS. ACCORDINGLY, EXCEPT AS PROVIDED FOR BY THE ACT AND THIS AGREEMENT, NEITHER CONSULTANT NOR DAOLABS WILL BE PERMITTED TO PURSUE COURT ACTION REGARDING CLAIMS THAT ARE SUBJECT TO ARBITRATION.

D. *Availability of Injunctive Relief.* THE PARTIES AGREE THAT ANY PARTY MAY ALSO PETITION THE COURT FOR INJUNCTIVE RELIEF WHERE EITHER PARTY ALLEGES OR CLAIMS A VIOLATION OF ANY AGREEMENT REGARDING INTELLECTUAL PROPERTY, CONFIDENTIAL INFORMATION OR NONINTERFERENCE. IN THE EVENT EITHER PARTY SEEKS INJUNCTIVE RELIEF, DAOLABS SHALL BE ENTITLED TO RECOVER REASONABLE COSTS AND ATTORNEYS' FEES.

E. *Administrative Relief.* CONSULTANT UNDERSTANDS THAT THIS AGREEMENT DOES NOT PROHIBIT CONSULTANT FROM PURSUING AN ADMINISTRATIVE CLAIM WITH A LOCAL, STATE OR FEDERAL ADMINISTRATIVE BODY OR GOVERNMENT AGENCY SUCH AS THE DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING, THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, THE NATIONAL LABOR RELATIONS BOARD, OR THE WORKERS' COMPENSATION BOARD. THIS AGREEMENT DOES, HOWEVER, PRECLUDE CONSULTANT FROM PURSUING COURT ACTION REGARDING ANY SUCH CLAIM, EXCEPT AS PERMITTED BY LAW.

F. *Voluntary Nature of Agreement.* CONSULTANT ACKNOWLEDGES AND AGREES THAT IT IS EXECUTING THIS AGREEMENT VOLUNTARILY AND WITHOUT ANY DURESS OR UNDUE INFLUENCE BY DAOLABS OR ANYONE ELSE. CONSULTANT FURTHER ACKNOWLEDGES AND AGREES THAT IT HAS CAREFULLY READ THIS AGREEMENT AND THAT CONSULTANT HAS ASKED ANY QUESTIONS NEEDED FOR CONSULTANT TO UNDERSTAND THE TERMS, CONSEQUENCES AND BINDING EFFECT OF THIS AGREEMENT AND FULLY UNDERSTAND IT, INCLUDING THAT ***CONSULTANT IS WAIVING ITS RIGHT TO A JURY TRIAL.*** FINALLY, CONSULTANT AGREES THAT IT HAS BEEN PROVIDED AN OPPORTUNITY TO SEEK THE ADVICE OF AN ATTORNEY OF CONSULTANT'S CHOICE BEFORE SIGNING THIS AGREEMENT.

14. **Miscellaneous**

A. *Governing Law; Consent to Personal Jurisdiction.* This Agreement shall be governed by the laws of the State of Washington, without regard to the conflicts of law provisions of any jurisdiction. To the extent that any lawsuit is permitted under this Agreement, the Parties hereby expressly consent to the personal and exclusive jurisdiction and venue of the state and federal courts located in Washington.

B. *Assignability.* This Agreement will be binding upon Consultant's assigns, administrators, and other legal representatives, and will be for the benefit of DAOLABS, its successors, and its assigns. There are no intended third-party beneficiaries to this Agreement, except as expressly stated. Except as may otherwise be provided in this Agreement, Consultant may not sell, assign or delegate any rights or obligations under this Agreement, by operation of law or otherwise (including by merger, consolidation, reorganization, reincorporation, sale of assets or stock or change of control), and any such attempted assignment, delegation or transfer shall be null and void. Notwithstanding anything to the contrary herein, DAOLABS may assign this Agreement and its rights and obligations under this Agreement to any successor to all or substantially all of DAOLABS's relevant assets, whether by merger, consolidation, reorganization, reincorporation, sale of assets or stock, change of control or otherwise.

PLAINTIFF0000392

C.     ***Entire Agreement.*** This Agreement constitutes the entire agreement and understanding between the Parties with respect to the subject matter herein and supersedes all prior written and oral agreements, discussions, or representations between the Parties. Consultant represents and warrants that it is not relying on any statement or representation not contained in this Agreement.  To the extent any terms set forth in any exhibit or schedule conflict with the terms set forth in this Agreement, the terms of this Agreement shall control unless otherwise expressly agreed by the Parties in such exhibit or schedule.

D.     ***Headings.*** Headings are used in this Agreement for reference only and shall not be considered when interpreting this Agreement.

E.     ***Severability.*** If a court or other body of competent jurisdiction finds, or the Parties mutually believe, any provision of this Agreement, or portion thereof, to be invalid or unenforceable, such provision will be enforced to the maximum extent permissible so as to effect the intent of the Parties, and the remainder of this Agreement will continue in full force and effect.

F.     ***Modification, Waiver.*** No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in a writing signed by the Parties. Waiver by DAOLABS of a breach of any provision of this Agreement will not operate as a waiver of any other or subsequent breach.

G.     ***Notices.*** Any notice or other communication required or permitted by this Agreement to be given to a Party shall be in writing and shall be deemed given (i) if delivered personally or by commercial messenger or courier service, (ii) when sent by confirmed facsimile, or (iii) if mailed by U.S. registered or certified mail (return receipt requested), to the Party at the Party's address written below or at such address as the Party may have previously specified by like notice. If by mail, delivery shall be deemed effective three business days after mailing in accordance with this Section .

H.     ***Attorneys' Fees.*** In any court action at law or equity that is brought by one of the Parties to this Agreement to enforce or interpret the provisions of this Agreement, DAOLABS will be entitled to reasonable attorneys' fees, in addition to any other relief to which DAOLABS may be entitled.

I.     ***Signatures.*** This Agreement may be signed in two counterparts, each of which shall be deemed an original, with the same force and effectiveness as though executed in a single document.

*[signature page follows]*

-7-

PLAINTIFF0000393

IN WITNESS WHEREOF, the Parties hereto have executed this Consulting Agreement as of the date first written above.

**CONTRACTOR**                                    **DAOLABS, INC.**

By: _____      By: _____

Name: _____      Name: BENJAMIN REED_____

Title: _____      Title: MANAGER_____

Address for Notice:

_____

_____

_____

PLAINTIFF0000394

## EXHIBIT A

## SERVICES AND COMPENSATION

1.    ***Contact.*** Consultant's principal Company contact:

DAOLABS, LLC.
620 131st AVE NE
Bellevue, WA 98005
(206) 866-0766

BLANK

CONTRACTOR had previous executed a NDA (attached) with DAOLABS, LLC dated August 12th, 2022, such that all communication with _____ will be covered by the agreement.

2.    ***Services.*** The Services shall consist of the following:

A.    See Attached Signed Scope of Work dated _____, however, Consultant will …

B.    and such other services that DAOLABS may reasonably request from time to time, including but not limited to ....

3.    ***Compensation.***

A.    DAOLABS will pay Consultant $100 an hour.

B.    DAOLABS will pay Consultant $1,500 30 days after contract signing, and another $1,500 after another 30 days, given that Consultant work at least 15 hours per month.

C.    DAOLABS will pay Consultant any overage hours spent from income derived from DAOLABS licensing or in installments of $1,000 after 4.5 months after contracting signing, whichever comes first.  Consultant will keep track of her time and provide a timesheet in excel format of hours worked per week.  Consultant will provide the timesheet to DAOLABS on a bi-monthly schedule for approval and record keeping.

D.    DAOLABS will reimburse Consultant, in accordance with DAOLABS policy, for all reasonable expenses incurred by Consultant in performing the Services pursuant to this Agreement, if Consultant receives written consent from an authorized agent of DAOLABS prior to incurring such expenses and submits receipts for such expenses to DAOLABS in accordance with DAOLABS policy.

Consultant shall submit to DAOLABS a written invoice for Services and expenses, and such statement shall be subject to the approval of the contact person listed above or other designated agent of DAOLABS.  Consultant shall submit to DAOLABS a written invoice for Services including hours worked and hours deferred that week, and cumulative, or total since contract signing.

PLAINTIFF0000395

This **Exhibit A** is accepted and agreed upon as of August 12, 2022.

**CONTRACTOR**                          **DAOLABS, LLC.**

By: _____    By: _____

Name: _____    Name: BENJAMIN REED_____

Title: _____    Title: MANAGER_____

-2-

PLAINTIFF0000396

**SCOPE OF WORKSTATEMENT OF WORK**

Contractor,

If there is a descriptive statement of work you want to include, please do it here.

**CONTRACTOR**                                    **DAOLABS, LLC.**


By: _____      By: _____

Name: _____      Name: BENJAMIN REED_____

PLAINTIFF0000397

# Exhibit C

PLAINTIFF0000398

## DAOLABS, LLC
## INNOVATIONS AND ASSIGNMENT AGREEMENT

This Agreement is made and entered into, as of **January 1, 2022** ("Effective Date"), by and between DAOLABS, LLC ("Company"), having a principal place of business at FL, and _____, ("Contractor").

1.     Consideration. This Agreement is signed in conjunction with an Independent Contractor Agreement ("ICA") and is incorporated therein. The parties agree that in performing the work under the ICA and the remuneration identified therein shall be good and reasonable consideration for the duties and obligations found in this Agreement.

2.     "Proprietary Information" Definition. "Proprietary Information" includes (a) any information that is confidential or proprietary, technical or non-technical information of Company, including for example and without limitation, information related to Innovations (as defined in Section 4 below), concepts, techniques, processes, methods, systems, designs, computer programs, source documentation, trade secrets, formulae, development or experimental work, work in progress, forecasts, proposed and future products, marketing plans, financial information, business plans, customers and suppliers and any other nonpublic information that has commercial value or (b) any information Company has received from others that Company is obligated to treat as confidential or proprietary, which may be made known to Contractor by Company, a third party or otherwise that Contractor may learn during my contract with Company.

3.     Ownership and Nondisclosure of Proprietary Information. All Proprietary Information is the sole property of Company, Company's assigns, Company's customers and Company's suppliers, as applicable. Company, Company's assigns, Company's customers and Company's suppliers, as applicable, are the sole and exclusive owners of all patents, copyrights, mask works, trade secrets and other rights in and to the Proprietary Information. Contractor will not disclose any Proprietary Information to anyone outside Company, and Contractor will use and disclose Proprietary Information to those inside Company only as may be necessary in the ordinary course of performing its duties as a contractor of Company. If Contractor has any questions as to whether information constitutes Proprietary Information, or to whom, if anyone, inside Company, any Proprietary Information may be disclosed, Contractor will consult with my manager at Company.

4.     "Innovations" Definition. In this Agreement, "Innovations" means all discoveries, designs, developments, improvements, inventions (whether or not protectable under patent laws), works of authorship, information fixed in any tangible medium of expression (whether or not protectable under copyright laws), trade secrets, know-how, ideas (whether or not protectable under trade secret laws), mask works, trademarks, service marks, trade names and trade dress.

5.     Disclosure and License of Prior Innovations. Company has listed on Exhibit A ("Prior Innovations"), attached hereto, all Innovations relating in any way to Company's Business or demonstrably anticipated research and development or business, which were conceived, reduced to practice, created, derived, developed, or made by Contractor prior to the contract with Company (collectively, the "Prior Innovations"). Contractor represents that neither Contractor or any of its employees, agents assigns or other associated with Contractor have no rights in any such Company-related Innovations other than those Innovations listed on Exhibit A. If nothing is listed on Exhibit A ("Prior Innovations"), Contractor represents that there are no Prior Innovations at the time of signing this Agreement. Contractor hereby grant to Company and Company's designees a royalty-free, irrevocable, worldwide, fully paid-up license (with rights to sublicense through multiple tiers

INNOVATIONS, ASSIGNMENT AGREEMENT          1

PLAINTIFF0000399

of sublicensees) to practice all patent, copyright, moral right, mask work, trade secret and other intellectual property rights relating to any Prior Innovations that Contractor incorporates or permits to be incorporated, in any Innovations that Contractor, solely or jointly with others, conceive, develop or reduce to practice during my contract with Company (the "Company Innovations"). Notwithstanding the foregoing, Contractor will not incorporate, or permit to be incorporated, any Prior Innovations in any Company Innovations without Company's prior written consent.

6.  Future Innovations.  Contractor will disclose promptly in writing to Company all Innovations conceived, reduced to practice, created, derived, developed, or made by Contractor, its employees, agents or assigns during the term of the contract and for three (3) months thereafter, whether or not Contractor believes such Innovations are subject to this Agreement, to permit a determination by Company as to whether or not the Innovations should be considered Company Innovations. Company will receive any such information in confidence.

7.  Disclosure and Assignment of Company Innovations.  Contractor will promptly disclose and describe to Company all Company Innovations. Contractor hereby does and will specifically assign to Company or Company's designee all rights, title, and interest in and to any and all Company Innovations. To the extent any of the rights, title and interest in and to Company Innovations cannot be assigned by Contractor to Company, Contractor hereby grants to Company an exclusive, royalty-free, transferable, irrevocable, worldwide license (with rights to sublicense through multiple tiers of sublicensees) to practice such non-assignable rights, title and interest. To the extent any of the rights, title and interest in and to Company Innovations can neither be assigned nor licensed by Contractor to Company, Contractor hereby irrevocably waives and agrees never to assert such non-assignable and non-licensable rights, title and interest against Company or any of Company's successors in interest. Contractor agrees to provide the names of all employees who will

perform work pursuant to this Agreement (Exhibit "B") and have them sign this agreement to indicate their understanding of their duties of non-disclosure and confidentiality as well as their obligations to disclose any prior innovations and to specifically assign all rights and claims developed under this Agreement.

8.  Exclusion from Assignment.  Contractor understands that its obligation to assign, license or waive a claim with respect to any Innovation must comply with the requirements of RCW 49.44.140.  Pursuant to this Washington statute, Section 7 of this Agreement (Disclosure and Assignment of Company Innovations) does not apply to, and Contractor does not assign its rights to any Innovation (whether a Company Innovation or otherwise) when Contractor or its employees, agents or assigns, can prove that: (a) the Innovation was developed entirely outside of the time covered by this Agreement; (b) Contractor, its employees, agents or assigns did not use Company equipment, supplies, facilities , or trade secret information in its development; (c) the Innovation does not relate (i) directly to the Business of Company, or (ii) to the actual or demonstrably anticipated research or development of Company; and (d) the Innovation does not result from any work performed by Contractor, its employees, agents or assigns for Company.  This Section will be construed to apply to all Innovations with which Contractor is involved from this date forward, as well as all Company Innovations with which Contractor has been involved since the Agreement with Company began.

9.  Restriction on Use of Software.  Contractor agrees that neither it, its employees, agents and assigns shall be prohibited and shall not use or deploy any software, programs or other intellectual property owned by Company or developed during the period of Agreement with Company for a period of 18 (eighteen) months after Company publishes or otherwise makes the software, programs or intellectual property available in open source.  Contractor acknowledges that due to the nature of the Company's Business, there is no restriction on the geographical scope of this prohibition of use to Company and further acknowledges that

PLAINTIFF0000400

Company competes on a worldwide basis and that the geographical scope of these limitations is reasonable and necessary for the protection of Company's trade secrets and other Proprietary Information. Contractor further acknowledges that if a court of competent jurisdiction finds this restriction provision invalid or unenforceable due to unreasonableness in time, geographic scope, or scope of the Business, then such court will interpret and enforce this provision to the maximum extent that such court deems reasonable.

10. <u>Cooperation in Perfecting Rights to Innovations</u>. Contractor agrees to perform, during and after the terms of this contract, all acts that Company deems necessary or desirable to permit and assist Company, at its expense, in obtaining and enforcing the full benefits, enjoyment, rights and title throughout the world in the Innovations as provided to Company under this Agreement. If Company is unable for any reason to secure any necessary signature to any document required to file, prosecute, register or memorialize the assignment of any rights or application or to enforce any right under any Innovations as provided under this Agreement, Contractor hereby irrevocably designates and appoints Company and Company's duly authorized officers and agents as Contractor's agents and attorneys-in-fact to act for and on Contractor's behalf and instead to take all lawfully permitted acts to further the filing, prosecution, registration, memorialization of assignment, issuance, and enforcement of rights under such Innovations, all with the same legal force and effect as if executed by Contractor. The foregoing is deemed a power coupled with an interest and is irrevocable.

11. <u>Contract at Will</u>. Contractor acknowledges that the contract will be of finite duration and that either Company or Contractor will be free to terminate the contract at any time with or without cause. Contractor also acknowledges that any representations to the contrary are unauthorized and void, unless contained in a formal written contract signed by an officer of Company.

12. <u>Return of Materials</u>. At any time upon Company's request, and when the contract with Company is over, Contractor will return all materials (including, without limitation, documents, drawings, papers, diskettes and tapes) containing or disclosing any Proprietary Information (including all copies thereof), as well as any keys, pass cards, identification cards, computers, printers, pagers, personal digital assistants or similar items or devices that the Company has provided to me. Contractor will provide Company with a written certification of its compliance with the obligations under this Section.

13. <u>Survival</u>. This Agreement (a) will survive the contract with Company; (b) does not in any way restrict Contractor's right to terminate or the right of Company to terminate the contract at any time, for any reason or for no reason; (c) inures to the benefit of successors and assigns of Company; and (d) is binding upon Contractors heirs and legal representatives.

14. <u>Non-Disparagement</u>. During the contract with Company and after the termination thereof, Contractor, its employees, agents and assigns will not disparage Company, its products, services, agents or contractors.

15. <u>Injunctive Relief</u>. Contractor agrees that if it violates this Agreement, Company will suffer irreparable and continuing damage for which money damages are insufficient, and Company will be entitled to injunctive relief and/or a decree for specific performance, and such other relief as may be proper (including money damages if appropriate).

16. <u>Notices</u>. Any notice required or permitted by this Agreement will be in writing and will be delivered as follows, with notice deemed given as indicated: (a) by personal delivery, when actually delivered; (b) by overnight courier, upon written verification of receipt; (c) by facsimile transmission, upon acknowledgment of receipt of electronic transmission; (d) by certified or registered mail, return receipt requested, upon verification of receipt; (e) or by email to the email address listed below. Notices to Contractor will be sent to any

INNOVATIONS, ASSIGNMENT AGREEMENT        3

PLAINTIFF0000401

address in Company's records or the email address listed below.

17. <u>Governing Law; Forum</u>. This Agreement will be governed by the laws of the United States of America and by the laws of the State of Washington, as such laws are applied to agreements entered into and to be performed entirely within Washington between Washington residents. Company and Contractor each irrevocably consent to the exclusive personal jurisdiction of the federal and state courts located in King County, Washington, as applicable, for any matter arising out of or relating to this Agreement, except that in actions seeking to enforce any order or any judgment of such federal or state courts located in King County, Washington, such personal jurisdiction will be nonexclusive.

18. <u>Severability</u>. If a court of law holds any provision of this Agreement to be illegal, invalid or unenforceable, (a) that provision will be deemed amended to provide Company the maximum protection permitted by applicable law and (b) the legality, validity and enforceability of the remaining provisions of this Agreement will not be affected.

19. <u>Waiver; Modification</u>. If Company waives any term, provision or breach by Contractor of this Agreement, such waiver will not be effective unless it is in writing and signed by Company. No waiver will constitute a waiver of any other or subsequent breach by Contractor. This Agreement may be modified only if both Company and Contractor consent in writing.

20. <u>Entire Agreement</u>. This Agreement represents the entire understanding with Company with respect to the subject matter of this Agreement and supersedes all previous understandings, written or oral. This Agreement is signed together with an ICA as outlined in Section 1.

I certify and acknowledge that I have carefully read all of the provisions of this Agreement and that I understand and will fully and faithfully comply with such provisions.

Executed as of the Date listed above.

COMPANY                                          CONTRACTOR

DAOLABS, LLC

By: _____    By: _____
      Reed Yurchak
      Law Offices of Reed Yurchak
      Bellevue, WA 98005                      Email:
      Email: Reed@yurchaklaw.com                    *Contractor*
      *Attorney for LLC*

INNOVATIONS, ASSIGNMENT AGREEMENT          4

PLAINTIFF0000402

Exhibit A

PRIOR INNOVATIONS


Check one of the following:

[  ]     NO SUCH PRIOR INNOVATIONS EXIST.

OR

[  ]     YES, SUCH PRIOR INNOVATIONS EXIST AS DESCRIBED BELOW (include basic
description of each Prior Innovation):

PLAINTIFF0000403

EXHIBIT "B"

Executed as of the date of this Agreement.

_____          _____
Employee Name                               Signature

_____          _____
Employee Name                               Signature

_____          _____
Employee Name                               Signature

_____          _____
Employee Name                               Signature

_____          _____
Employee Name                               Signature

_____          _____
Employee Name                               Signature

_____          _____
Employee Name                               Signature

_____          _____
Employee Name                               Signature

_____          _____
Employee Name                               Signature

_____          _____
Employee Name                               Signature

PLAINTIFF0000404

# Exhibit D

PLAINTIFF0000405

# DAOLABS CORPORATION

## STARTER KIT

*Please be aware that we have prepared these agreements as a generic starting point for you. Although each of the documents has a brief description of its intended use, we recommend that before you use any of these documents, you review it carefully and discuss its terms with a qualified attorney. Using any of these agreements in the wrong situation or without understanding and abiding by its terms may have detrimental and unintended consequences.*

*There are also several places in each document where additional information will be required to customize the document to a given situation, such as providing names and addresses of the parties and selecting one of several alternative provisions; these places have been bracketed ([ ]) and highlighted for your convenience. Furthermore, these sample forms may not have all the protections you or the other party may need or desire.*

*In summary, these forms are only provided as a starting point for documenting business relationships that you may encounter on a regular basis. However, we strongly encourage that you consult with legal counsel in order to understand the implications of using any of these documents in a given situation.*

PLAINTIFF0000406

INDEX

1.      SAMPLE OFFER LETTER

2.      EMPLOYEE NONDISCLOSURE AND ASSIGNMENT AGREEMENT

3.      CONFIDENTIALITY AGREEMENT (DISCLOSURES <u>BY</u> DAOLABS IP
        CORPORATION)

4.      CONFIDENTIALITY AGREEMENT (DISCLOSURES <u>TO</u> DAOLABS IP
        CORPORATION)

5.      MUTUAL CONFIDENTIALITY AGREEMENT (WITH SUPPLEMENT)

6.      MUTUAL CONFIDENTIALITY AGREEMENT (LONG FORM)

7.      MUTUAL CONFIDENTIALITY AGREEMENT (SHORT FORM)

8.      CONFIDENTIAL MATERIALS RELEASE FORM

9.      INDEPENDENT CONTRACTOR SERVICES AGREEMENT

PLAINTIFF0000407

**OFFER LETTER**

1.  <u>When Used</u>.  Use this letter to offer employment positions to any prospective
    employee of DAOLABS IP CORPORATION ("Company").  This letter may
    also be used to offer temporary employment by removing the brackets
    around "temporary" and completing the employment termination date.  If
    this letter is being used for ordinary employment positions, the brackets and
    references to "temporary" should be removed. ***DO NOT USE THIS
    AGREEMENT WHEN RETAINING INDEPENDENT CONTRACTORS
    OR CONSULTANT SERVICES***.

2.  <u>To Be Completed Before Signing</u>.  Enter the position being filled, to whom
    the employee should report, the date, and the amount of compensation.
    Decide upon which employee benefits you wish to list at the end of the
    second paragraph, and describe commission or bonus plan opportunities, if
    appropriate.

    The third, fourth and fifth paragraphs should either be completed, by filling
    in the necessary information or indicated blanks, or deleted as appropriate.

    With respect to the seventh paragraph, decide whether to include the
    arbitration paragraph and, if this paragraph will be retained, insert the county
    in which you wish to have disputes arbitrated.  Delete other brackets
    surrounding proposed text if you wish to retain the text in the letter.  Be sure
    to have the appropriate Company authority sign the letter before mailing to
    the prospective employee.

3.  <u>Signature</u>.  To be effective, the prospective employee must return the letter
    signed and dated to Company and Company must retain a copy in the
    employee's personnel file.

PLAINTIFF0000408

<u>OFFER LETTER</u>

[On Company Letterhead]

[Date]

[Name]
[Address Line]
[Address Line]

      **Re:**      **[Temporary] Employment Agreement**

Dear [Name]:

      On behalf of DAOLABS IP CORPORATION (the "Company"), I am pleased to confirm our verbal offer of [temporary] employment to you for the position of _____, reporting to ____ _____. This letter sets out the terms of your employment with the Company, which will start on [Month] ___, 200__ [; we anticipate that your temporary employment with the Company will terminate on or about [date]].

      [You will be paid a base salary of $_____ [every two weeks/semi-monthly] (which equals $_____ per year), less applicable tax and other withholdings.] OR [Your hourly pay rate will be $____, less applicable tax and other withholdings, and you will be paid [every two weeks/semi-monthly] in accordance with the Company's normal payroll procedure.] You will also be eligible to participate in various Company fringe benefit plans, including [list which apply: for example "group health insurance, 401(k), and vacation programs"]. [*Include information concerning commission or bonus plan participation if applicable.*]

      [*ADD IF APPLICABLE*] The Company will also assist you in your relocation to the _____ area. [Describe specific relocation benefits being offered. Be sure to place a "cap" on the maximum amount available for each relocation benefit.] If you terminate your employment with the Company for any reason within [two years] after your employment start date, you agree to repay the Company the amount of any relocation benefits paid to you pursuant to this paragraph on the date of your termination.

      [*ADD IF APPLICABLE*] The Company will pay you a "signing" bonus of $_____, less applicable tax and other withholdings, after you have successfully completed [90] days employment with the Company. If you terminate your employment with the Company for any reason within [two years] after your employment start date, you agree to repay the Company the amount of your signing bonus on the date of your termination.

      [*ADD IF APPLICABLE*] Subject to the approval of the Company's Board of Directors, you will be granted an option to purchase _____ shares of Company common stock under the Company's [incentive] stock option plan at an exercise price equal to the fair market value of that stock on your option grant date. Your option will vest over a period of [four] years, and will be subject to the terms and conditions of the Company's stock option plan and standard form of stock option agreement, which you will be required to sign as a condition of receiving the option.

      Your employment with the Company is "at will"; it is for no specified term, and may be terminated by you or the Company at any time, with or without cause or advance notice. As a condition of your employment, you will be required to sign the Company's standard form of employee nondisclosure and

SE\9066575.1
999850-1

PLAINTIFF0000409

assignment agreement, and to provide the Company with documents establishing your identity and right to work in the United States.  Those documents must be provided to the Company within three days after your employment start date.

[*ADD OR REMOVE AFTER CONSULTING WITH LEGAL COUNSEL*]  In the event of any dispute or claim solely related to or arising out of the termination of your employment with Company for any reason (including, but not limited to, any claims for breach of contract, wrongful termination, or age, sex, race, national origin, disability or other discrimination or harassment), you agree that all such disputes will be fully, finally and exclusively resolved by binding arbitration conducted by the American Arbitration Association in King County, Washington.  You and Company hereby waive your respective rights to have any such disputes or claims tried by a judge or jury.  This section will not apply to any claims for injunctive relief by Company or you, or to any claims by Company or you arising out of or related to proprietary and intellectual property rights.

This agreement and the non-disclosure [and stock option] agreement[s] referred to above constitute the entire agreement between you and the Company regarding the terms and conditions of your employment, and they supersede all prior negotiations, representations or agreements between you and the Company.  The provisions of this agreement regarding "at will" employment [and arbitration] may only be modified by a document signed by you and an authorized representative of the Company.

[Name], we look forward to working with you at the Company.  Please sign and date this letter on the spaces provided below to acknowledge your acceptance of the terms of this agreement.

Sincerely,

DAOLABS IP CORPORATION

By_____
        [Name]
        [Title]

I agree to and accept employment with DAOLABS IP CORPORATION on the terms and conditions set forth in this agreement.

Date:  [Month ]____, 200__          _____
                                      [Name]

PLAINTIFF0000410

## EMPLOYEE NONDISCLOSURE AND ASSIGNMENT AGREEMENT

1.  This agreement is to be signed by employees of DAOLABS IP
    CORPORATION ("Company") for new or continued employment by
    Company.  For continued employment, Company should have the employee
    sign this agreement at the time a bonus, a promotion, or some other new or
    increased "benefit" is provided to the employee by Company.  This
    agreement is intended to be used with the enclosed form of offer letter (or
    other separate employment agreement that does not already contain terms
    regarding confidentiality and intellectual property ownership).  ***DO NOT
    USE THIS AGREEMENT WHEN RETAINING INDEPENDENT
    CONTRACTOR OR CONSULTANT SERVICES***.

2.  To Be Completed Before Signing.

    Definition of Company's Business.  Complete the definition of the
    Company's business in Section 1 of the Agreement.

    Exhibit A ("Prior Innovations") must be completed prior to signing this
    agreement in accordance with Section 5 ("Disclosure and License of Prior
    Innovations").  If the employee has no such Prior Innovations, complete the
    form by checking the box next to "No Such Prior Innovations Exist."  *Do not
    leave Exhibit A incomplete*.

    Non-Competition Clause.  With respect to optional provision 9 of this
    Agreement, consult with an attorney about whether to include the non-
    compete provision, and the length of the non-competition obligation, if any,
    for particular employees.  Where Company wishes an existing employee to
    agree to a non-competition clause following the start of that employee's
    employment with Company, Company must provide some consideration,
    such as a bonus, promotion, or other new or increased "benefit" to the
    employee.  We recommend that Company consult with a qualified attorney
    where it wishes to enter into a non-compete clause with a new or an existing
    employee.

3.  Signature.  Have the employee and an authorized representative of the
    Company sign and date the signature page.  Company should retain a copy
    of this Agreement in the employee's personnel file and in Company's
    records.

PLAINTIFF0000411

## EMPLOYEE NONDISCLOSURE AND ASSIGNMENT AGREEMENT

This Agreement formalizes in writing certain understandings and procedures which have been in effect since the time I was initially employed by DAOLABS IP CORPORATION ("Company").

1.  <u>Duties</u>. In return for the compensation now and hereafter paid to me, I will perform such duties for Company as the Company may designate from time to time.   During my employment with Company, I will devote my best efforts to the interests of Company, will not engage in other employment or in any activities that Company determines to be detrimental to its best interests and will otherwise abide by all of Company's policies and procedures.   For purposes of this Agreement, Company's business means [DEFINE THE COMPANY'S BUSINESS] (the "Business").   Furthermore, I will not (a) reveal, disclose or otherwise make available to any person any Company password or key, whether or not the password or key is assigned to me or (b) obtain, possess or use in any manner a Company password or key that is not assigned to me.   I will use my best efforts to prevent the unauthorized use of any laptop or personal computer, peripheral device, software or related technical documentation that the Company issues to me, and I will not input, load or otherwise attempt any unauthorized use of software in any Company computer, whether or not such computer is assigned to me.

2.  <u>"Proprietary Information" Definition</u>. "Proprietary Information" includes (a) any information that is confidential or proprietary, technical or non-technical information of Company, including for example and without limitation, information related to Innovations (as defined in Section 4 below), concepts, techniques, processes, methods, systems, designs, computer programs, source documentation, trade secrets, formulae, development or experimental work, work in progress, forecasts, proposed and future products, marketing plans, financial information, business plans, customers and suppliers and any other nonpublic information that has commercial value

or (b) any information Company has received from others that Company is obligated to treat as confidential or proprietary, which may be made known to me by Company, a third party or otherwise that I may learn during my employment with Company.

3.  <u>Ownership and Nondisclosure of Proprietary Information</u>.   All Proprietary Information is the sole property of Company, Company's assigns, Company's customers and Company's suppliers, as applicable.   Company, Company's assigns, Company's customers and Company's suppliers, as applicable, are the sole and exclusive owners of all patents, copyrights, mask works, trade secrets and other rights in and to the Proprietary Information.   I will not disclose any Proprietary Information to anyone outside Company, and I will use and disclose Proprietary Information to those inside Company only as may be necessary in the ordinary course of performing my duties as an employee of Company.   If I have any questions as to whether information constitutes Proprietary Information, or to whom, if anyone, inside Company, any Proprietary Information may be disclosed, I will consult with my manager at Company.

4.  <u>"Innovations" Definition</u>.   In this Agreement, "Innovations" means all discoveries, designs, developments, improvements, inventions (whether or not protectable under patent laws), works of authorship, information fixed in any tangible medium of expression (whether or not protectable under copyright laws), trade secrets, know-how, ideas (whether or not protectable under trade secret laws), mask works, trademarks, service marks, trade names and trade dress.

5.  <u>Disclosure and License of Prior Innovations</u>.   I have listed on <u>Exhibit A</u> ("Prior Innovations"), attached hereto, all Innovations relating in any way to Company's Business or demonstrably anticipated research and development or business, which were conceived, reduced to practice, created, derived, developed, or made by me prior to my employment with

PLAINTIFF0000412

Company (collectively, the "Prior Innovations"). I represent that I have no rights in any such Company-related Innovations other than those Innovations listed on <u>Exhibit A</u>. If nothing is listed on <u>Exhibit A</u> ("Prior Innovations"), I represent that there are no Prior Innovations at the time of signing this Agreement. I hereby grant to Company and Company's designees a royalty-free, irrevocable, worldwide, fully paid-up license (with rights to sublicense through multiple tiers of sublicensees) to practice all patent, copyright, moral right, mask work, trade secret and other intellectual property rights relating to any Prior Innovations that I incorporate, or permit to be incorporated, in any Innovations that I, solely or jointly with others, conceive, develop or reduce to practice during my employment with Company (the "Company Innovations"). Notwithstanding the foregoing, I will not incorporate, or permit to be incorporated, any Prior Innovations in any Company Innovations without Company's prior written consent.

6.      <u>Future Innovations</u>.    I will disclose promptly in writing to Company all Innovations conceived, reduced to practice, created, derived, developed, or made by me during the term of my employment and for three (3) months thereafter, whether or not I believe such Innovations are subject to this Agreement, to permit a determination by Company as to whether or not the Innovations should be considered Company Innovations. Company will receive any such information in confidence.

7.      <u>Disclosure and Assignment of Company Innovations</u>.   I will promptly disclose and describe to Company all Company Innovations. I hereby do and will assign to Company or Company's designee all my right, title, and interest in and to any and all Company Innovations. To the extent any of the rights, title and interest in and to Company Innovations cannot be assigned by me to Company, I hereby grant to Company an exclusive, royalty-free, transferable, irrevocable, worldwide license (with rights to sublicense through multiple tiers of sublicensees) to practice such non-assignable rights, title and interest. To the extent any of the rights, title and interest in and to Company

Innovations can neither be assigned nor licensed by me to Company, I hereby irrevocably waive and agree never to assert such non-assignable and non-licensable rights, title and interest against Company or any of Company's successors in interest.

8.      <u>Exclusion from Assignment</u>.    I understand that my obligation to assign, license or waive a claim with respect to any Innovation must comply with the requirements of RCW 49.44.140.  Pursuant to this Washington statute, Section 7 of this Agreement (Disclosure and Assignment of Company Innovations) does not apply to, and I do not assign my rights to any Innovation (whether a Company Innovation or otherwise) when I can prove that: (a) I developed the Innovation entirely on my own time; (b) I did not use Company equipment, supplies, facilities , or trade secret information in its development; (c) the Innovation does not relate (i) directly to the Business of Company, or (ii) to the actual or demonstrably anticipated research or development of  Company; and (d) the Innovation does not result from any work performed by me for Company. This Section will be construed to apply to all Innovations with which I am involved from this date forward, as well as all Company Innovations with which I have been involved since my employment with Company began.

9.      [OPTIONAL] <u>Non-Competition</u>. For a period of [one year] after termination of my employment, I will not directly or indirectly, whether as an owner, director, officer, manager, consultant, agent or employee, accept employment or engage in activities that compete with the Business or with the reasonably anticipated planned product developments of Company as of my termination date.  I acknowledge that due to the nature of the Company's Business, there is no restriction on the geographical scope of my non-competition obligations to Company.  I acknowledge that Company competes on a worldwide basis and that the geographical scope of these limitations is reasonable and necessary for the protection of Company's trade secrets and other Proprietary Information.  I further acknowledge that if a court of  competent  jurisdiction  finds  this  non-

2

PLAINTIFF0000413

competition provision invalid or unenforceable due to unreasonableness in time, geographic scope, or scope of the Business, then such court will interpret and enforce this provision to the maximum extent that such court deems reasonable.

10.   Cooperation in Perfecting Rights to Innovations.  I agree to perform, during and after my employment, all acts that Company deems necessary or desirable to permit and assist Company, at its expense, in obtaining and enforcing the full benefits, enjoyment, rights and title throughout the world in the Innovations as provided to Company under this Agreement.  If Company is unable for any reason to secure my signature to any document required to file, prosecute, register or memorialize the assignment of any rights or application or to enforce any right under any Innovations as provided under this Agreement, I hereby irrevocably designate and appoint Company and Company's duly authorized officers and agents as my agents and attorneys-in-fact to act for and on my behalf and instead of me to take all lawfully permitted acts to further the filing, prosecution, registration, memorialization of assignment, issuance, and enforcement of rights under such Innovations, all with the same legal force and effect as if executed by me.  The foregoing is deemed a power coupled with an interest and is irrevocable.

11.   Employment at Will.  I acknowledge that my employment will be of indefinite duration and that either Company or I will be free to terminate my employment at any time with or without cause.    I also acknowledge that any representations to the contrary are unauthorized and void, unless contained in a formal written employment contract signed by an officer of Company.

12.   Return of Materials.  At any time upon Company's request, and when my employment with Company is over, I will return all materials (including, without limitation, documents, drawings, papers, diskettes and tapes) containing or disclosing any Proprietary Information (including all copies thereof), as well as any keys, pass cards, identification cards, computers, printers, pagers, personal digital assistants or similar items or devices that the Company has provided to me.  I will provide Company with a written certification of my compliance with my obligations under this Section.

13.   No Violation of Rights of Third Parties.  During my employment with Company, I will not (a) breach any agreement to keep in confidence any confidential or proprietary information, knowledge or data acquired by me prior to my employment with Company or (b) disclose to Company, or use or induce Company to use, any confidential or proprietary information or material belonging to any previous employer or any other third party.  I am not currently a party, and will not become a party, to any other agreement that is in conflict, or will prevent me from complying, with this Agreement.

14.   Survival.    This Agreement (a) will survive my employment by Company; (b) does not in any way restrict my right to resign or the right of Company to terminate my employment at any time, for any reason or for no reason; (c) inures to the benefit of successors and assigns of Company; and (d) is binding upon my heirs and legal representatives.

15.   No Solicitation.  During my employment with Company and for one (1) year thereafter, I will not solicit, encourage, or cause others to solicit or encourage any employees of Company to terminate their employment with Company.

16.   No Disparagement.    During my employment with Company and after the termination thereof, I will not disparage Company, its products, services, agents or employees.

17.   Injunctive Relief.  I agree that if I violate this Agreement, Company will suffer irreparable and continuing damage for which money damages are insufficient, and Company will be entitled to injunctive relief and/or a decree for specific performance, and such other relief as may be proper (including money damages if appropriate).

18.   Notices.    Any notice required or permitted by this Agreement will be in writing

PLAINTIFF0000414

and will be delivered as follows, with notice deemed given as indicated: (a) by personal delivery, when actually delivered; (b) by overnight courier, upon written verification of receipt; (c) by facsimile transmission, upon acknowledgment of receipt of electronic transmission; or (d) by certified or registered mail, return receipt requested, upon verification of receipt. Notices to me will be sent to any address in Company's records or such other address as I may provide in writing. Notices to Company will be sent to Company's Human Resources Department or to such other address as Company may specify in writing.

19.   Governing Law; Forum.   This Agreement will be governed by the laws of the United States of America and by the laws of the State of Washington, as such laws are applied to agreements entered into and to be performed entirely within Washington between Washington residents. Company and I each irrevocably consent to the exclusive personal jurisdiction of the federal and state courts located in King County, Washington, as applicable, for any matter arising out of or relating to this Agreement, except that in actions seeking to enforce any order or any judgment of such federal or state courts located in King County, Washington, such personal jurisdiction will be nonexclusive.

20.   Severability.   If a court of law holds any provision of this Agreement to be illegal, invalid or unenforceable, (a) that provision will be deemed amended to provide Company the maximum protection permitted by applicable law and (b) the legality, validity and enforceability of the remaining provisions of this Agreement will not be affected.

21.   Waiver; Modification.   If Company waives any term, provision or breach by me of this Agreement, such waiver will not be effective unless it is in writing and signed by Company. No waiver will constitute a waiver of any other or subsequent breach by me. This Agreement may be modified only if both Company and I consent in writing.

22.   Entire Agreement.   This Agreement represents my entire understanding with Company with respect to the subject matter of this Agreement and supersedes all previous understandings, written or oral.

I certify and acknowledge that I have carefully read all of the provisions of this Agreement and that I understand and will fully and faithfully comply with such provisions.

COMPANY:                                     EMPLOYEE:

DAOLABS IP CORPORATION          _____

By: _____        By: _____

Title _____       Title _____

Dated: _____      Dated: _____

PLAINTIFF0000415

Exhibit A

PRIOR INNOVATIONS

Check one of the following:

™        NO SUCH PRIOR INNOVATIONS EXIST.

OR

™        YES, SUCH PRIOR INNOVATIONS EXIST AS DESCRIBED BELOW (include basic
         description of each Prior Innovation):

SE\9066575.1
999850-1

PLAINTIFF0000416

## CONFIDENTIALITY AGREEMENT
### (DISCLOSURES **BY** DAOLABS IP CORPORATION)

1.  <u>When Used</u>.  DAOLABS IP CORPORATION ("Company") should use this agreement when it intends to engage in discussions in which Company will be **disclosing** confidential information, **including information that is technical**, to any party.  DO **NOT** USE THIS AGREEMENT IF COMPANY WILL BE **RECEIVING** CONFIDENTIAL INFORMATION OF ANOTHER PARTY; IN SUCH SITUATION, USE ONE OF THE MUTUAL CONFIDENTIALITY AGREEMENTS OR THE CONFIDENTIALITY AGREEMENT FOR DISCLOSURES **TO** COMPANY.

2.  <u>To Be Completed Before Signing</u>.  Fill in the "Effective Date" and the recipient's name and address, and check the appropriate box identifying whether the recipient is an individual, partnership, limited liability partnership, corporation, or limited liability company.

3.  <u>Signature</u>.  Have both parties sign the signature page and describe the purpose for the disclosures following the signature block.  For disclosures by Company of any tangible materials (documents, manuals, diskettes, tapes, cartridges, drawings, sketches, designs, etc.), you may wish to have the recipient complete a Confidential Materials Release Form (a form of which is also provided) before disclosing the materials.

PLAINTIFF0000417

## CONFIDENTIALITY AGREEMENT
### (DISCLOSURES **BY** DAOLABS IP CORPORATION)

This Agreement is made and entered into, as of _____, 200_ ("Effective Date"), by and between DAOLABS IP CORPORATION ("Company"), having a principal place of business at 720 Third Avenue, Suite 1100, Seattle, WA 98104, and [RECIPIENT NAME], a(n) ☐individual, ☐partnership, ☐limited liability partnership, ☐corporation, ☐limited liability company (check the appropriate box) of the state of _____, having a principal place of business at [RECIPIENT ADDRESS] ("Recipient").

1.     Definition of Confidential Information. "Confidential Information" means (a) any technical and non-technical information related to the Company's business and current, future and proposed products and services of Company, including for example and without limitation, information concerning research, development, design details and specifications, financial information, procurement requirements, engineering and manufacturing information, customer lists, business forecasts, sales information, marketing plans and business plans; and (b) any information that may be made known to Recipient and which Company has received from others that Company is obligated to treat as confidential or proprietary, whether or not marked as confidential.

2.     Nondisclosure and Nonuse Obligations. Recipient will not use, disseminate or in any way disclose any Confidential Information to any person, firm or business, except to the extent necessary for the purpose described below the signatures to this Agreement (the "Purpose"). Furthermore, Recipient may not disclose the existence of any negotiations, discussions or consultations in progress between the parties to any form of public media without the prior written approval of Company. Recipient will treat all Confidential Information with the same degree of care as Recipient accords to Recipient's own confidential information, but in no case less than reasonable care. Recipient will disclose

Confidential Information only to those of its employees who have a need to know such information to assist Recipient with respect to the Purpose. Recipient certifies that each such employee will have agreed, either as a condition of employment or in order to obtain the Confidential Information, to be bound by terms and conditions substantially similar to those terms and conditions applicable to Recipient under this Agreement. Recipient will immediately give notice to Company of any unauthorized use or disclosure of the Confidential Information. Recipient will assist Company in remedying any such unauthorized use or disclosure of the Confidential Information.

3.     Exclusions from Nondisclosure and Nonuse Obligations. Recipient's obligations under Section 2 (Nondisclosure and Nonuse Obligations) will not apply to any Confidential Information that Recipient can document (a) was in the public domain at or subsequent to the time such Confidential Information was communicated to Recipient by Company through no fault of Recipient; (b) was rightfully in Recipient's possession free of any obligation of confidence at or subsequent to the time such Confidential Information was communicated to Recipient by Company; or (c) was developed by employees, contractors or agents of Recipient independently of and without reference to any Confidential Information. A disclosure of any Confidential Information (i) in response to a valid order by a court or other governmental body or (ii) as otherwise required by law will not be considered to be a breach of this Agreement or a waiver of confidentiality for other purposes; provided, however, that Recipient will provide prompt prior written notice thereof to Company to enable Company to seek a protective order or otherwise prevent such disclosure.

4.     Ownership and Return of Confidential Information and Other Materials. All Confidential Information, and any Derivatives (defined below) thereof, whether created by Company or Recipient, will be the property of Company and no license or other rights to

PLAINTIFF0000418

Confidential Information or Derivatives is granted or implied hereby. For purposes of this Agreement, "Derivatives" will mean: (a) for copyrightable or copyrighted material, any translation, abridgment, revision or other form in which an existing work may be recast, transformed or adapted; (b) for patentable or patented material, any improvement thereon; and (c) for material protected by trade secret, any new material derived from such existing trade secret material, including new material that may be protected under copyright, patent and/or trade secret laws. Recipient hereby does and will assign to Company all of Recipient's rights, title in interest and interest in and to the Derivatives. All materials (including, without limitation, documents, drawings, papers, diskettes, tapes, models, apparatus, sketches, designs and lists) that Company furnishes to Recipient (whether or not they contain or disclose Confidential Information) are the property of Company. Within five (5) days after any request by Company, Recipient will destroy or deliver to Company, at Company's option, (i) all such Company-furnished materials and (ii) all materials in Recipient's possession or control (even if not Company-furnished) that contain or disclose any Confidential Information. Recipient will provide Company a written certification of Recipient's compliance with Recipient's obligations under this Section.

5.    No Warranty.    All Confidential Information is provided "AS IS" and without any warranty, express, implied or otherwise, regarding such Confidential Information's accuracy or performance. Recipient acknowledges and agrees that Company is not responsible or liable for any decisions made by Recipient in reliance upon disclosures made pursuant to this Agreement.

6.    No Export. Recipient will obtain any licenses or approvals the U.S. government or any agency thereof requires prior to exporting, directly or indirectly, any technical data acquired from Company pursuant to this Agreement or any product utilizing any such data.

7.    Term. This Agreement will govern all communications from Company to Recipient that

are made from the Effective Date to the date on which either party receives from the other party written notice that subsequent communications will not be so governed; provided, however, that Recipient's obligations under Section 2 (Nondisclosure and Nonuse Obligations) will continue in perpetuity with respect to Confidential Information of Company that Recipient has previously received unless such obligations no longer apply pursuant to Section 3 (Exclusions from Nondisclosure and Nonuse Obligations).

8.    No Assignment.    Recipient will not assign or transfer any rights or obligations under this Agreement without the prior written consent of Company.

9.    Injunctive Relief.    A breach of this Agreement will cause irreparable and continuing damage to Company for which money damages are insufficient, and Company will be entitled to injunctive relief and/or a decree for specific performance, and such other relief as may be proper (including money damages if appropriate).

10.    Notices.    Any notice required or permitted by this Agreement will be in writing and will be delivered as follows, with notice deemed given as indicated: (a) by personal delivery, when actually delivered; (b) by overnight courier, upon written verification of receipt; (c) by facsimile transmission, upon acknowledgment of receipt of electronic transmission; or (d) by certified or registered mail, return receipt requested, upon verification of receipt. Notice will be sent to the addresses set forth above or to such other address as either party may provide in writing.

11.    Governing Law; Forum; Legal Fees. This Agreement will be governed in all respects by the laws of the United States of America and by the laws of the State of Washington, as such laws are applied to agreements entered into and to be performed entirely within Washington between Washington residents. Each of the parties irrevocably consents to the exclusive personal jurisdiction of the federal and state courts located in King County, Washington, as applicable, for any matter arising out of or

PLAINTIFF0000419

relating to this Agreement, except that in actions seeking to enforce any order or any judgment of such federal or state courts located in King County, Washington, such personal jurisdiction will be nonexclusive.  If a proceeding is commenced to resolve any dispute that arises between the parties with respect to the matters covered by this Agreement, the prevailing party in such proceeding will be entitled to receive its reasonable attorneys' fees, expert witness fees and out-of-pocket costs incurred in connection with such proceeding, in addition to any other relief to which such prevailing party may be entitled.

12.     Severability.  If a court of law holds any provision of this Agreement to be illegal, invalid or unenforceable, (a) that provision will be deemed amended to achieve an economic effect that is as near as possible to that provided by the original provision and (b) the legality, validity and enforceability of the remaining provisions of this Agreement will not be affected.

13.     Waiver; Modification.    If Company waives any term, provision or Recipient's breach of this Agreement, such waiver will not be effective unless it is in writing and signed by Company. No waiver will constitute a waiver of any other or subsequent breach by Recipient. This Agreement may be modified only if authorized representatives of both parties consent in writing.

14.     Entire Agreement.    This Agreement constitutes the entire agreement with respect to the Confidential Information disclosed hereunder and supersedes all prior or contemporaneous agreements concerning such Confidential Information, written or oral.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective Date.

"Company"

DAOLABS IP CORPORATION

By: _____

Name: _____

Title: _____

"Recipient"

[RECIPIENT NAME]

By: _____

Name: _____

Title: _____

Purpose: _____

_____

PLAINTIFF0000420

CONFIDENTIALITY AGREEMENT
(DISCLOSURES **TO** DAOLABS IP CORPORATION)

1.    <u>When Used</u>.  DAOLABS IP CORPORATION ("Company") should use this
      agreement when it intends to engage in discussions with another party in which
      Company is **receiving** confidential information from the other party (the
      "Disclosing Party"), **including information that is technical**.  DO **NOT** USE
      THIS AGREEMENT IF COMPANY WILL **ALSO** BE **DISCLOSING**
      COMPANY'S CONFIDENTIAL INFORMATION TO DISCLOSING PARTY;
      IN SUCH SITUATION, USE ONE OF THE MUTUAL CONFIDENTIALITY
      AGREEMENTS.

2.    <u>To Be Completed Before Signing</u>.  Fill in the "Effective Date" and the
      discloser's name and address, and check the appropriate box identifying whether
      Disclosing Party is an individual, partnership, limited liability partnership,
      corporation, or limited liability company.

3.    <u>Signature</u>.  Have both parties sign the signature page.  For disclosures to
      Company of any tangible materials (documents, manuals, diskettes, tapes,
      cartridges, drawings, sketches, designs, etc.), you may wish to have the discloser
      complete a Confidential Materials Release Form (a form of which is also
      provided) before the Company receives the materials.

PLAINTIFF0000421

# CONFIDENTIALITY AGREEMENT
## (DISCLOSURES **TO** DAOLABS IP CORPORATION)

This Agreement is made and entered into, as of _____, 200_ ("Effective Date"), by and between DAOLABS IP CORPORATION ("Company"), having a principal place of business at 720 Third Avenue, Suite 1100, Seattle, WA 98104, and [DISCLOSER NAME], a(n) ☐individual, ☐partnership, ☐limited liability partnership, ☐corporation, ☐limited liability company (check the appropriate box) of the state of _____, having a principal place of business at [DISCLOSER ADDRESS] ("Disclosing Party").

1.    <u>Definition of Confidential Information</u>. "Confidential Information" means trade secrets, know-how, inventions, techniques, processes, algorithms, software programs, schematics, software source documents, contracts, customer lists, financial information, sales information and marketing plans concerning Disclosing Party's business that is valuable, not generally known to the public and disclosed to Company in written form and marked "Confidential" or, if disclosed orally, summarized in writing where such summary is marked "Confidential" and sent to Company no later than thirty (30) days after such disclosure.

2.    <u>Confidentiality Obligations</u>. Company will use reasonable care to disclose Confidential Information only to those employees or consultants of Company as reasonably necessary for the purpose of evaluating the commercial potential of a business relationship with Disclosing Party and for any other purpose that Disclosing Party may hereafter authorize in writing.

3.    <u>Exclusions from Nondisclosure and Nonuse Obligations</u>. Company's obligations under Section 2 (Confidentiality Obligations) will not apply to any Confidential Information that Company can demonstrate (a) was in the public domain at or subsequent to the time such Confidential Information was communicated to Company by Disclosing Party through no fault of Company; (b) was in Company's possession free of any obligation of confidence at or subsequent to the time such Confidential Information was communicated to Company by Disclosing Party; (c) was developed by employees, contractors or agents of Company independently of and without reference to any Confidential Information; (d) was known to Company at the time of disclosure; or (e) was approved for release by written authorization of Disclosing Party. A disclosure of any Confidential Information (i) in response to a valid order by a court or other governmental body; (ii) as otherwise required by law; or (iii) necessary to establish the rights of either party under this Agreement will not be considered to be a breach of this Agreement; provided, however, that Company will provide prompt prior written notice thereof to Disclosing Party to enable Disclosing Party to seek a protective order or otherwise prevent such disclosure.

4.    <u>Ownership of Materials</u>. All materials (including, without limitation, documents, drawings, papers, diskettes, tapes, models, apparatus, sketches, designs and lists) that Disclosing Party furnishes to Company, which are designated in writing to be the property of Disclosing Party, are the property of Disclosing Party. Within five (5) days after any written request by Disclosing Party, Company will destroy or deliver to Disclosing Party, at Disclosing Party's option, all materials it received from Disclosing Party (including any copies thereof).

5.    <u>Independent Development</u>. Company may currently or in the future be developing information internally, or receiving information from other parties that may be similar to the Confidential Information. Accordingly, nothing in this Agreement will be construed as a representation or inference that Company will not develop or have developed products or services that, without violation of this Agreement, might compete with the products or systems disclosed by the Confidential Information.

1

999850-1

PLAINTIFF0000422

6.   Disclosure of Third Party Information. Disclosing Party will not communicate any information to Company in violation of the proprietary rights of any third party.

7.   Term.  This Agreement will govern all communications from Disclosing Party to Company from the Effective Date and will remain in full force and effect for a period of two (2) years, unless such obligations terminate earlier pursuant to Section 3 (Exclusions from Nondisclosure and Nonuse Obligations).

8.   Notices.   Any notice required or permitted by this Agreement will be in writing and will be delivered as follows, with notice deemed given as indicated:   (a) by personal delivery, when actually delivered;   (b) by overnight courier, upon written verification of receipt; (c) by facsimile transmission, upon acknowledgment of receipt of electronic transmission;  or  (d) by certified or registered mail, return receipt requested, upon verification of receipt.  Notice will be sent to the addresses set forth above or to such other address as either party may provide in writing.

9.   Governing Law; Forum.   This Agreement will be governed in all respects by the laws of the United States of America and by the laws of the State of Washington, as such laws are applied to agreements entered into and to be performed entirely within Washington between Washington residents.   Each of the parties irrevocably consents to the exclusive personal jurisdiction of the federal and state courts located in King County, Washington, as applicable, for any matter arising out of or relating to this Agreement, except that in actions seeking to enforce any order or any judgment of such federal or state courts located in King County, Washington, such personal jurisdiction will be nonexclusive.

10.   Severability.  If a court of law holds any provision of this Agreement to be illegal, invalid or unenforceable, (a) that provision will be deemed amended to achieve an economic effect that is as near as possible to that provided by the original provision and (b) the legality, validity and enforceability of the remaining provisions of this Agreement will not be affected thereby.

11.   Waiver; Modification. If a party waives any term, provision or a party's breach of this Agreement, such waiver will not be effective unless it is in writing and signed by the party against whom such waiver is asserted.  No waiver by a party of a breach of this Agreement by the other party will constitute a waiver of any other or subsequent breach by such other party.  This Agreement may be modified only if authorized representatives of both parties consent in writing.

12.   Entire Agreement.   This Agreement constitutes the entire agreement with respect to the Confidential Information disclosed hereunder and supersedes all prior or contemporaneous agreements concerning such Confidential Information, written or oral

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective Date.

"Company"                                    "Disclosing Party"

DAOLABS IP CORPORATION                       [DISCLOSER NAME]

By: _____            By: _____

Name: _____            Name: _____

Title: _____           Title: _____

999850-1

PLAINTIFF0000423

## MUTUAL CONFIDENTIALITY AGREEMENT WITH SUPPLEMENT

1.   <u>When Used</u>.  DAOLABS IP CORPORATION ("Company") should use this agreement when either Company and another party will **both disclose** confidential information, including technical information, pursuant to a Supplement, the form of which is attached to this agreement, that identifies the specific confidential information that each party proposes to disclose to the other, subject to advance consent by the recipient of the confidential information.

2.   <u>To Be Completed Before Signing</u>.  Fill in the Effective Date, the other party's ("Other Party's") name and address, check the appropriate box identifying whether the Other Party is an individual, partnership, limited liability partnership, corporation, or limited liability company, and complete the Supplement.

3.   <u>Signature</u>.  Have the Other Party sign the signature page.

PLAINTIFF0000424

## MUTUAL NON-DISCLOSURE AGREEMENT

This Agreement is made and entered into, as of _____, 200__, ("Effective Date") by and between DAOLABS IP CORPORATION, with a principal place of business at 720 Third Avenue, Suite 1100, Seattle, WA 98104 ("Company"), and _____, a(n) ☐ individual, ☐ partnership, ☐ limited liability partnership, ☐ corporation, ☐ limited liability company (check the appropriate box) of the state of _____, having a principal place of business at [ADDRESS] ("Other Party").

The parties are engaged in discussions that may result in a business relationship or transaction. The parties desire to disclose confidential and proprietary information ("Confidential Information") in order to assist one another in evaluating the possible relationship or transaction. Each party will make the disclosures only if the other party agrees to maintain the confidentiality of its Confidential Information.

1.    Disclosure.    Neither party (a "Disclosing Party") will disclose Confidential Information to the other party (a "Recipient") until the subject matter of such disclosure has been described in a "Supplement" to this Agreement, signed by the parties prior to the disclosure. Each Supplement will contain a description of the Confidential Information to be disclosed and the purpose for such disclosure (the "Project") written in a non-confidential manner. Any additional terms and conditions for the particular disclosure of Confidential Information beyond the terms and conditions contained in this Agreement will be specified in the applicable Supplement pertaining to such additional terms and conditions of the particular disclosure. Each Supplement will be substantially in the form attached hereto as Exhibit A, and will be incorporated into this Agreement by this reference. The parties acknowledge and agree that the amount of Confidential Information to be disclosed resides solely in the discretion of the Disclosing Party and that disclosure of Confidential Information of any nature will not

obligate the Disclosing Party to disclose any further Confidential Information.

2.    Duty of Non-Disclosure.    A Recipient will not use, disseminate, or in any way disclose any Confidential Information of Disclosing Party to any person, firm or business, except to the extent necessary to evaluate the contemplated relationship or transaction. Recipient will treat all Confidential Information of Disclosing Party with the same degree of care as it accords to its own Confidential Information, but in no case less than reasonable care. Recipient will disclose Confidential Information of the Disclosing Party only to those of Recipient's employees who need to know such information, and will not disclose it to any other parties, including subsidiaries or associated companies, without express, written consent of Disclosing Party.    Recipient certifies that Recipient's employees have previously agreed, either as a condition of employment or in order to obtain the Confidential Information of Disclosing Party, to be bound by terms and conditions substantially similar to, but in no case less restrictive than, those terms and conditions applicable to such Recipient under this Agreement. Recipient will employ all reasonable steps to protect the Disclosing Party's Confidential Information from unauthorized or inadvertent disclosure or use, including, without limitation, all steps that it takes to protect its own Confidential Information. In the event Recipient proposes to disclose Confidential Information to an unaffiliated consultant or agent, it will obtain the written consent of Disclosing Party and arrange for the execution by the consultant or agent of a nondisclosure agreement in a form satisfactory to Disclosing Party.

3.    Duty to Mark Confidential Information.    A Disclosing Party will mark all Confidential Information provided in a tangible form to Recipient in a manner that indicates such materials are Confidential Information, and subject to the limited use and non-disclosure obligations provided in this Agreement.    If Disclosing    Party    provides    Confidential

SE\9066575.1
999850-1

1

PLAINTIFF0000425

Information orally, then Disclosing Party will summarize such Confidential Information in a writing and mark such summary as "Confidential," and send the marked summary to Recipient no later than thirty (30) days following such oral disclosure.

4.    Exceptions.  Recipient will have no obligation to keep confidential Confidential Information that (a) is known to Recipient prior to receipt from Disclosing Party, directly or indirectly, from a source other than one having any obligation of confidentiality to Disclosing Party, (b) becomes known (independently of disclosure by Disclosing Party) to Recipient, directly or indirectly, from a source other than one having an obligation of confidentiality to Disclosing Party, (c) becomes publicly known or otherwise ceases to be secret or confidential, except through a breach of this Agreement by Recipient, or (d) Recipient can demonstrate was developed by Recipient independently of and without reference to any Confidential Information disclosed to it by Disclosing Party.  A disclosure of any portion of Confidential Information, either (i) in response to a valid order by a court or other governmental body, or (ii) otherwise as required by law, will not be considered to be a breach of this Agreement, provided, however, that Recipient will provide prompt prior written notice thereof to Disclosing Party to enable Disclosing Party to seek a protective order or otherwise prevent such disclosure.  Any such disclosure by Recipient of the Confidential Information of Disclosing Party, will, in no way, be deemed to change, affect or diminish the confidential and proprietary status of such Confidential Information.

5.    No Warranties.  The parties acknowledge and agree that a Disclosing Party supplies Confidential Information on an "AS IS" basis and without express or implied warranties of any kind.  The parties further acknowledge and agree that neither party is responsible nor liable for any business decision made by the other in reliance on disclosures made pursuant to this Agreement.

6.    Ownership and Return of Confidential Information.    Confidential

Information will be deemed the property of Disclosing Party and nothing in this Agreement will be construed as conferring any rights upon Recipient, by license or otherwise, in any Confidential Information.  Upon request from Disclosing Party at any time, Recipient will, at Disclosing Party's option, return or destroy all Confidential Information to Recipient no later than five (5) days following such a request, and certify such destruction or return in writing to Disclosing Party.

7.    Independent Development.  Disclosing Party understands that Recipient may currently or in the future be developing information internally, or receiving information from other parties that may be similar to Disclosing Party's Confidential Information.  Nothing in this Agreement will be construed as a representation or inference that Recipient will not develop products or services, or have products or services developed for it that, without violation of this Agreement, compete with the products or systems contemplated by Disclosing Party's Confidential Information.

8.    Disclosure of Third Party Information.  The Disclosing Party will not communicate any information to Company in violation of the proprietary rights of any third party.

9.    Injunctive Relief.  The parties acknowledge and agree that monetary damages would not be a sufficient remedy for any breach of obligations under this Agreement and that a Disclosing Party will be entitled to injunctive relief as a remedy for any such breach by the Recipient.  Such remedy will not be deemed the exclusive remedy for a breach of Recipient's obligations under this Agreement, but will be in addition to all other available legal and equitable remedies.

10.    Term.  This Agreement will govern all communications between Disclosing Party and Recipient from the Effective Date and remain in full force and effect for five (5) years.

PLAINTIFF0000426

11.    Binding Effect.  This Agreement will benefit and be binding upon the parties and their respective successors and assigns.

12.    Governing Law; Venue.  This Agreement will be governed by, and construed in accordance with the laws of the State of Washington without giving effect to any conflict of laws principles to the contrary.  Venue for any disputes arising under this Agreement will lie exclusively in the state or federal courts located in King County, Washington.  The parties irrevocably waive any right to raise *forum non conveniens* or any other argument that King County, Washington is not the proper venue, and irrevocably consent to personal jurisdiction in the state and federal courts of Washington.

13.    Attorneys Fees.  The prevailing party in any such action will be entitled to recover its reasonable attorney fees and costs in such action and upon any appeals.

14.    Non-Waiver; Modification.  No failure or delay by either party in exercising any right, power, or remedy under this Agreement will operate as a waiver of any such right, power or remedy.  No waiver or modification of any provision of this Agreement will be effective unless in writing and signed by both parties.

15.    Entire Agreement.  This Agreement, together with the Supplements, constitutes the entire agreement with respect to the Confidential Information disclosed hereunder and supersedes all prior or contemporaneous oral or written agreements concerning such Confidential Information.

IN WITNESS WHEREOF, the parties through their duly authorized representatives have executed this Agreement as of the Effective Date.

"Company"                                    "Other Party"

DAOLABS IP CORPORATION            [OTHER PARTY]

By: _____            By: _____

Name: _____            Name: _____

Title: _____            Title: _____

PLAINTIFF0000427

## Exhibit A

Supplement No. __

To Mutual Non-Disclosure Agreement Between DAOLABS IP CORPORATION and Other Party

**Name and Address of**
**DAOLABS IP CORPORATION Contact**

**Name and Address of**
**Contact at Other Party**

_____

_____
_____
_____

720 Third Avenue, Suite 1100
Seattle, WA 98104

DAOLABS IP CORPORATION

Other Party

Tel : _____
Fax: _____
Email: _____

Tel: _____
Fax: _____
Email: _____

Effective Date: _____

Ending Date: _____

**1.    Confidential Information**

(a)  DAOLABS IP CORPORATION may disclose Confidential Information pertaining to:

(b)  Other Party may disclose Confidential Information pertaining to

**2.    Purpose of Disclosure (the "Project"):**

**3.    Additional Terms and Conditions:**

Accepted by:

DAOLABS IP CORPORATION

OTHER PARTY

By: _____

By: _____

Name: _____

Name: _____

Title: _____

Title: _____

PLAINTIFF0000428

## MUTUAL CONFIDENTIALITY AGREEMENT (LONG FORM)

1.  <u>When Used</u>.  DAOLABS IP CORPORATION ("Company") should use this agreement when Company and another party will **both disclose** to the other party any of such disclosing party's confidential information, **including information that is technical**.

2.  <u>To Be Completed Before Signing</u>.  Fill in the "Effective Date" and the other party's name and address, and check the appropriate box identifying whether the other party is an individual, partnership, limited liability partnership, corporation or limited liability company.

3.  <u>Description of "Confidential Information</u>."  Company must select one of three options in Section 1 for describing what constitutes "Confidential Information" based on the Company's role as both a recipient and a discloser of confidential information.  In order for the Company to understand more fully the impact of each of these options, we have provided the options in declining order of protection to Company from the perspective of Company **in the position of a "Recipient" more so than a "Disclosing Party**."  That is, if Company were receiving "Confidential Information," Company would be most protected if the Disclosing Party were required to mark all information that Disclosing Party wanted Company to treat as confidential under this agreement.  On the other hand, Company would have greater obligations (and therefore, less protection) if Disclosing Party's information could be considered confidential simply by the circumstances of disclosure.

4.  <u>Signature</u>.  Have both parties sign the signature page and describe the purpose for the disclosures following the signature block.  For disclosures by or to Company of any tangible materials (documents, manuals, diskettes, tapes, cartridges, drawings, sketches, designs, etc.), each party may wish to have the other complete a Confidential Materials Release Form (a form of which is also provided) before disclosing or receiving (as applicable) the materials.

PLAINTIFF0000429

## MUTUAL CONFIDENTIALITY AGREEMENT (LONG FORM)

This Agreement is made and entered into, as of _____, 200_ ("Effective Date"), by and between DAOLABS IP CORPORATION ("Company"), having a principal place of business at 720 Third Avenue, Suite 1100, Seattle, WA 98104, and [OTHER PARTY NAME], a(n) ☐individual, ☐partnership, ☐limited liability partnership, ☐corporation, ☐limited liability company (check the appropriate box) of the state of _____, having a principal place of business at [OTHER PARTY ADDRESS] ("Other Party").

1.      Definition of Confidential Information. "Confidential Information" means (a) any technical and non-technical information related to a party's business and current, future and proposed products and services of each of the parties, including for example and without limitation, each party's respective information concerning research, development, design details and specifications, financial information, procurement requirements, engineering and manufacturing information, customer lists, business forecasts, sales information and marketing plans and (b) any information a party has received from others that may be made known to the other party and which such party is obligated to treat as confidential or proprietary; provided, however, that any such information disclosed by a party to this Agreement (the "Disclosing Party") will be considered Confidential Information of Disclosing Party by the other party (the "Recipient"), only if such information **[OPTION 1:** (i) is provided as information fixed in tangible form or in writing (e.g., paper, disk or electronic mail), is conspicuously designated as "Confidential" (or with some other similar legend) or (ii) if provided orally, is identified as confidential at the time of disclosure and confirmed in writing within thirty (30) days of disclosure**] [OPTION 2:** is identified at the time of disclosure as "Confidential" (or with some other similar legend)**] [OPTION 3:** would be considered confidential based on the circumstances surrounding its disclosure by a reasonable person familiar with the Disclosing Party's business and the industry in which Disclosing Party operates**].

2.      Nondisclosure and Nonuse Obligations. Recipient will not use, disseminate, or in any way disclose any of Disclosing Party's Confidential Information to any person, firm or business, except to the extent necessary for the purpose described below the signatures to this Agreement (the "Purpose"). Furthermore, neither party may disclose the existence of any negotiations, discussions or consultations in progress between the parties to any form of public media without the prior written approval of the other party. Recipient will treat all of Disclosing Party's Confidential Information with the same degree of care as Recipient accords to Recipient's own Confidential Information, but not less than reasonable care. Recipient will disclose Disclosing Party's Confidential Information only to those of Recipient's employees, consultants and contractors who need to know such information. Recipient certifies that each such employee, consultant and contractor will have agreed, either as a condition to employment or in order to obtain Disclosing Party's Confidential Information, to be bound by terms and conditions substantially similar to those terms and conditions applicable to Recipient under this Agreement. Recipient will immediately give notice to Disclosing Party of any unauthorized use or disclosure of Disclosing Party's Confidential Information. Recipient will assist Disclosing Party in remedying any such unauthorized use or disclosure of Disclosing Party's Confidential Information.

3.      Exclusions from Nondisclosure and Nonuse Obligations. Recipient's obligations under Section 2 (Nondisclosure and Nonuse Obligations) will not apply to any of Disclosing Party's Confidential Information that Recipient can document: (a) was in the public domain at or subsequent to the time such Confidential Information was communicated to Recipient by Disclosing Party through no fault of Recipient; (b) was rightfully in Recipient's possession free of any obligation of confidence at or subsequent to the time such Confidential Information was communicated to Recipient by such Disclosing Party; (c) was developed by employees or agents of Recipient independently of and without

PLAINTIFF0000430

reference to any of Disclosing Party's Confidential Information; or (d) was communicated by Disclosing Party to an unaffiliated third party free of any obligation of confidence. A disclosure by Recipient of any of Disclosing Party's Confidential Information (i) in response to a valid order by a court or other governmental body; (ii) as otherwise required by law; or (iii) necessary to establish the rights of either party under this Agreement will not be considered to be a breach of this Agreement by such Recipient; provided, however, such Recipient will provide prompt prior written notice thereof to such Disclosing Party to enable Disclosing Party to seek a protective order or otherwise prevent such disclosure.

4. Ownership and Return of Confidential Information and Other Materials. All of Disclosing Party's Confidential Information, and any Derivatives (defined below) thereof, whether created by such Disclosing Party or Recipient, are the property of Disclosing Party and no license or other rights to such Disclosing Party's Confidential Information or Derivatives is granted or implied hereby. For purposes of this Agreement, "Derivatives" will mean: (a) for copyrightable or copyrighted material, any translation, abridgment, revision or other form in which an existing work may be recast, transformed or adapted; (b) for patentable or patented material, any improvement thereon; and (c) for material that is protected by trade secret, any new material derived from such existing trade secret material, including new material which may be protected under copyright, patent and/or trade secret laws. All materials (including, without limitation, documents, drawings, papers, diskettes, tapes, models, apparatus, sketches, designs and lists) furnished by Disclosing Party to Recipient (whether or not they contain or disclose Disclosing Party's Confidential Information) are the property of such Disclosing Party. Within five (5) days after any request by Disclosing Party, Recipient will destroy or deliver to Disclosing Party, at Disclosing Party's option, (i) all such Disclosing Party-furnished materials and (ii) all materials in Recipient's possession or control (even if not Disclosing Party-furnished) that contain or disclose any of such Disclosing Party's Confidential

Information. Recipient will provide Disclosing Party a written certification of Recipient's compliance with Recipient's obligations under this Section.

5. Independent Development. Recipient may currently or in the future be developing information internally, or receiving information from other parties that may be similar to such Disclosing Party's Confidential Information. Accordingly, nothing in this Agreement will be construed as a representation or inference that Recipient will not develop or have developed products or services, that, without violation of this Agreement, might compete with the products or systems contemplated by such Disclosing Party's Confidential Information.

6. Disclosure of Third Party Information. Neither party will communicate any information to the other in violation of the proprietary rights of any third party.

7. No Warranty. All Confidential Information is provided by Disclosing Party "AS IS" and without any warranty, express, implied or otherwise, regarding such Confidential Information's accuracy or performance. Recipient acknowledges and agrees that Disclosing Party will not be responsible or liable for any decisions made by Recipient in reliance upon disclosures made pursuant to this Agreement.

8. No Export. Recipient will obtain any licenses or approvals the U.S. government or any agency thereof requires prior to exporting, directly or indirectly, any technical data acquired from Disclosing Party pursuant to this Agreement or any product utilizing any such data.

9. Term. This Agreement will govern all communications between the parties from the Effective Date and remain in full force and effect for a period of five (5) years; provided, however, that a Recipient's obligations under Section 2 (Nondisclosure and Nonuse Obligations) will continue in perpetuity with respect to the Disclosing Party's Confidential Information that such Recipient has previously received unless such obligations no longer apply pursuant to

PLAINTIFF0000431

Section 3 (Exclusions from Nondisclosure and Nonuse Obligations).

10.   No Assignment.   Neither party will assign or transfer any rights or obligations under this Agreement without the prior written consent of the other party, which consent will not be unreasonably withheld.

11.   Injunctive Relief.  A breach by Recipient of this Agreement will cause irreparable and continuing damage to Disclosing Party for which money damages are insufficient, and Disclosing Party will be entitled to injunctive relief and/or a decree for specific performance, and such other relief as may be proper (including money damages if appropriate).

12.   Notices.   Any notice required or permitted by this Agreement will be in writing and will be delivered as follows, with notice deemed given as indicated:  (a) by personal delivery, when delivered personally;  (b) by overnight courier, upon written verification of receipt; (c) by or facsimile transmission, upon acknowledgment of receipt of electronic transmission; or (d) by certified or registered mail, return receipt requested, upon verification of receipt. Notice will be sent to the addresses set forth above or to such other address as either party may provide in writing.

13.   Governing Law; Forum.   This Agreement will be governed in all respects by the laws of the United States of America and by the laws of the State of Washington, as such laws are applied to agreements entered into and to be performed entirely within Washington between Washington residents.   Each of the parties irrevocably consents to the exclusive personal jurisdiction of the federal and state courts located in King County, Washington, as applicable, for any matter arising out of or relating to this Agreement, except that in actions seeking to enforce any order or any judgment of such federal or state courts located in King County, Washington, such personal jurisdiction will be nonexclusive.

14.   Severability.  If a court of law holds any provision of this Agreement to be illegal, invalid or unenforceable, (a) that provision will be deemed amended to achieve an economic effect that is as near as possible to that provided by the original provision  and (b) the legality, validity and enforceability of the remaining provisions of this Agreement will not be affected thereby.

15.   Waiver; Modification.  If a party waives any term, provision or a party's breach of this Agreement, such waiver will not be effective unless it is in writing and signed by the party against whom such waiver is asserted.  No waiver by a party of a breach of this Agreement by the other party will constitute a waiver of any other or subsequent breach by such other party.  This Agreement may be modified only if authorized representatives of both parties consent in writing.

16.   Entire Agreement.   This Agreement constitutes the entire agreement with respect to the Confidential Information disclosed hereunder and supersedes all prior or contemporaneous agreements   concerning   such   Confidential Information, written or oral.

PLAINTIFF0000432

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective Date.

"Company"                                          "Other Party"

DAOLABS IP CORPORATION                     [OTHER PARTY NAME]


By: _____       By: _____

Name: _____       Name: _____

Title: _____      Title: _____



Purpose: _____

_____

PLAINTIFF0000433

## MUTUAL CONFIDENTIALITY AGREEMENT (SHORT FORM)

1.  <u>When Used</u>.  DAOLABS IP CORPORATION ("Company") should use this form when either (a) Company and another party will **both disclose** to the other party any of such disclosing party's confidential information **and none of the information to be disclosed is technical**, **or** (b) when Company is **receiving** confidential information from another party who desires Company to sign a confidentiality agreement, and will not accept Company's form titled "Confidentiality Agreement (Disclosures to Company)."

2.  <u>To Be Completed Before Signing</u>.  Fill in the "Effective Date" and the other party's name and address, and check the appropriate box identifying whether the other party is an individual, partnership, limited liability partnership, corporation or limited liability company.

3.  <u>Signature</u>.  Have both parties sign the signature page.  For disclosures by or to Company of any tangible materials (documents, manuals, diskettes, tapes, cartridges, drawings, sketches, designs, etc.), each party may wish to have the other complete a Confidential Materials Release Form (a form of which is also provided) before disclosing or receiving (as applicable) the materials.

PLAINTIFF0000434

## MUTUAL CONFIDENTIALITY (SHORT FORM)

This Agreement is made and entered into, as of _____, 200_ ("Effective Date"), by and between DAOLABS IP CORPORATION ("Company"), having a principal place of business at 720 Third Avenue, Suite 1100, Seattle, WA 98104, and [OTHER PARTY NAME], a(n) ☐ individual, ☐ partnership, ☐ limited liability partnership, ☐ corporation, ☐ limited liability company (check the appropriate box) of the state of _____, having a principal place of business at [OTHER PARTY ADDRESS] ("Other Party")

1.   Definitions.  Company and Other Party recognize that there is a need to disclose to one another certain confidential information of each party for the purposes of evaluating whether to enter into a business relationship, and if they do, in carrying out their rights and obligations under that business relationship (the "Business Purpose"), and to protect such confidential information from unauthorized use and disclosure.  The term "Confidential Information" will mean any confidential, proprietary and trade secret information of the disclosing party which is (a) delivered in a tangible form that bears a "confidential," "proprietary," "secret," or similar legend, and (b) discussions relating to such information, whether those discussions occur concurrent with, or following disclosure of the information.

2.   Obligations of Receiving Party.  For two (2) years following initial disclosure of any Confidential Information, the receiving party ("Recipient") will (a) hold the other party's ("Disclosing Party") Confidential Information in confidence, (b) not disclose the Confidential Information to third parties, and (c) not use any Confidential Information for any purpose except for the Business Purpose.  The Recipient will treat all of Disclosing Party's Confidential Information with at least the same degree of care that it uses to protect its own confidential and proprietary information, but no less than a reasonable degree of care under the circumstances.  The Recipient may disclose the Confidential Information to its employees and contractors with a bona fide need to know in order to fulfill the Business Purpose, and who have signed a nondisclosure agreement at least as protective of the disclosing party's rights as those terms and conditions applicable to Recipient under this Agreement; provided that it is understood that barring a separate written agreement, access to Disclosing Party's Confidential Information will not restrict Recipient's assignment of any employees or contractors or restrict in any way Recipient's product plans.  The Recipient will not make any copies of the Confidential Information received from Disclosing Party except as necessary for its employees and contractors with a need to know to carry out the Business Purpose.  Any copies which are made will be identified as belonging to the disclosing party and marked "confidential" or with a similar legend.

3.   Exclusions from Obligation of Confidentiality.  The Recipient will not be liable for the use or disclosure of any Confidential Information which: (a) is now, or hereafter becomes, through no act or failure to act on the part of Recipient, generally known or available to the public; (b) is rightfully acquired by Recipient before receiving the information from Disclosing Party and without restriction as to use or disclosure; (c) is hereafter rightfully furnished to Recipient by a third party, without restriction as to use or disclosure; (d) is independently developed by employees of Recipient without reference to Disclosing Party's Confidential Information; or (e) is generally made available to third parties by Disclosing Party without restriction on disclosure.   A disclosure by Recipient in response to either a valid order by a court or other governmental body, or as otherwise required by law, will not be considered to be a breach of this Agreement; provided that Recipient provided Disclosing Party prompt prior written notice of the intended disclosure sufficient to enable Disclosing Party to seek a protective order or otherwise prevent such disclosure, and provided further that Recipient provides all cooperation to Disclosing Party at Disclosing Party's request and expense to prevent such disclosure.

1

PLAINTIFF0000435

4.    No Obligation of Disclosure.  Neither party has any obligation to disclose Confidential Information to the other. Either party may, at any time: (a) cease giving Confidential Information to the other party without any liability, and/or (b) request in writing the return of all or part of its Confidential Information previously disclosed, and all copies thereof, and Recipient will promptly comply with such request.  Recipient will provide Disclosing Party written certification of Recipient's compliance with Recipient's obligations under this Section within thirty (30) days of such request.

5.    Termination. Either party may terminate this Agreement at any time without cause upon written notice to the other party and Recipient's rights to use or disclose any of Disclosing Party's Confidential Information will terminate; provided that each party's obligations with respect to Confidential Information disclosed during the term of this Agreement will survive any termination or expiration of this Agreement.

6.    Ownership.    All    Confidential Information of each party, as Disclosing Party, will remain the property of such party and no license or other rights to such party's Confidential Information is granted or implied hereby.

7.    Warranty.  All Confidential Information is provided "AS IS" and without any warranty, express, implied or otherwise, regarding such Confidential Information's completeness, accuracy or performance.    Recipient acknowledges and agrees that Disclosing Party will not be responsible or liable for decisions made by Recipient in reliance upon disclosures made pursuant to this Agreement.

8.    Injunctive Relief. A breach by Recipient of any of the promises or agreements contained herein may result in irreparable and continuing damage to Disclosing Party for which there will be no adequate remedy at law, and Disclosing Party will be entitled to injunctive relief and/or a decree for specific performance, and such other relief as may be proper (including monetary damages if appropriate).

9.    General.   Neither party will assign or transfer any rights or obligations under this Agreement without the prior written consent of the other party, and any attempted assignment or transfer without such prior written consent will be null and void.  If any provision of this Agreement is held by a court of law to be illegal, invalid or unenforceable that provision will be deemed amended to achieve an economic effect that is as near as possible to that provided by the original provision.  This Agreement will be governed by the laws of the State of Washington without reference to conflict of laws principles.  Each of the parties irrevocably consents to the exclusive personal jurisdiction of the federal and state courts located in King County, Washington, as applicable, for any matter arising out of or relating to this Agreement.  Recipient will obtain any licenses or approvals the U.S. government or any agency thereof requires prior to exporting, directly or indirectly, any technical data acquired from Disclosing Party pursuant to this Agreement or any product utilizing any such data.   This Agreement constitutes the entire agreement with respect to the Confidential Information disclosed hereunder and supersedes any and all prior or contemporaneous oral or written agreements, negotiations, communications, understandings and terms, whether express or implied regarding the Confidential Information.  No subsequent alteration, waiver, amendment, change or addition to this Agreement ("Amendment") will be binding and valid unless in writing and signed by the parties, and then such Amendment will be effective only in the specific instance and for the specific purpose stated.

SE\9066575.1
999850-1

**PLAINTIFF0000436**

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective Date.

"Company"                                    "Other Party"

DAOLABS IP CORPORATION            [OTHER PARTY NAME]


By: _____     By: _____

Name: _____     Name: _____

Title: _____    Title: _____

3

PLAINTIFF0000437

# CONFIDENTIAL MATERIALS RELEASE FORM

1.  <u>When Used</u>. DAOLABS IP CORPORATION ("Company") may wish to use this form to **track** all tangible confidential material that Company **discloses to** or **receives from** a third party.  Use this form in conjunction with any Confidentiality Agreement under which Company will be disclosing or receiving confidential information, whether the agreement is provided by Company or provided by the receiving party.  Such a tracking system is useful for determining precisely what information was given to whom.  For example, at the termination of a confidential relationship, most contracts require the return or destruction of all disclosed materials.  This tracking system can help track the accomplishment of that obligation.  In addition, such a system can be useful in future infringement scenarios.

PLAINTIFF0000438

CONFIDENTIAL MATERIALS RELEASE FORM

To:

From:

Date:

Contact Person:

All materials released under this form are covered by the terms and conditions of:

Name of Contract: _____

Date of Contract: _____

Description of Materials Released:




Additional Restrictions and Comments:



Acknowledged and Agreed to by:

DAOLABS IP CORPORATION                   Accepting Party: _____

Date: _____        Date: _____


_____        _____
Signature                                 Signature

_____        _____
Print Name                                Print Name

Please sign above, print name and date and return to:

DAOLABS IP CORPORATION
720 Third Avenue, Suite 1100
Seattle, WA 98104

SE\9066575.1
999850-1

**PLAINTIFF0000439**

# INDEPENDENT CONTRACTOR
# SERVICES AGREEMENT

1.  <u>When Used</u>.  This agreement is to be used by DAOLABS IP CORPORATION ("Company") **when contracting to receive services to be performed by a third party**, including technical services.  The services to be performed would be described in the Project Assignments in <u>Exhibit A</u>.

2.  <u>To Be Completed Before Signing</u>.  Fill in the "Effective Date," and the independent contractor's ("Contractor") name and address, and check the appropriate box identifying whether Contractor is an individual, partnership, limited liability partnership, corporation, or limited liability company.  Fill in the date the agreement terminates in Section 9.  Meet with the manager responsible for overseeing Contractor's project and complete the Project Assignment form in <u>Exhibit A</u>.

3.  <u>Signature</u>.  Contractor must sign the signature page and all Project Assignments.

4.  <u>Indemnity</u>.  The agreement does not require Contractor to indemnify Company for intellectual property infringement claims, but there is a limited indemnity in Section 8.  If Company desires to include a provision whereby Contractor would indemnify Company for infringement or any other claims, please contact DLA Piper Rudnick Gray Cary US LLP for further assistance.

5.  <u>Confidentiality</u>.  The agreement contains a confidentiality provision so there is no need to sign a separate confidentiality agreement with the contractor.  If a separate confidentiality agreement has already been signed, the provisions of this agreement, as drafted, will supersede the prior agreement.

PLAINTIFF0000440

## INDEPENDENT CONTRACTOR SERVICES AGREEMENT

This Agreement is made and entered into, as of _____, 200_ ("Effective Date"), by and between DAOLABS IP CORPORATION ("Company"), having a principal place of business at 720 Third Avenue, Suite 1100, Seattle, WA 98104, and [CONTRACTOR NAME], a(n) ☐individual, ☐partnership, ☐limited liability partnership, ☐corporation, ☐limited liability company (check the appropriate box) of the state of _____, having a principal place of business at [CONTRACTOR ADDRESS] ("Contractor").

1.   <u>Engagement of Services</u>.  Company may issue Project Assignments to Contractor in the form attached to this Agreement as <u>Exhibit A</u> (Project Assignment).  A Project Assignment will become binding when both parties have signed it and once signed, Contractor will be obligated to provide the services as specified in such Project Assignment. The terms of this Agreement will govern all Project Assignments and services undertaken by Contractor for Company. Contractor will not subcontract or otherwise delegate performance of any work to third parties ("Subcontractors") without, in each instance, first executing an agreement with each Subcontractor that contains (a) confidentiality provisions substantially similar to Contractor's confidentiality obligations under this Agreement, and (b) intellectual property rights provisions that, among other things, assign all Company Innovations (defined below) resulting from such Subcontractor's work to Contractor.  Company will have the right to approve the form of such confidentiality and assignment agreements between Contractor and Subcontractors, or to provide its own form of agreement for execution by Subcontractors.  Upon request by Company, Contractor will provide copies of all confidentiality and proprietary rights assignment agreements executed by Subcontractors performing services for Company's benefit.

2.   <u>Compensation; Timing</u>.  Company will pay Contractor the fee set forth in each Project Assignment for the services provided as specified in such Project Assignment.  If provided for in the Project Assignment, Company will reimburse Contractor's expenses no later than thirty (30) days after Company's receipt of Contractor's invoice, provided that reimbursement for expenses may be delayed until such time as Contractor has furnished reasonable documentation for authorized expenses as Company may reasonably request.  Upon termination of this Agreement for any reason, Contractor will be (a) paid fees on the basis stated in the Project Assignment(s) and (b) reimbursed only for expenses that are incurred prior to termination of this Agreement and which are either expressly identified in a Project Assignment or approved in advance in writing by an authorized Company manager.

3.   <u>Independent Contractor Relationship</u>. Contractor's relationship with Company is that of an independent contractor, and nothing in this Agreement is intended to, or will be construed to, create a partnership, agency, joint venture, employment or similar relationship.  Contractor will not be entitled to any of the benefits that Company may make available to its employees, including, but not limited to, group health or life insurance, profit-sharing or retirement benefits.  Contractor is not authorized to make any representation, contract or commitment on behalf of Company unless specifically requested or authorized in writing to do so by a Company manager.  Contractor is solely responsible for, and will file, on a timely basis, all tax returns and payments required to be filed with, or made to, any federal, state or local tax authority with respect to the performance of services and receipt of fees under this Agreement.  Contractor is solely responsible for, and must maintain adequate records of, expenses incurred in the course of performing services under this Agreement.  No part of Contractor's compensation will be subject to withholding by Company for the payment of any social security, federal, state or any other employee payroll taxes.  Company will regularly report amounts paid to Contractor by filing Form 1099-MISC with the Internal Revenue Service as required by law.

1

PLAINTIFF0000441

4. Disclosure and Assignment of Work Resulting from Project Assignments.

4.1 "Innovations" and "Company Innovations" Definitions. "Innovations" means all discoveries, designs, developments, improvements, inventions (whether or not protectable under patent laws), works of authorship, information fixed in any tangible medium of expression (whether or not protectable under copyright laws), trade secrets, know-how, ideas (whether or not protectable under trade secret laws), mask works, trademarks, service marks, trade names and trade dress. "Company Innovations" means Innovations that Contractor, solely or jointly with others, conceives, develops or reduces to practice related to any Project Assignment.

4.2 Disclosure and Assignment of Company Innovations. Contractor agrees to maintain adequate and current records of all Company Innovations, which records will be and remain the property of Company. Contractor agrees to promptly disclose and describe to Company all Company Innovations. Contractor hereby does and will assign to Company or Company's designee all of Contractor's right, title and interest in and to any and all Company Innovations and all associated records. To the extent any of the rights, title and interest in and to Company Innovations cannot be assigned by Contractor to Company, Contractor hereby grants to Company an exclusive, royalty-free, transferable, irrevocable, worldwide license (with rights to sublicense through multiple tiers of sublicensees) to practice such non-assignable rights, title and interest. To the extent any of the rights, title and interest in and to the Company Innovations can neither be assigned nor licensed by Contractor to Company, Contractor hereby irrevocably waives and agrees never to assert such non-assignable and non-licensable rights, title and interest against Company or any of Company's successors in interest.

4.3 Assistance. Contractor agrees to perform, during and after the term of this Agreement, all acts that Company deems necessary or desirable to permit and assist Company, at its expense, in obtaining, perfecting and enforcing the full benefits, enjoyment, rights and title throughout the world in the Company Innovations as provided to Company under this Agreement. If Company is unable for any reason to secure Contractor's signature to any document required to file, prosecute, register or memorialize the assignment of any rights under any Company Innovations as provided under this Agreement, Contractor hereby irrevocably designates and appoints Company and Company's duly authorized officers and agents as Contractor's agents and attorneys-in-fact to act for and on Contractor's behalf and instead of Contractor to take all lawfully permitted acts to further the filing, prosecution, registration, memorialization of assignment, issuance and enforcement of rights under such Company Innovations, all with the same legal force and effect as if executed by Contractor. The foregoing is deemed a power coupled with an interest and is irrevocable.

4.4 Out-of-Scope Innovations. If Contractor incorporates or permits to be incorporated any Innovations relating in any way, at the time of conception, reduction to practice, creation, derivation, development or making of such Innovation, to Company's business or actual or demonstrably anticipated research or development but which were conceived, reduced to practice, created, derived, developed or made by Contractor (solely or jointly) either unrelated to Contractor's work for Company under this Agreement or prior to the Effective Date (collectively, the "Out-of-Scope Innovations") into any of the Company Innovations, then Contractor hereby grants to Company and Company's designees a non-exclusive, royalty-free, irrevocable, worldwide, fully paid-up license (with rights to sublicense through multiple tiers of sublicensees) to practice all patent, copyright, moral right, mask work, trade secret and other intellectual property rights relating to such Out-of-Scope Innovations. Notwithstanding the foregoing, Contractor agrees that Contractor will not incorporate, or permit to be incorporated, any Innovations conceived, reduced to practice, created, derived, developed or made by others or any Out-of-Scope Innovations into any Company Innovations without Company's prior written consent.

PLAINTIFF0000442

5.     Confidentiality.

5.1     Definition of Confidential Information.  "Confidential Information" means (a) any technical and non-technical information related to the Company's business and current, future and proposed products and services of Company, including for example and without limitation, Company Innovations, Company Property (as defined in Section 6 ("Ownership and Return of Confidential Information and Company Property")), and Company's information concerning research, development, design details and specifications, financial information, procurement requirements, engineering and manufacturing information, customer lists, business forecasts, sales information and marketing plans and (b) any information that may be made known to Contractor and that Company has received from others that Company is obligated to treat as confidential or proprietary.

5.2     Nondisclosure and Nonuse Obligations.  Except as permitted in this Section, Contractor will not use, disseminate or in any way disclose the Confidential Information. Contractor may use the Confidential Information solely to perform Project Assignment(s) for the benefit of Company.  Contractor will treat all Confidential Information with the same degree of care as Contractor accords to Contractor's own confidential information, but in no case will Contractor use less than reasonable care.  If Contractor is not an individual, Contractor will disclose Confidential Information only to those of Contractor's employees who have a need to know such information.  Contractor certifies that each such employee will  have agreed, either as a condition of employment or in order to obtain the Confidential Information, to be bound by terms and conditions at least as protective as those terms and conditions applicable to Contractor under this Agreement.  Contractor will immediately give notice to Company of any unauthorized use or disclosure of the Confidential Information. Contractor will assist Company in remedying any such unauthorized use or disclosure of the Confidential Information. Contractor agrees not to communicate any information to Company in violation of the proprietary rights of any third party.

5.3     Exclusions from Nondisclosure and Nonuse Obligations.  Contractor's obligations under Section 5.2 (Nondisclosure and Nonuse Obligations) will not apply to any Confidential Information that Contractor can demonstrate (a) was in the public domain at or subsequent to the time such Confidential Information was communicated to Contractor by Company through no fault of Contractor; (b) was rightfully in Contractor's possession free of any obligation of confidence at or subsequent to the time such Confidential Information was communicated to Contractor by Company; or (c) was developed by employees of Contractor independently of and without reference to any Confidential Information communicated to Contractor by Company.  A disclosure of any Confidential Information by Contractor (i) in response to a valid order by a court or other governmental body or (ii) as otherwise required by law will not be considered to be a breach of this Agreement or a waiver of confidentiality for other purposes; provided, however, that Contractor will provide prompt prior written notice thereof to Company to enable Company to seek a protective order or otherwise prevent such disclosure.

6.     Ownership and Return of Confidential Information and Company Property.    All Confidential Information and any materials (including, without limitation, documents, drawings, papers, diskettes, tapes, models, apparatus, sketches, designs and lists) furnished to Contractor by Company, whether delivered to Contractor by Company or made by Contractor in the performance of services under this Agreement and whether or not they contain or disclose Confidential Information (collectively, the "Company Property"), are the sole and exclusive property of Company or Company's suppliers or customers.    Contractor agrees to keep all Company Property at Contractor's premises unless otherwise permitted in writing by Company. Within five (5) days after any request by Company, Contractor will destroy or deliver to Company, at Company's option, (a) all Company Property and (b) all materials in

PLAINTIFF0000443

Contractor's possession or control that contain or disclose any Confidential Information. Contractor will provide Company a written certification of Contractor's compliance with Contractor's obligations under this Section.

7.      Observance of Company Rules.  At all times while on Company's premises, Contractor will observe Company's rules and regulations with respect to conduct, health, safety and protection of persons and property.

8.      No Conflict of Interest.  During the term of this Agreement, Contractor will not accept work, enter into a contract or accept an obligation inconsistent or incompatible with Contractor's obligations, or the scope of services to be rendered for Company, under this Agreement. Contractor warrants that, to the best of Contractor's knowledge, there is no other existing contract or duty on Contractor's part that conflicts with or is inconsistent with this Agreement.   Contractor agrees to indemnify Company from any and all loss or liability incurred by reason of the alleged breach by Contractor of any services agreement with any third party.

9.      Term and Termination.

        9.1     Term.   This Agreement is effective as of the Effective Date set forth above and will terminate on _____ unless terminated earlier as set forth below.

        9.2     Termination by Company. Except during the term of a Project Assignment, Company may terminate this Agreement without cause at any time, with termination effective fifteen (15) days after Company's delivery to Contractor of written notice of termination. Company also may terminate this Agreement (a) immediately upon Contractor's breach of Section 4 (Disclosure and Assignment of Work Resulting from Project Assignments), 5 (Confidentiality) or 10 (Noninterference with Business), or (b) immediately for a material breach by Contractor if Contractor's material breach of any other provision under this Agreement or obligation under a Project

Assignment is not cured within ten (10) days after the date of Company's  written notice of breach.

        9.3     Termination by Contractor. Contractor may terminate this Agreement without cause at any time, with termination effective fifteen (15) days after Contractor's delivery to Company of written notice of termination.  Contractor also may terminate this Agreement immediately for a material breach by Company if Company's material breach of any provision of this Agreement is not cured within ten (10) days after the date of Contractor's written notice of breach.

        9.4     Effect of Expiration or Termination.  Upon expiration or termination of this Agreement, Company will pay Contractor for services performed under this Agreement as set forth in each then pending Project Assignment(s). The definitions contained in this Agreement and the rights and obligations contained in this Section and Sections 4 (Disclosure and Assignment of Work Resulting from Project Assignments), 5 (Confidentiality), 6 (Ownership and Return of Confidential Information and Company Property),   10 (Noninterference with Business) and 11 (General Provisions) will survive any termination or expiration of this Agreement.

10.     Noninterference with Business.  During this Agreement, and for a period of two (2) years immediately following the termination or expiration of this Agreement, Contractor agrees not to solicit or induce any employee or independent contractor to terminate or breach an employment, contractual or other relationship with Company.

11.     General Provisions.

        11.1    Successors and Assigns. Contractor may not subcontract or otherwise delegate Contractor's obligations under this Agreement without Company's prior written consent.     Subject to the foregoing, this Agreement will be for the benefit of Company's successors and assigns, and will be binding on Contractor's assignees.

PLAINTIFF0000444

11.2 <u>Injunctive Relief</u>. Contractor's obligations under this Agreement are of a unique character that gives them particular value; Contractor's breach of any of such obligations will result in irreparable and continuing damage to Company for which money damages are insufficient, and Company will be entitled to injunctive relief and/or a decree for specific performance, and such other relief as may be proper (including money damages if appropriate).

11.3 <u>Notices</u>. Any notice required or permitted by this Agreement will be in writing and will be delivered as follows, with notice deemed given as indicated: (a) by personal delivery, when actually delivered; (b) by overnight courier, upon written verification of receipt; (c) by facsimile transmission, upon acknowledgment of receipt of electronic transmission; or (d) by certified or registered mail, return receipt requested, upon verification of receipt. Notice will be sent to the addresses set forth above or to such other address as either party may provide in writing.

11.4 <u>Governing Law; Forum</u>. This Agreement will be governed in all respects by the laws of the United States of America and by the laws of the State of Washington, as such laws are applied to agreements entered into and to be performed entirely within Washington between Washington residents. Each of the parties irrevocably consents to the exclusive personal jurisdiction of the federal and state courts located in King County, Washington, as applicable, for any matter arising out of or relating to this Agreement, except that in actions seeking to enforce any order or any judgment of such federal or state courts located in King County, Washington, such personal jurisdiction will be nonexclusive.

11.5 <u>Severability</u>. If a court of law holds any provision of this Agreement to be illegal, invalid or unenforceable, (a) that provision will be deemed amended to achieve an economic effect that is as near as possible to that provided by the original provision and (b) the legality, validity and enforceability of the remaining provisions of this Agreement will not be affected thereby.

11.6 <u>Waiver; Modification</u>. If Company waives any term, provision or Contractor's breach of this Agreement, such waiver will not be effective unless it is in writing and signed by Company. No waiver by a party of a breach of this Agreement will constitute a waiver of any other or subsequent breach by Contractor. This Agreement may be modified only by mutual written agreement of authorized representatives of the parties.

11.7 <u>Entire Agreement</u>. This Agreement constitutes the entire agreement between the parties relating to this subject matter and supersedes all prior or contemporaneous agreements concerning such subject matter, written or oral.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

"Company"                                      "Contractor"

DAOLABS IP CORPORATION          [CONTRACTOR NAME]

By: _____          By: _____

Name: _____          Name: _____

Title: _____          Title: _____

PLAINTIFF0000445

EXHIBIT A

PROJECT ASSIGNMENT

Services                                    Milestones

Acceptance Criteria                         Acceptance Procedure

Payment of Fees.  Fee will be **(CHECK ONE)**:

       ™       a fixed price for completion of $_____

       ™       based on a rate per hour of $_____

       ™       other, as follows **(describe payment)**:

       If either party for any reason terminates this Project Assignment or the Independent Contractor Services Agreement that governs it, fees will be paid based on **(CHECK ONE)**:

       ™       Contractor time spent.

       ™       the proportion of the deliverables furnished Company, as determined by Company.

       ™       other, as follows **(describe payment)**:

Expenses.  Company will reimburse Contractor for the following expenses incurred in connection with this Project Assignment upon receipt of proper documentation of those expenses from Contractor **(describe expenses)**:

PLAINTIFF0000446

NOTE:  This Project Assignment is governed by the terms of an Independent Contractor Services Agreement in effect between Company and Contractor.  Any item in this Project Assignment that is inconsistent with such agreement is invalid.

       IN WITNESS WHEREOF, the parties have executed this Project Assignment as of the later date below.

"Company"                                             "Contractor"

DAOLABS IP CORPORATION                [CONTRACTOR NAME]

By: _____        By: _____

Name: _____        Name: _____

Title: _____        Title: _____

Date: _____        Date: _____

PLAINTIFF0000447