

Company's Repurchase Option, where (i) any stock dividend, stock split or other change in the Shares, (ii) any dividend of cash or other property on the Shares, or (iii) any merger or sale of all or

substantially all of the assets or other acquisition of the Company, any and all new, substituted or additional securities or cash or other consideration to which the Purchaser is entitled by reason of the Purchaser's ownership of the Shares shall immediately become subject to this escrow, deposited with the Escrow Agent and included thereafter as "*Shares*" for purposes of this Agreement and the Company's Repurchase Option.

## 9. Tax Consequences.

The Purchaser has reviewed with the Purchaser's own tax advisors the federal, state, local and foreign tax consequences of this investment and the transactions contemplated by this Agreement. The Purchaser is relying solely on such advisors and not on any statements or representations of the Company or any of its agents. The Purchaser understands that the Purchaser (and not the Company) shall be responsible for any tax liability that may arise as a result of the transactions contemplated by this Agreement. The Purchaser understands that Section 83 of the Code, taxes as ordinary income the difference between the purchase price for the Shares and the fair market value of the Shares as of the date any restrictions on the Shares lapse. In this context, "restriction" includes the right of the Company to buy back the Shares pursuant to the Repurchase Option. The Purchaser understands that the Purchaser may elect to be taxed at the time the Shares are purchased rather than when and as the Repurchase Option expires by filing an election under Section 83(b) of the Code with the IRS within 30 days from the date of purchase. **The form for making this section 83(b) election is attached to this agreement as *Exhibit D* and the Purchaser (and not the Company or any of its agents) shall be solely responsible for appropriately filing such form, even if the purchaser requests the company or its agents to make this filing on THE purchaser's behalf.**

## 10. General Provisions.

A. *Choice of Law.* This Agreement shall be governed by the internal substantive laws, but not the choice of law rules, of [California].

B. *Integration.* This Agreement, including all exhibits hereto, represents the entire agreement between the parties with respect to the purchase of the Shares by the Purchaser and supersedes and replaces any and all prior written or oral agreements regarding the subject matter of this Agreement including, but not limited to, any representations made during any interviews, relocation discussions or negotiations whether written or oral.

C. *Notices.* Any notice, demand, offer, request or other communication required or permitted to be given by either the Company or the

PLAINTIFF0002437

Purchaser pursuant to the terms of this Agreement shall be in writing and shall be deemed effectively given the earlier of (i) when received, (ii) when delivered personally, (iii) one business day after being delivered by facsimile (with receipt of appropriate confirmation), (iv) one business day after being deposited with an overnight courier service or (v) four days after being deposited in the U.S. mail, First Class with postage prepaid and return receipt requested, and addressed to the parties at the addresses provided to the Company (which the Company agrees to disclose to the other parties upon request) or such other address as a party may request by notifying the other in writing.



D. **_Successors._** Any successor to the Company (whether direct or indirect and whether by purchase, merger, consolidation, liquidation or otherwise) to all or substantially all of the Company's business and/or assets shall assume the obligations under this Agreement and agree expressly to perform the obligations under this Agreement in the same manner and to the same extent as the Company would be required to perform such obligations in the absence of a succession. For all purposes under this Agreement, the term "Company" shall include any successor to the Company's business and/or assets which executes and delivers the assumption agreement described in this section or which becomes bound by the terms of this Agreement by operation of law. Subject to the restrictions on transfer set forth in this Agreement, this Agreement shall be binding upon the Purchaser and his or her heirs, executors, administrators, successors and assigns.

E. **_Assignment; Transfers._** Except as set forth in this Agreement, this Agreement, and any and all rights, duties and obligations hereunder, shall not be assigned, transferred, delegated or sublicensed by the Purchaser without the prior written consent of the Company. Any attempt by the Purchaser without such consent to assign, transfer, delegate or sublicense any rights, duties or obligations that arise under this Agreement shall be void. Except as set forth in this Agreement, any transfers in violation of any restriction upon transfer contained in any section of this Agreement shall be void, unless such restriction is waived in accordance with the terms of this Agreement.

F. **_Waiver._** Either party's failure to enforce any provision of this Agreement shall not in any way be construed as a waiver of any such provision, nor prevent that party from thereafter enforcing any other provision of this Agreement. The rights granted both parties hereunder are cumulative and shall not constitute a waiver of either party's right to assert any other legal remedy available to it.

G. **_Purchaser Investment Representations and Further Documents._** The Purchaser agrees upon request to execute any further documents or instruments necessary or reasonably desirable in the view of the Company to carry out the purposes or intent of this Agreement, including (but not limited to) the applicable exhibits and attachments

PLAINTIFF0002438

including (but not limited to) the applicable exhibits and attachments to this Agreement.



H. **Severability.** Should any provision of this Agreement be found to be illegal or unenforceable, the other provisions shall nevertheless remain effective and shall remain enforceable to the greatest extent permitted by law.

I. **Rights as Stockholder.** Subject to the terms and conditions of this Agreement, the Purchaser shall have all of the rights of a stockholder of the Company with respect to the Shares from and after the date that the Purchaser delivers a fully executed copy of this Agreement (including the applicable exhibits and attachments to this Agreement) and full payment for the Shares to the Company, and until such time as the Purchaser disposes of the Shares in accordance with this Agreement. Upon such transfer, the Purchaser shall have no further rights as a holder of the Shares so purchased except (in the case of a transfer to the Company) the right to receive payment for the Shares so purchased in accordance with the provisions of this Agreement, and the Purchaser shall forthwith cause the certificate(s) evidencing the Shares so purchased to be surrendered to the Company for transfer or cancellation.

J. **Adjustment for Stock Split.** All references to the number of Shares and the purchase price of the Shares in this Agreement shall be adjusted to reflect any stock split, stock dividend or other change in the Shares which may be made after the date of this Agreement.

K. **Employment at Will.** THE PURCHASER ACKNOWLEDGES AND AGREES THAT THE VESTING OF SHARES PURSUANT TO THIS AGREEMENT IS EARNED ONLY BY CONTINUING SERVICE AS A SERVICE PROVIDER AT WILL (AND NOT THROUGH THE ACT OF BEING HIRED OR PURCHASING SHARES HEREUNDER). THE PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREUNDER AND THE VESTING SCHEDULE SET FORTH HEREIN DO NOT CONSTITUTE AN EXPRESS OR IMPLIED PROMISE OF CONTINUED ENGAGEMENT AS A SERVICE PROVIDER FOR THE VESTING PERIOD, OR FOR ANY PERIOD AT ALL, AND SHALL NOT INTERFERE WITH THE PURCHASER'S RIGHT OR THE COMPANY'S RIGHT TO TERMINATE THE PURCHASER'S RELATIONSHIP WITH THE COMPANY AT ANY TIME, WITH OR WITHOUT CAUSE OR NOTICE.

L. **Arbitration and Equitable Relief.**

(1) *Arbitration.* IN CONSIDERATION OF THE PROMISES IN THIS AGREEMENT, THE PURCHASER AGREES THAT Any and all controversies, claims, or disputes with anyone (including the Company and any employee, officer, director, shareholder or benefit plan of the Company in their capacity as such or otherwise) arising out of, relating to, or resulting from this Agreement, shall be subject to binding arbitration under the Arbitration Rules set forth in California Code of

PLAINTIFF0002439



Civil Procedure Section 1280 through 1294.2, including
Section 1283.05 (the "*Rules*") and pursuant to California
law. Disputes which the Purchaser agrees to arbitrate, and
thereby agreeS to waive any right to a trial by jury,
include any statutory claims under state or federal law,
including, but not limited to, claims under Title VII of the
Civil Rights Act of 1964, The Americans with Disabilities
Act of 1990, The Age Discrimination in Employment Act of
1967, the Older Workers Benefit Protection Act, the Worker
Adjustment and Retraining Notification Act, the California
Fair Employment and Housing Act, the Family and Medical
Leave Act, the California Family Rights Act, the California
Labor Code, claims of harassment, discrimination or wrongful
termination and any statutory claims. the Purchaser further
understands that this Agreement to arbitrate also applies to
any disputes that the Company may have with the purchaser.

(2) *Procedure.* the purchaser agrees that any arbitration
will be administered by the American Arbitration Association
("*AAA*") and that the neutral arbitrator will be selected in
a manner consistent with its national rules for the
resolution of employment disputes. THE Purchaser agrees that
the arbitrator shall have the power to decide any motions
brought by any party to the arbitration, including motions
for summary judgment and/or adjudication and motions to
dismiss and demurrers, prior to any arbitration hearing. THE
Purchaser also agrees that the arbitrator shall have the
power to award any remedies, including attorneys' fees and
costs, available under applicable law. Purchaser understands
that the Company will pay for any administrative or hearing
fees charged by the arbitrator or AAA except that Purchaser
shall pay the first $125.00 of any filing fees associated
with any arbitration Purchaser initiates. Purchaser agrees
that the arbitrator shall administer and conduct any
arbitration in a manner consistent with the rules and that
to the extent that the AAA's National Rules for the
Resolution of Employment Disputes conflict with the Rules,
the Rules shall take precedence. The purchaser agrees that
The decision of the arbitrator shall be in writing.

(3) *Remedy.* Except as provided by the Rules and this
Agreement, arbitration shall be the sole, exclusive and
final remedy for any dispute between the Purchaser and the
Company. Accordingly, except as provided for by the Rules
and this Agreement, neither the Purchaser NOR the Company
will be permitted to pursue court action regarding claims
that are subject to arbitration. Notwithstanding, the
arbitrator will not have the authority to disregard or
refuse to enforce any lawful Company policy, and the

**PLAINTIFF0002440**

arbitrator shall not order or require the Company to adopt a policy not otherwise required by law which the Company has not adopted.



(4) *Availability of Injunctive Relief.* Both parties agree that any party may petition a court for injunctive relief as permitted by the rules including, but not limited to, where either party alleges or claims a violation of any confidential information or invention assignment agreement between the Purchaser and the Company or any other agreement regarding trade secrets, confidential information, nonsolicitation or Labor Code §2870. Both parties understand that any breach or threatened breach of such an agreement will cause irreparable injury and that money damages will not provide an adequate remedy therefor and both parties hereby consent to the issuance of an injunction. In the event either party seeks injunctive relief, the prevailing party shall be entitled to recover reasonable costs and attorneys' fees.

(5) *Administrative Relief.* The Purchaser understands that this Agreement does not prohibit the Purchaser from pursuing an administrative claim with a local, state or federal administrative body such as the Department of Fair Employment and Housing, the Equal employment Opportunity Commission or the Workers' Compensation Board. This agreement does, however, preclude the Purchaser from pursuing court action regarding any such claim.

(6) *Voluntary Nature of Agreement.* the purchaser acknowledges and agrees that the Purchaser is executing this agreement voluntarily and without any duress or undue influence by the Company or anyone else. the Purchaser further acknowledges and agrees that the Purchaser has carefully read this Agreement and that the Purchaser has asked any questions needed for the Purchaser to understand the terms, consequences and binding effect of this Agreement and fully understands it, including that ***the Purchaser is waiving THE Purchaser's right to a jury trial***. Finally, the Purchaser agrees that the Purchaser has been provided an opportunity to seek the advice of an attorney of THE Purchaser's choice before signing this Agreement.

M. ***Reliance on Counsel and Advisors.*** The Purchaser acknowledges that [Attorney-name], is representing only the Company in this transaction. The Purchaser acknowledges that he or she has had the opportunity to review this Agreement, including all attachments hereto, and the transactions contemplated by this Agreement with his or her own legal counsel, tax advisors and other advisors. The Purchaser is relying solely on his or her own counsel and advisors and not on any

**PLAINTIFF0002441**

statements or representations of the Company or its agents for legal or other advice with respect to this investment or the transactions contemplated by this Agreement.

N. **_Counterparts._** This Agreement may be executed in one or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same agreement. Facsimile copies of signed signature pages shall be binding originals.



[Signature page to follow]

The parties represent that they have read this Agreement in its entirety, have had an opportunity to obtain the advice of counsel prior to executing this Agreement and fully understand this Agreement. The Purchaser agrees to notify the Company of any change in his or her address below.

| PURCHASER | THE COMPANY |
| --- | --- |
| Signature: _____ | Signature: _____ |
| Print Name: [Purchaser-name] | Print Name: [Entity-signer-name] |
| Role: [Purchaser-role] | Role: [Entity-signer-role] |
| Dated: [Date] | Dated: [Date] |
| Address: [Purchaser-address] | Address: [Entity-address] |

# Exhibit A

### INVESTMENT REPRESENTATION STATEMENT

| INVESTMENT |
| --- |
| PURCHASER: **[Purchaser-name]** |
| COMPANY: **[Entity-name]** |
| SECURITY: Common Stock |
| AMOUNT: **[Share-amount]** |
| DATE: **[Date]** |

In connection with the purchase of the above-listed shares, I, the undersigned purchaser, represent to the Company as follows:

1. **_The Company may rely on these representations._** I understand that the Company's sale of the shares to me has not been registered under the Securities Act of 1933, as amended (the "**_Securities_**

PLAINTIFF0002442



Act"), because the Company believes, relying in part on my representations in this document, that an exemption from such registration requirement is available for such sale. I understand that the availability of this exemption depends upon the representations I am making to the Company in this document being true and correct.

2. *I am purchasing for investment.* I am purchasing the shares solely for investment purposes, and not for further distribution. My entire legal and beneficial ownership interest in the shares is being purchased and shall be held solely for my account, except to the extent I intend to hold the shares jointly with my spouse. I am not a party to, and do not presently intend to enter into, any contract or other arrangement with any other person or entity involving the resale, transfer, grant of participation with respect to or other distribution of any of the shares. My investment intent is not limited to my present intention to hold the shares for the minimum capital gains period specified under any applicable tax law, for a deferred sale, for a specified increase or decrease in the market price of the shares, or for any other fixed period in the future.

3. *I can protect my own interests.* I can properly evaluate the merits and risks of an investment in the shares and can protect my own interests in this regard, whether by reason of my own business and financial expertise, the business and financial expertise of certain professional advisors unaffiliated with the Company with whom I have consulted, or my preexisting business or personal relationship with the Company or any of its officers, directors or controlling persons.

4. *I am informed about the Company.* I am sufficiently aware of the Company's business affairs and financial condition to reach an informed and knowledgeable decision to acquire the shares. I have had opportunity to discuss the plans, operations and financial condition of the Company with its officers, directors or controlling persons, and have received all information I deem appropriate for assessing the risk of an investment in the shares.

5. *I recognize my economic risk.* I realize that the purchase of the shares involves a high degree of risk, and that the Company's future prospects are uncertain. I am able to hold the shares indefinitely if required, and am able to bear the loss of my entire investment in the shares.

6. *I know that the shares are restricted securities.* I understand that the shares are "restricted securities" in that the Company's sale of the shares to me has not been registered under the Securities Act in reliance upon an exemption for non-public

**PLAINTIFF0002443**

offerings. In this regard, I also understand and agree that:



A. I must hold the shares indefinitely, unless any subsequent proposed resale by me is registered under the Securities Act, or unless an exemption from registration is otherwise available (such as Rule 144);

B. the Company is under no obligation to register any subsequent proposed resale of the shares by me; *and*

C. the certificate evidencing the shares will be imprinted with a legend which prohibits the transfer of the shares unless such transfer is registered or such registration is not required in the opinion of counsel for the Company.

7. *I am familiar with Rule 144.* I am familiar with Rule 144 adopted under the Securities Act, which in some circumstances permits limited public resales of "restricted securities" like the shares acquired from an issuer in a non-public offering. I understand that my ability to sell the shares under Rule 144 in the future is uncertain, and may depend upon, among other things: (i) the availability of certain current public information about the Company; (ii) the resale occurring more than a specified period after my purchase and full payment (within the meaning of Rule 144) for the shares; and (iii) if I am an affiliate of the Company (A) the sale being made in an unsolicited "broker's transaction", transactions directly with a market maker or riskless principal transactions, as those terms are defined under the Securities Exchange Act of 1934, as amended, (B) the amount of shares being sold during any three-month period not exceeding the specified limitations stated in Rule 144, *and* (C) timely filing of a notice of proposed sale on Form 144, if applicable.

8. *I know that Rule 144 may never be available.* I understand that the requirements of Rule 144 may never be met, and that the shares may never be saleable under the rule. I further understand that at the time I wish to sell the shares, there may be no public market for the Company's stock upon which to make such a sale, or the current public information requirements of Rule 144 may not be satisfied, either of which may preclude me from selling the shares under Rule 144 even if the relevant holding period had been satisfied.

9. *I know that I am subject to further restrictions on resale.* I understand that in the event Rule 144 is not available to me, any future proposed sale of any of the shares by me will not be possible without prior registration under the Securities Act, compliance with some other registration exemption (which may

PLAINTIFF0002444



may not be available), or *each* of the following: (i) my written notice to the Company containing detailed information regarding the proposed sale, (ii) my providing an opinion of my counsel to the effect that such sale will not require registration, and (iii) the Company notifying me in writing that its counsel concurs in such opinion. I understand that neither the Company nor its counsel is obligated to provide me with any such opinion. I understand that although Rule 144 is not exclusive, the Staff of the SEC has stated that persons proposing to sell private placement securities other than in a registered offering or pursuant to Rule 144 will have a substantial burden of proof in establishing that an exemption from registration is available for such offers or sales, and that such persons and their respective brokers who participate in such transactions do so at their own risk.

10. ***I know that I may have tax liability due to the uncertain value of the shares.*** I understand that the board of directors believes its valuation of the shares represents a fair appraisal of their worth, but that it remains possible that, with the benefit of hindsight, the Internal Revenue Service may successfully assert that the value of the shares on the date of my purchase is substantially greater than the Board's appraisal. I understand that any additional value ascribed to the shares by such an IRS determination will constitute ordinary income to me as of the purchase date, and that any additional taxes and interest due as a result will be my sole responsibility payable only by me, and that the Company need not and will not reimburse me for that tax liability.

11. ***Residence.*** The address of my principal residence is set forth on the signature page below.

By signing below, I acknowledge my agreement with each of the statements contained in this Investment Representation Statement as of the date first set forth above, and my intent for the Company to rely on such statements in issuing the shares to me.

| PURCHASER |
| --- |
| Signature: _____ |
| Print Name: [Purchaser-name] |
| Role: Purchaser |
| Dated: [Date] |
| Address of Purchaser's principal residence: [Purchaser-address] |

PLAINTIFF0002445

# Exhibit B



**STOCK POWER AND ASSIGNMENT**

**SEPARATE FROM CERTIFICATE**

FOR VALUE RECEIVED and pursuant to that certain Restricted Stock Purchase Agreement dated as of **[Date],** the undersigned hereby sells, assigns and transfers unto **[Purchaser-name]**, **[Share-amount]** shares of Common Stock of **[Entity-name]**, a Delaware corporation, standing in the undersigned's name on the books of said corporation represented by certificate number **[Certificate-number]** delivered herewith, and does hereby irrevocably constitute and appoint **[Attorney-name]** as attorney-in-fact, with full power of substitution, to transfer said stock on the books of said corporation.

| PURCHASER | ATTORNEY |
|---|---|
| Signature: _____ | Signature: _____ |
| Print Name: [Purchaser-name] | Print Name: [Attorney-name] |
| Role: Purchaser | Role: Attorney |
| Dated: [Date] | Dated: [Date] |

This Assignment Separate From Certificate was executed in conjunction with the terms of a Restricted Stock Purchase Agreement between the above assignor and the above corporation, dated as of **[Date]**

**Instruction: Please do not fill in any blanks other than the signature and name lines.**

# Exhibit C

**JOINT ESCROW INSTRUCTIONS**

**[Entity-name]**

**[Entity-address]**

**Attn: Secretary**

Dear Secretary:

As Escrow Agent for both **[Entity-name]**, a Delaware corporation (the "*Company*"), and **[Purchaser-name]** (the "*Purchaser*"), you are hereby authorized and directed to hold the documents delivered to you pursuant to the terms of that certain Restricted Stock Purchase Agreement (the "*Agreement*"), dated as of **[Date]** to which a copy of these Joint Escrow Instructions is attached, in accordance with the

PLAINTIFF 0002446

the following instructions:



1. In the event that the Company and/or any assignee of the Company (referred to collectively for convenience herein as the "*Company*") exercises the Repurchase Option set forth in the Agreement, the Company shall give to the Purchaser and you a written notice specifying the number of shares of stock to be purchased, the purchase price, and the time for a closing hereunder at the principal office of the Company. The Purchaser and the Company hereby irrevocably authorize and direct you to close the transaction contemplated by such notice in accordance with the terms of said notice.

2. At the closing, you are directed (a) to date the stock assignments necessary for the transfer in question, (b) to fill in the number of shares being transferred, and (c) to deliver same, together with the certificate evidencing the shares of stock to be transferred, to the Company against the simultaneous delivery to you of the purchase price (by check or such other form of consideration mutually agreed to by the parties) for the number of shares of stock being purchased pursuant to the exercise of the Repurchase Option.

3. The Purchaser irrevocably authorizes the Company to deposit with you any certificates evidencing shares of stock to be held by you hereunder and any additions and substitutions to said shares as defined in the Agreement. The Purchaser does hereby irrevocably constitute and appoint you as his or her attorney-in-fact and agent for the term of this escrow to execute with respect to such securities all documents necessary or appropriate to make such securities negotiable and to complete any transaction herein contemplated. Subject to the provisions of this paragraph 3, the Purchaser shall exercise all rights and privileges of a stockholder of the Company while the stock is held by you.

4. Upon written request of the Purchaser after each successive one-year period from the date of the Agreement, unless the Repurchase Option has been exercised, you will deliver to the Purchaser a certificate or certificates representing so many shares of stock remaining in escrow as are not then subject to the Repurchase Option.

5. If at the time of termination of this escrow you should have in your possession any documents, securities, or other property belonging to the Purchaser, you shall deliver all of same to the Purchaser and shall be discharged of all further obligations hereunder.

PLAINTIFF0002447

6. Your duties hereunder may be altered, amended, modified or revoked only by a writing signed by all of the parties hereto.



7. You shall be obligated only for the performance of such duties as are specifically set forth herein and may rely and shall be protected in relying or refraining from acting on any instrument reasonably believed by you to be genuine and to have been signed or presented by the proper party or parties. You shall not be personally liable for any act you may do or omit to do hereunder as Escrow Agent or as attorney-in-fact for the Purchaser while acting in good faith and in the exercise of your own good judgment, and any act done or omitted by you pursuant to the advice of your own attorneys shall be conclusive evidence of such good faith.

8. The Company and the Purchaser hereby jointly and severally expressly agree to indemnify and hold harmless you and your designees against any and all claims, losses, liabilities, damages, deficiencies, costs and expenses, including reasonable attorneys' fees and expenses of investigation and defense incurred or suffered by you and your designees, directly or indirectly, as a result of any of your actions or omissions or those of your designees while acting in good faith and in the exercise of your judgment under the Agreement, these Joint Escrow Instructions, exhibits hereto or written instructions from the Company or the Purchaser hereunder.

9. You are hereby expressly authorized to disregard any and all warnings given by any of the parties hereto or by any other person or corporation, excepting only orders or process of courts of law, and are hereby expressly authorized to comply with and obey orders, judgments or decrees of any court. In case you obey or comply with any such order, judgment or decree, you shall not be liable to any of the parties hereto or to any other person, firm or corporation by reason of such compliance, notwithstanding any such order, judgment or decree being subsequently reversed, modified, annulled, set aside, vacated or found to have been entered without jurisdiction.

10. You shall not be liable in any respect on account of the identity, authorities or rights of the parties executing or delivering or purporting to execute or deliver the Agreement or any documents or papers deposited or called for hereunder.

11. You shall be entitled to employ such legal counsel and other experts as you may deem necessary properly to advise you in connection with your obligations hereunder, may rely upon the advice of such counsel, and may pay such counsel reasonable compensation therefor. The Company shall reimburse you for

PLAINTIFF0002448

such disbursements.



12. Your responsibilities as Escrow Agent hereunder shall terminate if you shall resign by written notice to each party. In the event of any such termination, the Company shall appoint a successor Escrow Agent.

13. You are expressly authorized to delegate your duties as Escrow Agent hereunder to the law firm of [Attorney-name], or any other law firm, which delegation, if any, may change from time to time and shall survive your resignation as Escrow Agent.

14. If you reasonably require other or further instruments in connection with these Joint Escrow Instructions or obligations in respect hereto, the necessary parties hereto shall join in furnishing such instruments.

15. It is understood and agreed that should any dispute arise with respect to the delivery and/or ownership or right of possession of the securities held by you hereunder, you are authorized and directed to retain in your possession without liability to anyone all or any part of said securities until such disputes shall have been settled either by mutual written agreement of the parties concerned or by a final order, decree or judgment of a court of competent jurisdiction after the time for appeal has expired and no appeal has been perfected, but you shall be under no duty whatsoever to institute or defend any such proceedings.

16. Any notice required or permitted hereunder shall be given in writing and shall be deemed effectively given upon personal delivery or four days following deposit in the United States Post Office, by registered or certified mail with postage and fees prepaid and return receipt requested, addressed to each of the other parties thereunto entitled at such address as a party may designate by written notice to each of the other parties hereto.

17. By signing these Joint Escrow Instructions, you become a party hereto only for the purpose of said Joint Escrow Instructions; you do not become a party to the Agreement.

18. This instrument shall be binding upon and inure to the benefit of the parties hereto, and their respective successors and permitted assigns.

[Signature page to follow]

Very truly yours,

[Entity-name] a Delaware corporation

PLAINTIFF0002449

_____, Chief Executive Officer

| PURCHASER | ESCROW AGENT |
|---|---|
| Signature: _____ | Signature: _____ |
| Print Name: [Purchaser-name] | Print Name: [Escrow-agent-name] |
| Role: Purchaser | Role: Agent |



ⓘ IF YO  WISH TO MAKE A SECTION 83(B) ELECTION, THE FILING OF S CH ELECTION IS **YOUR** RESPONSIBILITY.

ⓘ the form for making this section 83(B) election is attached to this agreement as **Exhibit D.**

ⓘ **YOU** M ST FILE THIS FORM WITHIN 30 DAYS OF P RCHASING THE SHARES.

ⓘ **YOU** (and **not** the Company or any of its agents) shall be solely responsible for filing such form WITH THE IRS, even if YO  request the company or its agents to make this filing on YO R behalf and even if the company or its agents have previously made this filing on YO R Behalf.

ⓘ The election should be filed by mailing a signed election form by certified mail, return receipt requested to the IRS Service Center where you file your tax returns. See www.irs.gov

# Exhibit D

### ELECTION UNDER SECTION 83(b) OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED

The undersigned taxpayer hereby elects, pursuant to Section 83(b) of the Internal Revenue Code of 1986, as amended, to include in his or her gross income the amount of any compensation taxable to him or her in connection with his or her receipt of the property described below:

1. The name, address and taxpayer identification number of the undersigned are as follows:

NAME OF TAXPAYER: **[Purchaser-name]**

TAXPAYER'S ADDRESS: **[Purchaser-address]**

TAXPAYER ID #: **[Purchaser-tax-id]** SPOUSE'S ID #: **[Spouse-tax-id]**

PLAINTIFF0002450



2. The property with respect to which the election is made is described as follows: **[Share-amount]** shares (the "*Shares*") of the Common Stock of

   **[Entity-name]** (the "*Company*").

3. The date on which the property was transferred is: **[Date-of-transfer]**



4. The taxable year for which the election is made is: **[Taxable-year]**

5. The property is subject to the following restrictions: The Shares may be repurchased by the Company, or its assignee, upon the occurrence of certain events. This right lapses with regard to a portion of the Shares over time.

6. The fair market value at the time of transfer, determined without regard to any restriction other than a restriction which by its terms will never lapse, of such property is: **[Market-value]**.

7. The amount, if any, paid for such property: **[Share-total-price]**.

The undersigned has submitted a copy of this statement to the person for whom the services were performed in connection with the undersigned's receipt of the above-described property. The transferee of such property is the person performing the services in connection with the transfer of said property.

The undersigned understand(s) that the foregoing election may not be revoked except with the consent of the Commissioner.

| TAXPAYER |
| --- |
| Signature: _____ |
| Print Name: [Purchaser-name] |
| Role: Taxpayer |
| Dated: [Date] |

The undersigned spouse of taxpayer joins in this election.

| SPOUSE OF TAXPAYER |
| --- |
| Signature: _____ |
| Print Name: [Spouse-name] |
| Role: Spouse of Taxpayer |
| Dated: [Date] |

# Exhibit E

PLAINTIFF0002451

## SPOUSAL CONSENT

I, **[Spouse-name]**, spouse of **[Purchaser-name]**, have read and approve of the foregoing Restricted Stock Purchase Agreement, dated as of **[Date]**, together with all exhibits and attachments thereto (collectively, the "***Agreement***"), by and between my spouse and **[Entity-name]**, a Delaware corporation (the "***Company***"). In consideration of the Company's granting of the right to **[Purchaser-name]** to purchase **[Share-amount]** shares of Common Stock of the Company as set forth in the Agreement, I hereby appoint **[Purchaser-name]** as my attorney-in-fact in respect to the exercise or waiver of any rights under the Agreement, and agree to be bound by the provisions of the Agreement insofar as I may have any rights in said Agreement or any shares issued pursuant thereto under the community property laws of the State of Washington, or under similar laws relating to marital property in effect in the state of our residence as of the date of the signing of the foregoing Agreement.

| SPOUSE OF PURCHASER |
| --- |
| Signature: _____ |
| Print Name: [Spouse-name] |
| Role: Spouse of Purchaser |
| Dated: [Date] |

Previous
Consent of Directors

Next
Common Stock Agreement

PLAINTIFF0002452



**LEGAL-TOOLS**  DAOLABS

Connect Wallet



# Variables

### Agreement Date

mm/dd/yyyy

### Total Number of Shares

100

### Price Per Share (USD)

1

### Aggregate Purchase Price (USD)

100

### Corporation's Name (ALL CAPS)

ACME CORPORATION

### Corporation CEO's Full Name

Ms. Jane Doe

### Purchaser's Entity Name (Full Name if Individual)

Road Runner LLC, Mr. John Doe, etc.

### Purchaser Representative's Name (Match Entity Name if Individual)

Mr. John Doe

### Purchaser Representative's Role

Pre ident

### Purchaser Entity's Type

Corporation, LLC, Individual, etc.

### Purchaser's Street Address

123 Main Street Apt. 45

### Purchaser Entity's City

Kalamazoo

### Purchaser Entity's State

Michigan

[Entity-name] COMMON STOCK PURCHASE AGREEMENT

1. Purchase and Sale of the Shares.

2. Issuance of Shares.

3. Restrictions on Transfer.

4. Company's Right of First Refusal.

5. Tax Consequences.

6. General Provisions.

Exhibit A

PLAINTIFF0002453

Michigan

Purchaser Entity's ZIP Code

49001

**Update document**



    

# [Entity-name] COMMON STOCK PURCHASE AGREEMENT

This Stock Purchase Agreement (the "**Agreement**") is made as of **[Date]** by and between **[Entity-name]**, a Delaware corporation (the "**Company**"), and **[Purchaser-name]**, a **[Purchaser-state] [Purchaser-type]** (the "**Purchaser**").

In consideration of the mutual covenants and representations set forth below, the Company and Purchaser agree as follows:

## 1. Purchase and Sale of the Shares.

Subject to the terms and conditions of this Agreement, the Company agrees to sell to Purchaser and Purchaser agrees to purchase from the Company **[Share-amount]** shares of the Company's Common Stock (the "**Shares**") at a price of $**[Share-price]** per share (the "**Purchase Price**"), for an aggregate purchase price of $**[Share-price-total]**.

## 2. Issuance of Shares.

The purchase and sale of the Shares will take place at the principal office of the Company or at such other place as shall be designated by the Company. Purchaser shall execute and deliver this Agreement, and the Company will issue, as promptly thereafter as practicable, a stock certificate, registered in the name of the Purchaser, reflecting the Shares.

PLAINTIFF0002454

# 3. Restrictions on Transfer.



A. Purchaser understands and agrees that the Company shall cause the legends set forth below, or substantially equivalent legends, to be placed upon any certificate(s) evidencing ownership of the Shares, together with any other legends that may be required by the Company or by applicable state or federal securities laws:

> THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "*ACT*") AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED UNLESS AND UNTIL REGISTERED UNDER THE ACT OR, IN THE OPINION OF COUNSEL SATISFACTORY TO THE ISSUER OF THESE SECURITIES, SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION OTHERWISE COMPLIES WITH THE ACT.

> THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO CERTAIN RESTRICTIONS ON TRANSFER AND A RIGHT OF FIRST REFUSAL HELD BY THE ISSUER OR ITS ASSIGNEE(S) AS SET FORTH IN THE COMMON STOCK PURCHASE AGREEMENT BETWEEN THE ISSUER AND THE ORIGINAL HOLDER OF THESE SHARES, A COPY OF WHICH MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE ISSUER. SUCH TRANSFER RESTRICTIONS AND RIGHT OF FIRST REFUSAL ARE BINDING ON TRANSFEREES OF THESE SHARES.

B. *Stop-Transfer Notices*. Purchaser agrees that to ensure compliance with the restrictions referred to herein, the Company may issue appropriate "stop transfer" instructions to its transfer agent, if any, and that, if the Company transfers its own securities, it may make appropriate notations to the same effect in its own records.

PLAINTIFF0002455



C. *Refusal to Transfer*. The Company shall not be required (i) to transfer on its books any Shares that have been sold or otherwise transferred in violation of any of the provisions of this Agreement or (ii) to treat as owner of such Shares or to accord the right to vote or pay dividends to any purchaser or other transferee to whom such Shares shall have been so transferred.

D. *Lock-Up Period*. Purchaser hereby agrees that Purchaser shall not sell, offer, pledge, contract to sell, grant any option or contract to purchase, purchase any option or contract to sell, grant any right or warrant to purchase, lend or otherwise transfer or encumber, directly or indirectly, any Shares or other securities of the Company, nor shall Purchaser enter into any swap, hedging or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of any Shares or other securities of the Company, during the 180-day period (or such other period as may be requested by the Company or the underwriters to accommodate regulatory restrictions on (i) the publication or other distribution of research reports and (ii) analyst recommendations and opinions, including, but not limited to, the restrictions contained in FINRA or NYSE rules, or any successor provisions or amendments thereto) following the effective date of the first registration statement of the Company filed under the Securities Act that includes securities to be sold on behalf of the Company to the public in an underwritten public offering under the Securities Act. Purchaser further agrees, if so requested by the Company or any representative of its underwriters, to enter into such underwriter's standard form of "lockup" or "market standoff" agreement in a form satisfactory to the Company and such underwriter. The Company may impose stop-transfer instructions with respect to securities subject to the foregoing restrictions until the end of such period.

PLAINTIFF0002456

# 4. Company's Right of First Refusal.

Before any Shares acquired by the purchaser pursuant to this Agreement (or any beneficial interest in such Shares) may be sold, gifted, transferred, encumbered or otherwise disposed of in any way (whether by operation of law or otherwise) by the Purchaser or any subsequent transferee (each a **"Holder"**), such Holder must first offer such Shares or beneficial interest to the Company and/or its assignee(s) as follows:



A. *Notice of Proposed Transfer*. The Holder shall deliver to the Company a written notice stating: (i) the Holder's bona fide intention to sell or otherwise transfer the Shares; (ii) the name of each proposed transferee; (iii) the number of Shares to be transferred to each proposed transferee; (iv) the bona fide cash price or other consideration for which the Holder proposes to transfer the Shares; and (v) that by delivering the notice, the Holder offers all such Shares to the Company and/or its assignee(s) pursuant to this Section and on the same terms described in the notice.

B. *Exercise of Right of First Refusal*. At any time within 30 days after receipt of the Holder's notice, the Company and/or its assignee(s) may, by giving written notice to the Holder, elect to purchase all, but not less than all, of the Shares proposed to be transferred to any one or more of the proposed transferees, at the purchase price determined in accordance with Section 4.C.

C. *Purchase Price*. The purchase price for the Shares purchased by the Company and/or its assignee(s) under this Section shall be the price listed in the Holder's notice. If the price listed in the Holder's notice includes consideration other than cash, the cash equivalent value of the non-cash consideration shall be determined by the Board of Directors of the Company in its sole discretion.

D. *Payment*. Payment of the purchase price shall be made, at the option of the Company

PLAINTIFF0002457

shall be made, at the option of the Company and/or its assignee(s), in cash (by check), by cancellation of all or a portion of any

outstanding indebtedness of the Holder to the Company and/or its assignee(s), or by any combination thereof within 30 days after receipt by the Company of the Holder's notice (or at such later date as is called for by such notice).

E. *Holder's Right to Transfer*. If all of the Shares proposed in the notice to be transferred to a given proposed transferee are not purchased by the Company and/or its assignee(s) as provided in this Section, then the Holder may sell or otherwise transfer such Shares to that proposed transferee, **provided that:** (i) the transfer is made only on the terms provided for in the notice, with the exception of the purchase price, which may be either the price listed in the notice or any higher price; (ii) such transfer is consummated within 60 days after the date the notice is delivered to the Company; (iii) the transfer is effected in accordance with any applicable securities laws, and if requested by the Company, the Holder shall have delivered an opinion of counsel acceptable to the Company to that effect; and (iv) the proposed transferee agrees in writing that the provisions of this Section shall continue to apply to the transferred Shares in the hands of such proposed transferee. If any Shares described in a notice are not transferred to the proposed transferee within the period provided above, then before any such Shares may be transferred, a new notice shall be given to the Company, and the Company and/or its assignees shall again be offered the right of first refusal described in this Section.

F. *Exception for Certain Family Transfers*. Notwithstanding anything to the contrary contained elsewhere in this Section, the transfer of any or all of the Shares during the Holder's lifetime or on the Holder's death by will or intestacy to the Holder's spouse, child, father, mother, brother,



PLAINTIFF0002458



sister, father-in-law, mother-in-law, brother-in-law, sister-in-law, grandfather, grandmother, grandchild, cousin, aunt, uncle,

niece, nephew, stepchild, or to a trust or other similar estate planning vehicle or the benefit of the Holder or any such person, shall be exempt from the provisions of this Section; **provided that**, in each such case, the transferee shall agree in writing to receive and hold the Shares so transferred subject to all of the provisions of this Agreement, including but not limited to this Section, and there shall be no further transfer of such Shares except in accordance with the terms of this Section.

G. *Termination of Right of First Refusal*. The right of first refusal contained in this Section shall terminate as to all Shares purchased hereunder upon the earlier of: (i) the closing date of the first sale of Common Stock of the Company to the general public pursuant to a registration statement filed with and declared effective by the Securities and Exchange Commission under the Securities Act, as amended, and (ii) the closing date of a Change of Control of the Company pursuant to which the holders of the outstanding voting securities of the Company receive securities of a class registered pursuant to Section 12 of the Securities Exchange Act of 1934, as amended.

For purposes of this Agreement, a "**Change of Control**" means either:

(1) the acquisition of the Company by another entity by means of any transaction or series of related transactions (including, without limitation, any reorganization, merger or consolidation or stock transfer, but excluding any such transaction effected primarily for the purpose of changing the domicile of the Company), unless the Company's stockholders of record immediately prior to such transaction or series of related transactions held immediately

PLAINTIFF0002459

transactions hold, immediately
after such transaction or series of
related transactions, at least a



majority of the voting power of the
surviving or acquiring entity
(provided that the sale by the
Company of its securities for the
purposes of raising additional
funds shall not constitute a Change
of Control hereunder); or

(2) a sale of all or substantially
all of the assets of the Company.

# 5. Tax Consequences.

The Purchaser has reviewed with the Purchaser's own tax
advisors the federal, state, local and foreign tax
consequences of this investment and the transactions
contemplated by this Agreement. The Purchaser is
relying solely on such advisors and not on any
statements or representations of the Company or any of
its agents. The Purchaser understands that the
Purchaser (and not the Company) shall be responsible
for any tax liability that may arise as a result of the
transactions contemplated by this Agreement.

# 6. General Provisions.

A. *Choice of Law; Entire Agreement.* This
Agreement shall be governed by the internal
substantive laws, but not the choice of law
rules, of Delaware.

B. *Integration.* This Agreement represents the
entire agreement between the parties with
respect to the purchase of the Shares by the
Purchaser and supersedes and replaces any and
all prior written or oral agreements
regarding the subject matter of this
Agreement including, but not limited to, any
representations made during any interviews,
relocation discussions or negotiations
whether written or oral.

C. *Notices.* Any notice, demand, offer,
request or other communication required or
permitted to be given by either the Company

PLAINTIFF0002460

or the Purchaser pursuant to the terms of this Agreement shall be in writing and shall be deemed effectively given the earlier of

(i) when received, (ii) when delivered personally, (iii) 1 business day after being delivered by facsimile (with receipt of appropriate confirmation), (iv) 1 business day after being deposited with an overnight courier service or (v) 4 days after being deposited in the U.S. mail, First Class with postage prepaid, and addressed to the parties at the addresses provided to the Company (which the Company agrees to disclose to the other parties upon request) or such other address as a party may request by notifying the other in writing.



D. *Successors*. Any successor to the Company (whether direct or indirect and whether by purchase, merger, consolidation, liquidation or otherwise) to all or substantially all of the Company's business and/or assets shall assume the obligations under this Agreement and agree expressly to perform the obligations under this Agreement in the same manner and to the same extent as the Company would be required to perform such obligations in the absence of a succession. For all purposes under this Agreement, the term "**Company**" shall include any successor to the Company's business and/or assets which executes and delivers the assumption agreement described in this Section or which becomes bound by the terms of this Agreement by operation of law. Subject to the restrictions on transfer set forth in this Agreement, this Agreement shall be binding upon Purchaser and his heirs, executors, administrators, successors and assigns.

E. *Assignment*. The rights granted to the Purchaser under this Agreement are not assignable by the Purchaser under any circumstances.

F. *Waiver*. Either party's failure to enforce any provision of this Agreement shall not in any way be construed as a waiver of any such provision, nor prevent that party from thereafter enforcing any other provision of

PLAINTIFF0002461



thereafter enforcing any other provision of
this Agreement. The rights granted both
parties hereunder are cumulative and shall

not constitute a waiver of either party's
right to assert any other legal remedy
available to it.

G. *Purchaser Investment Representations and
Further Documents*. The Purchaser agrees upon
request to execute any further documents or
instruments necessary or reasonably desirable
in the view of the Company to carry out the
purposes or intent of this Agreement. In
furtherance of the above, the Purchaser
hereby makes the investment representations
listed on **Exhibit A** to the Company as of the
date of this Agreement, and agrees that such
representations are incorporated into this
Agreement by this reference, such that the
Company may rely on them in issuing the
Shares.

H. *Severability*. Should any provision of this
Agreement be found to be illegal or
unenforceable, the other provisions shall
nevertheless remain effective and shall
remain enforceable to the greatest extent
permitted by law.

I. *Rights as Stockholder*. Subject to the
terms and conditions of this Agreement,
Purchaser shall have all of the rights of a
stockholder of the Company with respect to
the Shares from and after the date that
Purchaser delivers a fully executed copy of
this Agreement (including all exhibits and
attachments thereto) and full payment for the
Shares to the Company, and until such time as
Purchaser disposes of the Shares in
accordance with this Agreement. Upon such
transfer, Purchaser shall have no further
rights as a holder of the Shares so purchased
except (in the case of a transfer to the
Company) the right to receive payment for the
Shares so purchased in accordance with the
provisions of this Agreement, and Purchaser
shall forthwith cause the certificate(s)
evidencing the Shares so purchased to be
surrendered to the Company for transfer or
cancellation.

**PLAINTIFF0002462**

J. *Adjustment for Stock Split.* All references
to the number of Shares and the purchase
price of the Shares in this Agreement shall
be adjusted to reflect any stock split, stock
dividend or other change in the Shares which
may be made after the date of this Agreement.

K. *Counterparts.* This Agreement may be
executed in one or more counterparts, each of
which will be deemed an original, but all of
which together will constitute one and the
same agreement. Facsimile copies of signed
signature pages shall be binding originals.

[Signature page to follow]

The parties represent that they have read this
Agreement in its entirety, have had an opportunity to
obtain the advice of counsel prior to executing this
Agreement and fully understand this Agreement. The
Purchaser agrees to notify the Company of any change in
his address below.

| PURCHASER | COMPANY |
|---|---|
| Signature: | Signature: |
| Print Name: [Purchaser-signer-name] | Print Name: [Entity-signer-name] |
| Role: [Purchaser-signer-role] | Role: Chief Executive Officer |
| Address: [Purchaser-address], [Purchaser-city] [Purchaser-state] [Purchaser-zip] | |

# Exhibit A

## INVESTMENT REPRESENTATION STATEMENT

INVESTMENT

PLAINTIFF0002463

INVESTMENT

| PURCHASER: **[Purchaser-name]** |
| --- |



| INVESTMENT |
| --- |
| COMPANY: **[Entity-name]** |
| SECURITY: Common Stock |
| AMOUNT: **[Share-amount]** shares |
| DATE: **[Date]** |

In connection with the purchase of the above listed shares, I represent to the Company as follows:

1. *The Company May Rely on These Representations.* I understand that the Company's sale of the shares to me has not been registered under the Securities Act of 1933, as amended, because the Company believes, relying in part on my representations in this document, that an exemption from such registration requirement is available for such sale. I understand that the availability of this exemption depends upon the representations I am making to the Company in this document being true and correct.

2. *I am Purchasing for Investment.* I am purchasing the shares solely for investment purposes, and not for further distribution. My entire legal and beneficial ownership interest in the shares is being purchased and shall be held solely for my account, except to the extent I intend to hold the shares jointly with my spouse. I am not a party to, and do not presently intend to enter into, any contract or other arrangement with any other person or entity involving the resale, transfer, grant of participation with respect to or other distribution of any of the shares. My investment intent is not limited to my present intention to hold the shares for the minimum capital gains period

PLAINTIFF0002464

specified under any applicable tax law, for a deferred sale, for a specified increase or decrease in the market price of the shares, or for any other fixed period in the future.

3. *I Can Protect My Own Interests.* I can properly evaluate the merits and risks of an investment in the shares and can protect my own interests in this regard, whether by reason of my own business and financial expertise, the business and financial expertise of certain professional advisors unaffiliated with the Company with whom I have consulted, or my preexisting business or personal relationship with the Company or any of its officers, directors or controlling persons.

4. *I am Informed About the Company.* I am sufficiently aware of the Company's business affairs and financial condition to reach an informed and knowledgeable decision to acquire the shares. I have had opportunity to discuss the plans, operations and financial condition of the Company with its officers, directors or controlling persons, and have received all information I deem appropriate for assessing the risk of an investment in the shares.

5. *I Recognize My Economic Risk.* I realize that the purchase of the shares involves a high degree of risk, and that the Company's future prospects are uncertain. I am able to hold the shares indefinitely if required, and am able to bear the loss of my entire investment in the shares.

6. *I Know the Shares are Restricted Securities.* I understand that the shares are "restricted securities" in that the Company's sale of the shares to me has not been registered under the Securities Act in reliance upon an exemption for non-public offerings. In this regard, I also understand and agree that:

PLAINTIFF0002465

also understand and agree that

A. I must hold the shares indefinitely, unless any subsequent proposed resale by me is registered under the Securities Act, or unless an exemption from registration is otherwise available (such as Rule 144);

B. the Company is under no obligation to register any subsequent proposed resale of the shares by me; and

C. the certificate evidencing the shares will be imprinted with a legend which prohibits the transfer of the shares unless such transfer is registered or such registration is not required in the opinion of counsel for the Company.

7. *I am Familiar With Rule 144*. I am familiar with Rule 144 adopted under the Securities Act, which in some circumstances permits limited public resale of "restricted securities" like the shares acquired from an issuer in a non-public offering. I understand that my ability to sell the shares under Rule 144 in the future is uncertain, and will depend upon, among other things: (i) the availability of certain current public information about the Company; (ii) the resale occurring more than one year after my purchase and full payment (within the meaning of Rule 144) for the shares; and (iii) if I am an affiliate of the Company, or a non-affiliate who has held the shares less than two years after my purchase and full payment: (A) the sale being made through a broker in an unsolicited "broker's transaction" or in transactions directly with a market maker, as said term is defined under the Securities Exchange Act of 1934, as amended, (B) the amount of shares being sold during any three month period not exceeding the specified limitations stated in Rule 144, and (C)

PLAINTIFF0002466



limitations stated in Rule 144,20 and (c)
timely filing of a notice of proposed
sale on Form 144, if applicable.

8. *I Know Rule 144 May Never be Available*.
I understand that the requirements of
Rule 144 may never be met, and that the
shares may never be saleable. I further
understand that at the time I wish to
sell the shares, there may be no public
market for the Company's stock upon
which to make such a sale, or the
current public information requirements
of Rule 144 may not be satisfied, either
of which would preclude me from selling
the shares under Rule 144 even if the
one-year minimum holding period had been
satisfied.

9. *I Know I am Subject to Further
Restrictions on Resale*. I understand
that in the event Rule 144 is not
available to me, any future proposed
sale of any of the shares by me will not
be possible without prior registration
under the Securities Act, compliance
with some other registration exemption
(which may or may not be available), or
**each** of the following: (i) my written
notice to the Company containing
detailed information regarding the
proposed sale, (ii) my providing an
opinion of my counsel to the effect that
such sale will not require registration,
and (iii) the Company notifying me in
writing that its counsel concurs in such
opinion. I understand that neither the
Company nor its counsel is obligated to
provide me with any such opinion. I
understand that although Rule 144 is not
exclusive, the Staff of the SEC has
stated that persons proposing to sell
private placement securities other than
in a registered offering or pursuant to
Rule 144 will have a substantial burden
of proof in establishing that an
exemption from registration is available
for such offers or sales, and that such
persons and their respective brokers who

PLAINTIFF0002467

participate in such transactions do so
at their own risk.



10. *I Know I May Have Tax Liability Due to
the Uncertain Value of the Shares.* I
understand that the Board of Directors
believes its valuation of the shares
represents a fair appraisal of their
worth, but that it remains possible
that, with the benefit of hindsight, the
Internal Revenue Service may
successfully assert that the value of
the shares on the date of my purchase is
substantially greater than the Board's
appraisal. I understand that any
additional value ascribed to the shares
by such an IRS determination will
constitute ordinary income to me as of
the purchase date, and that any
additional taxes and interest due as a
result will be my sole responsibility
payable only by me, and that the Company
need not and will not reimburse me for
that tax liability. I understand that if
such additional value represents more
than 25% of my gross income for the year
in which the value of the shares is
taxable, the IRS will have 6 years from
the due date for filing the return (or
the actual filing date of the return if
filed thereafter) within which to assess
me the additional tax and interest due.

[Signature page to follow]

By signing below, I acknowledge my agreement with each
of the statements contained in this Investment
Representation Statement as of the date first set forth
above, and my intent for the Company to rely on such
statements in issuing the shares to me.

| PURCHASER |
| --- |
| Signature: |
| Print Name: [Purchaser-signer-name] |
| Role: [Purchaser-signer-role] |

PLAINTIFF0002468

Address: [Purchaser-address], [Purchaser-city]
[Purchaser-state] [Purchaser-zip]

Previous
Founder Stock Agreement

Next
Indemnification



PLAINTIFF0002469



**LEGAL-TOOLS** DAOLABS

Connect Wallet



# Variables

### Agreement Date

mm/dd/yyyy

### Corporation's Name (ALL CAPS)

ACME CORPORATION

### Entity CEO's Name

Ms. Jane Doe

### Indemnitee's Full Name

Mr. John Doe

**Update document**

    

# [Entity-name] INDEMNIFICATION AGREEMENT

This Indemnification Agreement (this "*Agreement*") is dated as of **[Date]** and is between **[Entity-name]**, a Delaware corporation (the "*Company*"), and **[Indemnitee-name]** ("*Indemnitee*").

## RECITALS

A. Indemnitee's service to the Company substantially benefits the Company.

B. Individuals are reluctant to serve as

---

[Entity-name] INDEMNIFICATION AGREEMENT

RECITALS

1. Definitions.

2. Indemnity in Third-Party Proceedings.

3. Indemnity in Proceedings by or in the Right of the Company.

4. Indemnification for Expenses of a Party Who is Wholly or Partly Successful.

5. Indemnification for Expenses of a Witness.

6. Additional Indemnification.

7. Exclusions.

8. Advances of Expenses.

9. Procedures for Notification and Defense of Claim.

10. Procedures upon Application for Indemnification.

11. Presumptions and Effect of Certain Proceedings.

12. Remedies of Indemnitee.

13. Contribution.

14. Non-exclusivity.

15. Primary Responsibility.

16. No Duplication of Payments.

PLAINTIFF0002470

directors or officers of corporations or in certain other capacities unless they are provided with adequate protection through insurance or

indemnification against the risks of claims and actions against them arising out of such service.

C. Indemnitee does not regard the protection currently provided by applicable law, the Company's governing documents and any insurance as adequate under the present circumstances, and Indemnitee may not be willing to serve as a director or officer without additional protection.

D. In order to induce Indemnitee to continue to provide services to the Company, it is reasonable, prudent and necessary for the Company to contractually obligate itself to indemnify, and to advance expenses on behalf of, Indemnitee as permitted by applicable law.

E. This Agreement is a supplement to and in furtherance of the indemnification provided in the Company's certificate of incorporation and bylaws, and any resolutions adopted pursuant thereto, and this Agreement shall not be deemed a substitute therefor, nor shall this Agreement be deemed to limit, diminish or abrogate any rights of Indemnitee thereunder.

The parties therefore agree as follows:

# 1. Definitions.

A "***Change in Control***" shall be deemed to occur upon the earliest to occur after the date of this Agreement of any of the following events:

> (a) *Acquisition of Stock by Third Party.* Any Person (as defined below) is or becomes the Beneficial Owner (as defined below), directly or indirectly, of securities of the Company representing fifteen percent (15%) or more of the combined voting power of the Company's then outstanding securities;

>> (i)*Change in Board Composition.* During any



17. Insurance.

18. Subrogation.

19. Services to the Company.

20. Duration.

21. Successors.

22. Severability.

23. Enforcement.

24. Entire Agreement.

25. Modification and Waiver.

26. Notices.

26. Applicable Law and Consent to Jurisdiction.

27. Counterparts.

28. Captions.

PLAINTIFF0002471



*composition.* During any period of two consecutive years (not including any

period prior to the execution of this Agreement), individuals who at the beginning of such period constitute the Company's board of directors, and any new directors (other than a director designated by a person who has entered into an agreement with the Company to effect a transaction described in Sections 1(a) (i), 1(a)(iii) or 1(a)(iv)) whose election by the board of directors or nomination for election by the Company's stockholders was approved by a vote of at least two-thirds of the directors then still in office who either were directors at the beginning of the period or whose election or nomination for election was previously so approved, cease for any reason to constitute at least a majority of the members of the Company's board of directors;

(ii)*Corporate Transactions.* The effective date of a merger or consolidation of the Company with any other entity, other than a merger or consolidation which would result in the voting securities of the Company outstanding immediately prior to such merger or consolidation continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity) more than 50% of the

PLAINTIFF0002472



combined voting power of the
voting securities of the
surviving entity outstanding

immediately after such merger
or consolidation and with the
power to elect at least a
majority of the board of
directors or other governing
body of such surviving
entity;

(iii)*Liquidation.* The
approval by the stockholders
of the Company of a complete
liquidation of the Company or
an agreement for the sale or
disposition by the Company of
all or substantially all of
the Company's assets; and

(iv)*Other Events.* Any other
event of a nature that would
be required to be reported in
response to Item 6(e) of
Schedule 14A of Regulation
14A (or in response to any
similar item on any similar
schedule or form) promulgated
under the Securities Exchange
Act of 1934, as amended,
whether or not the Company is
then subject to such
reporting requirement.

For purposes of this
Section 1(a), the following
terms shall have the
following meanings:

(1) "**Person**" shall
have the meaning as
set forth in
Sections 13(d) and
14(d) of the
Securities Exchange
Act of 1934, as
amended; *provided,
however,* that
"**Person**" shall
exclude (i) the

PLAINTIFF0002473



exclude (i) the Company, (ii) any trustee or other fiduciary holding securities under an employee benefit plan of the Company, and (iii) any corporation owned, directly or indirectly, by the stockholders of the Company in substantially the same proportions as their ownership of stock of the Company.

(2) "*Beneficial Owner*" shall have the meaning given to such term in Rule 13d-3 under the Securities Exchange Act of 1934, as amended; *provided, however,* that "*Beneficial Owner*" shall exclude any Person otherwise becoming a Beneficial Owner by reason of (i) the stockholders of the Company approving a merger of the Company with another entity or (ii) the Company's board of directors approving a sale of securities by the Company to such Person.

(b) "*Corporate Status*"

PLAINTIFF0002474



describes the status of a
person who is or was a
director, trustee, general

partner, managing member,
officer, employee, agent or
fiduciary of the Company or
any other Enterprise.

(c) "*DGCL*" means the General
Corporation Law of the State
of Delaware.

(d) "*Disinterested Director*"
means a director of the
Company who is not and was
not a party to the Proceeding
in respect of which
indemnification is sought by
Indemnitee.

(e) "*Enterprise*" means the
Company and any other
corporation, partnership,
limited liability company,
joint venture, trust,
employee benefit plan or
other enterprise of which
Indemnitee is or was serving
at the request of the Company
as a director, trustee,
general partner, managing
member, officer, employee,
agent or fiduciary.

(f) "*Expenses*" include all
reasonable attorneys' fees,
retainers, court costs,
transcript costs, fees and
costs of experts, witness
fees, travel expenses,
duplicating costs, printing
and binding costs, telephone
charges, postage, delivery
service fees, and all other
disbursements or expenses of
the types customarily
incurred in connection with
prosecuting, defending,
preparing to prosecute or
defend, investigating, being

PLAINTIFF0002475



defend, investigating, being or preparing to be a witness in, or otherwise

participating in, a Proceeding. Expenses also include (i) Expenses incurred in connection with any appeal resulting from any Proceeding, including without limitation the premium, security for, and other costs relating to any cost bond, supersedeas bond or other appeal bond or their equivalent, and (ii) for purposes of Section 12(d), Expenses incurred by Indemnitee in connection with the interpretation, enforcement or defense of Indemnitee's rights under this Agreement or under any directors' and officers' liability insurance policies maintained by the Company. Expenses, however, shall not include amounts paid in settlement by Indemnitee or the amount of judgments or fines against Indemnitee.

(g) "*Independent Counsel*" means a law firm, or a partner or member of a law firm, that is experienced in matters of corporation law and neither presently is, nor in the past five years has been, retained to represent (i) the Company or Indemnitee in any matter material to either such party (other than as Independent Counsel with respect to matters concerning Indemnitee under this Agreement, or other indemnitees under similar indemnification agreements), or (ii) any other party to

PLAINTIFF0002476

the Proceeding giving rise to
a claim for indemnification
hereunder. Notwithstanding
the foregoing, the term
"***Independent Counsel***" shall
not include any person who,
under the applicable
standards of professional
conduct then prevailing,
would have a conflict of
interest in representing
either the Company or
Indemnitee in an action to
determine Indemnitee's rights
under this Agreement.



(h) "***Proceeding***" means any
threatened, pending or
completed action, suit,
arbitration, mediation,
alternate dispute resolution
mechanism, investigation,
inquiry, administrative
hearing or proceeding,
whether brought in the right
of the Company or otherwise
and whether of a civil,
criminal, administrative or
investigative nature,
including any appeal
therefrom and including
without limitation any such
Proceeding pending as of the
date of this Agreement, in
which Indemnitee was, is or
will be involved as a party,
a potential party, a non-
party witness or otherwise by
reason of (i) the fact that
Indemnitee is or was a
director or officer of the
Company, (ii) any action
taken by Indemnitee or any
action or inaction on
Indemnitee's part while
acting as a director or
officer of the Company, or
(iii) the fact that he or she
is or was serving at the

PLAINTIFF0002477



request of the Company as a director, trustee, general partner, managing member, officer, employee, agent or fiduciary of the Company or any other Enterprise, in each case whether or not serving in such capacity at the time any liability or Expense is incurred for which indemnification or advancement of expenses can be provided under this Agreement.

(i) Reference to "*other enterprises*" shall include employee benefit plans; references to "*fines*" shall include any excise taxes assessed on a person with respect to any employee benefit plan; references to "*serving at the request of the Company*" shall include any service as a director, officer, employee or agent of the Company which imposes duties on, or involves services by, such director, officer, employee or agent with respect to an employee benefit plan, its participants or beneficiaries; and a person who acted in good faith and in a manner he or she reasonably believed to be in the best interests of the participants and beneficiaries of an employee benefit plan shall be deemed to have acted in a manner "*not opposed to the best interests of the Company*" as referred to in this Agreement.

## 2. Indemnity in Third-Party

PLAINTIFF0002478

**Proceedings.**

The Company shall indemnify Indemnitee in accordance with the provisions of this Section 2 if Indemnitee is, or is threatened to be made, a party to or a participant in any Proceeding, other than a Proceeding by or in the right of the Company to procure a judgment in its favor. Pursuant to this Section 2, Indemnitee shall be indemnified to the fullest extent permitted by applicable law against all Expenses, judgments, fines and amounts paid in settlement actually and reasonably incurred by Indemnitee or on his or her behalf in connection with such Proceeding or any claim, issue or matter therein, if Indemnitee acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the Company and, with respect to any criminal action or proceeding, had no reasonable cause to believe that his or her conduct was unlawful.

## 3. Indemnity in Proceedings by or in the Right of the Company.

The Company shall indemnify Indemnitee in accordance with the provisions of this Section 3 if Indemnitee is, or is threatened to be made, a party to or a participant in any Proceeding by or in the right of the Company to procure a judgment in its favor. Pursuant to this Section 3, Indemnitee shall be indemnified to the fullest extent permitted by applicable law against all Expenses actually and reasonably incurred by Indemnitee or on Indemnitee's behalf in connection with such Proceeding or any claim, issue or matter therein, if Indemnitee acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the Company. No indemnification for Expenses shall be made under this Section 3 in respect of any claim, issue or matter as to which Indemnitee shall have been adjudged by a court of competent jurisdiction to be liable to the Company, unless and only to the extent that the Delaware Court of Chancery or any court in which the Proceeding was brought shall determine upon

PLAINTIFF0002479

application that, despite the adjudication of liability but in view of all the circumstances of the case, Indemnitee is fairly and reasonably entitled to indemnification for such expenses as the Delaware Court of Chancery or such other court shall deem proper.



# 4. Indemnification for Expenses of a Party Who is Wholly or Partly Successful.

To the extent that Indemnitee is a party to or a participant in and is successful (on the merits or otherwise) in defense of any Proceeding or any claim, issue or matter therein, the Company shall indemnify Indemnitee against all Expenses actually and reasonably incurred by Indemnitee or on Indemnitee's behalf in connection therewith. To the extent permitted by applicable law, if Indemnitee is not wholly successful in such Proceeding but is successful, on the merits or otherwise, in defense of one or more but less than all claims, issues or matters in such Proceeding, the Company shall indemnify Indemnitee against all Expenses actually and reasonably incurred by Indemnitee or on Indemnitee's behalf in connection with (a) each successfully resolved claim, issue or matter and (b) any claim, issue or matter related to any such successfully resolved claim, issuer or matter. For purposes of this section, the termination of any claim, issue or matter in such a Proceeding by dismissal, with or without prejudice, shall be deemed to be a successful result as to such claim, issue or matter.

# 5. Indemnification for Expenses of a Witness.

To the extent that Indemnitee is, by reason of his or her Corporate Status, a witness in any Proceeding to which Indemnitee is not a party, Indemnitee shall be indemnified to the extent permitted by applicable law against all Expenses actually and reasonably incurred by Indemnitee or on Indemnitee's behalf in connection therewith.

PLAINTIFF0002480

# 6. Additional Indemnification.

(a) Notwithstanding any limitation in Sections 2, 3 or 4, the Company shall indemnify Indemnitee to the fullest extent permitted by applicable law if Indemnitee is, or is threatened to be made, a party to or a participant in any Proceeding (including a Proceeding by or in the right of the Company to procure a judgment in its favor) against all Expenses, judgments, fines and amounts paid in settlement actually and reasonably incurred by Indemnitee or on his or her behalf in connection with the Proceeding or any claim, issue or matter therein.



(b) For purposes of Section 6(a), the meaning of the phrase "**to the fullest extent permitted by applicable law**" shall include, but not be limited to:

(i) the fullest extent permitted by the provision of the DGCL that authorizes or contemplates additional indemnification by agreement, or the corresponding provision of any amendment to or replacement of the DGCL; and

(ii) the fullest extent authorized or permitted by any amendments to or replacements of the DGCL adopted after the date of this Agreement that increase the extent to which a corporation may indemnify its officers and directors.

# 7. Exclusions.

Notwithstanding any provision in this Agreement, the Company shall not be obligated under this

PLAINTIFF0002481

Agreement to make any indemnity in connection
with any Proceeding (or any part of any
Proceeding):

(a) for which payment has actually been made to
or on behalf of Indemnitee under any statute,
insurance policy, indemnity provision, vote or
otherwise, except with respect to any excess
beyond the amount paid;

(b) for an accounting or disgorgement of profits
pursuant to Section 16(b) of the Securities
Exchange Act of 1934, as amended, or similar
provisions of federal, state or local statutory
law or common law, if Indemnitee is held liable
therefor (including pursuant to any settlement
arrangements);

(c) for any reimbursement of the Company by
Indemnitee of any bonus or other incentive-based
or equity-based compensation or of any profits
realized by Indemnitee from the sale of
securities of the Company, as required in each
case under the Securities Exchange Act of 1934,
as amended (including any such reimbursements
that arise from an accounting restatement of the
Company pursuant to Section 304 of the Sarbanes-
Oxley Act of 2002 (the "*Sarbanes-Oxley Act*"), or
the payment to the Company of profits arising
from the purchase and sale by Indemnitee of
securities in violation of Section 306 of the
Sarbanes-Oxley Act), if Indemnitee is held liable
therefor (including pursuant to any settlement
arrangements);

(d) initiated by Indemnitee, including any
Proceeding (or any part of any Proceeding)
initiated by Indemnitee against the Company or
its directors, officers, employees, agents or
other indemnitees, unless (i) the Company's board
of directors authorized the Proceeding (or the
relevant part of the Proceeding) prior to its
initiation, (ii) the Company provides the
indemnification, in its sole discretion, pursuant
to the powers vested in the Company under
applicable law, (iii) otherwise authorized in
Section 12(d) or (iv) otherwise required by
applicable law; or

(e) if prohibited by applicable law.

PLAINTIFF0002482

# 8. Advances of Expenses.

The Company shall advance the Expenses incurred by Indemnitee in connection with any Proceeding, and such advancement shall be made as soon as reasonably practicable, but in any event no later than 60 days, after the receipt by the Company of a written statement or statements requesting such advances from time to time (which shall include invoices received by Indemnitee in connection with such Expenses but, in the case of invoices in connection with legal services, any references to legal work performed or to expenditure made that would cause Indemnitee to waive any privilege accorded by applicable law shall not be included with the invoice). Advances shall be unsecured and interest free and made without regard to Indemnitee's ability to repay such advances. Indemnitee hereby undertakes to repay any advance to the extent that it is ultimately determined that Indemnitee is not entitled to be indemnified by the Company. This Section 8 shall not apply to the extent advancement is prohibited by law and shall not apply to any Proceeding for which indemnity is not permitted under this Agreement, but shall apply to any Proceeding referenced in Section 7(b) or 7(c) prior to a determination that Indemnitee is not entitled to be indemnified by the Company.

# 9. Procedures for Notification and Defense of Claim.

(a) Indemnitee shall notify the Company in writing of any matter with respect to which Indemnitee intends to seek indemnification or advancement of Expenses as soon as reasonably practicable following the receipt by Indemnitee of notice thereof. The written notification to the Company shall include, in reasonable detail, a description of the nature of the Proceeding and the facts underlying the Proceeding. The failure by Indemnitee to notify the Company will not relieve the Company from any liability which it may have to Indemnitee hereunder or otherwise than under this Agreement, and any delay in so notifying the Company shall not constitute a

PLAINTIFF0002483



waiver by Indemnitee of any rights, except to the extent that such failure or delay materially prejudices the Company.

(b) If, at the time of the receipt of a notice of a Proceeding pursuant to the terms hereof, the Company has directors' and officers' liability insurance in effect, the Company shall give prompt notice of the commencement of the Proceeding to the insurers in accordance with the procedures set forth in the applicable policies. The Company shall thereafter take all commercially-reasonable action to cause such insurers to pay, on behalf of Indemnitee, all amounts payable as a result of such Proceeding in accordance with the terms of such policies.

(c) In the event the Company may be obligated to make any indemnity in connection with a Proceeding, the Company shall be entitled to assume the defense of such Proceeding with counsel approved by Indemnitee, which approval shall not be unreasonably withheld, upon the delivery to Indemnitee of written notice of its election to do so. After delivery of such notice, approval of such counsel by Indemnitee and the retention of such counsel by the Company, the Company will not be liable to Indemnitee for any fees or expenses of counsel subsequently incurred by Indemnitee with respect to the same Proceeding. Notwithstanding the Company's assumption of the defense of any such Proceeding, the Company shall be obligated to pay the fees and expenses of Indemnitee's counsel to the extent (i) the employment of counsel by Indemnitee is authorized by the Company, (ii) counsel for the Company or Indemnitee shall have reasonably concluded that there is a conflict of interest between the Company and Indemnitee in the conduct of any such defense such that Indemnitee needs to be separately represented, (iii) the fees and expenses are non-duplicative and reasonably incurred in connection with Indemnitee's role in the Proceeding despite the Company's assumption of the defense, (iv) the Company is not financially or legally able to perform its indemnification obligations or (v) the Company shall not have retained, or shall not continue to retain, such counsel to defend such Proceeding. The Company shall have the right

PLAINTIFF0002484



to conduct such defense as it sees fit in its
sole discretion. Regardless of any provision in
this Agreement, Indemnitee shall have the right

to employ counsel in any Proceeding at
Indemnitee's personal expense. The Company shall
not be entitled, without the consent of
Indemnitee, to assume the defense of any claim
brought by or in the right of the Company. *or* The
Company shall be entitled to participate in the
Proceeding at its own expense. Indemnitee agrees
to consult with the Company and to consider in
good faith the advisability and appropriateness
of joint representation in the event that either
the Company or other indemnitees in addition to
Indemnitee require representation in connection
with any Proceeding.

(d) Indemnitee shall give the Company such
information and cooperation in connection with
the Proceeding as may be reasonably appropriate.

(e) The Company shall not be liable to indemnify
Indemnitee for any settlement of any Proceeding
(or any part thereof) without the Company's prior
written consent, which shall not be unreasonably
withheld.

(f) The Company shall have the right to settle
any Proceeding (or any part thereof) without the
consent of Indemnitee.

# 10. Procedures upon Application for Indemnification.

(a) To obtain indemnification, Indemnitee shall
submit to the Company a written request,
including therein or therewith such documentation
and information as is reasonably available to
Indemnitee and as is reasonably necessary to
determine whether and to what extent Indemnitee
is entitled to indemnification following the
final disposition of the Proceeding. The Company
shall, as soon as reasonably practicable after
receipt of such a request for indemnification,
advise the board of directors that Indemnitee has
requested indemnification. Any delay in providing
the request will not relieve the Company from its
obligations under this Agreement, except to the
extent such failure is prejudicial.

PLAINTIFF0002485

extent such failure is prejudicial.



(b) Upon written request by Indemnitee for indemnification pursuant to Section 10(a), a determination, if required by applicable law, with respect to Indemnitee's entitlement thereto shall be made in the specific case (i) if a Change in Control shall have occurred, by Independent Counsel in a written opinion to the Company's board of directors, a copy of which shall be delivered to Indemnitee or (ii) if a Change in Control shall not have occurred, (A) by a majority vote of the Disinterested Directors, even though less than a quorum of the Company's board of directors, (B) by a committee of Disinterested Directors designated by a majority vote of the Disinterested Directors, even though less than a quorum of the Company's board of directors, (C) if there are no such Disinterested Directors or, if such Disinterested Directors so direct, by Independent Counsel in a written opinion to the Company's board of directors, a copy of which shall be delivered to Indemnitee or (D) if so directed by the Company's board of directors, by the stockholders of the Company. If it is so determined that Indemnitee is entitled to indemnification, payment to Indemnitee shall be made within ten days after such determination. Indemnitee shall cooperate with the person, persons or entity making the determination with respect to Indemnitee's entitlement to indemnification, including providing to such person, persons or entity upon reasonable advance request any documentation or information that is not privileged or otherwise protected from disclosure and that is reasonably available to Indemnitee and reasonably necessary to such determination. Any costs or expenses (including attorneys' fees and disbursements) reasonably incurred by Indemnitee in so cooperating with the person, persons or entity making such determination shall be borne by the Company, to the extent permitted by applicable law.

(c) In the event the determination of entitlement to indemnification is to be made by Independent Counsel pursuant to Section 10(b), the Independent Counsel shall be selected as provided

PLAINTIFF0002486



in this Section 10(c). If a Change in Control
shall not have occurred, the Independent Counsel
shall be selected by the Company's board of
directors, and the Company shall give written
notice to Indemnitee advising him or her of the
identity of the Independent Counsel so selected.
If a Change in Control shall have occurred, the
Independent Counsel shall be selected by
Indemnitee (unless Indemnitee shall request that
such selection be made by the Company's board of
directors, in which event the preceding sentence
shall apply), and Indemnitee shall give written
notice to the Company advising it of the identity
of the Independent Counsel so selected. In either
event, Indemnitee or the Company, as the case may
be, may, within ten days after such written
notice of selection shall have been given,
deliver to the Company or to Indemnitee, as the
case may be, a written objection to such
selection; *provided*, *however*, that such objection
may be asserted only on the ground that the
Independent Counsel so selected does not meet the
requirements of "Independent Counsel" as defined
in Section 1 of this Agreement, and the objection
shall set forth with particularity the factual
basis of such assertion. Absent a proper and
timely objection, the person so selected shall
act as Independent Counsel. If such written
objection is so made and substantiated, the
Independent Counsel so selected may not serve as
Independent Counsel unless and until such
objection is withdrawn or a court has determined
that such objection is without merit. If, within
20 days after the later of (i) submission by
Indemnitee of a written request for
indemnification pursuant to Section 10(a) hereof
and (ii) the final disposition of the Proceeding,
the parties have not agreed upon an Independent
Counsel, either the Company or Indemnitee may
petition a court of competent jurisdiction for
resolution of any objection which shall have been
made by the Company or Indemnitee to the other's
selection of Independent Counsel and for the
appointment as Independent Counsel of a person
selected by the court or by such other person as
the court shall designate, and the person with
respect to whom all objections are so resolved or
the person so appointed shall act as Independent
Counsel under Section 10(b) hereof. Upon the due

PLAINTIFF0002487



commencement of any judicial proceeding or
arbitration pursuant to Section 12(a) of this
Agreement, the Independent Counsel shall be
discharged and relieved of any further
responsibility in such capacity (subject to the
applicable standards of professional conduct then
prevailing).

(d) The Company agrees to pay the reasonable fees
and expenses of any Independent Counsel and to
fully indemnify such counsel against any and all
Expenses, claims, liabilities and damages arising
out of or relating to this Agreement or its
engagement pursuant hereto.

# 11. Presumptions and Effect of Certain Proceedings.

(a) In making a determination with respect to
entitlement to indemnification hereunder, the
person, persons or entity making such
determination shall, to the fullest extent not
prohibited by law, presume that Indemnitee is
entitled to indemnification under this Agreement
if Indemnitee has submitted a request for
indemnification in accordance with Section 10(a)
of this Agreement, and the Company shall, to the
fullest extent not prohibited by law, have the
burden of proof to overcome that presumption in
connection with the making by such person,
persons or entity of any determination contrary
to that presumption.

(b) The termination of any Proceeding or of any
claim, issue or matter therein, by judgment,
order, settlement or conviction, or upon a plea
of *nolo contendere* or its equivalent, shall not
(except as otherwise expressly provided in this
Agreement) of itself adversely affect the right
of Indemnitee to indemnification or create a
presumption that Indemnitee did not act in good
faith and in a manner which he or she reasonably
believed to be in or not opposed to the best
interests of the Company or, with respect to any
criminal Proceeding, that Indemnitee had
reasonable cause to believe that his or her
conduct was unlawful.

PLAINTIFF0002488



(c) for purposes of any determination of good
faith, Indemnitee shall be deemed to have acted
in good faith to the extent Indemnitee relied in

good faith on (i) the records or books of account
of the Enterprise, including financial
statements, (ii) information supplied to
Indemnitee by the officers of the Enterprise in
the course of their duties, (iii) the advice of
legal counsel for the Enterprise or its board of
directors or counsel selected by any committee of
the board of directors or (iv) information or
records given or reports made to the Enterprise
by an independent certified public accountant, an
appraiser, investment banker or other expert
selected with reasonable care by the Enterprise
or its board of directors or any committee of the
board of directors. The provisions of this
Section 11(c) shall not be deemed to be exclusive
or to limit in any way the other circumstances in
which Indemnitee may be deemed to have met the
applicable standard of conduct set forth in this
Agreement.

(d) Neither the knowledge, actions nor failure to
act of any other director, officer, agent or
employee of the Enterprise shall be imputed to
Indemnitee for purposes of determining the right
to indemnification under this Agreement.

## 12. Remedies of Indemnitee.

(a) Subject to Section 12(e), in the event that
(i) a determination is made pursuant to
Section 10 of this Agreement that Indemnitee is
not entitled to indemnification under this
Agreement, (ii) advancement of Expenses is not
timely made pursuant to Section 8 or 12(d) of
this Agreement, (iii) no determination of
entitlement to indemnification shall have been
made pursuant to Section 10 of this Agreement
within 90 days after the later of the receipt by
the Company of the request for indemnification or
the final disposition of the Proceeding,
(iv) payment of indemnification pursuant to this
Agreement is not made (A) within ten days after a
determination has been made that Indemnitee is
entitled to indemnification or (B) with respect
to indemnification pursuant to Sections 4, 5 and
12(d) of this Agreement within 20 days after

PLAINTIFF0002489

12(a) of this Agreement, within 30 days after
receipt by the Company of a written request
therefor, or (v) the Company or any other person



or entity takes or threatens to take any action
to declare this Agreement void or unenforceable,
or institutes any litigation or other action or
proceeding designed to deny, or to recover from,
Indemnitee the benefits provided or intended to
be provided to Indemnitee hereunder, Indemnitee
shall be entitled to an adjudication by a court
of competent jurisdiction of his or her
entitlement to such indemnification or
advancement of Expenses. Alternatively,
Indemnitee, at his or her option, may seek an
award in arbitration with respect to his or her
entitlement to such indemnification or
advancement of Expenses, to be conducted by a
single arbitrator pursuant to the Commercial
Arbitration Rules of the American Arbitration
Association. Indemnitee shall commence such
proceeding seeking an adjudication or an award in
arbitration within 180 days following the date on
which Indemnitee first has the right to commence
such proceeding pursuant to this Section 12(a);
*provided, however,* that the foregoing clause
shall not apply in respect of a proceeding
brought by Indemnitee to enforce his or her
rights under Section 4 of this Agreement. The
Company shall not oppose Indemnitee's right to
seek any such adjudication or award in
arbitration in accordance with this Agreement.

(b) Neither (i) the failure of the Company, its
board of directors, any committee or subgroup of
the board of directors, Independent Counsel or
stockholders to have made a determination that
indemnification of Indemnitee is proper in the
circumstances because Indemnitee has met the
applicable standard of conduct, nor (ii) an
actual determination by the Company, its board of
directors, any committee or subgroup of the board
of directors, Independent Counsel or stockholders
that Indemnitee has not met the applicable
standard of conduct, shall be a defense to the
action or create a presumption that Indemnitee
has or has not met the applicable standard of
conduct. In the event that a determination shall
have been made pursuant to Section 10 of this
Agreement that Indemnitee is not entitled to

PLAINTIFF0002490



indemnification, any judicial proceeding or arbitration commenced pursuant to this Section 12 shall be conducted in all respects as a *de novo* trial, or arbitration, on the merits, and Indemnitee shall not be prejudiced by reason of that adverse determination. In any judicial proceeding or arbitration commenced pursuant to this Section 12, the Company shall, to the fullest extent not prohibited by law, have the burden of proving Indemnitee is not entitled to indemnification or advancement of Expenses, as the case may be.

(c) To the fullest extent not prohibited by law, the Company shall be precluded from asserting in any judicial proceeding or arbitration commenced pursuant to this Section 12 that the procedures and presumptions of this Agreement are not valid, binding and enforceable and shall stipulate in any such court or before any such arbitrator that the Company is bound by all the provisions of this Agreement. If a determination shall have been made pursuant to Section 10 of this Agreement that Indemnitee is entitled to indemnification, the Company shall be bound by such determination in any judicial proceeding or arbitration commenced pursuant to this Section 12, absent (i) a misstatement by Indemnitee of a material fact, or an omission of a material fact necessary to make Indemnitee's statements not materially misleading, in connection with the request for indemnification, or (ii) a prohibition of such indemnification under applicable law.

(d) To the extent not prohibited by law, the Company shall indemnify Indemnitee against all Expenses that are incurred by Indemnitee in connection with any action for indemnification or advancement of Expenses from the Company under this Agreement or under any directors' and officers' liability insurance policies maintained by the Company to the extent Indemnitee is successful in such action, and, if requested by Indemnitee, shall (as soon as reasonably practicable, but in any event no later than 60 days, after receipt by the Company of a written request therefor) advance such Expenses to Indemnitee, subject to the provisions of

PLAINTIFF0002491

Section 8.

(e) Notwithstanding anything in this Agreement to the contrary, no determination as to entitlement to indemnification shall be required to be made prior to the final disposition of the Proceeding.



# 13. Contribution.

To the fullest extent permissible under applicable law, if the indemnification provided for in this Agreement is unavailable to Indemnitee, the Company, in lieu of indemnifying Indemnitee, shall contribute to the amounts incurred by Indemnitee, whether for Expenses, judgments, fines or amounts paid or to be paid in settlement, in connection with any claim relating to an indemnifiable event under this Agreement, in such proportion as is deemed fair and reasonable in light of all of the circumstances of such Proceeding in order to reflect (i) the relative benefits received by the Company and Indemnitee as a result of the events and transactions giving rise to such Proceeding; and (ii) the relative fault of Indemnitee and the Company (and its other directors, officers, employees and agents) in connection with such events and transactions.

# 14. Non-exclusivity.

The rights of indemnification and to receive advancement of Expenses as provided by this Agreement shall not be deemed exclusive of any other rights to which Indemnitee may at any time be entitled under applicable law, the Company's certificate of incorporation or bylaws, any agreement, a vote of stockholders or a resolution of directors, or otherwise. To the extent that a change in Delaware law, whether by statute or judicial decision, permits greater indemnification or advancement of Expenses than would be afforded currently under the Company's certificate of incorporation and bylaws and this Agreement, it is the intent of the parties hereto that Indemnitee shall enjoy by this Agreement the greater benefits so afforded by such change.

PLAINTIFF0002492



subject to the restrictions expressly set forth
herein or therein. Except as expressly set forth
herein, no right or remedy herein conferred is
intended to be exclusive of any other right or
remedy, and every other right and remedy shall be
cumulative and in addition to every other right
and remedy given hereunder or now or hereafter
existing at law or in equity or otherwise. Except
as expressly set forth herein, the assertion or
employment of any right or remedy hereunder, or
otherwise, shall not prevent the concurrent
assertion or employment of any other right or
remedy.

## 15. Primary Responsibility.

The Company acknowledges that Indemnitee has
certain rights to indemnification and advancement
of expenses provided by *insert name of fund* and
certain affiliates thereof (collectively, the
"**Secondary Indemnitor**"). The Company agrees that,
as between the Company and the Secondary
Indemnitor, the Company is primarily responsible
for amounts required to be indemnified or
advanced under the Company's certificate of
incorporation or bylaws or this Agreement and any
obligation of the Secondary Indemnitors to
provide indemnification or advancement for the
same amounts is secondary to those Company
obligations. To the extent not in contravention
of any insurance policy or policies providing
liability or other insurance for the Company or
any director, trustee, general partner, managing
member, officer, employee, agent or fiduciary of
the Company or any other Enterprise, the Company
waives any right of contribution or subrogation
against the Secondary Indemnitor with respect to
the liabilities for which the Company is
primarily responsible under this Section 15. In
the event of any payment by the Secondary
Indemnitor of amounts otherwise required to be
indemnified or advanced by the Company under the
Company's certificate of incorporation or bylaws
or this Agreement, the Secondary Indemnitor shall
be subrogated to the extent of such payment to
all of the rights of recovery of Indemnitee for
indemnification or advancement of expenses under
the Company's certificate of incorporation or

PLAINTIFF0002493

bylaws or this Agreement or, to the extent such
subrogation is unavailable and contribution is
found to be the applicable remedy, shall have a

right of contribution with respect to the amounts
paid. The Secondary Indemnitor are is an express
third-party beneficiary of the terms of this
Section 15.



# 16. No Duplication of Payments.

The Company shall not be liable under this
Agreement to make any payment of amounts
otherwise indemnifiable hereunder (or for which
advancement is provided hereunder) if and to the
extent that Indemnitee has otherwise actually
received payment for such amounts under any
insurance policy, contract, agreement or
otherwise.

# 17. Insurance.

To the extent that the Company maintains an
insurance policy or policies providing liability
insurance for directors, trustees, general
partners, managing members, officers, employees,
agents or fiduciaries of the Company or any other
Enterprise, Indemnitee shall be covered by such
policy or policies to the same extent as the most
favorably-insured persons under such policy or
policies in a comparable position.

# 18. Subrogation.

In the event of any payment under this Agreement,
the Company shall be subrogated to the extent of
such payment to all of the rights of recovery of
Indemnitee, who shall execute all papers required
and take all action necessary to secure such
rights, including execution of such documents as
are necessary to enable the Company to bring suit
to enforce such rights.

# 19. Services to the Company.

Indemnitee agrees to serve as a director or
officer of the Company or, at the request of the
Company, as a director, trustee, general partner,

PLAINTIFF0002494



managing member, officer, employee, agent or
fiduciary of another Enterprise, for so long as
Indemnitee is duly elected or appointed or until
Indemnitee tenders his or her resignation or is
removed from such position. Indemnitee may at any
time and for any reason resign from such position
(subject to any other contractual obligation or
any obligation imposed by operation of law), in
which event the Company shall have no obligation
under this Agreement to continue Indemnitee in
such position. This Agreement shall not be deemed
an employment contract between the Company (or
any of its subsidiaries or any Enterprise) and
Indemnitee. Indemnitee specifically acknowledges
that any employment with the Company (or any of
its subsidiaries or any Enterprise) is at will,
and Indemnitee may be discharged at any time for
any reason, with or without cause, with or
without notice, except as may be otherwise
expressly provided in any executed, written
employment contract between Indemnitee and the
Company (or any of its subsidiaries or any
Enterprise), any existing formal severance
policies adopted by the Company's board of
directors or, with respect to service as a
director or officer of the Company, the Company's
certificate of incorporation or bylaws or the
DGCL. No such document shall be subject to any
oral modification thereof.

## 20. Duration.

This Agreement shall continue until and terminate
upon the later of (a) ten years after the date
that Indemnitee shall have ceased to serve as a
director or officer of the Company or as a
director, trustee, general partner, managing
member, officer, employee, agent or fiduciary of
any other Enterprise, as applicable; or (b) one
year after the final termination of any
Proceeding, including any appeal, then pending in
respect of which Indemnitee is granted rights of
indemnification or advancement of Expenses
hereunder and of any proceeding commenced by
Indemnitee pursuant to Section 12 of this
Agreement relating thereto.

## 21. Successors.

PLAINTIFF0002495

This Agreement shall be binding upon the Company and its successors and assigns, including any direct or indirect successor by purchase, merger, consolidation or otherwise to all or substantially all of the business or assets of the Company, and shall inure to the benefit of Indemnitee and Indemnitee's heirs, executors and administrators. The Company shall require and cause any successor (whether direct or indirect by purchase, merger, consolidation or otherwise) to all or substantially all of the business or assets of the Company, by written agreement, expressly to assume and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform if no such succession had taken place.

## 22. Severability.

Nothing in this Agreement is intended to require or shall be construed as requiring the Company to do or fail to do any act in violation of applicable law. The Company's inability, pursuant to court order or other applicable law, to perform its obligations under this Agreement shall not constitute a breach of this Agreement. If any provision or provisions of this Agreement shall be held to be invalid, illegal or unenforceable for any reason whatsoever: (i) the validity, legality and enforceability of the remaining provisions of this Agreement (including without limitation, each portion of any section of this Agreement containing any such provision held to be invalid, illegal or unenforceable, that is not itself invalid, illegal or unenforceable) shall not in any way be affected or impaired thereby and shall remain enforceable to the fullest extent permitted by law; (ii) such provision or provisions shall be deemed reformed to the extent necessary to conform to applicable law and to give the maximum effect to the intent of the parties hereto; and (iii) to the fullest extent possible, the provisions of this Agreement (including, without limitation, each portion of any section of this Agreement containing any such provision held to be invalid, illegal or unenforceable, that is not itself invalid,



PLAINTIFF0002496

illegal or unenforceable) shall be construed so
as to give effect to the intent manifested
thereby.

## 23. Enforcement.



The Company expressly confirms and agrees that it
has entered into this Agreement and assumed the
obligations imposed on it hereby in order to
induce Indemnitee to serve as a director or
officer of the Company, and the Company
acknowledges that Indemnitee is relying upon this
Agreement in serving as a director or officer of
the Company.

## 24. Entire Agreement.

This Agreement constitutes the entire agreement
between the parties hereto with respect to the
subject matter hereof and supersedes all prior
agreements and understandings, oral, written and
implied, between the parties hereto with respect
to the subject matter hereof; *provided*, *however*,
that this Agreement is a supplement to and in
furtherance of the Company's certificate of
incorporation and bylaws and applicable law.

## 25. Modification and Waiver.

No supplement, modification or amendment to this
Agreement shall be binding unless executed in
writing by the parties hereto. No amendment,
alteration or repeal of this Agreement shall
adversely affect any right of Indemnitee under
this Agreement in respect of any action taken or
omitted by such Indemnitee in his or her
Corporate Status prior to such amendment,
alteration or repeal. No waiver of any of the
provisions of this Agreement shall constitute or
be deemed a waiver of any other provision of this
Agreement nor shall any waiver constitute a
continuing waiver.

## 26. Notices.

All notices and other communications required or
permitted hereunder shall be in writing and shall
be mailed by registered or certified mail,

PLAINTIFF0002497



postage prepaid, sent by facsimile or electronic mail or otherwise delivered by hand, messenger or courier service addressed:

> (a) if to Indemnitee, to Indemnitee's address, facsimile number or electronic mail address as shown on the signature page of this Agreement or in the Company's records, as may be updated in accordance with the provisions hereof; or

> (b) if to the Company, to the attention of the President or Chief Executive Officer of the Company at such current address as the Company shall have furnished to Indemnitee, with a copy (which shall not constitute notice) to ************ ***********.

Each such notice or other communication shall for all purposes of this Agreement be treated as effective or having been given (i) if delivered by hand, messenger or courier service, when delivered (or if sent *via* a nationally-recognized overnight courier service, freight prepaid, specifying next-business-day delivery, one business day after deposit with the courier), or (ii) if sent *via* mail, at the earlier of its receipt or five days after the same has been deposited in a regularly-maintained receptacle for the deposit of the United States mail, addressed and mailed as aforesaid, or (iii) if sent *via* facsimile, upon confirmation of facsimile transfer or, if sent *via* electronic mail, upon confirmation of delivery when directed to the relevant electronic mail address, if sent during normal business hours of the recipient, or if not sent during normal business hours of the recipient, then on the recipient's next business day.

# 26. Applicable Law and Consent to Jurisdiction.

This Agreement and the legal relations among the parties shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without regard to its conflict

PLAINTIFF0002498



State of Delaware, without regard to its conflict of laws rules. Except with respect to any arbitration commenced by Indemnitee pursuant to

Section 12(a) of this Agreement, the Company and Indemnitee hereby irrevocably and unconditionally (i) agree that any action or proceeding arising out of or in connection with this Agreement shall be brought only in the Delaware Court of Chancery, and not in any other state or federal court in the United States of America or any court in any other country, (ii) consent to submit to the exclusive jurisdiction of the Delaware Court of Chancery for purposes of any action or proceeding arising out of or in connection with this Agreement, (iii) appoint, to the extent such party is not otherwise subject to service of process in the State of Delaware, Incorporating Services, Ltd., Dover, Delaware as its agent in the State of Delaware as such party's agent for acceptance of legal process in connection with any such action or proceeding against such party with the same legal force and validity as if served upon such party personally within the State of Delaware, (iv) waive any objection to the laying of venue of any such action or proceeding in the Delaware Court of Chancery, and (v) waive, and agree not to plead or to make, any claim that any such action or proceeding brought in the Delaware Court of Chancery has been brought in an improper or inconvenient forum.

# 27. Counterparts.

This Agreement may be executed in one or more counterparts, each of which shall for all purposes be deemed to be an original but all of which together shall constitute one and the same Agreement. This Agreement may also be executed and delivered by facsimile signature and in counterparts, each of which shall for all purposes be deemed to be an original but all of which together shall constitute one and the same Agreement. Only one such counterpart signed by the party against whom enforceability is sought needs to be produced to evidence the existence of this Agreement.

PLAINTIFF0002499

## 28. Captions.

The headings of the paragraphs of this Agreement
are inserted for convenience only and shall not
be deemed to constitute part of this Agreement or
to affect the construction thereof.



[Signature page to follow]

The parties are signing this Indemnification
Agreement as of the date stated in the
introductory sentence.

| COMPANY | INDEMNITEE |
|---|---|
| Signature: | Signature: |
| Print Name: [Entity-signer-name] | Print Name: [Indemnitee-name] |
| Role: Chief Executive Officer | Role: Indemnitee |
| Dated: [Date] | Dated: [Date] |

**Previous**
Common Stock
Agreement

**Next**
Equity Incentives

PLAINTIFF0002500



**LEGAL–TOOLS** DAOLABS

Connect Wallet

# Variables

**Corporation's Name (ALL CAPS)**

ACME CORPORATION

**Maximum Number of Shares Sold Under the Plan**

100

**Year of the Plan**

2023

Update document



# [Entity-name] [Plan-year] EQUITY INCENTIVE PLAN

## 1. Purposes of the Plan.

The purposes of this Plan are:

- to attract and retain the best available personnel for positions of substantial responsibility,
- to provide additional incentive to Employees, Directors and Consultants, and
- to promote the success of the Company's business.

The Plan permits the grant of Incentive Stock Options, Nonstatutory Stock Options, Stock

[Entity-name] [Plan-year]
EQ ITY INCENTIVE PLAN

1. Purposes of the Plan.

2. Definitions.

3. Stock Subject to the Plan.

4. Administration of the Plan.

5. Eligibility.

6. Stock Options.

7. Stock Appreciation Rights.

8. Restricted Stock.

9. Restricted Stock Units.

10. Compliance With Code Section 409A.

11. Leaves of Absence Transfer Between Locations.

12. Limited Transferability of Awards.

13. Adjustments; Dissolution or Liquidation; Merger or Change in Control.

14. Tax Withholding.

15. No Effect on Employment or Service.

16. Date of Grant.

17. Term of Plan.

18. Amendment and Termination of the Plan.

19. Conditions Upon Issuance of Shares.

PLAINTIFF0002501

Appreciation Rights, Restricted Stock and
Restricted Stock Units.

# 2. Definitions.

As used herein, the following definitions will
apply:

> (a) **"Administrator"** means the Board or
> any of its Committees as will be
> administering the Plan, in accordance
> with Section 4 of the Plan.
>
> (b) **"Applicable Laws"** means the
> requirements relating to the
> administration of equity based awards
> under U.S. state corporate laws, U.S.
> federal and state securities laws, the
> Code, any stock exchange or quotation
> system on which the Common Stock is
> listed or quoted and the applicable
> laws of any foreign country or
> jurisdiction where Awards are, or will
> be, granted under the Plan.
>
> (c) **"Award"** means, individually or
> collectively, a grant under the Plan of
> Options, Stock Appreciation Rights,
> Restricted Stock, or Restricted Stock
> Units.
>
> (d) **"Award Agreement"** means the written
> or electronic agreement setting forth
> the terms and provisions applicable to
> each Award granted under the Plan. The
> Award Agreement is subject to the terms
> and conditions of the Plan.
>
> (e) **"Board"** means the Board of
> Directors of the Company.
>
> (f) **"Change in Control"** means the
> occurrence of any of the following
> events:
>
> > (i) **Change in Ownership of
> > the Company.** A change in the
> > ownership of the Company
> > which occurs on the date that
> > any one person, or more than

20. Inability to Obtain
Authority.

21. Stockholder Approval.

22. Information to

Participants.



PLAINTIFF0002502



any, if person, or more than
one person acting as a group
("Person"), acquires

ownership of the stock of the
Company that, together with
the stock held by such
Person, constitutes more than
50% of the total voting power
of the stock of the Company,
except that any change in the
ownership of the stock of the
Company as a result of a
private financing of the
Company that is approved by
the Board will not be
considered a Change in
Control; or

(ii) **Change in Effective
Control of the Company.** If
the Company has a class of
securities registered
pursuant to Section 12 of the
Exchange Act, a change in the
effective control of the
Company which occurs on the
date that a majority of
members of the Board is
replaced during any twelve
(12) month period by
Directors whose appointment
or election is not endorsed
by a majority of the members
of the Board prior to the
date of the appointment or
election. For purposes of
this clause (ii), if any
Person is considered to be in
effective control of the
Company, the acquisition of
additional control of the
Company by the same Person
will not be considered a
Change in Control; or

(iii) **Change in Ownership of
a Substantial Portion of the
Company's Assets.** A change in
the ownership of a

PLAINTIFF0002503



substantial portion of the Company's assets which occurs on the date that any Person

acquires (or has acquired during the twelve (12) month period ending on the date of the most recent acquisition by such person or persons) assets from the Company that have a total gross fair market value equal to or more than 50% of the total gross fair market value of all of the assets of the Company immediately prior to such acquisition or acquisitions. For purposes of this subsection (iii), gross fair market value means the value of the assets of the Company, or the value of the assets being disposed of, determined without regard to any liabilities associated with such assets.

For purposes of this Section 2(f), persons will be considered to be acting as a group if they are owners of a corporation that enters into a merger, consolidation, purchase or acquisition of stock, or similar business transaction with the Company.

Notwithstanding the foregoing, a transaction will not be deemed a Change in Control unless the transaction qualifies as a change in control event within the meaning of Code Section 409A, as it has been and may be amended from time to time, and any proposed or final Treasury Regulations and Internal Revenue Service guidance that has been

PLAINTIFF0002504



promulgated or may be
promulgated thereunder from
time to time.

Further and for the avoidance
of doubt, a transaction will
not constitute a Change in
Control if: (i) its sole
purpose is to change the
jurisdiction of the Company's
incorporation, or (ii) its
sole purpose is to create a
holding company that will be
owned in substantially the
same proportions by the
persons who held the
Company's securities
immediately before such
transaction.

(g) **"Code"** means the Internal Revenue
Code of 1986, as amended. Any reference
to a section of the Code herein will be
a reference to any successor or amended
section of the Code.

(h) **"Committee"** means a committee of
Directors or of other individuals
satisfying Applicable Laws appointed by
the Board, or by the compensation
committee of the Board, in accordance
with Section 4 hereof.

(i) **"Common Stock"** means the common
stock of the Company.

(j) **"Company"** means **[Entity-name]**, a
Delaware corporation, or any successor
thereto.

(k) **"Consultant"** means any person,
including an advisor, engaged by the
Company or a Parent or Subsidiary to
render services to such entity.

(l) **"Director"** means a member of the
Board.

(m) **"Disability"** means total and
permanent disability as defined in Code
Section 22(e)(3), provided that in the

PLAINTIFF0002505



case of Awards other than Incentive
Stock Options, the Administrator in its
discretion may determine whether a

permanent and total disability exists
in accordance with uniform and non-
discriminatory standards adopted by the
Administrator from time to time.

(n) "**Employee**" means any person,
including officers and Directors,
employed by the Company or any Parent
or Subsidiary of the Company. Neither
service as a Director nor payment of a
director's fee by the Company will be
sufficient to constitute "employment"
by the Company.

(o) "**Exchange Act**" means the Securities
Exchange Act of 1934, as amended.

(p) "**Exchange Program**" means a program
under which (i) outstanding Awards are
surrendered or cancelled in exchange
for Awards of the same type (which may
have higher or lower exercise prices
and different terms), Awards of a
different type, and/or cash, (ii)
Participants would have the opportunity
to transfer any outstanding Awards to a
financial institution or other person
or entity selected by the
Administrator, and/or (iii) the
exercise price of an outstanding Award
is reduced or increased. The
Administrator will determine the terms
and conditions of any Exchange Program
in its sole discretion.

(q) "**Fair Market Value**" means, as of
any date, the value of Common Stock
determined as follows:

> (i) If the Common Stock is
> listed on any established
> stock exchange or a national
> market system, including
> without limitation the Nasdaq
> Global Select Market, the
> Nasdaq Global Market or the
> Nasdaq Capital Market of The

PLAINTIFF0002506



Nasdaq Stock Market, its Fair
Market Value will be the
closing sales price for such
stock (or the closing bid, if
no sales were reported) as
quoted on such exchange or
system on the day of
determination, as reported in
*The Wall Street Journal* or
such other source as the
Administrator deems reliable;

(ii) If the Common Stock is
regularly quoted by a
recognized securities dealer
but selling prices are not
reported, the Fair Market
Value of a Share will be the
mean between the high bid and
low asked prices for the
Common Stock on the day of
determination (or, if no bids
and asks were reported on
that date, as applicable, on
the last trading date such
bids and asks were reported),
as reported in *The Wall
Street Journal* or such other
source as the Administrator
deems reliable; or

(iii) In the absence of an
established market for the
Common Stock, the Fair Market
Value will be determined in
good faith by the
Administrator.

(r) **"Incentive Stock Option"** means an
Option that by its terms qualifies and
is otherwise intended to qualify as an
incentive stock option within the
meaning of Code Section 422 and the
regulations promulgated thereunder.

(s) **"Nonstatutory Stock Option"** means
an Option that by its terms does not
qualify or is not intended to qualify
as an Incentive Stock Option.

PLAINTIFF0002507

(t) **"Option"** means a stock option granted pursuant to the Plan.

(u) **"Parent"** means a "parent corporation," whether now or hereafter existing, as defined in Code Section 424(e).



(v) **"Participant"** means the holder of an outstanding Award.

(w) **"Period of Restriction"** means the period during which the transfer of Shares of Restricted Stock are subject to restrictions and therefore, the Shares are subject to a substantial risk of forfeiture. Such restrictions may be based on the passage of time, the achievement of target levels of performance, or the occurrence of other events as determined by the Administrator.

(x) **"Plan"** means this **[Plan-year]** Equity Incentive Plan.

(y) **"Restricted Stock"** means Shares issued pursuant to an Award of Restricted Stock under Section 8 of the Plan, or issued pursuant to the early exercise of an Option.

(z) **"Restricted Stock Unit"** means a bookkeeping entry representing an amount equal to the Fair Market Value of one Share, granted pursuant to Section 9. Each Restricted Stock Unit represents an unfunded and unsecured obligation of the Company.

(aa) **"Service Provider"** means an Employee, Director or Consultant.

(ab) **"Share"** means a share of the Common Stock, as adjusted in accordance with Section 13 of the Plan.

(ac) **"Stock Appreciation Right"** means an Award, granted alone or in connection with an Option, that

PLAINTIFF0002508

pursuant to Section 7 is designated as
a Stock Appreciation Right.

(ad) **"Subsidiary"** means a "subsidiary
corporation," whether now or hereafter
existing, as defined in Code
Section 424(f).



# 3. Stock Subject to the Plan.

(a) **Stock Subject to the Plan.** Subject to the
provisions of Section 13 of the Plan, the maximum
aggregate number of Shares that may be subject to
Awards and sold under the Plan is **[Share-amount]**
Shares. The Shares may be authorized but
unissued, or reacquired Common Stock.

(b) **Lapsed Awards.** If an Award expires or becomes
unexercisable without having been exercised in
full, is surrendered pursuant to an Exchange
Program, or, with respect to Restricted Stock or
Restricted Stock Units, is forfeited to or
repurchased by the Company due to the failure to
vest, the unpurchased Shares (or for Awards other
than Options or Stock Appreciation Rights the
forfeited or repurchased Shares) which were
subject thereto will become available for future
grant or sale under the Plan (unless the Plan has
terminated). With respect to Stock Appreciation
Rights, only Shares actually issued pursuant to a
Stock Appreciation Right will cease to be
available under the Plan; all remaining Shares
under Stock Appreciation Rights will remain
available for future grant or sale under the Plan
(unless the Plan has terminated). Shares that
have actually been issued under the Plan under
any Award will not be returned to the Plan and
will not become available for future distribution
under the Plan; provided, however, that if Shares
issued pursuant to Awards of Restricted Stock or
Restricted Stock Units are repurchased by the
Company or are forfeited to the Company due to
the failure to vest, such Shares will become
available for future grant under the Plan. Shares
used to pay the exercise price of an Award or to
satisfy the tax withholding obligations related
to an Award will become available for future
grant or sale under the Plan. To the extent an
Award under the Plan is paid out in cash rather

PLAINTIFF0002509



Award under the Plan is paid out in cash other than Shares, such cash payment will not result in reducing the number of Shares available for

issuance under the Plan. Notwithstanding the foregoing and, subject to adjustment as provided in Section 13, the maximum number of Shares that may be issued upon the exercise of Incentive Stock Options will equal the aggregate Share number stated in Section 3(a), plus, to the extent allowable under Code Section 422 and the Treasury Regulations promulgated thereunder, any Shares that become available for issuance under the Plan pursuant to Section 3(b).

(c) **Share Reserve.** The Company, during the term of this Plan, will at all times reserve and keep available such number of Shares as will be sufficient to satisfy the requirements of the Plan.

# 4. Administration of the Plan.

(a) **Procedure.**

(i) **Multiple Administrative Bodies.** Different Committees with respect to different groups of Service Providers may administer the Plan.

(ii) **Other Administration.** Other than as provided above, the Plan will be administered by (A) the Board or (B) a Committee, which Committee will be constituted to satisfy Applicable Laws.

(b) **Powers of the Administrator.** Subject to the provisions of the Plan, and in the case of a Committee, subject to the specific duties delegated by the Board to such Committee, the Administrator will have the authority, in its discretion:

(i) to determine the Fair Market Value;

(ii) to select the Service

PLAINTIFF0002510



(ii) to select the Service Providers to whom Awards may be granted hereunder;

(iii) to determine the number of Shares to be covered by each Award granted hereunder;

(vi) to approve forms of Award Agreements for use under the Plan;

(v) to determine the terms and conditions, not inconsistent with the terms of the Plan, of any Award granted hereunder. Such terms and conditions include, but are not limited to, the exercise price, the time or times when Awards may be exercised (which may be based on performance criteria), any vesting acceleration or waiver of forfeiture restrictions, and any restriction or limitation regarding any Award or the Shares relating thereto, based in each case on such factors as the Administrator will determine;

(vi) to institute and determine the terms and conditions of an Exchange Program;

(vii) to construe and interpret the terms of the Plan and Awards granted pursuant to the Plan;

(viii) to prescribe, amend and rescind rules and regulations relating to the Plan, including rules and regulations relating to sub-plans established for the purpose of satisfying applicable foreign laws or

PLAINTIFF0002511

for qualifying for favorable tax treatment under applicable foreign laws; (ix) to modify or amend each Award (subject to Section 18(c) of the Plan), including but not limited to the discretionary authority to extend the post-termination exercisability period of Awards and to extend the maximum term of an Option (subject to Section 6(d));

(x) to allow Participants to satisfy withholding tax obligations in a manner prescribed in Section 14;

(xi) to authorize any person to execute on behalf of the Company any instrument required to effect the grant of an Award previously granted by the Administrator;

(xii) to allow a Participant to defer the receipt of the payment of cash or the delivery of Shares that otherwise would be due to such Participant under an Award; and

(xiii) to make all other determinations deemed necessary or advisable for administering the Plan.

(c) **Effect of Administrator's Decision.** The Administrator's decisions, determinations and interpretations will be final and binding on all Participants and any other holders of Awards.

# 5. Eligibility.

PLAINTIFF0002512

Nonstatutory Stock Options, Stock Appreciation
Rights, Restricted Stock, and Restricted Stock
Units may be granted to Service Providers.

Incentive Stock Options may be granted only to
Employees.



# 6. Stock Options.

(a) **Grant of Options.** Subject to the
terms and provisions of the Plan, the
Administrator, at any time and from
time to time, may grant Options in such
amounts as the Administrator, in its
sole discretion, will determine.

(b) **Option Agreement.** Each Award of an
Option will be evidenced by an Award
Agreement that will specify the
exercise price, the term of the Option,
the number of Shares subject to the
Option, the exercise restrictions, if
any, applicable to the Option, and such
other terms and conditions as the
Administrator, in its sole discretion,
will determine.

(c) **Limitations.** Each Option will be
designated in the Award Agreement as
either an Incentive Stock Option or a
Nonstatutory Stock Option.
Notwithstanding such designation,
however, to the extent that the
aggregate Fair Market Value of the
Shares with respect to which Incentive
Stock Options are exercisable for the
first time by the Participant during
any calendar year (under all plans of
the Company and any Parent or
Subsidiary) exceeds one hundred
thousand dollars ($100,000), such
Options will be treated as Nonstatutory
Stock Options. For purposes of this
Section 6(c), Incentive Stock Options
will be taken into account in the order
in which they were granted, the Fair
Market Value of the Shares will be
determined as of the time the Option
with respect to such Shares is granted,
and calculation will be performed in

PLAINTIFF0002513

accordance with Code Section 422 and

Treasury Regulations promulgated
thereunder.

(d) **Term of Option.** The term of each
Option will be stated in the Award
Agreement; provided, however, that the
term will be no more than ten (10)
years from the date of grant thereof.
In the case of an Incentive Stock
Option granted to a Participant who, at
the time the Incentive Stock Option is
granted, owns stock representing more
than ten percent (10%) of the total
combined voting power of all classes of
stock of the Company or any Parent or
Subsidiary, the term of the Incentive
Stock Option will be five (5) years
from the date of grant or such shorter
term as may be provided in the Award
Agreement.

(e) **Option Exercise Price and
Consideration.**

> (i) **Exercise Price.** The per
> Share exercise price for the
> Shares to be issued pursuant
> to the exercise of an Option
> will be determined by the
> Administrator, but will be no
> less than one hundred percent
> (100%) of the Fair Market
> Value per Share on the date
> of grant. In addition, in the
> case of an Incentive Stock
> Option granted to an Employee
> who owns stock representing
> more than ten percent (10%)
> of the voting power of all
> classes of stock of the
> Company or any Parent or
> Subsidiary, the per Share
> exercise price will be no
> less than one hundred ten
> percent (110%) of the Fair
> Market Value per Share on the
> date of grant.



PLAINTIFF0002514



date of grant. Notwithstanding the foregoing provisions of this

Section 6(e)(i), Options may be granted with a per Share exercise price of less than one hundred percent (100%) of the Fair Market Value per Share on the date of grant pursuant to a transaction described in, and in a manner consistent with, Code Section 424(a).

(ii) **Waiting Period and Exercise Dates.** At the time an Option is granted, the Administrator will fix the period within which the Option may be exercised and will determine any conditions that must be satisfied before the Option may be exercised.

(iii) **Form of Consideration.** The Administrator will determine the acceptable form of consideration for exercising an Option, including the method of payment. In the case of an Incentive Stock Option, the Administrator will determine the acceptable form of consideration at the time of grant. Such consideration may consist entirely of: (1) cash; (2) check; (3) promissory note, to the extent permitted by Applicable Laws, (4) other Shares, provided that such Shares have a Fair Market Value on the date of surrender equal to the aggregate exercise price of the Shares as to which such Option will be exercised and provided further that

PLAINTIFF0002515



accepting such Shares will not result in any adverse accounting consequences to

the Company, as the Administrator determines in its sole discretion; (5) consideration received by the Company under cashless exercise program (whether through a broker or otherwise) implemented by the Company in connection with the Plan; (6) by net exercise, (7) such other consideration and method of payment for the issuance of Shares to the extent permitted by Applicable Laws, or (8) any combination of the foregoing methods of payment. In making its determination as to the type of consideration to accept, the Administrator will consider if acceptance of such consideration may be reasonably expected to benefit the Company.

(f) **Exercise of Option.**

(i) **Procedure for Exercise; Rights as a Stockholder.** Any Option granted hereunder will be exercisable according to the terms of the Plan and at such times and under such conditions as determined by the Administrator and set forth in the Award Agreement. An Option may not be exercised for a fraction of a Share.

(ii) An Option will be deemed exercised when the Company receives: (i) notice of exercise (in such form as the Administrator may specify from time to time) from the

PLAINTIFF0002516

from time to time) from the person entitled to exercise the Option, and (ii) full



payment for the Shares with respect to which the Option is exercised (together with applicable tax withholding). Full payment may consist of any consideration and method of payment authorized by the Administrator and permitted by the Award Agreement and the Plan. Shares issued upon exercise of an Option will be issued in the name of the Participant or, if requested by the Participant, in the name of the Participant and his or her spouse. Until the Shares are issued (as evidenced by the appropriate entry on the books of the Company or of a duly authorized transfer agent of the Company), no right to vote or receive dividends or any other rights as a stockholder will exist with respect to the Shares subject to an Option, notwithstanding the exercise of the Option. The Company will issue (or cause to be issued) such Shares promptly after the Option is exercised. No adjustment will be made for a dividend or other right for which the record date is prior to the date the Shares are issued, except as provided in Section 13 of the Plan.

(iii) Exercising an Option in any manner will decrease the number of Shares thereafter available, both for purposes of the Plan and for sale under the Option, by the

PLAINTIFF0002517

number of Shares as to which the Option is exercised.



(iv) **Termination of Relationship as a Service Provider.** If a Participant ceases to be a Service Provider, other than upon the Participant's termination as the result of the Participant's death or Disability, the Participant may exercise his or her Option within thirty (30) days of termination, or such longer period of time as is specified in the Award Agreement (but in no event later than the expiration of the term of such Option as set forth in the Award Agreement) to the extent that the Option is vested on the date of termination. Unless otherwise provided by the Administrator, if on the date of termination the Participant is not vested as to his or her entire Option, the Shares covered by the unvested portion of the Option will revert to the Plan. If after termination the Participant does not exercise his or her Option within the time specified by the Administrator, the Option will terminate, and the Shares covered by such Option will revert to the Plan.

(v) **Disability of Participant.** If a Participant ceases to be a Service Provider as a result of the Participant's Disability, the Participant may exercise his or her Option within six (6) months of termination, or

PLAINTIFF0002518



such longer period of time as is specified in the Award Agreement (but in no event later than the expiration of the term of such Option as set forth in the Award Agreement) to the extent the Option is vested on the date of termination. Unless otherwise provided by the Administrator, if on the date of termination the Participant is not vested as to his or her entire Option, the Shares covered by the unvested portion of the Option will revert to the Plan. If after termination the Participant does not exercise his or her Option within the time specified herein, the Option will terminate, and the Shares covered by such Option will revert to the Plan.

(vi) **Death of Participant.** If a Participant dies while a Service Provider, the Option may be exercised within six (6) months following the Participant's death, or within such longer period of time as is specified in the Award Agreement (but in no event later than the expiration of the term of such Option as set forth in the Award Agreement) to the extent that the Option is vested on the date of death, by the Participant's designated beneficiary, provided such beneficiary has been designated prior to the Participant's death in a form acceptable to the Administrator. If no such beneficiary has been

PLAINTIFF0002519



designated by the Participant, then such Option may be exercised by the personal representative of the Participant's estate or by the person(s) to whom the Option is transferred pursuant to the Participant's will or in accordance with the laws of descent and distribution. Unless otherwise provided by the Administrator, if at the time of death Participant is not vested as to his or her entire Option, the Shares covered by the unvested portion of the Option will immediately revert to the Plan. If the Option is not so exercised within the time specified herein, the Option will terminate, and the Shares covered by such Option will revert to the Plan.

# 7. Stock Appreciation Rights.

(a) **Grant of Stock Appreciation Rights.** Subject to the terms and conditions of the Plan, a Stock Appreciation Right may be granted to Service Providers at any time and from time to time as will be determined by the Administrator, in its sole discretion.

(b) **Number of Shares.** The Administrator will have complete discretion to determine the number of Shares subject to any Award of Stock Appreciation Rights.

(c) **Exercise Price and Other Terms.** The per Share exercise price for the Shares that will determine the amount of the payment to be received upon exercise of a Stock Appreciation Right as set forth in Section 7(f) will be determined by the Administrator and will be no less

PLAINTIFF0002520

than one hundred percent (100%) of the Fair Market Value per Share on the date



of grant. Otherwise, the Administrator, subject to the provisions of the Plan, will have complete discretion to determine the terms and conditions of Stock Appreciation Rights granted under the Plan.

(d) **Stock Appreciation Right Agreement.** Each Stock Appreciation Right grant will be evidenced by an Award Agreement that will specify the exercise price, the term of the Stock Appreciation Right, the conditions of exercise, and such other terms and conditions as the Administrator, in its sole discretion, will determine.

(e) **Expiration of Stock Appreciation Rights.** A Stock Appreciation Right granted under the Plan will expire upon the date determined by the Administrator, in its sole discretion, and set forth in the Award Agreement. Notwithstanding the foregoing, the rules of Section 6(d) relating to the maximum term and Section 6(f) relating to exercise also will apply to Stock Appreciation Rights.

(f) **Payment of Stock Appreciation Right Amount.** Upon exercise of a Stock Appreciation Right, a Participant will be entitled to receive payment from the Company in an amount determined by multiplying:

      (i) The difference between the Fair Market Value of a Share on the date of exercise over the exercise price; times

      (ii) The number of Shares with respect to which the Stock Appreciation Right is exercised.

PLAINTIFF0002521

At the discretion of the Administrator, the payment upon Stock Appreciation Right exercise may be in cash, in Shares of equivalent value, or in some combination thereof.

# 8. Restricted Stock.

(a) **Grant of Restricted Stock.** Subject to the terms and provisions of the Plan, the Administrator, at any time and from time to time, may grant Shares of Restricted Stock to Service Providers in such amounts as the Administrator, in its sole discretion, will determine.

(b) **Restricted Stock Agreement.** Each Award of Restricted Stock will be evidenced by an Award Agreement that will specify the Period of Restriction, the number of Shares granted, and such other terms and conditions as the Administrator, in its sole discretion, will determine. Unless the Administrator determines otherwise, the Company as escrow agent will hold Shares of Restricted Stock until the restrictions on such Shares have lapsed.

(c) **Transferability.** Except as provided in this Section 8 or as the Administrator determines, Shares of Restricted Stock may not be sold, transferred, pledged, assigned, or otherwise alienated or hypothecated until the end of the applicable Period of Restriction.

(d) **Other Restrictions.** The Administrator, in its sole discretion, may impose such other restrictions on Shares of Restricted Stock as it may deem advisable or appropriate.

(e) **Removal of Restrictions.** Except as otherwise provided in this Section 8, Shares of Restricted Stock covered by

PLAINTIFF0002522



each Restricted Stock grant made under the Plan will be released from escrow as soon as practicable after the last day of the Period of Restriction or at such other time as the Administrator may determine. The Administrator, in its discretion, may accelerate the time at which any restrictions will lapse or be removed.

(f) **Voting Rights.** During the Period of Restriction, Service Providers holding Shares of Restricted Stock granted hereunder may exercise full voting rights with respect to those Shares, unless the Administrator determines otherwise.

(g) **Dividends and Other Distributions.** During the Period of Restriction, Service Providers holding Shares of Restricted Stock will be entitled to receive all dividends and other distributions paid with respect to such Shares, unless the Administrator provides otherwise. If any such dividends or distributions are paid in Shares, the Shares will be subject to the same restrictions on transferability and forfeitability as the Shares of Restricted Stock with respect to which they were paid.

(h) **Return of Restricted Stock to Company.** On the date set forth in the Award Agreement, the Restricted Stock for which restrictions have not lapsed will revert to the Company and again will become available for grant under the Plan.

# 9. Restricted Stock Units.

(a) **Grant.** Restricted Stock Units may be granted at any time and from time to time as determined by the Administrator. After the Administrator determines that it will grant Restricted Stock Units, it will advise

PLAINTIFF0002523



the Participant in an Award Agreement
of the terms, conditions, and
restrictions related to the grant,
including the number of Restricted
Stock Units.

(b) **Vesting Criteria and Other Terms.**
The Administrator will set vesting
criteria in its discretion, which,
depending on the extent to which the
criteria are met, will determine the
number of Restricted Stock Units that
will be paid out to the Participant.
The Administrator may set vesting
criteria based upon the achievement of
Company-wide, business unit, or
individual goals (including, but not
limited to, continued employment or
service), or any other basis determined
by the Administrator in its discretion.

(c) **Earning Restricted Stock Units.**
Upon meeting the applicable vesting
criteria, the Participant will be
entitled to receive a payout as
determined by the Administrator.
Notwithstanding the foregoing, at any
time after the grant of Restricted
Stock Units, the Administrator, in its
sole discretion, may reduce or waive
any vesting criteria that must be met
to receive a payout.

(d) **Form and Timing of Payment.** Payment
of earned Restricted Stock Units will
be made as soon as practicable after
the date(s) determined by the
Administrator and set forth in the
Award Agreement. The Administrator, in
its sole discretion, may settle earned
Restricted Stock Units in cash, Shares,
or a combination of both.

(e) **Cancellation.** On the date set forth
in the Award Agreement, all unearned
Restricted Stock Units will be
forfeited to the Company.

# 10. Compliance With Code

PLAINTIFF0002524

## Section 409A.



Awards will be designed and operated in such a manner that they are either exempt from the application of, or comply with, the requirements of Code Section 409A, except as otherwise determined in the sole discretion of the Administrator. The Plan and each Award Agreement under the Plan is intended to meet the requirements of Code Section 409A and will be construed and interpreted in accordance with such intent, except as otherwise determined in the sole discretion of the Administrator. To the extent that an Award or payment, or the settlement or deferral thereof, is subject to Code Section 409A the Award will be granted, paid, settled or deferred in a manner that will meet the requirements of Code Section 409A, such that the grant, payment, settlement or deferral will not be subject to the additional tax or interest applicable under Code Section 409A.

## 11. Leaves of Absence/Transfer Between Locations.

Unless the Administrator provides otherwise, vesting of Awards granted hereunder will be suspended during any unpaid leave of absence. A Participant will not cease to be an Employee in the case of (i) any leave of absence approved by the Company or (ii) transfers between locations of the Company or between the Company, its Parent, or any Subsidiary. For purposes of Incentive Stock Options, no such leave may exceed three (3) months, unless reemployment upon expiration of such leave is guaranteed by statute or contract. If reemployment upon expiration of a leave of absence approved by the Company is not so guaranteed, then six (6) months following the first (1^st^) day of such leave, any Incentive Stock Option held by the Participant will cease to be treated as an Incentive Stock Option and will be treated for tax purposes as a Nonstatutory Stock Option.

## 12. Limited Transferability of

PLAINTIFF0002525

## Awards.



(a) Unless determined otherwise by the Administrator, Awards may not be sold, pledged, assigned, hypothecated, or otherwise transferred in any manner other than by will or by the laws of descent and distribution, and may be exercised, during the lifetime of the Participant, only by the Participant. If the Administrator makes an Award transferable, such Award may only be transferred (i) by will, (ii) by the laws of descent and distribution, or (iii) as permitted by Rule 701 of the Securities Act of 1933, as amended (the "Securities Act").

(b) Further, until the Company becomes subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act, or after the Administrator determines that it is, will, or may no longer be relying upon the exemption from registration under the Exchange Act as set forth in Rule 12h-1(f) promulgated under the Exchange Act, an Option, or prior to exercise, the Shares subject to the Option, may not be pledged, hypothecated or otherwise transferred or disposed of, in any manner, including by entering into any short position, any "put equivalent position" or any "call equivalent position" (as defined in Rule 16a-1(h) and Rule 16a-1(b) of the Exchange Act, respectively), other than to (i) persons who are "family members" (as defined in Rule 701(c)(3) of the Securities Act) through gifts or domestic relations orders, or (ii) to an executor or guardian of the Participant upon the death or disability of the Participant. Notwithstanding the foregoing sentence, the Administrator, in its sole discretion, may determine to permit

PLAINTIFF0002526

transfers to the Company or in
connection with a Change in Control or
other acquisition transactions

involving the Company to the extent
permitted by Rule 12h-1(f).

# 13. Adjustments; Dissolution or Liquidation; Merger or Change in Control.



(a) **Adjustments.** In the event that any
dividend or other distribution (whether
in the form of cash, Shares, other
securities, or other property),
recapitalization, stock split, reverse
stock split, reorganization, merger,
consolidation, split up, spin off,
combination, repurchase, or exchange of
Shares or other securities of the
Company, or other change in the
corporate structure of the Company
affecting the Shares occurs, the
Administrator, in order to prevent
diminution or enlargement of the
benefits or potential benefits intended
to be made available under the Plan,
will adjust the number and class of
Shares that may be delivered under the
Plan and/or the number, class, and
price of Shares covered by each
outstanding Award; provided, however,
that the Administrator will make such
adjustments to an Award required by
Section 25102(o) of the California
Corporations Code to the extent the
Company is relying upon the exemption
afforded thereby with respect to the
Award.

(b) **Dissolution or Liquidation.** In the
event of the proposed dissolution or
liquidation of the Company, the
Administrator will notify each
Participant as soon as practicable
prior to the effective date of such
proposed transaction. To the extent it
has not been previously exercised, an
Award will terminate immediately prior

PLAINTIFF0002527

Award will terminate immediately prior
to the consummation of such proposed
action.



(c) **Merger or Change in Control**. In the
event of a merger or Change in Control,
each outstanding Award will be treated
as the Administrator determines
(subject to the provisions of the
following paragraph) without a
Participant's consent, including,
without limitation, that (i) Awards
will be assumed, or substantially
equivalent Awards will be substituted,
by the acquiring or succeeding
corporation (or an affiliate thereof)
with appropriate adjustments as to the
number and kind of shares and prices;
(ii) upon written notice to a
Participant, that the Participant's
Awards will terminate upon or
immediately prior to the consummation
of such merger or Change in Control;
(iii) outstanding Awards will vest and
become exercisable, realizable, or
payable, or restrictions applicable to
an Award will lapse, in whole or in
part prior to or upon consummation of
such merger or Change in Control, and,
to the extent the Administrator
determines, terminate upon or
immediately prior to the effectiveness
of such merger or Change in Control;
(iv) (A) the termination of an Award in
exchange for an amount of cash and/or
property, if any, equal to the amount
that would have been attained upon the
exercise of such Award or realization
of the Participant's rights as of the
date of the occurrence of the
transaction (and, for the avoidance of
doubt, if as of the date of the
occurrence of the transaction the
Administrator determines in good faith
that no amount would have been attained
upon the exercise of such Award or
realization of the Participant's
rights, then such Award may be
terminated by the Company without
payment), or (B) the replacement of

PLAINTIFF0002528



such Award with other rights or
property selected by the Administrator
in its sole discretion; or (v) any
combination of the foregoing. In taking
any of the actions permitted under this
subsection 13(c), the Administrator
will not be obligated to treat all
Awards, all Awards held by a
Participant, or all Awards of the same
type, similarly.

In the event that the successor
corporation does not assume or
substitute for the Award (or portion
thereof), the Participant will fully
vest in and have the right to exercise
all of his or her outstanding Options
and Stock Appreciation Rights,
including Shares as to which such
Awards would not otherwise be vested or
exercisable, all restrictions on
Restricted Stock and Restricted Stock
Units will lapse, and, with respect to
Awards with performance-based vesting,
all performance goals or other vesting
criteria will be deemed achieved at one
hundred percent (100%) of target levels
and all other terms and conditions met.
In addition, if an Option or Stock
Appreciation Right is not assumed or
substituted in the event of a merger or
Change in Control, the Administrator
will notify the Participant in writing
or electronically that the Option or
Stock Appreciation Right will be
exercisable for a period of time
determined by the Administrator in its
sole discretion, and the Option or
Stock Appreciation Right will terminate
upon the expiration of such period.

For the purposes of this subsection
13(c), an Award will be considered
assumed if, following the merger or
Change in Control, the Award confers
the right to purchase or receive, for
each Share subject to the Award
immediately prior to the merger or
Change in Control, the consideration

PLAINTIFF0002529



(whether stock, cash, or other securities or property) received in the merger or Change in Control by holders

of Common Stock for each Share held on the effective date of the transaction (and if holders were offered a choice of consideration, the type of consideration chosen by the holders of a majority of the outstanding Shares); provided, however, that if such consideration received in the merger or Change in Control is not solely common stock of the successor corporation or its Parent, the Administrator may, with the consent of the successor corporation, provide for the consideration to be received upon the exercise of an Option or Stock Appreciation Right or upon the payout of a Restricted Stock Unit, for each Share subject to such Award, to be solely common stock of the successor corporation or its Parent equal in fair market value to the per share consideration received by holders of Common Stock in the merger or Change in Control.

Notwithstanding anything in this Section 13(c) to the contrary, an Award that vests, is earned or paid-out upon the satisfaction of one or more performance goals will not be considered assumed if the Company or its successor modifies any of such performance goals without the Participant's consent; provided, however, a modification to such performance goals only to reflect the successor corporation's post-Change in Control corporate structure will not be deemed to invalidate an otherwise valid Award assumption.

Notwithstanding anything in this Section 13(c) to the contrary, if a payment under an Award Agreement is subject to Code Section 409A and if the change in control definition contained

PLAINTIFF0002530



in the Award Agreement does not comply
with the definition of "change of
control" for purposes of a distribution

under Code Section 409A, then any
payment of an amount that is otherwise
accelerated under this Section will be
delayed until the earliest time that
such payment would be permissible under
Code Section 409A without triggering
any penalties applicable under Code
Section 409A.

# 14. Tax Withholding.

(a) **Withholding Requirements.** Prior to
the delivery of any Shares or cash
pursuant to an Award (or exercise
thereof), the Company will have the
power and the right to deduct or
withhold, or require a Participant to
remit to the Company, an amount
sufficient to satisfy federal, state,
local, foreign or other taxes
(including the Participant's FICA
obligation) required to be withheld
with respect to such Award (or exercise
thereof).

(b) **Withholding Arrangements.** The
Administrator, in its sole discretion
and pursuant to such procedures as it
may specify from time to time, may
permit a Participant to satisfy such
tax withholding obligation, in whole or
in part by (without limitation) (i)
paying cash, (ii) electing to have the
Company withhold otherwise deliverable
Shares having a Fair Market Value equal
to the minimum statutory amount
required to be withheld, (iii)
delivering to the Company already owned
Shares having a Fair Market Value equal
to the statutory amount required to be
withheld, provided the delivery of such
Shares will not result in any adverse
accounting consequences, as the
Administrator determines in its sole
discretion, or (iv) selling a
sufficient number of Shares otherwise

PLAINTIFF0002531

sufficient number of shares otherwise deliverable to the Participant through such means as the Administrator may



determine in its sole discretion (whether through a broker or otherwise) equal to the amount required to be withheld. The amount of the withholding requirement will be deemed to include any amount which the Administrator agrees may be withheld at the time the election is made, not to exceed the amount determined by using the maximum federal, state or local marginal income tax rates applicable to the Participant with respect to the Award on the date that the amount of tax to be withheld is to be determined. The Fair Market Value of the Shares to be withheld or delivered will be determined as of the date that the taxes are required to be withheld.

## 15. No Effect on Employment or Service.

Neither the Plan nor any Award will confer upon a Participant any right with respect to continuing the Participant's relationship as a Service Provider with the Company, nor will they interfere in any way with the Participant's right or the Company's right to terminate such relationship at any time, with or without cause, to the extent permitted by Applicable Laws.

## 16. Date of Grant.

The date of grant of an Award will be, for all purposes, the date on which the Administrator makes the determination granting such Award, or such other later date as is determined by the Administrator. Notice of the determination will be provided to each Participant within a reasonable time after the date of such grant.

## 17. Term of Plan.

Subject to Section 21 of the Plan, the Plan will

PLAINTIFF0002532



become effective upon its adoption by the Board. Unless sooner terminated under Section 18, it will continue in effect for a term of ten (10) years from the later of (a) the effective date of the Plan, or (b) the earlier of the most recent Board or stockholder approval of an increase in the number of Shares reserved for issuance under the Plan.

# 18. Amendment and Termination of the Plan.

(a) **Amendment and Termination.** The Board may at any time amend, alter, suspend or terminate the Plan.

(b) **Stockholder Approval.** The Company will obtain stockholder approval of any Plan amendment to the extent necessary and desirable to comply with Applicable Laws.

(c) **Effect of Amendment or Termination.** No amendment, alteration, suspension or termination of the Plan will impair the rights of any Participant, unless mutually agreed otherwise between the Participant and the Administrator, which agreement must be in writing and signed by the Participant and the Company. Termination of the Plan will not affect the Administrator's ability to exercise the powers granted to it hereunder with respect to Awards granted under the Plan prior to the date of such termination.

# 19. Conditions Upon Issuance of Shares.

(a) **Legal Compliance.** Shares will not be issued pursuant to the exercise of an Award unless the exercise of such Award and the issuance and delivery of such Shares will comply with Applicable Laws and will be further subject to the approval of counsel for the Company

PLAINTIFF0002533

with respect to such compliance.



(b) **Investment Representations.** As a
condition to the exercise of an Award,
the Company may require the person
exercising such Award to represent and
warrant at the time of any such
exercise that the Shares are being
purchased only for investment and
without any present intention to sell
or distribute such Shares if, in the
opinion of counsel for the Company,
such a representation is required.

# 20. Inability to Obtain Authority.

The inability of the Company to obtain authority
from any regulatory body having jurisdiction,
which authority is deemed by the Company's
counsel to be necessary to the lawful issuance
and sale of any Shares hereunder, will relieve
the Company of any liability in respect of the
failure to issue or sell such Shares as to which
such requisite authority will not have been
obtained.

# 21. Stockholder Approval.

The Plan will be subject to approval by the
stockholders of the Company within twelve (12)
months after the date the Plan is adopted by the
Board. Such stockholder approval will be obtained
in the manner and to the degree required under
Applicable Laws.

# 22. Information to Participants.

Beginning on the earlier of (i) the date that the
aggregate number of Participants under this Plan
is five hundred (500) or more and the Company is
relying on the exemption provided by Rule 12h-
1(f)(1) under the Exchange Act and (ii) the date
that the Company is required to deliver
information to Participants pursuant to Rule 701
under the Securities Act, and until such time as

PLAINTIFF0002534



the Company becomes subject to the reporting
requirements of Section 13 or 15(d) of the
Exchange Act, is no longer relying on the
exemption provided by Rule 12h-1(f)(1) under the
Exchange Act or is no longer required to deliver
information to Participants pursuant to Rule 701
under the Securities Act, the Company shall
provide to each Participant the information
described in paragraphs (e)(3), (4), and (5) of
Rule 701 under the Securities Act not less
frequently than every six (6) months with the
financial statements being not more than 180 days
old and with such information provided either by
physical or electronic delivery to the
Participants or by written notice to the
Participants of the availability of the
information on an Internet site that may be
password-protected and of any password needed to
access the information. The Company may request
that Participants agree to keep the information
to be provided pursuant to this section
confidential. If a Participant does not agree to
keep the information to be provided pursuant to
this section confidential, then the Company will
not be required to provide the information unless
otherwise required pursuant to Rule 12h-1(f)(1)
under the Exchange Act or Rule 701 of the
Securities Act.

| Previous | Next |
|---|---|
| Indemnification | Stock Options |

PLAINTIFF0002535



**LEGAL—TOOLS**   DAOLABS



Connect Wallet

# Variables

### Agreement Date
```
mm/dd/yyyy
```

### Corporation's Name (ALL CAPS)
```
ACME CORPORATION
```

### Total Amount of Shares Under the Plan
```
100
```

### Year of the Plan
```
2023
```

### Corporation CEO's Full Name
```
Mr John Doe
```

### Corporation Secretary's Full Name
```
Mr. Jeff Doe
```

### Corporation Treasurer's Full Name
```
Ms. Jane Doe
```

**Update document**

ACTION BY WRITTEN CONSENT OF
THE STOCKHOLDERS OF [Entity-
name]

  Exhibit A

  Exhibit B



# ACTION BY WRITTEN CONSENT OF THE STOCKHOLDERS OF [Entity-name]

Pursuant to Section 228 of the Delaware General Corporation Law and the Bylaws of **[Entity-name]**, a Delaware corporation (the **"Company"**), the

PLAINTIFF0002536

a Delaware corporation (the "**Company**"),
undersigned stockholders of the Company hereby



take the following actions and adopt the
following resolutions by written consent.

*Adoption of* **[Plan-year]** *Equity Incentive Plan*

**RESOLVED:** That the **[Plan-year]** Equity Incentive
Plan (the "**Plan**"), substantially in the form
attached as **Exhibit A,** is adopted and approved.

**RESOLVED FURTHER:** That a total of **[Share-amount]**
shares of the Company's Common Stock is reserved
for sale and issuance under the Plan, and that
the sale and issuance of such shares in
accordance with the Plan are authorized and
approved.

*Approval of Indemnification Agreements*

**WHEREAS:** The Board of Directors of the Company
adopted a form of Indemnification Agreement,
attached as **Exhibit B** (the "**Indemnification
Agreement**"), to be entered into by and between
the Company and each current and future director
and executive officer of the Company.

**RESOLVED:** That the form of Indemnification
Agreement is ratified and approved.

**RESOLVED FURTHER:** That the Company is authorized
and empowered to enter into, and to perform its
obligations under, an Indemnification Agreement
(with such changes, additions or deletions
thereto as the officer executing the same on
behalf of the Company shall approve with the
advice of legal counsel) with (i) each of the
Company's current directors and executive
officers and (ii) each person elected or
appointed as a director or executive officer of
the Company in the future.

*Omnibus Resolutions*

**RESOLVED:** That the directors of the Company are
authorized and empowered to take any and all such
further action as may be deemed necessary or
advisable to effectuate the purposes and intent
of the resolutions hereby adopted.

PLAINTIFF0002537



**RESOLVED FURTHER:** That the officers of the Company be, and each of them hereby is, authorized and empowered to take any and all such further action, to execute and deliver any and all such further agreements, instruments, documents and certificates and to pay such expenses, in the name and on behalf of the Company or such officer, as any such officer may deem necessary or advisable to effectuate the purposes and intent of the resolutions hereby adopted, the taking of such actions, the execution and delivery of such agreements, instruments, documents and certificates and the payment of such expenses by any such officer to be conclusive evidence of his or her authorization hereunder and approval thereof.

**RESOLVED FURTHER:** That any and all actions taken by the directors and officers of the Company to carry out the purposes and intent of the foregoing resolutions prior to their adoption are approved, ratified and confirmed.

[Signature page to follow]

This action by written consent shall be effective as of the date the Company receives the requisite consent of the Company's stockholders. By executing this action by written consent, the undersigned stockholder is giving written consent with respect to all shares of the Company's capital stock held by such stockholder in favor of the above resolutions. This action by written consent may be executed in any number of counterparts, each of which shall constitute an original and all of which together shall constitute one action. Any copy, facsimile or other reliable reproduction of this action by written consent may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used, provided that such copy, facsimile or other reproduction is a complete reproduction of the entire original writing. This action by written consent shall be filed with the minutes of the proceedings of the stockholders of the Company.

CHIEF EXECUTIVE OFFICER

PLAINTIFF0002538



Signature:

| Print Name: [Ceo-name] |
|---|

| CHIEF EXECUTIVE OFFICER |
|---|
| Role: Chief Executive Officer |
| Dated: [Date] |

This action by written consent shall be effective as of the date the Company receives the requisite consent of the Company's stockholders. By executing this action by written consent, the undersigned stockholder is giving written consent with respect to all shares of the Company's capital stock held by such stockholder in favor of the above resolutions. This action by written consent may be executed in any number of counterparts, each of which shall constitute an original and all of which together shall constitute one action. Any copy, facsimile or other reliable reproduction of this action by written consent may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used, provided that such copy, facsimile or other reproduction is a complete reproduction of the entire original writing. This action by written consent shall be filed with the minutes of the proceedings of the stockholders of the Company.

| SECRETARY |
|---|
| Signature: |
| Print Name: [Secretary-name] |
| Role: Secretary |

This action by written consent shall be effective as of the date the Company receives the requisite consent of the Company's stockholders. By executing this action by written consent, the undersigned stockholder is giving written consent with respect to all shares of the Company's capital stock held by such stockholder in favor of the above resolutions. This action by written consent may be executed in any number of

PLAINTIFF0002539



counterparts, each of which shall constitute an original and all of which together shall constitute one action. Any copy, facsimile or

other reliable reproduction of this action by written consent may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used, provided that such copy, facsimile or other reproduction is a complete reproduction of the entire original writing. This action by written consent shall be filed with the minutes of the proceedings of the stockholders of the Company.

| TREASURER |
| --- |
| Signature: |
| Print Name: [Treasurer-name] |
| Role: Treasurer |

# Exhibit A

**[Plan-year]** equity incentive PLAN

# Exhibit B

FORM OF INDEMNIFICATION AGREEMENT

| Previous | Next |
| --- | --- |
| Stock Options | At-will Employment |

PLAINTIFF0002540

 **LEGAL—TOOLS**  DAOLABS

Connect Wallet



# Variables

**Agreement Date**

mm/dd/yyyy

**Corporation's Name (ALL CAPS)**

ACME CORPORATION

**Corporation's Address**

123 Main Street, Apt. 45

**Corporation Representative's Full Name**

Mr. John Doe

**Corporation Representative's Role/Title**

Chief E ecutive Officer

**Participant's Full Name**

Ms. Jane Doe

**Participant's Address**

123 Main Street, Apt. 45

**Year of the Plan**

2023

**Date of Grant**

01/01/2023

**Vesting Commencement Date**

01/01/2023

**Exercise Price Per Share (USD)**

1

**Total Number of Shares Granted**

100

**Total Share Exercise Price (USD)**

100

[Entity-name] [Plan-year]
EQ ITY INCENTIVE PLAN: STOCK OPTION AGREEMENT

I. NOTICE OF STOCK OPTION GRANT

II. AGREEMENT

Exhibit A

Exhibit B

PLAINTIFF0002541

Option Term/Expiration Date

01/01/2023

Vesting Schedule

1 January 2023, 50 options vested; 1 June 2023, 50 options v

Date Agreement is Accepted by Entity

01/01/2023

**Update document**





# [Entity-name] [Plan-year] EQUITY INCENTIVE PLAN

Unless otherwise defined herein, the terms defined in the **[Plan-year]** Equity Incentive Plan (the "Plan") shall have the same defined meanings in this Stock Option Agreement (the "Option Agreement").

# I. NOTICE OF STOCK OPTION GRANT

**[Participant-name]**

**[Participant-address]**

The undersigned Participant has been granted an Option to purchase Common Stock of the Company, subject to the terms and conditions of the Plan and this Option Agreement, as follows:

Date of Grant: **[Date-of-grant]**

Vesting Commencement Date: **[Date-vesting]**

Exercise Price per Share: $**[Share-exercise-price]**

Total Number of Shares Granted: **[Share-amount]**

Total Exercise Price : $**[Share-price-total]**

PLAINTIFF0002542

Type of Option:



- ☐ Incentive Stock Option
- ☐ Nonstatutory Stock Option

Term/Expiration Date: **[Date-term]**

Vesting Schedule: **[Vesting-schedule]**

This Option shall be exercisable, in whole or in part, according to the following vesting schedule:

Twenty-five percent (25%) of the Shares subject to the Option shall vest on the one (1) year anniversary of the Vesting Commencement Date, and one forty-eighth (1/48^th^) of the Shares subject to the Option shall vest each month thereafter on the same day of the month as the Vesting Commencement Date (and if there is no corresponding day, on the last day of the month), subject to Participant continuing to be a Service Provider through each such date.

**Termination Period:**

This Option shall be exercisable for three (3) months after Participant ceases to be a Service Provider, unless such termination is due to Participant's death or Disability, in which case this Option shall be exercisable for twelve (12) months after Participant ceases to be a Service Provider. Notwithstanding the foregoing sentence, in no event may this Option be exercised after the Term/Expiration Date as provided above and this Option may be subject to earlier termination as provided in Section 13 of the Plan.

# II. AGREEMENT

1. **Grant of Option.** The Administrator of the Company hereby grants to the Participant named in the Notice of Stock Option Grant in Part I of this Agreement ("Participant"), an option (the "Option") to purchase the number

PLAINTIFF0002543



of Shares set forth in the Notice of Stock Option Grant, at the exercise price per Share set forth in the Notice of Stock Option Grant (the "Exercise Price"), and subject to the terms and conditions of the Plan, which is incorporated herein by reference. Subject to Section 18 of the Plan, in the event of a conflict between the terms and conditions of the Plan and this Option Agreement, the terms and conditions of the Plan shall prevail.

If designated in the Notice of Stock Option Grant as an Incentive Stock Option ("ISO"), this Option is intended to qualify as an Incentive Stock Option as defined in Section 422 of the Code. Nevertheless, to the extent that it exceeds the $100,000 rule of Code Section 422(d), this Option shall be treated as a Nonstatutory Stock Option ("NSO"). Further, if for any reason this Option (or portion thereof) shall not qualify as an ISO, then, to the extent of such nonqualification, such Option (or portion thereof) shall be regarded as a NSO granted under the Plan. In no event shall the Administrator, the Company or any Parent or Subsidiary or any of their respective employees or directors have any liability to Participant (or any other person) due to the failure of the Option to qualify for any reason as an ISO.

2. **Exercise of Option.**

   (a) **Right to Exercise.** This Option shall be exercisable during its term in accordance with the Vesting Schedule set out in the Notice of Stock Option Grant and with the applicable provisions of the Plan and this Option Agreement

PLAINTIFF0002544

Agreement.



(b) **Method of Exercise.** This Option shall be exercisable by delivery of an exercise notice in the form attached as **Exhibit A** (the "Exercise Notice") or in a manner and pursuant to such procedures as the Administrator may determine, which shall state the election to exercise the Option, the number of Shares with respect to which the Option is being exercised (the "Exercised Shares"), and such other representations and agreements as may be required by the Company. The Exercise Notice shall be accompanied by payment of the aggregate Exercise Price as to all Exercised Shares, together with any applicable tax withholding. This Option shall be deemed to be exercised upon receipt by the Company of such fully executed Exercise Notice accompanied by the aggregate Exercise Price, together with any applicable tax withholding.

No Shares shall be issued pursuant to the exercise of an Option unless such issuance and such exercise comply with Applicable Laws. Assuming such compliance, for income tax purposes the Shares shall be considered transferred to Participant on the date on which the Option is exercised with respect to such Shares.

3. **Participant's Representations.** In

PLAINTIFF0002545

the event the Shares have not been
registered under the Securities
Act of 1933, as amended (the



"Securities Act"), at the time
this Option is exercised,
Participant shall, if required by
the Company, concurrently with the
exercise of all or any portion of
this Option, deliver to the
Company his or her Investment
Representation Statement in the
form attached hereto as **Exhibit B.**

4. **Lock-Up Period.** Participant hereby
agrees that Participant shall not
offer, pledge, sell, contract to
sell, sell any option or contract
to purchase, purchase any option
or contract to sell, grant any
option, right or warrant to
purchase, lend, or otherwise
transfer or dispose of, directly
or indirectly, any Common Stock
(or other securities) of the
Company or enter into any swap,
hedging or other arrangement that
transfers to another, in whole or
in part, any of the economic
consequences of ownership of any
Common Stock (or other securities)
of the Company held by Participant
(other than those included in the
registration) for a period
specified by the representative of
the underwriters of Common Stock
(or other securities) of the
Company not to exceed one hundred
and eighty (180) days following
the effective date of any
registration statement of the
Company filed under the Securities
Act (or such other period as may
be requested by the Company or the
underwriters to accommodate
regulatory restrictions on (i) the
publication or other distribution
of research reports and
(ii) analyst recommendations and
opinions, including, but not

PLAINTIFF0002546

limited to, the restrictions contained in NASD Rule 2711(f)(4) or NYSE Rule 472(f)(4), or any successor provisions or amendments thereto).

Participant agrees to execute and deliver such other agreements as may be reasonably requested by the Company or the underwriter which are consistent with the foregoing or which are necessary to give further effect thereto. In addition, if requested by the Company or the representative of the underwriters of Common Stock (or other securities) of the Company, Participant shall provide, within ten (10) days of such request, such information as may be required by the Company or such representative in connection with the completion of any public offering of the Company's securities pursuant to a registration statement filed under the Securities Act. The obligations described in this Section 4 shall not apply to a registration relating solely to employee benefit plans on Form S-1 or Form S-8 or similar forms that may be promulgated in the future, or a registration relating solely to a Commission Rule 145 transaction on Form S-4 or similar forms that may be promulgated in the future. The Company may impose stop-transfer instructions with respect to the shares of Common Stock (or other securities) subject to the foregoing restriction until the end of said one hundred and eighty (180) day (or other) period. Participant agrees that any transferee of the Option or shares acquired pursuant to the Option shall be bound by this Section 4.

5. **Method of Payment.** Payment of the aggregate Exercise Price shall be by any of the following, or a combination thereof, at the

PLAINTIFF0002547

election of the Participant:



(a) cash;

(b) check;

(c) consideration received by the Company under a formal cashless exercise program adopted by the Company in connection with the Plan; or

(d) surrender of other Shares which (i) shall be valued at its Fair Market Value on the date of exercise, and (ii) must be owned free and clear of any liens, claims, encumbrances or security interests, if accepting such Shares, in the sole discretion of the Administrator, shall not result in any adverse accounting consequences to the Company.

6. **Restrictions on Exercise.** This Option may not be exercised until such time as the Plan has been approved by the stockholders of the Company, or if the issuance of such Shares upon such exercise or the method of payment of consideration for such shares would constitute a violation of any Applicable Law.

7. **Non-Transferability of Option.**

(a) This Option may not be transferred in any manner otherwise than by will or by the laws of descent or distribution and may be exercised during the lifetime of Participant only by Participant. The terms of the Plan and this Option Agreement shall be binding upon the executors.

PLAINTIFF0002548



administrators, heirs, successors and assigns of Participant.

(b) Further, until the Company becomes subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act, or after the Administrator determines that it is, will, or may no longer be relying upon the exemption from registration of Options under the Exchange Act as set forth in Rule 12h-1(f) promulgated under the Exchange Act (the "Reliance End Date"), Participant shall not transfer this Option or, prior to exercise, the Shares subject to this Option, in any manner other than (i) to persons who are "family members" (as defined in Rule 701(c)(3) of the Securities Act) through gifts or domestic relations orders, or (ii) to an executor or guardian of Participant upon the death or disability of Participant. Until the Reliance End Date, the Options and, prior to exercise, the Shares subject to this Option, may not be pledged, hypothecated or otherwise transferred or disposed of, including by entering into any short position, any "put equivalent position" or any "call equivalent position" (as defined in Rule 16a-1(h) and Rule 16a-1(b) of the Exchange Act, respectively), other than as permitted in clauses (i) and (ii) of this paragraph.

8. **Term of Option.** This Option may be

PLAINTIFF0002549

exercised only within the term set out in the Notice of Stock Option Grant, and may be exercised during such term only in accordance with the Plan and the terms of this Option Agreement.

9. **Tax Obligations.**

(a) **Tax Withholding.** Participant agrees to make appropriate arrangements with the Company (or the Parent or Subsidiary employing or retaining Participant) for the satisfaction of all Federal, state, local and foreign income and employment tax withholding requirements applicable to the Option exercise. Participant acknowledges and agrees that the Company may refuse to honor the exercise and refuse to deliver the Shares if such withholding amounts are not delivered at the time of exercise.

(b) **Notice of Disqualifying Disposition of ISO Shares.** If the Option granted to Participant herein is an ISO, and if Participant sells or otherwise disposes of any of the Shares acquired pursuant to the ISO on or before the later of (i) the date two (2) years after the Date of Grant, or (ii) the date one (1) year after the date of exercise, Participant shall immediately notify the Company in writing of such disposition. Participant agrees that Participant may be subject to income tax withholding by the Company on the compensation income recognized by Participant

PLAINTIFF0002550

4/11/23 Case 1:23-cv-20727-RKA    Document 106-48    Entered on FLSD Docket 06/09/2023    Page 115
of 500
recognized by Participant.



(c) **Code Section 409A.** Under
Code Section 409A, an Option
that vests after December 31,
2004 (or that vested on or
prior to such date but which
was materially modified after
October 3, 2004) that was
granted with a per Share
exercise price that is
determined by the Internal
Revenue Service (the "IRS")
to be less than the Fair
Market Value of a Share on
the date of grant (a
"discount option") may be
considered "deferred
compensation." An Option that
is a "discount option" may
result in (i) income
recognition by Participant
prior to the exercise of the
Option, (ii) an additional
twenty percent (20%) federal
income tax, and (iii)
potential penalty and
interest charges. The
"discount option" may also
result in additional state
income, penalty and interest
tax to the Participant.
Participant acknowledges that
the Company cannot and has
not guaranteed that the IRS
will agree that the per Share
exercise price of this Option
equals or exceeds the Fair
Market Value of a Share on
the date of grant in a later
examination. Participant
agrees that if the IRS
determines that the Option
was granted with a per Share
exercise price that was less
than the Fair Market Value of
a Share on the date of grant,
Participant shall be solely

PLAINTIFF0002551

responsible for Participant's
costs related to such a
determination.

11. **Entire Agreement; Governing Law.**
The Plan is incorporated herein by
reference. The Plan and this
Option Agreement constitute the
entire agreement of the parties
with respect to the subject matter
hereof and supersede in their
entirety all prior undertakings
and agreements of the Company and
Participant with respect to the
subject matter hereof, and may not
be modified adversely to the
Participant's interest except by
means of a writing signed by the
Company and Participant. This
Option Agreement is governed by
the internal substantive laws but
not the choice of law rules of
Delaware.

12. **No Guarantee of Continued Service.**
PARTICIPANT ACKNOWLEDGES AND
AGREES THAT THE VESTING OF SHARES
PURSUANT TO THE VESTING SCHEDULE
HEREOF IS EARNED ONLY BY
CONTINUING AS A SERVICE PROVIDER
AT THE WILL OF THE COMPANY (OR THE
PARENT OR SUBSIDIARY EMPLOYING OR
RETAINING PARTICIPANT) AND NOT
THROUGH THE ACT OF BEING HIRED,
BEING GRANTED THIS OPTION OR
ACQUIRING SHARES HEREUNDER.
PARTICIPANT FURTHER ACKNOWLEDGES
AND AGREES THAT THIS AGREEMENT,
THE TRANSACTIONS CONTEMPLATED
HEREUNDER AND THE VESTING SCHEDULE
SET FORTH HEREIN DO NOT CONSTITUTE
AN EXPRESS OR IMPLIED PROMISE OF
CONTINUED ENGAGEMENT AS A SERVICE
PROVIDER FOR THE VESTING PERIOD,
FOR ANY PERIOD, OR AT ALL, AND
SHALL NOT INTERFERE IN ANY WAY
WITH PARTICIPANT'S RIGHT OR THE
RIGHT OF THE COMPANY (OR THE
PARENT OR SUBSIDIARY EMPLOYING OR



PLAINTIFF0002552



RETAINING PARTICIPANT) TO
TERMINATE PARTICIPANT'S
RELATIONSHIP AS A SERVICE PROVIDER

AT ANY TIME, WITH OR WITHOUT
CAUSE.

Participant acknowledges receipt of a
copy of the Plan and represents that he
or she is familiar with the terms and
provisions thereof, and hereby accepts
this Option subject to all of the terms
and provisions thereof. Participant has
reviewed the Plan and this Option in
their entirety, has had an opportunity
to obtain the advice of counsel prior
to executing this Option and fully
understands all provisions of the
Option. Participant hereby agrees to
accept as binding, conclusive and final
all decisions or interpretations of the
Administrator upon any questions
arising under the Plan or this Option.
Participant further agrees to notify
the Company upon any change in the
residence address indicated below.

| PARTICIPANT | COMPANY |
| --- | --- |
| Signature: | Signature: |
| Print Name: [Participant-name] | Print Name: [Entity-signer-name] |
| Role: Participant | Role: [Entity-signer-role] |
| Address: [Participant-address] | |

# Exhibit A

**[Plan-year] EQUITY INCENTIVE PLAN EXERCISE NOTICE**

**[Entity-name]**

**[Entity-address]**

PLAINTIFF0002553

Attention: Secretary

1. **Exercise of Option.** Effective as of today, **[Date-of-grant]**, the undersigned ("Participant") hereby elects to exercise Participant's option (the "Option") to purchase **[Share-amount]** of the Common Stock (the "Shares") of **[Entity-name]** (the "Company") under and pursuant to the **[Plan-year]** Equity Incentive Plan (the "Plan") and the Stock Option Agreement dated **[Plan-year]** (the "Option Agreement").

2. **Delivery of Payment.** Participant herewith delivers to the Company the full purchase price of the Shares, as set forth in the Option Agreement, and any and all withholding taxes due in connection with the exercise of the Option.

3. **Representations of Participant.** Participant acknowledges that Participant has received, read and understood the Plan and the Option Agreement and agrees to abide by and be bound by their terms and conditions.

4. **Rights as Stockholder.** Until the issuance of the Shares (as evidenced by the appropriate entry on the books of the Company or of a duly authorized transfer agent of the Company), no right to vote or receive dividends or any other rights as a stockholder shall exist with respect to the Common Stock subject to an Award, notwithstanding the exercise of the Option. The Shares shall be issued to Participant as soon as practicable after the Option is exercised in accordance with the

PLAINTIFF0002554



exercised in accordance with the
Option Agreement. No adjustment
shall be made for a dividend or

other right for which the record
date is prior to the date of
issuance except as provided in
Section 13 of the Plan.

5. **Company's Right of First Refusal.**
Before any Shares held by
Participant or any transferee
(either being sometimes referred
to herein as the "Holder") may be
sold or otherwise transferred
(including transfer by gift or
operation of law), the Company or
its assignee(s) shall have a right
of first refusal to purchase the
Shares on the terms and conditions
set forth in this Section 5 (the
"Right of First Refusal").

a. **Notice of Proposed
Transfer.** The Holder of the
Shares shall deliver to the
Company a written notice (the
"Notice") stating: (i) the
Holder's bona fide intention
to sell or otherwise transfer
such Shares; (ii) the name of
each proposed purchaser or
other transferee ("Proposed
Transferee"); (iii) the
number of Shares to be
transferred to each Proposed
Transferee; and (iv) the bona
fide cash price or other
consideration for which the
Holder proposes to transfer
the Shares (the "Offered
Price"), and the Holder shall
offer the Shares at the
Offered Price to the Company
or its assignee(s).

b. **Exercise of Right of First
Refusal.** At any time within
thirty (30) days after
receipt of the Notice, the
Company and/or its

PLAINTIFF0002555



Company and/or its assignee(s) may, by giving written notice to the Holder,

elect to purchase all, but not less than all, of the Shares proposed to be transferred to any one or more of the Proposed Transferees, at the purchase price determined in accordance with subsection (c) below.

c. **Purchase Price.** The purchase price ("Purchase Price") for the Shares purchased by the Company or its assignee(s) under this Section 5 shall be the Offered Price. If the Offered Price includes consideration other than cash, the cash equivalent value of the non-cash consideration shall be determined by the Board of Directors of the Company in good faith.

d. **Payment.** Payment of the Purchase Price shall be made, at the option of the Company or its assignee(s), in cash (by check), by cancellation of all or a portion of any outstanding indebtedness of the Holder to the Company (or, in the case of repurchase by an assignee, to the assignee), or by any combination thereof within thirty (30) days after receipt of the Notice or in the manner and at the times set forth in the Notice.

e. **Holder's Right to Transfer.** If all of the Shares proposed in the Notice to be transferred to a given
Proposed Transferee are not

PLAINTIFF0002556



Proposed Transferee are not purchased by the Company and/or its assignee(s) as

provided in this Section 5, then the Holder may sell or otherwise transfer such Shares to that Proposed Transferee at the Offered Price or at a higher price, *provided* that such sale or other transfer is consummated within one hundred and twenty (120) days after the date of the Notice, that any such sale or other transfer is effected in accordance with any applicable securities laws and that the Proposed Transferee agrees in writing that the provisions of this Section 5 shall continue to apply to the Shares in the hands of such Proposed Transferee. If the Shares described in the Notice are not transferred to the Proposed Transferee within such period, a new Notice shall be given to the Company, and the Company and/or its assignees shall again be offered the Right of First Refusal before any Shares held by the Holder may be sold or otherwise transferred.

f. **Exception for Certain Family Transfers.** Anything to the contrary contained in this Section 5 notwithstanding, the transfer of any or all of the Shares during the Participant's lifetime or on the Participant's death by will or intestacy to the Participant's immediate family or a trust for the

PLAINTIFF0002557

benefit of the Participant's immediate family shall be exempt from the provisions of this Section 5. "Immediate Family" as used herein shall mean spouse, lineal descendant or antecedent, father, mother, brother or sister. In such case, the transferee or other recipient shall receive and hold the Shares so transferred subject to the provisions of this Section 5, and there shall be no further transfer of such Shares except in accordance with the terms of this Section 5.



g. **Termination of Right of First Refusal.** The Right of First Refusal shall terminate as to any Shares upon the earlier of (i) the first sale of Common Stock of the Company to the general public, or (ii) a Change in Control in which the successor corporation has equity securities that are publicly traded.

6. **Tax Consultation.** Participant understands that Participant may suffer adverse tax consequences as a result of Participant's purchase or disposition of the Shares. Participant represents that Participant has consulted with any tax consultants Participant deems advisable in connection with the purchase or disposition of the Shares and that Participant is not relying on the Company for any tax advice.

7. **Restrictive Legends and Stop-Transfer Orders.**

a. **Legends.** Participant

PLAINTIFF0002558



a. **Legends.** Participant understands and agrees that the Company shall cause the

legends set forth below or legends substantially equivalent thereto, to be placed upon any certificate(s) evidencing ownership of the Shares together with any other legends that may be required by the Company or by state or federal securities laws:

THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "ACT") AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED UNLESS AND UNTIL REGISTERED UNDER THE ACT OR, IN THE OPINION OF COUNSEL SATISFACTORY TO THE ISSUER OF THESE SECURITIES, SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION IS IN COMPLIANCE THEREWITH.

THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO CERTAIN RESTRICTIONS ON TRANSFER AND A RIGHT OF FIRST REFUSAL HELD BY THE ISSUER OR ITS ASSIGNEE(S) AS SET FORTH IN THE EXERCISE NOTICE BETWEEN THE ISSUER AND THE ORIGINAL HOLDER OF THESE SHARES, A COPY OF WHICH MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE ISSUER. SUCH TRANSFER RESTRICTIONS AND RIGHT OF FIRST REFUSAL ARE BINDING ON TRANSFEREES OF THESE SHARES.

THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO RESTRICTIONS ON TRANSFER

PLAINTIFF0002559

TO RESTRICTIONS ON TRANSFER
FOR A PERIOD OF TIME
FOLLOWING THE EFFECTIVE DATE

OF THE UNDERWRITTEN PUBLIC
OFFERING OF THE COMPANY'S
SECURITIES SET FORTH IN AN
AGREEMENT BETWEEN THE ISSUER
AND THE ORIGINAL HOLDER OF
THESE SHARES AND MAY NOT BE
SOLD OR OTHERWISE DISPOSED OF
BY THE HOLDER PRIOR TO THE
EXPIRATION OF SUCH PERIOD
WITHOUT THE CONSENT OF THE
COMPANY OR THE MANAGING
UNDERWRITER.



b. **Stop-Transfer Notices.**
Participant agrees that, in
order to ensure compliance
with the restrictions
referred to herein, the
Company may issue appropriate
"stop transfer" instructions
to its transfer agent, if
any, and that, if the Company
transfers its own securities,
it may make appropriate
notations to the same effect
in its own records.

c. **Refusal to Transfer.** The
Company shall not be required
(i) to transfer on its books
any Shares that have been
sold or otherwise transferred
in violation of any of the
provisions of this Exercise
Notice or (ii) to treat as
owner of such Shares or to
accord the right to vote or
pay dividends to any
purchaser or other transferee
to whom such Shares shall
have been so transferred.

8. **Successors and Assigns.** The
Company may assign any of its
rights under this Exercise Notice
to single or multiple assignees,
and this Exercise Notice shall

PLAINTIFF0002560

and this Exercise Notice shall
inure to the benefit of the
successors and assigns of the

Company. Subject to the
restrictions on transfer herein
set forth, this Exercise Notice
shall be binding upon Participant
and his or her heirs, executors,
administrators, successors and
assigns.



9. **Interpretation.** Any dispute
regarding the interpretation of
this Exercise Notice shall be
submitted by Participant or by the
Company forthwith to the
Administrator, which shall review
such dispute at its next regular
meeting. The resolution of such a
dispute by the Administrator shall
be final and binding on all
parties.

10. **Governing Law; Severability.** This
Exercise Notice is governed by the
internal substantive laws, but not
the choice of law rules, of
Delaware. In the event that any
provision hereof becomes or is
declared by a court of competent
jurisdiction to be illegal,
unenforceable or void, this
Exercise Notice shall continue in
full force and effect.

11. **Entire Agreement.** The Plan and
Option Agreement are incorporated
herein by reference. This Exercise
Notice, the Plan, the Option
Agreement and the Investment
Representation Statement
constitute the entire agreement of
the parties with respect to the
subject matter hereof and
supersede in their entirety all
prior undertakings and agreements
of the Company and Participant
with respect to the subject matter
hereof, and may not be modified

PLAINTIFF0002561

adversely to the Participant's
interest except by means of a

writing signed by the Company and
Participant.

| Submitted Signature: | Accepted Signature: |
|---|---|
| **Participant:** | **[Entity-name]** |
| Signature:<br>-----------------------<br>-- | Signature:<br>-----------------------<br>-- |
| **[Participant-name]** | Print Name:<br>-----------------------<br>-- |
|  | Title:<br>-----------------------<br>-- |
| **[Participant-address]** | **[Entity-address]** |
| **[Date]** | **[Date-accepted]** |

# Exhibit B

## INVESTMENT REPRESENTATION STATEMENT

PARTICIPANT: **[Participant-name]**

COMPANY: **[Entity-name]**

SECURITY: COMMON STOCK

AMOUNT: **[Share-amount]**

DATE: **[Date-of-grant]**

In connection with the purchase of the above
listed Securities, the undersigned Participant
represents to the Company the following:

(a) Participant is aware of the Company's
business affairs and financial condition and has
acquired sufficient information about the Company
to reach an informed and knowledgeable decision
to acquire the Securities. Participant is
acquiring these Securities for investment for

PLAINTIFF0002562

Participant's own account only and not with a view to, or for resale in connection with, any "distribution" thereof within the meaning of the Securities Act of 1933, as amended (the "Securities Act").

(b) Participant acknowledges and understands that the Securities constitute "restricted securities" under the Securities Act and have not been registered under the Securities Act in reliance upon a specific exemption therefrom, which exemption depends upon, among other things, the bona fide nature of Participant's investment intent as expressed herein. In this connection, Participant understands that, in the view of the Securities and Exchange Commission, the statutory basis for such exemption may be unavailable if Participant's representation was predicated solely upon a present intention to hold these Securities for the minimum capital gains period specified under tax statutes, for a deferred sale, for or until an increase or decrease in the market price of the Securities, or for a period of one (1) year or any other fixed period in the future. Participant further understands that the Securities must be held indefinitely unless they are subsequently registered under the Securities Act or an exemption from such registration is available. Participant further acknowledges and understands that the Company is under no obligation to register the Securities. Participant understands that the certificate evidencing the Securities shall be imprinted with any legend required under applicable state securities laws.

(c) Participant is familiar with the provisions of Rule 701 and Rule 144, each promulgated under the Securities Act, which, in substance, permit limited public resale of "restricted securities" acquired, directly or indirectly from the issuer thereof, in a non-public offering subject to the satisfaction of certain conditions. Rule 701 provides that if the issuer qualifies under Rule 701 at the time of the grant of the Option to Participant, the exercise shall be exempt from registration under the Securities Act. In the event the Company becomes subject to the reporting requirements of Section 13 or 15(d) of

PLAINTIFF0002563



the Securities Exchange Act of 1934, ninety (90) days thereafter (or such longer period as any market stand-off agreement may require) the

Securities exempt under Rule 701 may be resold, subject to the satisfaction of the applicable conditions specified by Rule 144, including in the case of affiliates (1) the availability of certain public information about the Company, (2) the amount of Securities being sold during any three (3) month period not exceeding specified limitations, (3) the resale being made in an unsolicited "broker's transaction", transactions directly with a "market maker" or "riskless principal transactions" (as those terms are defined under the Securities Exchange Act of 1934) and (4) the timely filing of a Form 144, if applicable.

In the event that the Company does not qualify under Rule 701 at the time of grant of the Option, then the Securities may be resold in certain limited circumstances subject to the provisions of Rule 144, which may require (i) the availability of current public information about the Company; (ii) the resale to occur more than a specified period after the purchase and full payment (within the meaning of Rule 144) for the Securities; and (iii) in the case of the sale of Securities by an affiliate, the satisfaction of the conditions set forth in sections (2), (3) and (4) of the paragraph immediately above.

(d) Participant further understands that in the event all of the applicable requirements of Rule 701 or 144 are not satisfied, registration under the Securities Act, compliance with Regulation A, or some other registration exemption shall be required; and that, notwithstanding the fact that Rules 144 and 701 are not exclusive, the Staff of the Securities and Exchange Commission has expressed its opinion that persons proposing to sell private placement securities other than in a registered offering and otherwise than pursuant to Rules 144 or 701 shall have a substantial burden of proof in establishing that an exemption from registration is available for such offers or sales, and that such persons and their respective brokers who participate in such transactions do so at their

PLAINTIFF0002564

own risk. Participant understands that no
assurances can be given that any such other

registration exemption shall be available in such
event.



| PARTICIPANT |
| --- |
| Signature: |
| Print Name: [Participant-name] |
| Role: Participant |
| Dated: [Date] |

Previous
Equity Incentives

Next
Shareholder Consent



PLAINTIFF0002565



**LEGAL-TOOLS**  DAOLABS

Connect Wallet



# Variables

Agreement Date

mm/dd/yyyy

Corporation's Name (ALL CAPS)

ACME CORPORATION

Date Prior Engagement Began

mm/dd/yyyy

Employee's Full Name

Ms. Jane Doe

Witness' Full Name

Mr. John Doe

Employee's Address

123 Main Street, Apt. 45

**Update document**

ity-name] AT-WILL
LOYMENT, CONFIDENTIAL
ORMATION, INVENTION
IGNMENT, AND
ITRATION AGREEMENT

 At-Will Employment

 Applicability to
t Activities

 Confidentiality

 Ownership

 Conflicting
igations

 Return of Company
erials

 Termination
tification

 Notification of New
loyer

9. Solicitation of
Employees

10. Conflict of
Interest Guidelines

11. Representations

12. Audit

13. Arbitration and
Equitable Relief

14. Miscellaneous

Exhibit A

Exhibit B

Exhibit C

Exhibit D

# [Entity-name] AT-WILL EMPLOYMENT, CONFIDENTIAL INFORMATION, INVENTION ASSIGNMENT, AND ARBITRATION AGREEMENT

Note: List of prior inventions, check boxes in Exhibit A.

Note: Exhibit B is specific to California

PLAINTIFF0002566

Note: Exhibit C contains blanks for future employer/position.



As a condition of my employment with **[Entity-name]**, its subsidiaries, affiliates, successors or assigns (together, the "**Company**"), and in consideration of my employment with the Company and my receipt of the compensation now and hereafter paid to me by the Company, I agree to the following provisions of this **[Entity-name]** At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement (this "**Agreement**"):

# 1. At-Will Employment

I UNDERSTAND AND ACKNOWLEDGE THAT MY EMPLOYMENT WITH THE COMPANY IS FOR NO SPECIFIED TERM AND CONSTITUTES "AT WILL" EMPLOYMENT. I ALSO UNDERSTAND THAT ANY REPRESENTATION TO THE CONTRARY IS UNAUTHORIZED AND NOT VALID UNLESS IN WRITING AND SIGNED BY THE PRESIDENT OR CEO OF **[Entity-name]** ACCORDINGLY, I ACKNOWLEDGE THAT MY EMPLOYMENT RELATIONSHIP MAY BE TERMINATED AT ANY TIME, WITH OR WITHOUT GOOD CAUSE OR FOR ANY OR NO CAUSE, AT MY OPTION OR AT THE OPTION OF THE COMPANY, WITH OR WITHOUT NOTICE. I FURTHER ACKNOWLEDGE THAT THE COMPANY MAY MODIFY JOB TITLES, SALARIES, AND BENEFITS FROM TIME TO TIME AS IT DEEMS NECESSARY.

# 2. Applicability to Past Activities

A. **[Entity-name]** and I acknowledge that I have been engaged to provide services by **[Entity-name]** for a period of time prior to the date of this Agreement starting on **[Date-prior]** (the "**Prior Engagement Period**"). Accordingly, I agree that if and to the extent that, during the Prior Engagement Period: (i) I received access to any information from or on behalf of Company that would have been "Company Confidential Information" (as defined below) if I received access to such information during the period of my employment with Company under this Agreement; or (ii) I conceived, created, authored, invented, developed or reduced to practice any item, including any intellectual property rights with respect thereto, that would have been an "Invention" (as defined below) if conceived, created, authored, invented, developed or reduced to practice during the period of my employment with Company under this Agreement; then any such information shall be deemed "Company Confidential

PLAINTIFF0002567

Information" hereunder and any such item shall be deemed an "Invention" hereunder, and this Agreement shall apply to such information or item as if conceived, created, authored, invented, developed or reduced to practice under this Agreement.

# 3. Confidentiality

A. *Definition of Confidential Information*. I understand that "**Company Confidential Information**" means information that the Company has or will develop, acquire, create, compile, discover or own, that has value in or to the Company's business which is not generally known and which the Company wishes to maintain as confidential. Company Confidential Information includes both information disclosed by the Company to me, and information developed or learned by me during the course of my employment with Company. Company Confidential Information also includes all information of which the unauthorized disclosure could be detrimental to the interests of Company, whether or not such information is identified as Company Confidential Information. By example, and without limitation, Company Confidential Information includes any and all non-public information that relates to the actual or anticipated business and/or products, research or development of the Company, or to the Company's technical data, trade secrets, or know how, including, but not limited to, research, product plans, or other information regarding the Company's products or services and markets therefor, customer lists and customers (including, but not limited to, customers of the Company on which I called or with which I may become acquainted during the term of my employment), software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances, and other business information disclosed by the Company either directly or indirectly in writing, orally or by drawings or inspection of premises, parts, equipment, or other Company property. Notwithstanding the foregoing, Company Confidential Information shall not include any such information which I can establish (i) was publicly known or made generally available prior to the time of disclosure by Company to me; (ii)

PLAINTIFF0002568



becomes publicly known or made generally available after disclosure by Company to me through no wrongful action or omission by me; or (iii) is in

my rightful possession, without confidentiality obligations, at the time of disclosure by Company as shown by my then-contemporaneous written records. I understand that nothing in this Agreement is intended to limit employees' rights to discuss the terms, wages, and working conditions of their employment, as protected by applicable law.

B. *Nonuse and Nondisclosure.* I agree that during and after my employment with the Company, I will hold in the strictest confidence, and take all reasonable precautions to prevent any unauthorized use or disclosure of Company Confidential Information, and I will not (i) use the Company Confidential Information for any purpose whatsoever other than for the benefit of the Company in the course of my employment, or (ii) disclose the Company Confidential Information to any third party without the prior written authorization of the President, CEO, or the Board of Directors of the Company. Prior to disclosure when compelled by applicable law; I shall provide prior written notice to the President, CEO, and General Counsel of **[Entity-name]** (as applicable). I agree that I obtain no title to any Company Confidential Information, and that as between Company and myself, **[Entity-name]** retains all Confidential Information as the sole property of **[Entity-name]** I understand that my unauthorized use or disclosure of Company Confidential Information during my employment may lead to disciplinary action, up to and including immediate termination and legal action by the Company. I understand that my obligations under this **Section 3.B** shall continue after termination of my employment.

C. *Former Employer Confidential Information.* I agree that during my employment with the Company, I will not improperly use, disclose, or induce the Company to use any proprietary information or trade secrets of any former employer or other person or entity with which I have an obligation to keep in confidence. I further agree that I will not bring onto the Company's premises or transfer onto the Company's technology systems any unpublished document, proprietary information, or trade secrets

PLAINTIFF0002569



belonging to any such third party unless disclosure to, and use by, the Company has been consented to in writing by such third party.

D. *Third Party Information*. I recognize that the Company has received and in the future will receive from third parties associated with the Company, e.g., the Company's customers, suppliers, licensors, licensees, partners, or collaborators (**"Associated Third Parties"**), their confidential or proprietary information (**"Associated Third Party Confidential Information"**) subject to a duty on the Company's part to maintain the confidentiality of such Associated Third Party Confidential Information and to use it only for certain limited purposes. By way of example, Associated Third Party Confidential Information may include the habits or practices of Associated Third Parties, the technology of Associated Third Parties, requirements of Associated Third Parties, and information related to the business conducted between the Company and such Associated Third Parties. I agree at all times during my employment with the Company and thereafter, that I owe the Company and its Associated Third Parties a duty to hold all such Associated Third Party Confidential Information in the strictest confidence, and not to use it or to disclose it to any person, firm, corporation, or other third party except as necessary in carrying out my work for the Company consistent with the Company's agreement with such Associated Third Parties. I further agree to comply with any and all Company policies and guidelines that may be adopted from time to time regarding Associated Third Parties and Associated Third Party Confidential Information. I understand that my unauthorized use or disclosure of Associated Third Party Confidential Information or violation of any Company policies during my employment may lead to disciplinary action, up to and including immediate termination and legal action by the Company.

# 4. Ownership

A. *Assignment of Inventions*. As between Company and myself, I agree that all right, title, and interest in and to any and all copyrightable material, notes, records, drawings, designs, inventions, improvements, developments, discoveries and trade

PLAINTIFF0002570



secrets conceived, discovered, authored, invented, developed or reduced to practice by me, solely or in collaboration with others, during the period of

time I am in the employ of the Company (including during my off-duty hours), or with the use of Company's equipment, supplies, facilities, or Company Confidential Information, and any copyrights, patents, trade secrets, mask work rights or other intellectual property rights relating to the foregoing, except as provided in **Section 4.G** below (collectively, "**Inventions**"), are the sole property of **[Entity-name]** I also agree to promptly make full written disclosure to **[Entity-name]** of any Inventions, and to deliver and assign and hereby irrevocably assign fully to **[Entity-name]** all of my right, title and interest in and to Inventions. I agree that this assignment includes a present conveyance to **[Entity-name]** of ownership of Inventions that are not yet in existence. I further acknowledge that all original works of authorship that are made by me (solely or jointly with others) within the scope of and during the period of my employment with the Company and that are protectable by copyright are "works made for hire," as that term is defined in the United States Copyright Act. I understand and agree that the decision whether or not to commercialize or market any Inventions is within the Company's sole discretion and for the Company's sole benefit, and that no royalty or other consideration will be due to me as a result of the Company's efforts to commercialize or market any such Inventions.

B. *Pre-Existing Materials*. I have attached hereto as Exhibit A, a list describing all inventions, discoveries, original works of authorship, developments, improvements, trade secrets and other proprietary information or intellectual property rights owned by me or in which I have an interest prior to, or separate from, my employment with the Company, and which relate to the Company's proposed business, products, or research and development ("**Prior Inventions**"); or, if no such list is attached, I represent and warrant that there are no such Prior Inventions. Furthermore, I represent and warrant that if any Prior Inventions are included on Exhibit A, they will not materially affect my ability to perform all obligations under this Agreement. I will inform **[Entity-name]** in writing

PLAINTIFF0002571



before incorporating such Prior Inventions into any Invention or otherwise utilizing such Prior Invention in the course of my employment with the Company, and the Company is hereby granted a nonexclusive, royalty-free, perpetual, irrevocable, transferable worldwide license (with the right to grant and authorize sublicenses) to make, have made, use, import, offer for sale, sell, reproduce, distribute, modify, adapt, prepare derivative works of, display, perform, and otherwise exploit such Prior Inventions, without restriction, including, without limitation, as part of or in connection with such Invention, and to practice any method related thereto. I will not incorporate any invention, improvement, development, concept, discovery, work of authorship or other proprietary information owned by any third party into any Invention without **[Entity-name]**'s prior written permission.

C. *Moral Rights*. Any assignment to **[Entity-name]** of Inventions includes all rights of attribution, paternity, integrity, modification, disclosure and withdrawal, and any other rights throughout the world that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively, "**Moral Rights**"). To the extent that Moral Rights cannot be assigned under applicable law, I hereby waive and agree not to enforce any and all Moral Rights, including, without limitation, any limitation on subsequent modification, to the extent permitted under applicable law.

D. *Maintenance of Records*. I agree to keep and maintain adequate, current, accurate, and authentic written records of all Inventions made by me (solely or jointly with others) during the term of my employment with the Company. The records will be in the form of notes, sketches, drawings, electronic files, reports, or any other format that may be specified by the Company. As between Company and myself, the records are and will be available to and remain the sole property of **[Entity-name]** at all times.

E. *Further Assurances*. I agree to assist the Company, or its designee, at the Company's expense, in every proper way to secure the Company's rights in the Inventions in any and all countries.

PLAINTIFF0002572

in the inventions in any and all countries,
including the disclosure to the Company of all
pertinent information and data with respect



thereto, the execution of all applications,
specifications, oaths, assignments, and all other
instruments that the Company shall deem proper or
necessary in order to apply for, register, obtain,
maintain, defend, and enforce such rights, and in
order to deliver, assign and convey to the Company,
its successors, assigns, and nominees the sole and
exclusive rights, title, and interest in and to all
Inventions, and testifying in a suit or other
proceeding relating to such Inventions. I further
agree that my obligations under this **Section 4.E**
shall continue after the termination of this
Agreement.

F. *Attorney-in-Fact.* I agree that, if the Company
is unable because of my unavailability, mental or
physical incapacity, or for any other reason to
secure my signature with respect to any Inventions,
including, without limitation, for the purpose of
applying for or pursuing any application for any
United States or foreign patents or mask work or
copyright registrations covering the Inventions
assigned to **[Entity-name]** in **Section 4.A**, then I
hereby irrevocably designate and appoint the
Company and its duly authorized officers and agents
as my agent and attorney-in-fact, to act for and on
my behalf to execute and file any papers and oaths,
and to do all other lawfully permitted acts with
respect to such Inventions to further the
prosecution and issuance of patents, copyright and
mask work registrations with the same legal force
and effect as if executed by me. This power of
attorney shall be deemed coupled with an interest,
and shall be irrevocable.

G. *Exception to Assignments.* I UNDERSTAND THAT THE
PROVISIONS OF THIS AGREEMENT REQUIRING ASSIGNMENT
OF INVENTIONS TO **[Entity-name]** DO NOT APPLY TO ANY
INVENTION THAT QUALIFIES FULLY UNDER THE PROVISIONS
OF CALIFORNIA LABOR CODE SECTION 2870 (ATTACHED
HERETO AS EXHIBIT B). I WILL ADVISE **[Entity-name]**
PROMPTLY IN WRITING OF ANY INVENTIONS THAT I
BELIEVE MEET THE CRITERIA IN CALIFORNIA LABOR CODE
SECTION 2870 AND ARE NOT OTHERWISE DISCLOSED ON
EXHIBIT A.

PLAINTIFF0002573

# 5. Conflicting Obligations



A. *Current Obligations.* I agree that during the term of my employment with the Company, I will not engage in or undertake any other employment, occupation, consulting relationship, or commitment that is directly related to the business in which the Company is now involved or becomes involved or has plans to become involved, nor will I engage in any other activities that conflict with my obligations to the Company.

B. *Prior Relationships*. Without limiting **Section 5.A,** I represent and warrant that I have no other agreements, relationships, or commitments to any other person or entity that conflict with the provisions of this Agreement, my obligations to the Company under this Agreement, or my ability to become employed and perform the services for which I am being hired by the Company. I further agree that if I have signed a confidentiality agreement or similar type of agreement with any former employer or other entity, I will comply with the terms of any such agreement to the extent that its terms are lawful under applicable law. I represent and warrant that after undertaking a careful search (including searches of my computers, cell phones, electronic devices, and documents), I have returned all property and confidential information belonging to all prior employers (and/or other third parties I have performed services for in accordance with the terms of my applicable agreement). Moreover, I agree to fully indemnify the Company, its directors, officers, agents, employees, investors, shareholders, administrators, affiliates, divisions, subsidiaries, predecessor and successor corporations, and assigns for all verdicts, judgments, settlements, and other losses incurred by any of them resulting from my breach of my obligations under any agreement with a third party to which I am a party or obligation to which I am bound, as well as any reasonable attorneys' fees and costs if the plaintiff is the prevailing party in such an action, except as prohibited by law.

# 6. Return of Company Materials

PLAINTIFF0002574

Upon separation from employment with the Company, on Company's earlier request during my employment, or at any

time subsequent to my employment upon demand from the Company, I will immediately deliver to **[Entity-name]**, and will not keep in my possession, recreate, or deliver to anyone else, any and all Company property, including, but not limited to, Company Confidential Information, Associated Third Party Confidential Information, all devices and equipment belonging to the Company (including computers, handheld electronic devices, telephone equipment, and other electronic devices), all tangible embodiments of the Inventions, all electronically stored information and passwords to access such property, Company credit cards, records, data, notes, notebooks, reports, files, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, photographs, charts, any other documents and property, and reproductions of any of the foregoing items, including, without limitation, those records maintained pursuant to **Section 4.D.** I also consent to an exit interview to confirm my compliance with this **Article 6**.



# 7. Termination Certification

Upon separation from employment with the Company, I agree to immediately sign and deliver to the Company the "Termination Certification" attached hereto as Exhibit C. I also agree to keep **[Entity-name]** advised of my home and business address for a period of three (3) years after termination of my employment with the Company, so that the Company can contact me regarding my continuing obligations provided by this Agreement.

# 8. Notification of New Employer

In the event that I leave the employ of the Company, I hereby grant consent to notification by the Company to my new employer about my obligations under this Agreement.

# 9. Solicitation of Employees

To the fullest extent permitted under applicable law, I agree that during my employment and for a period of twelve (12) months immediately following the termination of my relationship with the Company for any reason, whether voluntary or involuntary, with or without cause, I will not directly or indirectly solicit any of the Company's employees

PLAINTIFF0002575

to leave their employment at the Company. I agree that
nothing in this **Article 9** shall affect my continuing
obligations under this Agreement during and after this twelve
(12) month period, including, without limitation, my
obligations under **Article 3**.

# 10. Conflict of Interest Guidelines

I agree to diligently adhere to all policies of the Company,
including the Company's insider trading policies and the
Company's Conflict of Interest Guidelines. A copy of the
Company's current Conflict of Interest Guidelines is attached
as Exhibit D hereto, but I understand that these Conflict of
Interest Guidelines may be revised from time to time during
my employment.

# 11. Representations

Without limiting my obligations under **Section 4.E** above, I
agree to execute any proper oath or verify any proper
document required to carry out the terms of this Agreement. I
represent and warrant that my performance of all the terms of
this Agreement will not breach any agreement to keep in
confidence information acquired by me in confidence or in
trust prior to my employment by the Company. I hereby
represent and warrant that I have not entered into, and I
will not enter into, any oral or written agreement in
conflict herewith.

# 12. Audit

I acknowledge that I have no reasonable expectation of
privacy in any computer, technology system, e-mail, handheld
device, telephone, voice-mail, or documents that are used to
conduct the business of the Company. All information, data,
and messages created, received, sent, or stored in these
systems are, at all times, the property of the Company. As
such, the Company has the right to audit and search all such
items and systems, without further notice to me, to ensure
that the Company is licensed to use the software on the
Company's devices in compliance with the Company's software
licensing policies, to ensure compliance with the Company's
policies, and for any other business-related purposes in the
Company's sole discretion. I understand that I am not
permitted to add any unlicensed, unauthorized, or non-
compliant applications to the Company's technology systems,
including, without limitation, open source or free software

PLAINTIFF0002576



not authorized by the Company, and that I shall refrain from
copying unlicensed software onto the Company's technology
systems or using non-licensed software or websites. I

understand that it is my responsibility to comply with the
Company's policies governing use of the Company's documents
and the internet, e-mail, telephone, and technology systems
to which I will have access in connection with my employment.

I am aware that the Company has or may acquire software and
systems that are capable of monitoring and recording all
network traffic to and from any computer I may use. The
Company reserves the right to access, review, copy, and
delete any of the information, data, or messages accessed
through these systems with or without notice to me and/or in
my absence. This includes, but is not limited to, all e-mail
messages sent or received, all website visits, all chat
sessions, all news group activity (including groups visited,
messages read, and postings by me), and all file transfers
into and out of the Company's internal networks. The Company
further reserves the right to retrieve previously deleted
messages from e-mail or voice-mail and monitor usage of the
Internet, including websites visited and any information I
have downloaded. In addition, the Company may review Internet
and technology systems activity and analyze usage patterns,
and may choose to publicize this data to assure that
technology systems are devoted to legitimate business
purposes.

# 13. Arbitration and Equitable Relief

A. *Arbitration*. IN CONSIDERATION OF MY EMPLOYMENT
WITH THE COMPANY, ITS PROMISE TO ARBITRATE ALL
EMPLOYMENT-RELATED DISPUTES, AND MY RECEIPT OF THE
COMPENSATION, PAY RAISES, AND OTHER BENEFITS PAID
TO ME BY THE COMPANY, AT PRESENT AND IN THE FUTURE,
I AGREE THAT ANY AND ALL CONTROVERSIES, CLAIMS, OR
DISPUTES WITH ANYONE (INCLUDING THE COMPANY AND ANY
EMPLOYEE, OFFICER, DIRECTOR, SHAREHOLDER, OR
BENEFIT PLAN OF THE COMPANY, IN THEIR CAPACITY AS
SUCH OR OTHERWISE), ARISING OUT OF, RELATING TO, OR
RESULTING FROM MY EMPLOYMENT WITH THE COMPANY OR
THE TERMINATION OF MY EMPLOYMENT WITH THE COMPANY,
INCLUDING ANY BREACH OF THIS AGREEMENT, SHALL BE
SUBJECT TO BINDING ARBITRATION, AND PURSUANT TO
DELAWARE LAW, AND SHALL BE BROUGHT IN MY INDIVIDUAL
CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN
ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING.
THE FEDERAL ARBITRATION ACT SHALL CONTINUE TO APPLY
WITH FULL FORCE AND EFFECT NOTWITHSTANDING THE

PLAINTIFF0002577

WITH FULL FORCE AND EFFECT NOTWITHSTANDING THE APPLICATION OF PROCEDURAL RULES SET FORTH IN THE ACT. **DISPUTES THAT I AGREE TO ARBITRATE, AND**



**THEREBY AGREE TO WAIVE ANY RIGHT TO A TRIAL BY JURY, INCLUDE ANY STATUTORY CLAIMS UNDER LOCAL, STATE, OR FEDERAL LAW, INCLUDING, BUT NOT LIMITED TO, CLAIMS UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, THE AMERICANS WITH DISABILITIES ACT OF 1990, THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967, THE OLDER WORKERS BENEFIT PROTECTION ACT, THE SARBANES-OXLEY ACT, THE WORKER ADJUSTMENT AND RETRAINING NOTIFICATION ACT, THE FAMILY AND MEDICAL LEAVE ACT, CLAIMS OF HARASSMENT, DISCRIMINATION, AND WRONGFUL TERMINATION, AND ANY STATUTORY OR COMMON LAW CLAIMS. NOTWITHSTANDING THE FOREGOING, I UNDERSTAND THAT NOTHING IN THIS AGREEMENT CONSTITUTES A WAIVER OF MY RIGHTS UNDER SECTION 7 OF THE NATIONAL LABOR RELATIONS ACT.** I FURTHER UNDERSTAND THAT THIS AGREEMENT TO ARBITRATE ALSO APPLIES TO ANY DISPUTES THAT THE COMPANY MAY HAVE WITH ME.

B. *Procedure*. I AGREE THAT ANY ARBITRATION WILL BE ADMINISTERED BY JUDICIAL ARBITRATION & MEDIATION SERVICES, INC. (**"JAMS"**), PURSUANT TO ITS EMPLOYMENT ARBITRATION RULES & PROCEDURES (THE **"JAMS RULES"**), WHICH ARE AVAILABLE AT http://www.jamsadr.com/rules-employment-arbitration/ AND FROM HUMAN RESOURCES. I AGREE THAT THE ARBITRATOR SHALL HAVE THE POWER TO DECIDE ANY MOTIONS BROUGHT BY ANY PARTY TO THE ARBITRATION, INCLUDING MOTIONS FOR SUMMARY JUDGMENT AND/OR ADJUDICATION, AND MOTIONS TO DISMISS AND DEMURRERS. I AGREE that the arbitrator shall issue a written decision on the merits. I ALSO AGREE THAT THE ARBITRATOR SHALL HAVE THE POWER TO AWARD ANY REMEDIES AVAILABLE UNDER APPLICABLE LAW, AND THAT THE ARBITRATOR SHALL AWARD ATTORNEYS' FEES AND COSTS TO THE PREVAILING PARTY, WHERE PROVIDED BY APPLICABLE LAW. I agree that the decree or award rendered by the arbitrator may be entered as a final and binding judgment in any court having jurisdiction thereof. I UNDERSTAND THAT THE COMPANY WILL PAY FOR ANY ADMINISTRATIVE OR HEARING FEES CHARGED BY THE ARBITRATOR OR JAMS EXCEPT THAT I SHALL PAY ANY FILING FEES ASSOCIATED WITH ANY ARBITRATION THAT I INITIATE, BUT ONLY SO MUCH OF THE FILING FEES AS I WOULD HAVE INSTEAD PAID HAD I FILED A COMPLAINT IN A COURT OF LAW. I AGREE THAT

PLAINTIFF0002578



THE ARBITRATOR SHALL ADMINISTER AND CONDUCT ANY ARBITRATION IN ACCORDANCE WITH DELAWARE LAW, AND THAT THE ARBITRATOR SHALL APPLY SUBSTANTIVE AND PROCEDURAL DELAWARE LAW TO ANY DISPUTE OR CLAIM, WITHOUT REFERENCE TO RULES OF CONFLICT OF LAW. TO THE EXTENT THAT THE JAMS RULES CONFLICT WITH DELAWARE LAW, DELAWARE LAW SHALL TAKE PRECEDENCE. I agree that any arbitration under this Agreement shall be conducted in KING COUNTY, WASHINGTON.

C. *Remedy.* EXCEPT AS PROVIDED BY THE ACT AND THIS AGREEMENT, ARBITRATION SHALL BE THE SOLE, EXCLUSIVE, AND FINAL REMEDY FOR ANY DISPUTE BETWEEN ME AND THE COMPANY. ACCORDINGLY, EXCEPT AS PROVIDED FOR BY THE ACT AND THIS AGREEMENT, NEITHER I NOR THE COMPANY WILL BE PERMITTED TO PURSUE COURT ACTION REGARDING CLAIMS THAT ARE SUBJECT TO ARBITRATION.

D. *Administrative Relief.* I UNDERSTAND THAT THIS AGREEMENT DOES NOT PROHIBIT ME FROM PURSUING AN ADMINISTRATIVE CLAIM WITH A LOCAL, STATE, OR FEDERAL ADMINISTRATIVE BODY OR GOVERNMENT AGENCY THAT IS AUTHORIZED TO ENFORCE OR ADMINISTER LAWS RELATED TO EMPLOYMENT, INCLUDING, BUT NOT LIMITED TO, THE DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING, THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, THE NATIONAL LABOR RELATIONS BOARD, OR THE WORKERS' COMPENSATION BOARD. THIS AGREEMENT DOES, HOWEVER, PRECLUDE ME FROM PURSUING COURT ACTION REGARDING ANY SUCH CLAIM, EXCEPT AS PERMITTED BY LAW.

E. *Voluntary Nature of Agreement.* I ACKNOWLEDGE AND AGREE THAT I AM EXECUTING THIS AGREEMENT VOLUNTARILY AND WITHOUT ANY DURESS OR UNDUE INFLUENCE BY THE COMPANY OR ANYONE ELSE. I FURTHER ACKNOWLEDGE AND AGREE THAT I HAVE CAREFULLY READ THIS AGREEMENT AND THAT I HAVE ASKED ANY QUESTIONS NEEDED FOR ME TO UNDERSTAND THE TERMS, CONSEQUENCES, AND BINDING EFFECT OF THIS AGREEMENT AND FULLY UNDERSTAND IT, INCLUDING THAT **I AM WAIVING MY RIGHT TO A JURY TRIAL.** FINALLY, I AGREE THAT I HAVE BEEN PROVIDED AN OPPORTUNITY TO SEEK THE ADVICE OF AN ATTORNEY OF MY CHOICE BEFORE SIGNING THIS AGREEMENT.

# 14. Miscellaneous

A. *Governing Law; Consent to Personal Jurisdiction.*

PLAINTIFF0002579



This Agreement will be governed by the laws of the State of Delaware without regard to Delaware's conflicts of law rules that may result in the application of the laws of any jurisdiction other than Delaware. To the extent that any lawsuit is permitted under this Agreement, I hereby expressly consent to the personal and exclusive jurisdiction and venue of the state and federal courts located in Washington for any lawsuit filed against me by the Company.

B. *Assignability*. This Agreement will be binding upon my heirs, executors, assigns, administrators, and other legal representatives, and will be for the benefit of the Company, its successors, and its assigns. There are no intended third-party beneficiaries to this Agreement, except as may be expressly otherwise stated. Notwithstanding anything to the contrary herein, **[Entity-name]** may assign this Agreement and its rights and obligations under this Agreement to any successor to all or substantially all of **[Entity-name]**'s relevant assets, whether by merger, consolidation, reorganization, reincorporation, sale of assets or stock, or otherwise.

C. *Entire Agreement*. This Agreement, together with the Exhibits herein and any executed written offer letter between me and the Company, to the extent such materials are not in conflict with this Agreement, sets forth the entire agreement and understanding between the Company and me with respect to the subject matter herein and supersedes all prior written and oral agreements, discussions, or representations between us, including, but not limited to, any representations made during my interview(s) or relocation negotiations. I represent and warrant that I am not relying on any statement or representation not contained in this Agreement. Any subsequent change or changes in my duties, salary, or compensation will not affect the validity or scope of this Agreement.

D. *Headings*. Headings are used in this Agreement for reference only and shall not be considered when interpreting this Agreement.

E. *Severability*. If a court or other body of competent jurisdiction finds, or the Parties mutually believe, any provision of this Agreement

PLAINTIFF0002580

mutually believe, any provision of this Agreement,
or portion thereof, to be invalid or unenforceable,
such provision will be enforced to the maximum

extent permissible so as to effect the intent of
the Parties, and the remainder of this Agreement
will continue in full force and effect.



F. *Modification, Waiver.* No modification of or
amendment to this Agreement, nor any waiver of any
rights under this Agreement, will be effective
unless in a writing signed by the President or CEO
of **[Entity-name]** and me. Waiver by **[Entity-name]** of
a breach of any provision of this Agreement will
not operate as a waiver of any other or subsequent
breach.

G. *Survivorship.* The rights and obligations of the
parties to this Agreement will survive termination
of my employment with the Company.

[Signature page to following]

| EMPLOYEE | WITNESS |
|---|---|
| Signature:<br>----------------------- | Signature:<br>----------------------- |
| Print Name: **[Employee-name]** | Print Name: **[Witness-name]** |
| Dated: **[Date]** | Dated: **[Date]** |

[New page]

# Exhibit A

### LIST OF PRIOR INVENTIONS AND ORIGINAL WORKS OF AUTHORSHIP

| Title | Date | Identifying Number or Brief Description |
|---|---|---|
| | | |

- ☐ No inventions or improvements
- ☐ Additional Sheets Attached

| EMPLOYEE |
|---|
| Signature: ----------------------- |
| Print Name: [Employee-name] |

PLAINTIFF0002581

```
Print Name: [Employee Name]

Dated: [Date]
```

# Exhibit B

## CALIFORNIA LABOR CODE SECTION 2870 INVENTION ON OWN TIME-EXEMPTION FROM AGREEMENT

(a) Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

(1) Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

(2) Result from any work performed by the employee for the employer.

(b) To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable."

# Exhibit C

## [Entity-name] TERMINATION CERTIFICATION

This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, any other documents or property, or reproductions of any and all aforementioned items belonging to **[Entity-name]**, its subsidiaries, affiliates, successors or assigns (together, the "**Company**").

I further certify that I have complied with all the terms of the Company's At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement signed by me,

PLAINTIFF0002582

including the reporting of any inventions and original works of authorship (as defined therein) conceived or made by me

(solely or jointly with others), as covered by that agreement.

I further agree that, in compliance with the At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement, I will preserve as confidential all Company Confidential Information and Associated Third Party Confidential Information, including trade secrets, confidential knowledge, data, or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, databases, other original works of authorship, customer lists, business plans, financial information, or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants, or licensees.

I also agree that for twelve (12) months from this date, I will not directly or indirectly solicit any of the Company's employees to leave their employment at the Company. I agree that nothing in this paragraph shall affect my continuing obligations under the At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement during and after this twelve (12) month period, including, without limitation, my obligations under **Article 3** (Confidentiality) thereof.

After leaving the Company's employment, I will be employed by _____ in the position of _____.

| EMPLOYEE |
| --- |
| Signature: _____ |
| Name: _____ |
| Date: _____ |
| Address for Notifications: _____ |

# Exhibit D

### [Entity-name] CONFLICT OF INTEREST GUIDELINES

It is the policy of [Entity-name] to conduct its affairs in

PLAINTIFF0002583

strict compliance with the letter and spirit of the law and
to adhere to the highest principles of business ethics.
Accordingly, all officers, employees, and independent
contractors must avoid activities that are in conflict, or
give the appearance of being in conflict, with these
principles and with the interests of the Company. The
following are potentially compromising situations that must
be avoided:



1. Revealing confidential information to
   outsiders or misusing confidential
   information. Unauthorized divulging of
   information is a violation of this policy
   whether or not for personal gain and whether
   or not harm to the Company is intended. (The
   At-Will Employment, Confidential Information,
   Invention Assignment, and Arbitration
   Agreement elaborates on this principle and is
   a binding agreement.)

2. Accepting or offering substantial gifts,
   excessive entertainment, favors, or payments
   that may be deemed to constitute undue
   influence or otherwise be improper or
   embarrassing to the Company.

3. Participating in civic or professional
   organizations that might involve divulging
   confidential information of the Company.

4. Initiating or approving personnel actions
   affecting reward or punishment of employees or
   applicants where there is a family
   relationship or is or appears to be a personal
   or social involvement.

5. Initiating or approving any form of personal
   or social harassment of employees.

6. Investing or holding outside directorship in
   suppliers, customers, or competing companies,
   including financial speculations, where such
   investment or directorship might influence in
   any manner a decision or course of action of
   the Company.

7. Borrowing from or lending to employees,
   customers, or suppliers.

8. Acquiring real estate of interest to the
   Company.

PLAINTIFF0002584

9. Improperly using or disclosing to the Company any proprietary information or trade secrets of any former or concurrent employer or other person or entity with whom obligations of confidentiality exist.

10. Unlawfully discussing prices, costs, customers, sales, or markets with competing companies or their employees.

11. Making any unlawful agreement with distributors with respect to prices.

12. Improperly using or authorizing the use of any inventions that are the subject of patent claims of any other person or entity.

13. Engaging in any conduct that is not in the best interest of the Company.

Each officer, employee, and independent contractor must take every necessary action to ensure compliance with these guidelines and to bring problem areas to the attention of higher management for review. Violations of this conflict of interest policy may result in discharge without warning.

Previous
Shareholder Consent

Next
Consulting Agreement

PLAINTIFF0002585



**LEGAL-TOOLS**  DAOLABS

Connect Wallet



# Variables

Corporation's Name (ALL CAPS)

ACME CORPORATION

Consultant's Full Name

Mr. John Doe

Consultant's Address

123 Main Street, Apt. 45

Consultant's Role/Title

Consultant

Corporation Contact's Full Name

Mr. Jane Doe

Corporation Contact's Role/Title

Chief Executive Officer

Corporation Contact's Email Address

jane@acme.co

Agreement Effective Date

01/01/2023

Description of Consultant's Services

Manufacturing and distribution of explosive tennis balls

IF FLAT PAY: Payment Amount upon Receipt/Acceptance of Services (USD)

100

IF HOURLY PAY: Hourly Payment Rate (USD)

100

IF HOULRY PAY: Maximum Weekly Billable Hours

100

IF GRANTING STOCK OPTION: Number of Optional Shares Granted to Consultant

100

PLAINTIFF0002586

Number of Years for Shares to Vest

> 1

Year of the Plan

> 2023

Exhibit A Agreement Date

> 01/01/2023

Service Provider's Full Name

> Ms. Jane Doe, Esq.

Service Provider's Relation to Consultant

> Coun el

Service Provider's Title

> Counsel

Corporation Signer's Name

> Mr. John Doe

Corporation Signer's Title

> Secretary

**Update document**

   

# [Entity-name] CONSULTING AGREEMENT

Note: Exhibit A section 3 has multiple options (flat vs. hourly, options, etc.) and shoul

This Consulting Agreement (this "*Agreement*") is made and entered into as of **[Date]** (the '
*Date*"), by and between **[Entity-name],** a Delaware corporation (the "*Company*"), and **[Consul**
an individual with his/her principal place of business at **[Consultant-address]** ("*Consulta*
herein referred to individually as a "*Party*," or collectively as the "*Parties*").

The Company desires to retain Consultant as an independent contractor to perform consulti
for the Company, and Consultant is willing to perform such services, on the terms describ
consideration of the mutual promises contained herein, the Parties agree as follows:

# 1. Services and Compensation.

PLAINTIFF0002587

Consultant shall perform the services described in **Exhibit A** (the "*Services*") for the Com designee), and the Company agrees to pay Consultant the compensation described in **Exhibit** Consultant's performance of the Services.

# 2. Applicability to Past Activities.

Consultant agrees that if and to the extent that Consultant provided any services or made behalf of or for the benefit of Company, or related to the current or prospective busines in anticipation of Consultant's involvement with the Company, that would have been "Servi performed during the term of this Agreement (the "*Prior Consulting Period*") and to the ex during the Prior Consulting Period:

- (i) Consultant received access to any information from or on behalf of Company that been "Confidential Information" (as defined below) if Consultant received access to information during the term of this Agreement; or
- (ii) Consultant
  - (a) conceived, created, authored, invented, developed or reduced to practi item (including any intellectual property rights with respect thereto) on of or for the benefit of Company, or related to the current or prospective business of Company in anticipation of Consultant's involvement with Compa would have been an "Invention" (as defined below) if conceived, created, a invented, developed or reduced to practice during the term of this Agreeme
  - (b) incorporated into any such item any pre-existing invention, improvemen development, concept, discovery or other proprietary information that woul been a "Prior Invention" (as defined below) if incorporated into such iten the term of this Agreement; then any such information shall be deemed "Confidential Information" hereunder and any such item shall be deemed an "Invention" or "Prior Invention" hereunder, and this Agreement shall apply activities, information or item as if disclosed, conceived, created, autho invented, developed or reduced to practice during the term of this Agreeme Consultant further acknowledges that Consultant has been fully compensated services provided during any such Prior Consulting Period.

# 3. Confidentiality.

A. *Definition of Confidential Information.* "*Confidential Information*" means any non-information that relates to the actual or anticipated business and/or products, rese development of the Company, its affiliates or subsidiaries, or to the Company's, its affiliates' or subsidiaries' technical data, trade secrets, or know-how, including, limited to, research, product plans, or other information regarding the Company's, i affiliates' or subsidiaries' products or services and markets therefor, customer lis customers (including, but not limited to, customers of the Company on whom Consultan or with whom Consultant became acquainted during the term of this Agreement), softwa developments, inventions, processes, formulas, technology, designs, drawings, engine

PLAINTIFF0002588

hardware configuration information, marketing, finances, and other business informat
disclosed by the Company, its affiliates or subsidiaries, either directly or indirec
writing, orally or by drawings or inspection of premises, parts, equipment, or other

property of Company, its affiliates or subsidiaries. Notwithstanding the foregoing,
Confidential Information shall not include any such information which Consultant can
establish (i) was publicly known or made generally available prior to the ti    di
to Consultant; (ii) becomes publicly known or made generally available after    los
Consultant through no wrongful action or inaction of Consultant; or (iii) is in the
possession of Consultant, without confidentiality obligations, at the time of disclo
shown by Consultant's then-contemporaneous written records.

B. *Nonuse and Nondisclosure.* During and after the term of this Agreement, Consultant
hold in the strictest confidence, and take all reasonable precautions to prevent any
unauthorized use or disclosure of Confidential Information, and Consultant will not
the Confidential Information for any purpose whatsoever other than as necessary for
performance of the Services on behalf of the Company, or (ii) disclose the Confident
Information to any third party without the prior written consent of an authorized
representative of Company, except that Consultant may disclose Confidential Informat
any third party on a need-to-know basis for the purposes of Consultant performing th
Services; provided, however, that such third party is subject to written non-use and
disclosure obligations at least as protective of Company and the Confidential Inform
this Article 3. Consultant may also disclose Confidential Information to the extent
compelled by applicable law; *provided however*, prior to such disclosure, Consultant
provide prior written notice to Company and seek a protective order or such similar
confidential protection as may be available under applicable law. Consultant agrees
ownership of Confidential Information is conveyed to the Consultant. Without limitin
foregoing, Consultant shall not use or disclose any Company property, intellectual p
rights, trade secrets or other proprietary know-how of the Company to invent, author
develop, design, or otherwise enable others to invent, author, make, develop, or des
identical or substantially similar designs as those developed under this Agreement f
third party. Consultant agrees that Consultant's obligations under this Section 3.B
continue after the termination of this Agreement.

C. *Other Client Confidential Information.* Consultant agrees that Consultant will not
improperly use, disclose, or induce the Company to use any proprietary information o
secrets of any former or concurrent employer of Consultant or other person or entity
which Consultant has an obligation to keep in confidence. Consultant also agrees tha
Consultant will not bring onto the Company's premises or transfer onto the Company's
technology systems any unpublished document, proprietary information, or trade secre
belonging to any third party unless disclosure to, and use by, the Company has been
consented to in writing by such third party.

D. *Third Party Confidential Information.* Consultant recognizes that the Company has
and in the future will receive from third parties their confidential or proprietary
information subject to a duty on the Company's part to maintain the confidentiality
information and to use it only for certain limited purposes. Consultant agrees that
times during the term of this Agreement and thereafter, Consultant owes the Company
third parties a duty to hold all such confidential or proprietary information in the
strictest confidence and not to use it or to disclose it to any person, firm, corpor

PLAINTIFF0002589

or other third party except as necessary in carrying out the Services for the Company
consistent with the Company's agreement with such third party.

# 4. Ownership.

A. *Assignment of Inventions.* Consultant agrees that all right, title, and in      . i
any copyrightable material, notes, records, drawings, designs, inventions, improveme
developments, discoveries and trade secrets conceived, discovered, authored, invente
developed or reduced to practice by Consultant, solely or in collaboration with othe
during the term of this Agreement and arising out of, or in connection with, perform
Services under this Agreement and any copyrights, patents, trade secrets, mask work
or other intellectual property rights relating to the foregoing (collectively,
"*Inventions*"), are the sole property of the Company. Consultant also agrees to prom
full written disclosure to the Company of any Inventions and to deliver and assign (
to be assigned) and hereby irrevocably assigns fully to the Company all right, title
interest in and to the Inventions.

B. *Pre-Existing Materials.* Subject to Section 4.A, Consultant agrees that if, in the
of performing the Services, Consultant incorporates into any Invention or utilizes i
performance of the Services any pre-existing invention, discovery, original works of
authorship, development, improvements, trade secret, concept, or other proprietary
information or intellectual property right owned by Consultant or in which Consultar
interest ("*Prior Inventions*"), (i) Consultant will provide the Company with prior wr
notice and (ii) the Company is hereby granted a nonexclusive, royalty-free, perpetua
irrevocable, transferable, worldwide license (with the right to grant and authorize
sublicenses) to make, have made, use, import, offer for sale, sell, reproduce, distr
modify, adapt, prepare derivative works of, display, perform, and otherwise exploit
Prior Inventions, without restriction, including, without limitation, as part of or
connection with such Invention, and to practice any method related thereto. Consulta
not incorporate any invention, improvement, development, concept, discovery, work of
authorship or other proprietary information owned by any third party into any Invent
without Company's prior written permission.

C. *Moral Rights.* Any assignment to the Company of Inventions includes all rights of
attribution, paternity, integrity, modification, disclosure and withdrawal, and any
rights throughout the world that may be known as or referred to as "moral rights," "
rights," "droit moral," or the like (collectively, "*Moral Rights*"). To the extent th
Rights cannot be assigned under applicable law, Consultant hereby waives and agrees
enforce any and all Moral Rights, including, without limitation, any limitation on
subsequent modification, to the extent permitted under applicable law.

D. *Maintenance of Records.* Consultant agrees to keep and maintain adequate, current,
accurate, and authentic written records of all Inventions made by Consultant (solely
jointly with others) during the term of this Agreement, and for a period of three (3
thereafter. The records will be in the form of notes, sketches, drawings, electronic
reports, or any other format that is customary in the industry and/or otherwise spec
the Company. Such records are and remain the sole property of the Company at all tin
upon Company's request, Consultant shall deliver (or cause to be delivered) the same

PLAINTIFF0002590

E. **_Further Assurances._** Consultant agrees to assist Company, or its designee, at the Company's expense, in every proper way to secure the Company's rights in Inventions and all countries, including the disclosure to the Company of all pertinent informat

data with respect thereto, the execution of all applications, specifications, oaths, assignments and all other instruments that the Company may deem necessary in order for, register, obtain, maintain, defend, and enforce such rights, and in order de assign and convey to the Company, its successors, assigns and nominees the s and exclusive right, title, and interest in and to all Inventions and testifying in a su other proceeding relating to such Inventions. Consultant further agrees that Consult obligations under this Section 4.E shall continue after the termination of this Agre

F. **_Attorney-in-Fact._** Consultant agrees that, if the Company is unable because of Consultant's unavailability, dissolution, mental or physical incapacity, or for any reason, to secure Consultant's signature with respect to any Inventions, including, limitation, for the purpose of applying for or pursuing any application for any Uni States or foreign patents or mask work or copyright registrations covering the Inver assigned to the Company in Section 4.A, then Consultant hereby irrevocably designate appoints the Company and its duly authorized officers and agents as Consultant's age attorney-in-fact, to act for and on Consultant's behalf to execute and file any pape oaths and to do all other lawfully permitted acts with respect to such Inventions to the prosecution and issuance of patents, copyright and mask work registrations with legal force and effect as if executed by Consultant. This power of attorney shall be coupled with an interest, and shall be irrevocable.

# 5. Conflicting Obligations.

Consultant represents and warrants that Consultant has no agreements, relationships, or any other person or entity that conflict with the provisions of this Agreement, Consultan obligations to the Company under this Agreement, and/or Consultant's ability to perform Consultant will not enter into any such conflicting agreement during the term of this Agr

Consultant shall require all Consultant's employees, contractors, or other third-parties Services under this Agreement to execute a Confidential Information and Assignment Agreer form of Exhibit B, and promptly provide a copy of each such executed agreement to the Cor Consultant's violation of this Article 5 will be considered a material breach under Secti

# 6. Return of Company Materials.

Upon the termination of this Agreement, or upon Company's earlier request, Consultant wi deliver to the Company, and will not keep in Consultant's possession, recreate, or delive else, any and all Company property, including, but not limited to, Confidential Informati embodiments of the Inventions, all devices and equipment belonging to the Company, all el stored information and passwords to access such property, those records maintained pursua Section 4.D and any reproductions of any of the foregoing items that Consultant may have Consultant's possession or control.

# 7. Reports.

PLAINTIFF0002591

Consultant agrees that Consultant will periodically keep the Company advised as to Consul progress in performing the Services under this Agreement. Consultant further agrees that

will, as requested by the Company, prepare written reports with respect to such progress. and Consultant agree that the reasonable time expended in preparing such written reports considered time devoted to the performance of the Services.

# 8. Term and Termination.

A. *Term.* The term of this Agreement will begin on the Effective Date of this Agreeme will continue until the earlier of (i) final completion of the Services or (ii) term as provided in Section 8.B.

B. *Termination.* The Company may terminate this Agreement upon giving Consultant four (14) days prior written notice of such termination pursuant to Section 14.G of this Agreement. The Company may terminate this Agreement immediately and without prior no Consultant refuses to or is unable to perform the Services or is in breach of any ma provision of this Agreement.

C. *Survival.* Upon any termination, all rights and duties of the Company and Consulta toward each other shall cease except:

(1) The Company will pay, within thirty (30) days after the effective date of termination, all amounts owing to Consultant for Services completed and accepte by the Company prior to the termination date and related reimbursable expenses, any, submitted in accordance with the Company's policies and in accordance with the provisions of Article 1 of this Agreement; and

(2) Article 3 (Confidentiality), Article 4 (Ownership), Section 5.B (Conflictin Obligations), Article 6 (Return of Company Materials), Article 8 (Term and Termination), Article 9 (Independent Contractor; Benefits), Article 10 (Indemnification), Article 11 (Noninterference), Article 12 (Limitation of Liability), Article 13 (Arbitration and Equitable Relief), and Article 14 (Miscellaneous) will survive termination or expiration of this Agreement in accordance with their terms.

# 9. Independent Contractor; Benefits.

A. *Independent Contractor.* It is the express intention of the Company and Consultant Consultant perform the Services as an independent contractor to the Company. Nothing Agreement shall in any way be construed to constitute Consultant as an agent, employ representative of the Company. Without limiting the generality of the foregoing, Cor is not authorized to bind the Company to any liability or obligation or to represent Consultant has any such authority. Consultant agrees to furnish (or reimburse the Co for) all tools and materials necessary to accomplish this Agreement and shall incur expenses associated with performance, except as expressly provided in **Exhibit A.** Cor acknowledges and agrees that Consultant is obligated to report as income all compens received by Consultant pursuant to this Agreement. Consultant agrees to and acknowle obligation to pay all self-employment and other taxes on such in **PLAINTIFF0002592**

obligation to pay all self-employment and other taxes on such income.

B. **Benefits.** The Company and Consultant agree that Consultant will receive no Company-sponsored benefits from the Company where benefits include, but are not limited to, vacation, sick leave, medical insurance and 401k participation. If Consultant is reclassified by a state or federal agency or court as the Company's employee, Consultant will become a reclassified employee and will receive no benefits from the Company except those mandated by state or federal law, even if by the terms of the Company's benefit plans or programs of the Company in effect at the time of such reclassification, Consultant would otherwise be eligible for such benefits.

# 10. Indemnification.

Consultant agrees to indemnify and hold harmless the Company and its affiliates and their officers and employees from and against all taxes, losses, damages, liabilities, costs and expenses, including attorneys' fees and other legal expenses, arising directly or indirectly from or in connection with (i) any negligent, reckless or intentionally wrongful act of Consultant or Consultant's assistants, employees, contractors or agents, (ii) a determination by a court that the Consultant is not an independent contractor, (iii) any breach by the Consultant or Consultant's assistants, employees, contractors or agents of any of the covenants contained in this Agreement and corresponding Confidential Information and Invention Assignment Agreement, (iv) any failure of Consultant to perform the Services in accordance with all applicable laws, rules and regulations, or (v) any violation or claimed violation of a third party's rights resulting in whole or in part from the Company's use of the Inventions or other deliverables of Consultant under this Agreement.

# 11. Nonsolicitation.

To the fullest extent permitted under applicable law, from the date of this Agreement until twelve (12) months after the termination of this Agreement for any reason (the "**Restricted Period**"), Consultant will not, without the Company's prior written consent, directly or indirectly, solicit any of the Company's employees to leave their employment, or attempt to solicit employees of the Company, either for Consultant or for any other person or entity. Consultant agrees that nothing in this Article 11 shall affect Consultant's continuing obligations under this Agreement during and after this twelve (12) month period, including, without limitation, Consultant's obligations under Article 6.

# 12. Limitation of Liability.

IN NO EVENT SHALL COMPANY BE LIABLE TO CONSULTANT OR TO ANY OTHER PARTY FOR ANY INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES, OR DAMAGES FOR LOST PROFITS OR LOSS OF BUSINESS, HOWEVER CAUSED AND UNDER ANY THEORY OF LIABILITY, WHETHER BASED IN CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHER THEORIES OF LIABILITY, REGARDLESS OF WHETHER COMPANY WAS ADVISED OF THE POSSIBILITY OF SUCH DAMAGE, AND NOTWITHSTANDING THE FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY. IN NO EVENT SHALL COMPANY'S LIABILITY ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT EXCEED THE AMOUNTS PAID BY COMPANY TO CONSULTANT UNDER THIS AGREEMENT FOR THE SERVICES, DELIVERABLES OR INVENTION GIVING RISE TO SUCH LIABILITY.

# 13. Arbitration and Equitable Relief.

PLAINTIFF0002593

A. ***Arbitration.*** In consideration of Consultant's consulting relationship with Compar promise to arbitrate all disputes related to Consultant's consulting relationship wi Company and Consultant's receipt of the compensation and other benefits paid to Cons by Company, at present and in the future, Consultant agrees that any and all controv claims, or disputes with anyone (including Company and any employee, officer ect shareholder or benefit plan of the Company in their capacity as such or othe )), BROUGHT ON AN INDIVIDUAL, GROUP, OR CLASS BASIS, arising out of, relating to, or res from Consultant's consulting relationship with the Company or the termination of Consultant's consulting relationship with the Company, including any breach of this Agreement, shall be subject to binding arbitration under the Arbitration pursuant to DELAWARE law, and shall be brought in consultant's individual capacity, and not as a plaintiff or class member in any purported class or representative proceeding. THE F ARBITRATION ACT SHALL CONTINUE TO APPLY WITH FULL FORCE AND EFFECT NOTWITHSTANDING T APPLICATION OF PROCEDURAL RULES SET FORTH IN THE ACT. **Disputes which Consultant agr arbitrate, and thereby agrees to waive any right to a trial by jury, include any sta claims under LOCAL, state, or federal law, including, but not limited to, claims und VII of the Civil Rights Act of 1964, the Americans with Disabilities Act of 1990, th Discrimination in Employment Act of 1967, the Older Workers Benefit Protection Act, SARBANES-OXLEY ACT, THE WORKER ADJUSTMENT AND RETRAINING NOTIFICATION ACT, claims of harassment, discrimination AND wrongful termination and any statutory OR COMMON LAW** Consultant further understands that this Agreement to arbitrate also applies to any that the Company may have with Consultant.

B. ***Procedure.*** Consultant agrees that any arbitration will be administered by Judicia Arbitration & Mediation Services, Inc. ("***JAMS***") pursuant to its EMPLOYMENT Arbitrati & Procedures (the "***JAMS Rules***"), WHICH ARE AVAILABLE AT http://www.jamsadr.com/rules employment-arbitration/ AND FROM HUMAN RESOURCES AND ATTACHED HERETO AS EXHIBIT C. Consultant agrees that the arbitrator shall have the power to decide any motions bro any party to the arbitration, including motions for summary judgment and/or adjudica motions to dismiss and demurrers. Consultant agrees that the arbitrator shall issue written decision on the merits. CONSULTANT ALSO AGREES THAT THE ARBITRATOR SHALL HAV POWER TO AWARD ANY REMEDIES AVAILABLE UNDER APPLICABLE LAW, AND THAT THE ARBITRATOR AWARD ATTORNEYS' FEES AND COSTS TO THE PREVAILING PARTY WHERE PROVIDED BY APPLICABLE CONSULTANT AGREES that the decree or award rendered by the arbitrator may be entered final and binding judgment in any court having jurisdiction thereof. Consultant agre the arbitrator shall administer and conduct any arbitration in ACCORDANCE with DELAW and that the arbitrator shall apply substantive and procedural DELAWARE law to any o or claim, without reference to rules of conflict of law. To the extent that the JAMS conflict with DELAWARE law, Delaware law shall take precedence. Consultant further a that any arbitration under this agreement shall be conducted in KING COUNTY, WASHING

C. ***Remedy.*** Except as provided by the ACT AND THIS AGREEMENT, arbitration shall be th exclusive, and final remedy for any dispute between Consultant and the Company. Acco except as provided for by the ACT AND this agreement, neither Consultant nor the Con will be permitted to pursue court action regarding claims that are subject to arbitr

D. ***Availability of Injunctive Relief.*** the Parties agree that any party may also peti court for injunctive relief where either party alleges or claims a violation of any agreement regarding INTELLECTUAL PROPERTY confidential informa

PLAINTIFF0002594

agreement regarding INTELLECTUAL PROPERTY, confidential information OR NONINTERFEREN
the event either party seeks injunctive relief, the prevailing party shall be entitl
recover reasonable costs and attorneys' fees.

E. **Administrative Relief.** Consultant understands that except as permitted by law thi
Agreement does not prohibit Consultant from pursuing certain Administrative claimS v
local, state or federal administrative bodIES OR GOVERNMENT AGENCIES such as Dep
of Fair Employment and Housing, the Equal Employment Opportunity Commission, Nat
Labor Relations Board, or the workers' compensation board. this agreement does, howe
preclUde consultant from bringing any alleged wage claims with the Department of lab
standards enforcement. Likewise, This Agreement does preclude Consultant from pursui
action regarding any Administrative claims, except as permitted by law.

F. **Voluntary Nature of Agreement.** Consultant acknowledges and agrees that he/she is
executing this Agreement voluntarily and without any duress or undue influence by th
Company or anyone else. Consultant further acknowledges and agrees that he/she has d
read this Agreement and that Consultant has asked any questions needed for Consultar
understand the terms, consequences and binding effect of this Agreement and fully ur
it, including that **Consultant is waiving his/her right to a jury trial**. Finally, Cor
agrees that he/she has been provided an opportunity to seek the advice of an attorne
Consultant's choice before signing this Agreement.

# 14. Miscellaneous.

A. **Governing Law; Consent to Personal Jurisdiction.** This Agreement shall be governed
laws of the State of Delaware, without regard to the conflicts of law provisions of
jurisdiction. To the extent that any lawsuit is permitted under this Agreement, the
hereby expressly consent to the personal and exclusive jurisdiction and venue of the
and federal courts located in Washington.

B. **Assignability.** This Agreement will be binding upon Consultant's heirs, executors,
assigns, administrators, and other legal representatives, and will be for the benefi
Company, its successors, and its assigns. There are no intended third-party benefici
this Agreement, except as expressly stated. Except as may otherwise be provided in t
Agreement, Consultant may not sell, assign or delegate any rights or obligations und
Agreement. Notwithstanding anything to the contrary herein, Company may assign this
Agreement and its rights and obligations under this Agreement to any successor to al
substantially all of Company's relevant assets, whether by merger, consolidation,
reorganization, reincorporation, sale of assets or stock, change of control or other

C. **Entire Agreement.** This Agreement constitutes the entire agreement and understandi
between the Parties with respect to the subject matter herein and supersedes all pri
written and oral agreements, discussions, or representations between the Parties. Co
represents and warrants that he/she is not relying on any statement or representatio
contained in this Agreement. To the extent any terms set forth in any exhibit or sch
conflict with the terms set forth in this Agreement, the terms of this Agreement sha
control unless otherwise expressly agreed by the Parties in such exhibit or schedule

D. **Headings.** Headings are used in this Agreement for reference only and shall not be
considered when interpreting this Agreement.

PLAINTIFF0002595

E. **Severability.** If a court or other body of competent jurisdiction finds, or the Pa mutually believe, any provision of this Agreement, or portion thereof, to be invalid

unenforceable, such provision will be enforced to the maximum extent permissible so effect the intent of the Parties, and the remainder of this Agreement will continue force and effect.

F. **Modification, Waiver.** No modification of or amendment to this Agreement, nor any of any rights under this Agreement, will be effective unless in a writing signed by Parties. Waiver by the Company of a breach of any provision of this Agreement will r operate as a waiver of any other or subsequent breach.

G. **Notices.** Any notice or other communication required or permitted by this Agreement given to a Party shall be in writing and shall be deemed given (i) if delivered pers or by commercial messenger or courier service, (ii) when sent by confirmed facsimile (iii) if mailed by U.S. registered or certified mail (return receipt requested), to Party at the Party's address written below or at such address as the Party may have previously specified by like notice. If by mail, delivery shall be deemed effective business days after mailing in accordance with this Section 14.G.

H. **Attorneys' Fees.** In any court action at law or equity that is brought by one of Parties to this Agreement to enforce or interpret the provisions of this Agreement, prevailing Party will be entitled to reasonable attorneys' fees, in addition to any relief to which that Party may be entitled.

I. **Signatures.** This Agreement may be signed in two counterparts, each of which shall deemed an original, with the same force and effectiveness as though executed in a si document.

[Signature page to follow]

IN WITNESS WHEREOF, the Parties hereto have executed this Consulting Agreement as of the written above.

| CONSULTANT | COMPANY |
|---|---|
| Signature: _____ | Signature: _____ |
| Print Name: **[Consultant-name]** | Print Name: **[Entity-signer-name]** |
| Role: **[Consultant-role]** | Role: **[Entity-signer-title]** |
| Address: **[Consultant-address]** | |

# Exhibit A

## SERVICES AND COMPENSATION

1. **Contact.** Consultant's principal Company contact:

PLAINTIFF0002596

Name: **[Contact-name]**

Role: **[Contact-role]**
e-mail: **[Contact-email]**



2. *Services*. The Services will include, but will not be limited to, the followi

**[Consultant-services]** and such other services that the Company may reasonably request fro
time.

3. *Compensation.*

A. The Company will pay Consultant $**[Pay-amount]** upon delivery by the Consultant and acce
Company of **[Consultant-services]**, as described in Article 2 above.

**OR**

A. The Company will pay Consultant $**[Hourly-rate]** per hour, except that Consultant will n
for more than **[Max-weekly-hours]** hours per week.

B. The Company will reimburse Consultant, in accordance with Company policy, for all reas
expenses incurred by Consultant in performing the Services pursuant to this Agreement, if
receives written consent from an authorized agent of the Company prior to incurring such
submits receipts for such expenses to the Company in accordance with Company policy.

**AND/OR**

C. Subject to the approval of the Company's Board of Directors, the Company will grant Co
nonqualified stock option to purchase **[Share-amount]** shares of the Company's Common Stock
"**Shares**") at a price per share equal to the fair market value per share of the Common Sto
date of grant, as determined by the Company's Board of Directors. Shares will vest monthl
amounts over **[Share-vesting-years]** years after the date Consultant's vesting begins, subj
Consultant continuing to provide Services to the Company pursuant to this Agreement, and
shall vest before such date and no rights to any vesting shall be earned or accrued prior
date. The Shares will be subject to the terms and conditions of the Company's **[Plan-year]**
Incentive Plan and a stock option agreement between Consultant and the Company, including
requirements.

Every two weeks, Consultant shall submit to the Company a written invoice for Services an
and such statement shall be subject to the approval of the contact person listed above or
designated agent of the Company. The Company will remit payment for properly submitted an
invoices within thirty (30) days following invoice submission.

All payments and benefits provided for under this Agreement are intended to be exempt fro
otherwise comply with the requirements of Section 409A of the Internal Revenue Code of 19
amended, and the regulations and guidance thereunder (together, "**Section 409A**") so that n
severance payments and benefits to be provided hereunder will be subject to the additiona
under Section 409A, and any ambiguities or ambiguous terms herein will be interpreted to
so comply. Each payment and benefit payable under this Agreement is intended to constitut
payment for purposes of Section 1.409A-2(b)(2) of the Treasury Regulations.

**PLAINTIFF0002597**

This **Exhibit A** is accepted and agreed upon as of **[Exhibit-a-date]**.

| CONSULTANT | COMPANY |
|---|---|
| Signature: _____ | Signature: _____ |
| Print Name: **[Consultant-name]** | Print Name: **[Entity-signer-name]** |
| Role: **[Consultant-role]** | Role: **[Entity-signer-title]** |

# Exhibit B

**FORM OF CONFIDENTIAL INFORMATION AND ASSIGNMENT AGREEMENT**

(*Attached*)

CONFIDENTIAL INFORMATION AND ASSIGNMENT AGREEMENT

This Confidential Information and Assignment Agreement (this "*Agreement*") is entered into **[Date]**, by and between **[Consultant-name]** ("*Consultant*") and **[Service-provider-name]** ("*Service Provider*"), **[Service-provider-relation]** of Consultant.

## RECITALS

A. The Consultant and **[Entity-name]**, a Delaware corporation (the "*Company*"), have entered Consulting Agreement, dated **[Date]** (the "*Consulting Agreement*").

B. Article 5 of the Consulting Agreement requires Consultant to have each of Consultant's and contractors with access to Confidential Information (as defined below) execute this A

C. Service Provider is **[Service-provider-relation]** of Consultant, who is performing for the services, or a portion of the services, described in **Exhibit A** of the Consulting Agree "*Services*").

D. Capitalized terms used but not defined in this Agreement shall have the meanings assig in the Consulting Agreement.

## AGREEMENT

In consideration of the mutual promises contained herein, the Parties agree as follows:

    1. **Confidentiality**

        A. *Definition.* "*Confidential Information*" means any non-public information that relates to the actual or anticipated business and/or products, research or development of the Company, or to the Company's technical data, trade secrets, know-how, including, but not limited to, research, product plans, or other information regarding the Company's products or services and markets therefor,

PLAINTIFF0002598

customer lists and customers (including, but not limited to, customers of the Company on whom Service Provider called or with whom Service Provider became acquainted during the term of Service Provider's employment or engagement),

software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances, and other business information disclosed by the Company either directly or indirectly in writing, orally or by drawings or inspection of premises, parts, equipment, or other Company property. Notwithstanding the foregoing, Confidential Information shall not include any such information which Service Provider can establish (i) was publicly known or made generally available prior to the time of disclosure by Company to Service Provider; (ii) becomes publicly known or made generally available after disclosure by Company to Service Provider through no wrongful action or omission of Service Provider; or (iii) is in the rightful possession of Service Provider, without confidentiality obligations, at the time of disclosure by Company as shown by Service Provider's then-contemporaneous written records.

B. ***Nonuse and Nondisclosure.*** During and after the term of this Agreement, Service Provider will hold in the strictest confidence, and take all reasonable precautions to prevent any unauthorized use or disclosure of Confidential Information, and Service Provider will not (i) use the Confidential Information for any purpose whatsoever other than as necessary for the performance of the Services on behalf of the Company, or (ii) disclose the Confidential Information to any third party without the prior written consent of an authorized representative of Company. Service Provider agrees that no ownership of Confidential Information is conveyed to the Service Provider. Without limiting the foregoing, Consultant shall not use or disclose any Company property, intellectual property rights, trade secrets or other proprietary know-how of the Company to invent, author, make, develop, or design, or otherwise enable others to invent, author, make, develop, design identical or substantially similar designs as those developed under this Agreement for any third party. Service Provider agrees that Service Provider's obligations under this Section 1.B shall continue after the termination of this Agreement.

C. ***Other Service Provider's Confidential Information.*** Service Provider agrees that Service Provider will not improperly use, disclose, or induce the Company to use any proprietary information or trade secrets of any former or concurrent employer of Service Provider or other person or entity with which Service Provider has an obligation to keep in confidence. Service Provider also agrees that Service Provider will not bring onto the Company's premises or transfer onto the Company's technology systems any unpublished document, proprietary information, or trade secrets belonging to any third party unless disclosure to, and use by, the Company has been consented to in writing by such third party.

D. ***Third Party Confidential Information.*** Service Provider recognizes that the Company has received and in the future will receive from third parties their confidential or proprietary information subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. Service Provider agrees that at all times during the term of

PLAINTIFF0002599

Consulting Agreement and thereafter, Consultant and the Service Provider owe tr
Company and such third parties a duty to hold all such confidential or propriet
information in the strictest confidence and not to use it or to disclose it to

person, firm, corporation, or other third party except as necessary in carrying
out the Services for the Company consistent with the Company's agreement with s
third party.

2. **Ownership.**

A. ***Assignment of Inventions.*** Service Provider agrees that all right, title, and
interest in and to any copyrightable material, notes, records, drawings, design
inventions, improvements, developments, discoveries and trade secrets conceived
discovered, authored, invented, developed or reduced to practice by Service
Provider, solely or in collaboration with others, during the term of the
Consulting Agreement and arising out of or in connection with performing the
Services under the Consulting Agreement and any copyrights, patents, trade
secrets, mask work rights or other intellectual property rights relating to the
foregoing (collectively, "***Inventions***"), are the sole property of the Company.
Service Provider also agrees to promptly make full written disclosure to the
Company of any Inventions and to deliver and assign (or cause to be assigned) a
hereby irrevocably assigns fully to the Company all right, title and interest i
and to the Inventions.

B. ***Pre-Existing Materials.*** Subject to Section 2.A of this Agreement, Service
Provider agrees that if, in the course of performing the Services, Service
Provider incorporates into any Invention or utilizes in the performance of the
Services any pre-existing invention, discovery, original works of authorship,
development, improvements, trade secret, concept, or other proprietary informat
or intellectual property right owned by Service Provider or in which Service
Provider has an interest ("***Prior Inventions***"), (i) Service Provider will provid
the Company with prior written notice, and (ii) the Company is hereby granted a
nonexclusive, royalty-free, perpetual, irrevocable, transferable, worldwide
license (with the right to grant and authorize sublicenses) to make, have made,
modify, use, import, offer for sale, sell, reproduce, distribute, modify, adapt
prepare derivative works of, display, perform, and otherwise exploit such Prior
Inventions, without restriction, including, without limitation, as part of or i
connection with such Invention, and to practice any method related thereto.
Service Provider will not incorporate any invention, improvement, development,
concept, discovery, work of authorship or other proprietary information owned b
any third party into any Invention without Company's prior written permission.

C. ***Moral Rights.*** Any assignment to the Company of Inventions includes all right
of attribution, paternity, integrity, modification, disclosure and withdrawal,
any other rights throughout the world that may be known as or referred to as
"moral rights," "artist's rights," "droit moral," or the like (collectively,
"***Moral Rights***"). To the extent that Moral Rights cannot be assigned under
applicable law, Service Provider hereby waives and agrees not to enforce any an
all Moral Rights, including, without limitation, any limitation on subsequent
modification.

PLAINTIFF0002600

D. **Maintenance of Records.** Service Provider agrees to keep and maintain adequate, current, accurate, and authentic written records of all Inventions made by Service Provider (solely or jointly with others) during the term of the Consulting Agreement, and for a period of three (3) years thereafter. The records will be in the form of notes, sketches, drawings, electronic files, reports, or any other format that is customary in the industry and/or otherwise specified by the Company. Such records are and remain the sole property of the Company at all times, and upon Company's request, Service Provider shall deliver (or cause to be delivered) the same.

E. **Further Assurances.** Service Provider agrees to assist Company, or its designee, at the Company's expense, in every proper way to secure the Company's rights in the Inventions in any and all countries, including the disclosure to the Company of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments and all other instruments that the Company may deem necessary in order to apply for, register, obtain, maintain, defend, and enforce such rights, and in order to deliver, assign and convey to the Company, its successors, assigns and nominees the sole and exclusive right, title and interest in and to all Inventions and testifying in a suit or other proceeding relating to such Inventions. Service Provider further agrees that Service Provider's obligations under this Section 2.E shall continue after the termination of this Agreement.

F. **Attorney-in-Fact.** Service Provider agrees that, if the Company is unable because of Service Provider's unavailability, dissolution, mental or physical incapacity, or for any other reason, to secure Service Provider's signature with respect to any Inventions, including, without limitation, for the purpose of applying for or pursuing any application for any United States or foreign patents or mask work or copyright registrations covering the Inventions assigned to the Company in Section 2.A of this Agreement, then Service Provider hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as Service Provider's agent and attorney-in-fact, to act for and on Service Provider's behalf to execute and file any papers and oaths and to do all other lawfully permitted acts with respect to such Inventions to further the prosecution and issuance of patents, copyright and mask work registrations with the same legal force and effect as if executed by Service Provider. This power of attorney shall be deemed coupled with an interest, and shall be irrevocable.

3. **Conflicting Obligations.** Service Provider represents and warrants that Service has no agreements, relationships, or commitments to any other person or entity conflict with the provisions of this Agreement, Service Provider's obligations Company under this Agreement, and/or Service Provider's ability to perform the Services. Service Provider will not enter into any such conflicting agreement the term of the Consulting Agreement. Service Provider shall have no right to subcontract the performance of any Services without the prior written permission Company. Service Provider's violation of this Article 3 will be considered a ma breach of this Agreement.

4. **Return of Materials.** Upon the termination of the Consulting Agreement, or upon Company's earlier request, Service Provider will immediately

PLAINTIFF0002601

company's earlier request, Service Provider will immediately deliver to the com
and will not keep in Service Provider's possession, recreate, or deliver to any
else, any and all Company property, including, but not limited to, Confidential

Information, all tangible embodiments of the Inventions, all devices and equipm
belonging to the Company, all electronically stored information and passwords 1
such property, records maintained pursuant to Section 2.D, and any repr        ior
of the foregoing items that Service Provider may have in Service Provia.       pos
or control.

5. **Third-Party Beneficiary.** Consultant and Service Provider agree that the Company
be deemed a direct and intended third-party beneficiary of this Agreement.

[Signature page to follow]

IN WITNESS WHEREOF, the parties hereto have executed this Confidential Information and As
Agreement as of the date first set forth above.

| SERVICE PROVIDER | CONSULTANT |
|---|---|
| Signature: _____ | Signature: _____ |
| Print Name: **[Service-provider-name]** | Print Name: **[Consultant-name]** |
| Role: **[Service-provider-title]** | Role: Consultant |

# Exhibit C

## JUDICIAL ARBITRATION & MEDIATION SERVICES, INC. EMPLOYMENT ARBITRATION RULES & PROCEDURES

SEE SECTION 13.B

Previous
At-will Employment

Consulti

PLAINTIFF0002602



**LEGAL—TOOLS**  DAOLABS

Connect Wallet



# Variables

**Effective Agreement Date**

01/01/2023

**Consultant Entity's Name**

Consultant LLC

**Consultant Entity's Address**

123 Main Street, Apt. 45

**Consultant's Full Name**

Ms. Jane Doe

**Consultant's Title/Role**

Pre ident

**Consultant's Address**

123 Main Street, Apt. 45

**Corporation's Name (ALL CAPS)**

ACME CORPORATION

**Entity Contact's Full Name**

Mr. John Doe

**Entity Contact's Role/Title**

Secretary

**Entity Contact's Email Address**

john@acme.co

**Description of Consultant's Services**

Manufacturing and distribution of explosive tennis balls

**IF FLAT PAY: Payment Amount upon Receipt/Acceptance of Services (USD)**

100

**IF HOURLY PAY: Hourly Payment Rate (USD)**

100

[Entity-name] CONSULTING AGREEMENT

1. Services and Compensation.

2. Applicability to Past Activities.

3. Confidentiality.

4. Ownership.

5. Conflicting Obligations.

6. Return of Company Materials.

7. Reports.

8. Term and Termination.

9. Independent Contractor Relationship.

10. Indemnification.

11. Nonsolicitation.

12. Limitation of Liability.

13. Arbitration and Equitable Relief.

14. Miscellaneous.

Exhibit A

Exhibit B

  RECITALS

  AGREEMENT

Exhibit C

**PLAINTIFF0002603**

100

IF HOURLY PAY: Maximum Weekly Billable Hours

100

Entity Representative's Name

M    Janet Joe

Entity Representative's Title/Role

Chief Executive Officer

Service Provider's Full Name

Mr. Jeff Joe, Esq.

Service Provider's Relation to Consultant

Counsel

**Update document**

     

# [Entity-name] CONSULTING AGREEMENT

This Consulting Agreement (this "*Agreement*") is made and entered into as of **[Date]** (the "*Effective Date*"), by and between **[Entity-name]**, a Delaware corporation (the "*Company*"), and **[Consultant-entity-name]**, a corporation with its principal place of business at **[Consultant-entity-address]** ("*Consultant*") (each herein referred to individually as a "*Party*," or collectively as the "*Parties*").

The Company desires to retain Consultant as an independent contractor to perform consulting services for the Company, and Consultant is willing to perform such services, on the terms described below. In consideration of the mutual promises contained herein, the Parties agree as follows:

# 1. Services and Compensation.

Consultant shall perform the services described in

PLAINTIFF0002604

Consultant shall perform the services described in **Exhibit A** (the "***Services***") for the Company (or its designee), and the Company agrees to pay Consultant the

compensation described in **Exhibit A** for Consultant's performance of the Services.

# 2. Applicability to Past Activities.

Company and Consultant acknowledge that Consultant may have performed work, activities, services or made efforts on behalf of or for the benefit of Company, or related to the current or prospective business of Company in anticipation of Consultant's involvement with Company, that would have been "Services" if performed during the term of this Agreement, for a period of time prior to the date of this Agreement (the "***Prior Consulting Period***"). Accordingly, Consultant agrees that if and to the extent that, during the Prior Consulting Period: (i) Consultant received access to any information from or on behalf of Company that would have been "Confidential Information" (as defined below) if Consultant received access to such information during the term of this Agreement; or (ii) Consultant (a) conceived, created, authored, invented, developed or reduced to practice any item (including any intellectual property rights with respect thereto) on behalf of or for the benefit of Company, or related to the current or prospective business of Company in anticipation of Consultant's involvement with Company, that would have been an "Invention" (as defined below) if conceived, created, authored, invented, developed or reduced to practice during the term of this Agreement; or (b) incorporated into any such item any pre existing invention, improvement, development, concept, discovery or other proprietary information that would have been a "Prior Invention" (as defined below) if incorporated into such item during the term of this Agreement; then any such information shall be deemed "Confidential Information" hereunder and any such item shall be deemed an "Invention" or "Prior Invention" hereunder, and this Agreement shall apply to such activities, information or item as if disclosed, conceived, created, authored, invented, developed or reduced to practice during the term of this Agreement.

# 3. Confidentiality.

### A. *Definition of Confidential Information.*

PLAINTIFF0002605



"**Confidential Information**" means any non-public information that relates to the actual or anticipated business and/or products, research or development of the Company, its affiliates or subsidiaries or to the Company's, its affiliates' or subsidiaries' technical data, trade secrets, or know-how, including, but not limited to, research, product plans, or other information regarding the Company's, its affiliates' or subsidiaries' products or services and markets therefor, customer lists and customers (including, but not limited to, customers of the Company on whom Consultant called or with whom Consultant became acquainted during the term of this Agreement), software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances, and other business information disclosed by the Company, its affiliates or subsidiaries, either directly or indirectly, in writing, orally or by drawings or inspection of premises, parts, equipment, or other property of Company, its affiliates or subsidiaries. Notwithstanding the foregoing, Confidential Information shall not include any such information which Consultant can establish (i) was publicly known or made generally available prior to the time of disclosure to Consultant; (ii) becomes publicly known or made generally available after disclosure to Consultant through no wrongful action or inaction of Consultant; or (iii) is in the rightful possession of Consultant, without confidentiality obligations, at the time of disclosure as shown by Consultant's then-contemporaneous written records.

B. **Nonuse and Nondisclosure.** During and after the term of this Agreement, Consultant will hold in the strictest confidence, and take all reasonable precautions to prevent any unauthorized use or disclosure of Confidential Information, and Consultant will not (i) use the Confidential Information for any purpose whatsoever other than as

PLAINTIFF0002606



necessary for the performance of the Services on behalf of the Company, or (ii) disclose the Confidential Information to any third

party without the prior written consent of an authorized representative of Company, except that Consultant may disclose Confidential Information to any third party on a need-to-know basis for the purposes of Consultant performing the Services; provided, however, that such third party is subject to written non-use and non-disclosure obligations at least as protective of Company and the Confidential Information as this Article 3. Consultant may also disclose Confidential Information to the extent compelled by applicable law; *provided however*, prior to such disclosure, Consultant shall provide prior written notice to Company and seek a protective order or such similar confidential protection as may be available under applicable law. Consultant agrees that no ownership of Confidential Information is conveyed to the Consultant. Without limiting the foregoing, Consultant shall not use or disclose any Company property, intellectual property rights, trade secrets or other proprietary know-how of the Company to invent, author, make, develop, design, or otherwise enable others to invent, author, make, develop, or design identical or substantially similar designs as those developed under this Agreement for any third party. Consultant agrees that Consultant's obligations under this Section 3.B shall continue after the termination of this Agreement.

C. ***Other Client Confidential Information.*** Consultant agrees that Consultant will not improperly use, disclose, or induce the Company to use any proprietary information or trade secrets of any former or concurrent employer of Consultant or other person or entity with which Consultant has an obligation to keep in confidence. Consultant also agrees that Consultant will not bring onto the Company's premises or transfer onto the Company's technology systems any unpublished document, proprietary

PLAINTIFF0002607

information, or trade secrets belonging to any third party unless disclosure to, and use

by, the Company has been consented to in writing by such third party.

D. ***Third Party Confidential Information.***
Consultant recognizes that the Company has received and in the future will receive from third parties their confidential or proprietary information subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. Consultant agrees that at all times during the term of this Agreement and thereafter, Consultant owes the Company and such third parties a duty to hold all such confidential or proprietary information in the strictest confidence and not to use it or to disclose it to any person, firm, corporation, or other third party except as necessary in carrying out the Services for the Company consistent with the Company's agreement with such third party.



# 4. Ownership.

A. ***Assignment of Inventions.*** Consultant agrees that all right, title, and interest in and to any copyrightable material, notes, records, drawings, designs, inventions, improvements, developments, discoveries and trade secrets conceived, discovered, authored, invented, developed or reduced to practice by Consultant, solely or in collaboration with others, during the term of this Agreement and arising out of, or in connection with, performing the Services under this Agreement and any copyrights, patents, trade secrets, mask work rights or other intellectual property rights relating to the foregoing (collectively, "***Inventions***"), are the sole property of the Company. Consultant also agrees to promptly make full written disclosure to the Company of any Inventions and to deliver and assign (or cause to be assigned) and hereby irrevocably assigns fully to the Company all

PLAINTIFF0002608



irrevocably assigns fully to the Company all
right, title and interest in and to the
Inventions.

B. *Pre-Existing Materials.* Subject to
Section 4.A, Consultant agrees that if, in
the course of performing the Services,
Consultant incorporates into any Invention or
utilizes in the performance of the Services
any pre-existing invention, discovery,
original works of authorship, development,
improvements, trade secret, concept, or other
proprietary information or intellectual
property right owned by Consultant or in
which Consultant has an interest ("*Prior
Inventions*"), (i) Consultant will provide the
Company with prior written notice and
(ii) the Company is hereby granted a
nonexclusive, royalty-free, perpetual,
irrevocable, transferable, worldwide license
(with the right to grant and authorize
sublicenses) to make, have made, use, import,
offer for sale, sell, reproduce, distribute,
modify, adapt, prepare derivative works of,
display, perform, and otherwise exploit such
Prior Inventions, without restriction,
including, without limitation, as part of or
in connection with such Invention, and to
practice any method related thereto.
Consultant will not incorporate any
invention, improvement, development, concept,
discovery, work of authorship or other
proprietary information owned by any third
party into any Invention without Company's
prior written permission.

C. *Moral Rights.* Any assignment to the
Company of Inventions includes all rights of
attribution, paternity, integrity,
modification, disclosure and withdrawal, and
any other rights throughout the world that
may be known as or referred to as "moral
rights," "artist's rights," "droit moral," or
the like (collectively, "*Moral Rights*"). To
the extent that Moral Rights cannot be
assigned under applicable law, Consultant
hereby waives and agrees not to enforce any
and all Moral Rights, including, without
limitation, any limitation on subsequent
modification, to the extent permitted under

PLAINTIFF0002609

applicable law.



D. ***Maintenance of Records.*** Consultant agrees
to keep and maintain adequate, current,
accurate, and authentic written records of
all Inventions made by Consultant (solely or
jointly with others) during the term of this
Agreement, and for a period of three (3)
years thereafter. The records will be in the
form of notes, sketches, drawings, electronic
files, reports, or any other format that is
customary in the industry and/or otherwise
specified by the Company. Such records are
and remain the sole property of the Company
at all times and upon Company's request,
Consultant shall deliver (or cause to be
delivered) the same.

E. ***Further Assurances.*** Consultant agrees to
assist Company, or its designee, at the
Company's expense, in every proper way to
secure the Company's rights in Inventions in
any and all countries, including the
disclosure to the Company of all pertinent
information and data with respect thereto,
the execution of all applications,
specifications, oaths, assignments and all
other instruments that the Company may deem
necessary in order to apply for, register,
obtain, maintain, defend, and enforce such
rights, and in order to deliver, assign and
convey to the Company, its successors,
assigns and nominees the sole and exclusive
right, title, and interest in and to all
Inventions and testifying in a suit or other
proceeding relating to such Inventions.
Consultant further agrees that Consultant's
obligations under this Section 4.E shall
continue after the termination of this
Agreement.

F. ***Attorney-in-Fact.*** Consultant agrees that,
if the Company is unable because of
Consultant's unavailability, dissolution,
mental or physical incapacity, or for any
other reason, to secure Consultant's
signature with respect to any Inventions,
including, without limitation, for the

PLAINTIFF0002610

purpose of applying for or pursuing any application for any United States or foreign patents or mask work or copyright



registrations covering the Inventions assigned to the Company in Section 4.A, then Consultant hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as Consultant's agent and attorney-in-fact, to act for and on Consultant's behalf to execute and file any papers and oaths and to do all other lawfully permitted acts with respect to such Inventions to further the prosecution and issuance of patents, copyright and mask work registrations with the same legal force and effect as if executed by Consultant. This power of attorney shall be deemed coupled with an interest, and shall be irrevocable.

## 5. Conflicting Obligations.

A. Consultant represents and warrants that Consultant has no agreements, relationships, or commitments to any other person or entity that conflict with the provisions of this Agreement, Consultant's obligations to the Company under this Agreement, and/or Consultant's ability to perform the Services. Consultant will not enter into any such conflicting agreement during the term of this Agreement.

B. Consultant shall require all Consultant's employees, contractors, or other third parties performing Services under this Agreement to execute a Confidential Information and Assignment Agreement in the form of Exhibit B, and promptly provide a copy of each such executed agreement to the Company. Consultant's violation of this Article 5 will be considered a material breach under Section 8.B.

## 6. Return of Company Materials.

Upon the termination of this Agreement, or upon Company's earlier request, Consultant will immediately deliver to the Company, and will not keep in

PLAINTIFF0002611

Consultant's possession, recreate, or deliver to anyone else, any and all Company property, including, but not limited to, Confidential Information, tangible embodiments of the Inventions, all devices and equipment belonging to the Company, all electronically-stored information and passwords to access such property, those records maintained pursuant to Section 4.D and any reproductions of any of the foregoing items that Consultant may have in Consultant's possession or control.



## 7. Reports.

Consultant agrees that Consultant will keep the Company advised as to Consultant's progress in performing the Services under this Agreement. Consultant further agrees that Consultant will, as requested by the Company, prepare written reports with respect to such progress. The Company and Consultant agree that the reasonable time expended in preparing such written reports will be considered time devoted to the performance of the Services.

## 8. Term and Termination.

A. **Term.** The term of this Agreement will begin on the Effective Date of this Agreement and will continue until the earlier of (i) final completion of the Services or (ii) termination as provided in Section 8.B.

B. **Termination.** The Company may terminate this Agreement upon giving Consultant fourteen (14) days prior written notice of such termination pursuant to Section 14.G of this Agreement. The Company may terminate this Agreement immediately and without prior notice if Consultant refuses to or is unable to perform the Services or is in breach of any material provision of this Agreement.

C. **Survival.** Upon any termination, all rights and duties of the Company and Consultant toward each other shall cease except:

(1) The Company will pay, within thirty (30) days after the effective date of termination, all amounts owing to Consultant for

PLAINTIFF0002612

amounts owing to Consultant for
Services completed and accepted by
the Company prior to the

termination date and related
reimbursable expenses, if any,
submitted in accordance with the
Company's policies and in
accordance with the provisions of
Article 1 of this Agreement; and



(2) Article 3 (Confidentiality),
Article 4 (Ownership), Section 5.B
(Conflicting Obligations),
Article 6 (Return of Company
Materials), Article 8 (Term and
Termination), Article 9
(Independent Contractor
Relationship), Article 10
(Indemnification), Article 11
(Noninterference), Article 12
(Limitation of Liability),
Article 13 (Arbitration and
Equitable Relief), and Article 14
(Miscellaneous) will survive
termination or expiration of this
Agreement in accordance with their
terms.

## 9. Independent Contractor Relationship.

It is the express intention of the Company and
Consultant that Consultant perform the Services as an
independent contractor to the Company. Nothing in this
Agreement shall in any way be construed to constitute
Consultant as an agent, employee or representative of
the Company. Without limiting the generality of the
foregoing, Consultant is not authorized to bind the
Company to any liability or obligation or to represent
that Consultant has any such authority. Consultant
agrees to furnish (or reimburse the Company for) all
tools and materials necessary to accomplish this
Agreement and shall incur all expenses associated with
performance, except as expressly provided in **Exhibit A.**
Consultant acknowledges and agrees that Consultant is
obligated to report as income all compensation received
by Consultant pursuant to this Agreement.

PLAINTIFF0002613

# 10. Indemnification.



Consultant agrees to indemnify and hold harmless the Company and its affiliates and their directors, officers and employees from and against all taxes, losses, damages, liabilities, costs and expenses, including attorneys' fees and other legal expenses, arising directly or indirectly from or in connection with (i) any negligent, reckless or intentionally wrongful act of Consultant or Consultant's assistants, employees, contractors or agents, (ii) any breach by the Consultant or Consultant's assistants, employees, contractors or agents of any of the covenants contained in this Agreement and corresponding Confidential Information and Invention Assignment Agreement, (iii) any failure of Consultant to perform the Services in accordance with all applicable laws, rules and regulations, or (iv) any violation or claimed violation of a third party's rights resulting in whole or in part from the Company's use of the Inventions or other deliverables of Consultant under this Agreement.

# 11. Nonsolicitation.

To the fullest extent permitted under applicable law, from the date of this Agreement until twelve (12) months after the termination of this Agreement for any reason (the "*Restricted Period*"), Consultant will not, without the Company's prior written consent, directly or indirectly, solicit any of the Company's employees to leave their employment, or attempt to solicit employees of the Company, either for Consultant or for any other person or entity. Consultant agrees that nothing in this Article 11 shall affect Consultant's continuing obligations under this Agreement during and after this twelve (12) month period, including, without limitation, Consultant's obligations under Article 3.

# 12. Limitation of Liability.

IN NO EVENT SHALL COMPANY BE LIABLE TO CONSULTANT OR TO ANY OTHER PARTY FOR ANY INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES, OR DAMAGES FOR LOST PROFITS OR LOSS OF BUSINESS, HOWEVER CAUSED AND UNDER ANY THEORY OF LIABILITY, WHETHER BASED IN CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHER THEORY OF LIABILITY, REGARDLESS OF WHETHER COMPANY WAS ADVISED OF THE

PLAINTIFF0002614

POSSIBILITY OF SUCH DAMAGES AND NOTWITHSTANDING THE FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY. IN NO EVENT SHALL COMPANY'S LIABILITY ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT EXCEED THE AMOUNTS PAID BY COMPANY TO CONSULTANT UNDER THIS AGREEMENT FOR THE SERVICES, DELIVERABLES OR INVENTION GIVING RISE TO SUCH LIABILITY.



# 13. Arbitration and Equitable Relief.

A. ***Arbitration.*** In consideration of Consultant's consulting relationship with Company, its promise to arbitrate all disputes related to Consultant's consulting relationship with the Company and Consultant's receipt of the compensation and other benefits paid to Consultant by Company, at present and in the future, Consultant agrees that any and all controversies, claims, or disputes with anyone (including Company and any employee, officer, director, shareholder or benefit plan of the Company in their capacity as such or otherwise), WHETHER BROUGHT ON AN INDIVIDUAL, GROUP, OR CLASS BASIS, arising out of, relating to, or resulting from Consultant's consulting relationship with the Company or the termination of Consultant's consulting relationship with the Company, including any breach of this Agreement, shall be subject to binding arbitration under the Arbitration PROVISIONS pursuant to DELAWARE law, and shall be brought in consultant's individual capacity, and not as a plaintiff or class member in any purported class or representative proceeding. THE FEDERAL ARBITRATION ACT SHALL CONTINUE TO APPLY WITH FULL FORCE AND EFFECT NOTWITHSTANDING THE APPLICATION OF PROCEDURAL RULES SET FORTH IN THE ACT. **Disputes which Consultant agrees to arbitrate, and thereby agrees to waive any right to a trial by jury, include any statutory claims under LOCAL, state, or federal law.** Consultant further understands that this Agreement to arbitrate also applies to any disputes that the Company may have with Consultant.

PLAINTIFF0002615



B. **Procedure.** Consultant agrees that any arbitration will be administered by Judicial Arbitration & Mediation Services, Inc. ("**JAMS**") pursuant to its COMMERCIAL Arbitration Rules & Procedures (the "**JAMS Rules**"), WHICH ARE AVAILABLE AT http://www.jamsadr.com/rules-employment-arbitration/ AND FROM HUMAN RESOURCES AND ATTACHED HERETO AS EXHIBIT C. Consultant agrees that the arbitrator shall have the power to decide any motions brought by any party to the arbitration, including motions for summary judgment and/or adjudication and motions to dismiss and demurrers. Consultant agrees that the arbitrator shall issue a written decision on the merits. CONSULTANT ALSO AGREES THAT THE ARBITRATOR SHALL HAVE THE POWER TO AWARD ANY REMEDIES AVAILABLE UNDER APPLICABLE LAW, AND THAT THE ARBITRATOR SHALL AWARD ATTORNEYS' FEES AND COSTS TO THE PREVAILING PARTY WHERE PROVIDED BY APPLICABLE LAW. CONSULTANT AGREES that the decree or award rendered by the arbitrator may be entered as a final and binding judgment in any court having jurisdiction thereof. Consultant agrees that the arbitrator shall administer and conduct any arbitration in ACCORDANCE with DELAWARE LAW, and that the arbitrator shall apply substantive and procedural DELAWARE law to any dispute or claim, without reference to rules of conflict of law. To the extent that the JAMS Rules conflict with DELAWARE law, DELAWARE law shall take precedence. Consultant further agrees that any arbitration under this agreement shall be conducted in KING COUNTY, WASHINGTON.

C. **Remedy.** Except as provided by the ACT AND THIS AGREEMENT, arbitration shall be the sole, exclusive, and final remedy for any dispute between Consultant and the Company. Accordingly, except as provided for by the ACT AND this agreement, neither Consultant nor the Company will be permitted to pursue court action regarding claims that are subject to arbitration.

PLAINTIFF0002616



D. *Availability of Injunctive Relief.* The Parties agree that any party may also petition the court for injunctive relief where either party alleges or claims a violation of any agreement regarding INTELLECTUAL PROPERTY, confidential information OR NONINTERFERENCE. In the event either party seeks injunctive relief, the prevailing party shall be entitled to recover reasonable costs and attorneys' fees.

E. Administrative Relief.** Consultant understands that this Agreement does not prohibit Consultant from pursuing an administrative claim with a local, state or federal administrative body OR GOVERNMENT AGENCY such as the Department of Fair Employment and Housing, the Equal Employment Opportunity Commission, the National Labor Relations Board, or the workers' compensation board. This Agreement does, however, preclude Consultant from pursuing court action regarding any such claim, except as permitted by law.

F. *Voluntary Nature of Agreement.* Consultant acknowledges and agrees that IT is executing this Agreement voluntarily and without any duress or undue influence by the Company or anyone else. Consultant further acknowledges and agrees that IT has carefully read this Agreement and that Consultant has asked any questions needed for Consultant to understand the terms, consequences and binding effect of this Agreement and fully understand it, including that *Consultant is waiving ITS right to a jury trial*. Finally, Consultant agrees that IT has been provided an opportunity to seek the advice of an attorney of Consultant's choice before signing this Agreement.

# 14. Miscellaneous.

A. *Governing Law; Consent to Personal Jurisdiction.* This Agreement shall be governed by the laws of the State of Delaware, without regard to the conflicts of law provisions of any jurisdiction. To the

PLAINTIFF0002617



extent that any lawsuit is permitted under this Agreement, the Parties hereby expressly

consent to the personal and exclusive jurisdiction and venue of the state and federal courts located in Washington.

B. **_Assignability._** This Agreement will be binding upon Consultant's assigns, administrators, and other legal representatives, and will be for the benefit of the Company, its successors, and its assigns. There are no intended third-party beneficiaries to this Agreement, except as expressly stated. Except as may otherwise be provided in this Agreement, Consultant may not sell, assign or delegate any rights or obligations under this Agreement, by operation of law or otherwise (including by merger, consolidation, reorganization, reincorporation, sale of assets or stock or change of control), and any such attempted assignment, delegation or transfer shall be null and void. Notwithstanding anything to the contrary herein, Company may assign this Agreement and its rights and obligations under this Agreement to any successor to all or substantially all of Company's relevant assets, whether by merger, consolidation, reorganization, reincorporation, sale of assets or stock, change of control or otherwise.

C. **_Entire Agreement._** This Agreement constitutes the entire agreement and understanding between the Parties with respect to the subject matter herein and supersedes all prior written and oral agreements, discussions, or representations between the Parties. Consultant represents and warrants that it is not relying on any statement or representation not contained in this Agreement. To the extent any terms set forth in any exhibit or schedule conflict with the terms set forth in this Agreement, the terms of this Agreement shall control unless otherwise expressly agreed by the Parties in such exhibit or schedule.

D. **_Headings._** Headings are used in this

PLAINTIFF0002618

D. **Headings.** Headings are used in this Agreement for reference only and shall not be considered when interpreting this Agreement.

E. **Severability.** If a court or other body of competent jurisdiction finds, or the Parties mutually believe, any provision of this Agreement, or portion thereof, to be invalid or unenforceable, such provision will be enforced to the maximum extent permissible so as to effect the intent of the Parties, and the remainder of this Agreement will continue in full force and effect.

F. **Modification, Waiver.** No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in a writing signed by the Parties. Waiver by the Company of a breach of any provision of this Agreement will not operate as a waiver of any other or subsequent breach.

G. **Notices.** Any notice or other communication required or permitted by this Agreement to be given to a Party shall be in writing and shall be deemed given (i) if delivered personally or by commercial messenger or courier service, (ii) when sent by confirmed facsimile, or (iii) if mailed by U.S. registered or certified mail (return receipt requested), to the Party at the Party's address written below or at such address as the Party may have previously specified by like notice. If by mail, delivery shall be deemed effective three business days after mailing in accordance with this Section .

H. **Attorneys' Fees.** In any court action at law or equity that is brought by one of the Parties to this Agreement to enforce or interpret the provisions of this Agreement, the prevailing Party will be entitled to reasonable attorneys' fees, in addition to any other relief to which that Party may be entitled.

I. **Signatures.** This Agreement may be signed in two counterparts, each of which shall be deemed an original, with the same force and effectiveness as though executed in a single



PLAINTIFF0002619

effectiveness as though executed in a single document.

[Signature page to follow]

IN WITNESS WHEREOF, the Parties hereto have executed this Consulting Agreement as of the date first written above.



| CONSULTANT | COMPANY |
|---|---|
| Signature: | Sig at re: |
| Print Name: **[Consultant-name]** | Print Name: **[Entity-signer-name]** |
| Role: **[Consultant-title]** | Role: **[Entity-signer-role]** |
| Address: **[Consultant-address]** | |

# Exhibit A

## SERVICES AND COMPENSATION

1. ***Contact.*** Consultant's principal Company contact:

Name: **[Entity-contact-name]**

Role: **[Entity-contact-role]**

e-mail: **[Entity-contact-email]**

2. ***Services.*** The Services shall consist of the following:

**[Consultant-services]** and such other services that the Company may reasonably request from time to time.

3. ***Compensation.***

A. The Company will pay Consultant $**[Hourly-rate]** per hour, except that Consultant will not be paid for more than **[Max-weekly-hours]** hours per week.

**OR**

A. The Company will pay Consultant $**[Pay-amount]** upon delivery by the Consultant and

PLAINTIFF0002620

acceptance by the Company of **[Consultant-services]**, as described in Article 2 above.



B. The Company will reimburse Consultant, in accordance with Company policy, for all reasonable expenses incurred by Consultant in performing the Services pursuant to this Agreement, if Consultant receives written consent from an authorized agent of the Company prior to incurring such expenses and submits receipts for such expenses to the Company in accordance with Company policy.

Every two weeks, Consultant shall submit to the Company a written invoice for Services and expenses, and such statement shall be subject to the approval of the contact person listed above or other designated agent of the Company.

[Signature page to follow]

This **Exhibit A** is accepted and agreed upon as of **[Date]**.

| CONSULTANT | COMPANY |
|---|---|
| Signature: | Sig at re: |
| Print Name: **[Consultant-name]** | Print Name: **[Entity-signer-name]** |
| Role: **[Consultant-title]** | Role: **[Entity-signer-role]** |

# Exhibit B

## FORM OF CONFIDENTIAL INFORMATION AND ASSIGNMENT AGREEMENT

(*Attached*)

CONFIDENTIAL INFORMATION AND ASSIGNMENT AGREEMENT

This Confidential Information and Assignment Agreement (this "*Agreement*") is entered into as of **[Date]**, by and between **[Consultant-name]** ("*Consultant*") and **[Service-provider-name]** ("*Service Provider*"), **[Service-provider-**

PLAINTIFF0002621

**relation]** of Consultant.

## RECITALS



A. The Consultant and **[Entity-name]**, a Delaware corporation (the "*Company*"), have entered into a Consulting Agreement, dated **[Date]** (the "*Consulting Agreement*").

B. Article 5 of the Consulting Agreement requires Consultant to have each of Consultant's employees and contractors with access to Confidential Information (as defined below) execute this Agreement.

C. Service Provider is **[Service-provider-relation]** of Consultant, who is performing for the Company the services, or a portion of the services, described in **Exhibit A** of the Consulting Agreement (the "*Services*").

D. Capitalized terms used but not defined in this Agreement shall have the meanings assigned to them in the Consulting Agreement.

## AGREEMENT

In consideration of the mutual promises contained herein, the Parties agree as follows:

1. **Confidentiality**

   A. *Definition.* "*Confidential Information*" means any non-public information that relates to the actual or anticipated business and/or products, research or development of the Company, or to the Company's technical data, trade secrets, or know-how, including, but not limited to, research, product plans, or other information regarding the Company's products or services and markets therefor, customer lists and customers (including, but not limited to, customers of the Company on whom Service Provider called or with whom Service Provider became acquainted during the term of

PLAINTIFF0002622



Service Provider's employment or engagement), software, developments, inventions,

processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances, and other business information disclosed by the Company either directly or indirectly in writing, orally or by drawings or inspection of premises, parts, equipment, or other Company property. Notwithstanding the foregoing, Confidential Information shall not include any such information which Service Provider can establish (i) was publicly known or made generally available prior to the time of disclosure by Company to Service Provider; (ii) becomes publicly known or made generally available after disclosure by Company to Service Provider through no wrongful action or omission of Service Provider; or (iii) is in the rightful possession of Service Provider, without confidentiality obligations, at the time of disclosure by Company as shown by Service Provider's then-contemporaneous written records.

B. **_Nonuse and Nondisclosure._** During and after the term of this Agreement, Service Provider will hold in the strictest confidence, and take all reasonable precautions to prevent any unauthorized use or disclosure of Confidential Information, and Service Provider will not (i) use the Confidential Information for any purpose whatsoever other than as necessary for the performance of the Services on behalf of the Company, or (ii) disclose the Confidential Information to any third party without the prior written consent of an authorized representative of

PLAINTIFF0002623



Company. Service Provider agrees that no ownership of Confidential Information is conveyed to the Service Provider. Without limiting the foregoing, Consultant shall not use or disclose any Company property, intellectual property rights, trade secrets or other proprietary know-how of the Company to invent, author, make, develop, or design, or otherwise enable others to invent, author, make, design, design identical or substantially similar designs as those developed under this Agreement for any third party. Service Provider agrees that Service Provider's obligations under this Section 1.B shall continue after the termination of this Agreement.

C. **Other Service Provider's Confidential Information.** Service Provider agrees that Service Provider will not improperly use, disclose, or induce the Company to use any proprietary information or trade secrets of any former or concurrent employer of Service Provider or other person or entity with which Service Provider has an obligation to keep in confidence. Service Provider also agrees that Service Provider will not bring onto the Company's premises or transfer onto the Company's technology systems any unpublished document, proprietary information, or trade secrets belonging to any third party unless disclosure to, and use by, the Company has been consented to in writing by such third party.

D. **Maintenance of Records.** Service Provider agrees to keep and maintain adequate, current, accurate, and authentic written

PLAINTIFF0002624



records of all Inventions made by
Service Provider (solely or jointly
with others) during the term of the

Consulting Agreement, and for a
period of three (3) years
thereafter. The records will be in
the form of notes, sketches,
drawings, electronic files,
reports, or any other format that
is customary in the industry and/or
otherwise specified by the Company.
Such records are and remain the
sole property of the Company at all
times and upon Company's request,
Service Provider shall deliver (or
cause to be delivered) the same.

E. *Further Assurances.* Service
Provider agrees to assist Company,
or its designee, at the Company's
expense, in every proper way to
secure the Company's rights in
Inventions in any and all
countries, including the disclosure
to the Company of all pertinent
information and data with respect
thereto, the execution of all
applications, specifications,
oaths, assignments and all other
instruments that the Company may
deem necessary in order to apply
for, register, obtain, maintain,
defend, and enforce such rights,
and in order to deliver, assign and
convey to the Company, its
successors, assigns and nominees
the sole and exclusive right,
title, and interest in and to all
Inventions and testifying in a suit
or other proceeding relating to
such Inventions. Service Provider
further agrees that Service
Provider's obligations under this
Section 2.E shall continue after
the termination of this Agreement.

F. *Attorney-in-Fact.* Service
Provider agrees that, if the
Company is unable because of

PLAINTIFF0002625



Service Provider's unavailability,
dissolution, mental or physical
incapacity, or for any other

reason, to secure Service
Provider's signature with respect
to any Inventions, including,
without limitation, for the purpose
of applying for or pursuing any
application for any United States
or foreign patents or mask work or
copyright registrations covering
the Inventions assigned to the
Company in Section 2.A of this
Agreement, then Service Provider
hereby irrevocably designates and
appoints the Company and its duly
authorized officers and agents as
Service Provider's agent and
attorney-in-fact, to act for and on
Service Provider's behalf to
execute and file any papers and
oaths and to do all other lawfully
permitted acts with respect to such
Inventions to further the
prosecution and issuance of
patents, copyright and mask work
registrations with the same legal
force and effect as if executed by
Service Provider. This power of
attorney shall be deemed coupled
with an interest, and shall be
irrevocable.

3. **Conflicting Obligations.** Service
   Provider represents and warrants that
   Service Provider has no agreements,
   relationships, or commitments to any
   other person or entity that conflict
   with the provisions of this Agreement,
   Service Provider's obligations to the
   Company under this Agreement, and/or
   Service Provider's ability to perform
   the Services. Service Provider will not
   enter into any such conflicting
   agreement during the term of the
   Consulting Agreement. Service Provider
   shall have no right to subcontract the
   performance of any Services without the
   prior written permission of Company.

PLAINTIFF0002626



Service Provider's violation of this Article 3 will be considered a material breach of this Agreement.

4. **Return of Materials.** Upon the termination of the Consulting Agreement, or upon Company's earlier request, Service Provider will immediately deliver to the Company, and will not keep in Service Provider's possession, recreate, or deliver to anyone else, any and all Company property, including, but not limited to, Confidential Information, all tangible embodiments of the Inventions, all devices and equipment belonging to the Company, all electronically stored information and passwords to access such property, records maintained pursuant to Section 2.D, and any reproductions of any of the foregoing items that Service Provider may have in Service Provider's possession or control.

5. **Third-Party Beneficiary.** Consultant and Service Provider agree that the Company shall be deemed a direct and intended third-party beneficiary of this Agreement.

[Signature page to follow]

IN WITNESS WHEREOF, the parties hereto have executed this Confidential Information and Assignment Agreement as of the date first set forth above.

| SERVICE PROVIDER | CONSULTANT |
| --- | --- |
| Signature:<br>----------------------- | Signature: |
| Print Name: **[Service-provider-name]** | Print Name:<br>**[Consultant-name]** |
| Role: **[Service-provider-relation]** of Consultant | Role: Consultant |

# Exhibit C

PLAINTIFF0002627

## JUDICIAL ARBITRATION & MEDIATION SERVICES, INC.

## RULES & PROCEDURES

[SEE SECTION 13.B]



| Previous | Next |
|---|---|
| Consulting Agreement | NDA, Disclosing |

PLAINTIFF0002628



**LEGAL-TOOLS** DAOLABS

Connect Wallet



# Variables

**Agreement Effective Date**

mm/dd/yyyy

**Corporation's Name (ALL CAPS)**

ACME CORPORATION

**Entity Signer's Name**

Mr. John Doe

**Entity Signer's Role/Title**

Chief Executive Officer

**Recipient's Full Name**

M  Jane Doe

**Recipient Entity's Name (Same as Name if Individual)**

Jane Doe LLC

**Recipient Entity's Type**

LLC, Individual, Corporation, etc.

**Recipient Entity's Street Address**

123 Main Street, Apt. 45

**Recipient Entity's City**

Kalamazoo

**Recipient Entity's State**

Michigan

**Recipient's Role/Title**

President

Update document

---

[Entity-name] NON-DISCLOSURE AGREEMENT

1. Purpose.

2. Confidential Information.

3. Non-use and Non-disclosure.

4. Maintenance of Confidentiality.

5. No Obligation.

6. No Warranty.

7. Return of Materials.

8. No License.

9. Term.

10. Remedies.

11. Recipient Information.

12. Miscellaneous.

Signature Page

PLAINTIFF0002629

     

# [Entity-name] NON-DISCLOSURE AGREEMENT

This Non disclosure Agreement (this "**Agreement**"), effective **[Date]** ("**Effective Date**"), is entered into by and between **[Entity-name]**, a Delaware corporation ("**Company**") and **[Recipient-entity-name]**, a **[Recipient-entity-state] [Recipient-entity-type]** having offices at **[Recipient-entity-address]**, **[Recipient-entity-city]**, **[Recipient-entity-state]** ("**Recipient**") (each herein referred to individually as a "**Party,**" or collectively as the "**Parties**"). In consideration of the covenants and conditions contained herein, the Parties hereby agree to the following:

## 1. Purpose.

The Parties wish to explore a business opportunity of mutual interest (the "**Opportunity**"), and in connection with the Opportunity, Company has disclosed, and may further disclose to Recipient certain confidential technical and business information that Company desires Recipient to treat as confidential.

## 2. Confidential Information.

A. *Definition*. "**Confidential Information**" means any information disclosed by Company to Recipient, including any information disclosed prior to the Effective Date, either directly or indirectly in writing, orally or by inspection of tangible objects (including, without limitation, research, product plans, products, services, equipment, customers, markets, software, inventions, processes, designs, drawings, hardware, formulations, specifications, product configuration information, marketing and finance documents, prototypes, samples, data sets, and equipment), whether or not designated as

PLAINTIFF0002630

equipment), whether or not designated as
"confidential" at the time of disclosure.
Confidential Information may also include



information of a third party that is in
Company's possession and is disclosed to
Recipient under this Agreement.

B. *Exceptions*. Confidential Information shall
not, however, include any information that
Recipient can establish: (i) was publicly
known or made generally available without a
duty of confidentiality prior to the time of
disclosure to Recipient by Company;
(ii) becomes publicly known or made generally
available without a duty of confidentiality
after disclosure to Recipient by Company
through no action or inaction of Recipient;
or (iii) is in the rightful possession of
Recipient without confidentiality obligations
at the time of disclosure by Company to
Recipient as shown by Recipient's then-
contemporaneous written files and records
kept in the ordinary course of business.

C. *Compelled Disclosure*. If Recipient becomes
legally compelled to disclose any
Confidential Information, other than pursuant
to a confidentiality agreement, Recipient
will provide Company prompt written notice of
such disclosure and will assist Company in
seeking a protective order or another
appropriate remedy. If Company waives
Recipient's compliance with this Agreement or
fails to obtain a protective order or other
appropriate remedy, Recipient will furnish
only that portion of the Confidential
Information that is legally required to be
disclosed; provided that any Confidential
Information so disclosed shall maintain its
confidentiality protection for all purposes
other than such legally compelled disclosure.

# 3. Non-use and Non-disclosure.

Recipient shall not use any Confidential Information
for any purpose except to evaluate and engage in
discussions concerning the Opportunity. Recipient shall
not disclose any Confidential Information or permit any
Confidential Information to be disclosed, either

PLAINTIFF0002631



confidential information - be disclosed or used, directly or indirectly, to any third party without Company's prior written consent. Recipient shall not

disclose Confidential Information or permit the disclosure of Confidential Information to its employees, except that Recipient may disclose Confidential Information to those employees of Recipient who are required to have the information in order for Recipient to evaluate or engage in discussions concerning the Opportunity; provided that such employee has signed a non-use and non-disclosure agreement in content at least as protective as the provisions hereof, prior to any disclosure of Confidential Information to such employee. Recipient shall not reverse engineer, disassemble, or decompile any prototypes, software, samples, or other tangible objects that embody the Confidential Information.

## 4. Maintenance of Confidentiality.

Recipient shall take reasonable measures to protect the secrecy of and avoid disclosure and unauthorized use of the Confidential Information. Without limiting the foregoing, Recipient shall take at least those measures it employs to protect its own most highly confidential information. Recipient shall not make any copies of the Confidential Information unless the same are previously approved in writing by Company. Recipient shall reproduce Company's proprietary rights notices on any such authorized copies, in the same manner in which such notices were set forth in or on the original. Recipient shall immediately notify Company of any unauthorized use or disclosure, or suspected unauthorized use or disclosure, of Confidential Information.

## 5. No Obligation.

Nothing in this Agreement shall obligate either Party to proceed with any transaction between them, and each Party reserves the right, in its sole discretion, to terminate the discussions contemplated by this Agreement concerning the Opportunity. Nothing in this Agreement shall be construed to restrict Company's use or disclosure of its own Confidential Information.

## 6. No Warranty.

PLAINTIFF0002632

ALL CONFIDENTIAL INFORMATION IS PROVIDED "AS IS."
COMPANY MAKES NO WARRANTIES, EXPRESS, IMPLIED OR

OTHERWISE, REGARDING THE ACCURACY, COMPLETENESS OR
PERFORMANCE OF ANY CONFIDENTIAL INFORMATION, OR WITH
RESPECT TO NON-INFRINGEMENT OR OTHER VIOLATION OF ANY
INTELLECTUAL PROPERTY RIGHTS OF A THIRD PARTY OR OF
RECIPIENT.



## 7. Return of Materials.

All documents and other tangible objects containing or
representing Confidential Information and all copies or
extracts thereof or notes derived therefrom that are in
the possession or control of Recipient shall be and
remain the property of Company and shall be promptly
returned to Company or destroyed (with proof of such
destruction), each upon Company's request.

## 8. No License.

Nothing in this Agreement is intended to grant any
rights to Recipient under any intellectual property
right of Company, nor shall this Agreement grant
Recipient any rights in or to the Confidential
Information except as expressly set forth in this
Agreement.

## 9. Term.

The obligations of Recipient under this Agreement shall
survive until such time as all Confidential Information
disclosed hereunder becomes publically known or made
generally available through no action or inaction of
Recipient.

## 10. Remedies.

Recipient agrees that any violation or threatened
violation of this Agreement will cause irreparable
injury to Company, entitling Company to obtain
injunctive relief in addition to all legal remedies
without showing or proving any actual damage and
without any bond being required to be posted.

## 11. Recipient Information.

PLAINTIFF0002633

Company does not wish to receive any confidential information from Recipient, and Company assumes no

obligation, either expressed or implied, with respect to any information disclosed by Recipient to Company.

# 12. Miscellaneous.

This Agreement shall bind and inure to the benefit of the Parties and their respective successors and permitted assigns; except that Recipient may not assign or otherwise transfer this Agreement, by operation of law or otherwise, (including by merger, reorganization, consolidation, change of control, or sale of all or substantially all of Recipient's assets to which this Agreement pertains), without written consent of Company. Any assignment or transfer of this Agreement in violation of the foregoing shall be null and void. This Agreement will be interpreted and construed in accordance with the laws of the State of Delaware, without regard to conflict of law principles. Recipient hereby represents and warrants that the persons executing this Agreement on its behalf have express authority to do so, and, in so doing, to bind Recipient thereto. This Agreement contains the entire agreement between the Parties with respect to the Opportunity and supersedes all prior written and oral agreements between the Parties regarding the Opportunity. If a court or other body of competent jurisdiction finds any provision of this Agreement, or portion thereof, to be invalid or unenforceable, such provision will be enforced to the maximum extent permissible so as to effect the intent of the Parties, and the remainder of this Agreement will continue in full force and effect. No provision of this Agreement may be waived except by a writing executed by the Party against whom the waiver is to be effective. A Party's failure to enforce any provision of this Agreement shall neither be construed as a waiver of the provision nor prevent the Party from enforcing any other provision of this Agreement. No provision of this Agreement may be amended or otherwise modified except by a writing signed by the Parties to this Agreement. The Parties may execute this Agreement in counterparts, each of which shall be deemed an original, but all of which together constitute one and the same agreement. This Agreement may be delivered by facsimile transmission, and facsimile copies of executed signature pages shall be binding as originals.

PLAINTIFF0002634

# Signature Page

[Signature page to follow]

IN WITNESS WHEREOF, the Parties by their duly
authorized representatives have executed this Non-
disclosure Agreement as of the Effective Date.



| COMPANY | RECIPIENT |
|---|---|
| Signature: | Sig at re: |
| Print Name: **[Entity-signer-name]** | Print Name: **[Recipient-name]** |
| Role: **[Entity-signer-role]** | Role: **[Recipient-role]** |

Previous
Consulting Agreement

Next
NDA, Mutual

PLAINTIFF0002635



**LEGAL-TOOLS**   DAOLABS

Connect Wallet



# Variables

Agreement Effective Date

mm/dd/yyyy

Corporation's Name (ALL CAPS)

ACME CORPORATION

Corporation Representative's Name

Ms. Jane Doe

Corporation Representative's Role/Title

Chief Executive Officer

Counterparty's Name

Road Runner LLC

Counterparty's Entity Type

Individual, LLC, Corporation, etc.

Counterparty's State

Kansas

Counterparty's City

Wichita

Counterparty's Street Address

123 Main Street, Apt  45

Counterparty Representative's Name

Mr. John Doe

Counterparty Representative's Role

President

Update document

[Entity-name] MUTUAL NON-DISCLOSURE AGREEMENT

1. Purpose.

2. Confidential Information.

3. Non-use and Non-disclosure.

4. Maintenance of Confidentiality.

5. No Obligation.

6. No Warranty.

7. Return of Materials.

8. No License.

9. Export Restrictions.

10. Term.

11. Remedies.

12. Residual Information.

13. Feedback.

14. Miscellaneous.

15. Disputes.

Signature Page

PLAINTIFF0002636

     

# [Entity-name] MUTUAL NON-DISCLOSURE AGREEMENT

This Mutual Non disclosure Agreement (this "**Agreement**"), effective **[Date]** ("**Effective Date**"), is entered into by and between **[Entity-name]**, a Delaware corporation ("**Company**"), and **[Counterparty-name]**, a **[Counterparty-state] [Counterparty-type]** having offices at **[Counterparty-address], [Counterparty-city], [Counterparty-state]** (each herein referred to individually as a "**Party**," or collectively as the "**Parties**"). In consideration of the covenants and conditions contained herein, the Parties hereby agree to the following:

## 1. Purpose.

The Parties wish to explore a business opportunity of mutual interest (the "**Opportunity**"), and in connection with the Opportunity, each Party has disclosed, and may further disclose certain confidential technical and business information (in such capacity, a Party disclosing the information, the "**Discloser**") to the other Party (in such capacity, a Party receiving the information, the "**Recipient**"), that Discloser desires Recipient to treat as confidential.

## 2. Confidential Information.

A. *Definition.* "**Confidential Information**" means: (i) any information disclosed (directly or indirectly) by Discloser to Recipient pursuant to this Agreement that is in written, graphic, machine readable or other tangible form (including, without limitation, research, product plans, products, services, equipment, customers, markets, software, inventions, processes, designs, drawings, formulations, specifications, product configuration

PLAINTIFF0002637

specifications, product configuration information, marketing and finance documents, prototypes, samples, data sets, and



equipment) and is marked "Confidential," "Proprietary" or in some other manner to indicate its confidential nature; (ii) oral information disclosed (directly or indirectly) by Discloser to Recipient pursuant to this Agreement; provided that such information is designated as confidential at the time of its initial disclosure and reduced to a written summary by Discloser that is marked in a manner to indicate its confidential nature and delivered to Recipient within thirty (30) days after its initial disclosure; and (iii) information otherwise reasonably expected to be treated in a confidential manner under the circumstances of disclosure under this Agreement or by the nature of the information itself. Confidential Information may include information of a third party that is in the possession of Discloser and is disclosed to Recipient under this Agreement.

B. *Exceptions*. Confidential Information shall not, however, include any information that: (i) was publicly known or made generally available without a duty of confidentiality prior to the time of disclosure by Discloser to Recipient; (ii) becomes publicly known or made generally available without a duty of confidentiality after disclosure by Discloser to Recipient through no wrongful action or inaction of Recipient; (iii) is in the rightful possession of Recipient without confidentiality obligations at the time of disclosure by Discloser to Recipient as shown by Recipient's then-contemporaneous written files and records kept in the ordinary course of business; (iv) is obtained by Recipient from a third party without an accompanying duty of confidentiality and without a breach of such third party's obligations of confidentiality; or (v) is independently developed by Recipient without use of or reference to Discloser's Confidential Information, as shown by written records and other competent evidence prepared

PLAINTIFF0002638



contemporaneously with such independent
development.

C. *Compelled Disclosure*. If Recipient becomes
legally compelled to disclose any
Confidential Information, other than pursuant
to a confidentiality agreement, Recipient
will provide Discloser prompt written notice,
if legally permissible, and will use its best
efforts to assist Discloser in seeking a
protective order or another appropriate
remedy. If Discloser waives Recipient's
compliance with this Agreement or fails to
obtain a protective order or other
appropriate remedy, Recipient will furnish
only that portion of the Confidential
Information that is legally required to be
disclosed; provided that any Confidential
Information so disclosed shall maintain its
confidentiality protection for all purposes
other than such legally compelled disclosure.

# 3. Non-use and Non-disclosure.

Recipient shall not use any Confidential Information of
Discloser for any purpose except to evaluate and engage
in discussions concerning the Opportunity. Recipient
shall not disclose any Confidential Information of
Discloser to third parties or to Recipient's employees,
except that, subject to Section 4 below, Recipient may
disclose Discloser's Confidential Information to those
employees of Recipient who are required to have such
information in order to evaluate or engage in
discussions concerning the Opportunity. Recipient shall
not reverse engineer, disassemble, or decompile any
prototypes, software, samples, or other tangible
objects that embody Discloser's Confidential
Information and that are provided to Recipient under
this Agreement.

# 4. Maintenance of Confidentiality.

Recipient shall take reasonable measures to protect the
secrecy of and avoid disclosure and unauthorized use of
the Confidential Information of Discloser. Without
limiting the foregoing, Recipient shall take at least
those measures that it employs to protect its own
confidential information of a similar nature and shall

PLAINTIFF0002639



ensure that its employees who have access to
Confidential Information of Discloser have signed a
non-use and non-disclosure agreement in content at
least as protective of Discloser and its Confidential
Information as the provisions of this Agreement, prior
to any disclosure of Discloser's Confidential
Information to such employees. Recipient shall not make
any copies of the Confidential Information of Discloser
unless the same are previously approved in writing by
Discloser. Recipient shall reproduce Discloser's
proprietary rights notices on any such authorized
copies in the same manner in which such notices were
set forth in or on the original. Recipient shall
promptly notify Discloser of any unauthorized use or
disclosure, or suspected unauthorized use or
disclosure, of Discloser's Confidential Information of
which Recipient becomes aware.

## 5. No Obligation.

Nothing in this Agreement shall obligate either Party
to proceed with any transaction between them, and each
Party reserves the right, in its sole discretion, to
terminate the discussions contemplated by this
Agreement concerning the Opportunity. Nothing in this
Agreement shall be construed to restrict either Party's
use or disclosure of its own Confidential Information.

## 6. No Warranty.

ALL CONFIDENTIAL INFORMATION IS PROVIDED "AS IS."
NEITHER PARTY MAKES ANY WARRANTIES, EXPRESS, IMPLIED OR
OTHERWISE, REGARDING THE ACCURACY, COMPLETENESS OR
PERFORMANCE OF ANY CONFIDENTIAL INFORMATION, OR WITH
RESPECT TO NON-INFRINGEMENT OR OTHER VIOLATION OF ANY
INTELLECTUAL PROPERTY RIGHTS OF A THIRD PARTY OR OF
RECIPIENT.

## 7. Return of Materials.

All documents and other tangible objects containing or
representing Confidential Information that have been
disclosed by Discloser to Recipient, and all copies or
extracts thereof or notes derived therefrom that are in
the possession of Recipient, shall be and remain the
property of Discloser and shall be promptly returned to
Discloser or destroyed (with proof of such

PLAINTIFF0002640

destruction), each upon Discloser's written request.



## 8. No License.

Nothing in this Agreement is intended to grant any rights to Recipient under any patent, mask work right or copyright of Discloser, nor shall this Agreement grant Recipient any rights in or to the Confidential Information of Discloser except as expressly set forth in this Agreement.

## 9. Export Restrictions.

Any software and other technical information disclosed under this Agreement may be subject to restrictions and controls imposed by the Export Administration Act, Export Administration Regulations and other laws and regulations of the United States and any other applicable government or jurisdiction, as enacted from time to time (the "**Acts**"). The Parties shall comply with all restrictions and controls imposed by the Acts.

## 10. Term.

The obligations of Recipient under this Agreement shall survive, with respect to any particular Confidential Information of Discloser, until three years from the Effective Date; except with respect to Confidential Information of the Discloser that constitutes a trade secret under applicable law, in which case, such obligations of Recipient shall continue until such Confidential Information becomes publically known or made generally available through no action or inaction of the Recipient.

## 11. Remedies.

Recipient agrees that any violation or threatened violation of this Agreement may cause irreparable injury to Discloser, entitling Discloser to seek injunctive relief in addition to all legal remedies.

## 12. Residual Information.

Subject to Article 8 hereof, Recipient may use and exploit Residuals for any purpose after the return or destruction of Discloser's Confidential Information without breach of its confidentiality obligations

PLAINTIFF0002641

hereunder. As used herein, **"Residuals"** shall mean ideas, information and understandings retained in the unaided memory of Recipient's employees as a result of their review, evaluation and testing of the Confidential Information of Discloser after the return thereof.



## 13. Feedback.

Any ideas, suggestions, guidance or other information disclosed by Recipient related to Discloser's Confidential Information and any intellectual property rights relating to the foregoing shall be collectively deemed **"Feedback."** Recipient agrees to grant and hereby grants to Discloser a nonexclusive, perpetual, irrevocable, royalty free, worldwide license (with the right to grant and authorize sublicenses) to make, have made, use, import, offer for sale, sell, reproduce, distribute, modify, adapt, prepare derivative works of, display, perform and otherwise exploit such Feedback without restriction.

## 14. Miscellaneous.

This Agreement shall bind and inure to the benefit of the Parties and their respective successors and permitted assigns. Neither Party may assign or otherwise transfer this Agreement without the prior written consent of the other Party; except that either Party may assign this Agreement without consent in connection with a merger, reorganization, consolidation, change of control, or sale of all or substantially all of the assets to which this Agreement pertains; provided that the assigning Party provides prompt written notice to the other Party of any such permitted assignment. Any assignment or transfer of this Agreement in violation of the foregoing shall be null and void. This Agreement will be interpreted and construed in accordance with the laws of the State of Delaware, without regard to conflict of law principles. Each Party hereby represents and warrants that the persons executing this Agreement on its behalf have express authority to do so, and, in so doing, to bind such Party thereto. This Agreement contains the entire agreement between the Parties with respect to the Opportunity and supersedes all prior written and oral agreements between the Parties regarding the Opportunity. Recipient shall not have any obligation.

PLAINTIFF0002642



express or implied by law, with respect to trade secret or proprietary information of Discloser disclosed under this Agreement except as set forth herein. If a court or other body of competent jurisdiction finds any provision of this Agreement, or portion thereof, to be invalid or unenforceable, such provision will be enforced to the maximum extent permissible so as to effect the intent of the Parties, and the remainder of this Agreement will continue in full force and effect. No provision of this Agreement may be waived except by a writing executed by the Party against whom the waiver is to be effective. A Party's failure to enforce any provision of this Agreement shall neither be construed as a waiver of the provision nor prevent the Party from enforcing any other provision of this Agreement. No provision of this Agreement may be amended or otherwise modified except by a writing signed by the Parties to this Agreement. The Parties may execute this Agreement in counterparts, each of which shall be deemed an original, but all of which together constitute one and the same agreement. This Agreement may be delivered by facsimile transmission, and facsimile copies of executed signature pages shall be binding as originals.

## 15. Disputes.

All disputes arising out of this Agreement will be subject to the exclusive jurisdiction and venue of the state courts located in King County, Washington and the federal courts located in Washington, and each Party hereby consents to the personal jurisdiction thereof.

## Signature Page

[Signature page to follow]

IN WITNESS WHEREOF, the Parties by their duly authorized representatives have executed this Mutual Non-disclosure Agreement as of the Effective Date.

| COMPANY | COUNTERPARTY |
| --- | --- |
| Signature: | Signature:<br>----------------------- |
| Print Name: **[Entity-signer-name]** | Print Name: **[Counterparty-representative-name]** |

PLAINTIFF0002643

| Role: **[Entity-signer-** | Role: **[Counterparty-** |
|---|---|
| COMPANY | COUNTERPARTY |
| **role]** | **representative-role]** |



**Previous**
NDA, Disclosing

**Next**
Nonqualified Stock
Option Agreement

PLAINTIFF0002644



LEGAL-TOOLS DAOLABS Connect Wallet



# Variables

Agreement Date

01/01/2023

Your Entity's Name

ACME CORPORATION

Your Entity Representative's Full Name

Ms. Jane Doe

Your Entity Representative's Title/Role

Chief Executive Officer

Recipient's Full Name

Mr John Doe

Recipient's Tax ID

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

Recipient's Address

123 Main Street, Apt. 45

Recipient's City

Kalamazoo

Recipient's State

Michigan

Recipient's ZIP Code

49001

Year of Stock Option Plan

2023

Total Amount of Shares

100

Price per Share (USD)

1

[Entity-name] NONQUALIFIED STOCK OPTION AGREEMENT

Exhibit A

PLAINTIFF0002645

Period for Shares to Vest

> 3 months

Percentage of Shares Which Vest Each Period

> 5

**Update document**



*The option evidenced by this agreement and the securities issuable upon exercise of such option have not been registered or qualified under any state or federal securities laws. This option agreement may not be transferred except by will or under the laws of descent and distribution. The securities issuable upon exercise of the option may not be offered or sold, pledged or otherwise distributed for value, nor may the securities issued upon exercise of the option be transferred on the books of the company, without an opinion of counsel, concurred in by counsel for the company, that no violation of said registration provisions would result therefrom. this option agreement does not constitute an offer or solicitation to any person in any jurisdiction where such offer or solicitation may not lawfully be made.*

# [Entity-name] NONQUALIFIED STOCK OPTION AGREEMENT

[Entity-name], a Washington corporation (the "Company"), through its Board of Directors or a Committee thereof (the "Plan Administrator") has granted to [Recipient-name] ("Optionee") an option (the "Option") to purchase [Share-amount] shares of the Company's common stock (the "Option Shares") at a price of $[Share-price] per share (the "Option Price"). The Option has been granted to Optionee on [Date] (the "Grant Date"), pursuant to the [Entity-name] [Plan-year] Stock Option Plan (the "Plan").

PLAINTIFF0002646

## 1. Nature of the Option.

**1.1** The Option is a nonqualified option and is not intended to qualify as an Incentive Stock Option as defined in Section 422 of the Internal Revenue Code of 1986, as amended (the "Code").

**1.2** Except as expressly provided herein, the Option is subject to the terms, definitions and provisions of the Plan including but not limited to Section 11.1 (which permits adjustments to Options upon the occurrence of certain events such as stock splits, stock dividends and recapitalizations) and Section 11.2 (which will apply if an Approved Transaction occurs). The terms defined in the Plan have the same meaning in this Agreement.

## 2. Date Exercisable; Vesting.

**2.1** Subject to the restrictions and conditions set forth in the Plan, the Option shall become exercisable by Optionee as follows:

**2.1.1** The Option shall become exercisable as to [Vesting-percent] percent of the total number of Option Shares at the end of the [Vesting-period] period of Optionee's Continuous Service with the Company following the Grant Date.

**2.1.2** The Option shall thereafter become exercisable as to [Vesting-percent] percent of the total number of Option Shares at the end of each subsequent [Vesting-period] period of Optionee's Continuous Service with the Company.

**2.1.3** The right to purchase any installment of the Option Shares shall be cumulative, so that when

PLAINTIFF0002647



the right to purchase any Option
Shares has accrued, such Option
Shares may be purchased at any

time or from time to time
thereafter prior to the
Expiration Date, subject to the
limitations of Sections 3 and 4
herein.

**2.2** In the event Optionee's status as a
director, officer, employee or consultant
of the Company is for any reason
terminated, the Option shall be exercisable
thereafter only to the extent the Option,
or any portion of the Option was vested and
exercisable on the Termination Date.

## 3. Exercise of Option.

**3.1 Manner of Exercise.** The Option may be
exercised in whole or in part by delivery
to the Company, from time to time, of
written notice, substantially in the form
of Exhibit A, attached hereto and
incorporated herein by reference, signed by
Optionee, specifying the number of Option
Shares that Optionee then desires to
purchase, together with cash or check
payable to the order of the Company, or
other form of payment acceptable to the
Plan Administrator, for an amount of United
States dollars equal to the Option Price of
such Option Shares.

**3.2 Stock Certificates.** As soon as
practicable after any exercise in whole or
in part of the Option by Optionee, the
Company shall deliver to Optionee or, at
Optionee's request, Optionee's designated
broker, a certificate or certificates for
the number of Option Shares with respect to
which the Option was so exercised,
registered in Optionee's name.

**4. Duration of Option.** The Option, to the extent not
previously exercised, shall terminate upon the
earliest of the following dates:

**4.1** The date ten (10) years from the Grant
Date (the "Expiration Date");

PLAINTIFF0002648



**4.2** Thirty (30) days after the Termination Date of the Optionee's status as an

employee, director, officer or consultant of the Company if the Optionee is terminated for reasons other than Cause, Disability or death;

**4.3** Immediately and automatically upon first notification to Optionee of Optionee's termination for Cause, unless the Plan Administrator in its sole discretion determines otherwise;

**4.4** Six (6) months after Optionee's Termination Date, if such termination is by reason of Optionee's Disability;

**4.5** Ninety (90) days after Optionee's Termination Date, if such termination is by reason of Optionee's death;

**4.6** The date of any sale, transfer or hypothecation, or any attempted sale, transfer or hypothecation, of such Option in violation of Section 5 hereof; or

**4.7** In accordance with Section 7.6 of the Plan.

## 5. Nontransferability.

**5.1 Restriction.** The Option is not transferable by Optionee other than by will and by the laws of descent and distribution, and during the lifetime of Optionee by gift and/or pursuant to a qualified domestic relations order to members of the Optionee's Immediate Family to the extent and in the manner determined by the Plan Administrator. No assignment or transfer of the Option, whether voluntary, involuntary, or by operation of law or otherwise, except by will or the laws of descent and distribution or as determined by the Plan Administrator shall vest in the assignee or transferee any interest or right, but immediately upon any attempt to assign or transfer the Option, the Option shall terminate and be of no further force

PLAINTIFF0002649

**5.2 Shareholder Agreement.** Unless the Plan Administrator determines otherwise, in connection with the exercise of the Option, in whole or in part, and as a condition to the issuance of the Option Shares, Optionee will be required to execute and deliver to the Company a Shareholder Agreement in such form as may be required by the Company at the time of such exercise, or a counterpart thereof together with a spousal consent, if applicable, unless Optionee has previously executed such Shareholder Agreement. The Shareholder Agreement may provide for, among other things, the repurchase by the Company of shares acquired upon exercise of an Option at a price equal to its exercise price in the event an Optionee's employment by the Company has terminated.

## 6. No Rights as a Shareholder Prior to Exercise.

Optionee shall not be deemed for any purpose to be a shareholder of the Company with respect to any Option Shares as to which the Option has not been exercised.

## 7. Adjustments.

In the event of an alteration in the capital structure of the Company on account of a stock split, reverse stock split, consolidation or any like capital adjustment, the Option shall be subject to adjustment by the Plan Administrator in accordance with the Plan.

## 8. Miscellaneous Provisions.

### 8.1 Taxation Upon Exercise of Option.

Optionee understands that pursuant to certain provisions of the Code, upon exercise of the Option, Optionee may recognize income for tax purposes in an amount equal to the excess of the then fair market value of the Option Shares over the Option Price. The Company may be required to withhold tax with respect to such income and the Company may require the Optionee to make a cash payment to cover such liability as a condition of exercise of the Option.

**8.2 Disputes.** Any dispute or disagreement

PLAINTIFF0002650



that may arise under or as a result of this Agreement, or any question as to the interpretation of this Agreement or the Plan, shall be determined by the Plan Administrator in its absolute discretion, and any such determination shall be final, binding, and conclusive on all affected persons.

**8.3 Compliance.** By accepting the Option, the Optionee represents and agrees, for the Optionee and all persons who acquire rights in the Option through the Optionee, that none of the Option Shares purchased upon exercise of the Option will be distributed in violation of applicable federal and state laws and regulations. If requested by the Company, the Optionee shall furnish evidence satisfactory to the Company (including a written and signed representation letter and a consent to be bound by all transfer restrictions imposed by applicable law, legend condition or otherwise) to that effect, before delivery of the Option Shares.

**8.4 Investment Intent.** By executing this Agreement:

> **8.4.1** The Optionee accepts the Option and agrees to comply with and be bound by all of the provisions of this Agreement and the Plan, including but not limited to the market standoff provisions of Section 13.5 of the Plan.

> **8.4.2** The Optionee acknowledges that no registration statement under the Securities Act, or under any state securities laws, has been filed with respect to the Option or any Option Shares that may be acquired upon exercise of the Option, and the Company is under no obligation to do so.

> **8.4.3** The Optionee represents and

PLAINTIFF0002651



warrants that the Option, and any Option Shares acquired upon exercise of the Option, will be acquired and held by the Optionee for the Optionee's own account, for investment purposes only, and not with a view towards the distribution or public offering thereof nor with any present intention of reselling or distributing the same at any particular future time.

**8.4.4** The Optionee agrees not to sell, transfer, or otherwise dispose of the Option except as specifically permitted by this Agreement, the Plan and any applicable securities laws.

**8.4.5** The Optionee agrees not to sell, transfer or otherwise dispose of any Option Shares acquired upon exercise of the Option unless (i) there is an effective registration statement under the Securities Act covering the proposed disposition and compliance with governing state securities laws, (ii) the Optionee delivers to the Company, at the Optionee's expense, a "no-action" letter or similar interpretative opinion, satisfactory in form and substance to the Company, from the staff of each appropriate securities agency, to the effect that such Option Shares may be disposed of by Optionee in the manner proposed, or (iii) the Optionee delivers to the Company, at the Optionee's expense, a legal opinion, satisfactory in form and substance to the Company, of legal counsel designated by the Optionee and satisfactory to the Company, to the effect that the proposed

PLAINTIFF0002652



disposition may be effected without registration or qualification of such Option

Shares under the Securities Act or any applicable state securities laws.

**8.5 Not an Employment Agreement.** This Agreement does not constitute an employment agreement nor does it entitle the Optionee to any specific employment or to employment for a period of time and that the Optionee's continued employment, if any, with the Company shall be at will and is subject to termination in accordance with the Company's prevailing policies and any other agreement between the Optionee and the Company.

**8.6 Governing Law.** This Agreement shall be administered, interpreted and enforced under the internal laws of the State of Washington, without regard to conflicts of laws thereof.

[Signature page to follow]

IN WITNESS WHEREOF, the parties have executed this Agreement effective on the Date of Grant.

| OPTIONEE | COMPANY |
|---|---|
| Signature: | Signature: |
| Print Name: [Recipient-name] | Print Name: [Entity-signer-name] |
| Role: Optionee | Role: [Entity-signer-role] |

# Exhibit A

NOTICE OF EXERCISE OF OPTION TO:

[Entity-name]

I, [Recipient-name], a resident of the State of [Recipient-state], hereby exercise my Option granted

PLAINTIFF0002653



by Corporation (the "Company") in the Nonqualified
Stock Option Agreement dated [Date], subject to all
the terms and provisions thereof and of the

Corporation Stock Option Plan referred to therein,
and notify the Company of my desire to purchase
[Share-amount] shares of common stock of the Company
(the "Option Shares") at the exercise price of
$[Share-price] per share, which were offered to me
pursuant to said Option.

I understand that in connection with this exercise of
my Option, I may also have to execute a Shareholder
Agreement if I do not presently own any shares in the
Company and have not previously executed a
Shareholder Agreement.

All capitalized terms shall have the meaning set
forth in the Plan or the Nonqualified Stock Option
Agreement.

| OPTIONEE |
| --- |
| Signature: |
| Print Name: [Recipient-name] |
| Dated: [Date] |
| Taxpayer I.D. Number: [Recipient-id] |
| Address: [Recipient address], [Recipient city] [Recipient state] [Recipient zip] |

Previous
NDA, Mutual

Next
Warrant to Purchase
Common Stock

PLAINTIFF0002654



**LEGAL—TOOLS** DAOLABS

Connect Wallet



# Variables

**Your Entity's Name**

ACME CORPORATION

**Agreement Date**

mm/dd/yyyy

**Recipient's Name**

Ms. Jane Doe

**Total Number of Shares of Common Stock**

100

**Warrant Price per Share in USD**

1

**Your Entity Representative's Name**

Mr. John Doe

**Your Entity Representative's Title/Role**

Chief Executive Officer

**Amount of Shares Being Purchased**

50

**Recipient's Address**

123 Main Street, Apt  45

**Recipient's City**

Kalamazoo

**Recipient's State**

Michigan

**Recipient's ZIP Code**

49001

**Recipient's Title/Role**

Treasurer

WARRANT TO PURCHASE COMMON
 STOCK OF [Entity-name]

Attachment 1

Attachment 2

Attachment 3

PLAINTIFF0002655

Common Stock Shares Being Acquired

> 30

Percentage of Warrant Being Acquired as Common Stock Shares

> 30

**Update document**



     

*THE SECURITIES EVIDENCED BY THIS WARRANT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND MAY NOT BE SOLD, TRANSFERRED OR ASSIGNED UNLESS THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT COVERING SUCH SECURITIES, THE SALE IS MADE IN ACCORDANCE WITH RULE 144 UNDER THE ACT, OR THE CORPORATION RECEIVES AN OPINION OF COUNSEL FOR THE HOLDER OF SUCH SECURITIES REASONABLY SATISFACTORY TO THE CORPORATION STATING THAT SUCH SALE, TRANSFER, ASSIGNMENT OR HYPOTHECATION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF SUCH ACT.*

[Date]

# WARRANT TO PURCHASE COMMON STOCK OF [Entity-name]

1. **Number of Shares Subject to Warrant.** FOR VALUE RECEIVED, subject to the terms and conditions herein set forth, [Recipient-name] or its assigns ("***Holder***") is entitled to purchase from [Entity-name], a Washington corporation (the "***Corporation***"), at a price per share equal to the Warrant Price (as defined below), the Warrant Stock (as defined below) upon exercise of this Warrant pursuant to Section 6 hereof, at any time before the termination of this Warrant as provided in Section 10 (the "***Exercise Period***"). Both the number of shares of Warrant

PLAINTIFF0002656

Stock purchasable upon exercise of this Warrant and the Warrant Price are subject to adjustment as provided herein. This Warrant is issued

pursuant to that certain Subscription Agreement, dated as of the date hereof (the "*Agreement*"), between the Corporation and Holder. Unless defined otherwise herein, capitalized terms shall have the meaning set forth in the Agreement.



2. **Definitions.** As used in this Warrant, the following terms shall have the definitions ascribed to them below:

(a) "*Common Stock*" shall mean the common stock of the Corporation.

(b) "*Fair Market Value*" of a share of Warrant Stock as of a particular date shall mean:

> (i) If traded on a national securities exchange or one of the Nasdaq Stock Markets, the Fair Market Value shall be deemed to be the average of the closing prices of the shares of Common Stock on such exchange or market over the five (5) business days ending immediately prior to the applicable date of valuation;

> (ii) If this Warrant is being converted in conjunction with the IPO, the Fair Market Value shall be deemed to be the price to the public per share pursuant to such offering;

> (iii) If actively traded over-the-counter, the Fair Market Value shall be deemed to be the average of the closing bid prices over the 30-day period ending immediately prior to the applicable date of valuation; and

> (iv) If there is no active public market, the Fair Market Value shall be the value thereof as

PLAINTIFF0002657

determined in good faith by the
Corporation's Board of Directors.



(c) "*IPO*" shall mean the first firm
commitment underwritten public offering of
Common Stock pursuant to an effective
registration statement filed with the SEC
under the Securities Act.

(d) "*SEC*" shall mean the U.S. Securities
and Exchange Commission.

(e) "*Securities*" shall mean [Share-amount]
shares of Common Stock.

(f) "*Securities Act*" shall mean the
Securities Act of 1933, as amended.

(g) "*Warrant Price*" shall be $[Share-price]
per share.

(h) "*Warrant Stock*" shall mean the
Securities purchasable upon exercise of
this Warrant or issuable upon conversion of
this Warrant.

3. **Fractional Shares.** No fractional shares shall be
issuable upon exercise or conversion of the
Warrant and the number of shares to be issued
shall be rounded down to the nearest whole
share. If a fractional share interest arises
upon any exercise or conversion of the Warrant,
the Corporation shall eliminate such fractional
share interest by paying the Holder an amount
computed by multiplying the fractional interest
by the fair market value of a full share.

4. **No Shareholder Rights.** This Warrant, by itself,
as distinguished from any shares purchased
hereunder, shall not entitle its Holder to any
of the rights of a shareholder of the
Corporation.

5. **Reservation of Stock.** The Corporation will
reserve from its authorized and unissued Common
Stock a sufficient number of shares to provide
for the issuance of Warrant Stock upon the
exercise or conversion of this Warrant. Issuance
of this Warrant shall constitute full authority
to the Corporation's officers who are charged
with the duty of executing stock certificates to

PLAINTIFF0002658

with the duty of executing stock certificates to execute and issue the necessary certificates for

shares of Warrant Stock issuable upon the exercise or conversion of this Warrant.

6. **Exercise of Warrant.** This Warrant may be exercised by the surrender of this Warrant, together with the Notice of Exercise and Investment Representation Statement in the forms attached hereto as **Attachments 1** and **2,** respectively, duly completed and executed, at the principal office of the Corporation, specifying the portion of the Warrant to be exercised and accompanied by payment in full of the Warrant Price in cash or by check with respect to the shares of Warrant Stock being purchased. This Warrant shall be deemed to have been exercised immediately prior to the close of business on the date of its surrender for exercise as provided above, and the person entitled to receive the shares of Warrant Stock issuable upon such exercise shall be treated for all purposes as Holder of such shares of record as of the close of business on such date. As promptly as practicable after such date, the Corporation shall issue and deliver to the person or persons entitled to receive the same a certificate or certificates for the number of full shares of Warrant Stock issuable upon such exercise. If the Warrant shall be exercised for less than the total number of shares of Warrant Stock then issuable upon exercise, promptly after surrender of the Warrant upon such exercise, the Corporation will execute and deliver a new Warrant, dated the date hereof, evidencing the right of the Holder to the balance of the Warrant Stock purchasable hereunder upon the same terms and conditions set forth herein.

7. **Conversion.** In lieu of exercising this Warrant or any portion hereof, the Holder hereof shall have the right to convert this Warrant or any portion hereof into Warrant Stock by executing and delivering to the Corporation at its principal office the written Investment Representation Statement and Notice of Conversion in the forms attached hereto as

PLAINTIFF0002659



**Attachments 2** and **3**, specifying the portion of the Warrant to be converted, and accompanied by this Warrant. The number of shares of Warrant

Stock to be issued to Holder upon such conversion shall be computed using the following formula:

| X = (P)(Y)(A−B)/A Where: |
|---|
| X   the number of shares of Securities to be issued to the Holder for the portion of the Warrant being converted. |
| P = the portion of the Warrant being converted expressed as a decimal fraction. |
| Y = the total number of shares of Securities issuable upon exercise of the Warrant in full. |
| A = the Fair Market Value on the date of conversion. |
| B   the Warrant Price on the date of conversion. |

Any portion of this Warrant that is converted shall be immediately canceled. This Warrant or any portion hereof shall be deemed to have been converted immediately prior to the close of business on the date of its surrender for conversion as provided above, and the person entitled to receive the shares of Warrant Stock issuable upon such conversion shall be treated for all purposes as Holder of such shares of record as of the close of business on such date. As promptly as practicable after such date, the Corporation shall issue and deliver to the person or persons entitled to receive the same a certificate or certificates for the number of full shares of Warrant Stock issuable upon such conversion. If the Warrant shall be converted for less than the total number of shares of Warrant Stock then issuable upon conversion, promptly after surrender of the Warrant upon such conversion, the Corporation will execute and deliver a new Warrant, dated the date hereof, evidencing the right of the Holder to the balance of the Warrant Stock purchasable hereunder upon the same terms and conditions set forth herein.

8. **Adjustment of Exercise Price and Number of Shares.** The Warrant Price and the number of

PLAINTIFF0002660



shares issuable upon exercise of this Warrant shall each be proportionally adjusted to reflect any stock dividend, stock split, reverse stock

split, combination of shares, reclassification, recapitalization or other similar event altering the number of outstanding shares of the Corporation's capital stock.

9. **Transfer of Warrant.** This Warrant may be transferred or assigned by the Holder hereof in whole or in part, provided that (i) the transferor provides, at the Corporation's request, an opinion of counsel satisfactory to the Corporation that such transfer does not require registration under the Securities Act and the securities law applicable with respect to any other applicable jurisdiction, and (ii) the Corporation, in its sole discretion, consents to such assignment or transfer.

10. **Vesting and Termination.**

(a) This Warrant is fully vested and immediately exercisable at any time and from time to time during the Exercise Period**; provided, however,** that this Warrant shall terminate upon the earlier of (i) a Reorganization (as defined below) or IPO and (ii) the date set forth in Section 10(d) below.

(b) Upon the closing of a merger, consolidation, acquisition of all or substantially all of the property or stock, reorganization or liquidation of the Company (collectively, a "*Reorganization*"), as a result of which the shareholders of the Company receive cash, stock or other property in exchange for their shares of Common Stock, this Warrant shall be canceled and all rights granted hereunder shall terminate**; provided, however,** that the Company shall have delivered to Holder notice of the Reorganization no less than fifteen (15) business days before the date scheduled for Reorganization.

(c) Upon the effectiveness of the IPO, this Warrant shall be canceled and all rights granted hereunder shall terminate:

PLAINTIFF0002661

**provided, however,** that the Company shall deliver to Holder notice of the IPO no less than fifteen (15) business days before the date scheduled for the effectiveness of the IPO.

(d) If not sooner canceled pursuant to the provisions of Sections 10(b) or 10(c), this Warrant shall be canceled and the rights granted hereunder shall terminate and no longer by exercisable at 5:00 p.m. Pacific time, on June 8, 2007.

11. **Miscellaneous.** This Warrant shall be governed by the laws of the State of Washington, as such laws are applied to contracts to be entered into and performed entirely in Washington by Washington residents. The parties agree that the venue of any dispute arising out of or in connection with this Warrant shall be in the state and federal courts in King County, Washington. The headings in this Warrant are for purposes of convenience and reference only, and shall not be deemed to constitute a part hereof. Neither this Warrant nor any term hereof may be changed or waived orally, but only by an instrument in writing signed by the Corporation and the Holder of this Warrant. All notices and other communications from the Corporation to the Holder of this Warrant shall be delivered personally or mailed by first class mail, postage prepaid, to the address furnished to the Corporation in writing by the last Holder of this Warrant who shall have furnished an address to the Corporation in writing, and if mailed shall be deemed given three days after deposit in the United States mail.

[Signature page to follow]

IN WITNESS WHEREOF, the duly authorized officer of the Corporation executes this Warrant effective as of the date first written above.

| CORPORATION |
| --- |
| Signature: |
| Print Name: [Entity-signer-name] |

PLAINTIFF0002662

Role: [Entity-signer-role]



# Attachment 1

NOTICE OF EXERCISE

TO: [Entity name]

1. The undersigned hereby elects to purchase [Share purchase amount] shares of the Warrant Stock of [Entity name] pursuant to the terms of the attached Warrant, and tenders herewith payment of the purchase price in full, together with all applicable transfer taxes, if any.

2. Please issue a certificate or certificates representing said shares of Warrant Stock in the name of the undersigned or in such other name as is specified below:

[Recipient name]

(Name)

[Recipient address], [Recipient city] [Recipient state] [Recipient zip]

(Address)

| WARRANT HOLDER |
| --- |
| Signature: _____ |
| Print Name: [Recipient-name] |
| Role: [Recipient role] |

# Attachment 2

### INVESTMENT REPRESENTATION STATEMENT

Shares of the Securities (as defined in the attached Warrant) of [Entity-name]

In connection with the purchase of the above-listed securities, the undersigned hereby represents to [Entity-name] (the "***Corporation***") as follows:

(a) The securities to be received upon the

PLAINTIFF0002663



(a) The Securities to be received upon the exercise of the attached Warrant (the "**Securities**") will be acquired for

investment for its own account, not as a nominee or agent, and not with a view to the sale or distribution of any part thereof, and the undersigned has no present intention of selling, granting participation in or otherwise distributing the same, but subject, nevertheless, to any requirement of law that the disposition of its property shall at all times be within its control. By executing this Statement, the undersigned further represents that it does not have any contract, undertaking, agreement or arrangement with any person to sell, transfer, or grant participation to such person or to any third person, with respect to any Securities issuable upon exercise of the Warrant.

(b) The undersigned understands that the Securities issuable upon exercise of the Warrant at the time of issuance may not be registered under the Securities Act of 1933, as amended (the "**Securities Act**"), and applicable state securities laws, on the ground that the issuance of such securities is exempt pursuant to Section 4(2) of the Securities Act and state law exemptions relating to offers and sales not by means of a public offering, and that the Corporation's reliance on such exemptions is predicated on the undersigned's representations set forth herein.

(c) The undersigned agrees that in no event will it make a disposition of any Securities acquired upon the exercise of the Warrant unless and until (i) it shall have notified the Corporation of the proposed disposition and shall have furnished the Corporation with a statement of the circumstances surrounding the proposed disposition, and (ii) it shall have furnished the Corporation with an opinion of counsel satisfactory to the Corporation and Corporation's counsel to the effect that (A) appropriate action

PLAINTIFF0002664

necessary for compliance with the Securities Act and any applicable state securities laws has been taken or an

exemption from the registration requirements of the Securities Act and such laws is available, and (B) the proposed transfer will not violate any of said laws. The undersigned acknowledges that all stock certificates representing any Securities acquired upon the exercise of the Warrant may have affixed thereto a legend substantially in the following form:



> THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. NO SUCH SALE OR DISTRIBUTION MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNLESS SOLD PURSUANT TO RULE 144 OF SUCH ACT.

(d) The undersigned acknowledges that an investment in the Corporation is highly speculative and represents that it is able to fend for itself in the transactions contemplated by this Statement, has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of its investments, and has the ability to bear the economic risks (including the risk of a total loss) of its investment. The undersigned represents that it has had the opportunity to ask questions of the Corporation concerning the Corporation's business and assets and to obtain any additional information which it considered necessary to verify the accuracy of or to

PLAINTIFF0002665



amplify the Corporation's disclosures, and
has had all questions which have been asked

by it satisfactorily answered by the
Corporation.

(e) The undersigned acknowledges that the
Securities issuable upon exercise of the
Warrant must be held indefinitely unless
subsequently registered under the
Securities Act or an exemption from such
registration is available. The undersigned
is aware of the provisions of Rule 144
promulgated under the Securities Act which
permit limited resale of shares purchased
in a private placement subject to the
satisfaction of certain conditions,
including, among other things, the
existence of a public market for the
shares, the availability of certain current
public information about the Corporation,
the resale occurring not less than one year
after a party has purchased and paid for
the security to be sold, the sale being
through a "broker's transaction" or in
transactions directly with a "market
makers" (as provided by Rule 144(f)) and
the number of shares being sold during any
three-month period not exceeding specified
limitations.

| WARRANT HOLDER |
| --- |
| Signature: |
| Print Name: [Recipient-name] |
| Role: [Recipient-role] |
| Dated: [Date] |

# Attachment 3

NOTICE OF CONVERSION

TO: [Entity-name]

1. The undersigned hereby elects to acquire [Share-conversion-amount] shares of the common stock of

PLAINTIFF0002666

[Entity-name] pursuant to the terms of the attached Warrant, by conversion of [Share-conversion-percent] percent of the Warrant.

2. Please issue a certificate or certificates representing said shares of the common stock of [Entity-name] Corporation in the name of the undersigned or in such other name as is specified below:

[Recipient-name]

(Name)

[Recipient-address], [Recipient-city] [Recipient-state] [Recipient-zip]

(Address)



| WARRANT HOLDER |
| --- |
| Signature: |
| Print Name: [Recipient-name] |
| Role: [Recipient-role] |

Previous
Nonqualified Stock Option Agreement

Next
Investment Letter

PLAINTIFF0002667



**LEGAL—TOOLS**    DAOLABS

    Connect Wallet

# Variables

INVESTMENT LETTER

**Your Entity's Name**

ACME CORPORATION

**Total Amount of Shares of Common Stock**

100

**Purchaser's Full Name**

M   Jane Doe

**Agreement Date**

mm/dd/yyyy

**Recipient's Street Address**

123 Main Street, Apt  45

**Recipient's City**

Kalamazoo

**Recipient's State**

Michigan

**Recipient's ZIP Code**

49001

**Recipient's Tax ID**

135 22 4451

**Update document**

     

**INVESTMENT LETTER**

PLAINTIFF0002668

# INVESTMENT LETTER



## In Connection with the Acquisition of Shares in [Entity-name]

Gentlemen:

In connection with receipt by the undersigned (the "***Subscriber***") of [Share-amount] shares of [Entity-name] (the "***Company***") Common Stock, the Subscriber hereby represents to the Company that such shares are being acquired for investment and not with a view to, or for resale in connection with, any distribution of such shares within the meaning of the Securities Act of 1933, as amended (the "***Act***"), or any applicable state securities laws.

By such representation, the Subscriber means that the Subscriber intends to hold such shares for investment for its own account, and that the Subscriber does not have any present intention of disposing of all or any part of such shares at any particular future time or upon the occurrence of any particular or presently foreseeable event. The Subscriber understands that these shares will not be transferable merely upon the occurrence of a change in its personal circumstances.

The Subscriber understands that the shares being issued to the Subscriber have not been registered under the Act, or any applicable state securities laws, by reason of a specific exemption under the provisions of such laws, which depends upon its intent. The Subscriber agrees that an appropriate restrictive legend shall be placed on the certificates issued to the Subscriber, referring to or stating explicitly the following restrictions on transfer to which the Subscriber hereby agrees:

The securities represented by this certificate have not been registered under the Securities Act of 1933 or any applicable state securities laws and may be transferred only on one of the following conditions:

> (a) The securities have been made subject to effective registration under the Securities Act of 1933 and any applicable state securities laws;

> (b) The Company has received an opinion of

PLAINTIFF0002669



counsel satisfactory to the Company that such
stock may be transferred without registration
under said Act or such laws; or

(c) The Securities and Exchange Commission
and any applicable state securities
regulatory agency have issued in respect to
such transfer a "no action" letter or
equivalent interpretive opinion.

The Subscriber also agrees that the Company's transfer
agent will be instructed not to transfer the shares
represented by the certificates without the
satisfaction of one of the above conditions.

The Subscriber recognizes that the Subscriber has no
right to require registration of the above-mentioned
securities under any applicable securities laws.

The Subscriber hereby agrees to indemnify the Company
against and to hold the Company harmless from any and
all liabilities, claims, losses, costs and expenses
(including, without limitation, counsel fees and
disbursements) that may be asserted against the Company
or incurred by the Company in the event that any
representation or agreement made herein shall be untrue
or shall be breached.

By accepting the shares, the Subscriber agrees that, in
connection with an initial public offering and upon
request of the Company or one or more of the
underwriters managing any underwritten offering of the
Company's securities, the Subscriber will not sell,
make any short sale of, loan, grant any option for the
purchase of, or otherwise dispose of any securities of
the Company (other than those included in the
registration) without the prior written consent of the
Company or such underwriters, as the case may be, for
such period of time (not to exceed 180 days) from the
effective date of such registration as may be requested
by the Company or such managing underwriters. The
Subscriber also agrees to execute an agreement
reflecting and confirming the foregoing as may be
requested by the underwriters at the time of the
initial public offering. To enforce this agreement, the
Company may impose stop-transfer instructions to its
transfer agent with respect to securities held by the
Subscriber until the end of such period.

Very truly yours,

PLAINTIFF0002670



| SUBSCRIBER |
| --- |
| Signature: |
| Print Name: [Recipient-name] |
| Role: Subscriber |
| Dated: [Date] |
| Address: [Recipient address], [Recipient city] [Recipient state] [Recipient zip] |
| Tax ID No: [Recipient-id] |

Previous
Warrant to Purchase
Common Stock

Next
Notice of Grant of Stock
Option (Double Trigger)

PLAINTIFF0002671



**LEGAL—TOOLS** DAOLABS

Connect Wallet



# Variables

[Entity-name] NOTICE OF
GRANT OF STOCK OPTION

Agreement Date

01/01/2023

Initial Vesting Date

01/01/2023

Your Entity's Name

ACME CORPORATION

Your Entity's Street Address

123 Main Street, Apt. 45

Your Entity's City

Kalamazoo

Your Entity's State

Michigan

Your Entity's ZIP Code

49001

Your Entity Representative's Full Name

Ms. Jane Doe

Your Entity Representative's Role/Title

Chief Executive Officer

Optionee's Full Name

Mr. John Doe

Optionee's Role/Title

Treasurer

Optionee's Street Address

123 Main Street, Apt. 45

Optionee's city

Wichita

PLAINTIFF0002672

Optionee's State

Kan a

Optionee's ZIP Code

62001

Year of Your Entity's Stock Option Plan

2023

Grant Number

223

Total Number of Option Shares

100

Price per Share in USD

1

Share's Tax Status (Incentive or Nonstatutory)

Incentive

**Update document**

    

# [Entity-name] NOTICE OF GRANT OF STOCK OPTION

## (Immediately Exercisable)

[Recipient-name] (the *"Optionee"*) has been granted an option (the *"Option"*) to purchase certain shares of Stock of Corporation pursuant to the [Entity-name] [Plan-year] Stock Option Plan (the *"Plan"*), as follows:

**Grant Number:** [Grant-number]

**Date of Option Grant:** [Date]

**Number of Option Shares:** [Share-number]

**Exercise Price:** $[Share-price] per share

PLAINTIFF0002673

**Initial Exercise Date:** Later of Date of Option Grant or Service commencement date.

**Initial Vesting Date:** (i.e., the date on which you first vest in some portion of your Option Shares) [Date-vesting]

**Option Expiration Date:** The date ten (10) years after the Date of Option Grant.

**Tax Status of Option:** [Share-status] Stock Option. (Enter "Incentive" or "Nonstatutory." If blank, this Option will be a Nonstatutory Stock Option.)

**Vested Shares:** Except as provided in the Stock Option Agreement, the number of Vested Shares (disregarding any resulting fractional share) as of any date is determined by multiplying the Number of Option Shares by the *"Vested Ratio"* determined as of such date as follows:

| Time | Vested Ratio |
|------|--------------|
| Prior to Initial Vesting Date | 0 |
| On Initial Vesting Date, provided the Optionee's Service has not terminated prior to such date | 1/5 |
| **Plus** | |
| For each full year of the Optionee's continuous Service from Initial Vesting Date until the Vested Ratio equals 1/1, an additional | 1/5 |

[Signature page to follow]

By their signatures below, the Company and the Optionee agree that the Option is governed by this Notice and by the provisions of the Plan and the Stock Option Agreement, both of which are attached to and made a part of this document. The Optionee acknowledges receipt of copies of the Plan and the Stock Option Agreement, represents that the Optionee has read and is familiar with their provisions, and hereby accepts the Option subject to all of their terms and conditions.

PLAINTIFF0002674



| CORPORATION | OPTIONEE |
|---|---|
| Signature: | Signature:<br><br>----------------------- |
| Print Name: [Entity-signer-name] | Print Name: [Recipient-name] |
| Role: [Entity-signer-role] | Role: [Recipient role] |
| Dated: [Date] | Dated: [Date] |
| Address: [Entity address], [Entity city] [Entity state] [Entity zip] | Address: [Recipient address], [Recipient city] [Recipient state] [Recipient zip] |

ATTACHMENTS: Stock Option Plan, as amended to the Date of Option Grant; Stock Option Agreement and Exercise Notice

Previous
Investment Letter

Next
Notice of Grant of Stock Option (Standard Vesting)

PLAINTIFF0002675



**LEGAL-TOOLS**  DAOLABS

Connect Wallet



# Variables

Agreement Date

```
mm/dd/yyyy
```

Initial Vesting Date

```
mm/dd/yyyy
```

Your Entity's Name

```
ACME CORPORATION
```

Your Entity's Street Address

```
123 Main Street, Apt. 45
```

Your Entity's City

```
Kalamazoo
```

Your Entity's State

```
Michigan
```

Your Entity's ZIP Code

```
49001
```

Your Entity Representative's Full Name

```
Ms. Jane Doe
```

Your Entity Representative's Role/Title

```
Chief Executive Officer
```

Optionee's Full Name

```
Mr John Doe
```

Optionee's Role/Title

```
Treasurer
```

Optionee's Street Address

```
123 Main Street, Apt. 45
```

Optionee's city

```
Wichita
```

[Entity-name] NOTICE OF GRANT OF STOCK OPTION

PLAINTIFF0002676

Optionee's State

Kan a

Optionee's ZIP Code

62001

Year of Your Entity's Stock Option Plan

2023

Grant Number

223

Total Number of Option Shares

100

Price per Share in USD

1

Share's Tax Status (Incentive or Nonstatutory)

Incentive

**Update document**

    

# [Entity-name] NOTICE OF GRANT OF STOCK OPTION

[Recipient-name] (the *"Optionee"*) has been granted an option (the *"Option"*) to purchase certain shares of Stock of Corporation pursuant to the **[Entity-name] [Plan-year]** Stock Option Plan (the *"Plan"*), as follows:

**Grant Number:** [Grant-number]

**Date of Option Grant:** [Date]

**Number of Option Shares:** [Share-number]

**Exercise Price:** $[Share-price] per share

**Initial Vesting Date:** (i.e., the date on which you

PLAINTIFF0002677

first vest in some portion of your Option Shares)
[Date-vesting]

**Option Expiration Date:** The date ten (10) years after
the Date of Option Grant.

**Tax Status of Option:** [Share-status] Stock Option.
(Enter "Incentive" or "Nonstatutory." If blank, this
Option will be a Nonstatutory Stock Option.)



**Vested Shares:** Except as provided in the Stock Option
Agreement, the number of Vested Shares (disregarding
any resulting fractional share) as of any date is
determined by multiplying the Number of Option Shares
by the **_"Vested Ratio"_** determined as of such date as
follows:

| Time | Vested Ratio |
|---|---|
| Prior to Initial Vesting Date | 0 |
| On Initial Vesting Date, provided the Optionee's Service has not terminated prior to such date | 1/5 |
| **Plus** | |
| For each full year of the Optionee's continuous Service from Initial Vesting Date until the Vested Ratio equals 1/1, an additional | 1/5 |

[Signature page to follow]

By their signatures below, the Company and the Optionee
agree that the Option is governed by this Notice and by
the provisions of the Plan and the Stock Option
Agreement, both of which are attached to and made a
part of this document. The Optionee acknowledges
receipt of copies of the Plan and the Stock Option
Agreement, represents that the Optionee has read and is
familiar with their provisions, and hereby accepts the
Option subject to all of their terms and conditions.

| CORPORATION | OPTIONEE |
|---|---|
| Signatures | |

PLAINTIFF0002678



| Signature:<br>------------------------ | Signature: |
| --- | --- |
| **CORPORATION** | **OPTIONEE** |
| Print Name: [Entity signer name] | Print Name: [Recipient name] |
| Role: [Entity-signer-role] | Role: [Recipient-role] |
| Dated: [Date] | Dated: [Date] |
| Address: [Entity-address], [Entity-city] [Entity-state] [Entity-zip] | Address: [Recipient-address], [Recipient-city] [Recipient-state] [Recipient-zip] |

ATTACHMENTS: Stock Option Plan, as amended to the Date of Option Grant; Stock Option Agreement and Exercise Notice

Previous
Notice of Grant of Stock Option (Double Trigger)

Next
C Corporations

PLAINTIFF0002679



**LEGAL-TOOLS**  DAOLABS

Connect Wallet



    

S Corporation
For Your Project
Documents

# S Corporation

According to the U.S. Small Business Administration:

> An S corporation, sometimes called an S corp, is a special type of corporation that's designed to avoid the double taxation drawback of regular C corps. S corps allow profits, and some losses, to be passed through directly to owners' personal income without ever being subject to corporate tax rates.
>
> S corps must file with the IRS to get S corp status, a different process from registering with their state.

Filing as an S corporation can help to save on taxes, but there are specific requirements for operating as one. To be an S corporation, your business must:

- Be a domestic corporation
- Have only allowable shareholders

  - May be individuals, certain trusts, and estates and
  - May not be partnerships, corporations or non-resident alien shareholders

- Have no more than 100 shareholders
- Have only one class of stock
- Not be an ineligible corporation (i.e. certain financial institutions, insurance companies, and domestic international sales corporations).

PLAINTIFF0002680

S corporations also have unique filing requirements: to learn more, visit <u>irs.gov</u>.

# For Your Project

S corporations are a good choice for project creators looking to avoid the "double taxation" associated with C corporations.



## Documents

- The <u>S corporation bylaws</u> are a sensible S corporation starting point.
- To obtain other S corporation tax filing documents for corporations and tax holders, visit <u>irs.gov</u>.

| Previous | Next |
|---|---|
| Washington C Corporation Bylaws | S Corporation Bylaws |

PLAINTIFF0002681

 **LEGAL-TOOLS**  DAOLABS    <span style="color:red">**Connect Wallet**</span>



# Variables

**Agreement Date**

| 01/01/2023 |

**Corporation's Name (ALL CAPS)**

| ACME CORPORATION |

**Corporation President's Full Name**

| Ms. Jane Doe |

**Corporation Secretary's Full Name**

| Mr. John Doe |

**Update document**

AMENDED AND RESTATED BYLAWS OF [Entity-name]

ARTICLE I - SHAREHOLDERS

ARTICLE II - BOARD OF DIRECTORS

ARTICLE III - OFFICERS

ARTICLE IV - CONTRACTS, LOANS, CHECKS AND DEPOSITS

ARTICLE V - STOCK

ARTICLE VI - BOOKS AND RECORDS

ARTICLE VII - FISCAL YEAR

ARTICLE VIII - DIVIDENDS

ARTICLE IX - CORPORATE SEAL

ARTICLE X - INDEMNIFICATION

ARTICLE XI - MISCELLANY

ARTICLE XII - AMENDMENT OF BYLAWS

ARTICLE XIII - AUTHENTICATION

# AMENDED AND RESTATED BYLAWS OF [Entity-name]

## ARTICLE I - SHAREHOLDERS

1.1 **Annual Meeting.** The annual meeting of the shareholders of the corporation for the election of directors and for the transaction of such other business as may properly come before the meeting shall be held each year on a date and at a time and place to be set by the Board of Directors.

1.2 **Special Meetings.** Special meetings of the shareholders for any purpose or purposes may be

**PLAINTIFF0002682**



called at any time by a majority of the Board of
Directors or by the Chairperson of the Board (if one
be elected) or by the President or by one or more

shareholders holding not less than one-tenth (1/10)
of all the votes entitled to be cast on any issue
proposed to be considered at the proposed special
meeting. The Board of Directors may designate any
place as the place of any special meeting called by
the Chairperson, the President or the Board, and
special meetings called at the request of
shareholders shall be held at such place as may be
determined by the Board and placed in the notice of
such meetings.

If a special meeting is called by any person or
persons other than the Board of Directors or the
President or the Chairperson of the Board (if one be
elected), then the request shall be in writing,
specifying the time of such meeting, to be held not
less than twenty (20) nor more than seventy (70)
days after the giving of the request for such
meeting, and the general nature of the business
proposed to be transacted, and shall be delivered
personally or sent by registered mail or by
telegraphic or other facsimile transmission to the
President or the Secretary of the corporation. Upon
receipt of such a request, the Secretary shall cause
notice of such meeting to be promptly given to the
shareholders entitled to vote, in accordance with
the provisions of Section 1.3 of these Bylaws.

1.3 **Notice of Meetings.** Except as otherwise provided
in Subsections 1.3.3, 1.3.4 and 1.3.5 below, the
Secretary, Assistant Secretary, or any transfer
agent of the corporation shall deliver either
written notice transmitted by: mail, private carrier
or personal delivery; telegraph or teletype; or
telephone, wire or wireless equipment which
transmits a facsimile of the notice; or shall
deliver notice in an electronic transmission not
less than ten (10) nor more than sixty (60) days
before the date of any meeting of shareholders
stating the place, day and time of the meeting to
each shareholder of record entitled to vote at such
meeting. Notice to shareholders in an electronic
transmission is effective only with respect to
shareholders that have consented, in the form of a
record, to receive electronically transmitted
notices and designated in the consent the address,

PLAINTIFF0002683

location or system to which the notice may be
electronically transmitted.



### 1.3.1 **Effective Time and Date of Notice.**

Written notice, correctly addressed to the
shareholder's address shown in the
corporation's current record of
shareholders, is effective when mailed, if
mailed with first class postage prepaid;
and when dispatched, if prepaid, by air
courier. Written notice, sent to the
shareholder's address, telephone number,
or other number appearing on the records
of the corporation, is effective when
dispatched by telegraph, teletype or
facsimile equipment. Notice provided in an
electronic transmission is effective when
it is electronically transmitted to an
address, location or system designated by
the shareholder for that purpose or has
been posted on an electronic network and a
separate record of the posting has been
delivered to the shareholder together with
comprehensible instructions regarding how
to obtain access to the posting on the
electronic network.

### 1.3.2 **Notice of Special Meeting.** In the

case of a special meeting, the notice
shall also state with reasonable clarity
the purpose or purposes for which the
meeting is called and the actions sought
to be approved at the meeting. No business
other than that specified in the notice
may be transacted at a special meeting.

### 1.3.3 **Proposed Articles of Amendment or Dissolution.** If the business to be

conducted at any meeting includes any
proposed amendment to the Articles of
Incorporation or the proposed voluntary
dissolution of the corporation, then the
notice shall be given not less than twenty
(20) nor more than sixty (60) days before
the meeting date and shall state that the
purpose or one of the purposes is to
consider the advisability thereof, and, in
the case of a proposed amendment, shall be
accompanied by a copy of the amendment

PLAINTIFF0002684

4/11/23, 9:52 AM    Case 1:23-cv-20727-RKA    Document 106-48    Entered on FLSD Docket 06/09/2023    Page 249
scorp/s-corp-bylaws.md                                                                                        of 500
accompanied by a copy of the amendment.



### 1.3.4 **Proposed Merger, Consolidation, Exchange, Sale, Lease, or Disposition**. If
the business to be conducted at any meeting includes any proposed plan of merger or share exchange, or any sale, lease, exchange, or other disposition of all or substantially all of the corporation's property otherwise than in the usual or regular course of its business, then the notice shall state that the purpose or one of the purposes is to consider the proposed plan of merger or share exchange, sale, lease, or disposition, as the case may be, shall describe the proposed action with reasonable clarity, and, if required by law, shall be accompanied by a copy or a detailed summary thereof; and notice shall be given to each shareholder of record, whether or not entitled to vote at such meeting, not less than twenty (20) nor more than sixty (60) days before such meeting, in the manner provided in Section 1.3 above.

### 1.3.5 **Less Than Unanimous Consent.** If
action is taken by less than unanimous consent, the corporation shall give nonconsenting shareholders notice, either in writing or by electronic transmission, in the form of a copy of the consent in lieu of meeting, at least one (1) day prior to the effective date of such action; provided, that if the action is of a type that would constitute a significant business transaction under RCW 23B.19.020(15), such notice must be given no fewer than twenty (20) days prior to the effective date of the action (such one (1) or twenty (20) day period, a "Notice Period"). Such notice shall be transmitted by: mail, private carrier or personal delivery; telegraph or teletype; or telephone, wire or wireless equipment which transmits a facsimile of the notice; or shall be provided in an electronic

PLAINTIFF0002685



transmission to each nonconsenting shareholder at the address or number on the books and records of the corporation.

Unless the consent of the shareholders specifies a different effective date, the action is effective when consents sufficient to authorize the action have been delivered to the corporation and the Notice Period has elapsed. If the action is of a type that would entitle shareholders to exercise dissenters' rights under RCW 23B.13.020(1), then (i) the notice must comply with RCW 23B.13.220(2), (ii) RCW 23B.13.210 shall not apply, and (iii) all nonconsenting shareholders are entitled to receive the notice, demand payment under RCW 23B.13.230 and assert other dissenters' rights to which they are by law entitled.

1.3.6 **Waiver of Notice**. A shareholder may waive any notice required by the Washington Business Corporation Act, the Articles of Incorporation, or Bylaws before or after the date and time of the meeting that is the subject of such notice, or in the case of notice required for action taken by less than unanimous consent, before or after the action to be taken by executed consent is effective. The waiver must be delivered by the shareholder entitled to notice to the corporation for inclusion in the minutes or filing with the corporate records, which waiver shall be set forth either in an executed and dated record or if the corporation has designated an address, location, or system to which the waiver may be electronically transmitted and the waiver is electronically transmitted to the designated address, location, or system, in an executed and dated electronically transmitted record. A shareholder's attendance at a meeting waives objection to lack of notice or defective notice, unless the shareholder at the beginning of the meeting objects to holding the meeting or transacting business at the meeting.

PLAINTIFF0002686



### 1.3.7 Declaration of Mailing. A
declaration of the mailing or other means

of giving any notice of any shareholders'
meeting, executed by the Secretary,
Assistant Secretary, or any transfer agent
of the corporation giving the notice,
shall be prima facie evidence of the
giving of such notice.

**1.4 Quorum.** A quorum shall exist at any meeting of
shareholders if a majority of the shares entitled to
vote is represented in person or by proxy. Shares
entitled to vote as a separate voting group may take
action on a matter at a meeting only if a quorum of
those shares exists with respect to that matter. The
shareholders present at a duly organized meeting may
continue to transact business at such meeting and at
any adjournment of such meeting (unless a new record
date is or must be set for the adjourned meeting),
notwithstanding the withdrawal of enough
shareholders from either meeting to leave less than
a quorum. Once a share is represented for any
purpose at a meeting other than solely to object to
holding the meeting or transacting business at the
meeting, it is deemed present for quorum purposes
for the remainder of the meeting and for any
adjournment of that meeting unless a new record date
is or must be set for the adjourned meeting.

**1.5 Voting of Shares.** Except as otherwise provided
in the Articles of Incorporation or these Bylaws,
every shareholder of record shall have the right at
every shareholders' meeting to one vote for every
share standing in that shareholder's name on the
books of the corporation. If a quorum exists, action
on a matter, other than the election of directors,
is approved by a voting group if the votes cast
within the voting group favoring the action exceed
the votes cast within the voting group opposing the
action, unless a greater number is required by the
Articles of Incorporation or the Washington Business
Corporation Act.

**1.6 Adjourned Meetings.** A majority of the shares
represented at a meeting, even if less than a
quorum, may adjourn the meeting from time to time
without further notice. However, if the adjournment
is for more than one hundred twenty (120) days from
the date set for the original meeting, a new record

PLAINTIFF0002687



the date set for the original meeting, a new record
date for the adjourned meeting shall be fixed and a
new notice of the adjourned meeting shall be given

to each shareholder of record entitled to vote at
the adjourned meeting, in accordance with the
provisions of Section 1.3 of these Bylaws. At any
adjourned meeting, the corporation may transact any
business which might have been transacted at the
original meeting.

1.7 **Record Date.** For the purpose of determining
shareholders entitled to notice of or to vote at any
meeting of shareholders, or any adjournment thereof,
or entitled to receive payment of any dividend, the
Board of Directors may fix in advance a record date
for any such determination of shareholders, such
date to be not more than seventy (70) days prior to
the meeting or action requiring such determination
of shareholders. If no record date is fixed for the
determination of shareholders entitled to notice of
or to vote at a meeting of shareholders, or
shareholders entitled to receive payment of a
dividend, the day before the date on which notice of
the meeting is mailed or the date on which the
resolution of the Board of Directors declaring such
dividend is adopted, as the case may be, shall be
the record date for such determination of
shareholders. When a determination of shareholders
entitled to vote at any meeting of shareholders has
been made as provided in this section, such
determination shall apply to any adjournment
thereof, unless the Board of Directors fixes a new
record date, which it must do if the meeting is
adjourned more than one hundred twenty (120) days
after the date is fixed for the original meeting.

1.8 **Record of Shareholders Entitled To Vote.** After
fixing a record date for a shareholders' meeting,
the corporation shall prepare an alphabetical list
of the names of all shareholders on the record date
who are entitled to notice of the shareholders'
meeting. The list shall be arranged by voting group,
and within each voting group by class or series of
shares, and show the address of and number of shares
held by each shareholder. A shareholder,
shareholder's agent, or a shareholder's attorney may
inspect the shareholders list, beginning ten days
prior to the shareholders' meeting and continuing
through the meeting, at the corporation's principal

office or at a place identified in the meeting
notice in the city where the meeting will be held
during regular business hours and at the

shareholder's expense. The shareholders list shall
be kept open for inspection during such meeting or
any adjournment. Failure to comply with the
requirements of this section shall not affect the
validity of any action taken at such meeting.



1.9 **Action by Shareholders Without a Meeting.** In
accordance with RCW 23B.07.040, any action that may
be taken at a meeting of shareholders may be taken
without a meeting if either (a) the action is taken
by all shareholders entitled to vote on the action,
or (b) the action is taken by shareholders holding
of record or otherwise entitled to vote in the
aggregate not less than the minimum number of votes
that would be necessary to authorize or take such
action at a meeting at which all shares entitled to
vote on the action were present and voted, and at
the time the action is taken the corporation is not
a public company and is authorized to take such
action by a general or limited authorization
contained in its articles of incorporation. The
taking of action without a meeting or vote must be
evidenced by one or more consents, each in the form
of a record describing the action taken, executed by
shareholders holding of record or otherwise entitled
to vote in the aggregate not less than the minimum
number of votes necessary in order to take such
action by consent, and delivered to the corporation
for inclusion in the minutes or filing with the
corporate records. Action taken by consent is
effective when consents sufficient to authorize
taking the action have been delivered to the
corporation and the period of advance notice
required by the corporation's articles of
incorporation to be given to any nonconsenting
shareholders has been satisfied, unless the consent
specifies a later effective date. Every consent
shall bear the date of execution of each shareholder
who executes the consent. A consent is not effective
to take the action referred to in the consent
unless, within sixty days of the earliest dated
consent delivered to the corporation, consents
executed by a sufficient number of shareholders to
take action are delivered to the corporation.

1.10 **Telephonic Meetings.** Shareholders may

PLAINTIFF0002689

participate in a meeting by means of a conference telephone or other communications equipment by which all persons participating in the meeting can hear each other during the meeting, and participation by such means shall constitute presence in person at a meeting.



**1.11 Proxies.** At all meetings of shareholders, a shareholder may vote by proxy executed in writing by the shareholder or by that shareholder's duly authorized attorney in fact. Such proxy shall be filed with the secretary of the corporation before or at the time of the meeting. No proxy shall be valid after eleven (11) months from the date of its execution, unless otherwise provided in the proxy.

# ARTICLE II - BOARD OF DIRECTORS

**2.1 Management Responsibility.** All corporate powers shall be exercised by or under the authority of, and the business and affairs of the corporation shall be managed under the direction of, the Board of Directors, except as may be otherwise provided in the Articles of Incorporation or the Washington Business Corporation Act.

**2.2 Number of Directors, Qualification.** The number of directors of the corporation shall be not less than one (1) nor more than five (5), the specific number to be set by resolution of the Board of Directors or the shareholders. No reduction of the authorized number of directors shall have the effect of removing any director before that director's term of office expires. No director need be a shareholder of the corporation or a resident of the State of Washington.

**2.3 Election, Term of Office.** At the first annual meeting of shareholders and at each annual meeting thereafter, the shareholders shall elect directors to hold office until the next annual meeting, except in the case of the classification of directors as permitted by RCW 23B.08.060. If, for any reason, the directors shall not have been elected at an annual meeting, they may be elected at a special meeting of shareholders called for that purpose in accordance with these Bylaws. Despite the expiration of a director's term, the director continues to serve until the director's successor shall have been

PLAINTIFF0002690

elected and qualified or until there is a decrease in the number of directors.

**2.4 Vacancies.** Any vacancy occurring in the Board of Directors (whether caused by resignation, death, an increase in the number of directors, or otherwise) may be filled by the shareholders or the Board of Directors. If the directors in office constitute fewer than a quorum of the Board, they may fill the vacancy by the affirmative vote of a majority of all the directors in office. A director elected to fill any vacancy shall hold office until the next shareholders meeting at which directors are elected.

**2.5 Removal.** One or more members of the Board of Directors (including the entire Board) may be removed, with or without cause, at a meeting of shareholders called expressly for that purpose. If the Articles of Incorporation do not permit cumulative voting, a director may be removed only if the number of votes cast to remove the director exceeds the number of votes cast not to remove the director. If the Articles of Incorporation permit cumulative voting in the election of directors, no one of the directors may be removed if the votes cast against that director's removal would be sufficient to elect that same director if then cumulatively voted at an election of the entire Board.

**2.6 Annual Meeting.** The first meeting of each newly elected Board of Directors shall be known as the annual meeting thereof and shall be held without notice immediately after the annual shareholders' meeting or any special shareholders' meeting at which a Board is elected. Said meeting shall be held at the same place as such shareholders' meeting unless some other place shall be specified by resolution of the Board of Directors.

**2.7 Regular Meetings.** Regular meetings of the Board of Directors or of any committee designated by the Board may be held at such place and such day and hour as shall from time to time be fixed by resolution of the Board or committee, without other notice than the delivery of such resolution as provided in Section 2.9 below.

**2.8 Special Meetings.** Special meetings of the Board of Directors or any committee designated by the



PLAINTIFF0002691



of Directors or any committee designated by the
Board may be called by the President, the
Chairperson of the Board (if one be elected) or any

one (1) or more directors or committee members to be
held at such place and such day and hour as
specified by the person or persons calling the
meeting.

2.9 **Notice of Meeting**. Notice of the date, time, and
place of all special meetings of the Board of
Directors or any committee designated by the Board
shall be given by the Secretary, or by the person
calling the meeting, by mail, private carrier or
personal delivery; telegraph or teletype; telephone,
wire or wireless equipment which transmits a
facsimile of the notice; electronic transmission; or
personal communication over the telephone or
otherwise, provided such notice is received at least
two (2) days prior to the day upon which the meeting
is to be held. Notice to directors in an electronic
transmission is effective only with respect to
directors who have consented, in the form of a
record, to receive electronically transmitted
notices and designated in the consent the address,
location or system to which the notice may be
electronically transmitted.

No notice of any regular meeting need be given if
the time and place thereof shall have been fixed by
resolution of the Board of Directors or any
committee designated by the Board and a copy of such
resolution has been delivered as provided herein to
every director or committee member and is received
at least two (2) days before the first meeting held
in pursuance thereof.

A director may waive any notice required by the
Washington Business Corporation Act, the Articles of
Incorporation, or Bylaws before or after the date
and time stated in the notice, and such waiver shall
be equivalent to the giving of such notice. The
waiver must be delivered by the director entitled to
the notice to the corporation for inclusion in the
minutes or filing with the corporate records, which
waiver shall be set forth either in an executed
record or if the corporation has designated an
address, location, or system to which the waiver may
be electronically transmitted and the waiver has
been electronically transmitted to the designated
address, location, or system, in an executed

PLAINTIFF0002692

address, location, or system, in an executed or electronically transmitted record.

A director's attendance at or participation in a meeting waives any required notice to the director of the meeting unless the director at the beginning of the meeting, or promptly upon the director's arrival, objects to holding the meeting or transacting business at the meeting and does not thereafter vote for or assent to action taken at the meeting. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the Board of Directors or any committee designated by the Board need be specified in the notice or waiver of notice of such meeting unless required by the Articles of Incorporation or these Bylaws.



### 2.9.1 Effective Time and Date of Notice.
Written notice is effective at the earliest of the following: (a) if notice is sent to the director's address, telephone number, or other number appearing on the records of the corporation, when dispatched by telegraph, teletype or facsimile equipment; (b) when received; (c) five (5) days after its deposit in the United States mail, as evidenced by the postmark, if mailed with first-class postage, prepaid and correctly addressed; or (d) on the date shown on the return receipt, if sent by registered or certified mail, return receipt requested, and the receipt is signed by or on behalf of the addressee. Notice provided in an electronic transmission is effective when it is electronically transmitted to an address, location or system designated by the director for that purpose or has been posted on an electronic network and a separate record of the posting has been delivered to the director together with comprehensible instructions regarding how to obtain access to the posting on the electronic network. Oral notice is effective when received.

### 2.10 Quorum of Directors.
Unless a greater number is required by the Articles of Incorporation, a

PLAINTIFF0002693



majority of the number of directors fixed by
the manner provided by these Bylaws shall constitute
a quorum for the transaction of business. If a

quorum is present when a vote is taken, the
affirmative vote of a majority of directors present
is the act of the Board of Directors unless the
Articles of Incorporation or these Bylaws require
the vote of a greater number of directors.

A majority of the directors present, whether or not
constituting a quorum, may adjourn any meeting to
another time and place. If the meeting is adjourned
for more than forty-eight (48) hours, then notice of
the time and place of the adjourned meeting shall be
given before the adjourned meeting takes place, in
the manner specified in Section 2.9 of these Bylaws,
to the directors who were not present at the time of
the adjournment.

2.11 **Presumption of Assent.** Any director who is
present at any meeting of the Board of Directors at
which action on any corporate matter is taken shall
be presumed to have assented to the action taken
unless (a) the director objects at the beginning of
the meeting, or promptly upon the director's
arrival, to holding the meeting or transacting
business at the meeting; (b) the director's dissent
or abstention from the action taken is entered in
the minutes of the meeting; or (c) the director
delivers written notice of dissent or abstention to
the presiding officer of the meeting before the
adjournment thereof or to the corporation within a
reasonable time after adjournment of the meeting.
Such right to dissent or abstain shall not be
available to any director who voted in favor of such
action.

2.12 **Action by Directors Without a Meeting.** Any
action required by law to be taken or which may be
taken at a meeting of the Board of Directors or of a
committee thereof may be taken without a meeting if
the action is taken by all members of the Board. The
action must be evidenced by one or more consents
describing the action taken, executed by each
director or each member of the committee, as the
case may be, either before or after the action
taken, and delivered to the corporation for
inclusion in the minutes or filing with the
corporate records, each of which consents shall be

PLAINTIFF0002694

set forth either in the executed record or the corporation has designated an address, location, or system to which the consents may be electronically



transmitted and the consent is electronically transmitted to the designated address, location, or system, in an executed electronically record. Such consent shall have the same effect as a unanimous vote at a meeting duly held upon proper notice on the date of the last signature thereto, unless the consent specifies a later effective date.

2.13 **Telephonic Meetings.** Members of the Board of Directors or any committee designated by the Board may participate in a meeting of the Board or committee by means of a conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other during the meeting. Participation by such means shall constitute presence in person at a meeting.

2.14 **Compensation.** By resolution of the Board of Directors, the directors and committee members may be paid their expenses, if any, or a fixed sum or a stated salary as a director or committee member for attendance at each meeting of the Board or of such committee as the case may be. No such payment shall preclude any director or committee member from serving the corporation in any other capacity and receiving compensation therefor.

2.15 **Committees.** The Board of Directors, by resolution adopted by a majority of the full Board, may from time to time designate from among its members one or more committees, each of which must have two or more members and, to the extent provided in such resolution, shall have and may exercise all the authority of the Board of Directors, except that no such committee shall have the authority to:

    (a) authorize or approve a distribution except according to a general orula or method prescribed by the Board of Directors;

    (b) approve or propose to shareholders action that the Washington usness Corporation Act requires to be approved by shareholders;

PLAINTIFF0002695

(c) fill vacancies on the Board of Directors or on any of its omittees;

(d) adopt any amendment to the Articles of Incorporation;



(e) adopt, amend or repeal these Bylaws;

(f) approve a plan of merger; or

(g) authorize or approve the issuance or sale or contract for sale of shares, or determine the designation and relative rights, preferences and limitations of a class or series of shares, except that the Board of Directors may authorize a committee, or a senior executive officer of the corporation, to do so within limits specifically prescribed by the Board of Directors.

Meetings of such committees shall be governed by the same procedures as govern the meetings of the Board of Directors. All committees so appointed shall keep regular minutes of their meetings and shall cause them to be recorded in books kept for that purpose at the office of the corporation.

# ARTICLE III – OFFICERS

3.1 **Appointment.** The officers of the corporation shall be appointed annually by the Board of Directors at its annual meeting held after the annual meeting of the shareholders. If the appointment of officers is not held at such meeting, such appointment shall be held as soon thereafter as a Board meeting conveniently may be held. Except in the case of death, resignation or removal, each officer shall hold office until the next annual meeting of the Board and until a successor is appointed and qualified.

3.2 **Qualification.** None of the officers of the corporation need be a director, except as specified below. Any two or more of the corporate offices may be held by the same person.

3.3 **Officers Designated.** The officers of the corporation shall be a President, a Secretary, and a Treasurer, each of whom shall be elected by the

PLAINTIFF0002696

Treasurer, each of whom shall be elected by one Board of Directors. Such other officers and

assistant officers as may be deemed necessary may be appointed by the Board of Directors.

The Board of Directors may, in its discretion, appoint a Chairperson of the Board of Directors; and, if a Chairperson has been appointed, the Chairperson shall, when present, preside at all meetings of the Board of Directors and the shareholders and shall have such other powers as the Board may prescribe.

3.3.1 **President.** The President shall be the chief executive officer of the corporation and, subject to the direction and control of the Board, shall supervise and control all of the assets, business, and affairs of the corporation. The President shall vote the shares owned by the corporation in other corporations, domestic or foreign, unless otherwise prescribed by resolution of the Board. In general, the President shall perform all duties incident to the office of President and such other duties as may be prescribed by the Board from time to time.

The President shall, unless a Chairperson of the Board of Directors has been appointed and is present, preside at all meetings of the shareholders and the Board of Directors.

3.3.2 **Vice Presidents.** In the absence of the President or the President's inability to act, the Vice Presidents, if any, in order of their rank as fixed by the Board of Directors or, if not ranked, a Vice President designated by the Board shall perform all the duties of the President and when so acting shall have all the powers of, and be subject to all the restrictions upon, the President; provided that no such Vice President shall assume the authority to preside as Chairperson of meetings of the Board unless such Vice President is a member of the Board. The Vice Presidents shall have such other

PLAINTIFF0002697



Vice Presidents shall have such other
powers and perform such other duties as
from time to time may be respectively

prescribed for them by the Board, these
Bylaws or the President.

3.3.3 **Secretary.** The Secretary shall:

> (a) keep the minutes of meetings
> of the shareholders and the
> Board of irctors in one or more
> books provided for that purpose;

> (b) see that all notices are
> duly given in accordance with
> the roisions of these Bylaws or
> as required by law;

> (c) be custodian of the
> corporate records and seal of
> the corporation, f ne be
> adopted;

> (d) keep a register of the post
> office address of each
> shareholder and irctor;

> (e) sign with the President, or
> a Vice President, certificates
> for haes of the corporation, the
> issuance of which shall have
> been utorized by resolution of
> the Board of Directors;

> (f) have general charge of the
> stock transfer books of the
> ororation; and

> (g) in general, perform all
> duties incident to the office of
> Secretary and such other duties
> as from time to time may be
> assigned by the President or the
> Board of Directors.

In the absence of the Secretary, an
Assistant Secretary may perform the duties
of the Secretary.

3.3.4 **Treasurer.** Subject to the direction
and control of the Board of Directors. the

PLAINTIFF0002698



Treasurer shall have charge and custody of
and be responsible for all funds and
securities of the corporation; and, at the
expiration of a term of office, a
Treasurer shall turn over to the successor
Treasurer all property of the corporation
in the existing Treasurer's possession.

In the absence of the Treasurer, an
Assistant Treasurer may perform the duties
of the Treasurer.

3.4 **Delegation.** In case of the absence or inability
to act of any officer of the corporation and of any
person herein authorized to act in any officer's
place, the Board of Directors may from time to time
authorize the delegation of the powers or duties of
such officer to any other person.

3.5 **Resignation.** Any officer may resign at any time
by delivering written notice to the corporation. Any
such resignation shall take effect when the notice
is delivered unless the notice specifies a later
date. Unless otherwise specified in the notice,
acceptance of such resignation by the corporation
shall not be necessary to make it effective. Any
resignation shall be without prejudice to the
rights, if any, of the corporation under any
contract to which the officer is a party.

3.6 **Removal.** Any officer or agent elected or
appointed by the Board of Directors may be removed
by the Board at any time with or without cause.
Election or appointment of an officer or agent shall
not of itself create contract rights.

3.7 **Vacancies.** A vacancy in any office because of
death, resignation, removal, disqualification,
creation of a new office, or any other cause may be
filled by the Board of Directors for the unexpired
portion of the term or for a new term established by
the Board.

3.8 **Compensation.** Compensation, if any, for officers
and other agents and employees of the corporation
shall be determined by the Board of Directors, or by
the President to the extent such authority may be
delegated to the President by the Board. No officer
shall be prevented from receiving compensation in
such capacity by reason of the fact that the officer

PLAINTIFF0002699

is also a director of the corporation. 

# ARTICLE IV - CONTRACTS, LOANS, CHECKS AND DEPOSITS

**4.1 Contracts.** The Board of Directors may authorize any officer or officers or agent or agents to enter into any contract or execute and deliver any instrument in the name of and on behalf of the corporation. Such authority may be general or confined to specific instances.

**4.2 Loans.** The corporation shall not borrow money and no evidences of indebtedness shall be issued in its name unless authorized by a resolution of the Board of Directors. Such authority may be general or confined to specific instances.

**4.3 Checks, Drafts, Etc.** All checks, drafts, or other orders for the payment of money, notes, or other evidences of indebtedness issued in the name of the corporation shall be signed by such officer or officers or agent or agents of the corporation and in such manner as may be determined from time to time by resolution of the Board of Directors.

**4.4 Deposits.** All funds of the corporation not otherwise employed shall be deposited from time to time to the credit of the corporation in such banks, trust companies, or other depositories as the Board of Directors may select.

# ARTICLE V - STOCK

**5.1 Issuance of Shares.** No shares of the corporation shall be issued unless authorized by the Board of Directors, which authorization shall include the maximum number of shares to be issued, the consideration to be received for each share, and, if the consideration is in a form other than cash, the determination of the value of the consideration and a statement that such consideration is adequate.

**5.2 Certificates of Stock.** Certificates of stock shall be issued in numerical order, and each shareholder shall be entitled to a certificate signed by the President or a Vice President,

PLAINTIFF0002700

attested to by the Secretary or Assistant Secretary, and sealed with the corporate seal, if any. Every certificate of stock shall be in such form as is consistent with the provisions of the Washington Business Corporation Act and shall state:

> (a) The name of the corporation and that the corporation is organized under the laws of this state;

> (b) The name of the registered holder of the shares represented thereby; and

> (c) The number and class of shares, and the designation of the series, if any, which such certificate represents.

If the corporation is authorized to issue different classes of shares or different series within a class, the designations, preferences, limitations, and relative rights applicable to each class and the variations in rights, preferences and limitations determined for each series, and the authority of the Board of Directors to determine variations for future series, must be summarized on the front or back of each certificate. Alternatively, each certificate may state conspicuously on its front or back that the corporation will furnish the shareholder this information without charge on request in writing.

If the shares are subject to transfer or other restrictions under applicable securities laws or contracts with the corporation, either a complete description of or a reference to the existence and general nature of such restrictions shall be placed on the face or back of the certificate.

5.3 **Restrictions on Transfer.** Except to the extent that the corporation has obtained an opinion of counsel acceptable to the corporation that transfer restrictions are not required under applicable securities laws, all certificates representing shares of the corporation shall bear the following legend (or a legend of substantially the same import) on the face of the certificate or on the reverse of the certificate if a reference to the legend is contained on the face:

NOTICE: RESTRICTIONS ON TRANSFER

PLAINTIFF0002701



"The securities evidenced by this certificate have
not been registered under the Securities Act of 1933

or any applicable state law, and no interest therein
may be sold, distributed, assigned, offered, pledged
or otherwise transferred unless (a) there is an
effective registration statement under such Act and
applicable state securities laws covering any such
transaction involving said securities, or (b) this
corporation receives an opinion of legal counsel for
the holder of these securities (concurred in by
legal counsel for this corporation) stating that
such transaction is exempt from registration or this
corporation otherwise satisfies itself that such
transaction is exempt from registration. Neither the
offering of the securities nor any offering
materials have been reviewed by any administrator
under the Securities Act of 1933, or any applicable
state law."

5.4 **Transfers.** Shares of stock may be transferred by
delivery of the certificates therefor, accompanied
by:

> (a) an assignment in writing on the back
> of the certificate, or an assignment
> separate from certificate, or a written
> power of attorney to sell, assign, and
> transfer the same, signed by the record
> holder of the certificate, and

> (b) such additional documents,
> instruments, or other items or evidence as
> may be reasonably necessary to satisfy the
> requirements of any transfer restrictions
> applicable to such shares, whether arising
> under applicable securities or other laws,
> or by contract, or otherwise.

Except as otherwise specifically provided in these
Bylaws, no shares of stock shall be transferred on
the books of the corporation until the outstanding
certificate therefor has been surrendered to the
corporation. All certificates surrendered to the
corporation for transfer shall be cancelled, and no
new certificate shall be issued until the former
certificate for a like number of shares shall have
been surrendered and cancelled, except that in case
of a lost, destroyed, or mutilated certificate a new
one may be issued therefor upon such terms

PLAINTIFF0002702

one may be issued therefor upon such terms
(including indemnity to the corporation) as the
Board of Directors may prescribe.

# ARTICLE VI - BOOKS AND RECORDS



**6.1 Books of Accounts, Minutes and Share Register.**
The corporation shall keep as permanent records
minutes of all meetings of its shareholders and
Board of Directors, a record of all actions taken by
the shareholders or Board of Directors without a
meeting, and a record of all actions taken by a
committee of the Board of Directors exercising the
authority of the Board of Directors on behalf of the
corporation. The corporation shall maintain
appropriate accounting records. The corporation or
its agent shall maintain a record of its
shareholders, in a form that permits preparation of
a list of the names and addresses of all
shareholders, in alphabetical order by class of
shares showing the number and class of shares held
by each. The corporation shall keep a copy of the
following records at its principal office: the
Articles or Restated Articles of Incorporation and
all amendments to them currently in effect; the
Bylaws or Restated Bylaws and all amendments to them
currently in effect; the minutes of all
shareholders' meetings, and records of all actions
taken by shareholders without a meeting, for the
past three years; its financial statements for the
past three years, including balance sheets showing
in reasonable detail the financial condition of the
corporation as of the close of each fiscal year, and
an income statement showing the results of its
operations during each fiscal year prepared on the
basis of generally accepted accounting principles
or, if not, prepared on a basis explained therein;
all written communications to shareholders generally
within the past three years; a list of the names and
business addresses of its current directors and
officers; and its most recent annual report
delivered to the Secretary of State of Washington.

**6.2 Copies of Resolutions.** Any person dealing with
the corporation may rely upon a copy of any of the
records of the proceedings, resolutions, or votes of
the Board of Directors or shareholders, when
certified by the President or Secretary.

**ARTICLE VII - FISCAL YEAR**

# ARTICLE VII – FISCAL YEAR

The fiscal year of the corporation shall be set by resolution of the Board of Directors.

# ARTICLE VIII – DIVIDENDS

The Board of Directors may from time to time declare, and the corporation may pay, dividends on its outstanding shares in the manner and to the extent prescribed and permitted by law and the Articles of Incorporation.

# ARTICLE IX – CORPORATE SEAL

The Board of Directors may adopt a corporate seal for the corporation which shall have inscribed thereon the name of the corporation, the year and state of incorporation and the words "corporate seal."

# ARTICLE X – INDEMNIFICATION

10.1 **Right to Indemnification.** Each individual (hereinafter an "indemnitee") who was or is made a party or is threatened to be made a party to or is otherwise involved (including, without limitation, as a witness) in any actual or threatened action, suit or proceeding, whether civil, criminal, administrative or investigative and whether formal or informal (hereinafter a "proceeding"), by reason of the fact that he or she is or was a director or officer of the corporation or that, while serving as a director or officer of the corporation, he or she is or was also serving at the request of the corporation as a director, officer, partner, trustee, employee or agent of another foreign or domestic corporation or of a foreign or domestic partnership, joint venture, trust, employee benefit plan or other enterprise, whether the basis of the proceeding is alleged action in an official capacity as such a director, officer, employee, partner, trustee, or agent or in any other capacity while serving as such director, officer, employee, partner, trustee, or agent, shall be indemnified and held harmless by the corporation to the full extent

PLAINTIFF0002704



permitted by applicable law as then in effect, against all expense, liability and loss (including, without limitation, attorneys' fees, judgments,

fines, ERISA excise taxes or penalties and amounts to be paid in settlement) incurred or suffered by such indemnitee in connection therewith, and such indemnification shall continue as to an indemnitee who has ceased to be a director, officer, employee, partner, trustee, or agent and shall inure to the benefit of the indemnitee's heirs, executors and administrators; provided, however, that no indemnification shall be provided to any such indemnitee if the corporation is prohibited by the Washington Business Corporation Act or other applicable law as then in effect from paying such indemnification; and provided, further, that except as provided in Section 10.2 of this article with respect to proceedings seeking to enforce rights to indemnification, the corporation shall indemnify any such indemnitee in connection with a proceeding (or part thereof) initiated by such indemnitee only if such proceeding (or part thereof) was authorized or ratified by the Board of Directors. The right to indemnification conferred in this Section 10.1 shall be a contract right and shall include the right to be paid by the corporation the expenses incurred in defending any proceeding in advance of its final disposition (hereinafter an "advancement of expenses"). Any advancement of expenses shall be made only upon delivery to the corporation of a written undertaking (hereinafter an "undertaking"), by or on behalf of such indemnitee, to repay all amounts so advanced if it shall ultimately be determined by final judicial decision from which there is no further right to appeal that such indemnitee is not entitled to be indemnified for such expenses under this Section 10.1 and upon delivery to the corporation of a written affirmation (hereinafter an "affirmation") by the indemnitee of his or her good faith belief that such indemnitee has met the standard of conduct necessary for indemnification by the corporation pursuant to this article.

10.2 **Right of Indemnitee to Bring Suit.** If a written claim for indemnification under Section 10.1 of this article is not paid in full by the corporation within sixty days after the corporation's receipt thereof, except in the case of a claim for an

PLAINTIFF0002705

advancement of expenses, in which case the
applicable period shall be twenty days, the
indemnitee may at any time thereafter bring suit
against the corporation to recover the unpaid amount
of the claim. If successful, in whole or in part, in
any such suit or in a suit brought by the
corporation to recover an advancement of expenses
pursuant to the terms of an undertaking, the
indemnitee shall be entitled to be paid also the
expenses of prosecuting or defending such suit. The
indemnitee shall be presumed to be entitled to
indemnification under this article upon submission
of a written claim (and, in an action brought to
enforce a claim for an advancement of expenses,
where the required undertaking and affirmation have
been tendered to the corporation) and thereafter the
corporation shall have the burden of proof to
overcome the presumption that the indemnitee is so
entitled. Neither the failure of the corporation
(including the Board of Directors, independent legal
counsel or the shareholders) to have made a
determination prior to the commencement of such suit
that indemnification of the indemnitee is proper in
the circumstances nor an actual determination by the
corporation (including the Board of Directors,
independent legal counsel or the shareholders) that
the indemnitee is not entitled to indemnification
shall be a defense to the suit or create a
presumption that the indemnitee is not so entitled.

10.3 **Nonexclusivity of Rights.** The right to
indemnification and the advancement of expenses
conferred in this article shall not be exclusive of
any other right which any person may have or
hereafter acquire under any statute, provision of
the Articles of Incorporation or Bylaws of the
corporation, general or specific action of the Board
of Directors, contract or otherwise.

10.4 **Insurance, Contracts and Funding.** The
corporation may maintain insurance, at its expense,
to protect itself and any individual who is or was a
director, officer, employee or agent of the
corporation or who, while a director, officer,
employee or agent of the corporation, is or was
serving at the request of the corporation as a agent
of another foreign or domestic corporation,
partnership, joint venture, trust, employee benefit
plan or other enterprise against any expense,

PLAINTIFF0002706

liability or loss asserted against or incurred by the individual in that capacity or arising from the individual's status as a director, officer, employee



or agent, whether or not the corporation would have the power to indemnify such person against such expense, liability or loss under the Washington Business Corporation Act. The corporation may enter into contracts with any director, officer, employee or agent of the corporation in furtherance of the provisions of this article and may create a trust fund, grant a security interest or use other means (including, without limitation, a letter of credit) to ensure the payment of such amounts as may be necessary to effect indemnification as provided in this article.

**10.5 Indemnification of Employees and Agents of the Corporation.** The corporation may, by action of the Board of Directors, grant rights to indemnification and advancement of expenses to employees and agents of the corporation with the same scope and effect as the provisions of this article with respect to the indemnification and advancement of expenses of directors and officers of the corporation or pursuant to rights granted pursuant to, or provided by, the Washington Business Corporation Act or otherwise.

**10.6 Persons Serving Other Entities.** Any individual who is or was a director, officer or employee of the corporation who, while a director, officer or employee of the corporation, is or was serving (a) as a director or officer of another foreign or domestic corporation of which a majority of the shares entitled to vote in the election of its directors is held by the corporation, (b) as a trustee of an employee benefit plan and the duties of the director or officer to the corporation also impose duties on, or otherwise involve services by, the director or officer to the plan or to participants in or beneficiaries of the plan, or (c) in an executive or management capacity in a foreign or domestic partnership, joint venture, trust or other enterprise of which the corporation is an equity interest holder or in which a wholly owned subsidiary of the corporation is a general partner or has a majority ownership or interest shall be deemed to be so serving at the request of the corporation and entitled to indemnification and

PLAINTIFF0002707

advancement of expenses under this article.

# ARTICLE XI - MISCELLANY



**11.1 Inspector of Elections.** Before any annual or special meeting of shareholders, the Board of Directors may appoint an inspector of elections to act at the meeting and any adjournment thereof. If no inspector of elections is so appointed by the Board, then the chairperson of the meeting may appoint an inspector of elections to act at the meeting. If any person appointed as inspector fails to appear or fails or refuses to act, then the chairperson of the meeting may, and upon the request of any shareholder or a shareholder's proxy shall, appoint a person to fill that vacancy.

Such inspector of elections shall:

> (a) determine the number of shares outstanding and the voting power of each, the number of shares represented at the meeting, the existence of a quorum, and, with the advice of legal counsel to the corporation, the authenticity, validity, and effect of proxies;

> (b) receive votes, ballots, or consents;

> (c) hear and determine all challenges and questions in any way arising in connection with the right to vote;

> (d) count and tabulate all votes or consents;

> (e) determine the result; and

> (f) do any other acts that may be proper to conduct the election or vote with fairness to all shareholders.

**11.2 Rules of Order.** The rules contained in the most recent edition of Robert's Rules of Order, Newly Revised, shall govern all meetings of shareholders and directors where those rules are not inconsistent with the Articles of Incorporation or Bylaws, subject to the following:

PLAINTIFF0002708



(a) The chairperson of the meeting shall have absolute authority over matters of procedure, and there shall be no appeal from the ruling of the chairperson. If the chairperson deems it advisable to dispense with the rules of parliamentary procedure for any meeting or any part thereof, the chairperson shall so state and shall clearly state the rules under which the meeting or appropriate part thereof shall be conducted.

(b) If disorder should arise which prevents continuation of the legitimate business of the meeting, the chairperson may quit the chair and announce the adjournment of the meeting; upon the chairperson so doing, the meeting shall be deemed immediately adjourned, subject to being reconvened in accordance with Section 1.6 of these Bylaws.

(c) The chairperson may ask or require that anyone not a bona fide shareholder or proxy leave the meeting of shareholders.

(d) A resolution or motion at a meeting of shareholders shall be considered for vote only if proposed by a shareholder or duly authorized proxy and seconded by an individual who is a shareholder or duly authorized proxy other than the individual who proposed the resolution or motion.

11.3 **Registered Office and Registered Agent.** The registered office of the corporation shall be located in the State of Washington at such place as may be fixed from time to time by the Board of Directors upon filing of such notices as may be required by law, and the registered agent shall have a business office identical with such registered office. Any change in the registered agent or registered office shall be effective upon filing such change with the office of the Secretary of State of the State of Washington.

# ARTICLE XII — AMENDMENT OF BYLAWS

12.1 **By the Shareholders.** These Bylaws may be

PLAINTIFF0002709

amended, altered, or repealed at any meeting of the shareholders, provided that in case of a special meeting, notice of the proposed alteration or amendment was contained in the notice of the meeting.



12.2 **By the Board of Directors.** These Bylaws may be amended, altered, or repealed by the affirmative vote of a majority of the whole Board of Directors at any regular or special meeting of the Board unless (a) the Articles of Incorporation or the Washington Business Corporation Act reserve the power to amend exclusively to the shareholders in whole or part; or (b) the shareholders, in amending or repealing a particular bylaw, provide expressly that the Board of Directors may not amend or repeal that bylaw. Any action of the Board with respect to the amendment, alteration or repeal of these Bylaws is hereby made expressly subject to change or repeal by the shareholders.

# ARTICLE XIII – AUTHENTICATION

[Signature page to follow]

The foregoing Amended and Restated Bylaws were read, approved, and duly adopted by the Board of Directors of the corporation on the undersigned date, and the President and Secretary of the corporation were empowered to authenticate such Bylaws by their signatures below.

| PRESIDENT | ATTEST |
|---|---|
| Signature: ----------------------- | Signature: ----------------------- |
| Print Name: [President-name] | Print Name: [Secretary-name] |
| Role: President | Role: Secretary |
| Dated: **[Date]** | Dated: **[Date]** |

Previous
README.md

Next
Unincorporated Non-Profit Agreement

PLAINTIFF0002710



**LEGAL-TOOLS**  DAOLABS

  Connect Wallet

For Your Project

    

> (i)  The legal ramifications of  nincorporated
> No  rofit Associatio s ( NAs)  iffer slightly
> from state to state. Reso rces o  this website
> are writte  with regar s to Neva a a   elaware
>  NAs. As always,  o yo r ow  research, s eak to
> legal ex erts, a   check yo r state's laws.

According to <u>Nevada Statutes</u>, an "Unincorporated Nonprofit Association" (or "UNA") is an unincorporated organization consisting of two or more members joined under an agreement that is oral, in a record or implied from conduct, for one or more common nonprofit purposes.

- An UNA *may* distribute funds so long as those distributions are in furtherance of its non-profit purposes.
- An UNA is a legal entity distinct from its members and managers—UNAs can hold property, debts, liabilities, and may sue or be sued.
- UNAs are formed by an agreement between their members, and do not typically need to file incorporating documents with any state authorities.
- UNAs can operate as a tax-exempt nonprofit if the purpose of its activity is of public benefit, and its annual revenues are less than $5,000. UNAs may also apply for 501(c)(3) status.
- UNAs may invoke a tax liability.

Whether you know this or not, most informal groups are effectively "unincorporated associations". Common

PLAINTIFF0002711

examples include neighborhood watches, groups pooling
funds for non-profit reasons, and little league or
similar teams. Simply by association, an entity is
formed.

The U.S. government frequently charges individuals for
18 U.S. Code 371, or conspiracy: *"two or more persons
conspir[ing] either to commit any offense against the
United States".* Simply put: individuals associated with
each other for an unlawful purpose.

**For Your Project**

Unincorporated Nonprofit Associations work best for
projects with token-based membership and governance.
You may want to utilize an UNA if you're forming a non-
profit DAO, a charity, or any project with a public
good or non-profit purpose.

- Projects with off-chain governance (such as
  Snapshot) may be able to use a <u>Nevada
  Unincorporated Nonprofit Association Agreement</u>.
- Projects with on-chain governance may be able to
  use a <u>Delaware Unincorporated Nonprofit
  Association Agreement</u>.

Also see:

- <u>Unicorporated Non-Profit Association Act of 2008
  (the "Act"), Model Act</u>
- <u>NRS 81.010</u>

| | |
|---|---|
| Previous<br>S Corporation Bylaws | Next<br>Delaware NA |

PLAINTIFF0002712



**LEGAL-TOOLS**  DAOLABS

**Connect Wallet**



# Variables

**Agreement Date**

01/01/2023

**Unincorporated Nonprofit Association Name**

ACME DAO

**URL Containing UNA Purpose**

https://acme.xyz/

**Governing Smart Contract's Address**

0x0000000000000000000000000000000000000000

**Update document**

     

ⓘ This agreeme t has bee  mi imize , constituting the bare necessities of a Delaware  nincorporated Nonprofit Association.

ⓘ To use this agreement, your entity's purpose must be laid out on a website. If you don't have a website, you can make a Notion page or use a no-code service like WebFlow.

Unincorporated Nonprofit Delaware Association Agreement

Article I – Organization

Section 1.1 Status.

Section 1.2 Purposes.

Section 1.3 Nondiscrimination.

Section 1.4 The Company.

Article II – Membership

Section 2.1 Eligibility.

Section 2.2 Admission.

Section 2.3 Rights.

Section 2.4 Responsibilities.

Section 2.5 Limitations.

Section 2.6 Inactive Status.

Section 2.7 Access to Information.

Section 2.8 Settlement of Disputes.

Section 2.9 Transferability of Membership.

Section 2.10 Withdrawal and Expulsion.

Article III – Meetings of Members

Section 3.1 Meetings.

Section 3.2 Special Meetings.

**PLAINTIFF0002713**

Last Updated: ⌊Date⌉

# Article I - Organization
## Section 1.1 Status.

[Entity-name] (the "Company") is a nonprofit
association under the Delaware Uniform
Unincorporated Nonprofit Association Act ("DUUNAA",
or "UNAA"), Del. Code Ann. Tit. 6, §§ 1901 1916. The
Company is not intended to be, and shall not be
deemed to be, a partnership.

## Section 1.2 Purposes.

**The Company is organized to carry out the missions
stated in its membership portal (available at
[Purpose-url]), related websites or otherwise
memorialized in a writing by the Company. The
Company is not intended to or become an entity
required to register as an "investment company" as
defined in Section3(a)(1)(A) of the Investment
Company Act of 1940, as amended.**

## Section 1.3 Nondiscrimination.

The Company shall not arbitrarily discriminate on
the basis of race, nationality, religion, age,
gender, sexual orientation, disability, political
affiliation, or otherwise.

## Section 1.4 The Company.

The Company is an unincorporated association of
individuals, corporations, statutory trusts,
business trusts, estates, trusts, partnerships,
limited liability companies, associations, joint
ventures, or any other legal or commercial entity,
many, if not all, of whom agree to join together for
a common, nonprofit purpose. For the Company, that
purpose is encapsulated in its mission statement.

# Article II - Membership

## Section 2.1 Eligibility.

Membership in the Company, as defined in Del. Code
Ann. Tit. 6, § 1901, shall be voluntary and open to
any individual whose purpose or presumed intent is

meetings.

Section 3.3 Time and
Place.

Section 3.4 Notice.



 Article IV -
Decentralized Governance

Section 4.1 Powers and
Duties.

 Article V - Decentralized
Governance

Section 5.1 Fiscal
Year.

Section 5.2
Indemnification.

Section 5.3
Communication by
Electronic Means.

 Article VI -
Interpretation and
Amendment of UNAA

Section 6.1
Interpretation.

Section 6.2
Severability.

Section 6.3 Amendment.

Article VII -
Definitions

PLAINTIFF0002714

to contribute to the Company and is willing to
accept the responsibilities and terms of membership.

## Section 2.2 Admission.

The Company is a network of members and may admit or
deny individuals for any arbitrary purpose or lack
of purpose.



**All of the Company governing members shall have
their membership determined upon receipt of voting
tokens secured on a public blockchain
("Cryptographic Units", and such holders,
"Members"). Cryptographic Units are used for
participating in and improving the governance of the
Company through affirmative votes effectuated via
the Designated Smart Contract (defined herein) (such
process, "Cryptographic Consensus"). Once the
Company admission requirements are met a prospective
Member may be put up to a vote of the full
membership or similar process enabled by the
Designated Smart Contract. The Company will
consistently review, and if necessary, Members may
make adjustments to the Company admission
requirements based on their evolving needs and as
registered in a successful vote through the
Designated Smart Contract.**

## Section 2.3 Rights.

**The Company's Members shall utilize the "Designated
Smart Contract" (a smart contract deployed to the
Designated Blockchain at the address [Contract-
address]) as the exclusive method of holding,
allocating rights and obligations among the Members,
and spending, or otherwise distributing any Tokens
that are Company Property, of minting and issuing
Cryptographic Units and holding and recording votes
among the Members. The Company may also utilize the
Designated Smart Contract to administer and
facilitate certain other arrangements and
transactions involving the Company, the Members
and/or third parties.**

Members' rights and responsibilities are controlled
by the use of the Designated Smart Contract used to
conduct the governance and activities of the
Company. Members will cast votes and carry out the
decisions made on the Designated Smart Contract. _      _

PLAINTIFF0002715

Cryptographic Units are held in **[Contract-address]**,
i.e., key paired wallets controlled by Members in a

designated hexadecimal address ("Member Web3
Account").



## Section 2.4 Responsibilities.

Each Member shall keep reasonably current in payment
of any dues or membership fees and other financial
obligations of membership, if applicable and
determined by the Company. Each Member shall notify
the Company of an e-mail address or other acceptable
communication channel by which such Member may
receive written or electronic materials required or
permitted by this document or shall notify the
Company that such Member has no e-mail address and
designate a mutually acceptable form of
communication.

If you have received any Cryptographic Units or are
otherwise a Member, you consent and agree to become
legally bound by this Agreement as both a
participant in the Company and more specifically a
"Company Member".

## Section 2.5 Limitations.

Status as a Company Member does not(and shall not be
deemed to) create, and the Company does not (and
shall not be deemed to) include, any authority,
right or power on the part of a Company Member to
act as the agent, representative or attorney of or
otherwise act on behalf of the Company or any other
Member, to bind the Company or any other Member to
any Contract or Liability or to convey any Company
Property or any asset, right or property owned or
held by or on behalf of the Company or any Member.
Without limiting the generality of the foregoing, no
Member shall be deemed the partner of the Company or
any other Member solely in virtue of being a Member.
No Member shall state, purport, imply, hold out or
represent to any person that such Member or any
other Member has any such authority, right or power.

To the maximum extent permitted by applicable law,
no Member shall be (or shall be deemed to be) liable
for any liability of the Company or any other
Member. This shall not (and shall not be deemed to)

PLAINTIFF0002716

create or imply any obligation of the Company or any
Member to indemnify or compensate any Member from,
or hold any Member harmless against, any Liabilities

incurred by such Company Member under any applicable
law, in connection with the Member's participation
in the Company or otherwise.



## Section 2.6 Inactive Status.

A Member who falls from good standing may have their
membership revoked or suspended through a Guild
Kick. References herein to the rights and
entitlements of Members shall be understood to refer
only to Members in good standing.

## Section 2.7 Access to Information.

Members shall have access to information concerning
operational and financial affairs via the Company's
preferred treasury application. Currently the
Company treasury can be viewed via Designated Smart
Contract.

## Section 2.8 Settlement of Disputes.

In any dispute between the Company and any of its
Members or former Members which cannot be resolved
through informal negotiation, it shall be the policy
of the Company to prefer the use of mediation
whereby an impartial mediator may facilitate
negotiations between the parties and assist them in
developing a mutually acceptable settlement. Neither
party with a grievance against the other shall have
recourse to litigation until the matter is submitted
to mediation and attempted to be resolved in good
faith. All Members agree that there is a preference
to settle disputes amongst Members or between
Members and the Company via decentralized dispute
mechanisms in smart contract protocols.

## Section 2.9 Transferability of Membership.

Membership rights and interests may not be
transferred except by an affirmative majority vote
of Members. Any attempted transfer contrary to this
section shall be wholly void and shall confer no
rights on the intended transferee and shall be cause
(though none is needed) to burn the Cryptographic
Units through a Guild Kick member removal procedure

PLAINTIFF0002717

uni's through a Guild Kick Member removal procedure. 

## Section 2.10 Withdrawal and Expulsion.

A Member may withdraw at any time upon notice to the
Company by electronic writing to an appointed
representative of the Company or by public display
to the Company's online coordination systems
(including, but not limited to, Discord or
Telegram). Withdrawal shall be effectuated through
the Member burning their Cryptographic Units, a vote
to burn such withdrawing Company Member's
Cryptographic Units, or mechanisms otherwise
authorized in the Designated Smart Contract. Any
such withdrawal request will not be unreasonably
denied and shall be deemed conclusively as the
Company Member's intent to withdraw from the
Company. A Member may be expelled by the Company
through the Guild Kick procedure established in
paragraph 2.6 of this document and adopted by the
membership. Upon termination of membership, all
rights and interests in the Company shall cease
except for rights to redemption of capital pursuant
to Article V below (if any).

# Article III - Meetings of Members

## Section 3.1 Meetings.

Meetings of members shall be described on a basis at
the discretion of the Members. Typically, governance
meetings are set on weekly cadence through online
chats where parties agree to conduct such other
business as may properly come before the meeting.

## Section 3.2 Special Meetings.

Special meetings of members may be called by a group
(the "Company Advisory Group") designated by an
affirmative vote of Company Members in accordance
with the governance procedures of the Designated
Smart Contract. The Company Advisory Group is not
required and may never be formed. Creation and
designation of the Company Advisory Group will be
approved via the Designated Smart Contract.

## Section 3.3 Time and Place.

The date, time and place of all meetings of the

PLAINTIFF0002718

Company Advisory Group shall be determined by the Company Advisory Group or, in the event that the Company Advisory Group fails to act, by a call for vote by the Members to be approved by the native governance processes to the Designated Smart Contract.



### Section 3.4 Notice.

Each Member is responsible for monitoring votes of concern on the Designated Smart Contract. Notice of votes can be set up by Company Members via the Designated Smart Contract. Notices of meetings shall also be posted on the Company's official media outlets, including the Company Member information roster, but the inadvertent failure to do so shall not affect the validity of the meeting. Any business conducted at a meeting of Company Members other than that specified in the notice of the meeting shall be of an advisory nature only.

## Article IV — Decentralized Governance

### Section 4.1 Powers and Duties.

Except as to matters reserved to members by law or by this agreement, all powers to be exercised on behalf of the Company shall be exercised by or under the authority of Members or such agents or designees approved by Members through Designated Smart Contract voting.

## Article V — Decentralized Governance

### Section 5.1 Fiscal Year.

The fiscal year of the Company shall be the calendar year beginning January 1st and ending December 31st.

### Section 5.2 Indemnification.

The Company shall indemnify its directors, officers, employees, or agents as required under Delaware law, and may indemnify such persons as permitted under Delaware law, including its Members for acts that do

PLAINTIFF0002719



Delaware law, including its members for actions that do not involve bad faith or intentional misconduct, including fraud. Indemnification payments shall be

made on a priority basis but only in such increments and at such times as will not jeopardize the ability of the Company to pay its other obligations as they become due.

### Section 5.3 Communication by Electronic Means.

Unless otherwise required by law or by agreement, any notice, vote, consent, petition, or other oral or written communication required or permitted can be delivered by electronic means, provided that, in the case where such communication expressly or impliedly requires the signature of the person submitting the communication, means are in place to reasonably assure the authenticity of the signature.

# Article VI - Interpretation and Amendment of UNAA

### Section 6.1 Interpretation.

The Company Advisory Group (if formed via vote of Members) shall have the power to interpret this UNAA, apply them to particular circumstances, and adopt policies in furtherance of them, provided that all such actions are reasonable and consistent.

### Section 6.2 Severability.

In the event that any provision of this UNAA is determined to be invalid or unenforceable under any statute or rule of law, then such provision shall be deemed inoperative to such extent and shall be deemed modified to conform with such statute or rule of law without affecting the validity or enforceability of any other provision of this UNAA.

### Section 6.3 Amendment.

This UNAA may be amended by presenting the redlined version of the amendments at a meeting of members, and adopted by a vote or merge request as recorded by Cryptographic Consensus. As an alternative to achieving Cryptographic Consensus, any Member may

PLAINTIFF0002720

achieving cryptographic consensus, any member may
timely protest a merge request made to the UNAA that

has not been adopted as an approved version by
Members via the Designated Smart Contract.

## Article VII - Definitions

- (a) **"Account Address"** means a public
  key address on the Designated
  Blockchain Network that is uniquely
  associated with a single private key
  or equivalent.
- (b) **"Consensus Rules"** means the rules
  for transaction validity, block
  validity and determination of the
  canonical blockchain that are
  embodied in the Designated Client.
- (c) **"Contract"** means any:

    - (i) written, oral,
      implied by course of
      performance or
      otherwise or other
      agreement, contract,
      understanding,
      arrangement,
      settlement,
      instrument, warranty,
      license, insurance
      policy, benefit plan
      or legally binding
      commitment or
      undertaking; or
    - (ii) any
      representation,
      statement, promise,
      commitment,
      undertaking, right or
      obligation that may be
      enforceable, or become
      subject to an Order
      directing performance
      thereof, based on
      equitable principles
      or doctrines such as
      estoppel, reliance, or
      quasi-contract.

PLAINTIFF0002721

- (d) **"Company Property"** means any Token or other asset, right or property licensed to or on deposit

  with or owned, held, custodied, controlled or possessed by or on behalf of the Company, including any Token on deposit with or held, controlled, possessed by or on deposit with the Designated Smart Contract.

- (e) **"Designated Blockchain"** means at any given time, the version of the digital blockchain ledger that at least a majority of nodes running the Designated Blockchain Client on the Designated Blockchain Network recognize as canonical as of such time in accordance with the Consensus Rules. The initial Designated Blockchain shall be theEthereum blockchain as recognized by the Designated Blockchain Client on the Designated Blockchain Network.

- (f) **"Designated Blockchain Client"** means the blockchain software client designated as the "Designated Blockchain Client" by the Members.

- (g) **"Designated Blockchain Network"** means the blockchain network designated as the "Designated Blockchain Network" by the Members. The initial Designated Blockchain Network shall be the Official Go Ethereum client available at "https://github.com/ethereum/go-ethereum", as recognized by the Designated Blockchain Client.

- (h) **"Designated Smart Contract"** means the smart contract deployed at an address associated with the creation of the Company on the Designated Blockchain associated with the Members and Cryptographic Units.

- (i) **"Liability"** means any debt, obligation, duty or liability of any nature (including any unknown, undisclosed, unmatured, unaccrued, unasserted, contingent, indirect, conditional, implied, vicarious,

PLAINTIFF0002722



inchoate derivative, joint, several or secondary liability), regardless of whether such debt, obligation, duty or liability would be required to be disclosed on a balance sheet prepared in accordance with generally accepted accounting principles and regardless of whether such debt, obligation, duty or liability is immediately due and payable. To be **"Liable"** means to have, suffer, incur, be obligated for or be subject to a Liability.

- (j) **"Guild Kick"** means removal from the membership via vote by Members upon their Cryptographic Units to destroy another Member's Cryptographic Units through a burn function or other similar process. Unless specifically provided otherwise, or in the Designated Smart Contract, a member subject to a Guild Kick shall not be entitled to any distribution or return of capital, funds, retains, etc.

| Previous | Next |
|---|---|
| Unincorporated Non-Profit Agreement | Nevada UNA |



**LEGAL—TOOLS**   DAOLABS

<span style="color:red">Connect Wallet</span>



# Variables

**Agreement Date**

| 01/01/2023 |

**UNA's Name**

| ACME DAO |

**UNA's Purpose**

| to provide explosives to Wile E. Coyote |

**Contribution Website URL**

| https://donate.acme.xyz |

**Formation Date**

| 01/01/2023 |

**Tokens per ETH**

| 100 |

**Max Token Grant**

| 500 |

**Service Provider's Name**

| dao-lawfirm.eth |

**Update document**

GUIDING PRINCIPLES

Organization

Membership; Governance Rights and Tokens; Limitations

Liability

Admission of Additional Members

Management

Withdrawal Rights; Compulsory Withdrawal

Fees and Expenses

Distributions; Dividends; Compensation; Sale of Assets

Dissolution

Limitations on Transfers

Books and Records; Accounting and Tax Matters

Waiver of Fiduciary Duties

Intellectual Property Rights

Amendments

Service Provider

General Provisions

Definitions

    

ⓘ The Agreement, or Guiding Principals, sets f rth the terms f r the membership, f

**PLAINTIFF0002724**

```
the  nincorporated association.
```

An Unincorporated Non-profit Nevada Association

Last Updated: [Date]

## GUIDING PRINCIPLES

These guiding principles constitute an Agreement
(hereinafter the "Agreement") and are entered into
by and amongst members of **[Entity-name]**
(hereinafter the "Company"), an unincorporated
nonprofit association organized under the laws of
the State of Nevada. The following terms apply
when you click to view or access Company's
Decentralized Application (or "Dapp") or the
Company's other online services, contribute
Ethereum via **[Contribution-url]**, become a Member
of the Company, receive Company Tokens, hold
Governance Rights for the Company, interact with
or access the Company's smart contracts in any
way, provide services to the Company, donate or
transfer any property to the Company, or otherwise
interact with or access the Company's services
through the Dapp. By doing any of the above, you
signify your agreement to these terms. If you do
not agree to be bound by the Agreement in its
entirety, you may not access, interact with, or
use the Company. Capitalized terms used herein
have the meanings ascribed to them in Section 17.

## Organization

(a) Formation. The Company was formed on
**[Date-formation]**. The duties and
obligations of the Members of the
Company shall be determined pursuant to
the Revised Uniform Unincorporated
Nonprofit Association Act of 2008 (the
"Act"), NRS §§ 81.700 to 81.890
inclusive, and this Agreement.

(b) Purpose. The primary purpose of the
Company is to **[Entity-purpose]**. The
Company shall have the power to do any
and all acts appropriate, convenient,
desirable, incidental, or necessary to
or in furtherance of the purposes

PLAINTIFF0002725

described in this Agreement, including, without limitation, any and all of the powers that may be exercised on behalf

of the Company by its members. The Company shall not engage in profit-making activities. Any profits that are incidentally accrued or earned from any of the Company's activities will be used or set aside for the Company's nonprofit purposes.

## Membership; Governance Rights and Tokens; Limitations

(a) Governance Rights. Governance Rights in the Company are represented by cryptographically secured tokens ("Tokens"), with each Token representing a fractional part of the Governance Rights of all Members (or assignees, as the case may be) equal to the quotient of one (1) divided by the total number of Tokens claimed at any time.

(b) Tokens. As of the date hereof, Tokens authorized to represent membership interests in the Company. The Company shall provide to each Member **[Tokens-per-eth]** Tokens for each Ethereum donated to the Company, unless otherwise agreed to by the Members via a vote occurring through the Dapp. Notwithstanding the foregoing or any other provision of this Agreement, the Company shall provide the members in Exhibit A and members of its technical partners, up to **[Max-token-grant]** Tokens, each, for their role in conceiving and supporting the Company.

(c) Governance Rights and Token Limitations. Possession or ownership of any of the Tokens issued by the Company do not provide any right of ownership or management of the Company and does no provide the holder of a token any possibility of a profit, nor any right to a future distribution or dividends paid by the Company. By entering this

PLAINTIFF0002726



Agreement each Member (or assignees, as the case may be) who receives or holds governance Tokens expressly and

unequivocally agrees that the Tokens provide no rights to an expectation of profit, no entitlement to distributions or dividends from the Company, and no right of ownership or management of the Company.



## Liability

(a) No Member Liability. Except as otherwise provided in this Agreement or the Act, no Member (or former Member) shall be personally liable for the obligations of the Company, including any obligations owed by such Member in connection with any breach of this Agreement. A debt, obligation, or other liability of the Company is solely the debt, obligation, or other liability of the Company. Members (or former Members) are not personally liable, directly or indirectly, by way of contribution or otherwise, for a debt, obligation, or other liability of the Company solely by reason of being or acting as a Member or acting on behalf of the Company. The failure of the Company to observe formalities relating to the exercise of its powers or management of its activities and affairs is not grounds for imposing liability on a Member of the Company for a debt, obligation, or other liability of the Company.

(b) Member Limitations. No Member shall have the right or power:

> (i) to cause the dissolution and winding up of the Company; or

> (ii) to demand or receive property, including any NFTs donated to the Company, except as agreed to by the Members or otherwise provided herein.

PLAINTIFF0002727

## Admission of Additional Members



(a) Subject to the provisions of this Agreement, the Members are authorized to accept additional donations from one or more Members, and to admit other Persons to the Company as additional Members (each such additional Member and such existing Member an "Additional Member"). Unless otherwise determined by the Members, any such Additional Members shall be admitted to the Company only if such Member or Additional Member makes a donation via the Dapp.

(b) Accession to Agreement. Each Person who is to be admitted as an Additional Member pursuant to this Agreement shall agree to be bound by all of the terms of this Agreement as if they were a member from the inception of the Company.

## Management

(a) Except as otherwise expressly required in this Agreement, the affairs of the Company shall be carried on and managed exclusively by the Members, who shall have sole and absolute discretion with respect thereto. No Member shall be a manager, as defined under the Act.

(b) Whenever any action, including any approval, consent, decision, determination, or resolution is to be taken or given by the Members or the Company under this Agreement or under the Act, it shall be authorized by a vote of the Members via the Dapp, unless otherwise provided herein. Such an authorization may be evidenced by a vote facilitated via the Dapp and one or more smart contracts, or by a written consent, in accordance with this Agreement. The Members intend that any action (which has been duly approved in accordance with this Agreement) taken by the Company via a Dapp, a smart contract,

PLAINTIFF0002728



the Company via a Dapp, a smart contract
or the blockchain, shall be a valid
action of the Members or the Company, as

applicable, and no Member shall
challenge the authority or validity of
any such action based solely upon such
fact.

(c) Except as otherwise expressly
required in this Agreement or in the
Act, no single Member (in their capacity
as a Member) shall have authority to
bind the Company in any way or to enter
into any agreement or contract
obligating the Company in any way unless
approved via a vote of the Members
occurring through the Dapp.

(d) To the extent that the Members have
approved a document in accordance with
the terms of this Agreement and the Act,
any Member can be expressly authorized
to execute and deliver such document on
behalf of the Company.

(e) Members may appoint a proxy to vote
or otherwise act for the Member with
regards to the any vote taken by the
Company via Dapp or any other action
taken by the Company on behalf of that
Member.

(f) The Company has the right to
delegate or retain third parties or
independent contractors to perform
certain technical or administrative
responsibilities and provide them with
reasonable compensation.

(g) Reliance by Third Parties. Persons
dealing with the Company are entitled to
rely conclusively upon the power and
authority of the Members (and any Person
to whom the Members delegated any such
power and authority pursuant to this
Agreement) and acknowledge that such
Member or designee is authorized to act
on behalf of the Company and may bind
the Company or otherwise enter into a
binding contract.

PLAINTIFF0002729



(h) Other Activities. Each Member acknowledges and agrees that in addition to transactions specifically contemplated by this Agreement, and subject to applicable law, the Members, the Company, and their respective Affiliates and Representatives are each hereby authorized to obtain property or obtain services from, to provide property or provide services to, or otherwise enter into any transaction with any Member, or any Affiliate or Representative of any of the foregoing Persons.

## Withdrawal Rights; Compulsory Withdrawal

(a) Limited Right to Withdraw. A Member may withdraw at any time by transferring their Tokens to a third party. Such withdrawal shall be facilitated and executed, in part, using one or more smart contracts and shall be effective as of the date of transfer of the Tokens. Any withdrawal by a Member from the Company is irrevocable.

(b) Compulsory Withdrawal. Not in limitation of Section 6(a), the Members acting by vote via the Dapp may cause a Member to be compulsory withdrawn from the Company to the extent that such Members, in their reasonable discretion, determine it to be necessary, desirable, or appropriate, including, without limitation, to comply with applicable law or regulations, or to avoid a material adverse effect on the Company or the other Members. For fairness, any Member proposed to be compulsorily withdrawn from the Company shall be entitled to vote on the proposal with respect to any vote of the Members regarding their compulsory withdrawal.

## Fees and Expenses

(a) Organizational Expenses. The Company

PLAINTIFF0002730

shall bear all of its organizational
expenses and costs, and may amortize

these expenses for accounting and/or tax
purposes.

(b) Operating Expenses.



    (i) The Company shall bear all
costs and expenses relating to
its activities, maintenance,
and operations, including,
without limitation, all fees,
expenses, and costs associated
(directly or indirectly) with
the acquiring, holding,
monitoring, managing tokens,
including NFTs, software
development, including graphic
design, frontend, smart
contract, auditing and any
extraordinary expenses
(including, without
limitation, litigation-related
and indemnification expenses),
legal, regulatory, research,
consulting, compliance,
auditing, accounting, and
other professional fees and
expenses, the costs of any
administrator, the costs of
any reporting to Members,
expenses of any administrative
proceedings undertaken by the
applicable Member in its
capacity, expenses incurred in
connection with the
dissolution, liquidation, and
termination of the Company,
and other expenses related to
the Company as determined by
the Members by a vote via the
Dapp (collectively, and
together with organizational
expenses, the "Company
Expenses").

    (ii) Company expenses, costs
or other fees shall be
allocated to and funded by the

PLAINTIFF0002731

allocated to and funded by the
Company.

## Distributions; Dividends; Compensation; Sale of Assets

(a) The Company shall not make any
distributions of any kind and it will
not pay dividends of any kind to any
Member or director/officer or other
person who may have an ownership
interest in the Company.

(b) The Company may pay reasonable
compensation or reimburse reasonable
expenses to a Member or third-party for
services rendered, confer benefits on a
Member or third party in conformity with
its nonprofit purposes, repurchase a
membership and repay a capital
contribution made by a Member to the
extent authorized by this Agreement, or
make distributions of property to
Members upon winding up and termination
to the extent permitted by this
Agreement.

(c) Unless otherwise agreed to by
Members via a Majority Vote, the Company
shall not sell any assets.

## Dissolution

(a) General. The Company shall be
dissolved and its affairs shall be wound
up upon the earliest to occur of:

> (i) a determination of
> dissolution by majority vote
> of the Members; or

> (ii) the entry of a decree of
> judicial dissolution pursuant
> to the Act or other court of
> competent jurisdiction.

(b) Upon the dissolution of the Company,
assets shall be distributed for one or
more exempt purposes within the meaning
of section 501(c)(3) of the Internal

PLAINTIFF0002732



of section 501(c)(3) of the Internal
Revenue Code or the corresponding
section of any future federal tax code

and consistent with the goals and
purpose of the Company, or shall be
distributed to the federal government,
or to a state or local government, for a
public purpose. Any such assets not so
disposed of shall be disposed of by a
court of competent jurisdiction of the
county in which the principal office of
the corporation is then located,
exclusively for such purposes or to such
organization or organizations, as said
Court shall determine, which are
organized and operated exclusively for
such purposes.

## Limitations on Transfers

(a) Transfers. Governance Rights and
Tokens are not transferable. Members may
vote to allow or disallow the ability of
Members to transfer their Governance
Rights and/or Tokens by a vote
facilitated via the Dapp. Tokens may
become freely transferable to Ethereum
addresses outside of the Company
("External Addresses") by a vote of the
Members. Tokens issued for the purpose
of participating by governance via the
DApp, or Snapshot, are transferable via
"delegation". In the event the Tokens
become freely transferable to an
External Addresses, each Member agrees
that holders of the External Address
shall automatically be granted
Membership rights within the Company
which "new" Members shall be subject to
this Agreement.s

(b) Admission of Substituted Members. If
the transferee is not already a Member,
any transferee of Tokens that were
transferred in accordance with the
provisions of this Section shall be
admitted as a Member. The Company shall
not recognize for any purpose any
purported transfer of all or any part of

PLAINTIFF0002733

a Member's interest or Tokens in the Company, and no purchaser, assignee, transferee, or other recipient of all or any part of such Tokens shall become a Member hereunder unless:



> (i) Transfer of Tokens. The transferee of Tokens transferred the Tokens pursuant to this Section is admitted to the Company as a transferee Member and shall succeed to the rights and liabilities of the transferor Member with respect to such transferred Tokens.

> (ii) Effect of Death, Dissolution, or Bankruptcy of a Member. Upon the death, incompetence, bankruptcy, insolvency, liquidation, or dissolution of a Member, the rights and obligations of that Member under this Agreement shall accrue to that Member's successor(s), estate, or legal representative, and each such Person shall be treated as an unadmitted transferee of that Member's Tokens, as described in the Act.

## Books and Records; Accounting and Tax Matters

The Company shall not be obligated to keep any books or records beyond what is made available via the Dapp or available via the Ethereum blockchain.

## Waiver of Fiduciary Duties

> (a) Except as expressly set forth in this Section, in the event that any Member initiates any Proceeding against the Company and a judgment or order not subject to further appeal or discretionary review is rendered in respect of such Proceeding, as the case

PLAINTIFF0002734



may be, such Member shall be solely liable for all costs and expenses related to the Proceeding.

(b) Limitation by Law. No provision of this Agreement shall be construed to provide for the indemnification for any liability to the extent (but only to the extent) that such indemnification would be in violation of applicable law, but instead shall be construed so as to effectuate the provisions thereof to the fullest extent permitted by law.

(c) Waiver of Fiduciary Duties. To the fullest extent permitted by applicable law, notwithstanding any other provision of this Agreement or otherwise of applicable law, including any in equity or at law, no Member shall have any fiduciary duty to the Company or to any Member by reason of this Agreement or in its capacity as a Member, except that the Members shall be subject to the implied contractual covenant of good faith and fair dealing and the terms and provisions of this Agreement. The provisions of this Agreement, to the extent that they restrict or eliminate the duties and liabilities of the Members otherwise existing at law or in equity, are agreed by the parties hereto to replace such other duties and liabilities of the Members. Members will exercise any rights under this Agreement consistent with this Agreement.

## Intellectual Property Rights

(a) Grant of Rights. Members that join the Company via a payout or via a reserved tokens grant to the Company a perpetual, non-exclusive, royalty-free license and right, and all ancillary and subsidiary rights therein and thereto, throughout the world, to use, edit, modify, include, incorporate, adapt, record, reproduce, display, and archive any copyrightable work associated with any contributions (the "Work") in any

PLAINTIFF0002735



manner whatsoever, in or out of context, by any and all means and/or devices and in any and all media now or known hereafter—all in connection with the production, exhibition, distribution, exploitation, advertising, marketing, publicity, and promotion of the Company and its works such as the smart contracts, website, or partners, and its members but which license shall be limited for the nonprofit, charitable, or public goods purposes of the Company as defined herein. The term of this license begins whenever an individual or entity is added to the Company payouts, receives a payout, or reserved tokens, or any tokens from the Company thereby entering into this Agreement as a Member or is subsequently admitted as a Member pursuant to the terms of this Agreement (i.e., any and all Members). Any transfer of intellectual property or property is agreed to occur in the State of Nevada, regardless of the residence or location of the donor and in no instance is any transfer intellectual property from the United Kingdom to the Company subject to the Copyright Designs and Patents Act (CDPA) of 1988.

(b) Reservation of Rights. All rights in any donated works not specifically granted to the Company here are reserved by the donating Member. Specifically, the Company acknowledges that its use of the Work will not affect the Member's continued and separate copyright ownership in the Work, and that the Member may use the Work and license others to use the Work elsewhere or separately from the Company.

(c) Representations and Warranties, Indemnification. The Member represents and warrants that it is the owner of the entirety of the rights in and to the Work and that the Member has the full authorization and authority to enter into this Agreement and grant the

PLAINTIFF0002736



licenses herein. No other rights, permissions, or consents are necessary for the Company to use the Work in

accordance with the licenses granted herein, and no fees, royalties, or use payments of any kind are due to the Member or third parties in connection with the exercise of the licenses granted herein. The Member guarantees that the Work does not infringe any copyright or trademark, and that the Work does not violate any privacy, personal, proprietary, common law, or statutory right, of any Person. Licensor shall indemnify and hold Licensee (and its agents, Affiliates, assigns, heirs, or other successors in interest) harmless from any claim, loss, liability, damage, or expense (including reasonable attorneys' fees) arising out of any claim, lawsuit, or demand which is inconsistent with or arises out of warranties or representations in this Section.

## Amendments

(a) Except as otherwise provided herein, the terms and provisions of this Agreement may be amended only with the prior consent of Members acting by a vote via the Dapp.

(b) Amendments to this Agreement shall only be made via the Dapp.

## Service Provider

(a) Appointment and Compensation of Service Provider. The Company shall have the right to appoint a Service Provider to perform administrative services, responsibilities, and duties to carry on the Company's operations, including maintenance of the Dapp and underlying smart contracts. The Company shall have the right to provide the Service Provider with reasonable compensation.

PLAINTIFF0002737

(b) Limitation of Liability. Notwithstanding anything contained in this Agreement to the contrary, any

Service Provider of the Company shall not be liable for any error of judgment, mistake of law, or for any loss suffered by the Company, its Members, Persons affiliated with the Company or its Members, or third parties in connection with the matters to which this Agreement relates or for any services provided by the Service Provider, except for a loss resulting from the Service Provider's willful misfeasance, gross negligence, or reckless disregard in the performance of its duties under this Agreement. Furthermore, the Service Provider shall not be liable for: (i) any action taken or omitted in accordance with or in reliance upon written or oral instructions, advice, data, documents, or information (without investigation or verification) received by the Service Provider from any Person; (ii) any liability arising from the transfer or use of any Governance Rights or Tokens, including with respect to matters arising under applicable laws or private rights of action; or (iii) any action taken or omitted by the Company, its Members, any affiliated Persons of the Company or its Members, or any third party.

## General Provisions

(a) Notices. Subject to Section 5, all notices required to be delivered under this Agreement shall be effective only if sent by electronic mail or other form of electronic communication through the Dapp. In computing the period of time for the giving of any notice, the day on which the notice is given shall be excluded, and the day on which the matter noticed is to occur shall be included. If notice is given by electronic means, it shall be deemed given when sent; provided, that the

sending party does not have reason to believe that such notice was not delivered.

(b) Further Assurance. Each Member agrees to perform all further acts and to execute, acknowledge, and deliver any document (including tax forms and information) that may reasonably be necessary to carry out the provisions of this Agreement.

(c) Interpretation. Unless otherwise indicated to the contrary herein by the context or use thereof the words, "herein," "hereto," "hereof," and words of similar import refer to this Agreement as a whole and not to any particular section or paragraph hereof; words importing the masculine gender shall include the feminine and neutral genders, and vice versa; and words importing the singular shall include the plural, and vice versa; plural forms of singular defined terms shall have corresponding meanings and singular forms of plural defined terms shall have corresponding meanings; the section headings contained in this Agreement are for reference purposes only and shall not affect the interpretation of this Agreement; references to statutes or regulations include amendments and successor or replacement statutes or regulations.

(d) Severability. If any term or provision of this Agreement or any application of this Agreement shall be declared or held invalid, illegal, or unenforceable, in whole or in part, whether generally or in any particular jurisdiction, such provision shall be deemed amended, but only to the extent, necessary to cure such invalidity, illegality, or unenforceability, and the validity,

PLAINTIFF0002739

legality, and enforceability of the
remaining provisions, both generally and
in every other jurisdiction, shall not

in any way be affected or impaired
thereby.

(e) Binding Agreement. This Agreement
shall be binding upon and inure to the
benefit of the parties and their
respective heirs, executors,
administrators, successors, permitted
assigns, trustees, and legal
representatives.

(f) Creditors. None of the provisions of
this Agreement shall be for the benefit
of, or enforceable by, any creditor of
any Member or of the Company. No
creditor who makes a loan to the Company
may have or acquire, as a result of
making the loan, any direct or indirect
interest in the Company's property.

(g) Waiver. Any term or condition of
this Agreement may be waived at any time
by the party or parties entitled to the
benefit thereof, but only by a writing
signed by the party or parties waiving
such term or condition. No waiver of any
provision of this Agreement or of any
right or benefit arising hereunder shall
be deemed to constitute or shall
constitute a waiver of any other
provision of this Agreement (whether or
not similar), nor shall any such waiver
constitute a continuing waiver, unless
otherwise expressly so provided in
writing.

(h) Waiver of Partition; No Bill for
Company Accounting. Each Member hereby
irrevocably waives any and all rights
that it may have to maintain an action
for partition of any of the Company's
property. Each Member covenants that it
shall not file a bill for Company
accounting.

(i) Limitation of Liability. Except for
any remedies that cannot be excluded or

PLAINTIFF0002740



limited by law, no party, or its agent,
Affiliate, assigns, heirs, or other
successors in interest, will be liable
under this Agreement to another party,
or that party's agent, Affiliate,
assigns, heirs, or other successors in
interest, or other third party, for any
special, reliance, punitive, indirect,
incidental, or consequential damages or
lost or imputed profits, lost data, lost
property, or any costs and fees. This
limitation of liability may not be valid
in some jurisdictions. Parties to this
Agreement may have rights that cannot be
waived under some laws. The Company and
its Members do not seek to limit the
Company's or Members' warranties or
remedies to any extent not permitted by
law.

(j) Governing Law; Jurisdiction; Venue.
Notwithstanding the place where this
Agreement may be executed by any of the
parties hereto, the parties expressly
agree that all of the terms and
provisions hereof shall be construed in
accordance with and governed by the laws
of the State of Nevada, without giving
effect to the principles of choice or
conflicts of laws thereof that would
require that this Agreement be governed
by the laws of another state. Each of
the parties hereto consents and agrees
to the exclusive personal jurisdiction
of any state or federal court sitting in
Nevada, and waives any objection based
on venue or forum non conveniens with
respect to any action instituted therein
and agrees that any dispute concerning
the conduct of any party in connection
with this Agreement shall be heard only
in the courts described above.

(k) Arbitration. In consideration of the
promises in this agreement, the parties
agree that any and all controversies,
claims, or disputes with anyone
(including the Company and any employee,
officer, director, shareholder or

PLAINTIFF0002741



benefit plan of the company in their capacity as such or otherwise) arising out of, relating to, or resulting from

this Agreement, shall be subject to binding arbitration under the arbitration rules set forth in Nevada law and thereby agrees to waive any right to a trial by jury, include any statutory claims under state or federal law, including, but not limited to, claims under title vii of the civil rights act of 1964, the Americans with Disabilities Act of 1990, the Age Discrimination in Employment Act of 1967, the Older Workers Benefit Protection Act, the Worker Adjustment and Retraining Notification Act, discrimination or wrongful termination and any statutory claims. The parties further understand that this Agreement to Arbitrate also applies to any disputes that the Company may have with a Member.

(1) Procedure. The parties agree that any arbitration will be administered by the American Arbitration Association ("AAA") and that the neutral arbitrator will be selected in a manner consistent with its national rules for the resolution of employment disputes. The parties agree that the Arbitrator shall have the power to decide any motions brought by any party to the arbitration, including motions for summary judgment and/or adjudication and motions to dismiss and demurrers, prior to any arbitration hearing. The parties also agree that the arbitrator shall have the power to award any remedies, including attorneys' fees and costs, available under applicable law. The parties understand that they shall share equally in paying for the administrative or hearing fees charged by the arbitrator or AAA. The parties agree that the Arbitrator shall administer and conduct any arbitration in a manner consistent with the rules and that to the extent

PLAINTIFF0002742

that the AAA's national rules for the resolution of employment disputes conflict with the rules, the rules shall take precedence. The parties agree that the decision of the Arbitrator shall be in writing.

(m) Entire Agreement. This Agreement (including the exhibits hereto) supersedes any and all other understandings and agreements, either oral or in writing, among the parties with respect to the subject matter hereof and constitutes the sole agreement among the parties with respect thereto, including but not limited to the Original Agreement.

(n) Amendment. This Agreement may not be amended, modified, or revoked, in whole or in part, or any provisions waived, except via a vote occurring through the Dapp.

(o) Securities Laws Matters. THE TOKENS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, STATE SECURITIES LAWS, OR THE LAWS OF ANY COUNTRY OUTSIDE THE UNITED STATES. THEY PROVIDE NO RIGHT TO ANY PROFITS OR LOSSES OF THE COMPANY NOR IS THERE A REASONABLE EXPECTATION OF PROFIT FROM BUYING OR RECEIVING THE TOKENS. THE TOKENS ONLY PROVIDE THE HOLDER WITH GOVERNANCE RIGHTS THAT ARE SPECIFICALLY LIMITED IN THIS AGREEMENT.

## Definitions

**"Act"** has the meaning ascribed to that term in Section 1(a).

**"Affiliate"** means, with respect to any Person, any other Person controlling, controlled by, or under common control with such Person; in such context, "control" means the possession, directly or indirectly, of the power to direct the management or policies of another, whether through the ownership of voting securities, by contract, or otherwise

PLAINTIFF0002743



otherwise.



**"Agreement"** means this Guiding Principles Agreement of the Company.

**"Company"** means **[Entity-name],** a Nevada unincorporated nonprofit association.

**"Company Expenses"** has the meaning ascribed to that term in Section 7(b)(i).

**"Dapp"** means an online portal (**[Contribution-url]**) or other interactive software used by the Company including Snapshot (snapshot.org), which is maintained by the Company, its Members, or another Person.

**"Governance Rights"** means the entire interest of a Member in the Company, as measured by a Member's Tokens, including, without limitation, all rights and obligations contemplated or agreed to under this Agreement, and any right to vote on, consent to, or otherwise participate in any decision or action of or by the Members granted by this Agreement or the Act.

**"Majority Vote"** means the approval of Members holding at least a majority-in-interest of all claimed Tokens.

**"Member"** means each Person entering into this Agreement as a member or subsequently admitted as a member pursuant to the terms of this Agreement, but does not include any Person that has ceased to be a Member of the Company. If at any time there is only one Member, then all references to "Members" shall be deemed to mean "Member."

**"Non-Fungible Tokens"** ("NFT" or "NFTs") means a cryptographic token based on the Ethereum ERC 721, 1155, or similar standard or other blockchain based asset.

**"Person"** means an individual, corporation, association, partnership, joint venture, limited liability company, estate, trust, or any other legal entity.

**"Proceeding"** means any action, claim, suit, investigation, or proceeding by or before any

PLAINTIFF0002744

investigation, or proceeding by or before any
court, arbitrator, governmental body, self-
regulatory agency, or other agency.

**"Representative"** means a member, manager, officer,
director, partner, employee, or agent.

**"Service Provider"** means the Person appointed by
the Company to perform administrative services,
responsibilities, and duties to carry on the
Company's operations. The initial Service Provider
shall be **[Service-provider-name]**, its predecessor
entities, or any future entity of **[Service-
provider-name]**.

| Previous | Next |
|----------|------|
| Delaware UNA | README.md |

PLAINTIFF0002745



**LEGAL-TOOLS**  DAOLABS

Connect Wallet



    

Ownerless Foundation (Nonprofit Corporation)

Nonprofit Status

For Your Project

Documents

# Ownerless Foundation (Nonprofit Corporation)

An ownerless foundation is managed by a council or a board, which can itself be directed by token holders, an advisory comittee, or something else. Board/council members have fiduciary obligations to the community, which can be to promote community or product growth and development.

- Typically, token holders do not have a direct ownership relationship with the foundation.
- Foundations are corporations, and thus have annual reporting filing requirements.
- Foundations have legal personhood.
- Founders may be responsible for liabilities not arising from the foundation, or for liabilities that founders cause the foundation to take on.
- Foundations are not typically used for raising capital.

## Nonprofit Status

According to the IRS:

> Organizations organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, educational, or other specified purposes and that meet certain other requirements are tax exempt under Internal Revenue Code Section 501(c)(3).

There are specific requirements to receive this

PLAINTIFF0002746

exemption—for an overview, read *Exemption Requirements - 501(c)(3) Organizations*. In short, the organization must be operated **exclusively** for exempt purposes (such as those listed above), and none of its earnings may inure to any private shareholder or individual. Nonprofit corporations also have unique <u>filing requirements</u>.



If your project meets the criteria above, organizing as a nonprofit corporation can dramatically reduce or altogether eliminate your tax liability.

## For Your Project

Ownerless foundations can be effective for communities looking to delegate authority over certain assets (including tokens, intellectual property, or onchain assets) to a board or council with fiduciary duty to the wider community and its goals. Ownerless foundations are often utilized by protocol DAOs.

### Documents

- The <u>Foundation Bylaws</u> are a sensible starting point for forming a Washington ownerless foundation.
- IRS resources for <u>Charities and Nonprofits</u>

Previous
Nevada UNA

Next
Foundation Bylaws

PLAINTIFF0002747



**LEGAL-TOOLS**   DAOLABS

Connect Wallet



# Variables

President's Full Name

Ms. Jane Doe

Secretary's Full Name

Mr. John Doe

**Update document**

    

# BYLAWS OF FOUNDATION

# ARTICLE I; PRINCIPAL PLACE OF BUSINESS.

The principal office of the foundation, a Washington nonprofit corporation (the "Corporation"), shall be located at its principal place of business or such other place as the Board of Directors may designate. The Corporation may have such other offices, either within or without the State of Washington, as the Board of Directors may designate or as the business of the Corporation may require from time to time.

# ARTICLE II; MEMBERSHIP.

The Corporation shall have no members.

BYLAWS OF FOUNDATION

ARTICLE I; PRINCIPAL PLACE OF BUSINESS.

ARTICLE II; MEMBERSHIP.

ARTICLE III; BOARD OF DIRECTORS.

ARTICLE IV; OFFICERS.

ARTICLE V; TRANSACTIONS WITH OFFICERS AND DIRECTORS.

ARTICLE VI; INDEMNIFICATION.

ARTICLE VII; RECORDS.

ARTICLE VIII; AMENDMENTS.

CERTIFICATE OF ADOPTION

**ARTICLE III; BOARD OF DIRECTORS**

PLAINTIFF0002748

# ARTICLE III; BOARD OF DIRECTORS.



**3.1 Composition.** The management of the affairs of the Corporation shall be vested in a Board of Directors. The number of directors shall be one (1) until amended in accordance with these Bylaws. The Board shall elect from amongst the directors a President who shall be the presiding officer of the Board and shall hold the office of President of the Corporation.

**3.2 Tenure.** The term of a director shall be for three (3) years or until a successor is elected and assumes his or her duties, whichever is later except in the event of an earlier death, removal or resignation. The directors shall have such qualifications as the Board may prescribe by resolution or by amendment to these Bylaws.

**3.3 Election.** The members of the Board shall be nominated by the President or a designated committee of the Board. Directors shall be elected from those so nominated by a majority vote of the entire, then existing Board of Directors at any regular or special meeting of directors, including those whose terms have expired but whose successors have not yet been elected. The directors so elected shall assume the duties of the term for which they are so elected at the conclusion of such regular or special meeting of the Board, and shall remain in office until their successors assume their duties. Directors shall be eligible for re-election.

**3.4 Voting.** Wherever these Bylaws provide for a vote by the directors, the vote required shall be a simple majority of the number of directors present and voting at the meeting, provided a quorum is present, unless these Bylaws clearly indicate that a vote of a certain percentage of the entire Board of Directors is required.

**3.5 Removal.** A director may be removed by a two-thirds vote of the entire Board of Directors.

**3.6 Vacancies.** Any vacancy occurring on the Board of Directors by reason of the death, resignation, or removal of a director may, but need not, be filled upon election of a successor by a majority vote of the entire Board of Directors. Such

PLAINTIFF0002749



successor shall serve during the unexpired term of
the director whose position became vacant.

3.7 **Regular Meetings.** The dates, times and places
of regular meetings of the Board shall be as
designated from time to time by the Board upon
giving of at least three (3) days advance notice to
each director; provided, that no notice of a
regular meeting shall be required if each director
has been furnished with a written schedule of the
dates, times and locations of two or more regular
meetings at least three (3) days in advance of the
first meeting on the schedule. Any member of the
Board may waive notice of any regular meeting.
Attendance at a meeting shall constitute waiver of
notice of such meeting except where a director
attends for the express purpose of objecting to the
transaction of any business because the meeting is
not lawfully called.

3.8 **Special Meetings.** Special meetings of the Board
may be called by the President or by any one (1)
director. Notice of any special meeting of the
Board shall be given at least three (3) days prior
to the meeting to each member of the Board except
that a special meeting of the Board for the express
purpose of amending either the Articles of
Incorporation or amending the Bylaws of the
Corporation shall require notice to be given at
least ten (10) days prior to said meeting. The
business to be transacted at, and the purpose of,
any such special meeting of the Board of Directors
shall be specified in the notice of the meeting.
Any member of the Board may waive notice of any
special meeting. Attendance at a meeting shall
constitute waiver of notice of such meeting except
where a director attends for the express purpose of
objecting to the transaction of any business
because the meeting is not lawfully called.

3.9 **Notice of Meetings.** Notice of the date, time,
and place of any meeting of the Board of Directors
or any committee designated by the Board may be
delivered by mail, private carrier or personal
delivery; telegraph or teletype; telephone, wire or
wireless equipment which transmits a facsimile of
the notice; electronic transmission; or personal
communication over the telephone or otherwise.
Notice to directors in an electronic transmission

PLAINTIFF0002750



is effective only with respect to directors that have consented, in the form of a record, to receive electronically transmitted notices and designated

in the consent the message format accessible to the recipient, and the address, location or system to which the notice may be electronically transmitted.

**3.10 Effective Date of Notice.** Written notice is effective at the earliest of the following: (a) if notice is sent to the director's address, telephone number, or other number appearing on the records of the Corporation, when dispatched by telegraph, teletype or facsimile equipment; (b) when received; or (c) when mailed, if mailed with first class postage prepaid correctly addressed to the director's address as shown in the Corporation's records. Notice provided in an electronic transmission is effective when it is electronically transmitted to an address, location or system designated by the director for that purpose or has been posted on an electronic network and a separate record of the posting has been delivered to the director together with comprehensible instructions regarding how to obtain access to the posting on the electronic network. Oral notice is effective when received.

**3.11 Telephonic Meetings.** Members the Board of Directors (or any committee designated by the Board) may participate in a meeting of such Board (or Committee) by means of a conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other at the same time and participation by such means shall constitute presence in person at the meeting.

**3.12 Quorum.** One more than fifty percent (50%) of the number of directors then in office shall constitute a quorum for the transaction of business at any regular or special meeting.

**3.13 Unanimous Consent.** Any action required to be taken at a meeting of the directors of the Corporation, or which may be taken at such a meeting, may be taken without a meeting if a consent in the form of a record setting forth the action so taken is executed by all of the directors. Such consent shall have the same force and effect as a unanimous vote.

PLAINTIFF0002751

and effect as a unanimous vote.

3.14 **Committees.** The Board of Directors by resolution adopted by a majority of the directors in office may designate and appoint one or more committees, each of which shall consist of two (2) or more directors, which committees to the extent provided in such resolution, shall have and exercise the authority of the Board of Directors in the management of the Corporation.

# ARTICLE IV; OFFICERS.

4.1 **Officers.** The officers of the Corporation shall be a President, one or more Vice Presidents, a Secretary, and a Treasurer. The Board may elect or appoint such other officers as it shall deem desirable, who shall have such authority and perform such duties as may be prescribed from time to time by the Board. Any two (2) or more offices may be held by the same person, except the offices of President and Secretary. None of the officers except the President shall be required to be a member of the Board of Directors.

4.2 **Election.** Officers shall be elected upon receiving a majority vote of the entire Board of Directors at any regular or special meeting of the Board.

4.3 **Term of Office.** The officers of the Corporation shall each serve for a term of one (1) year, which term shall start at the conclusion of the meeting at which they are elected and continue until their successors are elected and qualified. Officers may be elected by the Board of Directors to succeed themselves. Any officer may be removed by the affirmative vote of a majority of the entire Board of Directors (or, if such officer is a director, a majority of all other members of the Board of Directors).

4.4 **President.** The President shall be a member of the Board of Directors, and shall preside at all meetings of the Board of Directors. The President shall be the chief executive officer of the Corporation and, subject to the direction and control of the Board, shall supervise and control all of the assets, business, and affairs of the Corporation. The President may be assigned other

PLAINTIFF0002752

duties from time to time by the Board of Directors.



**4.5 Vice President.** In the absence or disability of the President, the Vice President shall perform all the duties of the President and when so acting shall have all the powers of, and be subject to all the restrictions upon, the President; provided that no such Vice President shall assume the authority to preside at meetings of the Board of Directors unless such Vice President is a member of the Board. The Vice President may be assigned other duties from time to time by the Board of Directors.

**4.6 Secretary.** The Secretary shall: (a) keep the minutes of the Board meetings and any minutes which may be maintained by committees of the Board; (b) see that all notices are duly given in accordance with the provisions of these Bylaws or as required by law; (c) be custodian of the corporate records of the Corporation; and (d) in general perform all duties incident to the office of Secretary and such other duties as from time to time may be assigned by the Board or the President.

**4.7 Treasurer.** The Treasurer shall have charge and custody of and be responsible for all funds and securities of the Corporation; receive and give receipts for moneys due and payable to the Corporation from any source whatsoever, and deposit all such moneys in the name of the Corporation in banks, trust companies or other depositories selected in accordance with the provisions of these Bylaws; and in general perform all of the duties incident to the office of Treasurer and such other duties as from time to time may be assigned by the Board or the President.

**4.8 Vacancies.** Any vacancy occurring by reason of the death, resignation, or removal of an officer may, but need not, be filled from time to time upon election of a successor by a majority vote of the entire Board of Directors. Such successor shall serve during the unexpired term of the officer whose position became vacant.

# ARTICLE V; TRANSACTIONS WITH OFFICERS AND DIRECTORS.

PLAINTIFF0002753



5.1 **Conflicts.** No transaction between the Corporation and any other corporation and no act of

the Corporation shall in any way be affected or invalidated merely by the fact that any director or officer of the Corporation is interested in, or is a director or officer of such other corporation.

5.2 **Disclosure.** With regard to any transaction with a director or officer or with a corporation, firm, entity or association wherein they may be or become interested, the existence and nature of the interest of the officer or director must be disclosed or known to the Board of Directors at or prior to the meeting at which such transaction is authorized or confirmed. The Corporation may pay compensation in a reasonable amount to its officers and directors for services rendered; provided, however, any transaction with an officer or director or with a corporation, firm, entity or association wherein they may be or become interested must be approved by a majority of the disinterested members of the Board.

5.3 **Loans to Officers or Directors Prohibited.** No loans shall be made by the Corporation to its directors or officers. The directors of the Corporation who vote for or assent to the making of a loan to a director or officer of the Corporation, and any officer or officers participating in the making of such loan, shall be jointly and severally liable to the Corporation for the amount of such loan until the repayment thereof.

# ARTICLE VI; INDEMNIFICATION.

6.1 **Right to Indemnification.** Each individual (hereinafter an "indemnitee") who was or is made a party or is threatened to be made a party to or is otherwise involved (including, without limitation, as a witness) in any actual or threatened action, suit or proceeding, whether civil, criminal, administrative or investigative and whether formal or informal (hereinafter a "proceeding"), by reason of the fact that he or she is or was a director or officer of the Corporation or that, while serving as a director or officer of the Corporation, he or she is or was also serving at the request of the Corporation as a director, officer, partner,

PLAINTIFF0002754



trustee, employee or agent of another foreign or
domestic corporation or of a foreign or domestic

partnership, joint venture, trust, employee benefit
plan or other enterprise, whether the basis of the
proceeding is alleged action in an official
capacity as such a director, officer, employee,
partner, trustee, or agent or in any other capacity
while serving as such director, officer, employee,
partner, trustee, or agent, shall be indemnified
and held harmless by the Corporation to the full
extent permitted by applicable law as then in
effect, against all expense, liability and loss
(including, without limitation, attorneys' fees,
judgments, fines, ERISA excise taxes or penalties
and amounts to be paid in settlement) incurred or
suffered by such indemnitee in connection
therewith, and such indemnification shall continue
as to an indemnitee who has ceased to be a
director, officer, employee, partner, trustee, or
agent and shall inure to the benefit of the
indemnitee's heirs, executors and administrators;
provided, however, that no indemnification shall be
provided to any such indemnitee if the Corporation
is prohibited by the Washington Nonprofit
Corporation Act or other applicable law as then in
effect from paying such indemnification; and
provided, further, that except as provided in this
Article with respect to proceedings seeking to
enforce rights to indemnification, the Corporation
shall indemnify any such indemnitee in connection
with a proceeding (or part thereof) initiated by
such indemnitee only if such proceeding (or part
thereof) was authorized or ratified by the Board of
Directors. The right to indemnification conferred
in this section shall be a contract right and shall
include the right to be paid by the Corporation the
expenses incurred in defending any proceeding in
advance of its final disposition (hereinafter an
"advancement of expenses"). Any advancement of
expenses shall be made only upon delivery to the
Corporation of a written undertaking (hereinafter
an "undertaking"), by or on behalf of such
indemnitee, to repay all amounts so advanced if it
shall ultimately be determined by final judicial
decision from which there is no further right to
appeal that such indemnitee is not entitled to be
indemnified for such expenses under this section
and upon delivery to the Corporation of a written

PLAINTIFF0002755

affirmation (hereinafter an "affirmation") by the
indemnitee of his or her good faith belief that
such indemnitee has met the standard of conduct
necessary for indemnification by the Corporation
pursuant to this article.

6.2 **Right of Indemnitee to Bring Suit.** If a written
claim for indemnification under this Article is not
paid in full by the Corporation within sixty (60)
days after the Corporation's receipt thereof,
except in the case of a claim for an advancement of
expenses, in which case the applicable period shall
be twenty (20) days, the indemnitee may at any time
thereafter bring suit against the Corporation to
recover the unpaid amount of the claim. If
successful, in whole or in part, in any such suit
or in a suit brought by the Corporation to recover
an advancement of expenses pursuant to the terms of
an undertaking, the indemnitee shall be entitled to
be paid also the expenses of prosecuting or
defending such suit. The indemnitee shall be
presumed to be entitled to indemnification under
this article upon submission of a written claim
(and, in an action brought to enforce a claim for
an advancement of expenses, where the required
undertaking and affirmation have been tendered to
the Corporation) and thereafter the Corporation
shall have the burden of proof to overcome the
presumption that the indemnitee is so entitled.
Neither the failure of the Corporation (including
the Board of Directors or independent legal
counsel) to have made a determination prior to the
commencement of such suit that indemnification of
the indemnitee is proper in the circumstances nor
an actual determination by the Corporation
(including the Board of Directors or independent
legal counsel) that the indemnitee is not entitled
to indemnification shall be a defense to the suit
or create a presumption that the indemnitee is not
so entitled.

6.3 **Nonexclusivity of Rights.** The right to
indemnification and the advancement of expenses
conferred in this article shall not be exclusive of
any other right which any person may have or
hereafter acquire under any statute, provision of
the Articles of Incorporation or Bylaws of the
Corporation, general or specific action of the
Board of Directors, contract or otherwise.

PLAINTIFF0002756



**6.4 Insurance, Contracts and Funding.** The Corporation may maintain insurance, at its expense,

to protect itself and any individual who is or was a director, officer, employee or agent of the Corporation or who, while a director, officer, employee or agent of the Corporation, is or was serving at the request of the Corporation as a agent of another foreign or domestic corporation, partnership, joint venture, trust, employee benefit plan or other enterprise against any expense, liability or loss asserted against or incurred by the individual in that capacity or arising from the individual's status as a director, officer, employee or agent, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under the Washington Nonprofit Corporation Act. The Corporation may enter into contracts with any director, officer, employee or agent of the Corporation in furtherance of the provisions of this article and may create a trust fund, grant a security interest or use other means (including, without limitation, a letter of credit) to ensure the payment of such amounts as may be necessary to effect indemnification as provided in this article.

**6.5 Indemnification of Employees and Agents of the Corporation.** The Corporation may, by action of the Board of Directors, grant rights to indemnification and advancement of expenses to employees and agents of the Corporation with the same scope and effect as the provisions of this article with respect to the indemnification and advancement of expenses of directors and officers of the Corporation or pursuant to rights granted pursuant to, or provided by, the Washington Nonprofit Corporation Act or otherwise.

**6.6 Persons Serving Other Entities.** Any individual who is or was a director, officer or employee of the Corporation who, while a director, officer or employee of the Corporation, is or was serving (a) as a director or officer of another foreign or domestic corporation of which a majority of the shares entitled to vote in the election of its directors is held by the Corporation, (b) as a trustee of an employee benefit plan and the duties of the director or officer to the Corporation also

PLAINTIFF0002757

impose duties on, or otherwise involve services by, the director or officer to the plan or to participants in or beneficiaries of the plan, or

(c) in an executive or management capacity in a foreign or domestic partnership, joint venture, trust or other enterprise of which the Corporation is an equity interest holder or in which a wholly owned subsidiary of the Corporation is a general partner or has a majority ownership or interest shall be deemed to be so serving at the request of the Corporation and entitled to indemnification and advancement of expenses under this article.



## ARTICLE VII; RECORDS.

The Corporation shall keep at its principal office or its registered office in this state the following documents in the form of a record:

1. Current Articles of Incorporation and Bylaws;

2. Correct and adequate statements of accounts and finances;

3. A list of the names and addresses of the officers and directors; and

4. Minutes of proceedings of the Board and any minutes which may be maintained by a Board Committee.

## ARTICLE VIII; AMENDMENTS.

These Bylaws may be altered, amended or repealed, and new Bylaws may be adopted by a vote of not less than a majority of the entire Board.

## CERTIFICATE OF ADOPTION

The foregoing Bylaws were read, approved, and duly adopted by the Board of Directors of the foundation on the undersigned date, and the President and Secretary of the Corporation were empowered to authenticate such Bylaws by their signatures below.

| PRESIDENT | SECRETARY |
| --- | --- |

PLAINTIFF0002758



| | |
|---|---|
| Signature: | Signature: |
| ---------------------- | ---------------------- |
| **PRESIDENT** | **SECRETARY** |
| | |
| Print Name: [President-name] | Print Name: [Secretary-name] |
| Role: President | Role: Secretary |

**Previous**
README.md

**Next**
Trusts



**LEGAL–TOOLS**   DAOLABS

<span style="background:red;color:white">Connect Wallet</span>



# Variables

### Agreement Date
```
01/01/2023
```

### Trust Name
```
Road Runner Preservation Trust
```

### Trust City
```
Kalamazoo
```

### Trust State
```
Michigan
```

### Grantor's Full Name
```
Mr John Doe
```

### Trustee's Full Name
```
Mrs. Jane Doe
```

### Beneficiary individual(s) or organization(s)
```
Mr. John and Jane Doe; ACME CORPORATION; and Acme LLC.
```

### Notary City
```
Wichita
```

### Notary's County
```
Sedgwick County
```

### Notary's State
```
Kansas
```

<span style="background:red;color:white">Update document</span>

For Your Project Documents

PLAINTIFF0002760

1/4

   



According to the <u>IRS</u>:

> *In general, a trust is a relationship in which one person holds title to property, subject to an obligation to keep or use the property for the benefit of another.*

Put otherwise, a trust is a right in property which is held by one party for the benefit of another. The *trustee* holds title to the trust property, and the *beneficiary* receives the benefits of the trust. The person or entity transferring property to the trust is the *settlor*.

- Trusts do not have legal personhood. The trustee is the principal actor and carries out the purposes of the trust in his own name. This can be beneficial from a tax perspective—beneficiaries are often taxed as the direct owners of the trust property.
- Trusts are flexible. Usually, provisions of a trust can be whatever is agreed between the settlor and the trustee.
- Trusts can be valuable for maintaining confidentiality. <u>The terms of a Trust Agreement</u> are usually not accessible to third parties. Instead, a <u>Declaration of Trust</u> which states the high-level terms of the agreement may be notarized and provided to 3rd parties who are required to validate ownership. The trustee may be required to provide the Certificate of Trust to a bank in order to open an account in which to deposit the property.
- Typically, trusts do not need to be filed. Unless there is a lawsuit concerning your trust, it usually won't become a matter of public record.

Trusts are established to provide legal protection for the trustor's assets, to make sure they are distributed according to the wishes of the trustors, to save time, to reduce paperwork, to avoid or reduce inheritance or estate taxes, to shield assets from 3rd parties, or a number of other applications.

Trusts are versatile legal devices: there are at least six broad categories of trust, including living,

PLAINTIFF0002761

testamentary, funded, unfunded, revocable, and
irrevocable.

# For Your Project

Juicebox projects have facilitated some of the largest
fundraisers of all time. A one time fundraise may be
accomplished via a _trust agreement_ where as the
contributors are the settlors, the individual who
created the project is the trustee, and the beneficiary
is the individual(s) who will receive the funds.

You can also use a trust for a _GoFundMe_ style
fundraiser to pay for medical or other expenses for a
family member, a friend, or even a pet.

Whether an attorney is available to help prepare the
documents, or you edit the documents and make them
available to the community, this device has substantial
statutory law protecting the contributors and the
beneficiary.

## Documents

- A _Trust Agreement_, which is used to establish a
  trust.
- A _Declaration of Trust_, which is provided to third
  parties.

Also see:

- The _Uniform Trust Code_.

> ⓘ By stat te, a tr st may be establishe  for a
> pet's lifetime, or in the case of multiple pets,
> the trust may provide for the care, alternative
> caregivers, and day-to-day requirements
> including emergency or extraordinary care for
> each pet. The term of such a trust extends
> through the lifetime of the last surviving pet,
> leaving our furry friend's progeny at the mercy
> of the elements.[1]

# Footnotes

PLAINTIFF0002762

1. <u>Can you trust your pet? A primer on Florida Pet Trusts</u> ↩

**Previous**
Foundation Bylaws

**Next**
Trust Agreement



PLAINTIFF0002763



**LEGAL-TOOLS** DAOLABS

Connect Wallet



# Variables

**Agreement Date**

01/01/2023

**Trust Name**

Road Runner Preservation Trust

**Trust City**

Kalamazoo

**Trust State**

Michigan

**Grantor's Full Name**

Mr John Doe

**Trustee's Full Name**

Mrs. Jane Doe

**Beneficiary individual(s) or organization(s)**

Mr. John and Jane Doe; ACME CORPORATION; and Acme LLC.

**Notary City**

Wichita

**Notary's County**

Sedgwick County

**Notary's State**

Kansas

Update document

GRANTOR

ARTICLE I

ARTICLE II

  Beneficiaries

ARTICLE III

  Assets and Property Allocations

ARTICLE IV

  Fiduciary Powers of Trustee

ARTICLE VI

  Additional Property

ARTICLE VI

  Successor Trustee

ARTICLE VII

  Situs

ACCEPTANCE CLAUSE

PLAINTIFF0002764

   



[Entity-name]
REVOCABLE LIVING TRUST AGREEMENT
[Date]
[Entity-city], [Entity-state]

# GRANTOR

**[Grantor-name],** individually (hereinafter "Grantor"),
hereby establishes a Trust upon the conditions and for
the purposes hereafter set forth and as of the date
this document is executed by the Grantor.

This Revocable Living Trust Agreement shall contain the
Grantor's wishes and directions regarding purpose
outlined herein unless further amended in writing. No
reference to the original Trust documents shall be
required to execute the terms of this Trust.

# ARTICLE I

Lifetime Rights and Appointment of Trustees

This Trust is specifically set up to provide financial
resources and economic support for the beneficiary
named below. Grantor has deemed it appropriate to
provide for the beneficiary and hereby establishes the
Trust primarily to achieve those goals. The Trustee
shall be empowered and directed to do the following:

  (1) Make any payment of income or principal
  of this Trust as Grantor may from time to
  time direct;

  (2) Pay or apply such part or all of the
  income and principal of this Trust as Grantor
  or the co-Trustees may deem necessary to
  fulfill the goals of the Trust;

  (3) Take any other action that Grantor may
  deem necessary for the goals and aims of the
  Trust.

  (4) The initial Trustee **[Trustee-name],** who
  shall serve for as long as Grantor deems
  necessary.

PLAINTIFF0002765

# ARTICLE II

## Beneficiaries

The beneficiaries of the Trust shall be: **[Beneficiary-name]**.

Any time that the beneficiary (neither beneficary, if more than one) is no longer living than all assets of the Trust shall revert to the Grantor.



# ARTICLE III

## Assets and Property Allocations

- **SECTION 1:** Option to fund the Trust

It is intended that the Grantor will fund the Trust with sufficient resources necessary to carry out the purpose of the Trust, which shall include, but are not limited to providing sufficient funding to allow beneficiaries to pay for the basic necessities of life.

- **SECTION 2:** Death of the Grantor

If the Grantor dies while the Trust is still operational and valid then the roles, duties and rights of the Grantor shall pass to the Trustee. It is not anticipated that the Trust shall generate any income or have any discernible assets that would require a plan for distribution in this founding document. Any assets that are in the possession of the Trust shall pass to the Beneficiaries and the Trustee shall determine the use of any assets held by the Trust at the time of the demise of the Grantor.

# ARTICLE IV

## Fiduciary Powers of Trustee

Grantor hereby grants the Trustee (and any successor Trustee or co-Trustee) the authority and power to exercise, in his or her sole discretion and without court order, in respect of any property forming part of any Trust created under this agreement or otherwise in its possession hereunder, all powers conferred by law upon Trustee, or expressed in this agreement, and we

PLAINTIFF0002766

intend that the powers so granted be construed in the broadest possible manner. In addition, the Trustee

shall also have the power, authority and discretion hereinafter set forth:



(1) To take any action necessary to manage and operate the Trust: To make any decision he/she deems necessary to manage and operate the Trust or any other entity deemed appropriate and necessary by the Grantors to carry out the purpose of the Trust.

(2) Transactions Between Related Entities: To transfer or move assets of any entity established or created by this Trust, as Executor or Trustee or any other Trust or estate, to fulfill the goals and purposes of the Trust.

(3) Court Accounting and Bond Excused: The Trustee shall not be required to qualify, to make or file any inventory, appraisal, account or report to any court or to give bond while he/she serves as co-Trustee.

(4) Withholding for Taxes: To withhold distribution of any amount of property sufficient, in his/her sole judgment, to cover any liability that may be imposed on the Trustee for taxes until such liability is finally determined and paid.

(5) The Trustee shall not be personally liable to any Grantor or beneficiary or other party interested in this Trust, or to any third parties, for any claim against the Trust for any action undertaken by the Trust to achieve the purpose of the Trust; provided that the Trustee shall not be excused from liability for his/her own wrongful or willful acts.

(6) The Trust and the Grantor shall indemnify and hold harmless Trustee for any action taken by Trustee on behalf of the Trust and at the direction of Grantor in good faith in the event any other entity or third party files a claim or suit naming Trustee.

PLAINTIFF0002767

(7) Miscellaneous Powers:

(a) To consent to the reorganization, consolidation, merger, liquidation, readjustment or other change in any corporation, company or association;

(b) To compromise, settle, arbitrate, or defend any claim or demand in favor of or against the Trust;

(c) To incur and pay the ordinary and necessary expenses of administration, including but not limited to reasonable attorneys' fees, accounting fees, investment fees, etc.

(d) To act through an agent or attorney-in-fact, by and under any power duly executed by any the Trustee, to the extent permitted by law;

(e) The creation of any business entity, including a corporation, for any purpose deemed appropriate by the Trustee, including the retention of experts and professionals to assist in the formation and management of the corporation;

(f) The creation of any banking account, payroll account, or other financial account deemed necessary by the Trustee to manage the affairs of the Trust or an entity controlled by the Trust;

(g) The Trustee may freely act under all or any of the powers by this agreement given to him in all matters concerning the Trust, after forming their judgment based upon all the circumstances of any

PLAINTIFF0002768

particular situation as to the wisest and best course to pursue in the interest of the Trust and the

beneficiaries, without the necessity of obtaining the consent or permission of any interested person, or the consent or approval of any court.



# ARTICLE VI

## Additional Property

Grantor reserves the right to establish or add to the corpus of the Trust, and any property added shall be held, administered, and distributed as part of the Trust.

# ARTICLE VI

## Successor Trustee

The Grantor shall have the power to change or appoint a successor Trustee at any time.

# ARTICLE VII

## Situs

- **SECTION 1: JURISDICTION.** This Trust has been executed and the Trust created by this Agreement shall be regulated and governed in accordance with the laws of the State of Washington. This document is intended to comply with all statutory requirements as found in RCW 11.103 et seq.

- **SECTION 2: COUNTERPART SIGNATURE.** This Agreement may be executed in several counterparts, as long as each party to this Agreement executes at least one such counterpart. Each of such counterparts shall be an original, but all of the counterparts, when taken together, shall constitute one and the same instrument and shall become effective when each party hereto has executed at least one such counterpart. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S.

PLAINTIFF0002769

federal ESIGN Act of 2000, Uniform Electronic Transactions Act or other applicable law) or other transmission method and any counterpart so

delivered will be deemed to have been duly and validly delivered and be valid and effective for all purposes.



# ACCEPTANCE CLAUSE

In Witness Whereof, the Grantor and the Trustee do hereby acknowledge execution of this Agreement.

[Signature page to follow]

| GRANTOR |
| --- |
| Signature: _____ |
| Print Name: [Grantor-name] |
| Role: Grantor |

Executed this **[Date]**, at **[Entity-city], [Entity-state]**.

| | |
| --- | --- |
| STATE OF [Notary-state] | ) |
| | )ss. |
| COUNTY OF [Notary-county] | ) |

On this _____, before me personally appeared **[Grantor-name]**, to me known to be described in and who executed the within and foregoing instrument and acknowledged that he signed the same as his/her free and voluntary act and deed for the uses and purposes therein mentioned. Given under my hand and official seal the day and year last above written.

Notary Public in and for the State of [Notary-state],

Residing at [Notary-city], [Notary-state], Notary Public:

My Appointment expires:

| Previous | Next |
| --- | --- |
| Trusts | Declaration of Trust |

PLAINTIFF0002770



**LEGAL—TOOLS**    DAOLABS

**Connect Wallet**



# Variables

**Agreement Date**

mm/dd/yyyy

**Trust Name**

Road Runner Preservation Trust

**Trustee's Full Name**

Mr. John Doe

**Beneficiary's Full Name**

Mrs. Jane Doe

**Trust Property Description**

500 rubber band ; 2 tenni  ball ; and 7 cryptopunk

**Update document**



[Entity-name]
Revocable Living Trust

THE TRUST DECLARATION made as of **[Date]** between **[Trustee-name]** (the "Trustee") and **[Beneficiary-name]** (the "Beneficiaries")

WHEREAS the Trust is the registered owner of [Property-description] (described herein as the "Property").

NOW THEREFORE this Trust Declaration witnesses as follows:

**PLAINTIFF0002771**

1. The Trustee hereby declares that he
   holds the Property in the name of the

   Trust for the benefit of the
   Beneficiaries in equal share alike.

2. The Trustee will at the request and cost
   of the Beneficiaries, transfer the
   Property to the Beneficiaries at such
   time or times and in such manner, or
   otherwise deal with the Property as the
   Beneficiaries shall direct or appoint,
   and will at all times execute and do all
   such documents and things as may be
   necessary to procure the appropriate
   registration to the Property to give
   effect to such transfer or dealing or if
   so required to protect the interest of
   the Beneficiaries.

3. The Beneficiaries hereby declare that
   the Corpus of the Trust and any proceeds
   of its sale thereof shall be held in
   trust for them and that all expenditures
   incurred in respect of the Property
   shall be borne by the Beneficiaries.

4. The Beneficiaries hereby covenant with
   the Trustee that they, and their heirs,
   executors, successors and assigns will
   at all times keep the Trustee
   indemnified against all costs, damages,
   expenses, claims, proceedings and
   demands in respect of the Property and
   any dealing therewith authorized by it.

5. The Trustee shall not be required to
   incur any expenditure in respect of the
   Property except in so far as monies in
   respect thereof shall have been provided
   by the Beneficiaries for that purpose.

IN WITNESS WHEREOF the Parties hereto have executed
this Trust Declaration as of the date first written
above.

[Signature page to follow]

| TRUSTEE AND WITNESS | BENEFICIARY AND WITNESS | | | :--
-------------------------------- | :----------------
.                              . .

PLAINTIFF0002772

------------------- | ---------------- | | Signature:

----------------------- | Signature:
----------------------- | | Print Name: [Trustee-name]

| Print Name: [Beneficiary-name] | | Role: Trustee and Witness | Role: Beneficiary and Witness | | Date: **[Date]** | | Date: **[Date]** |

**Previous**
Trust Agreement

**Next**
Promissory Note (Loans)

 **LEGAL—TOOLS** DAOLABS

**Connect Wallet**

Usage
Documents
Note

     

A *promissory note*, or a note payable, is an unconditional promise to pay a specific amount of money or property (the "principal") to another party at a specific time or times. Promissory notes usually include interest, and may contain additional terms, including terms for paying in installments, penalties, and more.

- Promissory notes are an agreement, and do not typically need to be filed with any authorities.
- Secured promissory notes are secured by some type of collateral, such as a piece of property or asset, like an NFT.
- Under an unsecured promissory note, the lender has no right to any property or collateral, even if the loaned funds were used to purchase it. Usually, loans which are unsecured carry higher interest rates.
- As long as the interest rate is legal, there is no limit to the number of promissory notes a party may borrow or enter into.

## Usage

Promissory notes can be used whenever money or property will be borrowed and repaid at a later time. This could be for the purpose of purchasing an asset, funding a production, or another purpose.

For your project, keep in mind that any two entities can agree to promissory notes, and that there is no limit to the number of promissory notes a party may enter into. The project creator, community members, builders, or specific individuals or entities can all be lenders or borrowers.

PLAINTIFF0002774

# Documents

This website includes templates for:

- A <u>Simple IOU</u>,
- A <u>Secured Promissory Note</u>.



# Note

Promissory notes are often abused by individuals or entities with no intention of repaying them. Individuals with secret off shore undisclosed assets in the Cayman Islands may use promissory notes to represent magical funds or assets. Entering into illusory promissory notes is questionable legally, and likely results in the money or benefit being confirmed considered income. Therefore, aside from honestly entering into a promissory note with the intention of repaying it, its important the following features are well understood.

1. The parties involved;
2. the amount of the loan;
3. the amount to be repaid;
4. when and how often the payments are to be made;
5. repayment, with dates if possible;
6. what happens when a payment is late or isn't repaid;
7. interest rate, whether fixed variable or increases over time;
8. the party responsible for repaying the loan;
9. any applicable collateral or security;
10. any rights transferring or assigning the promissory note (promissory notes can be transferable);
11. the date and place of issuance; and,
12. the signature of the party offering.

<table>
<tr><td>Previous<br><span style="color:blue">Declaration of Trust</span></td><td>Next<br><span style="color:blue">Sim le I</span></td></tr>
</table>

PLAINTIFF0002775



**LEGAL—TOOLS**   DAOLABS

Connect Wallet



# Variables

**Agreement Date**

01/01/2023

**Lender's Full Name**

Mrs. Jane Doe

**Lender's Street Address**

123 Main Street, Apt. 45

**Lender's City**

Kalamazoo

**Lender's State**

Michigan

**Lender's ZIP Code**

49001

**Lender's Email Address**

wile@acme.xyz

**Borrower's Full Name**

Mr. John Doe

**Borrower's Street Address**

123 Main Street, Apt. 45

**Borrower's City**

Wichita

**Borrower's State**

Kansas

**Borrower's ZIP Code**

67052

**Borrower's Email Address**

wile@acme.xyz

1. THE PARTIES.

2. LOAN TERMS.

3. PAYMENTS.

PLAINTIFF0002776

Amount to be Borrowed (USD)

100

Interest Rate (Percentage)

10

Interest Rate's Compound Frequency (Per)

Annum

Date of the Loan

01/01/2023

Date the Loan is Due

01/01/2023

USD Repayment Amount (for Lump Sum)

115

USD Installment Amount (for Installments)

10

Due Date of the First Installment (for Installments)

01/01/2023

Due Date for Remaining Balance (for Installments)

01/01/2023

**Update document**



I Owe You ("IOU")
[Date]

# 1. THE PARTIES.

This IOU made on **[Date],** is by and between:

Borrower: **[Borrower-name]** with a mailing address of:

**[Borrower-address], [Borrower-city], [Borrower-state]
[Borrower-zip]** ("Borrower"), and

PLAINTIFF0002777

Lender: **[Lender-name]** with a mailing address of:

**[Lender-address]**, **[Lender-city]**, **[Lender-state]** **[Lender-zip]** ("Lender").

# 2. LOAN TERMS.

The Lender agrees to lend the Borrower under the following terms:

a. Principal Amount: **$[Amount]**

b. Interest Rate: **[Interest-rate]%** compounded per: **[Compound-frequency]**

c. Borrower to Receive the Borrowed Money on: **[Borrowed-date]**

Hereinafter known as the "Borrowed Money."

# 3. PAYMENTS.

The full balance of the Borrowed Money, including all accrued interest and any other fees or penalties, is due and payable in: (check one)

- ☐ A LUMP SUM. The Borrower shall repay the Borrowed Money as a lump sum, in full, in the amount of **$[Repayment-amount]** (principal and interest) by **[Repayment-date]** ("Due Date").

- ☐ INSTALLMENTS. Borrower shall pay principal and interest installment amounts equal to **$[Installment-amount]** with the first (1st) payment due on **[Installment-first-date]** and the remaining payments to be paid: (check one)

- ☐ Weekly with any remaining balance payable on **[Installment-due-date]** ("Due Date").

- ☐ Monthly with any remaining balance payable on **[Installment-due-date]** ("Due Date").

- ☐ Quarterly with any remaining balance payable on **[Installment-due-date]** ("Due Date").

[Signature page to follow]

PLAINTIFF0002778



| BORROWER | LENDER |
|---|---|
| Signature: | Signature: |
| Print Name: [Borrower-name] | Print Name: [Lender-name] |
| [Borrower-address] | [Lender-address] |
| [Borrower-city], [Borrower-state] [Borrower-zip] | [Lender-city], [Lender-state] [Lender-zip] |
| Email: [Borrower email] | Email: [Lender email] |

*It is not required for the Lender to execute this agreement for it to valid and enforceable.*

**Previous**
Promissory Note (Loans)

**Next**
Promissory Note

PLAINTIFF0002779



**LEGAL—TOOLS** DAOLABS



Connect Wallet

# Variables

**Agreement Date**

01/01/2023

**Lender (or Lender Entity's) Full Name**

ACME CORPORATION

**Lender's Entity Type**

Corporation

**Lender Representative's Full Name (Same as Name if Type is Individual)**

Mr. John Doe

**Lender's Street Address**

123 Main Street, Apt 45

**Lender's City**

Kalamazoo

**Lender's State**

Michigan

**Lender's ZIP Code**

49001

**Lender's Email Address**

wile@acme.xyz

**Borrower's (or Borrower Entity's) Full Name**

Road Runner LLC

**Borrower's Entity Type**

Limited Liability Corporation

**Borrower Representative's Full Name (Match Name if Type is Individual)**

Mr. John Doe

**Borrower's Street Address**

1. Principal.
2. Interest.
3. Default Interest.
4. Payment.
5. Warrant Coverage.
6. Events of Default.
7. JURY WAIVER; GOVERNING LAW; VENUE.
8. Notices.
9. Severability.
10. Amendment Provisions.
11. Binding Effect; Assignment.
12. Time of Essence.
13. Enforcement Costs.
14. Headings.
15. [State-jurisdiction] State Notice.

Exhibit A

PLAINTIFF0002780

123 Main Street, Apt. 45

Borrower's City

Wichita

Borrower's State

Kan a

Borrower's ZIP Code

67052

Borrower's Email Address

wile@acme.xyz

Preferred State Jurisdiction

Delaware

Loan Amount (USD)

100

Prior Amount Advanced (USD)

50

Flat Origination Fee Paid to Lender in USD

10

Annual Interest Rate (Percentage)

5

Increased Annual Interest Rate in the Event of Default (Percentage)

10

Maturity Date (When the Loan is Due)

01/01/2023

USD Warrant Share Strike Price (Requires the Borrower to be an Entity)

200

Days of Nonpayment Until Borrower Defaults

90

**Update document**

PLAINTIFF0002781




PROMISSORY NOTE
Maximum Amount: [Loan amount] dollars

Latest Update: **[Date]**

**FOR VALUE RECEIVED,** the undersigned,
**[Borrower-name]**, a(n) **[Borrower-entity-type]**
("Borrower"), hereby promises to pay to
**[Lender-name]**, a **[Lender-entity-type]**
("Lender"), or order, on demand the principal
sum of **[Loan-amount]** dollars or so much of
the principal sum as may from time to time
have been advanced and be outstanding,
together with accrued interest, as provided
herein. Borrower and Lender are sometimes
referred to herein as a "Party" or,
collectively, as the "Parties."

This Note is being delivered in connection
with the performance and payment of
development services ("Services"), and
amounts outstanding under this Note represent
portion of the amounts owed to Lender, as the
Borrower informs what percentage of the funds
are subsequently earned and the Borrower is
required to ensure that the reconciliation of
payments which are apportioned as a loan and
which are earned every 4 months, or when it
is reasonable.

## 1. Principal.

**(a) Advances.** Prior to the date of this Note,
Lender has advanced Borrower the aggregate
sum of **[Lender-advanced-amount]** dollars (the
"Initial Advance"). In connection with the
performance of the Services, Borrower may
from time to time request that the repayment
of amounts due pursuant thereunder be
satisfied through additional advances from
Lender pursuant to this Note (individually,
an "Advance" and, collectively with the

PLAINTIFF0002782



Initial Advance and each other Advance, the "Advances") by giving notice to Lender, which notice shall indicate the amount of the

Advance requested and the related invoice issued pursuant to the Services. Provided that no Event of Default (as defined below) is in existence and that the requested Advance would not cause an Event of Default to occur,

- (i) Lender may, without obligation and in its sole discretion, make the Advance to Borrower within two (2) business days of receipt of Borrower's notice by providing notice of the Advance to Borrower (without any cash payment to Borrower under this Note), and
- (ii) Borrower shall have the right to re-borrow any Advance to the extent that it has been repaid.

**(b) Notation of Advances.** With respect to any Advances, Lender is hereby authorized to note the date of disbursement, principal amount, and any payments made thereon on Lender's books and records (either manually or by electronic entry) and/or on any schedule attached to this Note, which notations shall be prima facie evidence of the accuracy of the information noted; provided, however, that failure to make any notation, recordation or endorsement (or any errors in notation) shall not affect Borrower's obligations hereunder and payments of principal by Borrower shall be credited to Borrower notwithstanding the failure to make a notation thereof (or errors in notation). Borrower authorizes Lender to endorse this Note and to attach to and make a part of this Note a continuation of any such schedule as and when required.

**(c) Use of Proceeds.** The proceeds of Advances shall be used to satisfy outstanding invoices of Lender delivered to Borrower from time to time in connection with the performance of the Services. Promptly following the date of an Advance, Lender shall take such actions to indicate that the invoice applicable to such

PLAINTIFF0002783

Advance has been paid in full by Borrower.



**(d) Loan Fee.** Upon execution of this Note, Borrower will pay to Lender a fully earned, non-refundable loan fee of **[Loan-fee]** dollars.

## 2. Interest.

Interest shall accrue daily from the applicable dates of disbursement, computed on the principal balances hereof from time to time outstanding, at a rate of **[Annual-interest-rate]** percent per annum (the "Applicable Rate") until all obligations under this Note have been paid in full. Interest shall be computed on the basis of a 365-day year and shall be assessed for the actual number of days elapsed (including the first day but excluding the last day).

## 3. Default Interest.

If an Event of Default occurs, then, at the option of Lender hereof and without notice or demand, the entire balance of principal and accrued interest then remaining unpaid shall be immediately due, payable and collectible by Lender and shall thereafter bear interest, until paid in full, at the increased rate of **[Annual-interest-rate-default]** percent per annum over and above the Applicable Rate. Borrower acknowledges and agrees that during the continuance of an Event of Default, Lender will incur additional costs and expenses attributable to its loss of use of the money due and to the adverse impact on Lender's ability to avail itself of other opportunities. Borrower acknowledges and agrees that it is extremely difficult and impractical to ascertain the extent of such costs and expenses and that proof of actual damages would be costly or inconvenient. Borrower therefore agrees that interest at the increased rate of **[Annual-interest-rate-default]** percent per annum over and above the Applicable Rate represents a reasonable sum

PLAINTIFF0002784

considering all the circumstances existing on the date of this Note and represents a fair and reasonable estimate of such costs and expenses. No delay or omission on the part of Lender hereof in exercising any right hereunder or under any other agreement shall operate as a waiver of such right or of any other right under this Note or under any such other agreement.



## 4. Payment.

**(a) Scheduled Repayment.** The principal indebtedness of the Advances, together with all accrued but unpaid interest, shall be due and payable on **[Maturity-date]** (the "Maturity Date"), unless extended by agreement of the Parties.

**(b) Prepayment.** Borrower shall have the right at any time and from time to time to prepay, in whole or in part, the principal of this Note, without payment of any premium or penalty. Any principal prepayment shall be accompanied by a payment of all interest accrued on the amount prepaid through the date of such prepayment. All payments shall be applied first to accrued interest and thereafter to principal.

**(c) Form of Payment.** Principal, interest, fees, and all other amounts due hereunder are to be paid in lawful money of the United States of America in cash or other immediately available funds.

## 5. Warrant Coverage.

- ☐ Upon the execution of this Note, Borrower hereby grants to Lender a warrant to purchase fully paid, nonassessable shares of common stock of Borrower at a per share exercise price of **[Warrant-strike-price]** dollars, in substantially the form of Exhibit A hereto.

## 6. Events of Default.

**(a) Definition of Event of Default.** The occurrence of any one or more of the

PLAINTIFF0002785

following events shall constitute an **"Event of Default"** hereunder:



**(i)** Borrower's breach of the obligation to pay any amount payable hereunder within **[Borrower-default-days]** days after the date that it is due and payable; **(ii)** Borrower's institution of proceedings or filing of a petition seeking reorganization or release under the federal Bankruptcy Code, or any other applicable federal or state law relating to creditor rights and remedies, or Borrower's consent to the filing of any such petition or the appointment of a receiver, liquidator, assignee, trustee or other similar official of Borrower or of any substantial part of its property, or Borrower's making of an assignment for the benefit of creditors, or the taking of corporate action in furtherance of such action; or **(iii)** the entry of any judgment or order against Borrower which could reasonably be expected to have a material adverse effect on Borrower's business and which remains unsatisfied or undischarged and in effect for thirty (30) days after such entry without a stay of enforcement or execution. **(b) Rights and Remedies on Event of Default.** During the continuance of an Event of Default, as provided in Section 3 above, Lender may accelerate the payment of the amounts due by Borrower hereunder and enforce this Note by exercise of the rights and remedies granted to it by applicable law. Notwithstanding the foregoing, upon the occurrence of an Event of Default pursuant to Section 4(a)(ii) above, all principal and accrued but unpaid interest hereunder shall be immediately due,

PLAINTIFF0002786

payable and collectible by Lender.

## 7. JURY WAIVER; GOVERNING LAW; VENUE.

BORROWER AND LENDER IRREVOCABLY WAIVE ANY
RIGHT TO A JURY IN CONNECTION WITH ANY CLAIM
OR RIGHT ARISING OUT OF THIS NOTE OR THE
TRANSACTIONS CONTEMPLATED IN THIS NOTE. THIS
NOTE SHALL BE GOVERNED BY THE LAWS OF THE
STATE OF **[State-jurisdiction]**, WITHOUT GIVING
EFFECT TO CONFLICTS OF LAW PRINCIPLES.
BORROWER AND LENDER AGREE THAT ALL ACTIONS OR
PROCEEDINGS ARISING IN CONNECTION WITH THIS
NOTE SHALL BE TRIED AND LITIGATED ONLY IN THE
STATE AND FEDERAL COURTS LOCATED IN KING
COUNTY, STATE OF **[State-jurisdiction]**.



## 8. Notices.

Any notice or communication required or
desired to be served, given or delivered
hereunder shall be in the form and manner
specified below, and shall be addressed to
the Party to be notified as follows:

If to Lender: Attn: **[Lender-name]**, **[Lender-representative-name]**, **[Lender-address]**, **[Lender-city]**,
**[Lender-state] [Lender-zip]**

If to Borrower: Attn: **[Borrower-representative-name]**,
**[Borrower-address]**, **[Borrower-city]**, **[Borrower-state]**
**[Borrower-zip]**

or to such other address as each Party
designates to the other by notice in the
manner herein prescribed. Notice shall be
deemed given hereunder if

- (i) delivered personally or otherwise
  actually received,
- (ii) sent by overnight delivery service,
  or
- (iii) sent via telecopy machine with a
  duplicate signed copy sent on the same
  day as provided in clause (ii) above.
  Notice telecopied as provided in clause
  (iii) above shall be effective upon
  receipt of such telecopy if the
  duplicate signed copy is sent under
  clause (ii) above.

PLAINTIFF0002787



Notice given in any other manner described in this Section shall be effective upon receipt by the addressee thereof; provided, however, that if any notice is tendered to an addressee and delivery thereof is refused by such addressee, such notice shall be effective upon such tender unless expressly set forth in such notice.

## 9. Severability.

Whenever possible each provision of this Note shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision is prohibited by or invalid under applicable law, it shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of the provision or the remaining provisions of this Note.

## 10. Amendment Provisions.

This Note may not be amended or modified, nor may any of its terms be waived, except by written instruments signed by both Borrower and Lender.

## 11. Binding Effect; Assignment.

This Note shall be binding upon, and shall inure to the benefit of, Borrower and the holder hereof and their respective successors and assigns; provided, however, that Borrower's rights, specifically including the Warrant rights in Section 5, and obligations shall not be assigned or delegated without Lender's prior written consent, given in its sole discretion, and any purported assignment or delegation without such consent shall be void ab initio.

## 12. Time of Essence.

Time is of the essence of each and every provision of this Note.

## 13. Enforcement Costs.

PLAINTIFF0002788



Borrower shall pay all costs and expenses, including, without limitation, reasonable attorneys' fees and expenses Lender expends or incurs in connection with the enforcement of this Note, the collection of any sums due hereunder, any actions for declaratory relief in any way related to this Note, or the protection or preservation of any rights of the holder hereunder.

## 14. Headings.

Section headings used in this Note have been set forth herein for convenience of reference only. Unless the contrary is compelled by the context, everything contained in each Section hereof applies equally to this entire Note.

## 15. [State-jurisdiction] State Notice.

Lender notifies Borrower as follows:

ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT OR TO FORBEAR FROM ENFORCING PAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER [State-jurisdiction] LAW.

[Signature page to follow]

IN WITNESS WHEREOF, Borrower has caused this Promissory Note to be issued as of the date first written above.

| BORROWER/MAKER | LENDER |
| --- | --- |
| Signature:_____ | Signature:_____ |
| Print Name: [Borrower-representative-name] | Print Name: [Lender-representative-name] |
| [Borrower-name] | [Lender-name] |
| [Borrower-address] | [Lender-address] |
| [Borrower-city], [Borrower-state] [Borrower-zip] | [Lender-city], [Lender-state] [Lender-zip] |

PLAINTIFF0002789

| Email: **[Borrower-email]** | Email: **[Lender-email]** |
| --- | --- |

*It is not required for the Lender to execute this agreement for it to valid and enforceable.*



# Exhibit A

### Form of Warrant

| Previous | Next |
| --- | --- |
| Simple IOU | Resolutions |

PLAINTIFF0002790

 **LEGAL—TOOLS**    DAOLABS    <span style="float:right">**Connect Wallet**</span>



Documents

    

*Resolutions* are documents created by a board of directors which detail a binding corporate action.

Resolutions are subject to the **business judgement rule**.

According to the Montgomery County Department of Housing and Community Affairs:

> *Defined in very general terms, the business judgment rule says that the decisions of the governing body of an association and its members—usually the board of directors—are assumed to be correct, and the courts will therefore uphold them unless certain conditions are met.*
>
> *Or, put another way, when a dispute over the validity of a decision of the board is brought before a court, the court will not substitute its own judgment of what is best for the association in place of the judgment of the board of directors, so long as the board acted properly.*

## Documents

- The Banking Resolution, once ratified, allows an entity such as an Unincorporated Nonprofit Association to open a business bank account.
- The Board Resolution is a generic board resolution to ratify an agreement with a third party.

| Previous | Next |
|---|---|
| Promissory Note | Banking |

PLAINTIFF0002791



PLAINTIFF0002792



**LEGAL—TOOLS**    DAOLABS

Connect Wallet



# Variables

Agreement Date

| 01/01/2023 |
|---|

Voting Date

| 01/01/2023 |
|---|

Your Entity's Name

| Acme LLC |
|---|

Your Entity's Type

| Limited Liability Corporation |
|---|

Your Entity's Street Address

| 123 Main Street, Apt. 45 |
|---|

Your Entity's City

| Kalamazoo |
|---|

Your Entity's State

| Michigan |
|---|

Your Entity's ZIP Code

| 49001 |
|---|

Banking Authorized Individual's Full Name

| Mr. John Doe |
|---|

Bank's Name

| ACME Bank |
|---|

Bank's Street Address

| 123 Main Street, Apt. 45 |
|---|

Bank's City

| Wichita |
|---|

Bank's State

| Kansas |
|---|

PLAINTIFF0002793

Bank's ZIP Code

67201

**Update document**



     

[Entity-name] Resolution
to Open a Bank Account

| ACCOUNT | BANK |
|---|---|
| Account:_____ | Bank: **[Counterparty-name]** |
| Holder: **[Entity-name]** | Address: **[Counterparty-address]** |
| Address: **[Entity-address]** | **[Counterparty-city], [Counterparty-state] [Counterparty-zip]** |
| **[Entity-city], [Counterparty-state] [Counterparty-zip]** | Account #: |

As a Member of the Entity named above, I certify that the Entity has been organized within the bounds of state law as a(n) **[Entity-type]** with its principal office located at: **[Entity-address], [Entity-city], [Entity-state], [Entity-zip]**.

I further attest that at the initial meeting of the Entity's members held on **[Date-voting]**, a quorum was present and voting and adopted the following resolutions:

Resolved, that the financial institution named above is designated as a depository for the funds of this Entity, which may be withdrawn on checks, drafts, advices of debit, notes, or other orders for payments bearing any officer or authorized employee of this Entity,

PLAINTIFF0002794

Entity.

Further Resolved, that the financial institution will accept and pay on, without further inquiry, any checks or debits drawn against any of the Entity's accounts. The checks or debits will be honored by the financial institution whether the item has been drawn or endorsed to the order of any authorized officer or employee signing; tendered by the authorized officer or employee for the purpose of cashing or payment; or for deposit to the officer's or employee's personal account. The financial institution will not be required to inquire as to the use of any check or debit signed in accordance with the resolutions contained herein.

Further Resolved, that **[Entity-name]** authorizes **[Authorized-individual-name]** to act as the Entity's authorized signatory for the purpose of opening and maintaining the Entity's bank account.

Further Resolved, that the officers or authorized employees may execute other agreements, including, but not limited to, special depository agreements, and arrangements concerning the manner, condition, and/or purposes for which funds, checks, debits, or items of the Entity may be deposited, collected, or withdrawn, as long as these other agreements are not contrary to the provisions contained in this resolution.

Further Resolved, that the power granted to the Entity's officers or authorized employees will remain in full force and effect until written notice has been delivered and received by the financial institution at each location where an account is maintained. The financial institution will be indemnified and held harmless from any losses suffered or liabilities incurred by continuing to act in accordance with this resolution.

I Further Attest that the persons named below occupy the stated positions, as indicated by their signatures, and that the resolutions contained in this document are recorded on the books of the Entity, and these resolutions are in full force and effect and have not been altered in any way.

[Signature page to follow]

Agree to all of the above on this **[Date]**.

PLAINTIFF0002795



| CERTIFIED TO AND ATTESTED | [Entity-name] |
|---|---|
| CERTIFIED TO AND ATTESTED | [Entity-name] |
| Signature:_____ _____ | Signature:_____ _____ |
| Witness | **[Authorized-individual-name]** |

Previous
Resolutions

Next
Board Resolution

PLAINTIFF0002796

 **LEGAL-TOOLS**  DAOLABS

Connect Wallet



# Variables

**Agreement Date**

mm/dd/yyyy

**Your Entity's Name**

Acme LLC

**Your Entity's State**

Michigan

**Counterparty Entity's Name**

Roadrunner Corporation

**Counterparty's Entity Type**

Individual, Corporation, LLC, etc

**Agreement Name(s)**

Purchasing Agreement

**Director's Full Name**

Mr. John Doe

Update document

Approval of Various Agreements

General Authority

Exhibit A

ⓘ Generic board resolution to ratify an agreeme t with a thir  arty.

[Entity-name]

PLAINTIFF0002797

1/3

[Entity name]
### CONSENT OF DIRECTORS
### IN LIEU OF SPECIAL MEETINGS



The undersigned, being a member(s) of the board of directors (the *"Board"*) **[Entity-name]**, a **[Entity-state]** corporation (the *"Company"*), acting without the necessity of formal meetings, hereby waive all notices, statutory and otherwise, and DOES HEREBY UNANIMOUSLY ADOPT the following resolutions and DOES HEREBY UNANIMOUSLY CONSENT to the taking of the actions therein set forth:

## Approval of Various Agreements

WHEREAS, certain officers of the Company have caused to be prepared and negotiated the **[Agreement-name]** between the Company and **[Counterparty-name]**, a **[Counterparty-type]** (the "*Counterparty*"), in substantially the form of attached **Exhibit A** (the "*Agreement*"); and

WHEREAS, the Board deems it to be in the best interests of the Company and its shareholders to enter into the Agreements; NOW, THEREFORE, IT IS HERESignature:

> **RESOLVED,** that the Agreement be, and is hereby, ratified, confirmed, approved and adopted, and the execution and delivery of the Agreement by the appropriate officers of the Company are hereby ratified, confirmed, approved and adopted; and

> **FURTHER RESOLVED,** that the Agreement be, and is hereby, approved and adopted, and the appropriate officers of the Company are, and any one of them is, hereby authorized and directed to execute and deliver the Agreement on behalf of the Company with such changes as such officer(s) shall approve, such approval to be conclusively established by his execution of such Inbound Agreement; and

## General Authority

> **FURTHER RESOLVED,** that the officers of the Company are authorized and directed, in the name and on behalf of the Company, to take all such other actions, and to cause to be prepared and to execute, deliver, file and

PLAINTIFF0002798



perform all other instruments, documents and
certificates, as in the judgment of the
officers or counsel to the Company shall be

necessary or advisable to carry out the
intent of the foregoing resolutions, and the
execution of any such instrument, document or
certificate or the taking of any such action
in connection with the foregoing shall
conclusively establish the authority of the
officer with respect thereto and the approval
and ratification by the Company of the
instrument, document or certificate so
executed or the action so taken; and

**FURTHER RESOLVED,** that the Board and sole
shareholder hereby ratify and confirm any and
all lawful actions taken by any of the proper
officers of the Company prior to the date of
these resolutions to effect the purposes and
intent of the foregoing resolutions.

Execution and delivery of this Consent by facsimile
transmission shall be deemed for all purposes to be due
execution and delivery by the signing director and
shareholder.

[Signature page to follow]

| DIRECTOR(S) |
| --- |
| Signature: |
| Print Name: [Director-name] |
| Role: Director |
| Dated: [Date] |

# Exhibit A

### Form of Agreement

| Previous | Next |
| --- | --- |
| Banking | Toke s |

PLAINTIFF0002799



**LEGAL–TOOLS**  DAOLABS

**Connect Wallet**



Documents

    

Equity agreements allow employees, investors, service providers, or other individuals or entities to purchase, earn, or otherwise receive a share of ownership in your entity (equity). Companies often use equity agreements in addition to traditional compensation or as a mechanism for securing funds.

The documents in this section are like Simple Agreements for Future Equity (or SAFEs), but for cryptocurrency tokens. These are often referred to as Simple Agreements for Future Tokens (or SAFTs).

# Documents

- The <u>Short Simple Agreement for Future Tokens</u> allows an entity to designate future tokens to employees as a form of compensation.
- The <u>Long Simple Agreement for Future Tokens</u> is another commonly used agreement to promise a future distribution of tokens.
- The <u>Form of Confirmation Notice</u> is an exhibit to be used in combination with the Long Simple Agreement for Future Tokens.

Previous
Board Resolution

Next
Simple Agreement for Future Tokens (Short)

PLAINTIFF0002800



PLAINTIFF0002801



**LEGAL—TOOLS**  DAOLABS

Connect Wallet



# Variables

**Agreement's Effective Date**

01/01/2023

**Your Entity's Name**

ACME CORPORATION

**Your Entity's Street Address**

123 Main Street, Apt. 45

**Your Entity's City**

Kalamazoo

**Your Entity's State**

Michigan

**Your Entity's ZIP Code**

49001

**Your Entity's Contact Email Address**

info@acme.xyz

**Percentage of Consultant's Compensation Paid in Tokens**

50

**Consultant's Full Name**

Mr. John Doe

**Consultant's Street Address**

123 Main Street, Apt. 45

**Consultant's City**

Wichita

**Consultant's State**

Kansas

**Consultant's ZIP Code**

67201

1. Events

2. Company Representations

3. Consultant Representations

4. Miscellaneous

PLAINTIFF0002802

Consultant's Email Address

road-runner-expert@animalcountrol.xyz

**Update document**





[Entity-name]
SIMPLE AGREEMENT FOR FUTURE TOKENS SHORT

Effective Date: **[Date]**

THIS AGREEMENT (hereinafter "Agreement") is entered into by (hereinafter "Consultant") and (hereinafter "Company"), made of the Effective Date set forth above, in which Company agrees that a portion of the compensation paid to Consultant shall be in the form of certain units of Tokens (hereinafter "Tokens"), subject to the terms set forth below.

## 1. Events

- (a) Token Generating Event ("TGE"). Upon the TGE, the Company will automatically issue to the Consultant a number of units of the Token equal to the amount owed to Consultant for work performed under the Consulting Agreement to be paid as follows:

     [Consultant-token-percentage] percent

  of the total amount invoiced to Company shall be paid to Consultant in Tokens. The amount of the Tokens at the time of payment shall be the value of the Token as determined by the Company at the TGE.

- (b) Restricted Token. Consultant understands and acknowledges that there may be restrictions or limitations on the Tokens when sent to him which restrictions shall be left entirely to the discretion of the Company.

PLAINTIFF0002803

## 2. Company Representations



- (a) The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of **[Entity-state]**.
- (b) The execution, delivery and performance by the Company of this instrument is within the power of the Company. This instrument constitutes a legal, valid and binding obligation of the Company.
- (c) No consents or approvals are required in connection with the performance of this instrument.

## 3. Consultant Representations

- (a) The Consultant agrees acknowledges the following:

**THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "ACT") AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED UNLESS AND UNTIL REGISTERED UNDER THE ACT OR, IN THE OPINION OF COUNSEL SATISFACTORY TO THE ISSUER OF THESE SECURITIES, SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION OTHERWISE COMPLIES WITH THE ACT.**

**THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO CERTAIN RESTRICTIONS ON TRANSFER, A RIGHT OF FIRST REFUSAL, A LOCK-UP PERIOD IN THE EVENT OF A PUBLIC OFFERING AND A REPURCHASE OPTION HELD BY THE ISSUER OR ITS ASSIGNEE(S) AS SET FORTH IN THE RESTRICTED STOCK PURCHASE AGREEMENT BETWEEN THE ISSUER AND THE ORIGINAL HOLDER OF THESE SHARES, A COPY OF WHICH MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE ISSUER. SUCH TRANSFER RESTRICTIONS, RIGHT OF FIRST REFUSAL, LOCK-UP PERIOD AND REPURCHASE OPTION ARE BINDING ON TRANSFEREES OF THESE SHARES.**

## 4. Miscellaneous

- (a) Entire Agreement. This instrument sets forth the entire agreement and understanding of the parties. Any provision of this instrument may be amended, waived or modified only upon the written consent of the Company and Consultant.
- (b) No Rights of Ownership/Governance. This Agreement does not grant to Consultant any of the

PLAINTIFF0002804

rights of a stockholder or governor of the Company.

- (c) Severability. In the event any one or more of the provisions of this instrument is for any reason held to be invalid, illegal or unenforceable, then and in any such event, such provision(s) only will be deemed null and void and will not affect any other provision of this instrument.
- (d) Governing Law. This Agreement will be governed in all respects by the laws of the United States of America and by the laws of the State of , without giving effect to any conflicts of laws principles that require the application of the law of a different jurisdiction.
- (e) Tax Consequences. The Consultant shall review this Agreement with its own tax advisors regarding the federal, state, local and foreign tax consequences of the transactions contemplated by this Agreement. The Consultant is not relying on any statements or representations of the Company.

[Signature page to follow]

The parties have executed this Agreement as of the Effective Date.

| COMPANY | CONSULTANT |
|---|---|
| Signature: | Signature: |
| Print Name: **[Entity-name]** | Print Name: **[Consultant-name]** |
| **[Entity-address]** | **[Consultant-address]** |
| **[Entity-city], [Entity-state] [Entity-zip]** | **[Consultant-city], [Consultant-state] [Consultant-zip]** |
| Email: **[Entity-email]** | Email: **[Consultant-email]** |

Previous
Tokens

Next
Simple Agreement for Future Equity (Long)

PLAINTIFF0002805



**LEGAL-TOOLS**   DAOLABS

**Connect Wallet**



# Variables

**Agreement's Date**

01/01/2023

**Your Entity's Name**

Acme LLC

**Your Entity Representative's Full Name**

Mrs. Jane Doe

**Your Entity Representative's Role**

Secretary

**Your Entity's Street Address**

123 Main Street, Apt  45

**Your Entity's City**

Kalamazoo

**Your Entity's State**

Michigan

**Your Entity's ZIP Code**

49001

**Your Entity's Type**

Limited Liability Corporation

**Entity's Website URL (Where This Agreement is Available)**

https://acme-corporation.xyz

**Service Provider's Equity Percentage**

10

**Safe Equity Percentage**

5

**Token Smart Contract Address**

0x3abf2a4f8452ece2ef7b4e1e466314760064666

1. Events.

2. Definitions.

3. Company Representations.

4. Investor Representations.

5. Arbitration.

6. Miscellaneous.

Exhibit A

Exhibit B

Exhibit C-1

Exhibit C-2

**PLAINTIFF0002806**

0x3ab12a4i84b2ccc2ci7b4c1e46b3i4760U04bioo

Investor Entity's Name

Acme Investments LLC

Investor's Full Name

Mr John Doe

**Update document**

    

ⓘ This agreement is commonly used to promise future distribution of tokens.

**NOTICE TO US RESIDENTS**

**THIS INSTRUMENT AND ANY SECURITIES ISSUABLE PURSUANT HERETO HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES. THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED IN THIS ROLLING SAFE AND UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR AN EXEMPTION THEREFROM.**

**FOR ADDITIONAL JURISDICTION SPECIFIC NOTICES AND REPRESENTATIONS APPLICABLE TO NON-US RESIDENTS, PLEASE SEE APPENDIX A ATTACHED HERETO.**

[Entity-name]
Rolling SAFE
(Rolling Simple Agreement for Future Equity)

Last Updated: **[Date]**

THIS INSTRUMENT (the "Rolling SAFE") CERTIFIES THAT in exchange for the payment by the person listed on the

PLAINTIFF0002807



signature page attached hereto (the "Investor", and
together with all other Rolling SAFE holders, "Rolling
SAFE Investors") of the aggregate purchase amount

indicated on the signature page that will be generated
on the Site (as defined below) and attached hereto (the
"Purchase Amount") on or about the date indicated on
the signature page that will be generated on the Site
(as defined below) and attached hereto, **[Entity-name]**,
a **[Entity-state] [Entity-type]** (the "Company"), issues
to the Investor the right to certain equity interests
and/or shares of the Company's Capital Stock, subject
to the terms and conditions described below. This
instrument also constitutes a binding, enforceable
agreement being entered into among the Investor, the
other Rolling SAFE Investors and the Company. See
Section 2 for certain defined terms.

## 1. Events.

- **1.a** Purchase of Tokens.

    - **a.i** As consideration for
      the Investor paying the
      Purchase Amount and
      executing this Rolling
      SAFE on the Site, the
      Company shall issue to
      Investor a number of
      Rolling SAFE Tokens equal
      to the Purchase Amount
      divided by the Effective
      Purchase Price. The
      Company shall similarly
      issue to the other
      Rolling SAFE Investors
      who tender a purchase
      price in subsequent
      transactions a number of
      Rolling SAFE Tokens
      determined by dividing
      the purchase amounts
      under their respective
      Rolling SAFEs by the
      Effective Purchase Price
      reflected on such Rolling
      SAFE Investor's Dashboard
      at the time of their
      purchase, as set forth
      herein. Rolling SAFE

PLAINTIFF0002808



Tokens shall have no rights other than the rights provided in this Rolling SAFE and any subsequently executed transaction agreements between the Investor and the Company.

○ **a.ii** All payments due under this Rolling SAFE may be made in the forms and using the methods indicated on the Site which shall include but is not limited to, (A) payment by virtual currency from Investor's digital wallet, and (B) by bank wire, ACH or SEPA transfers in immediately available funds to a bank account designated by the Company (together, (A) and (B) the "Token Payment"). All payments hereunder shall be denominated in U.S. dollars.

- **ii.A** Investor hereby acknowledg es and agrees that this Rolling SAFE will not be deemed complete and executed until the Company has confirmed receipt of the Token

PLAINTIFF0002809



Payment in the account previously provided by the Company to Investor. Accordingly, the purchase price indicated to Investor on the Site at the date and time the Investor executes this Rolling SAFE (such price, the "Original Effective Purchase Price") may materially differ from the Effective Purchase Price (which is determined as of the date and time the Company confirms receipt of the Token Payment, such date and time

PLAINTIFF0002810



the, "Token Payment Confirmation Date"). Investor hereby acknowledges this risk and consents to the Company automatically processing Investor's purchase of the Rolling SAFE Tokens at the Effective Purchase Price in effect as of the Token Payment Confirmation Date so long as the Effective Purchase Price in effect as of such Token Payment Confirmation Date is within 5% of the Original Effective Purchase Price.

PLAINTIFF0002811



- **ii.B** If the difference between the Effective Purchase Price in effect as of the Token Payment Confirmati on Date and the Original Effective Purchase Price exceeds 5%, the Company shall contact Investor pursuant to the notice provisions provided herein (or at the most recent contact informatio n Investor has provided on the Site) and request that Investor reaffirm their interest in purchasing

PLAINTIFF0002812



the Rolling SAFE Tokens at the Effective Purchase Price in effect as of the Token Payment Confirmati on Date pursuant to a method of confirmati on determined by the Company in its sole discretion . In the event that the Investor confirms their intent to proceed with the purchase of Rolling SAFE Tokens at such new Effective Purchase Price, the Company shall process the Investor's payment and Investor

PLAINTIFF0002813



shall
receive
Rolling
SAFE
Tokens
equal to
the
Purchase
Amount
divided by
the
Effective
Purchase
Price in
effect as
of the
Token
Payment
Confirmati
on Date.
If the
Investor
indicates
that they
do not
wish to
purchase
the
Rolling
SAFE
Tokens at
the
Effective
Purchase
Price in
effect as
of the
Token
Payment
Confirmati
on Date,
the
Investor
shall be
eligible
to
withdraw
their
funds in

PLAINTIFF0002814



accordance with the Company's instructions provided to Investor, less applicable fees incurred by the Company in processing Investor's Token Payment. To the extent that an Investor does not respond to the Company in connection with a notice provided under this Section 1(a)(ii)(B).

- **ii.C** In connection with any Token Payment, the Company shall be allotted up to six (6) business days to confirm receipt of



the Investor's Token Payment and process such payment, provided that if the Effective Purchase Price as of the date of the Token Payment Confirmati on Date is within 5% of the Original Effective Purchase Price, the Company shall be permitted to process such payment in accordance with Section 1(a)(ii) (B) above, regardless of how many business days have elapsed since Investor has initiated the Token Payment.

PLAINTIFF0002816



If the difference between the Effective Purchase Price in effect as of the Token Payment Confirmation Date and the Original Effective Purchase Price exceeds 5%, the Company will follow the notice provisions set forth in Section 1(a)(ii)(B) above, and Investor shall be entitled to withdraw their funds from the Site and cancel this Rolling SAFE. If, as of the Token Payment Confirmation Date, the Effective

PLAINTIFF0002817



Purchase Price is within 5% of the Original Effective Purchase Price and the Company chooses to process such payment, the Company shall issue to Investor a Confirmation Notice in the form attached hereto as Exhibit A setting out the total Purchase Amount, Original Effective Purchase Price per Token, and number of Rolling SAFE Tokens issuable under this Agreement.

- **a.iii** The Company may also issue Rolling SAFE Tokens to certain other existing holders of other convertible equity instruments (the "Prior

PLAINTIFF0002818



Convertibles"), in such amounts as mutually agreed by and between the Company and such investors, subject to required adjustments to the Rolling SAFE Equity Percentage per Section 1(e) of this Agreement.

- **a.iv** In addition, to the extent that the Company has allocated Rolling SAFE Tokens for distribution to service providers as indicated on the Site, the Company may issue or have previously issued Rolling SAFE Tokens to such service providers.

- **1.b** Liquidity Event.

  - **b.i** If there is a Liquidity Event before the termination of this Rolling SAFE, the Investor shall, at its option, be entitled (subject to the liquidation priority set forth in Section 1(d) below) to either (A) receive a portion of Proceeds (if any) that are due and payable to the Rolling SAFE Investors as the result of such Liquidity Event as set forth the following subsection (the "Cash Option") or (B) receive from the Company the number of shares of Common Stock equal to the Pro Rata Share of the product of multiplying (x) the Rolling SAFE Equity Percentage and (y) the Liquidity

PLAINTIFF0002819



Capitalization (the "Equity Option"). If the Investor fails to select the Equity Option by written notice to the Company within thirty (30) days' notice by the Company of any such Liquidity Event, the Investor shall be deemed to have chosen the Cash Option.

- **b.ii** In the event the Investor elects to take the Cash Option then, subject to the liquidation priority set forth in Section 1(d) below, the amount payable in the event of a Liquidity Event shall be equal to the amount payable on the number of shares of Common Stock equal to the Pro Rata Share of the product of multiplying (x) the Rolling SAFE Equity Percentage and (y) the Liquidity Capitalization (the "Conversion Amount").

- **b.iii** In the event the Investor elects to take the Equity Option then, the number of shares of Common Stock the Investor shall be entitled to receive shall be equal Pro Rata Share of the product of multiplying (x) the Rolling SAFE Equity Percentage and (y) the Liquidity Capitalization; provided, however, the Equity Option may be conditioned by the Company (in its sole discretion) upon

PLAINTIFF0002820



Investor (1) having agreed to enter into any lock-up agreement reasonably requested by an underwriter in connection with an Initial Public Offering and (2) satisfying any relevant investor requirements required by the Company.

- ○ **b.iv** Notwithstanding the foregoing, in connection with a Change of Control intended to qualify as a tax-free reorganization, the Company may reduce the cash portion of Proceeds payable to the Investor by the amount determined by its board of directors in good faith for such Change of Control to qualify as a tax-free reorganization for U.S. federal income tax purposes, provided that such reduction (A) does not reduce the total Proceeds payable to such Investor and (B) is applied in the same manner and on a pro rata basis to all security holders who have equal priority to the Investor under Section 1(d).

- **1.c** Dissolution Event. If there is a Dissolution Event before the termination of this Rolling SAFE, the Investor will automatically be entitled (subject to the liquidation priority set forth in Section 1(d) below) to receive a portion of Proceeds equal to the Conversion Amount, due and payable to the Investor immediately prior to the consummation of the Dissolution Event.
- **1.d** Liquidation Priority. In a Liquidity Event or Dissolution Event. this Rolling

PLAINTIFF0002821



SAFE is intended to operate like standard non-participating, junior

Preferred Stock. The Investor's right to receive its Conversion Amount is:

- **d.i** Junior to payment of outstanding indebtedness and creditor claims, including contractual claims for payment and convertible promissory notes (to the extent such convertible promissory notes are not actually or notionally converted into Capital Stock);
- **d.ii** Junior to payment of any outstanding senior series of Preferred Stock of the Company or any Converting Securities with similar senior liquidation preferences;
- **d.iii** On par with payments for other SAFEs and/or Preferred Stock who are also receiving Conversion Amounts or Proceeds on a similar as-converted to Common Stock basis, and if the applicable Proceeds are insufficient to permit full payments to the Investor and such other SAFEs and/or Preferred Stock, the applicable Proceeds will be distributed pro rata to the Investor and such other SAFEs and/or Preferred Stock in proportion to the full payments that would otherwise be due; and
- **d.iv** Senior to payments for Common Stock.
- **1.e** Rolling SAFE Equity Percentage

PLAINTIFF0002822



Adjustment. In the event that the Company issues Rolling SAFE Tokens to one or more Rolling SAFE Investors in connection with the conversion of Prior Convertibles (such Rolling SAFE Tokens to be issued, the "Conversion Rolling SAFE Tokens"), the Rolling SAFE Equity Percentage shall be increased, concurrently with such issuance, to a new percentage (calculated to the nearest ten thousandth of a percent) in accordance with the following formula:

$$CP2 = CP1 * (A + B)/A.$$

- For purposes of the foregoing formula, the following definitions shall apply:
- **e.i** "CP2" shall mean the Rolling SAFE Equity Percentage in effect immediately after such issuance or deemed issuance of Conversion Rolling SAFE Tokens;
- **e.ii** "CP1" shall mean the Rolling SAFE Equity Percentage in effect immediately prior to such issuance or deemed issuance of Conversion Rolling SAFE Tokens;
- **e.iii** "A" shall mean the number of Rolling SAFE Tokens outstanding immediately prior to such issuance or deemed issuance of Conversion Rolling SAFE Tokens (treating for this purpose as outstanding all Rolling SAFE Tokens reserved but unissued by the Company); and
- **e.iv** "B" shall mean the number of Conversion Rolling SAFE Tokens to be issued to a Rolling SAFE Investor in connection with the conversion of a Prior Convertible, including the Investor's Prior Convertible (if any).

**1.f** Termination. This Rolling SAFE will

PLAINTIFF0002823

- **1.r** Termination. This Rolling SAFE will
  automatically terminate (without
  relieving the Company of any obligations

  arising from a prior breach of or non-
  compliance with this Rolling SAFE)
  immediately following the earliest to
  occur of: (i) the issuance of Capital
  Stock to the Investor pursuant to the
  conversion of this Rolling SAFE under
  Section 1(b), or (ii) the payment, or
  setting aside for payment, of amounts
  due the Investor pursuant to Section
  1(b) or Section 1(c). In the event of a
  termination of this Rolling SAFE, all
  rights and obligations of this Rolling
  SAFE which by their nature should
  survive termination will survive
  termination, including such applicable
  rights and obligations of the parties
  under Sections 3-5 and the attached
  exhibits referenced therein.
  Notwithstanding termination of this
  Rolling SAFE, the parties shall remain
  liable to the other party for breaches
  of the representations and warranties
  set forth in Sections 3 and 4 that arise
  prior to the termination of this Rolling
  SAFE.



## 2. Definitions.

**"Capital Stock"** means the capital stock of the Company,
including, without limitation, the "Common Stock" and
the "Preferred Stock."

**"Change of Control"** means (i) a transaction or series
of related transactions in which any "person" or
"group" (within the meaning of Section 13(d) and 14(d)
of the Securities Exchange Act of 1934, as amended),
becomes the "beneficial owner" (as defined in Rule 13d-
3 under the Securities Exchange Act of 1934, as
amended), directly or indirectly, of more than 50% of
the outstanding voting securities of the Company having
the right to vote for the election of members of the
Company's board of directors, (ii) any reorganization,
merger or consolidation of the Company, other than a
transaction or series of related transactions in which
the holders of the voting securities of the Company
outstanding immediately prior to such transaction or

PLAINTIFF0002824



series of related transactions retain, immediately after such transaction or series of related transactions, at least a majority of the total voting power represented by the outstanding voting securities of the Company or such other surviving or resulting entity or (iii) a sale, lease or other disposition of all or substantially all of the assets of the Company.

**"Converting Securities"** includes this Rolling SAFE and other convertible securities issued by the Company, including but not limited to: (i) other Rolling SAFEs; (ii) convertible promissory notes and other convertible debt instruments; and (iii) convertible securities that have the right to convert into shares of Capital Stock.

**"Dashboard"** means the Investor's investment dashboard on the Site.

**"Dissolution Event"** means (i) a voluntary termination of operations, (ii) a general assignment for the benefit of the Company's creditors or (iii) any other liquidation, dissolution or winding up of the Company (excluding a Liquidity Event), whether voluntary or involuntary.

**"Dividend Amount"** means, with respect to any date on which the Company pays a dividend on its outstanding Common Stock, the amount of such dividend that is paid per share of Common Stock multiplied by the Conversion Amount.

**"Effective Purchase Price"** means the effective price per Rolling SAFE Token at the time of confirmation of receipt of the Token Payment by the Company or, if applicable, at the time of Investor confirms its investment pursuant to Section 1(a)(ii)(B) above, which price reflects the effective average price per Rolling SAFE Token as determined by the linear function used by the Tokens smart contract further described on the Site.

**"Initial Public Offering"** means the closing of the Company's first firm commitment underwritten initial public offering of Common Stock pursuant to a registration statement filed under the Securities Act.

**"Liquidity Capitalization"** is calculated as of immediately prior to the Liquidity Event or Dissolution Event, and (without double-counting):

Includes all shares of Capital Stock issued and

PLAINTIFF0002825



- includes all shares of Capital Stock issued and
  outstanding;

- Includes all (i) issued and outstanding Options
  and (ii) to the extent receiving Proceeds,
  Promised Options;
- Includes all Converting Securities other than any
  Converting Securities and other convertible
  securities (including without limitation shares of
  Preferred Stock) where the holders of such
  securities are receiving their original purchase
  amounts or similar liquidation preference payments
  in lieu of Conversion Amounts or similar "as-
  converted" payments; and
- Excludes the Unissued Option Pool.

**"Liquidity Event"** means a Change of Control or an
Initial Public Offering.

**"Minimum Service Provider Token Sale"** means a number of
Rolling SAFE Tokens to service providers equal to the
Initial SP Percentage multiplied by the Starting
Valuation and divided by the Starting Price.

**"Minimum Token Sale"** means a number of Rolling SAFE
Tokens equal to the Initial Rolling SAFE Percentage
multiplied by the Starting Valuation and divided by the
Starting Price.

**"Options"** includes options, restricted stock awards or
purchases, RSUs, SARs, warrants or similar securities,
vested or unvested.

**"Proceeds"** means cash and other assets (including
without limitation stock consideration) that are
proceeds from the Liquidity Event or the Dissolution
Event, as applicable, and legally available for
distribution.

**"Promised Options"** means promised but ungranted Options
that are promised pursuant to agreements or
understandings made prior to the execution of, or in
connection with a Voluntary Company Conversion or
Liquidity Event, as the case may be.

**"Pro Rata Share"** means (i) in the event of a Liquidity
Event pursuant to which the Investor is electing the
Equity Option, the ratio of (a) the Investor's Rolling
SAFE Tokens to (b) the number of fully diluted Rolling
SAFE Tokens (i.e. including any Rolling SAFE Tokens

PLAINTIFF0002826



reserved but unissued by the Company) and (ii) in the event of a Liquidity Event pursuant to which the Investor is electing the Cash Option or a Dissolution Event, the ratio of (a) the Investor's Rolling SAFE Tokens to (b) the number of outstanding Rolling SAFE Tokens (i.e. excluding any Tokens reserved but unissued by the Company) each calculated as of immediately prior to the consummation of a Liquidity Event or Dissolution Event, as the case may be.

**"Rolling SAFE Service Provider Equity Percentage"** means **[Service-provider-equity-percentage] (i.e., [Service-provider-equity-percentage]%)** (the "Initial SP Percentage"), provided that (i) if, at the time of conversion of the Rolling SAFE Tokens or other termination of this Rolling SAFE, the Company has not sold the Minimum Service Provider Token Sale, the Rolling SAFE Service Provider Equity Percentage shall be equal to the product of Initial SP Percentage multiplied by the total number of outstanding Rolling SAFE Tokens originally issued to service providers and divided by the Minimum Service Provider Token Sale and (ii) the Company shall not increase the Rolling SAFE Service Provider Equity Percentage unless either (i) the prior consent of a majority of the Rolling SAFE Investors as set forth in the amendment section of this Agreement has been given or (ii) the dilution for Rolling SAFE Investors from the increase is not greater than any other class of equity security authorized by the Company.

**"Rolling SAFE Equity Percentage"** means **[Safe-equity-percentage] (i.e., [Safe-equity-percentage]%)** (the "Initial Rolling SAFE Percentage"), provided that (i) if, at the time of conversion of the Rolling SAFE Tokens or other termination of this Rolling SAFE, the Company has not sold the Minimum Token Sale (as defined below), the Rolling SAFE Equity Percentage shall be equal to the product of Initial Rolling SAFE Percentage multiplied by the total number of outstanding Rolling SAFE Tokens and divided by the Minimum Token Sale and (ii) the Company may, in its sole discretion, increase the Rolling SAFE Equity Percentage following the execution of this Rolling SAFE without the prior consent of the Rolling SAFE Investors, but in no event shall it decrease the Rolling SAFE equity percentage without the prior consent of a majority of the Rolling SAFE Investors as set forth in the amendment section of this Agreement. For the avoidance of doubt, the Rolling

PLAINTIFF0002827

SAFE Equity Percentage is inclusive of the Rolling SAFE Service Provider Equity Percentage (i.e., if the Rolling SAFE Equity Percentage is 10% and the Rolling

SAFE Service Provider Equity Percentage is 1%, the Rolling SAFE Service Provider Equity Percentage will constitute up to 10% of the Rolling SAFE Equity Percentage).



**"Rolling SAFE Tokens"** means the tokens having a smart contract address of **[Contract-address],** provided that in the event of a fork (i.e., the creation of a competing version of the Ethereum Network distributed ledger as a consequence of the consensus mechanism underlying the same), the Company shall have sole discretion in defining a new smart contract address for Rolling SAFE Tokens, if necessary. For additional information about risks related to the Rolling SAFE Tokens, please see the Risk Factors attached hereto as Exhibit B.

**"SAFE"** means an instrument containing a future right to shares of Capital Stock, similar in form and content to this instrument, purchased by investors for the purpose of funding the Company's business operations.

**"Starting Price"** means the initial per unit Token price of this Rolling SAFE.

**"Starting Valuation"** means the post-money company valuation (excluding the Rolling SAFE Service Provider Equity Percentage) established on the Site at the beginning of the Rolling SAFE offering. For the avoidance of doubt, the Starting Valuation is calculated on the assumption that the Company issues no Tokens to Service Providers and, consequently, there is no dilution of the investors in the amount of the Rolling SAFE Service Provider Equity Percentage.

**"Site"** means the online website operated by the Company at **[Entity-url].**

**"Unissued Option Pool"** means all shares of Capital Stock that are reserved, available for future grant and not subject to any outstanding Options or Promised Options (but in the case of a Liquidity Event, only to the extent Proceeds are payable on such Promised Options) under any equity incentive or similar Company plan.

## 3. Company Representations.

PLAINTIFF0002828

- **3.a** The Company is a corporation duly organized, validly existing and in good standing under the laws of its state of incorporation, and has the power and authority to own, lease and operate its properties and carry on its business as now conducted.
- **3.b** The execution, delivery and performance by the Company of this Rolling SAFE is within the power of the Company and has been duly authorized by all necessary actions on the part of the Company (subject to section 3(d)). This Rolling SAFE constitutes a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity. To its knowledge, the Company is not in violation of (i) its current certificate of incorporation or bylaws, (ii) any material statute, rule or regulation applicable to the Company or (iii) any material debt or contract to which the Company is a party or by which it is bound, where, in each case, such violation or default, individually, or together with all such violations or defaults, could reasonably be expected to have a material adverse effect on the Company.
- **3.c** The performance and consummation of the transactions contemplated by this Rolling SAFE do not and will not: (i) violate any material judgment, statute, rule or regulation applicable to the Company; (ii) result in the acceleration of any material debt or contract to which the Company is a party or by which it is bound; or (iii) result in the creation or imposition of any lien on any property, asset or revenue of the Company or the suspension, forfeiture, or nonrenewal of any material permit,

PLAINTIFF0002829

license or authorization applicable to
the Company, its business or operations.



- **3.d** No consents or approvals are
  required in connection with the
  performance of this Rolling SAFE, other
  than: (i) the Company's corporate
  approvals; (ii) any qualifications or
  filings under applicable securities
  laws; and (iii) necessary corporate
  approvals for the authorization of
  Capital Stock issuable pursuant to
  Section 1.
- **3.e** To its knowledge, the Company owns
  or possesses (or can obtain on
  commercially reasonable terms)
  sufficient legal rights to all patents,
  trademarks, service marks, trade names,
  copyrights, trade secrets, licenses,
  information, processes and other
  intellectual property rights necessary
  for its business as now conducted and as
  currently proposed to be conducted,
  without any conflict with, or
  infringement of the rights of, others.

## 4. Investor Representations.

- **4.a** The Investor has full legal
  capacity, power and authority to execute
  and deliver this Rolling SAFE and to
  perform its obligations hereunder. This
  Rolling SAFE constitutes a valid and
  binding obligation of the Investor,
  enforceable in accordance with its
  terms, except as limited by bankruptcy,
  insolvency or other laws of general
  application relating to or affecting the
  enforcement of creditors' rights
  generally and general principles of
  equity.
- **4.b** The Investor acknowledges and agrees
  that, by executing this Rolling SAFE,
  the Investor has read and understood the
  risk factors set forth on Exhibit B.
- **4.c** If the Investor is a U.S. Person (as
  defined in Regulation S promulgated
  under the Securities Act), the Investor
  acknowledges and agrees that, by

PLAINTIFF0002830



executing this Rolling SAFE, the
Investor is making all of the additional

representations and warranties set forth
on Exhibit C-1 to this Rolling SAFE.

- **4.d** If the Investor is not a U.S. Person
  (as defined in Regulation S promulgated
  under the Securities Act), the Investor
  acknowledges and agrees that, by
  executing this Rolling SAFE, the
  Investor is making all of the additional
  representations and warranties set forth
  on Exhibit C-2 to this Rolling SAFE.

## 5. Arbitration.

- **5.a** To expedite resolution and control
  the cost of any Dispute, Investor and
  the Company agree to first attempt to
  negotiate any dispute arising from or
  relating to the subject matter of this
  Rolling SAFE ("Dispute") informally for
  at least thirty (30) days before
  initiating any arbitration or court
  proceeding. Such informal negotiations
  commence upon written notice from one
  person to the other.
- **5.b** In the event that pre-arbitration
  negotiations fail, any Dispute arising
  under this Agreement shall be finally
  settled in binding arbitration in
  accordance with the Securities
  Arbitration Rules of the American
  Arbitration Association. The arbitration
  will be conducted by a single, neutral
  arbitrator and shall take place in the
  county or parish where the Company
  maintains its principal place of
  business or another mutually agreeable
  location, in the English language. The
  arbitrator may award any relief that a
  court of competent jurisdiction could
  award, including attorneys' fees when
  authorized by law, and the arbitral
  decision may be enforced in any court.
  Each party will be responsible for any
  other fees or costs, such as attorney
  fees that the party may incur. In any
  action or proceeding to enforce this

PLAINTIFF0002831

arbitration provision, the prevailing party shall be entitled to recover costs

and attorneys' fees from the non-prevailing party. If a court decides that any provision of this Section 5 is invalid or unenforceable, that provision shall be severed, and the other parts of this Section 5 shall still apply. In any case, the remainder of this Rolling SAFE, will continue to apply. ANY ARBITRATION UNDER THESE TERMS WILL TAKE PLACE ON AN INDIVIDUAL BASIS: CLASS ARBITRATIONS AND CLASS ACTIONS ARE NOT PERMITTED. INVESTOR UNDERSTANDS AND AGREES THAT BY ENTERING INTO THIS Rolling SAFE, INVESTOR AND THE COMPANY ARE EACH WAIVING THE RIGHT TO TRIAL BY JURY OR TO PARTICIPATE IN A CLASS ACTION.md



## 6. Miscellaneous.

- **6.a** Any provision of this Rolling SAFE may be amended, waived or modified by written consent of the Company and either (i) the Investor (other than with respect the Rolling SAFE Equity Percentage as set forth herein) or (ii) the majority-in-interest of all then-outstanding Rolling SAFEs held by the Rolling SAFE Investors, provided that with respect to clause (ii): (A) the Purchase Amount may not be amended, waived or modified in this manner and (B) such amendment, waiver or modification treats all such holders in the same manner. **"Majority-in-interest"** refers to the holders of the applicable group of Rolling SAFEs whose Rolling SAFEs represent a majority of the outstanding Rolling SAFE Tokens.
- **6.b** Any notice required or permitted by this Rolling SAFE will be deemed sufficient when delivered personally or by overnight courier or sent by e-mail to the relevant address listed on the signature page, or 48 hours after being deposited in the U.S. mail as certified

PLAINTIFF0002832



or registered mail with postage prepaid, addressed to the party to be notified at

such party's address listed on the signature page, as subsequently modified by written notice.

- **6.c** The Investor is not entitled, as a holder of this Rolling SAFE, to vote or be deemed a holder of Capital Stock for any purpose other than tax purposes, nor will anything in this Rolling SAFE be construed to confer on the Investor, as such, any rights of a Company stockholder or rights to vote for the election of directors or on any matter submitted to Company stockholders, or to give or withhold consent to any corporate action or to receive notice of meetings, until shares have been issued on the terms described in Section 1. However, if the Company pays a dividend on outstanding shares of Common Stock (that is not payable in shares of Common Stock) while this Rolling SAFE is outstanding, the Company will pay the Dividend Amount to the Investor at the same time.

- **6.d** Neither this Rolling SAFE nor the rights in this Rolling SAFE are transferable or assignable, by operation of law or otherwise, by the Investor without the prior written consent of the Company; *provided, however,* that this Rolling SAFE and/or its rights may be assigned by the Company without the Investor's prior written consent to any other entity who directly or indirectly, controls, is controlled by or is under common control with the Company, including, without limitation, any successor in interest or in connection with a reincorporation to change the Company's domicile.

- **6.e** In the event any one or more of the provisions of this Rolling SAFE is for any reason be held to be invalid, illegal or unenforceable, in whole or in part or in any respect, or in the event that any one or more of the provisions

PLAINTIFF0002833



of this Rolling SAFE operate or would prospectively operate to invalidate this Rolling SAFE, then and in any such event, such provision(s) only will be deemed null and void and will not affect any other provision of this Rolling SAFE and the remaining provisions of this Rolling SAFE will remain operative and in full force and effect and will not be affected, prejudiced, or disturbed thereby.

- **6.f** All rights and obligations hereunder will be governed by the laws of the State of **[Entity-state]**, without regard to the conflicts of law provisions of such jurisdiction.

- **6.g** The parties acknowledge and agree that for United States federal and state income tax purposes this Rolling SAFE is, and at all times has been, intended to be characterized as stock, and more particularly as common stock for purposes of Sections 304, 305, 306, 354, 368, 1036 and 1202 of the Internal Revenue Code of 1986, as amended. Accordingly, the parties agree to treat this Rolling SAFE consistent with the foregoing intent for all United States federal and state income tax purposes (including, without limitation, on their respective tax returns or other informational statements).

[Signature page to follow]

IN WITNESS WHEREOF, the undersigned have caused this Rolling SAFE to be duly executed and delivered.

| COMPANY | INVESTOR |
|---|---|
| Signature: | Sig at re: |
| Company Name: **[Entity-name]** | Investor Entity: **[Investor-entity-name]** [1] |
| Company Address: | Print Name: **[Investor-name]** |

PLAINTIFF0002834



| [Entity-address], | Dated: [Date] |
| --- | --- |

| COMPANY | INVESTOR |
| --- | --- |
| [Entity-city], [Entity-state] [Entity-zip] | |
| Print Name: [Entity-signer-name] | |
| Title: [Entity-signer-role] | |

| ADDITIONAL INVESTOR(S) |
| --- |
| Signature: _____ |
| Investor Entity: [Investor-entity-name] [1] |
| Print Name: [Investor-name] |
| Dated: [Date] |

# Exhibit A

**FORM OF CONFIRMATION NOTICE**

# Exhibit B

**RISK FACTORS**

# Exhibit C-1

**U.S. PERSON INVESTOR REPRESENTATIONS AND WARRANTIES**

# Exhibit C-2

**NON-U.S. PERSON INVESTOR REPRESENTATIONS AND WARRANTIES**

ⓘ DISCLAIMER: THIS IS A TEMPLATE FORM PROVIDED
P RELY FOR ED CATIONAL P RPOSES AND INTENDED TO
BE  TILIZED BY EXPERIENCED LEGAL CO NSEL.  NDER
NO CIRC MSTANCES ARE THE CREATORS OR P BLISHERS

PLAINTIFF0002835

F THIS TEMPLATE RESP NSIBLE F R THE
CONSEQ ENCES OF ANY COMPANY OR INVESTOR'S

 TILIZATION OF THIS TEMPLATE, EITHER WITH OR
WITHO T CO NSEL

ⓘ THIS DOC MENT IS INTENDED TO SERVE AS A
STARTING P INT, AN  S    BE TAI RE  T  MEET
Y  R SPECI IC REQ IREMENTS. T IS   C MENT S
N T BE C NSTR E  AS  EGA  A VICE   R ANY
PARTIC AR  ACTS  R CIRC MSTANCES.



# Footnotes

1. Required if signing on behalf of a company ↩ ↩[2]

Previous
Simple Agreement for
Future Tokens (Short)

Next
Simple Agreement for
Future Equity (Exhibits)

PLAINTIFF0002836



LEGAL-TOOLS DAOLABS Connect Wallet



# Variables

This Agreement's Date

mm/dd/yyyy

Your Entity's Name

ACME CORPORATION

Date the SAFE Agreement was Executed

mm/dd/yyyy

SAFE Agreement URL

https://acme-corporation.xyz/SAFE

Specific Risks Associated With Your Entity

our explosives are dangerous and volatile

Entity Representations Regarding Jurisdiction Law

This Agreement shall be in accordance with substantive laws

Token Purchase Amount

100

Price Per Token (USD)

1

Total Tokens Purchased

100

Update document

EXHIBIT A

EXHIBIT B

EXHIBIT C-1

1. Investor's Representations Related to the Purchase of the Rolling SAFE Tokens.

2. Information Provided by Investor.

3. Rights to Use Investor Information.

4. Relationship Between Investor and the Company Parties.

.5 Regulatory Limitations and Requirements.

6. Tax Requirements.

7. Other Risks.

8. Transfer and Storage of Personal Data.

EXHIBIT C-2

1. Investor's Representations Related to the Purchase of the Rolling SAFE Tokens.

2. Information Provided by Investor.

3. Rights to Use Investor Information.

4. Relationship Between Investor and the Company Parties.

PLAINTIFF0002837

# EXHIBIT A

## FORM OF CONFIRMATION NOTICE

Last Updated: **[Date]**

> (i) To be elivere  o  s ccessf l
> confirmation of final Original Effective
> Purchase Price

We refer to that certain Continuous Agreement for Future Equity of **[Entity-name]** (the "Company") issued to you on **[Agreement-date]**, (the "Rolling SAFE") a copy of which is available at **[Agreement-url]**. All terms used but not defined herein have the meanings given to them in the Rolling SAFE.

On the terms and conditions set forth in the Rolling SAFE, we have received and processed your payment and confirm your right to receive Rolling SAFE Tokens upon the following pricing terms:

Purchase Amount: **[Token-purchase-amount]**

Original Effective Purchase Price per Token: **[Token-price-per] dollars**

Number of Tokens Purchased: **[Tokens-purchase-total]**

This Confirmation Notice is hereby incorporated in, integrated with, and governed by the terms of the Rolling SAFE.

# EXHIBIT B

## RISK FACTORS

**[Entity-risks]**



5. Regulatory Limitations and Requirements.

6. Tax Requirements.

7. Other Risks.

8. Transfer and Storage Personal Data.

NOTICE TO RESIDENTS OF THE NITED STATES AND " .S. PERSONS"

NASAA UNIFORM LEGEND

NOTICE TO RESIDENTS OF ALL OTHER J RISDICTIONS

PLAINTIFF0002838



Purchasing Rolling SAFE Tokens involves a number of potential risks and uncertainties, including those described below. You should carefully consider these risks and we encourage you to speak with your financial, legal and/or tax advisors as necessary before deciding whether to enter into the Rolling SAFE and purchase Rolling SAFE Tokens.

In addition, this Rolling SAFE and the documents included herewith include "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933, as amended (the "Securities Act"), and Section 21E of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). These forward-looking statements include all statements other than statements of historical facts and current status contained or incorporated by reference in this Rolling SAFE, including statements regarding our future financial position, our business strategy, and the plans and objectives of management for future operations. The words "believe," "may," "will," "estimate," "continue," "anticipate," "intend," "expect" and similar expressions are intended to identify forward-looking statements.

We have based these forward-looking statements largely on our current expectations and projections about future events and financial trends that we believe may affect our financial condition, results of operations, business strategy, short-term and long-term business operations and objectives, and financial needs. These forward-looking statements involve risks, uncertainties and assumptions related to: significant regulatory uncertainty for digital assets; competition from other financial infrastructure software providers;

PLAINTIFF0002839

expectations of our revenue growth rate
to decline and anticipated downward
pressure on our operating margin;

fluctuations in our operating results;
failure to innovate and provide
products and services that are useful
to users; and other risks,
uncertainties and assumptions.



We caution you not to place undue
reliance on the forward-looking
statements contained in this Rolling
SAFE, which speak only as of the date
hereof.

We also note that digital assets,
including assets like the Rolling SAFE
Tokens are highly speculative in
nature, involve a high degree of risk
and should be purchased only by persons
who can afford to lose their entire
investment. There can be no assurance
that the Company's investment
objectives will be achieved or that a
secondary market would ever develop for
the Rolling SAFE Tokens, whether via
the Company itself, via third party
registered broker-dealers or otherwise.
The risks described in this section
should not be considered an exhaustive
list of the risks that prospective
investors should consider before
investing in Rolling SAFE Tokens.
Prospective investors should obtain
their own legal and tax advice prior to
making an investment in Rolling SAFE
Tokens and should be aware that an
investment in Rolling SAFE Tokens may
be exposed to other risks of an
exceptional nature from time to time.
The following considerations are among
those that should be carefully
evaluated before making an investment
in, and agreeing to enter into the
Rolling SAFE and acquire Rolling SAFE
Tokens.

# EXHIBIT C-1

PLAINTIFF0002840

U.S. PERSON INVESTOR REPRESENTATIONS AND
WARRANTIES

# 1. Investor's Representations Related to the Purchase of the Rolling SAFE Tokens.



- **1.a** The Investor, if an entity, is, and shall at all times while it holds the Rolling SAFE Tokens remains, duly organized, validly existing and in good standing under the laws of the state or other jurisdiction of the United States of America, having full power and authority to own its properties and to carry on its business as conducted. The Investor, if a natural person, is eighteen years of age or older, competent to enter into a contractual obligation, and a citizen or resident of the United States of America. The principal place of business or principal residence of the Investor is as shown in the Rolling SAFE Tokens.
- **1.b** The Investor has the requisite power and authority to deliver the Rolling SAFE Tokens, perform his, her or its obligations set forth in the Rolling SAFE and consummate the transactions contemplated in the Rolling SAFE. The Investor has duly executed and delivered the Rolling SAFE and has obtained the necessary authorization to execute and deliver the Rolling SAFE and to perform his, her or its obligations in the Rolling SAFE and to consummate the transactions contemplated in the Rolling SAFE. The Rolling SAFE, assuming the due execution and delivery hereof by the Company, is a legal, valid and binding obligation of the Investor enforceable against the Investor in accordance with its terms.
- **1.c** The Investor is subscribing for and purchasing the Rolling

PLAINTIFF0002841



for and purchasing the Rolling
SAFE Tokens solely for the
Investor's own account and not

with a view toward or in
connection with resale,
distribution (other than to its
shareholders or members, if any),
subdivision or fractionalization
thereof. The Investor has no
agreement or other arrangement,
formal or informal, with any
person or entity to sell, transfer
or pledge any part of the Rolling
SAFE or which would guarantee the
Investor any profit or insure
against any loss with respect to
the Rolling SAFE, and the Investor
has no plans to enter into any
such agreement or arrangement.

- **1.d** The Investor represents and
warrants that the execution,
delivery and performance of the
Rolling SAFE will not result in
(a) any violation of, be in
conflict with or constitute a
material default under, with or
without the passage of time or the
giving of notice of (i) any
provision of Investor's
organizational documents, if
applicable; (ii) any provision of
any judgment, decree or order to
which Investor is a party, by
which it is bound, or to which any
of its assets are subject; (iii)
any agreement, obligation, duty or
commitment to which Investor is a
party or by which it is bound; or
(iv) any laws, statutes,
ordinances, rules, regulations,
judgments, injunctions,
administrative interpretations,
orders and decrees of any
Governmental Authority, including
amendments thereto (collectively,
"Laws"); or (b) the creation of
any lien, charge or encumbrance
upon any assets of Investor.
"Governmental Authority" shall

PLAINTIFF0002842



mean any nation or government, any state or other political subdivision thereof, any entity exercising legislative, executive, judicial or administrative functions of or pertaining to government, including without limitation any government authority, agency, department, board, commission or instrumentality and any court, tribunal or arbitrator(s) of competent jurisdiction and any self-regulatory organization. For the avoidance of doubt, Governmental Authority may include private bodies exercising quasi-governmental, regulatory or judicial-like functions to the extent they relate to either Parties or the Rolling SAFE.

- **1.e** The Investor has sufficient knowledge and experience in business, technology, financial, securities and securities investments matters, including a sufficient understanding of blockchain or cryptographic tokens and other digital assets, smart contracts, storage mechanisms (such as digital or token wallets), blockchain-based software systems and blockchain technology to be able to evaluate the risks and merits of Investor's purchase of the Rolling SAFE Tokens, including but not limited to the matters set forth in the Rolling SAFE, and is able to bear the risks thereof, including loss of all amounts paid, loss of the Rolling SAFE Tokens and liability to the Company and others for its acts and omissions, including without limitation those constituting a breach of the Rolling SAFE, negligence, fraud or willful misconduct. Investor's financial situation is such that

PLAINTIFF0002843

Investor can afford to bear the economic risk of holding the Rolling SAFE Tokens for an indefinite period of time, and the Investor has adequate means to provide for the Investor's current needs and personal contingencies and has a sufficient net worth to sustain the loss of the Investor's entire investment in the Rolling SAFE or Rolling SAFE Tokens.

- **1.f** The Investor has obtained sufficient information in order to make an informed decision to purchase the Rolling SAFE Tokens. Investor is not relying on the Company or any of its owners, directors, officers, counsel, employees, agents or representatives for legal, investment or tax advice. Investor represents that, to the extent that Investor has any questions with respect to the purchase of the Rolling SAFE Tokens, Investor has sought professional advice. Investor has sought independent legal, investment and tax advice to the extent that Investor has deemed necessary or appropriate in connection with Investor's decision to purchase the Rolling SAFE Tokens described herein.

- **1.g** Investor understands and acknowledges that an investment in the Rolling SAFE Tokens is subject to all the risks that apply to early-stage investment opportunities, whether or not those risks are explicitly set out in the Rolling SAFE. Investor has received and carefully reviewed the Rolling SAFE. Investor, in making the decision to purchase the Rolling SAFE Tokens, has relied upon an independent investigation of the Company and has not relied upon any information or representations

PLAINTIFF0002844



made by any third parties or upon any oral or written representations or assurances from the Company, its owners, directors, officers, employees, agents, or any other representatives of the Company other than as expressly set forth in the Rolling SAFE.

- **1.h** Neither (i) the Investor, (ii) any of its directors, executive officers, other officers that may serve as director or officer of any company in which it invests, general partners or managing partners, nor (iii) any beneficial owner of the Company's securities held or to be held by the Investor is subject to any of the "bad actor" disqualifications described in Rule 506(d)(1)(i) through (viii) under the Securities Act ("Bad Actor Disqualifications"), except as set forth in Rule 506(d) (2)(ii) or (iii) or (d)(3) under the Securities Act and disclosed, reasonably in advance of the sale of the Rolling SAFE Tokens, in writing and in reasonable detail to the Company. The Investor will promptly notify the Company in writing if the Investor or, to the Investor's knowledge, any person specified in Rule 506(d)(1) under the Securities Act becomes subject to any Bad Actor Disqualification.

- **1.i** Investor understands that no state or federal authority has scrutinized the Rolling SAFE, has made any finding or determination relating to the fairness for purchase of the Rolling SAFE Tokens, or has recommended or endorsed the Rolling SAFE or Rolling SAFE Tokens and that the Rolling SAFE or Rolling SAFE Tokens have not been registered under the Securities Act or any state securities laws, in reliance

PLAINTIFF0002845



upon exemptions from registration thereunder.

- **1.j** Investor represents and warrants that Investor: (a) (1) is not located or domiciled; (2) does not have a place of business; or (3) is not conducting business (any of which would make Investor a "Resident") in a jurisdiction in which the Rolling SAFE or Rolling SAFE Tokens are prohibited by applicable Laws, (b) a Resident of, or located in, a jurisdiction that is subject to U.S. or other sovereign country sanctions or embargoes, or (c) an individual, or an individual employed by or associated with an entity, identified on the U.S. Department of Commerce's Denied Persons or Entity List, the U.S. Department of Treasury's Specially Designated Nationals or Blocked Persons Lists, the U.S. Department of State's Debarred Parties List, or other lists of prohibited persons and entities as may be mandated by applicable law or regulation (each a "Prohibited Investor"). Investor agrees that if Investor's country of residence or other circumstances change such that the above representations are no longer accurate, Investor's Rolling SAFE may be immediately terminated or repaid by the Company. Investor further represents and warrants that if Investor is purchasing the right to receive the Rolling SAFE Tokens on behalf of a legal entity: (1) such legal entity is duly organized and validly existing under the applicable laws of the jurisdiction of its organization, and (2) Investor is duly authorized by such legal entity to act on its behalf.

PLAINTIFF0002846

- **1.k** Investor is an "accredited investor" as defined in rule 501(a) of Regulation D of the Securities Act, and Investor hereby represents, warrants and covenants as follows:

  - **k.i** The Investor acknowledges and warrants that the issuance and sale to the Investor of the Rolling SAFE Tokens is intended to be exempt from the registration requirements of the Securities Act, pursuant to the provisions of Regulation D.

  - **k.ii** The Investor understands that the Rolling SAFE Tokens have not been, and will not be, registered under the Securities Act, by reason of a specific exemption from the registration provisions of the Securities Act under Regulation D which depends upon, among other things, the bona fide nature of the investment intent and the accuracy of the Investor's representations as expressed herein. The Investor understands that the Rolling SAFE Tokens are

PLAINTIFF0002847



"restricted securities" under applicable U.S. federal and state securities laws and that, pursuant to these laws, the Investor must hold the Rolling SAFE Tokens indefinitely unless they are registered with the Securities and Exchange Commission and qualified by state authorities, or an exemption from such registration and qualification requirements is available. The Investor acknowledges that the Company has no obligation to register or qualify the Rolling SAFE Tokens or the capital stock of the Company for resale. The Investor further acknowledges that if an exemption from registration or qualification is available, it may be conditioned on various requirements including, but not limited to, the time and manner of sale, the holding period for the Rolling SAFE Tokens (which is anticipated to be

PLAINTIFF0002848



no less than a period of 12 months after the issuance of the Rolling SAFE Tokens to the investor), and on requirements relating to the Company which are outside of the Investor's control, and which the Company is under no obligation and may not be able to satisfy

- **k.iii** The Investor consents to the placement of a legend on any certificate, note or other instrument (if any) evidencing the Rolling SAFE and understands that the Company will be required to refuse to register any transfer of the Rolling SAFE or Rolling SAFE Tokens not made in accordance with applicable U.S. securities laws.

- **1.1** With respect to the Site:

  - **1.i** Investor understands and acknowledges that the Company and/or its affiliated partners have established Terms of Use and a Privacy Policy for the Site, which Terms of Use and Privacy Policy may

PLAINTIFF0002849



be amended from time to time. Investor has read

and has complied with and agrees to continue to comply with the Terms of Use and Privacy Policy for the Site. Investor has verified the accuracy of the universal resource locator for the Site used to purchase the Rolling SAFE Tokens.

- **1.ii** Investor understands and acknowledges that Investor shall be solely responsible for inputting and transmitting its Purchase orders correctly and accurately.
- **1.iii** Investor understands and acknowledges access to the Site may be limited, unavailable or interrupted at any time, including, but not limited to, during periods of peak demand, market volatility, system upgrades, maintenance or during any other events impacting Investor, Company or third party providers providing systems or services necessary for the

PLAINTIFF0002850



Site to be available and that the Company will not be liable, and Investor will not attempt to hold the Company liable, for any losses arising out of or relating to any inaccuracies, duplications or errors in any purchase placed on the Purchasing Site or resulting transactions.

## 2. Information Provided by Investor.

- **2.a** The information that the Investor has furnished in connection with entering into the Rolling SAFE, including (without limitation) the information furnished by the Investor to the Company regarding whether Investor qualifies as an "accredited investor" as that term is defined in Rule 501 under Regulation D under the Securities Act is correct and complete as of the date of the Rolling SAFE and will be correct and complete on the date, if any, that the Company accepts the Rolling SAFE. Further, the Investor shall immediately notify the Company of any change in any statement made in the Rolling SAFE prior to the Investor's receipt of the Company's acceptance of the Rolling SAFE, including, without limitation, Investor's status as an "accredited investor". The representations and warranties made by the Investor may be fully relied upon by the Company, and any other Company Party (as

PLAINTIFF0002851



defined below), and by any
investigating party relying on

them. The Investor acknowledges
and agrees that the Investor shall
be liable for any loss, liability,
claim, damage and expense
whatsoever (including all expenses
incurred in investigating,
preparing or defending against any
claim whatsoever) arising out of
or based upon any inaccuracy in
the representations and warranties
in the information provided by the
Investor.

- **2.b** The Investor confirms that all
  information and documentation
  provided to the Company, including
  but not limited to all information
  regarding the Investor's identity
  and source of funds to be used to
  purchase the Rolling SAFE Tokens,
  is true, correct, and complete.
  The Investor is currently a bona
  fide resident of the state or
  jurisdiction set forth in the
  current address provided to the
  Company. The Investor has no
  present intention of becoming a
  resident of any other state or
  jurisdiction.

- **2.c** The representations,
  warranties, agreement,
  undertakings, and acknowledgments
  made by the Investor in the
  Rolling SAFE will be relied upon
  by the Company and its affiliates
  (the "Company Parties") and
  counsel to the Company in
  determining, among other things,
  whether to allow the Investor to
  purchase the Rolling SAFE Tokens.
  The representations, warranties,
  agreements, undertakings, and
  acknowledgments made by the
  Investor in the Rolling SAFE shall
  survive the Investor's purchase of

PLAINTIFF0002852

the Rolling SAFE Tokens. The Investor agrees to notify the Company immediately if any of the Investor's representations, warranties and covenants contained in the Rolling SAFE become untrue or incomplete in any respect.



- **2.d** The Company Parties may rely conclusively upon and shall incur no liability in respect of any action taken upon any notice, consent, request, instructions, or other instrument believed in good faith to be genuine or to be signed by properly authorized persons of the Investor.

## 3. Rights to Use Investor Information.

- **3.a** The Investor agrees and consents that the Company Parties and any administrator appointed from time to time with respect to the Company (the "Administrator") may obtain, hold, use, disclose, transfer, and otherwise process the Investor's data, including but not limited to the contents of the Rolling SAFE:

    - **a.i** as the Company Parties or the Administrator reasonably deem necessary or appropriate to facilitate the acceptance, management and administration of the Investor's Rolling SAFE Tokens, on an ongoing basis;
    - **a.ii** to provide notice of and/or to seek consent to uses or disclosures

PLAINTIFF0002853

of such data for
specific purposes;



- **a.iii** for any
  specific purposes
  where the Investor
  has given specific
  consent to do so;
- **a.iv** to carry out
  statistical
  analysis and market
  research, whereby
  the products of
  such statistical
  analysis or market
  research are not
  disclosed outside
  of the Company
  Parties or the
  Administrator on a
  basis in which
- **Investor** is
  identifiable
  without the
  Investor's specific
  consent;
- **a.v** as the Company
  Parties or the
  Administrator
  reasonably deem
  necessary or
  appropriate to
  comply with legal
  process, court
  orders, or other
  legal, regulatory,
  or self-regulatory
  requirements,
  requests, or
  investigations
  applicable to the
  Company Parties,
  the Administrator
  or the Investor,
  including, but not
  limited to, in
  connection with
  anti-money
  laundering and

PLAINTIFF0002854



similar laws, or to establish the availability under any applicable law of an exemption from registration of the Rolling SAFE Tokens or to establish compliance with applicable law generally by the Company Parties;

- **a.vi** for disclosure or transfer to third parties, including the Investor's financial adviser (where appropriate), regulatory bodies, auditors, or technology providers to any of the Company Parties or the Administrator, as reasonably necessary for the purposes described in this Section 3(a); and
- **a.vii** for any other purposes described in the Privacy Policy or the Rolling SAFE.

- **3.b** The Investor agrees and consents to disclosure by the Company Parties or the Administrator to relevant third parties of information pertaining to the Investor in respect of disclosure and compliance policies or information requests related thereto.
- **3.c** The Investor authorizes the Company Parties and any of their

PLAINTIFF0002855



agents to disclose the Investor's nonpublic personal information to comply with regulatory and contractual requirements applicable to the Company Parties. Any such disclosure shall, to the fullest extent permitted by law, be permitted notwithstanding any privacy policy or similar restrictions regarding the disclosure of the Investor's nonpublic personal information.

## 4. Relationship Between Investor and the Company Parties.

Investor acknowledges and agrees that the purchase and sale of the Rolling SAFE Tokens is an arms-length transaction between the Investor and the Company. In connection with the purchase and sale of the Rolling SAFE Tokens, none of the Company nor any other Company Party is acting as the Investor's agent or fiduciary. The Company Parties assume no advisory or fiduciary responsibility in connection with the Rolling SAFE Tokens. The Company Parties have not provided Investor with any legal, accounting, regulatory or tax advice with respect to the Rolling SAFE Tokens, and Investor has consulted its own respective legal, accounting, regulatory and tax advisers to the extent Investor deems appropriate.

## .5 Regulatory Limitations and Requirements.

- **5.a** The Investor understands, acknowledges and agrees that the sale of the Rolling SAFE Tokens is not fully registered with the SEC because it is being made in reliance on Regulation D under the Securities Act, and that the Company is not registered or licensed with any federal or state

PLAINTIFF0002856



licensed with any federal or state
regulator as an investment
adviser, broker-dealer, money

services business, money
transmitter, or virtual currency
business, or under the Investment
Advisers Act of 1940, as amended
(the "Advisers Act") or the
Investment Company Act of 1940
("1940 Act"). As a result, the
Investor will not be afforded the
full set of protections provided
to the clients and customers of
such entities under the Securities
Act, the Securities Exchange Act
of 1934, as amended (the "Exchange
Act"), the Advisers Act or the
1940 Act, or any money services
business, money transmitter, or
virtual currency laws.

- **5.b** The Investor understands and
  agrees that if, at any time, it is
  determined that the Company is not
  in compliance with the Securities
  Act, the Exchange Act, the
  Advisers Act, or the 1940 Act, or
  any laws or regulations applicable
  to money transmitters, money
  services businesses, or virtual
  currency businesses, or is
  otherwise not in compliance with
  applicable law, the Company may
  take any corrective action it
  determines is appropriate in its
  sole and absolute discretion.
- **5.c** The Investor understands that
  the Rolling SAFE Tokens are not
  legal tender, are not backed by
  the government, and accounts and
  value balances are not subject to
  Federal Deposit Insurance
  Corporation or Securities Investor
  Protection Corporation
  protections.
- **5.d** The Investor understands that
  he or she may be barred from
  purchasing the Rolling SAFE Tokens
  if the Investor is (i) an employee
  benefit plan that is subject to

PLAINTIFF0002857



the fiduciary responsibility
standards and prohibited
transaction restrictions of part 4
of Title I of U.S. Employee
Retirement Income Security Act of
1974, as amended ("ERISA"), (ii)
any plan to which Section 4975 of
the U.S. Internal Revenue Code of
1986, as amended (the "Code")
applies, (iii) a private
investment fund or other entity
whose assets are treated as "plan
assets" for purposes of ERISA and
Section 4975 of the Code or (iv)
an insurance company, whose
general account assets are treated
as "plan assets" for purposes of
ERISA and Section 4975 of the
Code. The Investor has notified
the Company if it falls into (i) –
(iv) of this paragraph.

- **5.e** It is the intent of the
  Company Parties to comply with all
  applicable federal, state, and
  local laws designed to combat
  money laundering and similar
  illegal activities. Investor
  hereby represents, covenants, and
  agrees that, to the best of
  Investor's knowledge based on
  reasonable investigation:

  - **e.i** None of the
    Investor's funds or
    securities tendered
    to acquire the
    Rolling SAFE Tokens
    (whether payable in
    cash or otherwise)
    shall be derived
    from money
    laundering or
    similar activities
    deemed illegal
    under federal laws
    and regulations.
  - **e.ii** To the extent
    within the
    Investor's control,

PLAINTIFF0002858



none of the
Investor's funds or
securities tendered
to acquire the
Rolling SAFE Tokens
(whether payable in
cash or otherwise)
will cause any
Company Party to be
in violation of
federal anti-money
laundering laws or
regulations.

- **e.iii** When
  requested by the
  Company, the
  Investor will
  provide any and all
  additional
  information, and
  the Investor
  understands and
  agrees that the
  Company or any
  other Company Party
  may release
  confidential
  information about
  the Investor and,
  if applicable, any
  underlying
  beneficial owner or
  Related Person to
  U.S. regulators and
  law enforcement
  authorities deemed
  reasonably
  necessary to ensure
  compliance with all
  applicable laws and
  regulations
  concerning money
  laundering and
  similar activities.
  The Company
  reserves the right
  to request any
  information as is
  necessary to verify

PLAINTIFF0002859



the identity of the
Investor and the
source of any
payment to the
Company. In the
event of delay or
failure by the
Investor to produce
any information
required for
verification
purposes, an
investment by the
Investor may be
refused.

- **e.iv** Neither the
  Investor, nor any
  person or entity
  controlled by,
  controlling or
  under common
  control with the
  Investor, nor any
  of the Investor's
  beneficial owners,
  nor any person for
  whom the Investor
  is acting as agent
  or nominee in
  connection with
  this investment,
  nor, in the case of
  an Investor which
  is an entity, any
  Related Person is:

  - **iv.1**
    a
    Proh
    ibit
    ed
    Inve
    stor
    ;
  - **iv.2**
    a
    Seni
    or
    Fore

PLAINTIFF0002860

ign Political Figure, any member of a Senior Foreign Political Figure's "immediate family," which includes the figure's parents, siblings, spouse, children and in-laws, or any Close Associat

PLAINTIFF0002861

e of
a
Seni
or
Fore
ign
Poli
tica
l
Figu
re,
or a
pers
on
or
enti
ty
resi
dent
in,
or
orga
nize
d or
char
tere
d
unde
r,
the
laws
of a
Non-
Coop
erat
ive
Juri
sdic
tion
; or

- **iv.3**
  a
  pers
  on
  or
  enti
  ty
  resi
  dent

PLAINTIFF0002862

in, or organize d or char tere d unde r, the laws of a juri sdic tion that has been desi gnat ed by the U.S. Secr etar y of the Trea sury unde r Sect ion 411 of the Prov idin g Appr opri ate Tool s Requ ired to

PLAINTIFF0002863



Intercept and Obstruct Terrorism Act of 2001 as warranting special measures due to money laundering concerns.

- e.v The Investor hereby agrees to immediately notify the Company if the Investor knows, or has reason to suspect, that any of the representations in this Section 5 have become incorrect or if there is any change in the information affecting these representations and covenants.
- e.vi The Investor agrees that, if at

PLAINTIFF0002864



any time it is discovered that any of the foregoing anti-money laundering representations are incorrect, or if otherwise required by applicable laws or regulations, the Company may undertake appropriate actions, and the Investor agrees to cooperate with such actions to ensure compliance with such laws or regulations.

- **e.vii** The Investor acknowledges and agrees that the Company, in complying with anti-money laundering statutes, regulations and goals, may file any information with governmental and law enforcement agencies to identify transactions and activities that the Company or any other Company Party or their agents reasonably determines to be suspicious, or as otherwise required by law.

- **5.f** The Investor understands that no Company Party is registered with the SEC or with the securities commission of any state

PLAINTIFF0002865



or other jurisdiction as a broker-
dealer under the Exchange Act. The
Investor will not be afforded the
full set of protections provided
under the Exchange Act or
comparable state law.

- **5.g** The Investor understands and
  agrees that if the Company were
  deemed to be a money transmitter
  or money services business, it
  would be subject to significant
  additional regulation that could
  lead to significant changes with
  respect to the Rolling SAFE
  Tokens, how the Rolling SAFE
  Tokens are structured, how the
  Rolling SAFE Tokens are purchased
  and sold, and other issues, and
  would greatly increase the
  Company's costs in creating and
  facilitating transactions with the
  Rolling SAFE Tokens. Further, a
  regulator could take action
  against the Company and Company
  Parties if it views the Rolling
  SAFE Tokens as a violation of
  existing law. Any of these
  outcomes would negatively affect
  the value of the Rolling SAFE
  Tokens and/or could cause the
  Company to cease operations.

- **5.h** Virtual Currency Business
  Matters:

  - h.i The Investor
    understands and
    agrees that the
    Company does not
    intend to operate
    in any state that
    requires the
    Company to obtain
    an applicable
    license to conduct
    a virtual currency
    business, and that
    if an Investor is a
    resident of a state
    that requires the

PLAINTIFF0002866

Company to obtain an applicable license to conduct a virtual currency business, the Rolling SAFE Tokens are void and all rights and privileges of the Investor under the Rolling SAFE are canceled. If an Investor is a resident of a state that requires the Company to obtain license to conduct a virtual currency business, the Company will not allow the Investor to receive the Rolling SAFE Tokens. Further, any prohibited transaction inconsistent with this Section 5 may be unable to be rescinded.

- h.ii The Investor understands and agrees that if the Company and the Company Parties were deemed to be conducting an unlicensed virtual currency business they would be subject to significant additional regulation and/or regulatory consequences, which could lead to significant changes with respect to the



PLAINTIFF0002867



Rolling SAFE
Tokens, how the
Rolling SAFE Tokens
are structured, how
the Rolling SAFE
Tokens are
purchased and sold,
and other issues
and would greatly
increase the
Company's costs.
Further, a
regulator could
take action against
the Company and the
Company Parties if
it views the
Rolling SAFE Tokens
as a violation of
existing law. Any
of these outcomes
would negatively
affect the value of
the Rolling SAFE
Tokens and/or could
cause the Company
to cease
operations.
Investors are
strongly encouraged
to seek independent
legal advice
regarding their
individual
circumstances in
determining whether
they are eligible
to purchase the
Rolling SAFE
Tokens.

- **5.i** The Investor understands and agrees that the regulatory risks described in this Section 5 primarily take into consideration U.S. law only and are a brief summary of the risks associated with the investment in the Rolling SAFE Tokens.
- **5.i** The Investor further

PLAINTIFF0002868



understands and agrees that it is anticipated that the Rolling SAFE Tokens will also be sold or resold outside the United States, which could subject the Company Parties or the Rolling SAFE Tokens to non-U.S. legal requirements, which could be significant. Non-U.S. regulation could lead to the same types of changes and outcomes described above with respect to U.S. regulation, and any of these outcomes would negatively affect the value of the Rolling SAFE Tokens and/or cause the Company Parties to cease operations.

## 6. Tax Requirements.

**6.a** The Investor certifies that the Investor has completed and submitted any required waiver of local privacy laws that could otherwise prevent disclosure of information to a Company Party, the IRS or any other governmental authority for purposes of complying with the Internal Revenue Code (the "Code") (including without limitation in connection with FATCA, as defined below) or any intergovernmental agreement entered into in connection with the implementation of the FATCA (an "IGA"), and any other documentation required to establish an exemption from, or reduction in, withholding tax or to permit the Company to comply with information reporting requirements pursuant to the Code (including, without limitation, in connection with FATCA or any IGA).

**6.b** The Investor further certifies that, upon request by the Company, the Investor will provide to the Company an IRS Form W-9, appropriate IRS Form W-8 or other applicable IRS Forms and any additional documentation or information required by the Company for purposes of satisfying the Company's obligations

PLAINTIFF0002869



under the Code, and in any event the Company may require such documentation

prior to the delivery of the Rolling SAFE Tokens to the Investor.

**6.c** The Investor further consents to the reporting of the information provided pursuant to this Section 6, in addition to certain other information, including, but not limited to, the value of the Investor's purchase of the Rolling SAFE Tokens to the IRS or any other governmental authority if the Company is required to do so under FATCA.

**6.d** As used in the Rolling SAFE, "FATCA" means one or more of the following, as the context requires: (i) Sections 1471 through 1474 of the Code and any associated legislation, regulations or guidance, or similar legislation, regulations or guidance enacted in any other jurisdiction which seeks to implement equivalent tax reporting, financial or tax information sharing, and/or withholding tax regimes, (ii) any intergovernmental agreement, treaty or any other arrangement between the United States and an applicable foreign country, entered into to facilitate, implement, comply with or supplement the legislation, regulations or guidance described in the foregoing clause (i), and (ii) any legislation, regulations or guidance implemented in a jurisdiction to give effect to the foregoing clauses (i) or (ii).

**6.e** By executing the Rolling SAFE, the Investor understands and acknowledges that (i) the Company (or any other Company Party) may be required to provide the identities of the Investor's direct and indirect beneficial owners to a governmental entity, and (ii) the Investor hereby waives any provision of law and/or

PLAINTIFF0002870

waives any provision of law and/or regulation of any jurisdiction that would, absent a waiver, prevent the

Company from compliance with the foregoing and otherwise with applicable law as described in this Section 6.

**6.f** The Investor confirms that the Investor has been advised to consult with the Investor's independent attorney regarding legal matters concerning the Company and to consult with independent tax advisers regarding the tax consequences of purchasing the Rolling SAFE Tokens. The Investor acknowledges and agrees that none of the Company Parties are providing any warranty or assurance regarding the tax consequences to the Investor by reason of the Purchase.

## 7. Other Risks.

**7.a** The Investor is solely responsible for reviewing, understanding and considering the risks above and any additional risks, including without limitation those described in the Rolling SAFE and the Exchange Offer. The Company's operations, financial condition, and results of operations could be materially and adversely affected by any one or more of those risk factors, as could the underlying value of each Investor's Rolling SAFE Tokens, which may lead to the Rolling SAFE Tokens losing all value.

## 8. Transfer and Storage of Personal Data.

**8.a** The Investor understands and agrees that in connection with the services provided by the Company, its personal data may be transferred and/or stored in various jurisdictions in which the Company Parties have a presence, including in or to jurisdictions that may not offer a level of personal data protection equivalent to the Investor's

PLAINTIFF0002871

country of residence.



**8.b** The Investor further understands and agrees that, although the Company Parties will use their reasonable efforts to maintain the confidentiality of the information provided in the Rolling SAFE, the Company Parties may disclose or transfer the Rolling SAFE Tokens, and disclose or transfer other data of Investor, as described in Section 3(a). Any disclosure, use, storage or transfer of information for these purposes shall not be treated as a breach of any restriction upon the disclosure, use, storage or transfer of information imposed on any person by law or otherwise.

# EXHIBIT C-2

**NON-U.S. PERSON INVESTOR REPRESENTATIONS AND WARRANTIES**

## 1. Investor's Representations Related to the Purchase of the Rolling SAFE Tokens.

- **1.a** The Investor, if an entity, is, and shall at all times while it holds the Rolling SAFE Tokens remains, duly organized, validly existing and in good standing under the laws of the state or other jurisdiction of its incorporation or organization, having full power and authority to own its properties and to carry on its business as conducted. The Investor, if a natural person, is eighteen years of age or older and competent to enter into a contractual obligation and is not a U.S. person as such term is used in Regulation S of the Securities Act of 1933 (the "Securities Act"). The principal place of

PLAINTIFF0002872



business or principal residence of
the Investor is as shown in the
Rolling SAFE Tokens.

- **1.b** The Investor has the requisite
  power and authority to deliver the
  Rolling SAFE Tokens, perform his,
  her or its obligations set forth
  in the Rolling SAFE and consummate
  the transactions contemplated in
  the Rolling SAFE. The Investor has
  duly executed and delivered the
  Rolling SAFE and has obtained the
  necessary authorization to execute
  and deliver the Rolling SAFE and
  to perform his, her or its
  obligations in the Rolling SAFE
  and to consummate the transactions
  contemplated in the Rolling SAFE.
  The Rolling SAFE, assuming the due
  execution and delivery hereof by
  the Company, is a legal, valid and
  binding obligation of the Investor
  enforceable against the Investor
  in accordance with its terms.
- **1.c** The Investor is purchasing the
  Rolling SAFE Tokens solely for the
  Investor's own account and not
  with a view toward or in
  connection with resale,
  distribution (other than to its
  shareholders or members, if any),
  subdivision or fractionalization
  thereof. The Investor has no
  agreement or other arrangement,
  formal or informal, with any
  person or entity to sell, transfer
  or pledge any part of the Rolling
  SAFE or which would guarantee the
  Investor any profit or insure
  against any loss with respect to
  the Rolling SAFE, and the Investor
  has no plans to enter into any
  such agreement or arrangement.
- **1.d** The Investor represents and
  warrants that the execution,
  delivery and performance of the
  Rolling SAFE will not result in
  (a) any violation of, be in
  conflict with or constitute a

PLAINTIFF0002873



material default under, with or
without the passage of time or the
giving of notice of (i) any
provision of Investor's
organizational documents, if
applicable; (ii) any provision of
any judgment, decree or order to
which Investor is a party, by
which it is bound, or to which any
of its assets are subject; (iii)
any agreement, obligation, duty or
commitment to which Investor is a
party or by which it is bound; or
(iv) any laws, statutes,
ordinances, rules, regulations,
judgments, injunctions,
administrative interpretations,
orders and decrees of any
Governmental Authority, including
amendments thereto (collectively,
"Laws"); or (b) the creation of
any lien, charge or encumbrance
upon any assets of Investor.
"Governmental Authority" shall
mean any nation or government, any
state or other political
subdivision thereof, any entity
exercising legislative, executive,
judicial or administrative
functions of or pertaining to
government, including without
limitation any government
authority, agency, department,
board, commission or
instrumentality and any court,
tribunal or arbitrator(s) of
competent jurisdiction and any
self-regulatory organization. For
the avoidance of doubt,
Governmental Authority may include
private bodies exercising quasi-
governmental, regulatory or
judicial-like functions to the
extent they relate to either
Parties or the Rolling SAFE.

- **1.e** The Investor has sufficient
knowledge and experience in
business, technology, financial,
securities and securities

PLAINTIFF0002874



investments matters, including a sufficient understanding of blockchain or cryptographic tokens and other digital assets, smart contracts, storage mechanisms (such as digital or token wallets), blockchain-based software systems and blockchain technology to be able to evaluate the risks and merits of Investor's purchase of the Rolling SAFE Tokens, including but not limited to the matters set forth in the Rolling SAFE, and is able to bear the risks thereof, including loss of all amounts paid, loss of the Rolling SAFE Tokens and liability to the Company and others for its acts and omissions, including without limitation those constituting a breach of the Rolling SAFE, negligence, fraud or willful misconduct. Investor's financial situation is such that Investor can afford to bear the economic risk of holding the Rolling SAFE Tokens for an indefinite period of time, and the Investor has adequate means to provide for the Investor's current needs and personal contingencies and has a sufficient net worth to sustain the loss of the Investor's entire investment in the Rolling SAFE or Rolling SAFE Tokens.

- **1.f** The Investor has obtained sufficient information in order to make an informed decision to purchase the Rolling SAFE Tokens. Investor is not relying on the Company or any of its owners, directors, officers, counsel, employees, agents or representatives for legal, investment or tax advice. Investor represents that, to the extent that Investor has any questions with respect to the purchase of the Rolling SAFE Tokens. Investor

PLAINTIFF0002875



has sought professional advice. Investor has sought independent legal, investment and tax advice to the extent that Investor has deemed necessary or appropriate in connection with Investor's decision to purchase the Rolling SAFE Tokens described herein.

- **1.g** Investor understands and acknowledges that an investment in the Rolling SAFE Tokens is subject to all the risks that apply to early-stage investment opportunities, whether or not those risks are explicitly set out in the Rolling SAFE. Investor has received and carefully reviewed the Rolling SAFE. Investor, in making the decision to purchase the Rolling SAFE Tokens, has relied upon an independent investigation of the Company and has not relied upon any information or representations made by any third parties or upon any oral or written representations or assurances from the Company, its owners, directors, officers, employees, agents, or any other representatives of the Company other than as expressly set forth in the Rolling SAFE.

- **1.h** Neither (i) the Investor, (ii) any of its directors, executive officers, other officers that may serve as director or officer of any company in which it invests, general partners or managing partners, nor (iii) any beneficial owner of the Company's securities held or to be held by the Investor is subject to any of the "bad actor" disqualifications described in Rule 506(d)(1)(i) through (viii) under the Securities Act ("Bad Actor Disqualifications"), except as set forth in Rule 506(d) (2)(ii) or (iii) or (d)(3) under

PLAINTIFF0002876



the Securities Act and disclosed, reasonably in advance of the sale of the Rolling SAFE Tokens, in writing and in reasonable detail to the Company. The Investor will promptly notify the Company in writing if the Investor or, to the Investor's knowledge, any person specified in Rule 506(d)(1) under the Securities Act becomes subject to any Bad Actor Disqualification

- **1.i** Investor understands that no state or federal authority has scrutinized the Rolling SAFE, has made any finding or determination relating to the fairness for purchase of the Rolling SAFE Tokens, or has recommended or endorsed the Rolling SAFE or Rolling SAFE Tokens and that the Rolling SAFE or Rolling SAFE Tokens have not been registered under the Securities Act or any state securities laws, in reliance upon exemptions from registration thereunder.

- **1.j** Investor represents and warrants that Investor: (a) (1) is not located or domiciled; (2) does not have a place of business; or (3) is not conducting business (any of which would make Investor a "Resident") in a jurisdiction in which the Rolling SAFE or Rolling SAFE Tokens are prohibited by applicable Laws, (b) a Resident of, or located in, a jurisdiction that is subject to U.S. or other sovereign country sanctions or embargoes, or (c) an individual, or an individual employed by or associated with an entity, identified on the U.S. Department of Commerce's Denied Persons or Entity List, the U.S. Department of Treasury's Specially Designated Nationals or Blocked Persons Lists, the U.S. Department of State's Debarred Parties List, or

PLAINTIFF0002877



other lists of prohibited persons
and entities as may be mandated by
applicable law or regulation (each
a "Prohibited Investor"). Investor
agrees that if Investor's country
of residence or other
circumstances change such that the
above representations are no
longer accurate, Investor's
Rolling SAFE may be immediately
terminated or repaid by the
Company. Investor further
represents and warrants that if
Investor is purchasing the right
to receive the Rolling SAFE Tokens
on behalf of a legal entity: (1)
such legal entity is duly
organized and validly existing
under the applicable laws of the
jurisdiction of its organization,
and (2) Investor is duly
authorized by such legal entity to
act on its behalf.

- **1.k** Investor is not a United
  States Person as defined under
  Regulation S of the Securities
  Act, and Investor hereby
  represents, warrants and covenants
  as follows:

    - **k.i** The Investor
      acknowledges and
      warrants that (a)
      the issuance and
      sale to the
      Investor of the
      Rolling SAFE Tokens
      is intended to be
      exempt from the
      registration
      requirements of the
      Securities Act,
      pursuant to the
      provisions of
      Regulation S; (b)
      it is not a United
      States Person and
      is not acquiring
      the Rolling SAFE

PLAINTIFF0002878



Tokens for the account or benefit of any United States Person; and (c) the offer and sale of the Rolling SAFE Tokens has not taken place, and is not taking place, within the United States of America or its territories or possessions. The Investor acknowledges that the offer and sale of the Rolling SAFE Tokens has taken place, and is taking place in an "offshore transaction," as such term is defined in Regulation S.

- **k.ii** The Investor acknowledges and agrees that, pursuant to the provisions of Regulation S, the Rolling SAFE Tokens cannot be sold, assigned, transferred, conveyed, pledged or otherwise disposed of to any United States Person or within the United States of America or its territories or possessions for a period of 12 months after the issuance of the Rolling SAFE Tokens to Investor, unless such Rolling

PLAINTIFF0002879



SAFE Tokens are registered for sale in the United States pursuant to an effective registration statement under the Securities Act or another exemption from such registration is available. The Investor acknowledges that it has not engaged in any hedging transactions with regard to the Rolling SAFE Tokens.

- k.iii The Investor consents to the placement of a legend on any certificate, note or other instrument (if any) evidencing the Rolling SAFE and understands that the Company will be required to refuse to register any transfer of the Rolling SAFE or Rolling SAFE Tokens not made in accordance with applicable U.S. securities laws.

- k.iv The Investor is not a "distributor" of securities, as that term is defined in Regulation S, nor a dealer in securities. The Investor is purchasing the

PLAINTIFF0002880



Rolling SAFE Tokens as principal for its own account, for investment purposes only and not with an intent or view towards further sale or distribution (as such term is used in Securities Act §2(11)) thereof, and has not pre-arranged any sale with any other Investor and has no plans to enter into any such agreement or arrangement.

- k.v The Investor is not an Affiliate of the Company nor is any Affiliate of the Investor an Affiliate of the Company. An "Affiliate" is an individual or corporation, partnership, trust, incorporate or unincorporated association, joint venture, limited liability company, joint stock company, government (or an agency or subdivision thereof) or other entity of any kind (each of the foregoing, a "Person") that, directly or indirectly through one or more intermediaries, controls or is

PLAINTIFF0002881



controlled by or is
under common
control with a
Person as such
terms are used in
and construed under
Rule 405 under the
Securities Act.
With respect to the
Investor, any
investment fund or
managed account
that is managed on
a discretionary
basis by the same
investment manager
as the Investor
will be deemed to
be an Affiliate of
such Investor.

- **k.vi** The Investor
  understands that
  the Rolling SAFE
  and Rolling SAFE
  Tokens have not
  been registered
  under the
  Securities Act or
  the securities laws
  of any state and
  are subject to
  substantial
  restrictions on
  resale or transfer.
  The Rolling SAFE
  Tokens are
  "restricted
  securities" within
  the meaning of
  Regulation S and
  Rule 144
  promulgated under
  the Securities Act.
- **k.vii** The Investor
  acknowledges that
  the Rolling SAFE
  Tokens may only be
  sold offshore in
  compliance with

PLAINTIFF0002882

Regulation S or pursuant to an effective registration statement under the Securities Act or another exemption from such registration, if available. In connection with any resale of the Rolling SAFE Tokens under Regulation S, the Company will not register a transfer not made in accordance with Regulation S, under an effective registration statement under the Securities Act or in accordance with another exemption from the Securities Act.

- **k.viii** The Investor represents that it has satisfied itself as to the full observance of the laws of its jurisdiction in connection with the offering of the Rolling SAFE Tokens, including: (a) the legal requirements within its jurisdiction for the purchase of the Rolling SAFE Tokens; (b) any foreign exchange restrictions applicable to such purchase; (c) any governmental or

PLAINTIFF0002883



other consents that may need to be obtained; and (d) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale or transfer of the Rolling SAFE Tokens. The Investor's investment and its continued beneficial ownership of the Rolling SAFE Tokens will not violate any applicable securities or other laws of the jurisdiction of its residence.

- **1.1** With respect to the Site:

  - **1.i** Investor understands and acknowledges that the Company and/or the Company Parties have established Terms of Use and a Privacy Policy for the Site, which Terms of Use and Privacy Policy may be amended from time to time. Investor has read and has complied with and agrees to continue to comply with the Terms of Use and Privacy Policy for the Site. Investor has verified the

PLAINTIFF0002884



accuracy of the universal resource locator for the Site used to purchase the Rolling SAFE Tokens.

- **1.ii** Investor understands and acknowledges that Investor shall be solely responsible for inputting and transmitting its Purchase orders correctly and accurately.
- **1.iii** Investor understands and acknowledges access to the Site may be limited, unavailable or interrupted at any time, including, but not limited to, during periods of peak demand, market volatility, system upgrades, maintenance or during any other events impacting Investor, Company or third party providers providing systems or services necessary for the Site to be available and that the Company will not be liable, and Investor will not attempt to hold the Company liable, for any losses arising out of or relating to any inaccuracies.

PLAINTIFF0002885



duplications or errors in any purchase placed on the Purchasing Site or resulting transactions.

## 2. Information Provided by Investor.

**2.a** The information that the Investor has furnished in connection with entering into the Rolling SAFE, including (without limitation) the information furnished by the Investor to the Company regarding whether Investor is a U.S. Person as that term is defined in Regulation S under the Securities Act, is correct and complete as of the date of the Rolling SAFE and will be correct and complete on the date, if any, that the Company accepts the Rolling SAFE. Further, the Investor shall immediately notify the Company of any change in any statement made in the Rolling SAFE prior to the Investor's receipt of the Company's acceptance of the Rolling SAFE, including, without limitation, Investor's status as a non-U.S. Person. The representations and warranties made by the Investor may be fully relied upon by the Company, and any other Company Party (as defined below), and by any investigating party relying on them. The Investor acknowledges and agrees that the Investor shall be liable for any loss, liability, claim, damage and expense whatsoever (including all expenses incurred in investigating, preparing or defending against any claim whatsoever) arising out of or based upon any inaccuracy in the representations and warranties in the information provided by the Investor.

**2.b** The Investor confirms that all information and documentation provided to the Company, including but not limited to all information regarding

PLAINTIFF0002886

the Investor's identity and source of
funds to be used to purchase the
Rolling SAFE Tokens, is true, correct
and complete. The Investor is currently
a bona fide resident of the state or
jurisdiction set forth in the current
address provided to the Company. The
Investor has no present intention of
becoming a resident of any other state
or jurisdiction.

**2.c** The representations, warranties,
agreement, undertakings and
acknowledgments made by the Investor in
the Rolling SAFE will be relied upon by
Company and its affiliates (the
"Company Parties") and counsel to the
Company in determining, among other
things, whether to allow the Investor
to purchase the Rolling SAFE Tokens.
The representations, warranties,
agreements, undertakings and
acknowledgments made by the Investor in
the Rolling SAFE shall survive the
Investor's purchase of the Rolling SAFE
Tokens. The Investor agrees to notify
the Company immediately if any of the
Investor's representations, warranties
and covenants contained in the Rolling
SAFE become untrue or incomplete in any
respect.

**2.d** The Company Parties may rely
conclusively upon and shall incur no
liability in respect of any action
taken upon any notice, consent,
request, instructions or other
instrument believed in good faith to be
genuine or to be signed by properly
authorized persons of the Investor.

## 3. Rights to Use Investor Information.

- **3.a** The Investor agrees and
  consents that the Company Parties
  and any administrator appointed
  from time to time with respect to
  the Company (the "Administrator")
  may obtain, hold, use, disclose,



PLAINTIFF0002887

transfer, and otherwise process the Investor's data, including but

not limited to the contents of the Rolling SAFE:



- **a.i** as the Company Parties or the Administrator reasonably deem necessary or appropriate to facilitate the acceptance, management and administration of the Investor's Rolling SAFE Tokens, on an ongoing basis;
- **a.ii** to provide notice of and/or to seek consent to uses or disclosures of such data for specific purposes;
- **a.iii** for any specific purposes where the Investor has given specific consent to do so;
- **a.iv** to carry out statistical analysis and market research, whereby the products of such statistical analysis or market research are not disclosed outside of the Company Parties or the Administrator on a basis in which Investor is identifiable without the Investor's specific consent;

PLAINTIFF0002888



- **a.v** as the Company Parties or the Administrator reasonably deem necessary or appropriate to comply with legal process, court orders, or other legal, regulatory, or self-regulatory requirements, requests, or investigations applicable to the Company Parties, the Administrator or the Investor, including, but not limited to, in connection with anti-money laundering and similar laws, or to establish the availability under any applicable law of an exemption from registration of the Rolling SAFE Tokens or to establish compliance with applicable law generally by the Company Parties;

- **a.vi** for disclosure or transfer to third parties, including the Investor's financial adviser (where appropriate), regulatory bodies, auditors or technology providers to any of the Company Parties

PLAINTIFF0002889

or the Administrator, as reasonably necessary for the purposes described in this Section 3(a); and

- **a.vii** for any other purposes described in the Privacy Policy or the Rolling SAFE.

- **3.b** The Investor agrees and consents to disclosure by the Company Parties or the Administrator to relevant third parties of information pertaining to the Investor in respect of disclosure and compliance policies or information requests related thereto.

- **3.c** The Investor authorizes the Company Parties and any of their agents to disclose the Investor's nonpublic personal information to comply with regulatory and contractual requirements applicable to the Company Parties. Any such disclosure shall, to the fullest extent permitted by law, be permitted notwithstanding any privacy policy or similar restrictions regarding the disclosure of the Investor's nonpublic personal information.

## 4. Relationship Between Investor and the Company Parties.

Investor acknowledges and agrees that the purchase and sale of the Rolling SAFE Tokens is an arms-length transaction between the Investor and the Company. In connection with the purchase and sale of the Rolling SAFE Tokens, none of the Company nor any other Company Party is acting as the Investor's agent or fiduciary. The Company Parties assume no advisory or

PLAINTIFF0002890



company Parties assume no advisory or
fiduciary responsibility in connection
with the Rolling SAFE Tokens. The

Company Parties have not provided
Investor with any legal, accounting,
regulatory or tax advice with respect
to the Rolling SAFE Tokens, and
Investor has consulted its own
respective legal, accounting,
regulatory and tax advisers to the
extent Investor deems appropriate.

## 5. Regulatory Limitations and Requirements.

- **5.a** The Investor understands,
  acknowledges and agrees that the
  sale of the Rolling SAFE Tokens is
  not fully registered with the SEC
  because it is being made in
  reliance on Regulation S under the
  Securities Act, and that the
  Company is not registered or
  licensed with any federal or state
  regulator as an investment
  adviser, broker-dealer, money
  services business, money
  transmitter, or virtual currency
  business, or under the Investment
  Advisers Act of 1940, as amended
  (the "Advisers Act") or the
  Investment Company Act of 1940
  ("1940 Act"). As a result, the
  Investor will not be afforded the
  full set of protections provided
  to the clients and customers of
  such entities under the Securities
  Act, the Securities Exchange Act
  of 1934, as amended (the "Exchange
  Act"), the Advisers Act or the
  1940 Act, or any money services
  business, money transmitter, or
  virtual currency laws.
- **5.b** The Investor understands and
  agrees that if, at any time, it is
  determined that the Company is not
  in compliance with the Securities
  Act, the Exchange Act, the
  Advisers Act, or the 1940 Act, or

PLAINTIFF0002891



advisers Act, or the rule not of
any laws or regulations applicable
to money transmitters, money

services businesses, or virtual
currency businesses, or is
otherwise not in compliance with
applicable law, the Company may
take any corrective action it
determines is appropriate in its
sole and absolute discretion.

- **5.c** The Investor understands that
  the Rolling SAFE Tokens are not
  legal tender, are not backed by
  the government, and accounts and
  value balances are not subject to
  Federal Deposit Insurance
  Corporation or Securities Investor
  Protection Corporation
  protections.

- **5.d** The Investor understands that
  he or she may be barred from
  purchasing the Rolling SAFE Tokens
  if the Investor is (i) an employee
  benefit plan that is subject to
  the fiduciary responsibility
  standards and prohibited
  transaction restrictions of part 4
  of Title I of U.S. Employee
  Retirement Income Security Act of
  1974, as amended ("ERISA"), (ii)
  any plan to which Section 4975 of
  the U.S. Internal Revenue Code of
  1986, as amended (the "Code")
  applies, (iii) a private
  investment fund or other entity
  whose assets are treated as "plan
  assets" for purposes of ERISA and
  Section 4975 of the Code or (iv)
  an insurance company, whose
  general account assets are treated
  as "plan assets" for purposes of
  ERISA and Section 4975 of the
  Code. The Investor has notified
  the Company if it falls into (i) –
  (iv) of this paragraph.

- **5.e** Investor understands and
  acknowledges that:

  - **e.i** [Entity-

PLAINTIFF0002892

jurisdiction-
representations]



- e.ii if it is
  resident of, or
  located in, other
  jurisdictions, the
  offer, sale, or
  distribution of the
  Rolling SAFE Tokens
  in such other
  jurisdictions may
  be restricted by
  law and therefore
  persons into whose
  possession the
  Rolling SAFE Tokens
  comes should inform
  themselves about
  and observe any
  such restrictions.
  Any failure to
  comply with these
  restrictions may
  constitute a
  violation of the
  securities or other
  applicable laws of
  any such
  jurisdiction.
- **5.f** It is the intent of the
  Company Parties to comply with all
  applicable federal, state and
  local laws designed to combat
  money laundering and similar
  illegal activities. Investor
  hereby represents, covenants, and
  agrees that, to the best of
  Investor's knowledge based on
  reasonable investigation:

  - **f.i** None of the
    Investor's funds or
    securities tendered
    to acquire the
    Rolling SAFE Tokens
    (whether payable in
    cash or otherwise)
    shall be derived

PLAINTIFF0002893



from money
laundering or
similar activities
deemed illegal
under federal laws
and regulations.

- **f.ii** To the extent
  within the
  Investor's control,
  none of the
  Investor's funds or
  securities tendered
  to acquire the
  Rolling SAFE Tokens
  (whether payable in
  cash or otherwise)
  will cause any
  Company Party to be
  in violation of
  federal anti-money
  laundering laws or
  regulations.

- **f.iii** When
  requested by the
  Company, the
  Investor will
  provide any and all
  additional
  information, and
  the Investor
  understands and
  agrees that the
  Company or any
  other Company Party
  may release
  confidential
  information about
  the Investor and,
  if applicable, any
  underlying
  beneficial owner or
  Related Person to
  U.S. regulators and
  law enforcement
  authorities deemed
  reasonably
  necessary to ensure
  compliance with all
  applicable laws and

PLAINTIFF0002894



regulations concerning money laundering and similar activities. The Company reserves the right to request any information as is necessary to verify the identity of the Investor and the source of any payment to the Company. In the event of delay or failure by the Investor to produce any information required for verification purposes, an investment by the Investor may be refused.

- **f.iv** Neither the Investor, nor any person or entity controlled by, controlling or under common control with the Investor, nor any of the Investor's beneficial owners, nor any person for whom the Investor is acting as agent or nominee in connection with this investment, nor, in the case of an Investor which is an entity, any Related Person is:

    - **iv.1** a Prohibit

PLAINTIFF0002895

ed
Inve

stor
;

- **iv.2**
  a
  Seni
  or
  Fore
  ign
  Poli
  tica
  l
  Figu
  re,
  any
  memb
  er
  of a
  Seni
  or
  Fore
  ign
  Poli
  tica
  l
  Figu
  re's
  "imm
  edia
  te
  fami
  ly,"
  whic
  h
  incl
  udes
  the
  figu
  re's
  pare
  nts,
  sibl
  ings
  ,
  spou
  se,
  chil

PLAINTIFF0002896



dren
and
in-
laws
, or
any
Clos
e
Asso
ciat
e of
a
Seni
or
Fore
ign
Poli
tica
l
Figu
re,
or a
pers
on
or
enti
ty
resi
dent
in,
or
orga
nize
d or
char
tere
d
unde
r,
the
laws
of a
Non-
Coop
erat
ive
Juri
sdic
tion

PLAINTIFF0002897

; or

- **iv.3** a person or entity resident in, or organized or chartered under, the laws of a jurisdiction that has been designated by the U.S. Secretary of the Treasury under Section 411 of the Prov

PLAINTIFF0002898

idin
g
Appr
opri
ate
Tool
s
Requ
ired
to
Inte
rcep
t
and
Obst
ruct
Terr
oris
m
Act
of
2001
as
warr
anti
ng
spec
ial
meas
ures
due
to
mone
y
laun
deri
ng
conc
erns
.

- f.v The Investor
  hereby agrees to
  immediately notify
  the Company if the
  Investor knows, or
  has reason to
  suspect, that any
  of the
  representations in

PLAINTIFF0002899

this Section 5 have
become incorrect or
if there is any
change in the
information
affecting these
representations and
covenants.

- ○ **f.vi** The Investor
  agrees that, if at
  any time it is
  discovered that any
  of the foregoing
  anti-money
  laundering
  representations are
  incorrect, or if
  otherwise required
  by applicable laws
  or regulations, the
  Company may
  undertake
  appropriate
  actions, and the
  Investor agrees to
  cooperate with such
  actions to ensure
  compliance with
  such laws or
  regulations.
- ○ **f.vii** The Investor
  acknowledges and
  agrees that the
  Company, in
  complying with
  anti-money
  laundering
  statutes,
  regulations and
  goals, may file any
  information with
  governmental and
  law enforcement
  agencies to
  identify
  transactions and
  activities that the
  Company or any
  other Company Party

PLAINTIFF0002900



or their agents
reasonably
determines to be
suspicious, or as
otherwise required
by law.

- **5.g** The Investor understands that
  no Company Party is registered
  with the SEC or with the
  securities commission of any state
  or other jurisdiction as a broker-
  dealer under the Exchange Act. The
  Investor will not be afforded the
  full set of protections provided
  under the Exchange Act or
  comparable state law.

- **5.h** The Investor understands and
  agrees that if the Company were
  deemed to be a money transmitter
  or money services business, it
  would be subject to significant
  additional regulation that could
  lead to significant changes with
  respect to the Rolling SAFE
  Tokens, how the Rolling SAFE
  Tokens are structured, how the
  Rolling SAFE Tokens are purchased
  and sold, and other issues, and
  would greatly increase the
  Company's costs in creating and
  facilitating transactions with the
  Rolling SAFE Tokens. Further, a
  regulator could take action
  against the Company and Company
  Parties if it views the Rolling
  SAFE Tokens as a violation of
  existing law. Any of these
  outcomes would negatively affect
  the value of the Rolling SAFE
  Tokens and/or could cause the
  Company to cease operations.

- **5.i** Virtual Currency Business
  Matters:

    - **i.i** The Investor
      understands and
      agrees that the
      Company does not
      intend to operate

PLAINTIFF0002901



in any state that
requires the
Company to obtain
an applicable
license to conduct
a virtual currency
business, and that
if an Investor is a
resident of a state
that requires the
Company to obtain
an applicable
license to conduct
a virtual currency
business, the
Rolling SAFE Tokens
are void and all
rights and
privileges of the
Investor under the
Rolling SAFE are
canceled. If an
Investor is a
resident of a state
that requires the
Company to obtain
license to conduct
a virtual currency
business, the
Company will not
allow the Investor
to receive the
Rolling SAFE
Tokens. Further,
any prohibited
transaction
inconsistent with
this Section 5 may
be unable to be
rescinded.

- **i.ii** The Investor
  understands and
  agrees that if the
  Company and the
  Company Parties
  were deemed to be
  conducting an
  unlicensed virtual
  currency business

PLAINTIFF0002902



they would be
subject to
significant
additional
regulation and/or
regulatory
consequences, which
could lead to
significant changes
with respect to the
Rolling SAFE
Tokens, how the
Rolling SAFE Tokens
are structured, how
the Rolling SAFE
Tokens are
purchased and sold,
and other issues
and would greatly
increase the
Company's costs.
Further, a
regulator could
take action against
the Company and the
Company Parties if
it views the
Rolling SAFE Tokens
as a violation of
existing law. Any
of these outcomes
would negatively
affect the value of
the Rolling SAFE
Tokens and/or could
cause the Company
to cease
operations.
Investors are
strongly encouraged
to seek independent
legal advice
regarding their
individual
circumstances in
determining whether
they are eligible
to purchase the
Rolling SAFE

PLAINTIFF0002903

Tokens.



- **5.j** The Investor understands and agrees that the regulatory risks described in this Section 5 primarily take into consideration U.S. law only and are a brief summary of the risks associated with the investment in the Rolling SAFE Tokens.
- **5.k** The Investor further understands and agrees that it is anticipated that the Rolling SAFE Tokens will also be sold or resold outside the United States, which could subject the Company Parties or the Rolling SAFE Tokens to non-U.S. legal requirements, which could be significant. Non-U.S. regulation scould lead to the same types of changes and outcomes described above with respect to U.S. regulation, and any of these outcomes would negatively affect the value of the Rolling SAFE Tokens and/or cause the Company Parties to cease operations.

## 6. Tax Requirements.

**6.a** The Investor certifies that the Investor has completed and submitted any required waiver of local privacy laws that could otherwise prevent disclosure of information to a Company Party, the IRS or any other governmental authority for purposes of complying with the Internal Revenue Code (the "Code") (including without limitation in connection with FATCA, as defined below) or any intergovernmental agreement entered into in connection with the implementation of the FATCA (an "IGA"), and any other documentation required to establish an exemption from, or reduction in, withholding tax or to permit the Company to comply with information reporting requirements pursuant to the Code (including, without limitation. in connection with

PLAINTIFF0002904

FATCA or any IGA).



**6.b** The Investor further certifies that, upon request by the Company, the Investor will provide to the Company an IRS Form W-9, appropriate IRS Form W-8 or other applicable IRS Forms and any additional documentation or information required by the Company for purposes of satisfying the Company's obligations under the Code, and in any event the Company may require such documentation prior to the delivery of the Rolling SAFE Tokens to the Investor.

**6.c** The Investor further consents to the reporting of the information provided pursuant to this Section 6, in addition to certain other information, including, but not limited to, the value of the Investor's purchase of the Rolling SAFE Tokens to the IRS or any other governmental authority if the Company is required to do so under FATCA.

**6.d** As used in the Rolling SAFE, "FATCA" means one or more of the following, as the context requires: (i) Sections 1471 through 1474 of the Code and any associated legislation, regulations or guidance, or similar legislation, regulations or guidance enacted in any other jurisdiction which seeks to implement equivalent tax reporting, financial or tax information sharing, and/or withholding tax regimes, (ii) any intergovernmental agreement, treaty or any other arrangement between the United States and an applicable foreign country, entered into to facilitate, implement, comply with or supplement the legislation, regulations or guidance described in the foregoing clause (i), and (ii) any legislation, regulations or guidance implemented in a jurisdiction to give effect to the

PLAINTIFF0002905

jurisdiction to give effect to the foregoing clauses (i) or (ii).



**6.e** By executing the Rolling SAFE, the Investor understands and acknowledges that (i) the Company (or any other Company Party) may be required to provide the identities of the Investor's direct and indirect beneficial owners to a governmental entity, and (ii) the Investor hereby waives any provision of law and/or regulation of any jurisdiction that would, absent a waiver, prevent the Company from compliance with the foregoing and otherwise with applicable law as described in this Section 6.

**6.f** The Investor confirms that the Investor has been advised to consult with the Investor's independent attorney regarding legal matters concerning the Company and to consult with independent tax advisers regarding the tax consequences of purchasing the Rolling SAFE Tokens. The Investor acknowledges and agrees that none of the Company Parties are providing any warranty or assurance regarding the tax consequences to the Investor by reason of the Purchase.

## 7. Other Risks.

**7.a** The Investor is solely responsible for reviewing, understanding and considering the risks above and any additional risks, including without limitation those described in the Rolling SAFE and the Exchange Offer. The Company's operations, financial condition, and results of operations could be materially and adversely affected by any one or more of those risk factors, as could the underlying value of each Investor's Rolling SAFE Tokens, which may lead to the Rolling SAFE Tokens losing all value.

PLAINTIFF0002906

# 8. Transfer and Storage of Personal Data.

**8.a** The Investor understands and agrees that in connection with the services provided by the Company, its personal data may be transferred and/or stored in various jurisdictions in which the Company Parties have a presence, including in or to jurisdictions that may not offer a level of personal data protection equivalent to the Investor's country of residence.

**8.b** The Investor further understands and agrees that, although the Company Parties will use their reasonable efforts to maintain the confidentiality of the information provided in the Rolling SAFE, the Company Parties may disclose or transfer the Rolling SAFE Tokens, and disclose or transfer other data of Investor, as described in Section 3(a). Any disclosure, use, storage or transfer of information for these purposes shall not be treated as a breach of any restriction upon the disclosure, use, storage or transfer of information imposed on any person by law or otherwise.

APPENDIX A — JURISDICTIONAL NOTICES

 Com a y co  sel sho l  co si er whether additional legends are warranted based on the facts and circumstances of the offering. If the user intends to sell to non-" .S. Person(s)", foreign law may apply, including the inclusion of additional legends or notations. Company counsel should consider engaging local counsel in any jurisdiction in which it advertises or solicits investors or conducts an offering of securities.

NOTICE TO RESIDENTS OF THE UNITED STATES

PLAINTIFF0002907

## NOTICE TO RESIDENTS OF THE UNITED STATES AND "U.S. PERSONS"



THE OFFER AND SALE OF THE Rolling SAFE TOKENS AND THE ROLLING SAFE CURRENTLY HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER THE SECURITIES LAWS OF ANY STATE THEREOF. THE Rolling SAFE TOKENS AND THE Rolling SAFE MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED WITHIN THE UNITED STATES OR TO A "U.S. PERSON" (AS DEFINED IN REGULATION S PROMULGATED UNDER THE SECURITIES ACT), EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR AN EXEMPTION THEREFROM.

## NASAA UNIFORM LEGEND

IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE COMPANY AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THE TOKENS HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION. PROSPECTIVE INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

## NOTICE TO RESIDENTS OF ALL OTHER JURISDICTIONS

NO ACTION HAS BEEN TAKEN TO PERMIT THE OFFER, SALE, POSSESSION OR DISTRIBUTION OF THE ROLLING SAFE TOKENS OR ANY RELATED DOCUMENTS IN ANY JURISDICTION WHERE ACTION FOR THAT PURPOSE IS REQUIRED. YOU ARE REQUIRED TO INFORM YOURSELF ABOUT, AND TO OBSERVE ANY RESTRICTIONS RELATING TO, THE ROLLING SAFE TOKENS AND ANY RELATED DOCUMENTS IN YOUR JURISDICTION

PLAINTIFF0002908

DOCUMENTS IN YOUR JURISDICTION.

| Previous | Next |
|---|---|
| Simple Agreement for Future Equity (Long) | README.md |





**LEGAL-TOOLS** DAOLABS


Connect Wallet

    

Licensing

 Documents

# Licensing

A licensing agreement allows a property owner (the licensor) to give another party (the licensee) permission to use their intellectual property, which could be a patent, a trademark, or a brand. The agreements on this website are intended to be used when licensing software.

# Documents

- The <u>Master Terms & Conditions for License</u> is a software licensing agreement with a detailed section describing fixes and escalation procedures. This agreement is useful if licensing software which will need ongoing maintenance.
- The <u>Product License Agreement</u> is a more generalized software licensing agreement.

Previous
Simple Agreement for Future Equity (Exhibits)

Next
Master Terms & Conditions for License

PLAINTIFF0002910



PLAINTIFF0002911



**LEGAL-TOOLS**   DAOLABS



Connect Wallet

# Variables

Agreement Date

| 01/01/2023 |

Your Entity's Name

| ACME CORPORATION |

Description of Your Entity's Services Being Licensed

| ACME CORPORATION's explosive tennis ball simulator and giant rub |

Your Entity Representative's Full Name

| Mr. John Doe |

Your Entity Representative's Role/Title

| Chief E ecutive Officer |

Counterparty Entity Representative's Full Name

| Ms. Jane Doe |

Counterparty Entity Representative's Role/Title

| President |

MASTER TERMS & CONDITIONS
  FOR LICENSE

  Exhibit A

  Exhibit B

**Update document**



# MASTER TERMS & CONDITIONS FOR LICENSE

THESE [Entity-name] MASTER TERMS & CONDITIONS FOR
LICENSE (THESE **"LICENSE TERMS"**) ARE PROVIDED BY
[Entity-name] ("**Licensor**"). TO THE UNDERSIGNED ENTITY

**PLAINTIFF0002912**

[Entity name];( "Licensor" ), TO THE UNDERSIGNED ENTITY
WHO BECOMES A LICENSEE OF Licensor's INFORMATION
TECHNOLOGY SOLUTIONS UNDER A Licensor PRODUCT LICENSING

ORDER ("**CUSTOMER**"). AS FURTHER DESCRIBED IN SECTION 1
BELOW, THESE LICENSE TERMS AND EACH PRODUCT LICENSING
ORDER FORM A SEPARATE CONTRACT BETWEEN Licensor AND
CUSTOMER.



1. **License & Terms; Orders.** These License Terms and
   Exhibit A below govern a fully executed Licensor
   Product License containing the mutually agreed
   terms and conditions specific to the purchase by
   Customer (the "**Agreement**"). The effective date of
   each such Agreement shall be the "Effective Date"
   specified in Exhibit A (the "**Effective Date**"). All
   capitalized terms used in these License Terms
   (other than those grammatically required to be
   capitalized) shall have the meanings ascribed to
   them in the Section in which they first appear as
   indicated by bold type.

2. **The Licensor Solution.** Licensor is the licensor of
   certain proprietary information technology
   solutions comprised of [Entity-services] (each a
   "**Licensor Solution**"; collectively, the "**Licensor
   Solution**"). The Licensor Solution is designed to
   be used on mobile phones, backend administration
   computers and networking equipment, and other
   electronic devices (each a "**Device**"; collectively
   the "**Devices**"). The Licensor Solution can be
   delivered to Customer by physical medium such as
   compact disc ("**Disc**") or via download from
   Licensor ftp site as indicated on each Order. As
   between Licensor and Customer, Licensor
   exclusively retains all intellectual property
   rights (including patents, trademarks and
   copyrights), proprietary rights (including trade
   secrets) and moral rights (including, rights of
   attribution and authorship) throughout the world
   in and to the Licensor Solution and all of their
   derivative works and improvements (as each of
   those terms is defined and applied under Title 17
   and Title 35 U.S.C., respectively). No right,
   title or interest is granted or otherwise
   transferred to Customer except for the license
   rights in Section 3.

3. **License Rights.** Exhibit A shall indicate the
   specific Licensor Solution to which Customer is
   granted rights hereunder and the specific license

PLAINTIFF0002913

granted rights hereunder and the specific license rights granted to Customer for each Licensor Solution indicated (a "**License**"). All Licenses are

subject to the terms and conditions of Exhibit A and this software license agreement. Unless otherwise stated in Exhibit A, Licensor grants to Customer, in consideration for the payment of all fees as listed in Exhibit A, the non-exclusive, non-transferable and non-sublicensable right and license to load, run and use, solely on equipment and Authorized Devices for the limited purposes for which the software was designed the Licensor Solution in object code only. If no license term is specified in Exhibit A, the licenses granted in this Agreement shall have a one year term.

**3.1. License Conditions & Restrictions.** As a condition of each License, Customer is prohibited from: (a) reverse engineering, decompiling or otherwise attempting to create human readable materials from the object code of the Licensor Solution; (b) modifying source code such as stored procedures, scripts, or any other interpreted or precompiled form of executable statements (c) allowing use of the object code on or by more than the number of Authorized Devices; (d) using or exploiting Licensor Solution to provide business process outsourcing, service bureau, ASP or any other similar or related services to any individual or entity; (e) removing proprietary rights notices, asset tags, brand labels or marks placed on Licensor Solution, Third Party Software (as defined below) or Equipment; (f) modifying or creating derivative works of the Licensor Solution; and (g) exporting Licensor Solution in violation of any U.S. export law or regulation. In addition, if Customer is required to provide any regulatory body with use or access to the Licensor Solution, the Third Party Software or the Equipment, then such use and access shall be subject to this Section and the confidentiality obligations of Customer and all items so provided or accessed shall bear the legend "Restricted Rights" and "Trade Secret Property of Licensor" in addition to all other notices; *provided*, however, if Customer's compliance



PLAINTIFF0002914



with this Section would, in the opinion of
Customer's legal counsel, result in
Customer's violation of a law, governmental
agency request, court order or other legal
proceeding, Customer may disclose the
Licensor Solution to such regulatory body,
but shall (a) only disclose that minimum
necessary to comply with the regulatory
body's request and (b) notify Licensor with
reasonable advance written notice of such
disclosure so that Licensor may seek
additional restrictions on such regulatory
body's access to the Licensor Solution.
Notwithstanding the foregoing, to the extent
expressly required by applicable law,
Customer shall have the right to make one (1)
additional copy of the Licensor Solution
solely for reasonable back-up, archive and
disaster recovery purposes.

3.2. **Installation.** Customer may, directly or
through an approved third party, install the
Licensor Solution services at locations owned
and operated by Customer listed in Exhibit A.

4. **Third Party Software & Equipment.** Use of the
Licensor Solution requires that Customer use
(whether as Devices or otherwise) hardware and
equipment owned by or leased from third parties
(collectively, the "**Equipment**"). The Licensor
Solution also may have embedded in or bundled or
linked with them software applications owned by
third parties (the "**Third Party Software**"). Unless
otherwise expressly stated in an Order, the
Equipment shall be obtained by Customer directly
from its original third party manufacturer or
lessor. As such, Licensor has no liability or
responsibility whatsoever for any Equipment unless
purchased or leased directly from Licensor under
written agreement. Unless otherwise stated in an
Order, the Third Party Software shall be obtained
by Customer either directly from its original
third party licensor or from Licensor via
sublicense or pass-through. Irrespective of which
method is used, all rights and obligations with
regard to the Third Party Software shall be as
between Customer and the applicable licensor or
reseller of the Third Party Software and Licensor
shall and does hereby pass-through any warranty,

PLAINTIFF0002915

support and other rights required to be passed-through.



5. **Services.** During the warranty period Licensor will provide error correction and technical support as outlined in Exhibit B. Except for such services no other support services are provided under this Agreement. Licensor offers separate services related to installation and implementation of, and/or creation of derivative works and improvements for the Licensor Solution (collectively, "**Professional Services**"). Professional Services, which may include educational and instructional training services in the use and operation of the Licensor Solution, also available under a separate agreement.

6. **Software Maintenance.** During the term of this Agreement, Licensor agrees to provide maintenance services for the Covered Software ("Maintenance Services"). Covered Software does not include hardware vendor operating systems and other system software, Client-developed software, and third-party software (except any third party software embedded in the Covered Software).

   6.1. **The Maintenance Services.** Subject to payment of all applicable fees due and owing and the conditions and exclusions set forth below, during the Term (as defined in Section 9, below) Licensor shall provide Customer with the services described in Section 7 (collectively hereinafter the "**Maintenance Services**") solely in connection with software Updates (as those terms are defined below) for the most recent release of the Covered Software application licensed by Customer under the License Agreement and the one (1) immediately preceding releases of such licensed application, whichever one (1) of which Customer has installed and operational in a live production environment (the "**Supported Application**").

7. **Maintenace Services.**

   7.1. **Subsequent Releases.** During the term of this Agreement, Licensor will maintain the Covered Software by providing software

PLAINTIFF0002916



updates and enhancements to Customer as the same are offered by Licensor to its licensees of the Covered Software under maintenance generally ("Updates"). All Updates provided to Customer by Licensor pursuant to the terms of this Agreement shall be subject to the terms and conditions of this License Agreement between the parties. Updates will be provided on an as-available basis and include (1) enhancements to Covered Software provided by Licensor to keep current with changes in text payment services or as Licensor makes enhancements; (2) Enhancements to keep current with the current hardware vendor's OS releases, as available from Licensor, provided that the current hardware vendor's OS release is both binary and source-compatible with the OS release currently supported by Licensor; and (3) Performance enhancements to Covered Software. Updates do not include: (a) Platform extensions including product extensions to (i) different hardware platforms; (ii) different windowing system platforms; (iii) different operating system platforms; and (b) New functions such as (i) new functionality in test payment servicesy; and (ii) new applications. Error corrections to Covered Software will be provided pursuant to Exhibit B of the Licensor Solution License Agreement. Maintenance for hardware and any related software will be provided by Customer or a third party selected by customer but approved in advance by Licensor.

7.2. **Installation by Customer.** If a Subsequent Release is so developed and released by Licensor, Licensor shall, provided that Customer has fulfilled all of its Maintenance Fee payment obligations, provide such Subsequent Release to Customer at no additional fee or charge (other than any fees for professional services associated with the installation or implementation of any such Subsequent Release). Customer shall at all times keep installed and operational the Supported Application. Customer shall install within thirty (30) calendar days of delivery by Licensor, at Customer's cost and

PLAINTIFF0002917



expense, such Subsequent Releases as are required to keep the Supported Application operational; provided, however, that where Licensor identifies a Subsequent Release as being delivered to Customer for the purpose of remedying a threatened or actual claim of infringement, Customer shall install such Subsequent Release (irrespective of the Supported Application) within ten (10) calendar days of delivery. If Customer fails to install and make operational any Subsequent Release within such ten (10) calendar day period, then until such time as the applicable Subsequent Release is installed and made operational by Customer at Customer's cost and expense: (a) any Licensor non-infringement warranty shall become null, void and unenforceable to the extent such failure or delay by Customer prejudices Licensor; (b) Licensor shall have no obligation to perform and Customer shall be barred from requesting, any Maintenance Services; and (c) Licensor reserves the right to automatically and immediately terminate without obligation to refund any Maintenance Services already being performed.

7.3. **Installation by 3rd Party Contractor.** If Customer has a 3rd party IT or product management related party who may operate, install, hold software images and or any documentation related to Licensor, Customer must notify and ensure that Licensor confidential information is protected and that the 3rd Party executes a Software Licensing Agreement and accepts the EULA.

8. **Conditions & Exclusions.** As an express condition of receipt of the Maintenance Services hereunder, Customer shall not request, permit or authorize any individual or entity other than Licensor to provide any Maintenance Services for the Supported Application. Licensor shall have no obligation to provide Maintenance Services for problems resulting from any modifications of the Supported Application made by any individual or entity other than Licensor, or a Licensor authorized representative, nor for any release or version other than the Supported Application. Licensor

PLAINTIFF0002918



shall have no responsibility or liability whatsoever for any delays which result from the

failure of Customer to fulfill the conditions of this Section.

8.1. **Services Not Included.** Maintenance Services do not include any of the following: (1) custom programming services; (2) on-site support, including installation of hardware or software; (3) support of any software that is not Covered Software; (4) training; (5) out-of-pocket and reasonable expenses, including hardware and related supplies; (6) any issue caused by the unauthorized use or misuse of the Covered Software or (7) any other activity not expressly provided in this Maintenance Agreement.

9. **Fees, Taxes & Payments.** The fees and the schedule of payments for all Licenses, Support Services, Professional Services and, if any, Equipment and Third Party Software to be provided by Licensor, are set forth in Exhibit A. In addition to such fees, Customer shall pay all taxes, however and by whatever authority levied as a result of each Agreement (except for taxes on the income of Licensor) as well as all reasonably documented expenses actually incurred in the course of its performance hereunder. The licenses granted under this Agreement shall be subject to payment of the associated fees.

10. **Term & Termination.** The Term of this agreement shall be one year from the Effective date and shall auto-renew each year unless terminated by either party. If either party materially breaches an Agreement the non-breaching party may provide a written notice specifying the nature of the breach. The breaching party shall have thirty (30) days from receipt of such notice to cure the breach; provided however, that the time period for cure for a breach of the license terms (Section 3) or the confidentiality obligations (Section 11) shall be ten (10) days from receipt of such written notice. If the breach is not cured within such period, the non-breaching party may terminate this Agreement and any licenses granted hereunder by providing a second written notice of termination. Any attempt to seek or obtain

PLAINTIFF0002919



termination. Any attempt to seek or obtain
protection from creditors shall be a material
breach subject to the foregoing provisions. If an

Agreement is terminated by either party or expires
pursuant to its terms, then all Confidential
Information of each party (as defined below) shall
be returned. Upon termination or expiration for
any reason, Customer shall return to Licensor the
original and all copies of the Covered Software
and discontinue all use thereof. Sections 9, and
10, the confidentiality obligations under Section
11, Sections 14, 16, 17 and 19 shall survive the
termination or expiration of each Agreement for
any reason.

11. **Confidentiality.**

11.1. **Licensor Information.** In addition to
Confidential Data Licensor may, in the
performance of the License Terms and
associated Maintenance Agreement, deliver to
or allow access by Customer to information,
data or materials in either tangible or
intangible form that are trade secrets of, or
proprietary and confidential (including as
may be required by law) to Licensor or its
clients or suppliers, including, the Licensor
Solution and Maintenance Services and the
Licensor Master Disc (collectively the
"**Confidential Information**"). Customer shall
not use the Confidential Information
internally within its organization except to
the minimum extent necessary to exercise its
rights or fulfil its obligations under each
applicable Agreement. In addition, Customer
shall not disclose the Confidential
Information to any third party during the
term of this Agreement or thereafter without
the express written consent of Licensor in
each instance, except to those of its legal
and financial advisers with a need to know.
Customer always shall handle Confidential
Information with at least reasonable care.
All Confidential Information shall remain the
exclusive property of Licensor. Customer's
obligations under this Section 8, shall not
apply to Confidential Information which
Customer can demonstrate by reasonable
evidence to be: (a) already known to it or

PLAINTIFF0002920



independently developed by it at the time of
its receipt; (b) generally available to the
public other than by breach of an Agreement;

or (c) independently obtained from a third
party whose disclosure to Customer does not
violate a duty of confidentiality. If
Customer is compelled by a court or other
body of competent jurisdiction to disclose
the Confidential Information, Customer shall
inform the Disclosing Party via written
notice and shall provide reasonable
assistance in obtaining and enforcing a
protective order or other appropriate means
of safeguarding the Confidential Information
required to be disclosed. Customer may then
disclose only so much of the Confidential
Information as is legally required to be
disclosed.

11.2. **Customer Information.** Use and
disclosure of Customer Confidential Data
shall be as provided in the Mutual
Confidentiality Agreement, dated, , the terms
of which are hereby incorporated by
reference.

12. **Representations and Warranties.** Each party
represents and warrants that (a) it has the right,
power and authority to enter into this Agreement
and fully perform its obligations hereunder; (b)
this Agreement does not and will not conflict with
any agreement between it and any other party; (c)
it has all necessary federal, state and local
authorizations to operate and otherwise perform
its obligations under this Agreement and will be
in compliance with all applicable laws and
regulations governing such performance.

13. **Additional Warranties.**

13.1. Licensor warrants that the Licensor
Solution licensed to Customer shall be free
of defects in materials or workmanship from
the date of initial delivery and for ninety
(90) calendar days thereafter. Licensor does
not warrant that the Licensor Solution meets
Customer's requirements, operate without
interruption or are error free. Customer's
sole remedy and Licensor' only liability with
respect to breach of the foregoing warranty

PLAINTIFF0002921



respect to breach of the foregoing warranty is to repair (pursuant to Exhibit A) or replace the Licensor Solution to bring them

in compliance with the warranty, or refund the fees paid by Customer for the defective product, at Licensor's option; provided, however, that Customer shall give notice to Licensor during normal business hours and within fifteen (15) business day after discovering any breach. Licensor shall not be responsible in any manner for: (a) errors or failures related to causes external to the Licensor Solution including failures of Equipment, third party telecommunications or data lines; (b) Customer's use of the Licensor Solution in a manner or on Equipment that does not conform to Licensor' specifications; (c) any defect or non-conformity or failure of the Licensor Solution to perform as warranted due in whole or in part to the installation of the Licensor Solution by any third party and/or (d) any defect or non-conformity not reported by Customer in accordance with this Section.

13.2. In addition, Licensor represents and warrants that (i) except as provided in (ii) below, it has the full and exclusive right to grant or otherwise permit Customer to use the Licensor Solution in accordance with the terms of this Agreement; and (ii) it has obtained the licenses necessary to permit it to sublicense to Customer the Third Party Software that it so sublicenses, or has all licenses and other rights necessary to pass-through rights to such Third Party Software that is so passed-through.

14. **Indemnification.**

14.1. **Licensor Indemnification.** Licensor shall, at its expense and option, defend or settle any claim, action or allegation brought against Customer that the Licensor Solution infringes any U.S. patent, copyright or trade secret of any third party and shall pay any final judgments awarded against Customer or settlements approved by Licensor entered by Customer disposing of such claims; provided that Customer gives prompt written

PLAINTIFF0002922

provided that Customer gives prompt written notice to Licensor of any such claim, action or allegation of infringement and gives



Licensor the authority to proceed as contemplated herein. Licensor shall have the exclusive right to defend any such claim, action of allegation and make settlements thereof at its own discretion, and Customer may not settle or compromise such claim, action or allegation, except with prior written consent of Licensor. Customer shall give such assistance and information as Licensor may reasonably require to settle or oppose such claims. In the event any such infringement, claim action or allegation is brought or threatened, Licensor may, at its sole option and expense pursue any of the following options to (1) procure for Customer the right to continue use of the Licensor Solution or Licensor Digital Platform, or infringing part thereof; (2) modify or amend the Licensor Solution or infringing part thereof, or replace the Licensor Solution or infringing part thereof with another platform having substantially the same or better capabilities; or (3) if neither of the forgoing is commercially practicable, terminate this Agreement. Licensor and Customer will then be released from any further obligation to the other under this Agreement, except for the obligations of indemnification provided for above and such other obligations that by their nature survive termination. The indemnity set forth in this Paragraph 11.1 and the warranties in Section 10 are given only to Customer and may not be extended to any other person or entity.

14.2. **Limitations.** Licensor's obligations under this Section 11 will not apply with respect to any Licensor Solution or portions or components thereof that are: (i) provided by any third party; (ii) Modified by any person other than Licensor where the alleged infringement relates to such Modification; (iii) combined with other software or hardware not provided by Licensor where the alleged infringement relates to such

PLAINTIFF0002923



combination; (iv) used other than in accordance with this Agreement or the applicable documentation; (v) used in any manner incident to an infringement not resulting primarily from the Licensor Solution; or (vi) created by Licensor in accordance with designs, plans or specifications furnished by or on behalf of Licensee where the provided designs, plans or specifications gave rise to the alleged infringement. In addition, Licensor' obligations hereunder will not apply to (a) any alleged infringement occurring after Customer has received written notice of such suit or proceeding unless Licensor has given written permission for such continuing infringement or (b) any amounts awarded against Customer based on any acts of Customer or any third party or an agreement between Customer and a third party inconsistent with the terms of this Agreement.

14.3. **Customer Indemnification.** Customer shall, at its expense and option, defend or settle any claim, action or allegation brought against Licensor by a third party arising out of Customer's use of the Licensor Solution, Licensor Digital Platform, Third Party Software, music content or any part thereof in a manner other than as expressly authorized under these License Terms and shall pay any final judgments awarded or settlements entered into; provided that Licensor gives prompt written notice to Customer of any such claim, action or allegation and gives Customer the authority to proceed as contemplated herein. Customer shall have the exclusive right to defend any such claim, action of allegation and may make settlements thereof, subject to prior written approval of Licensor. Licensor shall give such assistance and information as Customer may reasonably require to settle or oppose such claims.

15. **Disclaimers. TO THE MAXIMUM EXTENT PERMITTED BY LAW, Licensor EXPRESSLY DISCLAIMS ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, WITHOUT LIMITATION,**

PLAINTIFF0002924

THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NON-INFRINGEMENT, EXCEPT TO THE EXTENT EXPRESSLY PROVIDED IN SECTION

9 ABOVE AND FURTHER, BECAUSE Licensor IS NOT THE ORIGINAL MANUFACTURER OF THE EQUIPMENT OR THIRD PARTY SOFTWARE IT DOES NOT PROVIDE, AND EXPRESSLY DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED, AND ALL OBLIGATIONS OR LIABILITIES FOR DAMAGES ARISING OUT OF OR IN CONNECTION WITH THE USE, MAINTENANCE OR PERFORMANCE THEREOF.



16. **Limitation of Liability.**

16.1. **No Consequential Damages.** The limitations and exclusions set forth in this Section 13 apply to all claims or causes of action on whatever basis and under whatever theory brought and irrespective of whether the party has advised or has been advised of the possibility of such claim. IN NO EVENT SHALL Licensor BE LIABLE TO THE OTHER FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, RELIANCE OR PUNITIVE DAMAGES OR LOST OR IMPUTED PROFITS OR LOST DATA.

16.2. Limitation Of Damages. IN ALL EVENTS, Licensor' AGGREGATE, CUMULATIVE LIABILITY FOR ANY AND ALL CLAIMS ARISING IN CONNECTION WITH EACH AGREEMENT SHALL BE LIMITED TO DIRECT DAMAGES IN THE AMOUNT not to exceed USD $10,000.

17. **Assignment.** Neither party may assign this Agreement or any rights or obligations hereunder without first obtaining the written consent of the other party, which shall not be unreasonably withheld. Notwithstanding the preceding, Licensor may, upon written notice, assign this Agreement to (a) any subsidiary or affiliate more than fifty percent (50%) owned or otherwise controlled by Licensor or to its parent entity; (b) in connection with the sale of all or substantially all of its assets or capital stock; and/or (c) to the surviving or resulting entity in any merger or consolidation.

18. **Injunctive Relief.** The non-breaching party shall be entitled to seek injunctive relief for any breach or threatened breach of Sections 3 and 8 of these License. Customer shall indemnify, defend

PLAINTIFF0002925

and hold the Licensor harmless from any expense,
liability or damage arising out of breach of
Sections 3 and 8.

19. **Miscellaneous.** This Agreement is the complete
    agreement of the parties with respect to its
    subject matter and supersedes all prior
    discussions and negotiations and any earlier
    proposals all whether verbal or written. This
    Agreement shall be governed by and construed in
    accordance with the laws of the State of
    Washington without regard to principles of
    conflicts of laws. All notices, including notices
    of address changes, given by either party shall be
    sent by certified mail or by reputable overnight
    commercial delivery to the invoicing address
    specified by Customer in the applicable Order.
    Notices to Licensor shall be sent to the Licensor
    address in the initial paragraph of these License
    Terms. If any provision of an Agreement is held
    unenforceable the enforceability of the remaining
    provisions shall not be affected. Waiver by either
    party of any breach shall not constitute waiver of
    any other breach. The headings in each Agreement
    are used for convenience of reference only. Each
    Order may be executed in separate original or
    facsimile counterparts, each of which shall be
    deemed an original, and all of which shall be
    deemed one and the same instrument. No Agreement
    shall be amended except in a writing signed by
    both parties

[Signature page to follow]

IN WITNESS WHEREOF, the parties, through their duly
authorized representatives, hereby execute this Master
Terms and Conditions for License as of the date first
set forth below.

| COUNTERPARTY | LICENSOR |
| --- | --- |
| Signature: | Signature: |
| Print Name: [Counterparty-signer-name] | Print Name: [Entity-signer-name] |
| Role: [Counterparty-signer-role] | Role: [Entity-signer-role] |

PLAINTIFF0002926

| Dated: [Date] | Dated: [Date] |



# Exhibit A

TERMS AND TRANSACTION FEES

# Exhibit B

### FIXES AND ESCALATION PROCEDURES

This Exhibit B sets forth the terms and conditions of the fixes which Licensor shall provide to Customers for the Licensed Software during the warranty period in accordance with the terms of the Agreement.

### 1. Definitions.

Except as set forth below, capitalized terms used herein shall have the same meaning as set forth in the Agreement.

**"Error"** means a failure of the Licensed Software to perform in accordance with the specifications which degrades the use or performance of the Software.

**"Fix"** means corrections, bug fixes, workarounds and patches to the Object Code or Source Code versions of the Licensed Software designed to remedy an Error.

### 2. Maintenance and Technical Support.

In consideration of Customer's payment of the license fees set forth in the product licensing order form, Licensor will provide to Customer the services set forth below.

**(a) Fixes.** Licensor shall provide to Customer fixes in the form of bug fixes. This includes all Fixes created by or for Licensor to remedy any Errors reported by Customer or any other person. Customer will notify Licensor of any person that it designates to submit Errors.

**(b) Technical Support.** Licensor shall provide technical support services for the Licensed Software, which will include efforts to identify defective Source Code and Object Code and to provide Fixes to correct Errors. Licensor will provide Customer with a telephone number and an e-mail address which Customer may use to report

PLAINTIFF0002927



and an e-mail address which Customer may use to report
Errors during Licensor's standard support hours (Monday
through Friday, 7:30 a.m. to 5:00 p.m. Pacific Stanard

Time). Licensor will also provide Customer with an
emergency telephone pager number which Customer may use
to report Priority 1 Errors 24 hours a day, 7 days a
week. For Priority 1 Errors, Customer will use
commercially reasonable efforts to notify Licensor via
both telephone and email.

**(c) Response/Resolution Times.** Licensor will provide
Fixes to correct Errors classified by Customer, in its
reasonable discretion, as Priority 1 or 2 Errors (as
defined in "Error Description" below) within the "Error
Resolution" times set forth in the chart below and will
provide Fixes to correct all other Errors that Customer
identifies, classifies and reports to Licensor within
the corresponding Error Resolution times below.
Customer agrees to provide information to Licensor that
is available to Customer to help it to duplicate the
Error. Without limiting the foregoing, Licensor will
communicate with Customer via telephone or email within
the following response times:

| Priority | Error Description | Acknowledgment | Plan of Action | Error Resolution Time (after Plan of Action) |
|---|---|---|---|---|
| | | (after receipt of notice from Customer) | (after Acknowledgment) | |
| 1 | Fatal (no useful work can be done). | 1 hour | 4 hours | 24 hours |
| 2 | Severe Impact (functionality disabled): Errors which result in a lack of application | 2 hours | 8 hours | 36 hours |

PLAINTIFF0002928



| Priority | Error Description | Acknowledgment | Plan of Action | Error Resolution Time (after Plan of Action) |
|---|---|---|---|---|
| | intermittent system failure. | | | |
| 3 | Degraded Operations: Errors causing malfunction of non-critical functions. | 12 working hours | 24 working hours | 48 working hours |
| 4 | Minimal Impact: specific, non-critical attributes and/or options do not operate as stated. | 24 working hours | 3 days | N/A |

**(d) Escalation Procedures.** In the event that Licensor fails to acknowledge an Error, develop a plan of action or provide an Error Resolution within the times set forth above, Licensor shall internally escalate such matters to the person(s) identified below and such person(s) shall immediately contact Customer as to the status of such plan of action or problem resolution. In addition, Customer shall have the right, to the extent that Customer does not receive a response from Licensor within the targeted response times or is not timely contacted by the appropriate Licensor personnel in accordance with escalation procedures set forth below, to contact directly the appropriate Licensor personnel as to the status of any response, plan of action or problem resolution.

| Escalation Stage | Contact | Name | Phone | Pager | Email |
|---|---|---|---|---|---|
| 1 | Support Manager | TBD | TBD | TBD | TBD |
| 2 | Customer Account Manger | TBD | TBD | n.a. | TBD |

PLAINTIFF0002929



**(e) Exceptions.** In the event that Licensor and Customer mutually agree in writing that the error is not the result of defective Licensed Software, Customer agrees to pay Licensor for the services provided as a result of Errors reported by Customer, the following fees: (i) $200 per hour for all work related to priority 1 or 2 issues and (ii) $150 per hour for all work related to priority 3 or 4 issues. Customer may request to terminate or change the priority level of any reported error at any time by requesting such change in writing or electronic transmission to the Licensor Support Manager.

Previous
README.md

Next
Product License Agreement

PLAINTIFF0002930



**LEGAL-TOOLS** DAOLABS

<span style="color:red">Connect Wallet</span>



# Variables

**Agreement Effective Date**

01/01/2023

**Your Entity's Name**

ACME CORPORATION

**Your Entity's Type**

Corporation

**Your Entity's Street Address**

123 Main Street, Apt. 45

**Your Entity's City**

Kalamazoo

**Your Entity's State**

Michigan

**Your Entity's ZIP Code**

49001

**Your Entity Representative's Full Name**

Ms. Jane Doe

**Your Entity Representative's Role/Title**

Chief Executive Officer

**Counterparty Entity's Name**

Road Runner LLC

**Counterparty Entity's Type**

Limited Liability Corporation

**Counterparty Entity's Street Address**

123 Main Street, Apt. 45

**Counterparty Entity's City**

Wichita

**Counterparty Entity's State**

Kansas

**Counterparty-zip**

67201

**Counterparty Entity Representative's Name**

Mr. John Doe

**Counterparty Entity Representative's Title/Role**

PLAINTIFF0002931

President

**Update document**



(i) EXHIBITS NOT COMPLETED

# [Entity-name] PRODUCT LICENSE AGREEMENT

This Product License Agreement ("**Agreement**") is made and entered into as of [Date] ("**Effective Date**") between [Entity-name] a [Entity-state] [Entity-type], with its principal place of business at [Entity-address], [Entity-cit ], [Entity-state] [Entity-zip] ("**Licensor**"), and [Counterparty-name], a [Counterparty-state] [Counterparty-type], with its principal place of business at [Counterparty-address], [Counterparty-city], [Counterparty-state] [Counterparty-zip] ("**Licensee**"). The parties agree as follows:

## 1. DEFINITIONS.

1.1 "**Affiliate**" of a party means an entity that is controlled by the party, where "control" means beneficial ownership (direct or indirect) of at least 50 percent of the shares of such entity entitled to vote in the election of directors (or in the case of an entity that is not a corporation, for the election of corresponding managing authority).

1.2 "**Client Software**" means software provided by Licensor to Licensee hereunder for use in Devices, as identified in **Exhibit A.**

1.3 "**Device**" means a hardware apparatus that is either a personal computer Device ("**PC Device**") or a set-top box Device ("**STB Device**") that contains either Client Software or software licensed by Licensor to another licensee that would be Client Software if it were licensed to Licensee hereunder and is configured and deployed to receive data from Licensor-licensed content distributors.

1.4 "**Documentation**" means documentation provided by Licensor to describe formally the use, function, or technical details of Licensed Products for the benefit of Licensor licensees (e.g. installation guides, reference manuals, support manuals, and training manuals).

1.5 "**Error**" means a failure of a Licensed Product to perform substantially in accordance with the applicable material technical specifications set forth in the Documentation pertaining to that version of the Licensed Product (excluding faults in the Documentation).

1.6 "**Licensed Product(s)**" means each and/or both of Client Software and Server Software.

1.7 "**Maintenance & Support Services**" means the maintenance and support services specified in **Exhibit B.**

1.8 "**Malicious Code**" means (i) any code, program, or sub-program whose knowing or intended purpose is to damage or maliciously interfere with the operation of the computer s stem containing the code, program or sub-program, or to halt, disable or maliciously interfere with the operation of the software, or (ii) any device, method, or token that permits any person to circumvent the normal security of the software or the system containing the code

PLAINTIFF0002932

security of the software or the system containing such code.

1.9 **"Release"** means a Maintenance Release, Minor Release, or Major Release.



    (a) **"Maintenance Release"** means a new version of a Licensed Product that incorporates Error corrections or new transparent features. Licensor designates Maintenance Releases with a change to the third number in version designation (i.e., from version x.xx.x to x.xx.y).

    (b)**"Minor Release"** means a new version of a Licensed Product that incorporates support for new platforms or enhancements to existing features, including updates. Licensor designates Minor Releases with a change to the second number in version designation (i.e., from version x.xx.x to x.yy.x).

    (c)**"Major Release"** means a new version of a Licensed Product that provides new features, including upgrades. Licensor designates Major Releases with a change to the first number in version designation (i.e., from version x.xx.x to y.xx.x).

1.10 **"Public Software**  means any software that contains, or is derived in any manner (in whole or in part) from, any software that is distributed as free software, open source software (e.g., Linux) or similar licensing or distribution models, including software licensed or distributed under any of the following licenses or distribution models, or licenses or distribution models similar to any of the following: (A) GNU's General Public License (GPL) or Lesser/Library GPL (LGPL), (B) the Artistic License (e.g., PERL), (C) the Mozilla Public License, (D) the Netscape Public License, (E) the Sun Community Source License (SCSL), (F) the Sun Industry Standards License (SISL), (G) the BSD License, and (H) the Apache License.

1.11 **"Server Software**  means software provided by Licensor to Licensee hereunder for use on dedicated server(s) and/or hard drive(s), as identified in **Exhibit A.**

1.12 **"Sublicense Agreement"** means an agreement that meets the requirements of **Section 2.5(b).**

1.13 **"Sublicensee"** shall have the meaning set forth in **Section 2.5.**

1.14 **"Term"** shall have the meaning set forth in **Section 5.1.**

1.15 **"Unauthorized Use"** means any use, reproduction, distribution, disclosure, sale, offer to sell, lease or rental, possession, examination, or other activity involving any part of the Licensed Products or Documentation that is not expressly authorized under this Agreement or otherwise in writing by Licensor.

## 2. GRANT OF RIGHTS; MAINTENANCE & SUPPORT.

2.1 **License to Server Software.** Subject to the provisions of this Agreement, Licensor grants to Licensee a non-exclusive, non-transferable (except as provided in **Section 9.2**), non-sublicensable (except as provided in **Section 2.5**) worldwide license during the Term to use the Server Software solely in the form and on the hardware provided by Licensor to Licensee (or configured by Licensor for Licensee) and solely to distribute data to Devices. This license is limited to the number of copies of the Server Software paid for by Licensee.

2.2 **Delivery of Server Software.** Licensor will procure and deliver Server Software, in the quantities set forth in **Exhibit A,** to Licensee on dedicated servers and/or hard drives customized by Licensor to operate the Server Software, as follows:

    (a) Licensor will procure such dedicated servers and/or hard drives for Licensee, as between Licensee and Licensor; any attempt by Licensee to physically or electronically open, modify, or in any way examine the workings of a dedicated server and/or hard drive shall result in immediate termination of Licensee's rights under this Agreement; **provided, however,** that Licensor shall be responsible for any and all configuration, installation, maintenance and other services that may require that the servers be physically or electronically opened, modified or examined;

PLAINTIFF0002933

(b) Licensee agrees that once configured by Licensor the servers and/or hard drives will be used for no purpose other than to operate the Server Software in accordance with this

Agreement, and any attempt by Licensee to physically or electronically open, modify, or in any way examine the workings of a dedicated server and/or hard dri e shall result in immediate termination of Licensee's rights under this Agreement.



(c) Licensor will promptly repair or replace any malfunctioning dedicated server and/or hard drive pursuant to the terms of the Maintenance & Support Services attached hereto as **Exhibit B**.

**2.3 License to Client Software.** Subject to the provisions of this Agreement, Licensor grants to Licensee a non-exclusive, non-transferable (except as provided in **Section 9.2**), non-sublicensable (except as provided in **Section 2.5**) license during the Term to reproduce, without modification, executable object code copies of the Client Software solely for the purpose of installing them on Devices; install executable object code copies of the Client Software solely on Devices; use the Client Software solely in connection with the authorized consumption of content via a Device and grant customers the a sublicense to use the Client Software solely to view content on the Devices. This license is limited to the number of copies of the Client Software paid for by Licensee.

**2.4 License to the Documentation.** Subject to the provisions of this Agreement, Licensor grants to Licensee a non-exclusive, non-transferable (except as provided in **Section 9.2**), non-sublicensable (except as provided in **Section 2.5**) license during the term of this Agreement to reproduce, without modification, and internally use copies of the Documentation solely in connection with Licensee's use of the Licensed Products in accordance with this Agreement.

**2.5 Limited Permission to Sublicense**

(a) **Permitted Sublicensees.** Subject to the provisions of this Agreement, including without limitation **Section 2.5(b)**, Licensee may sublicense to an entity ("**Sublicensee**") the rights Licensor has granted to Licensee in **Section 2.1**, to enable Sublicensee to distribute data on Licensee's behalf to Devices; in **Section 2.3**, to enable Sublicensee to reproduce, distribute, install, and use Client Software on Devices on Licensee's behalf; and in **Section 2.4**, to enable Sublicensee to reproduce and make internal use of the Documentation. Licensee may grant such sublicenses only to (x) its Affiliates and (y) independent contractors engaged by Licensee for the purpose of implementing a Licensor-licensed content delivery system and who are approved in writing in advance by Licensor.

(b) **Sublicense Agreements.** In order for a Sublicensee to obtain an  rights from Licensee, such Sublicensee must first execute a written agreement ("**Sublicense Agreement**") that  is no less protective of Licensor's rights and proprietary interests than is this Agreement;  requires Sublicensee to comply with the applicable terms of this Agreement;  names Licensor as an intended third-party beneficiary with the right to enforce the terms of the Sublicense Agreement;  disclaims any and all warranties and indemnification on behalf of Licensor and disclaims, to the maximum extent permitted by applicable law, Licensor's liability for any damages, whether direct, indirect, incidental, or consequential, arising in connection with the Licensed Products (provided, however, that Licensee shall retain all of its rights under this Agreement and shall have the right to bring claims against Licensor for any damages suffered by any Sublicensees resulting from a breach of this Agreement by Licensor);  requires the sublicensee to comply fully with all relevant export laws and regulations;  prohibits sublicensing by Sublicensee of the rights obtained under the Sublicense Agreement; and ;  terminates upon the termination of this Agreement. Licensee shall provide a copy of each Sublicense Agreement to Licensor promptly after execution of it by Sublicensee. THIS IS SUBJECT TO FURTHER REVIEW AS WE DETERMINE OUR POTENTIAL CONTRACTORS.

(c) **Enforcement of Sublicense Agreements.** Licensee shall  diligently enforce each Sublicense Agreement; notif  Licensor of every material breach of a Sublicense Agreement (of which Licensee becomes aware) that might affect Licensor, its other licensee, or customers; and  cooperate with Licensor in any legal action to prevent or stop Unauthorized Use of Licensed Products by Sublicensees or others.

**PLAINTIFF0002934**

**2.6 No Sale of Licensed Products.** The Licensed Products are licensed, not sold, by Licensor to Licensee, and nothing in this Agreement shall be interpreted or construed as a sale or purchase of the

Licensed Products. Licensor shall be responsible, in accordance with the Maintenance & Support Services, to maintain each server and/or hard drive provided by it to Licensee in good working order and in conformance with all specifications. Licensee shall keep the Licensed Products installed on s equipment free of security interests, liens, and other encumbrances. Under no circumstance may Licen permit any security interest, lien, or other encumbrance to be created in the Licensed Products or Documentation.

**2.7 Reservation of Rights.** Licensee shall not have or acquire any rights in or to the Licensed Products except as expressly granted in this Agreement. Licensor reserves to itself all rights to the Licensed Products not expressl granted to Licensee under this Agreement. Licensor retains all intellectual property rights in and to the Licensed Products. Licensee acknowledges that the Licensed Products, all copies of the Licensed Products, and any know-how and trade secrets related to the Licensed Products are the sole and exclusive property of Licensor and contain Licensor's confidential and proprietary information and materials. Licensee is not authorized to make derivative works of the Licensed Products or Documentation, but should Licensee inadvertently or otherwise create any derivative work, Licensee hereby irrevocably assigns to Licensor all right, title, and interest in and to all such derivative works.

# 3. RESTRICTIONS AND OBLIGATIONS.

**3.1 General Restrictions.** Except as expressly provided in this Agreement or as may be expressly permitted by applicable law, Licensee shall not, and shall not permit or authorize third parties to: reproduce, modify, translate, enhance, decompile, disassemble, reverse engineer, or create derivative works of the Licensed Products or Documentation; rent, lease, or sublicense the Licensed Products or the use of them; pro ide, disclose, make available, or permit the use of the Licensed Products or Documentation by or for any third party; alter, encode, copy, distribute, or transmit any data using the Licensed Products without obtaining all necessary copyright and other permissions; circumvent or disable any technological features or measures in the Licensed Products attempt to access, remove, or alter any Licensed Products or the hardware upon which they have been provided; or install, distribute, or use the Client Software on a Device that Licensee reasonably believes is susceptible to modification that permits end-user access or other unauthorized access to the Client Software.

**3.2 Access to Ensure Security.** Licensee shall ensure at all times during the Term that each copy of the Server Software is accessible by Licensor via a secure network connection (such as a VPN) in a manner reasonably approved in writing by Licensor. Licensee acknowledges that Licensor may use this connection solely and only to the limited extent necessary to monitor the security of the Server Software and its environment, to ensure that unauthorized copies of the Server Software or Client Software have not been made, and to deliver Maintenance & Support Services to Licensee. Licensee acknowledges that if this connection is lost for more than 14 days the Server Software may cease to operate. In addition if Licensor should become aware that such connection has been lost and if Licensor should report the same to Licensee, Licensee shall respond to such report within twenty-four (24) hours and shall exercise commercially reasonable efforts to reestablish such connection with forty-eight (48) hours.

**3.3 Proprietary Rights Notices.** Licensee shall neither alter nor remove any copyright notice or other proprietary rights notices that may appear on any part of the Licensed Products or Documentation. In addition, when reproducing any part of the Licensed Products or Documentation in accordance with this Agreement, Licensee shall include all copyright and other proprietary rights notices as are currently contained on each part of the Licensed Products and Documentation or as may be reasonably specified from time to time by Licensor.

**3.4 Compliance with Laws.** Each party shall maintain high standards of professionalism and shall at all times comply with all applicable laws, statutes, ordinances, regulations, and, in the case of Licensee, instructions from Licensor regarding use of the Licensed Products and Documentation. Each party shall refrain from any unethical conduct or any other conduct that may damage the reputation of the other party or the other party's products.

PLAINTIFF0002935

3.5 **Export and Import.** Licensee shall at all times comply with all applicable export and import control laws and regulations and shall not export and/or import the Licensed Products or Documentation without Licensor's prior written consent.

3.6 **No Warranties.** Licensee shall not make or publish any representations, warranties, or guarantees concerning the Licensed Products on behalf of Licensor without Licensor s prior written consent.

3.7 **Protection Against Unauthorized Use.** Licensee acknowledges that the Licensed Products, Documentation, and other materials furnished to Licensee by Licensor comprise, include, and/or relate to valuable proprietary rights of Licensor. Licensee shall take all appropriate steps and precautions to protect the Licensed Products and Documentation. Without limiting the generality of the foregoing, Licensee shall exercise commercially reasonable efforts to prevent any Unauthorized Use and shall immediately notify Licensor in writing of any possible Unauthorized Use that comes to Licensee's attention. In the event of any Unauthorized Use by anyone who obtained access to the Licensed Products or Documentation directly or indirectly through Licensee or any of its Sublicensees or any of their employees, agents, representatives, or contractors, Licensee shall take all commercially reasonable steps necessary to terminate such Unauthorized Use and to retrieve any copy of the applicable Licensed Products and Documentation in the possession or control of the person or entity engaging in such Unauthorized Use. In the case of any Unauthorized Use resulting from Licensee's fault, Licensee shall provide to Licensor such cooperation and assistance as Licensor may reasonably request.

3.8 **Facilitation of Infringement.** Licensee shall not knowingly use or permit the use of any Licensed Products or Documentation to facilitate the infringement of copyrights or other proprietary rights.

3.9 **Indemnification.** Each party shall defend, indemnify and hold the other party, the other party's Affiliates and the officers, directors, shareholders, agents, employees and assigns of each, harmless from and against any and all claims, demands, suits, judgments, losses, or expenses of any nature whatsoever (including attorneys' fees) arising directly or indirectly, in whole or part, from or out of any breach of its representations, warranties or agreements as set forth herein. The indemnification obligations shall not be limited by the insurance requirements and shall extend to claims occurring after the Agreement has terminated as well as while the Agreement is in force. The provisions of this s**ection** shall survive the expiration or early termination of this Agreement.

# 4. FEES AND PAYMENT.

### 4.1 **Fees and Payment Terms**

(a) Licensee shall pay Licensor the license fees and any other amounts owing under this Agreement, as specified in **Exhibit A**, plus any applicable sales, use, excise, or other taxes and shipping charges from Licensor's location. Unless otherwise specified in **Exhibit A**, Licensee shall pay all amounts due within 30 days of the date of the applicable invoice. Licensor reserves the right to revise the fees specified in **Exhibit A** following the initial Term upon thirty (30) days written notice to Licensee.

(b) All amounts payable under this Agreement are denominated in United States dollars, and Licensee shall pay all amounts in United States dollars. Licensee shall promptly notify Licensor of any laws that Licensee is aware of that will prohibit Licensee from making payment in United States dollars.

4.2 **Taxes.** Other than federal and state net income taxes imposed on Licensor, Licensee shall bear all taxes, duties, and other governmental charges (collectively, "**taxes**") due in connection with this Agreement and the transaction contemplated hereby.

4.3 **Audit.** During the Term and for one year thereafter, Licensee shall keep current, complete, and accurate records regarding the reproduction, distribution, and use of Licensed Products and Documentation. Licensee shall provide such information to Licensor and certify that it has paid all fees required under this Agreement within fifteen business days of any written request to do so, provided that Licensor shall make no more than one such requests each year. Licensee shall, after reasonable prior notice from Licensor, provide Licensor reasonable access during standard business hours to Licensee's premises, records, and personnel solely and to the limited extent required for Licensor to audit and confirm that Licensee has complied and is complying with this Agreement.

PLAINTIFF0002936