**provided, however,** that such an audit shall not occur more than once per year. If an audit reveals any
reproduction, distribution, or use of the Licensed Products or Documentation that is not compliant with

this Agreement, Licensee shall promptly correct and remedy such noncompliance and shall make such
additional payments as are contemplated in this Agreement. If the amount of the underpayment to
Licensor is five percent or greater, Licensee shall promptly reimburse Licensor for its costs of
conducting such audit



# 5. TERM AND TERMINATION.

5.1 **Term.** The term of this Agreement ("**Term**") will commence upon the Effective Date and continue for a
period of one (1) year unless earlier terminated as provided in this Agreement; the Term shall renew on
an annual basis for additional one (1) year periods provided that the parties mutually agree.

5.2 **Notice of Material Breach or Default.** If either party commits a material breach or default in the
performance of any of its obligations under this Agreement, the nondefaulting party shall give the
defaulting party written notice of the material breach or default and the nondefaulting party's
intention to terminate the Agreement pursuant to **Section 5.3** if the material breach or default is not
cured within thirty (30) days after the defaulting party's receipt of such written notice (or such
later date as may be specified in writing by the nondefaulting party).

5.3 **Post-Termination Obligations.** If this Agreement is terminated for any reason, Licensee and its
Sublicensees shall immediately cease all reproduction, distribution, and use of the Licensed Products
and the Documentation   all licenses granted by Licensor and obligations assumed by Licensor hereunder
shall immediately terminate;  Licensee shall promptly pay to Licensor any fees, reimbursable expenses,
compensation, and other amounts that have accrued prior to termination, and all liabilities accrued by
Licensee prior to termination shall survive;  Licensee and its Sublicensees shall, within five (5) days
of termination, (i) return to Licensor all copies of the Server Software (along with the servers and/or
hard drives upon which they were provided); (ii) return to Licensor or destroy all copies of the Client
Software in its possession or control (and irretrievably destroy by electronic means all copies of the
Client Software installed in Devices); (iii) return to Licensor all copies of the Documentation; each
party will return to the other party all copies and other embodiments of the other party's Confidential
Information not otherwise specifically addressed in this Section 5.5 (and irretrievably destroy all
electronic copies and embodiments of such Confidential Information); and each party will provide the
other party with a written certification signed by an officer setting forth the manner in which it has
complied with the requirements of this **Section 5.5.** In the event that some but not all licenses granted
by Licensor to Licensee hereunder are terminated for any reason, the provisions of this **Section 5.5**
shall apply *mutatis mutandis* to the Licensed Products, Documentation, Confidential Information, amounts
due, and liabilities relating to such terminated licenses.

# 6. WARRANTIES AND DISCLAIMER.

6.1 **Mutual Warranties**  Each party represents and warrants to the other that  this Agreement has been
duly executed and delivered and constitutes a valid and binding agreement enforceable against such
party in accordance with its terms;  no authorization or approval from any third party is required in
connection with such party's execution, delivery, or performance of this Agreement; and  the execution,
delivery, and performance of this Agreement does not violate the laws of any jurisdiction or the terms
or conditions of any other agreement to which it is a party or by which it is otherwise bound.

6.2 **Ownership and Use**  Licensor represents, warrants and covenants that it is either the owner of, or
authorized to use the License Products.

6.3 **Performance.** Licensor represents, warrants and covenants that the Licensed Products and all other
software, equipment, materials and other items it provides or uses under this Agreement, whether owned
by Licensor or licensed from a third party, will perform in conformance with its documentation and
specifications and will provide the functions and features and operate in the manner described therein.

6.4 **Malicious Code.** Licensor shall use industry best practices and take prudent actions and precautions
to identify, screen and prevent the introduction and proliferation of, any Malicious Code into the

PLAINTIFF0002937

Licensee's environment or any system used by Licensor. Without limiting Licensor's other obligations under the Agreement, Licensor covenants that, in the event any Malicious Code is found in its software or systems, Licensor shall promptly notify Licensee in writing of the Malicious Code and shall at no additional charge promptly eliminate, and reduce the effects of the Malicious Code and, if the Malicious Code causes a loss of operational efficiency, loss of data or results in stolen or unauthorized access to Licensee Information, use diligent efforts to mitigate the effects of such losses and unauthorized access and restore any lost data using generall  accepted data restoration techniques. Licensor shall indemnify Licensee for all losses incurred b  Licensee as a result of such Malicious Code; provided, however, that such obligation will not be applicable with respect to Malicious Code that Licensor demonstrates was introduced by Licensee, its employees, agents or contractors. Licensor will cooperate with and assist Licensee to facilitate any required reporting related to any such loss of or stolen data or unauthorized access.

6.5 **Public Software.** Licensor shall notify Licensee of any Public Software components that are part of any Licensed Products as of the Effective Date. During the Term of this Agreement, Licensor will notify Licensee if it intends to add any new Public Software component to the Licensed Products. In the event that the Licensed Software (as it is currently configured and as it may be configured in the future) includes or is distributed with any Public Software, Licensor represents and warrants that (a) there are no provisions in any licenses covering the Public Software that would require the disclosure of any software or other technology of Licensee, its affiliates or contractors  and (b) to the extent that any such disclosure provisions become applicable to any Public Software included in or distributed with the Licensed Products in the future, Licensee's (and its Affiliates's) use of the Licensed Products under this Agreement will not require such a disclosure.

6.6 **Disclaimer.** EXCEPT FOR THE EXPRESS REPRESENTATIONS AND WARRANTIES STATED IN THIS **Agreement,** neither party MAKES ANY ADDITIONAL REPRESENTATION OR WARRANTY OF ANY KIND WHETHER EXPRESS, IMPLIED (EITHER IN FACT OR BY OPERATION OF LAW), OR STATUTORY, AS TO ANY MATTER WHATSOEVER  LICENSEE AND ITS SUBLICENSEES DO NOT HAVE THE RIGHT TO MAKE OR PASS ON ANY REPRESENTATION OR WARRANTY ON BEHALF OF Licensor TO ANY SUBLICENSEE, END-USER  OR OTHER THIRD PARTY.

# 7. LIMITATIONS OF LIABILITY.

7.1 **Disclaimer of Consequential Damages.** NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT, NEITHER PARTY WILL, UNDER ANY CIRCUMSTANCES, BE LIABLE TO THE OTHER PARTY, LICENSEE'S SUBLICENSEES, OR ANY END-USERS FOR CONSEQUENTIAL, INCIDENTAL, SPECIAL, OR EXEMPLARY DAMAGES ARISING OUT OF OR RELATED TO THE TRANSACTION CONTEMPLATED UNDER THIS AGREEMENT, INCLUDING BUT NOT LIMITED TO LOST PROFITS OR LOSS OF BUSINESS, EVEN IF APPRISED OF THE LIKELIHOOD OF SUCH DAMAGES.

7.2 **Independent Allocations of Risk.** EACH PROVISION OF THIS AGREEMENT THAT PROVIDES FOR A LIMITATION OF LIABILITY, DISCLAIMER OF WARRANTIES, OR EXCLUSION OF DAMAGES IS TO ALLOCATE THE RISKS OF THIS AGREEMENT BETWEEN THE PARTIES. THIS ALLOCATION IS REFLECTED IN THE PRICING OFFERED BY Licensor TO LICENSEE AND IS AN ESSENTIAL ELEMENT OF THE BASIS OF THE BARGAIN BETWEEN THE PARTIES. EACH OF THESE PROVISIONS IS SEVERABLE AND INDEPENDENT OF ALL OTHER PROVISIONS OF THIS AGREEMENT, AND EACH OF THESE PROVISIONS WILL APPLY EVEN IF THE WARRANTIES IN THIS AGREEMENT HAVE FAILED OF THEIR ESSENTIAL PURPOSE.

# 8. CONFIDENTIALITY.

8.1 **"Confidential Information"** means the trade secrets of each party, and any other information disclosed by either party to the other party during the Term, or otherwise in connection with the Agreement, that the other party knows or has reason to know is confidential, whether such information is of a technical, business, or other nature (including, without limitation, information relating to such party's technology, software, products, services, designs, methodologies, business plans, finances, marketing plans, licensees, prospects, or other affairs). For purposes of clarity, the Licensed Products and Documentation are the Confidential Information of Licensor. Confidential Information does not include any information that, as evidenced by the recipient's written records:  was known to recipient prior to receiving the same from the discloser;  is independently developed by the recipient without use of or reference to information of the discloser; or is or becomes part of the public domain through no fault or action of the recipient.

PLAINTIFF0002938

**8.2 Restricted Use and Nondisclosure.** During and after the Term, the recipient shall:  use the discloser's Confidential Information solely for the purpose for which it is provided (and if no purpose is specified, then solely to perform its obligations or exercise its rights under this Agreement);  not disclose the discloser's Confidential Information to any third party other than as expressly provided for under this Agreement; and  protect the discloser's Confidential Information from unauthorized use and disclosure to the same extent (but using no less than a reasonable degree of care) that it protect its own Confidential Information of a similar nature.

**8.3 Required Disclosure.** If either party is required by law to disclose the other party's Confidential Information or the terms of this Agreement, it must give prompt written notice of such requirement before such disclosure and assist the other party in obtaining an order protecting the Confidential Information from disclosure.

**8.4 Return or Destruction of Materials.** Upon the termination of this Agreement (as more particularly set forth in **Section 5**), or upon earlier request, each party shall deli er to the other party or destroy all of the other party's Confidential Information that it may have in its possession or control.

# 9. GENERAL.

**9.1 Relationship.** Each party hereto shall be and act as an independent contractor (and not as the agent or representative of the other) in the performance of this Agreement. This Agreement shall not be interpreted or construed as  creating or evidencing any association, joint venture, partnership, or franchise between the parties;  imposing any partnership or franchise obligation or liability on either party; or  prohibiting or restricting Licensor's work with or performance of any services for any third party. Licensee must not represent to anyone that Licensee is an agent of Licensor or is otherwise authorized to bind or commit Licensor in any way without Licensor's prior written consent.

**9.2 Assignability.** Licensee may not assign its rights, duties, or obligations under this Agreement without Licensor's prior written consent except to 1) an Affiliate, or 2) a third party in connection with the transfer of Licensee's video on demand project presently referred to as "MovieBeam". If consent is given, this Agreement shall bind Licensee's successors and assigns. Any attempt by Licensee to transfer its rights, duties, or obligations under this Agreement, including in connection with a change of control of Licensee, except as expressly provided in this Agreement is void and is a material breach of this Agreement.

**9.3 Nonsolicitation.** During the Term and for a period of one year thereafter, neither party shall, directly or indirectl , employ or solicit the employment or services of an employee or independent contractor of the other party without the other party's prior written consent.

**9.4 Notices.** All notices, requests, demands and other communications to either party hereunder shall be in writing and shall be given to such party at its address set forth below or such other address as such party may hereafter specify in writing in accordance with the requirements of this section for the purpose of notice to the other party. Each such notice, request or other communication shall be effective upon actual delivery to the party by registered or certified mail, return receipt requested or by any other means (including, without limitation, hand delivery or reputable nationally recognized overnight courier ser ice) when delivered at the address specified pursuant to this section and signed for by the intended receiving party.

| To Licensor: | To Licensee: |
|---|---|
| [Entity-name] | [Counterparty-name] |
| [Entity-address] | [Counterparty-address] |
| [Entity-city], [Entity-state] [Entity-zip] U.S.A. | [Counterparty-city], [Counterparty-state] [Counterparty-zip] U.S.A. |

PLAINTIFF0002939

Either party may change its address for receipt of notice by notice to the other party in accordance with this Section.

9.5 **Force Majeure.** Neither party shall be liable for, or be considered to be in breach of or default under this Agreement on account of, any delay or failure to perform as required by this Agreement as a result of any cause or condition beyond its reasonable control, so long as such party uses all commercially reasonable efforts to avoid or remove such causes of non-performance.

9.6 **Governing Law.** This Agreement shall be interpreted, construed, and enforced in all respects in accordance with the laws of the State of Alabama, U.S.A, without reference to its choice of law rules and not including the provisions of the 1980 U.N. Convention on Contracts for the International Sale of Goods. Except as specified in **Section 9.7,** any action arising out of or in connection with this Agreement shall be heard in the federal, state, or local courts in the county of Houston, Alabama, and each party hereby irrevocably consents to the exclusive jurisdiction and venue of these courts.

9.7 **Arbitration.** Except for the right of either party to apply to a court of competent jurisdiction for a temporary restraining order, a preliminary injunction, or other equitable relief to preserve the status quo or prevent irreparable harm, any dispute as to the interpretation, enforcement, breach, or termination of this Agreement shall be settled by binding arbitration in Houston, Alabama, U.S.A under the Rules of the International Chamber of Commerce by three arbitrators appointed in accordance with those rules. All other disputes shall be resolved by a court specified in **Section 9.6.** Judgment upon an award rendered by the arbitrators may be entered in any court of competent jurisdiction. The prevailing party shall be entitled to receive from the other party its attorneys' fees and costs incurred in connection with any arbitration and/or litigation.

9.8 **Foreign Corrupt Practices Act.** In conformity with the United States Foreign Corrupt Practices Act and with Licensor's corporate policies regarding foreign business practices, Licensee and its employees and agents shall not directly or indirectly make or offer any payment, promise to pay, or authorize payment, or offer a gift, promise to give, or authorize the giving of anything of value for the purpose of influencing an act or decision of an official of any government (including a decision not to act) or inducing such a person to use his influence to affect any such governmental act or decision in order to assist Licensor in obtaining, retaining, or directing any such business

9.9 **Waiver.** The waiver by either party of any breach of any provision of this Agreement does not waive any other breach. The failure of any party to insist on strict performance of any covenant or obligation in accordance with this Agreement shall not be a waiver of such party's right to demand strict compliance in the future, nor shall the same be construed as a novation of this Agreement.

9.10 **Severability.** If any part of this Agreement is found to be illegal  unenforceable, or invalid, the remaining portions of this Agreement shall remain in full force and effect. If any material limitation or restriction on the grant of any license to Licensee under this Agreement is found to be illegal, unenforceable, or invalid, the license shall immediately terminate.

9.11 **Survival.** The provisions of **Sections 2.6, 2.7, 3, 5.5, 6, 7 and 8** shall survive the termination of this Agreement for an  reason.

9.12 **Interpretation.** The parties have had an equal opportunity to participate in the drafting of this Agreement and the attached exhibits, if any. No ambiguity shall be construed against any party based upon a claim that that party drafted the ambiguous language. The headings appearing at the beginning of sections contained in this Agreement have been inserted for identification and reference purposes only and may not be used to construe or interpret this Agreement. Whenever required by context, a singular term shall include the plural, a plural term shall include the singular  and the gender of any pronoun shall include all genders. This Agreement is in English only, and all versions, if any, in any other language shall not be binding on the parties. All communications and notices under this Agreement must be provided in English.

9.13 **Counterparts.** This Agreement may be executed in any number of identical counterparts, notwithstanding that the parties have not signed the same counterpart, with the same effect as if the parties had signed the same document. All counterparts shall be construed as and constitute one and the same agreement. This Agreement may also be executed and delivered by facsimile and such execution and delivery shall have the same force and effect of an original document  th original

PLAINTIFF0002940

delivery shall have t e same force and effect or an original document with original signatures.

9.14 **Entire Agreement**  This Agreement, including all exhibits, is the final and complete expression of the agreement between these parties regarding the subject matter hereof  This Agreement supersedes, and the terms of this Agreement govern, all previous oral and written communications regarding these matters, all of which are merged into this Agreement. No employee, agent, or other representative of Licensor has any authority to bind Licensor with respect to any statement, representation, warranty, or other expression unless the same is specifically set forth in this Agreement. No usage of trade or other regular practice or method of dealing between the parties shall be used to modify, interpret, supplement, or alter the terms of this Agreement. This Agreement may be changed only by a written agreement signed by an authorized agent of the party against whom enforcement is sought.

[Signature page to follow]

IN WITNESS WHEREOF, each party has caused this Agreement to be executed on its behalf by a duly authorized representative as of the Effective Date.

| LICENSOR | LICENSEE |
|---|---|
| Signature: _____ | Signature: _____ |
| Print Name: [Entity-signer-name] | Print Name: [Counterparty-signer-name] |
| Role: [Entity-signer-role] | Role: [Counterparty-signer-role] |
| Dated: [Date] | Dated: [Date] |

# Exhibit A

LICENSED PRODUCTS AND FEES

1. LICENSE Fees

(a) **Revenue Share Fee**  Licensee shall pay to Licensor a quarterly non-refundable fee equal to the Rev Share percentage identified in the table below multiplied by the total Net Revenue received by Licensee during each calendar quarter for movie content delivered by Licensee to each Device on which the Client Software is installed and utilized to secure such movie content(**"Revenue Share Fee"**). **"Net Revenue"** shall be defined as gross revenue received by Licensee for such content rentals, less (a) direct fees payable by Licensee to the applicable studio or content owner for such content, (b) credits issued to customers and (c) tax payments made by customers. The Revenue Share Fee includes maintenance and support services as outlined in Exhibit B. The Revenue Share Fee is calculated each calendar quarter, based on the highest number of Devices which received such content at any point in the quarter?[THIS NEEDS TO BE FLESHED OUT]

(b) **Quarterly Reporting:**  Licensee shall deliver to Licensor a written quarterly report (each a **"Report"** and collecti ely the **"Reports"**) detailing at minimum: (i) the number of copies of Client Software distributed to end users on Devices during the calendar quarter; and (ii) the Net Revenue from such content for the calendar quarter. Such Report shall be delivered to Licensor within forty-five (45) calendar days following each quarter end, and shall be accompanied by full payment of the total fees due for the quarter. If the calculated Revenue Share Fee is less than $6,700 in a given quarter, Licensee shall pay a minimum Revenue Share Fee of $6,700 for such quarter.

**WHAT IS THE DEFINITION OF ACTIVE DEVICE??**

(c) **Server Software Fee:** Licensee shall pay to Licensor a non-refundable license fee for each server and/or hard drive upon which it wishes Licensor to install Server Software (**"Server Software Fee"**), and Licensee's license under this Agreement is limited to the number of such servers and/or hard drive

PLAINTIFF 0002941

which it has paid the Server Software Fee. Additional fees will apply if Licensee wishes Licensor to provide servers and/or hard drives. The Server Software Fee is calculated in accordance with the volume and price per server and/or hard drive terms specified in the table below.

(d) **Timing of Payments:** Licensor will issue an invoice to Licensee calling for the $40,000 payment associated with the Server Software to be provided above upon receipt b  Licensee of such Server Software 

   2. Professional Ser ice

Licensee shall pay to Licensor a non-refundable Professional Service fee of $100,000 for the initial installation and associated project management. Licensor will invoice separately all reasonable and actual travel expenses incurred while traveling to provide these services. [THIS NEEDS TO BE FURTHER CLARIFIED]

a. **Timing of Payments**  Upon the Effective Date, Licensor will issue an invoice to Licensee calling for payment of 100% of the total Professional Service fee due for the Term. Licensee shall pay such invoice upon the Effective Date. [WE WILL PAY UPON COMPLETION OF CERTAIN MILESTONES]

(b) The fee associated with the Statement of Work as detailed in **Exhibit C** is $500,000, and will be waived by Licensor.[WHAT DOES THIS MEAN?]

# Exhibit B

MAINTENANCE & SUPPORT SERVICES

   1. GOLD SECURITY MAINTENANCE & SUPPORT SERVICES

      a. **Maintenance.** Licensor will provide Licensee with the following services during the Term:

      i. **Telephone and Email Support**. Licensor will provide Licensee with 24/7 telephone and email suppo

      ii. **Licensed Product Corrections**. Licensor will correct (e.g., by providing a workaround or an Erro

         (b) **Support Levels**. The following support levels define which content security representative i

```
+------------------------+-------------------------------------------------------------+ | SUPPORT LEVEL |
ROLES & RESPONSIBILITIES: | +------------------------+-------------------------------------------------------------
---------+ | Level 1   Initial support of phone calls & emails to: | |   | | | - Define and isolate an
incident | | | | | - Define the priority of the incident | | | | | - Troubleshoot via phone or
email | | | | | | - Resolve the incident | | | | | - If required, escalate to Level 2 | +------------
----------+------------------------------------------------------------+ | Level 2 | Level 2 support of
incidents, to: | |   | | - Attempt to recreate the incident in a test lab | | | | | - Advanced
troubleshooting, configuration modifications | | | | | - Resolve the incident | | | | | - If
required, escalate to Level 3 | +------------------------+-----------------------------------------------
----------------+ | Level 3 | Support Engineering support of incidents, such as: | | | | | - Code
engineering/changes | +------------------------+-----------------------------------------------------------
---+
```

(c) **Managerial Escalation.** If at any time Licensee reasonably believes that a case is not being handled in accordance with the service levels under Gold Security Maintenance & Support Service or Licensee wishes to comment on the way a particular case is being addressed by a technician, Licensee may contact the appropriate support team manager.

(d) **Technical Escalation.** Maximum escalation time frames are determined by the priority assigned the case. Priority definitions are as follows:

**Incident Priority Description**

PLAINTIFF0002942

Priority 1: Critical. Cypher system is inoperable, leaving most content unprotected and/or leaving more than 5% video subscribers without video service.

Priority 2: Major. Significantly impacted video service with reduced performance for more than 10% video subscribers. The system is partially inoperative but still usable by the end user.



Priority 3: Minor. Impairment of video service for less than 10% of subscribers (such as single subscriber issues or non-service affecting issue).

Priority 4: Cosmetic. Intermittent quality issues with viewing content.

Priority 5: Non-incident: Feature requests, configuration questions and administrative tasks.

(e) **Technical Escalation Guidelines.** AFTER THE INITIAL RESPONSE, THE ESCALATION TIME FRAMES START ONCE THE LICENSEE PROVIDES THE TECHNICIAN WITH THE PERTINENT DATA (e.g. logs and configuration files) AND/OR SYSTEM ACCESS NEEDED FOR WIDEVINE TO EFFECTIVELY TROUBLESHOOT THE ISSUE

**Escalation from Level 1 to: Level 2 Level 3**

Priority 1 2 Business Hours 4 Business Hours

Priority 2 4 Business Hours 4 Business Hours

Priority 3 Next Business Day Next Business Day

Priority 4 & Priority 5 2nd Business Day 2nd Business Day

(ii) **Installation of Server Software.** Licensor shall install the Server Software at Licensee's designated location.

(iii) **Hardware Replacement Warranty.** Licensor shall replace any malfunctioning dedicated server and/or hard drive. Replacement hardware or parts may be new, reconditioned, or refurbished. The replaced hardware shall remain the property of Licensor–I THOUGHT WE OWN THEM. Licensee will ship any hardware in need of exchange to Licensor at its own expense and in accordance with the shipping instructions provided by Licensor. WHY DO WE HAVE TO PAY TO SHIP BACK MALFUNCTIOING EQUIPMENT? Licensor will pay shipping costs for the hardware being shipped to Licensee, except that Licensee will pay any applicable taxes, duties, or other costs for international shipments. Replacement hardware products or parts will be provided to Licensee at no cost if the malfunction is caused by normal wear and tear of the Licensed Products and not due to use of the Licensed Products contrary to the user manuals, specification or Licensor's instructions. Otherwise, Licensee will pay Licensor's then current list price for the replacement.

(iv) **Patches.** Within a reasonable time after general commercial release  Licensor will make available to Licensee one copy of all patches and all corrections to the associated Documentation at no charge.

(v) **Updates.** Within a reasonable time after general commercial release, Licensor will make available to Licensee one copy of all updates to Licensed Products at no charge.

(vi) **Maintenance, Minor, and Documentation Releases.** Licensor will, within a reasonable time after general commercial release, make available to Licensee one copy of all Maintenance Releases, Minor Releases and all corrections to the associated Documentation at no charge.

2. LIMITATIONS

a. **Outdated and Discontinued Releases.** Licensor reserves the right  in its sole discretion, to create Major Releases of the Licensed Products. Licensor will support each Major Release of a Licensed Product for a period of twelve months from the first production ship date of the Major Release that supersedes it or from the discontinuation date, as applicable. Special support prices may apply for the support of outdated or discontinued versions of Licensed Products after the

**PLAINTIFF0002943**

initial twelve-month period, but Licensor may require immediate installation of Major Releases.

### b. Exclusions

i.  Unless otherwise expressly agreed to in writing by Licensor, Licensor is not obligated to provide M

ii. Unless otherwise expressly agreed to in a separate agreement b  Licensor, the Maintenance S rt

## 3. LICENSEE OBLIGATIONS

a. **Trained Contacts.** Licensee will appoint up to two individuals within Licensee's organization that are trained on the operation of the Licensed Products to serve as primary contacts between Licensee and Licensor with regards to the Maintenance & Support Services. Licensee must initiate all requests for Maintenance & Support Services through these contacts.

b. **Error Reporting.** Licensee will document and promptly report all detected Errors to Licensor with enough detail to permit Licensor to reproduce the Error. Licensee will assist Licensor with recreating and diagnosing each Error.

c. **Installation of Releases.** Licensee will promptly implement all Releases and Error corrections and workarounds provided by Licensor**; provided, however,** that such corrections or workarounds do not require Licensee to incur any material expenses.

d. **Supervision of the Licensed Product.** Licensee must supervise, control, and manage the use of the Licensed Products. In addition, Licensee is responsible for archiving its data to mitigate against losses that may be caused by Errors.

e. **Upgrade Systems.** In order to provide Error corrections, workarounds, and Releases, Licensor may require Licensee to upgrade, at its own cost, its hardware and software systems to Licensor's then-current supported versions of system components.[WE NEED MORE DETAIL ON THIS SINCE IT WILL PROBABLY RESULT IN ADDITIONAL COST TO US]

f.

g. **Provide Access to Licensee Personnel and Equipment.** Licensee will provide Licensor with reasonable access to all necessary personnel to answer questions regarding Errors and other problems reported by Licensee. Licensee will also provide Licensor with reasonable access to its equipment pursuant to Section 3.2 of the Agreement.

### h. EXHIBIT C: STATEMENT OF WORK and INTEGRATION

Licensor may revise, change, or otherwise modify the Statement of Work and Integration (SOW) throughout the development cycle based on requirements captured from Licensee or at Licensor's reasonable discretion.

## 1. Statement of Work

## 2. MovieBeam Integration

**Version: 0.4**

**Document Status Sheet**

---

**Document Control Number**

---

**Revision History**

**Date**

**Status** Work In Progress Draft Issued Closed

**PLAINTIFF0002944**

**Distribution Restrictions** Author Internal Partner / Customer Public



## Key to Document Status Codes:

Status

- Work In Progress -- An incomplete document, designed to guide discussion and generate feedback. This may include multiple alternatives for consideration.

- Draft -- A document that is, for the most part, complete, but not reviewed. Drafts are susceptible to substantial change.

- Issued -- A stable document which has undergone rigorous review and is suitable for product development, cross-vendor interoperability, and certification testing. Signatures must exist at this point

- Public -- A static document that has been reviewed, tested, validated and closed to all further change requests. A document that represents the product "AS IS".

Distribution Restrictions

- Author -- This document may be consumed by the document author or authors.

- Internal -- This document may be consumed by Licensor employees only.

- Partner / Customer -- This document may be consumed by Licensor partners and customers.

- Public -- This document may be consumed by anyone.

## 1. Purpose

The purpose of the SOW is to define and estimate the work involved in the phase 1 integration of the Licensor Cypher Solution into the MovieBeam system.

## 2. General Description / Overview

The first phase of the integration shall involve the integration of the Cypher System into the MovieBeam system to create and manage the entitlements for already encr pted files. The Licensor solution shall handle the key management for the new deployed receiving devices (G2.5) as well as the existing G2.0 receiving devices.

The high level block diagram and the high level message flow are shown in the figure below (NOTE: The block diagram should include an interface to the existing G2.0 STBs):


The integration shall support the following actions/tasks:

1. The MovieBeam system middleware shall call an API in the Cypher Licensor system to add the Asset ID and the associated key for the asset into the database of the C pher System.

2. The MovieBeam system middleware shall call an API in the Cypher Licensor system to add all the subscribers and receiving devices into the database of the Cypher System.

3. The Licensor Cypher system shall create an entitlement (EMM) for each subscriber for each asset.

4. Every receiving device shall connect on a predefined interval to the Licensor Cypher EMMg server to retrieve its entitlements for all the assets.

5. During operation the MovieBeam system middleware shall call an API in the Licensor Cypher system for sending EMM commands to the receiving devices.

6. The Licensor EMMg server shall connect to the SkyStream MUX using the Simulcrypt **PLAINTIFF0002945**

6. The Licensor EMMg server shall connect to the 400-stream MUX using the Simulcrypt specification and then insert the EMM control commands into the live over the air broadcast.

7. The Licensor Cypher Client shall pass all received EMM control commands to the MovieBeam receiving device middleware.

8. On the purchase of a Movie on the receiving device the credit limit shall be deducted with the value associated to the Movie.

9. On the reaching of a specific pre-defined available credit value or when it receives an EMM control message the Cypher Client shall connection to the Cypher S stem to report the purchases made by the user

10. Integration with the MovieBeam G2 set top box and integration with the hosted service as configured as of the Effective Date of this Agreement.

## 3. Development Tasks

The following development tasks are required for the project:

1. API for adding encrypted assets

Develop a new Cypher Asset Owner interface message that can be used to define a new asset in the Cypher system by supplying the KeyId and Key associated to an already encrypted asset.

2. EMM CMD (IRD commands) APIs

Develop a new Cypher Subscriber Owner interface messages to allow for EMM CMD messages to be transmitted over the air to the receiving devices and also for the Cypher Client to pass it back to the Middleware on the receiving device.

3. Offline Credit Limit implementation

Develop a pay per view implementation that implements a credit limit that will allow a user to purchase content offline and also to report the purchases back to the Licensor C pher system.

4. STB Integration

Integrate the Licensor Cypher Client (virtual smart card) into the MovieBeam receiving devices. This will include the porting the Licensor Cypher Client to the Sigma 8634 XPU.

5. EMM insertion

Develop the interface that can be used to insert EMMs into the live transmission MUX equipment for the live over the air broadcast of EMMs.

6. MS ASF Decryption

The files will still be encrypted on the Head-End using the current MovieBeam system. The MS ASF decryption on the new receiving devices will have to be developed and implemented by Licensor.

7. Licensor CAS Console (EIM Manager)

Develop support for the new EMM CMD messages in the Licensor CAS Console.

8. Receiving Device Authentication/Provisioning (Chain of Trust)

Develop an Authentication/Provisioning (Chain of Trust) process for the new MovieBeam receiving device.

9. Application Signing

Develop an application signing process for applications targeted for the new MovieBeam receiving device. This process covers the complete trusted chain boot sequence starting from the

PLAINTIFF0002946

device. This process covers the complete crusadon boot sequence starting from power on.

10. Virtual Smart Card Protection

For 8634 based implementations, the secure store will involve the XPU. For 8622 and 8634 based implementations, the Licensor solution will include protection against hard disk state rollback.



11. Secure Storage Add-ons

Develop APIs that allow MovieBeam to add items to the secure store. For example, rental pricing.

## 4. Deliverables

### 4.1 Deliverables from MovieBeam to Licensor

1. Proxy Server command parameters specification associated to the already encrypted assets.

2. EMM Command Specification.

3. SkyStream MUX interface Specification.

4. Specification of the commands currently implemented by MovieBeam for the insertion of the EMM Commands.

5. STB (G2.5) Technical Specification.

6. Development platform of the STB (G2.5)

7. Specification of the MS ASF encryption method currently being used to encrypt the files.

8. Specification of the MovieBeam Middleware APIs for the rental event reporting.

9. Remote VPN Access to a MovieBeam Lab system to be used for development and testing purposes.

### 4.2 Deliverables from Licensor to MovieBeam

1. Licensor Cypher Interface Document defining the XML messages to the Licensor system. This will include the new defined APIs for the MovieBeam integration.

2. Licensor Cypher System for testing purposes.

3. Licensor Cypher Release incorporating the new development features for the MovieBeam integration.

4. Test results report for new developed components.

5. Licensor Cypher Module for the STB (G2.5) incorporating the new de elopment features for the MovieBeam integration.

6. Test plan for integrated solution.

# 5. Risks / Concerns

# Risk Probability Impact Mitigation

1 Late availability of a development reference platform for the new receiving device G2.5 Unknown (we have not discussed status of the G2.5 with MovieBeam) High: The integration of the Cypher Client on the receiving device is a major part of the work and receiving it late shall impact the delivery date of April 2007. Keep in close contact with MovieBeam on the delivery and status of the new development reference platform.

2 Longer implementation time required for the offline Credit Limit implementation Low High: The offline credit limit implementation is key to the MovieBeam solution Additional resources may be added to

PLAINTIFF0002947

project if required

3 Difficulty in supporting a proprietary format (Windows Media) Medium Medium: Most open video products have been built around an MPEG2TS and not a Windows ASF. This could limit the flexibility of future business models and device support. Most of the market has chosen H.264 over VC-1 even MS has de-prioritized internal codec efforts Consider conversion to H.264 w/MPEG2TS sooner rather then later.

**6. High Level Plan**

Previous
Master Terms & Conditions for License

Next
Director and Officer Indemnification Agreement

PLAINTIFF0002948



**LEGAL-TOOLS**  DAOLABS

**Connect Wallet**

Engagements
Documents



# Engagements

Typically, "Engagement" can be used to refer to any contract or agreement between two or more parties. The engagement agreements on this website define the relationship between your entity and a contractor, an employee, or a board member.

# Documents

- The Assignment of Interest assigns interest in an asset (partial or complete ownership) from one party (the assignor) to another (the assignee).
- The Board Member Offer Letter is an offer for an individual to join your entity's Board of Directors in exchange for compensation and indemnification.
- The Supplemental Compensation Agreement offers supplemental compensation to an independent contractor in exchange for work on a specific project. It allows the entity and the contractor to negotiate regarding ongoing work on some future date.
- The Contractor Agreement offers hourly compensation up to a monthly maximum for an independent contractor in exchange for work on a specific project.
- The Innovations and Assignment agreement defines proprietary information and outlines how intellectual property may be created, licensed, or assigned. This agreement should be signed in conjunction with the Contractor Agreement mentioned above.

PLAINTIFF0002949

**Previous**

Form of Indemnification
Agreement

**Next**
Assignment of Interest



PLAINTIFF0002950



**LEGAL—TOOLS**  DAOLABS

Connect Wallet



# Variables

**Date of Assignment**

01/01/2023

**Assignor of the asset**

ACME CORPORATION

**Corporation Representative's Full Name**

Ms. Jane Doe

**Property/Asset name**

Explosives

**Percentage of asset being assigned**

100

**Property/Asset name**

Dynamite and other explosives

Update document

    

This Assignment of Interest ("Assignment") is entered into and effective as of Date by [Assignor name] ("Assignor"), for the benefit of [Assignee name] ("Assignee").

WHEREAS, Assignor owns [Asset percentage] percent of all [Asset details] (the "Asset" or [Asset name]);

WHEREAS, Assignor wishes to effect the assignment to Assignee of all of the Assignors right, title, and

PLAINTIFF0002951

interest in the [Asset name]. THEREFORE:



1. Assignment/Conveyance of Title and Other Rights.
   Assignor hereby assigns, transfers, and conveys to
   Assignee, and Assignee hereby accepts, all rights,
   title, and interest whatsoever that Assignor has
   in, to, or related to the [Asset-name]. The
   Assignor assigns such rights whether they are
   known or unknown, suspected or unsuspected, and
   whether the Assignor has such rights now or may
   acquire them in the future. Assignor assigns such
   right, title and interest to Assignee exclusively,
   in perpetuity, and throughout the universe.

2. Consideration Acknowledgment. Assignor
   acknowledges received consideration in exchange
   for executing this Assignment, and that the
   consideration for this Assignment is sufficient.

IN WITNESS WHEREOF, this Assignment is executed and
effective as of the date below:

| ASSIGNOR | ASSIGNEE |
| --- | --- |
| Signature: | Sig at re: |
| Print Name: [Assignor-name] | Print Name: [Assignee-name] |
| Role: Assignor | Role: Assignee |
| Dated: **[Date]** | Dated: **[Date]** |

| Previous | Next |
| --- | --- |
| README.md | Board Member Offer Letter |

PLAINTIFF0002952



**LEGAL-TOOLS** DAOLABS

`Connect Wallet`



    

[Entity-name]

[Recipient-name]

[Date]

Dear [Recipient-name]:

[Entity-name] (the "**Company**") is pleased to memorialize the terms and conditions of your offer, effective as of **August 30, 2022** or upon your formal acceptance, as follows:

1. **Position.** You agree to serve as a member of the Company's Board of Directors (the "**Board**"), subject to your appointment and any required shareholder approval. The following outlines certain of your responsibilities as a member of the Board, which responsibilities will commence as soon therefore as Board of Director approval is obtained:

**Generally:** You shall have all responsibilities of a Director of the Company imposed by Washington or applicable law, the Certificate of Incorporation, as may be amended from time to time, and Bylaws, as may be amended from time to time, of Company. These responsibilities shall include, but shall not be limited to, the following:

- **Attendance:** Use best efforts to attend scheduled meetings of the Board;

- **Act as a Fiduciary:** Represent the shareholders and the interests of Company as a fiduciary; and

PLAINTIFF0002953



- **Participation:** Participate as a full voting member of the Board in setting

  overall objectives, approving plans and programs of operation, formulating general policies, offering advice and counsel, serving on Board Committees, and reviewing management performance.

As a member of the Board, you agree to execute an acknowledgement in the form attached hereto.

**Compensation.** In consideration for your joining the Board, the Company will grant to you Options of Common Stock in after you review the proposed Stock Option Plan by management; management intends to present a plan which would vest annually over four years; provided, however, that upon the closing of a change of control, the remaining unvested portion of the Options shall become fully vested and exercisable. The Option grant will be made subject to the terms and conditions of the Company's stock option plan. In addition, there will be cash compensation, paid quarterly in arrears of which again, the management will propose, however it is expected to be about $50,000.00 payable in Ethereum ERC-20 DAI.

3. **Indemnification.** You will be indemnified to the fullest extent provided by the Company's corporate documents as in effect from time to time, subject to your execution of applicable undertakings, as provided by such corporate documents.

We hope that you find the foregoing terms acceptable. You may indicate your acceptance of this offer by signing below and returning one copy of this offer to me.

[Signature page to follow]

| COMPANY |
| --- |
| Signature: |
| Print Name: [Entity-signer-name] |
| Role: [Entity-signer-role] |

I have read and accept this letter agreement:

PLAINTIFF0002954



| PROSPECTIVE BOARD MEMBER |
| --- |
| Signature: |
| Print Name: [Recipient-name] |
| Role: Board Member |

**Enclosure:**

- Certificate of Incorporation
- Bylaws
- Non-Disclosure Agreement
- Consulting Agreement
- Indemnification Agreement
- Stock Option Agreement

| Previous | Next |
| --- | --- |
| Assignment of Interest | Contractor Agreement |

PLAINTIFF0002955



**LEGAL—TOOLS**  DAOLABS

**Connect Wallet**



    

SUPPLEMENTAL COMPENSATION AGREEMENT

# SUPPLEMENTAL COMPENSATION AGREEMENT

This Supplemental Compensation Agreement ("Agreement") is entered as of [Date] (the "Effective Date") and made between **[Entity-name]** (the "Company") and **[Recipient-name]** ("Employee"). The parties agree that the Company desires to provide supplemental compensation for Employee for the expanded scope of work outlined below and will compensate him as agreed herein.

1. **Employee's Obligations.** Employee hereby agrees to [Recipient-services] (the "Project"). The Parties agree that Employee will substantially resign and conclude his involvement upon the deposit of the supplemental compensation funds ($[Pay-amount]) and that the compensation contemplated herein is, in part, based upon the loss of significant future benefits, opportunities, and income were he to continue his present engagement.

   Employee agrees to timely advise the Company if he needs additional talent or team members to facilitate the completion of the Project in a timely manner or if he requires any additional equipment that is crucial to the Project.

   Employee agrees to use his best efforts in order to successfully complete the Project, but the parties agree and understand that there is no guarantee that the Project will succeed despite Employee's and the others' best efforts.

2. **Independent Contractor Relationship.** The Parties agree that the relationship between the Parties is that of an independent contractor, and nothing in

PLAINTIFF0002956



this Agreement is intended to, nor should be
construed to, create a partnership, joint venture,
agency or engagement relationship between the

Company and Employee. Employee will not be
entitled to any benefits that the Company may make
available to his other employees, including, but
not limited to, group health or life insurance,
profit-sharing or retirement benefits. Because
Employee is an independent contractor, the Company
will not withhold or make payments for social
security, make un-engagement insurance or
disability insurance contributions, or obtain
workers' compensation insurance on behalf of
Employee.

3. **Additional Work/Projects.** The Parties agree that
on [Date-negotiation], they will negotiate in good
faith about ongoing roles and responsibilities
regarding the Project and other projects.

4. **Breach of Agreement.** In the event of a breach of
this Agreement the wronged party shall be entitled
to all remedies available to him under the laws of
the State of [Entity-state], including monetary
damages for all proven damages.

(a) *Breach by the Company.* The Company shall
be in breach of this Agreement if the Company
fails to deposit the funds identified herein.
In the event that the Company does not make
the initial $[Pay-amount] payment upon
execution of this agreement, Employee, at his
option, may continue to work on the Project
but shall be under no obligation to continue
any work on the Project and the Parties agree
that Employee' damages shall be $[Pay-
amount].

(b) *Breach by Employee.* Employee shall be in
breach of the Agreement if he fails to
provide his best efforts to the Project or
fails to notify the Company of the need for
talent or other material to complete the
Project.

5. **Covenant Not to Sue/Dispute Resolution/Attorney's
Fees.** The parties covenant that under no
conditions will either party or any affiliate file
any action against the other (except requests for
injunctive or other equitable relief only) in any

PLAINTIFF0002957



forum but instead agree to resolve any disagreement regarding the implementation of the Agreement or an alleged breach by a party by mandatory arbitration. The parties further choose to use Judicial Arbitration and Mediation Services ("JAMS") in [Entity-city], [Entity-state], as the agreed arbitrator in this matter. Either party may request arbitration of any dispute by sending notice to the other party, in writing, of the demand for arbitration.

In the event of any arbitration of a dispute between the parties, the Company agrees to pre-pay, after notice of arbitration has been sent, $50,000.00 (fifty thousand dollars USD) to the attorneys of Employee's choice. Following arbitration the arbitrator may award attorney's fees to the prevailing party, including the reimbursement of any attorney's fees that were pre-paid in the dispute.

6. **Executed Separately.** This Agreement may be executed in separate parts and at different times, each of which will be deemed an original, but all of which together will constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. Federal ESIGN Act of 2000).

[Signature page to follow]

AGREED AND EXECUTED ON THE DATES BELOW.

| COMPANY | CONSULTANT |
|---|---|
| Signature: | Sig at re: |
| Print Name: [Entity-signer-name] | Print Name: [Recipient-name] |
| Role: [Entity-signer-role] | Role: Co s lta t |
| Dated: [Date] | Dated: [Date] |

Executed this [Date]

| Previous | Next |
|---|---|
| Innovations and | RFA MF m |

PLAINTIFF0002958

Innovations and
Assignment

PLAINTIFF0002959



**LEGAL–TOOLS**   DAOLABS

Connect Wallet



# Variables

Exhibit A

**Agreement Date**

01/01/2023

**Hiring Entity's Name**

ACME CORPORATION

**Hiring Entity Type**

Corporation

**Hiring Entity Contact's Full Name**

Mr. John Smith

**Hiring Entity Contact's Email Address**

wile@coyote com

**Hiring Entity's Street Address**

123 Main Street, Apt. 45

**Hiring Entity's City**

Kalamazoo

**Hiring Entity's State**

Michigan

**Hiring Entity's ZIP Code**

49001

**Consultant's Full Name**

Mrs. Jane Doe

**Consultant's Email Address**

road@runner.org

**Consultant's Date of Birth (for Copyright Purposes)**

01/01/2023

**Consultant's Nationality (for Copyright Purposes)**

United States/American

PLAINTIFF0002960

Name of Relevant Project

ACME E plo ive  Online Store

Description of Consultant's Services

Web designs for dynamite and other Wile E. Coyote products.

Consultant's Hourly Rate (USD)

10

Consultant's Monthly Maximum (USD)

100

**Update document**

     

### INDEPENDENT CONTRACTOR AGREEMENT

Effective Date as of: **[Date]**

This Independent Contractor Agreement for consulting/creative agency services (the "Agreement") is made as of the Effective Date set forth above by and between **[Entity-name]**, a **[Entity-state] [Entity-type]** ("Company") and the Consultant (or Consulting Agency or Entity) named above and on the signature page hereto ("Consultant").

    1. **Engagement of Services.**

Company may issue Project Assignments to Consultant in the form attached to this Agreement as Exhibit A (each, a "Project Assignment"). Subject to the terms of this Agreement, Consultant will render the services set forth in Project Assignment(s) accepted by Consultant (the "Services") by the completion dates set forth therein. Except as otherwise provided in the applicable Project Assignment, Consultant will be free of control and direction from the Company (other than general oversight and control over the results of the Services), and will have exclusive control over the manner and means of performing the Services, including the choice of place and time. Consultant will provide,

PLAINTIFF0002961

at Consultant's own expense, a place of work and all
equipment, tools and other materials necessary to

complete the Services; however, to the extent necessary
to facilitate performance of the Services,

- Company may, in its discretion, make
  certain of its equipment or facilities
  available to Consultant at Consultant's
  request. While on the Company's
  premises, Consultant agrees to comply
  with Company's then-current access rules
  and procedures, including those related
  to safety, security and confidentiality.
  Consultant agrees and acknowledges that

- Consultant has no expectation of privacy
  with respect to Company's
  telecommunications, networking or
  information processing systems
  (including stored computer files, email
  messages and voice messages) and that
  Consultant's activities, including the
  sending or receiving of any files or
  messages, on or using those systems may
  be monitored, and the contents of such
  files and messages may be reviewed and
  disclosed, at any time, without notice.

## 2. Compensation.

Company will pay Consultant the fee set forth in each
Project Assignment for Services rendered pursuant to
this Agreement as Consultant's sole compensation for
such Services. Consultant will be reimbursed only for
expenses that are expressly provided for in a Project
Assignment or that have been approved in advance in
writing by Company, provided Consultant has furnished
such documentation for authorized expenses as Company
may reasonably request. Payment of Consultant's fees
and expenses will be in accordance with the applicable
Project Assignment. Upon termination of this Agreement
for any reason, Consultant will be paid fees on the
basis stated in the Project Assignment(s) for work that
has been completed. Unless otherwise provided in a
Project Assignment, payment to Consultant of undisputed
fees will be due 30 days following Company's receipt of
an invoice that contains accurate records of the work
performed that are sufficient to substantiate the
invoiced fees.

PLAINTIFF0002962

invoiced fees.

### 3. Ownership of Work Product.



Consultant hereby irrevocably assigns to Company all right, title and interest worldwide in and to any deliverables specified in a Project Assignment and to any ideas, concepts, processes, discoveries, developments, formulae, information, materials, improvements, designs, artwork, content, software programs, other copyrightable works, and any other work product created, conceived or developed by Consultant (whether alone or jointly with others) for Company during or before the term of this Agreement, including all copyrights, patents, trademarks, trade secrets, and other intellectual property rights therein (collectively, the "Work Product"). Consultant retains no rights to use the Work Product and agrees not to challenge the validity of Company's ownership of the Work Product. Consultant agrees to execute, at Company's request and expense, all documents and other instruments necessary or desirable to confirm such assignment, including without limitation, any copyright assignment or patent assignment provided by the Company. Consultant hereby irrevocably appoints Company as Consultant's attorney-in-fact for the purpose of executing such documents on Consultant's behalf, which appointment is coupled with an interest. At Company's request, Consultant will promptly record any such patent assignment with the United States Patent and Trademark Office. Company will reimburse Consultant for any reasonable out-of-pocket expenses actually incurred by Consultant in fulfilling its obligations under this section. Consultant will deliver each item of Work Product specified in each Project Assignment and disclose promptly in writing to Company all other Work Product.

### 4. Other Rights.

If Consultant has any rights, including without limitation "artist's rights" or "moral rights," in the Work Product that cannot be assigned, Consultant hereby unconditionally and irrevocably grants to Company an exclusive (even as to Consultant), worldwide, fully paid and royalty-free, irrevocable, perpetual license, with rights to sublicense through multiple tiers of sublicensees, to use, reproduce, distribute, create derivative works of, publicly perform and publicly display the Work Product in any medium or format,

PLAINTIFF0002963

whether now known or later developed. In the event that Consultant has any rights in the Work Product that cannot be assigned or licensed, Consultant

unconditionally and irrevocably waives the enforcement of such rights, and all claims and causes of action of any kind against Company or Company's customers.



### 5. License to Preexisting IP.

Consultant agrees not to use or incorporate into Work Product any intellectual property developed by any third party or by Consultant other than in the course of performing services for Company ("Preexisting IP") unless the Preexisting IP has been specifically identified and described in the applicable Project Assignment, such as in research reports in which the sources of research are cited. In the event Consultant uses or incorporates Preexisting IP into Work Product, Consultant hereby grants to Company a non-exclusive, worldwide, fully-paid and royalty-free, irrevocable, perpetual license, with the right to sublicense through multiple tiers of sublicensees, to use, reproduce, distribute, create derivative works of, publicly perform and publicly display in any medium or format, whether now known or later developed, such Preexisting IP incorporated or used in Work Product.

### 6. Representations and Warranties.

Consultant represents and warrants that: (a) the Services will be performed in a professional manner and in accordance with the industry standards and the Work Product will comply with the requirements set forth in the applicable Project Assignment, (b) the Work Product will be an original work of Consultant, (c) Consultant has the right and unrestricted ability to assign ownership of Work Product to Company as set forth in Section 3 (including without limitation the right to assign the ownership of any Work Product created by Consultant's employees or contractors), (d) neither the Work Product nor any element thereof will infringe upon or misappropriate any copyright, patent, trademark, trade secret, right of publicity or privacy, or any other proprietary right of any person, whether contractual, statutory or common law, (e) Consultant has an unqualified right to grant to Company the license to Preexisting IP set forth in Section 5, (f) none of the Work Product incorporates any software code licensed under the GNU General Public License or Lesser General Public License or any other license that, by

PLAINTIFF0002964



General Public License or any other license that, by its terms, requires or conditions the use or distribution of such code on the disclosure, licensing,

or distribution of any source code owned or licensed by Company, except as expressly agreed by the Company in writing, and (g) Consultant will comply with all applicable federal, state, local and foreign laws governing self-employed individuals, including laws requiring the payment of taxes, such as income and employment taxes, and social security, disability, and other contributions. Consultant further represents and warrants that Consultant is self-employed in an independently established trade, occupation, or business; maintains and operates a business that is separate and independent from Company's business; holds itself, himself or herself out to the public as independently competent and available to provide applicable services similar to the Services; has obtained and/or expects to obtain clients or customers other than Company for whom Consultant performs services; and will perform work for Company that Consultant understands is outside the usual course of Company's business. Consultant agrees to indemnify and hold Company harmless from any and all damages, costs, claims, expenses or other liability (including reasonable attorneys' fees) arising from or relating to the breach or alleged breach by Consultant of the representations and warranties set forth in this Section 6.

### 7. Independent Contractor Relationship.

Consultant's relationship with Company is that of an independent contractor, and nothing in this Agreement is intended to, or should be construed to, create a partnership, joint venture, agency (other than creative services agency, overseeing development of Company creative assets) or employment relationship between Company and any of Consultant's employees or agents. Consultant is not authorized to make any representation, contract or commitment on behalf of Company. Consultant (if Consultant is an individual) and Consultant's employees will not be entitled to any of the benefits that Company may make available to its employees, including, but not limited to, group health or life insurance, profit-sharing or retirement benefits. Because Consultant is an independent contractor, Company will not withhold or make payments for social security, make unemployment insurance or



PLAINTIFF0002965



disability insurance contributions, or obtain workers' compensation insurance on behalf of Consultant. Consultant is solely responsible for, and will file, on

a timely basis, all tax returns and payments required to be filed with, or made to, any federal, state or local tax authority with respect to the performance of Services and receipt of fees under this Agreement. Consultant is solely responsible for, and must maintain adequate records of, expenses incurred in the course of performing Services under this Agreement. No part of Consultant's compensation will be subject to withholding by Company for the payment of any social security, federal, state or any other employee payroll taxes. Company will regularly report amounts paid to Consultant by filing Form 1099-MISC with the Internal Revenue Service as required by law. If, notwithstanding the foregoing, Consultant is reclassified as an employee of Company, or any affiliate of Company, by the U.S. Internal Revenue Service, the U.S. Department of Labor, or any other federal or state or foreign agency as the result of any administrative or judicial proceeding, Consultant agrees that Consultant will not, as the result of such reclassification, be entitled to or eligible for, on either a prospective or retrospective basis, any employee benefits under any plans or programs established or maintained by Company.

## 8. Confidential Information.

During the term of this Agreement and thereafter Consultant (i) will not use or permit the use of Company's Confidential Information in any manner or for any purpose not expressly set forth in this Agreement, (ii) will hold such Confidential Information in confidence and protect it from unauthorized use and disclosure, and (iii) will not disclose such Confidential Information to any third parties except as set forth in this section and in Section 9 below. Consultant will protect Company's Confidential Information from unauthorized use, access or disclosure in the same manner as Consultant protects its own confidential information of a similar nature, but in no event will it exercise less than reasonable care. Notwithstanding the foregoing or anything to the contrary in this Agreement or any other agreement between Company and Consultant, nothing in this Agreement shall limit Consultant's right to report possible violations of law or regulation with any federal, state, or local government agency.



"Confidential Information" as used in this Agreement means all information disclosed by Company to Consultant, whether during or before the term of this

Agreement, that is not generally known in the Company's trade or industry and will include, without limitation: (a) concepts and ideas relating to the development and distribution of content in any medium or to the current, future and proposed products or services of Company or its subsidiaries or affiliates; (b) trade secrets, drawings, inventions, know-how, software programs, and software source documents; (c) information regarding plans for research, development, new service offerings or products, marketing and selling, business plans, business forecasts, budgets and unpublished financial statements, licenses and distribution arrangements, prices and costs, suppliers and customers; (d) existence of any business discussions, negotiations or agreements between the parties; and (e) any information regarding the skills and compensation of employees, contractors or other agents of Company or its subsidiaries or affiliates. Confidential Information also includes proprietary or confidential information of any third party who may disclose such information to Company or Consultant in the course of Company's business. Confidential Information does not include information that (x) is or becomes a part of the public domain through no act or omission of Consultant, (y) is disclosed to Consultant by a third party without restrictions on disclosure, or (z) was in Consultant's lawful possession without obligation of confidentiality prior to the disclosure and was not obtained by Consultant either directly or indirectly from Company. In addition, this section will not be construed to prohibit disclosure of Confidential Information to the extent that such disclosure is required by law or valid order of a court or other governmental authority; provided, however, that Consultant will first have given notice to Company and will have made a reasonable effort to obtain a protective order requiring that the Confidential Information so disclosed be used only for the purposes for which the order was issued. All Confidential Information furnished to Consultant by Company is the sole and exclusive property of or its suppliers or customers. Upon request by Company, Consultant agrees to promptly deliver to Company the original and any copies of the Confidential Information. Notwithstanding the foregoing nondisclosure obligations, pursuant to 18 U.S.C. Section 1833(b), Consultant will not be held

PLAINTIFF0002967



criminally or civilly liable under any federal or state
trade secret law for the disclosure of a trade secret
that is made: (1) in confidence to a federal, state, or
local government official, either directly or
indirectly, or to an attorney, and solely for the
purpose of reporting or investigating a suspected
violation of law; or (2) in a complaint or other
document filed in a lawsuit or other proceeding, if
such filing is made under seal. Consultant understand
that the Company intends to set up a foundation
dedicated to the public good and in order to accomplish
the goals of the Company the founders, owners and other
persons involved in the Company wish to remain
anonymous in order to avoid distracting attention or
resources form the Company's aims. Consultant agree
he/she/they shall not disclose, publish or otherwise
make know the identity of any of the principles,
managers, owners or other persons who are involved in
the Company to any third party or to any other
Consultant who may also be working for the Company, and
that the identities of the Owners, Founders or Managers
shall be considered both "confidential information" and
"personal information" under the terms of this
Agreement.

- 8.1 Personal Information. With respect to any
  Confidential Information that constitutes personal
  data, personal information, personally
  identifiable information or similar information
  under applicable privacy or data security laws
  (collectively, "Personal Information"), Consultant
  shall not (i) sell Personal Information or (ii)
  retain, use or disclose Personal Information for
  any purpose other than the specific purpose of
  providing the Services. For the avoidance of
  doubt, the foregoing prohibits Consultant from
  "selling" Personal Information, as defined in the
  California Consumer Privacy Act of 2018 (as
  amended, the "CCPA"), and from retaining, using,
  or disclosing Personal Information outside of the
  direct business relationship between Consultant
  and Company or for a "commercial purpose" (as
  defined in the CCPA). Consultant hereby certifies
  that it understands the obligations under this
  Section 8.1 and will comply with them. (a)
  Consultant shall use reasonable security measures
  appropriate to the nature of any Personal
  Information in its possession or control to
  protect the Personal Information from unauthorized

PLAINTIFF0002968



access, destruction, use, modification, or disclosure. (b) The parties acknowledge and agree that Consultant's access to Personal Information is not part of the consideration exchanged by the parties in respect of the Agreement. (c) If any individual contacts Consultant to make a request pertaining to their Personal Information, Consultant shall promptly forward the request to the Company and shall not respond to the individual except as instructed by Company. Consultant shall promptly take such actions and provide such information as Company may request to help Company fulfill requests of individuals to exercise their rights under the applicable privacy or data security laws, including, without limitation, requests to access, delete, opt-out of the sale of, or receive information about the processing of, Personal Information pertaining to them. Consultant agrees to cooperate with Company to further amend the Agreement as may be necessary to address compliance with applicable privacy or data security laws.

- 8.2 Breach of the Confidentiality/Personal Information and Liquidated Damages. The parties understand and agree that the personal information and identity of the Owners, Founders and Managers of the Company is of paramount importance and that such disclosure may harm the goals of the Company and the future success of its endeavors in terms of its non-profit work. These damages may be difficult to quantify as they include the good-will of the Company and its various anticipated projects as well as an effect the value of any tokens on the block-chain that do not necessarily conform to traditional notions of "damages." Therefore the parties agree that any breach of the duty to not disclose the personal information and identity of the Owners, Founders and Managers shall be subject to reasonable liquidated damages in the amount of $100,000.00 (one hundred thousand dollars).

## 9. Consultant's Employees, Consultant and Agents.

Consultant shall have the right to disclose Confidential Information only to those of its employees, Consultant's, and agents who have a need to know such information for the purpose of performing

PLAINTIFF0002969

know such information for the purpose of performing Services and who have entered into a binding written agreement that is expressly for the benefit of Company

and protects Company's rights and interests in and to the Confidential Information to at least the same degree as this Agreement. Company reserves the right to refuse or limit Consultant's use of any employee, Consultant or agent or to require Consultant to remove any employee, Consultant or agent already engaged in the performance of the Services. Company's exercise of such right will in no way limit Consultant's obligations under this Agreement.



### 10. Term and Termination.

- ### 10.1 Term.

The initial term of this Agreement is for 1 month from the Effective Date set forth above, unless earlier terminated as provided in this Agreement. Thereafter, this Agreement will automatically renew on its monthly anniversary date, for additional 1-month terms, unless Company provides written notice prior to any such monthly anniversary date that the Agreement will not renew.

- ### 10.2 Termination Without Cause.

Company may terminate this Agreement with or without cause, at any time upon 5 days' prior written notice to Consultant. Consultant may terminate this Agreement without cause, at any time when no Project Assignment is in effect upon 15 days' prior written notice to Company.

- ### 10.3 Termination for Cause.

Either party may terminate this Agreement immediately in the event the other party has materially breached the Agreement and failed to cure such breach within 3 days after notice by the non-breaching party is given.

- ### 10.4 Survival.

The rights and obligations contained in Sections 3 ("Ownership of Work Product"), 4 ("Other Rights"), 5 ("License to Preexisting IP"), 6 ("Representations and Warranties"), 8 ("Confidential Information") and 12 ("Non- solicitation") will survive any termination or expiration of this Agreement.

PLAINTIFF0002970



### 11. No Conflicts.

Consultant will refrain from any activity, and will not enter into any agreement or make any commitment, that is inconsistent or incompatible with Consultant's obligations under this Agreement, including Consultant's ability to perform the Services. Consultant represents and warrants that Consultant is not subject to any contract or duty that would be breached by Consultant's entering into or performing Consultant's obligations under this Agreement or that is otherwise inconsistent with this Agreement.

### 12. Non-solicitation.

Consultant agrees that during the Term of this Agreement, and for one year thereafter, Consultant will not either directly or indirectly, solicit or attempt to solicit any employee, independent contractor, or Consultant of Company to terminate his, her or its relationship with Company in order to become an employee, Consultant, or independent contractor to or for any other person or entity, with the exception of contractors or agencies with whom the Consultant has originally engaged and whose ongoing relationship originates with the Consultant for the purposes of doing work for Company.

### 13. Successors and Assigns.

Consultant may not subcontract or otherwise delegate or assign this Agreement or any of its obligations under this Agreement without Company's prior written consent. Any attempted assignment in violation of the foregoing will be null and void. Subject to the foregoing, this Agreement will be for the benefit of Company's successors and assigns and will be binding on Consultant's assignees.

### 14. Notices.

Any notice required or permitted by this Agreement will be in writing and will be delivered as follows with notice deemed given as indicated: (i) by personal delivery when delivered personally; (ii) by overnight courier upon written verification of receipt; (iii) by telecopy or facsimile transmission upon acknowledgment of receipt of electronic transmission; or (iv) by certified or registered mail, return receipt requested,

PLAINTIFF0002971



upon verification of receipt. Notice will be sent to the addresses set forth below or such other address as either party may specify in writing.

### 15. Governing Law/Attorney's Fees/Damages.

This Agreement will be governed in all respects by the laws of the United States of America and by the laws of the State of Washington with jurisdiction in King County, without giving effect to any conflicts of laws principles that require the application of the law of a different jurisdiction. Each of the parties irrevocably consents to the exclusive personal jurisdiction of the federal and state courts located in King County, Washington, as applicable, for any matter arising out of or relating to this Agreement, except that in actions seeking to enforce any order or any judgment of such federal or state courts located in King County, Washington, such personal jurisdiction will be nonexclusive. If a proceeding is commenced to resolve any dispute that arises between the parties with respect to the matters covered by this Agreement, the prevailing party in such proceeding will be entitled to receive its reasonable attorneys' fees, expert witness fees and out of pocket costs incurred in connection with such proceeding, in addition to any other relief to which such prevailing party may be entitled. If a proceeding is instigated due to a breach of the non-disclosure of confidential or personal information as outlined in Section 8, then the Company shall be entitled to the liquidated damages as agreed by the parties upon a showing of such breach. In all other matters involving breach of the agreement the parties shall retain their rights to demonstrate actual damages for recompense.

### 16. Severability.

Should any provisions of this Agreement be held by a court of law to be illegal, invalid or unenforceable, the legality, validity and enforceability of the remaining provisions of this Agreement will not be affected or impaired thereby.

### 17. Waiver.

The waiver by Company of a breach of any provision of this Agreement by Consultant will not operate or be construed as a waiver of any other or subsequent breach by Consultant. Injunctive Relief for Breach.

PLAINTIFF0002972



Consultant's obligations under this Agreement are of a unique character that gives them particular value; and, in the event of such breach, Company will be entitled to injunctive relief and/or a decree for specific performance, and such other and further relief as may be proper (including monetary damages if appropriate).

## 18. Entire Agreement.

This Agreement may be signed concurrently with a Simple Agreement for Future Tokens, which agreements constitute the entire understanding between the parties relating to this subject matter and which supersede all prior or contemporaneous oral or written agreements concerning such subject matter. The terms of this Agreement will govern all services undertaken by Consultant for Company; provided, however, that in the event of any conflict between the terms of this Agreement and any Project Assignment, the terms of the applicable Project Assignment will control, provided that the Project Assignment specifically calls out the applicable Section number of this Agreement to be superseded and has been signed by an authorized officer of Company. This Agreement may only be changed or amended by mutual agreement of authorized representatives of the parties in writing. This Agreement may be executed in two or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, Uniform Electronic Transactions Act or other applicable law) or other transmission method and any counterpart so delivered will be deemed to have been duly and validly delivered and be valid and effective for all purposes.

[Signature page to follow]

The parties have executed this Agreement as of the Effective Date.

| CLIENT COMPANY | INDEPENDENT CONTRACTOR |
| --- | --- |
| Signature: | Signature: |
| Print Name: [Entity- | Print Name: [Consultant- |

PLAINTIFF0002973



| | |
|---|---|
| Print Name: [Entity contact-name] | Print Name: [Consultant name] |
| **[Entity-name]**<br>CLIENT COMPANY | Email: **[Consultant-email]**<br>INDEPENDENT CONTRACTOR |
| **[Entity-address]** | Date of Birth:<br>**[Consultant-dob]** |
| **[Entity-city] [Entity-state] [Entity-zip]** | Nationality or domicile:<br>**[Consultant-nationality]**[1] |
| **[Entity-contact-email]** | |

# Exhibit A

INDEPENDENT CONTRACTOR

PROJECT: **[Consultant-project-name]**

Consultant will render the following services as instructed by the Company: **[Consultant-services]**

Fees and Reimbursement

- Rate Fee: $**[Consultant-hourly-rate]** per hour.
- Maximum chargeable by Consultant per month is $**[Consultant-monthly-max]**.
- Communications and addendum may occur via e-mail.
- Any increase in scope must be approved by Company in advance.
- Consultant will be reimbursed for third party expenses, if approved in writing in advance by Company.

# Footnotes

1. For copyright registration purposes only, Independent Contractor must provide date of birth and Nationality or domicile. ↩

| Previous | Next |
|---|---|
| Board Member Offer Letter | Innovations and Assignment |

PLAINTIFF0002974



**LEGAL-TOOLS**  DAOLABS

**Connect Wallet**

# Variables

**Agreement Date**

mm/dd/yyyy

**Hiring Entity's Name**

Acme LLC

**Hiring Entity's Type**

Limited Liability Corporation

**Hiring Entity Contact's name**

Mr. John Smith

**Hiring Entity's Street Address**

123 Main Street, Apt 45

**Hiring Entity's City**

Kalamazoo

**Hiring Entity's State**

Michigan

**Hiring Entity's ZIP Code**

49001

**Hiring Entity Contact's Email Address**

wile@coyote com

**Consultant's Full Name**

Mrs. Jane Doe

**Consultant's Email Address**

road@runner.org

**Update document**

1. Consideration.

2. "Proprietary Information" Definition.

3. Ownership and Nondisclosure of Proprietary Information.

4. "Innovations" Definition.

5. Disclosure and License of Prior Innovations.

6. Future Innovations.

7. Disclosure and Assignment of Company Innovations.

8. Exclusion from Assignment.

9. Restriction on Use of Software.

10. Cooperation in Perfecting Rights to Innovations.

11. Contract at Will.

12. Return of Materials.

13. Survival.

14. Non-Disparagement.

15. Injunctive Relief.

16. Notices.

17. Governing Law; Forum.

18. Severability.

19. Waiver; Modification.

20. Entire Agreement.

PLAINTIFF0002975

Exhibit A

Exhibit B



[Entity name]
INNOVATIONS AND ASSIGNMENT AGREEMENT

This Agreement is made and entered into, as of **[Date]** ("Effective Date"), by and between **[Entity-name]**, **[Entity-type]** ("Company"), having a principal place of business at **[Entity-city]**, **[Entity-state]**, and **[Consultant-name]**, ("Contractor").

## 1. Consideration.

This Agreement is signed in conjunction with an Independent Contractor Agreement ("ICA") and is incorporated therein. The parties agree that in performing the work under the ICA and the remuneration identified therein shall be good and reasonable consideration for the duties and obligations found in this Agreement.

## 2. "Proprietary Information" Definition.

"Proprietary Information" includes

- (a) any information that is confidential or proprietary, technical or non-technical information of Company, including for example and without limitation, information related to Innovations (as defined in Section 4 below), concepts, techniques, processes, methods, systems, designs, computer programs, source documentation, trade secrets, formulae, development or experimental work, work in progress, forecasts, proposed and future products, marketing plans, financial information, business plans, customers and suppliers and any other nonpublic information that has commercial value or
- (b) any information Company has received from others that Company is obligated to treat as confidential or proprietary, which

PLAINTIFF0002976



may be made known to Contractor by Company,
a third party or otherwise that Contractor
may learn during my contract with Company.

## 3. Ownership and Nondisclosure of Proprietary Information.

All Proprietary Information is the sole property
of Company, Company's assigns, Company's
customers and Company's suppliers, as applicable.
Company, Company's assigns, Company's customers
and Company's suppliers, as applicable, are the
sole and exclusive owners of all patents,
copyrights, mask works, trade secrets and other
rights in and to the Proprietary Information.
Contractor will not disclose any Proprietary
Information to anyone outside Company, and
Contractor will use and disclose Proprietary
Information to those inside Company only as may
be necessary in the ordinary course of performing
its duties as a contractor of Company. If
Contractor has any questions as to whether
information constitutes Proprietary Information,
or to whom, if anyone, inside Company, any
Proprietary Information may be disclosed,
Contractor will consult with my manager at
Company.

## 4. "Innovations" Definition.

In this Agreement, "Innovations" means all
discoveries, designs, developments, improvements,
inventions (whether or not protectable under
patent laws), works of authorship, information
fixed in any tangible medium of expression
(whether or not protectable under copyright
laws), trade secrets, know-how, ideas (whether or
not protectable under trade secret laws), mask
works, trademarks, service marks, trade names and
trade dress.

## 5. Disclosure and License of Prior Innovations.

Company has listed on Exhibit A ("Prior
Innovations"), attached hereto, all Innovations
relating in any way to Company's Business or
demonstrably anticipated research and development
or business, which were conceived, reduced to

PLAINTIFF0002977

practice, created, derived, developed, or made by
Contractor prior to the contract with Company
(collectively, the "Prior Innovations").

Contractor represents that neither Contractor or
any of its employees, agents assigns or other
associated with Contractor have no rights in any
such Company-related Innovations other than those
Innovations listed on Exhibit A. If nothing is
listed on Exhibit A ("Prior Innovations"),
Contractor represents that there are no Prior
Innovations at the time of signing this
Agreement. Contractor hereby grant to Company and
Company's designees a royalty-free, irrevocable,
worldwide, fully paid-up license (with rights to
sublicense through multiple tiers of
sublicensees) to practice all patent, copyright,
moral right, mask work, trade secret and other
intellectual property rights relating to any
Prior Innovations that Contractor incorporates or
permits to be incorporated, in any Innovations
that Contractor, solely or jointly with others,
conceive, develop or reduce to practice during my
contract with Company (the "Company
Innovations"). Notwithstanding the foregoing,
Contractor will not incorporate, or permit to be
incorporated, any Prior Innovations in any
Company Innovations without Company's prior
written consent.

## 6. Future Innovations.

Contractor will disclose promptly in writing to
Company all Innovations conceived, reduced to
practice, created, derived, developed, or made by
Contractor, its employees, agents or assigns
during the term of the contract and for three (3)
months thereafter, whether or not Contractor
believes such Innovations are subject to this
Agreement, to permit a determination by Company
as to whether or not the Innovations should be
considered Company Innovations. Company will
receive any such information in confidence.

## 7. Disclosure and Assignment of Company Innovations.

Contractor will promptly disclose and describe to
Company all Company Innovations. Contractor
hereby does and will specifically assign to

PLAINTIFF0002978



hereby does and will specifically assign to
Company or Company's designee all rights, title,
and interest in and to any and all Company



Innovations. To the extent any of the rights,
title and interest in and to Company Innovations
cannot be assigned by Contractor to Company,
Contractor hereby grants to Company an exclusive,
royalty-free, transferable, irrevocable,
worldwide license (with rights to sublicense
through multiple tiers of sublicensees) to
practice such non-assignable rights, title and
interest. To the extent any of the rights, title
and interest in and to Company Innovations can
neither be assigned nor licensed by Contractor to
Company, Contractor hereby irrevocably waives and
agrees never to assert such non-assignable and
non-licensable rights, title and interest against
Company or any of Company's successors in
interest. Contractor agrees to provide the names
of all employees who will perform work pursuant
to this Agreement (Exhibit "B") and have them
sign this agreement to indicate their
understanding of their duties of non-disclosure
and confidentiality as well as their obligations
to disclose any prior innovations and to
specifically assign all rights and claims
developed under this Agreement.

## 8. Exclusion from Assignment.

Contractor understands that its obligation to
assign, license or waive a claim with respect to
any Innovation must comply with the requirements
of RCW 49.44.140. Pursuant to this Washington
statute, Section 7 of this Agreement (Disclosure
and Assignment of Company Innovations) does not
apply to, and Contractor does not assign its
rights to any Innovation (whether a Company
Innovation or otherwise) when Contractor or its
employees, agents or assigns, can prove that:

- (a) the Innovation was developed entirely
  outside of the time covered by this
  Agreement;
- (b) Contractor, its employees, agents or
  assigns did not use Company equipment,
  supplies, facilities , or trade secret
  information in its development;
- (c) the Innovation does not relate

PLAINTIFF0002979



- ○ (i) directly to the Business of Company, or
- ○ (ii) to the actual or demonstrably anticipated research or development of Company; and
- (d) the Innovation does not result from any work performed by Contractor, its employees, agents or assigns for Company. This Section will be construed to apply to all Innovations with which Contractor is involved from this date forward, as well as all Company Innovations with which Contractor has been involved since the Agreement with Company began.

## 9. Restriction on Use of Software.

Contractor agrees that neither it, its employees, agents and assigns shall be prohibited and shall not use or deploy any software, programs or other intellectual property owned by Company or developed during the period of Agreement with Company for a period of 18 (eighteen) months after Company publishes or otherwise makes the software, programs or intellectual property available in open source. Contractor acknowledges that due to the nature of the Company's Business, there is no restriction on the geographical scope of this prohibition of use to Company and further acknowledges that Company competes on a worldwide basis and that the geographical scope of these limitations is reasonable and necessary for the protection of Company's trade secrets and other Proprietary Information. Contractor further acknowledges that if a court of competent jurisdiction finds this restriction provision invalid or unenforceable due to unreasonableness in time, geographic scope, or scope of the Business, then such court will interpret and enforce this provision to the maximum extent that such court deems reasonable.

## 10. Cooperation in Perfecting Rights to Innovations.

Contractor agrees to perform, during and after the terms of this contract, all acts that Company

PLAINTIFF0002980



the terms of this contract, all acts that Company deems necessary or desirable to permit and assist Company, at its expense, in obtaining and

enforcing the full benefits, enjoyment, rights and title throughout the world in the Innovations as provided to Company under this Agreement. If Company is unable for any reason to secure any necessary signature to any document required to file, prosecute, register or memorialize the assignment of any rights or application or to enforce any right under any Innovations as provided under this Agreement, Contractor hereby irrevocably designates and appoints Company and Company's duly authorized officers and agents as Contractor's agents and attorneys in fact to act for and on Contractor's behalf and instead to take all lawfully permitted acts to further the filing, prosecution, registration, memorialization of assignment, issuance, and enforcement of rights under such Innovations, all with the same legal force and effect as if executed by Contractor. The foregoing is deemed a power coupled with an interest and is irrevocable.

## 11. Contract at Will.

Contractor acknowledges that the contract will be of finite duration and that either Company or Contractor will be free to terminate the contract at any time with or without cause. Contractor also acknowledges that any representations to the contrary are unauthorized and void, unless contained in a formal written contract signed by an officer of Company.

## 12. Return of Materials.

At any time upon Company's request, and when the contract with Company is over, Contractor will return all materials (including, without limitation, documents, drawings, papers, diskettes and tapes) containing or disclosing any Proprietary Information (including all copies thereof), as well as any keys, pass cards, identification cards, computers, printers, pagers, personal digital assistants or similar items or devices that the Company has provided to me. Contractor will provide Company with a

PLAINTIFF0002981



that Contractor will provide Company with written certification of its compliance with the obligations under this Section.

## 13. Survival.

This Agreement

- (a) will survive the contract with Company;
- (b) does not in any way restrict Contractor's right to terminate or the right of Company to terminate the contract at any time, for any reason or for no reason;
- (c) inures to the benefit of successors and assigns of Company; and
- (d) is binding upon Contractors heirs and legal representatives.

## 14. Non-Disparagement.

During the contract with Company and after the termination thereof, Contractor, its employees, agents and assigns will not disparage Company, its products, services, agents or contractors.

## 15. Injunctive Relief.

Contractor agrees that if it violates this Agreement, Company will suffer irreparable and continuing damage for which money damages are insufficient, and Company will be entitled to injunctive relief and/or a decree for specific performance, and such other relief as may be proper (including money damages if appropriate).

## 16. Notices.

Any notice required or permitted by this Agreement will be in writing and will be delivered as follows, with notice deemed given as indicated:

- (a) by personal delivery, when actually delivered;
- (b) by overnight courier, upon written verification of receipt;
- (c) by facsimile transmission, upon acknowledgment of receipt of electronic transmission;
- (d) by certified or registered mail, return

PLAINTIFF0002982

receipt requested, upon verification of
receipt;

- (e) or by email to the email address listed
  below. Notices to Contractor will be sent to
  any address in Company's records or the
  email address listed below.



## 17. Governing Law; Forum.

This Agreement will be governed by the laws of
the United States of America and by the laws of
the State of Washington, as such laws are applied
to agreements entered into and to be performed
entirely within Washington between Washington
residents. Company and Contractor each
irrevocably consent to the exclusive personal
jurisdiction of the federal and state courts
located in King County, Washington, as
applicable, for any matter arising out of or
relating to this Agreement, except that in
actions seeking to enforce any order or any
judgment of such federal or state courts located
in King County, Washington, such personal
jurisdiction will be nonexclusive.

## 18. Severability.

If a court of law holds any provision of this
Agreement to be illegal, invalid or
unenforceable,

- (a) that provision will be deemed amended to
  provide Company the maximum protection
  permitted by applicable law and
- (b) the legality, validity and
  enforceability of the remaining provisions
  of this Agreement will not be affected.

## 19. Waiver; Modification.

If Company waives any term, provision or breach
by Contractor of this Agreement, such waiver will
not be effective unless it is in writing and
signed by Company. No waiver will constitute a
waiver of any other or subsequent breach by
Contractor. This Agreement may be modified only
if both Company and Contractor consent in
writing.

PLAINTIFF0002983

## 20. Entire Agreement.

This Agreement represents the entire understanding with Company with respect to the subject matter of this Agreement and supersedes all previous understandings, written or oral. This Agreement is signed together with an ICA as outlined in Section 1.



[Signature page to follow]

I certify and acknowledge that I have carefully read all of the provisions of this Agreement and that I understand and will fully and faithfully comply with such provisions.

Executed as of the Date listed above.

| COMPANY | CONTRACTOR |
|---|---|
| Signature: | Signature: |
| Print Name: **[Entity-contact-name]** | Print Name: **[Consultant-name]** |
| **[Entity-address]** | Email: **[Consultant-email]** |
| **[Entity-city], [Entity-state] [Entity-zip]** | |
| Email**[Entity contact email]** | |

# Exhibit A

### PRIOR INNOVATIONS

Check one of the following:

- ☐ NO SUCH PRIOR INNOVATIONS EXIST.

OR

- ☐ YES, SUCH PRIOR INNOVATIONS EXIST AS DESCRIBED BELOW (include basic description

PLAINTIFF0002984

of each Prior Innovation):

# Exhibit B



| CONTRACTOR |
| --- |
| Signature: ------------------------------------- |
| Print Name: **[Consultant-name]** |
| Role: Contractor |
| Executed as of the date of this Agreement. |



| Previous | Next |
| --- | --- |
| Contractor Agreement | Supplemental Compensation Agreement |

**PLAINTIFF0002985**

 **LEGAL-TOOLS** DAOLABS  Connect Wallet

# Variables

**Your Entity's Name**

ACME Corporation

**Your Entity's Street Address**

123 Main Street, Apt. 45

**Your Entity's City**

Kalamazoo

**Your Entity's State**

Michigan

**Your Entity's ZIP Code**

49001

**Your Entity Representative's Full Name**

Ms. Jane Doe

**Your Entity Representative's Role**

Chief E ecutive Officer

**Indemnitee's Name**

Mr. John Doe

**Indemnitee's Role**

Director and Board Member

**Indemnitee's Street Address**

123 Main Street, Apt. 45

**Indemnitee's City**

Wichita

**Indemnitee's State**

Kansas

**Indemnitee's ZIP Code**

43201

DIRECTOR AND OFFICER
INDEMNIFICATION
AGREEMENT

RECITALS

AGREEMENT

PLAINTIFF0002986

Indemnitee's Email Address

john@doe com

**Update document**



    

# DIRECTOR AND OFFICER INDEMNIFICATION AGREEMENT

THIS INDEMNIFICATION AGREEMENT (this "**Agreement**") is made as of February 4, 2022, by and between [Entity-name], a Delaware corporation (the "**Company**"), and the undersigned ("**Indemnitee**"). Capitalized terms not defined elsewhere in this Agreement are used as defined in Section 14.

## RECITALS

WHEREAS, the Board of Directors of the Company (the "**Board**") has determined that it is reasonable, prudent and necessary for the Company to contractually obligate itself to indemnify, hold harmless, exonerate and advance expenses on behalf of persons who serve the Company and its direct and indirect subsidiaries, to the fullest extent permitted by applicable law, in order to, among other things, support the retention of highly competent persons who may be hesitant to serve in such roles without such protections;

WHEREAS, this Agreement is a supplement to and in furtherance of the Company's Certificate of Incorporation (the "**Charter**") and Bylaws (the "**Bylaws**") and together with the Charter, the "**Organizational Documents**"), in each case, as may be amended from time to time, and any resolutions adopted pursuant thereto, as well as any rights of Indemnitees under any directors' and officers' policies of liability insurance, and shall not be deemed a substitute therefor, nor to diminish or abrogate any rights of Indemnitee thereunder; and

PLAINTIFF0002987

WHEREAS, Indemnitee may not be willing to serve as an officer or director without adequate protection, and the Company desires Indemnitee to serve in such capacity, and Indemnitee is willing to serve, continue to serve, and to take on additional service for or on behalf of the Company on the condition that Indemnitee be so indemnified.

# AGREEMENT



In consideration of the Indemnitee's agreement to serve as a director or officer of the Company from and after the date hereof, and the premises and the covenants contained herein, the Company and Indemnitee do hereby covenant and agree as follows:

1. **Services by Indemnitee; Indemnity of Indemnitee.** The Company hereby agrees to hold harmless and indemnify Indemnitee to the fullest extent permitted by law, as such may be amended from time to time. In furtherance of the foregoing indemnification, and without limiting the generality thereof:

    (a) **Services by Indemnitee.** Indemnitee hereby agrees to serve or continue to serve as a director or officer of the Company, for so long as Indemnitee is duly elected or appointed or until Indemnitee tenders such Indemnitee's resignation or is removed. This Agreement shall not be deemed an employment contract between the Company or any of its subsidiaries or any Enterprise and Indemnitee.

    (b) **Proceedings Other Than Proceedings by or in the Right of the Company.** Indemnitee shall be entitled to the rights of indemnification provided in this **Section 1(b)** if, by reason of Indemnitee's Corporate Status, Indemnitee is, or is threatened to be made, a party to or participant in any Proceeding other than a Proceeding by or in the right of the Company. Pursuant to this **Section 1(b),** Indemnitee shall be indemnified against all Expenses, judgments, penalties, fines and amounts paid in settlement actually and reasonably incurred by Indemnitee, or on Indemnitee's behalf, in

PLAINTIFF0002988



connection with such Proceeding or any claim, issue or matter therein, if Indemnitee acted in good faith and in a manner Indemnitee reasonably believed to be in or not opposed to the best interests of the Company, and with respect to any criminal Proceeding, had no reasonable cause to believe Indemnitee's conduct was unlawful.

(c) **Proceedings by or in the Right of the Company.** Indemnitee shall be entitled to the rights of indemnification provided in this **Section 1(c)** if, by reason of Indemnitee's Corporate Status, Indemnitee is, or is threatened to be made, a party to or participant in any Proceeding brought by or in the right of the Company. Pursuant to this **Section 1(c),** Indemnitee shall be indemnified against all Expenses actually and reasonably incurred by Indemnitee, or on Indemnitee's behalf, in connection with such Proceeding if Indemnitee acted in good faith and in a manner Indemnitee reasonably believed to be in or not opposed to the best interests of the Company; **provided, however**, if applicable law so provides, no indemnification against such Expenses shall be made in respect of any claim, issue or matter in such Proceeding as to which Indemnitee shall have been adjudged to be liable to the Company unless and to the extent that the Court of Chancery of the State of Delaware shall determine that such indemnification may be made.

(d) **Indemnification for Expenses of a Party Who is Wholly or Partly Successful.** Without limiting any other provision of this Agreement, to the extent that Indemnitee is, by reason of Indemnitee's Corporate Status, a party to (or a participant in) and is successful, on the merits or otherwise, in any Proceeding or in defense of any claim, issue or matter therein, in whole or in part, Indemnitee shall be indemnified to the maximum extent permitted by law, as such may be amended from time to time, against all Expenses actually and reasonably incurred by

PLAINTIFF0002989

Indemnitee or on Indemnitee's behalf in connection therewith. If Indemnitee is not wholly successful in such Proceeding but is

successful, on the merits or otherwise, as to one or more but less than all claims, issues or matters in such Proceeding, the Company shall, to the fullest extent permitted by applicable law, indemnify Indemnitee against all Expenses actually and reasonably incurred by Indemnitee or on Indemnitee's behalf in connection with each successfully resolved claim, issue or matter. For purposes of this **Section 1(d)** and without limitation, the termination of any claim, issue or matter in such a Proceeding by dismissal, with or without prejudice, shall be deemed to be a successful result as to such claim, issue or matter.

(e) **Partial Indemnification.** If Indemnitee is entitled under any provision of this Agreement to indemnification by the Company for some or a portion of Expenses, but not, however, for the total amount thereof, the Company shall nevertheless indemnify Indemnitee for the portion thereof to which Indemnitee is entitled.

2. **Additional Indemnity; Hold Harmless and Exoneration Rights.** In addition to, and without regard to any limitations on, the indemnification provided for in **Section 1** of this Agreement, the Company shall, to the fullest extent permitted by applicable law, indemnify, hold harmless and exonerate Indemnitee if Indemnitee is a party to or threatened to be made a party to any Proceeding against all Expenses and judgments, fines, penalties and amounts paid in settlement in any Proceeding by or in the right of the Company to procure a judgment in its favor (including all interest, assessments and other charges paid or payable in connection with or in respect of such Expenses, judgments, fines, penalties and amounts paid in settlement) actually and reasonably incurred by Indemnitee in connection with the Proceeding.

3. **Contribution.**

(a) **Payment by the Company.** Whether or not the indemnification provided in **Sections**

PLAINTIFF0002990



the indemnification provided in **Sections 1** and **Section 2** hereof is available, in respect of any threatened, pending or

completed action, suit or proceeding in which the Company is jointly liable with Indemnitee (or would be if joined in such action, suit or proceeding), the Company shall pay, in the first instance, the entire amount of any judgment or settlement of such action, suit or proceeding without requiring Indemnitee to contribute to such payment and the Company hereby waives and relinquishes any right of contribution it may have against Indemnitee.

(b) **Expenses, Judgements, Fines and Settlement Amounts.** Without diminishing or impairing the obligations of the Company set forth in **Section 3(a)** hereof, if, for any reason, Indemnitee shall elect or be required to pay all or any portion of any judgment or settlement in any threatened, pending or completed action, suit or proceeding in which the Company is jointly liable with Indemnitee (or would be if joined in such action, suit or proceeding), the Company shall contribute to the amount of Expenses, judgments, fines and amounts paid in settlement actually and reasonably incurred and paid or payable by Indemnitee in proportion to the relative benefits received by the Company and all officers, directors or employees of the Company, other than Indemnitee, who are jointly liable with Indemnitee (or would be if joined in such action, suit or proceeding), on the one hand, and Indemnitee, on the other hand, from the transaction from which such action, suit or proceeding arose; **provided, however**, that the proportion determined on the basis of relative benefit may, to the extent necessary to conform to law, be further adjusted by reference to the relative fault of the Company and all officers, directors or employees of the Company other than Indemnitee who are jointly liable with Indemnitee (or would be if joined in such action, suit or proceeding), on the one hand, and Indemnitee, on the other hand, in

PLAINTIFF0002991



connection with the events that resulted in such Expenses, judgments, fines or settlement amounts, as well as any other equitable considerations which applicable law may require to be considered. The relative fault of the Company and all officers, directors or employees of the Company, other than Indemnitee, who are jointly liable with Indemnitee (or would be if joined in such action, suit or proceeding), on the one hand, and Indemnitee, on the other hand, shall be determined by reference to, among other things, the degree to which their actions were motivated by intent to gain personal profit or advantage, the degree to which their liability is primary or secondary and the degree to which their conduct is active or passive.

(c) **Indemnification of Claims of Contribution.** The Company hereby agrees to fully indemnify and hold Indemnitee harmless from any claims of contribution that may be brought by officers, directors or employees of the Company, other than Indemnitee, who may be jointly liable with Indemnitee.

(d) **Contribution for Indemnifiable Events.** To the fullest extent permissible under applicable law, if the indemnification provided for in this Agreement is unavailable to Indemnitee for any reason whatsoever, the Company, in lieu of indemnifying Indemnitee, shall contribute to the amount incurred by Indemnitee, whether for judgments, fines, penalties, amounts paid in settlement and/or for Expenses, in connection with any claim relating to an indemnifiable event under this Agreement, in such proportion as is deemed fair and reasonable in light of all of the circumstances of such Proceeding in order to reflect (i) the relative benefits received by the Company and Indemnitee as a result of the event(s) and/or transaction(s) giving cause to such Proceeding; and/or (ii) the relative fault of the Company (and its directors, officers, employees and agents)

PLAINTIFF0002992

and Indemnitee in connection with such event(s) and/or transaction(s).



**4. Indemnification for Expenses of a Witness.** Notwithstanding any other provision of this Agreement, to the extent that Indemnitee is, by reason of Indemnitee's Corporate Status, a witness, or is made (or asked to) respond to discovery requests, in any Proceeding to which Indemnitee is not a party, he or she shall be indemnified against all Expenses actually and reasonably incurred by Indemnitee or on Indemnitee's behalf in connection therewith.

**5. Advancement of Expenses.** Notwithstanding any other provision of this Agreement, the Company shall advance all Expenses incurred by or on behalf of Indemnitee in connection with any Proceeding by reason of Indemnitee's Corporate Status within thirty (30) days after the receipt by the Company of a statement or statements from Indemnitee requesting such advance or advances from time to time, whether prior to or after final disposition of such Proceeding and regardless of such Indemnitee's ability to repay any such amounts in the event of an ultimate determination that Indemnitee is not entitled thereto. Such statement or statements shall reasonably evidence the Expenses incurred by Indemnitee and shall include or be preceded or accompanied by a written undertaking by or on behalf of Indemnitee to repay any Expenses advanced if it shall ultimately be determined by final judgment or other final adjudication under the provisions of any applicable law (as to which all rights of appeal therefrom have been exhausted or lapsed) that Indemnitee is not entitled to be indemnified against such Expenses under the provisions of this Agreement, the Organizational Documents, applicable law or otherwise. Any advances and undertakings to repay pursuant to this **Section 5** shall be unsecured and interest free. This Section 5 shall be subject to Section 13 and shall not apply to any claim made by Indemnitee for which indemnity is excluded pursuant to Section 9.

**6. Procedures and Presumptions for Determination of Entitlement to Indemnification.** It is the intent of this Agreement to secure for Indemnitee rights of indemnity that are as favorable as may be permitted under the Delaware General Company Law (**"DGCL"**) and public policy of the State of Delaware. Accordingly,

PLAINTIFF0002993

the parties agree that the following procedures and presumptions shall apply in the event of any question

as to whether Indemnitee is entitled to indemnification under this Agreement:

(a) **Written Request of Indemnification.** To obtain indemnification under this Agreement, Indemnitee shall submit to the General Counsel of the Company a written request, including therein or therewith such documentation and information as is reasonably available to Indemnitee and is reasonably necessary to determine whether and to what extent Indemnitee is entitled to indemnification. The General Counsel of the Company shall, promptly upon receipt of such a request for indemnification, advise the Board in writing that Indemnitee has requested indemnification. Notwithstanding the foregoing, any failure of Indemnitee to provide such a request to the Company, or to provide such a request in a timely fashion, shall not relieve the Company of any liability that it may have to Indemnitee unless, and to the extent that, such failure actually and materially prejudices the interests of the Company.

(b) **Determination of Indemnification.** Upon written request by Indemnitee for indemnification pursuant to the first sentence of **Section 6(a)** hereof, a determination with respect to Indemnitee's entitlement thereto shall be made in the specific case by one of the following four methods, which shall be at the election of the Board: (i) by a majority vote of the Disinterested Directors, even though less than a quorum, (ii) by a committee of Disinterested Directors designated by a majority vote of the Disinterested Directors, even though less than a quorum, (iii) if there are no Disinterested Directors, or if the Disinterested Directors so direct, by Independent Counsel in a written opinion to the Board, a copy of which shall be delivered to Indemnitee, or (iv) if so directed by the Board, by the

PLAINTIFF0002994

stockholders of the Company; **provided, however**, that if a Change in Control has occurred, the determination

with respect to Indemnitee's entitlement to indemnification shall be made by Independent Counsel.

(c) **Independent Counsel**. In the event the determination of entitlement to indemnification is to be made by Independent Counsel, the Independent Counsel shall be selected as provided in this **Section 6(c)**. If a Change in Control has not occurred, the Independent Counsel shall be selected by the Board (including a vote of a majority of the Disinterested Directors, if obtainable), and the Company shall give written notice advising the Indemnitee of the identity of the Independent Counsel so selected. Indemnitee may, within ten (10) days after such written notice of selection shall have been given, deliver to the Company a written objection to such selection; **provided, however**, that such objection may be asserted only on the ground that the Independent Counsel so selected does not meet the requirements of "Independent Counsel" as defined in **Section 14** of this Agreement, and the objection shall set forth with particularity the factual basis of such assertion. Absent a proper and timely objection, the person so selected shall act as Independent Counsel. If a written objection is made, the Independent Counsel selected may not serve as Independent Counsel unless and until such objection is withdrawn or a court has determined that such objection is without merit. If a Change in Control has occurred, the Independent Counsel shall be selected by the Indemnitee (unless the Indemnitee shall request that such selection be made by the Board, in which event the preceding sentence shall apply), and approved by the Board (which approval shall not be unreasonably withheld). If (i) an Independent Counsel is to make the determination of entitlement pursuant to this **Section 6**, and (ii) within twenty (20) days after submission by



PLAINTIFF0002995



Indemnitee of a written request for indemnification pursuant to **Section 6(a)** hereof, no Independent Counsel shall have been selected and not objected to, either the Company or Indemnitee may petition the Court of Chancery of the State of Delaware or other court of competent jurisdiction for resolution of any objection which shall have been made by Indemnitee to the Company's selection of Independent Counsel and/or for the appointment as Independent Counsel of a person selected by the court or by such other person as the court shall designate, and the person with respect to whom all objections are so resolved or the person so appointed shall act as Independent Counsel under **Section 6(b)** hereof. The Company shall pay any and all reasonable fees and expenses of Independent Counsel incurred by such Independent Counsel in connection with acting pursuant to **Section 6(b)** hereof, and the Company shall pay all reasonable fees and expenses incident to the procedures of this **Section 6(c)**, regardless of the manner in which such Independent Counsel was selected or appointed.

(d)* **\*Presumption of Indemnification.** In making a determination with respect to entitlement to indemnification hereunder, the person or persons or entity making such determination shall presume that Indemnitee is entitled to indemnification under this Agreement. Anyone seeking to overcome this presumption shall have the burden of proof and the burden of persuasion by clear and convincing evidence. Neither the failure of the Company (including by its directors or independent legal counsel) to have made a determination prior to the commencement of any action pursuant to this Agreement that indemnification is proper in the circumstances because Indemnitee has met the applicable standard of conduct, nor an actual determination by the Company (including by its directors or independent legal counsel) that Indemnitee has not met such applicable standard of conduct, shall

PLAINTIFF0002996



be a defense to the action or create a presumption that Indemnitee has not met the applicable standard of conduct.

(e)* **Presumption of Good Faith.** Indemnitee shall be deemed to have acted in good faith if Indemnitee's action is based on the records or books of account of the Enterprise, including financial statements, or on information supplied to Indemnitee by the officers of the Enterprise in the course of their duties, or on the advice of legal counsel for the Enterprise or on information or records given or reports made to the Enterprise by an independent certified public accountant or by an appraiser or other expert selected by the Enterprise. The provisions of this **Section 6(e)** shall not be deemed to be exclusive or to limit in any way the other circumstances in which the Indemnitee may be deemed to have met the applicable standard of conduct set forth in this Agreement. In addition, the knowledge and/or actions, or failure to act, of any director, officer, agent or employee of the Enterprise shall not be imputed to Indemnitee for purposes of determining the right to indemnification under this Agreement. Whether or not the foregoing provisions of this **Section 6(e)** are satisfied, it shall in any event be presumed that Indemnitee has at all times acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the Company. Anyone seeking to overcome this presumption shall have the burden of proof and the burden of persuasion by clear and convincing evidence.

(f)* **Timing.** If the person, persons or entity empowered or selected under this **Section 6** to determine whether Indemnitee is entitled to indemnification shall not have made a determination within sixty (60) days after receipt by the Company of the request therefor, the requisite determination of entitlement to indemnification shall, to the fullest extent permitted by law, be deemed to have been made and Indemnitee shall be entitled to

PLAINTIFF0002997



such indemnification absent (i) a misstatement by Indemnitee of a material fact, or an omission of a material fact necessary to make Indemnitee's statement not materially misleading, in connection with the request for indemnification, or (ii) a prohibition of such indemnification under applicable law; **provided, however,** that such sixty (60) day period may be extended for a reasonable time, not to exceed an additional thirty (30) days, if the person, persons or entity making such determination with respect to entitlement to indemnification in good faith requires such additional time to obtain or evaluate documentation and/or information relating thereto; and **provided, further,** that the foregoing provisions of this **Section 6(f)** shall not apply if the determination of entitlement to indemnification is to be made by the stockholders pursuant to **Section 6(b)** of this Agreement and if (A) within fifteen (15) days after receipt by the Company of the request for such determination, the Board or the Disinterested Directors, if appropriate, resolve to submit such determination to the stockholders for their consideration at an annual meeting thereof to be held within seventy-five (75) days after such receipt and such determination is made thereat, or (B) a special meeting of stockholders is called within fifteen (15) days after such receipt for the purpose of making such determination, such meeting is held for such purpose within sixty (60) days after having been so called and such determination is made thereat.

(g)* **Cooperation.** Indemnitee shall cooperate with the person, persons or entity making such determination with respect to Indemnitee's entitlement to indemnification, including providing to such person, persons or entity upon reasonable advance request any documentation or information, which is not privileged or otherwise protected from disclosure and which is reasonably available to Indemnitee and reasonably necessary to such determination. Any Independent Counsel

PLAINTIFF0002998



or member of the Board shall act reasonably and in good faith in making a determination regarding Indemnitee's entitlement to indemnification under this Agreement. Any costs or expenses (including attorneys' fees and disbursements) incurred by Indemnitee in so cooperating with the person, persons or entity making such determination shall be borne by the Company (irrespective of the determination as to Indemnitee's entitlement to indemnification) and the Company hereby indemnifies and agrees to hold Indemnitee harmless therefrom.

(h)* **Presumption of Success on the Merits.** The Company acknowledges that a settlement or other disposition short of final judgment may be successful if it permits a party to avoid expense, delay, distraction, disruption and uncertainty. In the event that any action, claim or proceeding to which Indemnitee is a party is resolved in any manner other than by adverse judgment against Indemnitee (including, without limitation, settlement of such action, claim or proceeding with or without payment of money or other consideration) it shall be presumed that Indemnitee has been successful on the merits or otherwise in such action, suit or proceeding. Anyone seeking to overcome this presumption shall have the burden of proof and the burden of persuasion by clear and convincing evidence.

(i) **Termination of Proceeding.** The termination of any Proceeding or of any claim, issue or matter therein, by judgment, order, settlement or conviction, or upon a plea of nolo contendere or its equivalent, shall not (except as otherwise expressly provided in this Agreement) of itself adversely affect the right of Indemnitee to indemnification or create a presumption that Indemnitee did not act in good faith and in a manner which he or she reasonably believed to be in or not opposed to the best interests of the Company or, with respect to any criminal Proceeding, that Indemnitee had reasonable cause to believe that

PLAINTIFF0002999

Indemnitee's conduct was unlawful.

## 7. Remedies of Indemnitee.



(a) **Disputes.** In the event of any dispute
between Indemnitee and the Company hereunder
as to entitlement to indemnification or
advancement of Expenses, including where (i)
a determination is made pursuant to **Section
6** of this Agreement that Indemnitee is not
entitled to indemnification, (ii) payment is
not timely made following a determination of
entitlement to indemnification pursuant
to **Section 6** of this Agreement, (iii) an
advancement of Expenses is not timely made
pursuant to **Section 5** of this Agreement,
(iv) a contribution payment is not timely
made pursuant to **Section 3** of this
Agreement, or (v) no determination as to
entitlement to indemnification is timely
made pursuant to **Section 6** of this Agreement
and payment is not timely made after
entitlement is deemed to have been
determined pursuant to **Section 6(f),**
Indemnitee may at any time thereafter bring
suit against the Company seeking an
adjudication of entitlement to such
indemnification or advancement of Expenses,
and any such suit shall be brought in the
Court of Chancery of the State of Delaware,
or in any other court of competent
jurisdiction. Alternatively, Indemnitee, at
such person's option, may seek an award in
arbitration to be conducted by a single
arbitrator pursuant to the Commercial
Arbitration Rules of the American
Arbitration Association. Except as set forth
herein, the provisions of Delaware law
(without regard to its conflict of law
rules) shall apply to any such arbitration.
The Company shall not oppose Indemnitee's
right to seek any such adjudication or award
in arbitration.

(b) **Burden of Proof.** In the event that a
determination shall have been made pursuant
to **Section 6(b)** of this Agreement that
Indemnitee is not entitled to
indemnification, any judicial proceeding or

PLAINTIFF0003000

arbitration commenced pursuant to this **Section 7** shall be conducted in all respects as a de novo trial, or arbitration,

on the merits, and Indemnitee shall not be prejudiced by reason of the adverse determination under **Section 6(b).** In any judicial proceeding or arbitration commenced pursuant to this **Section 7**, the Company shall have the burden of proving that Indemnitee was not entitled to the requested indemnification, advancement or payment of Expenses. It shall be a defense to any such action (other than an action brought to enforce a claim for Expenses incurred in defending any proceeding in advance of its final disposition where the required undertaking, if any is required, has been tendered to the Company) that Indemnitee has not met the standards of conduct which make it permissible under this Agreement, the Organizational Documents or the DGCL for the Company to indemnify Indemnitee for the amount claimed. Neither the failure of the Company (including the Board, Independent Counsel, or its stockholders) to have made a determination prior to the commencement of such action that indemnification or advancement is proper in the circumstances because Indemnitee has met the applicable standard of conduct set forth in this Agreement, the Organizational Documents or the DGCL, nor an actual determination by the Company (including the Board, Independent Counsel, or its stockholders) that Indemnitee has not met such applicable standard of conduct, shall be a defense to the action or create a presumption that Indemnitee has not met any applicable standard of conduct. If successful, in whole or in part, Indemnitee shall also be entitled to be paid the Expenses of prosecuting such action to the fullest extent permitted by law.

(c) **Binding Effect.** If a determination shall have been made pursuant to **Section 6(b)** of this Agreement that Indemnitee is entitled to indemnification, the Company shall be bound by such determination in any judicial



PLAINTIFF0003001

proceeding or arbitration commenced pursuant to this **Section 7**, absent (i) a misstatement by Indemnitee of a material fact, or an omission of a material fact necessary to make Indemnitee's misstatement not materially misleading in connection with the application for indemnification, or (ii) a prohibition of such indemnification under applicable law.

(d) **Remedies for Breaches of this Agreement.** In the event that Indemnitee, pursuant to this **Section 7**, seeks a judicial adjudication of Indemnitee's rights under, or to recover damages for breach of, this Agreement, or to recover under any directors' and officers' liability insurance policies maintained by the Company, the Company shall pay on Indemnitee's behalf, in advance, any and all expenses (of the types described in the definition of Expenses in **Section 14** of this Agreement) actually and reasonably incurred by Indemnitee in such judicial adjudication to the fullest extent permitted by applicable law.

(e) **Binding Effect of this Agreement.** The Company shall be precluded from asserting in any judicial proceeding or arbitration commenced pursuant to this **Section 7** that the procedures and presumptions of this Agreement are not valid, binding and enforceable and shall stipulate in any such court or before any such arbitrator that the Company is bound by all the provisions of this Agreement. It is the intent of the Company that, to the fullest extent permitted by law, the Indemnitee not be required to incur legal fees or other Expenses associated with the interpretation, enforcement or defense of Indemnitee's rights under this Agreement by litigation or otherwise because the cost and expense thereof would substantially detract from the benefits intended to be extended to the Indemnitee hereunder. The Company shall indemnify Indemnitee against any and all Expenses and, if requested by Indemnitee, shall timely advance, to the extent



PLAINTIFF0003002



permitted by law, such expenses to Indemnitee, which are incurred by Indemnitee in connection with any action brought by

Indemnitee for indemnification or advance of Expenses from the Company under this Agreement or under any directors' and officers' liability insurance policies maintained by the Company, regardless of whether Indemnitee ultimately is determined to be entitled to such indemnification, advancement of Expenses or insurance recovery, as the case may be.

(f) **Final Disposition.** Notwithstanding anything in this Agreement to the contrary, no determination as to entitlement to indemnification under this Agreement shall be required to be made prior to the final disposition of the Proceeding.

8. **Non-Exclusivity; Survival of Rights; Insurance; Primacy of Indemnification; Subrogation.**

(a) **Non-Exclusive Rights.** The rights of indemnification and to receive advancement of expenses as provided by this Agreement shall not be deemed exclusive of any other rights to which Indemnitee may at any time be entitled under applicable law, the Organizational Documents, any agreement, a vote of stockholders, a resolution of directors or otherwise, of the Company. No amendment, alteration or repeal of this Agreement or of any provision hereof shall limit or restrict any right of Indemnitee under this Agreement in respect of any action taken or omitted by such Indemnitee in such person's Corporate Status prior to such amendment, alteration or repeal. To the extent that a change in the DGCL, whether by statute or judicial decision, permits greater indemnification than would be afforded currently under the Organizational Documents and this Agreement, it is the intent of the parties hereto that Indemnitee shall enjoy by this Agreement the greater benefits so afforded by such change. No right or remedy herein conferred is intended to be exclusive of any other right or

PLAINTIFF0003003

remedy, and every other right and remedy
shall be cumulative and in addition to every
other right and remedy given hereunder or

now or hereafter existing at law or in
equity or otherwise. The assertion or
employment of any right or remedy hereunder,
or otherwise, shall not prevent the
concurrent assertion or employment of any
other right or remedy.

(b) **D&O Liability Insurance.** The Company
shall obtain and maintain in effect during
the entire period for which the Company is
obligated to indemnify Indemnitee under this
Agreement, one or more policies of insurance
("**D&O Liability Insurance**") with one or more
reputable insurance companies to provide the
directors and officers of the Company with
standard coverage to ensure the Company's
performance of its indemnification
obligations under this Agreement. Indemnitee
shall be covered by such policy or policies
in accordance with its or their terms to the
maximum extent of the coverage available for
any such director or officer under such
policy or policies. In all such insurance
policies, Indemnitee shall be named as an
insured in such a manner as to provide
Indemnitee with the same rights and benefits
as are accorded to the most favorably
insured of the Company's directors and
officers. At the time of the receipt of a
notice of a claim pursuant to the terms
hereof, the Company shall give prompt notice
of the commencement of such proceeding to
the insurers in accordance with the
procedures set forth in the respective
policies. The Company shall thereafter take
all necessary or desirable action to cause
such insurers to pay, on behalf of
Indemnitee, all amounts payable as a result
of such proceeding in accordance with the
terms of such policies. Upon request by
Indemnitee, the Company shall provide copies
of all policies of D&O Liability Insurance
obtained and maintained in accordance with
the foregoing. The Company shall promptly
notify Indemnitee of any changes in such
insurance coverage.

PLAINTIFF0003004



(c) **Subrogation.** In the event of any payment under this Agreement, the Company shall be

subrogated to the extent of such payment to all of the rights of recovery of Indemnitee, who shall execute all papers required and take all action necessary to secure such rights, including execution of such documents as are necessary to enable the Company to bring suit to enforce such rights.

(d) **Double Recovery.** The Company shall not be liable under this Agreement to make any payment of amounts otherwise indemnifiable hereunder if and to the extent that Indemnitee has otherwise actually received such payment under any insurance policy, contract, agreement or otherwise.

(e) **Sources of Recovery.** The Company's obligation to indemnify or advance Expenses hereunder to Indemnitee who is or was serving at the request of the Company as a director, officer, employee or agent of any other corporation, partnership, joint venture, trust, employee benefit plan or other Enterprise shall be reduced by any amount Indemnitee has actually received as indemnification or advancement of expenses from such other corporation, partnership, joint venture, trust, employee benefit plan or other enterprise.

(f) **Third-Party Indemnification.** The Company hereby acknowledges that Indemnitee has or may from time to time obtain certain rights to indemnification, advancement of expenses and/or insurance provided by one or more third parties (collectively, the "**Third-Party Indemnitors**"). The Company hereby agrees that it is the indemnitor of first resort (*i.e.,* its obligations to Indemnitee are primary and any obligation of the Third-Party Indemnitors to advance expenses or to provide indemnification for the same expenses or liabilities incurred by Indemnitee are secondary), and that the Company will not assert that the Indemnitee

PLAINTIFF0003005

must seek expense advancement or
reimbursement, or indemnification, from any
Third-Party Indemnitor before the Company



must perform its expense advancement and
reimbursement, and indemnification
obligations, under this Agreement. No
advancement or payment by the Third-Party
Indemnitors on behalf of Indemnitee with
respect to any claim for which Indemnitee
has sought indemnification from the Company
shall affect the foregoing. The Third-Party
Indemnitors shall be subrogated to the
extent of such advancement or payment to all
of the rights of recovery which Indemnitee
would have had against the Company if the
Third-Party Indemnitors had not advanced or
paid any amount to or on behalf of
Indemnitee. If for any reason a court of
competent jurisdiction determines that the
Third-Party Indemnitors are not entitled to
the subrogation rights described in the
preceding sentence, the Third-Party
Indemnitors shall have a right of
contribution by the Company to the Third-
Party Indemnitors with respect to any
advance or payment by the Third-Party
Indemnitors to or on behalf of the
Indemnitee.

9. **Exception to Right of Indemnification.**
Notwithstanding any provision in this Agreement, the
Company shall not be obligated under this Agreement to
make any indemnity in connection with any claim made
against Indemnitee:

(a) for which payment has actually been made
to or on behalf of Indemnitee under any
insurance policy or other indemnity
provision, except with respect to any excess
beyond the amount paid under any insurance
policy or other indemnity provision or any
amount received that is required to be
repaid;

(b) for an accounting of profits made from
the purchase and sale (or sale and purchase)
by Indemnitee of securities of the Company
within the meaning of Section 16(b) of the
Exchange Act or similar provisions of state
statutory law or common law;

PLAINTIFF0003006

statutory law or common law;

(c) for reimbursement to the Company of any bonus or other incentive-based or equity-based compensation or of any profits realized by Indemnitee from the sale of securities of the Company in each case as required under the Exchange Act; or

(d) in connection with any Proceeding (or any part of any Proceeding) initiated by Indemnitee, including any Proceeding (or any part of any Proceeding) initiated by Indemnitee against the Company or its directors, officers, employees or other indemnitees, unless (i) the Company has joined in or the Board authorized the Proceeding (or any part of any Proceeding) prior to its initiation, (ii) the Company provides the indemnification, in its sole discretion, pursuant to the powers vested in the Company under applicable law, or (iii) the Proceeding is one to enforce Indemnitee's rights under this Agreement.

10.* **\*Non-Disclosure of Payments.** Except as expressly required by the securities laws of the United States of America, neither party shall disclose any payments under this Agreement unless prior approval of the other party is obtained. If any payment information must be disclosed, the Company shall afford the Indemnitee an opportunity to review all such disclosures and, if requested, to explain in such statement any mitigating circumstances regarding the events to be reported.

11. **Duration of Agreement.** All agreements and obligations of the Company contained herein shall continue upon the later of (a) ten (10) years after the date that Indemnitee shall have ceased to serve as a director of the Company or a director, officer, trustee, partner, managing member, fiduciary, employee or agent of any other corporation, partnership, joint venture, trust, employee benefit plan or other Enterprise which Indemnitee served at the request of the Company; or (b) one (1) year after the final termination of any Proceeding (including any rights of appeal thereto) in respect of which Indemnitee is

PLAINTIFF0003007

granted rights of indemnification or advancement of Expenses hereunder and of any Proceeding commenced by Indemnitee pursuant to **Section 7** of this Agreement



relating thereto (including any rights of appeal of any **Section 7** Proceeding). This Agreement shall be binding upon and inure to the benefit of and be enforceable by the parties hereto and their respective successors (including any direct or indirect successor by purchase, merger, consolidation or otherwise to all or substantially all of the business or assets of the Company), assigns, spouses, heirs, executors and personal and legal representatives.

12. **Security.** To the extent requested by Indemnitee and approved by the Board, the Company may at any time and from time to time provide security to Indemnitee for the Company's obligations hereunder through an irrevocable bank line of credit, funded trust or other collateral. Any such security, once provided to Indemnitee, may not be revoked or released without the prior written consent of Indemnitee.

13. **Defense of Claims.** The Company will be entitled to participate in the Proceeding at its own expense. The Company shall not settle any action, claim or Proceeding (in whole or in part) which would impose any Expense, judgment, fine, penalty or limitation on Indemnitee without Indemnitee's prior written consent, such consent not to be unreasonably withheld. Indemnitee shall not settle any action, claim or Proceeding (in whole or in part) which would impose any Expense, judgment, fine, penalty or limitation on the Company without the Company's prior written consent, such consent not to be unreasonably withheld.

14. **Definitions.** For purposes of this Agreement:

  (a) **"Beneficial Owner"** shall have the meaning given to such term in Rule 13d-3 under the Exchange Act; **provided, however,** that Beneficial Owner shall exclude any Person otherwise becoming a Beneficial Owner by reason of the stockholders of the Company approving a merger of the Company with another entity.

  (b) **"Change in Control"** shall be deemed to occur upon the earliest to occur after the date of this Agreement of any of the following events:

PLAINTIFF0003008



(i) **Acquisition of Stock by Third Party.** Any Person (excluding any Person who, as of the closing date of the Company's initial public offering of its Class A Common Stock pursuant to a registration statement on Form S-1 filed with and declared effective by the Securities Exchange Commission, who was at that date the record or beneficial owner of shares of the Company's Class B Common Stock and any group consisting solely of such Persons) is or becomes the Beneficial Owner, directly or indirectly, of securities of the Company representing twenty percent (20%) or more of the combined voting power of the Company's then outstanding securities;

(ii) **Change in Board.** During any period of two (2) consecutive years (not including any period prior to the execution of this Agreement), individuals who at the beginning of such period constitute the Board, and any new director (other than a director designated by a person who has entered into an agreement with the Company to effect a transaction described in **Section 14(b) (i), 14(b)(iii)** or **14(b)(iv)**) whose election by the Board or nomination for election by the Company's stockholders was approved by a vote of at least two-thirds of the directors then still in office who either were directors at the beginning of the period or whose election or nomination for election was previously so approved, cease for any reason to constitute a least a majority of the members of the Board; **provided, however,** that the

PLAINTIFF0003009



Sunset (as defined in the Certificate of Incorporation) shall not be deemed a Change in the Board for purposes of this **Section 14(b)(ii)**;

(iii) **Corporate Transactions.** The effective date of a merger or consolidation of the Company with any other entity, other than a merger or consolidation which would result in the voting securities of the Company outstanding immediately prior to such merger or consolidation continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity) more than 51% of the combined voting power of the voting securities of the surviving entity outstanding immediately after such merger or consolidation and with the power to elect at least a majority of the board of directors or other governing body of such surviving entity;

(iv) **Asset Sale\*.** \*The sale or disposition of all or substantially all the assets of the Company in a transaction or series of related transactions; and

(v) **Liquidation\*.** \*The approval by the stockholders of the Company of a complete liquidation of the Company or an agreement or series of agreements for the sale or disposition by the Company of all or substantially all of the Company's assets, or, if such approval is not required, the decision by the Board to proceed with such a liquidation, sale, or disposition in one transaction or a series of related transactions.

PLAINTIFF0003010



(c) **"Corporate Status"** describes the status of an individual who is or was or has agreed

to become a director or officer of the Company or while a director or officer of the Company who is serving, was serving, or has agreed to serve at the request of the Company as a director, officer, trustee, general partner, managing member, fiduciary, employee or agent of any other Enterprise.

(d) **"Disinterested Director"** means a director of the Company who is not and was not a party to the Proceeding in respect of which indemnification is sought by Indemnitee.

(e) **"Enterprise"** means the Company and any other corporation, constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger to which the Company (or any of their wholly owned subsidiaries) is a party, limited liability company, partnership, joint venture, trust, employee benefit plan or other enterprise, of which Indemnitee is or was serving at the request of the Company as a director, officer, trustee, general partner, managing member, fiduciary, employee or agent.

(f) **"Exchange Act"** means the Securities Exchange Act of 1934, as amended.

(g) **"Expenses"** includes all direct and indirect costs, fees and expenses of any type or nature whatsoever, including, without limitation, all attorneys' fees and costs, retainers, court costs, transcript costs, fees of experts, witness fees, travel expenses, fees of private investigators and professional advisors, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees, fax transmission charges, secretarial services, any federal, state, local or foreign taxes imposed on Indemnitee as a result of the actual or deemed receipt of any payments under this Agreement, ERISA excise taxes and penalties, and all other disbursements



penalties, and all other disbursements,
obligations or expenses in connection with
prosecuting, defending, preparing to

prosecute or defend, investigating, being or
preparing to be a witness in, settlement or
appeal of, or otherwise participating in, a
Proceeding, including, without limitation,
reasonable compensation for time spent by
the Indemnitee for which he or she is not
otherwise compensated by the Company or any
third party. Expenses also shall include
Expenses incurred in connection with any
appeal resulting from any Proceeding,
including without limitation the principal,
premium, security for, and other costs
relating to any cost bond, supersedes bond,
or other appeal bond or its equivalent.

(h) "**Independent Counsel**" means a law firm,
or a member of a law firm, that is
experienced in matters of corporation law
and neither presently is, nor in the past
five years has been, retained to represent:
(i) the Company or Indemnitee in any matter
material to either such party (other than
with respect to matters concerning
Indemnitee under this Agreement, or of other
indemnitees under similar indemnification
agreements), or (ii) any other party to the
Proceeding giving rise to a claim for
indemnification hereunder. Notwithstanding
the foregoing, the term "Independent
Counsel" shall not include any person who,
under the applicable standards of
professional conduct then prevailing, would
have a conflict of interest in representing
either the Company or Indemnitee in an
action to determine Indemnitee's rights
under this Agreement. The Company agrees to
pay the reasonable fees of the Independent
Counsel referred to above and to fully
indemnify such counsel against any and all
Expenses, claims, liabilities and damages
arising out of or relating to this Agreement
or its engagement pursuant hereto.

(i) "**Person**" shall have the meaning as set
forth in Sections 13(d) and 14(d) of the
Exchange Act; **provided, however,** that Person

PLAINTIFF0003012

shall exclude (i) the Company, (ii) any trustee or other fiduciary holding securities under an employee benefit plan of the Company, and (iii) any corporation owned, directly or indirectly, by the stockholders of the Company in substantially the same proportions as their ownership of stock of the Company.

(j) "**Proceeding**" includes any threatened, pending or completed action, derivative action, claim, counterclaim, cross claim, suit, arbitration, mediation, alternate dispute resolution mechanism, investigation, inquiry, administrative hearing or any other actual, threatened or completed proceeding, whether brought by or in the right of the Company or otherwise and whether of a civil (including intentional or unintentional tort claims), criminal, administrative or investigative (formal or informal) nature, including appeal therefrom, or any inquiry or investigation that Indemnitee in good faith believes might lead to the institution of any such action, suit or other proceeding hereinabove listed in which Indemnitee was, is, will or might be involved as a party, potential party, non-party witness or otherwise by reason of the fact of Indemnitee's Corporate Status, by reason of any action (or failure to act) taken by him or her or of any action (or failure to act) on his or her part while acting pursuant to his or her Corporate Status, whether or not serving in such capacity at the time any liability or expense is incurred for which indemnification, reimbursement, or advancement of expenses can be provided under this Agreement. If the Indemnitee believes in good faith that a given situation may lead to or culminate in the institution of a Proceeding, this shall be considered a Proceeding under this Agreement.

15. **Severability.** If any provision or provisions of this Agreement shall be held to be invalid, illegal or unenforceable for any reason whatsoever: (a) the validity, legality, and enforceability of the

PLAINTIFF0003013

remaining provisions of this Agreement (including, without limitation, each portion of any Section, paragraph or sentence of this Agreement containing any



such provision held to be invalid, illegal or unenforceable, that is not itself invalid, illegal or unenforceable) shall not in any way be affected or impaired thereby and shall remain enforceable to the fullest extent permitted by law; (b) such provision or provisions shall be deemed reformed to the fullest extent necessary to conform to applicable law and to give the maximum effect to the intent of the parties hereto; and (c) to the fullest extent possible, the provisions of this Agreement (including, without limitation, each portion of any Section, paragraph or sentence of this Agreement containing any such provision held to be invalid, illegal or unenforceable, that is not itself invalid, illegal or unenforceable) shall be construed so as to give effect to the intent manifested thereby. Without limiting the generality of the foregoing, this Agreement is intended to confer upon Indemnitee indemnification rights to the fullest extent permitted by applicable law.

16. **Enforcement and Binding Effect.**

(a) **Reliance.** The Company expressly confirms and agrees that it has entered into this Agreement and assumed the obligations imposed on it hereby in order to induce Indemnitee to serve as a director or officer of the Company, and the Company acknowledges that Indemnitee is relying upon this Agreement in serving in such capacity.

(b) **Entire Agreement.** Without limiting any of the rights of Indemnitee under the Organizational Documents of the Company as they may be amended from time to time, this Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral, written and implied, between the parties hereto with respect to the subject matter hereof.

(c) **Binding Agreement.** The indemnification and advancement of expenses provided by, or granted pursuant to this Agreement shall be

PLAINTIFF0003014



granted pursuant to this Agreement shall be binding upon and be enforceable by the parties hereto and their respective

successors and assigns (including any direct or indirect successor by purchase, merger, consolidation or otherwise to all or substantially all of the business or assets of the Company), shall continue as to an Indemnitee who has ceased to be a director, officer, employee or agent of the Company or of any other Enterprise at the Company's request, and shall inure to the benefit of Indemnitee and such person's spouse, assigns, heirs, devisees, executors and administrators and other legal representatives.

(d) **Successors.** The Company shall require and cause any successor (whether direct or indirect by purchase, merger, consolidation or otherwise) to all, substantially all or a substantial part, of the business and/or assets of the Company to expressly to assume and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform if no such succession had taken place.

(e) **Specific Performance.** The Company and Indemnitee agree herein that a monetary remedy for breach of this Agreement, at some later date, may be inadequate, impracticable and difficult of proof, and further agree that such breach may cause Indemnitee irreparable harm. Accordingly, the parties hereto agree that Indemnitee may enforce this Agreement by seeking injunctive relief and/or specific performance hereof, without any necessity of showing actual damage or irreparable harm and that by seeking injunctive relief and/or specific performance, Indemnitee shall not be precluded from seeking or obtaining any other relief to which he or she may be entitled. The Company and Indemnitee further agree that Indemnitee shall be entitled to such specific performance and injunctive relief, including temporary restraining orders, preliminary injunctions and

PLAINTIFF0003015



permanent injunctions, without the necessity
of posting bonds or other undertaking in
connection therewith. The Company

acknowledges that in the absence of a
waiver, a bond or undertaking may be
required of Indemnitee by the Court, and the
Company hereby waives any such requirement
of such a bond or undertaking.

**17. Modification and Waiver.** No supplement,
modification, termination or amendment of this
Agreement shall be binding unless executed in writing
by both of the parties hereto. No waiver of any of the
provisions of this Agreement shall be deemed or shall
constitute a waiver of any other provisions hereof
(whether or not similar) nor shall such waiver
constitute a continuing waiver.

**18. Notice By Indemnitee.** Indemnitee agrees promptly
to notify the Company in writing upon being served
with or otherwise receiving any summons, citation,
subpoena, complaint, indictment, information or other
document relating to any Proceeding or matter which
may be subject to indemnification covered hereunder.
The failure to so notify the Company shall not relieve
the Company of any obligation which it may have to
Indemnitee under this Agreement or otherwise.

**19. Notices.** All notices and other communications
given or made pursuant to this Agreement shall be in
writing and shall be deemed effectively given: (a)
upon personal delivery to the party to be notified,
(b) when sent by confirmed electronic mail or
facsimile if sent during normal business hours of the
recipient, and if not so confirmed, then on the next
business day, (c) five (5) days after having been sent
by registered or certified mail, return receipt
requested, postage prepaid, or (d) one (1) day after
deposit with a nationally recognized overnight
courier, specifying next day delivery, with written
verification of receipt. All communications shall be
sent:

| INDEMNITEE |
|---|
| [Recipient name] |
| [Recipient-address] |
| [Recipient-city] [Recipient-state] [Recipient-zip] |

PLAINTIFF0003016



```
| COMPANY | | :-------------------------------
-- | --- | | [Entity-name] | | [Entity-address] | |
[Entity-city], [Entity-state] [Entity-zip] |   |
```

or to such other address as may have been furnished to
Indemnitee by the Company or to the Company by
Indemnitee, as the case may be.

20. **Counterparts.** This Agreement may be executed in
two or more counterparts, each of which shall be
deemed an original, but all of which together shall
constitute one and the same Agreement. This Agreement
may also be executed and delivered by facsimile
signature and in two or more counterparts, each of
which shall be deemed an original, but all of which
together shall constitute one and the same instrument.

21. **Headings.** The headings of the paragraphs of this
Agreement are inserted for convenience only and shall
not be deemed to constitute part of this Agreement or
to affect the construction thereof.

22. **Usage of Pronouns.** Use of the masculine pronoun
shall be deemed to include usage of the feminine
pronoun where appropriate.

23. **Governing Law and Consent to Jurisdiction.** This
Agreement and the legal relations among the parties
shall be governed by, and construed and enforced in
accordance with, the laws of the State of Delaware,
without regard to its conflict of laws rules. The
Company and Indemnitee hereby irrevocably and
unconditionally (a) agree that any action or
proceeding arising out of or in connection with this
Agreement shall be brought only in the Chancery Court
of the State of Delaware (the "**Delaware Court**"), and
not in any other state or federal court in the United
States of America or any court in any other country,
(b) generally and unconditionally consent to submit to
the exclusive jurisdiction of the Delaware Court for
purposes of any action or proceeding arising out of or
in connection with this Agreement, (c) waive any
objection to the laying of venue of any such action or
proceeding in the Delaware Court, and (d) waive, and
agree not to plead or to make, any claim that any such
action or proceeding brought in the Delaware Court has
been brought in an improper or inconvenient forum. The

PLAINTIFF0003017

foregoing consent to jurisdiction shall not constitute general consent to service of process in the state for any purpose except as provided above, and shall not be deemed to confer rights on any person other than the parties to this Agreement.

[Signature page to follow]

The parties have executed this Agreement as of the date first set forth above.

| COMPANY | INDEMNITEE |
|---|---|
| Signature: | Signature: |
| Print Name: [Entity-signer-name] | Print Name: [Recipient-name] |
| Role: [Entity-signer-role] | Role: [Recipient role] |
|  | Email: [Recipient-email] |

**Previous**
Product License Agreement

**Next**
Form of Indemnification Agreement

PLAINTIFF0003018

 **LEGAL-TOOLS**  DAOLABS

**Connect Wallet**



# Variables

**Date**

| mm/dd/yyyy | 📅 |

**Your Entity's Name**

ACME Corporation

**Your Entity Representative's Full Name**

Mr. John Doe

**Your Entity Representative's Role/Title**

Chief Executive Officer

**Indemnitee's Full Name**

M   Jane Doe

**Indemnitee's Role/Title**

Director and Board Member

**Indemnitee's Email Address**

jane@doe.com

**Update document**

[Entity-name] FORM OF
INDEMNIFICATION AGREEMENT



# [Entity-name] FORM OF INDEMNIFICATION AGREEMENT

This Indemnification Agreement ("Agreement") is
effective as of [Date], by and between [Entity-name],
a Delaware corporation (the "Company")

**PLAINTIFF0003019**



a Delaware corporation (the "Company")
and [Recipient-name] ("Indemnitee"). For purposes of
this Agreement, the "Company" shall be deemed to

include [Entity-name] and its subsidiaries, as
appropriate.

WHEREAS, in order to induce Indemnitee to provide, or
continue to provide, services to the Company, the
Company wishes to provide for the indemnification of,
and advancement of expenses to, Indemnitee to the
maximum extent permitted by law;

WHEREAS, Indemnitee does not regard the current
protection available as adequate under the present
circumstances, and the Indemnitee and other directors,
officers, employees, agents and fiduciaries of the
Company may not be willing to continue to serve in
such capacities without additional protection;

WHEREAS, it is reasonable, prudent and necessary for
the Company contractually to obligate itself to
indemnify, and to advance expenses on behalf of,
Indemnitee to the fullest extent permitted by
applicable law so that Indemnitee will serve or
continue to serve the Company free from undue concern
that he or she will not be so indemnified.

NOW, THEREFORE, in consideration of the foregoing and
Indemnitee's agreement to provide, or continue to
provide, services to the Company, the Company and
Indemnitee hereby agree as set forth below.

1. **Certain Definitions**.

   (a) **"Claim"** shall mean any threatened,
   pending or completed action, suit,
   proceeding or alternative dispute resolution
   mechanism, or any hearing, inquiry or
   investigation that Indemnitee in good faith
   believes might lead to the institution of
   any such action, suit, proceeding or
   alternative dispute resolution mechanism,
   whether civil, criminal, administrative,
   whether formal or informal, investigative or
   other.

   (b) References to the "Company" shall
   include, in addition to [Entity-name], any
   constituent corporation (including any
   constituent of a constituent) absorbed in a

PLAINTIFF0003020



consolidation or merger to which [Entity-name] (or any of its wholly owned subsidiaries) is a party which, if its

separate existence had continued, would have had power and authority to indemnify its directors, officers, employees, agents or fiduciaries, so that if Indemnitee is or was a director, officer, employee, agent or fiduciary of such constituent corporation, or is or was serving at the request of such constituent corporation as a director, officer, employee, agent or fiduciary of another corporation, partnership, joint venture, employee benefit plan, trust or other enterprise, Indemnitee shall stand in the same position under the provisions of this Agreement with respect to the resulting or surviving corporation as Indemnitee would have with respect to such constituent corporation if its separate existence had continued.

(c) **"Expenses"** shall mean any and all expenses (including attorneys' fees and all other costs, expenses and obligations) incurred in connection with investigating, defending, being a witness in or participating in (including on appeal), or preparing to defend, to be a witness in or to participate in, any action, suit, proceeding, alternative dispute resolution mechanism, hearing, inquiry or investigation, whether formal or informal.

(d) **"Expense Advance"** shall mean an advance payment of Expenses to Indemnitee pursuant to Section 3(a).

(e) **"Indemnifiable Event"** shall mean any event or occurrence related to the fact that Indemnitee is or was a director, officer, employee, agent or fiduciary of the Company, or any subsidiary of the Company, or is or was serving at the request of the Company as a director, officer, employee, agent or fiduciary of another corporation, partnership, joint venture, trust or other enterprise, or by reason of any action or inaction on the part of Indemnitee while serving in such capacity.

PLAINTIFF0003021

serving in such capacity.



(f) **"Independent Directors"** shall mean those members of the Board consisting of directors who are not parties to the Claim.

(g) **"Independent Legal Counsel"** shall mean an attorney or firm of attorneys, selected in accordance with the provisions of Section 3(e) hereof, who shall not have otherwise performed services for the Company or Indemnitee within the last three years (other than with respect to matters concerning the rights of Indemnitee under this Agreement, or of other indemnitees under similar indemnity agreements).

(h) **"Other Liabilities"** shall mean judgments, fines, penalties and amounts paid in settlement (if such settlement is approved in advance by the Company, which approval shall not be unreasonably withheld) of any Claim regarding any Indemnifiable Event and any federal, state, local or foreign taxes imposed on the Indemnitee as a result of the actual or deemed receipt of any payments under this Agreement.

(i) References to "other enterprises" shall include employee benefit plans; references to "fines" shall include any excise taxes assessed on Indemnitee with respect to an employee benefit plan; and references to "serving at the request of the Company" shall include any service as a director, officer, employee, agent or fiduciary of the Company which imposes duties on, or involves services by, such director, officer, employee, agent or fiduciary with respect to an employee benefit plan, its participants or its beneficiaries; and if Indemnitee acted in good faith and in a manner Indemnitee reasonably believed to be in the interest of the participants and beneficiaries of an employee benefit plan, Indemnitee shall be deemed to have acted in a manner "not opposed to the best interests of the Company" as referred to in this Agreement

PLAINTIFF0003022



Agreement.

(j) **"Reviewing Party"** shall mean an election made from among the following: (i) those members of the Board who are Independent Directors even though less than a quorum; (ii) a committee of Independent Directors designated by a majority of the Independent Directors, even though less than a quorum; or (iii) Independent Legal Counsel selected by the Indemnitee and approved by the Company (which approval shall not be unreasonably withheld).

## 2. **Indemnification.**

(a) Indemnification of Expenses and Other Liabilities. The Company shall indemnify Indemnite to the fullest extent permitted by law if Indemnitee was or is or becomes a party to or witness or other participant in, or is threatened to be made a party to or witness or other participant in, any Claim by reason of (or arising in part out of) any Indemnifiable Event against Expenses and Other Liabilities, including all interest, assessments and other charges paid or payable in connection with or in respect of such Expenses. Indemnitee hereby agrees to repay to the Company all amounts advanced to Indemnite hereunder if it is ultimately determined that Indemnitee is not entitled to indemnification hereunder. Other than in respect of Expense Advances paid in accordance with Section 3(a) hereof, such payment of Expenses shall be made by the Company as soon as practicable but in any event no later than five (5) business days after written demand by Indemnitee therefor is presented to the Company.

(b) Determination of Right to Indemnification. Unless otherwise provided in Section 11 hereof, the Company shall indemnify Indemnite pursuant to Section 2(a) if Indemnitee has not failed to meet the applicable standard of conduct for indemnification. With respect to all matters

PLAINTIFF0003023



arising concerning whether or not the Indemnitee has met the applicable standard of conduct, the Indemnitee shall be entitled

to select the Reviewing Party. The Reviewing Party shall determine whether and to what extent Indemnitee would be permitted to be indemnified under applicable law and the Company and Idemnitee agree to abide by such determination, which, if made by Independent Legal Counsel shall be made in a written opinion.

(c) Mandatory Payment of Expenses. Notwithstanding any other provision of this Agreement other than Section 11 hereof, to the extent that Indemnitee has been successful on the merits or otherwise, including, without limitation, the dismissal of an action without prejudice, in defense of any Claim regarding any Indemnifiable Event, Indemnitee shall be indemnified against all Expenses incurred by Indemnitee in connection therewith.

3. **Expenses; Indemnification Procedure.**

(a) Advancement of Expenses. The Company shall advance all Expenses incurred by Indemnitee. The advances to be made hereunder shall be paid by the Company to Indemnitee as soon as practicable but in any event no later than 30 days after written demand by Indemnitee therefor to the Company. Indemnitee hereby agrees to repay to the Company all amounts advanced to Indemnitee hereunder if it is ultimately determined that Indemnitee is not entitled to indemnification hereunder. The Company's obligation to advance Expenses shall terminate with respect to any Claim as to which the Indemnitee shall have entered a plea of guilty or nolo contendere, or an equivalent plea acknowledging guilt.

(b) Notice/Cooperation by Indemnitee. Indemnitee shall, as a condition precedent to Indemnitee's right to be indemnified under this Agreement, give the Company notice in writing as soon as practicable of any Claim made against Indemnitee for which

PLAINTIFF0003024



any claim made against indemnitee for which indemnification will or could be sought under this Agreement; provided however that

the failure to so provide notice to the Company shall not relieve the Company from any liability that it may have to Indemnitee hereunder unless the Company's ability to participate in the defense of such claim was materially and adversely affected by such failure. Notice to the Company shall be directed to the Chief Executive Officer of the Company at the address shown on the signature page of this Agreement (or such other address as the Company shall designate in writing to Indemnitee). In addition, Indemnitee shall give the Company such information and cooperation as it may reasonably require and as shall be within Indemnitee's power, to the extent that doing so is consistent with the exercise of the Indemnitee's rights under the federal and state Constitutions. Company shall provide Indemnitee with such information and cooperation as Indemnitee may reasonably require, to the extent that doing so is consistent with the Company's obligation to cooperate with regulatory or law enforcement agencies.

(c) No Presumptions; Burden of Proof. For purposes of this Agreement, the termination of any Claim by judgment, order, settlement (whether with or without court approval) or conviction, or upon a plea of nolo contendere, or its equivalent, shall not create a presumption that Indemnitee did not meet any particular standard of conduct or have any particular belief or that a court has determined that indemnification is not permitted by applicable law.

(d) Notice to Insurers. If, at the time of the receipt by the Company of a notice of a Claim pursuant to Section 3(b) hereof, the Company has liability insurance in effect which may cover such Claim, the Company shall give prompt notice of the commencement of such Claim to the insurers in accordance with the procedures set forth in the

PLAINTIFF0003025



respective policies. The Company shall thereafter take all necessary or desirable action to cause such insurers to pay, on

behalf of the Indemnitee, all amounts payable as a result of such Claim in accordance with the terms of such policies. The Company shall keep Indemnitee reasonably informed as to the status of all relevant insurance matters.

(e) Selection of Counsel. In the event the Company shall be obligated hereunder to pay the Expenses of any Claim the Company, if appropriate, shall be entitled to assume the defense of such Claim with counsel approved by Indemnitee (not to be unreasonably withheld) upon the delivery to Indemnitee of written notice of the Company's election so to do. After delivery of such notice, approval of such counsel by Indemnitee and the retention of such counsel by the Company, the Company will not be liable to Indemnitee under this Agreement for any fees of counsel subsequently incurred by Indemnitee with respect to the same Claim; provided that, (i) Indemnitee shall have the right to employ Indemnitee's separate counsel in any such Claim at Indemnitee's own expense and (ii) if (A) the employment of separate counsel by Indemnitee has been previously authorized by the Company, (B) Indemnitee shall have reasonably concluded that there may be a conflict of interest between the Company and Indemnitee in the conduct of any such defense, or (C) the Company shall not continue to retain such counsel to defend such Claim, then the fees and expenses of Indemnitee's separate counsel shall be considered an Expense.

## 4. Additional Indemnification Rights; Nonexclusivity; Company Obligations Primary.

(a) Scope. The Company hereby agrees to indemnify the Indemnitee to the fullest extent permitted by law, notwithstanding that such indemnification is not specifically authorized by the other provisions of this Agreement, the Company's Certificate of Incorporation, the Company's

PLAINTIFF0003026



Certificate of Incorporation, the Company's Bylaws (as now or hereafter in effect) or by statute. In the event of any change after

the date of this Agreement in any applicable law, statute or rule which expands the right of a Delaware corporation to indemnify a member of its board of directors or an officer, employee, agent or fiduciary, it is the intent of the parties hereto that Indemnitee shall enjoy by this Agreement the greater benefits afforded by such change. In the event of any change in any applicable law, statute or rule which narrows the right of a Delaware corporation to indemnify a member of its board of directors or an officer, employee, agent or fiduciary, such change, to the extent not otherwise required by such law, statute or rule to be applied to this Agreement, shall have no effect on this Agreement or the parties' rights and obligations hereunder except as set forth in Section 11(a) hereof.

(b) Nonexclusivity. The indemnification provided by this Agreement shall be in addition to any rights to which Indemnitee may be entitled under the Company's Certificate of Incorporation, its Bylaws (as now hereafter in effect), any other agreement, any vote of stockholders or disinterested directors, the General Corporation Law of the State of Delaware, or otherwise. The indemnification provided under this Agreement shall continue as to Indemnitee for any action taken or not taken while serving in an indemnified capacity even though Indemnitee may have ceased to serve in such capacity.

(c) Company Obligations Primary. The Company hereby acknowledges that Indemnitee may have rights to indemnification for Expenses and Other Liabilities provided by other sponsoring organizations ("Other Indemnitor"). The Company agrees with Indemnitee that the Company is the indemnitor of first resort of Indemnitee with respect to matters for which indemnification is provided under this

PLAINTIFF0003027



Agreement and that the Company will be obligated to make all payments due to or for the benefit of Indemnitee under this

Agreement without regard to any rights that Indemnitee may have against the Other Indemnitor. The Company hereby waives any equitable rights to contribution or indemnification from the Other Indemnitor in respect of any amounts paid to Indemnitee hereunder. The Company further agrees that no payment of Expenses or Other Liabilities by the Other Indemnitor to or for the benefit of Indemnitee shall affect the obligations of the Company hereunder, and that the Company shall be obligated to repay the Other Indemnitor for all amounts so paid or reimbursed to the extent that the Company has an obligation to indemnify Indemnitee for such Expenses or Other Liabilities hereunder.

5. **Contribution.**

(a) Whether or not the indemnification provided in Section 2 hereof is available, in respect of any threatened, pending or completed action, suit or proceeding in which the Company is jointly liable with Indemnitee (or would be if joined in such action, suit or proceeding), the Company shall, unless indemnification would not be available as a result of Section 11 hereof, pay, in the first instance, the entire amount of any judgment or settlement of such action, suit or proceeding without requiring Indemnitee to contribute to such payment and the Company hereby waives and relinquishes any right of contribution it may have against Indemnitee. The Company shall not enter into any settlement of any action, suit or proceeding in which the Company is jointly liable with Indemnitee (or would be if joined in such action, suit or proceeding) unless such settlement provides for a full and final release of all claims asserted against Indemnitee.

(b) Without diminishing or impairing the obligations of the Company set forth in the preceding subparagraph, if, for any reason

PLAINTIFF0003028



preceding subparagraph, if, for any reason,
Indemnitee shall elect or be required to pay
all or any portion of any judgment or

settlement in any threatened, pending or
completed action, suit or proceeding in
which the Company is jointly liable with
Indemnitee (or would be if joined in such
action, suit or proceeding), the Company
shall contribute to the amount of expenses
(including attorneys' fees), judgments,
fines and amounts paid in settlement
actually and reasonably incurred and paid or
payable by Indemnitee in proportion to the
relative benefits received by the Company
and all officers, directors or employees of
the Company, other than Indemnitee, who are
jointly liable with Indemnitee (or would be
if joined in such action, suit or
proceeding), on the one hand, and
Indemnitee, on the other hand, from the
transaction from which such action, suit or
proceeding arose; provided, however, that
the proportion determined on the basis of
relative benefit may, to the extent
necessary to conform to law, be further
adjusted by reference to the relative fault
of the Company and all officers, directors
or employees of the Company other than
Indemnitee who are jointly liable with
Indemnitee (or would be if joined in such
action, suit or proceeding), on the one
hand, and Indemnitee, on the other hand, in
connection with the events that resulted in
such expenses, judgments, fines or
settlement amounts, as well as any other
equitable considerations which the Law may
require to be considered. The relative fault
of the Company and all officers, directors
or employees of the Company, other than
Indemnitee, who are jointly liable with
Indemnitee (or would be if joined in such
action, suit or proceeding), on the one
hand, and Indemnitee, on the other hand,
shall be determined by reference to, among
other things, the degree to which their
actions were motivated by intent to gain
personal profit or advantage, the degree to
which their liability is primary or
secondary and the degree to which their

PLAINTIFF0003029

conduct is active or passive.

(c) The Company hereby agrees to fully indemnify and hold Indemnitee harmless from any claims of contribution which may be brought by officers, directors or employees of the Company, other than Indemnitee, who may be jointly liable with Indemnitee.

(d) To the fullest extent permissible under applicable law, if the indemnification provided for in this Agreement is unavailable to Indemnitee for any reason whatsoever other than the reasons set forth in Section 11 hereof, the Company, in lieu of indemnifying Indemnitee, shall contribute to the amount incurred by Indemnitee, whether for judgments, fines, penalties, excise taxes, amounts paid or to be paid in settlement and/or for Expenses and Other Liabilities, in connection with any claim relating to an indemnifiable event under this Agreement, in such proportion as is deemed fair and reasonable in light of all of the circumstances of such proceeding in order to reflect (i) the relative benefits received by the Company and Indemnitee as a result of the event(s) and/or transaction(s) giving cause to such proceeding; and/or (ii) the relative fault of the Company (and its directors (other than Indemnitee) officers, employees and agents) and Indemnitee in connection with such event(s) and/or transaction(s).

6. **Settlement.** The Company acknowledges that a settlement or other disposition short of final judgment may be successful if it permits a party to avoid expense, delay, distraction, disruption and uncertainty. In the event that any action, claim or proceeding to which Indemnitee is a party is resolved in any manner other than by adverse judgment against Indemnitee (including, without limitation, settlement of such action, claim or proceeding with or without payment of money or other consideration) it shall be presumed that Indemnitee has been successful on the merits or otherwise in such action, suit or proceeding. Anyone seeking to overcome this

PLAINTIFF0003030

presumption shall have the burden of proof.

**7. No Duplication of Payments.** The Company shall not be liable under this Agreement to make any payment in connection with any Claim made against Indemnitee to the extent Indemnitee has otherwise actually received payment (under any insurance policy, provision of the Company's Certificate of Incorporation, Bylaw (as now or hereafter in effect) or otherwise) of the amounts otherwise indemnifiable hereunder.

**8. Partial Indemnification.** If Indemnitee is entitled under any provision of this Agreement to indemnification by the Company for some or a portion of Expenses or Other Liabilities incurred in connection with any Claim, but not, however, for all of the total amount thereof, the Company shall nevertheless indemnify Indemnitee for the portion of such Expenses and Other Liabilities to which Indemnitee is entitled.

**9. No Imputation.** The knowledge or actions, or failure to act, of any director, officer, agent or employee of the Company or the Company itself shall not be imputed to Indemnitee for purposes of determining the right to indemnification under this Agreement.

**10. Liability Insurance.** For the duration of Indemnitee's service as a director or officer or other agent of the Company, and thereafter for so long as Indemnitee shall be subject to any pending or possible Claim by reason of any Indemnifiable Event, the Company shall use commercially reasonable efforts (taking into account the scope and amount of coverage available relative to the cost thereof) to cause to be maintained in effect policies of liability insurance providing coverage for directors and officers of the Company that are at least substantially comparable in scope and amount to that provided by the Company's current policies of directors' and officers' liability insurance. To the extent the Company maintains liability insurance applicable to directors, officers, employees, agents or fiduciaries, Indemnitee shall be covered by such policies in such a manner as to provide Indemnitee the same rights and benefits as are provided to the most favorably insured of the Company's directors, if Indemnitee is a director; or of the Company's officers, if Indemnitee is not a director of the Company but is an officer; or of the

PLAINTIFF0003031

director of the Company but is an officer or the Company's key employees, agents or fiduciaries, if

Indemnitee is not an officer or director but is a key employee, agent or fiduciary.

11. **Exceptions.** Notwithstanding any other provision of this Agreement, the Company shall not be obligated pursuant to the terms of this Agreement:

(a) Excluded Action or Omissions. To indemnify Indemnitee for acts, omissions or transactions if a final decision by a court having jurisdiction in the matter shall determine that such indemnification is prohibited by applicable law.

(b) Claims Initiated by Indemnitee. To indemnify Expenses or Other Liabilities or advance Expenses to Indemnitee with respect to Claims initiated or brought voluntarily by Indemnitee and not by way of defense, except (i) with respect to actions or proceedings brought to establish or enforce a right to indemnification under this Agreement or any other agreement or insurance policy or under the Company's Certificate of Incorporation or Bylaws now or hereafter in effect relating to Claims for Indemnifiable Events, (ii) in specific cases if the Board of Directors has approved the initiation or bringing of such Claim, or (iii) as otherwise required under Section 145 of the Delaware General Corporation Law, regardless of whether Indemnitee ultimately is determined to be entitled to such indemnification, advance Expense payment or insurance recovery, as the case may be.

(c) Lack of Good Faith. To indemnify Indemnitee for any Expenses or Other Liabilities incurred by the Indemnitee with respect to any proceeding instituted by Indemnitee to enforce or interpret this Agreement, if a court of competent jurisdiction determines that each of the material assertions made by the Indemnitee in such proceeding was not made in good faith or was frivolous

PLAINTIFF0003032



faith or was frivolous.

(d) Claims Under Section 16(b). To indemnify Indemnitee for the payment of profits arising from the purchase and sale by Indemnitee of securities in violation of Section 16(b) of the Securities Exchange Act of 1934, as amended, or any similar successor statute; provided that the Company shall advance Expenses in connection with Indemnitee's defense of a claim under Section 16(b), which advances shall be repaid to the Company if it is ultimately determined that Indemnitee is not entitled to indemnification of such Expenses.

12. **Period of Limitations.** No legal action shall be brought and no cause of action shall be asserted by or in the right of the Company against Indemnitee, Indemnitee's estate, spouse, heirs, executors or personal or legal representatives after the expiration of two years from the date of accrual of such cause of action, and any claim or cause of action of the Company shall be extinguished and deemed released unless asserted by the timely filing of a legal action within such two-year period; provided, however, that if any shorter period of limitations is otherwise applicable to any such cause of action, such shorter period shall govern.

13. **Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall constitute an original.

14. **Binding Effect; Successors and Assigns.** This Agreement shall be binding upon and inure to the benefit of and be enforceable by the parties hereto and their respective successors, assigns (including any direct or indirect successor by purchase, merger, consolidation or otherwise to all or substantially all of the business or assets of the Company), spouses, heirs and personal and legal representatives. The Company shall require and cause any successor (whether direct or indirect, and whether by purchase, merger, consolidation or otherwise) to all, substantially all, or a substantial part, of the business or assets of the Company, by written agreement in form and substance satisfactory to Indemnitee, expressly to assume and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform if no such succession had taken

PLAINTIFF0003033

be required to perform if no such succession had taken place. This Agreement shall continue in effect regardless of whether Indemnitee continues to serve as

a director, officer, employee, agent or fiduciary (as applicable) of the Company or of any other enterprise at the Company's request.

15. **Attorneys' Fees.** In the event that any action is instituted by Indemnitee under this Agreement or under any liability insurance policies maintained by the Company to enforce or interpret any of the terms hereof or thereof, Indemnitee shall be entitled to be paid all Expenses incurred by Indemnitee with respect to such action, regardless of whether Indemnitee is ultimately successful in such action, and shall be entitled to the advancement of Expenses with respect to such action, unless as a part of such action a court of competent jurisdiction over such action determines that each of the material assertions made by Indemnitee as a basis for such action was not made in good faith or was frivolous. In the event of an action instituted by or in the name of the Company under this Agreement to enforce or interpret any of the terms of this Agreement, Indemnitee shall be entitled to be paid all Expenses incurred by Indemnitee in defense of such action (including costs and Expenses incurred with respect to Indemnitee's counterclaims and cross-claims made in such action), and shall be entitled to the advancement of Expenses with respect to such action.

16. **Notice.** All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed duly given (i) if delivered by hand and signed for by the party addressed, on the date of such delivery, or (ii) if mailed by domestic certified or registered mail with postage prepaid, on the third business day after the date postmarked. Addresses for notice to either party are as shown on the signature page of this Agreement, or as subsequently modified by written notice.

17. **Consent to Jurisdiction.** The Company and Indemnitee each hereby irrevocably consent to the jurisdiction of the courts of the State of Delaware for all purposes in connection with any action or proceeding which arises out of or relates to this Agreement and agree that any action instituted under this Agreement shall be commenced, prosecuted and continued only in the Court of Chancery of the State

PLAINTIFF0003034

continued only in the Court of Chancery of the State
of Delaware in and for New Castle County, which shall

be the exclusive and only proper forum for
adjudicating such a claim.

18. **Severability.** The provisions of this Agreement
shall be severable in the event that any of the
provisions hereof (including any provision within a
single section, paragraph or sentence) are held by a
court of competent jurisdiction to be invalid, void or
otherwise unenforceable, and the remaining provisions
shall remain enforceable to the fullest extent
permitted by law. Furthermore, to the fullest extent
possible, the provisions of this Agreement (including,
without limitations, each portion of this Agreement
containing any provision held to be invalid, void or
otherwise unenforceable, that is not itself invalid,
void or unenforceable) shall be construed so as to
give effect to the intent manifested by the provision
held invalid, illegal or unenforceable.

19. **Choice of Law.** This Agreement shall be governed by
and its provisions construed and enforced in
accordance with the laws of the State of Delaware as
applied to contracts between Delaware residents
entered into and to be performed entirely within the
State of Delaware.

20. **Subrogation.** In the event of payment under this
Agreement, the Company shall be subrogated to the
extent of such payment to all of the rights of
recovery of Indemnitee, who shall execute all
documents required and shall do all acts that may be
necessary to secure such rights and to enable the
Company effectively to bring suit to enforce such
rights.

21. **Amendment and Termination.** Due to the uncertain
application of any statutes of limitations that may
govern any Claim, this Agreement shall be of
indefinite duration. No amendment, modification,
termination or cancellation of this Agreement shall be
effective unless it is in writing signed by both the
parties hereto. No waiver of any of the provisions of
this Agreement shall be deemed to be or shall
constitute a waiver of any other provisions hereof
(whether or not similar), nor shall such waiver
constitute a continuing waiver.

PLAINTIFF0003035



**22. Integration and Entire Agreement.** This Agreement sets forth the entire understanding between the parties hereto and supersedes and merges all previous written and oral negotiations, commitments, understandings and agreements relating to the subject matter hereof between the parties hereto. If the Company and Indemnitee have previously entered into an indemnification agreement providing for indemnification of Indemnitee by the Company, the parties' entry into this Indemnification Agreement shall be deemed to amend and restate such Indemnification Agreement to read in its entirety as, and to be superseded by, this Indemnification Agreement.

**23. No Construction as Employment Agreement.** Nothing contained in this Agreement shall be construed as giving Indemnitee any right to be retained in the employ of the Company or any of its subsidiaries or affiliated entities.

[Signature page to follow]

IN WITNESS WHEREOF, the parties hereto have executed this Indemnification Agreement as of the date first above written.

| COMPANY | INDEMNITEE |
|---|---|
| Signature: | Signature: |
| Print Name: [Entity-signer-name] | Print Name: [Recipient-name] |
| Role: [Entity-signer-role] | Role: [Recipient role] |
| | Email: [Recipient-email] |

Previous
Director and Officer Indemnification Agreement

Next
README.md

PLAINTIFF0003036



**LEGAL—TOOLS**  DAOLABS

Connect Wallet



     

Settlements

Documents

# Settlements

When one party can no longer meet their obligations under an agreement, that party will often pay the other party a lump sum to resolve any potential disputes—this is a settlement.

# Documents

- The <u>Settlement Agreement and Release</u> is a settlement agreement ending the obligations from a previous agreement between two entities in exchange for a lump sum.
- The <u>Confidential Settlement Agreement</u> is a settlement agreement ending the obligations from a previous agreement between an entity and an independent contractor in exchange for a lump sum.
- The <u>Separation Agreement, Release, and Covenant Not to Sue</u> is a settlement agreement ending the obligations from a previous agreement between an entity and an employee in exchange for a lump sum.

Previous
Supplemental Compensation Agreement

Next
Settlement Agreement and Release

PLAINTIFF0003037



PLAINTIFF0003038



**LEGAL-TOOLS**    DAOLABS



Connect Wallet

# Variables

Agreement Effective Date

| 01/01/2023 |

Your Entity's Name

| ACME CORPORATION |

Your Entity's Type

| Corporation, LLC, Individual, etc. |

Your Entity's Street Address

| 123 Main Street, Apt. 45 |

Your Entity's City

| Kalamazoo |

Your Entity's State

| Michigan |

Your Entity's ZIP Code

| 49001 |

Your Entity Representative's Full Name

| Mr. John Doe |

Your Entity Representative's Role

| Chief Executive Officer |

Counterparty Entity's Name

| Road Runner LLC |

Counterparty Entity's Type

| Limited Liability Corporation |

Counterparty Entity's Street Address

| 123 Street Name, Apt. 45 |

Counterparty Entity's City

| Wichita |

SETTLEMENT AGREEMENT AND
RELEASE

  RECITALS

  AGREEMENT

PLAINTIFF0003039

Counterparty Entity's State

Kansas

Counterparty Entity's ZIP Code

67201

Counterparty Entity Respresentative's Full Name

M  Jane Doe

Counterparty Entity Representative's Role/Title

Chief Executive Officer

Name of Prior Agreement Between Party and Counterparty

ACME CORPORATION Agreement No. 06722CK

Date of Prior Agreement Between Party and Counterparty

01/01/2023

Settlement Amount (USD)

100

Purchaser of Your Entity's Assets

Coyote Corporation

**Update document**

     

# SETTLEMENT AGREEMENT AND RELEASE

This SETTLEMENT AGREEMENT AND RELEASE (this "**Agreement**") is made and entered into as of **[Date]** (the "**Effective Date**"), by and between **[Entity-name]** a **[Entity-state] [Entity-type]**, located at **[Entity-address], [Entity-city], [Entity-state] [Entity-zip]** (the "**Company**") and **[Counterparty-name]** a **[Counterparty-state] [Counterparty-type]**, having its principal place of business at **[Counterparty-address], [Counterparty-city], [Counterparty-state] [Counterparty-zip]** ("**Vendor**"), with reference to the following facts and on the following terms and conditions:

PLAINTIFF0003040

settlements/...

## RECITALS

**WHEREAS,** the parties have entered into that certain Agreement (**[Agreement-name]**), dated **[Agreement-date]** (the "**Prior Agreement**");

**WHEREAS,** the parties subsequently entered into the certain Amendments to the Prior Agreement, (the "**Amendments**");

**WHEREAS,** the Company has advised Vendor that the Company's funding efforts have not been successful to date and that the ability of the Company to continue in business is at risk; and

**WHEREAS,** the parties now wish to reach full and final settlement of all obligations of the Company and its affiliates to Vendor.

## AGREEMENT

**NOW, THEREFORE,** in consideration of the premises and of the mutual covenants contained herein, the parties agree as follows:

**1. Definitions.** Capitalized terms not defined herein are defined in the Prior Agreement and Amendments.

**2. Payment of Final Settlement.** As a full and final settlement of claims on the Company and its affiliates by Vendor, the Company agrees to immediately pay Vendor $**[Pay-amount]** (the "**Settlement Amount**").

**3. Assignment Consent.** Vendor hereby agrees that in connection with the close of **[Entity-name]**'s anticipated sale of substantially all of its assets to **[Purchaser-name]** or one of its affiliates ("**Purchaser**"), **[Entity-name]** shall have the right to assign the Prior Agreement and the Amendments, both between the parties, to Purchaser; **provided, however,** that Purchaser agrees in writing to be bound by the terms of such agreements. For purposes of clarification, all of **[Entity-name]**'s rights and obligations under such agreements shall continue in full and shall transfer to Purchaser in connection with such assignment, except for the terms settled in this Agreement.

**4. Release of the Company.** Vendor agrees that the

PLAINTIFF0003041

 Settlement Amount represents settlement in full of all outstanding obligations owed to Vendor by the Company

and on behalf of Vendor, and its heirs, executors, officers, directors, employees, investors, shareholders, creditor administrators, predecessor and successor corporations, assigns, legal representatives, agents, successors in interest, and partners, hereby fully and forever releases the Company and its affiliates and their officers, directors, employees, investors, shareholders, administrators, predecessor and successor corporations, assigns, legal representatives, agents, successors in interest, and partners, of and from any claim, duty, obligation, cause of action, action, right, judgment, obligation, demand, accounting, liability or damages relating to any matters of any kind, whether presently known or unknown, suspected or unsuspected, that any of them may possess arising from any omissions, acts or facts that have occurred up until and including the Effective Date of this Agreement including, without limitation, any and all claims for attorneys' fees and costs.

**5. Representations and Warranties by Company.** The Company hereby represents and warrants, as a material condition to this Agreement, that it is not engaged in any litigation proceedings.

**6. No Assignment.** Vendor represents and warrants that it has not assigned or surrogate any said claim, duty, obligation, cause of action, action, right judgment, obligation, demand accounting, liability or damages, or authorized any other person or entity to assert such a claim, duty, obligation, cause of action, action, right, judgment, obligation, demand, accounting, liability or damages on its behalf.

**7. No Reliance.** Each party represents that it has had the opportunity to consult with an attorney, and has carefully read and understands the scope and effect of the provisions of this agreement. Neither party has relied upon any representations or statements made by the other party hereto which are not specifically set forth in this Agreement.

**8. Civil Code Section 1542.** With respect to all the matters herein released, Vendor knowingly waives any and all rights and benefits conferred by the provisions of Section 1542 of the Civil Code of the State of California, and any similar law of any state or

PLAINTIFF0003042



california, and any similar law of any state or
territory of the United States or any other

jurisdiction; provided that there is no fraud in this
settlement. Said Section 1542 provides as follows.

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS
> WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT
> TO EXIST IN HIS FAVOR AT THE TIME OF
> EXECUTING THE RELEASE WHICH IF KNOWN BY HIM
> MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT
> WITH THE DEBTOR.

**9. Agreement Null and Void.** In the event that the
Company does not make the payment set forth in
paragraph 2.2(a) within seven (7) days of the signing
of this Agreement, this Agreement shall be null and
void.

**10. Governing Law.** This Agreement shall be governed by
the laws of the State of **[Entity-state]**.

**11. Authority.** Each party warrants that any person
executing this Agreement on its behalf has the full
authority to do so.

**12. Counterparts.** This Agreement may be executed in one
or more counterparts. All executed counterparts and
each of them shall be deemed to be one and the same
instrument. The parties shall exchange among themselves
original signed or telecopied counterparts.

**13. Entire Agreement.** This Agreement represents the
entire agreement and understanding between the parties
concerning its subject matter and supersedes and
replaces any and all prior agreements and
understandings concerning such matters.

[Signature page to follow]

**IN WITNESS WHEREOF,** the duly authorized representatives
of each of the parties have executed this Agreement as
of the Effective Date.

| COMPANY | COUNTERPARTY |
| --- | --- |
| Signature: | Signature: |
| Print Name: [Entity-signer-name] | Print Name: [Counterparty-signer-name] |

PLAINTIFF0003043

| signer-name] | signer-name] |

| COMPANY | COUNTERPARTY |
| --- | --- |
| Role: [Entity signer role] | Role: [Counterparty signer role] |
| Dated: **[Date]** | Dated: **[Date]** |

(SIGNATURE PAGE TO SETTLEMENT AND RELEASE AGREEMENT)



Previous
README.md

Next
Confidential Settlement Agreement

PLAINTIFF0003044



**LEGAL-TOOLS**    DAOLABS

**Connect Wallet**



    

# CONFIDENTIAL SETTLEMENT AGREEMENT AND MUTUAL RELEASE WITH NON-DISPARAGEMENT CLAUSE

This Confidential Settlement Agreement and Mutual Release ("Agreement") is entered into as of the date signed by the Parties and memorializes the Agreement between the undersigned hereafter ("Consultant") and the undersigned manager and recruiter, individually ("Manager") and undersigned entity ("Company") ("collectively referred to as the "Parties").

## RECITALS

A. Consultant was hired to perform work at the behest of Manager on behalf of Company.

B. Consultant did perform certain preliminary tasks as directed by Manager.

C. A dispute has arisen between the parties as to the competency and quality of the work provided and any amount owed to Consultant for the work that he performed.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

CONFIDENTIAL SETTLEMENT AGREEMENT AND M T AL RELEASE WITH NON-DISPARAGEMENT CLA SE

RECITALS

SETTLEMENT TERMS

RELEASES

NON-DISPARAGEMENT

CONFIDENTIALITY

REPRESENTATIONS AND WARRANTIES

COMPROMISE

ENTIRE AGREEMENT

GOVERNING LAW; VENUE

ATTORNEYS' FEES

EXECUTION IN COUNTERPARTS

PLAINTIFF0003045

acknowledged, the Parties agree as follows:

## SETTLEMENT TERMS

1. Manager and Company agree to pay Consultant the sum below in U.S. dollars in full and final settlement of any and all claims that Consultant may have against Manager and/or Company.



## RELEASES

2. As of the date of execution of this Agreement the Parties hereby fully and forever release and discharge each other, and each of the other's present and former agents, servants, partners, partnerships, joint ventures, co venturers, corporations, business entities, owners, directors, officers, managers, employees, contractors, predecessors, successors, assigns, heirs, beneficiaries, executors, administrators, representatives, parents, shareholders, subsidiaries, affiliates, divisions, licensees, licensors, customers, officers, spouses, insurers, underwriters, accountants, and lawyers from any and all damages, suits, actions, claims, debts, demands, assessments, obligations, liabilities, judgments, attorneys' fees, costs, expenses, rights of action and causes of action, of any kind or character whatsoever, in law or equity, whether known or unknown, accrued or unaccrued, contingent or non contingent, which any of them ever had, now have, or may in the future have as a consequence of any matter which has occurred between or among them from the beginning of time up and to including the date of execution of this Agreement by all Parties, arising out of or relating in any way to the facts found in the Recital.

## NON-DISPARAGEMENT

3. The Parties agree that they, each of them, and each of their employees and agents will refrain from defaming or making any disparaging comment to any person or entity.

PLAINTIFF0003046



whether in-person, on the internet, or in any other medium whatsoever. For example, any comments by any Party that reflect negatively upon the professional competence, ethics, or business of the other Party would be a breach of this clause. Further, Consultant agrees to refrain from making any mention of or comment about Manager to Company or to any third party. The Parties understand and agree that this Paragraph is a material provision of this Agreement and that any breach of this Paragraph shall be a material breach of this Agreement, and that each Party would be irreparably harmed by violation of this provision. The Parties expressly agree that any breach of this Paragraph shall entitle the other Party or Parties to seek injunctive relief in Court to prevent further reputational damage. In addition, the Parties agree that breach of the non-disparagement clause will cause the aggrieved party damages that are difficult to quantify and therefore the Parties agree that any breach of the non-disparagement clause shall entitled the aggrieved party to liquidated damages in the amount of $50,000.00 (fifty thousand dollars USD).

## CONFIDENTIALITY

4. The Parties agree to maintain in strict confidence the existence of this Agreement, the contents and terms of this Agreement (including but not limited to the consideration for this Agreement), and the disputes, claims and potential claims covered by this Agreement (herein collectively referred to as the "Settlement Information"). The Parties agree not to disclose any Settlement Information to third parties.

## REPRESENTATIONS AND WARRANTIES

5. Each Party warrants and represents that: (a) in executing this Agreement, it does so with full knowledge of any and all rights that it may have with respect to the matters set

PLAINTIFF0003047



forth and claims released herein; (b) it is entering into this Agreement of its own free will; (c) it, or its authorized representatives, have each carefully read this Agreement and know and fully understand its contents and significance; (d) it has been represented, or had the opportunity to be represented, by independent counsel in the negotiation and preparation of this Agreement; (e) it enters into this Agreement freely, without coercion, based upon its own judgment and not in reliance on any other representations or promises; (f) it has the authority to enter into this Agreement; and (g) it has not assigned, transferred, conveyed or encumbered any claim or right of action, or any part thereof, which such Party has against each other and which is released herein.

## COMPROMISE

6. The Parties acknowledge that this Agreement represents a compromise settlement of the dispute between the Parties and should not be construed as or constitute an admission of any fact, legal conclusion, fault, wrongdoing or liability by any Party. Without limiting the foregoing, the Parties agree that this Agreement shall not be used as evidence in any proceeding between the Parties, except in a subsequent proceeding to construe or enforce this Agreement only.

## ENTIRE AGREEMENT

7. This Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes and replaces any and all contemporaneous or prior agreements or understandings, whether written or oral, with respect to the subject matter hereof. Each Party expressly acknowledges that, in making this Agreement, it has not relied upon any statement or representation made by another that is not set forth herein.

PLAINTIFF0003048

## GOVERNING LAW; VENUE



8. The validity of this Agreement, any of its terms or provisions and the rights and duties of the Parties, shall be governed by the laws of the state of [Entity-state], without regard to that state's conflict of laws doctrine. The parties agree that any action related to or arising out of this Agreement shall be brought exclusively in a court having jurisdiction located in [Entity-county], [Entity-state] State.

## ATTORNEYS' FEES

9. In the event of any action or proceeding to enforce or interpret this Agreement or its terms, the prevailing party (as determined by the Court) shall be entitled to reasonable attorneys' fees and costs, in addition to any other relief to which the prevailing party may be entitled.

## EXECUTION IN COUNTERPARTS

10. This Agreement may be executed in any number of counterparts and by each Party on separate counterparts, each of which when so executed and delivered to the other shall be deemed an original and all of which taken together shall constitute one and the same instrument. The Parties may initially exchange counterparts by facsimile transmission or images sent by e-mail (such as a PDF scanned file), with original counterparts to be exchanged promptly thereafter in "hard" copy.

[Signature page to follow]

IN WITNESS HEREOF, the Parties have executed this Agreement on the dates indicated below.

| Consultant, on his own behalf: | Manager, on his behalf and on behalf of [Entity-name]: |
| --- | --- |
| Signature: | Signature: |

PLAINTIFF0003049



| | Signature:                     |
|-------------------|--------------------------------|
| | ------------------------ |

| Consultant, on his own behalf: | Manager, on his behalf and on behalf of [Entity-name]: |
|--------------------------------|--------------------------------------------------------|
| Print Name: [Consultant name] | Print Name: [Manager-name] |
| Role: Consultant | Role: Manager |
| Date: [Date] | Date: [Date] |

**Previous**
Settlement Agreement and Release

**Next**
Separation Agreement, Release, and Covenant Not to Sue

PLAINTIFF0003050



**LEGAL—TOOLS**  DAOLABS



Connect Wallet

# Variables

**Date**

01/01/2023

**Termination Date**

01/01/2023

**Your Entity's Name**

ACME CORPORATION

**Your Entity's Street Address**

123 Main Street, Apt. 45

**Your Entity's City**

Kalamazoo

**Your Entity's County**

Kalamazoo County

**Your Entity's State**

Michigan

**Your Entity's ZIP Code**

49001

**Your Entity Representative's Name**

Ms. Jane Doe

**Your Entity Representative's Role/Title**

Chief Executive Officer

**Witness's Name**

Ms. Janet Dow

**Witness's Role/Title**

Secretary

**Employee's Name**

Mr. John Doe

SEPARATION AGREEMENT,
RELEASE AND COVENANT NOT TO
SUE

1. Background.

2. Operative Terms.

PLAINTIFF0003051

Employee's Street Address

123 Main Street, Apt 45

Employee's City

Wichita

Employee's State

Kan a

Employee's ZIP Code

67201

Employee's Role(s)

Company Board Member, President, Chief Executive Officer, and

Total Severance Amount (USD)

100

Severance Period (Severance Amount/Salary)

9 months

**Update document**

     

# SEPARATION AGREEMENT, RELEASE AND COVENANT NOT TO SUE

This is a SEPARATION AGREEMENT, RELEASE AND COVENANT NOT TO SUE (this "Agreement") dated as of [Date], between [Employee-name], and his heirs, assigns, and any person claiming any interest in his employment or employment related compensation or benefits (collectively and individually referred to as "Employee") and [Entity-name] (the "Company").

# 1. Background.

Employee was employed by the Company. The Company and the Employee have agreed to end their relationship on terms that are mutually agreeable.

PLAINTIFF0003052

Employee resigns from his position(s) as [Employee-role]. Employee and the Company agree that

Employee's separation from the Company is effective as of his last day of work, [Date-termination] (the "Separation Date"). The Company will provide Employee with financial benefits and other consideration in return for Employee's execution of this Agreement and the release Employee is providing under this Agreement.

## 2. Operative Terms.

The Company and the Employee agree as follows:

1. **Recitals.** The parties agree that the above Recitals are true and correct and are incorporated into this Agreement by reference.

2. **Resignation; Severance Compensation.** Employee resigns from his position(s) as [Employee role], effective [Date termination] (the "Termination Date"). The Company shall pay to Employee [Pay period] ("the Severance Period") of his current salary in the total gross amount of $[Pay amount] (less ordinary payroll deductions and any outstanding advances or other amounts owed by Employee to the Company) ("the Severance Compensation"). The Severance Compensation will be paid on a periodic basis in accordance with the Company's normal payroll practices. Payment of the Severance Compensation will not commence until the first available payroll date after the Revocation Period referenced in Section 8 of this Agreement has expired, will be distributed by Company check mailed to Employee's address, and is contingent upon Employee's satisfactorily performing his obligations under this Agreement, including but not limited to all obligations concerning the return of property in Section 3 of the Agreement and the restrictive covenants in Section 4 of this Agreement. Specifically, if Employee has not satisfactorily performed all of his obligations under this Agreement, Employee will not be entitled to any Severance Compensation and the Company shall not pay the Severance Compensation; or, if such Severance



PLAINTIFF0003053

Compensation has already been paid, Employee
shall be required to reimburse the Company in
the full amounts paid.



3. **Return of All Company Property.** Employee shall
immediately return to the Company all property
of the Company in his possession or under his
control, including but not limited to all
Company records, files, equipment, supplies,
keys, confidential or proprietary information,
credit card(s), laptop and phone. In addition,
Employee shall return to the Company on a
computer disk any electronically stored
information that is the property of the
Company, including but not limited to any data
and files Employee has stored on his home or
other computer or on a portable storage device;
Employee shall also permanently and completely
delete and remove such electronically stored
information from wherever it is stored and
provide written verification of doing so.

4. **Restrictive Covenants.** Employee covenants and
agrees that:

(a) Non-Competition: Employee shall not
compete with the Company at any time
during employment with the Company and for
twelve (12) months after Employee's
termination of employment or resignation.
To "compete" means (i) to directly or
indirectly establish or aid in
establishing, or have effective control
over any business competitive with the
Company's business; or (ii) to become
associated with or render services as an
employee, independent contractor,
consultant or otherwise, to any person,
firm, corporation or other entity engaged
in any business competitive with the
Company's business. Mere ownership of less
than one percent (1%) of the outstanding
common stock of a corporation competitive
with the Company's business whose stock is
traded on any major United States stock
exchange or on the over-the-counter market
shall not be considered as a violation of
this Agreement. For purpose of this

PLAINTIFF0003054

this Agreement. For purpose of Section 4(a), "any business competitive with the Company's business" shall mean a

business that provides power distribution or power management solutions for military or commercial customers.

(b) Non-Solicitation: For twenty-four (24) months after the termination of Employee's employment or Employee's resignation, Employee shall not solicit the business of any of the persons, firms, corporations or other entities who are the Company's customers, for or on behalf of Employee (if Employee is competing with the Company) or any person, firm, corporation or other entity that is in competition for the Company's business. For purpose of this Section 4(b), "any business competitive with the Company's business" shall mean a business that provides power distribution or power management solutions for military or commercial customers.

(c) Non-Inducement: At all times during Employee's employment and for twenty-four (24) months after the termination of Employee's employment or Employee's resignation, the Employee shall not, directly or indirectly, induce or attempt to induce any present or former employee of the Company to gain or seek employment with any person or business, or hire any such person.

(d) Non-Disclosure: At all times during Employee's employment and after the termination of Employee's employment or Employee's resignation, Employee shall protect and guard the Company's Confidential Information. Employee shall not at any time, directly or indirectly, disclose to any person, firm, corporation or other entity, or use for Employee's own purposes any Confidential Information, regardless of how it is acquired, except as Employee's use of the Confidential Information may be authorized by the Company; provided, however, that if

PLAINTIFF0003055



Employee is required to disclose any
Confidential Information by legal process,
including a subpoena to testify or produce

documents, Employee shall satisfy his
obligations under this Section 4(d) by
promptly giving notice to the Company of
the demand for disclosure and cooperating
with the Company to contest the disclosure
(if the Company so elects) and obtain
confidential treatment for any
Confidential Information which is
disclosed.

5. **Remedy at Law Insufficient.** Employee
acknowledges that damages at law will be an
insufficient remedy if Employee violates the
terms of Section 4, and that the Company would
suffer a decrease in value and irreparable
damage as a result of such violation.
Accordingly, on a violation of any of those
covenants, the Company, without excluding or
limiting any other available remedy, shall be
entitled to the following remedies:

5.1. Upon posting a bond of up to $10,000
and filing with a court of competent
jurisdiction an appropriate pleading and
affidavit specifying each obligation
breached by Employee, automatic entry by a
court having jurisdiction of an order
granting an injunction or specific
performance compelling Employee to comply
with that obligation, without proof of
monetary damage or an inadequate remedy at
law; and

5.2. The recovery from Employee of all
profit, remuneration, or other
consideration that Employee gains from
breaching the covenant and all damages
that the Company suffers as a result of
the breach; and

The foregoing remedies are cumulative to all other
remedies afforded by law or in equity, and the
Company may exercise any such remedy concurrently,
independently, or successively.

6. **Miscellaneous.**

PLAINTIFF0003056

6.1. Effective as of the Separation Date, Employee agrees that he shall have no authority to and shall not enter or attempt to enter into any agreements with third-parties on behalf of or purportedly on behalf of the Company. Employee shall also not represent himself as being employed by or associated with the Company.

6.2. Employee shall refrain from making any disparaging statements, written or oral, in any forum or media, regarding the Company or its executives, managers, employees, policies, products, processes, operations, or facilities. The Company agrees not to permit any executive officer of the Company to make any disparaging statements about Executive after the termination of Executive's employment or Executive's resignation; provided, however, that it shall not be considered a breach of this section for (i) any executive officer of the Company to make disparaging statements to another executive officer about Executive and/or his performance in their capacity in operating the business or (ii) the Company to make a factual statement regarding the circumstances of Executive's departure if required by law or for a business purpose, with such confidentiality protections as are reasonably practicable.

6.3. Employee acknowledges and agrees that he has completely disclosed to Company management, in writing, any and all incidents, events, procedures, practices or occurrences, that he is aware of, which have the potential of exposing the Company to any federal, state, or local civil monetary penalty or exclusion claim or any other claim that Employee believes may have resulted in a violation of any other federal, state, or local statutes, rules, regulations or guidelines.

6.4. Employee further acknowledges that he is not aware of any unreported work related illness or injury that he has

PLAINTIFF0003057



related illness or injury that he
suffered that would entitle his to
Workers' Compensation benefits.

6.5. In the event Employee's testimony or
court appearance is required concerning
any litigation the Company is now or may
be involved in, or if in the Company's
opinion, his appearance or testimony would
be beneficial to the Company's position,
Employee agrees to make himself reasonably
available to the Company and its counsel.
The Company shall reimburse Employee for
his expenses and, after the expiration of
the Severance Period, pay Employee a
reasonable per diem for his time spent in
litigation support activities.

[6.6. Employee acknowledges and agrees
that he owns the stock and option rights
set forth in Schedule A, that he does not
own any other equity or option rights with
respect to the Company, that his unvested
stock options have expired. The Company
shall extend from 90 days to 180 days from
the Separation Date the time period within
which Employee may exercise vested options
Employee acknowledges that any vested
options not so exercised will expire 180
days after the Separation Date. As of the
date of this Agreement, Employee will no
longer be eligible to participate in any
other benefit programs offered to
employees by the Company, including but
not limited to, vacation, 401(k) plan, and
short-term and long-term disability.]

7. **Release and Covenant Not to Sue.**

7.1. Employee, for himself and his heirs,
successors, and assigns, and anyone
claiming by or through them (collectively,
the "Releasing Parties"), irrevocably and
unconditionally releases, waives, and
forever discharges [Entity-name], its
parent, subsidiaries and affiliates, and
each of their respective directors,
agents, attorneys, present and former
employees, partners, investors,
shareholders, insurers, predecessors,

PLAINTIFF0003058

successors, assigns, and representatives
(the "Released Parties"), from any and all
actual or potential claims, complaints,

liabilities, obligations, promises,
actions, causes of action, liabilities,
agreements, damages, costs, debts, and
expenses of any kind, whether known or
unknown, that the Releasing Parties have
ever had or now have from the beginning of
time through the date Employee executes
this agreement (collectively, the
"Released Claims"). Without limitation,
the Released Claims include all claims
arising out of, related to or connected
with Employee's employment, the
termination of his employment, or the
payment of wages, salary, or any other
benefit Employee received or claims he
should have received in connection with
his employment; all claims under Title VII
of the Civil Rights Act of 1964, as
amended; (42 U.S. C. § 2000e, et seq.);
the Civil Rights Acts of 1866, 1871 and
1991, all as amended; 42 U.S.C. § 1981;
the Family and Medical Leave Act of 1993,
as amended (29 U.S.C. § 2601, et seq.);
the Americans With Disabilities Act, as
amended (42 U.S.C. § 12101, et seq.); the
Rehabilitation Act of 1973, as amended (29
U.S.C. § 793-94); the Fair Labor Standards
Act, as amended (29 U.S.C. § 201, et.
seq.); the Equal Pay Act of 1963, as
amended (29 U.S.C. § 206); the Employee
Retirement Income Security Act, as amended
(29 U.S.C. § 1001, et seq.); the
Consolidated Omnibus Budget Reconciliation
Act of 1985 (29 U.S.C. § 1161, et seq.);
the Age Discrimination in Employment Act
(29 U.S.C. § 621 et seq.); the Older
Workers Benefit Protection Act of 1990 (29
U.S.C. § 623); the National Labor
Relations Act (NLRA); the Occupational
Safety and Health Act (OSHA); and any
other federal or state whistle-blower
statute or regulation; [Chapter 760 of the
Florida Civil Rights Act of 1992, as
amended; any provision of Chapters 250,
440, 443, 447, 448, and 760 of Florida
Statutes: the Florida General Labor



PLAINTIFF0003059



Regulations, as amended;] any other state
law, rule or regulation of any other
state; any local ordinance; workers'
compensation statutes; unemployment
compensation laws; and any other federal,
state or local statute, rule, regulation
or ordinance; any obligations under,
arising out of, or related to any actual
or quasi-contract, including but not
limited to, salary payments, bonus
payments, benefits, stock, or stock
options [(subject to the terms and
conditions set forth in Section 6.6 above
and Schedule A);] common law claims,
including but not limited to claims of
intentional or negligent infliction of
emotional distress, negligent hiring,
retention, training or supervision,
defamation, invasion of privacy, breach of
a covenant of good faith and fair dealing,
breach of fiduciary duty, breach of
express or implied contract, promissory
estoppel, negligence or wrongful
termination of employment; any claims for
or to past or future unpaid salary,
commissions, bonuses, incentive payments,
expense reimbursements, health care
benefits, life insurance, disability
insurance and any other income or benefits
the Releasing Parties received or claim
they should receive; and all other claims
of any kind, including but not limited to
any claims for attorneys' fees.

7.2. The Releasing Parties covenant not to
sue any Released Party for any Released
Claim. The Releasing Parties warrant that
they have not filed any complaint, claim
or charge against a Released Party with
any local, state or federal agency or
court. The Releasing Parties agree that,
if any such agency or court assumes the
prosecution or jurisdiction of any
complaint or charge against a Released
Party, the Releasing Parties will
immediately dismiss the complaint or
charge and/or will immediately request
such agency or court to dismiss and
withdraw from the matter, and the

PLAINTIFF0003060



Releasing Parties will not support the effort of anyone else or any entity that might file an action against a Released Party. In the event the Releasing Parties fail or refuse to undertake these obligations, the Releasing Parties agree that this Agreement shall operate to effectuate his/their dismissal or withdrawal of such complaint, charge or claim and that the Releasing Parties will forward to the Released Party any monies the Releasing Parties receive from such complaint, charge or claim.

7.3. The Releasing Parties have not assigned or otherwise transferred any interest in any Released Claim. The Releasing Parties shall not commence, join in, or in any manner seek relief through any suit arising out of, based upon, or relating to any Released Claim.

7.4. If any provision of this release is held invalid, unenforceable or void to any extent by a court of competent jurisdiction, the provision shall be modified, if possible, by reducing its duration and scope to allow enforcement of the maximum permissible duration and scope. The Company reserves the right to rescind this Agreement and recover all amounts paid under it if any provision of this release is held invalid, unenforceable or void.

8. **Review of this Agreement.**

8.1. Employee acknowledges that he has read each section of this Agreement, that the Agreement is written in a manner calculated to be understood by Employee, and that Employee in fact understands his rights and obligations under it, including the fact that he is waiving and releasing his rights to sue the Company.

8.2. Employee is advised to consult with legal counsel before executing this Agreement.

PLAINTIFF0003061



8.3. Employee acknowledges that the money being paid pursuant to this Agreement and any other consideration is in excess of all monies or anything else of value owed to him/her.

8.4. Employee has up to twenty-one (21) calendar days following the receipt of this Agreement to consider this Agreement before signing it. However, Employee may consider and sign this Agreement in less time if he so chooses.

8.5. Employee may revoke this Agreement within seven (7) days after his execution of this Agreement (the "Revocation Period"). To revoke this Agreement, Employee shall deliver notice of such election in writing to Company's representative, [Entity-signer-name], before 5:00 p.m. on the seventh day after execution. If the seventh day does not fall on a business day, then the Revocation Period shall be deemed extended to 5:00 p.m. the next business day.

8.6. This Agreement is not effective or enforceable until the Revocation Period has expired, and no monies or other consideration will be sent to Employee until after the Revocation Period has expired (assuming the Employee has not timely exercised his right to revoke the Agreement).

9. **Governing Law; Venue; Dispute Resolution.** This Agreement has been delivered in the State of [Entity-state] and shall be governed by and construed in accordance with the laws of the State of [Entity-state]. Any action based upon or arising out of this Agreement shall lie exclusively in the federal or state courts located in [Entity-county], [Entity-state]. This Agreement shall not be construed to waive any right of removal that may apply to any action filed in any court by either Party.

10. **Arbitration.** If any dispute arises between Employee and the Company with respect to this Agreement, either party may elect (but is not

PLAINTIFF0003062



obligated) to submit the dispute to arbitration
before a panel of arbitrators in accordance
with the [Entity-state] Arbitration Code by
giving the other party a notice of arbitration
in accordance with Section 21 of this
Agreement. If a party elects to arbitrate a
dispute, arbitration will be the sole and
exclusive method of resolving the dispute, the
other party must arbitrate the dispute, and
each party will be barred from filing a lawsuit
concerning the subject matter of the
arbitration, except to obtain an equitable
remedy.

The arbitration panel will consist of one
arbitrator, who will be a neutral arbitrator
selected by the agreement of one arbitrator selected
by the Company and a second selected by Employee,
and the third neutral arbitrator selected by
agreement of the first two arbitrators. Each party
shall select an arbitrator and notify the other
party of the selection within 15 days after the
effective date of the notice of arbitration and the
two arbitrators selected by the parties shall select
the third arbitrator within 30 days after the
effective date of the notice of arbitration. A party
who fails to select an arbitrator within the
prescribed 15-day period waives the right to have
the two selected arbitrators select an arbitrator to
arbitrate the dispute, and the arbitrator chosen by
the other party will constitute the "arbitration
panel" for purposes of this Agreement.

Every arbitrator must be independent (not a relative
of Employee or an officer, director, employee, or
shareholder of the Company, the Company or any
subsidiary) without any economic or financial
interest of any kind in the outcome of the
arbitration. Each arbitrator's conduct will be
governed by the Code of Ethics for Arbitrators in
Commercial Disputes (1986) that has been approved
and recommended by the American Bar Association and
the American Arbitration Association.

Within 120 days after the effective date of the
notice of arbitration, the arbitrator who will
arbitrate the dispute shall convene a hearing for
the dispute to be held on such date and at such time
and place in [Entity-city], [Entity-state], as the
arbitrator designates upon 60 days' advance notice

PLAINTIFF0003063

arbitrator designates upon 60 days' advance notice
to Employee and the Company. The arbitrator shall
render his or her decision within 30 days after the

conclusion of the hearing. The decision of the
arbitrator will be binding and conclusive as to
Employee and the Company and, upon the pleading of
either party, any court having jurisdiction may
enter a judgment of any award rendered in the
arbitration, which may include an award of damages.
The arbitrator shall hear and decide the dispute
based on the evidence produced, notwithstanding the
failure or refusal to appear by a party who has been
duly notified of the date, time, and place of the
hearing.



11. **No Jury Trial.** EACH OF THE EMPLOYEE AND THE
    COMPANY KNOWINGLY, VOLUNTARILY, AND
    INTENTIONALLY WAIVES THE RIGHT TO A JURY TRIAL
    IN ANY LAWSUIT BETWEEN EMPLOYEE AND THE COMPANY
    WITH RESPECT TO THIS AGREEMENT.

12. **Entire Agreement; Modification.** This Agreement
    represents the entire agreement of the parties
    with respect to the subject matters addressed
    herein and may not be modified or amended
    except upon a written agreement signed by both
    parties.

13. **No Fraud.** The parties agree that no
    inducements, statements or representations have
    been made that are not set forth in this
    Agreement and that they did not rely on any
    inducements, statements or representations not
    set forth herein.

14. **Binding Effect.** This Agreement shall be binding
    upon the parties and their respective heirs,
    devisees, legal representatives, personal
    representatives, successors, and assigns.

15. **Counterparts and Originals.** The parties may
    execute this Agreement in counterparts. Each
    executed counterpart shall be deemed an
    original, and all of them together shall
    constitute one document.

16. **Successors and Assigns.** This Agreement is not
    assignable by any party without the prior
    written consent of the other parties, and any
    attempted assignment without the prior written

PLAINTIFF0003064



consent of the other parties shall be invalid and unenforceable against the other parties. This Agreement is binding upon, and inures to the benefit of, the respective heirs, authorized assignees, successors and personal representatives of the parties.

17. **Titles and Headings.** The titles and headings of the various sections of this Agreement are intended solely for convenience of reference and are not intended to explain, modify or place any interpretation upon any of the provisions of this Agreement.

18. **Severability.** If any term or provision of this Agreement is determined to be illegal or unenforceable, to the extent possible, such term or provision shall be severed from this Agreement and all other terms and provisions shall be remain in full force and effect.

19. **Gender and Number.** As used in this Agreement, the masculine, feminine or neuter gender, and the singular or plural number, shall each include the others whenever the context so requires.

20. **Interpretation.** The language used in this Agreement shall not be construed in favor of or against any of the parties, but shall be construed as if all parties participated jointly in the preparation of this Agreement. The language used in this Agreement shall be deemed to be the language chosen by the parties to express their mutual intent, and no rule of strict construction shall be applied against any party.

21. **Legal Fees and Costs.** In any litigation that arises from this Agreement, the prevailing party (or parties) may recover its legal fees and costs from the non-prevailing party (or parties).

22. **Notices.** Except as otherwise specified in this Agreement, every demand, notice, consent, or approval required or permitted to be given by a party under this Agreement will be valid only if it is (a) in writing, (b) delivered personally or by telecopy, commercial courier,

PLAINTIFF0003065

or first class, postage prepaid, United States mail (whether or not certified or registered and regardless of whether a return receipt is requested or received by the sender), and (c) addressed by the sender to the intended recipient as follows:



| If to Company, to: |
| --- |
| [Entity name] |
| [Entity-address] |
| [Entity-city], [Entity-state] [Entity-zip] |

If to Employee, to Employee's address as set forth on the signature page.

Or such other address as the intended recipient may designate by written notice given to every other party to this Agreement in the manner provided in this Section. Each party to this Agreement shall promptly notify every other party of any change in its mailing address.

23. **Section 409A.** For purposes of Section 409A of the Internal Revenue Code of 1986, as amended ("Section 409A"), (a) Employee's right to the series of installment payments of the Severance Compensation shall be treated as a right to a series of separate payments under Treasury Regulations Section 1.409A-2(b)(2)(iii), and (b) Employee's termination of employment with the Company is an "involuntary separation from service" within the meaning of Treasury Regulation Section 1.409A-1(n) as of the Separation Date. The Severance Compensation is intended to be exempt from Section 409A as a short-term deferral under Treasury Regulation Section 1.409A-1(b)(4) and as exempt separation pay under Treasury Regulation Section 1.409A-1(b)(9)(iii) and (v).

[Signature page to follow]

PLEASE READ CAREFULLY. THIS GENERAL RELEASE INCLUDES A RELEASE OF ALL KNOWN AND UNKNOWN CLAIMS.

IN WITNESS WHEREOF, Company and Employee have

PLAINTIFF0003066

executed this Agreement as of the date first above
written.

Executed this [Date].



| Company: | Employee: |
|---|---|
| Signature:<br>----------------------- | Signature: |
| [Entity-signer-name],<br>[Entity-signer-role] | [Employee-name],<br>[Employee-role] |
| COMPANY | EMPLOYEE |
| Signature: | Signature: |
| Print Name: [Entity-<br>signer-name] | Print Name: [Employee-<br>name] |
| Role: [Entity-signer-<br>role] | Role: [Employee role] |

[Employee-name] ("Employee")

[Employee-address]

[Employee-city], [Employee-state] [Employee-zip]

Executed this [Date].

[Entity-name]

(the "Company")

| WITNESS | WITNESS |
|---|---|
| Signature:<br>-----------------------<br>- | Signature:<br>-----------------------<br>- |
| Print Name: [Entity-<br>signer-name] | Print Name: [Witness-<br>name] |
| Role: [Entity-signer-<br>role] | Role: [Witness-role] |

PLAINTIFF0003067

**Previous**

Confidential
Settlement Agreement

**Next**

README.md



PLAINTIFF0003068



**LEGAL—TOOLS**  DAOLABS

Connect Wallet



Terms of Service

  Documents

    

# Terms of Service

Terms of service are agreements between a service provider and an entity or individual which wants to use that service. Terms of service can be used for a website, a product, or any other offering.

This section contains customizable terms and conditions for projects which provide online services.

## Documents

- The <u>Long Terms of Service</u> is written for a DAO which primary operates out of a decentralized application which is hosted as a website.
- The <u>Simple Terms of Service</u> are written concerning content available on a website or application.
- The <u>Acceptable Use Policy</u> generally contains narrower restrictions than the Terms of Service. The Acceptable Use Policy is a subset of the Terms of Service.
- The <u>Privacy Policy</u> can be used by projects using <u>Fantom Analytics</u>.

Previous
Separation Agreement, Release, and Covenant Not to Sue

Next
Detailed Terms of Service

PLAINTIFF0003069



PLAINTIFF0003070



LEGAL-TOOLS DAOLABS Connect Wallet



# Variables

Last Updated Date

01/01/2023

Your Entity's Name

Acme DAO

Entity's City

Kalamazoo

Entity's State

Michigan

Entity's Service URLs

http //acme yz/; http //di cord gg/acme; http //twitter com/a

Entity Contact URL (Discord, Telegram, Twitter, etc.)

https://discord.gg/acme

Entity Notice Email Address

acme@ethereum.email

Legal Service Provider

Mrs. Jane Doe Esq., dao-lawfirm.eth, etc.

Legal Service Provider Email Address

m@dao-lawfirm.xyz

Update document

     

Decentralized, Centralized Applications.

Parties, Notice addresses.

Introduction.

1. By using the Site, you agree to these Terms.
2. Information of a Legal, Accounting, or Tax Matters.
3. Risks Involved in the Use of the Smart Contracts.
4. Source Code Repositories.
5. Intellectual Property.
6. The Decentralized Application.
7. Access to the DAO Application.
8. Securities Law Matters.
9. OFAC Compliance.
10. Third Party Links.
11. Privacy Policy.
12. Disclaimers; Limitation of Liability.
13. Indemnification.
14. Arbitration.
15. Governing Law.
16. General.
17. Contacting Us.

>  The followi g Terms of Service is for a
> DAO which primary operates out of a
> decentralized application which is hosted
> as a Website.

### [Entity-name] Terms of Service
### Last Updated: [Date]

PLEASE READ THIS TERMS OF SERVICE AGREEMENT (THE "TERMS OF SERVICE") CAREFULLY. THIS SITE AND ANY OTHER WEBSITES OF THE DAO ("DAO"), ITS AFFILIATES OR AGENTS (COLLECTIVELY, THE "SITE") IS CONTROLLED BY THE DAO. THESE TERMS OF USE GOVERN THE USE OF THE SITE AND APPLY TO ALL INTERNET USERS VISITING THE SITE. BY ACCESSING OR USING THE SITE IN ANY WAY, INCLUDING USING THE SERVICES AND RESOURCES AVAILABLE OR ENABLED VIA THE SITE (EACH A "SERVICE" AND COLLECTIVELY, THE "SERVICES"). BY CLICKING ON THE "I ACCEPT" BUTTON, COMPLETING THE REGISTRATION PROCESS, AND/OR BROWSING THE SITE, YOU REPRESENT THAT (1) YOU HAVE READ, UNDERSTAND, AND AGREE TO BE BOUND BY THE TERMS OF SERVICE, (2) YOU ARE OF LEGAL AGE TO FORM A BINDING CONTRACT WITH THE DAO, AND (3) YOU HAVE THE AUTHORITY TO ENTER INTO THE TERMS OF USE PERSONALLY OR ON BEHALF OF THE ENTITY YOU HAVE NAMED AS THE USER, AND TO BIND THAT ENTITY TO THE TERMS OF SERVICE. THE TERM "YOU" REFERS TO THE INDIVIDUAL OR LEGAL ENTITY, AS APPLICABLE, IDENTIFIED AS THE USER WHEN YOU REGISTERED ON THE SITE. IF YOU DO NOT AGREE TO BE BOUND BY THE TERMS OF SERVICE, YOU MAY NOT ACCESS OR USE THIS SITE OR THE SERVICES.

PLEASE BE AWARE THAT SECTION 15 (ARBITRATION, OUR DISPUTE RESOLUTION PROCESS) OF THIS AGREEMENT, BELOW, CONTAINS PROVISIONS GOVERNING HOW DISPUTES THAT YOU AND WE HAVE AGAINST EACH OTHER ARE RESOLVED, INCLUDING, WITHOUT LIMITATION, ANY DISPUTES THAT AROSE OR WERE ASSERTED PRIOR TO THE EFFECTIVE DATE OF THIS AGREEMENT. IN PARTICULAR, IT CONTAINS AN ARBITRATION AGREEMENT WHICH WILL, WITH LIMITED EXCEPTIONS, REQUIRE DISPUTES BETWEEN US TO BE SUBMITTED TO BINDING AND FINAL

PLAINTIFF0003072

ARBITRATION. UNLESS YOU OPT OUT OF THE ARBITRATION
AGREEMENT:



- (1) YOU WILL ONLY BE PERMITTED TO PURSUE
  DISPUTES OR CLAIMS AND SEEK RELIEF AGAINST US
  ON AN INDIVIDUAL BASIS, NOT AS A PLAINTIFF OR
  CLASS MEMBER IN ANY CLASS OR REPRESENTATIVE
  ACTION OR PROCEEDING; AND
- (2) YOU ARE WAIVING YOUR RIGHT TO PURSUE
  DISPUTES OR CLAIMS AND SEEK RELIEF IN A COURT
  OF LAW AND TO HAVE A JURY TRIAL.

## Decentralized, Centralized Applications.

DAO applications may be accessed at the following
URL(s): **[Entity-urls]** and any services used by the
DAO, such as Discord, Twitter, Instagram and
Github.

## Parties, Notice addresses.

The parties to this agreement are **you** (user of the
DAO's decentralized application) and **the DAO.** For
the purpose of electronic communication or other
electronic notice you may contact the DAO via its
Service Provider at **[Service-provider-name]** or by
e-mail at **[Service-provider-email]** or **[Entity-
email]**.

## Introduction.

Please read these terms of service ("Terms")
carefully. These Terms are between you and the DAO
(the "DAO," "we," "us," or "our") concerning your
use of the **DAO's decentralized application
("DAPP") or websites,** including the sites listed
above, other DAO websites, and other websites
maintained by the DAO (together the "Site" or
"Sites") which may interact with and operate on
the Juicebox protocol (the "Juicebox DAO
Protocol") currently available on Ethereum via
smart contracts ("Smart Contracts").

These Terms apply to you (**"you,"** or **"User"**) as a
user of the Site information made available on the
Site.

## 1. By using the Site, you agree to these
Terms.

PLAINTIFF0003073



Certain features on the site may be offered while still in "beta" form (**"Services"**). By accepting these Terms or using the Services, You understand and acknowledge that the Services are being provided as a version and made available on an "As Is" or "As Available" basis. The Services may contain bugs, errors, and other problems.

You assume all risks and all costs associated with your use of the DAO services, including, without limitation, any internet access fees, back-up expenses, costs incurred for the use of your device and peripherals, and any damage to any equipment, software, information, or data. In addition, we are not obligated to provide any maintenance, technical support, or other support for the Services.

None of the information, services, or materials offered on the Sites constitute, or are intended to constitute, legal, financial, tax, investment, or other advice, and you should not act or refrain from acting based on any information, services, or materials provided on the Sites. All content on the Sites is information of a general nature and does not address the unique circumstances of any particular user. You are strongly urged to consult with your own legal, financial, tax, investment, and other advisors as to all legal, financial, tax, and investment-related questions you have.

You must be able to form a legally binding contract online either as an individual or on behalf of a legal entity. You represent that as a User, you have the legal authority to bind the company or other legal entity on the behalf of which you are acting to these Terms, you are at least 18 years old or the age of majority where you reside, whichever is older, you can form a legally binding contract online, and you have the full right, power, and authority to enter into and to comply with the obligations under these Terms on your own behalf, or on behalf of the company or other legal entity on the behalf of which you are acting.

PLEASE NOTE THAT THE AGREEMENT IS SUBJECT TO

PLAINTIFF0003074

PLEASE NOTE THAT THE AGREEMENT IS SUBJECT TO CHANGE BY THE DAO IN ITS SOLE DISCRETION AT ANY TIME. When changes are made, the DAO will make a

new copy of the Terms of Service Agreement available at the Site and any new Supplemental Terms will be made available from within, or through, the affected Service on the Site. We will also update the "Last Updated" date at the top of the Terms of Service Agreement. The DAO may require you to provide consent to the updated Agreement in a specified manner before further use of the Site and/ or the Services is permitted. If you do not agree to any change(s) after receiving a notice of such change(s), you shall stop using the Site and/or the Services. Otherwise, your continued use of the Site and/or Services constitutes your acceptance of such change(s). PLEASE REGULARLY CHECK THE SITE TO VIEW THE THEN-CURRENT TERMS.

As a User, you agree to be bound by any changes, variations, or modifications to our terms of service and your continued use of the Site shall constitute acceptance of any such changes, variations, or modifications.

## 2. Information of a Legal, Accounting, or Tax Matters.

Any legal, financial, or tax comments within the Sites are provided for informational and illustrative purposes only, and are not intended to constitute legal, financial, tax, or other advice. You should not act or refrain from acting based on any information gleaned from any documents, comments, or instructions within the Sites. The DAO does not endorse or make any representation as to the capabilities of any legal or tax professional or advisors within our Sites (or the Internet), and the provision of contact information is not a recommendation that you hire any such person. Please check with your legal and tax advisors to make the best decisions for your specific circumstances.

## 3. Risks Involved in the Use of the Smart Contracts.

The DAO protocol runs entirely on publicly

PLAINTIFF0003075

The DAO protocol runs entirely on publicly
accessible smart contracts explained in detail
throughout the Juicebox DAO's online documents,

currently available at
https://info.juicebox.money. The Juicebox DAO's
protocol is public infrastructure running well-
known code. All consequences from interacting with
networks running the protocol are borne by the
entities who sign each transaction. The protocol
works according to the specifications outlined in
these docs to the extent the code is written and
deployed correctly, which is a collective
responsibility and is not guaranteed. There are
major risks that the code is not written and
deployed correctly. **Please do your own research.**

## 4. Source Code Repositories.

No Warranties. The DAO's source code Repository is
only a presentation of information regarding
certain view points and technologies. The
statements contained in the Repository do not
provide any advice, representation, warranty,
certification, guarantee or promise relating to
these technologies, any uses thereof or any of the
other matters discussed in the Repository, nor
does the Repository provide an offer or agreement
to make such technologies available, maintain or
update such technologies, or sell or buy any asset
or enter into any transaction. You should not rely
on the Repository as a basis for making any
financial or other decision.

## 5. Intellectual Property.

The rights granted to you in the Agreement are
subject to the following restrictions: (a) you
shall not license, sell, rent, lease, transfer,
assign, reproduce, distribute, host or otherwise
commercially exploit the DAO's Properties or any
portion of the DAO's Properties, including the
Site; (b) you shall not frame or utilize framing
techniques to enclose any trademark, logo, or
other DAO Properties (including images, text, page
layout or form) of the DAO; (c) you shall not use
any metatags or other "hidden text" using the
DAO's name or trademarks; (d) you shall not
modify, translate, adapt, merge, make derivative
works of, disassemble, decompile, reverse compile



PLAINTIFF0003076



or reverse engineer any part of the DAO's
Properties except to the extent the foregoing

restrictions are expressly prohibited by
applicable law; (e) you shall not use any manual
or automated software, devices or other processes
(including but not limited to spiders, robots,
scrapers, crawlers, avatars, data mining tools or
the like) to "scrape" or download data from any
web pages contained in the Site (except that we
grant the operators of public search engines
revocable permission to use spiders to copy
materials from the Site for the sole purpose of
and solely to the extent necessary for creating
publicly available searchable indices of the
materials, but not caches or archives of such
materials); (f) except as expressly stated herein,
no part of the DAO's Properties may be copied,
reproduced, distributed, republished, downloaded,
displayed, posted or transmitted in any form or by
any means; and (h) you shall not remove or destroy
any copyright notices or other proprietary
markings contained on or in the DAO's Properties.
Any future release, update or other addition to
the DAO's Properties shall be subject to the
Agreement. The DAO, its suppliers and Service
Providers reserve all rights not granted in the
Agreement. Any unauthorized use of any the DAO's
Property terminates the licenses granted by the
DAO pursuant to the Agreement.

**1. The DAO Properties.** Except with respect to Your
Content and User Content, you agree that the DAO
and its suppliers own all rights, title and
interest in the DAO Properties. You will not
remove, alter or obscure any copyright, trademark,
service mark, or other proprietary rights notices
incorporated in or accompanying any of the DAO
Properties.

**2. Your Content.** The DAO does not claim ownership
of Your Content. However, when you as a Registered
User post or publish Your Content on or in the DAO
Properties, you represent that you own and/or have
a royalty-free, perpetual, irrevocable, worldwide,
non-exclusive right (including any moral rights)
and license to use, license, reproduce, modify,
adapt, publish, translate, create derivative works
from, distribute, derive revenue or other

PLAINTIFF0003077



remuneration from, and communicate to the public,
perform and display Your Content (in whole or in
part) worldwide and/or to incorporate it in other

works in any form, media or technology now known
or later developed, for the full term of any
worldwide intellectual property right that may
exist in Your Content.

**3. License to Your Content.** Subject to any
applicable account settings that you select, you
grant the DAO a fully paid, royalty-free,
perpetual, irrevocable, worldwide, royalty-free,
non-exclusive and fully sublicensable right
(including any moral rights) and license to use,
license, distribute, reproduce, modify, adapt,
publicly perform, and publicly display Your
Content (in whole or in part) for the purposes of
operating and providing the DAO Properties to you
and to our other Registered Users. Please remember
that other Registered Users may search for, see,
use, modify and reproduce any of Your Content that
you submit to any "public" area of the DAO
Properties. You warrant that the holder of any
worldwide intellectual property right, including
moral rights, in Your Content, has completely and
effectively waived all such rights and validly and
irrevocably granted to you the right to grant the
license stated above. You agree that you, not the
DAO, are responsible for all of Your Content that
you Make Available on or in the DAO Properties.
Any Content posted by you in your profile may not
contain nudity, violence, sexually explicit, or
offensive subject matter as determined by the DAO
in its sole discretion. You may not post or submit
for print services a photograph of another person
without that person's permission.

## 6. The Decentralized Application.

The DAO provides access to a DAPP, a decentralized
finance application, (**"Application"**) on the
Ethereum blockchain that allows individuals to
contribute Ethereum assets including Ethereum,
ERC-20, ERC-721, and other Ethereum-based assets
(**"Cryptocurrency Assets"**) to the DAO Treasury as
contributions. The Application may be configured
as to emit project tokens (**"Project Tokens"**) which
may or may not have utility. The Application spans
a front-end application, middleware (including

    **PLAINTIFF0003078**



Interplanetary File System metadata, Graph
indexers, Blocknative API functions, Infura
services, Cloud Functions, etc.) and an array of
Ethereum smart contracts - the user is required to
authorize the execution of the Smart Contracts
when interacting with their wallet at all times.

Using the DAO protocol may require that you pay a
fee, such as gas fees on the Ethereum network, to
perform a transaction. You acknowledge and agree
that the DAO has no control over any transactions
among Users over the DAO's protocol, or the method
of payment of any such transactions or any actual
payments of such transactions. Accordingly, you
must ensure that you have a sufficient balance of
the applicable cryptocurrency tokens stored at
your DAO protocol-compatible wallet address
(**"Cryptocurrency Wallet"**) to complete any such
transaction on the DAO protocol or the Ethereum
network before initiating such a transaction.

## 7. Access to the DAO Application.

Access to the Site is provided on an "AS IS" and
"as available" basis only. We do not guarantee
that the Site, or any content on it, will always
be available or uninterrupted. From time to time,
access may be interrupted, suspended, or
restricted, including because of a fault, an
error, or unforeseen circumstances, or because we
are carrying out planned maintenance. With regards
to the Sites; We reserve the right to limit the
availability of the Site to any person, geographic
area or jurisdiction we so desire and/or to
terminate your access to and use of the Site, at
any time and in our sole and absolute discretion.
We may remove or amend the content of the Site at
any time. Some of the Site content may be out of
date at any given time and we are under no
obligation to update it. We do not guarantee that
the Site, or any content on it, will be free from
errors or omissions.

We will not be liable to you for any loss or
damage you may suffer as a result of the Site
being unavailable at any time for any reason. You
will comply with all applicable domestic and
international laws, statutes, ordinances and
regulations applicable to your use of the Site.

PLAINTIFF0003079

**Registering Your Account.** In order to access certain features of the DAO's Properties you may

be required to become a Member. For purposes of the Agreement, a Member is also a "Registered User", which is a user who has registered an account on the Site ("Account"), and has a valid account on a third party service through which the user has connected to the Site (each such account, a "Third-Party Account").

**As a condition to accessing or using the Site, you will:**

1. only use the Site in accordance with these Terms;
2. ensure that all information that you provide on the Site is current, complete, and accurate;
3. ensure compliance with all U.S. Securities laws; and
4. maintain the security and confidentiality of access to your Cryptocurrency Wallet address.

You acknowledge that all Content, including DAO Properties, is the sole responsibility of the party from whom such Content originated. This means that you, and not the DAO, are entirely responsible for all Content that **you upload, post, e-mail, transmit or otherwise make available ("Make Available")** through the DAO Properties ("Your Content"), and that you and other Registered Users of DAO Properties, and not DAO, are similarly responsible for all Content that you and they Make Available through the DAO Properties ("User Content").

You acknowledge that the DAO has no obligation to pre-screen Content (including, but not limited to, User Content), although the DAO reserves the right in its sole discretion to pre-screen, refuse or remove any Content. By entering into the Agreement, you hereby provide your irrevocable consent to such monitoring. You acknowledge and agree that you have no expectation of privacy concerning the transmission of Your Content, including without limitation chat, text, or voice communications. In the event that the DAO pre-screens, refuses or removes any Content, you acknowledge that the DAO will do so for the DAO's

PLAINTIFF0003080

acknowledge that the DAO will do so for the DAO's
benefit, not yours. Without limiting the
foregoing, The DAO shall have the right to remove

any Content that violates the Agreement or is
otherwise objectionable.

**As a condition to accessing or using the Site, you
will not:**

1. violate any applicable law, including,
   without limitation, any relevant and
   applicable anti-money laundering and anti-
   terrorist financing laws as well as any
   relevant and applicable privacy and data
   collection laws, in each case as may be
   amended;
2. export, reexport, or transfer, directly or
   indirectly, any DAO technology in violation
   of applicable export laws or regulations;
3. infringe on or misappropriate any contract,
   intellectual property or other third-party
   right, or commit a tort while using the Site;
4. make commercial use of the Site or any of its
   content without our express written
   permission;
5. misrepresent the truthfulness, sourcing or
   reliability of any content on the Site;
6. use the Site or its content to simulate
   communications from us or another service or
   entity in order to collect identity
   information, authentication credentials, or
   other information (known as 'phishing');
7. use the Site in any manner that could
   interfere with, disrupt, negatively affect,
   or inhibit other users from fully enjoying
   the Site or the DAO protocol, or that could
   damage, disable, overburden, or impair the
   functioning of the Site or the DAO protocol
   in any manner;
8. attempt to circumvent any content filtering
   techniques or security measures that DAO
   employs on the Site, or attempt to access any
   service or area of the Site that you are not
   authorized to access;
9. use any robot, spider, crawler, scraper, or
   other automated means or interface not
   provided by us, to access the Site to extract
   data;
10. introduce any malware, virus, Trojan horse,

PLAINTIFF0003081



worm, logic bomb, drop-dead device, backdoor, shutdown mechanism or other harmful material into the Site;

11. **post content or communications on the Site that are, in our sole and absolute discretion, libelous, defamatory, profane, obscene, pornographic, sexually explicit, indecent, lewd, vulgar, suggestive, harassing, hateful, threatening, offensive, discriminatory, bigoted, abusive, inflammatory, fraudulent, deceptive, or otherwise objectionable;**

12. post content on the Site containing unsolicited promotions, commercial messages, or any chain messages or user content designed to deceive or trick the user of the Site; or

13. encourage or induce any third party to engage in any of the activities prohibited under these Terms.

**You acknowledge that the Site and your use of the Site contain certain risks, including, without limitation, the following risks:**

1. that any Smart Contracts you interact with are entirely your own responsibility and liability;

2. that at any time, your access to your Cryptocurrency Assets may be suspended or terminated or there may be a delay in your access or use of your Cryptocurrency Assets which may result in the Cryptocurrency Assets diminishing in value or you being unable to complete a transaction or interact with a Smart Contract; and

3. That the Site and/or application may be suspended or terminated for any or no reason, which may limit your access to your Cryptocurrency Assets.

**Accordingly, you expressly agree that:**

1. you assume all risks in connection with your access and use of the Site, the DAO Application and the Smart Contracts; and

2. you expressly release the DAO and our contributors, Members, and affiliates, and hold them harmless from and against any and all liability, claims, causes of action

PLAINTIFF0003082



all liability, claims, causes of action,
losses, expenses, or damages (whether arising
in law or equity, including but not limited

to special, consequential, indirect,
punitive, and exemplary damages, and
including but not limited to economic loss,
business disruption, and/or attorney's fees)
arising from or in any way related to the
Site, the Application, and/or the Smart
Contracts. You expressly waive all such
claims against the Releases.

**Feedback.** You agree that submission of any ideas,
suggestions, documents, and/or proposals to the
DAO through its suggestion, feedback, wiki, forums
(e.g. Discord or Snapshot), or similar pages
("Feedback") is at your own risk and that the DAO
has no obligations (including without limitation
obligations of confidentiality) with respect to
such Feedback. You represent and warrant that you
have all rights necessary to submit the Feedback.
You hereby grant to the DAO a fully paid, royalty-
free, perpetual, irrevocable, worldwide, non-
exclusive, and fully sublicensable right and
license to use, reproduce, perform, display,
distribute, adapt, modify, re-format, create
derivative works of, and otherwise commercially or
non-commercially exploit in any manner, any and
all Feedback, and to sublicense the foregoing
rights in connection with the operation and
maintenance of the DAO Properties and/or the DAO's
purpose.

**Export control.** You may not use, export, import,
or transfer the DAO DAPP except as authorized
under U.S. law and the laws of the jurisdiction in
which you obtained the DAO property (DAPP or
Site), and any other applicable laws. In
particular, but without limitation, the DAO
properties may not be exported or re-exported (a)
into any United States embargoed countries, or (b)
to anyone on the U.S. Treasury Department's list
of Specially Designated Nationals or the U.S.
Department of Commerce's Denied Person's List or
Entity List. By using the DAO DAPP, you represent
and warrant that (i) you are not located in a
country that is subject to a U.S. Government
embargo, or that has been designated by the U.S.
Government as a "terrorist supporting" country and

PLAINTIFF0003083

(ii) you are not listed on any U.S. Government list of prohibited or restricted parties. You also will not use the DAO DAPP for any purpose

prohibited by U.S. law, including the development, design, manufacture or production of missiles, nuclear, chemical or biological weapons. You acknowledge and agree that products, services or technology provided by the DAO are subject to the export control laws and regulations of the United States. You shall comply with these laws and regulations and shall not, without prior U.S. government authorization, export, re-export, or transfer DAO DAPP products, services or technology, either directly or indirectly, to any country in violation of such laws and regulations.



## 8. Securities Law Matters.

ANY GOVERNANCE TOKENS RECEIVED BY MEMBERS HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION, ANY STATE SECURITIES COMMISSION, OR OTHER REGULATORY AUTHORITY, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON THE MERITS OF THIS OFFERING OR UPON THE ACCURACY OR ADEQUACY OF THIS AGREEMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THIS DOCUMENT DOES NOT CONSTITUTE AN OFFER OR SOLICITATION TO ANYONE IN ANY JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

ANY GOVERNANCE TOKENS THAT YOU MAY ACQUIRE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT, STATE SECURITIES LAWS, OR THE LAWS OF ANY COUNTRY OUTSIDE THE UNITED STATES. THE DAO'S POSITION IS THAT THE DAO'S GOVERNANCE TOKENS SHOULD NOT BE CONSIDERED OR REGARDED AS SECURITIES AS THE PURPOSE OF THE DAO IS TO PROVIDE A BLOCKCHAIN NATIVE TREASURY MANAGEMENT APPLICATION AND THE DAO TOKENS PROVIDE NO RIGHTS TO ANY DISTRIBUTION OR PROFITS, AND ARE NON-TRANSFERABLE AS DETAILED IN THE TERMS OF USE.

### "Not an Invitation to Invest or Purchase."

The information contained on the DAO Properties is not an invitation or solicitation to invest in or purchase any cryptocurrency or NFTs or to invest in the shares or other products or services or otherwise deal in these or enter into a contract

PLAINTIFF0003084



otherwise deal in these or enter into a contract with the DAO, any cryptocurrency marketplace or any other company. The information provided herein

should not be relied upon in connection with any investment decision. No reliance should be placed on any statements, rankings or ratings on the DAO Properties, whether for investment purposes or otherwise.

## 9. OFAC Compliance.

The U.S. Department of Treasury, through the Office of Foreign Assets Control ("OFAC"), prohibits U.S. companies from engaging in all or certain commercial activities with certain sanctioned countries (each a "Sanctioned Country") and certain individuals, organizations, or entities, including, without limitation, certain "Specially Designated Nationals" ("SDN") listed by OFAC. **If you use the Site, you expressly represent that you are not located in a Sanctioned Country and are not listed as an SDN. If the DAO determines that the Site is being used by prohibited persons, it will take any and all actions to terminate that User's access to the Site.** See generally, _https://home.treasury.gov/policy-issues/financial-sanctions/consolidated-sanctions-list-non-sdn-lists_.

## 10. Third Party Links.

The Site may contain hyperlinks or references to third party websites. Any such hyperlinks or references are provided for your information and convenience only. We have no control over third party websites and accept no legal responsibility for any content, material, or information contained in them. The display of any hyperlink and reference to any third-party website does not mean that we endorse that third party's website, products, or services. Your use of a third-party site may be governed by the terms and conditions of that third-party site.

## 11. Privacy Policy.

Certain areas of the Site or Application, including any and all interactions with the

PLAINTIFF0003085



Ethereum blockchain, record your Cryptocurrency
address and details of the transactions you

authorize. You understand that transactions,
including parties you transact with, specific
Cryptocurrency Assets you hold, including unique
ENS domain NFTs, third-party NFTs, the
Cryptocurrency address, metadata associated with
any Smart Contract such as the executing function,
its arguments (or parameters) will contain in
aggregate information which *may* identify you
personally.

The Ethereum blockchain transactions are not
temporary or transient, but are permanently and
permissionlessly accessible. The DAO, its
contributors, and its affiliates are not engaged
in profiling activities whatsoever; however, *any
other* third party, including government agencies
and/or foreign adversaries, will have unfettered
access to all of your transactions on the
blockchain forever.

Your authorization of transactions with your
Cryptocurrency address, using Cryptocurrency
Tokens, will result in the indelible dissemination
of information to the Ethereum blockchain.
Notwithstanding, the Application, handles as
little personal information as possible, only your
Cryptographic address. With regards to transaction
with the Application, including any payments or
transfer of funds, any information you provide to
the payment vendors we do not retain, have access
to or control; your authorization of any payment
or execution of transactions you provide to the
site is voluntary, and final.

Additionally, the Sites may employ Fathom
Analytics for website traffic analytics, which
doesn't use cookies and complies with the GDPR,
ePrivacy (including PECR), COPPA and CCPA. The
decision to potentially use this privacy-friendly
analytics software, was in large part to ensure
your IP address is only briefly processed by this
3rd party, and the DAO and the Site have no way of
identifying you (aside from the aforementioned
indelible entire history of Cryptographic
transactions). As per the CCPA, your personal
information is de-identified.

PLAINTIFF0003086

The purpose of the DAO potentially using Fathom Analytics is to understand the Application website

traffic in the most privacy-friendly way possible so that the DAO can continually improve the Application. The lawful basis as per the GDPR is "Article 6(1)(f); where our legitimate interests are to improve our website and business continually." Additionally, the DAO and its contributors have no interest in collecting this information.



## 12. Disclaimers; Limitation of Liability.

YOU EXPRESSLY AGREE THAT ACCESS TO AND USE OF THE SITE IS AT YOUR SOLE RISK AND IS PROVIDED ON AN "AS IS" AND "AS AVAILABLE" BASIS WITHOUT WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, WARRANTIES OF TITLE OR IMPLIED WARRANTIES OF NON-INFRINGEMENT, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE (EXCEPT ONLY TO THE EXTENT PROHIBITED UNDER THE LAWS APPLICABLE TO TERMS OF SERVICE WITH ANY LEGALLY REQUIRED WARRANTY PERIOD TO THE SHORTER OF THIRTY DAYS FROM FIRST USE OR THE MINIMUM PERIOD REQUIRED). WITHOUT LIMITING THE FOREGOING, NEITHER THE DAO NOR ITS AFFILIATES OR SUBSIDIARIES, OR ANY OF THEIR DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS, AGENTS, ATTORNEYS, THIRD-PARTY PROVIDERS, DISTRIBUTORS, LICENSEES, LICENSORS, SUCCESSORS, OR ASSIGNS (COLLECTIVELY, "DAO PARTIES") WARRANT THAT THE SITE WILL BE UNINTERRUPTED, BUG-FREE, OR ERROR-FREE, AND NONE OF THE DAO PARTIES WARRANT THAT SMART CONTRACTS ARE MERCHANTABLE, FIT FOR ANY PARTICULAR PURPOSE, AND/OR RECOGNIZED BY ANY PARTICULAR JURISDICTION(S).

TO THE FULLEST EXTENT PERMITTED BY LAW, THE DISCLAIMERS OF LIABILITY CONTAINED HEREIN APPLY TO ANY AND ALL DAMAGES, LOSSES AND/OR INJURY WHATSOEVER CAUSED BY OR RELATED TO USE OF, OR INABILITY TO USE, THE SERVICES UNDER ANY CAUSE OR ACTION WHATSOEVER OF ANY JURISDICTION, INCLUDING, WITHOUT LIMITATION, ACTIONS FOR BREACH OF WARRANTY, BREACH OF CONTRACT AND/OR TORT (INCLUDING NEGLIGENCE). THE DAO PARTIES SHALL NOT BE LIABLE FOR ANY DIRECT, INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE AND/OR CONSEQUENTIAL

PLAINTIFF0003087



DAMAGES IN ANY WAY WHATSOEVER ARISING OUT OF THE
USE OF, OR INABILITY TO USE, THE SITE. YOU FURTHER
SPECIFICALLY ACKNOWLEDGE THAT THE DAO PARTIES ARE
NOT LIABLE, AND YOU AGREE NOT TO SEEK TO HOLD THE
DAO PARTIES LIABLE, FOR THE CONDUCT OF THIRD
PARTIES, INCLUDING OTHER USERS OF THE SITE AND
OPERATORS OF EXTERNAL WEBSITES, AND THAT THE RISK
OF THE SITE AND EXTERNAL WEBSITES AND OF INJURY
FROM THE FOREGOING RESTS ENTIRELY WITH YOU.

IN THE EVENT THAT A COURT AND/OR ARBITRATOR(S) OF
COMPETENT JURISDICTION HOLDS THAT ANY DAO PARTY IS
LIABLE TO YOU (FOR EXAMPLE AND WITHOUT LIMITATION,
BECAUSE ANY RELEASE OR WAIVER HEREUNDER IS FOUND
TO BE VOID OR OTHERWISE UNENFORCEABLE, OR BECAUSE
ANY CLAIMS ARE FOUND TO BE OUTSIDE THE SCOPE OF
ANY SUCH RELEASE OR WAIVER), UNDER NO
CIRCUMSTANCES WILL ANY OF THE DAO PARTIES BE
LIABLE TO YOU IN THE AGGREGATE FOR MORE THAN THE
AMOUNT YOU HAVE PAID THE **DAO DIRECTLY ARISING FROM
YOUR CONTRIBUTION TO THE DAO** IN THE THIRTY (30)
DAYS IMMEDIATELY PRECEDING THE DATE ON WHICH YOU
FIRST ASSERT ANY SUCH CLAIM, WHETHER SUCH
LIABILITY IS BASED ON BREACH OF WARRANTY, BREACH
OF CONTRACT OR TORT (INCLUDING NEGLIGENCE) OR
OTHERWISE.

We do not guarantee that the Site will be secure
or free from bugs or viruses.

You are responsible for configuring your
information technology, computer programs and
platform in order to access the Site. You should
use your own virus protection software.

We cannot promise that the use of the Site, or any
content taken from the Site, will not infringe the
rights of any third party.

Certain content and materials available on the
Site are for informational purposes only and are
not intended to address your particular
requirements. In particular, the content and
materials available on the Site do not constitute
any form of advice or recommendation by us, should
not be regarded as an offer, solicitation,
invitation or recommendation to buy or sell
investments, securities or any other financial
services and are not intended to be relied upon by
you in making any specific investment or other

PLAINTIFF0003088



decisions. We recommend that you seek independent
advice from your own financial advisors and legal
counsel before making any such decision.
Nothing included in the Site constitutes an offer
or solicitation to sell, or distribution of,
investments and related services by the DAO to
anyone in any jurisdiction.

You may only participate with Smart Contracts on
the Site by linking your Cryptocurrency Wallet on
supported bridge extensions such as MetaMask
(currently available at https://metamask.io/).
MetaMask is an electronic wallet that allows you
to purchase, store, and engage in transactions
using Ethereum cryptocurrency. Before putting your
Cryptocurrency Asset into a Smart Contract, you
will be required to download a supported
electronic wallet extension and connect and unlock
your Cryptocurrency Wallet with that extension.

ALL TRANSACTIONS INITIATED THROUGH OUR SERVICE ARE
FACILITATED AND RUN BY THIRD-PARTY ELECTRONIC
WALLET EXTENSIONS, AND BY USING OUR SERVICES YOU
AGREE THAT YOU ARE GOVERNED BY THE TERMS OF
SERVICE AND PRIVACY POLICY FOR THE APPLICABLE
EXTENSIONS. FOR METAMASK, THOSE TERMS ARE
AVAILABLE AT https://metamask.io/terms.html AND
https://metamask.io/privacy.html.

## 13. Indemnification.

You agree to indemnify and hold the DAO and its
parents, subsidiaries, affiliates, officers,
employees, agents, partners, suppliers, and
licensors (each, a "DAO Party" and collectively,
the "DAO Parties") harmless from any losses,
costs, liabilities, and expenses (including
reasonable attorneys' fees) relating to or arising
out of any and all of the following: (a) Your
Content; (b) your use of, or inability to use, any
DAO Property; (c) your violation of the Agreement;
(d) your violation of any rights of another party,
including any Registered Users; or (e) your
violation of any applicable laws, rules, or
regulations. The DAO reserves the right, at its
own cost, to assume the exclusive defense and
control of any matter otherwise subject to
indemnification by you, in which event you will
fully cooperate with the DAO in asserting any

PLAINTIFF0003089

available defenses. This provision does not
require you to indemnify any of the DAO Parties
for any unconscionable commercial practice by such

party or for such party's fraud, deception, false
promise, misrepresentation, or concealment, or
suppression or omission of any material fact in
connection with the Website or any Services
provided hereunder. You agree that the provisions
in this section will survive any termination of
your Account, the Agreement, and/or your access to
the DAO Properties.



## 14. Arbitration.

**Informal Negotiations.** To expedite resolution and
control the cost of any dispute, controversy or
claim arising under or related to your account,
the DAO protocol or Application, the Site, these
Terms, or any other transaction involving you and
the DAO, whether in contract, warranty,
misrepresentation, fraud, tort, intentional tort,
statute, regulation, ordinance, or any other legal
or equitable basis (or the breach, termination,
enforcement, interpretation or validity thereof)
(**"Dispute"**), you and the DAO agree to first
attempt to negotiate any Dispute (except those
Disputes expressly provided below) informally for
at least ninety (90) days before initiating any
arbitration. Such informal negotiations commence
upon written notice from one person to the other.
You should send your notice in an appropriate
channel via **[Entity-contact-url]** or via an e-mail
message to **[Entity-email]** (**"Notice Address"**). The
DAO will send its notice to you by the Discord
handle provided by you in connection with the
aforementioned notice or to the notice e-mail
message address above.

**Binding Arbitration.** If you and the DAO are unable
to resolve a Dispute through informal
negotiations, either you or the DAO may elect to
have the Dispute (except those Disputes expressly
excluded below) finally and exclusively resolved
by confidential binding arbitration, and not in a
class, representative or consolidated action or
proceeding. In such event, these Terms memorialize
a transaction in interstate commerce; (i) the
Federal Arbitration Act (9 U.S.C. § 1, et seq.)
governs the interpretation and enforcement of this

Section; and (ii) this Section shall survive termination of these Terms.

Any election to arbitrate by one party shall be final and binding on the other, and your grounds for appeal are limited. YOU UNDERSTAND THAT ABSENT THIS PROVISION, YOU WOULD HAVE THE RIGHT TO SUE IN COURT AND HAVE A JURY TRIAL. The arbitrator may award you the same damages and relief as a court sitting in proper jurisdiction could, and may award declaratory or injunctive relief. In addition, in some instances, the costs of arbitration could exceed the costs of litigation and the right to discovery may be more limited in arbitration than in court. The arbitration shall be commenced and conducted under the Commercial Arbitration Rules of the American Arbitration Association ("AAA") and, where appropriate, the AAA's Supplementary Procedures for Consumer Related Disputes ("AAA Consumer Rules"), both of which are available at the AAA website. The determination of whether a Dispute is subject to arbitration shall be governed by the Federal Arbitration Act. The parties agree that the arbitrator shall have exclusive authority to decide all issues relating to the interpretation, applicability, enforceability and scope of this arbitration agreement. Your arbitration fees and your share of arbitrator compensation shall be governed by the AAA Rules and, where appropriate, limited by the AAA Consumer Rules. If such costs are determined by the arbitrator to be excessive, you will pay all arbitration fees and expenses. The arbitration may be conducted, at the option of the claimant, either in person or by video conference. The arbitrator will make a decision in writing, but need not provide a statement of reasons unless requested by a party. The arbitrator must follow applicable law, and any award may be challenged within a reasonable period of time (not to exceed 30 days) if the arbitrator fails to do so. Except as otherwise provided in this Agreement, you and the DAO may litigate in court to compel arbitration, stay proceedings pending arbitration or to confirm, modify, vacate or enter judgment on the award entered by the arbitrator. Judgment upon any award rendered by the arbitrator(s) may be entered and enforcement obtained thereon in any court having jurisdiction.

PLAINTIFF0003091



All arbitration proceedings shall be closed to the public and confidential and all records relating thereto shall be permanently sealed, except as necessary to obtain court confirmation of the arbitration award. Each party shall have the right to participate by video conference in order to minimize travel and expense burdens. Subject to the terms and conditions of these Terms, the arbitrator shall have authority to grant any form of appropriate relief, whether legal or equitable in nature, including specific performance.

**Restrictions/No Class Actions.** You and the DAO agree that any claim brought in connection with a Dispute, whether resolved through arbitration or not, will be brought between the DAO and you individually, and that you may not assert any such claim against the DAO as plaintiff or class Member in any purported class or representative proceeding. To the fullest extent permitted by law, (1) no arbitration shall be joined with any other; (2) no Dispute between you and the DAO is to be arbitrated on a class-action basis or will utilize class action procedures; and (3) you may not bring any Dispute in a purported representative capacity on behalf of the general public, other Users of the Site or any other persons. If this specific provision is determined to be unenforceable, then the entirety of this Arbitration section will be null and void.

**Exceptions to Informal Negotiations and Arbitration.** You and the DAO agree that the following Disputes are not subject to the above provisions concerning informal negotiations and binding arbitration:

- (1) any Disputes seeking to enforce or protect, or concerning the validity of, any of your or the DAO's intellectual property rights; and
- (2) any claim for injunctive relief.

**Effect of Changes on Arbitration.** Notwithstanding the provisions of these Terms, if the DAO changes any of the terms of this Arbitration section after the date you first accepted these Terms (or accepted any subsequent changes to these Terms), you may reject any such change by sending us written notice (including by electronic mail to

PLAINTIFF0003092



written notice (including by electronic e-mail) to
the aforementioned Notice Address via e-mail)
within 30 days of the date such change became

effective, as indicated in the "Last Updated" date
above or in the date of the DAO's e-mail to you
notifying you of such change (whichever is
earlier). By rejecting any change, you are
agreeing that you will arbitrate any Dispute
between you and the DAO in accordance with the
terms of this Arbitration section as of the date
you first accepted these Terms (or accepted any
subsequent changes to these Terms.

**Small Claims Court.** Notwithstanding the foregoing,
you may bring an individual action in the small
claims court of your state or municipality if the
action is within that court's jurisdiction and is
pending only in that court.

**Release.** You hereby release the DAO, affiliates,
Service Provider, and their successors from
claims, demands, any and all losses, damages,
rights, and actions of any kind, including
personal injuries, death, and property damage,
that is either directly or indirectly related to
or arises from your use of the DAO DAPP, including
but not limited to, any use of any information,
ratings, rankings, scores, tips, or advice Made
Available via the DAO DAPP and any reliance
thereon, of any kind arising in connection with or
as a result of the Agreement or your use of the
DAO DAPP. If you are a California resident, you
hereby waive California Civil Code Section 1542,
which states, "A general release does not extend
to claims that the creditor or releasing party
does not know or suspect to exist in his or her
favor at the time of executing the release and
that, if known by him or her, would have
materially affected his or her settlement with the
debtor or released party." The foregoing release
does not apply to any claims, demands, or any
losses, damages, rights, and actions of any kind,
including personal injuries, death, or property
damage for any unconscionable commercial practice
by a DAO Party or for such party's fraud,
deception, falsehood, promise, misrepresentation,
or concealment, suppression, or omission of any
material fact in connection with the DAPP or the
DAO Site or any Services provided hereunder.

PLAINTIFF0003093

## 15. Governing Law.

These Terms and all aspects of your use of the Site shall be governed by and construed in accordance with the internal laws of the United States and the State of **[Entity-state]** governing contracts entered into and to be fully performed in **[Entity-state]** (i.e., without regard to conflict of law's provisions) regardless of your location except that the Arbitration section above shall be governed by the Federal Arbitration Act. For the purpose of any judicial proceeding to enforce an arbitration award or incidental to such arbitration or to compel arbitration, or if for any reason a claim proceeds in court rather than in arbitration, you hereby submit to the non-exclusive jurisdiction of the state and Federal courts sitting in **[Entity-city]**, **[Entity-state]**, and agree that service of process in such arbitration or court proceedings shall be satisfactorily made upon a party if sent by certified, express or registered mail addressed to it at the address set forth in the books and records of the DAO, or if no such address has been provided, by e-mail to the e-mail address, or by notice via Discord, or by the aforementioned chat to the Notice Address provided by the relevant party to the DAO in connection with its use of the Site. With respect to any Disputes not subject to informal dispute resolution or arbitration (as set forth above), you agree not to commence or prosecute any action in connection therewith other than in the state and Federal courts located in **[Entity-city]**, **[Entity-state]**, and you hereby consent to, and waive all defenses of lack of personal jurisdiction and forum non conveniens with respect to, venue and jurisdiction in the state and Federal courts located in **[Entity-city]**, **[Entity-state]**. To the extent non-U.S. laws mandate a different approach with respect to governing law, venue, statute of limitation, and dispute resolution method with respect to certain non-U.S. persons, each such required standard shall be applied, but all other provisions under this section shall remain in full force.

## 16. General.

PLAINTIFF0003094



If any clause or part of any clause of these Terms is found to be void, unenforceable or invalid,

then it will be severed from these Terms, leaving the remainder in full force and effect, provided that the severance has not altered the basic nature of these Terms.

No single or partial exercise, or failure or delay in exercising any right, power or remedy by us shall constitute a waiver by us of, or impair or preclude any further exercise of, that or any right, power or remedy arising under these terms and conditions or otherwise.

If any of the provisions in these Terms are found to be illegal, invalid or unenforceable by any court of competent jurisdiction, the remainder shall continue in full force and effect.

The DAO shall not be liable for any unforeseeable event beyond its reasonable control not caused by its fault or negligence (each, a "force majeure event"), which causes the DAO to be unable to perform its obligations under these Terms, and which it has been unable to overcome by the exercise of its due diligence, provided that the DAO shall use reasonable efforts to avoid or remove such causes of nonperformance, shall suspend performance only for such period of time as is necessary as a result of such force majeure event and shall resume performance as quickly as reasonably possible.

All disclaimers, indemnities and exclusions in these Terms shall survive termination of the Terms and shall continue to apply during any suspension or any period during which the Site is not available for you to use for any reason whatsoever.

These Terms and the documents referred to in them set out the entire agreement between you and us with respect to your use of the Site, the DAO and the services provided via the Site and supersede any and all prior or contemporaneous representations, communications or agreements (written or oral) made between you or us.

## 17. Contacting Us.

PLAINTIFF0003095



Should you have any question about these Terms, or
wish to contact us for any reason whatsoever,
please do so by sending a message to the DAO's
Discord public channels, or by sending an e-mail
message to the Notice Address **[Entity-email]**,
which has been provided for convenience, or to the
above referenced Service Provider.

| Previous | Next |
|---|---|
| README.md | Simple Terms of Service |

PLAINTIFF0003096

 **LEGAL-TOOLS** DAOLABS    Connect Wallet



# Variables

**Date of Last Review**

mm/dd/yyyy

**Your Entity's Name**

Acme DAO

**Update document**

Responsibility of
Contributors

Limitation of Liability

General Representation
and Warranty

Indemnification

Changes

---



ⓘ PLEASE READ THESE TERMS OF SERVICE
(HEREINAFTER TERMS) CAREF LLY BEFORE  SING THE
SERVICES DESCRIBED HEREIN.

[Entity name]
[Date]

The following Terms govern all use of the Services and
all content, services and products available at or
through the Website and the Application.

The Services are owned and operated by **[Entity-name]**.
The Services are offered subject to User's acceptance
without modification of all of the Terms contained
herein and all other operating rules, policies and
procedures.

**[Entity-name]** is operating under the OpenSource
Licenses. The software licenses find examples here.

**PLAINTIFF0003097**

# Responsibility of Contributors

Website and App are used as the interfaces to manage user Cryptocurrency accounts (hereinafter the "Content"). **[Entity-name]** does not host the Content. All Content is hosted in IPFS (The InterPlanetary File System) and blockchains and it allows Users to publish and retrieve the Content from public blockchains.

If a User posts Content through the Website or App, posts links on the Website or App, or otherwise make (or allow any third party to make) material available by means of the Website and App, User is entirely responsible for the Content of, and any harm resulting from, that Content. That is the case regardless of whether the Content in question constitutes text, graphics, an audio file, or computer software. By making Content available, User represents and warrants that:

1. The downloading, copying and use of the Content will not infringe the proprietary rights, including but not limited to the copyright, patent, trademark or trade secret rights, of any third party;
2. The user has fully complied with any third-party licenses relating to the Content, and have done all things necessary to successfully pass through to end users any required terms;
3. The content does not contain or install any viruses, worms, malware, Trojan horses or other harmful or destructive content;
4. The Content is not spam, is not machine- or randomly-generated, and does not contain unethical or unwanted commercial content designed to drive traffic to third party sites or boost the search engine rankings of third party sites, or to further unlawful acts (such as phishing) or mislead recipients as to the source of the material (such as spoofing);
5. The Content is not pornographic, libellous, or defamatory, does not contain threats or incite violence



PLAINTIFF0003098

towards individuals or entities, and
does not violate the privacy or
publicity rights of any third party.

# Limitation of Liability

In no event will **[Entity-name]** be liable with respect
to any subject matter of this Agreement under any
contract, negligence, strict liability or other legal
or equitable theory for:

1. any special, incidental or consequential
   damages;
2. any content published by third parties
   on Website or App,
3. the cost of procurement of substitute
   products or services;
4. or interruption of use or loss or
   corruption of data; or
5. for any amounts that exceed the fees
   paid by User to **[Entity-name]** under this
   Agreement during the twelve (12) month
   period prior to the cause of action.

**[Entity-name]** shall have no liability for any failure
or delay due to matters beyond their reasonable
control. The foregoing shall not apply to the extent
prohibited by applicable law.

# General Representation and Warranty

User represents and warrants that:

use of the Services will be in strict
accordance with the **[Entity-name]** Privacy
Policy, with this Agreement and with all
applicable laws and regulations (including
without limitation any local laws or
regulations in User's country, state, city,
or other governmental area, regarding online
conduct and acceptable content, and including
all applicable laws regarding the
transmission of technical data exported from
the country in which the User reside) and use
of the Services will not infringe or
misappropriate the intellectual property
rights of any third party.

# Indemnification

PLAINTIFF0003099



User agrees to indemnify and hold harmless **[Entity-name]**, its contractors, and its licensors, and their respective directors, officers, employees and agents from and against any and all claims and expenses, including attorneys' fees, arising out of use of the Services, including but not limited to violation of this Agreement.

## Changes

Continued use of the Website and App following the posting of such changes will constitute assent to all such changes. Please periodically visit this section to review the current version of these Terms.

- **[Entity-name]** reserves the right, at its sole discretion, to modify or replace any part of this Agreement.
- **[Entity-name]** reserves the right, at its sole discretion, to modify or replace any part of this Agreement. **[Entity-name]** will not make any change to this Agreement without a previous publicly announced and hearing the comments from the User and the community.
- **[Entity-name]** may also, in the future, offer new Services and/or features through the Website and App (including, the release of new tools and resources). Such new features and/or services shall be subject to the Terms of this Agreement.

Last review **[Date]**

I have read and accept the terms and conditions of service and **[Entity-name]** privacy policy.

| Previous | Next |
|---|---|
| Detailed Terms of Service | Acce table se Policy |

PLAINTIFF0003100



**LEGAL-TOOLS**   DAOLABS

Connect Wallet



# Variables

Date Last Updated

mm/dd/yyyy

Entity's Name

ACME CORPORATION

**Update document**

User Obligations.

Prohibited Activities.

Company Reservation of Rights.

Indemnification.

Trademark or Copyright Claims.

No Agency Relationship.

Enforceability.

Force Majeure.

Headings.

ⓘ Acceptable  se Policy generally contain narrower restrictions than the Terms of Service. The Acceptable  se Policy is a subset of the Terms of Service.

Acceptable Use Policy ("AUP")
[Date]

This Acceptable Use Policy (the "Agreement") sets forth the terms and conditions of Your Use of hosting and related services ("Services"). In this Agreement "You" and "Your" refer to You, as the user of Our Services, or any agent, employee, servant or person authorized to act on Your behalf. "We", "us" and "our" refer to **[Entity-name]** (the "Company"). This Agreement explains Our obligations to You, and explains Your obligations to Us for various services offered by the Company. When You Use Your account or permit someone else to Use it

**PLAINTIFF0003101**



to purchase or otherwise acquire access or additional Company service(s) or products or to cancel Your Company service(s) (even if We were not notified of

such authorization), this Agreement covers such service or actions. *The Company's Terms of Service agreement ("TOS") is incorporated herein by reference and is applicable to all Services under this Accepted Use Policy.*

## User Obligations.

You represent and warrant to the Company that: Your content does not and shall not contain any content, materials, data, work, trade or service mark, trade name, link, advertising or services that actually or potentially violate any applicable law or regulation or infringe or misappropriate any proprietary, intellectual property, contract or tort right of any person and that You own Your account content and all proprietary or intellectual property rights therein, or have express written authorization from the owner to copy, use and display the content on and within Your Treasury account. You also represent and warrant that the server content being hosted by the Company shall not be used in connection with any illegal activity.

You expressly (i) grant to the Company permission to cache the entirety of the content that is submitted, stored, distributed or disseminated by you via the Services and your website, including content supplied by third parties, hosted by the Company under this agreement; and (ii) agree that such caching is not an infringement on any of your intellectual property rights or any third party's intellectual property rights.

## Prohibited Activities.

By using any Services provided by the Company You agree:

1. not to violate the laws, regulations, ordinances or other such requirements of any applicable Federal, State or local government.
2. not to transmit any unsolicited commercial or bulk e-mail, not to be engaged in any activity known or considered to be spamming or Mail Bombing.
3. not to make any illegal communication to any Newsgroup, Mailing List, Chat Facility, or another

PLAINTIFF0003102

Internet Forum.



4. not to make, attempt or allow any unauthorized access to Company website, servers, your own

   hosting account or the account of any other users of the Company.

5. not to allow any remote code execution of malicious software through the hosting account provided by the Company.

6. not to cause denial of service attacks, port scans or other endangering and invasive procedures against Company servers and facilities or the servers and facilities of other network hosts or Internet users.

7. not to forge the signature or other identifying mark or code of any other person or engage in any activity to attempt to deceive other persons regarding the true identity of the User.

8. not to use Company services to host any website, other content, links or advertisements of websites that: infringe any copyright, trademark, patent, trade secret, or other proprietary rights of any third party information; contain nudity, pornography or other content deemed adult related; profess hatred for particular social, ethnical, religious or other group; contain viruses, Trojan horses, worms, time bombs, corrupted files, or any other similar software or programs that may damage the operation of a computer or a person's property; contain warez; contain any kind of proxy server or other traffic relaying programs; promote money making schemes, multi-level marketing or similar activities; contain lottery, gambling, casino; contain torrent trackers, torrent Portals or similar software; violent or encouraging violence.

9. not to upload unacceptable material which includes: IRC bots, warez, image, file storage, mirror, or banner-ad services, topsites, streaming, Escrow, High-Yield Interest Programs (HYIP) or related sites, investment sites (FOREX, E-Gold Exchange, etc), cryptocurrency miners, sale of any controlled substances without providing proof of appropriate permit(s) in advance, AutoSurf sites, Bank Debentures, Bank Debenture Trading Programs, Prime Banks Programs, lottery sites, muds / rpg's, hate sites, hacking focused sites/archives/programs, or sites promoting illegal activities, IP Scanners, Brute Force Programs, Mail Bombers and Spam Scripts.

PLAINTIFF0003103



10. not to engage in or to instigate actions that cause harm to the Company or other users. Such actions include, but are not limited to, actions resulting in blacklisting any of Our IPs by the any online spam database, actions resulting in DDOS attacks for any servers, etc. The Company reserves the right to refuse service to anyone upon Our discretion. Any material that in Company judgment, is either obscene or threatening is strictly prohibited and will be removed from the Company servers immediately with or without prior notice and may lead to possible warning, suspension or immediate account termination with no refund. You agree that We have the sole right to decide what constitutes a violation of the acceptable policy use described above as well as what is the appropriate severity of any corrective action to be applied. In the event that a violation of Our Acceptable Use Policy is found, the Company will take corrective action upon our own discretion and will notify You. The Company's decision in such case is binding and final, and cannot be a subject of a further change. The Company cannot and shall not be liable for any loss or damage arising from Our measures against actions causing harm to the Company or any other third party. We have the right to terminate each and any hosting account that has been suspended for any reason for more than 14 calendar days after the suspension date, unless You has taken corrective measures to remove the initial suspension threat or violation. Any backup copies of the hosting account will be permanently deleted upon termination and no refund will be due. The Company will not be liable for any loss or damages in such cases.

11. not to violate the Ryan Haight Online Pharmacy Consumer Protection Act of 2008 or similar legislation, or promote, encourage or engage in the sale or distribution of prescription medication without a valid prescription.

At its discretion, the Company reserves the right to investigate the use of its services for violations of its policies. This includes all hosting packages and services. The Company further reserves the right to remove any content we determine to be prohibited by this agreement or our Terms and Conditions. No backups will be kept of removed content.

PLAINTIFF0003104

## Company Reservation of Rights.

The Company explicitly reserves the right and sole discretion to: (i) modify its pricing, if desired by the Company; (ii) establish limits and guidelines concerning the use of Company services and/or products; (iii) terminate Your use of Company services and/or products for use of Company services and/or products to unnecessarily or illegally harass the Company or third parties, non-payment of fees for Company services and/or products, activities designed to defame, embarrass, harm, abuse, threaten, slander or harass third parties, activities prohibited by the laws of the United States and/or foreign territories in which You conduct business, activities designed to encourage unlawful behavior by others, such as hate crimes, terrorism and child pornography, activities that are tortuous, vulgar, obscene, invasive of the privacy of a third party, racially, ethnically, or otherwise objectionable in the sole opinion of the Company, activities designed to impersonate the identity of a third party, activities designed to harm minors in any way, and other activities whether lawful or unlawful that the Company determines, in its sole discretion, to be harmful to its other users, operations, or reputation; (iv) terminate Your use of Company services and/or products if Your use of Company services and/or products may results in, results in, or is the subject of, legal action or threatened or proposed legal action, against the Company or any of its affiliates or partners, without consideration for whether such legal action or threatened or proposed legal action is eventually determined to be with or without merit; and (v) terminate Your use of Company services and/or products at any time and for any reason if deemed reasonably necessary by the Company. The Company has no obligation to monitor Your use of Company services and/or products, but reserves the right in its sole discretion to do so.

## Indemnification.

Accordingly, You for Yourself and all of Your heirs, personal representatives, predecessors, successors and assigns, hereby fully release, remise, and forever discharge the Company and all affiliates of the Company, and all officers, agents, employees, and representatives of the Company, and all of their heirs,

PLAINTIFF0003105



personal representatives, predecessors, successors and
assigns, for, from and against any and all claims,

liens, demands, causes of action, controversies,
offsets, obligations, losses, damages and liabilities
of every kind and character whatsoever, including, but
not limited to, any action omission, misrepresentation
or other basis of liability founded either in tort or
contract and the duties arising thereunder, whether
known or unknown, relating to or arising out of, or in
any way connected with or resulting from, the Services
and Your acquisition and use thereof, including, but
not limited to, the provision of the Company products
and/or services by Company and its agents and
employees. Further, You agree to defend, indemnify and
hold harmless the Company and any of its contractors,
agents, employees, officers, directors, shareholders,
affiliates and assigns from any loss, liability,
damages or expense, including reasonable attorneys'
fees, arising out of (i) any breach of any
representation or warranty provided in this Agreement,
or as provided by the Company's AUP or any other
agreement that has been incorporated by reference
herein; (ii) the Services or your use of the Services,
including without limitation infringement or dilution
by You or by another using the Services from Your
computer; (iii) any intellectual property or other
proprietary right of any person or entity; (iv) any
information or data You supplied to the Company,
including, without limitation, any misrepresentation in
Your application, if applicable; (v) the inclusion of
metatags or other elements in any website created for
you or by you via the Services; (vi) any information,
material, or services available on your Company hosted
website; or (vii), any negligence or willful misconduct
by You, or any allegation that Your account infringes a
third person's copyright, trademark or proprietary or
intellectual property right, or misappropriates a third
person's trade secrets.

This indemnification is in addition to any
indemnification required of You elsewhere. Should the
Company be notified of a pending law suit, or receive
notice of the filing of a law suit, the Company may
seek a written confirmation from You concerning Your
obligation to defend, indemnify the Company. Such
written confirmation may include the posting of
performance bonds or other guarantees. Your failure to
provide such a confirmation may be considered a breach

PLAINTIFF0003106



of this agreement. You agree that the Company shall have the right to participate in the defense of any such claim through counsel of its own choosing. You agree to notify the Company of any such claim promptly in writing and to allow the Company to control the proceedings. You agree to cooperate fully with the Company during such proceedings. The terms of this section will survive any termination or cancellation of this Agreement.

## Trademark or Copyright Claims.

The Company is a service provider and respects the copyrights and other intellectual property rights of others and herein incorporates its Copyright Infringement Policy, if applicable. To the extent the Company receives a proper notice of infringement of copyright, trademark or other intellectual property, the Company reserves the right to access, preserve and disclose to third parties any of Your information or data (including personally identifiable information and private communications) related to a written complaint of infringement if the Company believes in its sole discretion that such access, preservation, or disclosure is necessary or useful to respond to or otherwise address such complaint.

## No Agency Relationship.

Nothing contained in this Agreement shall be construed as creating any agency, partnership, or other form of joint enterprise between the parties hereto. Each party shall ensure that the foregoing persons shall not represent to the contrary, either expressly, implicitly, by appearance or otherwise.

## Enforceability.

In the event that any provision of this Agreement shall be unenforceable or invalid under any applicable law or be so held by applicable court decision, such unenforceability or invalidity shall not render this Agreement unenforceable or invalid as a whole. We will amend or replace such provision with one that is valid and enforceable and which achieves, to the extent possible, our original objectives and intent as reflected in the original provision.

## Force Majeure.

PLAINTIFF0003107

Force Majeure.



Neither party shall be deemed in default hereunder, nor shall it hold the other party responsible for, any cessation, interruption or delay in the performance of its obligations hereunder due to causes beyond its control including, but not limited to: earthquake; flood; fire; storm; natural disaster; act of God; war; terrorism; armed conflict; labor strike; lockout; boycott; supplier failures, shortages, breaches, or delays; or any law, order regulation, direction, action or request of the government, including any federal, state and local governments having or claiming jurisdiction over the Company, or of any department, agency, commission, bureau, corporation or other instrumentality of any federal, state, or local government, or of any civil or military authority; or any other cause or circumstance, whether of a similar or dissimilar nature to the foregoing, beyond the reasonable control of the affected party, provided that the party relying upon this section (i) shall have given the other party written notice thereof promptly and, in any event, within 60 (sixty) days of discovery thereof and (ii) shall take all steps reasonably necessary under the circumstances to mitigate the effects of the force majeure event upon which such notice is based; provided further, that in the event a force majeure event described in this Section extends for a period in excess of ninety (90) days in the aggregate, the Company may immediately terminate this Agreement.

## Headings.

The section headings appearing in this Agreement are inserted only as a matter of convenience and in no way define, limit, construe or describe the scope or extent of such section or in any way affect such section.

| Previous | Next |
|---|---|
| Simple Terms of Service | Privacy Policy |

PLAINTIFF0003108



**LEGAL-TOOLS**   DAOLABS

Connect Wallet



# Variables

Date Last Updated

mm/dd/yyyy

Entity's Name

ACME CORPORATION

Update document

[Entity name]
Last Updated: [Date]

We want to process as little personal information as possible when you use our website. That's why we've chosen Fathom Analytics for our website analytics, which doesn't use cookies and complies with the GDPR, ePrivacy (including PECR), COPPA and CCPA. Using this privacy friendly website analytics software, your IP address is only briefly processed, and we (running this website) have no way of identifying you. As per the CCPA, your personal information is de identified. You can read more about this on Fathom Analytics' website.

The purpose of us using this software is to understand our website traffic in the most privacy friendly way possible so that we can continually improve our website and business. The lawful basis as per the GDPR is "where our legitimate interests are to improve our website and business continually." As per the explanation, no personal data is stored over time.

PLAINTIFF0003109

## Fathom Privacy Policy

**Previous**
Acceptable Use Policy

**Next**
Headcount-
Calculator.xlsx



PLAINTIFF0003110



**LEGAL—TOOLS**    DAOLABS

    Connect Wallet

          

This page contains various organizational calculator tools which have been used for small projects and billion-dollar valuation public companies alike; they have been made available for projects employing the Juicebox Protocol.

- The Headcount Calculator forecasts employee/contractor headcount and salary expenses as your entity grows.
- The Capitalization Forecast Calculator (commonly called a "cap table") can be used to forecast equity capitalization over time.

## Headcount Calculator

This calculator is primarily used to compute current and projcet future headcount burn rate; these calculations are often incorporated in a Series A presentation deck. This particular headcount calculator works well for planning and forecasting project or division resources either for product planning or for contractual headcount expenses.

Headcount Calculator

Capitalization Calculator

PLAINTIFF0003111





# Capitalization Calculator

Also referred to as the so-called "cap-table", this is the cornerstone to any startup and best friend to any founder with the intention to maintain control or have any semblance of fundraising/compesation forecasting. This spreadsheet accomplishes the exact activity and purpose as paid commercial software solutions such as LTSE Equity, (less some wizard modals and pretty layouts) with due effort to make the layout non-atrocious. This very spreadsheet has faciliated over $100m in pre-seed, seed, option, and Series A securities sales.



PLAINTIFF0003112





**Previous**
Headcount-
Calculator.xlsx

**Next**
Stock-Allocation-
Capitalization.xlsx

**PLAINTIFF0003113**



**LEGAL—TOOLS** DAOLABS

Connect Wallet



    

Headcount Calculator

Capitalization Calculator

This page contains various organizational calculator tools which have been used for small projects and billion-dollar valuation public companies alike; they have been made available for projects employing the Juicebox Protocol.

- The Headcount Calculator forecasts employee/contractor headcount and salary expenses as your entity grows.
- The Capitalization Forecast Calculator (commonly called a "cap table") can be used to forecast equity capitalization over time.

## Headcount Calculator

This calculator is primarily used to compute current and projcet future headcount burn rate; these calculations are often incorporated in a Series A presentation deck. This particular headcount calculator works well for planning and forecasting project or division resources either for product planning or for contractual headcount expenses.

PLAINTIFF0003114





# Capitalization Calculator

Also referred to as the so-called "cap-table", this is the cornerstone to any startup and best friend to any founder with the intention to maintain control or have any semblance of fundraising/compesation forecasting. This spreadsheet accomplishes the exact activity and purpose as paid commercial software solutions such as LTSE Equity, (less some wizard modals and pretty layouts) with due effort to make the layout non-atrocious. This very spreadsheet has faciliated over $100m in pre-seed, seed, option, and Series A securities sales.



PLAINTIFF0003115




Previous
Privacy Policy

Next
Calculators

PLAINTIFF0003116



LEGAL-TOOLS  DAOLABS

Connect Wallet



     

Headcount Calculator

Capitalization Calculator

This page contains various organizational calculator tools which have been used for small projects and billion-dollar valuation public companies alike; they have been made available for projects employing the Juicebox Protocol.

- The Headcount Calculator forecasts employee/contractor headcount and salary expenses as your entity grows.
- The Capitalization Forecast Calculator (commonly called a "cap table") can be used to forecast equity capitalization over time.

## Headcount Calculator

This calculator is primarily used to compute current and projcet future headcount burn rate; these calculations are often incorporated in a Series A presentation deck. This particular headcount calculator works well for planning and forecasting project or division resources either for product planning or for contractual headcount expenses.

PLAINTIFF0003117





# Capitalization Calculator

Also referred to as the so-called "cap-table", this is the cornerstone to any startup and best friend to any founder with the intention to maintain control or have any semblance of fundraising/compesation forecasting. This spreadsheet accomplishes the exact activity and purpose as paid commercial software solutions such as LTSE Equity, (less some wizard modals and pretty layouts) with due effort to make the layout non-atrocious. This very spreadsheet has faciliated over $100m in pre-seed, seed, option, and Series A securities sales.



PLAINTIFF0003118





**Previous**
Calculators

**Next**
Durable Power of Attorney for Asset Management

PLAINTIFF0003119



**LEGAL—TOOLS** DAOLABS

Connect Wallet



    

This directory contains general agreements which may be needed when operating an entity.

- <u>Durable Power of Attorney for Asset Management</u> allows an attorney to manage assets for an entity.
- The <u>Due Diligence Checklist</u> is a diligence checklist based on a PriceWaterHouse Coopers (PwC) procedure used to audiet companies on behalf of Fortune 500 companies prior to an acquisition or investment.

If you plan on seeking external financing through traditional routes, you may be required to provide a boatload of accounting and legal documents. While this is par-for-the-course with traditional finance systems, crypto accounting is still very nascent. The following document was procedure for PriceWaterHouse Coopers (PwC) to provide to companies they were auditing on behalf of fortune 500 companies prior to an acquisition or investment. While PWC has a number of questionable past fines from the SEC, some times has passed. In comparison to PWC's competitor Ernst & Young, who was recently fined <u>$100m for their employees cheating on CPA Ethics Exams and misleading the ensuing investigations.</u> PWC's violation of auditor independence and improper professional conduct resulting in a fine of <u>$7.9m</u> seems minor, yet still ridiculous.

| Previous | Next |
|---|---|
| Durable Power of Attorney for Asset Management | Checklist |

PLAINTIFF0003120



PLAINTIFF0003121

 **LEGAL—TOOLS** DAOLABS

**Connect Wallet**



# Variables

**Individual's Name**

Ms. Jane Doe

**Individual's County**

Kalamazoo

**Individual's State**

Michigan

**Attorney's Name**

Mr. John Doe

**Agreement Date**

01/01/2023

**Update document**

DURABLE POWER OF ATTORNEY
FOR ASSET MANAGEMENT



# DURABLE POWER OF ATTORNEY FOR ASSET MANAGEMENT

The principal, **[Individual-name]**, residing in [Individual-county] County, [Individual-state], hereby revokes all prior powers of attorney for asset management signed by the principal and designates the following person as attorney-in-fact for the principal: **[Attorney-name]**. If a named attorney-in-fact is unable or unwilling to so serve, the attorney-in-fact may choose a successor. A written declination/resignation by, or death certificate of,

PLAINTIFF0003122

declination/resignation by, or death certificate of,
the prior attorney-in-fact, or reasonable proof of the
revocation of a named attorney-in-fact as set forth in

Section 4 below, shall serve as conclusive evidence of
the succeeding attorney-in-fact's authority to act.

1. **Effective Immediately.** This power of attorney
   shall be effective immediately and shall continue
   until it is terminated under section 4 of this
   document. This document shall be a durable power
   of attorney. As such, this power of attorney
   shall not be affected by any uncertainty as to
   whether the principal is alive, and shall not be
   affected by any event or condition which would
   render the principal unable to manage his or her
   property or affairs, including but not limited to
   the following: incapacity, disability,
   confinement, detention, or disappearance.

2. **Powers.** The attorney-in-fact shall have all of
   the powers of an absolute owner over the assets
   and liabilities of the principal, whether real or
   personal and whether located within or without
   the state of Washington. This power of attorney
   shall be construed and interpreted as a general
   power of attorney granting to the attorney-in-
   fact the power to act in the principal's place
   and stead to the fullest extent permitted by law
   and shall include all powers granted to trustees
   by the Washington Trust Act of 1984 and any
   amendments thereto (which list is incorporated
   herein by this reference). The enumeration of
   specific items, rights, acts, or powers herein
   shall not limit or restrict, and is not to be
   construed or interpreted as limiting or
   restricting, the general powers herein granted
   the attorney-in-fact. The attorney-in-fact has
   the power and authority:

   2.1. **Real and Personal Property.** To
   purchase, receive, take possession of,
   lease, sell, convey, exchange, endorse,
   pledge, mortgage, release, hypothecate,
   encumber or otherwise dispose of property or
   any interest in property (including life
   insurance and annuity policies), whether
   real, personal, mixed, tangible or
   intangible;

   2.2. **Financial Accounts.** To exercise any and

PLAINTIFF0003123



**2.2. Financial Accounts.** To exercise any and every right and power which the principal may now or later have in respect to any and all savings, checking, brokerage or agency accounts (including but not limited to custodial accounts) maintained or owned by or on behalf of the principal with institutions (including, without limitation, banks, savings and loan companies, escrow agents, trustees, and securities dealers). This power shall include the authority to maintain and close existing accounts, to open, maintain and close other accounts, and to borrow on, or to make deposits, transfers, exchanges, and withdrawals with respect to all such accounts, and shall include without limitation all savings, checking, or agency accounts;

**2.3. Safety Deposit Boxes.** To enter all safe deposit boxes and envelopes or other safekeeping accounts, including, without limitation, the power and authority to enter and remove items from any safe deposit box to which the principal has a right of access, to open any such accounts for the principal in the principal's name, and to give instructions in respect of and make deposits in and make withdrawals from any and all such accounts whether or not the same have been opened by the attorney-in-fact;

**2.4. Claims.** To pay, settle, compromise or otherwise discharge any and all claims of liability or indebtedness against the principal;

**2.5. Money Due.** To demand, sue for, collect and receive all debts, accounts, inheritances, dividends, annuities, interests in real and personal property, and rights to the possession or use of such property;

**2.6. Legal Proceedings.** To participate in any legal action in the name of the principal, on behalf of the principal, or otherwise involving the principal. This shall include: (a) actions for attachment

PLAINTIFF0003124

shall include: (a) actions for accounting,
execution, eviction, foreclosure, indemnity,
and any proceedings for equitable or

injunctive relief; and (b) legal proceedings
in connection with the authority granted in
this document, including without limitation
proceedings under RCW 11.94;



2.7. **U.S. Bonds**. To purchase and sell United
States treasury bonds which may be redeemed
at par in payment of federal estate tax;

2.8. **Transact Business**. To make, do and
transact all and every kind of business of
every kind and description, including
without limitation: to act as the
principal's attorney or proxy in respect to
any stock, shares, bonds, or other
securities or investments, rights, or
interest the principal may now or hereafter
hold; and to form, dissolve and otherwise
deal with any type of business entity,
including without limitation, a limited
partnership or a limited liability company;

2.9. **Federal and State Taxes**. To represent
the principal in all tax matters; to
prepare, sign, and file federal, state, and
local income, gift and other tax returns of
all kinds, including, where appropriate,
joint returns, FICA returns, payroll tax
returns, claims for refunds, requests for
extensions of time to file returns and/or
pay taxes, extensions and waivers of
applicable periods of limitation, protests
and petitions to administrative agencies or
courts, including the tax court, regarding
tax matters, and any and all other tax-
related documents, including but not limited
to consents and agreements under Section
2032A of the Internal Revenue Code of 1986,
as amended, and consents to split gifts,
closing agreements, and any power of
attorney form required by the Internal
Revenue Service and any state and local
taxing authority with respect to any open
tax year, and to allocate any generation-
skipping tax exemption to which the
principal is entitled;

PLAINTIFF0003125



**2.10. Advisers.** To engage, compensate and discharge attorneys, accountants and other

tax and financial advisers and consultants to represent and assist the principal and the attorney-in-fact in connection with any and all matters involving or in any way related to the principal or any property in which the principal has or may have an interest or responsibility;

**2.11. Act for Fiduciary.** To the extent permitted by law, in any case in which the principal may now or hereafter be a fiduciary, to exercise for the principal, and in the principal's name, place, and stead, any or all of the powers and authorities granted thereby;

**2.12. Qualifying for Assistance.** To make transfers of the principal's property, including but not limited to transfers to and gifts to the principal's descendants and their spouses, for the purpose of qualifying the principal for governmental medical assistance or the limited casualty program for the medically needy to the full extent provided by the law should there be a need for medical care; any transfers made pursuant to this paragraph shall not be deemed to be a breach of fiduciary duty by the attorney-in-fact. This power shall include the right to revoke any community property agreement when the terms of such an agreement would result in disqualification of the principal for medical assistance or any limited casualty program for the medically needy. This power shall only apply in the event the principal requires, or is reasonably expected to require, the type of services and benefits available under such programs. This paragraph shall not be construed to prohibit transfers which would cause there to be a waiting period or disqualification, if in the attorney-in-fact's judgment, incurring the waiting period or disqualification is in the long run best interest of the principal and the principal's estate. The provisions of the

PLAINTIFF0003126

preceding paragraph regarding powers to cause distributions from a trust for gifting purposes are hereby incorporated in this

paragraph respecting the types of transfers and gifts contemplated by this paragraph;

2.13. **Contracts.** To provide for, and enter into contracts for, the support, maintenance, health emergencies, and urgent necessities of the disabled or incapacitated principal;

2.14. **Disclaimers.** To make and file disclaimers under federal or state law, notwithstanding Section 3 of this document;

2.15. **Agreements; Beneficiary Designations.** To make, amend, alter or revoke any community property agreement, agreement as to status of property, or other document of similar import entered into by the principal, and to make, amend, alter or revoke any of the principal's (i) life insurance beneficiary designations, (ii) annuity beneficiary designations, (iii) employee benefit plan beneficiary designations, (iv) trust agreements, (v) registration of the principal's securities in beneficiary form, (vi) payable on death or transfer on death designations; (vii) designation of persons as joint tenants with right of survivorship with the principal with respect to any of the principal's property, (viii) 529 and similar plans, and (ix) provisions for non-probate transfer at death contained in any other non-testamentary instruments described in RCW 11.02.091. The foregoing changes may be made in favor of the attorney-in-fact and other persons or entities to the same extent that gifting is permitted under this instrument;

2.16. **Retirement Plans.** To roll over any qualified plan assets into an inherited individual retirement account ("IRA") for the benefit of the principal, to establish other IRA accounts for the principal, including Roth IRA's, to consolidate or merge IRA accounts, to change the beneficiaries of any such IRA, to make

PLAINTIFF0003127



beneficiaries of any such IRA, to make elections regarding the form and timing of payments from any IRA, and to take any other

actions regarding IRA's and any other retirement plans, in which the principal has an interest;

2.17. **Revocable Trusts**. To fund any of the principal's revocable (living) trusts which have been established by the principal by executing any and all documents, including without limitation, change of beneficiary designations and ownership forms on any and all IRAs, annuities, retirement plans, profit sharing plans, life insurance policies, joint tenancy and other accounts; stock powers, assignments, bills of sale, deeds, endorsements and the like; as may be required to carry out the principal's purposes as set forth in such revocable trust(s). Notwithstanding the foregoing, this paragraph shall only apply with respect to a trust if the principal then has the power (whether or not the principal can effectively exercise it because of disability or otherwise) to amend, modify or revoke such trust with respect to property attributable to the principal;

2.18. **Transfers to Trust**. The attorney-in-fact shall have the authority to transfer assets of all kinds to the trustee of any trust which:

    a. is for sole benefit of the principal with respect to the principal's separate property, and

    b. which terminates at the principal's death as to the principal's property with the principal's property distributable to the personal representative of the principal's estate for distribution as part of the principal's estate or to one or more of the principal's surviving descendants or to a trust or trusts for such descendants, or to any charity or charities then

PLAINTIFF0003128



any charity or charities then
described in Sections 170(c),
2055(a), and 2522(a) of the Code.

2.19. **Powers of Appointment.** To
exercise any general or limited
power of appointment granted to
the principal under any Will,
trust or other instrument. The
exercise of a testamentary power
of appointment shall not be deemed
a testamentary disposition.

3. **Limitations on Powers.** The powers of the
attorney-in-fact under this document are subject
to the following limitations:

3.1. **No Limitations on Gifting.** With respect
to the gifting powers of the attorney-in-
fact set forth in the various subsections of
Section 2, the attorney-in-fact shall have
unlimited gifting powers so long as in the
reasonable discretion of the attorney-in-
fact such action would be in the best
interests of the principal.

3.2. **No Changes to Will or Codicils.** The
attorney-in-fact shall not have the power to
make, alter amend or revoke (each such
action being referred to as a "change") any
Will or codicil previously signed by the
principal, unless such change to a Will or
codicil is made with the approval of a court
of competent jurisdiction. For purposes of
this subsection 3.2, the exercise of any
power set forth in Section 2 above shall not
be deemed a change in the principal's Will
or codicil.

3.3. **Fiduciary Limitations.** All actions of
the attorney-in-fact under this document are
subject to the attorney-in-fact's fiduciary
duty to the principal, and all such actions
shall be made in good faith and for the
principal's benefit.

3.4. **No General Power of Appointment.**
Notwithstanding any provision of this power
of attorney or of applicable law seemingly
to the contrary, any right or power
exercisable by the attorney-in-fact, which

PLAINTIFF0003129

would otherwise constitute a general power
of appointment in the attorney-in-fact under
Sections 2041 or 2514 of the U.S. Internal
Revenue Code, may only be exercised by the
attorney-in-fact in his or her favor for the
purpose of providing for the attorney-in-
fact's health, education, support or
maintenance as described in Section 2041 or
2514 of the U.S. Internal Revenue Code and
the applicable regulations adopted by those
sections.



4. **Suspension and Termination of Effectiveness.** In
   addition, the effectiveness of this power of
   attorney shall be terminated upon the destruction
   of the original by the principal, or amended,
   terminated or suspended when the attorney-in-fact
   receives any of the following:

   4.1. A copy of a written instrument
   amending, revoking or suspending the durable
   power of attorney, signed by: (a) the
   principal; or (b) the duly appointed
   guardian of the estate of the principal, but
   only after court approval of such revocation
   or suspension; or

   4.2. Actual knowledge or receipt of written
   notice of the death of the principal; or

   4.3. A copy of a subsequently signed power
   of attorney revoking all powers of attorney
   previously signed by the principal.

   In addition, if this power of attorney has
   been recorded, the written instrument of
   revocation shall be recorded in the office
   of the recorder or auditor of any county in
   which the power of attorney was recorded.

5. **Accounting.** Upon request of the principal, or the
   guardian of the estate of the principal, or the
   personal representative of the principal's
   estate, the attorney-in-fact shall account for
   all actions taken by the attorney-in-fact for or
   on behalf of the principal. The attorney-in-fact
   shall keep a reasonable record of all actions
   taken on the principal's behalf. Records shall
   include check statements, cancelled checks, check
   registers, mutual or stock fund statements, and

PLAINTIFF0003130

similar items, and shall be kept until at least one year after the death of the principal.

6. **Guardian.** If it becomes necessary to appoint a guardian of the principal's person or estate, the principal hereby nominates the attorneys-in-fact named above in order of preference and succession to serve in that capacity.

7. **Reliance.** The attorney-in-fact and all persons dealing with the attorney-in-fact shall be entitled to rely upon this power of attorney for so long as neither the attorney-in-fact nor any person with whom the attorney-in-fact deals at the time of any act taken pursuant to this power of attorney has received actual knowledge or actual notice of any revocation, suspension or termination of the power of attorney by death or other legal instrument. This power of attorney shall not be rendered ineffective by the passage of time alone, and the passage of time from the date of execution shall not, alone, be reason for a person dealing with the attorney-in-fact to refuse to rely on this document. Any action so taken shall be binding on the heirs, devisees, legatees and personal representative of the principal.

8. **Indemnity.** The principal, any guardian for the principal, and the estate of the principal (as well as the principal's heirs, successors and assigns) shall hold harmless and indemnify the attorney-in-fact from all liability for acts done in good faith and not in fraud of the principal, provided, however, this indemnity shall not extend to acts or omissions constituting gross negligence or intentional wrongdoing. Subject to the forgoing limitations, this indemnity shall also extend to any loss suffered or liability incurred because the attorney-in-fact acted in accordance with this document prior to the attorney-in-fact's receipt of written notice of any such termination or amendment hereof.

9. **Compensation.** The attorney-in-fact shall be reimbursed for all costs and expenses reasonably incurred and shall receive at least annually, without court approval, such reasonable compensation for services performed as attorney-

PLAINTIFF0003131

compensation for services performed as attorney in-fact as is reasonable in the community for

like services performed as attorney-in-fact and/or as guardian of the principal's estate.



10. **Photocopies.** The attorney-in-fact is authorized to make photocopies of this document as frequently and in such quantity as the attorney-in-fact deems appropriate. The principal directs that a photocopy be given the same force and effect as the original.

11. **Statutory References.** All references made to the Internal Revenue Code or the "IRC" shall mean the Internal Revenue Code of 1986, as amended, or any corresponding provisions of succeeding law. All references made to the statutes, legislative acts of any jurisdiction, or any regulations include any applicable successor legislation or regulations.

12. **Severability.** If any part of any section of this document shall be invalid or unenforceable under applicable law, such part shall be ineffective only to the extent of such invalidity without in any way affecting the remaining parts of such section or the remaining provisions of this document.

13. **Applicable Law.** The laws of the state of Washington, and specifically RCW Chapter 11.94, as amended from time to time, shall govern this durable power of attorney. The principal intends for this durable power of attorney to be honored in any jurisdiction where it may be presented, and for any such jurisdiction to refer to Washington law to interpret and determine the validity of this document and any of the powers granted under this document.

[Signature page to follow]

| PRINCIPAL |
| --- |
| Signature: |
| Print Name: [Individual-name] |
| Role: Principal |

PLAINTIFF0003132

Dated: [Date]

| | |
|---|---|
| STATE OF WASHINGTON | ) |
| | ) ss. |
| COUNTY OF King | ) |

I certify that I know or have satisfactory evidence that **[Individual-name]** signed this document and acknowledged it to be the principal's free and voluntary act for the uses and purposes mentioned in the document.

DATED: [Date]

| Notary Seal |
|---|
| By: _____ |
| Printed Name: _____ |
| Notary Public in and for the State of Washington |
| Residing at: |
| My comission expires: _____ |



| Previous | Next |
|---|---|
| Stock-Allocation-Capitalization.xlsx | Miscellaneous |

PLAINTIFF0003133



**LEGAL-TOOLS**  DAOLABS

Connect Wallet



     

I. BASIC CORPORATE INFORMATION

II. FINANCIAL INFORMATION

General Financial Information

Cash, Marketable Securities, and Investments

Accounts Receivable

Other Current Assets

Property, Plant & Equipment

Other Assets

Liabilities

III. CONTINGENT LIABILITIES

IV. FINANCIAL FORECASTS

V. HUMAN RESOURCES

(i) It is unknown if the practice is still in effect, b t  ormally for a $50m Series A   e  ilige ce a team of 4 acco  ta ts wo l  visit the target com a y a   over see the collectio of the followi g i formatio . At the   e  ilige ce co cl sio , the team members wo l  rovi e their ma ager a  , s bseq e tly their clie t with a  i ta gible  co fi e ce score  o how  re are , orga ize  tra s are t a com ete t the team res o  i g. It is a goo  habit to be aware of what i vestors, c stomers,  art ers are i tereste  i  a   make best efforts to co  ct yo r fi a ces, acco  ti g, a   cor orate affairs as if a  e  ilige ce team is always aro   the cor er.

(i) Obviously this precludes and forecloses any remote activities which may be construed as  financial shenanigans .

The items set forth in this checklist are requested with respect to Company. and its subsidiaries (collectively referred to herein as the "Company"). Please provide copies of the indicated documents or the information requested as appropriate.

Finance / accounting procedures will focus on the Company's financial statements for the years ended December 31, 2019 ("FY19") and December 31, 2020 ("FY20") and the most recent interim period through March 31, 2021 ("YTD 21"). Please provide the requests for each of the periods listed above, unless

PLAINTIFF0003134

otherwise requested. Where possible, please provide schedules in Excel format.

As we continue our due diligence procedures, additional documents or information may be requested. To the extent possible, we would like to utilize your existing reports. If you have information that may be similar to the requested items, please discuss the applicable items with us before doing additional work.



> ⓘ If yo   rese t to c stomers or  art ers with any regularity, your entity history, including legal structure, subsidiaries often double as company backgrounds on some websites. Considering finding reasonable ongoing activities to support the efforts below.

# I. BASIC CORPORATE INFORMATION

1. Brief outline of the history of the Company including major events, restructurings, acquisitions, mergers or divestitures, and their financial/tax/accounting treatment.
2. Legal structure along with a list of all subsidiaries
3. Listing of all joint ventures, partnerships, and/or equity or debt relationships with other companies.
4. Current capitalization table

# II. FINANCIAL INFORMATION

## General Financial Information

1. Copies of most recent audited financial statements.
2. Quarterly internal financial reporting packages (include income statement, balance sheet, cash flow statement and key performance metrics) for FY19, FY20 and YTD 21. Measurements should reflect year to year performance, performance to plan and full year plan. Include any variance analysis explanation and all other supporting financial information.

PLAINTIFF0003135



3. Monthly consolidated account level trial balance details for FY19, FY20 and YTD 21.

4. Monthly revenue by type from January 2019 through June 2021

5. Monthly revenue by geography from January 2019 through March 2021.

6. Gross to net sales bridge for FY19, FY20 and YTD 21.

7. Listing of non-recurring or unusual revenue and/or expenses during FY19, FY20 and YTD 21.

8. Breakdown of each of the operating expense categories (including cost of sales, selling and administration, restructuring and asset impairment, as applicable).

9. Description of key accounting policies, any changes to such during FY19, FY20 and YTD 21, and any anticipated changes reflected in the forecast. Particular emphasis on revenue/cost recognition, software development capitalization (if applicable).

10. Summary of sales by customer for FY19, FY20 and YTD 21.

11. A summary of the standard contract terms, fee structure, and the underlying revenue recognition policy for each major product or service category.

12. Provide copies of all customer contracts.

13. All significant communications between the Company and the Company's independent accountants,including letters regarding certain representations requested by independent accountants in connection with their audits and content relating to the Company and internal control letters with written responses from management.

14. Overview of the Company's financial reporting process and structure, including the nature and extent of year-end closing adjustments versus interim financial statements.

15. Summary of all barter transactions in effect at any point since inception and the related accounting treatment.

16. Summary of related party transactions and inter-company transaction activity.

## Cash, Marketable Securities, and Investments

17. Schedule of cash. marketable securities and

PLAINTIFF0003136

investments as of March 31, 2021. Documentation supporting current market value.

18. Copies of the most recent bank reconciliations.

## Accounts Receivable

19. Schedule of accounts receivable aging and allowances for returns and doubtful accounts by customer as of December 31, 2019 and 2020 and March 31, 2021.
20. Summary of write-off, return, and rebill experience during FY19, FY20 and YTD 08.
21. Listing and description of indebtedness of employees to/from the company and any other receivable balances.

## Other Current Assets

22. Schedule breaking out components of other current assets at December 31, 2019 and 2020 and March 31, 2021.
23. Summary of all royalty and licensing agreements and the key terms thereof, including minimum payment obligations and duration. Copies of all royalty and licensing agreements.

## Property, Plant & Equipment

24. Schedule of property, plant and equipment by category including gross asset value, accumulated depreciation, range of depreciable lives, depreciation methods and market value/replacement cost estimates (if available) as of March 31, 2020.
25. Description, location, character and business purpose of all real property owned or leased.
26. List of all material leases, including descriptions, terms of leases, options, annual costs, etc.
27. Summary of all outstanding capital purchase commitments.
28. A copy of the Company's capital budget for FY21 including a breakout between repair/upgrade and expansion activities.

## Other Assets

29. Schedule detailing the components of other

PLAINTIFF0003137



29. Schedule of aging - no component of assets

30. Summary of capitalized software development costs (if any), the Company's policy of capitalization and amortization of those and other assets, and the anticipated net realizable value of products for which costs have been capitalized.

## Liabilities

31. Schedule of current liabilities by category.
32. Copies of the Company's bonus, incentive, sales commission, and employee benefit plans, and summaries thereof.
33. Summary of the remaining obligations surrounding and anticipated timing of recognition of customer advances and deferred revenue amounts (if any).
34. A schedule of the top ten suppliers (ranked by total annual purchases) detailing the amounts due to them, what they supply, volume supplied and the type of relationship that is maintained.
35. Summary of and access to all severance and employee termination agreements.
36. Bank line of credit agreements including any amendments, renewal letters, notices, waivers, correspondences, etc.
37. Schedule of long term debt, including interest rates, repayment terms, and conversion privileges.
38. List of any off balance sheet liabilities not appearing in most recent financial statements (including the notes thereto).
39. Any other actual or contingent indebtedness (e.g., loan guarantees, letters of credit, banker's acceptances, swaps) not reflected in most recent financial statements and all agreements and material correspondence relating thereto.

# III. CONTINGENT LIABILITIES

1. Summary of any contingent liabilities or commitments.
2. List of all pending or threatened litigation, arbitration, administrative or other proceedings

PLAINTIFF0003138



involving the Company, any subsidiary, or any
officer or director (including parties, remedies
sought and nature of action).

3. Letters from lawyers to auditors during FY19,
FY20 and YTD 21 concerning litigation and other
legal proceedings.

## IV. FINANCIAL FORECASTS

1. Current Business Plan including five year
financial projections (income statement, balance
sheet and cash flow) and a discussion of
strategy and assumptions representing
management's best assessment of the current
outlook.
2. A description of all product/service offerings
included in the financial forecast but not
currently being offered.
3. Any business plans and financial projections
(including supporting information) prepared
within the last two years including but not
limited to annual budgets, long term plans,
marketing plans and competitive analysis.

## V. HUMAN RESOURCES

1. Detailed organization chart with names and
titles.

2. Monthly headcount analysis by department for
FY19, FY20 and YTD 21.

3. List and description of senior management and
any outside directors, including length of
service, business affiliations, and compensation
(salary, bonus, profit sharing, stock, fringes,
etc.).

| Previous | Next |
|---|---|
| Miscellaneous | Research |

PLAINTIFF0003139

 **LEGAL-TOOLS** DAOLABS

**Connect Wallet**



     

This page contains various DAO related research.

- A regulatory classification of digital assets: toward an operational howey test for cryptocurrencies, ICOs, and other digital assets
- Decentralised Autonomous Organisations: Governance, Dispute Resolution and Regulation
- A Legal Framework for Decentralized Autonomous Organizations, part 1
- A Legal Framework for Decentralized Autonomous Organizations, part 2
- Legal Wrappers and DAOs
- PWC Annual Global Crypto Tax Report 2021
- Chase Unincorporated Business Checklist to Opening Bank Account

Previous
Checklist

Next
Our Policies

**PLAINTIFF0003140**



PLAINTIFF0003141



**LEGAL-TOOLS**  DAOLABS

**Connect Wallet**





This section contains our disclaimers, terms, policies, and conditions. Read these carefully before using this website.

- The following Decentralized Applications, websites, and entities are affiliated with DAOLABS.
- You agree to our General Terms of Service when you access our services. They dictate the conditions and ways in which you can use our resources.
- The Application Terms of Service are written with regards to DAO applications.
- The Disclaimers are presented within the juicebox.wtf Terms of Service and have been consolidated for your convenience.
- Our Privacy Policy: we don't collect any information.

| Previous | Next |
|---|---|
| Research | Entities |

**PLAINTIFF0003142**



PLAINTIFF0003143



**LEGAL-TOOLS** DAOLABS

Connect Wallet



    

DAOLABS is a collaboration and collection of entities, Web3 applications, websites, projects and DAOs, in the absence of explicit terms of services on the applications affiliated with DAOLABS, the following policies apply.

The following entities are affiliated with DAOLABS:

- DAOLABS
- Treasury Application — juicebox.wtf
- Minting Application

**Previous**
Our Policies

**Next**
Terms of Service

PLAINTIFF0003144



PLAINTIFF0003145



**LEGAL-TOOLS**   DAOLABS

<div style="button">Connect Wallet</div>



    

*Effective Date: September 1, 2022 Last pdated: August 27th, 2022*
_0x3fa802d55c2eaebe6333e217323e7f07a2ca92b4@ethereum.email_ _ daolabs.wtf_

> ⓘ This website is available to
> i ivi als or  rojects which  se the
> J icebox  rotocol. This Terms of Service
> is s ecifically regar i g the  se of the
> this website.

The following governs your use of all the web pages hosted by DAOLABS, LLC, a Washington Limited Liability Company, and any affiliates or partners owned or managed by DAOLABS, LLC (collectively referred to as **"DAOLABS"**, "Legal Resources", "we" or the "Site"). By accessing or using the Site, you expressly agree and consent to the following terms and conditions. If you do not accept the following terms and conditions, then do not use this Site.

# 1. WHO DOES THIS APPLY TO?

This Agreement is applicable to any User who enters the Site. The definition of a "User" is an end-user who either creates a registration on our Site in order to create a form, downloads or prints any information, content, materials or documents (referred to throughout as "Site Content"), whether published by DAOLABS or created by the User or makes use of any of the

1. WHO DOES THIS APPLY TO?

2. WHAT IS YOUR OBLIGATION AS A  SER?

3. PENALTIES FOR IMPROPER SE.

4. LICENSE OF SITE CONTENT.

5. WHEN YOU WANT TO  PLOAD POST OR DISTRIB TE FORMS AND DOC MENTS.

6. DAOLABS DOES NOT PROVIDE LEGAL ADVICE.

7. PAYMENT.

8. REFUND AND EXCHANGE POLICY.

9. THIRD PARTIES LINKS, PROD CTS, AND INTEGRATIONS.

10. REPRESENTATIONS AND WARRANTIES.

11. LIABILITY DISCLAIMER.

12. PROPRIETARY RIGHTS.

13. FITNESS FOR USE.

14. BINDING ARBITRATION.

15. MONTHLY SUBSCRIPTIONS (with FREE TRIAL).

16. PRICING CHANGES.

17. GENERAL TERMS.

PLAINTIFF0003146



created by the user or makes use of any of the Site's services. A User also includes anyone who uses any of our products or tools without

registering on our Site. These Terms of Use apply to all Site Content and services made available through the Site at any time, including those not available as of the "Effective Date" above.

# 2. WHAT IS YOUR OBLIGATION AS A USER?

You represent that you are at least 18 years of age and are not prohibited from receiving services under the laws of the applicable jurisdiction. You agree to provide accurate and complete information on the Site's registration form. You acknowledge that DAOLABS owns your account and that you have no ownership rights to your account. You agree to abide by the following rules:

- You agree not to disseminate your user name or password and that you are responsible for maintaining the confidentiality of your user name and password to protect your personal information. Whether you authorize it or not, you are responsible for any and all uses of your registration.
- You agree to notify DAOLABS immediately of any unauthorized use of your registration and password.
- You agree not to present DAOLABS Site Content (or permit Site Content to be presented) in such a way that it appears to be available from a third-party Web site.
- You agree to not delete or revise any material posted by others.
- You agree to not breach or attempt to breach the security measures incorporated in the Site or access data not intended for your use.
- You agree to not log into a server or account which you are not authorized to use.
- You agree that you will not use the Site to advertise or offer to sell or buy any goods or services.
- You agree to not use the Site for any unlawful purpose or in any manner that would

PLAINTIFF0003147

violate international, federal, or local
laws or regulations.



- You agree not to interfere with the service
  to any User, host, or network.
- You agree not to modify, reverse engineer,
  decompile, translate or disassemble any
  portion of the Site. · You agree not to
  forge any TCP/IP packet header or any part
  of the header information in any e-mail or
  posting.
- You agree to access the Site only through
  the interfaces provided by the Site using a
  web browser.- - You agree to not use the
  software, devices, script robots, other
  means or processes to access, "scrape,"
  "crawl," or "spider" any web pages or other
  services contained in or on the Site. · You
  agree to not use or copy information,
  content or any data you view on and/or
  obtain from the Site to provide any service
  that is competitive with the Site.
- You agree to report inappropriate postings
  or conduct to DAOLABS.
- You agree to not

  - (i) copy, print (except for the
    express limited purpose
    permitted), republish, display,
    distribute, transmit, sell, rent,
    lease, loan or otherwise make
    available in any form or by any
    means all or any portion of the
    Site or any Site Content retrieved
    therefrom without DAOLABS' express
    written permission;
  - (ii) use the Site or any materials
    obtained from the Site to develop
    or as a component of, any
    information, storage and retrieval
    system, database, information
    base, or similar resource (in any
    media now existing or hereafter
    developed), that is offered for
    commercial distribution of any
    kind, including through sale,
    license, lease, rental,
    subscription, or any other
    commercial distribution mechanism.

PLAINTIFF0003148

To the extent you use or obtain a
contract, application, agreement,
or other Site Content from
DAOLABS, its licensors, or the
Site, all such information is
intended by DAOLABS for personal
use by individual consumers only.



# 3. PENALTIES FOR IMPROPER USE.

Your violation of any of these Rules may result
in civil or criminal liability. DAOLABS will
investigate occurrences relating to such
violations and may involve and cooperate with law
enforcement authorities in prosecuting Users
involved in such violations. If DAOLABS
determines you misled DAOLABS or violated these
rules or the Terms of Use, we reserve the right
to terminate this Agreement and your use of the
Site. DAOLABS is under no obligation to monitor
the conduct of its Users, but it may investigate
and respond when violations are reported. It is
your responsibility to ensure that your use of
the Site complies with these Terms of Use and all
applicable laws.

# 4. LICENSE OF SITE CONTENT.

DAOLABS grants you a non-exclusive, non-
transferable, revocable license to:

- access and use the Site strictly in
  accordance with this Agreement;
- use the Site solely for personal, non-
  commercial uses;
- share your content with friends, relatives
  and trusted advisors for the purpose of
  assisting you with your personal
- print information from the Site solely for
  personal, non-commercial purposes
  maintaining all copyright and other policies
  contained therein.

# 5. WHEN YOU WANT TO UPLOAD/POST OR DISTRIBUTE FORMS AND DOCUMENTS.

PLAINTIFF0003149

Your submission of information to the Site,
including the uploading of Documents is also

governed by DAOLABS' Privacy Policy, the terms of
which are fully incorporated by reference herein.
You agree that you are solely responsible for the
content of any Document you post to the Site and
any consequences arising from such posting. In
order to maintain Site integrity and a positive
Site experience for all, the following rules
apply:



Your Documents may not contain:

- (i) confidential or private information
  belonging to others;
- (ii) material that infringes on intellectual
  property rights, or violates the privacy or
  publicity rights of others;
- (iii) anything sexually explicit, obscene,
  libelous, defamatory, threatening,
  harassing, abusive, or hateful;
- (iv) anything offensive to another person or
  entity;
- (v) anything that may give rise to criminal
  or civil liability,
- (vi) anything providing instructional
  information about illegal activities;
- (vii) any computer code, file, or program
  that is harmful or invasive or may damage or
  hijack the operation of, or to monitor the
  use of, any hardware, software or equipment;
  or
- (viii) any unauthorized advertising,
  promotional material, "junk mail," "spam,"
  "chain letter," "pyramid scheme" or
  investment opportunity, or any other form of
  solicitation.

You may not use your Documents to:

- (i) impersonate another person, living or
  dead;
- (ii) post false, inaccurate or misleading
  information;
- (iii) post advertisements;
- (iv) post chain letters or pyramid schemes;
- (v) post opinions or notices, commercial or
  otherwise; or
- (vi) restrict the ability of any other

PLAINTIFF0003150



- (vi) restrict the ability of any other
  person to use the Site.

If you have an idea or information that you want
to remain confidential or do not want others to
use, or that is subject to third party rights
that may be infringed by your sharing it, do not
post it to any portion of the DAOLABS' Site or to
any other site through DAOLABS.

**DAOLABS IS NOT RESPONSIBLE FOR A USER'S MISUSE OR
MISAPPROPRIATION OF ANY CONTENT OR INFORMATION
POSTED ON OR THROUGH OUR SITE.**

DAOLABS has no obligation to review Documents
posted on the Site, but it may do so in its sole
discretion. Documents found to violate these
Terms of Use may be removed at DAOLABS' sole
discretion and may result in DAOLABS terminating
your use of the Site or our services.

**Special Terms Related To Profiles and Documents:**
As part of the services offered on our Site,
DAOLABS permits the creation of an electronic
profile for individuals who register for the Site
("Profiles"). These profiles may include
graphics, images, text, or data. DAOLABS does not
screen or review any of the User-posted/uploaded
materials to determine suitability for any
purpose. In addition, DAOLABS shall not be
considered an agent for anyone submitting a
Document or other materials through the Site or
any company that may view a person's Document or
materials through the Site. Nothing herein shall
be construed to create an employer-employee,
agency, or other relationship between DAOLABS and
any individual or entity. DAOLABS has no
responsibility for, control over or liability
related to anyone using this Site or any Document
posted or uploaded to the Site. The Site is
merely a venue for Users to create and edit
Documents and for others to view Documents when
the User provides permission. DAOLABS does not
review, screen, edit or monitor the Documents
posted on our Site or make any judgments about or
selections of Documents or individuals. DAOLABS
is not a party to any transaction between Users
through the Site and has no control over the
Documents or the quality, truth, accuracy,
reliability, completeness, or timeliness of such

PLAINTIFF0003151

reliability, completeness, or timeliness of such
materials. DAOLABS makes no representations or

warranties about any material Users post on our
Site.

# 6. DAOLABS DOES NOT PROVIDE LEGAL ADVICE.

DAOLABS is not a law firm. By using this Site,
you acknowledge and agree that DAOLABS and its
affiliates are not providing legal advice or
acting as your attorney, and you assume full
responsibility for any consequences and costs
associated with your use of this Site and as it
relates to your legal matters. No attorney-client
relationship or privilege is created with
DAOLABS. DAOLABS strives to keep its legal
documents accurate, current, and up-to-date.
However, because the law changes rapidly, DAOLABS
cannot guarantee that all of the information on
the Site or downloadable documentation is
completely current. The law is different from
jurisdiction to jurisdiction and may be subject
to interpretation by different courts. The law is
a personal matter, and no general information or
legal tool like the kind DAOLABS provides can fit
every circumstance. Furthermore, the legal
information contained on the Site or downloadable
documentation is not legal advice and is not
guaranteed to be correct, complete, or up-to-
date. Therefore, if you need legal advice for
your specific problem, or if your specific
problem is too complex to be addressed by our
tools, you should consult a licensed attorney in
your area. **If prior to your purchase, you believe
that DAOLABS is giving you any legal advice,
opinion or recommendation about your legal
rights, remedies, defenses, options, selection of
forms or strategies, you will not proceed with
this purchase, and any purchase that you do make
will be null and void.** DAOLABS is not a party to
any agreement that you enter into as a result of
the use of any Document that you create, use, or
download from the Site. Use of the Site and any
Document does not constitute an attorney-client
relationship, joint venture, or partnership
between DAOLABS and any User or third party.

PLAINTIFF0003152



# 7. PAYMENT.

Use of the DAOLABS services is free for individuals or Cryptographic Addresses related to the Juicebox Protocol. Individuals who have created a Juicebox Project, or are related to a Payout Address, Reserved Rate Address shall be given access to the DAOLABS Legal Resources services.

At this time separate payment or billing is not an option, however, they may be added in the future. The following section relates to our agreement as it relates to any future payment or billing services.

*In order to use our services that have fees associated with them, you must provide accurate billing and payment information. You agree to pay DAOLABS for all charges incurred as a result of your use of the Site, including all applicable taxes, fees, and surcharges. You authorize DAOLABS to bill your designated payment method for such charges. If DAOLABS, for any reason, does not receive payment from your designated payment method, you agree to pay all amounts due upon demand by DAOLABS or its vendor. Every time you use the Site, you reaffirm that*

- *(i) DAOLABS (or its billing agent) is authorized to bill your chosen payment method;*
- *(ii) DAOLABS may submit charges incurred under your account for payment; and*
- *(iii) you will be responsible for such charges.*

*DAOLABS may use a domestic or an international third-party payment service, the latter of which could result in international transaction fees billed to your credit card, (collectively, the "Payment Service"), to collect payments for all fees. Any international transaction fees that you may incur are charged by your bank and not by DAOLABS. All questions concerning such fees should be directed towards your bank. Any information you provide us in connection with the payment that we provide to the Payment Service will be subject to the Payment Service's user*

PLAINTIFF0003153

will be subject to the Payment Service’s
agreement and privacy policy, not this Agreement
or our Privacy Policy. You acknowledge and agree

that DAOLABS is not liable for the Payment
Service’s services, its site, or any acts or
omissions of the Payment Service.

The Price and availability of any product or
service offered through the Site are subject to
change without notice. Refunds and exchanges will
be subject to DAOLABS’ refund and exchange
policies then in effect. You agree to pay all
charges incurred by you or on your behalf through
the Site, at the price(s) in effect when such
charges are incurred, including without
limitation, any applicable taxes.

# 8. REFUND AND EXCHANGE POLICY.

This section was intentionally left blank.

# 9. THIRD PARTIES LINKS, PRODUCTS, AND INTEGRATIONS.

Third parties may offer or provide materials
through the pages on our Site. You also may
obtain access to other sites on the Internet
through the pages on our Site. By providing this
service, DAOLABS is not undertaking any
responsibility or liability for information or
publications of third parties on the Internet
even if you access them through these pages. The
use of these third party services/ add ons
require customers to agree to additional terms
and conditions. Your dealings with, or
participation in promotions of, advertisers found
on or through the Site, including payment and
delivery of related goods or services and any
other terms, conditions, warranties or
representations associated with such dealings,
are solely between you and that third party.
DAOLABS is not responsible in any way for
customer’s data once it is transmitted, copied,
or removed from our site by the customer or under
direction or control of the customer. DAOLABS
does not warrant or support any third party
content or services, you agree that DAOLABS shall
not be responsible or liable for any loss or

PLAINTIFF0003154



not be responsible or liable for any
damage of any sort incurred as the result of any
such dealings or as the result of the presence of

such third parties' links and/or ads or third
party products and services on the Site and
DAOLABS expressly disclaims any responsibility or
liability for any material communicated by third
parties through these pages or for any claims,
damages or losses resulting from the use thereof.
We and/or third-parties may make available
through the Site message boards, chat
functionality and comment features to which you
are able to post information and materials (each,
a "Forum").

**PLEASE BE AWARE THAT SUCH FORUMS MAY BE PROVIDED
BY A THIRD PARTY, AND MAY BE SUBJECT TO THE TERMS
AND CONDITIONS OF SUCH THIRD PARTY AS WELL AS
THIS AGREEMENT**

DAOLABS does not warrant or support any third-
party content or services and disclaims all
liability for these items and their access to
DAOLABS services, including their modification,
deletion, or collection of customer data.

## 10. REPRESENTATIONS AND WARRANTIES.

DAOLABS makes no representations or warranties
with regard to the Site Content (including,
without limitation, third party material) or
communications from Customer Service
representatives, all of which are provided on an
"as is" and/or "as available" basis. DAOLABS
hereby disclaims all warranties, express or
implied, including without limitation the implied
warranties of merchantability and fitness for a
particular purpose. DAOLABS makes no
representations or warranties that the services
provided by the Site or any customer service
representatives will be uninterrupted or error-
free, that defects will be corrected, or that the
pages or the server that makes them available are
free from viruses, worms or other harmful
components. If your use of the Site results
directly or indirectly in the need for servicing
or replacing equipment or data, DAOLABS is not

PLAINTIFF0003155



responsible for such costs. DAOLABS also makes no
representations or warranties as to whether the
information accessible via these pages or

customer service representatives, including
information posted by Users or third parties, is
accurate, complete, current, reliable or
truthful. DAOLABS assumes no responsibility for
the timeliness, deletion, misdelivery, or failure
to store any User communications or
personalization settings. Nothing on the Site
shall be considered an endorsement,
representation, or warranty with respect to any
User or third-party, any website, product,
service, experience, recruiting, hiring, or
otherwise. No advice or information obtained by
any User from DAOLABS or its personnel shall
create any warranty not expressly provided for in
this Agreement. You agree that any reliance on
materials/information posted by Users or on any
other form of communication with Users will be at
your own risk. DAOLABS acts as, among other
things, a portal for the online distribution and
publication of User submitted information and has
no obligation to screen communications or
information in advance and is not responsible for
screening or monitoring User posted material or
information, although it reserves the right to do
so. DAOLABS makes no representations or
guarantees regarding the effectiveness or
timeliness of the Site Content in meeting
objectives of Users. DAOLABS does not guarantee
that Documents created, checked or reviewed using
the Site, Documents written by DAOLABS or
materials posted by Users will result in an
agreement, contract or successful application,
for whatever reason made, made by any User or
third party. You hereby represent and warrant
that you

- (i) are using the Site Content solely for
  your own personal use and not for any
  business or research purpose;
- (ii) are not a human resource specialist,
  researcher, hiring manager or another
  similar employee of a business or
  organization that is accessing employment
  hiring or firing Site Content for use in
  your job duties or for the benefit of your
  employer or organization;

PLAINTIFF0003156

- (iii) will not use the Site Content for commercial purposes and will not aggregate, redistribute or otherwise transmit the Site Content to any other individual or entity; and

- (iv) will not use (or plan, encourage or help others to use) the Site for any purpose or in any manner that is prohibited by this Terms of Use Agreement or by applicable law.



# 11. LIABILITY DISCLAIMER.

YOU EXPRESSLY UNDERSTAND AND AGREE THAT DAOLABS AND ITS PARENT, SUBSIDIARIES, AFFILIATES, OFFICERS, EMPLOYEES, AGENTS, PARTNERS AND LICENSORS OR ANYONE ELSE WHO HAS BEEN INVOLVED IN THE CREATION, PRODUCTION, OR DELIVERY OF THESE PAGES, SERVICES, AND SITE CONTENT SHALL NOT BE LIABLE TO YOU FOR ANY DIRECT, INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL OR EXEMPLARY DAMAGES, INCLUDING, BUT NOT LIMITED TO, DAMAGES FOR LOSS OF PROFITS, GOODWILL, USE, DATA (INCLUDING, WITHOUT LIMITATION, ANY DOCUMENTS WRITTEN OR CREATED BY DAOLABS, AND ANY OTHER USER INFORMATION PROVIDED IN CONNECTION THEREWITH) OR OTHER INTANGIBLE LOSSES (EVEN IF DAOLABS HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES), RESULTING FROM: (a) THE USE OR THE INABILITY TO USE THE SITE; (b) THE COST OF PROCUREMENT OF SUBSTITUTE GOODS AND SERVICES RESULTING FROM ANY GOODS, DATA, INFORMATION OR SERVICES PURCHASED OR OBTAINED OR MESSAGES RECEIVED OR TRANSACTIONS ENTERED INTO THROUGH OR FROM THE SITE; (c) UNAUTHORIZED ACCESS TO OR ALTERATION OF YOUR TRANSMISSIONS OR DATA; (d) STATEMENTS OR CONDUCT OF ANY THIRD PARTY ON THE SITE; OR (e) ANY OTHER MATTER RELATING TO THE SITE OR THE SITE CONTENT. DAOLABS RESERVES THE RIGHT AT ANY TIME TO MODIFY OR DISCONTINUE, TEMPORARILY OR PERMANENTLY, THE SITE (OR ANY PART THEREOF) WITH OR WITHOUT NOTICE. YOU AGREE THAT DAOLABS SHALL NOT BE LIABLE TO YOU OR TO ANY THIRD PARTY FOR ANY MODIFICATION, SUSPENSION OR DISCONTINUANCE OF THE SITE. IF ANY LIMITATIONS ARE HELD INAPPLICABLE OR UNENFORCEABLE FOR ANY REASON, THEN DAOLABS'S MAXIMUM LIABILITY TO YOU FOR ANY NON-DIRECT TYPE OF DAMAGES SHALL BE LIMITED TO U.S. $50.00 IN THE AGGREGATE. IN NO EVENT SHALL DAOLABS (ITS PARENT,

PLAINTIFF0003157



SUBSIDIARIES, AFFILIATES, OFFICERS, EMPLOYEES, AGENTS, PARTNERS, AND LICENSORS OR ANYONE ELSE WHO HAS BEEN INVOLVED IN THE CREATION,

PRODUCTION, OR DELIVERY OF THESE PAGES), BE LIABLE FOR ANY DIRECT DAMAGES IN EXCESS IN THE AGGREGATE OF U.S. $50.00 OR FIVE TIMES THE AMOUNT OF YOUR MOST RECENT MONTHLY PAYMENT (IN THE EVENT YOU ARE A PAYING SUBSCRIBER), WHICHEVER IS LESS. IF ANY PART OF THE EXCLUSIONS OF DAMAGES OR LIMITATIONS OF LIABILITY SET FORTH HEREIN IS UNENFORCEABLE UNDER APPLICABLE LAW, DAOLABS'S AGGREGATE LIABILITY RELATED THERETO WILL BE LIMITED TO THE MAXIMUM EXTENT PERMITTED BY LAW, EVEN IF ANY REMEDY FAILS ITS ESSENTIAL PURPOSE. DAOLABS CANNOT AND DOES NOT CHECK EACH USER'S IDENTITY. WE ARE NOT INVOLVED IN USER-TO-USER DEALINGS NOR DO WE CONTROL THE BEHAVIOR OF PARTICIPANTS ON ANY SITE. THEREFORE, IN THE EVENT THAT YOU HAVE A DISPUTE WITH ONE OR MORE USERS, YOU RELEASE DAOLABS (AND OUR AGENTS AND EMPLOYEES) FROM CLAIMS, DEMANDS AND DAMAGES (ACTUAL AND CONSEQUENTIAL AND DIRECT AND INDIRECT) OF EVERY KIND AND NATURE, KNOWN AND UNKNOWN, SUSPECTED AND UNSUSPECTED, DISCLOSED AND UNDISCLOSED, ARISING OUT OF OR IN ANY WAY CONNECTED WITH SUCH DISPUTES. IF YOU ARE A CALIFORNIA RESIDENT, YOU WAIVE CALIFORNIA CIVIL CODE SECTION 1542, WHICH SAYS: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

## 12. PROPRIETARY RIGHTS.

The Site and all rights, title, and interest in and to the Site is the sole property of DAOLABS and/or its Affiliates or licensors, and is protected by U.S. copyright and international treaties. " DAOLABS " and the DAOLABS design logo may be registered service or trademarks. All related products and service names, design marks, and slogans are also the service marks or trademarks of DAOLABS. In addition, the "look" and "feel" of the Site (including color combinations, button shapes, layout, design, and all other graphical elements) are protected by



PLAINTIFF0003158

DAOLABS' trademarks, service marks, and copyrights. Each User retains ownership of any materials the User submits through the Site

(each, a "Submission"). However, in order to make Submissions available on the Site and to best provide you with services tailored to such Submissions, DAOLABS require certain rights to User Submissions. By submitting materials to our Site, including Documents, the User grants to DAOLABS and its designees a worldwide, non-exclusive, transferable, royalty-free, fully paid up, perpetual, irrevocable right and license, without compensation or further notice to you: (i) to use, reproduce, distribute, adapt, edit, modify, create derivative works of, publicly display and publicly perform such Submission, and the contents of such Submission, in any media now known or hereafter developed, for DAOLABS's business, marketing and promotional purposes and (ii) to sublicense the foregoing rights, through multiple tiers, to the maximum extent permitted by applicable law; provided however, such rights shall be subject to any restrictions or limitations established by the User in connection with the creation or maintenance of such Document (for example, if you limit availability of your Document, DAOLABS will use commercially reasonable efforts to ensure that the availability of your Document complies with the settings you selected). By way of further explanation, DAOLABS would not be able to perform many of the services we offer without your granting DAOLABS these rights. For example, without the right to "adapt," we would be unable to make the necessary changes to the Submissions so that the Submissions meet our technical criteria; without the right to reproduce, we would be unable to make copies of Submissions on our servers to post the Submissions. For each Submission, you represent and warrant that you have all rights necessary for you to grant the licenses as set forth in this section and that such Submission through the Site complies with all applicable laws, rules, and regulations. You acknowledge that you are solely responsible for verifying any and all information contained in any Submission, including, without limitation, confirming your own data, terms, or language, and that DAOLABS is not responsible for correcting

PLAINTIFF0003159



any information provided to any third party. You further irrevocably waive any "moral rights" or other rights with respect to attribution of authorship or integrity of materials regarding each Submission that you may have under any applicable law under any legal theory. If you have a good faith belief that materials available on the Site infringe your copyright, send DAOLABS a notice requesting that we remove the material or block access to it and we will investigate the claim and inform you of the results.

## 13. FITNESS FOR USE.

DAOLABS makes no representation as to appropriateness or availability for use of any of its Site Content in any particular location. Those who choose to access these pages do so on their own initiative and are solely responsible for compliance with local laws.

## 14. BINDING ARBITRATION.

THIS SECTION PROVIDES FOR RESOLUTION OF DISPUTES THROUGH FINAL AND BINDING ARBITRATION BEFORE A NEUTRAL ARBITRATOR INSTEAD OF IN A COURT BY A JUDGE OR JURY.

If any dispute arises, you must first contact DAOLABS by e-mail at m@daolabs.wtf, so that we can endeavor to resolve the issue. In the event that we cannot resolve a dispute within thirty (30) days of notification, then all disputes arising under or relating to this Agreement shall be settled by arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules and Supplementary Procedures for Consumer-Related Disputes ("Supplementary Procedures") as it may be amended from time to time.

## 15. MONTHLY SUBSCRIPTIONS (with FREE TRIAL).

Pricing for DAOLABS Legal Resources has not been determined. While the services are currently free, they may change in the future. At this time

PLAINTIFF0003160

access and use to this website is limited to
individuals who have created a Juicebox project,
thus access to the site may be limited to wallets

or individuals who are associated with a Juicebox
project either as a project owner or project
member.



# 16. PRICING CHANGES.

Effective: August 22, 2022, DAOLABS published
pricing or restrictions of the following
products: Subscription: Juicebox Protocol project
with 5 ETH A grace period of 90 days after the
effective date will be provided to all
individuals regardless of ownership of a Juicebox
project NFT.

DAOLABS shall have the right to increase prices
from time to time. Any such price change shall
not apply to subscriptions or purchases submitted
before August 22, 2019, unless the User stops for
any reason making payments after August 22, 2019.
DAOLABS will notify the User (not applicable to
PayPal customers) to remind him or her to make
the respective payments. If User declines to make
such payments, User will no longer have the right
to remain with the price made available to User
before August 22, 2019, and will be subject to
the new pricing structure. For Users that have
registered using 3rd party payment facilitator,
please refer to those Legal Agreements for the
3rd party Services.

# 17. GENERAL TERMS.

- **Entire Agreement.** This Terms of Use
  Agreement constitutes the full agreement
  between you and DAOLABS and governs your use
  of the Site, superseding any prior
  agreements between you and DAOLABS with
  respect to the Site.
- **User Remedies.** You acknowledge that, except
  as expressly provided elsewhere in this
  Agreement, your only right with respect to
  any dissatisfaction with any modification or
  discontinuation of service made by DAOLABS
  or any policies or practices in providing
  this Site or our products, including without

PLAINTIFF0003161



limitation any change in content or any
change in the amount or type of fees or
charges associated with our products, is to
cancel your subscription or user account, as
applicable. In no event shall you seek or be
entitled to rescission, injunctive or other
equitable relief, or to enjoin or restrain
the operation of the DAOLABS' services.

- **Choice of Law and Forum.** The Terms of Use
  and the relationship between you and DAOLABS
  shall be governed by the laws of the State
  of Washington without regard to its conflict
  of law provisions. You and DAOLABS agree to
  submit to the personal and exclusive
  jurisdiction of the courts located within
  the county of King, Washington. You agree to
  defend, indemnify, and hold harmless DAOLABS
  (and its officers, directors, employees, and
  agents) from and against any third-party
  claims, actions or demands (including,
  without limitation, costs, damages, and
  reasonable legal and accounting fees)
  alleging or resulting from or in connection
  with your use of the Site.
- **Waiver and Severability of Terms.** The
  failure of DAOLABS to exercise or enforce
  any right or provision of the Terms of Use
  shall not constitute a waiver of such right
  or provision. In the event that any
  provision of the Terms of Use is found by a
  court of competent jurisdiction to be
  invalid, the parties agree that the court
  should endeavor to give effect to the
  parties' intentions as reflected in the
  provision, and the other provisions of the
  Terms of Use shall remain in full force and
  effect.
- **Statute of Limitations.** You agree that
  regardless of any statute or law to the
  contrary, any claim or cause of action
  arising out of or related to use of the Site
  or the Terms of Use must be filed within one
  (1) year after such claim or cause of action
  arose or be forever barred. DAOLABS reserves
  the right to update or amend these Terms of
  Use at any time without notice.
- **Term and Termination.** This Agreement is
  effective until terminated. DAOLABS, at its
  sole discretion, may terminate your access

PLAINTIFF0003162



to or use of the Site, at any time and for any reason. Such termination, including deactivation or deletion of your password and user name, and all related information and files associated with it may happen without prior notice. DAOLABS is not liable to you or any third party for any termination of your access to the Site or to any such information or files and shall not be required to make such information or files available to you.

- **For purposes of service messages and notices about the services to you, notice shall consist of an e-mail from DAOLABS to the e-mail address associated with your account, regardless of any other information we may have. DAOLABS shall have no liability associated with your failure to maintain accurate contact information.**

- **Customer Service.** No customer service representatives used by DAOLABS are permitted to bind the company or contravene this Terms of Use Agreement. In addition, DAOLABS expressly disclaims any liability for information provided by its customer service representatives to the extent the information is inconsistent with the information set forth herein.

- **Section Titles.** Section titles in this Terms of Use Agreement are for convenience only and have no legal effect ·

- **Privacy Information.** Please review our complete Privacy Policy which is fully incorporated by reference into this Terms of Use Agreement. If you have questions about any of the provisions described above, please contact us at the above e-mail address.

Previous
Entities

Next
Treasury Terms of Service

PLAINTIFF0003163



**LEGAL-TOOLS**   DAOLABS                    **Connect Wallet**



    

*Effective Date: September 1, 2022 Last Updated:
August 27th, 2022*
_0x3fa802d55c2eaebe6333e217323e7f07a2ca92b4@ethere
um.email _ *daolabs.wtf*

---

(i) This Terms of Service is specifically
regar i g the  se of the Treas ry website,
which is c rre tly theme  exactly like
htt s:  j icebox.mo ey while a  licatio
feat res are c rre tly    er  evelo me t.
 e to the  ser's ability to obtai  toke s
for co trib tio s, the followi g terms of
service are i  effect.

---

PLEASE READ THIS TERMS OF SERVICE AGREEMENT (THE
"TERMS OF SERVICE") CAREFULLY. THIS SITE AND ANY
OTHER WEBSITES OF THE DAO ("DAO"), ITS AFFILIATES
OR AGENTS (COLLECTIVELY, THE "SITE") IS CONTROLLED
BY THE DAO. THESE TERMS OF USE GOVERN THE USE OF
THE SITE AND APPLY TO ALL INTERNET USERS VISITING
THE SITE. BY ACCESSING OR USING THE SITE IN ANY
WAY, INCLUDING USING THE SERVICES AND RESOURCES
AVAILABLE OR ENABLED VIA THE SITE (EACH A
"SERVICE" AND COLLECTIVELY, THE "SERVICES"). BY
CLICKING ON THE "I ACCEPT" BUTTON, COMPLETING THE
REGISTRATION PROCESS, AND/OR BROWSING THE SITE,
YOU REPRESENT THAT (1) YOU HAVE READ, UNDERSTAND,
AND AGREE TO BE BOUND BY THE TERMS OF SERVICE, (2)
YOU ARE OF LEGAL AGE TO FORM A BINDING CONTRACT
WITH THE DAO, AND (3) YOU HAVE THE AUTHORITY TO
ENTER INTO THE TERMS OF USE PERSONALLY OR ON
BEHALF OF THE ENTITY YOU HAVE NAMED AS THE USER,

Decentralized, Centralized
Applications.

Parties, Notice addresses.

Introduction.

1. By using the Site, you
agree to these Terms.

2. Information of a Legal,
Accounting, or Tax Matters.

3. Risks Involved in the
Use of the Smart Contracts.

4. Source Code
Repositories.

5. Intellectual Property.

6. The Decentralized
Application.

7. Access to the DAO
Application.

8. Securities Law Matters.

9. OFAC Compliance.

10. Third Party Links.

11. Privacy Policy.

12. Disclaimers;
Limitation of Liability.

13. Indemnification.

14. Arbitration.

15. Governing Law.

16. General.

17. Contacting Us.

**PLAINTIFF0003164**



AND TO BIND THAT ENTITY TO THE TERMS OF SERVICE.
THE TERM "YOU" REFERS TO THE INDIVIDUAL OR LEGAL
ENTITY, AS APPLICABLE, IDENTIFIED AS THE USER WHEN

YOU REGISTERED ON THE SITE. IF YOU DO NOT AGREE TO
BE BOUND BY THE TERMS OF SERVICE, YOU MAY NOT
ACCESS OR USE THIS SITE OR THE SERVICES.

PLEASE BE AWARE THAT SECTION 15 (ARBITRATION, OUR
DISPUTE RESOLUTION PROCESS) OF THIS AGREEMENT,
BELOW, CONTAINS PROVISIONS GOVERNING HOW DISPUTES
THAT YOU AND WE HAVE AGAINST EACH OTHER ARE
RESOLVED, INCLUDING, WITHOUT LIMITATION, ANY
DISPUTES THAT AROSE OR WERE ASSERTED PRIOR TO THE
EFFECTIVE DATE OF THIS AGREEMENT. IN PARTICULAR,
IT CONTAINS AN ARBITRATION AGREEMENT WHICH WILL,
WITH LIMITED EXCEPTIONS, REQUIRE DISPUTES BETWEEN
US TO BE SUBMITTED TO BINDING AND FINAL
ARBITRATION. UNLESS YOU OPT OUT OF THE ARBITRATION
AGREEMENT: (1) YOU WILL ONLY BE PERMITTED TO
PURSUE DISPUTES OR CLAIMS AND SEEK RELIEF AGAINST
US ON AN INDIVIDUAL BASIS, NOT AS A PLAINTIFF OR
CLASS MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION
OR PROCEEDING; AND (2) YOU ARE WAIVING YOUR RIGHT
TO PURSUE DISPUTES OR CLAIMS AND SEEK RELIEF IN A
COURT OF LAW AND TO HAVE A JURY TRIAL.

## Decentralized, Centralized Applications.

DAO applications may be accessed at the following
URLs: daolabs.wtf, dao-lawfirm.xyz, movement.xyz,
juicebox.wtf, treasury.wtf, tiles.wtf and any
services used by the DAO, such as Discord,
Twitter, Instagram and Github.[^1]

## Parties, Notice addresses.

The parties to this agreement are **you** (user of the
DAO's decentralized application) and **the DAO**. For
the purpose of electronic communication or other
electronic notice you may contact the DAO via its
Service Provider at dao-lawfirm.xyz or by e-mail
at
<u>0x752515a3A1091b9f1c04416CF79D1F14d2340085@ethereum.email</u> or
<u>0x3fa802d55c2eaebe6333e217323e7f07a2ca92b4@ethereum.email</u> .

## Introduction.

PLAINTIFF0003165



Please read these terms of service ("Terms") carefully. These Terms are between you and the DAO (the "DAO," "we," "us," or "our") concerning your use of the **DAO's decentralized application ("DAPP") or websites,** including the sites listed above, other DAO websites, and other websites maintained by the DAO (together the "Site" or "Sites") which may interact with and operate on the Juicebox protocol (the "Juicebox DAO Protocol") currently available on Ethereum via smart contracts ("Smart Contracts").

These Terms apply to you (**"you,"** or **"User"**) as a user of the Site information made available on the Site.

## 1. By using the Site, you agree to these Terms.

Certain features on the site may be offered while still in "beta" form (**"Services"**). By accepting these Terms or using the Services, You understand and acknowledge that the Services are being provided as a version and made available on an "As Is" or "As Available" basis. The Services may contain bugs, errors, and other problems.

You assume all risks and all costs associated with your use of DAO services, including, without limitation, any internet access fees, back-up expenses, costs incurred for the use of your device and peripherals, and any damage to any equipment, software, information, or data. In addition, we are not obligated to provide any maintenance, technical support, or other support for the Services.

None of the information, services, or materials offered on the Sites constitute, or are intended to constitute, legal, financial, tax, investment, or other advice, and you should not act or refrain from acting based on any information, services, or materials provided on the Sites. All content on the Sites is information of a general nature and does not address the unique circumstances of any particular user. You are strongly urged to consult with your own legal, financial, tax, investment, and other advisors as to all legal, financial, tax, and investment-related questions you have.

PLAINTIFF0003166

You must be able to form a legally binding contract online either as an individual or on

behalf of a legal entity. You represent that as a User, you have the legal authority to bind the company or other legal entity on the behalf of which you are acting to these Terms, you are at least 18 years old or the age of majority where you reside, whichever is older, you can form a legally binding contract online, and you have the full right, power, and authority to enter into and to comply with the obligations under these Terms on your own behalf, or on behalf of the company or other legal entity on the behalf of which you are acting.

PLEASE NOTE THAT THE AGREEMENT IS SUBJECT TO CHANGE BY THE DAO IN ITS SOLE DISCRETION AT ANY TIME. When changes are made, the DAO will make a new copy of the Terms of Service Agreement available at the Site and any new Supplemental Terms will be made available from within, or through, the affected Service on the Site. We will also update the "Last Updated" date at the top of the Terms of Service Agreement. The DAO may require you to provide consent to the updated Agreement in a specified manner before further use of the Site and/ or the Services is permitted. If you do not agree to any change(s) after receiving a notice of such change(s), you shall stop using the Site and/or the Services. Otherwise, your continued use of the Site and/or Services constitutes your acceptance of such change(s). PLEASE REGULARLY CHECK THE SITE TO VIEW THE THEN-CURRENT TERMS.

As a User, you agree to be bound by any changes, variations, or modifications to our terms of service and your continued use of the Site shall constitute acceptance of any such changes, variations, or modifications.

## 2. Information of a Legal, Accounting, or Tax Matters.

Any legal, financial, or tax comments within the Sites are provided for informational and illustrative purposes only, and are not intended to constitute legal, financial, tax, or other



PLAINTIFF0003167



advice. You should not act or refrain from acting based on any information gleaned from any documents, comments, or instructions within the

Sites. The DAO does not endorse or make any representation as to the capabilities of any legal or tax professional or advisors within our Sites (or the Internet), and the provision of contact information is not a recommendation that you hire any such person. Please check with your legal and tax advisors to make the best decisions for your specific circumstances.

## 3. Risks Involved in the Use of the Smart Contracts.

The DAO protocol runs entirely on publicly accessible smart contracts explained in detail throughout the Juicebox DAO's online documents, currently available at https://info.juicebox.money. The Juicebox DAO's protocol is public infrastructure running well-known code. All consequences from interacting with networks running the protocol are borne by the entities who sign each transaction. The protocol works according to the specifications outlined in these docs to the extent the code is written and deployed correctly, which is a collective responsibility and is not guaranteed. There are major risks that the code is not written and deployed correctly. **Please do your own research.**

## 4. Source Code Repositories.

No Warranties. The DAO's source code Repository is only a presentation of information regarding certain view points and technologies. The statements contained in the Repository do not provide any advice, representation, warranty, certification, guarantee or promise relating to these technologies, any uses thereof or any of the other matters discussed in the Repository, nor does the Repository provide an offer or agreement to make such technologies available, maintain or update such technologies, or sell or buy any asset or enter into any transaction. You should not rely on the Repository as a basis for making any financial or other decision.

## 5. Intellectual Property

PLAINTIFF0003168

**5. Intellectual Property.**



The rights granted to you in the Agreement are subject to the following restrictions: (a) you shall not license, sell, rent, lease, transfer, assign, reproduce, distribute, host or otherwise commercially exploit the DAO's Properties or any portion of the DAO's Properties, including the Site; (b) you shall not frame or utilize framing techniques to enclose any trademark, logo, or other DAO Properties (including images, text, page layout or form) of the DAO; (c) you shall not use any metatags or other "hidden text" using the DAO's name or trademarks; (d) you shall not modify, translate, adapt, merge, make derivative works of, disassemble, decompile, reverse compile or reverse engineer any part of the DAO's Properties except to the extent the foregoing restrictions are expressly prohibited by applicable law; (e) you shall not use any manual or automated software, devices or other processes (including but not limited to spiders, robots, scrapers, crawlers, avatars, data mining tools or the like) to "scrape" or download data from any web pages contained in the Site (except that we grant the operators of public search engines revocable permission to use spiders to copy materials from the Site for the sole purpose of and solely to the extent necessary for creating publicly available searchable indices of the materials, but not caches or archives of such materials); (f) except as expressly stated herein, no part of the DAO's Properties may be copied, reproduced, distributed, republished, downloaded, displayed, posted or transmitted in any form or by any means; and (h) you shall not remove or destroy any copyright notices or other proprietary markings contained on or in the DAO's Properties. Any future release, update or other addition to the DAO's Properties shall be subject to the Agreement. The DAO, its suppliers and Service Providers reserve all rights not granted in the Agreement. Any unauthorized use of any the DAO's Property terminates the licenses granted by the DAO pursuant to the Agreement.

**1. The DAO Properties.** Except with respect to Your Content and User Content, you agree that the DAO

PLAINTIFF0003169



and its suppliers own all rights, title and interest in the DAO Properties. You will not remove, alter or obscure any copyright, trademark, service mark, or other proprietary rights notices incorporated in or accompanying any of the DAO Properties.

**2. Your Content.** The DAO does not claim ownership of Your Content. However, when you as a Registered User post or publish Your Content on or in the DAO Properties, you represent that you own and/or have a royalty-free, perpetual, irrevocable, worldwide, non-exclusive right (including any moral rights) and license to use, license, reproduce, modify, adapt, publish, translate, create derivative works from, distribute, derive revenue or other remuneration from, and communicate to the public, perform and display Your Content (in whole or in part) worldwide and/or to incorporate it in other works in any form, media or technology now known or later developed, for the full term of any worldwide intellectual property right that may exist in Your Content.

**3. License to Your Content.** Subject to any applicable account settings that you select, you grant the DAO a fully paid, royalty-free, perpetual, irrevocable, worldwide, royalty-free, non-exclusive and fully sublicensable right (including any moral rights) and license to use, license, distribute, reproduce, modify, adapt, publicly perform, and publicly display Your Content (in whole or in part) for the purposes of operating and providing the DAO Properties to you and to our other Registered Users. Please remember that other Registered Users may search for, see, use, modify and reproduce any of Your Content that you submit to any "public" area of the DAO Properties. You warrant that the holder of any worldwide intellectual property right, including moral rights, in Your Content, has completely and effectively waived all such rights and validly and irrevocably granted to you the right to grant the license stated above. You agree that you, not the DAO, are responsible for all of Your Content that you Make Available on or in the DAO Properties. Any Content posted by you in your profile may not contain nudity, violence, sexually explicit, or offensive subject matter as determined by the DAO

PLAINTIFF0003170

in its sole discretion. You may not post or submit for print services a photograph of another person without that person's permission.

## 6. The Decentralized Application.

The DAO provides access to a DAPP, a decentralized finance application, (**"Application"**) on the Ethereum blockchain that allows individuals to contribute Ethereum assets including Ethereum, ERC 20, ERC 721, and other Ethereum based assets (**"Cryptocurrency Assets"**) to the DAO Treasury as contributions. The Application may be configured as to emit project tokens (**"Project Tokens"**) which may or may not have utility. The Application spans a front end application, middleware (including Interplanetary File System metadata, Graph indexers, Blocknative API functions, Infura services, Cloud Functions, etc.) and an array of Ethereum smart contracts   the user is required to authorize the execution of the Smart Contracts when interacting with their wallet at all times.

Using the DAO protocol may require that you pay a fee, such as gas fees on the Ethereum network, to perform a transaction. You acknowledge and agree that the DAO has no control over any transactions among Users over the DAO's protocol, or the method of payment of any such transactions or any actual payments of such transactions. Accordingly, you must ensure that you have a sufficient balance of the applicable cryptocurrency tokens stored at your DAO protocol compatible wallet address (**"Cryptocurrency Wallet"**) to complete any such transaction on the DAO protocol or the Ethereum network before initiating such a transaction.

## 7. Access to the DAO Application.

Access to the Site is provided on an "AS IS" and "as available" basis only. We do not guarantee that the Site, or any content on it, will always be available or uninterrupted. From time to time, access may be interrupted, suspended, or restricted, including because of a fault, an error, or unforeseen circumstances, or because we are carrying out planned maintenance. With regards to the Sites; We reserve the right to limit the availability of the Site to any person, geographic area or jurisdiction we so desire and/or to



PLAINTIFF0003171



terminate your access to and use of the Site, at any time and in our sole and absolute discretion. We may remove or amend the content of the Site at any time. Some of the Site content may be out of date at any given time and we are under no obligation to update it. We do not guarantee that the Site, or any content on it, will be free from errors or omissions.

We will not be liable to you for any loss or damage you may suffer as a result of the Site being unavailable at any time for any reason. You will comply with all applicable domestic and international laws, statutes, ordinances and regulations applicable to your use of the Site.

**Registering Your Account.** In order to access certain features of the DAO's Properties you may be required to become a Member. For purposes of the Agreement, a Member is also a "Registered User", which is a user who has registered an account on the Site ("Account"), and has a valid account on a third party service through which the user has connected to the Site (each such account, a "Third-Party Account").

### As a condition to accessing or using the Site, you will:

1. only use the Site in accordance with these Terms;
2. ensure that all information that you provide on the Site is current, complete, and accurate;
3. ensure compliance with all U.S. Securities laws; and
4. maintain the security and confidentiality of access to your Cryptocurrency Wallet address.

You acknowledge that all Content, including DAO Properties, is the sole responsibility of the party from whom such Content originated. This means that you, and not the DAO, are entirely responsible for all Content that **you upload, post, e-mail, transmit or otherwise make available ("Make Available")** through the DAO Properties ("Your Content"), and that you and other Registered Users of DAO Properties, and not DAO, are similarly responsible for all Content that you and they Make Available through the DAO Properties

PLAINTIFF0003172

("User Content").



You acknowledge that the DAO has no obligation to
pre-screen Content (including, but not limited to,
User Content), although the DAO reserves the right
in its sole discretion to pre-screen, refuse or
remove any Content. By entering into the
Agreement, you hereby provide your irrevocable
consent to such monitoring. You acknowledge and
agree that you have no expectation of privacy
concerning the transmission of Your Content,
including without limitation chat, text, or voice
communications. In the event that the DAO pre-
screens, refuses or removes any Content, you
acknowledge that the DAO will do so for the DAO's
benefit, not yours. Without limiting the
foregoing, The DAO shall have the right to remove
any Content that violates the Agreement or is
otherwise objectionable.

**As a condition to accessing or using the Site, you
will not:**

1. violate any applicable law, including,
   without limitation, any relevant and
   applicable anti-money laundering and anti-
   terrorist financing laws as well as any
   relevant and applicable privacy and data
   collection laws, in each case as may be
   amended;
2. export, reexport, or transfer, directly or
   indirectly, any DAO technology in violation
   of applicable export laws or regulations;
3. infringe on or misappropriate any contract,
   intellectual property or other third-party
   right, or commit a tort while using the Site;
4. make commercial use of the Site or any of its
   content without our express written
   permission;
5. misrepresent the truthfulness, sourcing or
   reliability of any content on the Site;
6. use the Site or its content to simulate
   communications from us or another service or
   entity in order to collect identity
   information, authentication credentials, or
   other information (known as 'phishing');
7. use the Site in any manner that could
   interfere with, disrupt, negatively affect,

PLAINTIFF0003173



or inhibit other users from fully enjoying the Site or the DAO protocol, or that could damage, disable, overburden, or impair the functioning of the Site or the DAO protocol in any manner;

8. attempt to circumvent any content filtering techniques or security measures that DAO employs on the Site, or attempt to access any service or area of the Site that you are not authorized to access;

9. use any robot, spider, crawler, scraper, or other automated means or interface not provided by us, to access the Site to extract data;

10. introduce any malware, virus, Trojan horse, worm, logic bomb, drop-dead device, backdoor, shutdown mechanism or other harmful material into the Site;

11. **post content or communications on the Site that are, in our sole and absolute discretion, libelous, defamatory, profane, obscene, pornographic, sexually explicit, indecent, lewd, vulgar, suggestive, harassing, hateful, threatening, offensive, discriminatory, bigoted, abusive, inflammatory, fraudulent, deceptive, or otherwise objectionable;**

12. post content on the Site containing unsolicited promotions, commercial messages, or any chain messages or user content designed to deceive or trick the user of the Site; or

13. encourage or induce any third party to engage in any of the activities prohibited under these Terms.

**You acknowledge that the Site and your use of the Site contain certain risks, including, without limitation, the following risks:**

1. that any Smart Contracts you interact with are entirely your own responsibility and liability;

2. that at any time, your access to your Cryptocurrency Assets may be suspended or terminated or there may be a delay in your access or use of your Cryptocurrency Assets which may result in the Cryptocurrency Assets diminishing in value or you being unable to

PLAINTIFF0003174

complete a transaction or interact with a
Smart Contract; and



3. That the Site and/or application may be
   suspended or terminated for any or no reason,
   which may limit your access to your
   Cryptocurrency Assets.

**Accordingly, you expressly agree that:**

1. you assume all risks in connection with your
   access and use of the Site, the DAO
   Application and the Smart Contracts; and
2. you expressly release the DAO and our
   contributors, Members, and affiliates, and
   hold them harmless from and against any and
   all liability, claims, causes of action,
   losses, expenses, or damages (whether arising
   in law or equity, including but not limited
   to special, consequential, indirect,
   punitive, and exemplary damages, and
   including but not limited to economic loss,
   business disruption, and/or attorney's fees)
   arising from or in any way related to the
   Site, the Application, and/or the Smart
   Contracts. You expressly waive all such
   claims against the Releases.

**Feedback.** You agree that submission of any ideas,
suggestions, documents, and/or proposals to the
DAO through its suggestion, feedback, wiki, forums
(e.g. Discord or Snapshot), or similar pages
("Feedback") is at your own risk and that the DAO
has no obligations (including without limitation
obligations of confidentiality) with respect to
such Feedback. You represent and warrant that you
have all rights necessary to submit the Feedback.
You hereby grant to the DAO a fully paid, royalty-
free, perpetual, irrevocable, worldwide, non-
exclusive, and fully sublicensable right and
license to use, reproduce, perform, display,
distribute, adapt, modify, re-format, create
derivative works of, and otherwise commercially or
non-commercially exploit in any manner, any and
all Feedback, and to sublicense the foregoing
rights in connection with the operation and
maintenance of the DAO Properties and/or the DAO's
purpose.

**Export control.** You may not use, export, import

PLAINTIFF0003175



**Export Control.** You may not use, export, re-export, or transfer the DAO DAPP except as authorized under U.S. law and the laws of the jurisdiction in which you obtained the DAO property (DAPP or Site), and any other applicable laws. In particular, but without limitation, the DAO properties may not be exported or re-exported (a) into any United States embargoed countries, or (b) to anyone on the U.S. Treasury Department's list of Specially Designated Nationals or the U.S. Department of Commerce's Denied Person's List or Entity List. By using the DAO DAPP, you represent and warrant that (i) you are not located in a country that is subject to a U.S. Government embargo, or that has been designated by the U.S. Government as a "terrorist supporting" country and (ii) you are not listed on any U.S. Government list of prohibited or restricted parties. You also will not use the DAO DAPP for any purpose prohibited by U.S. law, including the development, design, manufacture or production of missiles, nuclear, chemical or biological weapons. You acknowledge and agree that products, services or technology provided by the DAO are subject to the export control laws and regulations of the United States. You shall comply with these laws and regulations and shall not, without prior U.S. government authorization, export, re-export, or transfer DAO DAPP products, services or technology, either directly or indirectly, to any country in violation of such laws and regulations.

## 8. Securities Law Matters.

ANY GOVERNANCE TOKENS RECEIVED BY MEMBERS HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION, ANY STATE SECURITIES COMMISSION, OR OTHER REGULATORY AUTHORITY, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON THE MERITS OF THIS OFFERING OR UPON THE ACCURACY OR ADEQUACY OF THIS AGREEMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THIS DOCUMENT DOES NOT CONSTITUTE AN OFFER OR SOLICITATION TO ANYONE IN ANY JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

ANY GOVERNANCE TOKENS THAT YOU MAY ACQUIRE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT,

PLAINTIFF0003176



STATE SECURITIES LAWS, OR THE LAWS OF ANY COUNTRY OUTSIDE THE UNITED STATES. THE DAO'S POSITION IS THAT THE DAO'S GOVERNANCE TOKENS SHOULD NOT BE CONSIDERED OR REGARDED AS SECURITIES AS THE PURPOSE OF THE DAO IS TO PROVIDE A BLOCKCHAIN NATIVE TREASURY MANAGEMENT APPLICATION AND THE DAO TOKENS PROVIDE NO RIGHTS TO ANY DISTRIBUTION OR PROFITS, AND ARE NON-TRANSFERABLE AS DETAILED IN THE TERMS OF USE.

### "Not an Invitation to Invest or Purchase."

The information contained on the DAO Properties is not an invitation or solicitation to invest in or purchase any cryptocurrency or NFTs or to invest in the shares or other products or services or otherwise deal in these or enter into a contract with the DAO, any cryptocurrency marketplace or any other company. The information provided herein should not be relied upon in connection with any investment decision. No reliance should be placed on any statements, rankings or ratings on the DAO Properties, whether for investment purposes or otherwise.

## 9. OFAC Compliance.

The U.S. Department of Treasury, through the Office of Foreign Assets Control ("OFAC"), prohibits U.S. companies from engaging in all or certain commercial activities with certain sanctioned countries (each a "Sanctioned Country") and certain individuals, organizations, or entities, including, without limitation, certain "Specially Designated Nationals" ("SDN") listed by OFAC. **If you use the Site, you expressly represent that you are not located in a Sanctioned Country and are not listed as an SDN. If the DAO determines that the Site is being used by prohibited persons, it will take any and all actions to terminate that User's access to the Site.**

## 10. Third Party Links.

The Site may contain hyperlinks or references to third party websites. Any such hyperlinks or references are provided for your information and convenience only. We have no control over third

PLAINTIFF0003177

party websites and accept no legal responsibility for any content, material, or information contained in them. The display of any hyperlink

and reference to any third-party website does not mean that we endorse that third party's website, products, or services. Your use of a third-party site may be governed by the terms and conditions of that third-party site.



## 11. Privacy Policy.

Certain areas of the Site or Application, including any and all interactions with the Ethereum blockchain, record your Cryptocurrency address and details of the transactions you authorize. You understand that transactions, including parties you transact with, specific Cryptocurrency Assets you hold, including unique ENS domain NFTs, third-party NFTs, the Cryptocurrency address, metadata associated with any Smart Contract such as the executing function, its arguments (or parameters) will contain in aggregate information which *may* identify you personally.

The Ethereum blockchain transactions are not temporary or transient, but are permanently and permissionlessly accessible. The DAO, its contributors, and its affiliates are not engaged in profiling activities whatsoever; however, *any other* third party, including government agencies and/or foreign adversaries, will have unfettered access to all of your transactions on the blockchain forever.

Your authorization of transactions with your Cryptocurrency address, using Cryptocurrency Tokens, will result in the indelible dissemination of information to the Ethereum blockchain. Notwithstanding, the Application, handles as little personal information as possible, only your Cryptographic address. With regards to transaction with the Application, including any payments or transfer of funds, any information you provide to the payment vendors we do not retain, have access to or control; your authorization of any payment or execution of transactions you provide to the site is voluntary, and final.

Additionally, the Site may employ Ether

PLAINTIFF0003178

Additionally, the Sites may employ Fathom Analytics for website traffic analytics, which doesn't use cookies and complies with the GDPR,

ePrivacy (including PECR), COPPA and CCPA. The decision to potentially use this privacy-friendly analytics software, was in large part to ensure your IP address is only briefly processed by this 3rd party, and the DAO and the Site have no way of identifying you (aside from the aforementioned indelible entire history of Cryptographic transactions). As per the CCPA, your personal information is de-identified.

The purpose of the DAO potentially using Fathom Analytics is to understand the Application website traffic in the most privacy-friendly way possible so that the DAO can continually improve the Application. The lawful basis as per the GDPR is "Article 6(1)(f); where our legitimate interests are to improve our website and business continually." Additionally, the DAO and its contributors have no interest in collecting this information.

## 12. Disclaimers; Limitation of Liability.

YOU EXPRESSLY AGREE THAT ACCESS TO AND USE OF THE SITE IS AT YOUR SOLE RISK AND IS PROVIDED ON AN "AS IS" AND "AS AVAILABLE" BASIS WITHOUT WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, WARRANTIES OF TITLE OR IMPLIED WARRANTIES OF NON-INFRINGEMENT, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE (EXCEPT ONLY TO THE EXTENT PROHIBITED UNDER THE LAWS APPLICABLE TO TERMS OF SERVICE WITH ANY LEGALLY REQUIRED WARRANTY PERIOD TO THE SHORTER OF THIRTY DAYS FROM FIRST USE OR THE MINIMUM PERIOD REQUIRED). WITHOUT LIMITING THE FOREGOING, NEITHER THE DAO NOR ITS AFFILIATES OR SUBSIDIARIES, OR ANY OF THEIR DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS, AGENTS, ATTORNEYS, THIRD-PARTY PROVIDERS, DISTRIBUTORS, LICENSEES, LICENSORS, SUCCESSORS, OR ASSIGNS (COLLECTIVELY, "DAO PARTIES") WARRANT THAT THE SITE WILL BE UNINTERRUPTED, BUG-FREE, OR ERROR-FREE, AND NONE OF THE DAO PARTIES WARRANT THAT SMART CONTRACTS ARE MERCHANTABLE, FIT FOR ANY PARTICULAR PURPOSE, AND/OR RECOGNIZED BY ANY PARTICULAR JURISDICTION(S).

PLAINTIFF0003179





TO THE FULLEST EXTENT PERMITTED BY LAW, THE DISCLAIMERS OF LIABILITY CONTAINED HEREIN APPLY TO

ANY AND ALL DAMAGES, LOSSES AND/OR INJURY WHATSOEVER CAUSED BY OR RELATED TO USE OF, OR INABILITY TO USE, THE SERVICES UNDER ANY CAUSE OR ACTION WHATSOEVER OF ANY JURISDICTION, INCLUDING, WITHOUT LIMITATION, ACTIONS FOR BREACH OF WARRANTY, BREACH OF CONTRACT AND/OR TORT (INCLUDING NEGLIGENCE). THE DAO PARTIES SHALL NOT BE LIABLE FOR ANY DIRECT, INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE AND/OR CONSEQUENTIAL DAMAGES IN ANY WAY WHATSOEVER ARISING OUT OF THE USE OF, OR INABILITY TO USE, THE SITE. YOU FURTHER SPECIFICALLY ACKNOWLEDGE THAT THE DAO PARTIES ARE NOT LIABLE, AND YOU AGREE NOT TO SEEK TO HOLD THE DAO PARTIES LIABLE, FOR THE CONDUCT OF THIRD PARTIES, INCLUDING OTHER USERS OF THE SITE AND OPERATORS OF EXTERNAL WEBSITES, AND THAT THE RISK OF THE SITE AND EXTERNAL WEBSITES AND OF INJURY FROM THE FOREGOING RESTS ENTIRELY WITH YOU.

IN THE EVENT THAT A COURT AND/OR ARBITRATOR(S) OF COMPETENT JURISDICTION HOLDS THAT ANY DAO PARTY IS LIABLE TO YOU (FOR EXAMPLE AND WITHOUT LIMITATION, BECAUSE ANY RELEASE OR WAIVER HEREUNDER IS FOUND TO BE VOID OR OTHERWISE UNENFORCEABLE, OR BECAUSE ANY CLAIMS ARE FOUND TO BE OUTSIDE THE SCOPE OF ANY SUCH RELEASE OR WAIVER), UNDER NO CIRCUMSTANCES WILL ANY OF THE DAO PARTIES BE LIABLE TO YOU IN THE AGGREGATE FOR MORE THAN THE AMOUNT YOU HAVE PAID THE **DAO DIRECTLY ARISING FROM YOUR CONTRIBUTION TO THE DAO** IN THE THIRTY (30) DAYS IMMEDIATELY PRECEDING THE DATE ON WHICH YOU FIRST ASSERT ANY SUCH CLAIM, WHETHER SUCH LIABILITY IS BASED ON BREACH OF WARRANTY, BREACH OF CONTRACT OR TORT (INCLUDING NEGLIGENCE) OR OTHERWISE.

We do not guarantee that the Site will be secure or free from bugs or viruses.

You are responsible for configuring your information technology, computer programs and platform in order to access the Site. You should use your own virus protection software.

We cannot promise that the use of the Site, or any content taken from the Site, will not infringe the rights of any third party

PLAINTIFF0003180



rights of any third party.

Certain content and materials available on the Site are for informational purposes only and are not intended to address your particular requirements. In particular, the content and materials available on the Site do not constitute any form of advice or recommendation by us, should not be regarded as an offer, solicitation, invitation or recommendation to buy or sell investments, securities or any other financial services and are not intended to be relied upon by you in making any specific investment or other decisions. We recommend that you seek independent advice from your own financial advisors and legal counsel before making any such decision.

Nothing included in the Site constitutes an offer or solicitation to sell, or distribution of, investments and related services by the DAO to anyone in any jurisdiction.

You may only participate with Smart Contracts on the Site by linking your Cryptocurrency Wallet on supported bridge extensions such as MetaMask (currently available at https://metamask.io/). MetaMask is an electronic wallet that allows you to purchase, store, and engage in transactions using Ethereum cryptocurrency. Before putting your Cryptocurrency Asset into a Smart Contract, you will be required to download a supported electronic wallet extension and connect and unlock your Cryptocurrency Wallet with that extension.

ALL TRANSACTIONS INITIATED THROUGH OUR SERVICE ARE FACILITATED AND RUN BY THIRD-PARTY ELECTRONIC WALLET EXTENSIONS, AND BY USING OUR SERVICES YOU AGREE THAT YOU ARE GOVERNED BY THE TERMS OF SERVICE AND PRIVACY POLICY FOR THE APPLICABLE EXTENSIONS. FOR METAMASK, THOSE TERMS ARE AVAILABLE AT https://metamask.io/terms.html AND https://metamask.io/privacy.html.

## 13. Indemnification.

You agree to indemnify and hold the DAO and its parents, subsidiaries, affiliates, officers, employees, agents, partners, suppliers, and licensors (each, a "DAO Party" and collectively, the "DAO Parties") harmless from any losses,

PLAINTIFF0003181



costs, liabilities, and expenses (including
reasonable attorneys' fees) relating to or arising
out of any and all of the following: (a) Your

Content; (b) your use of, or inability to use, any
DAO Property; (c) your violation of the Agreement;
(d) your violation of any rights of another party,
including any Registered Users; or (e) your
violation of any applicable laws, rules, or
regulations. The DAO reserves the right, at its
own cost, to assume the exclusive defense and
control of any matter otherwise subject to
indemnification by you, in which event you will
fully cooperate with the DAO in asserting any
available defenses. This provision does not
require you to indemnify any of the DAO Parties
for any unconscionable commercial practice by such
party or for such party's fraud, deception, false
promise, misrepresentation, or concealment, or
suppression or omission of any material fact in
connection with the Website or any Services
provided hereunder. You agree that the provisions
in this section will survive any termination of
your Account, the Agreement, and/or your access to
the DAO Properties.

## 14. Arbitration.

**Informal Negotiations.** To expedite resolution and
control the cost of any dispute, controversy or
claim arising under or related to your account,
the DAO protocol or Application, the Site, these
Terms, or any other transaction involving you and
the DAO, whether in contract, warranty,
misrepresentation, fraud, tort, intentional tort,
statute, regulation, ordinance, or any other legal
or equitable basis (or the breach, termination,
enforcement, interpretation or validity thereof)
(**"Dispute"**), you and the DAO agree to first
attempt to negotiate any Dispute (except those
Disputes expressly provided below) informally for
at least ninety (90) days before initiating any
arbitration. Such informal negotiations commence
upon written notice from one person to the other.
You should send your notice in an appropriate
Discord channel via https://discord.gg/movexyz or
via a message on https://chat.blockscan.com
addressed to the DAO Gnosis multi-signature
address 0x143cC0A996De329C1C5723Ee4F15D2a40c1203c6
(**"Notice Address"**). The DAO will send its notice

PLAINTIFF0003182



to you by the Discord handle provided by you in connection with the aforementioned notice or to

the Cryptographic address used in connection with the Application via the aforementioned https://chat.blockscan.com/.

**Binding Arbitration.** If you and the DAO are unable to resolve a Dispute through informal negotiations, either you or the DAO may elect to have the Dispute (except those Disputes expressly excluded below) finally and exclusively resolved by confidential binding arbitration, and not in a class, representative or consolidated action or proceeding. In such event, these Terms memorialize a transaction in interstate commerce; (i) the Federal Arbitration Act (9 U.S.C. § 1, et seq.) governs the interpretation and enforcement of this Section; and (ii) this Section shall survive termination of these Terms.

Any election to arbitrate by one party shall be final and binding on the other, and your grounds for appeal are limited. YOU UNDERSTAND THAT ABSENT THIS PROVISION, YOU WOULD HAVE THE RIGHT TO SUE IN COURT AND HAVE A JURY TRIAL. The arbitrator may award you the same damages and relief as a court sitting in proper jurisdiction could, and may award declaratory or injunctive relief. In addition, in some instances, the costs of arbitration could exceed the costs of litigation and the right to discovery may be more limited in arbitration than in court. The arbitration shall be commenced and conducted under the Commercial Arbitration Rules of the American Arbitration Association ("AAA") and, where appropriate, the AAA's Supplementary Procedures for Consumer Related Disputes ("AAA Consumer Rules"), both of which are available at the AAA website. The determination of whether a Dispute is subject to arbitration shall be governed by the Federal Arbitration Act. The parties agree that the arbitrator shall have exclusive authority to decide all issues relating to the interpretation, applicability, enforceability and scope of this arbitration agreement. Your arbitration fees and your share of arbitrator compensation shall be governed by the AAA Rules and, where appropriate, limited by the AAA Consumer Rules. If such costs

PLAINTIFF0003183



are determined by the arbitrator to be excessive,
you will pay all arbitration fees and expenses.
The arbitration may be conducted, at the option of

the claimant, either in person or by video
conference. The arbitrator will make a decision in
writing, but need not provide a statement of
reasons unless requested by a party. The
arbitrator must follow applicable law, and any
award may be challenged within a reasonable period
of time (not to exceed 30 days) if the arbitrator
fails to do so. Except as otherwise provided in
this Agreement, you and the DAO may litigate in
court to compel arbitration, stay proceedings
pending arbitration or to confirm, modify, vacate
or enter judgment on the award entered by the
arbitrator. Judgment upon any award rendered by
the arbitrator(s) may be entered and enforcement
obtained thereon in any court having jurisdiction.
All arbitration proceedings shall be closed to the
public and confidential and all records relating
thereto shall be permanently sealed, except as
necessary to obtain court confirmation of the
arbitration award. Each party shall have the right
to participate by video conference in order to
minimize travel and expense burdens. Subject to
the terms and conditions of these Terms, the
arbitrator shall have authority to grant any form
of appropriate relief, whether legal or equitable
in nature, including specific performance.

**Restrictions/No Class Actions.** You and the DAO
agree that any claim brought in connection with a
Dispute, whether resolved through arbitration or
not, will be brought between the DAO and you
individually, and that you may not assert any such
claim against the DAO as plaintiff or class Member
in any purported class or representative
proceeding. To the fullest extent permitted by
law, (1) no arbitration shall be joined with any
other; (2) no Dispute between you and the DAO is
to be arbitrated on a class-action basis or will
utilize class action procedures; and (3) you may
not bring any Dispute in a purported
representative capacity on behalf of the general
public, other Users of the Site or any other
persons. If this specific provision is determined
to be unenforceable, then the entirety of this
Arbitration section will be null and void.

PLAINTIFF0003184

**Exceptions to Informal Negotiations and Arbitration.** You and the DAO agree that the following Disputes are not subject to the above provisions concerning informal negotiations and binding arbitration:

(1) any Disputes seeking to enforce or protect, or concerning the validity of, any of your or the DAO's intellectual property rights; and (2) any claim for injunctive relief.

**Effect of Changes on Arbitration.** Notwithstanding the provisions of these Terms, if the DAO changes any of the terms of this Arbitration section after the date you first accepted these Terms (or accepted any subsequent changes to these Terms), you may reject any such change by sending us written notice (including by electronic mail to the aforementioned Notice Address via https://chat.blockscan.com/) within 30 days of the date such change became effective, as indicated in the "Last Updated" date above or in the date of the DAO's e-mail to you notifying you of such change (whichever is earlier). By rejecting any change, you are agreeing that you will arbitrate any Dispute between you and the DAO in accordance with the terms of this Arbitration section as of the date you first accepted these Terms (or accepted any subsequent changes to these Terms.

**Small Claims Court.** Notwithstanding the foregoing, you may bring an individual action in the small claims court of your state or municipality if the action is within that court's jurisdiction and is pending only in that court.

**Release.** You hereby release the DAO, affiliates, Service Provider, and their successors from claims, demands, any and all losses, damages, rights, and actions of any kind, including personal injuries, death, and property damage, that is either directly or indirectly related to or arises from your use of the DAO DAPP, including but not limited to, any use of any information, ratings, rankings, scores, tips, or advice Made Available via the DAO DAPP and any reliance thereon, of any kind arising in connection with or as a result of the Agreement or your use of the DAO DAPP. If you are a California resident, you hereby waive California Civil Code Section 1542

PLAINTIFF0003185





hereby waive California Civil Code Section 1542,
which states, "A general release does not extend
to claims that the creditor or releasing party

does not know or suspect to exist in his or her
favor at the time of executing the release and
that, if known by him or her, would have
materially affected his or her settlement with the
debtor or released party." The foregoing release
does not apply to any claims, demands, or any
losses, damages, rights, and actions of any kind,
including personal injuries, death, or property
damage for any unconscionable commercial practice
by a DAO Party or for such party's fraud,
deception, falsehood, promise, misrepresentation,
or concealment, suppression, or omission of any
material fact in connection with the DAPP or the
DAO Site or any Services provided hereunder.

## 15. Governing Law.

These Terms and all aspects of your use of the
Site shall be governed by and construed in
accordance with the internal laws of the *United
States and the State of Delaware* governing
contracts entered into and to be fully performed
in *Delaware* (i.e., without regard to conflict of
law's provisions) regardless of your location
except that the Arbitration section above shall be
governed by the Federal Arbitration Act. For the
purpose of any judicial proceeding to enforce an
arbitration award or incidental to such
arbitration or to compel arbitration, or if for
any reason a claim proceeds in court rather than
in arbitration, you hereby submit to the non-
exclusive jurisdiction of the state and Federal
courts sitting in *Georgetown, Delaware*, and agree
that service of process in such arbitration or
court proceedings shall be satisfactorily made
upon a party if sent by certified, express or
registered mail addressed to it at the address set
forth in the books and records of the DAO, or if
no such address has been provided, by e-mail to
the e-mail address, or by notice via Discord, or
by the aforementioned chat to the Notice Address
provided by the relevant party to the DAO in
connection with its use of the Site. With respect
to any Disputes not subject to informal dispute
resolution or arbitration (as set forth above),
you agree not to commence or prosecute any action

PLAINTIFF0003186

in connection therewith other than in the state
and Federal courts located in *Georgetown,*

*Delaware*, and you hereby consent to, and waive all
defenses of lack of personal jurisdiction and
forum non conveniens with respect to, venue and
jurisdiction in the state and Federal courts
located in *Georgetown, Delaware*. To the extent
non-U.S. laws mandate a different approach with
respect to governing law, venue, statute of
limitation, and dispute resolution method with
respect to certain non-U.S. persons, each such
required standard shall be applied, but all other
provisions under this section shall remain in full
force.

## 16. General.

If any clause or part of any clause of these Terms
is found to be void, unenforceable or invalid,
then it will be severed from these Terms, leaving
the remainder in full force and effect, provided
that the severance has not altered the basic
nature of these Terms.

No single or partial exercise, or failure or delay
in exercising any right, power or remedy by us
shall constitute a waiver by us of, or impair or
preclude any further exercise of, that or any
right, power or remedy arising under these terms
and conditions or otherwise.

If any of the provisions in these Terms are found
to be illegal, invalid or unenforceable by any
court of competent jurisdiction, the remainder
shall continue in full force and effect.

The DAO shall not be liable for any unforeseeable
event beyond its reasonable control not caused by
its fault or negligence (each, a "force majeure
event"), which causes the DAO to be unable to
perform its obligations under these Terms, and
which it has been unable to overcome by the
exercise of its due diligence, provided that the
DAO shall use reasonable efforts to avoid or
remove such causes of nonperformance, shall
suspend performance only for such period of time
as is necessary as a result of such force majeure
event and shall resume performance as quickly as

PLAINTIFF0003187

reasonably possible.



All disclaimers, indemnities and exclusions in
these Terms shall survive termination of the Terms
and shall continue to apply during any suspension
or any period during which the Site is not
available for you to use for any reason
whatsoever.

These Terms and the documents referred to in them
set out the entire agreement between you and us
with respect to your use of the Site, the DAO and
the services provided via the Site and supersede
any and all prior or contemporaneous
representations, communications or agreements
(written or oral) made between you or us.

## 17. Contacting Us.

Should you have any question about these Terms, or
wish to contact us for any reason whatsoever,
please do so by sending a message to the DAO's
Discord public channels, or by sending a message
via https://chat.blockscan.com/ addressed to the
Notice Address
eth:0x143cC0A996De329C1C5723Ee4F15D2a40c1203c6,
which has been provided for convenience, or to the
above referenced Service Provider notice address.

---

[1]: Additional domains include: *dao advice.xyz,
dao advisors.xyz, move.xyz, movementdao.org,
movementdao.xyz, movementdao.wtf, mvmtdao.xyz,
themovementdao.xyz, bannymart.xyz, bannyverse.xyz,
juicebox.beer, juicebox.builders, juicebox.cafe,
juicebox.cash, juicebox.click, juicebox.cash,
juicebox.coffee, juicebox.cool,
juicebox.directory, juicebox.domains,
juicebox.engineering, juicebox.fund, juicebox.fyi,
juicebox.lol, juicebox.miami, juicebox.monster,
juicebox.name, juicebox.page, juicebox.plus,
juicebox.wtf, treasury.wtf, treasuries.wtf,
tiles.wtf*

| Previous | Next |
|---|---|
| Terms of Service | Disclaimers |

PLAINTIFF0003188



**LEGAL–TOOLS**  DAOLABS

<div style="float:right">Connect Wallet</div>



    

The following disclaimers are presented within the daolabs.wtf Terms of Service and have been consolidated here for your convenience.

> (i) None of the information, services or materials offere  o  o r Site co stit te, a  are ot i te  e  to co stit te, legal, fi a cial, tax, i vestme t or other a vice, a   yo  sho l  ot act or refrai from acti g base  o  a y i formatio , services or materials  rovi e  o  this Site.

# Limitation of Liability.

## 1. Prohibition from Illegal Activities.

> (i) You agree and acknowledge that the use of the services is ma e solely at yo r ow risk a   res o sibility a   that  A  ABS bares  o res o sibility or liability for yo r  se of the  A  Beta Services  rovi e i cl  i g, witho t limitatio , for a y harm, loss, or  amages arisi g from i correct  se of the services, i cl  i g co str cte  tra sactio s,  etwork a tech ical fail res,  a thorize  access to a y  ser wallets, legal a   reg latory matters a   co seq e ces, or fra

Limitation of Liability.

   1. Prohibition from Illegal Activities.

   2. Legal, Financial, Tax, Investment Information Presented.

   3. Securities Law Matters.

   4. Regarding Ethereum Platform Risks.

   5. Regarding privacy.

PLAINTIFF0003189



e     y     r    ar   es. Y    agree a
ack owle ge that yo  will  ot  se the
services:

- (i) in a manner that
  violates any applicable law
  or regulation;
- (ii) to fund terrorism or
  other criminal activity;
- (iii) to circumvent any
  export restrictions or
  economic sanctions; or
- (iv) to engage in unlawful
  money transmission,
  currency exchanging, or
  money laundering. :::

## 2. Legal, Financial, Tax, Investment Information Presented.

ⓘ None of the information,
services or materials offered on our
Site constitute, and are not
intended to constitute, legal,
financial, tax, investment or other
advice, and you should not act or
refrain from acting based on any
information, services or materials
provided on this Site. All content
on our Site is information of a
general nature and does not address
the unique circumstances of any
particular user. You are strongly
urged to consult with your own
legal, financial, tax, investment
and other advisors as to all legal,
financial, tax and investment-
related questions you have.

## 3. Securities Law Matters.

ⓘ Any Governance Tokens received by
Members have not been approved or

PLAINTIFF0003190



disapproved by the  nited States
Securities and Exchange Commission, any
state securities commission, or other

regulatory authority, nor have any of the
foregoing authorities passed upon the
merits of this offering or upon the
accuracy or adequacy of this agreement.
Any representation to the contrary is a
criminal offense. This document does not
constitute an offer or solicitation to
anyone in any jurisdiction in which such
offer or solicitation is not authorized.

ⓘ Any Governance Tokens that you may
acq ire have  ot bee  registere    er the
Sec rities Act, state sec rities laws, or
the laws of a y co  try o tsi e the   ite
States.  A  ABS' ositio  is that they
sho l   ot be si ce the   r ose of
J icebox is to ma age Ethere m treas ries,
 rovi es  o rights to a y  istrib tio  or
 rofits, a   are  o  tra sferrable exce t
 etaile  i  the Terms of  se.

## 4. Regarding Ethereum Platform Risks.

Limitation of liability on a broader scope, with
Ethereum in general.

ⓘ The  ser expressly knows and agrees
that the  ser is  si g the Ethere m
 latform at the  ser's sole risk. The  ser
re rese ts that the  ser has a  a eq ate
   ersta  i g of the risks,  sage a
i tricacies of cry togra hic toke s a
blockchai  base  o e  so rce software, ET
 latform a   ET . The  ser ack owle ges
a   agrees that, to the f llest exte t
 ermitte  by a y a  licable law, the
 isclaimers of liability co tai e  herei
a  ly to a y a   all  amages or i j ry
whatsoever ca se  by or relate  to risks
of,  se of, or i ability to  se, ET  or
the Ethere m  latform   er a y ca se or
actio  whatsoever of a y ki  i  a y

PLAINTIFF0003191



limitatio , actio s for breach of warra ty, breach of co tract or tort

(including negligence) and that neither Ethereum team shall be liable for any indirect, incidental, special, exemplary or consequential damages, including for loss of profits, goodwill or data. Some jurisdictions do not allow the exclusion of certain warranties or the limitation or exclusion of liability for certain types of damages. Therefore, some of the above limitations in this section may not apply to a  ser.

## 5. Regarding privacy.

- Privacy Policy

| Previous | Next |
|---|---|
| Treasury Terms of Service | Privacy Policy |

PLAINTIFF0003192

 **LEGAL—TOOLS**  DAOLABS

**Connect Wallet**



    

DAOLABS and specifically this website does not collect any information. All form data is used immediatelly to update the working document and provide you with a printable, downloadable copy. We do not employ any cookies, database, or persistence.

| Previous | Next |
|---|---|
| Disclaimers | DAOLABS |

PLAINTIFF0003193



PLAINTIFF0003194



LEGAL-TOOLS    **DAOLABS**

**Connect Wallet**



    

# About Us

DAOLABS.wtf is building a powerful suite of tools for web3 communities: flexible enough to operate at any scale, with powerful token issuance, treasury management, fiat compatibility, governance, and legal compliance out of the box.

- To learn about our platform, look at the Documentation.
- If you are looking to set up a legal entity for your project, or to learn more about compliance in web3, read our Legal Primer
- To learn about the tools and resources which make this possible, read the Copyright section.
- Be sure to read Our Policies before accessing the rest of this website.

Our platform is possible thanks to amazing work from Juicebox, Safe, Bolt, and the Ethereum community.

> ## Gnosis Contributors
>
> ⓘ **If you have made significant contributions to DAOLABS, MOVE, or the original Movement DAO Gnosis in 2021, please fill out this form.**

# Our Partners

## Movement DAO

About Us

Gnosis Contributors

Our Partners

  Movement DAO

  Peace DAO

Contact

PLAINTIFF0003195



<u>Movement DAO</u> is an Unincorporated Nonprofit Association which is working with DAOLABS to offer web3 tools for

non-profits, charities, and public good projects. Movement DAO is <u>governed by its community</u>, and builds in the open. To learn more or to join the DAO, visit the <u>Move Discord</u>.

## Peace DAO

<u>The Peace Movement DAO's</u> purpose is to fund life-saving assistance and support for Ukranian refugees and displaced people. The DAO is providing immediate support for Ukranians facing humanitarian crises, and will continue to provide support as they rebuild their lives. Peace DAO is democratically governed by its community, **radically reducing overhead and maximizing impact.** To learn more, visit the <u>Peace DAO Docs</u> and join the <u>Discord Server</u>.

# Contact

Please direct feedback, bug reports, requests, and inquiries to the <u>Feedback Form</u>.



**Previous**
Privacy Policy



**Next**
oc me tatio

PLAINTIFF0003196

 LEGAL-TOOLS **DAOLABS**                                    **Connect Wallet**



    

This directory contains high-level documentation for the DAOLABS application ("Dapp") stack.

## Sitewide

- A navbar with L: Discover, Start a Project, Learn and R: Search, language selector, night mode toggle, and Connect.
- Footer with GitHub, privacy policy, ToS, social links, etc.

## Home (/)

The Home page is a landing page, and the first page users are met with. It includes:

1. A brief Dapp explainer and CTAs to (i) create a project and (ii) to discover existing projects.
2. Protocol/Dapp stats (# of projects, amount raised, # of payments).
3. A "featured projects" section containing a CTA to browse projects (direct to explore page).
4. A more detailed overview of project creation and experience.
5. Further FAQs.

## Discover (/discover)

The Discover page curates and presents projects, collections, and users. Users are presented with a number of filtering options above the screen—see Kickstarter's discover page for an example. For the Dapp, these fields could read: "Show me CATEGORY TYPE sorted by SORTING", with modifications for additional filters. Again, see Kickstarter's discover page. As an

Sitewide

Home (/)

Discover (/discover)

Project (/@handle)

   Home

   Treasury

   Store

   Govern

   Documents

Collection (/c/handle)

   User (/u/handle)

   Create (/create)

PLAINTIFF0003197

example, the default could be: "Show me all projects, sorted by total raised".

# Project (/@handle)



A customizable Project page is created for each project on the Dapp. The Project page contains several tabs:

## Home

A project's home tab contains an overview of the project and its characterizing configurations. When creating a project, creators prescribe a name, description, logo, and links as metadata to be prominently displayed on the project's home tab. The home page also contains:

- A "pay" button which allows users to contribute funds to the project's treasury.
- An overall trust score for the project.
- Brief mention of the project's custody and basic configurations (e.g. "onchain governance, owned by smart contract" or "Snapshot voting, owned by Gnosis Safe at example.eth with signers . . .").
- Basic dashboard-style information about the project (e.g. # of token holders, total volume, total distributed, date created, etc.). This information should be communicated graphically if possible. More complex information should be left to the treasury page.

## Treasury

The treasury tab displays an overview of treasury inflows and outflows, as well as specific treasury configuration information—this can be likened to a juicebox.money project page. This tab clearly displays any additional terminals and information pertaining to those terminals.

## Store

The store tab displays NFT collections associated with the project.

## Govern

The govern tab displays active governance proposals

PLAINTIFF0003198

associated with the project, and allows users to vote on those proposals. Projects can elect to utilize offchain governance (a la Snapshot) or onchain

governance (onchain governance solution not yet decided).

## Documents

The documents tab displays documents which are relevant to a project. This might include a mission statement, a governance process, a road map, guiding principles, or several legal agreements for DAO members. These documents should all be templated to the extent possible.

# Collection (/c/handle)

An NFT collection's page displays an overview of the collection and its characterizing configurations. When creating a collection, creators prescribe a name, description, logo, and links as metadata to be prominently displayed on the associated collection page. The collection page also contains:

- A scrolling showcase of various NFTs in the collection. In the case of an edition mint, one NFT is showcased.
- A "purchase" section. This could be a mint button, or a bid button in the case of an auction.
- Basic dashboard-style information about the collection (e.g. # of NFTs, # of holders, collection type, total volume, date created, etc.). This information should be communicated graphically if possible.

# User (/u/handle)

A User's page displays basic user information. Users can customize their name, description, logo, and links as metadata to be prominently displayed on their user page. The page also contains:

- "Trust" score
- Projects associated with the user (via ownership, creation, governance participation, token holding, etc.)
- Collections associated with the user (via creation, ownership, minting, purchase, sale, etc.)

PLAINTIFF0003199

- Documents associated with the user (resume/CV, legal agreements, etc.)

## Create (/create)

| Previous | Next |
|---|---|
| DAOLABS | Contracts |



PLAINTIFF0003200



LEGAL-TOOLS    **DAOLABS**                                    **Connect Wallet**



    

This section contains documentation for the contracts which comprise the DAOLABS application components. This includes Juicebox v3 protocol which is well documented here as well, as changes to the core protocol.

1. Juicebox Fork
2. Pay Delegates
3. Extensions
4. Auctions
5. Deployer
6. NFT Features

**Previous**
Documentation

**Next**
Juicebox Fork

PLAINTIFF0003201



PLAINTIFF0003202



LEGAL-TOOLS    **DAOLABS**

**Connect Wallet**



    

DAOLABS has forked the Juicebox v3 protocol, the fork contains modifications which revolve around the following:

1. United States (U.S.) regulatory compliance;
2. Protocol fee configuration;

Despite these changes, DAOLABS has made an effort to keep the fork as close to the original protocol as possible.

Previous
Contracts

Next
Pay Delegates

PLAINTIFF0003203



PLAINTIFF0003204



LEGAL-TOOLS  **DAOLABS**

**Connect Wallet**



NFT Rewards
  Motivation
  Implementation
  Example Uses
    Bounded Tiers
    Unbounded Tiers
  Deployment
  Post-deployment Admin Actions
    Mint
    Prevent Token Transfers
    URI Management

   

# NFT Rewards

## Motivation

If added to an existing project via a funding cycle, NFT rewards can provide additional incentive for contributors to participate in funding of a project.

## Implementation

NFTRewardDataSourceDelegate implements several Juicebox interfaces (IJBFundingCycleDataSource, IJBPayDelegate, IJBRedemptionDelegate) that make it possible to use it as a funding cycle data source. It also acts as an ERC721 reward token itself. The contract is highly configurable through constructor parameters. Note that this isn't meant to replace the ERC20 project token distribution.

In its most basic configuration NFTRewardDataSourceDelegate will mint NFTs to participants contributing over some defined minimum and up to some number of NFTs. The constructor parameters are:

- projectId: JBX project id of the project in question.
- directory: Platform JBDirectory.
- maxSupply: NFT supply cap, to remove supply constraint, set this to type(uint256).max.
- minContribution: JBTokenAmount-based definition of minimum contribution that includes the token if used and balance to qualify for the mint.
- _name: NFT name.
- _symbol: NFT symbol.
- _uri: NFT base URI.
- _tokenUriResolverAddress: Token URI resolver, in the basic case this should be address(0).
- _contractMetadataUri: Location of OpenSea-style contract metadata.
- _admin: EOA or multisig capable of executing arbitrary contract calls.

PLAINTIFF0003205



- _priceResolver: For the basic case, set this to address(0). In this case maxSupply and minContribution parameters will govern the mint.

# Example Uses

## Bounded Tiers

IPriceResolver and IToken721UriResolver parameters add flexibility to how the NFTRewardDataSourceDelegate contract can be used. There are two sample implementations of the price resolver that allow project runners to reward contributors in tiers. For example, the higher the contribution the more rare the NFT the participant would get.

TieredPriceResolver takes tier configuration that includes tier floor contribution amount, tier size and id definition. Consider this tier definition:

```
[
  { contributionFloor: 1 ether, idCeiling: 1001, remainingAllowance: 1000 },
  { contributionFloor: 5 ether, idCeiling: 1501, remainingAllowance: 500 }
]
```

This configuration will mint 1000 NFTs for contributors depositing more than 1 ether but below 5 and 500 NFTs for people contributing 5 or more. The combination of idCeiling and remainingAllowance will generate consecutive, increasing token ids. For example, the first deposit of 1 ether will receive token id 1001 - 1000: 1. The second will get 1001 - 999: 2, and so on. Token id 0 is interpreted by NFTRewardDataSourceDelegate as a do not mint instruction.

In addition to this globalMintAllowance and userMintCap constructor parameters provide the option of additional caps. For example, setting globalMintAllowance to 1000 in the above case will limit total number of issued NFTs to 1000 regardless of the tier they were minted in while still limiting the 5 ether + tier to 500 tokens. userMintCap can be used to limit how many NFT rewards a single account can get. To disable these limits them to type(uint256).max.

It is necessary to pass the tier configuration into the constructor sorted by contribution amount and there should be no id range overlap.

## Unbounded Tiers

Another, simpler and gas-cheaper example of a price resolver is OpenTieredPriceResolver, this contract comes with its own token URI resolver as well: OpenTieredTokenUriResolver. It is necessary to use them together or to implement another IToken721UriResolver. OpenTieredPriceResolver is a leaner version that removes caps and range limits. This reduces storage and call gas costs. Tier configuration might look like this:

PLAINTIFF0003206



```
[
  { contributionFloor: 1 ether },

  { contributionFloor: 5 ether },
  { contributionFloor: 10 ether }
]
```

In this configuration anyone who deposits more than 1 ether, but less than 5 will get a tier-1 NFT, 5-10 tier-2 NFT and 10+ tier-3 NFT. There are no explicit limits on how many NFTs can be issued per tier. Practically however they're limited to type(uint248).max. The reason is that the tier is encoded in the low 8 bits of the token id. This is the reason for the custom token URI resolver. The URI resolver will parse the bottom 8 bits into an int and return an URI with that id. This means that many token ids will show the same content. The main content of the token id is derived from the contributor address and current block number. There is no collision check because the price resolver isn't aware if it's working with an ERC721 or 1155 type token.

It is necessary for the tiers to be sorted by contribution amount in the constructor.

## Deployment

It is necessary to deploy the TieredPriceResolver then NFTRewardDataSourceDelegate and then assign the latter to a funding cycle of the project. In the unbounded example, OpenTieredPriceResolver and OpenTieredTokenUriResolver need to deployed first, passed to the deployment of NFTRewardDataSourceDelegate and then assigned to a funding cycle.

## Post-deployment Admin Actions

One of the deployment parameters is an address that can be used to administer the contract. It should be set to an EOA or a multisig address capable of performing arbitrary operations. This account will be able to perform the following actions.

### Mint

The admin account can issue tokens to any address without payment. Use of this function is not recommended. Currently it will mint the next token id to the provided address which may not mesh well with whatever price resolver the token may be using.

### Prevent Token Transfers

There are use cases where it's necessary to block reward NFT token holders from transferring them. This can be done after the token contract is deployed by calling setTransferrable(false). At this point the admin will

PLAINTIFF0003207

also be able to burn tokens from holders.

## URI Management

There are two URIs associated with the contract: token URI and contract URI. The former is used to determine the location of the specific asset and the latter should contain OpenSea-style metadata. These can be set with either setTokenUriResolver or setTokenUri and setContractUri. setTokenUriResolver is used for complex cases where appending the token id to a base URI is not enough. All of these parameters are also part of the constructor.



Previous
Juicebox Fork

Next
Extensions

PLAINTIFF0003208

 **LEGAL-TOOLS**    **DAOLABS**    **Connect Wallet**

Auctions
Deployer
NFT
NFT Rewards
Utils
    JBSplitPayerUtil
Misc contracts
    DaiTreasuryDelegate
    JBRoleManager
    LogPublisher
    MixedPaymentSplitter
    PaymentProcessor
    TokenLiquidator
    Vest Tokens
Notes
Contributing

     

This is a collection of additional contracts providing functionality on top of Juicebox v3 that is fully integrated with the rest of the platform.

# Auctions

NFT English (increasing price) and Dutch (decreasing price) auction contracts for ERC721 tokens.

# Deployer

An upgradeable proxy contract to deploy reusable system components like NFTs, payment processors, etc. For more details see the readme there.

# NFT

A collection of NFT contracts with ERC721 functionality hooked into the Juicebox payment system along with auction mechanics and other features. For more details, see the NFT readme.

# NFT Rewards

Juicebox rewards project contributors with ERC20 tokens, the contracts here allow project controllers to also issue NFTs. These can be used a simple rewards, memberships, etc. There are several examples of price resolvers to demonstrate different use cases. This is the original implementation which was changed and updated by the core Juicebox team in xxx.

# Utils

PLAINTIFF0003209

## JBSplitPayerUtil

This contract allows processing of JBSplit objects and execute the associated payment outside the context of JBPayoutRedemptionTerminal. Currently this is used in the auction contracts described above.



# Misc contracts

## DaiTreasuryDelegate

An automated DAI treasury that will convert incoming Ether into DAI on Uniswap. This contract is an implementation of IJBFundingCycleDataSource, IJBPayDelegate and IJBRedemptionDelegate providing deposit and withdraw functionality as part of a <u>Funding Cycle</u> via didPay and didRedeem. This contract is meant to be shared across all projects on the platform that would like to diversify some their holdings from Ether into DAI.

## JBRoleManager

A contract to enable a dynamic access control mechanism. While conceptually similar to JBOperatorStore, JBRoleManager allows on-the-fly creation of project-specific roles, their assignment to users and validation.

## LogPublisher

A generic contract to push events to the log.

## MixedPaymentSplitter

Based on OpenZeppelin finance/PaymentSplitter.sol v4.7.0, this contract allows registered parties to claim Ether or ERC20 token balances held by the Splitter instance prorated to their share. Registered parties can be EOAs, smart contracts or Juicebox projects.

## PaymentProcessor

This contract is meant to be a proxy that receives payments and forwards them to the pre-configured Juicebox project. The proxy can accept payment in ERC20

PLAINTIFF0003210

tokens and optionally liquidate them. The proxy also
optionally allows payment in case of project
misconfiguration.

## TokenLiquidator



This contract integrates with Uniswap to allow seamless
liquidation of tokens into WETH or Ether which is then
forwarded to a Juicebox terminal. The contract is
generic, meaning that a project doesn't need to deploy
their own copy of it. Liquidation happens via
liquidateTokens called by the token holder. This
contract has a fee mechanism where a small portion of
the proceeds is sent to the platform.

To pay into a project using tokens call liquidateTokens
with the following arguments:

- token: ERC20 address.
- amount: Token amount to pay.
- minValue: Minimum liquidation value. To sell at
  "market" price, set this to 0.
- jbxProjectId: Juicebox project to pay into.
- beneficiary: Beneficiary address tha the project
  terminal will receive. This is used to possibly
  issue project tokens and most often is expected to
  be the same as msg.sender.
- memo: Contribution memo text, a Juicebox terminal
  parameter, can be blank.
- metadata: Contribution metadata, a Juicebox
  terminal parameter, can be blank.

The contract will attempt to pay into the project with
Ether or with WETH, depending on what kind of terminal
the project exposes. The operation will fail otherwise.
Payment happens via the terminal's pay function which
may issue project tokens or other assets to the
beneficiary address.

## Vest Tokens

Allows creation of vesting schedules that release ERC20
tokens to a destination address on a regular interval.
The vesting schedule can have a cliff, interval
duration and total duration. Token amount per vesting
event is calculated evenly across the number of events.
It is possible to perform the vesting payout
trustlessly.

## Notes

PLAINTIFF0003211

Unless stated otherwise, 0 is not considered a valid
value. For example in the NFToken contract setting
mintAllowance to 0 will effectively prevent minting.

## Contributing



The code here attempts to follow some conventions to
make code reviews easier.

- Function arguments start with an underscore.
- Storage parameters do not start with an underscore
  regardless of visibility.
- Constants in storage are all caps.
- revert is used instead of require.
- Error names are capitalized in snake case.
- for loops increment at the end as ++i and test for
  continuation with =/ .
- Solidity version is defined with a caret,
  currently as ^0.8.6.

---

**Previous**
Pay Delegates

**Next**
A ctio s

PLAINTIFF0003212

 LEGAL-TOOLS **DAOLABS** **Connect Wallet**

DutchAuction
  Creating Dutch Auctions
  Bidding on and ending Dutch Auctions
  Other Methods
EnglishAuction
  Creating English Auctions
  Bidding on and ending English Auctions
  Other Functions

    

These contracts allow for creation of ERC721 auctions where proceeds from the auction will be paid to a collection of JBSplit objects. The contracts are intended to be deployed at platform level where the primary platform project would keep the fee from the auction sale. However 3rd party deployments are also possible. Fee would go to a Juicebox terminal via addToBalanceOf. It is possible to deploy the either contract with a fee of 0.

# DutchAuction

Allows listing NFTs with a starting price, an ending price and an auction duration. This auction type expects bidders to place decreasing bids. It is possible to set a lower bid than the current price to "reserve" your place for the case where the price decreases to that point. When settling an auction, the contract will send the sale proceeds to the listing party, the NFT to the buyer and a commission to a Juicebox project. The commission rate is configurable and capped at 10%. It is possible to perform the auction settlement trustlessly.

The contract uses the initializer pattern with the following parameters:

- projectId: Project that manages this auction contract.
- feeReceiver: An instance of IJBPaymentTerminal which will get auction fees.
- feeRate: Fee percentage expressed in terms of JBConstants.SPLITS_TOTAL_PERCENT (1000000000).
- allowPublicAuctions: A flag to allow anyone to create an auction on this contract rather than

PLAINTIFF0003213

only accounts with the AUTHORIZED_SELLER_ROLE
permission.



- periodDuration: Number of seconds for each pricing
  period.
- owner: Contract admin if, should be msg.sender or
  another address.
- directory: JBDirectory instance to enable JBX
  integration.

Pricing period above is used as an interval where item
price drops. Meaning that for every N seconds the price
at which the auction can be closed reduces by some
amount.

After deployment it's possible to modify the
allowPublicAuctions flag via setAllowPublicAuctions.

## Creating Dutch Auctions

Call create to start an auction and pass the following
arguments:

- collection: ERC721 contract.
- item: Token id to list.
- startingPrice: Starting price for the auction from
  which it will drop.
- endingPrice: Minimum price for the auction at
  which it will end at expiration time.
- duration: Auction duration in seconds.
- saleSplits: Juicebox splits collection that will
  receive auction proceeds.
- memo: Memo to publish in the auction creation
  event.

The auction starts immediately on successful execution
of this function. Ownership of the NFT being sold will
be transferred to the auction contract. The auction
duration is a number of seconds from deploymentOffset
of the contract, a public property. This is done to
save some storage cost. The price drop amount is
calculated automatically as the difference between
starting and ending prices divided by the number of
periods, duration of which is defined in the
initializer and shared across all auctions, between
"now" and expiration.

Creating an auction fires the CreateDutchAuction event.
There is no internal auction index, it is expected that
auction state would be picked up from events. There is

PLAINTIFF0003214

a public auctions map where the key is defined as
keccak256(abi.encodePacked(address(collection), item)).

Note that improperly configured splits, for example
attempting to send Ether to a project with a
misconfigured terminal, will prevent auction
settlement. To mitigate this an updateAuctionSplits
function is present that can be called by the auction
creator.



### Bidding on and ending Dutch Auctions

This auction contract will accept the highest bid for
an item as long as it is above the ending price.
Meaning that interested parties can register their
interest before the price is at the bid amount. If this
happens, the auction still needs to be settled manually
when enough periods pass to hit the desired price. To
get the current price call currentPrice(IERC721
collection, uint256 item). This method will calculate
the number of elapsed periods and return the reduced
item price accordingly. Place bids by calling
bid(IERC721 collection, uint256 item, string calldata
_memo) which will generate an event, PlaceBid, with the
provided arguments.

Dutch auctions can be settled ahead of expiration if
the required price is met.

Auction settlement is trustless and is performed by
settle(IERC721 collection, uint256 item, string
calldata _memo). The last parameter is optional text
that would get published with the settlement event
(ConcludeAuction).

### Other Methods

Contract admin can execute several functions to manage
the authorized sellers list with addAuthorizedSeller
and removeAuthorizedSeller. They can also change the
fee receiver with setFeeReceiver. This is in addition
to setAllowPublicAuctions described above.

# EnglishAuction

Allows listing NFTs with a starting price, a reserve
price and an auction duration. This auction type
expects bidders to place increasing bids. When settling
an auction, the contract will send the sale proceeds to

PLAINTIFF0003215

an auction, the contract will send the NFT proceeds to the listing party, the NFT to the buyer and a commission to a Juicebox project. The commission rate

is configurable and capped at 10%. It is possible to perform the auction settlement trustlessly. Contracts in this section are designed to be as functionally similar as possible and with the exception of auction-specific mechanics they work in a similar fashion firing similar events.



The contract uses the initializer pattern with the following parameters:

- projectId: Project that manages this auction contract.
- feeReceiver: An instance of IJBPaymentTerminal which will get auction fees.
- feeRate: Fee percentage expressed in terms of JBConstants.SPLITS_TOTAL_PERCENT (1000000000).
- allowPublicAuctions: A flag to allow anyone to create an auction on this contract rather than only accounts with the AUTHORIZED_SELLER_ROLE permission.
- owner: Contract admin if, should be msg.sender or another address.
- directory: JBDirectory instance to enable JBX integration.

## Creating English Auctions

Call create to start an auction and pass the following arguments:

- collection: ERC721 contract.
- item: Token id to list.
- startingPrice: Minimum auction price. 0 is a valid price.
- reservePrice: Reserve price at which the item will be sold once the auction expires. Below this price, the item will be returned to the seller.
- expiration: Seconds, offset from deploymentOffset, at which the auction concludes.
- saleSplits: Juicebox splits collection that will receive auction proceeds.
- memo: Memo to publish in the auction creation event.

The auction starts immediately on successful execution of this function. Ownership of the NFT being sold will be transferred to the auction contract. The auction

PLAINTIFF0003216

be transferred to the auction contract. Auction
duration is a number of seconds from deploymentOffset
of the contract, a public property. This is done to

save some storage cost. This contract accepts
increasing item bids up until auction expiration.

Creating an auction fires the CreateEnglishAuction
event. There is no internal auction index, it is
expected that auction state would be picked up from
events. There is a public auctions map where the key is
defined as
keccak256(abi.encodePacked(address(collection), item)).

Note that improperly configured splits, for example
attempting to send Ether to a project with a
misconfigured terminal, will prevent auction
settlement. To mitigate this an updateAuctionSplits
function is present that can be called by the auction
creator.

## Bidding on and ending English Auctions

A bid will be placed successfully by calling
bid(IERC721 collection, uint256 item, string calldata
_memo) if the auction is still in progress and the new
bid is higher than the current bid. The contract only
stores the highest bid and automatically refunds the
previous bidder in case they are outbid.

Auction settlement is trustless and is performed by
settle(IERC721 collection, uint256 item, string
calldata _memo). The last parameter is optional text
that would get published with the settlement event
(ConcludeAuction).

## Other Functions

Contract admin can execute several functions to manage
the authorized sellers list with addAuthorizedSeller
and removeAuthorizedSeller. They can also change the
fee receiver with setFeeReceiver. This is in addition
to setAllowPublicAuctions described above.

Previous
Extensions

Next
Deployer

PLAINTIFF0003217

 LEGAL-TOOLS    **DAOLABS**    **Connect Wallet**



    

Design

Auctions

NFTs

Payment Splitter

These contracts demonstrate an upgradeable deployer pattern for the various contracts included in the extensions collection.

# Design

The deployer contract is meant to be a trusted mechanism for platform users to create instances of contracts they require. This is a managed, upgradeable contract. The first four iterations are meant to demonstrate this functionality. Subsequent development will only create new versions as they are deployed, aggregating multiple features per release where possible.

The contract has two types parts. The deployer contract itself, which has deploy*** functions for each of the contracts it's aware of and supporting libraries. Breaking out the actual contract deployment functionality into library contracts allows us to reuse them across versions, replace them if needed and generally keep upgrade costs lower.

All deployment functions return the address of the just-created contract and emit an event with the contract type name and the address.

# Auctions

Version three of the contract introduced the ability to deploy auction house contracts. It's expected that DAO Labs will offer a platform-level Dutch and English auction house contracts that can be used by the projects on the platform, we still want an easy option for people to instantiate their own during their...

PLAINTIFF0003218

for people interested in deploying their own.



There are two functions, deployDutchAuction and deployEnglishAuction that will create these contracts. This is done with the clone pattern where the deployer contract is given a known-good version of the logic contract and calls to these functions will deploy proxies that will delegatecall into it. The function parameters are the same as the ones going into the auction contract initializers. Actual deployment logic is in the AuctionsFactory contract.

deployDutchAuction:

- projectId
- feeReceiver
- feeRate
- allowPublicAuctions
- periodDuration
- owner
- directory

deployEnglishAuction

- projectId,
- feeReceiver,
- feeRate,
- allowPublicAuctions,
- owner,
- directory

# NFTs

The first version of the deployer introduced the ability to create NFT contracts, the logic is in NFTokenFactory. The createNFToken function accepts the parameters necessary to deploy a copy of the NFToken contract which is described in more detail in the NFT section.

Version four of the deployer added the option of deploying a cloned NFT in NFUTokenFactory. deployNFUToken takes the necessary arguments but omits mintPeriodStart and mintPeriodEnd which can be set by the NFT admin after deployment if needed. Contracts created via this process are storage proxies that forward function calls with delegatecall. This is a lower fee option compared to the one above.

PLAINTIFF0003219

# Payment Splitter

Deployer version two added the option to deploy a MixedPaymentSplitter contract. This is a full copy and it's done via deployMixedPaymentSplitter function which calls into MixedPaymentSplitterFactory. The parameters are below, for more details see the top-level readme of the extensions directory.



- name
- payees
- projects
- shares
- jbxDirectory
- owner

Previous
Auctions

Next
NFT Features

PLAINTIFF0003220



LEGAL-TOOLS    **DAOLABS**      **Connect Wallet**



    

NFToken

NFUToken

SupplyPriceResolver

BalancePriceResolver

MerklePriceResolver

DutchActionMachine

EnglishAuctionMachine

This is a collection of contracts for publishing ERC721 NFTs with additional functionality for pricing and sales. The contract (ERC721FU.sol) is based on the Rari Capital ERC721 implementation but removes the constructor to enable upgradeability. BaseNFT.sol extends that functionality with Juicebox integration, basic pricing and distribution features. The simplest functionality is implemented in NFToken.sol

Contracts in this section are (alphabetically):

- components/BaseNFT - Abstract opinionated ERC721 functionality with Juicebox integration.
- components/ERC721FU - Abstract baseline ERC721 functionality.
- <u>BalancePriceResolver</u> - NFT pricing contract based on address balance.
- <u>DutchActionMachine</u> - Perpetual NFT minting Dutch auction.
- <u>EnglishAuctionMachine</u> - Perpetual NFT minting English auction.
- <u>NFToken</u> - Deployable NFT contract.
- <u>NFUToken</u> - Deployable, upgradeable NFT contract.
- <u>SupplyPriceResolver</u> - NFT pricing contract based on total supply.

## NFToken

The constructor takes several parameters.

- name: Name of the token.
- symbol: Token symbol.
- baseUri: Token asset base uri.
- contractUri: OpenSea-compatible metadata uri.
- jbxProjectId: Juicebox project id that will

PLAINTIFF0003221

receive initial sale proceeds.



- jbxDirectory: Juicebox directory contract to get Terminal information for proceeds distribution.
- maxSupply: Supply cap.
- unitPrice: Base NFT mint price.
- mintAllowance: Per-address mint allowance.
- mintPeriodStart: Mint period start time stamp expressed in seconds. Can be set to 0 to allow immediate minting.
- mintPeriodEnd: Mint period end time stamp expressed in seconds. Can be set to 0 for an unbounded minting period.

This contract supports several common ERC standards: ERC721, ERC165, EIP2981.

It is possible to set royalty information after contract deployment. This is done with setRoyalties(address _royaltyReceiver, uint16 _royaltyRate). This method is gated with OpenZeppelin AccessControl for DEFAULT_ADMIN_ROLE. The first parameter must be an EOA or a payable contract. Consider using a deployment of MixedPaymentSplitter to pay multiple collaborators. The second parameter is royalty rate expressed as basis points where 10,000 is 100%. The royaltyInfo(uint256 _tokenId, uint256 _salePrice) view returns the actual royalty being collected and the address where it should be sent.

In addition to setting a bounded mint period, which can be modified after deployment with updateMintPeriod(uint128 _mintPeriodStart, uint128 _mintPeriodEnd), it's possible to implement a simple "reveal" mechanic with this contract. setBaseURI(string memory _baseUri, bool _reveal). On deployment the internal reveal flag is set to false. This causes tokenURI(uint256 _tokenId) to return base uri value without modification. The deployment value of base uri can then be used as a placeholder. Calling setBaseURI with reveal true will then append the token id to the base uri in the tokenURI view. Reveal can be set only once. There is a role, REVEALER_ROLE, that is allowed to perform this operation.

It's possible to store a provenance hash in the contract. It can be set only once using setProvenanceHash(string memory _provenanceHash).

By default token mint price is the value of unitPrice set in the constructor. It can be changed with

PLAINTIFF0003222



updateUnitPrice(uint256 _unitPrice) at any time to any value by a caller with the DEFAULT_ADMIN_ROLE permission. For advanced pricing calculation there is an option to associate a price resolver contract. This is done with updatePriceResolver(INFTPriceResolver _priceResolver). Several sample implementations are provided, They are described in detail below. It is possible to set price resolver to address(0). If the token is to have perpetual free mints setting both price resolver and unitPrice to 0 is the most cost-effective way to do it.

Several other features are available. setContractURI(string memory _contractUri) can change the OpenSea metadata uri. Mint can be paused and resumed with setPause(bool pause). mintFor(address _account) is an admin mint function gated with MINTER_ROLE role that allows unbounded mints to arbitrary accounts limited only by maxSupply. Minters can be added and removed by an account with DEFAULT_ADMIN_ROLE permission using addMinter(address _account) and removeMinter(address _account). These two functions are used by the "Auction Machine" contracts described below. Lastly there is a function to recover ERC20 token balances – transferTokenBalance(IERC20 token, address to, uint256 amount).

The mint functions require payment.

## NFUToken

This contract is exactly like NFToken, but instead of a constructor collects parameters via an initializer function. U is for Upgradeable.

## SupplyPriceResolver

This contract can be used together with an NFT contract to generate the mint price based on current NFT supply. The contract accepts a multiplier which increases the price for each tier defined up to a certain price cap. This increase can be linear or exponential.

Note that the per-user mint limit is enforced in NFToken, not in this price resolver.

The constructor arguments are as follows.

- basePrice: Minimum price to return.

PLAINTIFF0003223



- multiplier: Price multiplier.
- tierSize: Number of tokens per price tier.
  Crossing the boundary increases the price.
- priceCap: Maximum price to return.
- priceFunction: Values are LINEAR, EXP and
  CONSTANT.

The contract is immutable, parameters cannot be changed
after deployment. NFToken and related contracts will
call the getPrice(address _token, address, uint256) and
getPriceWithParams(address _token, address _minter,
uint256 _tokenid, bytes calldata) views. In this
implementation the latter simply calls the former.

getPrice will get the current token supply, hence the
contract name, determine the price tier by dividing the
supply by tierSize set in the constructor. The returned
value will be at least basePrice and at most priceCap.
If the priceFunction is "LINEAR" then the price will
always be basePrice. If it's "LINEAR", current tier is
multiplied by multiplier and then basePrice. If it is
"EXP", multiplier will be raised to the power of
current tier and then multiplied by basePrice.

# BalancePriceResolver

This contract calculates the NFT mint price based on
the user's current NFT balance. It has options to allow
for free initial, subsequent or repeated mints. It's
based on SupplyPriceResolver and inherits the tier
based pricing functions if the per user mint conditions
are not met.

Note that the per user mint limit is enforced in
NFToken, not in this price resolver.

The constructor parameters introduces here in addition
to what SupplyPriceResolver already has are:

- freeSample: First mint free flag.
- nthFree: Allows every nth mint to be free. Should
  be set to 0 to remove this functionality.
- freeMintCap: Limits the number of free mints if
  nthFree is set.

This contract will get the minter's current token
balance based on parameters passed to getPrice() and
make a price determination. If the current balance is 0
and freeSample is set, the returned price will be 0.
Beyond that if nthFree is set and the new mint

PLAINTIFF0003224

Beyond that if nthFree is set and the mint
operation results in user balance being a multiple of
that and freeMintCap has not been reached, the price

will also be 0. Logically this is freeMintCap > 0 &&
minterBalance + 1 ≤ nthFree * freeMintCap.

The functionality is built on top of the
SupplyPriceResolver and if the initial conditions are
not met the logic of that contract will be applied.



## MerklePriceResolver

Coming Soon™.

## DutchActionMachine

This contract enables the perpetual Dutch auction
function for the NFT contracts in this repo. This works
by minting a new NFT against the specified contract and
then accepting bids for it until the auction ends. At
this point, if there is a valid bid, the contract will
send the NFT to the bidder, if not it will retain the
NFT and mint a new one and start the new auction. All
this actions happen on bid() call. To bootstrap the
process, whoever deploys the contract can simply call
bid with 0 Ether. Retained NFTs can be transferred out
by the admin by calling recoverToken(address _account,
uint256 _tokenId).

The constructor parameters are as follows.

- maxAuctions: Maximum number of auctions to perform
  automatically, 0 for no limit. Note this cannot be
  changed after deployment, but multiple auction
  machine contracts can be deployed for the same NFT
  contract.
- auctionDuration: Auction duration in seconds.
- periodDuration: Price reduction period in seconds.
- maxPriceMultiplier: Starting price multiplier.
  Token unit price is multiplied by this value to
  become the auction starting price.
- projectId: Juicebox project id, used to transfer
  auction proceeds.
- jbxDirectory: Juicebox directory, used to transfer
  auction proceeds to the correct terminal.
- token: Token contract to operate on.

This contract expect to work with NFTToken and NFUToken
contracts, but it will be compatible with other

PLAINTIFF0003225

contracts, but it will be compatible with other contracts as long as it supports the following functions:



- mintFor(address) ⇒ uint256: This will be called by the auction machine to get a new token to offer for sale. NFToken contract has a minter role that must be granted to the auction machine.
- unitPrice() ⇒ uint256: This will be called to set the auction reserve price. transferFrom will be called to transfer the token to the auction winner if any.
- function transferFrom(address, address, uint256): Standard ERC721/1155 transfer function.

## EnglishAuctionMachine

This contract enables the perpetual English auction function for the NFT contracts in this repo. This is the same concept as the DutchActionMachine but sells a token for an increasing price rather than accepting decreasing bids.

The constructor parameters are as follows.

- maxAuctions: Maximum number of auctions to perform automatically, 0 for no limit.
- auctionDuration: Auction duration in seconds.
- projectId: Juicebox project id, used to transfer auction proceeds.
- jbxDirectory: Juicebox directory, used to transfer auction proceeds to the correct terminal.
- token: Token contract to operate on.



Previous
Deployer

Next
Wallet Services

PLAINTIFF0003226



User's Landing Page

    Assets

    NFTs

    Assets by performance

     

# User's Landing Page

## Assets

PLAINTIFF0003227







LEGAL-TOOLS    **DAOLABS**

**Connect Wallet**

PLAINTIFF0003228

Back to top | Terms of service

# NFTs





PLAINTIFF0003229

# Assets by performance



PLAINTIFF0003230





PLAINTIFF0003231





**Previous**
NFT Features

**Next**
Authentication Services

PLAINTIFF0003232



LEGAL-TOOLS    **DAOLABS**

**Connect Wallet**



    

User Profiles

User Settings

# User Profiles

PLAINTIFF0003233



PLAINTIFF0003234

# User Settings



| Previous | Next |
|----------|------|
| **Wallet Services** | **Anonymous** |

PLAINTIFF0003235



LEGAL-TOOLS    **DAOLABS**

**Connect Wallet**





This markdown file is intentionally blank. file is intentionally blank.

| Previous | Next |
|---|---|
| Authentication Services | Twitter |

PLAINTIFF0003236



PLAINTIFF0003237



LEGAL-TOOLS    **DAOLABS**

**Connect Wallet**



User Wallet Settings

    



# User Wallet Settings



| Previous | Next |
|---|---|
| Anonymous | Im orti g Wallets |

PLAINTIFF0003238



PLAINTIFF0003239



LEGAL-TOOLS    **DAOLABS**

Connect Wallet



     

This markdown file is intentionally blank. file is
intentionally blank.

Previous
Twitter

Next
Payment Services

PLAINTIFF0003240



PLAINTIFF0003241



LEGAL-TOOLS    **DAOLABS**

**Connect Wallet**



    

This markdown file is intentionally blank. file is intentionally blank.

| Previous | Next |
|---|---|
| Importing Wallets | Create Wallets |

PLAINTIFF0003242



PLAINTIFF0003243

 LEGAL-TOOLS    **DAOLABS**                                    **Connect Wallet**



    

This markdown file is intentionally blank. file is
intentionally blank.

| Previous | Next |
|---|---|
| Payment Services | Exporting Wallets |

**PLAINTIFF0003244**



PLAINTIFF0003245



LEGAL-TOOLS    **DAOLABS**

**Connect Wallet**



Sharding secrets

Recovery Code

     

# Sharding secrets



# Recovery Code

**PLAINTIFF0003246**





PLAINTIFF0003247

 LEGAL-TOOLS   **DAOLABS**                                    **Connect Wallet**



    

This markdown file is intentionally blank. file is intentionally blank.

| Previous | Next |
|---|---|
| Exporting Wallets | ser Landing Page |

PLAINTIFF0003248



PLAINTIFF0003249



LEGAL-TOOLS **DAOLABS**

**Connect Wallet**



     

User Landing Page

# User Landing Page

PLAINTIFF0003250





PLAINTIFF0003251

Back to top | Terms of service

**Previous**
Gnosis

**Next**
Legal



PLAINTIFF0003252



LEGAL-TOOLS    **DAOLABS**

**Connect Wallet**



     

Legal Docs

Legal Docs Form

Legal Docs Search

# Legal Docs



# Legal Docs Form

PLAINTIFF0003253



## Legal Docs Search



Previous
**User Landing Page**

Next
**Splits**

PLAINTIFF0003254



LEGAL-TOOLS **DAOLABS**

Connect Wallet



     

Revenue Splits

# Revenue Splits

PLAINTIFF0003255



PLAINTIFF0003256

 LEGAL-TOOLS    DAOLABS                                          Connect Wallet



     

# Accounting Landing



Accounting Landing

Accounting Configuration

Accounting Address Configuration

# Accounting Configuration

PLAINTIFF0003257





PLAINTIFF0003258



## Accounting Address Configuration



Accounting configuration                                                    ✕

Addresses      Category      Export      Ipsum      Lorem

Select addresses

Lorem ipsum.

☁  ☑ dao-lawfirm.eth    0x7525...0085   3   transaction(s)
☁  ☑ tankbottoms.eth    0x5d95...d27e   1   transaction(s)
☁  ☐ meowsdao.eth       0xB772...F628   0   transaction(s)

Edit

Add address

Create contact

Use the selector below to either associate the address to an already existing contact, or create a new one.

☐ 0x0000...E581    | Opensea Exchange... |   8   transaction(s)
☐ 0xd8b4...47d3    | Name                |   3   transaction(s)
☐ 0x57ed...aac0    | Name                |   2   transaction(s)
☐ 0x2187...6fbd    | Name                |   2   transaction(s)

Add address

Cancel    Save

Previous
Splits

Next
Collections

PLAINTIFF0003259

 LEGAL-TOOLS    DAOLABS    Connect Wallet



Create NFTs

Select Contract Type

Auction

    

Collections are a way to group NFTs together. They are a way to organize NFTs and provide a way to display them in a more organized way. While an NFT is defined by its name, symbol and each of the token's metadata. Collections are additional richer information that can be added of which a subset will be used for the Contract-level metadata which OpenSea uses.

## Create NFTs

The first option presented to a user in creating an NFT are high level concepts or types which are optimized for a user's workflow. However, prior to our ability to streamline a particular workflow, the option 'Advanced' contains the most granular options for creating an NFT. Import, as the name implies, allows users to easily load a project configuration which was previously created and exported. This is particularly useful for collaborative projects or where one project requires another user to control the Collection.

At the beta launch, we expect to have Edition, Generative, Advanced, and Import options available.

PLAINTIFF0003260





## Select Contract Type

This modal allows users to streamline the type of contract creation workflow based on the type of content they intend to deploy.

PLAINTIFF0003261





## Auction

PLAINTIFF0003262



| Previous | Next |
|---|---|
| Accounting | E itio |

PLAINTIFF0003263



LEGAL-TOOLS   **DAOLABS**



**Connect Wallet**

Edition

    

# Edition

The Edition NFT creation modal is the simplest and fastest way to deploy an NFT through our tools. It was heavily designed and inspired by OpenSea's minimist creation tool and Zora's Edition.



---

**Previous**
Collections

**Next**
Image NFTs

PLAINTIFF0003264



PLAINTIFF0003265



LEGAL-TOOLS **DAOLABS**

**Connect Wallet**





This markdown file is intentionally blank. file is intentionally blank.

| Previous | Next |
|---|---|
| Edition | Music NFTs |

PLAINTIFF0003266



PLAINTIFF0003267

 LEGAL-TOOLS **DAOLABS**

**Connect Wallet**



   

This markdown file is intentionally blank. file is intentionally blank.

| Previous | Next |
|---|---|
| Image NFTs | Video NFTs |

PLAINTIFF0003268



PLAINTIFF0003269



LEGAL-TOOLS   **DAOLABS**

**Connect Wallet**





This markdown file is intentionally blank. file is intentionally blank.

| Previous | Next |
|----------|------|
| Music NFTs | p5.js |

PLAINTIFF0003270



PLAINTIFF0003271



LEGAL-TOOLS  **DAOLABS**

**Connect Wallet**



     

# Create p5.js Collection

Create p5.js Collection

Create p5.js Population

p5.js Editor

PLAINTIFF0003272



PLAINTIFF0003273

# Create p5.js Population



# p5.js Editor



| Previous | Next |
|---|---|
| Video NFTs | pfp |

PLAINTIFF0003274



LEGAL-TOOLS    **DAOLABS**

**Connect Wallet**





This markdown file is intentionally blank. file is intentionally blank.

| Previous | Next |
|----------|------|
| p5.js | Pricing |

PLAINTIFF0003275



PLAINTIFF0003276



LEGAL—TOOLS **DAOLABS**

**Connect Wallet**



# Collection

## Collection Pricing

     

Collection

Collection Pricing

Collection Fixed Pricing

Collection Declining Pricing

Collection Timed Auction

Creation

Creation Price Start

Price Options

Pricing Detail

Pricing Tab

Pricer Deployed

Examples

Dutch Payments

English Auction

Fixed Payments



**PLAINTIFF0003277**

# Collection Fixed Pricing





# Collection Declining Pricing

PLAINTIFF0003278



# Collection Timed Auction

PLAINTIFF0003279





# Creation

# Creation Price Start

PLAINTIFF0003280





## Price Options

Sell with declining price

**Sell to highest bidder**

Fixed price

PLAINTIFF0003281

## Pricing Detail





PLAINTIFF0003282



# Pricing Tab



PLAINTIFF0003283



PLAINTIFF0003284



## Pricer Deployed





PLAINTIFF0003285

# Examples

# Dutch Payments



PLAINTIFF0003286



# Collection settings

**Settings**   NFT   *Pricing*   Export

---

Contract deployed (?)

Name (?)
Pricing Proxy

Creator (?)
meowsdao.eth

Address (?)
0x7932903a11317f8848BC5aC4173F7EdAEC38EcE8

IPFS address (?)
QmbWqxBEKC3P8tqsKc98xmWNzrzDtRLMiMPL8wBuTGsMnR

Price (?)

Method (?)
☐ Fixed price
☑ Timed auction

> **Method:** Sell with declining price
> **Starting price:** 0.5 ETH
> **Duration:** 22 Jan 2023 (3:00 PM) - 22 Feb 2023 (3:00 PM)
> **Ending price:** 0.1 ETH

Edit

Revenue (?)

Per unit split (?)
Projected revenue distributions per NFT and collection total collection.

| | |
|---|---|
| Royalty rate: (?) | 10 ETH / 1 NFT |
| Revenue: (?) | 89 ETH / 1 NFT |
| Service fee: (?) | 1 ETH / 1 NFT |

Total project actual revenue (?)

| | |
|---|---|
| Total royalty rate: (?) | 0 ETH |
| Total revenue: (?) | 0 ETH |
| Service fee: (?) | 0 ETH |

Total project projected revenue (?)

| | |
|---|---|
| Total royalty rate: (?) | 200 ETH |
| Total revenue: (?) | 1780 ETH |
| Service fee: (?) | 20 ETH |

PLAINTIFF0003287





PLAINTIFF0003288





PLAINTIFF0003289





PLAINTIFF0003290



PLAINTIFF0003291



Service fee: ⑦

**Per payout receiver** ⑦

0x7932903a11317f884BBC5aC4173F7EdAEC38EcE8:     10% / 0 ETH
0x58a93EA9fD840174ba370FF9977bd5FD555c5054:     90% / 0 ETH

**Previous**                                    **Next**

pfp                        Edit    Contract Deployment

Cancel    Finish



PLAINTIFF0003292

 LEGAL-TOOLS **DAOLABS** **Connect Wallet**



    

Deployment Panel

# Deployment Panel

Components which are deployable will have a deployment panel within the tools and the editor tab itself. This panel will convey the information passed to the constructor of the contract, where possible links to all the associated data.

Contract deployed ⑦

Name ⑦

Price Deployer

Creator ⑦

meowsdao.eth 🐱 📋

Address ⑦

0x7932903a11317f8848BC5aC4173F7EdAEC38EcE8 🐱 📄 📋

Previous
Pricing

Next
Juicebox Protocol User Interface

PLAINTIFF0003293



PLAINTIFF0003294

 LEGAL-TOOLS **DAOLABS** [Connect Wallet]



     

Exemplar

Creating a new Project

Project Configuration

Funding

Tokens

Rules

# Exemplar

Juicebox started in July 2021 is the prototypical example of a Juicebox Project as it is configured as Juicebox Project No. 1 which receives the protocol fee from all other projects. Additionally, the project is configured and maintained by the Juicebox DAO which uses the fees to maintain the protocol.

PLAINTIFF0003295









## Creating a new Project

Project are not required to have anything besides the
name. All other fields are contained within the project
settings which is an IPFS document.



## Project Configuration

## Funding

PLAINTIFF0003297





# Tokens

PLAINTIFF0003298





## Rules

PLAINTIFF0003299





| Previous | Next |
|---|---|
| Contract Deployment | Terminal |

PLAINTIFF0003300

LEGAL-TOOLS **DAOLABS**

Connect Wallet

 

     

This markdown file is intentionally blank. file is intentionally blank.

Previous
Juicebox Protocol User Interface

Next
Extensions

PLAINTIFF0003301



PLAINTIFF0003302



LEGAL-TOOLS  **DAOLABS**

Connect Wallet





This markdown file is intentionally blank. file is intentionally blank.

Previous
Terminal

Next
Gnosis

PLAINTIFF0003303



PLAINTIFF0003304



LEGAL-TOOLS   **DAOLABS**

**Connect Wallet**



 

This markdown file is intentionally blank. file is intentionally blank.

| Previous | Next |
|---|---|
| Extensions | NFT Rewards |

PLAINTIFF0003305



PLAINTIFF0003306



LEGAL-TOOLS    **DAOLABS**

**Connect Wallet**



    

# NFT Rewards Example



NFT Rewards Example: Aztecs

NFT Rewards Example: Chess

Juicebox NFT Rewards Example

NFT Rewards Config

NFT Rewards Config Example: Banny

# NFT Rewards Example

**PLAINTIFF0003307**





## Juicebox NFT Rewards Example

PLAINTIFF0003308



# NFT Rewards Config

PLAINTIFF0003309



# Project configuration                                            ✕

Reconfiguration    **Tokens**    API KEYS    Payments



ERC-20, ERC-721 token whitelisting

Add ERC-20 and/or ERC-720 tokens which you want to have by
default visible from the treasury wallet under All Assets.
Tokens defined here will include a badge which will signify that
they are safe to interact with.

Add tokens

Voting escrow ⓘ

Setting token quantity tiers and escrow durations projects may
configure voting escrow mechanics (also known as staking) which
project governance is incentivized. Create or edit your token
ranges, escrow durations, and NFT artwork or used built-in
templates. Configuration via examples.

1  < X >  99 JBX  Nammu Banny ⌁                                    ✕
                  Stake Juicebox ($JBX) tokens for irrevocable
                  durations in exchange for voting weight. In
                  return, you will impact Juicebox governance
                  and recieve a choice anthropomorphic banana
                  character NFT.

Durations:
1 week   1 month   3 months   6 months   1 year   4 years

Token ranges

Escrow durations

Upload configuration

Vesting

Vesting a token means locking a certain amount of tokens over a
certain period as a commitment to hold the Token. It's a
mechanism that allows the founding team or core contributor to
prove they are highly interested in the project.

0xb1C9...699322 :     MEOW          999/99,999    6 Months
meowsdao.eth :        MEOW        9,999/99,999    2 Months
tankbottoms.eth :     MEOW       10,000/99,999    1 Years
natash..kina.eth :    MEOW       10,000/99,999    1 Years

Deposit

Deploy Deposit(s)

PLAINTIFF0003310

Cancel   Deploy tokens configuration



# NFT Rewards Config Example

PLAINTIFF0003311





# Extensions ✕

ⓘ Extensions faciliate additional functionality when funds are contributed or redeemed. ✕

● Deploy project with Gnosis safe ⓘ                                        ✕

Deploy a Gnosis safe with your treasury for built-in management of transactions and assets.

**Add safe**

## Add verified extensions ⓘ

Extensions provided here are the commonly requested feature extensions and were developed and audited by the team. Be aware that extensions have direct control over funds contributed and tokens redeemed with your project and ensure that operate as you intend.

Extention contract ⓘ

| Investment club (SHA34567/±0.125 ETH) ▾ | **Add** |

Description about the selected extension with preview and count of projects using.

Tier criteria ⓘ

**Deploy extension**

## Add NFT reward ⓘ

Encourage treasury contributions by offering a reward NFT to early supporters or people who contribute above a certain threshold.

Tier criteria ⓘ

> 0.5 ETH  **Nammu Banny Reward** ⅋
Σ 100 NFTs
        Supporters of the Bannyverse can flex by showing
        off this unique Banny NFT. Contributors were
        generous with 0.5 ETH.

> 0.75 ETH  **Farceur Banny Reward** ⅋
Σ 200 NFTs
        Supporters of the Bannyverse can flex by showing
        off this unique Banny NFT. Contributors were
        generous with 0.75 ETH.

**Add tier**

**Use tier template**

## Voting escrow ⓘ

Setting token quantity tiers and escrow durations projects may configure voting escrow mechanics (also known as staking) which project governance is incentivized. Create or edit your token

PLAINTIFF0003312



ranges, escrow durations, and NFT artwork or used built-in templates. Project MEOWsDAO has a total supply of 2,500,000 tokens, the option to use the system generative token design is avaiable. Configuration via examples.

Token ranges

**Previous**                         **Next**
Gnosis           Escrow durations      Legal Resources

Create generative veTokens

Upload configuration

Save extensions configuration



PLAINTIFF0003313



LEGAL-TOOLS    **DAOLABS**    Connect Wallet



     

This markdown file is intentionally blank. file is intentionally blank.

Previous
NFT Rewards

Next
Governance

PLAINTIFF0003314



PLAINTIFF0003315

 LEGAL-TOOLS  **DAOLABS**    **Connect Wallet**



    

This markdown file is intentionally blank. file is
intentionally blank.

| Previous | Next |
|---|---|
| Legal Resources | Collection Examples |

PLAINTIFF0003316



PLAINTIFF0003317



LEGAL-TOOLS     **DAOLABS**

**Connect Wallet**



     

The Collection tool is what we call our nft minting
application, or minter tool. This creation tool is a
powerful and complex tool which we have strived to
simplify without sacrificing the features or
capabilities. To quickly communicate and demonstrate
its power we have created several examples of each type
of project which we are making available here for you
to download and explore. To import the below project-
configuration files, use the import option in the
Collection Creation modal.

You should be presented with the following modal after
selecting "Create" from the Collection page. Your last
option is to import a project configuration file.

PLAINTIFF0003318





You will be presented with a Preview modal with the following options:



The following examples are provided with a high-level overview for your convenience.

PLAINTIFF0003319

- <u>Edition</u>

| Previous | Next |
|----------|------|
| Governance | Edition |



PLAINTIFF0003320



LEGAL-TOOLS    **DAOLABS**    **Connect Wallet**



    

This file was left intentionally blank.

| Previous | Next |
|---|---|
| Collection Examples | Images |

PLAINTIFF0003321



PLAINTIFF0003322



LEGAL-TOOLS    **DAOLABS**

**Connect Wallet**





This file was left intentionally blank.

| Previous | Next |
|---|---|
| Edition | Video |

PLAINTIFF0003323



PLAINTIFF0003324



LEGAL-TOOLS    **DAOLABS**

**Connect Wallet**





This file was left intentionally blank.

| Previous | Next |
|---|---|
| Images | p5.js |

PLAINTIFF0003325



PLAINTIFF0003326



LEGAL-TOOLS   **DAOLABS**

**Connect Wallet**





This file was left intentionally blank.

| Previous | Next |
|----------|------|
| Video | pfp |

PLAINTIFF0003327



PLAINTIFF0003328



LEGAL-TOOLS **DAOLABS**

Connect Wallet





This file was left intentionally blank.

| Previous | Next |
|---|---|
| p5.js | DAO Governance |

PLAINTIFF0003329



PLAINTIFF0003330

 LEGAL-TOOLS    **DAOLABS**                    **Connect Wallet**



        

This directory contains deployed on-going DAO governance resources which may be used as a starting point for your own DAO.

| Previous | Next |
|---|---|
| pfp | Terms and Conditions of Token Sale and Use |

PLAINTIFF0003331



PLAINTIFF0003332



LEGAL-TOOLS    **DAOLABS**                                    **Connect Wallet**



        TERMS AND CONDITIONS OF
                                                            TOKEN SALE AND USE

# TERMS AND CONDITIONS OF TOKEN SALE AND USE

> (i) PLEASE READ THESE TERMS AND CONDITIONS OF T KEN SA E AN  SE CARE   Y BE  RE ACCESSING T E WEBSITE  CATE  AT _TIPS:  A ABS.WT_ (T E  WEBSITE )  R P RC ASING T KENS  ERE  BY ANY PR JECT  N T E P AT  RM (T E  P AT  RM ). Y ACKN W E GE T AT T ERE ARE CERTAIN RISKS ASS CIATE  WIT  P RC ASING T E T KENS  ESCRIBE  EREIN AN  AGREE T  ASS ME S C  RISKS  P N ANY P RC ASE   T KENS. IN A  ITI N, N TE T AT T ESE TERMS C NTAIN A BIN ING C ASS ACTI N WAIVER, W IC , I  APP ICAB E T  Y  , A ECT Y  R  EGA RIG TS. I  Y    N T AGREE T  T ESE TERMS, N T P RC ASE T E T KENS  ESCRIBE   EREIN.

Prior to purchasing Tokens, you should carefully consider these Terms and, to the extent necessary, consult a lawyer, accountant, and/or tax professional, as applicable.

Purchases of Tokens should be undertaken only by individuals or companies that have significant experience with, and understanding of, the usage and intricacies of cryptographic tokens, including Ethereum-based tokens and blockchain-based software systems. Purchasers should have an expert understanding of the storage and transmission mechanisms associated with cryptographic tokens. While the Platform will be available to assist the Purchaser of Tokens during the

PLAINTIFF0003333



Token Sale via instructions or an application, the Platform will not be responsible in any way for loss of any cryptocurrency, including Tokens, resulting from

actions taken by, or omitted by Purchaser. If you do not have such experience or expertise, then you should not purchase Tokens or participate in the Token Sale. Your participation in the Token Sale is deemed to be your understanding and acknowledgment that you satisfy the requirements mentioned in this paragraph.

As further described herein, by purchasing Tokens, and to the extent permitted by law, you agree to not hold the Platform or its respective past, present, and future employees, officers, directors, contractors, consultants, equity holders, suppliers, vendors, service providers, parent companies, subsidiaries, affiliates, agents, representatives, predecessors, successors and/or designees liable for any losses or any special, incidental, or consequential damages arising from, or in any way connected, to the sale of Tokens, including losses associated with these Terms.

**You acknowledge, understand and agree that:**

You are subject to and bound by these Terms by virtue of purchasing the Tokens.

The Tokens have no rights, intended uses or attributes outside of use with the Platform or as otherwise expressly referred to in these Terms.

1. A purchase of Tokens is non-refundable and cannot be cancelled.
2. A purchase of Tokens involves many, varied risks which can result in the loss of all amounts paid.
3. The Platform reserves the right to refuse or cancel Token purchase requests at any time in its sole and absolute discretion.
4. The Tokens are not backed by any physical bullion or other assets which a Purchaser would have any rights or access to.
5. Other Token purchasers who made their purchase at a different time may receive more Tokens for the same amount paid.
6. These Terms limit the liability of the DAO and its Associated Parties (defined below) in connection with the sale of Tokens.

**Right to review information**

PLAINTIFF0003334

You have reviewed to your satisfaction all supporting documents and collateral sources concerning all risks with purchasing Tokens.

*NOTHING IN THESE TERMS SHALL BE DEEMED TO CONSTITUTE A PROSPECTUS OF ANY SORT, A SOLICITATION FOR INVESTMENT OR INVESTMENT ADVICE NOR DOES IT IN ANY WAY PERTAIN TO AN OFFERING OR A SOLICITATION OF AN OFFER TO BUY ANY SECURITIES IN ANY JURISDICTION. TO THE MAXIMUM AMOUNT PERMITTED BY APPLICABLE LAW, EACH OF THE PLATFORM AND FOUNDATION (COLLECTIVELY, THE "ASSOCIATED PARTIES" AND EACH AN "ASSOCIATED PARTY") EXPRESSLY DISCLAIM AND SHALL NOT BE LIABLE FOR ANY AND ALL RESPONSIBILITY FOR ANY DIRECT OR ANY INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL OR OTHER LOSSES OF ANY KIND, IN TORT, CONTRACT OR OTHERWISE (INCLUDING BUT NOT LIMITED TO LOSS OF REVENUE, INCOME OR PROFITS, AND LOSS OF USE OR DATA), ARISING OUT OF OR IN CONNECTION WITH (I) THE PURCHASER'S ACCEPTANCE OF OR RELIANCE ON ANY INFORMATION CONTAINED IN THESE TERMS OR THE WHITEPAPER, (II) ANY ERROR, OMISSION OR INACCURACY IN ANY SUCH INFORMATION OR (III) ANY ACTION RESULTING THEREFROM.*



Purchaser agrees to buy, and DAO agrees to sell, Tokens in accordance with the following terms:

*Acceptance of Confidential Offering Memorandum, Whitepaper and Terms*

Previous
DAO Governance

Next
DAOLABS

PLAINTIFF0003335



LEGAL-TOOLS    **DAOLABS**

**Connect Wallet**



    

About Us
Our Partners
   Movement DAO
   Peace DAO

# About Us

DAOLABS.wtf is building a powerful suite of tools for web3 communities: flexible enough to operate at any scale, with powerful token issuance, treasury management, fiat compatibility, governance, and legal compliance out of the box.

We also build tools like this website and manage governance and operations for our partners, including Movement DAO, The Peace Movement DAO, and dao-lawfirm.eth.

- To learn about our platform, look at the Documentation.
- If you are looking to set up a legal entity for your project, or to learn more about compliance in web3, read our Legal Primer
- To learn about the tools and resources which make this possible, read the Copyright section.
- Be sure to read Our Policies before accessing the rest of this website.

Our platform is possible thanks to amazing work from Juicebox, Safe, Bolt, and the Ethereum community.

# Our Partners

## Movement DAO

Movement DAO is an Unincorporated Nonprofit Association which is working with DAOLABS to offer web3 tools for non-profits, charities, and public good projects. Movement DAO is governed by its community, and builds in the open. To learn more or to join the DAO, visit

PLAINTIFF0003336