```
 1                   UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2                         MIAMI DIVISION
                   CASE NO. 23-cv-20727-ALTMAN/Reid
 3

 4   RYAN BRESLOW, ALEX FINE, and JON        Miami, Florida
     GORDON,
 5
                        Plaintiffs,          May 30, 2023
 6
              vs.                            11:10 a.m. - 3:32 p.m.
 7
     MARK PHILLIPS and BENJAMIN REED,
 8
                        Defendants.          Pages 1 to 175
 9   _____

10              PRELIMINARY INJUNCTION HEARING CONTINUED
                BEFORE THE HONORABLE LISETTE M. REID
11                UNITED STATES MAGISTRATE JUDGE

12   APPEARANCES:

13   FOR THE PLAINTIFFS:    ELLIS GEORGE CIPOLLONE O'BRIEN ANNAGUEY LLP
                            CHRISTOPHER T. BERG, ESQ.
14                          BENJAMIN J. KUSSMAN, ESQ.
                            ANDREW IGLESIAS, ESQ.
15                          2121 Avenue of the Stars, 30th Floor
                            Los Angeles, California 90067
16

17   FOR THE DEFENDANTS:    DHILLON LAW GROUP INC.
                            NITOJ P. SINGH, ESQ.
18                          JESSE FRANKLIN-MURDOCK, ESQ.
                            177 Post Street
19                          Suite 700
                            San Francisco, California 94108
20

21
     STENOGRAPHICALLY REPORTED BY:
22
                            LAURA E. MELTON, RMR, CRR, FPR
23                          Official Court Reporter
                            United States District Court
24                          400 North Miami Avenue
                            Miami, Florida 33128
25
```

```
 1                    E X A M I N A T I O N S
 2      Witness                                          Page
 3      MARK PHILLIPS
        CROSS-EXAMINATION (CONTINUED) BY MR. BERG          10
 4      REDIRECT EXAMINATION BY MR. SINGH                  78

 5                        E X H I B I T S
 6                      PLAINTIFF EXHIBITS
 7      Exhibit                                          Page
 8      9                                                  22
        30                                                 27
 9      11                                                 32
        378                                                35
10      211                                                49
        221                                                51
11      204                                                63
        203                                                64
12

13

14                    DEFENDANT EXHIBITS

15      Exhibit                                          Page

16                            NONE
17

18

19

20

21

22

23

24

25
```

1          (Call to the Order of the Court.)

2          THE COURT:  Good morning.  Please be seated.  So this

3    is the screen that -- okay.  All right.  We want to be as

4    efficient as we can, moving through the matters that we have to

5    take care of.  I know we were -- we had Mr. Phillips on the

6    witness stand and the -- you were about to do your

7    cross-examination.

8          MR. BERG:  Yes, Your Honor, that's right.

9          THE COURT:  Okay.  So let's start with that.  And then,

10   Mr. Singh, you had some witnesses that you wanted to present?

11   Or what did you want to do next?

12         MR. SINGH:  Yes, Your Honor.  We have Benjamin Reed in

13   the courtroom, ready to resume his examination.  The other

14   witnesses we have prior brought to the two hearings were unable

15   to come today.  We would ask that we would be permitted to

16   submit declarations and move their live testimony, as a

17   declaration was submitted for one of plaintiffs' witnesses in

18   lieu of live testimony.

19         THE COURT:  Okay.  Any problem with that?

20         MR. BERG:  Yes, Your Honor.  Whoever they're going to

21   move a declaration to, we would be able to cross, and we're not

22   going to be able to do that here.  And it -- just as a -- a

23   point of illustration, I think defendants' request to continue

24   Mr. Reid's examination should not be allowed, given the already

25   disproportionate time allocation that have been afforded to

1   defendants.  And I think to illustrate that, I have a printout

2   of the time distribution that's been undergoing with this

3   hearing so far, if you would like to see it.  I think that

4   might put things into focus.

5          THE COURT:  Well, let's start with the proposition

6   that, of course, as -- you are the plaintiff, so you have the

7   burden of proof, and we understand that.  And you have a lot to

8   prove in order to get a preliminary injunction.  So I'm aware

9   of that.  But, again, I don't want to spend all the time on the

10  argument, if we can get through the -- the witness.  We do want

11  to hear from Mr. Phillips, of course, very important witness.

12  And if we have time after that, we will deal with everything

13  else.  But you need to make your case.

14         MR. BERG:  Yes, Your Honor.

15         THE COURT:  And there will be a trial, if we get to

16  that point, where all witnesses that are necessary to prove the

17  case will be presented.

18         MR. BERG:  Your Honor, my point simply is defendants

19  have had six hours of courtroom time and defendants -- or

20  plaintiffs have had three hours and forty minutes.  It's a

21  pretty tremendous disparity, given that it's our elevated

22  burden.  And so what we would propose here is Mr. Reid's direct

23  is over.  We take an hour for Mr. Phillips.  We take

24  10 minutes, 15 minutes of cross of Mr. Reed, and then we move

25  right into closings because there is a lot of evidence to

1    summarize.

2        MR. SINGH:  Your Honor, two points.  We haven't

3    reviewed the timing that Counsel has prepared.  And I do

4    understand that as we were taking the examinations, we were

5    interrupted for many legal arguments on many legal issues,

6    including the privilege issue and other issues that arose.  So

7    we can't -- we can't comment on the timing without

8    understanding that breakdown.

9        Second, on the declarations.  We didn't have an

10   opportunity to cross-examine Mr. Jango, which I believe is his

11   internet handle.  Their declaration -- Jango's declaration was

12   admitted by the Court without an opportunity for defendants to

13   cross-examine that individual.  And so we would similarly posit

14   that we be permitted to submit declarations even though

15   plaintiffs don't have the opportunity to cross-examine those

16   witnesses.

17       THE COURT:  Okay.  I will hold that issue in abeyance

18   so we can move forward.

19       MR. BERG:  In response, Your Honor, we presented that

20   issue through Mr. Gordon, and defendants had an opportunity to

21   cross Mr. Gordon on it.

22       THE COURT:  All right.  So let's bring Mr. Phillips

23   back.

24       Mr. Phillips, if you can come forward.  Remember that

25   you are still under oath.  Please have a seat.

```
 1            (Discussion off the record regarding camera for Zoom.)

 2            MR. BERG:  This is Christopher Berg for plaintiffs.

 3            (Discussion off the record regarding camera for Zoom.)

 4            THE COURT:  Where is the camera that is supposed to be

 5   looking at the podium?  It's not on.  It's just not on.  I see

 6   only the three squares.  I have a feeling that's what she is

 7   seeing as well.

 8            Okay.  So then I will make sure that everybody at least

 9   states who they are before they speak.  All right.

10            THE STENOGRAPHER:  Okay.

11            THE COURT:  And then maybe, meanwhile, we will get

12   someone from IT to turn that camera on for you.  Okay?

13            THE STENOGRAPHER:  Thank you so much.

14            THE COURT:  All right.

15            So, Mr. Berg, so let me have counsels make their

16   appearance.  And, Mr. Berg, you did.

17            Mr. Singh, go ahead.

18            MR. SINGH:  Good morning.  Nitoj Singh on behalf of

19   defendants.

20            THE COURT:  Okay.  And go ahead, Mr. -- I'm sorry.

21            MR. MURDOCK:  Good morning, Your Honor.  Jesse

22   Franklin-Murdock also for defendants.

23            THE COURT:  Mr Murdock.  Okay.

24            MR. KUSSMAN:  Good morning, Your Honor.

25   Benjamin Kussman on behalf of plaintiffs.
```

 1          THE COURT:  Okay.  Speak into the microphone.

 2          MR. KUSSMAN:  Benjamin Kussman on behalf of plaintiffs.

 3          THE COURT:  Okay.

 4          MR. IGLESIAS:  Good morning, Your Honor.  Andrew

 5  Iglesias also on behalf of plaintiffs.

 6          THE COURT:  All right.  Thank you.

 7          All right.  Counsel, please proceed.

 8          MR. BERG:  Your Honor, rather than interrupt the

 9  cross-examination, there is one legal issue that I just would

10  like to raise now, as I know it's going to draw an objection.

11  I'm about to seek to introduce Mr. Phillips' former conviction.

12  And we want to just lay out a foundation for why it's

13  appropriate under Rule 609.

14          THE COURT:  Okay.  Go ahead.

15          MR. MURDOCK:  Under 11th Circuit precedence,

16  United States vs. Cohen, in Rule 609, evidence of a conviction

17  involving untruthfulness is automatically admitted.  The

18  11th Circuit measures that 10-year period from the date of the

19  release to the date of the proceeding where the witness

20  testifies.  That's US v. Cohen, 544 F.2d 781.

21          The start of this PI hearing was on March 28, 2023.

22  The paperless order from Judge Altman continuing that hearing

23  reads the following preliminary injunction hearing was held on

24  March 28th.  Mr. Phillips was released from confinement on

25  March 29, 2013.  So the PI hearing began one day before the

1    10-year period lapsed.  So this evidence should come in under

2    609(a).

3         609(b) also applies here.  That standard is, a

4    conviction that's older than 10 years is admitted if the

5    probative value substantially outweighs potentia prejudice;

6    that requires looking at specific -- specific circumstances to

7    make that determination.

8         United States vs. Pritchard, 11th Circuit, 1992, lays

9    out the factors for considering that.  The circumstances here

10   are the very similar conduct that was at issue.  The issue of

11   false invoices was in the prior case, and the issue of the use

12   of a law firm to facilitate the deceptive scheme was also at

13   issue.

14        You also consider the impeachment value of the prior

15   crime.  That's strong here because the prior crime involved

16   dishonesty.  The convictions were for wire fraud and money

17   laundering.

18        The point of the time of the conviction's subsequent

19   history.  If the Court considers the demarcation date, then

20   we're within the -- as the PI hearing, then we're within a

21   10-year window and we don't need to do this analysis.  But even

22   if you don't, that means the demarcation date is about two

23   months past the 10-year marker, okay?

24        You also need to consider the similarity between the

25   past crime and the charged crime.  We have gone over those

1   points.  Also consider the importance of the defendants'

2   testimony, which is critical here because it really is the

3   principal source of evidence that counters plaintiffs'

4   evidence.

5        And then, of course, the centrality of the credibility

6   issue.  That's critical here because the question is of honesty

7   in pursuit of financial self-interest.

8        So we would submit, Your Honor, that under all of the

9   factors under Pritchard, the testimony -- the evidence is

10   admissible under 609(b).

11        THE COURT:  Okay.  Any objection, Mr. Singh?

12        MR. SINGH:  Yes, Your Honor.  We would object.  As the

13   Court just heard, the conviction and the release is more than

14   10 years prior to today's date.  And the prejudicial value

15   greatly exceeds the probative value here.  We further note that

16   Counsel has offered up that there are similarities between the

17   two cases, but none of that is in evidence, none of that is at

18   issue, and the Court is unable to make a determination without

19   that information.  But simply releasing that information and

20   having it heard in this courtroom would be prejudicial.

21        THE COURT:  Okay.  So the Court will overrule that

22   objection.  I find that because the witness will be testifying,

23   his credibility is at issue, and any prior offense that has to

24   do with fraud which relates to truthfulness, would be relevant,

25   in any event.  So the evidence is admitted.

    1           MR. BERG:  Thank you, Your Honor.  Based on that

    2  ruling, I would like to move into evidence Exhibit 139.

    3           Mr. Phillips, in Volume I of plaintiffs' exhibits --

    4           THE COURT:  Ms. Melton, are you able to hear us --

    5           THE STENOGRAPHER:  Yes.

    6           THE COURT:  -- or see the person at the podium?

    7           THE STENOGRAPHER:  Yes, ma'am, I can.

    8           THE COURT:  Do I have the right set of exhibits that

    9  you're referring to?

   10           MR. BERG:  Yes, Your Honor.  It's Volume II of

   11  Plaintiff's Exhibits.  139.

   12           THE COURT:  Okay.  I have it.

   13           MR. BERG:  Thank you, Your Honor.

   14           Do you have it, Mr. Phillips?

   15           THE WITNESS:  This is Mr. Phillips speaking.

   16           Yes.

   17  THEREUPON:

   18                     MARK PHILLIPS,

   19  a witness called by the Defendant, having been duly sworn

   20  previously, testified as follows:

   21                CROSS-EXAMINATION (CONTINUED)

   22  BY MR. BERG:

   23  Q.  Mr. Phillips, you were previously convicted of four counts

   24  of wire fraud and two counts of money laundering in the

   25  U.S. District Court of the Western District of Washington;

1    correct?

2    A.   Yes.

3    Q.   Before you, as Exhibit 139, is a copy of the amended

4    judgment that was ultimately entered against you; is that

5    correct?

6    A.   Yes.

7    Q.   In the middle of the page where it says "Nature of

8    Offense," it lists wire fraud and money laundering; correct?

9    A.   Yes.

10   Q.   The District Court imposed a sentence on you of 40 months

11   imprisonment, three years supervised release, and $100,000 in

12   restitution; correct?

13   A.   Yes.

14   Q.   Okay.  If you could put that to the side.

15        You were a defendant in a civil litigation in Washington

16   State Superior Court in the case called Arnold v. Phillips; is

17   that correct?

18   A.   Yes.

19   Q.   That case number is 10-2 -- 10227-2; right?

20   A.   I don't recall the specific.

21   Q.   In that case you formed a company called Banana Corporation

22   into which plaintiff, Robert M. Arnold, invested $5.5 million

23   and procured a 15 percent ownership interest; right?

24   A.   Yes.

25   Q.   You owned the other 85 percent?

1   A.   Yes.

2   Q.   The Court in that case granted summary judgment against you

3   on liability for, among other things, breach of fiduciary duty,

4   conversion, and embezzlement; right?

5   A.   Yes.

6   Q.   A bench trial was eventually held in that case; right?

7   A.   Yes.

8   Q.   And you testified at that trial?

9   A.   Yes.

10  Q.   The Court made a factual finding that your testimony was

11  not credible; is that right?

12  A.   Yes.

13  Q.   In 2019, you were a party to divorce proceedings in

14  Washington state court; right?

15  A.   Yes.  I don't recall the specific year.

16  Q.   The Court held a bench trial in that proceeding; is that

17  correct?

18  A.   Yes.

19  Q.   You provided testimony in connection with those

20  proceedings?

21  A.   Yes.

22  Q.   In finding of fact, 80, the Court expressly found that much

23  of your testimony was not credible; right?

24  A.   I don't recall the specifics.

25  Q.   Do you recall there being a finding that your testimony was

1    not credible?

2    A.   I don't recall that specific finding.

3    Q.   Mr. Phillips, you testified that you worked as a contractor

4    at the SEC in this proceeding; do you remember that?

5    A.   As a -- as an employee of Info Trend, which was a

6    subcontractor to the SEC.

7    Q.   You were actually employed as a -- by Info Trend, which is

8    a subcontractor to ITS Agile LLC; right?

9    A.   I don't know the relationships between the different

10   entities.

11   Q.   If we go to Volume I of plaintiffs' exhibits.

12        Now, you submitted a declaration in this case; correct?

13   Dated March 16, 2023?

14   A.   Excuse me.  Which exhibit?

15   Q.   We will get there.  March 16, 2023; correct?  You submitted

16   a declaration in this case dated March 16, 2023; correct?

17   A.   I will take your word for that.

18   Q.   All right.  And you were being truthful when you submitted

19   that declaration; correct?

20   A.   Yes.

21   Q.   Okay.  Turn to Exhibit 73, please.  Let me know when you

22   are there.

23   A.   Yes.

24   Q.   There you wrote, "I was employed by Info Trend

25   Incorporated, a subcontractor to ITS Agile, which was a prime

1    contractor to the SEC."  Do you see that?

2    A.  Yes.

3    Q.  Is that correct?

4    A.  Yes.

5    Q.  You wrote in your declaration that, "Plaintiffs plan to

6    develop a decentralized autonomous organization to facilitate

7    social and environmental impact groups"; correct?

8    A.  Yes.

9    Q.  "But plaintiffs lacked the technical ability to develop and

10   manage the contemplated DAOS creation and needed your help for

11   the task"; right?

12   A.  Yes.

13   Q.  "The GitBook is a document that describes MovementDAO's

14   policies, goals, and governance mechanisms"; correct?

15   A.  It was intended to communicate the goals, yes.

16   Q.  It's a document that describes MovementDAO's policies,

17   goals, and governance mechanisms; right?

18   A.  Yes.

19   Q.  GitBook was MovementDAO's initial governing document;

20   correct?

21   A.  Yes.

22   Q.  GitBook functioned much like a set of corporate bylaws;

23   right?

24   A.  I don't think so.

25   Q.  Let's go to Exhibit 73, paragraph 20, second sentence from

 1    above -- from the bottom.

 2         "Much like a set of corporate bylaws, the GitBook was

 3    intended to function as Movement's initial government

 4    document."  And further on -- apologies.

 5         We will move on.

 6         Let's go to paragraph 24 of your declaration.  Last

 7    sentence of that paragraph you wrote, "MovementDAO's

 8    relationship with its members or contributors was governed by

 9    inter alia GitBook"; is that right?

10    A.  Yes.

11    Q.  That includes you; right?

12    A.  Right.  As a member?

13    Q.  As -- "MovementDAO's relationship with its members or

14    contributors was governed by GitBook."  The question is, was

15    the GitBook governing you?

16    A.  Yes.

17    Q.  You testified that after January 1, 2022, you regarded your

18    relationship with plaintiffs as equals or members in

19    MovementDAO; right?

20    A.  Yes.

21    Q.  You also testified that you believed you were working for

22    MovementDAO, starting January 1, 2022, onward; right?

23    A.  Yes.

24    Q.  Throughout your work on MovementDAO, you would have -- you

25    had conversations with Mr. Breslow about the project; right?

1    A.   Yes.

2    Q.   And when you had these conversations, you were truthful

3    with him; correct?

4    A.   Yes.

5    Q.   You were not trying to deceive him when you spoke with him

6    or texted with him; right?

7    A.   No.

8    Q.   On July 30, 2022, you thanked him for being an awesome

9    boss, and that you just want to work and add value and protect

10   his interests; isn't that right?

11   A.   I recall writing something to that effect.

12   Q.   You led Mr. Breslow to believe that he was in charge of the

13   MovementDAO project, didn't you?

14   A.   No.

15   Q.   Why did you call him your boss?

16   A.   I was showing deference.  He was the largest contributor to

17   MovementDAO, the nonprofit.  So I was absolutely showing

18   deference to someone who contributed that much money, as well

19   as that much faith in having me work on its development.

20   Q.   So are you now saying -- is it your testimony now that he

21   was not your boss?

22   A.   Not after January 1st of 2022.

23   Q.   Didn't you write that text in August 2022?

24   A.   I did.

25   Q.   So was he your boss in August of 2022, or was he not?

1   A.   I refer to all the members of MovementDAO as my boss.

2   Q.   Really?  Okay.

3        On March 13, 2022, you told Mr. Gordon that you were

4   executing on Ryan and your -- Mr. Gordon's -- behalf, didn't

5   you?

6   A.   I did.

7   Q.   So you testified that on January 1, 2022, you considered

8   yourself equals with plaintiffs, but two months later you were

9   telling Mr. Gordon you were doing things on Mr. Breslow and

10  Mr. Gordon's behalf; right?

11  A.   I think that comment is taken out of context.  They asked

12  me to do very specific things like write an NFT contract or

13  review some information.

14  Q.   Okay.  And you continued four months later, in July 2022,

15  when you told Mr. Breslow you wanted to protect his interest

16  and referred to him as "an awesome boss"; right?

17  A.   So you're referring to the first comment?

18  Q.   Yeah, let's pull that up.  Let's go to Exhibit 135, which

19  is in Volume I of the plaintiffs' exhibits.  And I misspoke

20  earlier.  I referenced this as August 2022.  Exhibit 135 was

21  submitted in July 30 of 2022.  Are you there?

22  A.   Exhibit 135?

23  Q.   Correct.

24  A.   Yes.

25  Q.   It says here, "Thank you for being an awesome boss.  Very

1    perfect.  Just want to work and add value and protect your

2    interests."  That's what you wrote; right?

3    A.   Yes, per my comment, this is about his philanthropic

4    efforts for PeaceDAO and providing funding for displaced

5    Ukrainian war victims.

6    Q.   I mean, where does it say it's about Ukrainian war victims

7    in this text?

8    A.   That image is specifically about PeaceDAO which he had

9    asked myself and my wife to create a set of NFTs that he could

10   distribute to friends or people interested in contributing.

11   Q.   Were you paid for your work with PeaceDAO?

12   A.   Excuse me?

13   Q.   Were you paid for your work with PeaceDAO?

14   A.   I was paid for MovementDAO.

15   Q.   Were you paid for your work with PeaceDAO?

16   A.   I don't recall.

17   Q.   You testified that the GitBook says that it can be modified

18   through the MIPs; right?

19   A.   I did.

20        Are we done with this exhibit?

21   Q.   We are.

22        Where in the GitBook does it talk about how an MIP can

23   modify the Gitbook's terms?

24   A.   I believe in the Guiding Principles, the terms of service,

25   the code of conduct, have statements that say that the terms

1    can be modified.

2    Q.   Mr. Phillips, those aren't in the GitBook, are they?

3    A.   No.

4    Q.   So your testimony was that the GitBook contained a

5    provision that said the GitBook could be modified; right?

6    A.   The GitBook contains a provision.  I don't recall

7    specifically where that says that the DAO is member managed and

8    that the members can propose changes.

9    Q.   Well, I've got an OCR version of Exhibit 6 which is the

10   GitBook.  Let's see if we can Control-F and see if there is any

11   section here that will help us help you remember.  I will

12   search for the word "modify."

13        Is this the section you are talking about, by "modifying

14   these techniques to handle the idiosyncrasies"?

15   A.   Never.

16   Q.   How about this one?  "Note that we reserve the right to

17   modify the terms at any time at our sole discretion."

18   A.   That sounds like something that MovementDAO can reserve the

19   right to modify the terms.

20   Q.   It's problematic, though, don't you think?  Because up here

21   it refers to "terms" as the terms of use in this sentence here.

22   Do you see that?

23   A.   I'm sorry.  I don't understand the question.

24   Q.   The section here, it says terms of use, up at the top of

25   the page.  Do you see that?

1    A.   I do.

2    Q.   Below that it says, "Welcome MovementDAO.  Please read

3    these terms of use," and it defines terms of use as terms.  Do

4    you see that?

5    A.   Yes.

6    Q.   And further down the page it says:  "Note that we reserve

7    the right to modify the, capital T, 'Terms.'"  Do you see that?

8    A.   Yes.

9    Q.   So this isn't referring to the GitBook.  This was referring

10   specifically to these terms of use; isn't that right?

11   A.   Yes.

12   Q.   All right.

13   A.   But perhaps searching for a change.  Or --

14   Q.   How about -- how about modify?

15        MR. SINGH:  Your Honor, objection.  Counsel has asked

16   the witness where in the agreement that specific language

17   exists.  The witness has asked for a specific search to help

18   find that language, and counsel has ignored that request.  I

19   just want to note that for the record.

20        THE COURT:  Well, when you cross-examine, you can

21   certainly -- when you recross, you can bring that up.

22   BY MR. BERG:

23   Q.   Alternate -- is that it?  Alternate DNS?  Is that the

24   section?

25   A.   I'm sorry.  What's the question?

1   Q.   Is that the section that you're referencing, relating to

2   modifying the GitBook through MIP proposals?

3   A.   Well, that suggestion is -- changes or members, perhaps,

4   might be a better search term.

5   Q.   And your client -- and your counsel will be able to do that

6   on cross.  I'm asking for the word "alter."  Is this the

7   section?

8   A.   Is that a section that states the word "alter"?

9   Q.   Is this the section that you're referring to when you said

10  there is a section in the GitBook that says MIP proposals can

11  alter terms of the GitBook?

12  A.   I don't recall the specific location.

13  Q.   I know.  But I'm asking you if this is the specific

14  location.

15  A.   No, I don't believe that is the specific section.

16  Q.   How about this one either, alternate ES?

17  A.   No.

18  Q.   "Alternate approaches, and other relevant facts to the

19  implementation," not this one either; right?

20  A.   Would you scroll up, please, so I could see.

21       Proposal -- "fleshes out the specification by describing

22  what motivated the design or particular decisions were made,

23  alternative approaches, or other relevant facts..."

24       So this section describes a proposal format in which the

25  contents --

1   Q.   Mr. Phillips, does this show that a proposal can alter the

2   GitBook?

3   A.   This shows how to make a proposal --

4   Q.   Mr. Phillips, answer my question.  Does this show that the

5   proposal can alter the GitBook?

6   A.   No.

7   Q.   Okay.  How about this one?

8   A.   No.

9   Q.   The GitBook doesn't say it can be amended, altered, or

10  changed by a proposal, does it?

11  A.   I believe there is a section that states that the community

12  members managed the DAO and that can propose changes.

13  Q.   You authored a series of proposals in August of 2022 that

14  you posted on MovementDAO's Snapshot page; right?

15  A.   I was a coauthor, but I wasn't the primary author.

16       MR. BERG:  I would like to introduce Exhibit 9 into

17  evidence.

18       THE COURT:  Mr. Singh, any objection?

19       MR. SINGH:  No objection.

20       MR. BERG:  That exhibit will be found in Volume I,

21  plaintiffs' exhibits.

22       THE COURT:  The exhibit is admitted.

23       (Plaintiff Exhibit 9 was received in evidence.)

24  BY MR. BERG:

25  Q.   Please let me know when you are there, Mr. Phillips.

1    A.   Yes.

2    Q.   This document is MIP 1, a proposal you coauthored in August

3    of 2022 that sought to adopt a document called Governance

4    Process; right?

5    A.   Yes.

6    Q.   Please turn to page 258.  The first sentence of the

7    governance process document, the top of this page says, "The

8    DAO is governed by its community as expressed through MAIP NFT

9    voting"; right?

10   A.   Yes.

11   Q.   That reference to MAIP NFTs, that's not a reference to MOVE

12   tokens; correct?

13   A.   MAIP stands for Movement AIP, non-fungible token so it

14   does -- it is a MOVE token.

15   Q.   It's not a reference to "$ M-O-V-E" token; right?

16   A.   No, it's not.

17   Q.   Okay.  Go to page 259.  At the top of the page there is a

18   reference to the DAO's consensus base.  Do you see that?

19   A.   Yes.

20   Q.   That's a reference to Movement's Snapshot page; correct?

21   A.   Yes.

22   Q.   At the time you posted Exhibit 9 as a proposal on the

23   MovementDAO's Snapshot page, is it your contention that

24   Snapshot voting governed the MovementDAO's actions?

25   A.   I wasn't the one who posted this.  What was the question?

1   What was the rest of the question?

2   Q.   At the time of this proposal was posted by whoever, is it

3   your contention that Snapshot voting governed MovementDAO's

4   actions?

5   A.   Yes.

6   Q.   $MOVE tokens had not been issued at the time Snapshot

7   voting on Exhibit 9 occurred; correct?

8   A.   No.  However, the GitBook did state that --

9   Q.   Mr. Phillips, just answer my question.  Thank you.

10       To this day, $MOVE tokens still have not issued; right?

11  A.   That's correct.

12  Q.   So no one holds a $MOVE token; correct?

13  A.   That's correct.

14  Q.   Okay.  Under that governance process -- which you authored;

15  correct?

16  A.   I was a coauthor, but I wasn't the primary author, "Philip

17  V."

18  Q.   All right.  Under the governance process in this proposal,

19  you did not -- you do not need a $MOVE token to participate in

20  the MovementDAO's Snapshot voting; right?

21  A.   No.

22  Q.   Okay.  Please go to Exhibit 6 in the binder.

23  A.   Yes.

24  Q.   Please turn to page 89.  Are you there?

25  A.   Yes.

1   Q.   All right.  Under the heading "Staking," second paragraph,

2   it says, "Only staked $MOVE holders will be able to participate

3   in Snapshot governance."  Did I read that correctly?

4   A.   You did.

5   Q.   So the governance process that you coauthored is

6   inconsistent with this provision of the GitBook; is that

7   correct?

8   A.   Yes.

9   Q.   Okay.  I would like you to turn to Exhibit 8, please.  This

10  is also in plaintiffs' exhibits, Volume I.  Let me know when

11  you are there.

12  A.   Yes.

13  Q.   This is MIP 0, a proposal you coauthored in August 2022

14  that sought to adopt a document called "Guiding Principles";

15  correct?

16  A.   That's correct.

17  Q.   Go to page 192.  Let me know when you are there.

18  A.   Yes.

19  Q.   The bottom of the page says "the DAO shall not create any

20  liquidity pools"; is that correct?

21  A.   That's correct.

22  Q.   All right.  Let's go back to Exhibit 6.  Please turn to

23  page 60.  Are you there?

24  A.   Yes.

25  Q.   The middle of the page it says:  "Movement endowments

1   generate ongoing revenue through," paragraph 2, "deploying

2   liquidity pools to earn fees."  Did I read that correctly?

3   A.   That's correct.

4   Q.   Okay.  So the Guiding Principles is inconsistent with this

5   provision of the GitBook?

6   A.   They mean different things.

7   Q.   They both say liquidity pools; don't they?

8   A.   They both use the word "liquidity pools."

9   Q.   Okay.

10  A.   The reference on page 60 means deploying two different

11  types of tokens and earning fees during the slots.  The

12  reference in the Guiding Principles refers to creating

13  liquidity in -- for the MOVE token, which was at the center of

14  how we were making decisions on not making a token that wasn't

15  an offering of an unregistered security.

16  Q.   Okay.  Same page, the heading is called "Endowment Basics."

17  Do you see that?

18  A.   Yes.

19  Q.   First -- first line says:  "The purpose of the endowment is

20  to earn via various defy protocols in order to produce a yield

21  for the DAO."

22       Is that -- is that -- did I read that correctly?

23  A.   Yes.

24  Q.   And below that, down the page, there is a list of eight

25  examples of how the Movement endowment might generate ongoing

1   revenue; right?

2   A.   Yes.

3   Q.   Okay.  How much revenue has the MovementDAO endowment

4   generated since February 2022?

5   A.   I don't know the specific number.

6   Q.   Less than $500,000?

7   A.   Less than $500,000.

8   Q.   Less than $200,000?

9   A.   Perhaps less.  Maybe 200,000, I don't know.  But --

10   Q.   That's fine.

11        Let's go to Exhibit 30 in your binder.

12        MR. BERG:  Your Honor, I would like to introduce

13   Exhibit 30 into evidence.

14        THE COURT:  Mr. Singh, any objection?

15        MR. SINGH:  No, no objection.

16        THE COURT:  Okay.  It's admitted.

17        MR. BERG:  Thank you, Your Honor.

18        (Plaintiff Exhibit 30 was received in evidence.)

19   BY MR. BERG:

20   Q.   Are you there, Mr. Phillips?

21   A.   Yes.

22   Q.   This is a proposal called MIP 21 posted on the MovementDAO

23   Snapshot page that you coauthored in January 2023; right?

24   A.   Yes.

25   Q.   And it proposes to authorize the transfer of 5.3 million

1   Dai for development expenses; correct?

2   A.   Yes.

3   Q.   Let's go to page 65 of Exhibit 6.  Let me know when you are

4   there.

5   A.   Excuse me.  Page 65 of Exhibit 6?

6   Q.   Exhibit 6.

7   A.   I'm here.

8   Q.   Under the heading "How Does an Endowment Work

9   Logistically?" there is a -- in the second paragraph the

10  GitBook says, "MovementDAO has a pool of capital called an

11  endowment.  Money in the endowment cannot be spent.  The

12  endowment's yield funds the platform"; right?

13  A.   It does say that.

14  Q.   Okay.  Let's go -- so when the -- so when the Snapshot

15  proposal, MIP 21, Exhibit 30, was ratified in January of 2023,

16  the funds that were transferred out of the endowment pursuant

17  to that proposal were not from yield generated by the

18  endowment, but were funds from the endowment itself; correct?

19  A.   That's correct.

20  Q.   In August 2022, you authored a proposal, excuse me,

21  coauthored a proposal on the Movement Snapshot page that

22  proposed that "the DAO is not entitled to keep any records

23  concerning legal accounting or other affairs, and aside from

24  the above public information the DAO shall not be required to

25  maintain any additional records"; is that correct?

1   A.   I'm sorry.  Excuse me.  On page 65 --

2   Q.   That's not -- that's not in this.  I'm just trying to move

3   things along a little faster.  But if you don't recall, we can

4   go to the document.

5   A.   All right.  If you could repeat the question.  I was

6   just --

7   Q.   Let's just go to Exhibit 8 in the binder.

8   A.   -- pointing out that it says "fully managed by its token

9   holders."

10  Q.   Exhibit 8 --

11        MR. BERG:  And I would like to move to strike that

12  response as nonresponsive.

13        THE COURT:  Since I'm the only one here and I have

14  heard it, we will just move on, so that I can hear all of the

15  evidence.

16        MR. BERG:  Sure.

17  BY MR. BERG:

18  Q.   Let's go to Exhibit 8, please.

19  A.   Exhibit 8?  I'm here.

20  Q.   Exhibit 8.  Let's go to page 194, top of the page.  Let me

21  know when you are there.

22  A.   Yes.

23  Q.   It says:  "The DAO is not entitled to keep any records

24  concerning legal, accounting, or other affairs, and aside from

25  the above public information, the DAO shall not be required to

1    maintain any additional records."  Do you see that?

2    A.  Yes.

3    Q.  And the "above public information" is a reference to the

4    Gnosis sig wallet, Etherscan records, and Snapshot page; right?

5    A.  No.  It -- it referred to -- as much as possible, we made

6    all the documents public, so in a public Google drive or a push

7    to Snapshot.  So the intention was to ensure that there was no

8    information asymmetry, or that all information was made public,

9    to the -- to the best --

10   Q.  In that section, there is -- the top of that section is

11   called "Information Rights"; right?

12   A.  Yes.

13   Q.  It says:  "Member shall have access to all information

14   concerning operational and financial affairs of the DAO via the

15   Gnosis multisig wallet, Etherscan records, and Snapshot; right?

16   A.  Yes.

17   Q.  Okay.  So in the following paragraph, when it says "the

18   above public information," it's only referring to those three

19   things; correct?

20   A.  Yes.  But this GitBook is published somewhere.

21   Q.  This is not a GitBook, Mr. Phillips.

22   A.  Or this --

23   Q.  This proposal, you coauthored, this is MIP 0.

24   A.  Yes.

25   Q.  Okay.  So just to make sure we're clear, the above public

1   information referred to in 194 is a reference to the Gnosis sig

2   wallet, the Etherscan records, and Snapshot; correct?

3   A.   That's what the statement says, yes.

4   Q.   That's what it says; right?

5   A.   Yes.

6   Q.   And this was a proposal that you coauthored; right?

7   A.   Yes.

8   Q.   And this was a proposal that was passed through a Snapshot

9   vote; right?

10  A.   Yes.

11  Q.   Okay.  Let's go to Exhibit 12 in the same binder.  Please

12  turn to page 302.  Are you there?

13  A.   Yes.

14  Q.   Under the heading "Ratification of Future Disbursements,"

15  it says that:  "The DAO ratifies and approves a $100,000

16  spending threshold for service providers, including

17  tankbottoms, whereby prior verbal approval, initial sign-ins

18  for governance approval is not necessary to spend up to

19  $100,000 worth of funds in cryptographic assets"; is that

20  correct?

21  A.   Yes.

22  Q.   Tankbottoms is you; correct?

23  A.   Yes.

24  Q.   I would like you to turn to Tab 11 in that binder.

25          MR. BERG:  I would like to move Tab 11 into evidence as

```
 1    Exhibit 11.
 2              MR. SINGH:  No objection, Your Honor.
 3              THE COURT:  So moved.  Admitted.
 4         (Plaintiff Exhibit 11 was received in evidence.)
 5    BY MR. BERG:
 6    Q.  This is MIP3; is that right?
 7    A.  Yes.
 8    Q.  You coauthored this proposal in August of 2022; correct?
 9    A.  Yes.
10    Q.  Okay.  Let's turn to 290.  Let me know when you are there.
11    A.  Yes.
12    Q.  At the top of the page, the first paragraph, it said:
13    "Resolved further, authorizes the use of DAO endowment funds to
14    refund expenses that you incurred"; correct?
15    A.  Yes.
16    Q.  The proposal doesn't provide any details about what those
17    expenses were or how they related to MovementDAO business, does
18    it?
19    A.  No.  The proposal doesn't.
20    Q.  Mr. Phillips, you testified that you created and maintained
21    the DAO-lawfirm ENS; correct?
22    A.  That's correct.
23    Q.  By "maintained," you mean you used the cryptocurrency
24    address ending in 0085 which was registered to the ENS
25    DAO-lawfirm; right?
```

1   A.   Yes.

2   Q.   You testified that plaintiffs knew that you were using the

3   DAO-lawfirm address to sign transactions; correct?

4   A.   Yes.

5   Q.   Now, in that testimony, you weren't saying that plaintiffs

6   knew you were signing transactions with DAO-lawfirm without

7   receiving direction or consultation with Mr. Yurchak; right?

8   A.   Sorry.  I wasn't -- I was signing without receiving

9   direction or consultation?

10   Q.   You told plaintiffs you would use DAO-lawfirm ENS in

11   coordination with Mr. Yurchak; right?

12   A.   Yes, it was -- yes.

13   Q.   So plaintiffs believed you would be using DAO-lawfirm.eth

14   with Mr. Yurchak's signoff; right?

15   A.   Yes.

16   Q.   Let's go to Exhibit 6, page 88.  Let me know when you are

17   there.

18   A.   Yes.

19   Q.   Under "How do I know the token launch is fair?,"

20   paragraph 2, the GitBook states:  "A registered law firm acts

21   as a signatory of the funds wallet.  They therefore owe a

22   fiduciary duty to the movement and will employ their expertise

23   to ensure that no funds are moved in violation of the movement

24   rules and no requests for funding will be indicative of

25   fraudulent activity."

1        Did I read that accurately?

2    A.   Yes.

3    Q.   So this language in the GitBook would also lead plaintiffs

4    to understand that Mr. Yurchak would be reviewing requests for

5    funding; right?

6    A.   Yes.  I just wanted to share these MIPs with him, yes.

7    Q.   Like the ones posted on Snapshot; right?

8    A.   Yes.

9    Q.   Now, Mr. Phillips, in your declaration, you wrote that:

10   "In MIP4 and MIP7, they specifically identify Mr. Yurchak's law

11   firm as a service provider"; right?

12   A.   Yes.

13   Q.   And both MIP4 and MIP7 were dated August 2022; correct?

14   A.   Yes.

15   Q.   Okay.  You coauthored both of those MIPs; correct?

16   A.   Yes.

17   Q.   Now, the GitBook lists the law office of Reed Yurchak as

18   the initial service provider, doesn't it?

19   A.   Yes.

20   Q.   And you testified that Mr. Yurchak never objected to being

21   identified in the GitBook; correct?

22   A.   Yes.

23        MR. BERG:  I would like to introduce Exhibit 378 for

24   the limited purpose of Mr. Phillips' knowledge.  This will be

25   in defendants' exhibit binder Volume II.

```
 1              THE COURT:  Mr. Singh, any objection?

 2              MR. SINGH:  No objection.

 3              THE COURT:  What's the number again?

 4              MR. BERG:  378.

 5              THE COURT:  Okay.  Admitted.

 6          (Plaintiff Exhibit 378 was received in evidence.)

 7              MR. BERG:  It should be defendants' Volume II,

 8    Mr. Phillips.

 9              THE COURT:  Oh, it's defendants'.

10              MR. BERG:  Yes.  Yes, Your Honor.  Sorry.

11              Defendants' Exhibit 378.  Volume II, please.

12              THE WITNESS:  This -- this binder starts at 426.

13              MR. BERG:  May I approach the witness, Your Honor?

14              THE COURT:  Yes, you may.

15              MR. BERG:  This one seems to have --

16              THE WITNESS:  378?

17    BY MR. BERG:

18    Q.  Are you there?

19    A.  Yes.

20              MR. BERG:  Your Honor, are you there?

21              THE COURT:  Yes.

22    BY MR. BERG:

23    Q.  On April 11, 2022, you received this e-mail from Marc

24    Welton, who was a paralegal of the law office of Reed Yurchak;

25    right?
```

1   A.   Yes.

2   Q.   And the e-mail Mr. Welton writes:  "I have gone in and

3   edited out the reference to L-O-R-Y"; right?

4   A.   Yes.

5   Q.   LORY is a reference to law office of Reed Yurchak; correct?

6   A.   I didn't -- I didn't know that.

7   Q.   So this e-mail didn't inform you that Mr. Yurchak was using

8   his paralegal to edit out references to his firm name from the

9   GitBook; right?

10   A.   Well, this was on April 11th, and the DAO launched on

11   February 2nd.

12   Q.   I understand.

13   A.   So, but I -- I -- I didn't know that it was L -- I didn't

14   know.

15   Q.   You didn't know what?

16   A.   I didn't know that that stood for "Law Offices of Reed

17   Yurchak."

18   Q.   At no other point did Mr. Yurchak indicate to you that he

19   wanted his name removed from the GitBook?

20   A.   No.

21   Q.   Okay.  Do you understand now that the initials LORY

22   correspond to Law Office Reed Yurchak?

23          MR. SINGH:  Objection.  Calls for speculation.

24          THE COURT:  Overruled.

25          MR. BERG:  I ask for --

1   A.   I do now.  But it is still on April 11th, and not

2   February 2nd or January 1st.

3   BY MR. BERG:

4   Q.   So you understand now that LORY refers to law office of

5   Reed Yurchak and that Marc Welton sent this e-mail on April 11,

6   2022.  But despite receiving this e-mail on April 11, 2022, you

7   still wrote in MIPS 4 and 7, in August of 2022, that the law

8   office of Reed Yurchak was acting as a service provider of the

9   MovementDAO; right?

10  A.   Well, this doesn't say where he removed it.  And this

11  e-mail, we were speaking specifically about the token use --

12  token sale use and there was a reference to, incorrectly, when

13  the -- that law office of Reed Yurchak was written as the

14  company.

15       So I can see how this -- but this doesn't say that it is

16  specifically removed as the service provider.

17  Q.   You authored several proposals in August of '22 that were

18  posted on the MovementDAO Snapshot page, coauthored; right?

19  A.   Yes.

20  Q.   Those proposals were MIP 0 through MIP 8; correct?

21  A.   Yes.

22  Q.   The address ending in 0085 cast over 10 million votes for

23  those proposals; is that right?

24  A.   That's correct.

25  Q.   You were the one that physically cast those votes?

1   A.   Yes.

2   Q.   -- right?

3   A.   Yes.

4   Q.   Right.

5        You didn't consult with Mr. Yurchak about those proposals

6   before you did that, did you?

7   A.   I did.

8   Q.   On August 30, 2022, $1.75 million was transferred out of

9   the DAO endowment account ending in 03C6; right?

10  A.   Yes.

11  Q.   You were the one that executed that transfer; right?

12  A.   Yes.

13  Q.   That 1.75 million was supposed to cover Movement's spending

14  through the end of 2022; right?

15  A.   What do you mean by "cover"?

16  Q.   You proposed a budget -- well, let me -- let me -- we will

17  get there.

18       After that transfer occurred in August, Mr. Breslow began

19  asking you for more frequent updates about the DAO endowment

20  balance and the development expense budget; is that right?

21  A.   No.  He asked me for updates generally, but nothing

22  specifically.

23  Q.   He didn't ask you about the treasury balance in the Gnosis

24  and the development expense budget?

25  A.   I would provide him with that information.

1   Q.   Listen to my question.   Is it your testimony that

2   Mr. Breslow did not begin seeking constant updates on the

3   treasury balance in the Gnosis and the development expense

4   budget?

5   A.   He sought updates from me, yes.

6   Q.   Did he specifically seek constant updates on the treasury

7   balance in the Gnosis and the development expense budget, yes

8   or no?

9   A.   He didn't specifically give me instructions on what those

10   meetings were about --

11   Q.   Let's go to exhibit --

12   A.   -- updates.

13   Q.   Excuse me.   Go to Exhibit 93, please.

14   A.   In which binder?

15   Q.   This should be plaintiffs' Volume I.

16   A.   Which number again?

17   Q.   93.   That's paragraph 52, please.   Let me know when you are

18   there.

19   A.   Yes.

20   Q.   Okay.   So this is your declaration, Exhibit 93 is your

21   declaration dated March 17, 2023; right?

22   A.   Yes.

23   Q.   In paragraph 52, the last sentence of your declaration

24   says:   "Mr. Breslow began for the first time seeking constant

25   updates on the treasury balance in the Gnosis and the

1   development expense budget"; right?

2   A.   Yes.

3   Q.   Okay.  You prepared a budget and related materials on

4   September 11, 2022; right?

5   A.   On September 11th, 2022, I prepared a budget?

6   Q.   Yes.

7   A.   I -- I participated in many budgets.  I don't recall that

8   specific one.

9   Q.   Let's go back to Exhibit 93, paragraph 53.  Are you there?

10  A.   Yes.

11  Q.   First sentence:  "I prepared a budget for MovementDAO on

12  September 11, 2022, which contains an instructive Snapshot of

13  the organization at that time."  That's your sworn declaration;

14  correct?

15  A.   Yes.

16  Q.   Okay.  Let's go to Exhibit 90.

17          MR. SINGH:  Was that 9 or 90?

18          MR. BERG:  9-0.

19  BY MR. BERG:

20  Q.   Let me know when you are there.

21  A.   Yes.

22  Q.   These are the materials that you prepared for Mr. Breslow

23  and Mr. Gordon that you just referenced in your declaration;

24  correct?

25  A.   I think so.  They're small.  But, yeah, I think -- these

1   are some of them.

2   Q.   You shared this document with Mr. Breslow and Mr. Gordon,

3   and discussed it with them; right?

4   A.   Yes.

5   Q.   Okay.  Let's go to 776 of that document.  Are you there?

6   A.   Yes.

7   Q.   It says "MovementDAO Initialization Budget" at the top;

8   correct?

9   A.   Yes.

10   Q.   And this budget lists the developers who you were proposing

11   to pay with this budget; right?

12   A.   But this was the corroboration of everybody in Movement,

13   but, yes.

14   Q.   This budget doesn't reference any deferred payments to

15   developers; right?

16   A.   No, it does not.

17   Q.   Nowhere in this document is there a reference to deferred

18   developer payouts; right?

19   A.   On 778, it does list G tokens.

20   Q.   Okay.

21   A.   And -- I'm sorry.  And then on 780, there is some legal,

22   like, from the -- from the law firm.  There is deferred fees to

23   the law firm.

24   Q.   My question was related to deferred developer payments.

25   A.   And the -- on 779, the FC column, is -- refers to funding

1   cycle --

2   Q.   Uh-huh.

3   A.   -- which -- which describes, like, a payout schedule.   But

4   the word "deferred" is not --

5   Q.   What do you mean a "payout schedule"?

6   A.   Well, the way this is outlined was that all of these

7   individuals were -- we were looking at the annualized budget.

8   And so the idea was that every three months or six months we

9   would go through a governance process to continue on.   But

10  everyone who has the 100K G tokens was considered a core

11  contributor that was being employed by the DAO.   And so that

12  was what we were using as our -- like, our yearly budget.

13  Q.   Okay.   Let's go -- if you could go back to 776, the column

14  under ENS.   Do you see that?

15  A.   776?

16  Q.   Yes.

17  A.   What column?

18  Q.   These are the list of the developers that are -- you're

19  proposing to employ; is that right?

20  A.   Yes.

21  Q.   Okay.   Same thing on 77 -- 777?   ENS is listed there; is

22  that right?

23  A.   Yes.

24  Q.   Okay.   Disintermediated.eth is Mikhail Radin's ENS;

25  correct?

1   A.   That's one of his addresses, yes.

2   Q.   That's not on here, is it?

3   A.   No.

4   Q.   Okay.  Is any reference to Mikhail Radin on here?

5   A.   The blockchain architect on CaptainSpaceCadet.eth.

6   Q.   Captain Space -- is CaptainSpaceCadet.eth Mikhail Radin?

7   A.   He uses that -- the developers use that account.

8   Q.   The developers or Mikhail Radin?

9   A.   All of the developers share use of that account for

10  deploying contracts.

11  Q.   So when you listed it here, what human being were you

12  referencing?

13  A.   Mikhail.  And so in the description section it says tezos,

14  blockchain architect tezos.

15  Q.   Uh-huh.

16  A.   That -- myself and Mikhail are the two tezos developers.

17  Q.   And you're looking at page 777 when you say that; right?

18  A.   776.

19  Q.   776.  Okay.

20       Okay.  Let's go to 777 where it says CaptainSpaceCadet.eth,

21  do you see that?

22  A.   Yes.

23  Q.   Okay.  The annualized income is 552,000; do you see that?

24  A.   Yes.

25  Q.   That's not 400,000, is it?

1    A.   No.

2    Q.   That's --

3    A.   We were compensating for -- the reason we were using Space

4    Cadet was that Mikhail wanted to be paid in fiat and not Dai or

5    ETH.  And so it would have to go through Fiat LLC.  And we were

6    considering the expenses related to converting -- selling

7    cryptocurrency and then paying taxes on the capital gains,

8    and we weren't sure how that was working.  So I think we -- we

9    outlined somewhere for an accountant to give us guidance.

10   Q.   So there is nowhere on this budget that indicates that

11   Mikhail Radin was receiving an annual salary of $400,000;

12   correct?

13   A.   No.

14   Q.   Okay.  On February 2, 2023, 7.5 million Dai and 805 ETH

15   were transferred out of the account ending in 03C6; right?

16   A.   Let me clear up -- my last response is that Mikhail Radin,

17   that's his line item.  Let me just make it very clear about

18   that.

19   Q.   Okay.

20   A.   I gave, you know, details on the why, but --

21   Q.   On February 2, 2023, 7.5 million Dai and 805 ETH were

22   transferred out of the account ending in 03C6; right?

23   A.   Yes.

24   Q.   You executed those transfers; right?

25   A.   I signed -- I finalized them, that's correct.

1   Q.   Did anyone besides you confirm that transaction?

2   A.   The emergency committee authorized that transaction.

3   Q.   The use of the three addresses to confirm -- please listen

4   to my question, Mr. Phillips.

5        Did anyone besides you confirm those transactions?

6   A.   A Mr. Ben Reed.

7   Q.   And which transaction did he confirm?

8   A.   I'm not sure.  I would have to look at the signings.

9   Q.   So it was either you or Mr. Reed?

10  A.   I could be wrong.  I need to see the transaction hashes.

11  Q.   Okay.  Are you also the one that executed the transactions

12  to remove Alex Fine and Jon Gordon as signatories from the

13  account ending in 03C6?

14  A.   Yes.

15  Q.   Anyone help you confirm that transaction?

16  A.   No.

17  Q.   Since you introduced plaintiffs to the alias DAO-lawfirm,

18  you have used that alias as your alter ego; isn't that correct?

19  A.   I -- no.

20  Q.   You used that alias to provide you with what you described

21  as air cover for you to bill for legal work under the name of

22  Reed Yurchak's firm, without Mr. Yurchak performing or

23  overseeing that work; right?

24  A.   No.

25  Q.   You have used a third-party entity as an alter ego to pay

1    yourself fees before; isn't that right?

2    A.   Are you referring to the criminal conviction?

3    Q.   No.

4    A.   Or the civil --

5    Q.   I am.

6    A.   -- matter, the A-Dot Corporation?

7    Q.   Uh-huh.

8    A.   A-Dot Corporation was a S-corporation that I -- I earned

9    over $8 million in, and the Court considered that it was an

10   alter alias.

11   Q.   So the answer to my question --

12   A.   So, yes.

13   Q.   You used a third-party entity as alter ego to pay yourself

14   fees before?  And the answer to that is "yes"; right?

15   A.   Yes.

16   Q.   Okay.  In September 2022 in the accounting you prepared for

17   Mr. Gordon and Mr. Breslow, Exhibit 90 -- do you remember that?

18   A.   Sorry.  Let me just be clear.  With the accounting, there

19   were other members of the DAO that prepared that.

20   Q.   Mr. Phillips, please answer my question.

21        In the September of 2022 accounting, you showed Mr. Gordon

22   and Mr. Breslow, you included a list of billed time from the

23   Yurchak firm related to the MovementDAO, didn't you?

24   A.   There was an outline of time spent doing paralegal work for

25   MovementDAO.

1   Q.   Just paralegal work?

2   A.   I don't recall.

3   Q.   Let's look at it.  Let's go to Exhibit 90.  Page 780.

4        Are you there?

5   A.   780?

6   Q.   Uh-huh.

7   A.   Yes.  So this is what I was speaking about.

8   Q.   I'm sorry.  Wait for my question, Mr. Phillips.

9        Under "Biller" it says MP.  That's Mark Phillips; right?

10  A.   Yes.

11  Q.   Okay.  It also says MW.  That is Marc Welton; right?

12  A.   Yes.

13  Q.   But it also says RY.  That's Reed Yurchak; right?

14  A.   Yes.

15  Q.   Okay.  So it's not just a listing of time billed for

16  paralegal activities; correct?

17  A.   All right.  So --

18  Q.   It's not just a listing of billed activities for

19  paralegals; correct?

20  A.   I -- I would have to read this.  But --

21  Q.   This is very simple.  We show those entries for three

22  different folks, one of which is an attorney.  So it's not just

23  limited to paralegals; right?

24  A.   But no invoice was generated from this.

25  Q.   That's not my question, Mr. Phillips.

1    A.   Okay.

2    Q.   At the bottom of this document that you characterize as

3    "not an invoice," it says $20,000 and some change; right?

4    A.   Yeah, I'm sorry, it's difficult to --

5    Q.   I'm sure it is.  I'm sorry.

6    A.   So the -- the purpose of this --

7    Q.   I'm not asking for the purpose.  I'm asking what the number

8    is.

9    A.   I'm sorry.  I can't --

10   Q.   That's fine.  I will represent that it's $20,000 and

11   some -- some other dollars.

12        Now, this isn't the first time you've presented a document

13   that was purporting to list billed time, like a false invoice,

14   is it?

15   A.   This is not an invoice.

16   Q.   That's not my question.

17        Have you, in the past, presented false invoices?

18   A.   Yes.  It related to a girlfriend that I had at the time,

19   who wanted me to change her name, Jan Wallace, to her company,

20   Wallace Black.  I disclosed it to the board of directors --

21   Q.   Mr. Phillips, I'm not asking for a narrative here, but we

22   will get into this.

23        MR. BERG:  I would like to introduce impeachment

24   Exhibit 211.  This is the superseding indictment.

25        THE COURT:  Admitted.

```
1              (Plaintiff Exhibit 211 was received in evidence.)

2              MR. BERG:  Your Honor, may I approach?

3              THE COURT:  Yes, you may.

4     BY MR. BERG:

5     Q.   This is the superseding indictment underlying your criminal

6     conviction; right?

7     A.   Yes.

8     Q.   In that indictment you were charged with submitting false

9     documents invoicing a company called MOD for supposed services

10    provided by a company called Wallace Black; right?

11    A.   Yes.

12    Q.   Okay.  At the time you were MOD's chief executive officer

13    and a member of its board of directors; right?

14    A.   And its majority shareholder, yes.

15    Q.   All three of those; right?

16    A.   Yes.

17    Q.   You were also charged with using a Seattle law firm to

18    receive funds from MOD pursuant to those false invoices, and

19    then direct the law firm to transfer those falsely invoiced

20    amounts to Wallace Black's bank account; is that correct?

21    A.   Yes.

22    Q.   Okay.  And you were charged with causing Wallace Black to

23    transfer those invoiced amounts to you and others for your

24    personal benefit; right?

25    A.   I learned later that she did that.
```

1   Q.   I'm asking if you were charged with doing it.

2   A.   Yes.

3   Q.   Okay.  All of those allegations in the indictment were in

4   connection with the wire fraud counts asserted against you by

5   the U.S. government; correct?

6   A.   Yes.

7   Q.   And a jury found you guilty of those wire fraud counts;

8   correct?

9   A.   Yes.

10   Q.   You appealed your conviction to the 9th Circuit, but not on

11   the wire fraud counts; right?

12   A.   I don't recall the specifics of the appeal.

13   Q.   In the 9th Circuit's opinion, the Court described the

14   evidence that was submitted to the jury, which included all the

15   facts established by the record that were read in the light

16   most favorable to the government; right?

17   A.   I -- is that --

18   Q.   It's a question?

19   A.   What was the question?

20   Q.   Did the 9th Circuit enumerate the facts that the jury found

21   in its opinion?

22   A.   I don't recall --

23   Q.   Okay.

24   A.   -- the --

25        MR. BERG:   Let's -- I would like to introduce

1   Exhibit 221.

2          THE COURT:  Admitted.

3      (Plaintiff Exhibit 221 was received in evidence.)

4          MR. BERG:  You know what?  We will move on.

5   BY MR. BERG:

6   Q.  Mr. Phillips, you used the DAO-lawfirm alias to make

7   plaintiffs believe that Mr. Yurchak's firm was providing advice

8   and oversight on the MovementDAO project when it, in fact, was

9   just you; right?

10  A.  That's not correct.  I consulted with Mr. Yurchak regarding

11  governance and many legal matters with -- as it related to

12  MovementDAO.

13  Q.  Uh-huh.

14      You used the DAO-lawfirm alias to misrepresent actions that

15  you were taking and recommendations that you were giving as if

16  they were actions and recommendations from the law firm of Reed

17  Yurchak; right?

18  A.  I -- I did not give any advice.

19  Q.  Okay.  The case number for your criminal case was 10-cr-269

20  in the Western District of Washington State; correct?

21  A.  Yes.

22  Q.  A sentencing hearing was held in connection with your

23  conviction; right?

24  A.  Yes.

25  Q.  A copy of a transcript of that sentencing hearing was filed

1   in the Court's docket, a docket number 185; right?

2   A.   I don't know the specific docket.

3   Q.   You were present for that sentencing hearing; correct?

4   A.   Yes.

5   Q.   Sorry.  Correct?

6   A.   Yes.

7   Q.   During that hearing, the judge added a two-level

8   enhancement to your sentencing calculation by making a factual

9   finding that you willfully obstructed justice; right?

10   A.   Yes.

11   Q.   The Court found that you willfully obstructed justice by

12   falsely testifying about a material matter with intent to

13   provide false testimony, didn't you?

14   A.   Yes.

15   Q.   The Court found that you willfully provided false testimony

16   about disclosing the false invoices from Wallace Black; right?

17   A.   When you testify on your behalf and you don't have

18   materials to support it, that's what happens.

19   Q.   I'm sorry.  The Court found that you willfully provided

20   false testimony about disclosing false invoices from Wallace

21   Black; right?

22   A.   I will take your word for it.  I don't recall the

23   specific --

24   Q.   The Court found that you willfully provided false testimony

25   about the reasons you offered for altering those invoices;

1    right?

2    A.   Again, I don't -- I'll take your word for it.

3    Q.   You don't recall?

4    A.   I don't recall.  I just -- obviously, it's a traumatic

5    period and I didn't want to have anything to do with repeating

6    that here.

7    Q.   So you don't recall?

8    A.   I don't recall the specifics of what the findings were.

9    Q.   The Court found that you willfully provided false testimony

10   about your explanation at the money from those false invoices

11   was not for your personal benefit; right?

12   A.   I remember disclosing it, having a board meeting about

13   those payments.

14   Q.   I'm just asking you about what it -- I'm just asking about

15   what the Court found.

16   A.   Again, I -- I don't recall exactly --

17   Q.   Okay.

18   A.   -- what --

19   Q.   The Court found that you willfully provided false testimony

20   about receiving permission to pay yourself $1.5 million when

21   you did not, in fact, receive that permission; right?

22   A.   Again, I have board minutes that were not disclosed or not

23   provided in the criminal case.

24   Q.   Did you recall that, the Court's finding?

25   A.   I will take your word for it.

1    Q.   Okay.  So, in all, the Court found that you willfully

2    provided false testimony on four different occasions, during

3    the course of your testimony of your criminal trial; right?

4    A.   Yes.  And, again, this is why I was very adamant about

5    having all of our governance public and all our communications

6    public in the DAO.

7    Q.   Mr. Phillips, I'm not asking for why you did other things.

8    I'm asking if you recall the findings of the Court.  Thank you.

9         And do you recall?

10        THE COURT:  Mr. Berg, my concern is that I can read

11   this opinion.  And you're asking him if he recalls, is

12   interesting, but it is not helpful.

13        MR. BERG:  Yes, Your Honor.  I'm reading it for the

14   record.  I can't introduce this exhibit under 608(b), and so

15   for purposes of the record, it's important that I want to get

16   this in.  It's pretty important.

17        THE COURT:  Right.

18        MR. BERG:  I'm done with it and I'm moving on.

19        THE COURT:  Okay.  Very good.  I can always refer to --

20   you're reading an opinion from a case, and I can always look

21   that up.

22   BY MR. BERG:

23   Q.   You used the law firm of Reed Yurchak as a passthrough

24   entity to conceal the transfer of money to yourself; is that

25   correct?

1  A.  No.

2  Q.  Do you recall Mr. Singh asking questions of Mr. Yurchak and

3  yourself about One Of?

4  A.  Mr. Yurchak executed an engagement agreement in order to

5  handle accounting for me because I didn't --

6  Q.  You recall that testimony; right?

7  A.  I do recall.

8  Q.  Thank you.

9      And you currently pay child support; correct?

10 A.  I do.

11 Q.  Near the end of 2018, you requested that the Washington

12 Department of Social Health Services petition the Superior

13 Court of Washington or the County of King to adjust your child

14 support payments.

15 A.  Right.

16 Q.  In connection with that request, you represented your gross

17 monthly income was $500; right?

18 A.  Yes.

19 Q.  All right.  Pursuant to that request, the Court altered

20 your monthly support obligations to $50; right?

21 A.  Yes.

22 Q.  Around August of 2021, you began doing work for the company

23 One Of; correct?

24 A.  Yes.

25 Q.  But One Of didn't pay you directly.  They paid you through

1   the office of Reed Yurchak; right?

2   A.   Yes, he was handling my accounting and taxes.

3   Q.   Mr. Yurchak would receive money from One Of, and distribute

4   these payments to you in bitcoin; right?

5   A.   He would pay me in cash or a Darian Morian (phonetic)

6   bitcoin.

7   Q.   Under this arrangement, how much would you receive a month

8   for your work with One Of?

9   A.   On the low end, $10,000; and on the high-end, $180,000.

10   Q.   This arrangement, by which One Of paid you through

11   Mr. Yurchak's law firm, was that done at your request?

12   A.   It was by mutual agreement.

13   Q.   Was it initiated by your request?

14   A.   I asked him if he would provide the accounting services for

15   me so I could focus on programming.

16   Q.   So is that a yes --

17   A.   Yes.

18   Q.   Is that a yes to my question?

19   A.   Yes.

20   Q.   Around August of 2021, you were also hired by Merkaba;

21   correct?

22   A.   Yes.

23   Q.   Throughout your work with MovementDAO, you were not paid

24   directly; right?

25   A.   Yes.

1   Q.   Instead, payments would be sent to Mr. Yurchak's law firm,

2   and Mr. Yurchak would then distribute those payments to you via

3   cryptocurrency; right?

4   A.   Either paid into the Meow LLC or in bitcoin or in Midereum

5   (phonetic).  It depended.

6   Q.   Okay.  Under this arrangement, you were receiving $88,000 a

7   month from January 2022 onward; correct?

8   A.   From Merkaba?

9   Q.   From -- related to the MovementDAO work.

10  A.   From -- Merkaba paid me -- I don't recall the specifics,

11  but a couple of thousand dollars, until December of 2000 --

12  Q.   Listen to my question.

13       From January of 2022 onward --

14  A.   January 2022.

15  Q.   -- you were receiving $88,000 a month for your work with

16  MovementDAO?

17  A.   That was -- yes.

18  Q.   And that money was paid to you through Mr. Yurchak's law

19  firm in the form of cryptocurrency; correct?

20  A.   Those payments were paid to Meow LLC.

21  Q.   And that's an entity that you controlled; right?

22  A.   Yes.

23  Q.   So you were receiving payments for work with MovementDAO to

24  yourself personally or to an entity that you control; right?

25  A.   Yes.

1   Q.   Okay.  Now, that arrangement was done at your request;

2   right?

3   A.   Yes.

4   Q.   Did the Department of Child Services ever learn that your

5   monthly income had increased beyond $500?

6   A.   I don't know.

7   Q.   All right.  For the work you performed for One Of, you

8   didn't report that to the Department of Social Health Services;

9   right?

10  A.   We haven't finalized the accounting.

11  Q.   Okay.  And for the work you performed relating to

12  MovementDAO, you didn't report that to the Department either;

13  right?

14  A.   Not at this time.

15  Q.   Okay.  Did you have payments from Merkaba and One Of sent

16  through Yurchak's law firm from Merkaba or to MovementDAO

17  generally to prevent the Department of Social Health Services

18  from learning about your substantially increased income?

19  A.   No.

20  Q.   You testified that you did not receive a 1099 or a W-2 from

21  plaintiffs for the work you did in 2022; right?

22  A.   Yes.

23  Q.   Okay.  Did you pay taxes on the money you received in 2022

24  in connection with the MovementDAO?

25  A.   I was preparing to before the TRO was put in place.

1    Q.   And you received over a million dollars; right?

2    A.   I did.

3    Q.   Had you paid taxes on that money, notice of that income

4    would have been conveyed to the Department of Social Health

5    Services; right?

6    A.   Again, I was preparing to do so with the accountant, but

7    the TRO went in place.

8    Q.   move.xyz is the MovementDAO's website; right?

9    A.   One of them.

10   Q.   You testified that MovementDAO launched in February of

11   2022; right?

12   A.   Yes.

13   Q.   Okay.  When the GitBook was published on February 2, 2022,

14   the GitBook said:  "The platform is currently under development

15   and conducting a presale to fund its endowment"; right?

16   A.   Yeah, that sounds correct.

17   Q.   The GitBook even included a Snapshot of the presale page

18   for MOVE tokens; right?

19   A.   Yes, I believe that's correct.

20   Q.   Let's go to Exhibit 6.

21   A.   Which binder?

22   Q.   It's going to be plaintiffs' Volume I.

23        THE COURT:  Okay.  Just a few minutes, probably the

24   court reporter needs a break.  Ms. Melton.

25        THE STENOGRAPHER:  Yes, ma'am, I'm here.

```
 1              THE COURT:  Okay.  We have been going now for over an

 2    hour, at least.  I wanted to make sure you were okay.  Or when

 3    do you need a break?

 4              THE STENOGRAPHER:  Whenever you plan on taking a lunch

 5    break or -- if there is going to be a lunch break, that will be

 6    fine for me.  I'm not sure how long the hearing is scheduled

 7    for.

 8              THE COURT:  We are actually scheduled for 1:00, to end

 9    at 1:00.

10              THE STENOGRAPHER:  Oh.

11              THE COURT:  But it looks like we could go -- we may

12    need a little bit more time than that.

13              THE STENOGRAPHER:  Okay.

14              THE COURT:  But do you want to go to 1:00 and then take

15    a break, and then see what's going on at that point?

16              THE STENOGRAPHER:  That sounds good.

17              THE COURT:  Mr. Berg, how much more time do you need?

18              MR. BERG:  10 to 15.

19              THE COURT:  10 to 15.

20              Okay.  So why don't we just go to that 15 minutes, and

21    then we will take a break so that she can rest.

22              Okay.  Very good.

23    BY MR. BERG:

24    Q.  Page 87 of Exhibit 6, please.  Let me know when you are

25    there.
```

1    A.   Which page, again?  I'm sorry?

2    Q.   87.

3    A.   Yes.

4    Q.   Okay.  That page of the GitBook shows a screenshot of the

5    MOVE presale page; right?

6    A.   Yes.

7    Q.   It says:  "Become an early $MOVE adopter.  Sending from

8    Coinbase?  Learn more here."

9         Do you see that?

10   A.   Yes.

11   Q.   It doesn't say anything about launch of the MovementDAO,

12   does it?

13   A.   Not on this page.

14   Q.   Okay.  In March 2022, the move.xyz website stated that:

15   "The platform is currently under development and conducting a

16   token presale to fund its endowment"; right?

17        You won't see that on Exhibit 6, Mr. Phillips.  I'm just

18   asking if you recall.

19   A.   Can you repeat that statement again?

20   Q.   On March 2022, the move.xyz website stated:  "The platform

21   is currently under development and conducting a token presale

22   to fund its endowment"; right?

23   A.   On the website it's stated to fund -- isn't that in the

24   GitBook?

25   Q.   On the website it said that the platform is currently under

1    development; is that right?

2    A.   The sister website.

3    Q.   Mr. Phillips, let me back up for you.

4    A.   Right.

5    Q.   We're looking at Exhibit 6.  This is the GitBook that was

6    published on February 2, 2022.  We're done with that.  I'm

7    asking you a new question.

8         In March 2022, on the move.xyz website, did it say, "The

9    platform is currently under development"?

10   A.   Just -- this page would have been posted on that --

11   Q.   Mr. Phillips, I'm not asking about this page anymore.  I'm

12   asking on move.xyz website.

13   A.   Yeah, and above -- in this address line, it says

14   presale.move.xyz.

15   Q.   Uh-huh.

16   A.   And so, I think if you went to move.xyz directly, it would

17   reroute you to this.

18   Q.   Okay.  Let's -- let's pull out Exhibit 204.

19              MR. BERG:  Your Honor, may I approach?

20              THE COURT:  Yes, you may.

21              MR. BERG:  Your Honor, Exhibit 204 is an archived web

22   page of move.xyz.  I would like to move Exhibit 204 into

23   evidence.

24              THE COURT:  Mr. Singh?

25              MR. SINGH:  No objection.

1          (Plaintiff Exhibit 204 was received in evidence.)

2     BY MR. BERG:

3     Q.  Mr. Phillips --

4     A.  Yes.

5     Q.  -- Exhibit 204 is a web archive page of move.xyz taken on

6     March 14, 2022.  Do you see that at the top of the page?

7     A.  Yes.

8          THE COURT:  I'm seeing April 17th.

9          MR. BERG:  I'm sorry, Your Honor.  That's the date

10    the capture occurred.  If you look at the bottom right --

11    sorry -- in that banner on the far right side, there is a black

12    box that says March 14, 2022.

13         THE COURT:  I see.  Thank you.

14         MR. BERG:  That's the feature of the web archive

15    format.

16    BY MR. BERG:

17    Q.  Okay.  Now, Mr. Phillips, if you'd go to the very bottom of

18    that page, the very last sentence, it says:  "The platform is

19    currently under development and conducting a token presale to

20    fund its endowment."

21         Do you see that?

22    A.  Yes.

23    Q.  Okay.  Now, move.xyz website said the exact same thing in

24    June 2022; is that right?

25    A.  It had the same page in June?

 1    Q.   Same page, same language:  "The platform is currently under

 2    development."

 3    A.   Perhaps, yes.  I -- I will agree with that.

 4    Q.   Do you recall it or not?

 5    A.   I don't recall the specific time frame in which various web

 6    pages were updated --

 7    Q.   Okay.

 8    A.   -- and programmed.

 9         MR. BERG:  I would like to move Exhibit 203 into

10    evidence.

11         Your Honor, may I approach?

12         THE COURT:  Yes, you may.

13         Mr. Singh, any objection?

14         MR. SINGH:  No objection.

15         THE COURT:  Admitted.

16       (Plaintiff Exhibit 203 was received in evidence.)

17    BY MR. BERG:

18    Q.   Top right corner of Exhibit 203, it says June 13, 2022.  Do

19    you see that, Mr. Phillips?

20    A.   Yes.

21    Q.   Same thing.  All the way down at the bottom of the page:

22    "The platform is currently under development"; correct?

23    A.   Yes.

24    Q.   Okay.  Thank you.

25         Mr. Phillips, you manage and maintain move.xyz; is that

1   right?

2   A.   I -- I -- the developers all have shared credentials to

3   manage the -- the DNA domains.

4   Q.   Mr. Phillips, do you manage and maintain --

5   A.   I participate in managing it, yes.

6   Q.   And you oversee all the developers; right?

7   A.   I'm -- I participate.

8   Q.   Answer the question, please.

9        You oversee the developers; right?

10  A.   I -- the DAO is member managed and it's flat.  So I am not

11  anyone's boss.  But I do -- I'm an architect and I lead the

12  team.

13  Q.   You lead the team.

14  A.   I provide -- I mix pieces.

15  Q.   That's correct.  You lead the team; right?

16           MR. SINGH:  Objection.  It misstates prior testimony.

17           MR. BERG:  It does not.  He said, "I lead the team."

18           THE COURT:  I heard him say he leads the team.  Did I

19  misunderstand?

20  A.   Yeah, I'm just trying to be clear that, like, as an

21  architect, as a senior developer, I don't have a heavier weight

22  in terms of opinions.  We're all trying to collaborate to build

23  something.

24           THE COURT:  All right.  Thank you.

25  ///

1   BY MR. BERG:

2   Q.   It was developed, is it fair to say?

3   A.   I do coordination part of the work.

4   Q.   move.xyz currently has an application linked to it that

5   purports to let a user create their own DAO; right?

6   A.   Currently.  Currently we're in development.

7   Q.   Okay.  That application is still under development in beta;

8   right?

9   A.   Yes.

10  Q.   So there is no application or interface currently

11  operational that will allow you to build a DAO on the Movement

12  website; correct?

13  A.   It depends on your definition of DAO.  But -- because you

14  can create a token and you can make a Snapshot space, or you

15  can create a Gnosis wallet and make a Snapshot space, and agree

16  on how decisions are made.

17  Q.   What's your understanding in answering when you answer --

18  when I say, There isn't an application on move.xyz that allows

19  you to create a DAO, based on your understanding, is that

20  correct?

21  A.   It's currently in development and in various stages of

22  working and not working.  We break it all the time.

23  Q.   Okay.  So the answer is:  No, there is not currently an

24  operational application that lets you create a DAO; right?

25  A.   We have code that creates a DAO.  Today it may not work.

1    Tomorrow it may.  If we need to make it work today, we can do

2    that.  But we're in development, adding features, and changing

3    things.

4    Q.  What are the names of the DAO's created using that

5    application that are currently hosted on move.xyz?

6    A.  We don't have any.

7    Q.  You recently changed the current home page of move.xyz;

8    correct?

9    A.  As I stated, that we are currently in development.

10   Q.  Did you recently change the current home page of move.xyz?

11   A.  Yes.

12   Q.  When did you change that home page?

13   A.  In the last week or two.

14   Q.  Okay.  The move.xyz home page is a copy of an old version

15   of the Juicebox launch page; right?

16   A.  No.

17   Q.  Okay.  Is it a copy of any Juicebox page?

18   A.  We share similar layouts and we used some of their image

19   assets.  But our application is different than Juicebox.

20   Q.  Did you ever -- that's fine.  We will move on.

21       Did you ever have a conversation with Evita Stenqvist after

22   she received a transfer from February 2023 regarding whether or

23   not those funds would be clawed back from her?

24   A.  I only know a general concern about what the state of our

25   salaries were, and not understanding whether the Court will

1    allow us to pay developers or not.

2         MR. BERG:  Your Honor, may I approach?

3         THE COURT:  Yes, you may.

4         MR. BERG:  Your Honor, I would like to move Exhibit 212

5    in evidence.

6         THE COURT:  Mr. Singh?

7         MR. SINGH:  Yes, Your Honor.

8         This appears to be a conversation between Evita

9    Stenqvist and Mr. Iglesias.  I don't see how it's relevant to

10   Mr. Phillips' testimony or how he can authenticate or anybody

11   can cause this exhibit to be admitted.

12        THE COURT:  Okay.  So, Mr. Berg, how is this

13   authenticated?

14        MR. BERG:  What we're asking -- we're using this to try

15   to elicit from Mr. Phillips if he was the one that told

16   Ms. Stenqvist that her salary would be clawed back.

17        THE COURT:  Okay.  So why don't you just go ahead and

18   ask that question.

19   BY MR. BERG:

20   Q.  Mr. Phillips, if you can see -- look at the last sentence

21   of the top e-mail on Exhibit 212.

22        Do you see that?

23   A.  Yes.

24   Q.  It says -- Ms. Stenqvist writes:  "I was told that my

25   salary wouldn't be clawed back.  As such, I have acted as if it

1    wouldn't."

2         Do you see that?

3    A.   Yes.

4    Q.   Did you tell Ms. Stenqvist that you -- that her salary

5    would not be clawed back?

6    A.   No.

7    Q.   Do you know who did?

8    A.   No.

9         THE COURT:  Okay.  So that's withdrawn?

10        MR. BERG:  Yes, Your Honor.

11   BY MR. BERG:

12   Q.   Mr. Phillips, to the extent it exists at all, the

13   MovementDAO, unincorporated nonprofit association, was formed

14   in August 2022; is that right?

15   A.   It was my understanding that the initial launch was

16   technically an unincorporated nonprofit association.  That,

17   like GitBook, as was referred to as a white paper, that there

18   was a token terms of use, and an application terms of use, but

19   the structure of the DAO was an unincorporated nonprofit.

20        So the paperwork that we did in the governance was an

21   attempt to reflect how the DAO was operating up to that point.

22   Q.   Okay.  Let's go to Exhibit 8.  This is going to be in

23   plaintiffs' Volume I.

24        THE COURT:  You have five more minutes, Mr. Berg.

25        MR. BERG:  That's all I will need.

 1   BY MR. BERG:

 2   Q.   Let me know when you are there.

 3   A.   Exhibit 8?

 4   Q.   Yes, sir.

 5   A.   Yes, I'm here.

 6   Q.   This was -- this was MIP 0; right?

 7   A.   Yes.

 8   Q.   This is the proposal that was posted on MovementDAO's

 9   Snapshot; right?

10   A.   Yes.

11   Q.   Dated August 23, 2022?

12   A.   Yes.

13   Q.   In this -- and you coauthored this proposal; right?

14   A.   Yes.

15   Q.   In this proposal you asked the DAO community to ratify a

16   document called Guiding Principles; right?

17   A.   Yes.

18   Q.   You told the DAO community in this proposal that ratifying

19   the Guiding Principles attached to the proposal would establish

20   an unincorporated nonprofit association called MovementDAO;

21   right?

22   A.   Yes.

23   Q.   Let's go to 177 of that document.

24   A.   Yes.

25   Q.   Under "Rationale," it says:  "Ratifying the Guiding

1   Principles establishes an unincorporated nonprofit

2   association"; right?

3   A.   Yes.

4   Q.   And then on 176, first bullet on that page, it says:

5   "Guiding Principles established the DAO as an unincorporated

6   nonprofit association"; right?

7   A.   Yes.

8            MR. BERG:  No further questions, Your Honor.

9            THE COURT:  All right.  Thank you.  So we will take a

10  10-minute break.  That will bring us back at roughly 10 minutes

11  to 1:00; correct?  About 12 -- let's come back at 12:55.

12           MR. BERG:  Thank you, Your Honor.

13      (A recess was taken from 12:43 p.m. to 12:55 p.m.)

14           THE COURT:  Please be seated.  It's 12:55.

15           You're finished with cross-examination, right,

16  Mr. Berg?

17           MR. BERG:  Yes, I am, Your Honor.

18           THE COURT:  Okay.  So Mr. Singh, do you have any

19  redirect?

20           MR. SINGH:  I do, Your Honor.

21           THE COURT:  Okay.  How many minutes will that take?

22           MR. SINGH:  Your Honor, I estimate about 20 to

23  30 minutes.

24           THE COURT:  Wow.  Okay.  Well, look, here is my

25  concern.  You all have a trial, if that's what you want.  But

1    here are the issues I need to address.  I need to address

2    preliminary injunction.  One, substantial likelihood on the

3    merit.  Two, is this injunction necessary to prevent or

4    irreparable injuries?  Three, threaten injury that outweighs

5    harm, and whether there is some adverse affect on the public by

6    my granting this preliminary injunction.  Right.

7         So plaintiff has the burden of proof.  They produced

8    evidence.  I need to know when you -- I know that, of course,

9    if I stay here, we can just talk about all of this forever.

10   But we have to narrow down the issues.

11        So what do you have to ask in redirect, Mr. Singh,

12   that's going to go directly to those issues?  And if you could

13   address that for me, please.

14        MR. SINGH:  Yes, Your Honor.

15        The bulk of my redirect will go to the issue of

16   likelihood of success on the merits.  And, specifically, I

17   believe the -- the primary issue here is whether the DAO

18   launched or did not launch.  And the reason why I say that is,

19   if the DAO launched, then plaintiffs' agreements were not with

20   individual defendant; they had a contractual relationship with

21   MovementDAO.  And to the extent that Mr. Phillips, then, caused

22   any harm, they should have been brought as derivative claims

23   against the DAO or pursuant to their contractual obligations

24   with the DAO.

25        Second, potentially plaintiffs have claims arising from

1    Mr. Phillips' conduct as a security consultant under

2    Mr. Yurchak's engagement agreement.  And even there, if there

3    is a contract issue, those claims should have been brought

4    against Mr. Yurchak's firm.

5            And so going to the issue of DAO launch and whether the

6    DAO launched and the DAO being a separate entity compared to

7    the software platform, are all key issues that I can further

8    comment on on redirect.

9            THE COURT:  Okay.  So what you have done is -- you're

10   explaining to me how he is going to -- you are going to walk

11   this witness through the documents that are going to establish

12   that MovementDAO is a separate entity, that it -- that it's

13   somehow authorized to do all of these things that it has

14   done --

15           MR. SINGH:  Yes, Your Honor.

16           THE COURT:  -- aside from Mr. Breslow, and Mr. Gordon,

17   and Mr. Fine's wishes.

18           MR. SINGH:  Correct, Your Honor.

19           THE COURT:  Okay.  Well, I will give you 20 minutes in

20   which to do that.  And then you are asking also for Mr. Reed to

21   testify.  How does his testimony affect my ruling on a

22   preliminary injunction?

23           MR. SINGH:  Yes, Your Honor.

24           Mr. Reed can testify to the fact that the DAO did

25   launch; the DAO engaged in business; it entered into agreements

1    with companies; it hired employee.  And Mr. Reed, as an

2    authorized member of the DAO, directly managed and governed

3    those processes.

4        THE COURT:  Okay.

5        MR. SINGH:  So we had to show that this was not simply

6    some garage startup that was abandoned.  It was an entity.  It

7    had its own IRS tax number.  It had real obligations, and

8    Mr. Reed was managing those operations.

9        THE COURT:  What is the definition of "launch"?

10       MR. SINGH:  Your Honor, that's in dispute.  Our

11   position is that a DAO launches simply when there is an

12   agreement amongst the parties as to where DAO assets are to be

13   stored, and how decisions are made.  That's different than the

14   software product the DAO creates which is the DAO platform and

15   the ability to create other DAOs.

16       And we further know, Your Honor, the formation of a

17   Delaware unincorporated nonprofit association requires even

18   less.  It requires simply the joining of two or more members

19   for a unified nonprofit purpose.  And so, in essence, as soon

20   as two members join together for a nonprofit purpose, an

21   unincorporated, nonprofit association was formed.  As soon as

22   those two members agreed with respect to how assets were to be

23   stored and decisions to be made, and that's reflected in the

24   GitBook, the DAO launched.

25       THE COURT:  Those two members would be who?

1            MR. SINGH:  Your Honor, I'm not saying that there is

2     only two members.  I'm saying that Delaware law only requires

3     two members.  But the initial members here were defendant,

4     Mark Phillips, and as well as the individual plaintiffs.

5            THE COURT:  Okay.  So you're going to show me where in

6     this evidence the defendants and the plaintiffs agreed that

7     this DAO was launched?

8            MR. SINGH:  Yes, Your Honor.

9            The GitBook itself contains that evidence.  The GitBook

10    states where -- where the -- where the funds for the DAO are to

11    be stored.  And there has been no objection.  We have been

12    referring to that as the DAO Movement endowment notices.

13           THE COURT:  Okay.

14           MR. SINGH:  And I will point now to -- point now to

15    Mr. Phillips' point -- places in the GitBook where the parties

16    have come to an understanding that initial governance was done

17    by MAPE voting.  And --

18           THE COURT:  And not by MOVE tokens?

19           MR. SINGH:  Not by MOVE tokens.

20           It was always implied that MOVE tokens would come into

21    effect later on, but the GitBook specifically provides that in

22    the initial bootstrapping phase, voting was done with these

23    MAPE NFTs.

24           THE COURT:  Okay.  And you will show me where the

25    GitBook or the MIPs, or wherever in the record, the individuals

1    who have funded the DAO determined that the DAO would be run

2    without their leadership.

3            MR. SINGH:  Well, Your Honor, we addressed that point

4    when we took Mr. Phillips' direct testimony last time.  And

5    the -- the summary there is, because individual plaintiffs

6    sought to anonymize their contributions to the DAO,

7    they -- they contributed money to the DAO-lawfirm.eth address

8    and the DAO-lawfirm.eth address contributed to the Movement

9    Gnosis.

10            And so because there was this anonymizing concern by

11   plaintiffs, as well as other individuals, Mr. Ryan Mallory, who

12   we brought last time, Freddie Montero, and Mr. Ben Reed, those

13   individuals didn't have the same voting rights initially that

14   other direct contributors to the Movement Gnosis did have.

15            And so Mr. Phillips, last time, testified that because

16   those individuals contributed through the DAO-lawfirm.eth

17   account, he, while managing the DAO-lawfirm eth account on

18   behalf of Reed Yurchak, went to each of those individual

19   members and sought their consent before voting for those

20   initial MIPS.

21            THE COURT:  Okay.  So if I understand you correctly,

22   the DAO -- the DAO-lawfirm began, then, to be the controlling

23   vote, but according to his testimony, he individually would

24   seek their -- or sought their approval before he would vote?

25            MR. SINGH:  That's correct, Your Honor.

1          Mr. Phillips testified, and we produced as an exhibit,

2    that he referred the -- a link to the MIPs to Mr. Fine.  He

3    testified that Mr. Gordon was involved in drafting the MIPs.

4    And he also testified that he discussed the MIPs with

5    Mr. Breslow, and Mr. Breslow consented to those August 2022

6    MIPs.

7          THE COURT:  Okay.  So I can tell you from what you have

8    explained to me that in terms of the testimony from Mr. Reed, I

9    don't see how its relevance is going to help me in making a

10   decision on preliminary injunction.  I would like to give you

11   the 20 minutes to -- to redirect with Mr. Phillips, but I don't

12   see how anything else is needed.  So once you have done that,

13   if we can could go straight to argument and you are directing

14   me, both parties, then I can get a sense of exactly what I need

15   to know to make this decision.

16         MR. SINGH:  Understood, Your Honor.

17         THE COURT:  All right.  Mr. Berg, I see you standing.

18   And it's not that I don't want to hear your concerns, it's just

19   that if we -- we need to move forward, and then you will get an

20   opportunity to also present argument.

21         MR. BERG:  One small element I would like you to

22   consider, Your Honor, regarding Ben Reed.

23         I totally agree, the additional testimony on direct is

24   not necessary, but we should have a very brief opportunity to

25   cross-examine him.

1          THE COURT:  On what issues?

2          MR. BERG:  Credibility.

3          THE COURT:  Okay.  Let's do this 20 minutes, and we can

4    talk about that later.

5          So you will be done by no later than 1:30.

6          MR. SINGH:  Yes, Your Honor.  I will strive to keep it

7    short and sweet.

8                         REDIRECT EXAMINATION

9    BY MR. SINGH:

10   Q.  Mr. Phillips, what is a DAO?

11   A.  A DAO is an agreement on where the funds are stored and how

12   decisions are made.

13   Q.  Is a DAO an organization?

14   A.  Yes.

15   Q.  And did you consider yourself -- did you consider

16   MovementDAO to be an unincorporated nonprofit association?

17   A.  Yes.

18   Q.  And is the DAO organization separate to what's been

19   referred to as "the platform"?

20   A.  Yes.  The platform is software, or what -- the purpose of

21   what we were building.  And the DAO was where the money is

22   stored and then how decisions were made.

23   Q.  What is the -- what is "the platform"?

24   A.  A platform is a complicated set of software for how users

25   would create a treasury and issue tokens, also create NFTs, and

1    do all the things that we've been talking about in a

2    pretty-to-use application.

3    Q.   And so you mentioned earlier that the software for the

4    platform was in development; correct?

5    A.   Yes.

6    Q.   Was transparency a goal of the DAO?

7    A.   Yeah, the first tenet of everything on the blockchain, and

8    specifically DAOs, was the experiences that I had where board

9    minutes disappeared, everything related to a DAO in terms of

10   where the money is stored, how payments are made, who has

11   control, what -- what wallets are interacting and people voting

12   and what they're voting on.  Everything is -- everything is

13   public, everything is transparent.  That -- that's the goal.

14   Q.   How was the DAO decision-making made public?

15   A.   So in this program called Discord, which is a chat

16   application, there were channels that would say here -- here is

17   some ideas for this proposal or -- so there is a website.

18   There is Discord where people can communicate.  There is

19   Snapshot that would capture a specific vote.  But a lot of

20   communication would occur in -- in Discord.

21   Q.   Did plaintiffs have access to the Discord?

22   A.   They did.

23   Q.   Did plaintiffs have access to the website?

24   A.   They did.

25   Q.   Did plaintiffs have access to the Snapshot proposals?

1   A.   They did.

2   Q.   I'm going to have you turn to Plaintiffs' Exhibit 6.

3        THE COURT:   Let me clarify something, Counsel.   I just

4   want to be most efficient in use of time.   When you say

5   "website," you asked a question, plaintiff having access to the

6   website.   What website are we discussing?

7   BY MR. SINGH:

8   Q.   Mr. Phillips, does MovementDAO have its own website?

9   A.   Yes.

10  Q.   Sorry.   Go ahead.

11  A.   move.xyz.

12  Q.   And were MovementDAO's documents accessible via that

13  website?

14  A.   They were.   But on the second page of the -- Exhibit 6,

15  there is a list of internet addresses which includes the

16  Snapshot and then the web address.

17  Q.   Let's go to Exhibit 6.   And is Exhibit 6 a copy of

18  MovementDAO's GitBook or at least a version thereof?

19  A.   Yes.

20  Q.   Can you turn to page -- oh, it's 47 of 653 at the top.

21       THE COURT:   Excuse me.   Another question.

22       When you say that something is "accessible on the

23  website," were there links to go to another area?   Or, if I

24  looked at the website, would I see all of the MovementDAO

25  documents?

1          That's the question I'm asking counsel to clarify for

2   me.

3          MR. SINGH:  Sure.

4   BY MR. SINGH:

5   Q.  Mr. Phillips, if you can go to the MovementDAO website

6   today, are all of the MovementDAO documents accessible on that

7   website?

8   A.  There -- the answer is yes, there are -- there is a menu on

9   the top, and it may direct you to go to other sections or other

10  sites.  But, generally, it was described in Discord where

11  docs.move.xyz would have documents.  And gov.move.xyz would

12  have government-related stuff.

13         And there is some overlap.  NFT's dot would have an

14  application in DAO, so forth.  But on the main move.xyz, the

15  intention is to have everything accessible and may be not

16  intuitive because we have to do more work in terms of

17  documentation.

18  Q.  Does the MovementDAO website contain links to its Snapshot

19  website?

20  A.  Yes.

21  Q.  And Snapshot is a separate website?

22  A.  Yes.

23  Q.  And that Snapshot website is publicly accessible?

24  A.  Yes.

25  Q.  And does that Snapshot website list all of MovementDAO's

1  Movement Improvement Proposals, or MIPs?

2  A.  Yes.

3  Q.  And you can also read the individual MIPs on that Snapshot

4  website?

5  A.  Yes.

6  Q.  And you can also see the votes made in favor or against

7  each of those MIPs; is that correct?

8  A.  Yes.

9        THE COURT:  All right.  Thank you.

10 BY MR. SINGH:

11 Q.  So let's go back to Exhibit 6, and that's page 47 of 653 at

12 the top.

13       Do you see that?

14 A.  Yes.

15 Q.  At the very top of the page, it says that:  "Benefits to

16 Movement token holders."  First bullet point says:  "Governance

17 of the Movement and governance proposals."

18 A.  I'm sorry.  Which -- defendants' --

19 Q.  I have Exhibit 6.

20 A.  Okay.  Plaintiff --

21 Q.  It's Bates -- or it has an ECF tag at the top.

22 A.  Uh-huh.  Yes.

23 Q.  That's 47 of 650 --

24 A.  I'm sorry.  Excuse me.  Yes.

25 Q.  Does that first bullet point state "Governance of the

1   movement and governance proposals"?

2   A.   Yes.

3   Q.   And what does -- what does that bullet point relay, to the

4   best of your understanding?

5   A.   That -- that Movement members would be able to participate

6   in the governance and governance in the proposals.

7   Q.   Did the MovementDAO GitBook contain any restrictions that

8   the endowment could not be spent?

9   A.   There is a section saying that it shall not be spent, but

10   that's not what we -- how we -- how we operated.

11   Q.   So you say that's not how you operated.  What was the

12   actual understanding of MovementDAO members?

13   A.   It was my understanding, and it was -- as discussed in

14   Discord, that the organization would be focused on building

15   tools to help DAOs and social movements be able to have a tool

16   that traditional non-profits could use and that would be able

17   to seed -- seed those movements.

18   Q.   Was the Movement endowment used to pay your salary?

19   A.   It was.  And Mr. Gordon's.

20   Q.   Was the Movement endowment used to pay the engineering

21   team?

22   A.   It was.

23   Q.   And did plaintiffs consent to that spend of MovementDAO

24   endowment funds?

25   A.   They did.

1    Q.   And did MovementDAO use --

2         THE COURT:  I have a question.  I want to make sure I

3    understand that answer.

4         So, Counsel, I understood there was a separate amount

5    of a million dollars that was paid to Mr. Phillips to develop

6    the platform.  That was separate from the endowment; correct?

7         MR. SINGH:  That's correct, Your Honor.

8         Mr. Phillips, pursuant to the December 2021,

9    independent contractor agreement he entered with Mr. Breslow,

10   received a million dollars and was supposed to receive

11   10 percent of the founder tokens upon completion of that

12   agreement.

13        THE COURT:  Okay.

14        MR. SINGH:  And that agreement was completed in --

15   January 1st of 2022.  And thereafter, we're now talking about

16   the authorization of funds and payments made from the endowment

17   in 2022.

18        THE COURT:  Okay.  So aside from that million dollars,

19   he is saying -- well, he was given -- he was -- it was agreed

20   with the plaintiffs that he would get money from the endowment

21   fund itself.

22        MR. SINGH:  That's correct, Your Honor.

23        THE COURT:  Okay.  And where would I find that?

24        MR. SINGH:  I believe it was referenced in the budget

25   and that was Mr. -- Mr. Phillips' salary, we testified -- or

1    Mr. Phillips testified last -- at the last hearing that we

2    pointed to a specific provision in the GitBook that stated that

3    there was a private, anonymous donor who was fronting money on

4    behalf of the MovementDAO until MovementDAO was ready to itself

5    make those payments.

6              THE COURT:  Okay.  So you're saying there is somewhere

7    in the GitBook that it says that he is to get a salary from

8    MovementDAO endowment fund?

9              MR. SINGH:  The -- that, I believe, was in the budget

10   and the MIPs.

11             THE COURT:  Okay.  Show me where I can find it.

12             MR. SINGH:  I don't have those numbers in front of me

13   yet.

14             THE COURT:  Okay.  Maybe Mr. Murdock could work on that

15   while you go ahead.  Because I need to be able to see where

16   that is in the record and also see where the plaintiffs agreed

17   to it.

18             MR. SINGH:  Sure, Your Honor.  We testified --

19             THE COURT:  And so it will show me where they said that

20   money can come out of the endowment funds.

21             MR. SINGH:  Yes, Your Honor.

22             I think the point here is that there is only one source

23   of funds; it's just the endowment funds.  And Mr. Phillips'

24   testimony earlier -- I'm sorry -- the last time we were here

25   was that he spoke to -- or connected with all of the individual

1    plaintiffs, they agreed to the August 2022 MIPs, and they had

2    previously thereafter been paying him his salary, and there had

3    been no objection to those funds coming out of the endowment

4    after the August 2022 --

5         THE COURT:  Okay.  So Mr. Murdock will show me all of

6    that.

7         MR. BERG:  Your Honor, I think we can -- I don't think

8    there is a dispute here; I just want to clarify that for you.

9         Plaintiffs have testified that they paid Mr. Phillips

10   after a certain point through the DAO endowment.  That's not in

11   dispute.

12        THE COURT:  Okay.

13        MR. BERG:  The position here is the DAO endowment was

14   not supposed to be locked until launch.  Because things haven't

15   launched, they were able to use the endowment for expenses and

16   things like that.  That's -- that was the testimony of

17   Mr. Breslow and Mr. Gordon.  So I don't think there is any

18   dispute --

19        THE COURT:  Okay.  So once it's launched, it's locked?

20        MR. BERG:  That's right.  Just another reason why

21   launch is important, but I don't think --

22        THE COURT:  I see.

23        MR. BERG:  -- there is any dispute about --

24        THE COURT:  That he could take money out of the

25   endowment fund?

 1          MR. BERG:  Prelaunch.

 2          THE COURT:  Prelaunch.

 3          MR. BERG:  Right.

 4          I just wanted to make sure that is clear.  I don't

 5     think we're really disputing that it's coming from the DAO

 6     endowment account.

 7          THE COURT:  Okay.  That was confusing to me because I

 8     was told nothing was coming out of that endowment fund.

 9          MR. SINGH:  Yeah.

10          And, Your Honor, the point we're trying to make here is

11     the GitBook stated no funds are to come out of the endowment.

12     MIPS later provided for spending money out of the endowment.

13          THE COURT:  Okay.

14          MR. SINGH:  So the understanding amongst the parties is

15     that the MIPS can modify terms in the GitBook.

16          THE COURT:  Okay.  All right.  And -- and you agree to

17     that, Mr. Berg?  MIPS can modify?

18          MR. BERG:  No.  MIPS cannot modify.

19          THE COURT:  Oh.

20          MR. BERG:  The $1.75 million that was referenced in

21     August 2022 to pay the developers, there was a separate

22     agreement, a separate discussion with Mr. Breslow and

23     Mr. Gordon where they authorized that.  And once that was done,

24     then Mr. Phillips issued a MIP, purporting to authorize to the

25     community.

1          And Mr. Breslow's testimony was that Mr. Phillips said:

2     You don't have to pay any attention to this.  This is just a

3     rehash of what we're doing.  We've already agreed to it.  And

4     we're just providing notice to the community.

5          Which, under Mr. Breslow's testimony, was what he

6     thought MAPE NFTs were only allowed to do.  That that type of

7     voting, using that token, was just advisory in providing

8     notice.  But the MOVE tokens, as referenced in the GitBook, are

9     what actually constitute governance binding Snapshot.

10         THE COURT:  Okay.  So these MIPS are what you're

11    saying, Mr. Singh, authorized payments out of the endowment

12    fund.

13         MR. SINGH:  Yes, Your Honor.

14         THE COURT:  That that's what's in dispute; that MIPS

15    can't do that?

16         MR. SINGH:  Yes, Your Honor.

17         THE COURT:  All right.

18         MR. SINGH:  And we have a MIP number.  It's --

19    Plaintiff's Exhibit 11 is MIP003.  And the heading there is

20    "Bootstrap Product Development," and that the heading states:

21    "Transfer 1.75 million Dai from the DAO multisig to the

22    developer multisig to bootstrap product development, funding

23    four months of product development and operations."

24         And so, Your Honor, our position is that it was not

25    simply enough for Mr. Phillips to discuss this issue with

 1    plaintiffs; they had to use governance.  They had to put

 2    together a MIP.  They had to get voting on it.  And that was

 3    the only way that they could authorize any funds of endowment

 4    assets, and also that MovementDAO -- MIPs can modify the

 5    GitBook.

 6              THE COURT:  All right.  And you will show me where it

 7    says that in the GitBook?

 8              MR. SINGH:  Well, Your Honor -- yes.  So let's turn

 9    back to page 47.

10    BY MR. SINGH:

11    Q.  Mr. Phillips, the first bullet point there, again, is:

12    "Governance of the Movement and governance proposals are a

13    benefit of holding movement tokens"; that's correct?

14    A.  Yes.

15    Q.  Is it your understanding that by governance of the

16    Movement, that includes modifying the GitBook?

17              MR. BERG:  Objection, Your Honor.

18              THE COURT:  What page are you on?

19              I'm sorry, Mr. Berg.

20              What page are you on, Mr. Singh?

21              MR. SINGH:  At the top, there is an ECF marker that

22    says 47 of 653.

23              THE COURT:  Oh, I see.  Okay.  That's why -- I'm

24    looking at 47 in the Bates numbers.  So 47 -- it would be Bates

25    54.

 1          MR. SINGH:  Yes.  I think, Your Honor, the issue is,

 2     Your Honor, after we exchanged exhibits, the Bates numbers were

 3     added thereafter, so I don't have a --

 4          THE COURT:  Okay.

 5          MR. SINGH:  -- Bates number.

 6          THE COURT:  But at the top it says 47 of 653?

 7          MR. SINGH:  That's correct.

 8          THE COURT:  Okay.  Now, could you ask that question

 9     again?

10          MR. BERG:  I have an objection to the question.

11          THE COURT:  Okay.  Then, could you ask the question

12     again so that I can hear it before the witness answers?

13          MR. SINGH:  Sure.

14     BY MR. SINGH:

15     Q.  Mr. Phillips, do you see at the top of the page, it says:

16     "Movements [sic] to $Movement token holders," and the first

17     bullet point there is "Governance of the Movement and

18     governance proposals"?

19     A.  Yes.

20          MR. BERG:  Objection.

21          THE COURT:  Okay.  Your objection, Mr. Berg?

22          MR. BERG:  This reference to $Movement tokens is being

23     mischaracterized as a MOVE token, which is different.

24          THE COURT:  Oh, okay.

25          MR. BERG:  And as you can see in the prior page,

1   Bates 53, the $Movement token refers to tokens that are issued

2   to the subDAOs that the platform is supposed to create.  But if

3   you just go further up top that page, there is a reference to

4   $MOVE governance tokens, under which it says:  "MovementDAO is

5   governed by its staked token holders, $MOVE tokens represent

6   the power to influence change to governance."

7            THE COURT:  Okay.  All right.  Thank you.

8            Mr. Singh.

9            MR. SINGH:  Yes, Your Honor.  I will move on.

10           Can we move to 58 -- sorry.  Actually, strike that.

11           Your Honor, let's move to page 65.  I'm referring to

12   the ECF marking at the top.

13           THE COURT:  Okay.

14   BY MR. SINGH:

15   Q.  Are you there, Mr. Phillips?

16   A.  Yes.

17   Q.  Do you see the second paragraph under Snapshot voting?

18   A.  Yes.

19   Q.  It states there:  "Snapshot voting strategies during the

20   MovementDAO will employ a governance token available to

21   individuals who stake $MOVE."

22       The second sentence reads:  "However, during the

23   bootstrapping phase of the DAO community contributors and based

24   on participation will be granted a MAPE-1420 NFT which will be

25   employed for initial governance."

1        What is the MAPE-1420 NFT?

2   A.   That is the Movement APE NFT that we created and

3   distributed to the DAO members.

4   Q.   So is it your understanding that prior to the MOVE tokens

5   being distributed, governance was done pursuant to these MAPE

6   NFTs?

7   A.   Yes.

8        MR. BERG:   Your Honor, objection.  Mr. Phillips has

9   already testified to these questions.

10       THE COURT:   All right.

11       MR. SINGH:   Your Honor, that question --

12       THE COURT:   Thank you, Mr. Berg.  But I will -- I was

13   wanting to see exactly where his testimony would have come from

14   within the book.  Thank you.

15       Okay.  Thank you, Mr. Singh.  You may continue.

16       MR. SINGH:   Thank you, Your Honor.

17   BY MR. SINGH:

18   Q.   We will go to plaintiff -- I'm sorry -- Defendants'

19   Exhibit 375.

20   A.   Yes.

21   Q.   And have you turn to page 374.

22   A.   Yes.

23   Q.   Do you see the heading that says:  "How does an endowment

24   work logistically?

25   A.   Yes.

1    Q.   And just to start off, is Exhibit 375 a copy of the

2    GitBook?

3    A.   Yes.

4    Q.   So right above the heading it states:  "How does an

5    endowment work logically?"

6         It states:  "MovementDAO is fully managed by its token

7    holders."

8    A.   Yes.

9    Q.   Is that your understanding, that MovementDAO was fully

10   managed by its token holders?

11   A.   Yes.

12   Q.   And the MAPE NFT is a form of a MovementDAO token; correct?

13   A.   Yes.

14   Q.   What does NFT stand for again?

15   A.   It's a non-fungible token.  And it's further up -- 1, 2, 3,

16   4, 5 -- "MovementDAO token holders also govern how the

17   endowment manages its assets."

18   Q.   Did Mr. Yurchak have any cryptocurrency technical

19   experience, to the best of your knowledge?

20   A.   No.

21   Q.   And did he delegate responsibility to you to manage the

22   DAO-lawfirm.eth account?

23   A.   Yes.

24   Q.   Did you use the DAO-lawfirm.eth account to create

25   plaintiffs' wallets?

1    A.    Yes.

2    Q.    And is that reflected online anywhere?

3    A.    Yes.  If you go to Etherscan and you enter in the Gnosises

4    of the plaintiffs and MovementDAO, all of the Gnosises

5    associated with everyone, it will say -- now it's been updated

6    to the service provider, but it will show who created the

7    contract or who controlled -- who created the Gnosis.

8        So it's -- it was also the -- it also transferred the first

9    seed funds into each of the accounts.

10   Q.    So plaintiffs -- sorry -- strike that.

11       You were the only one associated with the law offices of

12   Reed Yurchak that had the technical ability to create those

13   wallets; correct?

14   A.    Yes.

15   Q.    And to the best of your understanding, you were referred to

16   as the security consultant in Mr. Yurchak's custodial trust

17   agreements with plaintiffs for those services; correct?

18   A.    Yes.

19   Q.    And did the DAO-lawfirm.eth address also create the

20   Movement Gnosis?

21   A.    Yes.

22   Q.    And was that information also publicly online?

23   A.    Yes.  On Etherscan, as well as the Gnosis tool that was

24   used by the expert, it states who created that Gnosis.

25   Q.    How long did you manage the DAO-lawfirm.eth address on

1    behalf of Mr. Yurchak?

2    A.   How -- until February 10, 2023.

3         MR. SINGH:  No further questions, Your Honor.

4         THE COURT:  All right.  Thank you.

5         So what would be most helpful for me at this point is

6    to get argument from counsel.  I would want to hear your

7    positions, and then be able to ask questions.  And then, if

8    there is some evidence that you really believe you need from

9    Mr. Reed, fine.  But I would really rather make sure that I

10   fully understand how all of this evidence works together,

11   rather than hear more evidence.

12        MR. SINGH:  Thank you, Your Honor.

13        May Mr. Phillips step down?

14        THE COURT:  Thank you.  You may step down, sir.

15        THE WITNESS:  Thank you.

16        THE COURT:  So, Mr. Berg, this is your opportunity to

17   explain to me why I should grant the preliminary injunction.

18        MR. BERG:  Oh, how long I have been itching,

19   Your Honor.

20        THE COURT:  I know.  And I'm giving you the chance.

21        MR. BERG:  Just give me one second.  I wanted to

22   address something on redirect, but I folded it in here.

23   Your Honor, I'm about to provide a summation tieing everything

24   together.  There is, of course, a lot of evidence.  I'm going

25   to try to put a bow on this for you, but please stop me with

1   any questions, very happy to address anything you have.

2          Your Honor, the preliminary injunction should be

3   granted for the following reasons.  Plaintiffs have shown a

4   substantially likelihood that they will be able to establish

5   that Mark Phillips owed a fiduciary duty to act in their best

6   interests.  Under Florida law, an implied fiduciary

7   relationship rely where there is a degree of dependency on one

8   side and an undertaking on the other side to protect or benefit

9   the defendant party.

10          The testimony of Mr. Breslow, Mr. Gordon, and

11   Mr. Phillips all show that Mr. Phillips had superior knowledge

12   to plaintiffs on blockchain coding and how to create and manage

13   a DAO.

14          The evidence shows that plaintiffs placed Mark Phillips

15   in a position of trust around late February or March 2022, when

16   he replaced Alex Fine as the person charged with implementing

17   the MovementDAO project as described in the GitBook.

18          The evidence shows that plaintiffs relied on Phillips

19   tremendously.  Mr. Breslow specifically testified that they

20   depended on Phillips so much that he posed keyman risk, which

21   meant that without Mr. Phillips the project would come to a

22   halt.

23          The testimony shows that in January 2022, plaintiffs

24   entrusted Mr. Phillips with the ability to use their keys to

25   implement transactions in the DAO endowment account, and that

1   plaintiffs trusted Mark Phillips to use those keys in

2   accordance with their wishes.

3          The evidence shows that Mark Phillips repeatedly

4   indicated he accepted this position of trust and reaffirmed

5   that he was acting on behalf of plaintiffs to serve their

6   interests.

7          This is reflected in testimony but also in

8   Mr. Phillips' own written statements, Exhibit 135, 115, and

9   116.  Specifically on 135, Mr. Phillips telling Mr. Breslow

10   that he is the boss, and he is working to protect Mr. Breslow's

11   interests.

12          Now, defendants presented evidence that showed the

13   December 2022 -- actually, Your Honor, for the purposes of

14   confidentiality, I'm going to be referring to the IC agreement

15   an awful lot, can we seal the transcript for the duration of

16   closings?

17          THE COURT:  Okay.

18          MR. BERG:  Thank you.

19          Defendants presented evidence that showed that the

20   December 2022 independent contractor agreement disclaimed that

21   Mark Phillips owed Mr. Breslow a fiduciary duty.  But the

22   evidence shows that agreement terminated on December 31, 2022.

23   Plaintiffs entrusted Mr. Phillips with access to their DAO

24   endowment keys in January of 2022.  Excuse me.  That agreement

25   terminated on December 31, 2021.

1          THE COURT:  Okay.  Thank you.

2          MR. BERG:  Plaintiffs entrusted Mr. Phillips with

3     access to their DAO endowment keys on January 2022.  And

4     plaintiffs placed Mr. Phillips in a position of trust over the

5     MovementDAO project in February or March 2022.

6          At this point Mr. Phillips assumed a different

7     relationship with plaintiffs, with different and greater

8     duties.  The relationship was not constrained by the

9     then-expired IC agreement.  Defendants also claimed that Mark

10    Phillips owed duties to the movement MovementDAO, not

11    plaintiffs, beginning on February 2, 2022.  That position is

12    inconsistent with Mr. Phillips' statements that postdate

13    February 2, 2022.

14         Next, plaintiffs have shown a substantial likelihood

15    that they will be able to establish that Mark Phillips is

16    liable for fraudulent misrepresentation.  The testimony of

17    Mr. Breslow and Mr. Gordon shows that in February of 2022, Mark

18    Phillips represented to plaintiffs that he would implement the

19    MovementDAO project, according to the GitBook, and execute

20    plaintiffs' wishes in connection with the use of their keys.

21    That statement is corroborated by Mr. Phillips' testimony that

22    he was bound by the GitBook.

23         Plaintiffs have shown a substantial likelihood that

24    they will be able to establish that Mr. Phillips' promises were

25    false and fraudulent, and that his conduct related to those

1   promises breached the fiduciary duty he owed plaintiffs.  The

2   evidence shows that Mark Phillips used the DAO-lawfirm alias

3   and cryptocurrency address ending in 0085 as an alter ego to

4   deceive plaintiffs and misappropriate money from the DAO

5   endowment account.

6       In January '22, Mark Phillips introduced plaintiffs to

7   the alias DAO-lawfirm which was registered to 0085.  According

8   to Mr. Phillips, he informed plaintiffs that he would use that

9   address on behalf of Mr. Yurchak with Mr. Yurchak's

10  consultation and authorization.  The GitBook describes what

11  role Mr. Yurchak would have.  It states an independent law firm

12  would review spending requests for the DAO endowments.

13      That evidence corroborates plaintiffs' testimony that

14  they believed Mr. Yurchak was providing oversight of the

15  MovementDAO project.

16      Now, the evidence shows that Mr. Phillips went on to

17  use that 85 address to perform numerous transactions for the

18  DAO endowment account and engage in other conduct.  There is no

19  dispute that plaintiffs were under the impression that

20  Mark Phillips was the person behind the keyboard executing

21  transactions using 0085 and DAO-lawfirm.

22      The testimony of Mr. Yurchak shows, however, that

23  Mr. Phillips did not consult or obtain authorization from

24  Mr. Yurchak prior to using 0085 or DAO-lawfirm for a wide range

25  of activity.  And let's explore what that is.

1          Mr. Yurchak's testimony establishes that he did not act

2     as service provider for the MovementDAO, despite the GitBook

3     listing his name as service provider.  Exhibit 378, that we

4     looked at today, shows that Mr. Yurchak discovered the

5     inclusion of his name in April of 2022, and he e-mailed

6     Mark Phillips to have it removed.  That e-mail directly

7     contradicts Mr. Phillips' testimony that Mr. Yurchak never

8     objected to being listed as the service provider to the

9     MovementDAO.

10          Despite that e-mail demonstrating to Mr. Phillips that

11     Mr. Yurchak objected to being service provider, the evidence

12     shows that Mr. Phillips went on to author at least two

13     proposals in August of 2022, that identified Mr. Yurchak as the

14     MovementDAO's service provider; that's Exhibits 12 and 15.

15          The evidence shows that Mr. Phillips took affirmative

16     steps to induce plaintiffs to rely on Mr. Phillips' claim that

17     Mr. Yurchak was overseeing the use of the DAO-lawfirm address.

18     Mr. Phillips created a website that associated Mr. Yurchak with

19     the DAO-lawfirm.eth address; that's from Mr. Gordon's

20     testimony.

21          Mr. Phillips sent e-mails to Jon Gordon that listed

22     Reed Yurchak's name as the sender to make is seem like

23     Mr. Yurchak was engaged in the MovementDAO project; that's

24     Exhibit 110.

25          Mr. Yurchak testified that he was not actively engaged

1    in the project, and that his role was so de minimis that he

2    never billed any work related to the MovementDAO after

3    March 2022.  And he also testified that he never authorized

4    anyone to send e-mails on his behalf as being from Reed

5    Yurchak.

6          The evidence supports plaintiffs' claim that

7    Mr. Phillips deceived plaintiffs about Yurchak's oversight.

8    This supports the fraud claim and itself constitutes a breach

9    of duty.

10          Now Mr. Yurchak testified that he was not aware of any

11   actions using the 85 address and did not authorize any actions

12   used by him.  That unrebutted testimony colors the activity

13   undertaken by Mr. Phillips using the 85 address in a fraudulent

14   light, including the following:

15          The evidence shows that Mr. Phillips cast over

16   10 million votes, over 95 percent of the votes cast, using the

17   85 address for nine Snapshot proposals he authored in August of

18   2022.  That's fact stipulation Number 19.  By using that 85

19   address, Mr. Phillips was communicating to plaintiffs that

20   Mr. Yurchak approved those proposals.  But Mr. Yurchak's

21   testimony, which is contrary to Mr. Phillips', is that he never

22   reviewed or authorized any proposal posted on Snapshot.  And

23   you can see that in his declaration as well; Exhibit 95,

24   paragraph 10.

25          Those proposals furthered Mr. Phillips' efforts to

1    extract money from the DAO endowment for his personal gain.

2    The proposals purported to relieve the MovementDAO of any

3    recordkeeping obligations; that's Exhibit 8 at 194.  The

4    proposals authorized Mark Phillips to spend up to $100,000

5    without approval by a Snapshot vote; that's Exhibit 12 at 302.

6         The proposals also authorized reimbursement of expenses

7    without Mr. Phillips providing any description of the expenses

8    or the amount to be reimbursed; that's Exhibit 11 at 290.  The

9    evidence shows that the Snapshot voting power attributed to 85,

10   that Mr. Phillips used to pass those proposals, was procured by

11   Mr. Phillips using deceptive means in February 2022, prior to

12   plaintiffs placing Mr. Phillips in a position of trust over the

13   MovementDAO project.

14        The analysis of plaintiffs' expert, Nicolas Bax, shows

15   that Mr. Phillips used the 85 address to make swap

16   transactions -- "swap" being a contribution from one

17   cryptocurrency to another -- made by others to the DAO

18   endowment, and count those swaps as voting power for the 85

19   address on Snapshot.  Mr. Bax's analysis also shows that

20   Mr. Phillips made an indirect deposit of Mr. Breslow's

21   $9.7 million contribution on February 2, 2022, before

22   Mr. Phillips assumed power over the project, and then

23   attributed that deposit to 85 to augment its Snapshot voting

24   power.

25        Now, the combined swap transactions and the indirect

1   deposit contribution are the exact number of votes Mr. Phillips

2   exercised when voting on his August '22 proposals with the 0085

3   address.  That's important to keep in mind.  The origin of the

4   voting power of the 85 address demonstrated by Mr. Bax's

5   analysis is inconsistent with Mr. Phillips' testimony which

6   stated that the votes from the 85 address were a combination of

7   all of the individuals who made contributions to the DAO

8   endowment via the law firm's address, including plaintiffs, Ben

9   Reed, Ryan Mallory, and Freddie Montero.

10          According to Mr. Bax's analysis of the DAO endowment

11   transaction record, that's listed in Exhibit 90, only one

12   contribution, Mr. Breslow's, was used by the DAO-lawfirm

13   address, 0085, to make a deposit into the DAO endowment.  That

14   is critical.

15          From that, the evidence supports the conclusion that

16   both the origin and the use of the voting power attributed to

17   0085 was procured by fraud and to facilitate Mr. Phillips to

18   more easily obtain money from the DAO endowment for his own

19   benefit and conceal his efforts in doing so.

20          Now, defendants have just elicited testimony from

21   Mr. Phillips contending that the MAPE NFTs govern the platform.

22   But Mr. Bax's analysis of the Snapshot voting shows that

23   Snapshot voting was not governed by MAPE NFTs.  And there is no

24   correlation with how many MAPE NFTs you have and how much

25   voting power you have.  That's also critical.  Where is that in

1    the GitBook?

2           The evidence shows that the context -- the content of

3    Mr. Phillips' proposals supports plaintiffs' claim that

4    Mr. Phillips was breaching his duty and demonstrate intention

5    contrary to his promise to get the GitBook.  Mr. Phillips

6    acknowledged that the GitBook governors the MovementDAO's

7    relationship with its members and contributors, including

8    Mr. Phillips himself.  The GitBook states:  "The Snapshot

9    voting is only binding when MOVE tokens are issued, $MOVE, and

10   that only $MOVE token holders can participate in Snapshot

11   voting to buy Movement DAO"; that is Exhibit 6 at 89.  However,

12   Mark Phillips authored a proposal in which MAPE NFT holders can

13   vote on the MovementDAO and Snapshot, instead of MOVE token

14   holders.  We elicited that on cross.  That proposal is

15   inconsistent with the GitBook.

16          Mr. Phillips testified that the GitBook stated that it

17   could be amended by Snapshot proposals.  But on cross,

18   Mr. Phillips could not identify any section of the GitBook that

19   indicated the GitBook could be amended or changed by subsequent

20   Snapshot proposals.  We even did word searches.

21          This evidence supports the testimony of Mr. Breslow and

22   Mr. Gordon, that they believe the Snapshot proposals to be

23   advisory only.  The language that the defendant have pointed

24   out about MAPE NFTs refers to participating in governance, not

25   that those proposals are binding.  And when you compare all of

1   the enunciations in the GitBook reiterating that MOVE tokens

2   bind, MOVE tokens control, the vague reference to MAPE NFTs,

3   which, by the way, just says "more details to follow" at the

4   end of that paragraph, is so unarticulated it's not reasonable

5   to conclude that MAPE -- that NFTs overcome MOVE tokens.  Never

6   has there been a better case of the minnow swallowing the

7   whale.

8          This is consistent with Mr. Breslow and Mr. Gordon's

9   testimony.  MOVE tokens had not been issued, no Snapshot

10  proposals were not binding.  And it's also consistent with

11  their testimony that Mr. Phillips told them, confirmed for them

12  that the proposals were not binding.

13         This evidence also supports plaintiffs' claim that

14  Mr. Phillips was attempting to implement structures that were

15  inconsistent with the GitBook, which itself constitutes a

16  breach of duty and a violation of the promise.

17         Finally, that evidence supports plaintiffs' claim that

18  from August to February -- August '22 to February '23,

19  Mr. Phillips and Mr. Reed were acting pursuant to Snapshot

20  proposals that lacked authority.  This is a critical point

21  because the February 2023 Snapshot proposals, which were

22  authored by Ben Reed, purported to authorize a transfer of

23  $8.5 million out of the DAO endowment, which is one of the

24  central claims of theft and misappropriation.  Those proposals

25  are inconsistent with the Gitbook's clear statement that the

1    DAO endowment cannot be spent.  Thus, those proposals, the

2    transfer of the 8 1/2 million constitute breach of duty and

3    further evidence of Mr. Phillips' fraudulent scheme, that also

4    constitute the harm that plaintiffs have suffered as a result

5    of Mr. Phillips' breach and misrepresentation.

6         Now, plaintiffs testified that that the DAO endowment

7    could be spent prior to the MovementDAO's launch.  According to

8    Mr. Breslow's testimony prior to launch, the DAO endowment

9    functioned as the equivalent of a trust account, that

10   Mr. Breslow held in trust for the benefit of everyone who

11   contributed to the DAO until the DAO launched.

12        The evidence supports plaintiffs' position.  The

13   evidence shows that in January 2022, Mr. Phillips was acting as

14   Mr. Breslow's agent.  The agency relationship continued through

15   at least August 2022 which is supported by Mr. Phillips' text

16   messages, Exhibits 115, 116, 135.

17        In January 2022, Mr. Breslow directed Mr. Phillips to

18   create the DAO endowment account.  As cited in plaintiffs'

19   proposed stipulation of law, when an agent performs an act

20   pursuant to the direction of a principal, such as creating a

21   financial account, that account is the property of the

22   principal, not the agent.  Accordingly, the DAO endowment

23   account created in January of 2022, before the GitBook was

24   published in February, by Mr. Phillips in his agency capacity,

25   was and is the property of Ryan Breslow being held in trust.

1          Now, defendants contend that the MovementDAO launched

2     on February 2, 2022.  And on that date, all moneys in DAO

3     endowment account became the property of the MovementDAO.

4          Okay.  That position is inconsistent with the record.

5     First, Mr. Phillips' testimony on cross established that the

6     MovementDAO nonprofit association was established on August 31,

7     2022.  His testimony that an agreement was formed with

8     plaintiffs and himself to form that nonprofit association, is

9     inconsistent with the record.  There has been no testimony from

10    plaintiffs saying that there was ever such an agreement.  In

11    fact, Mr. Breslow said the first time he ever heard of a

12    nonprofit association was in July of 2022.

13         Thus, prior to August 2022, when the MovementDAO was

14    established by this Snapshot vote, there was no MovementDAO

15    entity to which property could be transferred.  Second, the

16    record is devoid of any evidence that shows Mr. Breslow

17    transferred ownership of the DAO endowment account to anyone or

18    any entity.

19         So the evidence shows that prior to a transfer of

20    ownership, the DAO endowment account belonged to Mr. Breslow

21    who held it in trust and that Mr. Phillips' seizure of that

22    account constituted a breach of duty.

23         Plaintiffs have also presented sufficient evidence to

24    establish that Mark Phillips committed fraud and breach of duty

25    in creation -- in connection with the creation of a false

1    invoice.  Mr. Yurchak's testimony established that Mr. Phillips

2    was using Mr. Yurchak's law firm as cover to build a

3    MovementDAO for activities he was performing without

4    Mr. Yurchak's oversight or direction.  That testimony described

5    how Mr. Phillips was attempting to enlist Mr. Yurchak and his

6    plan to continue to do -- use the DAO-lawfirm alias without any

7    involvement with from Mr. Yurchak, and merely used

8    Mr. Yurchak's law firm as a passthrough to enrich himself.

9    Mr. Yurchak testified that Mr. Phillips prepared a false

10   invoice listing work that Mr. Yurchak had not billed or

11   performed as well as work Mr. Phillips claimed to have

12   performed, but that Mr. Yurchak did not oversee.  We saw that

13   in Exhibit 90, and the magnified version Exhibit 98.

14          Mr. Yurchak confirmed that he never submitted that

15   invoice.  But he also confirmed that that false invoice was the

16   same document that Mr. Phillips presented to Mr. Breslow and

17   Mr. Gordon because when we were directing Mr. Yurchak, we

18   showed him Exhibit 90.  That was the same document that

19   Mr. Phillips presented to Mr. Breslow and Mr. Gordon when he

20   discussed the MovementDAO's operational budget in September of

21   2022.

22          Now, the gravity of this conduct is multiplied by

23   Mr. Phillips' own testimony, in which he said that he stopped

24   working as a consultant for Mr. Yurchak in January 2022.

25   Nevertheless, the record shows that Mr. Phillips presented that

1   false invoice to Mr. Breslow and Mr. Gordon in which he listed

2   himself as billing time on behalf of the law firm from April to

3   September 2022.  That evidence supports plaintiffs' claim that

4   Mr. Phillips breached his duty to plaintiffs and was not

5   implementing the MovementDAO project as he promised.

6          The evidence supports plaintiffs' contention that

7   transfers of MovementDAO assets to third-party developers in

8   February 2023 were fraudulent.  The declarations of Ben Reed

9   purport to provide an accounting of where defendants

10   transferred MovementDAO assets in February 2023.  Mr. Reed

11   characterized certain transfers to developers as deferred

12   payments for services rendered in 2022; that's Exhibit 118.

13          Plaintiffs presented a September 2022 operational

14   budget, authored by Mark Phillips, purporting to set forth the

15   budget for the MovementDAO through the end of 2022, which was

16   the basis for plaintiffs authorizing $1.75 million out of DAO

17   endowment to cover that proposed budget.

18          That budget, as we just saw, did not reference any

19   deferred payments or even name the names or the ENSs of

20   developers that received the transfers in February of 2023,

21   including Mikhail Radin, disintermediated.eth.

22          THE COURT:  So let me ask you a question there.  So

23   1.75 million was authorized by the plaintiffs out of the

24   endowment fund.

25          MR. BERG:  (Nods head.)

 1          THE COURT:  Where did they think that money was going

 2    to go?

 3          MR. BERG:  Yes.  They -- they -- exactly how it was

 4    listed on the -- excuse me -- on the operational budget.  There

 5    were a list -- and you can see this in Exhibit 90.  There were

 6    lists of developers.  They had annualized salaries.  They had

 7    monthly salaries.  This was going to be a budget for

 8    four months, August to January of 2022.  And at the very bottom

 9    of that page 2, it says year-end total.  It's a little bit

10    under 1.75 million, but the idea was, this is what it's going

11    to take for our people.  Let's pay them.  And then if, lo and

12    behold, several months later in February of 2023, now there are

13    hundreds of thousands of dollars, millions maybe, going out for

14    deferred payments for work in 2022.  Nowhere listed --

15          THE COURT:  So at the end of that payment, 1.75 million

16    roughly --

17          MR. BERG:  Uh-huh.

18          THE COURT:  -- what do they expect to have happened at

19    that point subject -- with the project.

20          MR. BERG:  I'm sorry.

21          Yes.  So the -- this 1.75 million was a -- sort of a

22    last ditch effort to juice the project.  There had been a lot

23    of delays, things were not happening.  As a result of this

24    bootstrapping, the business development, the DAO community

25    organizers were laid off, all funds were re -- were dedicated

1    to developers.

2           And Mr. Breslow testified the idea here was let's just

3    get it done; I want to launch the DAO.  And essential to that

4    was launching the platform.  And we will get into the only

5    evidence in this case that shows why launch of the platform is

6    synonymous with launch of the DAO.

7           THE COURT:  Okay.

8           MR. BERG:  Okay.  Plaintiffs also presented evidence

9    that showed one individual, jango.eth, received $10,000 in

10   cryptocurrency, but never performed any development work for

11   the MovementDAO.  That's all you need to consider.  These

12   transfers were fraudulent.  And, of course, there is no

13   evidence in the record, there is no contracts or invoices in

14   the record showing how any of these developers were entitled to

15   any money.  All that evidence supports plaintiffs' contention

16   that the transfers made by defendants were fraudulent and a

17   breach of Mr. Phillips' duty.

18          Now, the lengths that Mr. Phillips took to deceive

19   plaintiffs -- it's a lot of evidence we just covered --

20   demonstrated the plaintiffs to rely on his promise that we

21   implement the GitBook, and -- but the vast -- but not unlimited

22   discretion that plaintiffs bestowed upon Mr. Phillips

23   establishes that they relied on his misrepresentation.

24          Now, let's move to launch.  Very important point.

25   Exhibit 367 is the IC agreement.  Defendants just made an

1    argument contending that this agreement was about the launch of

2    the platform, not launch of the DAO.  Don't look at this

3    agreement, it doesn't really matter.

4         But if you go to page -- page 1, page 347 of

5    Defendants' Exhibit 367.  Under "scope of work," it says

6    plaintiff -- excuse me -- Breslow hereby engages Phillips to

7    work exclusively on a decentralized autonomous organization,

8    and then it defines that term as DAO, to fully develop and

9    launch the DAO.  Not the DAO platform, the DAO.

10        And if you go to Exhibit A of that document, which is

11   page 351, the top of that exhibit says, to fully develop and

12   launch the DAO, consistent with the agreement.  Not the

13   platform.  The point is, the evidence showing Mr. Breslow, the

14   boss, and Mr. Phillips, the genius, agreeing, signing their

15   names to a document, evidencing that this is what we all agree

16   means launch.  There is no launch as a matter of law.  It's all

17   circumstantial, and this is the best evidence of it.

18        Mr. Phillips and Mr. Reed provided testimony that the

19   MovementDAO launched on February 2, 2022.  Mr. Reed's testimony

20   is not credible and lacks foundation because he was not

21   involved with the MovementDAO until after February 2, 2022.

22   The only reason offered by Mr. Phillips for why the MovementDAO

23   launched on February 2, 2022, was because that was when --

24   quote, "That was when MovementDAO was promoted through bulk

25   e-mail and social media."  That testimony is inconsistent with

1    the other evidence in the record.   Now, the IC -- we mentioned

2    the IC agreement identifies several criteria that must be

3    completed before launch occurs.

4         You know, the fact that the IC agreement was terminated

5    in December of 2022 does not undermine its evidentiary value of

6    the parties' state of mind.   No evidence has been presented in

7    the record that demonstrates that criteria ever changed.

8    Mr. Breslow, Mr. Gordon, all testified that, yeah, this was

9    what was required.

10        THE COURT:   So I want to make sure I understand then

11   why this Juicebox entity or platform suddenly started being

12   used.   I wasn't clear on that when Mr. Breslow testified.

13        MR. BERG:   It started being used as --

14        THE COURT:   As some sort of platform for --

15        MR. BERG:   As sort of a --

16        THE COURT:   -- for MovementDAO.

17        MR. BERG:   -- as a standby.   So Mr. Breslow's testimony

18   was he wanted to launch PeaceDAO because of the Ukraine charity

19   organization on MovementDAO.   He was unable to because the

20   platform was not ready, okay?   So instead -- he had to launch

21   something.   He launched it on Juicebox.   Juicebox allowed the

22   ability to -- for him to create peace tokens, to take in

23   contributions, to distribute the money, to the -- the actual

24   charitable efforts on the ground, and so forth.   Wasn't able to

25   do any of that with MovementDAO.

1          But he -- he acknowledged he was trying to place

2     PeaceDAO very closely with MovementDAO.  There was a launch

3     page on move.xyz.  Because the idea was as soon as the

4     MovementDAO platform was live, they were going to move it onto

5     MovementDAO.  And that was going to be, you know, the show

6     pony, the poster child of the MovementDAO.  But that never

7     happened, and he was lying in wait.  And so all of this

8     evidence of about how he is so closely associating it, yes, but

9     he never put it on there because, as Mr. Phillips just

10    testified, that thing is not operational.

11         THE COURT:  Who created the Juicebox platform?

12         MR. BERG:  So Mr. Breslow -- sorry -- the entire

13    platform?

14         THE COURT:  Juicebox.

15         MR. BERG:  Yeah, Juicebox.  Good question.  I had asked

16    Jango that question.  It's -- his answer was, you know, the

17    community created it.  It's -- it's -- the Juicebox community

18    created it, a bunch of developers created it.  Jango.eth had a

19    sizable role, all of these developers are quite humble.  No one

20    is taking, like, ownership of "it was me."  But jango.eth, it's

21    been around while.

22         THE COURT:  It's okay.  Not Mr. Phillips?  A different

23    entity?

24         MR. BERG:  You know, I -- that's a question you could

25    ask opposing counsel.  I understand that Mr. Phillips has done

1   some work with Juicebox --

2         THE COURT:  Okay.

3         MR. BERG:  -- separate from his work with MovementDAO.

4   But the point -- I think the -- one of the things to remember

5   here is that MovementDAO -- part of the efforts to develop

6   MovementDAO was taking Juicebox and trying to alter some of its

7   code to help jump start the MovementDAO platform.  And it just

8   never turned into something that was useful or operational.  So

9   that was why Mr. Breslow had to go to Juicebox.

10        Okay.  So Mr. Phillips testified that Mr. Fine told

11  Mr. Phillips not to complete the principal requirement of that

12  agreement, just to create a user interface for the platform.

13  Whether Mr. Phillips was assigned that task or someone else

14  was, that evidence still shows that an operational user

15  interface is required for the MovementDAO launch, whether

16  Mr. Phillips made it or not.  And the point is, there isn't

17  one.  It's one of the terms of this agreement, no user

18  interface, no launch.

19        Mr. Phillips just told you on cross that it's still in

20  beta, and there is a disclaimer on that website that makes it

21  very clear it's beta.  Not in dispute.  If that's not in

22  dispute, this IC agreement tells you there is no launch.

23  Period.  There is nothing that they have shown that controverts

24  that.  It's the simplest point in the case.

25        THE COURT:  Now, what is the irreparable injury here?

1          MR. BERG:  Yes, sure.

2          Plaintiffs have presented evidence that, absent an

3     injunction, the DAO endowment assets will continue to be

4     dissipated and concealed.  And that, under the 11th Circuit,

5     constitutes irreparable harm, even though it's just money.

6     That analysis is ascribed in Mr. Bax's testimony showing that

7     the defendants have been unable to account for all the assets

8     they transferred from the DAO endowment, that the statements

9     and their representations about the transfers are inconsistent,

10    and that the defendants have made transfers of assets covered

11    by the TRO after the TRO has issued.  Failure to abide by the

12    TRO is strong evidence that absent the injunction, the DAO

13    assets will continue to be dissipated, because they're being

14    dissipated anyway.  And the failure to provide a coherent

15    accounting supports plaintiffs' claims that some assets may

16    still be concealed.

17         In addition, defendants have admitted they will

18    continue to dissipate DAO endowment assets.  They recently

19    filed a motion to amend the TRO, and sought permission to spend

20    nearly $500,000 of the DAO endowment.

21         THE COURT:  So what social impact projects have been

22    launched?

23         MR. BERG:  You heard -- you heard from Mr. Phillips

24    today.  None.

25         THE COURT:  What about PeaceDAO?

1           MR. BERG:  PeaceDAO, Your Honor, is on Juicebox.

2           THE COURT:  Okay.  So PeaceDAO is, though, funded by

3    the same money that is funding MovementDAO?  Or is there

4    another fund?

5           MR. BERG:  No, Your Honor.  PeaceDAO -- Juicebox is the

6    mechanism by which PeaceDAO receives contributions.

7           THE COURT:  Okay.

8           MR. BERG:  So individuals who want to participate in,

9    you know, want to, you know, donate to PeaceDAO, send

10   their -- register their wallet with PeaceDAO -- excuse me --

11   with Juicebox and transfer money through that platform.

12          THE COURT:  Okay.  So the endowment money --

13          MR. BERG:  It's not --

14          THE COURT:  So the endowment money is not what is

15   funding the -- the aid to Ukraine through PeaceDAO.  That's a

16   whole separate business plan, essentially.

17          MR. BERG:  And, you know, just to be clear, Your Honor,

18   members of MovementDAO participated in some of the marketing,

19   tried to help out PeaceDAO, the whole idea was this -- this was

20   going to be absorbed, was going to be a part of MovementDAO,

21   but it couldn't yet.  It just technically and functionally

22   could not.  So you will hear -- you have heard evidence of

23   MovementDAO members participating, that's why Mr. Breslow

24   directed PeaceDAO to send some tribute to the MovementDAO

25   endowment as a thank you.  It's set up to do that.

1           THE COURT:  Right.  Because that's what makes it a

2    little confusing here.  So there is a DAO that's operational.

3    It is Mr. Breslow's --

4           MR. BERG:  Yes.

5           THE COURT:  -- brainchild, at least.

6           MR. BERG:  What we would call, I think in the

7    nomenclature of this case, a subDAO.

8           THE COURT:  Okay.

9           MR. BERG:  Right.

10          THE COURT:  So there is a subDAO that is operating

11   Mr. Breslow's brainchild; this was what he wanted to do.

12          MR. BERG:  Uh-huh.

13          THE COURT:  And he wanted Mr. Phillips to manage.

14          MR. BERG:  I think Mr. Phillips was helping.

15   Mr. Phillips certainly created the page on Juicebox, so that --

16   the project on Juicebox, that's true.  I don't know if he was

17   managing it, but --

18          THE COURT:  But there was some understanding with

19   Mr. Breslow that Mr. Phillips was managing PeaceDAO?

20          MR. BERG:  I don't think it's in evidence that

21   Mr. Phillips was managing PeaceDAO.

22          THE COURT:  So who was managing PeaceDAO?

23          MR. BERG:  Mr. Breslow was the head of it, but I

24   think -- and I -- we have submitted evidence that shows that

25   Mr. Phillips created the project.

1            THE COURT:  Correct.

2            MR. BERG:  But as far as the day-to-day, I'm not sure.

3     I'm not sure that's in evidence.  I'm not sure I have that

4     answer for you.

5            THE COURT:  Okay.  So everything would just go -- there

6     would be a link to it from the MovementDAO website.

7            MR. BERG:  Uh-huh.

8            THE COURT:  And that's all that's -- that you know?

9            MR. BERG:  Yeah, there is a -- there is a landing page.

10    I think it's peace.move.xyz.  You click on that page.  There is

11    some text and there is a link.

12           THE COURT:  Right.

13           MR. BERG:  You click that link and it takes you to

14    Juicebox.

15           THE COURT:  Okay.

16           MR. BERG:  And it takes you to the PeaceDAO Juicebox

17    page.  And there you see all of the interesting information of

18    this is how much is in our endowment; this is how the tribute

19    is allocated; this is who created it.  All of that information

20    is on the Juicebox.

21           THE COURT:  What is in the endowment for Juicebox?

22           MR. BERG:  Oh, goodness.  I would have to go back and

23    look.

24           THE COURT:  Whatever the people who have contributed to

25    it have put into it?

 1          MR. BERG:  Yes.

 2          THE COURT:  Okay.  And so there are no other subDAOs?

 3    That's it.

 4          MR. BERG:  That's it.

 5          So if you're looking for harm that might be incurred

 6    if -- if this injunction is implemented, no one is getting

 7    harmed.  The injunction asks for a freeze on MovementDAO

 8    assets, which, frankly, is supposed to be frozen anyway and you

 9    are not supposed to spend the endowment, if you assume

10    defendants' position, which is MovementDAO has launched.  If

11    you assume that to be true, that thing is locked anyway.  No

12    prejudice.  Right?

13          PeaceDAO, which is run by -- which was created by

14    Mr. Breslow, you have heard from him, doesn't rely on

15    MovementDAO funds anyway.  No prejudice.  PeaceDAO continues to

16    tick unabated, regardless of this litigation.

17          THE COURT:  Okay.  So no harm to the public.  PeaceDAO

18    would continue its work.  Irreparable injury, in that the money

19    that is still missing which is, what, approximately

20    2 1/2 million that has not been put back or the 8 1/2 million?

21          MR. BERG:  2.3, I believe, we think is still

22    unaccounted for.  It's in cash and various other -- who knows

23    where.  But we're eerily awaiting updated accounting because --

24          THE COURT:  But that's the injury right now, is it?

25          MR. BERG:  Well, no -- well, that is the injury that we

1   think is being dissipated.  The likely injury that would occur

2   without the injunction is greater which is --

3        THE COURT:  Right.  I understand.

4        MR. BERG:  -- more of the assets will be dissipated and

5   concealed.

6        THE COURT:  But right now you are talking about a 2.3,

7   roughly, million-dollar injury, and you think the entire

8   endowment, the 16 million would disappear if the whole business

9   is not stopped.

10        MR. BERG:  For good reason.  Because, in February,

11   8 1/2 million left.

12        THE COURT:  And still no projects.

13        MR. BERG:  (Indicating).

14        THE COURT:  Okay.

15        MR. BERG:  Okay.  Your Honor, I'm getting the signal

16   that you would not like to hear about civil conspiracy.

17        THE COURT:  I just want to hear about injunctions.

18        MR. BERG:  Well, you're right, but for a substantial

19   likelihood on civil conspiracy.

20        THE COURT:  Okay.  Oh, the substantial likelihood of

21   success on civil conspiracy?

22        MR. BERG:  Uh-huh.

23        THE COURT:  Go ahead.  Make your argument.

24        MR. BERG:  Plaintiffs have presented evidence that

25   Mr. Reed acted in concert with Mr. Phillips to commit fraud and

1   breached Mr. Phillips' duty.  The evidence shows that Mr. Reed

2   was the author of the proposals that purported to authorize the

3   8 1/2 million in transfer out of the DAO endowment.  Evidence

4   also shows that Mr. Reed -- strike that.

5        Mr. Reed was also an active participant in all of the

6   governance and the Snapshot proposals and overseeing financial

7   issues, as Mr. Reed testified to.  All of those were happening

8   within the context of the fraudulent scheme that Mr. Phillips

9   has created.  So he is an active accomplice.

10        THE COURT:  I see.

11        MR. BERG:  Therefore, if you find that

12   Mr. Phillips -- there is a substantial likelihood of success

13   against Mr. Phillips, you should also find it for Mr. Reed.

14        Finally, public interest.  There is a strong public

15   interest in granting the injunction.  Mr. Phillips is a

16   convicted felon for wire fraud and money laundering.  That

17   conviction involved the same methods issued here; a law firm to

18   conceal the scheme, use of a false invoice.  He's also been

19   found in civil litigation to have transferred money to himself

20   through a third-party entity that he controls, very similar to

21   what was going on with Mr. Yurchak's law firm.

22        And based on the evidence that's been presented, his

23   credibility, his character for untruthfulness is, shall we say,

24   well established.

25        The public has a strong interest in stopping ongoing

1   fraudulent schemes before more harm is incurred on the opposite

2   end.  There are no DAOs.  There are no subDAOs that would be

3   harmed here.  The developers that -- I'm sure you will hear

4   from defendants who are supposed to be getting money.  There

5   are no contracts, no invoices, nothing to corroborate those

6   claims for fees.  And, again, as we just walked through, that

7   operational budget shows they've already been paid.  And on top

8   of that, the Snapshot analysis shows there is no authorization

9   to hire them in the first place.

10          So this Court should not permit the dissipation of

11   97 percent of the endowment which was contributed by plaintiffs

12   to be further dissipated for highly suspicious third-party

13   claims.

14          Thank you, Your Honor.

15          THE COURT:  All right.  Thank you.

16          Mr. Singh.  Let me start with the lack of injury to the

17   public.  Plaintiff says that there are no subDAOs anyway, other

18   than PeaceDAO, and it's functioning fine with the contributions

19   that people are making to that cause.  So why shouldn't we

20   pause and sort out the respective rights and interests in this

21   case?

22          MR. SINGH:  Yes, Your Honor, I can address that

23   question.

24          So, first of all, PeaceDAO consists of more than simply

25   the operation of Juicebox.  Juicebox handles one aspect of what

1    a DAO is.  And that's simply managing the treasury.  And when I

2    say "by managing the treasury," that means money going into

3    some sort of account and the treasury spitting out tokens.

4         Now, Juicebox does not handle any other aspect --

5    necessary aspect of a DAO.  It doesn't handle governance;

6    that's still done on Snapshot.  It doesn't handle community

7    discussions; that's still done on Discord.  And --

8         THE COURT:  But Snapshot and Discord are not

9    necessarily -- they're not on the Movement platform; right?  I

10   mean, they're obviously not on the Movement platform because

11   there is no MovementDAO platform.

12        MR. SINGH:  Well, the PeaceDAO Discord channel exists

13   on the MovementDAO Discord channel.  And Snapshot for PeaceDAO

14   is separately managed, but it was the MovementDAO contributors

15   and community, including Mr. Reed and Mr. Phillips, that were

16   managing those aspects of PeaceDAO.  So if -- if --

17        THE COURT:  So what would change?

18        MR. SINGH:  Well, if the community members, including

19   defendants here, are simply not getting paid and don't have

20   access to the endowment, they're not going to manage PeaceDAO

21   anymore.

22        THE COURT:  Oh, okay.  So what you're explaining to me

23   is that PeaceDAO is being -- the people who are running

24   PeaceDAO are Mr. Reed and Mr. Phillips.

25        MR. SINGH:  Amongst --

```
 1              THE COURT:  And they're getting paid by -- through the
 2    MovementDAO money.
 3              MR. SINGH:  That's correct, Your Honor.
 4              THE COURT:  So that subDAO is not creating its
 5    own -- it doesn't have enough funds to pay them?  I mean, I
 6    don't understand.
 7              MR. SINGH:  It doesn't have its own management
 8    structure, Your Honor.  The PeaceDAO was launched by
 9    MovementDAO.  And so MovementDAO members, including
10    Mr. Phillips, set up the Juicebox.  It set up the Snapshot
11    platform.  It set up the Discord channel.  Now --
12              THE COURT:  Okay.  So it wouldn't surprise you that
13    MovementDAO people are -- that the people who started
14    MovementDAO are saying, well, yeah, we started PeaceDAO.  Maybe
15    the same people.
16              MR. SINGH:  Sure, Your Honor.
17              So PeaceDAO was started when Mr. Breslow provided the
18    instruction to MovementDAO to launch PeaceDAO.  And so once he
19    provided that instruction, Mr. Phillips who wasn't being
20    separately paid by PeaceDAO, went and set up the Juicebox page
21    for PeaceDAO to manage the treasury aspects of it, and other
22    members of MovementDAO then went up and set up the Discord
23    channel, set up the Snapshot page, and set up the governance
24    for PeaceDAO.
25              THE COURT:  I see.  And so it's your representation
```

1    that Breslow and Gordon knew that PeaceDAO was some subsets and

2    function of MovementDAO and that everyone was going to get paid

3    out of MovementDAO?

4         MR. SINGH:  Yes, Your Honor.  There is no separate

5    employees or managers for PeaceDAO other than the MovementDAO

6    members, as far as I know.

7         THE COURT:  And the reason that you say Breslow and

8    Gordon knew all of this was happening was because it says in

9    the MIPs that this is -- that this can happen.

10        MR. SINGH:  I don't know if the MIPs themselves refer

11   to PeaceDAO.  But, Your Honor, every aspect of the DAOs,

12   PeaceDAO, MovementDAO, it's all fully transparent.  Everything

13   is on the blockchain.  It's in MIPs.  It's in written

14   proposals.  It's in Discord chat.

15        And, Your Honor, the underlying bases of plaintiffs'

16   case is all built on those public documents.

17        THE COURT:  So Breslow and Gordon would have to go to

18   those public documents to realize that PeaceDAO is being

19   funded, all -- or that the people working for PeaceDAO are

20   being funded from MovementDAO, and if they went and looked,

21   they would find that out.

22        MR. SINGH:  They wouldn't have to go to the documents,

23   Your Honor.  Mr. Breslow directed MovementDAO to do so through

24   Mr. Phillips and through Mr. Gordon.  Mr. Gordon was actively

25   involved in governance and community management.  They were

1   both active players in the space and knew what was going on.

2        THE COURT:  And they knew that the money to pay

3   Mr. Phillips and Mr. Reed was coming out of MovementDAO month

4   after month?

5        MR. SINGH:  That's right, Your Honor.  Everything is

6   public here.  Defendants' case is built on public documents.

7   They could have accessed them at any time and looked exactly

8   what was going on.

9        THE COURT:  Right.  But that's what I was just saying.

10  You are saying that the only way they would have known about

11  it, though, is if they accessed it.

12       MR. SINGH:  Yeah, and they had access to it.

13       THE COURT:  Right.  I mean, I don't have access to it.

14  But what would make me go and look?

15       MR. SINGH:  Your Honor, you're not a -- you were not an

16  early contributor to MovementDAO, as far as I know.  And so

17  they were contributors.

18       THE COURT:  And any --

19       MR. SINGH:  They had a vested interest in keeping track

20  as to what was going on.  They were members of the Discord

21  channel.  They had access to the Snapshot platform.

22  Anytime --

23       THE COURT:  I think your argument is, well, now we

24  found out that this is going on and we don't want it to go on

25  anymore.  Why is that not okay?

1          MR. SINGH:  Yes, Your Honor.

2          I mean, as plaintiffs authorized the governing

3    documents of MovementDAO -- and we're talking about the

4    GitBook, the Guiding Principles, the terms of use, as well as

5    the MIPS that had been passed in August of 2022.

6          Now, we don't contest that plaintiffs should have

7    voting rights.  But the governing documents also state that

8    plaintiffs were committed to a six-year lockup.

9          And so we're fine if they, after their lockup, want to

10   vote to close down the DAO.  That's fine.  But they committed

11   to a lockup.  And based on that commitment, they recruited

12   other members of the community to contribute to the DAO, to

13   leave their jobs and work for the DAO, and that speaks to the

14   irreparable harm here, Your Honor.  Members of the

15   community who left their --

16         THE COURT:  Who did MovementDAO recruit to work for

17   MovementDAO?

18         MR. SINGH:  Two of our clients, Your Honor.

19   Mr. Phillips left the SEC to work for MovementDAO.  Mr. Reed

20   left his previous job at T-Mobile to work for the DAO.

21         THE COURT:  But I -- I don't see any employment

22   contracts with Mr. Reed.  I do see a contract with

23   Mr. Phillips.

24         MR. SINGH:  So Mr. --

25         THE COURT:  And I don't think that it's quite accurate

1    that he left the SEC.  I think he has already testified to

2    that.

3         MR. SINGH:  Mr. Phillips left the SEC -- his testimony

4    was that he left the SEC --

5         THE COURT:  But he worked for a company who worked --

6    who was a contractor.

7         MR. SINGH:  Sure, Your Honor.

8         He left his position as a subcontractor to the SEC --

9         THE COURT:  Right.

10        MR. SINGH:  -- who worked for Mr. Breslow during that

11   first-month period and that was based on the understanding they

12   reached.

13        THE COURT:  Okay.  There was an IC agreement, right.

14        MR. SINGH:  Yes.  And thereafter continued that work

15   based on the understanding that was reached.

16        THE COURT:  The additional 1.75 million.  But then how

17   does Mr. Reed come into play?

18        MR. SINGH:  Mr. Reed was recruited to work on the DAO

19   as well in August of 2022.

20        THE COURT:  By whom?

21        MR. SINGH:  By Mr. Phillips and the DAO itself.  The

22   DAO expressed a need to help for -- further help with

23   governance and management of the DAO because Mr. Phillips was

24   entrusted with simple engineering and --

25        THE COURT:  So at that point the DAO was voting for

1    itself.  It was managed by itself, is what you are saying.

2              MR. SINGH:  That's correct, Your Honor.

3              THE COURT:  But, according to plaintiffs, that

4    management was really through this law firm that controlled all

5    of the votes; correct?

6              MR. SINGH:  No, Your Honor.  Management has always been

7    through community participation and voting.

8              THE COURT:  Right.

9              MR. SINGH:  Voting took place on Discord or through

10   NFTs, and MAPES, and on Snapshot.  And our testimony -- our

11   position and Mr. Phillips' testimony has been that he consented

12   with each one of plaintiffs before voting the DAO-lawfirm

13   account, which -- which held the votes because --

14             THE COURT:  And that part is the part that is not in

15   writing, these consults that he had individually with

16   Gordon --

17             MR. SINGH:  Well, yes, Your Honor.  That was part of --

18             THE COURT:  -- and Breslow --

19             MR. SINGH:  -- Mr. Phillips' the oral testimony, but we

20   do have text messages between Mr. Phillips and plaintiffs where

21   he directs them in August 2022 to read the MIPS.

22             And so when we're talking about irreparable harm here,

23   Your Honor, it's community members who have contributed money,

24   community members who have contributed their work and efforts.

25   Mr. Reed and Mr. Phillips left other jobs to come work on this

1    project, and the public has an interest in seeing their efforts

2    being rewarded and that the platform and the DAO should

3    continue to operate.  The platform should be continued -- the

4    platform should be completed such that it can fund social

5    movement efforts.

6              THE COURT:  I understand your position.

7              MR. SINGH:  Also, as to irreparable injury, we're

8    talking about monetary damages here.  The possibility, the mere

9    possibility alone that adequate compensatory relief will be

10   available at a later date weighs heavily against the claim of

11   irreparable injury.

12             THE COURT:  Where would that compensatory relief come

13   from?

14             MR. SINGH:  Your Honor, Mr. Phillips has testified that

15   he is a well-compensated developer.  And plaintiffs' testimony

16   speaks to the market rate for Mr. Phillips' work.  He was paid

17   approximately $2 million worth of money and token contributions

18   in a single month, from One Of he would be making on a monthly

19   basis between 10,000 to $180,000.  He has access to other

20   contracting opportunities.  And Mr. Reed also was employed; he

21   managed multiple businesses.

22             And so there has been no showing that either defendant

23   is insolvent and there is no showing that the possibility of

24   compensatory relief is -- is not an option at a future date.

25             THE COURT:  Okay.  So it's their burden to show that

1    they could -- that suing Mr. Phillips for $16 million and

2    getting him to pay the money, in the event all of this money is

3    dissipated, is --

4          MR. SINGH:  That's plaintiffs' burden, Your Honor.

5          THE COURT:  Plaintiffs' burden must show that they

6    can't just get this money out of Mr. Phillips.

7          MR. SINGH:  That's right.  And there has been no

8    showing to that effect.

9          THE COURT:  Well, in a sense it has, because their

10   argument is, well, Mr. Phillips is getting that money from

11   them.  He is using their money essentially as his revenue and

12   his income.  So if he had this money, otherwise, why wouldn't

13   he just put his money into MovementDAO?

14         MR. SINGH:  Well, Your Honor, Mr. Phillips' testimony

15   has been that he received income from One Of as well.  And

16   $180,000 a month annualizes out to over $2 million a year.  And

17   with the issue of funding specifically, Mr. Phillips

18   and -- it's uncontested that this was initially plaintiffs'

19   vision to build this DAO and Mr. Phillips was brought in, in

20   part to execute on that vision.

21         And so when it comes to the question of why isn't

22   Mr. Phillips funding this project?  It's because it was

23   initially plaintiffs' vision.  They chose to fund it.  And

24   defendants now have been individually funding aspects of this

25   project out of their own pockets, since the endowment has

1    been -- since the endowment has been frozen pursuant to the

2    TRO.  And Mr. Phillips also earlier contributed to expenses of

3    MovementDAO before August, and those expenses weren't

4    reimbursed.  So I wouldn't say it's accurate that Mr. Phillips

5    hasn't put any of his own money into the DAO.

6         THE COURT:  Okay.  So you're making the argument that

7    there is a likelihood of success on the merits because there is

8    agreement from the plaintiffs for this money to be spent, even

9    though --

10        MR. SINGH:  Your Honor, we are arguing that the --

11        THE COURT:  -- and the MovementDAO's agreement to --

12        MR. SINGH:  Sorry, Your Honor.

13        THE COURT:  -- spend this money.

14        MR. SINGH:  Sorry, Your Honor.

15        We are arguing that there is no likelihood of success

16   on the plaintiffs' claim.

17        THE COURT:  I understand.  That they won't succeed

18   because the documents are all showing that the MovementDAO

19   controls this money now, and not Mr. Breslow, and Mr. Gordon,

20   and Mr. Fine.  I understand.

21        MR. SINGH:  That's correct, Your Honor.

22        We will show -- our argument is that the great weight

23   of the evidence shows that MovementDAO launched.  And we know

24   that because MovementDAO was promoted on social media;

25   plaintiffs themselves promoted on social media; MovementDAO

 1   accepted monetary contributions from just plaintiffs as well as

 2   members of the public.

 3          And this is an interesting point:  If MovementDAO

 4   hadn't launched, why did plaintiffs move money from their own

 5   wallets to the MovementDAO Gnosis?  If Plaintiff's position is

 6   simply that they were just funding expenses and it was still

 7   theirs, they could have kept the money in their own wallet.

 8   But moving money to the Movement Gnosis was a signal that it

 9   was no longer their money.  It was Movement Gnosis's money.

10   They could have kept it in their own accounts; they didn't.

11          THE COURT:  And then I'm curious as to why there is no

12   MovementDAO platform.

13          MR. SINGH:  Your Honor, we were prepared to testify to

14   that, if we were provided further time.  But essentially,

15   Mr. Phillips completed a version of the platform at the

16   conclusion of his independent contractor agreement with

17   Mr. Breslow.  Since then, there was a decision to add

18   additional functionality to the platform that would

19   differentiate it from other services available on the market.

20          And because there is continually demands for additional

21   features, additional security, my understanding is the platform

22   is very close now to being completed, but it was just they

23   wanted to add features; they wanted to make sure it worked

24   correctly; they wanted to make sure that there was, in

25   particular, protections that platform wouldn't be used to

1    easily commit SEC violations, that's the unregistered offering

2    of securities, by creating a simple Juicebox-type service where

3    anybody can create a DAO, anybody can create a, sort of, pump

4    and dump scheme and face the ramifications of doing so.

5          MR. BERG:  Your Honor, I have to object.  None of that

6    is in evidence.

7          THE COURT:  No.  So that -- because I'm just asking for

8    argument at this point.  And he explained why it's not in

9    evidence.

10         So -- so let me see if I understand.

11         The concern and the fears of illegality are that people

12   will supply funds for a DAO, and whoever is managing the DAO

13   will just simply take the money and that money will not go to

14   the -- to whoever it's purported to -- supposed to have gone

15   to; correct?  Is that the concern?

16         MR. SINGH:  Your Honor, that's certainly one concern,

17   and it's every concern associated with the unregistered

18   offering of securities, Your Honor.

19         THE COURT:  Okay.

20         MR. SINGH:  And so --

21         THE COURT:  Is that a concern of MovementDAO anyway;

22   right?  That people who are unauthorized might take the funds

23   and not use them for the social impact projects.  That's --

24   that's the fear.

25         MR. SINGH:  That's a potential -- well, Your Honor, the

1    concerns specifically with MovementDAO is that it be seen as an

2    unregistered offering of securities; in that, if there is a

3    profit motive with respect to the DAO, and you're selling an

4    interest in the DAO, without having specific disclosures,

5    without ensuring that the contributors are, say, accredited

6    investors, that's the underlying concern.  And we know that

7    from Mr. Phillips' testimony that the SEC has been very

8    aggressive pursuing crypto-related fundraising.  It's suing

9    DAOs.  It's suing other crypto operations.  And that's --

10            THE COURT:  Okay.  So that the concern is that

11   maybe -- I'm just trying to understand what the concern is.

12   That Breslow and Gordon are going to solicit money in this

13   MovementDAO and -- and they're going to make -- they're going

14   to invest it and make a profit on this money.  Even if they are

15   using it at -- some of it for the project, they're really just

16   doing it to invest it.  That there are people who do this.

17            MR. SINGH:  Well, Your Honor, the concern, I think,

18   specifically is that they're promoting MovementDAO as a

19   profit-making scheme.  And so what typically happens --

20            THE COURT:  As a profit-making scheme for whom?  Who is

21   going to make the profit?

22            MR. SINGH:  For anybody that holds the tokens.

23            THE COURT:  Oh, okay.

24            MR. SINGH:  So, Your Honor --

25            THE COURT:  Not just anyone.

1          MR. SINGH:  Sure, Your Honor.  So the issue typically

2     with cryptocurrency and DAOs is that a project or a token

3     offering is made, and that token offering is promoted as a

4     profit-making scheme, and people will purchase the tokens.  The

5     tokens will dramatically increase in value, and then they will

6     sell the tokens.  And if there isn't a, sort of, nonprofit

7     basis and a careful control of what you can purchase and sell

8     those tokens for, it's -- it's a security.  And an unregistered

9     offering of securities is the issue here.

10          THE COURT:  And help me understand this issue.  So

11     let's say Mr. Breslow and Mr. Gordon, Mr. Fine, did say:  Well,

12     at one point we want to put this money in here and freeze it

13     for six years, and then change their minds and say, well, no,

14     we don't, what's wrong with that?

15          MR. SINGH:  Well, Your Honor, we don't see anything

16     wrong with that, if they can get buy in from the community as a

17     whole.  And so when Mr. Phillips -- I'm sorry -- when

18     plaintiffs expressed to the DAO that they wanted to pull their

19     money out, the DAO convened this emergency committee.  That

20     emergency committee was then pulled as to whether they --

21     all members of the community wanted to engage in the shutdown,

22     whether they all wanted to pull their money out.  And the vote

23     of the emergency committee was, no, they believed in the

24     project, they wanted to keep their money in, and they didn't

25     want to wind down operations and pull their money out.

1          THE COURT:  They could keep their money in.  What's

2     wrong with certain individuals taking their money out?

3          MR. SINGH:  Well, Your Honor, there is nothing wrong

4     with it if they hadn't made that commitment to keep their funds

5     locked in.  And it was that commitment that enticed other

6     members of the community to put their money in.

7          THE COURT:  So --

8          MR. SINGH:  So if they hadn't made that --

9          THE COURT:  -- what could happen; right?  They could

10    sue.

11          I mean, I guess I want to understand what the remedy

12    is.  Do these other -- let's say -- after all, it's Mr. Breslow

13    and Mr. Gordon's money, Mr. Fine's money.  Let's say they say,

14    okay, you know, we are going to take it out.  We're going to go

15    home with our marbles.  Isn't the remedy, then, for the other

16    individuals -- they can vote, do whatever they want -- but at

17    the end of the day, if they took their money, wouldn't the

18    individuals then just have a cause of action against these

19    individuals because they were induced to invest because of

20    them?

21          MR. SINGH:  Sure.

22          THE COURT:  Would that really be the remedy?

23          MR. SINGH:  Sure, Your Honor.  I think there is

24    multiple remedies and multiple causes of action that are

25    potentially -- potentially can be brought here.

         1        First, we -- we analogize the situation to any donation

         2    or contribution to a charity; in that once you give the money

         3    to that nonprofit, to that charity, you can't simply take your

         4    money out.

         5        Second, once they put the money in MovementDAO, if they

         6    wanted their money back out, they should -- they need to come

         7    to an agreement with MovementDAO or sue MovementDAO for breach

         8    of contract if they think there is a contract claim, if they

         9    force their money out through -- without consent of

        10    MovementDAO, MovementDAO would have a contract claim against

        11    plaintiffs.

        12        THE COURT:  All right.

        13        MR. SINGH:  But they haven't been able to do that

        14    because they don't hold the keys, admittedly.  But yes,

        15    Your Honor, other members of MovementDAO could also sue

        16    plaintiffs should plaintiffs successfully pull their money out

        17    of the MovementDAO.

        18        THE COURT:  So all of this works because the -- these

        19    investors have equal control with -- with -- everyone has equal

        20    control who is invested in the MovementDAO.

        21        MR. SINGH:  I wouldn't say there is equal control,

        22    Your Honor.  Waiting -- I think contributors' contribution -- I

        23    wouldn't call it an investment because that speaks to a

        24    profit-making motive.  An individual's contribution to

        25    MovementDAO is a -- is the primary basis for their voting

1   power.  But --

2            THE COURT:  Okay.

3            MR. SINGH:  -- in this particular case, because

4   plaintiffs sought to take action that was antithetical to the

5   DAO and in violation of their commitments to the DAO to keep

6   their funds looked up, they were not permitted to vote their

7   shares in a manner that would breach their contract and breach

8   their obligations to the --

9            THE COURT:  And exactly who stopped them from voting

10  their shares?

11           MR. SINGH:  The emergency committee convened and

12  recommended that the service providers to the DAO take action

13  to strip their votes of plaintiffs.

14           THE COURT:  And who on the emergency committee has the

15  most weighted votes?

16           MR. SINGH:  I don't know the answer to that,

17  Your Honor.  But I believe that when the emergency committee

18  was convened, they were each voting equally at that point.

19           THE COURT:  Okay.  So everyone had an equal vote,

20  regardless of their amount of money they contributed?

21           MR. SINGH:  That's my understanding.

22           THE COURT:  Everybody except the people who contributed

23  the most.

24           MR. SINGH:  Plaintiffs were not a part of the emergency

25  committee.  But I also want to challenge the characterization

1    that -- that other members other than plaintiffs didn't

2    contribute significant money.  We had brought Mr. Mallory who

3    contributed, I believe, $200,000 to the Movement Gnosis.

4            THE COURT:  I see.

5            MR. SINGH:  Mr. Phillips' contributions to the Gnosis

6    were made on -- by Mr. Breslow's behalf pursuant to their

7    independent contractor agreement.  So when Mr. Breslow and his

8    counsel argue that they contributed 97 percent of the funds,

9    they're not taking into account that 10 percent of those

10   founder contributions were made on behalf of Mr. Phillips,

11   pursuant to that earlier agreement.

12           THE COURT:  Right.  Well, okay.  I think I understand

13   your position.  Is that everything you need to present within

14   your argument?

15           MR. SINGH:  No, Your Honor, I would like to speak

16   briefly to the -- why plaintiffs haven't met their burden on

17   issues such as successfully -- successful likelihood that they

18   will succeed on their merits.  And I can run through those

19   pretty quickly for Your Honor, just so -- just to provide you a

20   summary, and to respond to some of plaintiffs' points.

21           The great weight of the evidence shows that there was a

22   launch.  And we talked, Your Honor, the fact that it was

23   promoted; they were accepting monetary contributions from

24   third parties.  Members of the community engaged in governance.

25   They went through the complicated process.  And Your Honor will

1    see that there is thousands of pages of MIPS and proposals.  If

2    that wasn't binding, if that was simply advisory, why go

3    through that expensive and time-consuming process?

4         We also provided testimony and evidence that, as a

5    result of such voting, the DAO was memorialized as a Delaware

6    unincorporated nonprofit association.  It had its own IRS EIN.

7    Now, if it hadn't launched, why was it a separate entity?  Why

8    did it have its own tax number?  Why did it have its own tax

9    obligations?  And the DAO engaged in business.  It hired and

10   paid people.

11        Now, if plaintiffs' contention is that they were in

12   control, it was all their operation, why isn't there any

13   documents or conduct or evidence showing that?  Why weren't

14   they involved in the hiring?  Why weren't they responsible for

15   tax issues?  They didn't issue W-2s or 1099s to anybody who

16   provided services in relation to the DAO.

17        There are over 5,500 pages of exhibits exchanged

18   between the parties.  There isn't a single document that shows

19   that voting on the MIPS was nonbinding and advisory in nature.

20   Instead, the GitBook explicitly states that the voting was done

21   pursuant to the MIPS and -- sorry -- pursuant to the NFTs.

22   There isn't a single document that shows that

23   defendants -- sorry -- that plaintiffs were all dissatisfied

24   with the efforts of Mr. Phillips and defendants prior to

25   December 2022.

1        Now, they've expressed repeatedly that they had issues,

2   they had concerns, yet there is no text messages, there is no

3   documents, there is no paper trail showing they had any issue

4   up until December 2022 when their own financial concerns caused

5   them to withdraw money from the DAO.

6        THE COURT:  Yeah, but I guess I just don't understand

7   the governance issue.  So let's go to the governance voting

8   document where it says in the -- in the GitBook, "Snapshot

9   voting strategies during the MovementDAO will employ a

10  governance token available to individuals who stake $MOVE."

11  But there is no $MOVE tokens.

12       MR. SINGH:  Well, Your Honor --

13       THE COURT:  And then it says:  "However, during the

14  bootstrapping phase of the DAO, community contributions, and

15  based on participation, will be granted a MAPE-1420 NFT which

16  will be employed for initial governance."  I'm not sure what

17  that means --

18       MR. SINGH:  Your Honor --

19       THE COURT:  -- this bootstrapping phase --

20       MR. SINGH:  Sure.

21       THE COURT:  -- and initial governance, and then details

22  to follow.

23       But it's very clear that, "Snapshot voting strategies

24  during the MovementDAO will employ a governance token available

25  to individuals who stake $MOVE."

1          MR. SINGH:  Yes, Your Honor.

2          So the bootstrapping phase is the phase prior to the

3     Movement tokens being issued.  And the parties all agreed that

4     the parties would -- all contributors and all members of the

5     MovementDAO would use their MAPE NFTs to vote on the Movement

6     Improvement Proposals until the tokens were launched.

7          THE COURT:  And when are the tokens going to be

8     launched?

9          MR. SINGH:  Your Honor, my -- I don't have an exact

10    timeline on that, but my understanding, it would be soon.

11         THE COURT:  Why haven't they been launched already?

12         MR. SINGH:  Sure, Your Honor.

13         The idea was they needed to set up a clear structure to

14    separate the nonprofit aspects of the MovementDAO from the

15    profit-motivated opportunities that plaintiffs were seeking.

16    So --

17         THE COURT:  Oh, plaintiffs were seeking profit-motive

18    opportunities?

19         MR. SINGH:  That's correct, Your Honor.

20         THE COURT:  Where do I find that in the record?

21         MR. SINGH:  Your Honor, we had to, unfortunately,

22    minimize some of the testimony.  But if you look to the

23    testimony of Mr. Breslow, Mr. Breslow talks about discussions

24    he had with Mr. Phillips concerning setting up structures.  And

25    so the idea was that there would be MovementDAO, which is the

1    Delaware unincorporated nonprofit association, and then there

2    would be a series of other LLCs and entities, including

3    DAOLabs; there would be a DAOLabs IP holding.

4           And the basic idea was that certain IP developed by

5    MovementDAO would be moved to the DAOLabs IP holdings.  That IP

6    company would ultimately be owned by Mr. Phillips and others,

7    and that could license IP to MovementDAO and other entities,

8    and there would be an opportunity to make money off of that IP

9    licensing.

10          THE COURT:  And where will I find that in Mr. Breslow's

11   testimony?

12          MR. SINGH:  Mr. Breslow spoke briefly about that

13   subject when we were -- when there was a discussion and text

14   message exchange between Mr. Phillips and Mr. Breslow regarding

15   the formation of structures.  I don't have that exhibit number

16   in front of me right now, but I can provide it to you later on.

17          THE COURT:  Yes.

18          MR. SINGH:  And Mr. Phillips was prepared to testify to

19   those structures and the, kind of, ideas that the parties had

20   discussed.

21          THE COURT:  Mr. Phillips did testify.

22          MR. SINGH:  We didn't have -- Your Honor, we shortened

23   his testimony to accommodate the Court's concerns concerning

24   timing.

25          THE COURT:  I see.  So Mr. Phillips would have

1    testified that he had discussions with Mr. Breslow with respect

2    to some sort of profit motive --

3           MR. SINGH:  Yes, Your Honor.  And --

4           THE COURT:  -- for MovementDAO.

5           MR. SINGH:  That's correct.  And Mr. Phillips had --

6           THE COURT:  Or would they have been for other types of

7    businesses that they would have done separately?  I just want

8    to understand.

9           MR. SINGH:  Sure.

10          It would be related to the MovementDAO IP.  And so the

11   idea is, Mr. Phillips and the development team spend a

12   significant amount of time developing MovementDAO IP in the,

13   kind of, software that they created, which now is something

14   like 20 million lines of code.  That software and that platform

15   could be commercialized --

16          THE COURT:  Could be.

17          MR. SINGH:  Could be.  Okay.

18          THE COURT:  Okay.

19          MR. SINGH:  But it couldn't be commercialized under

20   Movement DAO as an unincorporated nonprofit association because

21   it is supposed to be a nonprofit effort.  So that IP would be

22   moved to a separate entity.  And Mr. Phillips had discussed

23   that structure of those separate entities with both Mr. Breslow

24   and Mr. Yurchak.  And that discussion is reflected in e-mails

25   with Mr. Yurchak that were excluded due to the limited purpose

1  basis.

2          THE COURT:  Okay.  All right.  Anything else?

3          MR. SINGH:  Yes, Your Honor.

4          I just want to note that plaintiffs' arguments depend

5  on a certain amount of mental gymnastics here.  On the one

6  hand, they argue that the GitBook is the governing document and

7  that Mr. Phillips violated covenants of that GitBook.  But, on

8  the other hand, they seem to argue that the GitBook itself had

9  not launched or the GitBook itself was not enforceable due to

10  there not being a launch.

11          And if you look to -- to plaintiffs' argument, they

12  follow the same kind of concern, in that there is a lot of

13  mental gymnastics here.  They claim that everything was being

14  hid from them, yet they're relying solely now on publicly

15  available documents that they always had access to, that they

16  were pointed to and discussed with throughout the course of the

17  relationship.

18          THE COURT:  Okay.  I think you've made that point.

19          MR. SINGH:  With respect to Mr. Yurchak's testimony, I

20  want to note that his testimony was wholly unreliable.  He

21  repeatedly contradicted his earlier declaration submitted under

22  the penalty of perjury.  Mr. Yurchak's testimony was so bad,

23  that on redirect the only questions asked of him were to

24  correct testimony on cross, so as to not suborn perjury.  But

25  Mr. Yurchak admitted and plaintiffs have not disputed that the

1    only person associated with Mr. Yurchak's firm that could

2    provide any cryptocurrency services was Mr. Phillips.

3         Everybody always knew -- and Mr. Phillips is the only

4    one associated with Mr. Yurchak's firm that was providing

5    services with regard to the DAO-lawfirm account.

6         Your Honor, I will just close by saying that plaintiffs

7    have a significant burden here.  They haven't met that burden.

8    And something more must be required before the Court issues a

9    preliminary injunction which will have the effect of

10   essentially shutting down the DAO.  Without its funds, it can

11   no longer fund operations; it can't pay for developers; it

12   can't pay for actually launching the platform.  And now the

13   year and a half's worth of the work, the contributions from the

14   community, will all be for naught.

15        With that, we will submit, Your Honor.

16        THE COURT:  All right.  Thank you.

17        Mr. Berg, you have five minutes.

18        MR. BERG:  Okay.

19        THE COURT:  I'm curious to know what would happen to

20   these contributions from the community if I have -- if the

21   preliminary injunction is granted?  They will still be

22   preserved; right?

23        MR. BERG:  Correct, Your Honor.

24        THE COURT:  Okay.

25        MR. BERG:  That's right.  We're just asking for a

1    freeze.

2         THE COURT:  Okay.

3         MR. BERG:  We will -- once the PI is granted, we

4    will -- as part of our motion to hold defendants in contempt

5    for failing to comply with the TRO, we have asked that the

6    funds in the endowment account be either converted to cash and

7    held in escrow with the clerk, or we can set up some sort of

8    escrow regime in cryptocurrency to save those transaction costs

9    because their pattern of noncompliance warrants that.  But the

10   endpoint is the same.  Everything is just frozen in place until

11   we could hash out who properly is entitled to this money.

12        THE COURT:  Okay.

13        MR. BERG:  A few points, Your Honor.  I won't take

14   long.  PeaceDAO; it's a red herring.  There is -- Mr. Phillips

15   was not being -- there is no evidence that Mr. Phillips was

16   being paid for PeaceDAO.  It's not in any operational budget.

17   You can look at Exhibit 90; you won't find it there.

18        Mr. Singh said that defendants were fine with

19   plaintiffs' voting.  But the point is they were stripped of

20   their votes.  And this emergency committee, where the -- the

21   proposal to redeem Mr. Breslow's generous proposal for a

22   one-to-one redemption, where he would take the loss for

23   everything, and just give everyone back the exact amount they

24   contributed, those were never presented by plaintiffs to the

25   committee.

1          The emergency committee was a coup, not a vote.  It was

2    held in the deep of night.  It was one-sided.  It was presented

3    by Mr. Reed and Mr. Phillips with very one-sided articulations

4    of what was happening.  And they were judge, jury, and

5    executioner.

6          THE COURT:  So were plaintiffs aware of this emergency

7    committee meeting?

8          MR. BERG:  No, they weren't.

9          THE COURT:  Could they have been aware if they had

10   looked at this Snapshot?

11         MR. BERG:  No.  Never -- never --

12         THE COURT:  Was it posted on the Snapshot?

13         MR. BERG:  All of this transparency and the -- the main

14   acts of fraud and breach of duty, all of this transparency,

15   they were not posted.  So what happened was in January -- early

16   January when Ryan Breslow finally sent his e-mail and said:

17   Mr. Phillips, here are a list of things that we think you're

18   doing that are fraudulent, this has got to stop, communication

19   went silent about a month and a half, five weeks maybe.

20         And during that period, these emergency committee

21   meeting minutes were -- or emergency committee meetings were

22   held.  Only after, not just his presentation for redemption,

23   but after Mr. Breslow accused Mr. Phillips of fraud.  That's

24   when they happened.

25         The evidence shows that the redemption proposal was

1    being made in early December, and even before that.  That's

2    when --

3          THE COURT:  What is the redemption proposal?  I want to

4    make sure I'm clear on what you're saying.

5          MR. BERG:  Ryan Breslow's redemption proposal:  DAO

6    community, all contributors, we are uncomfortable with how the

7    development of the project is going.  I want to --

8          THE COURT:  I see.

9          MR. BERG:  -- return your contributions, even though

10   there has been the 1.75 million, there has been all of these

11   additional expenses.  I, Ryan Breslow, am going to eat those

12   costs and give back everyone their money, so everyone is back

13   to status quo, pre whenever you contributed.  Very generous

14   offer.  Would have cost him a lot of money.  But that is what

15   triggered -- and there is evidence that we didn't put in today

16   that we will do so at trial, that will show that it's that

17   redemption offer -- there is actually -- there is emergency

18   committee meetings, but there is also authorized member

19   meetings between Ben Reed and Mr. Phillips alone.  And that's

20   where you see the resolutions that say "the redemption proposal

21   is why we're doing this."  Right?

22         And the notion that there was a committee -- a large

23   participation by the DAO community, there were five or six

24   people on these committees, and they're all friends of

25   Mr. Phillips.  This is not a transparent communal situation.

1     This is a farce.  This is a way to get the guys out, take the

2     money, because they're getting -- they're savvying up to our

3     scheme.  That's what this is.

4          Look -- and we will prove that in time.  I think we

5     presented more than enough evidence to show that something is

6     rotten in Denmark.  And all we need is time.

7          We haven't taken a single bit of discovery in this

8     case, and look how much we've presented.  And think about that.

9     Look at how much defendants' counsel leaves untouched.

10    Snapshot voting fraud.  Wait.  Was it Mr. Breslow's

11    contribution that was providing all of the votes to Snapshot?

12    Or was it all the votes of all of these contributors,

13    Mr. Montero, Mr. -- didn't touch that.  Can't.  Because

14    Mr. Bax's analysis is airtight, right?  Mr. Phillips was lying

15    when he told you that.  Right?

16         What else?  Didn't touch the conversation that he had

17    with Mr. Yurchak:  Provide me air cover.  We will just loop

18    things through your firm and pay me.  Mr. Yurchak decided --

19    look, Mr. Yurchak, you either believe him that he was a patsy,

20    or if you don't believe him, then he was in on it.  Either way,

21    plaintiffs are getting defrauded.  Either way.  I don't know if

22    I believe it, but I know that that conversation he testified to

23    was a fraud.  I know.  He confirmed for me that that -- that

24    document, Exhibit 90, that false invoice, he didn't submit it.

25    But he confirmed from the document pulled from Mark Phillips'

1    declaration, that was the same one that he showed -- that

2    Mr. Phillips showed to Mr. Gordon, Mr. Breslow.  Didn't touch

3    that, did they?  Not with a 10-foot pole because

4    that's -- that's lava.

5        This is one important question.  Mr. Singh said if

6    they -- if the MovementDAO did not launch, why contribute the

7    money?  It's a great point, and I want to make sure it's clear

8    to the Court.  The DAO endowment was not supposed to use

9    endowment funds to fund the Movement.  It was supposed to be

10    invested.  And then from that yield, you use that to fund your

11    operations.  So, of course, structurally, you would need to

12    bring the funds into the DAO endowment, invest it, let that

13    generate for a while, and then you would be able to launch.  Of

14    course.  That's exactly why they did it.

15        Now, that didn't happen because we couldn't get the

16    dang platform on all fours.

17        THE COURT:  Who was in charge of investing that money?

18        MR. BERG:  That's a good question.  There is -- there

19    was a discussion -- it's just not clear.  I don't think it's

20    clear.  There was --

21        THE COURT:  There is no written agreement with that in

22    it?

23        MR. BERG:  There was -- there was a MIP proposal which,

24    of course, is not authorized.  But there was discussions about

25    Discord and there were -- I think there were grumblings, but it

1    never got --

2         THE COURT:  Okay.  Never got to that point.

3         MR. BERG:  Exactly.

4         THE COURT:  I see.  Okay.

5         MR. BERG:  Oh, the MIP voting and the MAPE NFTs.  One

6    last thing.  And again, I employ Your Honor to consider the

7    presentation of Nicolas Bax.  It really provides a pretty

8    comprehensive treatment of the facts, not just the testimony,

9    but the data.

10        His analysis shows that Snapshot voting for those

11   foundational MIPS, not happening with MAPE NFTs.  No

12   correlation with MAPE NFTs.  And how many votes do you get?

13   Right?  So right there, what was articulated in the GitBook is

14   not happening.

15        THE COURT:  So even if MAPE NFTs were used to employ

16   initial governance, that's not what happened?

17        MR. BERG:  This is just a structure designed to extract

18   money from the DAO, but provide reasonable cover.  That's all

19   this is.

20        THE COURT:  All right.  Thank you.

21        MR. BERG:  You can tell that when you -- you heard

22   Mr. Reed saying:  Oh, the Discord community can move the DAO;

23   there is 500 people in it.  Look at how many people are voting

24   on these proposals.  It's like nine people.

25        THE COURT:  All right.  Well, thank you very much.  I

1    think I understand the case.

2         We do have the issue of the motion that was recently

3    filed regarding how to put the money back into MovementDAO.

4    The first proposal with regard to the -- the structure of

5    moving or converting the money into crypto, I don't know if you

6    have seen the motion, Mr. Berg.

7         MR. BERG:  It's very brief.

8         THE COURT:  Okay.  So I want to take a few minutes and

9    discuss that because I know that Judge Altman is going to refer

10   that to me as well, since it's all part of the TRO.

11        If you want to take a break for about five minutes and

12   let's come back and talk about that.  I know that's very

13   important to Mr. Singh as well, because the second part of it

14   is to do with your fees.

15        So let's make sure that we give a few minutes to that

16   today, all right?  So five minutes.  And -- oh, let's say let's

17   be back at 3:00, and we will take about 15 minutes to discuss

18   that.

19        MR. SINGH:  Thank you, Your Honor.

20        MR. BERG:  Thank you, Your Honor.

21   (A recess was taken from 2:52 p.m. to 3:03 p.m.)

22        THE COURT:  I just want to talk for a few minutes

23   about, perhaps, just a few questions about this motion.  Oh,

24   here we go -- expedited motion for clarification of the Court's

25   February 28th order, document number 93.

1          So, first of all, defendants want to return the DAO

2     endowment assets rather than unwinding the transactions from

3     Robinhood online cryptocurrency platform at $5,000 increments.

4     They propose a transfer of the assets subject to TRO back to

5     the endowment Gnosis through alternative means.

6          Defendants understand they can transfer the assets and

7     issue it back to the DAO endowment Gnosis through Coinbase,

8     another cryptocurrency trading platform, and that can be done

9     within 15 business days.

10          Any objection to that from the plaintiffs?  I would

11     think that seems like a reasonable way to work.

12          MR. BERG:  I'm a little -- well, it depends,

13     Your Honor.  I'm a little confused by the request.

14          You know, Mr. Singh e-mailed me while I was on the

15     plane yesterday to meet and confer, and I e-mailed back but

16     never got a response.  My question was:  Have you contacted

17     anyone at Robinhood and said there is an injunction.  You have

18     got to waive your $5,000 cap and let us get this money out.

19          And I didn't get a response.

20          THE COURT:  Okay.  But then my other question would be,

21     also, it -- you still have to get it out of Robinhood to this

22     Coinbase platform.  So somehow it would still -- I guess

23     Robinhood has no problem just transferring currency to somebody

24     else if it's still crypto, crypto to crypto.

25          MR. SINGH:  Well, Your Honor, just to clarify.  First,

1   Mr. Phillips did contact Robinhood in March to see if they

2   could increase the limit.  Unfortunately, there is limited ways

3   you can contact Robinhood, and the person he spoke to in

4   customer service says -- he said you could not increase that

5   limit.

6           Second --

7           THE COURT:  Well, you know these customer service

8   people.

9           MR. BERG:  That was the chatbot you posted in this

10  exhibit right?  The chatbot.

11          MR. SINGH:  It was a -- the chat service, the customer

12  representative, I think --

13          THE COURT:  Right.  Maybe we should -- maybe you can

14  take it up to the attorney level and see what happens.

15          MR. SINGH:  We can reach out to counsel, if we can find

16  them.

17          THE COURT:  If you can find them.  Mr. Singh, I have a

18  lot of faith in you.

19          MR. BERG:  And, Your Honor, if they can't, we sure

20  will.

21          MR. SINGH:  And so, Your Honor, with respect -- my

22  understanding is that when you transfer cryptocurrency from out

23  of the Robinhood account, there is a $5,000 transaction limit.

24  There isn't a similar limit when you withdraw money out of

25  Robinhood into your own bank account.

1    And so what we're proposing is money be withdrawn out

2    of the Robinhood account, transferred to another bank account

3    that's linked to a Coinbase account, and then that path be used

4    to transfer from Coinbase back to the MovementDAO Gnosis.  And

5    Coinbase doesn't have the Dai cryptocurrency or access to the

6    Dai cryptocurrency, so we're also proposing it be sent back in

7    U.S. dollar coin, which is a, sort of, equivalent stablecoin

8    cryptocurrency.

9         THE COURT:  Plaintiff.

10        MR. BERG:  Are there significant transaction costs with

11   the Dai to USDC, Mr. Singh?

12        MR. SINGH:  I think it's just the same as if we were to

13   go back through this process.  Because when we

14   were -- when -- when Dai was taken out of the Gnosis, it was

15   converted to ETH.  So there was a conversion from Dai to ETH

16   that incurred a transaction cost.  When it was put into

17   Robinhood and then converted to cash, there was a transaction

18   cost.  And so these transaction costs are unavoidable if we're

19   unwinding the transaction.

20        And so if we're incurring the transaction costs to

21   unwind these transactions, our preference is to move it back as

22   fast as we can, instead of using the "$5,000 at a chunk"

23   method.  That would be construed as a strict unwinding of

24   transactions.

25        THE COURT:  But it requires you to put the -- take the

1    money from Robinhood and put it into whose personal account?

2           MR. SINGH:  So the Robinhood account is already

3    Mr. Phillips' personal account.

4           THE COURT:  Uh-huh.

5           MR. SINGH:  And that is linked to his personal bank

6    account.

7           THE COURT:  Uh-huh.

8           MR. SINGH:  And so we would be moving money from his

9    personal bank account to the DAO-lawfirm checking account.

10          THE COURT:  Uh-huh.

11          MR. SINGH:  I'm sorry.  DAOLabs checking account.

12          THE COURT:  Okay.

13          MR. SINGH:  From the DAOLabs checking account would be

14   going to the DAOLabs Coinbase account.  And from the DAOLabs

15   Coinbase account, it would go to the Movement Gnosis.

16          Now, the problem also is that Mr. Phillips has a

17   personal Coinbase account, but that Coinbase account is now

18   restricted after they were provided notice of these

19   proceedings.  But my understanding is that the DAOLabs Coinbase

20   account is not yet restricted.

21          MR. BERG:  Here is my concern, Your Honor.  Recent

22   revelations about the accountings that defendants have provided

23   have indicated to me --

24          THE COURT:  Move closer to the microphone just to make

25   sure --

 1        MR. BERG:  -- have indicated to me that it's not

 2   clear -- we don't have a situation where we had:  Here are the

 3   eight accounts that received MovementDAO funds.  This is how

 4   much MovementDAO funds are within each of these accounts, and

 5   this is the total balance.  Which is to say, in other words,

 6   these accounts are commingled.  And I don't have a good sense

 7   about how much plaintiffs -- or, excuse me, defendants are

 8   claiming still has been unspent.  Unclear to me.

 9        I don't know how much is still in their control.  If we

10   start bouncing funds to all these commingled accounts, it's

11   going to be hard to get my arms around something when I don't

12   have a clear representation from defendants about what is what.

13        So what I propose in the alternative is give us a week.

14   We will endeavor to contact Robinhood, as I hope defendants do

15   as well, and we will -- it's been our experience with this TRO

16   that these Coin -- these cryptocurrency exchanges don't see

17   injunctions from federal courts very often, and when they do

18   they are quite compliant.  So I think there is a simpler way to

19   get this done.

20        THE COURT:  But --

21        MR. BERG:  If we're not successful, then I think we

22   could be okay.  I think we will -- we can communicate our

23   position in a week, 10 days, through a response to the motion;

24   that way you would have an understanding of where we are after

25   we've looked into it --

1                THE COURT:  Okay.

2                MR. BERG:  -- and you can decide accordingly.

3                THE COURT:  Isn't the Robinhood account frozen anyway?

4    Or is it not frozen?

5                MR. SINGH:  The Robinhood account is not frozen.

6    Robinhood, as a platform, institutes these $5,000 limits.

7                THE COURT:  Right.  So, really, the -- maybe the

8    Robinhood should be frozen.  How much --

9                MR. BERG:  I agree Robinhood should be frozen,

10   Your Honor.  There is a limit to which our sleuthing, without

11   discovery, could bring us, but --

12               THE COURT:  I see.  Why haven't you done any discovery

13   yet?

14               MR. BERG:  Because we haven't gotten to discovery yet.

15   This is all preliminary injunction.

16               THE COURT:  Wow.

17               MR. SINGH:  Your Honor, our position would be that the

18   Robinhood account contains both personal accounts and assets

19   that are subject to the TRO.

20               THE COURT:  Okay.

21               MR. SINGH:  But I think also, a related point, and this

22   is on the accounting we are providing, it would be much -- it

23   would be a much simpler process if we're permitted to return

24   assets to the Gnosis, and then we can clearly show --

25               THE COURT:  But your path doesn't sound simple; right?

1   So what sounds simple is presenting the TRO or Judge Altman's

2   order to Robinhood and requiring them to comply.

3        But then Robinhood needs to know the amount that

4   they're going to comply with.

5        MR. BERG:  Yeah, I mean, I think the way you would

6   convey it to Robinhood is:  We have a TRO.  It covers this

7   account.  Lift your cap and let us move out what needs to be

8   moved out.

9        If they require more, then we can -- we can address

10  that.

11       THE COURT:  Yeah, I think -- I think that seems simple

12  first.

13       MR. SINGH:  Your Honor, we're happy to go with that

14  approach initially.

15       THE COURT:  Right.

16       MR. SINGH:  Our goal is just to move money back and

17  move assets back into the Gnosis.

18       THE COURT:  Okay.

19       MR. SINGH:  But, Your Honor --

20       THE COURT:  So you want to try that for one week?

21       MR. BERG:  Yeah, give us 10 days, if you wouldn't mind.

22       THE COURT:  A week, 10 days.  Okay.  All right.

23       MR. SINGH:  Your Honor, related, we had an additional

24  question just on the accounting before we move on to the next

25  step.

1          THE COURT:  Oh, yeah.  Go ahead.

2          MR. SINGH:  And so, right now we've provided previously

3  accounting to plaintiffs.  We are in the process of preparing a

4  further accounting that we are prepared to submit today.  I

5  think the accounting will be greatly simplified if we can

6  simply just show what money was taken out of the Gnosis, what

7  money has been returned, and why certain additional funds have

8  not been returned, where they have been spent.  Because right

9  now the accounting we are preparing talks about all of the

10  different accounts that may hold TRO funds, which aspects of

11  those accounts are TRO funds versus non-TRO funds?  And I think

12  if we reduce that complexity by quickly moving back into the

13  Gnosis -- money back into the Gnosis, the accounting process

14  and the discussions about the accounting will be much more

15  simplified.

16          And so we're requesting an extension of time until we

17  can move back money to the Gnosis before we provide that

18  further accounting you requested of us today.

19          MR. BERG:  No.

20          THE COURT:  There is an accounting that has been done

21  each month; right?  There was a March accounting?

22          MR. BERG:  Your Honor --

23          THE COURT:  There were four accountings.  How would

24  this differ from what --

25          MR. SINGH:  So, Your Honor, over the last few days we

1  have been moving money back into the Gnosis --

2          THE COURT:  Oh, I see.

3          MR. SINGH:  -- in $5,000 increments.

4          THE COURT:  Okay.

5          MR. SINGH:  And we have tried to provide more clarity

6  to the accounting based on plaintiffs' objections to date.

7          THE COURT:  I see.

8          MR. SINGH:  So the underlying amounts are not in flux

9  aside from the $5,000.  But we're trying to -- we're trying to

10 get this in a format that's -- that's more digestible.  But I

11 think that process will be aided if we can simply put money

12 back in the Gnosis and account for what's outstanding.

13         THE COURT:  So what are you asking essentially, then?

14         MR. SINGH:  An extension of time to provide that

15 accounting that we were going to provide later today.

16         THE COURT:  How much time?

17         MR. SINGH:  Well, it depends on process employed.  And

18 so if we can send everything back to the Gnosis within 15 days,

19 then we can simply provide an accounting within the next few

20 days after that.

21         MR. BERG:  Your Honor, the problem, before we start

22 moving more money, is I don't know how much they had.  And this

23 is -- this is not -- this is not brain surgery; right?  I mean,

24 I need to know how much money was moved out of the DAO

25 endowment and where it went, okay?  Those accounts, where it

1   went.  How much money constitutes MovementDAO assets, how much

2   money is not MovementDAO assets.

3            THE COURT:  I thought that's what we were going to get.

4            MR. BERG:  I thought so too.

5            MR. SINGH:  I provided --

6            MR. BERG:  I'm sorry.  And then what I need is anything

7   that's not currently within the control of defendants or the

8   MovementDAO entity; right?  Where did that go?  And how much?

9            THE COURT:  Right.

10           MR. BERG:  That's all I need.

11           THE COURT:  Who was paid?

12           MR. SINGH:  Your Honor, we have provided an accounting,

13   and we are, again, prepared to provide that again today.

14           THE COURT:  Okay.

15           MR. SINGH:  It is going to be this complex accounting.

16   We're happy to send it over once it's finalized today.

17           THE COURT:  Yeah, let's take that.

18           MR. SINGH:  Okay.

19           THE COURT:  Now, if you want to do a separate

20   accounting once you've restored everything in 15 days, that's

21   fine too.

22           MR. SINGH:  Okay, Your Honor.

23           THE COURT:  But at least that will give us something to

24   compare it to.

25           MR. SINGH:  And, Your Honor, we're only able to restore

1    within approximately 15 days if we are granted permission to

2    take this path.  Now, if the Court would, instead, like to us

3    to first reach out to Coinbit -- I'm sorry -- reach out to

4    Robinhood and see --

5              THE COURT:  Yes.

6              MR. SINGH:  -- if the restriction can be lifted --

7              THE COURT:  Yes.

8              MR. SINGH:  -- then we can't commit to returning

9    everything within 15 days because there are a series of

10   transfers that have to happen.

11             THE COURT:  Right.

12             MR. SINGH:  Every time a transfer has been made, there

13   has to be a settlement process before the bank will allow us to

14   release those funds.

15             THE COURT:  Okay.

16             MR. SINGH:  And so that takes time.

17             THE COURT:  But you can commit to reporting to the

18   Court within 15 days.  So let's leave --

19             MR. SINGH:  Okay.  Yes.

20             THE COURT:  Let's do that.  Right?  So that I will know

21   what the status is.  We will all know what the status is,

22   whether you have been able to get Robinhood to simply send the

23   money directly back.

24             MR. SINGH:  Of course, Your Honor.

25             THE COURT:  Okay?  Or if not, what has been happening

1    since; and I will know.

2         Okay.  Well, here is the more difficult question,

3    though.  And as an attorney, I understand that you're in a

4    difficult situation, but how are you authorized, Mr. Singh, to

5    be paid out of MovementDAO funds?  That's -- that's a surprise

6    to me.  I mean, we've got two individuals who are being

7    personally sued.  Why aren't they paying for their own

8    representation?

9         MR. SINGH:  Well, Your Honor, I think multiple points

10   there.  First, the GitBook and the MIPS provided for

11   indemnification of my clients.  And they relied on those

12   indemnification provisions to take money from the Gnosis for

13   their --

14        THE COURT:  For legal services on their own personal

15   behalf.

16        MR. SINGH:  It was legal services for claims incurred

17   in relation to the services they provided to MovementDAO.  So

18   it was not simply --

19        THE COURT:  There is somewhere that says that, that

20   they can do that?

21        MR. SINGH:  Sure, Your Honor.  There is indemnification

22   provisions in the GitBook as well as in the MIPS.

23        THE COURT:  I see.

24        MR. SINGH:  They were relying on those provisions when

25   seeking indemnification funds.

1          THE COURT:  Okay.  And that is obviously under question

2    right now.

3          MR. SINGH:  Yes.

4          THE COURT:  That is the whole lawsuit.

5          MR. SINGH:  Yes, Your Honor.

6          And the second part of this is our fund -- our firm

7    accepted those funds without knowledge of the TRO because it

8    hadn't been issued yet.  We engaged in an arm's length

9    transaction with defendants when receiving those funds which,

10   admittedly, were a deposit.  But had we not received a deposit

11   of that nature, we wouldn't have agreed to accept defendants as

12   clients because of the complexity of this dispute and the

13   appreciation that this was going to be a dispute that incurred

14   significant fees.

15         And so it was an arm's length transaction.  We were

16   bona fide purchasers with respect to that agreement, and we had

17   no knowledge that the TRO had issued because it hadn't been

18   issued.

19         THE COURT:  Understood.  But now it's been issued, and

20   now we all understand that that really is the basis of the

21   lawsuit.  It seems to me that your client ought to pay you --

22   and your client is Mark Phillips and --

23         MR. BERG:  Ben Reed.

24         THE COURT:  -- and Ben Reed; correct?

25         MR. SINGH:  And MovementDAO as well, Your Honor.

1        THE COURT:  MovementDAO is not a party.

2        MR. SINGH:  We have filed counterclaims on behalf of

3   MovementDAO.

4        THE COURT:  Oh, that is true, there's counterclaims.

5        MR. SINGH:  We do represent MovementDAO.

6        THE COURT:  But then we don't have authority -- or

7   there is no clear authority.  There is a dispute that

8   MovementDAO even has the authority to pay you.  So now you've

9   found yourself in the middle of a lawsuit yourself.

10       So at this point we know how much you have.  It's

11  $300,000.

12       MR. SINGH:  Yes, Your Honor.

13       THE COURT:  Certainly, if the TRO is properly followed,

14  and -- in this case nothing else comes out of MovementDAO to

15  pay you going forward, and there is a possibility that what you

16  have been paid wasn't properly authorized.  And -- and I'm

17  concerned, as I'm sure you very much are concerned.  I think

18  that you will need to sit down and have that discussion with

19  your client, Mr. Phillips and Mr. Reed, and determine how they

20  want to go forward from here.

21       But to authorize any further payments from MovementDAO

22  is not possible until the entire lawsuit is determined.

23       MR. SINGH:  Understood, Your Honor.

24       THE COURT:  All right.  And not that I don't feel your

25  pain, I do, but you'll need to have a discussion with them

1    about how they want to proceed.

2         MR. SINGH:  Understood, Your Honor.

3         THE COURT:  Okay.  All right.  Anything else for today?

4    I think that should do it.

5         MR. BERG:  One small point.  I asked this clarification

6    on meet and confer.

7         The thing about bona fide purchasers, they stopped

8    being bona fide purchasers when they have notice.  And what I

9    would like to know is, how much in legal fees have been

10   expended from that 300,000 prior to the TRO that Mr. Singh just

11   admitted they didn't know anything about before February 28th?

12   It's probably not a lot.  And if that's true --

13        THE COURT:  We've spent so much time here, and we're

14   only spending more every minute.

15        MR. BERG:  You are so right.  I promise it will be it.

16        If that's true, then Mr. Singh was on notice that he

17   was not supposed to spend any of that money once the TRO was

18   issued.  That should just come right back.  And that should

19   not -- that's pretty straightforward, Your Honor.

20        MR. SINGH:  Your Honor, our position there -- and we

21   have touched briefly on this in our motion.  The amount -- the

22   exact amount we have spent, we believe, is privileged and we

23   have not closed that.  We will acknowledge that the full amount

24   of that initial deposit wasn't spent from the, kind of,

25   February 13th to February 28th period.  But we did incur

1    significant fees during that period because my clients were

2    preparing to sue plaintiffs and then ended up defending the

3    lawsuit.

4         And, second, as I mentioned earlier, had we not that

5    deposit in the bank, we would not have agreed to represent

6    defendants.

7         THE COURT:  So let me say this with respect to that

8    amount.  This is an attorney with a trust account.  And I

9    assume if he hasn't actually earned the money, he is not going

10   to draw it down; right?

11        Now, based on the fact that he's a member of the Bar,

12   just like us, we would expect that kind of behavior from him.

13        Now, if you -- at the end of the lawsuit, it is

14   determined that this money was not properly authorized to be

15   removed from MovementDAO, I also feel confident, and as a

16   member of the Bar, you know that you're obligated to return it

17   all.

18        MR. SINGH:  Very much understood, Your Honor.

19        THE COURT:  All right.  So I don't know that I need to

20   go into that -- that this moment, to find out how much he has

21   earned or hasn't earned.  He is going to have to give us that

22   accounting at some point, if that's the -- the way the lawsuit

23   comes out.

24        MR. BERG:  Your Honor, I think you do.  The TRO issues

25   on February 28th, and it says defendants' attorneys return

1    money that they have from DAO endowment assets.  That's -- if

2    it was unspent, that needs to come right back.

3          THE COURT:  Okay.  Let me look.

4          MR. BERG:  On page 5 of the TRO, subparagraph C.

5          THE COURT:  "Defendants, their agents, employees,

6    attorneys, and any persons in active concert or participation

7    with them are further ordered to unwind any transfers that have

8    been made in the last 30 days."

9          So was the transfer made within the last 30 days of

10   this order?

11         MR. BERG:  Yes, it was, Your Honor.

12         MR. SINGH:  Yes, Your Honor.  It was made, as we noted,

13   February 13th, prior to the TRO being issued.

14         THE COURT:  But within the last 30 days.

15         MR. SINGH:  That's the issue we're facing, Your Honor.

16   We received that deposit and accepted this engagement without

17   notice of the TRO.  And had it not been for that payment, we

18   wouldn't have accepted this case.

19         THE COURT:  Okay.  So then you definitely need to have

20   a talk with your client about them paying for your costs

21   because, according to this order, you would need to unwind any

22   transfer made in the last 30 days, and that would be you.

23         MR. SINGH:  Yes, Your Honor.  That's why we're seeking

24   clarification.  Because when we -- when we initially raised

25   this issue before Judge Altman, he indicated that we would need

1   to provide an accounting, and that's the portion of that

2   transcript that I provided in the motion.  And so we are now

3   seeking clarification from you, Your Honor.  Whether we can

4   pull that money and under -- acknowledge here on the record

5   that we will be responsible for it at the conclusion of this

6   action --

7            THE COURT:  Uh-huh.

8            MR. SINGH:  Or if Court's order is that we immediately

9   return the full amount now, or a portion thereof, and, again,

10  the issue with the portion thereof is that we believe

11  that's -- that's privileged information.

12           THE COURT:  Okay.  Well, it may be privileged, but it

13  seems that you would have to, at least, unwind the transfers

14  and any portion that you haven't earned.  And you may even have

15  to --

16           MR. BERG:  I haven't heard "since getting notice."

17           THE COURT:  Since getting notice.

18           And then you may have to eventually give back the rest.

19  So you definitely want to speak to your clients about how

20  they're going to compensate you going forward --

21           MR. SINGH:  So the Court --

22           THE COURT:  -- from -- from the date that you received

23  that court order.

24           MR. SINGH:  Okay, Your Honor.  So I just want to be

25  explicitly clear.  Is it the Court's order that we should

1    return that money within a certain time period?

2           THE COURT:  Yes.

3           MR. SINGH:  Okay.  And we will just request time

4    because we will need to, as a fund, understand how we're going

5    to put that money together and then return it in cryptocurrency

6    form or unwind that transaction.

7           THE COURT:  You can report to me in 15 days on that as

8    well.

9           MR. SINGH:  Thank you, Your Honor.

10          THE COURT:  Okay.  Yeah, I think plaintiff has a point.

11   It doesn't except attorney's fees.  It says "actually

12   attorney's."

13          All right.  Okay.  So you will report to me in 15 days

14   with respect to that as well.

15          MR. BERG:  And, Your Honor, we will submit a response

16   to the motion in 10 days with our update about the Robinhood

17   contacts.

18          THE COURT:  Okay.  Very good.  So a response to the --

19          MR. BERG:  The expedited motion.

20          THE COURT:  -- the expedited motion.  Okay.  And

21   15 days will be the accounting.

22          Okay.  Thank you.  Thank you, Counsel.

23          (These proceedings concluded at 3:32 p.m.)

24

25

1                    C E R T I F I C A T E

2

3

            I hereby certify that the foregoing is an
4
   accurate transcription of the proceedings in the
5
   above-entitled matter.
6

7

8   DATE:   06-08-2023          /s/Laura Melton
                                LAURA E. MELTON, RMR, CRR
9                               Official Court Reporter
                                United States District Court
10                              Southern District of Florida
                                400 North Miami Avenue
11                              Miami, Florida 33128

12

13

14

15

16

17

18

19

20

21

22

23

24

25