**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

RYAN BRESLOW, ALEX FINE, and
JON GORDON,

        Plaintiffs,

    v.

MARK PHILLIPS and BENJAMIN REED,

        Defendants.

_____

MOVEMENTDAO and MARK PHILLIPS,

        Counterclaim-Plaintiffs
    v.

RYAN BRESLOW, ALEX FINE, and
JON GORDON,

        Counterclaim-Defendants

Action No.: 23-cv-20727-ALTMAN/Reid

Honorable Roy K. Altman

**REDACTED VERSION**

## <u>DECLARATION OF CHRISTPHER T. BERG</u>

I, Christopher T. Berg, make the following declaration based on my personal knowledge:

1.      My name is Christopher T. Berg. I am over the age of 18, competent to testify, and have personal knowledge of the matters stated herein.

2.      I am a partner at the law firm of Ellis George Cipollone O'Brien LLP, located at 2121 Avenue of the Stars, 30th Floor, Los Angeles, California 90067, and counsel of record for Plaintiffs Ryan Breslow, Alex Fine, and Jon Gordon (collectively, "Plaintiffs").

3.      I am a resident of Los Angeles, California.

4.      Attached hereto as **Exhibit A** is a true and correct copy of excerpts from the transcript of the morning session of the April 27, 2023 preliminary injunction hearing before Magistrate Judge Reid.

5.      Attached hereto as **Exhibit B** is a true and correct copy of excerpts from the sealed transcript of the morning session of the April 27, 2023 preliminary injunction hearing before Magistrate Judge Reid.

6.      Attached hereto as **Exhibit C** is a true and correct copy of excerpts from the transcript of the afternoon session of the April 27, 2023 preliminary injunction hearing before Magistrate Judge Reid.

7.      Attached hereto as **Exhibit D** is a true and correct copy of excerpts from the sealed transcript of the afternoon session of the April 27, 2023 preliminary injunction hearing before Magistrate Judge Reid.

8.      Attached hereto as **Exhibit E** is a true and correct copy of excerpts from the transcript of the May 25, 2023 preliminary injunction hearing before Magistrate Judge Reid.

9.      Attached hereto as **Exhibit F** is a true and correct copy of excerpts from the transcript of the May 30, 2023 preliminary injunction hearing before Magistrate Judge Reid.

10.     Attached hereto as **Exhibit G** is a true and correct copy of the demonstrative provided to Magistrate Judge Reid and the parties during the testimony of Plaintiffs' expert in cryptocurrency tracing analysis, Nicholas Bax, during the May 25, 2023 preliminary injunction hearing.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 4th day of August 2023.

Christopher T. Berg

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a true and correct copy of the foregoing document was served by the

Court's CM/ECF system on August 4, 2023 on all counsel of record.

<u>/s/ Jamie L. Katz</u>
Jamie L. Katz

# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
(MIAMI DIVISION)

CASE NO. 1:23-CV-20727-RKA

RYAN BRESLOW, ALEX FINE,              Miami, Florida
AND JON GORDON,

          PLAINTIFFS/                 April 27, 2023
          COUNTER DEFENDANTS,         Thursday

     VS.

MARK PHILLIPS, BENJAMIN REED,         Scheduled for 9:00 a.m.
                                      9:06 a.m. to 4:41 p.m.
          DEFENDANTS/
          COUNTER CLAIMANTS.

                                      Pages 1 - 127
-------------------------------------------------------------

PRELIMINARY INJUNCTION HEARING

(A.M. SESSION)


BEFORE THE HONORABLE LISETTE M. REID
UNITED STATES MAGISTRATE JUDGE


APPEARANCES:


FOR THE PLAINTIFFS:          CHRISTOPHER T. BERG, ESQ.
                             BENJAMIN J. KUSSMAN, ESQ.
                             ANDREW IGLESIAS, ESQ.
                             Ellis George Cipollone
                             O'Brien Annaguey, LLP
                             2121 Avenue of the Stars
                             30th Floor
                             Los Angeles, California 90067

                             JAMIE LEIGH KATZ, ESQ.
                             Shubin Bass, P.A.
                             150 West Flagler Street
                             Suite 1420
                             Miami, Florida 33130

```
 1        It would also be tied to the parent MovementDAO through
 2   potential fundings and its substantiation.
 3   Q.   And where would those sub DAOs be hosted?
 4   A.   They would be hosted on the blockchain.
 5   Q.   And is there a platform on which the sub DAOs would be
 6   hosted?
 7   A.   Yes, it would be hosted on the MovementDAO on the
 8   blockchain, correct.
 9   Q.   So a MovementDAO is a DAO for DAOs?
10   A.   Yes, that's right.
11   Q.   Whose idea was the MovementDAO?
12   A.   It was an idea that Jon Gordon and myself developed.
13   Q.   And who would you describe as the founders?
14   A.   Myself, Jon Gordon, and Alex Fine.
15   Q.   Are you the head of the MovementDAO project?
16   A.   Yes.
17   Q.   Now, you mentioned user interface for the MovementDAO.
18        Are there any other core tenets that are unique to the
19   MovementDAO?
20   A.   Yes.  So a MovementDAO would issue MOVE tokens.  It will
21   have interface on XYZ that users can use to create DAOs.
22        It would also invest its endowment, its money, into
23   yield-producing investments.
24        There may also be a proposal system and a voting system to
25   decide what sub movements would receive funding from the
```

1    parent.

2    Q.   So the parent would provide some sort of financial

3    assistance --

4    A.   Correct.

5    Q.   -- to sell DAOs?

6    A.   Yes.

7    Q.   You mentioned the endowment being invested for yields.

8         Can you explain what "yields" means?

9    A.   Yes.  So blockchain has these things called "De-Fi"

10   protocols, decentralized finance protocols, where you loan your

11   crypto and you generate yield, meaning you just get more crypto

12   back.  It's like earning interest on your crypto.

13   Q.   Did you personally contribute anything to the MovementDAO

14   endowment?

15   A.   I did, yes.

16   Q.   How much did you contribute?

17   A.   Roughly, 13 million dollars.

18   Q.   Were you the largest contributor to the project?

19   A.   Yes.

20   Q.   What about Alex Fine and Jon Gordon, did they make

21   contributions?

22   A.   They did.  Alex Fine was the second largest contributor at

23   about three million dollars, and Jon Gordon was the third

24   largest at, approximately, $300,000.

25   Q.   All combined, approximately, how much did the three of you

1    contribute?

2    A.    A little over 16 million dollars.

3    Q.    Did others contribute to the project?

4    A.    They did.

5    Q.    Excluding you, Mr. Fine and Mr. Gordon, approximately, how

6    much did all the other contributors --

7    A.    About 3 or --

8    Q.    -- provide to the endowment?

9    A.    About 3 or $400,000 in aggregate.

10   Q.    Were you supposed to get anything in exchange for that

11   contribution?

12   A.    Yes.

13   Q.    What was that?

14   A.    We were supposed to get MOVE tokens.

15   Q.    Now, MOVE tokens, are those unique to the MovementDAO?

16   A.    They are, yes.

17   Q.    What were MOVE tokens supposed to do?

18   A.    MOVE tokens were how governance would work, so depending on

19   how many MOVE tokens you have, you'd be able to cast votes on

20   proposals, on which sub movements receive funding, any other

21   governance matters on MovementDAO.

22   Q.    When you say "governance matters," can you explain what you

23   mean by that?

24   A.    Yes.  Anything that requires a vote.

25         So, electing officials, voting on which proposals, we would

1   invest in any governance -- other governance matters on the

2   DAO.  Your MOVE tokens on a pro rata basis would weigh your

3   voting power.

4   Q.   And is the dynamic one vote, one MOVE token?

5   A.   Yes.

6   Q.   Can you explain how the MovementDAO would actually perform

7   the voting function?

8   A.   Yeah.  Voting would happen in a decentralized way, where

9   you would go to a web page hosted on move.xyz.  You would

10  connect your wallet, which would verify how many MOVE tokens

11  you'd owned; and then you'd be able to click on the interface

12  which votes you wanted to cast, which proposals you wanted to

13  approve, and what other actions that you were in favor of

14  taking.

15  Q.   Is there a platform that MovementDAO would use or

16  contemplated using to perform these voting actions?

17  A.   MovementDAO is supposed to have a blockchain-based approach

18  to voting, that was also integrated with Snapshot for

19  recordkeeping.  Snapshot is a centralized, basically -- it's a

20  software voting system.

21  Q.   So, as some of the largest contributors to the projects,

22  what was your 16 million dollars supposed to get you once the

23  project launched?

24  A.   Well, it was supposed to get us -- when the project

25  launched, we were supposed to get MOVE tokens.

1    Q.   And based on your contribution -- the size of your

2    contribution, how much voting power would that have given you?

3    A.   We would have a vast majority of voting power, which gave

4    us assurance that they, basically, couldn't get done without

5    us.

6    Q.   Did you ever receive MOVE tokens?

7    A.   No.

8    Q.   What happened instead?

9          MR. SINGH:   Objection.   Vague, calls for a narrative.

10         THE COURT:   Overruled.

11   A.   I never received MOVE tokens and all -- one day we were

12   told that our money no longer belongs to us and we were no

13   longer in control.

14   Q.   When that happened, were you able to participate in the

15   MovementDAO community from that point forward?

16   A.   We had access to the community Discord, but we were not

17   able to vote on any proposals or access our funds or anything

18   of the like.

19   Q.   Can you please explain to the Court what "Discord" is?

20   A.   It's a software application that let's users chat with each

21   other.

22   Q.   Who is responsible for locking out the MovementDAO project?

23   A.   Mark Phillips.

24   Q.   How was Mark Phillips involved with MovementDAO?

25   A.   We originally hired him as a senior engineer on the

1  project.

2  Q.  Over time, did you put him in a position of authority over

3  the project?

4  A.  Yes, we did.

5  Q.  Did you charge him with implementing the MovementDAO?

6  A.  Yes, we did.

7  Q.  Can you tell me what "implementing the MovementDAO" meant?

8  A.  There was very specific requirements for what that meant.

9      We needed MOVE tokens, we needed a user interface, move Dot

10 XYZ that users could use.

11     We needed users to be able to create their own DAOs.  We

12 needed an elections system.  We needed decentralized voting and

13 governance, a whole bunch of things.

14 Q.  The same core tenets we talked about earlier?

15 A.  Correct.  Correct.

16 Q.  Did Mr. Phillips have expertise in structuring and

17 developing a DAO platform?

18 A.  We were -- we believe that he did.

19 Q.  Do you have that expertise?

20 A.  I did not.

21 Q.  Did you rely upon him to help implement the MovementDAO

22 project?

23 A.  Yes, almost entirely.

24 Q.  Did he explain to you that you were in control of that

25 project?

1   A.   All the time.

2   Q.   While he was doing that, was he taking steps to help launch

3   the project?

4   A.   He was telling us, and we believed that he was, yes.

5   Q.   Did that include operationalizing that Snapshot platform we

6   discussed?

7   A.   Yes, that's correct.

8   Q.   And were proposals passed on Snapshot through voting?

9   A.   They were.

10   Q.   Were those votes binding on the MovementDAO project?

11   A.   Not at all.

12   Q.   Why were they not binding?

13   A.   Because we were told that they were not binding and a

14   mechanism to receive feedback and engagement from the

15   community.

16   Q.   Prior to you being locked out of the project, who

17   controlled the project?

18   A.   I did.

19   Q.   Did you pull the team together for the project?

20   A.   I did.

21   Q.   Did you pay the team's salaries?

22   A.   I did.

23   Q.   Would the leaders of the project come to you for final

24   approvals?

25   A.   Yes.

1   Q.   Buck stops with you?

2   A.   Yes.

3   Q.   Did Mr. Phillips tell you you were in control?

4   A.   All the time.

5   Q.   Did you ever intend for your 16 million dollar contribution

6   -- when I say "your," I mean your contribution, Mr. Fine's and

7   Mr. Gordon's -- to be under the management of the MovementDAO

8   project once the project launched?

9   A.   Can you repeat the question?

10  Q.   Did you ever intend for your contribution to be under the

11  management of the MovementDAO project once the project

12  launched?

13  A.   Yes.

14  Q.   What were the prerequisites before that would occur?

15  A.   Once again, many things needed to be built.

16      There needed to be decentralized voting and interface, and

17  we needed to receive MOVE tokens.

18      And there would need to update a sign-off on my behalf to

19  officiate the launch of the project.

20  Q.   In other words, there would have to be an exchange with

21  your money for MOVE tokens?

22  A.   Yes.

23  Q.   Was there a document that memorialized MovementDAO vision

24  in writing?

25  A.   Yes.

1   Q.   What is that called?

2   A.   It's called the "GitBook."

3   Q.   What is the "GitBook"?

4   A.   The "GitBook" is a document that the founders and Mark

5   Phillips worked on it in unison to memorialize or share

6   understanding of the project.

7   Q.   Did the GitBook outline the defining features we discussed

8   earlier?

9   A.   It did, yes.

10   Q.   And would implementing those features be necessary for the

11   MovementDAO to launch?

12   A.   Yes.

13   Q.   Does the GitBook define how the MovementDAO platform would

14   govern itself?

15   A.   Yes.

16   Q.   Did that include defining the authorities MOVE token

17   holders would have over the platform?

18   A.   Yes.

19   Q.   When was the GitBook published online to the public?

20   A.   On February 2nd, 2022.

21   Q.   Were there several versions of the GitBook?

22   A.   Yes.

23   Q.   Did the key provisions vary from version to version?

24   A.   No.  Changes were made -- a handful of changes, but they

25   were mostly cosmetic.

1    MR. BERG:  In your binder, Mr. Breslow, I'd like you to

2  turn to tab 6.

3    Your Honor, I'd like to move this Exhibit -- tab 6 into

4  evidence as Exhibit 6.

5    THE COURT:  Betty, do you have that book?

6    (Courtroom deputy handing document to the Judge.)

7    THE COURT:  Okay.  So this is a document that was

8  agreed to by the parties?

9    MR. BERG:  Yes, Your Honor.

10    THE COURT:  It's admitted.

11    (Plaintiffs' Exhibit 6 received into evidence.)

12  BY MR. BERG:

13  Q.  Mr. Breslow, in your binder, please turn to tab six, and

14  you'll notice there is pagination on the bottom right-hand

15  corner.  Do you see that?

16  A.  Yes.

17  Q.  If you could please turn to page 65.

18    Would you please read beneath the heading, "How Does an

19  Endow.

20    Ment Work Logistically?"  Just the first paragraph there?

21  A.  "MovementDAO has a pool of capital called an endowment.

22  Money in the endowment cannot be spent.  The endowment's yield

23  funds the platform."

24  Q.  What is meant by money in the endowment could not be spent?

25  A.  It means that after this was launched, the contributors'

1  money cannot be spent; only yield generated on top of that

2  money.

3  Q.   Can you please go to page 60 of Exhibit 6.

4       Let me know when you're there.

5  A.   Yep.

6  Q.   Please go to the heading "Endowment Basics" and read the

7  first sentence beneath that.

8  A.   "The purpose of the endowment is to earn via various De-Fi

9  protocols in order to produce a yield for the DAO, which will

10  be used for further blockchain development of tooling for its

11  communities."

12  Q.   Those are the De-Fi protocols we discussed earlier;

13  correct?

14  A.   Correct.

15  Q.   And those De-Fi protocols are what would generate the yield

16  for the endowment?

17  A.   Correct.

18  Q.   Does the MovementDAO community have any say about how the

19  endowment itself can be spent?

20  A.   No.

21  Q.   Can you please turn to page 55 in Exhibit 6.

22       Does the GitBook state that limitation upon the MovementDAO

23  community?

24  A.   Yes.

25  Q.   On page 55 of Exhibit 6, please read that last sentence on

1    the page.

2    A.    "Proceeds of endowment earnings are deployed by the

3    community."

4    Q.    "Proceeds of endowment earnings," is that a reference to

5    the yield you described?

6    A.    Correct, yes.

7    Q.    So once MovementDAO is launched, MOVE token holders only

8    have authority over the revenue generated by the endowment; is

9    that correct?

10   A.    Correct.

11   Q.    What would happen if a Snapshot proposal purported to

12   authorize the transfer of endowment funds, instead of revenue

13   generated from buying endowment funds?

14   A.    It would go against the terms.  It's not allowed.

15   Q.    Based on your understanding, was the endowment ever

16   invested to generate revenue?

17   A.    No.

18   Q.    Does the GitBook describe when the MovementDAO community

19   begins to exercise control over the revenue generated by the

20   endowment?

21   A.    Yes, it does.

22   Q.    Please turn to page 54, and please read the second

23   paragraph under the heading "Token Distribution."

24   A.    After the initial MOVE distribution via contributions to

25   the endowment and via a community (inaudible) distributor

1  airdrop, the community will manage the remaining treasury

2  through Snapshot.

3  Q.   Does the GitBook describe when the community's votes on

4  Snapshot become binding --

5  A.   Yes, it does.

6  Q.   -- on the MovementDAO?

7       Please turn to page 120 of Exhibit 6.  Top of the page

8  there, please read the second paragraph on the top of the page.

9  A.   "TLDR" -- too long, didn't read -- "at launch we are

10  employing a Gnosis multi-signature safe to manage the DAO

11  funds, Community Discord to coordinate discussions, and

12  Snapshot, after the token distribution, for voting until the

13  OpenLaw Tribute audit is complete."

14  Q.   Snapshot is the voting platform we discussed earlier;

15  correct?

16  A.   Correct.

17  Q.   The reference to tokens in that sentence, is that referring

18  to MOVE tokens?

19  A.   Correct.

20  Q.   According to the GitBook, when do Snapshot votes become

21  binding?

22  A.   After the tokens are distributed.

23  Q.   In the front pocket of your binder, Mr. Breslow, there is a

24  document which is the joint stipulation of facts provided to

25  this Court by the parties.

1    Can you turn to fact stipulation number 12 and read it into

2  the record.

3  A.   "As of the date of this joint stipulation, no MOVE tokens

4  have been created or dispersed to anyone who contributed to the

5  DAO endowment."

6  Q.   Thank you.  Does the GitBook expressly articulate the role

7  MOVE tokens have on the MovementDAO platform?

8  A.   Yes.

9  Q.   Please turn to page 48 of Exhibit 6.  Please read the first

10  sentence under the heading "MOVE Token System."

11  A.   "The MOVE token governs the platform.  These token holders

12  are responsible for growing the endowment and deploying capital

13  into movements."

14  Q.   You said the GitBook was published on February 2, 2022; is

15  that correct?

16  A.   Correct.

17  Q.   Does the GitBook contain any reference to the status of the

18  MovementDAO platform at the time of its publication?

19  A.   Yes.

20  Q.   On that same page, Mr. Breslow, under the heading, "How It

21  Works," can you please go to the third paragraph and read the

22  second sentence.

23  A.   "The platform is currently under development and conducting

24  a token presale to fund its endowment."

25  Q.   Did the GitBook contemplate a mechanism that would allow

1    the MovementDAO community to participate in governance before

2    the issuance of MOVE tokens?

3    A.   Yes.

4    Q.   And how did it do that?

5    A.   It describes that Snapshot would be used as a preliminary

6    data mechanism to get the community participating in a data

7    fashion.

8    Q.   Can you tell me what a "MAPE" is?

9    A.   A "MAPE" is a digital art piece of an ape that is split up

10   into many pieces and handed out to individuals, it's otherwise

11   known as an NFT.

12   Q.   And "NFT" stands for?

13   A.   Non-fungible token.

14   Q.   And how were MAPES used as part of -- were MAPES used as

15   part of the initial governance process?

16   A.   They're used as part of the data Snapshot feedback

17   mechanism.

18   Q.   And what relationship do MAPES have with the initial

19   governance of the platform?

20   A.   Well, they were a facility for participants in the

21   community to have their voices heard and feedback collected, so

22   that when we got in the motion of possible feedback in forming

23   the community prior to launch.

24   Q.   And how would they provide that feedback?

25   A.   They would use their MAPES to cast votes on Snapshot.

1   Q.   Were the votes on Snapshot -- before MOVE tokens were

2   issued, but using MAPES, binding in any way?

3   A.   Absolutely not.

4   Q.   Did Mr. Phillips tell you prior to February 2023 that the

5   votes on Snapshot were binding?

6   A.   No, he told us the contrary, which is that they were not

7   binding.

8   Q.   How did the GitBook describe how the DAO endowment would be

9   stored?

10  A.   It described that the endowment would be stored in a

11  multi-signature secure safe.

12  Q.   What is a multi-signature safe?

13  A.   It is a digital safe that required a majority of signers to

14  sign off on money moving out of it.

15  Q.   And with what means would a signer sign off on a

16  transaction with a safe?

17  A.   They would -- they would sign off on, basically,

18  spending -- yeah, I'm not sure I understand the question.

19  Q.   Let me rephrase my question for you, Mr. Breslow.

20  A.   Yeah.

21  Q.   Would using that safe involve a crytocurrency address?

22  A.   That's correct, yes.

23  Q.   How would a signer interact with a safe using a

24  crytocurrency address?

25  A.   They would use their address and their private key to cast

1    a signature to approve a transaction.

2    Q.   I would like you to go to page 52 of Exhibit 6, and under

3    the heading Gnosis safes, do you see that alphanumeric series

4    that ends in 03c6?

5    A.   Yes.

6    Q.   What is that?

7    A.   That's its public address.

8    Q.   The public address for what?

9    A.   For the endowment.  The MovementDAO endowment address.

10   Q.   I'll call that -- the DAO endowment -- app for short; is

11   that okay?

12   A.   Yes.

13   Q.   There's a table below that address that lists seven

14   alphanumeric strings.  Do you see that?

15   A.   Yes.

16   Q.   What are those?

17   A.   These are the signatories to the MovementDAO endowment.

18   Q.   And what is contained in the column to the left of those

19   addresses?

20   A.   It's an alias.

21   Q.   Those are aliases of the signatories?

22   A.   Yes.

23   Q.   There are three blanks in that column.

24        Who do those addresses belong to?

25   A.   The founders, myself, Jon Gordon, and Alex Fine.

```
 1   Q.   One of the aliases is tankbottoms.eth.  Do you see that?
 2   A.   Yes.
 3   Q.   Who does that alias belong to?
 4   A.   Mark Phillips.
 5   Q.   Who created the DAO endowment account?
 6   A.   Mark Phillips did, under my instruction.
 7   Q.   Was he working for you when you instructed him to create
 8   it?
 9   A.   Yes.
10   Q.   Approximately, when did Mr. Phillips create the DAO
11   endowment account?
12   A.   I believe it was February of '22.
13   Q.   What about the alias at the top of the table,
14   dao-lawfirm.eth; do you see that?
15   A.   Yes.
16   Q.   Whose alias is that?
17   A.   That's Reed Yurchak's law firm.
18   Q.   What made you think that was Reed Yurchak's law firm?
19   A.   Mark Phillips told us that was Reed Yurchak's law firm.
20   Q.   Any other reason?
21   A.   Yes.  It's described in the GitBook.
22   Q.   Let's go to page 63 of Exhibit 6.
23        Would you please read the fourth line from the top of the
24   page, starting from "the law office?"
25   A.   "The law office of Reed Yurchak (the company) will act as a
```

1   service-provider for the MovementDAO."

2   Q.   Now, please go back to page 52.

3        Read the last sentence on that page.

4   A.   "The dao-lawfirm.eth is acting as the initial

5   service-provider for the DAO."

6   Q.   What does this representation tell you?

7   A.   That this was represented by Reed Yurchak's law firm.

8   Q.   What was represented?

9   A.   Dao-lawfirm.eth.

10  Q.   Why was the law firm involved in MovementDAO project?

11  A.   Because we were storing over 16 million dollars in crypto

12  and we needed to insure maximum security, and Mark Phillips

13  suggested that having a law firm as a signatory would increase

14  the protection and security of the multi-signature.

15  Q.   Was the involvement of a law firm important to you?

16  A.   It -- after Mark Phillips recommended it, I thought it was

17  a good idea, and it became important to me, yes.

18  Q.   And you believe that law firm was the Law Office of Reed

19  Yurchak?

20  A.   Yes.

21  Q.   Who was the primary point of contact of Mr. Yurchak's firm

22  in connection with the MovementDAO project?

23  A.   It was Mark Phillips, who I believe works or worked there.

24  Q.   Did Mr. Phillips convey to you advice that Mr. Yurchak

25  allegedly provided about the project?

1   A.   All the time, yes.

2   Q.   Did you rely on that advice that Mr. Phillips claim came

3   from the law firm?

4   A.   We relied deeply on that advice.

5   Q.   Did Mr. Phillips ever say that Mr. Yurchak advised to

6   create certain entities to support the MovementDAO project?

7   A.   Yes.

8   Q.   What entities were those?

9   A.   He advised that we create unincorporated non-profit entity

10  and later an LLC and a trust.

11  Q.   And about when did Mr. Phillips tell you about that?

12  A.   The unincorporated non-profit was advised around June of

13  2022.

14  Q.   And did Mr. Phillips tell you who had control of these

15  proposed entities?

16  A.   He made it very clear that I would.

17  Q.   Were the entities actually structured so that you would

18  hold ultimate control over them?

19  A.   I believe that they were, and only discovered docs recently

20  to find the opposite was true.

21  Q.   Would Mr. Phillips refer to Mr. Yurchak's law firm by an

22  alias?

23  A.   Yes.  He would refer to it as the law firm -- DAO Law Firm,

24  the storage service-provider.

25  Q.   Early on in the project, did you form a company called

```
 1   Merkaba, Inc. --
 2   A.   Yes.
 3   Q.   -- to assist with the MovementDAO?
 4   A.   Yes, I did.
 5   Q.   What did Merkaba do?
 6   A.   We needed an entity to make hires around the project, so it
 7   hired Mark Phillips and it hired Alex Fine.
 8   Q.   Did Merkaba retain legal counsel to help with the project?
 9   A.   It did.
10   Q.   Who was that?
11   A.   Reed Yurchak's law firm.
12   Q.   Did you personally also retain Mr. Yurchak as counsel?
13   A.   I did.
14   Q.   Did Mr. Gordon?
15   A.   Yes.
16   Q.   Did Mr. Fine?
17   A.   Yes.
18   Q.   Who introduced you to Mr. Yurchak?
19   A.   Mark Phillips.
20   Q.   When did you first meet Mr. Phillips?
21   A.   In August of '21.
22   Q.   And what were you -- in what context did you come to know
23   him?
24   A.   We were using a recruiter that I had used for many of my
25   other companies to hire senior engineers, and very
```

1   successfully; that recruiter introduced us to Mark Phillips.

2   Q.   What position were you interviewing him for?

3   A.   For a senior blockchain engineer.

4   Q.   And you had a team sit down with him to conduct that

5   interview?

6   A.   We did.

7   Q.   What was their impression of him?

8   A.   They were extremely impressed.  He was one of the -- he was

9   leaps and bounds better performing in interviews than anyone we

10  had met.

11  Q.   Did he have any experience or expertise that stood out?

12  A.   Yes.

13  Q.   What was that?

14  A.   In addition to his coding proficiency, he had worked for

15  the SEC.

16  Q.   What about his experience with the SEC was impressive?

17  A.   He had told us that he had written all of the code that the

18  SEC used to discover fines and investigate fraudulent crypto

19  projects.

20  Q.   Why was that important to you?

21  A.   Because we wanted to build this mass client as well as

22  possible, and that experience is one of a kind, and we thought

23  that we had hit the jackpot, in terms of a hire.

24  Q.   So he had the -- he had the SEC experience, and you also

25  mentioned he had coding experience?

1    A.    Correct.

2    Q.    What was so impressive about his coding experience?

3    A.    It was a truly -- it was exceptional.

4          One of our team members at the time, Joey Cruz, who's a

5    very well-known coder, was completely awestruck by Mark

6    Phillips' coding answers to the quiz that he designed.

7    Q.    So you hired him?

8    A.    Yes.

9    Q.    When did Mr. Phillips start working on the MovementDAO

10   project?

11   A.    Around August.  August 2021.

12   Q.    I'm sorry, when was it?

13   A.    I believe that month, August of '21.

14   Q.    When -- excuse me.  Who was he working for at that time?

15   A.    Merkaba, Inc.

16   Q.    After he was -- accept the job you started onboarding him

17   to the project?

18   A.    Correct.

19   Q.    Did you explain the MovementDAO vision to him?

20   A.    Totally.

21   Q.    What did you explain?

22   A.    We explained the vision I have been describing this whole

23   time.

24   Q.    Those same concepts that are in the GitBook?

25   A.    Yes.

1    Q.   He agreed to implement that vision?

2    A.   He did.

3    Q.   How do you know that?

4    A.   He signed an agreement to implement that vision.

5    Q.   How would you describe your relationship with Mr. Phillips

6    at that time, both professionally and socially?

7    A.   He quickly earned my trust.  I thought I found someone who

8    was deeply capable of many different necessary functions for

9    this project and would be able to make this real.

10          MR. BERG:  Your Honor, at this time, I'm going to begin

11   asking questions regarding a sealed document.

12          I request to seal the courtroom.

13          THE COURT:  Okay.  Who in the courtroom is here that's

14   a party, who is not -- you can help me with sealing the

15   courtroom, that would be fine.

16          MR. BERG:  Everyone here to this gentleman on our side

17   is a party.

18          THE COURT:  Okay.  And on the --

19          MR. SINGH:  We have some witnesses in the courtroom, we

20   will ask them to step out.

21          THE COURT:  Okay.  Thank you.

22          (Non-party individuals exited courtroom at 9:46 a.m.)

23          (Sealed portion of the proceedings held as follows:)

24                      *  *  *  *  *

25                   S E A L E D

```
 1                        *  *  *  *  *

 2                     S  E  A  L  E  D

 3                        *  *  *  *  *

 4          THIS PAGE INTENTIONALLY LEFT BLANK

 5                        *  *  *  *  *

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    * * * * *

 2                 S E A L E D

 3                    * * * * *

 4        THIS PAGE INTENTIONALLY LEFT BLANK

 5                    * * * * *

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    * * * * *

2                  S E A L E D

3                    * * * * *

4        THIS PORTION OF PAGE INTENTIONALLY LEFT BLANK

5                    * * * * *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20                   * * * * *

21         (Sealed portion of the proceedings were concluded, and

22    the following was held in open court:)

23         (Non-party individuals entered courtroom at 9:51 a.m.)

24    BY MR. BERG:

25    Q.   After the agreement ended, what was the arrangement with
```

```
 1   Mr. Phillips after that?

 2   A.   I would pay him continued salary for him to continue to

 3   march towards full release of the project.

 4   Q.   And how did you compensate him?

 5   A.   I paid him out of my own pocket.

 6   Q.   From January '22, going forward, were you still his boss?

 7   A.   Yes.

 8   Q.   Did he tell you that you were his boss?

 9   A.   Repeatedly.

10        MR. BERG:  I would like you to turn to tab 135 in your

11   binder.

12        Your Honor, I'd like to admit tab 135 into evidence as

13   Exhibit 135.

14        THE COURT:  Admitted.

15        (Plaintiffs' Exhibit 135 received into evidence.)

16   BY MR. BERG:

17   Q.   Mr. Breslow, can you tell me what this document is?

18   A.   It's a Signal messaging exchange to myself and Mark

19   Phillips.

20   Q.   Can you tell me what the date is?

21   A.   July 30th, '22.

22   Q.   This is seven months after the independent contractor

23   agreement ended?

24   A.   Yes.

25   Q.   Can you -- who is writing in the gray text bubbles in this
```

 1   document?

 2   A.   That's Mark Phillips.

 3   Q.   Can you read the first gray text bubble for the Court?

 4   A.   "Thank you for being an awesome boss, very perfect, just

 5   want to work and have value and protect your interests, so to

 6   do what I love everyday and be thoughtful and intentional, very

 7   happy."

 8   Q.   At the time Mr. Phillips created the DAO endowment account,

 9   was he working for you, personally?

10   A.   Yes.

11   Q.   Were you paying his salary?

12   A.   Yes.

13   Q.   Did he acknowledge you as his boss?

14   A.   All the time, yes.

15   Q.   Did he say he was working to protect your interests?

16   A.   All the time.

17   Q.   Were those representations consistent with what you just

18   read in Exhibit 135?

19   A.   Yes.

20   Q.   Are you the owner of the DAO endowment account?

21   A.   Yes.

22   Q.   Do you own all of the assets in the DAO endowment account?

23   A.   No.

24   Q.   What about the assets that you contributed?

25   A.   I owned what I contributed in the account, yes.

1   Q.   What about the other assets in the endowment account?

2   A.   They belong to the contributors.

3   Q.   Did you ever authorize a transfer of ownership of the DAO

4   endowment account to anyone or any entity?

5   A.   Nope.

6   Q.   Did you ever intend to purchase MOVE tokens with your

7   contributions once the MovementDAO platform launched?

8   A.   Upon launch, yes, sir, that was the intention.

9   Q.   Over the course of your work on the MovementDAO project,

10  did you get to know Mr. Phillips well?

11  A.   Extremely.  Or I thought I did.

12  Q.   Prior to the events that led to this lawsuit, how would you

13  describe your relationship with Mr. Phillips?

14  A.   It was an extremely intimate and trusting relationship.

15  Mark had the keys -- the key code to my house.  He had an

16  office in my house.  I put him up in another house of mine.

17      We had lots of meals together and time together.  He knew

18  my significant other, I got to know his significant other very

19  well, and he was like family to me.

20  Q.   Mr. Breslow, why would you describe someone you only knew

21  for a year, or so, as family?

22  A.   Because he was deep -- he was deeply capable, everything he

23  said to me was extremely reassuring.  Everything he said to me

24  was extremely reverent and respectful of his relationship with

25  me, and he gave me no reason at the time to not trust him.

1      He gave me every reason to trust him.

2  Q.  Did his knowledge and expertise in the technical aspects of

3  the project exceed yours?

4  A.  Yes.

5  Q.  Is that why you paid him a million dollars?

6  A.  Yes.

7  Q.  How important was Mr. Phillips to the project at this

8  point?

9  A.  Mark Phillips was the key man for the project.

10     Us, as founders, would describe how lucky we were to have

11 him and how our job was, basically, just to support Mark in the

12 community, but he was the key man to get the code and

13 operationally get this out the door.

14 Q.  Was there a leadership shift in the project in February of

15 2022?

16 A.  Yes.

17 Q.  How did that come about?

18 A.  Alex Fine and Mark Phillips never got along.

19     Mark wanted to throw out his code and had repeatedly

20 represented to us that he was incompetent, both from a coding

21 perspective and a legal and compliance perspective, and they

22 were unable to work harmoniously together; and Alex hadn't

23 planned to be with the project forever anyway, so Alex decided

24 to depart the project around February/March.

25 Q.  After Alex departed, who did you put in charge?

1    A.   Mark.  I told Mark, there's no more roadblocks, you would

2    be able to assume Alex's operational responsibilities and have

3    the operational autonomy that he wanted.

4    Q.   What did you charge him to do?

5    A.   To operationalize and launch the MovementDAO.

6    Q.   And what was he charged with?

7         What document was he supposed to implement that embodied

8    the MovementDAO?

9    A.   He was supposed to implement the GitBook.

10   Q.   Did he understand that was his charge?

11   A.   Yes.

12   Q.   Beyond implementing the principles in the GitBook, did you

13   entrust Mr. Phillips with anything else?

14   A.   Yes, we did.

15   Q.   What was that?

16   A.   Securely storing our keys and securely creating the

17   multi-signature safe, and then also being a custodian and

18   storer of our keys.

19   Q.   The multi-signature safe, that's a reference to the DAO

20   endowment account?

21   A.   Yes.

22   Q.   Was it Mr. Phillips' idea to create a Gnosis safe for the

23   DAO endowment account?

24   A.   Yes.

25   Q.   Did he ask you to give him your keys of the DAO endowment?

1  A.   Yes.  He said that him and the law firm would securely hold

2  them on our behalf.

3  Q.   And you provided those keys to him?

4  A.   Yes.

5  Q.   Did Alex Fine?

6  A.   Yes.

7  Q.   Why did you provide Mr. Phillips with your keys?

8  A.   Because we were storing large sums of money.

9       At this point, I fully trusted him and the law firm; and it

10 was both convenient and -- in my belief at the time -- more

11 secure to have him and the law firm securely hold onto our

12 keys.

13 Q.   Did you ever tell Mr. Phillips that you would never need

14 access to your keys?

15 A.   No.

16 Q.   Did the MovementDAO project make progress after Mr. Fine

17 left and Mr. Phillips became the lead?

18 A.   It may have perceived progress.  Mark would report all of

19 these progress updates to us, but Jon and I didn't have the

20 technical prowess to vet how legitimate that project was.

21 Q.   So, at this time, in February of 2022, how long did he say

22 it would take until the platform was launched?

23 A.   Consistently, it was a few more months, a few more months.

24 Q.   When you say "consistently," what do you mean there?

25 A.   A few months would go by, and then we would talk to him and

1   he needed another few months.  We were always very close, and

2   the excuse up to that time is Alex was getting in the way.

3       Now that excuse was gone, and so now we thought we would

4   just give him some more time.

5   Q.  During this time, in early 2022, did you start another DAO?

6   A.  Yes.

7   Q.  What was it called?

8   A.  PeaceDAO.

9   Q.  On what platform was it launched?

10  A.  JuiceBox.money.

11  Q.  Is JuiceBox.money related to MovementDAO?

12  A.  No.

13  Q.  Why did you not launch it on Movement?

14  A.  Because nothing was ready for us to launch on MovementDAO.

15  Q.  Did the JuiceBox platform have a user interface to create

16  your DAO?

17  A.  It did.  It had a full user interface to create the DAO.

18  Q.  Had MovementDAO's platform achieved that functionality?

19  A.  No.

20  Q.  Did the JuiceBox platform --

21      THE COURT REPORTER:  Excuse me, could you slow down

22  just a tad?

23      MR. BERG:  Certainly, of course.

24      THE COURT REPORTER:  Thank you.

25  BY MR. BERG:

1   Q.   Did the JuiceBox platform operationalize fundraising for

2   PeaceDAO?

3   A.   Yes.

4   Q.   Had MovementDAO's platform achieved that functionality?

5   A.   No.

6   Q.   Could PeaceDAO issue tokens?

7   A.   Yes.

8   Q.   Had MovementDAO's platform achieved that functionality?

9   A.   No.

10   Q.   Did PeaceDAO, in fact, use JuiceBox to issue tokens?

11   A.   Yes.

12   Q.   What were those called?

13   A.   Peace tokens.

14   Q.   Peace tokens.  Did the MovementDAO platform ever host any

15   social impact groups or any other DAO on its platform?

16   A.   Not really.  There was a beta one on Alex's front end that

17   never really got anywhere and -- but meaningfully, no.

18   Q.   And you said Mr. Fine's front end interface was scrapped;

19   is that right?

20   A.   Correct.

21   Q.   So if MovementDAO's endowment was frozen, dead, would that

22   impact PeaceDAO's operations in any way?

23   A.   No.

24   Q.   Would that impact any other DAO in any way?

25   A.   Nope.

1   Q.   By August 2022, what was your mind-set in relation to

2   MovementDAO's progress?

3   A.   By when?

4   Q.   August of 2022.

5   A.   I was extremely frustrated, I was embarrassed that I had to

6   launch PeaceDAO on another platform, and I was starting to get

7   worried that we were dealing with a team that was unable to

8   launch a product.

9   Q.   Did you reach any decision about how to give the project a

10  boost?

11  A.   Us, as founders, consulted, and we also consulted with

12  Mark, and we were debating whether we should shutdown the

13  project, and we decided we had enough faith in Mark to give it

14  one final shot.

15  Q.   So what was -- what was the course of action you decided to

16  take?

17  A.   Mark requested 1.7 million dollars through January -- from

18  August through January to get this finally launched.

19  Q.   What was that 1.7 million dollars for?

20  A.   Well, Jon and Alex didn't want to do it, and I said that we

21  would this time demand detailed accounting, reporting from Mark

22  and track his progress far more rigorously than we had ever

23  tracked it.

24  Q.   Was the transfer -- excuse me, was the 1.7 million dollars

25  Mr. Phillips' idea?

1    A.    Yes.

2    Q.    And you, ultimately, agreed to make that transfer?

3    A.    We did, under the conditions that we would get detailed

4    reporting about how every single penny was spent, and we would

5    track the progress very closely.

6    Q.    From where did that money come from?

7    A.    It came from the DAO endowment.

8    Q.    Mr. Breslow, I thought you said the DAO endowment is not

9    supposed to be spent?

10   A.    It's not supposed to be spent.  It is hard law after

11   launch, but since this was still pre-launch, we decided that we

12   could make this one -- this exception to spend some money to

13   get it out the door.

14   Q.    Who made that transfer out of the DAO endowment?

15   A.    Mark Phillips.

16   Q.    How was he able to do that?

17   A.    He used keys on our behalf.

18   Q.    By the end of August 2022, did you notice any activity on

19   Snapshot?

20   A.    Yes.  There was a flurry of Snapshot proposals.

21   Q.    Did you know what the proposals were about?

22   A.    Vaguely.  Mark had represented to me that they were consist

23   can't with our project, that they were merely to inform the

24   community of how the 1.7 million is going to be approved and

25   then spent.

1  Q.   Prior to August 2022, had there been a lot of Snapshot
2  proposal activity?
3  A.   Some, but not nearly as much.
4  Q.   Were the proposals limited to just the 1.7 million
5  transfer?
6  A.   I believe they were at the time, that's what I was told,
7  but in reality, they were not.
8  Q.   Did Mr. Phillips suggest to you that you should read the
9  proposals and vote on them?
10 A.   No.  He suggested the contrary, that I didn't need to read
11 the proposals, that he was working with the law firm that had
12 represented our discussions and reiterated to us that very few
13 people read these anyway.
14 Q.   Are you aware that defendants' intend that by August 2022
15 the MovementDAO launched and these proposals were binding at
16 that time?
17 A.   I am now aware that this is what they were contending.
18 Q.   You contributed the majority of the funds of DAO endowment;
19 correct?
20 A.   Yes.
21 Q.   Does that entitle you to a majority of votes about how
22 MovementDAO's governance should be crafted once Snapshot became
23 binding?
24 A.   Yes, there should be no actions possible without my vote.
25 Q.   Did you cast a single vote on any of those proposals?

1    A.    No.

2    Q.    Had you ever cast a vote on any proposal on Snapshot?

3    A.    I've never casted a vote.  I never read a Snapshot

4    proposal.

5    Q.    Did Mr. Phillips say anything about Mr. Yurchak's firm

6    regarding the proposals?

7    A.    He said that Mr. Yurchak was signed off and reviewed on all

8    of the proposals so that messaging was nice and consistent to

9    the community, and we were in good standing with the community.

10   Q.    Did the posting of these proposals create any concern among

11   the other founders?

12   A.    It did, yes.

13   Q.    Who was most concerned about these proposals?

14   A.    Alex Fine was the most concerned.

15   Q.    Why was that?

16   A.    He thought even though we were pre-launched, we still

17   should not be spending any money out of the endowment.

18   Q.    Did anyone else express concerns?

19   A.    Yes, Jon Gordon did.

20   Q.    What happened as a result of Alex and Jon expressing

21   concerns?

22   A.    We had some very hard conversations, and we had so much

23   cost to the project and we still believed that Mark at the

24   time -- we decided to give Mark a final chance as long as we

25   were closely monitoring spending and progress.  This was his

1   final shot to prove that this could be launched.

2   Q.   And did Mr. Phillips provide you with information that

3   allowed you to monitor spending on the project?

4   A.   Yes.  We had a three-hour sit-down meeting with a

5   comprehensive Excel sheet outlining all of the expenses that

6   were planned for this final push to launch.

7   Q.   And that occurred August/September?

8   A.   Correct.

9        MR. BERG:  I'd like you to turn to tab 90.

10       Your Honor, I'd like to move into evidence tab 90 as

11   Exhibit 90.

12       THE COURT:  I'm just double-checking to see if that was

13   one where there was no objection, and it appears that it is.

14       Yes, 90's fine, admitted.

15       (Plaintiffs' Exhibit 90 received into evidence.)

16   BY MR. BERG:

17   Q.   Mr. Breslow, I would like you to take a look through

18   Exhibit 90.  Are these the materials that Mr. Phillips gave you

19   that August/September time period?

20   A.   Yes.

21   Q.   Did you review these materials with Jon Gordon at the time?

22   A.   Yes.

23   Q.   Did they assure you that that 1.7 million you authorized

24   was being spent appropriately?

25   A.   Yes.

1   Q.   Over the next few months, did the project issue MOVE
2   tokens?
3   A.   No.
4   Q.   Was its user interface created?
5   A.   No.
6   Q.   Had the endowment assets been invested to produce yield?
7   A.   No.
8   Q.   Was this the progress on the project that you had hoped
9   would materialize?
10  A.   Not at all.
11  Q.   As the months went on, did your faith in Mr. Phillips begin
12  to wane?
13  A.   Terribly.
14  Q.   What did you decide to do about that?
15  A.   I decided that this was a black hole for our money and we
16  should shutdown the project.
17  Q.   And how did you go about executing on that decision?
18  A.   We decided that we needed a peaceful way out.  Mark still
19  held onto all of our crypto, and we didn't want to make an
20  enemy out of him, so I decided to take the hit and make sure
21  everyone could get reimbursed one-to-one, all the other
22  contributors, as we shutdown the office.
23  Q.   Explain to me what you mean by reimbursed one-to-one.
24  A.   If someone put in $100,000 as a contributor, they would get
25  100,000 back.

1      Any money that had been spent would come out of my pocket.

2  Q.  Your share?

3  A.  My share.

4  Q.  How did you convey that offer to the community?

5  A.  We told Mark to convey it on our behalf.  And it wasn't an

6  offer.  We told Mark that it was a decision that he needed to

7  convey that decision to the community.

8  Q.  Did he do that?

9  A.  He did not.

10  Q.  Around what time did you direct Mr. Phillips to present the

11  redemption decision to the community?

12  A.  December '22.

13  Q.  By December 2022, what was your position on spending on the

14  MovementDAO project?

15  A.  It should be completely halted, except for bare minimum

16  fees, legally, to facilitate in the wind down.

17      MR. BERG:  I would like you to turn to tab 92 in your

18  binder.

19      Your Honor, I'd like to move tab 92 into evidence as

20  Exhibit 92.

21      THE COURT:  Admitted.

22      (Plaintiffs' Exhibit 92 received into evidence.)

23  BY MR. BERG:

24  Q.  Mr. Breslow, can you tell me what this document is?

25  A.  It's an e-mail exchange between myself and Mark Phillips.

1   Q.   Anyone else on this e-mail chain?

2   A.   Jon and Alex.

3   Q.   And when were these e-mails sent?

4   A.   They were sent starting on December 30th, 2022.

5   Q.   Can you explain what's happening in this e-mail chain?

6   A.   We were informing Mark of finally overwriting, even though

7   we had done it over calls, but were afraid to go against Mark

8   in writing.  We finally put it in writing that we vote to stop

9   all spend out of the MOVE treasury.

10  Q.   Did he follow your wishes?

11  A.   No.

12  Q.   What did he do instead?

13  A.   He did the opposite.  He took steps to prevent the shutdown

14  of the project and continued to spend more money.

15  Q.   Did he propose additional proposals on Snapshot?

16  A.   He did.  He requested more money.  He manufactured

17  back-dated fees that were owed; and when we explicitly rejected

18  that, he pushed it to Snapshot and pushed it through approvals.

19  Q.   Did you explain to Mr. Phillips that you thought these were

20  back-dated fees?

21  A.   Yes.  When he presented a manufactured back-dated fee,

22  which seemed out of thin air, that's when I realized that I was

23  not dealing with someone who couldn't code.

24       I realized I was dealing with a fraudster.

25  Q.   By January 2023, was Mr. Phillips openly defying your

1   instructions?

2   A.   Yes.

3          MR. BERG:   I would like you to turn to tab 120.

4          Your, Honor I would like to move tab 120 into evidence

5   as Exhibit 120.

6          THE COURT:   Admitted.

7          (Plaintiffs' Exhibit 120 received into evidence.)

8   BY MR. BERG:

9   Q.   Mr. Breslow, this is an e-mail chain between you and

10  Mr. Phillips dated January 6 and January 29, 2023; is that

11  right?

12  A.   Yes.

13  Q.   In that e-mail, can you explain -- in the January 6th

14  e-mail, can you explain what you are conveying to Mr. Phillips?

15  A.   There were eight actions that Mr. Phillips had taken to

16  explicitly going against instructions and also explicitly

17  defrauding Jon Gordon, Alex Fine, and myself.

18  Q.   You sent that on January 6th; correct?

19  A.   Correct.

20  Q.   Did you send a follow-up on January 29th?

21  A.   I did, yes.

22  Q.   Did you not hear from Mr. Phillips for over a month?

23  A.   Radio silence after multiple requests to meet and hop on

24  calls.  We were extremely terrified because he had all of our

25  crypto.  And so during that month we were still hoping that we

1   could peacefully wind this down, and that became clearer to us

2   during that month that this was a grave risk.

3   Q.   At the beginning of February, 2023, what happened to the

4   DAO endowment?

5   A.   Eight million dollars were siphoned out of the endowment.

6   Q.   What about your status as signers on the endowment?

7   A.   We were removed as signers on the endowment.

8   Q.   Did you receive any warning that this was going to happen?

9   A.   No.  We didn't even receive a notification, we had to find

10  out on our own days after.

11  Q.   Where did the eight-and-a-half-million dollars go?

12  A.   It left the endowment and went to a whole assortment of

13  other parties.

14  Q.   How did you react to this?

15  A.   By this point, we -- everything started to make sense on

16  who we were dealing with, and, you know, that all the cards

17  were on the table.

18  Q.   Was there any activity on Snapshot going on at this time?

19  A.   I believe there was some.

20       Once again, I wasn't checking Snapshot.

21  Q.   Were there proposals being posted relating to these

22  transfers?

23  A.   Yes, I believe so.

24  Q.   Relating to you being removed as a signatory?

25  A.   Yes, I believe so.

1   Q.   Were any of the February 2023 transfers authorized?

2   A.   No.  In fact, we explicitly rejected any additional

3   transfers that were sent.

4   Q.   Prior to February 2023?

5   A.   Correct.

6   Q.   Who authored the proposals that were posted on Snapshot at

7   this time?

8   A.   Mark Phillips and Ben Reed.

9   Q.   Who's Ben Reed?

10  A.   That's a good question.

11       It was someone that Mark appeared to have hired to work

12  with him on MovementDAO.

13  Q.   As part of his work with the MovementDAO, was Mr. Reed

14  overseen by Mr. Phillips?

15  A.   Yes.

16  Q.   Do you know if Mr. Reed was acting at the direction of

17  Mr. Phillips?

18  A.   Yes, he was.

19  Q.   Did you ever receive any justification from Mr. Phillips or

20  Mr. Reed for making the transfers out of the DAO endowment

21  account?

22  A.   No, it just happened one day.

23  Q.   At this point, did you come to realize what Mr. Phillips

24  had been doing throughout the time he had been working for you

25  throughout the MovementDAO project?

1    experimental, that impact comes before profits.  There might or

2    might not be token appreciation on these projects, and we had

3    no clue how that would play out.

4    Q.   Did you regard your contributions to MovementDAO to be a

5    charitable contribution or an investment contribution?

6    A.   It was something in between, and that's why we were so

7    excited about this project.  We thought that there was a new

8    form factor that wasn't a non-profit with all the bureaucratic

9    elements of the non-profit.  It was a de-central -- and it

10   wasn't a for-profit.

11        It was a decentralized organization or impact.

12        In fact, the very nature of this project is to innovate on

13   that exact question.

14   Q.   Are you familiar with an entity called DAO Labs, LLC?

15   A.   Yes, to some degree.

16   Q.   When did you first learn about DAO Labs, LLC?

17   A.   Mark Phillips had brought up the idea to the founders that

18   there should be an LLC, potentially, a trust for tax purposes

19   and IP purposes to protect the IP that had belonged to us.

20   Q.   And when was that?

21   A.   I don't recall exactly.  What I believe, it was in the

22   second half of 2022.

23   Q.   Do you have an understanding as to when DAO labs LLC was

24   formed?

25   A.   I don't -- what was the question, is when was it formed?

1    Q.   Yes.

2    A.   I don't recall exactly.  I believe it was in the second

3    half of 2022.

4    Q.   Was DAO labs LLC formed with your consent?

5    A.   We vaguely approved it, where I would be in control, and we

6    approved -- either Jon Gordon or myself -- being in control of

7    these entities that were presented to us.

8    Q.   And when did you give that vague approval?

9    A.   Sometime in the second half of 2022.

10        We signed -- we agreed with Mark to proceed with the

11   creation of these entities in the way that he described it to

12   us.

13   Q.   Did he provide you with any writing with respect to

14   creating the entities?

15   A.   I believe he did provide some writing.

16   Q.   And did the ultimate creation of those entities reflect

17   that writing?

18   A.   No.

19   Q.   How so?

20   A.   We were not in control of the entities in the ultimate

21   creation of the entities, from my understanding.

22        I'm not truly familiar with the final docs, but I believe

23   that we are not in control of those entities.

24   Q.   Did you launch PeaceDAO?

25   A.   Yes, with Mark Phillips' assistance.

1   Q.   So how did you -- what did you do to launch PeaceDAO?

2   A.   I instructed that it should be launched, and I came up with

3   its content, its strategy, its concept, and Mark Phillips went

4   to, basically, build it on JuiceBox as his proposed path since

5   the MovementDAO wasn't ready for launch.

6   Q.   Do any components of PeaceDAO exist outside of JuiceBox?

7   A.   There is a marketing page on peace.move.xyz that has no

8   functionality, other than plain text, and points to the

9   JuiceBox page where all of the functionality resides.

10  Q.   What is the MOVE.XYZ website you just identified?

11  A.   That is the core predetermined website and public domain

12  name where the eventually launched project and interface would

13  be presented to the world.

14  Q.   Does MovementDAO own the MOVE.XYZ domain?

15  A.   I purchased MOVE.XYZ, so as far as I know I own that

16  domain.

17  Q.   And you purchased that for the benefit of MovementDAO?

18  A.   For the ultimate launch of MovementDAO, yes.

19  Q.   Does PeaceDAO have a Discord server or channel?

20  A.   Yes.  We decided to put the Discord channel inside of the

21  MovementDAO Discord channel to train the MovementDAO community

22  members on how to start actually building a DAO, since we had

23  not been able to launch one.

24  Q.   So the PeaceDAO channel was on the MovementDAO server?

25  A.   That's correct, at this point in time.

1    Q.   Did you tweet about PeaceDAO when it launched?

2    A.   I did.

3    Q.   This was to your couple hundred thousand followers at the

4    time?

5    A.   I did.

6    Q.   And you tweeted to announce that it was launching; correct?

7    A.   I did.  And frankly, I was embarrassed and frustrated that

8    I had to do this project on another DAO building platform.

9         So we created a front to say, Oh, it's on PeaceDAO XYZ, and

10   oh, it's on our Discord, but all the functionality would be on

11   JuiceBox.

12        And it was extremely embarrassing to me; at this point, I

13   had invested millions of dollars into this project, couldn't

14   launch a DAO on it, really wanted to try launching a DAO, and

15   so we did it on JuiceBox, but ended it through our Discord and

16   our sub domain on our website.

17   Q.   How is governance handled on PeaceDAO?

18   A.   On JuiceBox.

19   Q.   JuiceBox handled the voting for PeaceDAO?

20   A.   Uh-huh.  There is -- there might be Snapshot voting in the

21   PeaceDAO Discord as well.

22   Q.   So governance -- your testimony is that governance for

23   PeaceDAO occurs on JuiceBox, Discord and Snapshot?

24   A.   Correct, yes.

25   Q.   You said you were frustrated that you couldn't launch

1    PeaceDAO on MovementDAO; correct?

2    A.   Correct.

3    Q.   And was it earlier your testimony that, I think, by July

4    you had expressed this frustration with Mark Phillips?

5    A.   By July/August, yes.

6    Q.   And by August 2022, your testimony was that you were

7    extremely frustrated?

8    A.   Yeah, us, as founders, were very frustrated and -- yeah.

9    Q.   And you decided to take a closer look at everything that

10   Mark Phillips was doing?

11   A.   Right.

12   Q.   So then did you take a close look at the August 2022

13   Movement Improvement Proposals that were posted?

14        MR. BERG:  Objection.

15   A.   No, those came after.

16        THE COURT:  I'm sorry, wait.  There's an objection.

17        Mr. Berg, I can barely hear you, maybe you can move the

18   microphone closer to you.

19        MR. BERG:  My apologies, Your Honor.

20        The question's vague.

21        THE COURT:  So can you ask the question again.

22        MR. SINGH:  Yes, Your Honor, I'll clarify.

23   BY MR. SINGH:

24   Q.   In August of 2022, did MovementDAO post a series of

25   Movement Improvement Proposals or MIPs?

1   A.   They did.  That came after our conversations with Mark, and

2   they were supposed to be reflective of our conversations with

3   Mark, but I learned after that they were not.

4   Q.   So, in August 20, 2022, you were extremely frustrated and

5   you vowed to take a closer look at everything Mark was doing,

6   and you said you met with Mark for three hours, that was your

7   testimony; correct?

8   A.   Yes.

9   Q.   And then, thereafter, did you closely look at the August

10  2022 Movement Improvement Proposals that were published?

11         MR. BERG:  Objection.  Vague as to "Movement

12  Improvement Proposals."

13         MR. SINGH:  Just the series of Movement Improvement

14  Proposals that were published in August of 2022.

15         THE COURT:  Did that clarify it?

16         MR. BERG:  No, I do not know what those are.

17         THE WITNESS:  Neither do I.

18  BY MR. SINGH:

19  Q.   Your testimony earlier was that there was a series of

20  Movement Improvement Proposals published in August of 2022?

21         MR. BERG:  Objection.  Misstates prior testimony.

22  A.   There were --

23         THE COURT:  Wait.  Wait, let me just rule.

24         Objection overruled, so that we can find out what his

25  prior testimony was.

 1   We'll see you after lunch.

 2          COURTROOM DEPUTY:  All rise.

 3          (Witness excused.)

 4          COURTROOM DEPUTY:  The Court is in recess.

 5          (Luncheon recess taken from 11:53 a.m. to 1:09 p.m.)

 6

 7

 8                  C E R T I F I C A T E

 9

10      I hereby certify that the foregoing is an

11   accurate transcription of the excerpt of the

12   proceedings in the above-entitled matter.

13      June 7th, 2023

14

15                          S/Glenda M. Powers

16                          GLENDA M. POWERS, RPR, CRR, FPR
                            United States District Court
                            400 North Miami Avenue
17                          Miami, Florida  33128

18

19

20

21

22

23

24

25

# Exhibit B

## Filed Under Seal

# Exhibit C

```
1                   UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
2                        (MIAMI DIVISION)

3                  CASE NO. 1:23-CV-20727-RKA

4
   RYAN BRESLOW, ALEX FINE,          Miami, Florida
5  AND JON GORDON,

6           PLAINTIFFS/              April 27, 2023
            COUNTER DEFENDANTS,      Thursday
7
        VS.
8
   MARK PHILLIPS, BENJAMIN REED,     Scheduled for 9:00 a.m.
9                                    9:06 a.m. to 4:41 p.m.
            DEFENDANTS/
10          COUNTER CLAIMANTS.

11                                   Pages 1 - 162
   -------------------------------------------------------------
12
                   PRELIMINARY INJUNCTION HEARING
13
                        (P.M. SESSION)
14

15         BEFORE THE HONORABLE LISETTE M. REID
                UNITED STATES MAGISTRATE JUDGE
16

17  APPEARANCES:

18
   FOR THE PLAINTIFFS:             CHRISTOPHER T. BERG, ESQ.
19                                 BENJAMIN J. KUSSMAN, ESQ.
                                   ANDREW IGLESIAS, ESQ.
20                                 Ellis George Cipollone
                                   O'Brien Annaguey, LLP
21                                 2121 Avenue of the Stars
                                   30th Floor
22                                 Los Angeles, California 90067

23                                 JAMIE LEIGH KATZ, ESQ.
                                   Shubin Bass, P.A.
24                                 150 West Flagler Street
                                   Suite 1420
25                                 Miami, Florida 33130
```

```
1              (Call to the order of the Court:)

2         COURTROOM DEPUTY:  Court is back in session.

3         THE COURT:  Good afternoon.  Please be seated.

4         Mr. Berg, if you could call your next witness.

5         MR. BERG:  Mr. Kussman will be calling the next

6    witness, Your Honor.

7         THE COURT:  Okay.  Very good.

8         MR. KUSSMAN:  Your Honor, plaintiffs call Jon Gordon.

9         Your Honor, I also have binders here that are

10   individual.

11        THE COURT:  Okay, I'm glad to hear there are subsets.

12        Betty, if you can hand that to me, please.

13        COURTROOM DEPUTY:  Please raise your right hand.

14        Do you solemnly swear that the testimony you're about

15   to give will be the truth, the whole truth, and nothing but the

16   truth, so help you God?

17        THE WITNESS:  Yes.

18        COURTROOM DEPUTY:  Please state your name and spell

19   your last name for the record.

20        THE WITNESS:  Jonathan E. Gordon, G-O-R-D-O-N.

21        (JONATHAN E. GORDON, being sworn, testified as

22   follows:)

23                        DIRECT EXAMINATION

24   BY MR. KUSSMAN:

25   Q.  Good afternoon, Mr. Gordon.
```

1    Now, this morning you heard us talking about something
2 called the MovementDAO project.  Do you recall that?
3 A.   Yes.
4 Q.   And can you tell me how you first got involved in the
5 MovementDAO project?
6 A.   It was Ryan Breslow and myself, it was our vision.
7 Q.   And did you personally contribute money to that project?
8 A.   Yes.
9 Q.   And in exchange for that money, did you expect to receive
10 anything in return?
11 A.   MOVE tokens.
12 Q.   And, approximately, how much did you contribute?
13 A.   215,000.
14 Q.   Now, can you tell me how you first met Mr. Phillips?
15 A.   I met Mr. Phillips through a recruiting firm called
16 Intelletec.
17 Q.   And did you interview him for a role at that point in time?
18 A.   Yes, for senior blockchain engineer.
19 Q.   And did you hire him?
20 A.   Yes.
21 Q.   And can you tell me, Mr. Gordon, what was it about
22 Mr. Phillips that made you want to hire him?
23 A.   He demonstrated a high level of competency in Solidity,
24 which is a coding language for Ethereum, which was critical to
25 this project.

1         He demonstrated that competency through -- what we call a

2    button test.  And another partner at the time who was way more

3    technically proficient said that this is one of the best

4    examples he'd ever seen.

5    Q.   And you've just mentioned sort of technical expertise.

6         So you needed someone who was fluent in Solidity; is that

7    right?

8    A.   Yes.

9    Q.   And can you tell me, why was proficiency and Solidity so

10   important?

11   A.   It was important because the foundation of this project was

12   to be on the Ethereum blockchain and neither Ryan nor myself

13   had that competency.

14   Q.   And could you build this project without those types of

15   coding skills?

16   A.   No.

17   Q.   And neither you nor Ryan had those coding skills; was that

18   right?

19   A.   No.

20   Q.   Okay.  Was there anything else about Mr. Phillips'

21   experience or his representations to you that made you want to

22   hire him at that level?

23   A.   At the time he was working for the SEC.  He was leading a

24   blockchain surveillance project.  He demonstrated the work that

25   he was working on in person with me.

```
 1        He also demonstrated a high level of knowledge and
 2   competency in navigating legal, regulatory, and tax treatment
 3   of these types of projects.
 4   Q.   And that was important to you?
 5   A.   Yes.
 6   Q.   And is that a type of experience that it's fair to say you
 7   and Ryan Breslow did not have at the time?
 8   A.   We did not have that experience.
 9   Q.   Now, at some point, we talked about this earlier testimony,
10   Mr. Phillips entered into an independent contractor agreement
11   with Mr. Breslow.  Do you recall that?
12   A.   Yes.
13   Q.   Do you remember what the time frame of that agreement was?
14   A.   It was, roughly, a six-month contract starting in around
15   July, ending in around December.
16   Q.   Okay.  And after that contract term, did Mr. Phillips
17   continue working for Mr. Breslow?
18   A.   Yes.
19        MR. KUSSMAN:  Your Honor, I'd like to admit into
20   evidence tab 115, as Exhibit 115.
21        THE COURT:  Admitted.
22        (Plaintiffs' Exhibit 115 received into evidence.)
23   BY MR. KUSSMAN:
24   Q.   Do you have that open in front of you, Mr. Gordon?
25   A.   Yes.
```

1  Q.  And have you ever seen this document before?

2  A.  Yes.

3  Q.  And can you tell me what it is.

4  A.  This is an exchange between Mark Phillips and myself.

5  Q.  And what's the date on that exchange?

6  A.  March 13th, 2022.

7  Q.  Okay.  And can you read the second sentence here in this

8  text.  Well, let me backup.

9      The text here on the left, the long text, who sent that

10  text message?

11  A.  Mark Phillips.

12  Q.  Can you read the second sentence of that text that begins

13  with "but."

14  A.  "But I just like executing on Ryan and your behalf."

15  Q.  Is that consistent, Mr. Gordon, with your understanding

16  that Mr. Phillips was working for Mr. Breslow at that point?

17  A.  Yes.

18      MS. KUSSMAN:  Now, I'd like to move to a new tab 16,

19  Your Honor, as Exhibit 16.

20      THE COURT:  Admitted.

21      (Plaintiffs' Exhibit 16 received into evidence.)

22  BY MR. KUSSMAN:

23  Q.  Have you seen this document, Mr. Gordon?

24  A.  Yes.

25  Q.  And can you tell me what it is?

1   A.   This is MIP 11, a proposal on Snapshot, entitled "paid

2   deferred legal fees from 2022."

3   Q.   Is that Exhibit 116?

4   A.   Sorry, I thought you said 16.

5           THE COURT:  Yeah, I thought you said 16 as well.

6           You're going to 116?

7           MR. KUSSMAN:  My apologies, Your Honor.

8           THE COURT:  Okay.

9           THE WITNESS:  16?

10           MR. KUSSMAN:  116.

11           THE WITNESS:  This looks like a text between Mark

12   Phillips and myself.

13           THE COURT:  It's admitted, just to make that clear for

14   the record, 116 is admitted.

15           (Plaintiffs' Exhibit 116 received into evidence.)

16   BY MR. KUSSMAN:

17   Q.   And what's the date of this text?

18   A.   August 9th, 2022.

19   Q.   And the text up on the left in white, that's a text from

20   Mr. Phillips; correct?

21   A.   Yes.

22   Q.   Okay.  I'm going to read the first part of this text:

23       It says, quote:  If I have treated anyone like stupid

24   idiots, this is wrong.  And I am sorry, I was speaking to you

25   privately about the inconsistency of the governance proposals,

1   lack of proposals, board minutes, or understanding after

2   multiple discussions of the seriousness of duties,

3   specifically, fiduciary, something that I take very, very

4   seriously.  Do you see that?

5   A.   Yes.

6   Q.   Okay.  And what did you take this part -- this section of

7   the text to mean, "seriousness of duties, specifically,

8   fiduciary"?

9   A.   A fiduciary duty to Ryan Breslow.

10   Q.   Was it your understanding that he owed fiduciary duties to

11   Ryan Breslow at that point?

12   A.   Yes.

13   Q.   Now, at the beginning of your testimony, Mr. Gordon, you

14   said that you contributed some money to the project; right?

15   A.   Yes.

16   Q.   And do you know where those funds were kept?

17   A.   In a Gnosis multi-signature safe.

18       MR. KUSSMAN:  Now, Your Honor, I'd like to move to have

19   tab 5 admitted as Exhibit 5.

20       THE COURT:  Admitted.

21       (Plaintiffs' Exhibit 5 received into evidence.)

22   BY MR. KUSSMAN:

23   Q.   Mr. Gordon, have you seen this document?

24   A.   Yes.

25   Q.   And if you look at the top of this Etherscan page, is this

1   the Etherscan page for the endowment account?

2   A.   Yes.

3   Q.   And if you look at the top of this document, is there any

4   type of label or tag used with respect to this Etherscan

5   printout?

6   A.   Yes.

7   Q.   And what tag is that?

8   A.   It says "MovementDAO presale."

9   Q.   And what does "presale" mean, do you know?

10  A.   "Presale" was on the original landing page.

11       There was a button that connected your wallet to be able to

12  contribute to a specific wallet.  That contribution represented

13  a future expectation of an air drop of MOVE tokens.

14  Q.   And were you a signatory to the safe account?

15  A.   Yes.

16  Q.   Okay.  Now, I want to switch gears here a little bit.

17       Mr. Gordon, are you familiar with something called the

18  GitBook?

19  A.   Yes.

20  Q.   And are you familiar with a reference in the GitBook to a

21  service-provider?

22  A.   Yes.

23  Q.   And who did you think the service-provider was?

24  A.   The Law Office of Reed Yurchak.

25  Q.   And why did you think that was the case?

1  A.   This was a firm that we originally retained through Merkaba

2  to help us with the formation of the project and for legal

3  advice regarding these initial foundational documents.

4  Q.   Did Mark tell you anything about that?

5  A.   Yes.

6  Q.   And during this course of this project, did you come to

7  trust and rely on Mr. Phillips?

8  A.   Yes.

9  Q.   Can you tell me a little bit about the trust relationship

10 that you had with Mr. Phillips at some points during the

11 project?

12 A.   Yes.  We -- one of the main reasons we hired him was not

13 only his coding expertise, but his understanding of the legal

14 framework, his work with the law firm and, you know, he insured

15 our safety and our compliance with this project with respect to

16 regulators.

17         MR. KUSSMAN:  Okay.  Now, I'd like you to turn to

18 Exhibit 322.

19         Your Honor, I'd like to move tab 322 into evidence as

20 Exhibit 322.

21         THE COURT:  Admitted.

22         (Plaintiffs' Exhibit 322 received into evidence.)

23 BY MR. KUSSMAN:

24 Q.   Now, Mr. Gordon, the parties entered some joint facts

25 stipulations, one of which was fact stipulation number 21,

1   which says that Exhibit 322 is the voting tally for MIP five.

2   　　Do you understand that?

3   A.   Yes.

4   Q.   And if you look at Exhibit 322, do you see the

5   service-provider's address there?

6   A.   Yes.  It ends in 0085.

7   Q.   Okay.  So it's that one at the top?

8   A.   Yes.

9   Q.   Okay.  And what does this show the service-provider doing?

10   A.   It shows the service-provider casting a vote on proposal

11   MIP five with 10 million -- roughly, 10.2 million votes.

12   Q.   And for all the votes cast by the service-provider, who did

13   you think was casting those votes?

14   A.   The Law Offices of Reed Yurchak.

15   Q.   Now, have you ever heard the term dao-lawfirm.eth?

16   A.   Yes.

17   Q.   Who did you believe was dao.lawfirm.eth?

18   A.   Law Offices of Reed Yurchak.

19   Q.   And why did you believe that to be the case?

20   A.   This is the firm that we hired.  This is the only law firm

21   that we interfaced.  This was a -- the only law firm that was

22   documented in the original foundational documents, which is the

23   GitBook.

24   Q.   Did you have any conversations with Mr. Phillips about

25   dao-lawfirm.eth?

1    A.   Yes.

2    Q.   And what did he tell you about that?

3    A.   He appeared to be constantly interacting with the law firm

4    on legal opinions and guidance.

5         MR. KUSSMAN:  Okay.  Your Honor, if we could move tab

6    110 into evidence as Exhibit 110, please.

7         THE COURT:  Admitted.

8         (Plaintiffs' Exhibit 110 received into evidence.)

9    BY MR. KUSSMAN:

10   Q.   Mr. Gordon, have you seen this document?

11   A.   I'm sorry, which one is it?

12   Q.   It's 110.

13   A.   Yes.

14   Q.   Okay.  And can you tell me what I'm looking at?

15   A.   This is a screenshot of my e-mail in-box searching for

16   m@dao-lawfirm.xyz.

17   Q.   And if you look at this left-hand column there appears to

18   be a number of e-mails from someone named "Reed."

19        Do you see that?

20   A.   Yes.

21   Q.   Who did you think those e-mails were from?

22   A.   Reed Yurchak.

23   Q.   Now, can you turn to page two of this document, please.

24   A.   Yep.

25   Q.   And can you tell me what I'm looking at here on page two?

1    A.   This is an e-mail from Reed Yurchak.

2    Q.   And again, at the time you received this e-mail, who did

3    you think this e-mail was from?

4    A.   Reed Yurchak.

5    Q.   Now, if you look at the bottom, about a little more than

6    halfway down the page, do you see a reference to

7    m@daolawfirm.xyz?

8    A.   Yes.

9    Q.   Who did you think that was?

10   A.   I thought that was someone from Reed Yurchak's law firm.

11   He -- I knew that he had a paralegal named Marc, M-A-R-C.

12        MR. KUSSMAN:  Now, Your Honor, if I can move tab 95

13   into evidence as Exhibit 95, please.

14        THE COURT:  Admitted.

15        (Plaintiffs' Exhibit 95 received into evidence.)

16   BY MR. KUSSMAN:

17   Q.   Do you have Exhibit 95 in front of you, Mr. Gordon?

18   A.   Yep.

19   Q.   Okay.  You've seen this document before?

20   A.   Yes.

21   Q.   Okay.  And this is a declaration from Reed Yurchak, and I'm

22   going to read from paragraph 12 here.  It says, quote:

23       "I understand that there is a website at the address

24   www.dao-lawfirm.xyz; neither I, nor my law firm, have any

25   affiliation with that website.

1      "Upon my review of the current iteration of this site, I

2  can see that www.dao-lawfirm.xyz only lists the e-mail address

3  m@dao-lawfirm.xyz.  I do not know the identity of the owner of

4  that e-mail address.

5      "That e-mail address is not affiliated with my law firm,

6  and that e-mail address is not authorized to send

7  communications on my or my firm's behalf."

8      Do you see that?

9  A.   Yes.

10  Q.   Let me ask you the question again, Mr. Gordon.

11      Do you now think that those e-mails came from Reed Yurchak

12  or his law office?

13  A.   No.

14  Q.   Now, prior to August 2022, did you have any responsibility

15  for MovementDAO's business operations or finances?

16  A.   Yes.

17  Q.   And can you briefly describe for me what your role was.

18  A.   My role was operating within the community, approving

19  financial transactions on Ryan's behalf, and really supporting

20  Mark operationally wherever I could.

21  Q.   Okay.  And in that role, did you come to know a developer

22  who goes by the alias Django.eth?

23  A.   Yes.

24  Q.   And how did you know him?

25  A.   Django is a developer with juicebox.money, and he is

1    someone that I met in person with Mark in Miami.

2    Q.   Mr. Gordon, did Django.eth ever perform any development

3    work for MovementDAO?

4    A.   Not to my knowledge.

5    Q.   Did he ever bill MovementDAO for any development work?

6    A.   No.

7    Q.   Was he ever owed any money from MovementDAO for development

8    work?

9    A.   No.

10   Q.   How do you know that?

11   A.   Because I spoke with him directly.

12        MR. KUSSMAN:  Your Honor, at this time, I'd like to

13   move tab 165 into evidence as Exhibit 165.

14        Now, this is also a sealed exhibit, Your Honor, if we

15   could seal the courtroom.

16        THE COURT:  Okay.  So --

17        MR. KUSSMAN:  One thing I will say, though, there is an

18   objection.  I don't know if you'd like to rule on the objection

19   first or --

20        THE COURT:  No.  Let's discuss the objection without

21   the individuals in the courtroom who are not parties.

22        (Non-party individuals exited courtroom at 1:25 p.m.)

23        (Sealed portion of the proceedings held as follows:)

24                          * * * * *

25          THIS PORTION OF PAGE INTENTIONALLY LEFT BLANK

```
 1                        * * * * *

 2                     S E A L E D

 3                        * * * * *

 4          THIS PAGE INTENTIONALLY LEFT BLANK

 5                        * * * * *

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



* * * * *

S E A L E D

* * * * *

THIS PAGE INTENTIONALLY LEFT BLANK

* * * * *

```
 1                        * * * * *

 2                       S E A L E D

 3                        * * * * *

 4         THIS PORTION OF PAGE INTENTIONALLY LEFT BLANK

 5                        * * * * *

 6

 7

 8

 9

10

11

12

13                       * * * * *

14          (Sealed portion of the proceedings were concluded, and

15    the following was held in open court:)

16          (Non-party individuals entered courtroom at 1:30 p.m.)

17    BY MR. KUSSMAN:

18    Q.   Mr. Gordon, prior to August 2022, are you aware of anything

19    that Mr. Phillips and his team were doing to try to get this

20    project towards launch?

21    A.   Yes.  They had launched a beta website called juicebox.wtf.

22    Q.   And when you say "beta website," what do you mean exactly

23    by that?

24    A.   My understanding is this was a testing ground for various

25    features and iterations based off of the juicebox.money as kind
```

1    of the foundational layer.

2    Q.   And did that ever evolve or become any type of fully

3    functional user interface for MovementDAO?

4    A.   No.

5    Q.   And, in fact, do you know if it says anywhere on

6    juicebox.wtf anything about it being a beta platform or

7    application?

8    A.   Yes.  It says "beta" in the disclaimer.

9    Q.   Are you aware of any other type of similar beta effort --

10   we'll call it -- from Mr. Phillips during that time period?

11   A.   Yes.  There was also madik.move.xyz, which, to my

12   understanding, was juicebox.wtf, but built on a different

13   blockchain called polygon.

14   Q.   Also, always in beta, as far as you know?

15   A.   Yes.

16   Q.   Also, that never blossomed into or became a fully

17   functional UI for MovementDAO; right?

18   A.   Correct.

19   Q.   Now, again, I'm talking about prior to August of 2022, did

20   Mr. Phillips ever approach you or talk to you about setting up,

21   let's say, a more traditional structure versus this thing with

22   MovementDAO project?

23   A.   Yes.

24   Q.   And was DAO Labs one of those structures?

25   A.   Yes.

1    Q.    Whose idea was DAO Labs?

2    A.    Ultimately, Mark Phillips' idea.

3    Q.    And how did Mr. Phillips explain DAO Labs to you?

4    A.    My understanding was that there was a lot of features being

5    built as a result of iterating and innovating, not just

6    juicebox.ntf platform and, you know, testing ground, and a lot

7    of those features had commercial applicability and potential

8    value beyond what we were building at MovementDAO, and so there

9    was a general agreement that we needed a home for specific

10   intellectual property that we thought had value.

11   Q.    Do you remember when that conversation took place?

12   A.    I would say late summer of 2022.

13   Q.    Okay.  Now, in addition to DAO Labs, did you discuss or did

14   he discuss with you any other entities?

15   A.    Yes.  There was also the formation of an unincorporated

16   non-profit.

17   Q.    Did Mr. Phillips tell you on whose behalf these entities

18   would be formed?

19   A.    On Ryan's behalf.

20   Q.    Now, let's move forward in time a little bit to August

21   2022, do you recall any conversations with Mr. Phillips around

22   that time about development spending?

23   A.    Yes.

24   Q.    And what did he say to you about that?

25   A.    Well, it was in the context of broader spending.  At the

1    A.   Yes.

2    Q.   How did you see it?

3    A.   Alex Fine showed it to me in person.

4    Q.   And he told you what it was?

5    A.   Yes.

6    Q.   Okay.  Just very quickly --

7              THE COURT:  Objection overruled.

8    Q.   -- where it says, "Do you have a timeline for token

9    launch," did that tell you anything about whether the project

10   had launched as of August 2022?

11   A.   No, the token had not launched.

12   Q.   Okay.  Now, I want to get back to the 1.7 million you

13   talked about.  Was there a Snapshot proposal relating to that?

14   A.   Yes.

15   Q.   What was it?

16   A.   MIP three.

17   Q.   And was there other MIPs submitted around that time?

18   A.   Yes.

19   Q.   Okay.  Do you remember, approximately, how many?

20   A.   Nine.

21   Q.   Did you vote for any of them?

22   A.   Yes.

23   Q.   Which ones did you vote for?

24   A.   I voted for all but MIP three.

25   Q.   Okay.  And did you closely read through the proposals

1    before you voted on them?

2    A.   Some, but not all.

3    Q.   Why not?

4    A.   Most of the time I had a direct communication with Mark who

5    would summarize the proposal for me.  I would ask questions.

6    He also had open forums for discussions on Discord.

7    Q.   And did you believe those Snapshot proposals were binding

8    in any way?

9    A.   No.

10   Q.   Okay.  Then why did you vote on some of them?

11   A.   I was trying to encourage community engagement, engagement

12   and transparency of what our governance initiatives and the

13   evolution of governance process looked like.

14   Q.   Okay.  And as far as you were concerned, was MIP three then

15   different than the rest of the MIPs?

16   A.   From my perspective, I felt conflicted on that particular

17   proposal.

18   Q.   Okay.  Now, by December 2022, had you, Alex and -- you and

19   Mr. Breslow and Mr. Fine directed Mr. Phillips to stop spending

20   money?

21   A.   Yes.

22   Q.   Okay.  And did Mr. Phillips keep submitting proposals to

23   spend DAO money?

24   A.   Yes.

25        MR. KUSSMAN:  Your Honor, I'd like to move tab 16 in

```
 1    evidence as Exhibit 16.
 2              THE COURT:  Admitted.
 3              (Plaintiffs' Exhibit 16 received into evidence.)
 4    BY MR. KUSSMAN:
 5    Q.   Have you seen this document before?
 6    A.   Yes.
 7    Q.   And this is called "paid deferred legal fees from 2022."
 8         Can you just briefly describe for me what the purpose of
 9    this MIP was?
10    A.   Yes.  This is a proposal to pay deferred legal fees from
11    2022.
12    Q.   And how did you vote on this MIP?
13    A.   I voted no.
14    Q.   Okay.  Now, if you go to page eight of this document.
15              THE COURT:  Can you use the --
16              MR. KUSSMAN:  Of course, it's Bate's number 455.
17              THE COURT:  -- Bate's number?
18    BY MR. KUSSMAN:
19    Q.   Do you see a comment on this page?
20    A.   Yes.
21    Q.   Is that from you?
22    A.   Yes.
23    Q.   What's the comment say?
24    A.   "This proposal should be removed for making false claims.
25         This is not approved by me, nor should that have been
```

1    stated.  Need supporting documents."

2    Q.  Did you believe MIP 11 was seeking legitimate expenses?

3    A.  No.

4    Q.  Now, did you ever see any backup to justify what they were

5    asking for in this MIP?

6    A.  No.

7    Q.  Okay.  And there was another proposal around that time,

8    MIP 12.  Do you recall that?

9    A.  Yes.

10   Q.  And did that one also seek money out of the DAO endowment?

11   A.  Yes.

12   Q.  How did you vote on that one?

13   A.  "No."

14   Q.  Did you see any backup to justify that MIP?

15   A.  No.

16   Q.  Okay.  Did Mark -- sorry, did Mr. Phillips stop submitting

17   proposals at that point?

18   A.  No.

19   Q.  Was there another round of proposals?

20   A.  Yes.

21   Q.  Do you recall, approximately, when those were?

22   A.  Um, shortly after.  I don't recall the exact date.

23   Q.  After the beginning of January?

24   A.  Yes.

25   Q.  Okay.  Did you vote on those, that last round of proposals?

```
1    A.   No.

2    Q.   Why not?

3    A.   I was stripped of my voting privileges.

4         MR. KUSSMAN:  No further questions, Your Honor.

5         THE COURT:  All right.  Thank you.

6         Any cross-examination?

7         MR. FRANKLIN-MURDOCK:  Yes, Your Honor.

8         Your Honor, may I provide the witness with two binders?

9         THE COURT:  Yes.

10        Are those defense exhibits?

11        MR. FRANKLIN-MURDOCK:  Yes, Your Honor.  And one of

12   them is already here.

13        THE COURT:  Okay.

14                    CROSS-EXAMINATION

15   BY MR. FRANKLIN-MURDOCK:

16   Q.   What do you do for a living, Mr. Gordon?

17   A.   I currently do consulting for Family Office.

18   Q.   Is that Mr. Breslow's Family Office?

19   A.   Yes.

20   Q.   And when you say you do consulting, do you mean you're his

21   chief investment officer?

22   A.   Yes.

23   Q.   And do you recall discussing with Mr. Kussman the objection

24   you lodged to MIP 11?

25   A.   Yes.
```

1    A.   Yes, I do.

2    Q.   Do you control whether the firm takes on a matter?

3    A.   Yes, I do.

4    Q.   Do you control what work the firm will agree to perform?

5    A.   Yes, I do.

6    Q.   When did you first meet Mark Phillips?

7    A.   Approximately, 2013.

8    Q.   And under what circumstances did you meet him?

9    A.   I was made aware that he had been released from federal

10   custody and a mutual acquaintance referred him to me because he

11   was in need of legal services.

12   Q.   Did you form a relationship with him, either professional

13   or social?

14   A.   Yes, I did.

15   Q.   Did you later allow him to use space in your law firm?

16   A.   Yes, I did.

17   Q.   What did he use that space for?

18   A.   He used it as his own personal working space.

19   Q.   Did he provide you -- did you employ Mr. Phillips?

20   A.   No, I did not.

21   Q.   Did he provide you with IT services while he worked in your

22   office space?

23   A.   Yeah, it was a bit of quid pro quo relationship.  He would

24   do different things in exchange for the use of space, one of

25   which was IT services.  There was also some marketing.  And

1    just sort of generally trying to be helpful around the office.

2    Q.   Did you ever hire him as a consultant for your firm?

3    A.   I think, yes, there was one matter that came up that

4    required some pretty in-depth computer analysis, some sort of a

5    natural fit, so I used him for that one case.

6    Q.   Did you come to represent Mr. Breslow, Mr. Gordon, and

7    Mr. Fine in 2021?

8    A.   Yes.

9    Q.   Did you also come to represent a company called Merkaba,

10   Inc., in 2021?

11   A.   That's correct, yes.

12   Q.   In the course -- did you ever encounter a document called

13   the "GitBook"?

14   A.   Yes.

15   Q.   I'd like you to pull up Exhibit 6.

16        For the record, Mr. Yurchak was previously provided with

17   all of the binders of exhibits from plaintiffs and defendants.

18        Do you have that up, Mr. Yurchak?

19   A.   Yes, I do.

20   Q.   Do you know what this document is?

21   A.   It appears to be the GitBook.

22   Q.   What is the date on this document?

23   A.   February 2 of 2022.

24   Q.   If you could please turn to page 63 of the document, and

25   four lines from the top, you can start reading the fourth line,

1  just beginning with the "law office."

2  A.   "The law office of Reed Yurchak, the company will act as

3  the service-provider for the MovementDAO."

4  Q.   Did you authorize your firm's name to be included in the

5  GitBook?

6  A.   No, actually, the opposite.

7  Q.   Did your firm act as the service-provider for the

8  MovementDAO?

9  A.   It did not act as the service-provider for the MovementDAO,

10  under my authority, anyway.

11  Q.   Were there several iterations of the GitBook?

12  A.   There were many.

13  Q.   When you encountered your name in the GitBook, what did you

14  do?

15  A.   So, on the edits that we would send back would not include

16  my name or the law office.  And then I recall very well in

17  around April of 2022 an issue was brought to our attention, and

18  in our review of the GitBook we noticed again, there's my name,

19  and we have written correspondence stating that it should be

20  "scrubbed" was the term, should be removed.

21  Q.   Did you tell anyone that you did not want your law firm's

22  name in the GitBook?

23  A.   Yes, I think that e-mail correspondence certainly slices in

24  that regard.

25  Q.   Who did you tell?

1  A.   It would be Mark Phillips.

2  Q.   After you told him that, was it your understanding that

3  your name and the name of your firm had been removed from the

4  GitBook?

5  A.   I believe that it had.

6  Q.   I would like you to go to page 52 of Exhibit 6.

7  A.   I'm here.

8  Q.   At the bottom of the page, can you read that last sentence?

9  A.   "The daolawfirm.eth is acting as the initial

10  service-provider for the DAO."

11  Q.   Do you control the alias daolawfirm.eth?

12  A.   No, I do not.

13  Q.   Does your firm control the alias daolawfirm.eth?

14  A.   It never did, no.

15  Q.   Further up the page there's a table of cryptocurrency

16  addresses.  Do you see that?

17  A.   Yeah.

18  Q.   The top entry, it says:  "Daolawfirm.eth, and then lists an

19  address ending in 0085.  Do you see that?

20  A.   Yes.

21  Q.   In February of 2022, by that time, had you encountered this

22  cryptocurrency address?

23  A.   Yes.

24  Q.   Do you know how to create a cryptocurrency address?

25  A.   No, I don't personally know.

1   Q.   Do you know how to use a cryptocurrency address?

2   A.   I do not and was never instructed.

3   Q.   Have you ever executed a cryptocurrency transaction with

4   the address ending in 0085?

5   A.   I have never executed any action with that address, or was

6   aware of any actions used with that address, or authorized any

7   actions used by that address.

8   Q.   Have you ever executed a cryptocurrency transaction with

9   any cryptocurrency address?

10  A.   No.

11  Q.   Was this address created for you?

12  A.   It was created as a part process of setting up the

13  multi-safe wallets and security keys in the course of my

14  representation for my client.

15  Q.   And was the idea that you would hold on -- that this

16  address was created for you?

17  A.   Yes.

18  Q.   Who created it?

19  A.   Mark Phillips.  He was the technical expertise for the

20  project and was relied upon for these functions.

21  Q.   Were you given a copy of the keys to this cryptocurrency

22  account?

23  A.   I believe that I was, yes.

24  Q.   Did Mark Phillips also have access to The Keys for the

25  cryptocurrency address ending in 0085?

1   A.   Yes, I believe so, since he, after all, created them.

2   Q.   I'd like you to go back to exhibit 6, at page 40 -- strike

3   that.  Page 52, just above the table on that page there is a

4   cryptocurrency address ending in 03C6.  Do you see that?

5   A.   Yes.

6   Q.   Do you know what that cryptocurrency address is?

7   A.   I believe it's for the creation of the MovementDAO,

8   essentially, what is referred to as the endowment fund.

9         MR. BERG:  I next like you to turn to Exhibit 154.

10        Your Honor, I would like to now move tab 154 into

11   evidence.

12        THE COURT:  Is there any objection to that one?

13        MR. BERG:  Your Honor, I'm sorry, I jumped the gun.

14   Allow me to hand out a subset of binders for you to make this

15   easier.

16        THE COURT:  Okay.  I don't have the -- yeah, the 154.

17        MR. BERG:  May I approach?

18        THE COURT:  Yes, you may give it to my courtroom deputy

19   and she will hand it up to me.

20        MR. BERG:  Thank you.

21        THE COURT:  It's admitted.

22        (Plaintiffs' Exhibit 154 received into evidence.)

23        MR. BERG:  Thank you, Your Honor.

24   BY MR. BERG:

25   Q.   Mr. Yurchak, do you have Exhibit 154 in front of you?

1   A.   Yes, I do.

2   Q.   Exhibit 154 is a copy of the DAO endowment Gnosis account

3   transaction history.  Do you see that?

4   A.   Yes, I do.

5   Q.   On the top left side of the page there's a heading that

6   says "Ethereum" and below that there is a alphanumeric string

7   ending in 03C6.  Do you see that?

8   A.   Yes, I do.

9   Q.   Those are the same letter and numbers for the DAO endowment

10  account; is that right?

11  A.   Yes.

12  Q.   I'd like you to turn to page 1796 of Exhibit 154.

13  A.   Okay.

14  Q.   Do you see the entry at the top of the page dated

15  February 2, 2023?

16  A.   Yes.  Sorry.

17  Q.   At the top of that entry, what does it say?

18  A.   I believe it says "remove owner."

19  Q.   What cryptocurrency address is listed below the "remove

20  owner" heading, if you could just refer to the last four digits

21  in the string.

22  A.   Okay.  D410.

23  Q.   On the right-hand side of the entry under the heading

24  "confirmations," do you see the address ending in 0085 listed

25  there?

1  A.  Yes, I do.

2  Q.  Did you confirm this remove-owner transaction?

3  A.  Absolutely not, I was not involved with in any way.

4  Q.  Did you direct anyone to use the wallet 0085 to confirm

5  this transaction?

6  A.  No.

7  Q.  I'd like you to turn to page 01795.

8  A.  Okay.

9  Q.  Do you see the entry at the bottom of the page labeled

10  Entry 36?

11  A.  Read the entry from --

12  Q.  No, I'm sorry.  I'm asking if you have identified the entry

13  labeled Entry 36?

14  A.  Oh.  Yeah.

15  Q.  And besides the number 36, in the green highlighted field,

16  it says "sent."  Do you see that?

17  A.  Yes.

18  Q.  And below that "sent" text, it says "sent 7.5 million DAI

19  to an address ending in 6FBD."  Do you see that?

20  A.  Yeah, I do.

21  Q.  And on the right-hand side of the entry under the heading

22  "confirmation" is the address ending in 0085.

23      Do you see that listed there?

24  A.  I see it there.

25  Q.  Did you confirm this transaction to send 7.5 million DAI?

1   A.   No.  It just says, "with the prior transmission, I was not
2   involved or aware."
3   Q.   Did you direct anyone to use this cryptocurreny address
4   ending in 0085 to confirm this transaction?
5   A.   I did not.
6   Q.   I'd like you to go to the entry immediately above that.
7   It spills over onto the previous page.
8   A.   Okay.
9   Q.   On page 1794, entry 37, in the green highlighted field,
10  there's an entry that says "sent."  Do you see that?
11  A.   Yes, I do.
12  Q.   And beside it, to the right of it, it says "805 Ethereum."
13       Do you see that?
14  A.   Yes, I do.
15  Q.   And on the next page, 1795, there is an address that say
16  6FBD.  Do you see that?
17  A.   Yes, I do.
18  Q.   Do you understand this to be an entry authorizing the
19  transfer of 805 Ethereum to the address ending in 6FBD?
20  A.   Yes, that's what it would appear to be.
21  Q.   On the right-hand side of the entry under the heading
22  "confirmations," there is an address ending in 0085 listed
23  there.  Do you see that?
24  A.   Yes, I do.
25  Q.   Did you confirm this transaction to send 805 Ethereum?

1    A.   I did not.

2    Q.   Did you direct anyone to use the cryptocurrency address

3    ending in 0085 to confirm this transaction?

4    A.   I did not.  I can further state --

5    Q.   I'm sorry, Mr. Yurchak.  You were saying?

6    A.   I can further state with some high degree of confidence

7    that there would be no communications or written record

8    regarding these transactions with me.

9    Q.   Did you ever use Mr. Breslow or Mr. Fine's keys to the DAO

10   endowment account?

11   A.   Did I ever --

12   Q.   Did you ever direct anyone to access Mr. Breslow or

13   Mr. Fine or Mr. Gordon's keys to the DAO endowment account?

14   A.   Never.

15   Q.   Did you ever direct anyone to transfer assets out of the

16   DAO endowment account?

17   A.   Never.

18         MR. BERG:  I'd like you to turn to Exhibit 12.

19         Your Honor, I'd like to admit Exhibit 12 into evidence.

20         THE COURT:  Admitted.

21         (Plaintiffs' Exhibit 12 received into evidence.)

22   BY MR. BERG:

23   Q.   Mr. Yurchak, Exhibit 12 is a copy of a proposal called

24   mip0004.action.  Do you see that?

25   A.   Yes.

1   Q.   Can you please turn to page 298 of Exhibit 12.

2   A.   Okay.

3   Q.   Who is listed as the author of the proposal?

4   A.   Tankbottoms and Phillip B.

5   Q.   Who's tankbottomes?

6   A.   That's the handle for Mark Phillips.

7   Q.   And what was the date of this document?

8   A.   August 23 of 2022.

9   Q.   Please turn to page 302 of Exhibit 12.

10       Under the heading "Snapshot Consensus By the DAO Members,"

11  can you please read the sentence beneath that?

12  A.   "Dao-lawfirm.eth of Law Offices Reed Yurchak, tankbottoms,

13  Ben Reed, NCPTS -- CPT space cadet will hereafter be

14  collectively referred to as the "service-providers."

15  Q.   Did you ever act under the alias DAO Law Firm?

16  A.   No.

17  Q.   Has your firm ever acted as a service-provider for the

18  MovementDAO?

19  A.   No.

20  Q.   Was the name of your law firm inserted into this proposal

21  without your authorization?

22  A.   That is correct.

23       MR. BERG:  Further down the page -- scratch that.

24       I'd like you to turn to Exhibit 15.

25       Your Honor, I'd like to introduce tab 15 into evidence

1    as Exhibit 15.

2            THE COURT:  Admitted.

3            (Plaintiffs' Exhibit 15 received into evidence.)

4    BY MR. BERG:

5    Q.   Let me know when you're there, Mr. Yurchak.

6    A.   I'm there.

7    Q.   Exhibit 15 is a copy of a proposal called "MIP seven

8    Snapshot consensus of the members of the DAO."

9         Do you see that?

10   A.   Yes.

11   Q.   If you could please turn to page 365 of Exhibit 15.

12   A.   Okay.

13   Q.   Let's back up one minute, Mr. Yurchak.

14        Please go to 362.

15   A.   Okay.

16   Q.   Who are the authors of this document?

17   A.   Tankbottoms and Phillip B.

18   Q.   And then under the heading "Ratification of Actions of the

19   Service-Providers," can you please read that first sentence up

20   through -- yes, just that first sentence.

21   A.   "The service-providers as defined by the guiding principles

22   in paragraph 16A, A through D, specifically, as DAO Law Firm

23   ETH, Attorney Reed Yurchak, the Law Offices of Reed Yurchak and

24   forensic blockchain engineer tankbottoms."

25   Q.   Were you the service-provider to the MovementDAO?

1  A.   No.

2  Q.   Did you vote to authorize this proposal?

3  A.   No.

4  Q.   And your name is inserted into this document without your

5  authorization as well; is that right?

6  A.   I would definitely agree.

7  Q.   Did you ever review or approve any proposals that were

8  posted on Snapshot in connection with MovementDAO?

9  A.   I can't 100 percent recall if some may have been sent to

10  me.  There was a lot of stuff that was just dumped in a very

11  cursory fashion to say, Hey, look at this.

12       But I can say, unequivocally, that I never gave any

13  approval for any of these -- of the ratification of any of

14  these actions.

15  Q.   As you sit here today, you've got no memory of reviewing

16  any MIP proposal in connection with MovementDAO; is that right?

17  A.   I have no memory of that, that's correct.

18  Q.   Mr. Yurchak, the parties entered into fact stipulations in

19  this case.  Can you please open a copy of the fact stipulations

20  sent to you.

21  A.   Okay.

22  Q.   Please turn to fact stipulation number 13 and read that

23  into the record.

24  A.   "The cryptocurrency address registered to ENS

25  service-provider.eth is 0085."

1    Q.   Do you notice anything about whether service-provider.eth

2    and DAO Law Firm has anything in common?

3    A.   They have the same cryptocurrency address.

4    Q.   Do you control service-provider.eth?

5    A.   No.

6    Q.   Does your firm?

7    A.   No.

8    Q.   Did you authorize anyone to use service-provider.eth on

9    your firm's behalf?

10   A.   No.

11   Q.   Turn to fact stipulation number 19.

12   A.   Okay.

13   Q.   Please read that into the record.

14   A.   "Service-provider.eth cast over 10 million votes on each of

15   the following proposals posted on Snapshot.org MIP-0000 through

16   MIP-0008."

17   Q.   Did you cast any of those votes cast by the

18   service-provider?

19   A.   I had not.

20   Q.   Did you authorize anyone to cast those votes on your

21   behalf?

22   A.   No.  I wasn't even aware this was happening.

23        MR. BERG:  I'd like you to turn to Exhibit 3.

24        Your Honor, I'd like to introduce tab 3 as Exhibit 3 in

25   evidence.

```
 1            THE COURT:  Admitted.
 2            (Plaintiffs' Exhibit 3 received into evidence.)
 3  BY MR. BERG:
 4  Q.   Please let me know when you're there, Mr. Yurchak.
 5  A.   I am there.
 6  Q.   Exhibit 3 is a web page from the internet web archive
 7  showing the web page associated with internet address
 8  dao.lawfirm.xyz.  Do you see that?
 9  A.   Yes.
10  Q.   To the left of -- on the left-hand column of the page, what
11  is listed there, in bold letters?
12  A.   Daolawfirm.eth.
13  Q.   To the right of that, does it list your name?
14  A.   I see my name.
15  Q.   Does it list your firm's -- your e-mail address through
16  your firm?
17  A.   One of them.
18  Q.   Is this website affiliated with your firm?
19  A.   No.
20  Q.   Have you ever seen this website prior to this litigation?
21  A.   Yeah, I have.
22  Q.   Can you explain how you encountered it?
23  A.   Yeah, I remember the end of 2021 or start of 2022,
24  Mr. Phillips said, Hey, look what I made, it was a very simple
25  web page, just one page with sort of a graphic that reminded me
```

1   of these old window screen-savers, and the page -- this

2   representation of it is, essentially, how I remember it.

3       He said it was something that was web3-enabled or would

4   work with web3 applications, which was the wave of the future,

5   and this could be used to provide future marketing purposes, if

6   I so desired.

7       I noticed that, in terms of the list of services on this

8   page, that many of them are highly technical in nature.

9   They're not legal services, you know, in terms of programmable

10  treasuries, data orchestration, et cetera, et cetera.

11      And I also noticed at the bottom that I provide -- that

12  daolawfirm.eth, anyway, purports to provide traditional Meat

13  Space services.  "Meat Space," I had to Google.  That is,

14  apparently, something that has to do with procuring meat or

15  beef from space; so, apparently, that's a service this law firm

16  provides as well.

17  Q.   Thank you.  Did you create this website?

18  A.   No.

19  Q.   Did you ask Mr. Phillips to create that website?

20  A.   No, I did not authorize.

21  Q.   Did you ever instruct Mr. Phillips to operate the web page

22  daolawfirm.xyz on your firm's behalf?

23  A.   No.  I -- after seeing it, I actually kind of forgot about

24  it.

25  Q.   You never took up Mr. Phillips' suggestion to use it as a

1   marketing tool, perhaps?

2   A.  I never did, no.

3   Q.  Mr. Yurchak, you control the e-mail address

4   m@daolawfirm.xyz?

5   A.  I don't control that, no.

6   Q.  Did you authorize m@daolawfirm.xyz to send e-mails on your

7   behalf?

8   A.  No.

9   Q.  Did you ever authorize Mr. Phillips to send e-mails that

10  show your name, Reed Yurchak, as the sender?

11  A.  No.

12  Q.  Mr. Yurchak, after March of 2022, do you believe your

13  interactions with the MovementDAO project had come to an end?

14  A.  Yes.

15  Q.  Were you later contacted by Mr. Phillips and Mr. Reed in

16  the early summer of 2022?

17  A.  Yes.

18  Q.  Did you bill for any services you provided at that time

19  related to their outreach?

20  A.  No, because I don't feel I was -- had provided any services

21  to bill for.

22  Q.  In July 2022, did Mr. Phillips notify you about the status

23  of your representation of plaintiffs and Merkaba?

24  A.  Did he -- oh, yes.

25  Q.  And up to this point, did you understand that Mr. Phillips

1   was acting on behalf of plaintiffs and Merkaba whenever he

2   would reach out to you?

3   A.   Yeah, that just seemed to me the way it went.  I didn't --

4   I really didn't hear much from the plaintiffs, they seemed to

5   prefer to communicate through him, and he was appearing to

6   purport to relay their information to me.

7   Q.   Now, in that July 2022 outreach, what did Mr. Phillips tell

8   you about the status of the representation?

9   A.   He conveyed in no uncertain terms that my further

10  involvement was not wanted, and it seemed to be an agreed

11  opinion of both himself and the plaintiffs, and this was with

12  respect to services provided in connection to furtherance of

13  whatever was happening to move the MovementDAO project along.

14  Q.   Up to this point, did anyone keep you in the loop about the

15  status of the MovementDAO project?

16  A.   No.  I had my own assumptions, that's all.

17  Q.   Can you describe the frequency of your interactions with

18  Mr. Phillips regarding the MovementDAO project?

19  A.   They were sporadic and infrequent.  There was a sudden

20  barrage of activity in this time frame that you're talking

21  about, which had resulted in that e-mail in July.

22       And then things dropped off from there for another couple

23  months, I think.

24  Q.   Did you receive another communication from Mr. Phillips in

25  August of 2022?

1  A.  Yes, I did.

2  Q.  Did Mr. Phillips attach anything to that communication?

3  A.  He sent me an e-mail with a spreadsheet, I think it's

4  called "DAO budgeting."

5  Q.  And what did one of those tabs in that document appear to

6  be?

7  A.  One of the tabs included an invoice for time for legal

8  services during the period of time when I thought I had been

9  let go.

10  Q.  Was that an invoice you or your firm prepared?

11  A.  No.  It was -- it would have been prepared by Mark

12  Phillips.

13  Q.  What time period did those entries purport to cover?

14  A.  April 2022 through September 2022.

15  Q.  Did you ever enter time entries from March to September

16  2022 in connection with the MovementDAO project?

17  A.  No.

18  Q.  Did the entries in that document reflect that Mr. Phillips

19  was billing time for providing legal services?

20  A.  Yeah, so what seemed to have occurred is that this falling

21  out happened over his -- the dissatisfaction with the degree to

22  which I was responsive to all his requests he was making during

23  the summer.  He was working on this corporate governance, want

24  ing to formalize these corporations.

25      So what appeared to have happened is that after no longer

1    trying to utilize me for it, he went about it himself and then

2    must have thought, Well, why don't I try to bill this as a

3    legal service to, you know, get more money out of the project.

4        But the problem with me was that he did that work, of

5    course, as a non-attorney, as a paralegal, which is -- I'm

6    sorry, strike that -- not as a paralegal, but as a

7    non-attorney.

8        What I'm trying to say is that he wanted it to appear as if

9    he had done it as a paralegal on my behalf; and therein lies

10   the problem, because if I agreed and approved with this

11   invoice -- and that means I explicitly -- it explicitly means

12   that he was acting under the color of my authority, which is

13   simply not true, that is not the case, that's not what happened

14   during that period of time.

15       He is the sole individual who devised the strategy of what

16   he wanted to do and he executed that strategy unilaterally; at

17   the most, he may have asked me to simply put eyeballs on

18   certain documents.  I was not the author of those documents.

19       I did not know the overall architecture or game plan about

20   all of the stuff that was going on.  I agreed to make some

21   edits and comments, and I did nothing more.  Um --

22   Q.   In the e-mail -- I'm sorry, please finish, Mr. Yurchak.

23   A.   And so that's -- to answer your question, I didn't feel

24   that level of activity was anything that I should bill for, for

25   that reason, and because I was still quite uncertain about my

1  role, my overall role in this project.

2      I, in my head, still believed I was not wanting to be used

3  and that my remaining role was merely in a fiduciary capacity

4  to oversee the custodial accounts; that the keys that we've

5  been discussing earlier of the defendant had been made for.

6  Q.  Your reference to "custodial accounts," Mr. Yurchak, you're

7  referring to custodial accounts you oversee on behalf of

8  plaintiffs?

9  A.  Yes, that's correct.

10 Q.  Not on behalf of MovementDAO?

11 A.  That's correct.

12 Q.  The e-mail you reference in August 2022, did Mr. Phillips

13 make a request relating to his association with your firm?

14 A.  Yeah, he, essentially, wanted this invoice to go out so

15 that it be paid, and I felt that was totally inappropriate for

16 the reasons I just explained.  But I -- and it seemed, you

17 know, again, it's perfectly fine for him to have done this

18 work, but it's perfectly not fine and inappropriate to pass it

19 off as actual legal work that I was not made involved.

20     But I wanted to test that, so, I, essentially, wrote -- I

21 wanted to test that hypothesis, you know, he's trying to use

22 me, he's using the law office name as an alias in order to,

23 essentially, milk more money out of the project.

24     So that's what I wrote in the e-mail, I said, Go ahead, you

25 can do whatever you want and I'll just go ahead and give you

1    all the money.  And I did that just to see what the response

2    would be, and he responded very enthusiastically to the idea

3    that I wouldn't be claiming any fees and that he would be able

4    to.

5    Q.   Just, specifically, how did you -- what was it that

6    Mr. Phillips asked you to do?

7    A.   Just add my time for work that I hadn't been doing during

8    the summer to that invoice and approve it and get it sent out.

9    Q.   And when Mr. Phillips responded to you enthusiastically, as

10   you said, what did that confirm to you?

11   A.   It confirmed my suspicion that, you know, on top of

12   everything else, being the lead developer on the project and

13   all that responsibility, he wanted to be, essentially, the lead

14   attorney, too.

15        He wanted to exert control over that area of the project as

16   well and expected to get paid for it, and he wanted me to

17   simply rubber-stamp it, and that's not something that I'm,

18   obviously, going to do.

19   Q.   Were you going to actually permit Mr. Phillips to collect

20   fees through an invoice sent on behalf of your firm?

21   A.   No, I didn't permit that.

22   Q.   And how did you prevent Mr. Phillips from doing that?

23   A.   I didn't respond in any way authorized that this -- well,

24   first of all, I didn't add any time, I didn't add my time to

25   the invoice.  I didn't approve it.  I didn't respond

1   affirmatively to say, this is fine, go and present it for

2   payment.  So -- so I -- my response was just to leave it be,

3   not touch it, essentially.

4   Q.   Did you ever send the invoice that Mr. Phillips drafted for

5   you?

6   A.   No.  My response to it, again, was that I did de minimus

7   work, I wouldn't be billing, so --

8   Q.   I'm sorry, Mr. Yurchak, please, finish.

9   A.   And since he did the work himself in his own orbit, I

10  wasn't going to submit it on his behalf, of course.

11  Q.   Did you think you were thwarting Mr. Phillips' plan by

12  simply declining to submit the invoice he drafted to

13  plaintiffs?

14  A.   Yeah, I felt that was sufficient, simply not respond and

15  not authorize it.  And in the past invoices that were submitted

16  back in, I think, December and March, March 2022, you know, I

17  spent a lot of time making sure that the time billing entries

18  were correct, finalized it, submitted it.

19  Q.   When was the last invoice you submitted in connection with

20  the MovementDAO project?

21  A.   March of 2022.

22  Q.   Did you warn plaintiffs about Mr. Phillips' plan?

23  A.   No, I did not.

24  Q.   Why not?

25  A.   I guess to a certain extent you could say I just sort of

1   had my head in the sand.  I assumed that by not giving my

2   approval that it would not be submitted, and I assumed that

3   would resolve that issue.

4   Q.   You did not think that if you didn't submit the invoice

5   there was a way for Mr. Phillips to collect those fees; is that

6   right?

7   A.   Yeah, that's correct.

8   Q.   Do you wish you had done more?

9   A.   Sitting here now, with hindsight being 20/20 such as it is,

10  I wish, yes, I had been more vocal about it.

11  Q.   If you had submitted the invoice that Mr. Phillips sent to

12  you in that e-mail, do you think that would have made you an

13  accessory to fraud?

14          MR. SINGH:  Objection.  Calls for a legal conclusion.

15          THE COURT:  I'm sorry?

16          MR. SINGH:  Objection.  Calls for a legal conclusion.

17          THE COURT:  Mr. Berg?

18          MR. BERG:  I'm trying to assess Mr. Yurchak's state of

19  mind and see what he was trying to do in responding to this

20  e-mail.

21          THE COURT:  So you're asking for his opinion?

22          MR. BERG:  Yes.

23          THE COURT:  I don't see that it's a problem, so

24  objection overruled.

25          THE WITNESS:  Well, it was certainly dishonest and

1   inaccurate.  And again, would mean that I would be endorsing

2   through color of my authority everything that he had done --

3   and I have no grasp of what he had done, really, I just --

4   besides getting some e-mails here and there, it was never

5   explained to me about what's really going on, what's the

6   purpose, you know.

7          There is actually no way that I could endorse something

8   that I simply wasn't involved in and call it a legal service;

9   so if that's fraud, then the answer to your question would have

10  to be yes.

11         MR. BERG:  Mr. Yurchak, I'd like you to turn to Exhibit

12  90.

13         Your Honor, Exhibit 90's already been admitted, but I'd

14  like to introduce Exhibit 90A, which is an excerpt that had

15  been magnified because it's a printout of a spreadsheet.

16         THE COURT:  Okay.  Admitted.

17         (Plaintiffs' Exhibit 90A received into evidence.)

18  BY MR. BERG:

19  Q.  Mr. Yurchak, do you have Exhibit 90A before you?

20  A.  Yes, I do.

21  Q.  Please turn to page 786.

22  A.  Okay.

23  Q.  Is this a copy of the invoice that Mark Phillips sent to

24  you in August of 2022?

25  A.  Yes, it is.

1        MR. BERG:  No further questions.

2        THE COURT:  All right.  Thank you.

3        Is there any cross-examination?

4        MR. SINGH:  Yes, Your Honor.

5        THE COURT:  Before you start, let me ask a question.

6        Betty, did you find out anything about scheduling this

7   afternoon?

8        COURTROOM DEPUTY:  Let me find out.

9        THE COURT:  Apparently, there's some roads that are

10  going to be shut down in downtown Miami this afternoon, and I

11  was not aware of that.

12       (Brief pause in the proceedings.)

13       THE COURT:  Let's go ahead and finish this witness and

14  then we'll talk about it.

15       MR. SINGH:  Thank you, Your Honor.

16                    CROSS-EXAMINATION

17  BY MR. SINGH:

18  Q.  Mr. Yurchak, do you have a professional relationship with

19  Mr. Phillips?

20  A.  Yes, there was one that existed.

21  Q.  And you mentioned that there was a single case that you

22  used him as a consultant?

23  A.  Yeah, that I can recall.

24  Q.  Did you have any other agreements where you used him as a

25  consultant?

```
 1                   C E R T I F I C A T E

 2
        I hereby certify that the foregoing is an
 3
      accurate transcription of the excerpt of the
 4
      proceedings in the above-entitled matter.
 5

 6    June 7th, 2023

 7
                        S/Glenda M. Powers
 8
                        GLENDA M. POWERS, RPR, CRR, FPR
 9                      United States District Court
                        400 North Miami Avenue
10                      Miami, Florida  33128

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

# Exhibit D

## Filed Under Seal

# Exhibit E

```
 1                   UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2                         MIAMI DIVISION
                     CASE NO. 1:23-cv-20727 -RKA
 3

 4    RYAN BRESLOW, ET AL.,                  Miami, Florida

 5         Plaintiff,                        May 25, 2023

 6             vs.                           9:40 a.m. to 5:15 p.m.

 7    MARK PHILLIPS, ET AL.

 8         Defendant.                        Pages 1 to 243
      _____

 9

10                 DEFENDANTS' MOTION TO MODIFY TRO
                         BEFORE THE HONORABLE
11          UNITED STATES MAGISTRATE JUDGE LISETTE M. REID

12    APPEARANCES:

13
      FOR THE PLAINTIFFS:       CHRISTOPHER T. BERG, ESQ.
14                              Ellis George Cipollone
                                O'Brien Annaguey LLP
15                              2121 Avenue of the Stars
                                30th Floor
16                              Los Angeles, CA 90067
                                Cberg@egcfirm.com
17

18
                                ANDREW IGLESIAS, ESQ.
19                              Ellis George Cipollone
                                O'Brien Annaguey LLP
20                              2121 Avenue of the Stars
                                30th Floor
21                              Los Angeles, CA 90067
                                Aiglegias@dgcfirm.com
22

23

24

25
```

1    looking at the -- the complicating factor is in February 2023,

2    when what plaintiffs claim were the unauthorized transfer of

3    eight and a half million dollars, that all went to the

4    developer budget first, which is a budget Mr. Phillips

5    controls, an account Mr. Phillips controls.  And then from the

6    developer budget, that is where the transfers were to third

7    parties.

8            THE COURT:  So 8.5 million dollars went to the

9    developer budget.

10           MR. BERG:  Yes.  And that was 7.5 million dollars in

11   DAI, D-A-I cryptocurrency, and 805 ethereum.  And, when you

12   convert that to U.S. dollars, the total of those two transfers

13   is approximately eight-and-a-half million dollars.

14           THE COURT:  Okay.  But, I want to make sure I am clear

15   on this.

16           So, at some point, 8.5 million dollars was the budget

17   for the developer.

18           MR. BERG:  No, 1.75 million was the budget in August.

19   So, that transfer was made.  As Mr. Murdock mentioned there was

20   a MIP proposal in reference to it.  That was supposed to take

21   us through the end of 2022.

22           THE COURT:  So the 8.5 million is something completely

23   different, that is the unauthorized --

24           MR. BERG:  That is the problem.

25           THE COURT:  So, the unauthorized transfer of

1   1.75 million is made.  So to the extent there is 1.7 million

2   still left in that developer account, that -- those funds could

3   be used to pay these individuals?

4        MR. BERG:  No, your Honor.  That money has been spent.

5   So --

6        THE COURT:  So that 1.7 is not there.

7        MR. BERG:  What we will contend here is

8   eight-and-a-half million dollars was transferred to the

9   developer account, and then shot out across the land.

10       THE COURT:  Okay.

11       MR. BERG:  A large portion of that has been returned.

12   But, there is still outstanding approximately $2.3 million.

13   That is the money that has been converted by defendants into

14   cash.

15       THE COURT:  Okay.

16       MR. BERG:  And, one of the bases for our opposition,

17   your Honor, to the amendment of the TRO is that money still has

18   not been returned, that is still held in defendant's accounts,

19   Mr. Murdock referenced Mr. Rayden, he returned the money he

20   received to defendants, but defendants didn't return it to the

21   Endaoment account as they were supposed to.

22       THE COURT:  Okay.  All right.

23       So, does the 2.1 million that's still outstanding

24   include the 1.75 million, or that is aside from that?

25       MR. BERG:  That is aside from that.

1          THE COURT:  So, to the extent there is 1.7 million,

2    let's say that the development money, development money was

3    still there, they could have used that to pay these people,

4    correct?

5          MR. BERG:  That would be the understanding; however,

6    what we would say, present to the Court is that the money went

7    to a black box.  It was spent, and we don't have an ability to

8    discern currently what is $1.75 million from August versus what

9    has been taken as a result of the February activity; that the

10   difficulty, in essence, we certainly would not concede that

11   what happens to be $1.75 million that DAO developer payment,

12   that should go to the developers.

13         THE COURT:  It is not the same amount.

14         MR. BERG:  It's not the same amount.  And, on top of

15   that, the justification for these transfers, as you will see

16   this afternoon and this morning, is fraudulent.  These are all

17   fraudulent transfers.  No one is owed this money.

18         THE COURT:  Okay.  So -- okay.

19         So one more question to you, Mr. Berg.  The reason no

20   one is owed this money is because it was never authorized by

21   Movement DAO, or it just never happened, they never did the

22   work?

23         MR. BERG:  Not authorized, nothing to corroborate that

24   they were owed this money.  We think the payments are

25   arbitrary.  The evidence that you saw from Mr. Breslow -- or

1    excuse me, from Mr. Gordon, for example, about Jengo.eth

2    receiving $10,000, he never even worked on the project, your

3    Honor, and he returned that money.

4         That is probably the cleanest example when you consider

5    that there is -- the legitimacy of these payments to these

6    developers is deeply in question.

7         And, until the evidence is presented, until your Honor

8    makes a ruling, we should not modify the TRO to permit

9    additional payments because we believe that these are not real.

10        THE COURT:  Okay.  All right, thanks.

11        So, Mr. Murdock, all of this appears to me to be tied

12   up in the lawsuit, itself.  Right?

13        Well, I understand that there are affidavits here from

14   these individuals.  Some of them are saying that they are owed

15   this money.  There is a big question, while -- there is this

16   big question as to whether they were authorized in the first

17   place to do the work they did, and whether they are owed this

18   money.  Help me out.  Isn't that the case?

19        MR. FRANKLIN-MURDOCK:  I think, after we put our case

20   in chief on this afternoon, it will certainly bolster our claim

21   that these individuals are owed this money.  But, we would

22   still maintain that regardless of the question of authority,

23   there are third parties who are entitled to payment.

24        And, one thing I want to highlight that Mr. Berg did

25   not mention in his argument is the issue of whether or not

1    Mr. Rayden received funds.  Mr. Berg emphasized there was a

2    budget, and Mr. Berg claims that may or may not have been money

3    supposed to go to Mr. Rayden.  What he did not say is Mr.

4    Rayden got paid this money.

5         We have presented evidence in our submissions and we

6    are going to present evidence this afternoon that Mr. Rayden

7    did, and the other developers did indeed perform these

8    services.

9         And performance of services plus nonpayment, your

10   Honor, we would submit to -- amounts to a need to pay them.

11        And, one thing I will also note, that there was another

12   component of our motion that we have not discussed so far,

13   which was our client's personal accounts containing personal

14   funds.

15        Now, Mr. Berg said the $2.3 million has not been

16   returned.  What Mr. Berg left out is that that money is in fiat

17   accounts.  As a crypto organization, a DAO, Movement DAO

18   cannot, at least yet, open bank accounts, itself.  So, it

19   relied on bank accounts belonging to related entities.

20        In order for that to be returned to Movement DAO's

21   cryptocurrency wallet, it would have to be returned to some

22   kind of cryptocurrency and then routed back to it.

23        Earlier in this case, the plaintiffs demanded all

24   cryptocurrency be converted to fiat.  So, right now, that money

25   is being held in conventional bank accounts, untouched.

1   MEOW account -- there are eight accounts.

2       THE COURT:  It's going to be very difficult to unwind,

3   is what you are telling me?

4       MR. BERG:  There is a much more elegant solution here.

5   All the money that is from Movement DAO, in cash, return it.

6   That is what the TRO orders the defendants to do.

7       Once all that money is returned -- and, if it is not

8   all of it --

9       THE COURT:  Well, that's what we are trying to find out

10  first, how much is it?

11      MR. BERG:  Your Honor, there have been four accountings

12  already that defense has provided.

13      Return all that money to the DAO Endaoment.  Provide a

14  list of all of the expenses that have gone to third parties in

15  case the balance doesn't equal out.  And then, there is nothing

16  left in these accounts to freeze.  Right?

17      At that point, all the money that we have claimed was

18  taken has now been returned.  Or, it has been spent to

19  third-parties.  That -- the creating another accounting doesn't

20  make any sense because they have already been ordered to return

21  the money to Movement DAO.  Just comply with the order, and

22  then it will be much simpler.

23      THE COURT:  I guess this is the point.  How will I know

24  they complied without some sort of accounting?

25      MR. BERG:  That makes sense, your Honor.

1          But, what we can do is you can order them to say --
2     "Everything you contend is Movement DAO money, return it.  Tell
3     us how much you returned.  Everything that has been sent to
4     third parties that you can't return, provide an accounting of
5     that."
6          They have already done that.
7          And then, we -- that should -- those two numbers should
8     balance, should equal what we are missing.
9          THE COURT:  That makes sense to me.
10         So, they have already given you, you say, four
11    accountings?
12         MR. BERG:  Four different spreadsheets, your Honor.
13         THE COURT:  So, based on that, has the number been
14    moving?
15         Is that the concern?
16         MR. BERG:  It is.
17         THE COURT:  And they are saying, "Well, the money is
18    moving because crypto or cash keeps changing its value."
19         MR. FRANKLIN-MURDOCK:  Your Honor, I can briefly go
20    over the four accountings.
21         The April 8th accounting was the one that I described,
22    which was every account in a pretty detailed level of
23    granularity showing both Movement and nonMovement transactions,
24    for the purpose of showing what happened in every account
25    through which Movement funds passed.

1          They objected to that accounting and asked us to do it

2    in a different way that showed only transfers that we

3    identified as Movement DAO funds.  There was the April 8th

4    one -- I believe I actually sent it a few minutes after

5    midnight, so call it April 13 one that did it in the summary

6    form.

7          The very next day, or later that day, Mr. Rayden

8    returned funds to Movement DAO.  We updated that accounting to

9    show that return.

10          And then the fourth accounting was the one that we

11    submitted with our motion, which was almost identical to the

12    third one, except -- because cryptocurrency values fluctuate,

13    the final balance in the Phillips Robinhood investment account

14    differed.

15          And, to say that we did not disclose it, it is not

16    cryptocurrency, we labeled it "The Robinhood investment

17    account."

18          And, to address Mr. Berg's point about simply returning

19    all the cash to Movement DAO, maybe that sounds reasonable in

20    theory.  But, when -- you just heard from Mr. Berg -- your

21    Honor just heard from Mr. Berg that we don't want this

22    cryptocurrency because it can just be absconded with.

23    Returning it to Movement DAO means cryptocurrency to --

24    Movement DAO, as such, does not have a bank account.  It can't

25    be wired to Movement DAO.  It would have to be converted to

1    cryptocurrency, and then ultimately placed in one of these

2    Gnosis safe accounts that Mr. Berg said he doesn't want the

3    money, he doesn't want the money to be in.

4         I would urge your Honor, if he timely does it, what

5    your Honor first suggested, and allow us to show your Honor how

6    much is defendant's money versus how much is Movement DAO's

7    money.  And that way, defendants can use their personal funds.

8         THE COURT:  Okay.  So you just talked about four

9    accountings, and you said the last one was attached to your

10   motion.  Which motion?

11        MR. FRANKLIN-MURDOCK:  The motion to modify the TRO.

12        THE COURT:  Okay.  Motion 86 that I have received.  So

13   there is a final accounting attached there?

14        MR. FRANKLIN-MURDOCK:  Yes, your Honor.

15        THE COURT:  And then in that accounting --

16        Have you reviewed that accounting, Mr. Berg?

17        MR. BERG:  Yes, we have, yes.

18        THE COURT:  And what are your concerns?

19        MR. BERG:  We will be getting into them this morning.

20        But, the -- one of my concerns is that the money is

21   fluctuating from the last accounts.

22        And, Mr. Murdock said I should have known that the

23   Robinhood accounts had contained cryptocurrency.  But, the

24   heading above those accounts said "fiat," which is cash.

25        This declaration from Mr. Singh says, "Cash

1    accounting."

2          It doesn't say, "cryptocurrency."

3          And, the reason I thought it made sense to consider

4    that cash is because if it was cryptocurrency, it should have

5    been unwound, notwithstanding defendant's protest they can't

6    unwind transactions once the crypto has been converted to cash.

7    If it is already in crypto, then the excuse for not unwinding

8    doesn't exist.

9          THE COURT:  Okay.  So, is it in crypto or cash?

10         MR. FRANKLIN-MURDOCK:  So, this was a point we

11   addressed previously between counsel.  It is in crypto

12   currency.  But, Robinhood places -- it is either five thousand

13   dollars limit per day on how much can be transferred from

14   cryptocurrency to cash -- so, we would -- it would have to be

15   done five thousand dollars per 24-hour increments.  That is

16   Robinhood's rule.

17         THE COURT:  It is in crypto right now.

18         And what does Mr. Singh's affidavit about it being cash

19   mean?

20         MR. SINGH:  Your Honor, my understanding is we were

21   just providing a cash value of the cryptocurrency.

22         THE COURT:  I understand.

23         MR. BERG:  Cash value?

24         THE COURT:  All right, Mr. Berg.  Thank you very much.

25         My understanding is, it says, "I caused a cash

1    accounting substantially similar to the cash accounting

2    attached to the declaration of Benjamin Reed as Exhibit 1, to

3    be shared with plaintiff's counsel on April 13th."

4         So, it is a cash accounting.  But, by that, Mr. Singh,

5    you don't mean that it is in cash?

6         MR. SINGH:  My understanding has always been, your

7    Honor, that the Robinhood account does, indeed, hold

8    cryptocurrency, and Robinhood is known to be a part of the

9    cryptocurrency exchange platform.

10        THE COURT:  Okay.  So, there is nothing stopping the

11   defendant from transferring the crypto back to Movement DAO?

12        MR. FRANKLIN-MURDOCK:  The cryptocurrency can only be

13   transferred in five-thousand-dollars-a-day increments.

14        THE COURT:  Right.  But, you have had plenty of days.

15        MR. FRANKLIN-MURDOCK:  The second part of that, your

16   Honor, is that a significant amount of that money is

17   Mr. Phillips' money.

18        THE COURT:  Okay.  So, now, we come to the root of what

19   I am trying to understand, is how much belongs to Movement DAO,

20   or came from Movement DAO.

21        I guess those are the two different things we need to

22   clarify, just because you are saying it may have come from

23   Movement DAO, but Mr. Phillips sees it as his own funds he has

24   earned.

25        So, now, we are back to the preliminary injunction

1    issues and the underlying issues in this lawsuit.

2         Is that what you are saying?

3         MR. FRANKLIN-MURDOCK:  Not exactly, your Honor.  The

4    reason we identified the Robinhood account is because it was an

5    account that, in addition to having Mr. Phillips' personal

6    funds, also would be used to route Movement DAO funds.

7         So, what we are proposing is that we identify -- and we

8    would be happy to do it with greater granularity -- any

9    accounting of the account, which funds originated from Movement

10   DAO, and those funds can be held in the account, or exposed in

11   accordance with your Honor's direction, and the remainder can

12   be free so Mr. Phillips can use them to pay expenses.

13        THE COURT:  Okay.  So, what you are going to do is

14   whether it is his or not, you are going to do an accounting of

15   everything that originated from Movement DAO?

16        MR. FRANKLIN-MURDOCK:  Yes, your Honor.

17        THE COURT:  Okay.  Has such an accounting been done

18   before, Mr. Berg?

19        MR. BERG:  I have to say, I was represented that it

20   was.  I now know less today than I did yesterday.

21        The accountings that we received purported to show how

22   much Movement DAO funds are in these accounts.

23        THE COURT:  There is a difference between Movement DAO

24   funds and funds that originated from Movement DAO?

25        MR. BERG:  No, your Honor.  Sorry.

1          The accounts that -- the accountings that I have

2    received throughout this entire episode has been these that

3    represent the values of Movement DAO funds that are in these

4    accounts.

5          Now, what I am hearing is the balances listed in these

6    spreadsheets show the total value, some of which might be

7    Movement DAO money, and some of which might be Mr. Phillips'

8    money.  So, now, when I look at the sum totals on these

9    spreadsheets, that 2.3 million dollars -- I actually don't know

10   if that is all the Movement DAO money.

11         Now, it may be some of Mr. Phillips' money.  But, the

12   important point that I don't think we should let defendants'

13   dance around is they have admitted that the Robinhood account

14   has Movement DAO funds in cryptocurrency and they haven't moved

15   it back to the DAO Endaoment, notwithstanding that some of it

16   might be Mr. Phillips' -- but, we know some of it isn't -- so,

17   why haven't they transferred five thousand dollars at a time?

18         It has been 90 days.  What is the answer to that

19   question?

20         THE COURT:  Well, Mr. Murdock, can you answer that

21   question?

22         MR. FRANKLIN-MURDOCK:  Rather than making five thousand

23   transactions day by day, Mr. Phillips has simply left the money

24   untouched.

25         And, one point of clarification, your Honor, is that

1   the funds in the Robinhood investment firm's account include

2   salary that he was paid from Movement DAO and indemnification

3   funds he received from Movement DAO.

4          THE COURT:  Well, but as I am reading Judge Altman's

5   order, it is saying that any funds, that any funds that were

6   transferred from DAO are to be returned, and any funds that

7   were transferred within the last 30 days of his order are to be

8   returned.

9          Am I misunderstanding Judge Altman's order?

10          MR. FRANKLIN-MURDOCK:  No, your Honor.

11          And we -- our best effort at compliance is leaving the

12   funds untouched, given two main override- -- actually, three

13   factors; No. 1, the limit that Robinhood imposes; number two,

14   the fact that moving assets between different fiat and

15   cryptocurrency entails transaction costs; and, number three,

16   that the Movement -- that Movement DAO does not have real

17   world, in its own name, a real world account.  So, it is just

18   not a matter of doing a wire transfer from a bank account to

19   another.

20          THE COURT:  But a crypto transfer from one crypto

21   account to the other?

22          MR. FRANKLIN-MURDOCK:  Your Honor, I --

23          THE COURT:  And, let me ask you this:  Did you explain

24   all this to Judge Altman as to why you were not complying with

25   his order?

1          MR. FRANKLIN-MURDOCK:  We filed a response or an

2     opposition to the plaintiff's motion that I -- the motion

3     sought two things; the motion sought a transfer of all

4     cryptocurrency into cash.  That part of the motion was denied.

5     And, the remainder of the motion was not ruled upon.

6          THE COURT:  Okay.  So, I have an order that says that

7     you are to transfer the funds, and I am going to try to

8     understand what you are telling me.  But, it seems that you are

9     telling me that you didn't comply with Judge Altman's order for

10    several reasons.  But, at the end of the day, you didn't comply

11    with Judge Altman's order.

12         MR. FRANKLIN-MURDOCK:  Your Honor, in addition to all

13    that, the order set forth enumerated accounts.  The Robinhood

14    account was not an enumerated account.  That is not the only

15    reason, but that's to add to all the other factors.

16         MR. BERG:  Your Honor, that is a misrepresentation of

17    the order.  Those accounts are examples.  And, you -- if you

18    read just above the listing of those accounts, it says, "Any

19    account."  It says, "any account."

20         THE COURT:  Okay.  I think we have to move on from that

21    and proceed with the defendant's case, because at the end of

22    the day, it comes down to the factors involved in this case,

23    itself.  And, I want to make sure that I know all of the facts.

24         MR. FRANKLIN-MURDOCK:  Thank you, your Honor.  Does

25    your Honor still wish for us to submit the accounting in camera

1    in five days?

2          THE COURT:  Yes.

3          MR. FRANKLIN-MURDOCK:  Thank you, your Honor.

4          THE COURT:  Okay.  So, let's start to -- actually start

5    -- try to complete, today, defendant's evidence in the

6    preliminary injunction matter.

7          MR. BERG:  Your Honor, when we ended, we had --

8    plaintiffs had one more witness to do.

9          THE COURT:  Okay.  I'm sorry.

10         MR. BERG:  And, I just wanted to reiterate what we

11   discussed at the status conference.  Defendant is going to have

12   two-and-a-half hours to put on their case, plaintiffs would

13   have three.  And, that is the hours we had left for our case,

14   and two hours for cross, equivalent to what you awarded

15   defendants.

16         THE COURT:  We hoped for each side to get an equivalent

17   amount.

18         MR. BERG:  One last housekeeping.

19         I believe you provided us five minutes for summation,

20   and plaintiff's three minutes for rebuttal.  I beg your

21   indulgence for ten.

22         THE COURT:  You may need more?

23         MR. BERG:  There's quite a bit to cover.

24         THE COURTROOM DEPUTY:  Your Honor, I would like to go

25   through the exhibits so we are all on the same page.

1   blockchain.

2   Q.  And Mr. Bax, is the DAO Endaoment kept in a Gnosis safe?

3   A.  It is.

4   Q.  Were these information sources relied upon in your field of

5   crypto tracing?

6   A.  These are the bread and butter of my field.

7   Q.  And can you describe the methodology you used to use these

8   sources in conducting your analysis?

9   A.  It was primarily comparative.  I would compare things from

10  the blockchain or from snapshot.org from the Gnosis safe with

11  other documents which have already been presented in the court

12  case, you know, declarations, accountings, and so forth.

13  Q.  And when you say the blockchain, is that shorthand for your

14  reference to information reflected on etherscan transaction

15  records?

16  A.  That's correct.  Etherscan is a very good way to obtain

17  information from the blockchain.

18  Q.  And is the methodology you just described one that is

19  widely used in field cryptocurrency tracing?

20  A.  It is.

21  Q.  Is that methodology capable of peer review?

22  A.  It is.

23  Q.  And is this methodology one that you specifically typically

24  employ in your practice as a crypto tracing -- cryptocurrency

25  tracing analyst?

1    A.   Every day.

2         MR. BERG:  Your Honor, I proffer Mr. Bax as an expert

3    in cryptocurrency tracing analysis.

4         THE COURT:  Mr. Singh, or Mr. Murdock?

5         MR. FRANKLIN-MURDOCK:  No objection, your Honor.

6         THE COURT:  Okay.

7    BY MR. BERG:

8    Q.   What was the first issue you looked into, Mr. Bax?

9    A.   The first issue I looked into was many of Endaoments were

10   contributed by the plaintiffs.

11   Q.   What source materials did you use to conduct your --

12   A.   I relied upon Exhibit 90, which was produced by Mark

13   Phillips, and I also relied on etherscan transaction records.

14   Q.   Now, Exhibit 90, is that the operational budget we were

15   discussing earlier today?

16   A.   It is a portion of the operational budget.  It was -- the

17   first page just showed a list of transactions which purported

18   to transfer funds to the Movement DAO Endaoment.

19         THE COURT:  Is this the Snapshot of the first page of

20   that Exhibit 90?

21         THE WITNESS:  That is the beginning of the first page

22   of Exhibit 90.

23   BY MR. BERG:

24   Q.   What does that page show?

25   A.   It -- it was a spreadsheet with 139 rows of transaction

 1    history data.  It showed -- for each transaction, it showed a

 2    block number which, for our purposes, is essentially the time

 3    that the transaction was put on the blockchain.  It includes a

 4    transaction hash, which is a unique identifier which allows you

 5    to pull up transaction records using etherscan.  For instance,

 6    it includes a column labeled sender, which is the

 7    cryptocurrency address that initiated that transaction.

 8        It also says the amount of cryptocurrency and the currency,

 9    itself, either ether or DAI, which was sent to the DAO

10    Endaoment, and the amount in cryptocurrency units, as well as

11    the dollar amounts as they were calculated, I believe, by

12    Mark Phillips.

13    Q.  Were you able to discern into what account this list of

14    transfers were made?

15    A.  The vast majority of these transfers were sending funds

16    into the DAO Endaoment account.

17    Q.  Was the total at the bottom of this document?

18    A.  Yes, at the very bottom, there was a summation, which said

19    that the total amount of the transactions listed was

20    17,189,461.91.

21    Q.  Now, you said the vast majority of these transactions were

22    transfers to the DAO Endaoment account.  What did you mean by

23    that?

24    A.  That's correct.  Of these, almost all of them were just

25    transferring assets into the DAO Endaoment.  I did identify

1  some which I would not consider contributions to the DAO

2  Endaoment.

3  Q.  We will get to that in a moment.

4      What analysis did you perform with this data?

5  A.  I began by writing a really simple Python script, which

6  went through each transaction, pulled the data from the

7  blockchain, and identified those which I would not consider

8  very simple transfers.

9  Q.  So, when this Python script identified transactions that

10  were not simple transfers, what did you do with those?

11  A.  It flagged those transactions.  And then I would pull up

12  those transaction hashes and pick up the -- sorry, I pulled up

13  the transaction records on the etherscan, and would take a very

14  close look at what the transaction actually did.

15  Q.  And what did you find in your analysis of those not simple

16  transactions?

17  A.  I identified at least six transactions which I don't think

18  should be counted to the contribution total.

19  Q.  Why did you conclude that?

20  A.  They were not contributing assets to the DAO Endaoment.

21  They were actually swaps.  So, specifically, there was the

22  cryptocurrency DAI in the DAO Endaoment, and these transactions

23  were taking DAI out of the DAO endowment, sending it to a

24  decentralized exchange called Uniswap, which converted the DAI

25  into ether and then sent the E-T-H, ether back in the DAO

1    Endaoment.

2    Q.   How were you able to confirm -- your Honor, I would like to

3    direct the Court to review the printout here, as the width of

4    the projector is a little too narrow?

5         THE COURT:   I see it.

6    BY MR. BERG:

7    Q.   Now, how did you determine that a transaction was a swap?

8    A.   So, the etherscan transaction record, the figure in the

9    upper left here shows, first off, the transaction hash, the

10   identifier in the transaction, and then it shows that 50,000

11   DAI was transferred out of Movement DAO Endaoment to Uniswap.

12   It was converted to USDC and other cryptocurrency, and from

13   USDC, it was converted into ether, and then that ether was

14   transferred back into the DAO Endaoment, all in the single

15   transaction.

16   Q.   And what does the table on the right-hand side of your

17   slide show?

18   A.   That table shows the six transactions, which I identified

19   as being swaps.

20        MR. BERG:   Your Honor, I am going to hand Mr. Bax a

21   paper copy, given the state of the projecting of his

22   presentation.

23        Thank you.

24        And how much did the swap transactions count for total

25   contributions in the DAO Endaoment contribution list?

1    A.   $462,411, if you use the defendant's price calculation.

2    Q.   Who was responsible for initiating these swap transactions?

3    A.   These transactions were all initiated by the cryptocurrency

4    address with the ENS service provider .eth.

5         You can see that in the etherscan screenshot.  It shows

6    from service provider .eth.

7    Q.   Okay.  Did you notice any other suspect transactions when

8    conducting your analysis?

9    A.   I did.  The very largest deposit from Ryan Breslow, which

10   totaled about $9.78 million, was a little unusual.

11   Q.   How so?

12   A.   Instead of going directly from Ryan Breslow's Gnosis safe,

13   as his other contributions had, directly from the Gnosis safe

14   to the Movement DAO Endaoment, it went -- what was indirectly

15   deposited, the 9.8 million dollars was withdrawn from the

16   Gnosis safe to serviceprovider.eth, and then deposited from

17   serviceprovider.eth into the Movement DAO Endaoment.

18   Q.   The exact same amount?

19   A.   The exact same amount.

20   Q.   About how much time lapsed between that transfer?

21   A.   About 15 or 20 minutes.

22   Q.   And on what date did that transfer occur?

23   A.   February 2nd, 2022.

24   Q.   So, how did this activity impact your analysis?

25   A.   It actually didn't.

1    Q.   Did it have anything to do with any other analysis that you

2    performed?

3    A.   It did become relevant later on.

4    Q.   We will get back to that.

5         What did you do next?

6    A.   I looked at the plaintiff's contributions and summed up the

7    amount that they had contributed based on the spreadsheet.

8    Q.   And how exactly did you come up with what were plaintiff's

9    contributions?

10   A.   They came from the plaintiff's declarations, and then I

11   spoke to the plaintiffs and asked them to verify it, and --

12   Q.   Did you do anything with etherscan transaction records to

13   confirm what plaintiffs told you?

14   A.   I reviewed each of these transactions to make sure it was

15   actually a contribution to the Movement DAO Endaoment.

16   Q.   How much did you conclude plaintiffs contributed to the DAO

17   Endaoment?

18   A.   Using the defendant's numbers, it sums up to

19   $16,825,680.97.

20   Q.   Once you calculated plaintiff's contribution and the swap

21   contributions, swap transactions, what did you do?

22   A.   I subtracted the improperly counted swap contributions from

23   the summation at the bottom of the spreadsheet, which gave me

24   the total contributions excluding those swaps.

25   Q.   And what was that total?

1   A.   That was $16,727,050.90.

2   Q.   How did you use that total in your analysis?

3   A.   I then calculated a percentage to figure out what percent

4   of the plaintiffs' contributions were of the total.

5   Q.   Based on your calculations, what percentage did you

6   conclude?

7   A.   The plaintiffs contributed a little over 97 percent of

8   assets in the DAO Endaoment.

9   Q.   And just to be clear, the assets -- by assets in the DAO

10  Endaoment, you are referring to the cryptocurrency address

11  ending in 03C6; is that correct?

12  A.   That's correct.

13  Q.   What was your next task?

14  A.   Next, I was tasked with looking into the removal of the

15  plaintiffs as signatories from the DAO Endaoment on February

16  2nd of 2023.

17          MR. BERG:  And your Honor, before I go on, I would like

18  to move into evidence the exhibit that Mr. Bax relied on in his

19  analysis for the previous issue.  I would like to move into

20  evidence Exhibits 251, 92, and 150.

21          THE COURT:  Any objection from the defendants?

22          MR. FRANKLIN-MURDOCK:  No, your Honor.

23          THE COURT:  Okay.  They are admitted.

24          (Exhibits 251, 92, and 50 were received in evidence.)

25  BY MR. BERG:

1    Q.   Mr. Bax, on removing plaintiffs as signatories, that issue,

2    what source documents did you use for your analysis?

3    A.   I relied primarily on the DAO Endaoment Gnosis safe

4    transaction records.

5    Q.   And what is that?

6    A.   That is on safe.global.  It shows each transaction that

7    involved the DAO Endaoment Gnosis safe.

8    Q.   Did you use anything else?

9    A.   I also relied on a text message which -- I wouldn't say,

10   "relied."  I used a text message which I was provided by the

11   plaintiffs between Mark Phillips and Jon Gordon.

12   Q.   And what were you using that text message for?

13   A.   I was using that to determine who was in possession of Alex

14   Fine's private keys.

15   Q.   And what does the text message tell you?

16   A.   The text message -- in the text message, Mark Phillips said

17   he did not possess Alex Fine's keys.  They were held by the DAO

18   law firm.

19          MR. BERG:  I would like to move Exhibit 149 into

20   evidence.

21          THE COURT:  Any objection?

22          MR. FRANKLIN-MURDOCK:  No, your Honor.

23          THE COURT:  Admitted.

24          (Exhibit No. 149 was received in evidence.)

25   BY MR. BERG:

1    Q.   How did you begin your analysis?

2    A.   I began by looking at the stipulations.

3    Q.   And what did you use the stipulations to do?

4    A.   The stipulations helped me identify which ENS and addresses

5    belonged to whom.

6    Q.   ENS addresses belonging to the DAO Endaoment account?

7    A.   To the DAO law firm accounts, and Tankbottoms.eth,

8    specifically.

9    Q.   But those ENSs, you were investigating who was the

10   signatory on the DAO Endaoment; correct?

11   A.   That's correct.  I was identifying who was the signatory on

12   the DAO Endaoment Gnosis safe.

13   Q.   And on this -- on slide 14 here, there are four names.

14   These are the four names you concluded were signatories to the

15   DAO Endaoment account; is that correct?

16   A.   That's correct.

17   Q.   And who -- who are the signatories listed here?

18   A.   They are Ryan Breslow, Mark Phillips, Alex Fine and

19   Jon Gordon.

20   Q.   Did you confirm the identity of the addresses associated

21   with DAOlawfirm.eth?

22   A.   Yes.

23   Q.   How did you do that?

24   A.   In Mark Phillips' declaration, he stated, "I created and

25   maintained DAOlawfirm.eth.

1   Q.   What does this slide show?

2   A.   This slide shows each of the addresses with the names

3   associated of who controlled them.

4   Q.   So, based on your analysis, these were the names that you

5   were able to identify and verify from signatories of DAO

6   Endaoment account?

7   A.   That's correct.

8   Q.   What analysis did you undertake with the identities, the

9   signatories of the DAO Endaoment?

10   A.   I then went to the Gnosis -- the safe.global site, and

11   looked over major transaction record events to determine who

12   exercised control over the DAO Endaoment and who authorized

13   these major transactions.

14   Q.   What event did you examine first?

15   A.   The first event that I looked at was the creation of the

16   DAO Endaoment Gnosis safe on January -- give me a moment --

17   January 8, 2022.

18   Q.   And how did you do that?

19   A.   I went to the Gnosis -- the safe.global site and scrolled

20   down the transaction records to the very first transaction,

21   which stated, safe created.

22   Q.   And what did you conclude when you reviewed that entry?

23   A.   The creator of the safe was the address beginning in 0X7525

24   and ending in 0085.

25        From the stipulations, we know that that address is

1    associated with DAOlawfirm.eth.

2        And, we know that DAOlawfirm.eth was created and maintained

3    by Mark Phillips.  Therefore, I concluded that Mark Phillips

4    created the DAO Endaoment Gnosis safe.

5    Q.  What event did you examine next?

6    A.  Next, I looked into the removal of Jon Gordon and Alex Fine

7    as signatories on the DAO Endaoment.

8    Q.  And how did you do that?

9    A.  I found the entries on the Gnosis safe transaction records

10   where they were removed as signatories.

11   Q.  That is entry 22 and entry 34?

12   A.  Correct.

13   Q.  And when you found those entries, what did they show?

14   A.  So, entry 22, in the upper left-hand corner there, it says,

15   "Remove owner," and then lists the address that we identified

16   as belonging to Jon Gordon.  So, that told me that Jon Gordon

17   was removed as a signatory on this transaction.

18   Q.  And you mentioned that -- this is a Gnosis safe; correct?

19   A.  That's correct.

20   Q.  You mentioned that Gnosis safes require confirmation from a

21   number of signatories in order to implement a transaction,

22   right?

23   A.  Correct.

24   Q.  Did you determine who confirmed this transaction to

25   authorize the removal of Jon Gordon?

1  A.   The transaction was confirmed by the addresses belonging to

2  Alex Fine, Ryan Breslow and Mark Phillips.  Therefore, someone

3  with access to Ryan Breslow, Alex Fine and Mark Phillips'

4  private keys removed Jon Gordon as a signatory.

5  Q.   When did that occur?

6  A.   That removal occurred on February 2nd, 2023, at 1:33 A.M.

7  Pacific time.

8  Q.   And did you -- what did you conclude about Alex Fine's

9  removal as a signer?

10  A.   Alex Fine was removed from the Gnosis safe in Entry 34.

11  Q.   And how did you conclude that?

12  A.   If you look in the upper left hand corner of the screenshot

13  entry 34, it shows Alex Fine's address was removed as an owner.

14  Q.   And did you conclude who confirmed that transaction?

15  A.   I did.

16  Q.   Who was that?

17  A.   The addresses that confirmed the transaction for

18  Mark Phillips, using the DAOlawfirm.eth address, Ryan Breslow's

19  address and Mark Phillips' other address.

20  Q.   What did you conclude as a result of reviewing this entry?

21  A.   On February 2, 2023, at around 3:32 A.M., Pacific Time,

22  someone with access to the DAO law firm private keys, Ryan

23  Breslow's private key and Mark Phillips' private key, removed

24  Alex Fine as a signatory from the DAO Endaoment.

25  Q.   What event did you examine next?

1    A.   Next, I looked into the major DAO Endaoment transfers that

2    happened on February 2nd, 2023.

3    Q.   And where did you find those transfers in the transaction

4    record?

5    A.   These transactions were entries 36 and 37 on the Movement

6    DAO Endaoment transaction records.

7    Q.   And entry 36 was a transfer of 7.5 million DAIs; is that

8    correct?

9    A.   That's correct.

10   Q.   And entry 37 was a transfer of 805 eth?

11   A.   That's correct.

12   Q.   And did you determine what signatories confirmed both these

13   transactions?

14   A.   Two of the accounts that confirmed the transaction were

15   Mark Phillips' DAO law firm and Mark Phillips using his other

16   address.

17        The third signatory was an address ending in 68-AD, which

18   was added as a signatory a couple of hours earlier at 1:55

19   A.M., Pacific Time, using the private keys belonging to

20   Breslow, Phillips and the DAO law firm.

21   Q.   What did you determine about who authorized these

22   transfers?

23   A.   Whoever authorized these transfers had access to Mark

24   Phillips' private keys, the DAO law firm private keys and had

25   also used Ryan Breslow's private keys to add the third

1    signatory.

2    Q.   After reviewing all of the major transactions of the DAO

3    Endaoment transaction records, what did you conclude from your

4    review?

5    A.   The addresses that Mark Phillips controls, the ones ending

6    in 0085 and 7409, were used to create the DAO Endaoment on

7    January 8, 2022, and they were also used to remove the

8    plaintiffs as signatories on February 2nd, 2023.  And, they

9    were used to transfer over 8.5 million dollars out of the DAO

10   Endaoment on February 2nd, 2023.

11   Q.   What else did you conclude?

12   A.   Removal of plaintiffs as signatories of the DAO Endaoment

13   account required access to the plaintiff's private keys, Mark

14   Phillips' private key and the DAOlawfirm.eth private key.

15   Q.   What was your next task?

16   A.   Next, I was tasked to look into Movement DAO's Snapshot

17   voting allocation and whether it was arbitrary.

18   Q.   And what source documents did you use for your analysis?

19   A.   I relied on the Snapshot voting records, primarily the MIP

20   0000 Snapshot voting record, but I also looked at other

21   Snapshot voting records.  And, in addition to that, I looked at

22   etherscan transaction records for addresses that voted.

23        MR. BERG:  Your Honor, at this point, I would like to

24   move in Exhibits 125 through 132, 155, 333, 358, and 362 into

25   evidence.

```
1              THE COURT:  Any objections?

2              MR. FRANKLIN-MURDOCK:  No, your Honor.

3              THE COURT:  Okay.  Admitted.

4              (Exhibits 125 through 132, 155, 333, 358, and 362 were

5    received in evidence.)

6    BY MR. BERG:

7    Q.  So, do you have any theories for how voting might be

8    allocated in the Movement DAO Snapshot?

9    A.  Yes.  The first hypothesis was that Snapshot voting power

10   was determined by MOVE tokens in a voting addresses possession.

11   Q.  What was your next theory?

12   A.  The next theory was that Snapshot voting power was

13   determined by MAPE NFTs in the voting address's possession.

14   Q.  And your final theory?

15   A.  That Snapshot voting power was determined by a voter's

16   contribution to the DAO Endaoment.

17   Q.  How did you conduct your analysis?

18   A.  I checked the historical data for each account that voted

19   on Movement DAO's Snapshot page, specifically to see their

20   ERC20 and their ERC721 or NFT transaction history, and also to

21   find their contributions to the DAO Endaoment.

22   Q.  ERC20 -- that is another way of saying token?

23   A.  That's correct.  MOVE tokens should be in ERC20 standard

24   token.

25   Q.  And ER721, that's a reference to an NFT, or nonfungible
```

1   token?

2   A.   That's correct.  The ERT721 and NFT are used almost

3   interchangeably.

4   Q.   And you used that to see if any voter had a MAPE NFT, is

5   that correct?

6   A.   That's correct.

7   Q.   Did you examine anything else?

8   A.   I actually created my own Snapshot page to see if I could

9   replicate some of the behavior that I was seeing on the

10  snapshot.move.eth Snapshot page.

11  Q.   What proposal did you focus on to conduct your review?

12  A.   I focused on MIP 0000.

13  Q.   And what did you conclude with regard to the MOVE tokens

14  related to voting power?

15  A.   I concluded that since no Snapshot voting address contained

16  a MOVE token in their cryptocurrency account or their ERC20

17  transaction history, that the MOVE tokens do not govern the

18  Snapshot votes.

19  Q.   What did you examine next?

20  A.   Next, I examined whether MAPE NFTs may govern the Snapshot

21  votes.

22  Q.   Were you make assumptions when you were conducting your

23  analysis regarding MAPE, NFTs?

24  A.   Yes.  I assumed that the MAPE NFT was a nonfungible token

25  or NFT, that the defendant 's claim was intended to control the

1  initial governance of the Movement DAO.

2  Q.  What did you conclude about MAPE NFTs?

3  A.  I concluded that they were not being used to governed the

4  Snapshot.  There was no correlation between the number of MAPE

5  NFTs in an address and the voting power of that address.

6  Q.  So the voters who possessed MAPE NFTs, they didn't have any

7  discernible correlation?

8  A.  That's correct.

9  Q.  What did you examine next?

10  A.  Next, I looked into whether the DAO Endaoment contributions

11  may have governed Snapshot voting power.

12  Q.  What did you conclude about that?

13  A.  Voting power may be based on the amount contributed to the

14  DAO Endaoment address, but not really because that's invalid

15  because serviceprovider.eth contributed zero dollars, but has

16  over 10 million votes.

17  Q.  But you observed that the service provider contribution was

18  zero?

19  A.  Yes.

20  Q.  The votes exercised were in excess of 10 million?

21  A.  That's correct.

22  Q.  Mr. Bax, I thought you testified earlier that

23  serviceprovider.eth had transferred 9.7 million dollars into

24  the DAO Endaoment account?

25  A.  It had transferred those funds, but that was not a

1    contribution by serviceprovider.eth.  That was a contribution

2    by Ryan Breslow.

3    Q.  So, when you went back and looked at the indirect deposit

4    and the swaps, did you conclude anything about their relation

5    to the votes?

6    A.  When I summed the value of the swap transactions, and the

7    indirect deposit, I came to the exact number of votes that the

8    service provider was using.

9    Q.  So, the transactions initiated by the serviceprovider.eth

10   that you concluded were not legitimate contributions were used

11   to have the precise equivalent number of votes for service

12   provider in Snapshot?

13   A.  That's correct.

14   Q.  What happens if you exclude the swap and indirect deposit

15   transactions?

16       How many votes would serviceprovider.eth have then?

17   A.  If you exclude the swap and indirect deposit transactions,

18   serviceprovider.eth contributed zero dollars to the DAO

19   Endaoment, and would have zero votes.

20   Q.  Do you conclude anything else about serviceprovider.eth

21   when conducting your analysis?

22   A.  Yes.  Serviceprovider.eth was responsible for over 95

23   percent of the votes cast in favor of all proposals posted to

24   the Snapshot page in August and September of 2022.

25   Q.  And you reached that conclusion by evaluating the voting

1    records for those Snapshot proposals?

2    A.   That's correct.  I went through the voting records from MIP

3    0000 through MIP 0008, and looked at the number of votes cast

4    by the addresses.

5    Q.   Did you come to a conclusion about who controls

6    serviceprovider.eth?

7    A.   I did.

8    Q.   What did you conclude?

9    A.   I concluded that serviceprovider.eth was controlled by

10   Mark Phillips.

11   Q.   How did you do that?

12   A.   Mark Phillips stated that he created and maintained

13   DAOlawfirm.eth.  DAOlawfirm.eth is assigned to the address

14   ending in 0085.  In the stipulations, it also says that

15   serviceprovider.eth is assigned to the address ending in 0085.

16        They are --

17   Q.   Serviceprovider.eth and DAOlawfirm.eth are registered to

18   the same cryptocurrency address?

19   A.   That's correct.

20   Q.   Is it possible to do that with an ENS?

21   A.   It is.

22   Q.   Did you examine the voting power of any other ENS?

23   A.   I did.

24   Q.   And whose did you examine?

25   A.   I looked at Mark Phillips' Tankbottoms.eth ENS and the

1  address ending in d27E.

2  Q.  And you know that that address belongs to Mr. Phillips

3  because of the fact stipulation entered into by the parties;

4  correct?

5  A.  That's correct.  Tankbottoms.eth is Mark Phillips.

6  Q.  What analysis did you perform?

7  A.  I looked at his voting power over time on the Snapshot

8  votes.

9  Q.  What else did you look at?

10  A.  I looked at the amount that his address contributed to the

11  DAO Endaoment over time.

12  Q.  And what did you conclude?

13  A.  I found that his voting power increased over time, but the

14  address never contributed to the DAO Endaoment.

15  Q.  So, in March 21, 2023, Mr. Phillips cast over one million

16  votes?

17  A.  That's correct.

18  Q.  How much did he contribute to the DAO Endaoment?

19  A.  Zero dollars.

20  Q.  How did you conclude that Tankbottoms.eth never contributed

21  to the DAO Endaoment?

22  A.  I checked the transaction records for both the DAO

23  Endaoment and for the Tankbottoms.eth address.

24  Q.  And what did that show you?

25  A.  It showed me that no assets were contributed from

1    Tankbottoms.eth to the DAO Endaoment.

2    Q.   Did the voting characteristics associated with service

3    provider and Tankbottoms prompt you to conduct any further

4    examination?

5    A.   They did.

6    Q.   What did you do?

7    A.   I looked at the settings on the Snapshot page and I found

8    that the Movement.snapshot page was using something called a

9    voting strategy that was white-list weighted.

10   Q.   And what is white-list weighted?

11   A.   White-list weighted allows administrators for a Snapshot

12   page to basically assign an arbitrary number of votes to any

13   account.

14   Q.   And how did you go about conducting your analysis with this

15   white-list weighted strategy?

16   A.   I made my own Snapshot page, and I set it to the white-list

17   weighted strategy, and I tested this hypothesis by uploading a

18   JSON file.

19   Q.   And that JSON file -- that is basically a list of

20   cryptocurrency addresses, with a number beside them, and that

21   number constitutes how many votes Snapshots will register to

22   that address?

23   A.   That's correct.  The administrator uploads that file with

24   the list of addresses, and corresponding votes assigned to that

25   address.

1   Q.   So, when you created your own Snapshot pages, what were you

2   able to determine?

3   A.   I found I could assign myself any arbitrary number of

4   votes.

5   Q.   And that was the same strategy that was deployed on the

6   Movement DAO Snapshot; is that correct?

7   A.   That's correct.

8   Q.   What did you conclude from your analysis of Movement DAO's

9   Snapshot voting power?

10  A.   For Tankbottoms.eth, voting power was allocated to

11  Mark Phillips in a manner that gave him massively

12  disproportionate voting power without any discernible pattern

13  of consulting.

14  Q.   What about service provider?

15  A.   For serviceprovider.eth, voting power was allocated to

16  Mark Phillips in a manner that credited serviceprovider.eth

17  for contributions that others had made.

18  Q.   What was your next task?

19  A.   Next, I looked into whether a DAO can launch using the

20  tooling on the application on move.xyz.

21  Q.   Can you explain what you mean by a tooling application?

22  A.   Yes.  On move.xyz, there was a link that said, "tooling,"

23  and when I clicked it, it sent me to a website,

24  DAOLabs-NFTtooling.onfleek, the URL is there on the slide.

25  Q.   And your task was to test whether that application was to

1   create a DAO, is that correct?

2   A.   Correct.

3   Q.   What source documents did you consider?

4   A.   I considered the move.xyz website and the tooling

5   application.

6   Q.   And the reference to a tooling application appears on

7   Page 1842 of Exhibit 168?

8   A.   That's correct.

9         MR. BERG:  I would like to move Exhibit 168 into

10   evidence.

11         THE COURT:  Any objection?

12         MR. FRANKLIN-MURDOCK:  No, your Honor.

13         THE COURT:  Admitted.

14         (Exhibit 168 was received in evidence.)

15   BY MR. BERG:

16   Q.   What methodology did you use to conduct your analysis?

17   A.   I walked through the DAO creation process on the move.xyz

18   tooling application.

19   Q.   And then what did you do?

20   A.   I used console code debugging which comes with almost every

21   Internet browser to ascertain whether the textile could be

22   launched on the new move.xyz tooling application.

23   Q.   Now, this console code debugging application, is that a

24   tool that you use in the normal course of your profession?

25   A.   That is.

1   Q.   Is that a tool other cryptocurrency analysts use?

2   A.   They do when the need arises.

3   Q.   Is that a reliable tool?

4   A.   It is.

5   Q.   Is the use of that tool and the analysis you derived from

6   it something that is capable of being replicated and tested --

7   A.   It is.

8   Q.   -- based on what is shown on slide 35?

9   A.   That was the landing page on move.xyz on Sunday evening,

10   this past Sunday evening.  May 21st.

11   Q.   And, at the bottom of that page is a link that says

12   "tooling."  Is that right?

13   A.   That's correct.

14   Q.   What does that link do?

15   A.   When you click that link, it sends you to the address I

16   previously identified, the DAOLabsNFT tooling address, and the

17   -- it is the tooling application which allows you to design and

18   launch a project.

19   Q.   So, when you click on tooling, it takes you to a page that

20   has two buttons; is that correct?

21   A.   That is correct.

22   Q.   And what are those two buttons?

23   A.   The first button says, "launch your project," and the other

24   says, "create tokens."

25   Q.   And you clicked launch your project?

1    A.    Yes.

2    Q.    What happens when you do that?

3    A.    It sent me to the tooling application pages where I could

4    enter project details and other parameters for launching a DAO.

5    Q.    Okay.  And what did you do once you navigated to the page?

6    A.    I input in a project name.  I called it test.  And project

7    description, I called it test, as well.

8          I also input in a website and a Twitter handle for it.

9    Q.    All called test?

10   A.    All called test.

11   Q.    When you completed all fields, what was the final step

12   before completing the process?

13   A.    The final step was a button which, or there were two

14   buttons.  One says, "Juicebox," and one said "DAOLabs."  And

15   then a button which said, "Deploy project to main net."

16   Q.    And what platform did you collect?

17   A.    I collected the DAOLabs platform.

18   Q.    What did you do?

19   A.    I clicked the "deploy project to main net" button.

20   Q.    What happened when you did that?

21   A.    Nothing.

22   Q.    Can you explain, on nothing --

23   A.    Nothing happened.  So then I opened up the console tool we

24   had previously discussed.

25   Q.    And what did you find from that?

1    A.   When I clicked the button a second time, it gave me a

2    message which said, "failed to deploy project," and then it

3    gave me an error message which said, "invalid contract address

4    or ENS name."

5    Q.   Do you know what those errors mean?

6    A.   I did not.

7    Q.   What were you able to conclude from this information?

8    A.   That when I clicked "deploy project," these errors arose

9    and it did not have the expected behavior which would allow me

10   to launch a project on the tooling application.

11   Q.   Did you do anything to confirm that conclusion?

12   A.   I did.  I clicked all over the website and checked it.

13   Perhaps my project was, you know, launched somewhere else, and

14   I also checked the blockchain, to see if maybe the transaction

15   was broadcast somewhere else.

16   Q.   And what did you conclude?

17   A.   I didn't find any evidence that my project had launched.

18   Q.   Over the course of your examination of the tooling

19   application, did you observe that the application could verify

20   a user or Twitter account?

21   A.   I did not observe that.

22   Q.   Did you observe whether voting and submission functions

23   were integrated to the application via Snapshot?

24   A.   I did not see any voting or voting functions.

25   Q.   Did you observe whether there was functionality that

1    allowed a user to vote on whether initiatives should receive

2    funding on the DAO Endaoment?

3    A.   I did not see that functionality.

4    Q.   Based on your analysis, what did you conclude about the

5    tooling application on move.xyz?

6    A.   It was nonfunctional for launching a DAOLabs DAO.

7    Q.   When did you conduct your analysis on tooling application

8    on move.xyz?

9    A.   I conducted the analysis on the evening of Sunday, May 21st

10   and Monday, May 22nd.

11   Q.   Did you visit move.xyz since conducting that analysis?

12   A.   I did.

13   Q.   And what did you discover when you did that?

14   A.   Yesterday afternoon, when I visited it, I found that the

15   landing page on move.xyz looked completely different.

16   Q.   So, between Sunday and yesterday, the page changed?

17   A.   That's correct.

18   Q.   Was the tooling application still visible?

19   A.   It was not.

20   Q.   What else had changed?

21   A.   It said something about launching projects and exploring

22   projects, and the logo was different.  It looked like an

23   entirely different service.

24   Q.   Was there a "launch your project" button?

25   A.   There was.

1    Q.   Did you click it?

2    A.   I did.

3    Q.   What happened when you did that?

4    A.   It took me to something that looked very similar to the

5    tooling application.

6    Q.   Okay.  Did you conduct the same analysis on this new

7    application that you did previously on May 21st?

8    A.   I did.

9    Q.   And what did you conclude?

10   A.   I went through all of the steps, and I got the same error

11   message.

12   Q.   Did you notice anything else about projects that were

13   displayed on this website?

14   A.   Yes.  When I clicked the "Explore Your Project" website,

15   button, it showed many projects.

16   Q.   And did that suggest to you that those projects were

17   operating on the move.xyz website?

18   A.   At first glance, it looked like there were a lot of

19   projects operating on the move.xyz website.

20   Q.   Why do you say, "at first glance"?

21   A.   I took a closer look at this, and I realized that these

22   were actually projects that had been launched on a different

23   service, juicebox.money.

24   Q.   How do you know that?

25   A.   I looked, I saw a bunch of these projects.  I then checked

1   make it seem as if these were move.xyz projects.

2   Q.  What was your next task?

3   A.  My next task was to look at the defendant's TRO accounting

4   and determine whether it is trustworthy.

5   Q.  What do you mean by --

6        MR. FRANKLIN-MURDOCK:  Your Honor, I am going to object

7   to the line of questioning.  It is not relevant to the issues

8   before the Court as to whether there is a likelihood of success

9   on the merits for the claims raised in the verified complaint,

10  nor does it show irreparable harm.  This is merely more of the

11  same as far as plaintiff's efforts to argue their outstanding

12  motion regarding compliance with the TRO.

13       We would ask the Court to not permit this line of

14  questioning.

15       THE COURT:  Well, actually, that motion has been

16  referred to me now by Judge Altman.  So, I will need to make a

17  decision with regard to the motion to modify the TRO that you,

18  the defendants, have filed.  So, this is relevant for me to

19  make a determination.  But, I will say, I need to know if our

20  court reporter needs a break.

21       MR. BERG:  I just have ten minutes, if you will indulge

22  me.

23       THE COURT REPORTER:  Of course.

24       THE COURT:  So, we will do these ten minutes and we

25  will break for one hour for lunch.

1            And then I am sure you will want to cross-examine --

2            But, this is only ten more minutes with this particular

3    witness?

4            MR. BERG:  That's correct, your Honor.

5            THE COURT:  Mr. Murdock, I see you are standing.

6            MR. FRANKLIN-MURDOCK:  Your Honor, that is -- my cross

7    is not going to be very long in case that affects the Court's

8    consideration.  I don't know if your Honor would like to take

9    five minutes and then we could finish Mr. Bax and my cross

10   before lunch and then proceed to the defendant's case in chief.

11           THE COURT:  Well, let's start with the ten minutes and

12   see if it really is ten, and then we will make a decision.

13           MR. BERG:  Thank you.

14   BY MR. BERG:

15   Q.   What was your next task, Mr. Bax?

16   A.   My next task was to determine whether the defendant's TRO

17   accounting was trustworthy.

18   Q.   What you mean by TRO accounting?

19   A.   The defendants were ordered to file a Notice of Compliance

20   stating either they complied with the order requiring them to

21   unwind transfers from the DAO Endaoment or showing cause as to

22   why they have not complied.

23   Q.   What source documents did you use for your analysis?

24   A.   I carried out a comparison of the various accounting

25   representations and source documents, as well as blockchain

1    activity; specifically, I looked at Mark Phillips' declaration

2    from March 17, Ben Reed's declaration from March 17, MIP 0018,

3    the Defendant's Notice of Compliance, the defendant's various

4    cash accountings, and the etherscan transaction records.

5              MR. BERG:  I would like to move into evidence Exhibits

6    27, 85, 118, 133, 134, 160, 169, and 172.

7              THE COURT:  Can you repeat them?

8              You were going fast.

9              MR. BERG:  I'm sorry.  27, 85, 118, 133, 134, 160, 169,

10   and 172.

11             THE COURT:  Are those all on the screen at the moment?

12             I don't see 160, but I do see 169.

13             MR. BERG:  160 was inadvertently omitted as the

14   April 13th cash account.

15             THE COURT:  Okay.

16             Any objection from the defendants?

17             MR. FRANKLIN-MURDOCK:  No, your Honor.

18             THE COURT:  Admitted.

19             (Exhibits 27, 85, 118, 133, 134, 160, 169, and 172 were

20   received in evidence.)

21             (Exhibit No. 160 was received in evidence.)

22   BY MR. BERG:

23   Q.   What did you do for your first accounting analysis?

24   A.   First, I looked at MIP 0018, which -- go ahead.

25   Q.   What did you review -- what did you conclude from your

1   doing that?

2   A.   I concluded that the developer payments in Ben Reed's

3   declaration exceeded what was authorized by the MIP 0018

4   Snapshot proposal.

5   Q.   So, in Mr. Reed's declaration, he identified several

6   transactions that were authorized pursuant to MIP 18.  Is that

7   right?

8   A.   That's correct.

9   Q.   And, when you added up all those transactions in his

10   declaration, how much money did you total?

11   A.   Ben Reed's declaration, the amounts summed up to 457,034

12   DAI.

13   Q.   And when you -- and then you compared that total with what

14   was authorized in MIP 18, is that right?

15   A.   That's correct.

16   Q.   And what did the total amount in MIP 18 authorized?

17   A.   MIP 18 authorized 349,035 DAI.

18   Q.   When you compared those two numbers, what did you conclude?

19   A.   The amount paid pursuant to MIP 18 was about $108,000 more

20   than was authorized by MIP 18.

21   Q.   What did you do for your next accounting?

22   A.   Next, I looked into TRO assets for -- relating to an

23   attorney named Daniel Resnick-Neillie.

24   Q.   How did you do that?

25   A.   I looked at the defendant's April 12th cash accounting.

1    Q.   And what did you conclude?

2    A.   The April 12th, cash accounting said that $16,298 were

3    converted to fiat and not unwound as a reimbursement of

4    expenses paying Daniel Resnick-Neillie.

5    Q.   Now, this was -- these payments were from the

6    ensdeveloper.gnosis.ether.  Is that what the spreadsheet

7    communicated to you?

8    A.   Yes.

9    Q.   That is a DAO Endaoment account, right?

10   A.   That's correct.

11   Q.   And the date of that transaction was 2-5-2022?

12   A.   That is what it said.

13   Q.   The fact that it is appearing on defendant's cash

14   accounting that indicated that it was not unwound, does that

15   indicate to you that these were assets from the Movement DAO

16   subject to the TRO?

17   A.   That is how I interpreted it.

18   Q.   Now, did the accounting on April 12th, go on to specify how

19   that cash was transferred to Mr. Resnick-Neillie?

20   A.   The April 12th cash accounting did not show these

21   transfers.

22   Q.   So what did you do next?

23   A.   I went to the April 8th cash accounting.

24   Q.   And what did you learn there?

25   A.   The April 8th cash accounting showed that six payments were

1   made -- were sent to Resnick-Neillie, and five of them were

2   after the February 28th, TRO.

3   Q.   How did that relate to the April 12th cash accounting?

4   A.   In the April 12th cash accounting, these were not

5   classified as TRO assets, even though they admitted that TRO

6   assets were converted to cash to pay Resnick-Neillie.

7   Q.   What did you do for your next accounting?

8   A.   Next, I looked at the disintermediated.eth accounting.

9   Q.   And this disintermediated.eth, that is the ENS associated

10  with Mr. Rayden?

11  A.   That's correct.

12  Q.   What did you find?

13  A.   I found that the accounting was unreliable and

14  inconsistent.

15  Q.   How so?

16  A.   Ben Reed's March 17th declaration stated that

17  disintermediated.eth received 322,034 DAI, and then an

18  additional 100,000 DAI.

19  Q.   And did you compare that with other representations made by

20  defendants?

21  A.   I did.

22  Q.   And what did you conclude?

23  A.   I looked at the Notice of Compliance where it stated that

24  disintermediated.eth received only 322,034 DAI.  The Notice of

25  Compliance omitted the 100,000 DAI that was identified in the

1   declaration.

2   Q.  Did you look at any other source?

3   A.  I did.  I looked at the defendant's April 12th cash

4   accounting, which also omitted the 100,000 DAI which was

5   identified in the declaration.

6   Q.  Now, in the April 12th cash accounting, it did list the

7   322,000; is that correct, to Mr. Rayden?

8   A.  I don't have the April 12th accounting.  I believe it did,

9   yes.

10  Q.  Did the cash account -- did that accounting spreadsheet

11  indicate that the money was transferred to Mr. Rayden in cash

12  or in DAI?

13  A.  In cash, yes, across four transfers.

14  Q.  And now, is that different than what was said in Mr. Reed's

15  declaration and the Notice of Compliance?

16  A.  It is.

17  Q.  Because in those two documents, they said it was

18  transferred in DAI; is that correct?

19  A.  That's correct.

20  Q.  What did you do next for your accounting analysis?

21  A.  Next, I looked at the defendant's cookieslayer.eth

22  accounting.

23  Q.  Where did you start with that?

24  A.  I began with Ben Reed's March 17th declaration.

25  Q.  And what did you conclude?

1   A.   In that declaration, it stated that cookieslayer.eth

2   received 35,000 DAI on February 2nd, 2023.

3   Q.   Did you compare that to any other documents submitted by

4   the defendants?

5   A.   I did.   I compared it to the defendants' notice of

6   compliance.

7   Q.   What did that tell you?

8   A.   The notice of compliance said that cookieslayer.eth

9   received over 235,000 DAI on February 2, 2023.

10  Q.   That is a $200,000 discrepancy?

11  A.   That's correct.

12  Q.   What did you do to verify what document was correct?

13  A.   I checked the blockchain, and specifically, the etherscan

14  transaction records for the cookieslayer.eth address.

15  Q.   And what did you find?

16  A.   The cookieslayer.eth address showed that that address had

17  only received 35,000 DAI since February 2, 2023 from the

18  Endaoment.

19  Q.   And what did that indicate to you about the status of that

20  200,000 DAI?

21  A.   The etherscan records contradict the Notice of Compliance

22  and leave 200,000 DAI unaccounted for.

23  Q.   Did you make any other observations related to when

24  transfers of TRO assets were made in the course of your

25  analysis?

1   A.  I did.  I looked for transfers which occurred after the TRO

2   was issued.

3   Q.  And what did you find when you did that for the April 12th

4   cash accounting?

5   A.  The April 12th cash accounting showed that the defendants

6   made six transfers involving TRO assets after the February 28th

7   TRO.

8   Q.  Did you find any other transfers after the TRO when you

9   examined the April 8th cash accounting?

10  A.  Yes.  The April 8th cash accounting showed that the

11  defendants made five transfers involving TRO assets.

12  Q.  Did you notice anything in the April 8th cash accounting

13  related to Benjamin Reed's accounts?

14  A.  I did.  The April 8th cash accounting also showed that

15  Ben Reed transferred $10,500 from his Robinhood brokerage

16  account to a Wells Fargo account on March 3rd of 2023.

17  Q.  And the description of that transfer on March 3rd, 2023,

18  what does that say?

19  A.  It says Robinhood ACH of Movement funds.

20  Q.  Okay.  Mr. Bax, what is displayed on slide 49?

21  A.  That is the April 13th cash accounting and also the May

22  10th cash accounting beneath it.

23  Q.  And how do you know that the accounts here are cash?

24  A.  It says, "balance of fiat accounts," and it says, "balance

25  in USD."

1   Q.   And did you observe any irregularities here?

2   A.   I did.  I noticed discrepancies in the values between

3   several of the accounts.

4   Q.   And can you explain the largest discrepancy that you

5   identified?

6   A.   Yes.  The largest discrepancy was in Mark Phillips'

7   investment account.  The April 13th cash accounting showed a

8   little over $1.3 million in it, and the May 10th accounting

9   showed $1.216 million in that account.

10  Q.   And what about the Ben Reed WF checking account?

11  A.   The Ben Reed WF checking account had about $8,000 less in

12  the May 10 accounting than it did for the April 13th

13  accounting.

14  Q.   What about Mark Phillips' Robinhood spending account?

15  A.   Over $12,000 in the April 13th accounting, and it had zero

16  dollars in the May 10th accounting.

17  Q.   Any changes in the MEOW LLC Chase checking account?

18  A.   Yes, the MEOW LLC increased by about $35,000.

19  Q.   Now, all of those changes you have identified, those all

20  occurred after the TRO was in effect; is that correct?

21  A.   That's correct.

22  Q.   And there are eight accounts listed here, is that right?

23  A.   There are eight accounts listed here.

24  Q.   How many accounts did you identify with irregularities?

25  A.   Four that had significant irregularities.

1   Q.   So, half?

2   A.   Half.

3   Q.   What did you conclude, ultimately, from your analysis of

4   the defendant's TRO accounting?

5   A.   The defendant's TRO accounting is untrustworthy.  It is

6   inconsistent with proposals purported to authorize transfers.

7   It contradicts prior representations about transfers, and it is

8   inconsistent with the onchain data transaction records.

9   Q.   Did you conclude anything else?

10   A.   Yes.  The defendant's TRO account shows the defendants

11   transferred TRO assets at least 12 times after the TRO was in

12   effect.

13        MR. BERG:  No further questions, your Honor.

14        THE COURT:  All right.  Thank you.

15        So, counsel, Mr. Murdock, you are saying you have five

16   minutes of cross-examination?

17        MR. FRANKLIN-MURDOCK:  I think ten minutes, your Honor

18   -- it might be five, but I think ten is a safe estimate.  I

19   don't want to underestimate.

20        THE COURT:  Okay.  So, I think that we will take that

21   break so that we have a lunch, a lunch break.

22        And, we will bring back Mr. Bax, at that point, so that

23   he can finish his testimony.  So -- because you never know,

24   there might be some redirect.  All right?

25        Thank you.  So, we will be back at one o'clock.

1              Will that work for everyone?

2              MR. BERG:  Thank you, your Honor.

3              THE COURT:  Thank you.

4              (Whereupon, there was a recess at 12:18 p.m., after

5    which the following proceedings were had at 1:05 p.m.:)

6              THE COURTROOM DEPUTY:  All rise.

7              Court is back in session.

8              THE COURT:  Good afternoon.  Please be seated.

9              THE COURT:  So, Mr. Bax is on the stand.  He is under

10   oath.  And go ahead, Mr. Murdock.

11                        CROSS-EXAMINATION

12   BY MR. FRANKLIN-MURDOCK:

13   Q.  Good afternoon, Mr. Bax.

14   A.  Good afternoon.

15   Q.  When you analyzed the total amount of plaintiff's

16   contributions to Movement DAO, did you, at any point, assume

17   that Mr. Breslow made a contribution to Movement DAO on behalf

18   of any other individual?

19   A.  I did not.

20   Q.  If Mr. Breslow had, indeed, made one or more contributions

21   to Movement DAO on behalf of other individuals, would your

22   conclusion as to the plaintiffs' total contributions to

23   Movement DAO of $16,325,680.97 have been inaccurate?

24             MR. BERG:  Objection.  Incomplete hypothetical.

25             THE COURT:  I don't know why that would be an

1    Q.   Is it your testimony that Juicebox isn't displayed on

2    there?

3    A.   It is -- it is like a subpath.  The domain is very clearly

4    move.xyz.

5              MR. FRANKLIN-MURDOCK:  Thank you.

6              No further questions, your Honor.

7              THE COURT:  All right.  Thank you.

8              Mr. Berg, did you have any redirect?

9              MR. BERG:  I do, very briefly, your Honor.

10                        REDIRECT EXAMINATION

11   BY MR. BERG:

12   Q.   Sorry.  I am going to have to use the projector.

13        Before I do that, in case there is any objection, I am

14   going to take the Court to the live Movement DAO Snapshot page,

15   to -- unfortunately, a lot of the features on this page -- you

16   would have to mouse over to see the information.  So, it is

17   necessary.  It is not captioned on printouts.

18             THE COURT:  Okay.

19             Any objection?

20             MR. FRANKLIN-MURDOCK:  Perhaps, for efficiency's sake,

21   Mr. Berg could ask the Court to take judicial notice of the

22   website rather than walking us through it.

23             THE COURT:  Well, he is going to have to walk me

24   through it.  Thank you.

25             MR. BERG:  I can proffer what I will show while this

1   warms up.

2            THE COURT:  Okay.

3   BY MR. BERG:

4   Q.  Mr. Bax, you were asked questions about the proposals that

5   you evaluated and the strategies that they are associated with.

6   Do you recall that?

7   A.  I do.

8   Q.  I'd like to show you MIP 16, which opposing counsel just

9   showed you.  If you have that in front of you, please turn back

10  to it.  This is Exhibit D-347.  If you could please turn to

11  Page 260 of that document --

12            At the bottom of that document, there is a -- under the

13  heading, "Information," there is an entry that says

14  "strategies."  Do you see that?

15  A.  I do.

16  Q.  And, if you go to the right side of that page, what do you

17  see?

18  A.  There are two circles with what might be the Movement DAO

19  logo in them.

20  Q.  Now, before you is a display of my computer screen.  And,

21  at the top there, is that the snapshot.org web address for the

22  Movement DAO Snapshot page?

23  A.  It is a little hard to see it from back here.  But, it

24  certainly looks like Movement DAO's Snapshot page from here.  I

25  just want to read.

1    Q.   I will represent to the Court it is

2    Snapshot.org/#/snapshot.movedao.eth.

3         Mr. Bax, is that the Snapshot page?

4    A.   It is.

5    Q.   Okay.  Now, you examined MIP 0000.  Scrolling to the bottom

6    of the Snapshot page -- and I am clicking on MIP 0000 -- and I

7    am navigating -- I am navigating to the information header that

8    says "strategies."

9         Do you see that?

10   A.   I do.

11   Q.   Now, I am going to click on the strategies.  Now, a window

12   pops up when I click that.

13        Do you see that?

14   A.   I do.

15   Q.   What is that first strategy listed there?

16   A.   White list-weighted.

17   Q.   Does that tell you that white list-weighted strategy was

18   used on the proposals you evaluated?

19   A.   It does.

20   Q.   You were asked a question by Mr. Murdock about evaluating

21   -- whether you evaluated any other transfers that may have gone

22   to Evita Stenquist.  Do you recall that?

23   A.   I do.

24   Q.   In the documents that you reviewed, you only looked at the

25   ENS address cookieslayer.eth.  Is that right?

1  A.  That's correct.

2  Q.  Is that because the documents you reviewed indicated that

3  those transfers were made to cookieslayer.eth?

4  A.  Yes.

5  Q.  That's why you looked at that, at the address associated

6  with that ENS; correct?

7  A.  That's correct.

8           MR. BERG:  No further questions.

9           THE COURT:  I have a question for you, Mr. Bax.

10           In document number 49 -- I mean, not Document 49, the

11  Convex Lab analysis, Page 49, it says at the top, "Analysis,

12  Defendant's Transfer of TRO Assets After TRO Issued."

13           You have the balances in U.S. dollars.  Right?

14           THE WITNESS:  Yes.

15           THE COURT:  Where did you get those calculations in

16  U.S. dollars?

17           Were they given to you in U.S. dollars, or did you

18  translate it somehow in U.S. dollars?

19           THE WITNESS:  They were given to me in U.S. dollars.

20           THE COURT:  So, you didn't change anything from

21  cryptocurrency into U.S. dollars, it was simply U.S. dollars

22  all along?

23           THE WITNESS:  Yes.

24           THE COURT:  And you made a chart out of it, correct?

25           THE WITNESS:  That's correct.

1    Reed.

2    Thereupon:

3                          BENJAMIN REED

4    was called as a witness and, having been duly sworn, was

5    examined and testified as follows:

6              THE WITNESS:  I do.

7              THE COURTROOM DEPUTY:  Please state your name for the

8    record.

9              THE WITNESS:  My name is Benjamin David Reed.

10                         DIRECT EXAMINATION

11   BY MR. FRANKLIN-MURDOCK:

12   Q.  Mr. Reed, where do you live?

13   A.  I live just outside of Seattle, Washington, in a town

14   called Snoqualmie.

15   Q.  Where are you employed?

16   A.  I am currently employed as the authorized member of the

17   Movement DAO, and I also own a couple of small businesses.

18   Q.  How long have you had the position of authorized member at

19   Movement DAO?

20   A.  I have held that position since August of 2022.

21   Q.  What are the small businesses that you referenced?

22   A.  I own an auto detail shop, a landscaping construction

23   company and a skin care company.

24   Q.  Prior to joining Movement DAO as its authorized member, did

25   you hold any other salaried job in addition to working in those

1   small businesses?

2   A.   I did.  I worked for T-Mobile as a senior project manager.

3   Q.   How long were you at T-Mobile?

4   A.   Just over four and-a-half years.

5   Q.   Since becoming a Movement DAO authorized member, how do you

6   allocate your time between Movement DAO and your other

7   businesses?

8   A.   The majority of my time is allocated to Movement DAO; about

9   70 percent of that.

10       30 percent is to my other businesses.  On lighter weeks, it

11   is 60 percent Movement DAO and 40 percent other businesses.

12   Q.   How did you first find out about the project that became

13   Movement DAO?

14   A.   My friend, Mr. Phillips.

15   Q.   And when was that?

16   A.   It would have been in December of 2021.  I learned that he

17   was working on a crypto Web 3 project.  But, I came to know

18   that it was Movement DAO when it launched on February 2nd,

19   2022.

20   Q.   How did you first meet Mr. Phillips?

21   A.   Mr. Phillips -- I met Mr. Phillips through my wife.  Before

22   we got married, I inherited that friendship.  He became a good

23   friend, and before he was moved to Miami, we attended church

24   together.

25   Q.   Speaking of your church, do you hold any leadership

1    positions there?

2    A.   I do.  So, my wife and I are -- we lead the marriage

3    ministry.

4        I also am on the coleadership team for our church.  I lead

5    a men's small group as well as attend men pastors small group.

6    Q.   What was your understanding of the Movement DAO project

7    when you first became involved?

8    A.   When I first became involved in February of 2022, I

9    understood that the platform would be a platform that would

10   allow fundraising launch and operation of social projects.

11   Q.   How did you first get involved with the project?

12   A.   My first involvement was to make a contribution to Movement

13   DAO, and I made a contribution in the sum of $80,000.

14   Q.   What was your goal in making that contribution?

15   A.   I had three goals:  First off, charity.  Social compassion

16   has been a part of my entire life.  I grew up in the

17   Philippines as a missionary kid.  Early in my career, I spent

18   years in humanitarian aid.  So, that was close to my passions.

19       I also wanted to learn about technology.  I have been in

20   technology for 15 years, with Microsoft and other companies,

21   and was a new and emerging field that I wanted to get

22   experience in.  And then third, I wanted to support a friend.

23   Q.   So, is it fair to say that earning a profit was not your

24   primary goal?

25   A.   That's correct.

1    A.   I did.

2    Q.   Could you please go to Page 371?

3         MR. IGLESIAS:  Your Honor, I would move 420 into

4    evidence.

5         THE COURT:  Any objection, plaintiff?

6         MR. BERG:  No objection, your Honor.

7         THE COURT:  Admitted.

8    (Exhibit No. 420 was received in Evidence.)

9         THE COURT:  Which one are you on right now, sir?

10        MR. BERG:  Sorry, your Honor.  There is an objection to

11   371, not to 420.

12        THE COURT:  So, let's go to 371 and see if I can keep

13   up.  Hold on.

14        That is in a different notebook.

15        MR. FRANKLIN-MURDOCK:  Your Honor, it should be in the

16   same binder that was provided with Mr. Reed's examination.

17        THE COURT:  Okay.  371.  It looks like an email.  Okay.

18        What is your objection, plaintiff?

19        MR. IGLESIAS:  Yes, your Honor.  It is a rule of

20   completeness objection.  There is not even a subject line on

21   this email, and it appears to be excerpted so that we can't

22   tell what the subject is, or if there is more to this email,

23   based on what is provided.

24        THE COURT:  Okay.  So, I will overrule that, but I will

25   observe that caveat.

1          MR. IGLESIAS:  Thank you.

2    BY MR. FRANKLIN-MURDOCK:

3    Q.  Mr. Reed, do you recognize this to be an email from

4    Mr. Yurchak to you?

5    A.  It is.

6    Q.  Who else is included on the email?

7    A.  Ryan Mallory and Freddy Montero.

8    Q.  Do you recall speaking with Mr. Yurchak about the custodial

9    account he was setting up for you?

10   A.  Multiple times.

11   Q.  Without revealing what he told you, did he provide you with

12   legal advice related to his handling of your cryptocurrency?

13   A.  Yes, he did.

14   Q.  Did you ever provide Mr. Yurchak with notice that you did

15   not want him to represent you anymore?

16   A.  No, I did not.

17   Q.  Did Mr. Yurchak ever tell you that his representation of

18   you under the engagement agreement you both entered into was

19   over?

20   A.  To this day, he has not.

21   Q.  So, as far as you understand it, is the engagement

22   agreement between you and Mr. Yurchak's firm still in effect?

23   A.  That's correct.

24   Q.  After you contributed $80,000 to Movement DAO, did you have

25   any other -- did you have any further involvement with Movement

1   DAO?

2   A.   Yes.  I contributed from some of my ethereum wallets

3   directly to Community DAO, as well as I got involved in the

4   Discord community.

5   Q.   When you say, "Discord community," what do you mean?

6   A.   The Discord community essentially was where all the

7   operations and communications of DAO took place.  It is

8   essentially what I would call the heartbeat of the DAO, I

9   joined Discord and immediately got involved around promoting

10  the DAO.

11       I worked with plaintiff, Fine, to run Facebook ads, to

12  recruit new members to the DAO.

13       I also worked on -- I was engaged in conversations for

14  early IDs, they called them seedlings of the DAO, as well as

15  early discussions around how to structure governance, and then

16  when the subDAO, PeaceDAO launched, I got heavily involved in

17  the execution and delivery of proposals and work for PeaceDAO.

18  Q.   When did you start participating in the community in the

19  manner in which you have just been discussing?

20  A.   Immediately upon launch.  I think it was February 10th of

21  2022.

22  Q.   So, a little after the DAO launched?

23  A.   Correct.

24  Q.   How many other people were trying -- were active in

25  participating in Movement DAO's community after the DAO was

1   launched?

2   A.   The DAO grew fairly quickly.   The first month, I think

3   there were over a hundred, 120 people that were a part of the

4   conversations and the Discord server.   Probably there is about

5   500.

6   Q.   But would you say you were among the more active

7   participants?

8   A.   Yes, I would.   In terms of like ranking, I would probably

9   be in the top 20.

10  Q.   Did you continue to participate in the Movement DAO

11  community until the time you became the authorized member?

12  A.   That's correct.

13  Q.   How many hours a week would you say you spent on Movement

14  DAO between February 2022 and August 2022?

15  A.   The workload would vary, depending on what we were dealing

16  with at the time.   But, it was not uncommon for me to spend

17  about 20 hours a week.

18  Q.   How much were you compensated for all that time you spent

19  working at Movement DAO?

20  A.   I wasn't compensated consistently.   I received one donation

21  of 2,222 DAI, which is the equivalent in dollars, and that came

22  from Mr. Gordon.

23  Q.   Did you impart any significance to that number, 2,222?

24  A.   I took it as a joke in reference to February 2, 2022, when

25  DAO launched.

```
1    full trial.

2              So, you see where I am.

3              Thank you very much.  And you are both, I know, doing

4    your best with very -- and are both very professional, both

5    sides.  I do appreciate that.

6              MR. BERG:  Thank you, your Honor.

7              MR. SINGH:  Thank you, your Honor.

8

9                            —      —      —

10

11                      C E R T I F I C A T E

12

13              I hereby certify that the foregoing is an

14   accurate transcription of the proceedings in the

15   above-entitled matter.

16

17
     May 29, 2023          /s/Sharon Velazco
18   DATE                   SHARON VELAZCO, RPR, FPR
                             Official Court Reporter
19                           United States District Court
                             400 North Miami Avenue
20                           8th Floor
                             Miami, Florida 33128

21

22

23

24

25
```

# Exhibit F

```
 1                   UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2                         MIAMI DIVISION
                   CASE NO. 23-cv-20727-ALTMAN/Reid
 3

 4    RYAN BRESLOW, ALEX FINE, and JON       Miami, Florida
      GORDON,
 5
                         Plaintiffs,         May 30, 2023
 6
               vs.                           11:10 a.m. - 3:32 p.m.
 7
      MARK PHILLIPS and BENJAMIN REED,
 8
                         Defendants.         Pages 1 to 175
 9    _____

10             PRELIMINARY INJUNCTION HEARING CONTINUED
                 BEFORE THE HONORABLE LISETTE M. REID
11                 UNITED STATES MAGISTRATE JUDGE

12    APPEARANCES:

13    FOR THE PLAINTIFFS:    ELLIS GEORGE CIPOLLONE O'BRIEN ANNAGUEY LLP
                             CHRISTOPHER T. BERG, ESQ.
14                           BENJAMIN J. KUSSMAN, ESQ.
                             ANDREW IGLESIAS, ESQ.
15                           2121 Avenue of the Stars, 30th Floor
                             Los Angeles, California 90067
16

17    FOR THE DEFENDANTS:    DHILLON LAW GROUP INC.
                             NITOJ P. SINGH, ESQ.
18                           JESSE FRANKLIN-MURDOCK, ESQ.
                             177 Post Street
19                           Suite 700
                             San Francisco, California 94108
20


21
      STENOGRAPHICALLY REPORTED BY:
22
                             LAURA E. MELTON, RMR, CRR, FPR
23                           Official Court Reporter
                             United States District Court
24                           400 North Miami Avenue
                             Miami, Florida 33128
25
```

1    points.  Also consider the importance of the defendants'

2    testimony, which is critical here because it really is the

3    principal source of evidence that counters plaintiffs'

4    evidence.

5          And then, of course, the centrality of the credibility

6    issue.  That's critical here because the question is of honesty

7    in pursuit of financial self-interest.

8          So we would submit, Your Honor, that under all of the

9    factors under Pritchard, the testimony -- the evidence is

10   admissible under 609(b).

11        THE COURT:  Okay.  Any objection, Mr. Singh?

12        MR. SINGH:  Yes, Your Honor.  We would object.  As the

13   Court just heard, the conviction and the release is more than

14   10 years prior to today's date.  And the prejudicial value

15   greatly exceeds the probative value here.  We further note that

16   Counsel has offered up that there are similarities between the

17   two cases, but none of that is in evidence, none of that is at

18   issue, and the Court is unable to make a determination without

19   that information.  But simply releasing that information and

20   having it heard in this courtroom would be prejudicial.

21        THE COURT:  Okay.  So the Court will overrule that

22   objection.  I find that because the witness will be testifying,

23   his credibility is at issue, and any prior offense that has to

24   do with fraud which relates to truthfulness, would be relevant,

25   in any event.  So the evidence is admitted.

1            MR. BERG:  Thank you, Your Honor.  Based on that

2    ruling, I would like to move into evidence Exhibit 139.

3            Mr. Phillips, in Volume I of plaintiffs' exhibits --

4            THE COURT:  Ms. Melton, are you able to hear us --

5            THE STENOGRAPHER:  Yes.

6            THE COURT:  -- or see the person at the podium?

7            THE STENOGRAPHER:  Yes, ma'am, I can.

8            THE COURT:  Do I have the right set of exhibits that

9    you're referring to?

10            MR. BERG:  Yes, Your Honor.  It's Volume II of

11    Plaintiff's Exhibits.  139.

12            THE COURT:  Okay.  I have it.

13            MR. BERG:  Thank you, Your Honor.

14            Do you have it, Mr. Phillips?

15            THE WITNESS:  This is Mr. Phillips speaking.

16            Yes.

17    THEREUPON:

18                          MARK PHILLIPS,

19    a witness called by the Defendant, having been duly sworn

20    previously, testified as follows:

21                    CROSS-EXAMINATION (CONTINUED)

22    BY MR. BERG:

23    Q.  Mr. Phillips, you were previously convicted of four counts

24    of wire fraud and two counts of money laundering in the

25    U.S. District Court of the Western District of Washington;

1   correct?

2   A.   Yes.

3   Q.   Before you, as Exhibit 139, is a copy of the amended

4   judgment that was ultimately entered against you; is that

5   correct?

6   A.   Yes.

7   Q.   In the middle of the page where it says "Nature of

8   Offense," it lists wire fraud and money laundering; correct?

9   A.   Yes.

10  Q.   The District Court imposed a sentence on you of 40 months

11  imprisonment, three years supervised release, and $100,000 in

12  restitution; correct?

13  A.   Yes.

14  Q.   Okay.  If you could put that to the side.

15       You were a defendant in a civil litigation in Washington

16  State Superior Court in the case called Arnold v. Phillips; is

17  that correct?

18  A.   Yes.

19  Q.   That case number is 10-2 -- 10227-2; right?

20  A.   I don't recall the specific.

21  Q.   In that case you formed a company called Banana Corporation

22  into which plaintiff, Robert M. Arnold, invested $5.5 million

23  and procured a 15 percent ownership interest; right?

24  A.   Yes.

25  Q.   You owned the other 85 percent?

```
 1   A.   Yes.

 2   Q.   The Court in that case granted summary judgment against you

 3   on liability for, among other things, breach of fiduciary duty,

 4   conversion, and embezzlement; right?

 5   A.   Yes.

 6   Q.   A bench trial was eventually held in that case; right?

 7   A.   Yes.

 8   Q.   And you testified at that trial?

 9   A.   Yes.

10   Q.   The Court made a factual finding that your testimony was

11   not credible; is that right?

12   A.   Yes.

13   Q.   In 2019, you were a party to divorce proceedings in

14   Washington state court; right?

15   A.   Yes.  I don't recall the specific year.

16   Q.   The Court held a bench trial in that proceeding; is that

17   correct?

18   A.   Yes.

19   Q.   You provided testimony in connection with those

20   proceedings?

21   A.   Yes.

22   Q.   In finding of fact, 80, the Court expressly found that much

23   of your testimony was not credible; right?

24   A.   I don't recall the specifics.

25   Q.   Do you recall there being a finding that your testimony was
```

1    not credible?

2    A.   I don't recall that specific finding.

3    Q.   Mr. Phillips, you testified that you worked as a contractor

4    at the SEC in this proceeding; do you remember that?

5    A.   As a -- as an employee of Info Trend, which was a

6    subcontractor to the SEC.

7    Q.   You were actually employed as a -- by Info Trend, which is

8    a subcontractor to ITS Agile LLC; right?

9    A.   I don't know the relationships between the different

10   entities.

11   Q.   If we go to Volume I of plaintiffs' exhibits.

12        Now, you submitted a declaration in this case; correct?

13   Dated March 16, 2023?

14   A.   Excuse me.  Which exhibit?

15   Q.   We will get there.  March 16, 2023; correct?  You submitted

16   a declaration in this case dated March 16, 2023; correct?

17   A.   I will take your word for that.

18   Q.   All right.  And you were being truthful when you submitted

19   that declaration; correct?

20   A.   Yes.

21   Q.   Okay.  Turn to Exhibit 73, please.  Let me know when you

22   are there.

23   A.   Yes.

24   Q.   There you wrote, "I was employed by Info Trend

25   Incorporated, a subcontractor to ITS Agile, which was a prime

1    contractor to the SEC."  Do you see that?

2    A.  Yes.

3    Q.  Is that correct?

4    A.  Yes.

5    Q.  You wrote in your declaration that, "Plaintiffs plan to

6    develop a decentralized autonomous organization to facilitate

7    social and environmental impact groups"; correct?

8    A.  Yes.

9    Q.  "But plaintiffs lacked the technical ability to develop and

10   manage the contemplated DAOS creation and needed your help for

11   the task"; right?

12   A.  Yes.

13   Q.  "The GitBook is a document that describes MovementDAO's

14   policies, goals, and governance mechanisms"; correct?

15   A.  It was intended to communicate the goals, yes.

16   Q.  It's a document that describes MovementDAO's policies,

17   goals, and governance mechanisms; right?

18   A.  Yes.

19   Q.  GitBook was MovementDAO's initial governing document;

20   correct?

21   A.  Yes.

22   Q.  GitBook functioned much like a set of corporate bylaws;

23   right?

24   A.  I don't think so.

25   Q.  Let's go to Exhibit 73, paragraph 20, second sentence from

1    above -- from the bottom.

2        "Much like a set of corporate bylaws, the GitBook was

3    intended to function as Movement's initial government

4    document."  And further on -- apologies.

5        We will move on.

6        Let's go to paragraph 24 of your declaration.  Last

7    sentence of that paragraph you wrote, "MovementDAO's

8    relationship with its members or contributors was governed by

9    inter alia GitBook"; is that right?

10   A.  Yes.

11   Q.  That includes you; right?

12   A.  Right.  As a member?

13   Q.  As -- "MovementDAO's relationship with its members or

14   contributors was governed by GitBook."  The question is, was

15   the GitBook governing you?

16   A.  Yes.

17   Q.  You testified that after January 1, 2022, you regarded your

18   relationship with plaintiffs as equals or members in

19   MovementDAO; right?

20   A.  Yes.

21   Q.  You also testified that you believed you were working for

22   MovementDAO, starting January 1, 2022, onward; right?

23   A.  Yes.

24   Q.  Throughout your work on MovementDAO, you would have -- you

25   had conversations with Mr. Breslow about the project; right?

```
 1   A.   Yes.

 2   Q.   And when you had these conversations, you were truthful

 3   with him; correct?

 4   A.   Yes.

 5   Q.   You were not trying to deceive him when you spoke with him

 6   or texted with him; right?

 7   A.   No.

 8   Q.   On July 30, 2022, you thanked him for being an awesome

 9   boss, and that you just want to work and add value and protect

10   his interests; isn't that right?

11   A.   I recall writing something to that effect.

12   Q.   You led Mr. Breslow to believe that he was in charge of the

13   MovementDAO project, didn't you?

14   A.   No.

15   Q.   Why did you call him your boss?

16   A.   I was showing deference.  He was the largest contributor to

17   MovementDAO, the nonprofit.  So I was absolutely showing

18   deference to someone who contributed that much money, as well

19   as that much faith in having me work on its development.

20   Q.   So are you now saying -- is it your testimony now that he

21   was not your boss?

22   A.   Not after January 1st of 2022.

23   Q.   Didn't you write that text in August 2022?

24   A.   I did.

25   Q.   So was he your boss in August of 2022, or was he not?
```

1   A.   I refer to all the members of MovementDAO as my boss.

2   Q.   Really?  Okay.

3        On March 13, 2022, you told Mr. Gordon that you were

4   executing on Ryan and your -- Mr. Gordon's -- behalf, didn't

5   you?

6   A.   I did.

7   Q.   So you testified that on January 1, 2022, you considered

8   yourself equals with plaintiffs, but two months later you were

9   telling Mr. Gordon you were doing things on Mr. Breslow and

10  Mr. Gordon's behalf; right?

11  A.   I think that comment is taken out of context.  They asked

12  me to do very specific things like write an NFT contract or

13  review some information.

14  Q.   Okay.  And you continued four months later, in July 2022,

15  when you told Mr. Breslow you wanted to protect his interest

16  and referred to him as "an awesome boss"; right?

17  A.   So you're referring to the first comment?

18  Q.   Yeah, let's pull that up.  Let's go to Exhibit 135, which

19  is in Volume I of the plaintiffs' exhibits.  And I misspoke

20  earlier.  I referenced this as August 2022.  Exhibit 135 was

21  submitted in July 30 of 2022.  Are you there?

22  A.   Exhibit 135?

23  Q.   Correct.

24  A.   Yes.

25  Q.   It says here, "Thank you for being an awesome boss.  Very

1   Q.   Is that the section that you're referencing, relating to

2   modifying the GitBook through MIP proposals?

3   A.   Well, that suggestion is -- changes or members, perhaps,

4   might be a better search term.

5   Q.   And your client -- and your counsel will be able to do that

6   on cross.  I'm asking for the word "alter."  Is this the

7   section?

8   A.   Is that a section that states the word "alter"?

9   Q.   Is this the section that you're referring to when you said

10  there is a section in the GitBook that says MIP proposals can

11  alter terms of the GitBook?

12  A.   I don't recall the specific location.

13  Q.   I know.  But I'm asking you if this is the specific

14  location.

15  A.   No, I don't believe that is the specific section.

16  Q.   How about this one either, alternate ES?

17  A.   No.

18  Q.   "Alternate approaches, and other relevant facts to the

19  implementation," not this one either; right?

20  A.   Would you scroll up, please, so I could see.

21       Proposal -- "fleshes out the specification by describing

22  what motivated the design or particular decisions were made,

23  alternative approaches, or other relevant facts..."

24       So this section describes a proposal format in which the

25  contents --

1   Q.   Mr. Phillips, does this show that a proposal can alter the

2   GitBook?

3   A.   This shows how to make a proposal --

4   Q.   Mr. Phillips, answer my question.  Does this show that the

5   proposal can alter the GitBook?

6   A.   No.

7   Q.   Okay.  How about this one?

8   A.   No.

9   Q.   The GitBook doesn't say it can be amended, altered, or

10  changed by a proposal, does it?

11  A.   I believe there is a section that states that the community

12  members managed the DAO and that can propose changes.

13  Q.   You authored a series of proposals in August of 2022 that

14  you posted on MovementDAO's Snapshot page; right?

15  A.   I was a coauthor, but I wasn't the primary author.

16       MR. BERG:  I would like to introduce Exhibit 9 into

17  evidence.

18       THE COURT:  Mr. Singh, any objection?

19       MR. SINGH:  No objection.

20       MR. BERG:  That exhibit will be found in Volume I,

21  plaintiffs' exhibits.

22       THE COURT:  The exhibit is admitted.

23    (Plaintiff Exhibit 9 was received in evidence.)

24  BY MR. BERG:

25  Q.   Please let me know when you are there, Mr. Phillips.

1    A.  Yes.

2    Q.  This document is MIP 1, a proposal you coauthored in August

3    of 2022 that sought to adopt a document called Governance

4    Process; right?

5    A.  Yes.

6    Q.  Please turn to page 258.  The first sentence of the

7    governance process document, the top of this page says, "The

8    DAO is governed by its community as expressed through MAIP NFT

9    voting"; right?

10   A.  Yes.

11   Q.  That reference to MAIP NFTs, that's not a reference to MOVE

12   tokens; correct?

13   A.  MAIP stands for Movement AIP, non-fungible token so it

14   does -- it is a MOVE token.

15   Q.  It's not a reference to "$ M-O-V-E" token; right?

16   A.  No, it's not.

17   Q.  Okay.  Go to page 259.  At the top of the page there is a

18   reference to the DAO's consensus base.  Do you see that?

19   A.  Yes.

20   Q.  That's a reference to Movement's Snapshot page; correct?

21   A.  Yes.

22   Q.  At the time you posted Exhibit 9 as a proposal on the

23   MovementDAO's Snapshot page, is it your contention that

24   Snapshot voting governed the MovementDAO's actions?

25   A.  I wasn't the one who posted this.  What was the question?

1   What was the rest of the question?

2   Q.   At the time of this proposal was posted by whoever, is it

3   your contention that Snapshot voting governed MovementDAO's

4   actions?

5   A.   Yes.

6   Q.   $MOVE tokens had not been issued at the time Snapshot

7   voting on Exhibit 9 occurred; correct?

8   A.   No.  However, the GitBook did state that --

9   Q.   Mr. Phillips, just answer my question.  Thank you.

10      To this day, $MOVE tokens still have not issued; right?

11  A.   That's correct.

12  Q.   So no one holds a $MOVE token; correct?

13  A.   That's correct.

14  Q.   Okay.  Under that governance process -- which you authored;

15  correct?

16  A.   I was a coauthor, but I wasn't the primary author, "Philip

17  V."

18  Q.   All right.  Under the governance process in this proposal,

19  you did not -- you do not need a $MOVE token to participate in

20  the MovementDAO's Snapshot voting; right?

21  A.   No.

22  Q.   Okay.  Please go to Exhibit 6 in the binder.

23  A.   Yes.

24  Q.   Please turn to page 89.  Are you there?

25  A.   Yes.

1    Q.  All right.  Under the heading "Staking," second paragraph,

2    it says, "Only staked $MOVE holders will be able to participate

3    in Snapshot governance."  Did I read that correctly?

4    A.  You did.

5    Q.  So the governance process that you coauthored is

6    inconsistent with this provision of the GitBook; is that

7    correct?

8    A.  Yes.

9    Q.  Okay.  I would like you to turn to Exhibit 8, please.  This

10   is also in plaintiffs' exhibits, Volume I.  Let me know when

11   you are there.

12   A.  Yes.

13   Q.  This is MIP 0, a proposal you coauthored in August 2022

14   that sought to adopt a document called "Guiding Principles";

15   correct?

16   A.  That's correct.

17   Q.  Go to page 192.  Let me know when you are there.

18   A.  Yes.

19   Q.  The bottom of the page says "the DAO shall not create any

20   liquidity pools"; is that correct?

21   A.  That's correct.

22   Q.  All right.  Let's go back to Exhibit 6.  Please turn to

23   page 60.  Are you there?

24   A.  Yes.

25   Q.  The middle of the page it says:  "Movement endowments

1    generate ongoing revenue through," paragraph 2, "deploying

2    liquidity pools to earn fees."  Did I read that correctly?

3    A.   That's correct.

4    Q.   Okay.  So the Guiding Principles is inconsistent with this

5    provision of the GitBook?

6    A.   They mean different things.

7    Q.   They both say liquidity pools; don't they?

8    A.   They both use the word "liquidity pools."

9    Q.   Okay.

10   A.   The reference on page 60 means deploying two different

11   types of tokens and earning fees during the slots.  The

12   reference in the Guiding Principles refers to creating

13   liquidity in -- for the MOVE token, which was at the center of

14   how we were making decisions on not making a token that wasn't

15   an offering of an unregistered security.

16   Q.   Okay.  Same page, the heading is called "Endowment Basics."

17   Do you see that?

18   A.   Yes.

19   Q.   First -- first line says:  "The purpose of the endowment is

20   to earn via various defy protocols in order to produce a yield

21   for the DAO."

22        Is that -- is that -- did I read that correctly?

23   A.   Yes.

24   Q.   And below that, down the page, there is a list of eight

25   examples of how the Movement endowment might generate ongoing

1   revenue; right?

2   A.   Yes.

3   Q.   Okay.   How much revenue has the MovementDAO endowment

4   generated since February 2022?

5   A.   I don't know the specific number.

6   Q.   Less than $500,000?

7   A.   Less than $500,000.

8   Q.   Less than $200,000?

9   A.   Perhaps less.   Maybe 200,000, I don't know.   But --

10   Q.   That's fine.

11        Let's go to Exhibit 30 in your binder.

12        MR. BERG:   Your Honor, I would like to introduce

13   Exhibit 30 into evidence.

14        THE COURT:   Mr. Singh, any objection?

15        MR. SINGH:   No, no objection.

16        THE COURT:   Okay.   It's admitted.

17        MR. BERG:   Thank you, Your Honor.

18    (Plaintiff Exhibit 30 was received in evidence.)

19   BY MR. BERG:

20   Q.   Are you there, Mr. Phillips?

21   A.   Yes.

22   Q.   This is a proposal called MIP 21 posted on the MovementDAO

23   Snapshot page that you coauthored in January 2023; right?

24   A.   Yes.

25   Q.   And it proposes to authorize the transfer of 5.3 million

1    information referred to in 194 is a reference to the Gnosis sig

2    wallet, the Etherscan records, and Snapshot; correct?

3    A.   That's what the statement says, yes.

4    Q.   That's what it says; right?

5    A.   Yes.

6    Q.   And this was a proposal that you coauthored; right?

7    A.   Yes.

8    Q.   And this was a proposal that was passed through a Snapshot

9    vote; right?

10   A.   Yes.

11   Q.   Okay.  Let's go to Exhibit 12 in the same binder.  Please

12   turn to page 302.  Are you there?

13   A.   Yes.

14   Q.   Under the heading "Ratification of Future Disbursements,"

15   it says that:  "The DAO ratifies and approves a $100,000

16   spending threshold for service providers, including

17   tankbottoms, whereby prior verbal approval, initial sign-ins

18   for governance approval is not necessary to spend up to

19   $100,000 worth of funds in cryptographic assets"; is that

20   correct?

21   A.   Yes.

22   Q.   Tankbottoms is you; correct?

23   A.   Yes.

24   Q.   I would like you to turn to Tab 11 in that binder.

25        MR. BERG:  I would like to move Tab 11 into evidence as

1    Exhibit 11.

2              MR. SINGH:  No objection, Your Honor.

3              THE COURT:  So moved.  Admitted.

4         (Plaintiff Exhibit 11 was received in evidence.)

5    BY MR. BERG:

6    Q.  This is MIP3; is that right?

7    A.  Yes.

8    Q.  You coauthored this proposal in August of 2022; correct?

9    A.  Yes.

10   Q.  Okay.  Let's turn to 290.  Let me know when you are there.

11   A.  Yes.

12   Q.  At the top of the page, the first paragraph, it said:

13   "Resolved further, authorizes the use of DAO endowment funds to

14   refund expenses that you incurred"; correct?

15   A.  Yes.

16   Q.  The proposal doesn't provide any details about what those

17   expenses were or how they related to MovementDAO business, does

18   it?

19   A.  No.  The proposal doesn't.

20   Q.  Mr. Phillips, you testified that you created and maintained

21   the DAO-lawfirm ENS; correct?

22   A.  That's correct.

23   Q.  By "maintained," you mean you used the cryptocurrency

24   address ending in 0085 which was registered to the ENS

25   DAO-lawfirm; right?

1   A.   Yes.

2   Q.   You testified that plaintiffs knew that you were using the

3   DAO-lawfirm address to sign transactions; correct?

4   A.   Yes.

5   Q.   Now, in that testimony, you weren't saying that plaintiffs

6   knew you were signing transactions with DAO-lawfirm without

7   receiving direction or consultation with Mr. Yurchak; right?

8   A.   Sorry.  I wasn't -- I was signing without receiving

9   direction or consultation?

10   Q.   You told plaintiffs you would use DAO-lawfirm ENS in

11   coordination with Mr. Yurchak; right?

12   A.   Yes, it was -- yes.

13   Q.   So plaintiffs believed you would be using DAO-lawfirm.eth

14   with Mr. Yurchak's signoff; right?

15   A.   Yes.

16   Q.   Let's go to Exhibit 6, page 88.  Let me know when you are

17   there.

18   A.   Yes.

19   Q.   Under "How do I know the token launch is fair?,"

20   paragraph 2, the GitBook states:  "A registered law firm acts

21   as a signatory of the funds wallet.  They therefore owe a

22   fiduciary duty to the movement and will employ their expertise

23   to ensure that no funds are moved in violation of the movement

24   rules and no requests for funding will be indicative of

25   fraudulent activity."

1          Did I read that accurately?

2     A.   Yes.

3     Q.   So this language in the GitBook would also lead plaintiffs

4     to understand that Mr. Yurchak would be reviewing requests for

5     funding; right?

6     A.   Yes.  I just wanted to share these MIPs with him, yes.

7     Q.   Like the ones posted on Snapshot; right?

8     A.   Yes.

9     Q.   Now, Mr. Phillips, in your declaration, you wrote that:

10    "In MIP4 and MIP7, they specifically identify Mr. Yurchak's law

11    firm as a service provider"; right?

12    A.   Yes.

13    Q.   And both MIP4 and MIP7 were dated August 2022; correct?

14    A.   Yes.

15    Q.   Okay.  You coauthored both of those MIPs; correct?

16    A.   Yes.

17    Q.   Now, the GitBook lists the law office of Reed Yurchak as

18    the initial service provider, doesn't it?

19    A.   Yes.

20    Q.   And you testified that Mr. Yurchak never objected to being

21    identified in the GitBook; correct?

22    A.   Yes.

23          MR. BERG:  I would like to introduce Exhibit 378 for

24    the limited purpose of Mr. Phillips' knowledge.  This will be

25    in defendants' exhibit binder Volume II.

```
 1              THE COURT:  Mr. Singh, any objection?

 2              MR. SINGH:  No objection.

 3              THE COURT:  What's the number again?

 4              MR. BERG:  378.

 5              THE COURT:  Okay.  Admitted.

 6         (Plaintiff Exhibit 378 was received in evidence.)

 7              MR. BERG:  It should be defendants' Volume II,

 8    Mr. Phillips.

 9              THE COURT:  Oh, it's defendants'.

10              MR. BERG:  Yes.  Yes, Your Honor.  Sorry.

11              Defendants' Exhibit 378.  Volume II, please.

12              THE WITNESS:  This -- this binder starts at 426.

13              MR. BERG:  May I approach the witness, Your Honor?

14              THE COURT:  Yes, you may.

15              MR. BERG:  This one seems to have --

16              THE WITNESS:  378?

17    BY MR. BERG:

18    Q.  Are you there?

19    A.  Yes.

20              MR. BERG:  Your Honor, are you there?

21              THE COURT:  Yes.

22    BY MR. BERG:

23    Q.  On April 11, 2022, you received this e-mail from Marc

24    Welton, who was a paralegal of the law office of Reed Yurchak;

25    right?
```

1   A.   Yes.

2   Q.   And the e-mail Mr. Welton writes:  "I have gone in and

3   edited out the reference to L-O-R-Y"; right?

4   A.   Yes.

5   Q.   LORY is a reference to law office of Reed Yurchak; correct?

6   A.   I didn't -- I didn't know that.

7   Q.   So this e-mail didn't inform you that Mr. Yurchak was using

8   his paralegal to edit out references to his firm name from the

9   GitBook; right?

10  A.   Well, this was on April 11th, and the DAO launched on

11  February 2nd.

12  Q.   I understand.

13  A.   So, but I -- I -- I didn't know that it was L -- I didn't

14  know.

15  Q.   You didn't know what?

16  A.   I didn't know that that stood for "Law Offices of Reed

17  Yurchak."

18  Q.   At no other point did Mr. Yurchak indicate to you that he

19  wanted his name removed from the GitBook?

20  A.   No.

21  Q.   Okay.  Do you understand now that the initials LORY

22  correspond to Law Office Reed Yurchak?

23       MR. SINGH:  Objection.  Calls for speculation.

24       THE COURT:  Overruled.

25       MR. BERG:  I ask for --

1   A.   I do now.  But it is still on April 11th, and not

2   February 2nd or January 1st.

3   BY MR. BERG:

4   Q.   So you understand now that LORY refers to law office of

5   Reed Yurchak and that Marc Welton sent this e-mail on April 11,

6   2022.  But despite receiving this e-mail on April 11, 2022, you

7   still wrote in MIPS 4 and 7, in August of 2022, that the law

8   office of Reed Yurchak was acting as a service provider of the

9   MovementDAO; right?

10  A.   Well, this doesn't say where he removed it.  And this

11  e-mail, we were speaking specifically about the token use --

12  token sale use and there was a reference to, incorrectly, when

13  the -- that law office of Reed Yurchak was written as the

14  company.

15       So I can see how this -- but this doesn't say that it is

16  specifically removed as the service provider.

17  Q.   You authored several proposals in August of '22 that were

18  posted on the MovementDAO Snapshot page, coauthored; right?

19  A.   Yes.

20  Q.   Those proposals were MIP 0 through MIP 8; correct?

21  A.   Yes.

22  Q.   The address ending in 0085 cast over 10 million votes for

23  those proposals; is that right?

24  A.   That's correct.

25  Q.   You were the one that physically cast those votes?

1   A.   Yes.

2   Q.   -- right?

3   A.   Yes.

4   Q.   Right.

5        You didn't consult with Mr. Yurchak about those proposals

6   before you did that, did you?

7   A.   I did.

8   Q.   On August 30, 2022, $1.75 million was transferred out of

9   the DAO endowment account ending in 03C6; right?

10  A.   Yes.

11  Q.   You were the one that executed that transfer; right?

12  A.   Yes.

13  Q.   That 1.75 million was supposed to cover Movement's spending

14  through the end of 2022; right?

15  A.   What do you mean by "cover"?

16  Q.   You proposed a budget -- well, let me -- let me -- we will

17  get there.

18       After that transfer occurred in August, Mr. Breslow began

19  asking you for more frequent updates about the DAO endowment

20  balance and the development expense budget; is that right?

21  A.   No.  He asked me for updates generally, but nothing

22  specifically.

23  Q.   He didn't ask you about the treasury balance in the Gnosis

24  and the development expense budget?

25  A.   I would provide him with that information.

1    Q.   Listen to my question.   Is it your testimony that

2    Mr. Breslow did not begin seeking constant updates on the

3    treasury balance in the Gnosis and the development expense

4    budget?

5    A.   He sought updates from me, yes.

6    Q.   Did he specifically seek constant updates on the treasury

7    balance in the Gnosis and the development expense budget, yes

8    or no?

9    A.   He didn't specifically give me instructions on what those

10   meetings were about --

11   Q.   Let's go to exhibit --

12   A.   -- updates.

13   Q.   Excuse me.   Go to Exhibit 93, please.

14   A.   In which binder?

15   Q.   This should be plaintiffs' Volume I.

16   A.   Which number again?

17   Q.   93.   That's paragraph 52, please.   Let me know when you are

18   there.

19   A.   Yes.

20   Q.   Okay.   So this is your declaration, Exhibit 93 is your

21   declaration dated March 17, 2023; right?

22   A.   Yes.

23   Q.   In paragraph 52, the last sentence of your declaration

24   says:   "Mr. Breslow began for the first time seeking constant

25   updates on the treasury balance in the Gnosis and the

1    A.   That's one of his addresses, yes.

2    Q.   That's not on here, is it?

3    A.   No.

4    Q.   Okay.  Is any reference to Mikhail Radin on here?

5    A.   The blockchain architect on CaptainSpaceCadet.eth.

6    Q.   Captain Space -- is CaptainSpaceCadet.eth Mikhail Radin?

7    A.   He uses that -- the developers use that account.

8    Q.   The developers or Mikhail Radin?

9    A.   All of the developers share use of that account for

10   deploying contracts.

11   Q.   So when you listed it here, what human being were you

12   referencing?

13   A.   Mikhail.  And so in the description section it says tezos,

14   blockchain architect tezos.

15   Q.   Uh-huh.

16   A.   That -- myself and Mikhail are the two tezos developers.

17   Q.   And you're looking at page 777 when you say that; right?

18   A.   776.

19   Q.   776.  Okay.

20        Okay.  Let's go to 777 where it says CaptainSpaceCadet.eth,

21   do you see that?

22   A.   Yes.

23   Q.   Okay.  The annualized income is 552,000; do you see that?

24   A.   Yes.

25   Q.   That's not 400,000, is it?

1    A.    No.

2    Q.    That's --

3    A.    We were compensating for -- the reason we were using Space

4    Cadet was that Mikhail wanted to be paid in fiat and not Dai or

5    ETH.  And so it would have to go through Fiat LLC.  And we were

6    considering the expenses related to converting -- selling

7    cryptocurrency and then paying taxes on the capital gains,

8    and we weren't sure how that was working.  So I think we -- we

9    outlined somewhere for an accountant to give us guidance.

10   Q.    So there is nowhere on this budget that indicates that

11   Mikhail Radin was receiving an annual salary of $400,000;

12   correct?

13   A.    No.

14   Q.    Okay.  On February 2, 2023, 7.5 million Dai and 805 ETH

15   were transferred out of the account ending in 03C6; right?

16   A.    Let me clear up -- my last response is that Mikhail Radin,

17   that's his line item.  Let me just make it very clear about

18   that.

19   Q.    Okay.

20   A.    I gave, you know, details on the why, but --

21   Q.    On February 2, 2023, 7.5 million Dai and 805 ETH were

22   transferred out of the account ending in 03C6; right?

23   A.    Yes.

24   Q.    You executed those transfers; right?

25   A.    I signed -- I finalized them, that's correct.

1    Q.   Did anyone besides you confirm that transaction?

2    A.   The emergency committee authorized that transaction.

3    Q.   The use of the three addresses to confirm -- please listen

4    to my question, Mr. Phillips.

5         Did anyone besides you confirm those transactions?

6    A.   A Mr. Ben Reed.

7    Q.   And which transaction did he confirm?

8    A.   I'm not sure.  I would have to look at the signings.

9    Q.   So it was either you or Mr. Reed?

10   A.   I could be wrong.  I need to see the transaction hashes.

11   Q.   Okay.  Are you also the one that executed the transactions

12   to remove Alex Fine and Jon Gordon as signatories from the

13   account ending in 03C6?

14   A.   Yes.

15   Q.   Anyone help you confirm that transaction?

16   A.   No.

17   Q.   Since you introduced plaintiffs to the alias DAO-lawfirm,

18   you have used that alias as your alter ego; isn't that correct?

19   A.   I -- no.

20   Q.   You used that alias to provide you with what you described

21   as air cover for you to bill for legal work under the name of

22   Reed Yurchak's firm, without Mr. Yurchak performing or

23   overseeing that work; right?

24   A.   No.

25   Q.   You have used a third-party entity as an alter ego to pay

1    yourself fees before; isn't that right?

2    A.   Are you referring to the criminal conviction?

3    Q.   No.

4    A.   Or the civil --

5    Q.   I am.

6    A.   -- matter, the A-Dot Corporation?

7    Q.   Uh-huh.

8    A.   A-Dot Corporation was a S-corporation that I -- I earned

9    over $8 million in, and the Court considered that it was an

10   alter alias.

11   Q.   So the answer to my question --

12   A.   So, yes.

13   Q.   You used a third-party entity as alter ego to pay yourself

14   fees before?  And the answer to that is "yes"; right?

15   A.   Yes.

16   Q.   Okay.  In September 2022 in the accounting you prepared for

17   Mr. Gordon and Mr. Breslow, Exhibit 90 -- do you remember that?

18   A.   Sorry.  Let me just be clear.  With the accounting, there

19   were other members of the DAO that prepared that.

20   Q.   Mr. Phillips, please answer my question.

21        In the September of 2022 accounting, you showed Mr. Gordon

22   and Mr. Breslow, you included a list of billed time from the

23   Yurchak firm related to the MovementDAO, didn't you?

24   A.   There was an outline of time spent doing paralegal work for

25   MovementDAO.

1   Q.   I'm asking if you were charged with doing it.

2   A.   Yes.

3   Q.   Okay.  All of those allegations in the indictment were in

4   connection with the wire fraud counts asserted against you by

5   the U.S. government; correct?

6   A.   Yes.

7   Q.   And a jury found you guilty of those wire fraud counts;

8   correct?

9   A.   Yes.

10  Q.   You appealed your conviction to the 9th Circuit, but not on

11  the wire fraud counts; right?

12  A.   I don't recall the specifics of the appeal.

13  Q.   In the 9th Circuit's opinion, the Court described the

14  evidence that was submitted to the jury, which included all the

15  facts established by the record that were read in the light

16  most favorable to the government; right?

17  A.   I -- is that --

18  Q.   It's a question?

19  A.   What was the question?

20  Q.   Did the 9th Circuit enumerate the facts that the jury found

21  in its opinion?

22  A.   I don't recall --

23  Q.   Okay.

24  A.   -- the --

25          MR. BERG:  Let's -- I would like to introduce

1    Exhibit 221.

2         THE COURT:  Admitted.

3       (Plaintiff Exhibit 221 was received in evidence.)

4         MR. BERG:  You know what?  We will move on.

5    BY MR. BERG:

6    Q.   Mr. Phillips, you used the DAO-lawfirm alias to make

7    plaintiffs believe that Mr. Yurchak's firm was providing advice

8    and oversight on the MovementDAO project when it, in fact, was

9    just you; right?

10   A.   That's not correct.  I consulted with Mr. Yurchak regarding

11   governance and many legal matters with -- as it related to

12   MovementDAO.

13   Q.   Uh-huh.

14        You used the DAO-lawfirm alias to misrepresent actions that

15   you were taking and recommendations that you were giving as if

16   they were actions and recommendations from the law firm of Reed

17   Yurchak; right?

18   A.   I -- I did not give any advice.

19   Q.   Okay.  The case number for your criminal case was 10-cr-269

20   in the Western District of Washington State; correct?

21   A.   Yes.

22   Q.   A sentencing hearing was held in connection with your

23   conviction; right?

24   A.   Yes.

25   Q.   A copy of a transcript of that sentencing hearing was filed

1   in the Court's docket, a docket number 185; right?

2   A.   I don't know the specific docket.

3   Q.   You were present for that sentencing hearing; correct?

4   A.   Yes.

5   Q.   Sorry.   Correct?

6   A.   Yes.

7   Q.   During that hearing, the judge added a two-level

8   enhancement to your sentencing calculation by making a factual

9   finding that you willfully obstructed justice; right?

10  A.   Yes.

11  Q.   The Court found that you willfully obstructed justice by

12  falsely testifying about a material matter with intent to

13  provide false testimony, didn't you?

14  A.   Yes.

15  Q.   The Court found that you willfully provided false testimony

16  about disclosing the false invoices from Wallace Black; right?

17  A.   When you testify on your behalf and you don't have

18  materials to support it, that's what happens.

19  Q.   I'm sorry.   The Court found that you willfully provided

20  false testimony about disclosing false invoices from Wallace

21  Black; right?

22  A.   I will take your word for it.   I don't recall the

23  specific --

24  Q.   The Court found that you willfully provided false testimony

25  about the reasons you offered for altering those invoices;

1   right?

2   A.   Again, I don't -- I'll take your word for it.

3   Q.   You don't recall?

4   A.   I don't recall.  I just -- obviously, it's a traumatic

5   period and I didn't want to have anything to do with repeating

6   that here.

7   Q.   So you don't recall?

8   A.   I don't recall the specifics of what the findings were.

9   Q.   The Court found that you willfully provided false testimony

10  about your explanation at the money from those false invoices

11  was not for your personal benefit; right?

12  A.   I remember disclosing it, having a board meeting about

13  those payments.

14  Q.   I'm just asking you about what it -- I'm just asking about

15  what the Court found.

16  A.   Again, I -- I don't recall exactly --

17  Q.   Okay.

18  A.   -- what --

19  Q.   The Court found that you willfully provided false testimony

20  about receiving permission to pay yourself $1.5 million when

21  you did not, in fact, receive that permission; right?

22  A.   Again, I have board minutes that were not disclosed or not

23  provided in the criminal case.

24  Q.   Did you recall that, the Court's finding?

25  A.   I will take your word for it.

1  Q.   Okay.  So, in all, the Court found that you willfully

2  provided false testimony on four different occasions, during

3  the course of your testimony of your criminal trial; right?

4  A.   Yes.  And, again, this is why I was very adamant about

5  having all of our governance public and all our communications

6  public in the DAO.

7  Q.   Mr. Phillips, I'm not asking for why you did other things.

8  I'm asking if you recall the findings of the Court.  Thank you.

9       And do you recall?

10       THE COURT:  Mr. Berg, my concern is that I can read

11  this opinion.  And you're asking him if he recalls, is

12  interesting, but it is not helpful.

13       MR. BERG:  Yes, Your Honor.  I'm reading it for the

14  record.  I can't introduce this exhibit under 608(b), and so

15  for purposes of the record, it's important that I want to get

16  this in.  It's pretty important.

17       THE COURT:  Right.

18       MR. BERG:  I'm done with it and I'm moving on.

19       THE COURT:  Okay.  Very good.  I can always refer to --

20  you're reading an opinion from a case, and I can always look

21  that up.

22  BY MR. BERG:

23  Q.   You used the law firm of Reed Yurchak as a passthrough

24  entity to conceal the transfer of money to yourself; is that

25  correct?

1   A.   No.

2   Q.   Do you recall Mr. Singh asking questions of Mr. Yurchak and

3   yourself about One Of?

4   A.   Mr. Yurchak executed an engagement agreement in order to

5   handle accounting for me because I didn't --

6   Q.   You recall that testimony; right?

7   A.   I do recall.

8   Q.   Thank you.

9        And you currently pay child support; correct?

10  A.   I do.

11  Q.   Near the end of 2018, you requested that the Washington

12  Department of Social Health Services petition the Superior

13  Court of Washington or the County of King to adjust your child

14  support payments.

15  A.   Right.

16  Q.   In connection with that request, you represented your gross

17  monthly income was $500; right?

18  A.   Yes.

19  Q.   All right.  Pursuant to that request, the Court altered

20  your monthly support obligations to $50; right?

21  A.   Yes.

22  Q.   Around August of 2021, you began doing work for the company

23  One Of; correct?

24  A.   Yes.

25  Q.   But One Of didn't pay you directly.  They paid you through

```
 1              THE COURT:  Okay.  We have been going now for over an
 2   hour, at least.  I wanted to make sure you were okay.  Or when
 3   do you need a break?
 4              THE STENOGRAPHER:  Whenever you plan on taking a lunch
 5   break or -- if there is going to be a lunch break, that will be
 6   fine for me.  I'm not sure how long the hearing is scheduled
 7   for.
 8              THE COURT:  We are actually scheduled for 1:00, to end
 9   at 1:00.
10              THE STENOGRAPHER:  Oh.
11              THE COURT:  But it looks like we could go -- we may
12   need a little bit more time than that.
13              THE STENOGRAPHER:  Okay.
14              THE COURT:  But do you want to go to 1:00 and then take
15   a break, and then see what's going on at that point?
16              THE STENOGRAPHER:  That sounds good.
17              THE COURT:  Mr. Berg, how much more time do you need?
18              MR. BERG:  10 to 15.
19              THE COURT:  10 to 15.
20              Okay.  So why don't we just go to that 15 minutes, and
21   then we will take a break so that she can rest.
22              Okay.  Very good.
23   BY MR. BERG:
24   Q.  Page 87 of Exhibit 6, please.  Let me know when you are
25   there.
```

1   A.   Which page, again?  I'm sorry?

2   Q.   87.

3   A.   Yes.

4   Q.   Okay.  That page of the GitBook shows a screenshot of the

5   MOVE presale page; right?

6   A.   Yes.

7   Q.   It says:  "Become an early $MOVE adopter.  Sending from

8   Coinbase?  Learn more here."

9        Do you see that?

10  A.   Yes.

11  Q.   It doesn't say anything about launch of the MovementDAO,

12  does it?

13  A.   Not on this page.

14  Q.   Okay.  In March 2022, the move.xyz website stated that:

15  "The platform is currently under development and conducting a

16  token presale to fund its endowment"; right?

17       You won't see that on Exhibit 6, Mr. Phillips.  I'm just

18  asking if you recall.

19  A.   Can you repeat that statement again?

20  Q.   On March 2022, the move.xyz website stated:  "The platform

21  is currently under development and conducting a token presale

22  to fund its endowment"; right?

23  A.   On the website it's stated to fund -- isn't that in the

24  GitBook?

25  Q.   On the website it said that the platform is currently under

1   development; is that right?

2   A.  The sister website.

3   Q.  Mr. Phillips, let me back up for you.

4   A.  Right.

5   Q.  We're looking at Exhibit 6.  This is the GitBook that was

6   published on February 2, 2022.  We're done with that.  I'm

7   asking you a new question.

8       In March 2022, on the move.xyz website, did it say, "The

9   platform is currently under development"?

10  A.  Just -- this page would have been posted on that --

11  Q.  Mr. Phillips, I'm not asking about this page anymore.  I'm

12  asking on move.xyz website.

13  A.  Yeah, and above -- in this address line, it says

14  presale.move.xyz.

15  Q.  Uh-huh.

16  A.  And so, I think if you went to move.xyz directly, it would

17  reroute you to this.

18  Q.  Okay.  Let's -- let's pull out Exhibit 204.

19          MR. BERG:  Your Honor, may I approach?

20          THE COURT:  Yes, you may.

21          MR. BERG:  Your Honor, Exhibit 204 is an archived web

22  page of move.xyz.  I would like to move Exhibit 204 into

23  evidence.

24          THE COURT:  Mr. Singh?

25          MR. SINGH:  No objection.

         1              (Plaintiff Exhibit 204 was received in evidence.)

         2      BY MR. BERG:

         3      Q.   Mr. Phillips --

         4      A.   Yes.

         5      Q.   -- Exhibit 204 is a web archive page of move.xyz taken on

         6      March 14, 2022.  Do you see that at the top of the page?

         7      A.   Yes.

         8              THE COURT:  I'm seeing April 17th.

         9              MR. BERG:  I'm sorry, Your Honor.  That's the date

        10      the capture occurred.  If you look at the bottom right --

        11      sorry -- in that banner on the far right side, there is a black

        12      box that says March 14, 2022.

        13              THE COURT:  I see.  Thank you.

        14              MR. BERG:  That's the feature of the web archive

        15      format.

        16      BY MR. BERG:

        17      Q.   Okay.  Now, Mr. Phillips, if you'd go to the very bottom of

        18      that page, the very last sentence, it says:  "The platform is

        19      currently under development and conducting a token presale to

        20      fund its endowment."

        21              Do you see that?

        22      A.   Yes.

        23      Q.   Okay.  Now, move.xyz website said the exact same thing in

        24      June 2022; is that right?

        25      A.   It had the same page in June?

1   Q.   Same page, same language:   "The platform is currently under

2   development."

3   A.   Perhaps, yes.   I -- I will agree with that.

4   Q.   Do you recall it or not?

5   A.   I don't recall the specific time frame in which various web

6   pages were updated --

7   Q.   Okay.

8   A.   -- and programmed.

9        MR. BERG:   I would like to move Exhibit 203 into

10   evidence.

11       Your Honor, may I approach?

12       THE COURT:   Yes, you may.

13       Mr. Singh, any objection?

14       MR. SINGH:   No objection.

15       THE COURT:   Admitted.

16     (Plaintiff Exhibit 203 was received in evidence.)

17   BY MR. BERG:

18   Q.   Top right corner of Exhibit 203, it says June 13, 2022.   Do

19   you see that, Mr. Phillips?

20   A.   Yes.

21   Q.   Same thing.   All the way down at the bottom of the page:

22   "The platform is currently under development"; correct?

23   A.   Yes.

24   Q.   Okay.   Thank you.

25       Mr. Phillips, you manage and maintain move.xyz; is that

1   right?

2   A.   I -- I -- the developers all have shared credentials to

3   manage the -- the DNA domains.

4   Q.   Mr. Phillips, do you manage and maintain --

5   A.   I participate in managing it, yes.

6   Q.   And you oversee all the developers; right?

7   A.   I'm -- I participate.

8   Q.   Answer the question, please.

9        You oversee the developers; right?

10  A.   I -- the DAO is member managed and it's flat.  So I am not

11  anyone's boss.  But I do -- I'm an architect and I lead the

12  team.

13  Q.   You lead the team.

14  A.   I provide -- I mix pieces.

15  Q.   That's correct.  You lead the team; right?

16       MR. SINGH:  Objection.  It misstates prior testimony.

17       MR. BERG:  It does not.  He said, "I lead the team."

18       THE COURT:  I heard him say he leads the team.  Did I

19  misunderstand?

20  A.   Yeah, I'm just trying to be clear that, like, as an

21  architect, as a senior developer, I don't have a heavier weight

22  in terms of opinions.  We're all trying to collaborate to build

23  something.

24       THE COURT:  All right.  Thank you.

25  ///

1   BY MR. BERG:

2   Q.   It was developed, is it fair to say?

3   A.   I do coordination part of the work.

4   Q.   move.xyz currently has an application linked to it that

5   purports to let a user create their own DAO; right?

6   A.   Currently.  Currently we're in development.

7   Q.   Okay.  That application is still under development in beta;

8   right?

9   A.   Yes.

10  Q.   So there is no application or interface currently

11  operational that will allow you to build a DAO on the Movement

12  website; correct?

13  A.   It depends on your definition of DAO.  But -- because you

14  can create a token and you can make a Snapshot space, or you

15  can create a Gnosis wallet and make a Snapshot space, and agree

16  on how decisions are made.

17  Q.   What's your understanding in answering when you answer --

18  when I say, There isn't an application on move.xyz that allows

19  you to create a DAO, based on your understanding, is that

20  correct?

21  A.   It's currently in development and in various stages of

22  working and not working.  We break it all the time.

23  Q.   Okay.  So the answer is:  No, there is not currently an

24  operational application that lets you create a DAO; right?

25  A.   We have code that creates a DAO.  Today it may not work.

1    Tomorrow it may.  If we need to make it work today, we can do

2    that.  But we're in development, adding features, and changing

3    things.

4    Q.  What are the names of the DAO's created using that

5    application that are currently hosted on move.xyz?

6    A.  We don't have any.

7    Q.  You recently changed the current home page of move.xyz;

8    correct?

9    A.  As I stated, that we are currently in development.

10   Q.  Did you recently change the current home page of move.xyz?

11   A.  Yes.

12   Q.  When did you change that home page?

13   A.  In the last week or two.

14   Q.  Okay.  The move.xyz home page is a copy of an old version

15   of the Juicebox launch page; right?

16   A.  No.

17   Q.  Okay.  Is it a copy of any Juicebox page?

18   A.  We share similar layouts and we used some of their image

19   assets.  But our application is different than Juicebox.

20   Q.  Did you ever -- that's fine.  We will move on.

21       Did you ever have a conversation with Evita Stenqvist after

22   she received a transfer from February 2023 regarding whether or

23   not those funds would be clawed back from her?

24   A.  I only know a general concern about what the state of our

25   salaries were, and not understanding whether the Court will

1    allow us to pay developers or not.

2            MR. BERG:  Your Honor, may I approach?

3            THE COURT:  Yes, you may.

4            MR. BERG:  Your Honor, I would like to move Exhibit 212

5    in evidence.

6            THE COURT:  Mr. Singh?

7            MR. SINGH:  Yes, Your Honor.

8            This appears to be a conversation between Evita

9    Stenqvist and Mr. Iglesias.  I don't see how it's relevant to

10   Mr. Phillips' testimony or how he can authenticate or anybody

11   can cause this exhibit to be admitted.

12           THE COURT:  Okay.  So, Mr. Berg, how is this

13   authenticated?

14           MR. BERG:  What we're asking -- we're using this to try

15   to elicit from Mr. Phillips if he was the one that told

16   Ms. Stenqvist that her salary would be clawed back.

17           THE COURT:  Okay.  So why don't you just go ahead and

18   ask that question.

19   BY MR. BERG:

20   Q.  Mr. Phillips, if you can see -- look at the last sentence

21   of the top e-mail on Exhibit 212.

22           Do you see that?

23   A.  Yes.

24   Q.  It says -- Ms. Stenqvist writes:  "I was told that my

25   salary wouldn't be clawed back.  As such, I have acted as if it

```
 1                    C E R T I F I C A T E

 2

 3

 4          I hereby certify that the foregoing is an

        accurate transcription of the proceedings in the
 5
        above-entitled matter.
 6

 7

 8      DATE:   06-08-2023         /s/Laura Melton
                                   LAURA E. MELTON, RMR, CRR
 9                                 Official Court Reporter
                                   United States District Court
10                                 Southern District of Florida
                                   400 North Miami Avenue
11                                 Miami, Florida 33128

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

# Exhibit G

# Convex Labs Analysis

*Breslow et al., v. Phillips et al.*

5/25/2023

# Nicolas Bax  -  Background

- Blockchain analyst since 2017

- Co-founder and Head of Research at Convex Labs
  - Convex Labs is a blockchain intelligence company which specializes in identifying illicit activity and emerging threats in digital assets.
  - Blockchain forensics, crypto asset due diligence, trade surveillance, money laundering tracing, and digital asset theft detection
  - Crypto-tracing consulting

- Developed and published numerous methods of cryptocurrency analysis
  - NFT insider trading detection and mitigation
  - Tornado Cash tracing
  - Monero tracing

# Assignment

- Conduct blockchain analysis regarding
  - Contributions to the DAO endowment
  - Removal of Plaintiffs as signatories of DAO endowment
  - Whether Snapshot vote allocation is arbitrary
  - Whether the Move.xyz Tooling application creates a DAO
  - Whether Defendants' TRO accounting is trustworthy

# Foundational observations

- I used cryptocurrency transaction records from Etherscan.io in my analysis
  - Etherscan.io is an online application that enables a user to access details on Ethereum blockchain, including transaction data, cryptocurrency wallet addresses, smart contracts, and Ethereum Name Service ("ENS") aliases that are registered to a particular cryptocurrency address.

- I analyzed data on Snapshot.org
  - Snapshot.org is an online platform that allows a user to create and vote on proposals using cryptocurrency. A user seeking to cast a vote on a Snapshot proposal must register a cryptocurrency address with Snapshot to vote. When that user casts a vote, their ENS alias or cryptocurrency address will appear as the vote-caster.

- I analyzed Gnosis Safe transactions
  - Gnosis Safes are a type of multi-signature wallet smart contract on the Ethereum blockchain. E.g. for a 2-of-3 multi-signature wallet, there are three authorized signatories, but only two of them are required to approve a transaction.
  - Safe.global is a user interface that enables a user to see who proposed and approved transactions from Gnosis Safe wallets

4

# Did Plaintiffs contribute 97% of the DAO endowment?

- Source document: DAO endowment contributor list and Etherscan transaction records.  Exs. 2, 51, 90, 150

- "I prepared a budget for MovementDAO on September 11, 2022, which contains an instructive snapshot of the organization at that time."  Declaration of Mark Phillips (March 17, 2023),  Ex. 93, ¶ 53

# Analysis – DAO endowment contributors

| blockNumber | transactionHash | sender | value | symbol | normalizedAmount | dollarAmount |
|---|---|---|---|---|---|---|
| 14013047 | 0xb206f2ff77b0963c4ba9d589ce54375ed46b2949e2dc5901bdbcae084ee9b015 | 0x4Ab54c9eA8b56db62832ed20654F373B7305dB0c | 1.00E+15 | eth | 3.33E+18 $ | 3.32 |
| 14110042 | 0xc4bc25f20a19a135d3444f582161a56c74188799a73d65ff0acc978ad62b104a | 0x4Ab54c9eA8b56db62832ed20654F373B7305dB0c | 1.00E+15 | eth | 2.60E+18 $ | 2.60 |
| 14110006 | 0x78c6c8f39e93a7663a31e96fc9c951100619d1307e85052ce22266cc5ae197b0 | 0x4Ab54c9eA8b56db62832ed20654F373B7305dB0c | 5.00E+19 | dai | 5.00E+19 $ | 50.00 |
| 14110021 | 0x7ff7f949be56e9a501a9e1b4aed6426f9d5955973393ece970e03213c2a203db | 0x4Ab54c9eA8b56db62832ed20654F373B7305dB0c | 1.00E+18 | dai | 1.00E+18 $ | 1.00 |
| 14124492 | 0x6371362f112ea5610c0a80f715662b02d1d893908483e7aa51150bcd89925c4a | 0x4Ab54c9eA8b56db62832ed20654F373B7305dB0c | 1.50E+16 | eth | 4.02E+19 $ | 40.18 |

Ex. 90

- Ex. 90 contains 139 rows with transaction history data

- It purports to list transactions that contributed to the DAO endowment account (0x143cC0A996De329C1C5723Ee4F15D2a40c1203c6)

- The end of the document contains a summation of all the transactions listed: **$17,189,461.91**

# Methodology

- Use simple python script to analyze each transaction and identify those which were not transfers

- Manually inspect Etherscan transaction records for those transactions that were not transfers

# Analysis

- At least 6 transactions should not be counted in the contribution total

- Suspect contributions:
  - Swaps: transactions where existing contributions of cryptocurrency are converted from DAI to ETH but counted in total as distinct contributions (totaling $462,411)

# Analysis – Swap transactions

- $462,411 of the transactions from service-provider.eth were swaps of existing endowment funds between different cryptocurrencies



| Transaction Hash | Dollar Amount* |
|---|---|
| 0xafe47fe9f127f4427f1fac31aec44fda730650 7c214a28505a3eeb1c2ecd944f | 99,164.83 |
| 0x8beaec7c3ed1ac55ae2b95cc8ff5f71f46f0b5 f38c920801a7949793de9f008e | 100,426.5 |
| 0x6b177130f75ddf8bf43380171f3f9d9e0ffdb2 e2c8ce0278991106339b55b81b | 55,052.88 |
| 0x9220f2803481949c3cbaed722998d10d9aa2 c364b371a8ee0e5efd85da8a7d43 | 49,706.02 |
| 0xf620fca9109f1d526f6816048cae911a54b6d cc578ad3525818426 1136b49460 | 105,879.54 |
| 0x238c8382ee0bf1bca90eed7b3f4be7a0623e 0adac1d58800e18ec5d5baf2148d | 52,181.25 |
| **Total** | **$462,411.01** |

*using defendant's price calculations          Ex. 150

Ex. 150, PLAINTIFF0001759

9

# Analysis

- Suspect contributions:
  - Indirect deposits: for the largest deposit ($9,786,795 from Ryan Breslow), service-provider.eth withdrew that amount from Breslow's Gnosis Safe account to service-provider.eth's wallet and then deposited that same amount in the DAO endowment minutes later.  Ex. 51
    - Although strange, this activity did not impact the total contribution amount so did not factor into my contribution analysis



Exs. 2, 51   10

# Analysis – Plaintiffs' contributions

| blockNumber | transactionHash | sender | dollarAmount | Name |
|---|---|---|---|---|
| 141292860 | 0x7b918b7cd3c66d6bfc81bc42be6d6d16af265b50cc0e9610837b8a7444f0a2d2 | 0x752515a3A1091b9f1c04416CF79D1F14d2340085 | 9786795.79 | Breslow |
| 141294140 | 0x233834c33ad4a6e120a647b567add893dc1869c1cf04d3c28aa9e23d08500485 | 0xD78368092Cb1079e3DdaE7f192F5dCdE53949CCD | 3000000 | Fine |
| 141294660 | 0x068ddb3c424b3b9d3c1ef644d7164f0f321a1fb4fe7542a11aee166fa4d93ee8 | 0x58F09dd6DF8dFCe8c209A00BaE4348002BACac1d | 1841026 | Breslow |
| 141292780 | 0xaeb8614064e3bae8011201c426cb75e3371a3d34de3bca63bd4dac1f590a0f05 | 0x58F09dd6DF8dFCe8c209A00BaE4348002BACac1d | 1200000 | Breslow |
| 141293610 | 0x8bbc858653f31158809e425074cc585faf63e8b088e335a6e12a23eee64f355fd | 0xfE021e62637Cf8B880a76b09E94904693D38256A | 214146.5 | Gordon |
| 141567710 | 0x3f4c724dddaedffb5be6d7633992a9021acd129c37536f284348a4fff15a3b27 | 0xDe10F01e3f9bF288eF7A91cb4744B4AF3F2797F0 | 200000 | Fine |
| 141356130 | 0xa5ef0b4edd588dc3b789279d8c10f85cbedfc62038fc97dd76ecb42f8b6202ed | 0x211be2dDC09c482B27Ed780A710b18d8Cb76328E | 80000 | Fine |
| 141356180 | 0xd698d9dcb05e4bfc1c06c0c3d0b836fc2675fa242887afd1c709df7751ad4b7d | 0x211be2dDC09c482B27Ed780A710b18d8Cb76328E | 2693.68 | Fine |
| 141356160 | 0x210614f9f5c95e40a963674e69f26d89369d8b49746110f3b89659fbebf98dd6 | 0x211be2dDC09c482B27Ed780A710b18d8Cb76328E | 1000 | Fine |
| 141356050 | 0x8912ddc0ddc57c5e2f545b627da296f249774dc5b07fa06ee39509c716def5a6 | 0x211be2dDC09c482B27Ed780A710b18d8Cb76328E | 20 | Fine |

Exs. 2, 90

- Total contributions listed: $17,189,461.91
- Plaintiffs' total contributions: $16,325,680.97
- Improperly counted "swap" contributions: $462,411.01
- Total contributions listed after exclusion: **$16,727,050.90**

11

# Conclusion

- Excluding the "swap" transactions, the list of transactions in Ex. 90 shows that Plaintiffs contributed 97% of the assets in the DAO endowment

# Who removed Plaintiffs as signatories from the DAO endowment?

- Source document: DAO endowment Gnosis SAFE transaction record - Ex. 154; Fact Stip. No. 11

- *"I don't have his keys with me anymore, since it was for the dao-lawfirm, the key was split and its held in the law firm's secure files."* Ex. 149 (Text between Mark Phillips to Jon Gordon)

> so i'm guessing you talked about keys with alex because right after we talked, he texted me asking for his key information.
>
> 8:32 AM

> He asked me about it

> He asked how many signers were required
>
> 9:43 AM

> to be clear, he should have his keys and i wrote a detailed ledger how to with his key information and gave it to him when we were at ryan's, i don't need or want more work, and more importantly, i never used it without his explicit instruction, so as a result, i don't think i have actually used it aside from the contribution which you were present. as i shared last night, i don't have his keys with me anymore, since it was for the dao-lawfirm, the key was split and its held in the law firm's secure files



13

# Analysis

- Original signatories to the DAO endowment account

- Ryan Breslow

- Mark Phillips

- Alex Fine

- Jon Gordon



| ENS | Ξ |
|---|---|
| dao-lawfirm.eth | 0x752515a3A1091b9f1c04416CF79D1F14d2340085 |
| adridadou.eth | 0xDe6ab16a4015c680daab58021815D09ddB57db8E |
| — | 0xDbE76F6ae97dFD5bdd1D7DAD8972740d18aB2b57 |
| *tankbottoms.eth* | 0x468f178672C86bFA02e5E1B0413C3ccf55A37409 |
| — | 0x550bD0F03580B9a687931af4d837F8e45D61d410 |
| — | 0x746cf650d4E5431474E8D4E2d5B6Bbe53772b498 |
| fredymontero.eth | 0x67A5A5136ba1725359bfdf204Cbbb1c809Cc5490 |

Ex. 6; Fact Stip. No. 11

14

# Analysis

- Mark Phillips

I created and maintained dao-lawfirm.eth

Declaration of Mark Phillips, Ex. 93, ¶ 22

| ENS | Ξ |
|-----|---|
| dao-lawfirm.eth | 0x752515a3A1091b9f1c04416CF79D1F14d2340085 |
| adridadou.eth | 0xDe6ab16a4015c680daab58021815D09ddB57db8E |
| — | 0xDbE76F6ae97dFD5bdd1D7DAD8972740d18aB2b57 |
| *tankbottoms.eth* | 0x468f178672C86bFA02e5E1B0413C3ccf55A37409 |
| — | 0x550bD0F03580B9a687931af4d837F8e45D61d410 |
| — | 0x746cf650d4E5431474E8D4E2d5B6Bbe53772b498 |
| fredymontero.eth | 0x67A5A5136ba1725359bfdf204Cbbb1c809Cc5490 |

Ex. 6; Fact Stip. No. 11

15

# Analysis

- Mark Phillips

- Ryan Breslow

- Mark Phillips

- Alex Fine

- Jon Gordon



| ENS | Ξ |
| --- | --- |
| dao-lawfirm.eth | 0x752515a3A1091b9f1c04416CF79D1F14d2340085 |
| adridadou.eth | 0xDe6ab16a4015c680daab58021815D09ddB57db8E |
| — | 0xDbE76F6ae97dFD5bdd1D7DAD8972740d18aB2b57 |
| *tankbottoms.eth* | 0x468f178672C86bFA02e5E1B0413C3ccf55A37409 |
| — | 0x550bD0F03580B9a687931af4d837F8e45D61d410 |
| — | 0x746cf650d4E5431474E8D4E2d5B6Bbe53772b498 |
| fredymontero.eth | 0x67A5A5136ba1725359bfdf204Cbbb1c809Cc5490 |

Ex. 6; Fact Stip. No. 11

# Methodology

- Review major transaction record events to determine who exercises control over the DAO endowment account

# Analysis – DAO endowment account created



Ex. 154

• Mark Phillips

Ex. 6; Fact Stip. No. 11

Declaration of Mark Phillips, Ex. 93, ¶ 22

18

# Analysis – DAO endowment signatories removed

Entry 22



Entry 34



- On February 2, 2023 at 1:33 AM (PST), someone with access to Ryan Breslow, Alex Fine, and Mark Phillips's keys removed Jon Gordon as a signatory

- On February 2, 2023 at 3:32 AM (PST), someone with access to Dao-lawfirm, Ryan Breslow, Mark Phillips's keys removed Alex Fine as a signatory

Ex. 154

19

# Analysis – Major DAO endowment transfers

**Entry 36**



**Entry 37**



Ex. 154

- On February 2, 2023 at 3:39 AM and 3:42 AM (PST), the dao-lawfirm and Mark Phillips keys were used to remove $8.5 million

- The 68aD signatory was added at 1:55 AM (PST) using the Breslow, Phillips, and dao-lawfirm keys

20

# Conclusion

- Addresses that Mark Phillips controls (0085 and 7409) were used to
  - Create the DAO endowment account on 1/8/2022
  - Remove Plaintiffs as signatories on 2/2/2023
  - Transfer over $8.5 million out of the DAO endowment on 2/2/2023
- Removal of Plaintiffs as signatories of the DAO endowment account required access to (1) Plaintiffs' keys, (2) Mark Phillips's key, and (3) the dao-lawfirm.eth key

21

# Is MovementDAO's Snapshot voting allocation arbitrary?

- Source documents:
- Snapshot voting record for MIP-0000: Proposal to Adopt the Guiding Principles, Terms of Service, and Code of Conduct. Exs. 8, 155
- Other Snapshot voting records. Exs. 333, 358, 362
- Etherscan transaction records. Exs. 125–132



Ex. 8

22

# Is MovementDAO's Snapshot voting allocation arbitrary?

- Is Snapshot voting power determined by MOVE tokens in a voter's possession?

- Is Snapshot voting power determined by MAPE NFTs in a voter's possession?

- Is Snapshot voting power determined by a voter's contribution to the DAO endowment?



Ex. 8

23

# Methodology

- Checked historical data for each account that voted on MovementDAO's snapshot page (Exs. 125-132)
  - ERC-20 and ERC-721 (NFT) transaction history
  - Contributions to DAO Endowment
- Created a Snapshot page with the same settings as snapshot.movedao.eth

# Analysis – MOVE tokens do not govern Snapshot

- Voting record for proposal MIP-0000
- No Snapshot voter contained a MOVE token in their cryptocurrency account

| address | Name | voting_power |
|---|---|---|
| 0x7525...0085 | service-provider.eth | 10249206 |
| 0x58Ba...E1650 | unknown | 9501.82 |
| 0xAE13...Dcd1 | obstacker.eth | 4155.55 |
| 0xA4e...931c | Ben Reed | 2172.59 |
| 0x1DD...0CF0 | Natasha Pankina | 186.88 |
| 0x2B07...da84c | pillowfightclub | 38.93 |
| 0xB646...0675 | partypants | 38.93 |
| 0x5d95...0d27E | tankbottoms.eth | 0 |

Exs. 155, 125–132; Fact Stip. No. 12

25

# Analysis – MAPE NFTs do not govern Snapshot

- Each Snapshot voter held MAPE NFTs
- No correlation between number of MAPE NFTs and voting power

| address | Name | voting_power | # of MAPE-1420 NFTs |
|---|---|---|---|
| 0x7525...0085 | service-provider.eth | 10249206 | 12 |
| 0x58Ba...E1650 | unknown | 9501.82 | 2 |
| 0xAE13...Dcd1 | obstacker.eth | 4155.55 | 7 |
| 0xA4e...931c | Ben Reed | 2172.59 | 5 |
| 0x1DD...0CF0 | Natasha Pankina | 186.88 | 11 |
| 0x2B07...da84c | pillowfightclub | 38.93 | 5 |
| 0xB646...0675 | partypants | 38.93 | 9 |
| 0x5d95...0d27E | tankbottoms.eth | 0 | 20 |

**Assumption:** a MAPE NFT is a non-fungible token that Defendants claim was intended to control the initial governance of the Movement DAO

Exs. 155, 125–132

26

# Analysis – DAO endowment contributions do not govern Snapshot

- Voting power may be based on amount contributed to DAO endowment address
- But that theory is invalid because **service-provider.eth** contributed $0 but has over 10 million votes

| address | Name | voting_power | # of MAPE-1420 NFTs | Contribution to DAO Endowment ($) |
|---|---|---|---|---|
| 0x7525…0085 | service-provider.eth | 10249206 | 12 | 0 |
| 0x58Ba…E1650 | unknown | 9501.82 | 2 | 9501.82 |
| 0xAE13…Dcd1 | obstacker.eth | 4155.55 | 7 | 4155.55 |
| 0xA4e…931c | Ben Reed | 2172.59 | 5 | 2172.59 |
| 0x1DD…0CF0 | Natasha Pankina | 186.88 | 11 | 186.88 |
| 0x2B07…da84c | pillowfightclub | 38.93 | 5 | 38.93 |
| 0xB646…0675 | partypants | 38.93 | 9 | 38.93 |
| 0x5d95…0d27E | tankbottoms.eth | 0 | 20 | 0 |

Exs. 155, 125–132

27

# Analysis – service-provider.eth voting power

- Service-provider.eth's votes appear to be the sum of the "swaps" and "indirect deposit" from my contribution analysis:

  $462,411 **(swaps)** + $9,786,795 **(indirect deposit)** = 10,249,206 **(votes)**

- The "swaps" and "indirect deposit" transactions are not actual contributions

- Excluding "swap" and "indirect deposit" transactions, service-provider.eth contributed $0 to the DAO endowment

# Analysis – service-provider.eth voting power

- Service-provider.eth was responsible for over 95% of the votes cast in favor of all proposals posted in August and September 2022

17.  →  Service-provider.eth·cast·over·10,000,000·votes·on·each·of·the·following·proposals·posted·on·https://snapshot.org/#/snapshot.movedao.eth:·MIP-0000,·MIP-0001,·MIP-0002,·MIP-0003,·MIP-0004,·MIP-0005,·MIP-0006,·MIP-0007,·MIP-0008.··¶

Fact Stip. No. 17

29

# Analysis – Mark Phillips is service-provider.eth



I created and maintained dao-lawfirm.eth

Declaration of Mark Phillips, Ex. 93 ¶ 22

dao-lawfirm.eth                    0x752515a3A1091b9f1c04416
                                   CF79D1F14d2340085

Ex. 6; Fact Stip. No. 11

13. → The·cryptocurrency·address·registered·to·ENS·service-provider.eth·is·

0x752515a3A1091b9f1c04416CF79D1F14d2340085.¶

Fact Stip. No. 13

30

# Analysis – Snapshot votes are manipulated to enhance Phillips's influence over time

- Mark Phillips's (tankbottoms.eth) address ends in d27E. Fact Stip. No. 16
- His voting power increased over time but that address never contributed to the DAO endowment

| Voting Record | Tankbottoms.eth Snapshot Votes | Amount contributed |
|---|---|---|
| MIP-0000, 8/29/22 (Ex. 115) | 0 votes | $0 |
| MIP-0008, 9/19/22 (Ex. 333) | 226 votes  (226 votes "delegated") | $0 |
| MIP-0021, 2/9/23 (Ex. 358) | 1,072,663 votes (39 votes "delegated") | $0 |
| MIP-0023, 3/21/23 (Ex. 362) | 1,172,850 votes (100k votes "delegated") | $0 |

Exs. 115, 333, 358, 362; Fact Stip. No. 24

31

# "Whitelist-weighted" strategy

- Movement DAO Snapshot page was set to "Whitelist-weighted"
- "Whitelist-weighted" strategy allows admins to assign arbitrary number of votes to any account





[2]https://snapshot.org/#/snapshot.movedao.eth/settings

32

# Conclusion

- For tankbottoms.eth, voting power was allocated to Mark Phillips in a manner that gave him massively disproportionate voting power without any discernible pattern or principle.

- For service-provider.eth, voting power was allocated to Mark Phillips in a manner that credited service-provider.eth for contributions that others had made.

# Can a DAO launch from the Tooling application on move.xyz?

Source documents:

- Move.xyz website (Ex. 168)
- The move.xyz Tooling application (Ex. 168 at -1842):

https://daolabs-nft-tooling.on.fleek.co/?network=mainnet

Methodology:

- Walk through DAO creation process on move.xyz Tooling application
- Use console code-debugging application to ascertain whether a "test DAO" can be launched from the move.xyz Tooling application

34

# Move.xyz – Tooling application



## DAO-KIT LEGAL TEMPLATES

Entity formation templates for DAOs. Legal templates accessible for Treasury creators, DAOs, and NFT Creators.

Designed to be used with our tools: Juicebox native treasuries, rich creation tooling for diverse NFT collections, and more.



LFG        Tooling →

Ex. 168 at -1837

35

# Move.xyz – Tooling application



https://daolabs-nft-tooling.on.fleek.co/?network=mainnet

Ex. 168 at -1842

# Move.xyz – Tooling application



# Move.xyz – Tooling application

# Move.xyz – Tooling application

# Is Defendants' TRO accounting trustworthy?

Order directing Defendants to "file a notice of compliance, stating either that they've complied with our order requiring Defendants, their agents, employees, attorneys, and any persons in active concert or participation with them to unwind any transfers in the last 30 days from the DAO endowment's gnosis account . . . or showing cause as to why they haven't complied with our order and why they shouldn't be held in contempt of court and sanctioned." Dkt. No. 47 (March 22, 2023 Paperless Order)

40

# Methodology

- Comparison of accounting representations in source documents for internal consistency, as well as with the blockchain activity of purported recipients of TRO assets

- Source documents:
  - Mark Phillips declaration March 17, 2023, Ex. 93
  - Ben Reed declaration March 17, 2023, Ex. 85
  - MIP-0018, Ex. 27
  - Defendants' Notice of Compliance, Ex. 118
  - Defendants' April 8 cash accounting, Ex. 133
  - Defendants' April 12 cash accounting, Ex. 134
  - Defendants' May 10 cash accounting, Ex. 172
  - Etherscan transaction record.  Ex. 169

# Analysis – Developer payments exceed Snapshot proposal authorization

## MIP-0018, Ex. 27

| Due Date | Developer Consultant | Deferred Amount | Deferred Months | Practice Area |
|---|---|---|---|---|
| 2023-01-01 | 0xF1cf...eD7C | DAI 234,035 | January, October, November | Smart Contracts |
| 2023-01-01 | 0x89Ff...84fF | DAI 85,000 | October, November | UX Typescript |
| 2023-01-01 | 0x57a1...0d37 | DAI 30,000 | October, November | UX Typescript |

The total amount of developer payouts deferred in 2022 was DAI 349,035 .

Total amount authorized by MIP-0018:
**349,035 DAI**

## Ben Reed Declaration (March 17, 2023), Ex. 85

16.     Pursuant to MIP-0018, I received 322,034.67 DAI to make a deferred payout to Mr. Radin/disintermediated.eth.

17.     On or about February 2, 2023, transfers were done for a legitimate business purpose and with proper authority:

b.   20,000 DAI to cookieslayer.eth (Evita Stenqvist, a Senior Developer) as a deferred payout pursuant to MIP-0018.

c.   100,000 DAI to dsintermedatd.eth (Mikhail Radin, a Senior Developer) as a deferred payout pursuant to MIP-0018.

d.   15,000 DAI to cookieslayer.eth/Ms. Stenqvist as a deferred payout pursuant to MIP-0018.

Total amount claimed to be paid pursuant to MIP-0018:
**457,034.67 DAI**

42

# Analysis - Resnick-Neillie received TRO assets in undisclosed transfers

- Defendants admit that $16,298 in TRO assets were converted to cash for the purpose of paying attorney Daniel Resnick-Neillie

| AMOUNT OF CRYPTOCURRENCY RECEIVED BY BENJAMIN REED & MARK PHILLIPS - CONVERTED TO FIAT AND NOT UNWOUND | | | | |
|---|---|---|---|---|
| TnX Date | From ENS | To ENS | Amount - USD | Comments |
| 2/5/2023 | dev.gnosis.eth | serviceprovider.eth | $          16,298.00 | reimbursement of expenses - Daniel Resnick-Neillie |

Ex. 134 (Defendants' April 12 cash accounting)

- Nevertheless, Defendants did not disclose any transfers to Resnick-Neillie as involving TRO assets in their April 12 cash accounting

43

# Analysis – Resnick-Neillie accounting is unreliable

- Defendants' April 8 cash accounting shows that six cash payments were, in fact, sent to Resnick-Neillie—five after the 2/28/23 TRO.

| MEOW LLC CHASE BUSINESS CHECKING…0326 | | | | | |
|---|---|---|---|---|---|
| 2/21/2023 | DEBIT | MEOW…0326 | Daniel Resnick | Contractor payment - legal | $ (3,857.50) |
| 3/7/2023 | DEBIT | MEOW…0326 | Daniel Resnick | Contractor payment - legal | $ (3,857.50) |
| 3/10/2023 | DEBIT | MEOW…0326 | Daniel Resnick | Contractor payment - legal | $ (3,857.50) |
| 3/24/2023 | DEBIT | MEOW…0326 | Daniel Resnick | Contractor payment - legal | $ (3,857.50) |
| 3/10/2023 | DEBIT | MEOW…0326 | Daniel Resnick | Contractor payment - legal | $ (3,857.50) |
| 3/24/2023 | DEBIT | MEOW…0326 | Daniel Resnick | Contractor payment - legal | $ (3,857.50) |

Ex. 133 (Defendants' April 8 cash accounting)

- Defendants did not classify these payments as TRO assets in their April 12 accounting, even though they admitted that $16,298 of TRO assets were converted to cash to pay Resnick-Neillie

| AMOUNT OF CRYPTOCURRENCY RECEIVED BY BENJAMIN REED & MARK PHILLIPS - CONVERTED TO FIAT AND NOT UNWOUND | | | | |
|---|---|---|---|---|
| TnX Date | From ENS | To ENS | Amount - USD | Comments |
| 2/5/2023 | dev.gnosis.eth | serviceprovider.eth | $ 16,298.00 | reimbursement of expenses - Daniel Resnick-Neillie |

Ex. 134 (Defendants' April 12 cash accounting)

44

# Analysis – dsintermediatd.eth accounting is unreliable

- Ben Reed's March 17, 2023 declaration: dsintermediatd.eth received 322,034 DAI **AND** 100,000 DAI. Ex. 85, ¶¶ 16 & 17(c)

- Defendants' Notice of Compliance: dsintermediatd.eth received only 322,034 DAI.  The notice **omits** the 100,000 DAI identified in Ex. 85 ¶ 16.  Ex. 118.

- Defendants' April 12 cash accounting also **omits** the 100,000 DAI to dsintermediatd.eth identified in Ex. 85 ¶ 16. Ex. 134

45

# Analysis – Defendants' cookieslayer.eth accounting is unreliable

- Ben Reed declaration (March 17, 2023): cookieslayer.eth received **35,000 DAI** on 2/2/23. Ex. 85 ¶ 17

- Defendants' Notice of Compliance: cookieslayer.eth received over **235,000 DAI** on 2/2/23. Ex. 118

- Cookieslayer.eth's etherscan transaction record:  cookieslayer.eth has only received **35,000 DAI** since 2/2/23. Ex. 169



Ex. 169

- Etherscan record contradicts the Notice of Compliance and leaves **200,000 DAI unaccounted for**.

46

# Analysis – Defendants transferred TRO assets after TRO issued

- Defendants' April 12 cash accounting shows Defendants made six transfers involving TRO assets after the February 28 TRO

| 3/8/2023 | DAOLABS-LLC...0195 | Mikhail Radin | $ | 100,000.00 | Mikhail Radin payment ($322,034.67), installment 2 of 4 |
|---|---|---|---|---|---|
| 3/10/2023 | DAOLABS-LLC...0195 | Mikhail Radin | $ | 100,000.00 | Mikhail Radin payment ($322,034.67), installment 3 of 4 |
| 3/13/2023 | DAOLABS-LLC...0195 | Mikhail Radin | $ | 38,417.67 | Mikhail Radin payment ($322,034.67), installment 4 of 4 |
| 3/15/2023 | DAOLABS-LLC...0195 | Chase bank | $ | 40.00 | Bank fee |
| 3/15/2023 | DAOLABS-LLC...0195 | Aishwarya Narayana | $ | 14,700.00 | Payment for UX, UI, branding work |
| 3/16/2023 | DAOLABS-LLC...0196 | 8cast Corporation | $ | 548.25 | Consultant - financial; financial model work |

Ex. 134 (April 12 accounting)

47

# Analysis – Defendants transferred TRO assets after TRO issued

- Defendants' April 8 cash accounting shows Defendants made five transfers involving TRO assets after the February 28 TRO

| | | | | | | |
|---|---|---|---|---|---|---|
| 3/7/2023 | DEBIT | MEOW…0326 | Daniel Resnick | Contractor payment - legal | $ | (3,857.50) |
| 3/10/2023 | DEBIT | MEOW…0326 | Daniel Resnick | Contractor payment - legal | $ | (3,857.50) |
| 3/24/2023 | DEBIT | MEOW…0326 | Daniel Resnick | Contractor payment - legal | $ | (3,857.50) |
| 3/10/2023 | DEBIT | MEOW…0326 | Daniel Resnick | Contractor payment - legal | $ | (3,857.50) |
| 3/24/2023 | DEBIT | MEOW…0326 | Daniel Resnick | Contractor payment - legal | $ | (3,857.50) |

Ex. 133 (April 8 accounting)

- Defendants' April 8 cash accounting also shows Ben Reed transferred assets from an account ordered frozen by the TRO after February 28

| BEN REED ROBINHOOD | | | | | | |
|---|---|---|---|---|---|---|
| Date | Debit/Credit | Transfer from | Transfer To | Description | Amount - USD | Comments |
| 3/3/2023 | DEBIT | RobinhoodBrokerage | ReedWF…9216 | Robinhood ACH of Movement funds | $  10,500.00 | Reed Movement payroll |

Ex. 133 (April 8 accounting)

48

# Analysis – Defendants transferred TRO assets after TRO issued

- $91,163.77 discrepancy in Mark Phillips Robinhood Investment account

**BALANCE OF FIAT ACCOUNTS - MOVEMENT & PERSONAL**

| Date | Account | Beginning Balance (USD) | Current Balance (USD) | Comments |
|------|---------|------------------------|----------------------|----------|
| 4/12/2023 | DAOLABS LLC CHASE CHECKING…0195 | $ 1,336.46 | $ 280,513.32 | Current balance as of 4/13/23 |
| 4/12/2023 | DAOLABS INC CHASE CHECKING…2721 | $ 1,185.00 | $ 111,049.67 | Current balance as of 4/13/23 |
| 4/12/2023 | BEN REED ROBINHOOD | $ 90.26 | $ 261.26 | Current balance as of 4/13/23 |
| 4/12/2023 | BEN REED CHASE CHECKING…4135 | $ 188.00 | $ 257,138.33 | Current balance as of 4/13/23 |
| 4/12/2023 | BEN REED WF CHECKING…9216 | $ 5,855.19 | $ 134,413.25 | Current balance as of 4/13/23 |
| 4/12/2023 | MARK PHILLIPS ROBINHOOD - INVESTMENT | $ - | $ 1,308,093.00 | Current balance as of 4/13/23 |
| 4/12/2023 | MARK PHILLIPS ROBINHOOD - SPENDING | $ - | $ 12,626.94 | Current balance as of 4/13/23 |
| 4/12/2023 | MEOW LLC CHASE CHECKING…0326 | $ 100.55 | $ 9,622.82 | Current balance as of 4/13/23 |

Ex. 160 (April 13 accounting)

**BALANCE OF FIAT ACCOUNTS - MOVEMENT & PERSONAL**

| Date | Account | Beginning Balance (USD) | Current Balance (USD) | Comments |
|------|---------|------------------------|----------------------|----------|
| 4/12/2023 | DAOLABS LLC CHASE CHECKING…0195 | $ 1,336.46 | $ 280,498.32 | Current balance as of 5/10/23 |
| 4/12/2023 | DAOLABS INC CHASE CHECKING…2721 | $ 1,185.00 | $ 111,049.67 | Current balance as of 5/10/23 |
| 4/12/2023 | BEN REED ROBINHOOD | $ 90.26 | $ 261.26 | Current balance as of 5/10/23 |
| 4/12/2023 | BEN REED CHASE CHECKING…4135 | $ 188.00 | $ 257,138.33 | Current balance as of 5/10/23 |
| 4/12/2023 | BEN REED WF CHECKING…9216 | $ 5,855.19 | $ 126,119.62 | Current balance as of 5/10/23 |
| 4/12/2023 | MARK PHILLIPS ROBINHOOD - INVESTMENT | $ - | $ 1,216,929.23 | Current balance as of 5/10/23 |
| 4/12/2023 | MARK PHILLIPS ROBINHOOD - SPENDING | $ - | $ - | Current balance as of 5/10/23 |
| 4/12/2023 | MEOW LLC CHASE CHECKING…0326 | $ 100.55 | $ 45,316.89 | Current balance as of 5/10/23 |

Ex. 172 (May 10 accounting)

49

# Conclusion

- Defendants' TRO accounting is untrustworthy
  - Inconsistent with proposals purporting to authorize transfers
  - Contradicts prior representations about transfers
  - Inconsistent with on-chain data

- Defendants' TRO accounting shows that Defendants transferred TRO assets at least 12 times after the TRO was in effect