**EXCLUSIVE**   STARTUPS   *Published 31 minutes ago*

# Bolt Probed by SEC, Investors Over Statements Made During Fundraising

 **By Erin Woo**

 [ Share article ]

July 21, 2023 7:10 AM PDT

T he Securities and Exchange Commission subpoenaed e-commerce software startup Bolt and sent a notice to co-founder and former CEO Ryan Breslow last year over their past statements to current and potential investors, according to an April 2023 letter from a lawyer representing two of Bolt's major investors.

Brian Reinken of WestCap Management and Arjun Sethi of Tribe Capital Management claim Breslow misled investors when he was raising Bolt's $355 million Series E financing that valued the company at $11 billion in late 2021, according to the letter, which was sent to Bolt's general counsel as part of a demand to inspect the company's records. The shareholders are seeking to investigate "corporate wrongdoing" by Breslow and the board, the letter said. It said the SEC was investigating whether federal securities laws had been violated in connection with statements made when Bolt was raising money.

> **THE TAKEAWAY**
>
> Bolt, a symbol of overheated financing and questionable due diligence during the pandemic, received an SEC subpoena over statements it made to investors, according

to an investor letter. A separate suit says founder Ryan Breslow ousted three board members for not forgiving a $30 million loan.

The letter also alleged that Breslow, who has a controlling voting stake in the company and is executive chairman, directed Bolt in March 2023 to remove Reinken and Sethi from the board in a dispute over a $30 million personal loan to Breslow that the company guaranteed. Breslow had defaulted on the loan, which was made by JPMorgan. A third investor, Activant Ventures, echoed many of those allegations in a suit filed this week in the Delaware Court of Chancery.

Activant's founding partner Steve Sarracino was separately removed by Breslow from Bolt's board, in April 2023. In a statement, he said his firm "had to bring a suit to remedy lost compensation to the company."

News of the subpoena and suit haven't previously been reported. An SEC spokesperson said that the SEC does not comment on the existence or nonexistence of a possible investigation. In a statement, Bolt said on Friday "we continue to seek resolution" of the dispute over the $30 million loan. "We remain well capitalized and the existence of this outstanding obligation to the company does not and will not affect our day-to-day operations or prospects."

Breslow declined to comment.

The complaints are the latest examples of tensions between investors and founders as startups struggle or implode in the aftermath of the 2020-2022 funding boom. They are likely to become more common as a collapse in funding for startups exposes underlying problems with their businesses—and strains the portfolio of investors who backed startups when valuations were near their peak.

In the case of Bolt, Breslow raised the lion's share of the startup's $1 billion in capital in back-to-back funding rounds between 2020 and 2022. His pitch: software to help customers speed **up the online check-out process** would help online merchants siphon shoppers from Amazon and capitalize on skyrocketing demand for e-commerce. The company's $11 billion

valuation in the series E amounted to nearly 400 times its annual transactions-based revenue—an astounding valuation multiple.

But even as Breslow was wooing investors for that round, announced in January 2022, the company's **growth was slowing sharply** after it slashed the fees merchants pay for its services. Breslow stepped down as CEO in January 2022, shortly after the series E funding round was completed. Over the subsequent 12 months, the company slashed its staff by 50% through a series of layoffs.

In this market, "you don't have IPOs, there's less M&A, valuations are lower, you essentially have to fight for better results," said Evan Epstein, the executive director of the Center for Business Law at UC Law San Francisco. As companies need to shut down or lay off workers, "there will be more boardroom battles and litigation between different types of investors and founders."

In the April letter, the attorney representing WestCap and Tribe Capital wrote that Breslow "made material misrepresentations about the Company's financial condition and product pipeline that resulted in the Series E investors buying into the Company at a grossly inflated valuation." The investors represented the startup's third and fourth-largest shareholders after Breslow and an entity he controls, the letter states.

The SEC inquiry came two weeks after a **New York Times investigation** reported that Bolt had overstated its technical capacity in pitches to customers and misrepresented the number of merchants using its service in presentations for prospective investors. As of April 2023, Sethi and Reinken understood that Bolt had provided information in response to the SEC subpoena and the inquiry remained open, according to the attorney's letter.

The SEC's involvement isn't unprecedented. While the securities regulator has historically focused more on public companies, it has regularly opened investigations into private tech companies where reports raised red flags. For instance, the **SEC opened a probe into IRL** after the social media messaging app's CEO repeatedly said its app had 20 million active

Case 1:23-cv-20727-RKA Document 158-1 Entered on FLSD Docket 10/02/2023 Page 4 of 43

users, a figure the company's employees said was misleading, The Information reported in a series of articles.

The suit from the third former board member, Steve Sarracino of Activant Ventures, centers on the aftermath of Breslow's $30 million loan, which was roughly equivalent to Bolt's **revenue** in 2021. It alleges that after Breslow failed to pay the loan and refused to sell his shares to pay the debt, Breslow's lender, J.P. Morgan Private Bank, took the amount from Bolt's cash reserves, in accordance with Bolt's guarantee of the loan. Breslow asked its directors to enter into a new loan with him, effectively giving him more time to repay the original $30 million loan. When three of the five directors—Reinken, Sethi and Sarracino—denied the request and took steps to force Breslow to pay the loan, he removed them from their posts, the suit said.

That suit also targets Bolt CEO Maju Kuruvilla and three directors Breslow appointed after his overhaul of the board: Esther Wojcicki, a journalism educator who is the mother of tech executives Anne and Susan Wojcicki; Brock Pierce, the former child actor who co-founded a major cryptocurrency, Tether; and Larrance Dopson, a music producer. The suit alleges Kuruvilla and Breslow's hand-picked directors broke their fiduciary duty by declining to force Breslow to make the loan repayment.

Pierce stepped down from Bolt's board of directors on Monday, Pierce told The Information. Pierce did not comment further.

Wojcicki declined to comment. Dopson did not respond to a request for comment. JP Morgan did not respond to a request for comment.

*Laura Mandaro contributed to this article.*

*Erin Woo is a San Francisco-based reporter covering Twitter, TikTok and Snap for The Information. Contact her at erin@theinformation.com and at @erinkwoo on Twitter.*

# Add a Comment



**Erin Woo** 🄯
Reporter · The Information

Not you? Log Out
Want to edit your profile? Edit Profile

POST NEW COMMENT

## The Information Subscriber Council

Vauban from Carta: SPVs & funds for VC and angel investors
TapOnIt: The next generation of SMS
Thoughtworks: Extraordinary impact through technology excellence
Egon Zehnder: Leadership for a Better World
Felicis: Luck isn't made; it's engineered.
Loxz: Smart Workflows with Loxz Digital ML
Learn More



# Recent Articles



STARTUPS

## Lucy Guo's Passes to Buy Fanhouse

By Kaya Yurieff

STARTUPS    VENTURE CAPITAL

## Who Could Lead OpenAI's VC Fund?

By Kate Clark





STARTUPS

## Card Startup Karat Raises $70 Million, Bucking Funding Trend

By Kaya Yurieff

STARTUPS

## How Eight Social Networks Have Treated Disappearing Stories

By Alex Perry

ORG CHARTS    BRIEFINGS    ABOUT    VIDEO    EVENTS    PARTNERS



© 2013-2023 The Information. All Rights Reserved.

TERMS · PRIVACY · PAYMENT POLICY · HELP & SUPPORT · RSS FEED · TIPS · CAREERS

EFiled: Jul 21 2023 09:59AM EDT
Transaction ID 70450259
Case No. 2023-0721-NAC

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ACTIVANT VENTURES ADVISORS II, LLC, ACTIVANT VENTURES ADVISORS III, LLC, ACTIVANT VENTURES II, LP and ACTIVANT VENTURES III, LP, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | C.A. No.   2023-0721-NAC |
| RYAN BRESLOW, ESTHER WOCICKI, LARRANCE DOPSON, BROCK PIERCE AND MAJU KURUVILLA, | ) ) ) ) ) | **PUBLIC VERSION FILED JULY 20, 2023** |
| Defendants | ) ) | |
| and | ) ) | |
| BOLT FINANCIAL, INC., | ) ) | |
| Nominal Defendant | ) ) | |

## VERIFIED COMPLAINT

Plaintiffs Activant Ventures Advisors II LLC, Activant Ventures Advisors III
LLC, Activant Ventures II, LP and Activant Ventures III, LP ("Plaintiffs" or
"Activant"), by and through their undersigned counsel, bring the following Verified
Complaint derivatively in their capacities as stockholders of record of Bolt Financial,
Inc. ("Bolt" or the "Company"), a Delaware corporation, and the general partners
thereof, against defendants Ryan Breslow, Esther Wojcicki, Larrance Johnson,

1

Brock Pierce and Maju Kuruvilla ("Defendants") and nominal defendant Bolt, and aver as follows:

## NATURE OF THE ACTION

1.      This action arises from attempts by Ryan Breslow, Bolt's controlling shareholder, Executive Chairman and former Chief Executive Officer, to secure a $30 million windfall and other unwarranted remuneration from Bolt to the detriment of Bolt and its stakeholders.  To achieve this unlawful outcome, Breslow removed three directors from Bolt's five-person Board of Directors because they refused to do his bidding and instead sought to take appropriate and necessary action against him for Bolt's benefit after Breslow breached unambiguous obligations to the Company.

2.      This action also involves the failure of the current Board of Directors of Bolt (the "Current Board") to take steps to protect the Company from Breslow in breach of their fiduciary duties.  These breaches of fiduciary duty and other wrongs have harmed and continued to harm Bolt.

3.      In or about October 2021, Breslow secured a $30 million personal loan facility from JP Morgan Private Bank, guaranteed by Bolt.  In early 2023, Breslow alerted Bolt that he had decided not to repay his debt under the agreed upon terms. Under the operative agreements, Breslow's non-payment would entitle JP Morgan to sweep up to $30 million in cash maintained by Bolt as security for Breslow's loan.

Ultimately, Breslow defaulted, and JP Morgan immediately swept Bolt's $30 million, the amount outstanding on Breslow's loan.

4.      Breslow washed his hands of his obligations, including his contractual commitment to sell Bolt shares sufficient to satisfy his debt following JP Morgan's sweep of Bolt's cash.    Instead, Breslow pressured Bolt's directors to not only forebear any exercise of remedies against him, but to provide him with extended favorable loan terms. Several members of Bolt's then-board, in keeping with their fiduciary duties, commenced efforts to remedy Breslow's breach of contract and the Company's loss occasioned by Breslow.  In response, Breslow stated that unless the directors ceased these efforts and agreed to his demands, he would remove them from the Bolt board.

5.      And then, stunningly, over March and April 2023, in response to Breslow's inability to coerce submission to his financial demands, *Breslow fired several directors specifically because they were exercising their fiduciary duties to scrutinize and push back against his money grab*.  Breslow had these directors— senior investment professionals representing significant shareholders—replaced with friends and colleagues. He knew his hand-picked new directors would accede to his demands and not act against him in response to Bolt's $30 million loss, irrespective of what was in the Company's best interests, in contrast to the directors he had removed.

6.      As is evident, Breslow operates as if the rules do not apply to him. Perhaps in some instances his lack of respect for authority or interest in norms and rules of conduct is an asset. To be sure, he has been extremely successful in driving valuations and raising funds for his businesses, generating a personal paper net-worth reportedly exceeding a billion dollars while in his mid-twenties. But today, as the controlling shareholder and Executive Chairman of a Delaware corporation with extraordinary governance powers and attendant fiduciary duties, Breslow's self-interested approach to Bolt is unlawful.

7.      Breslow has intentionally installed a board that is and will continue to place his interests ahead of those of the Company and its stakeholders. He has created an environment in which all Bolt directors know that he will remove them if they do not do what he wants. If individual directors show an inclination towards dissent, as they did after Breslow breached his obligations to the Company in connection with his loan, Breslow will just get rid of them (and subsequent objecting directors) until he lands on a board majority that will unfailingly acquiesce to his requests regardless of what those requests mean for the Company to whom Breslow and the board owe fiduciary duties. This dynamic is untenable under Delaware law and must be remedied. Breslow has demonstrated that he is incapable of complying with his fiduciary duties under Delaware law and if allowed to wield his powers unchecked will continue to harm Bolt when it suits his interests.

8.      The Current Board is now enabling Breslow by abdicating altogether its responsibilities and yielding to Breslow's wishes. The Current Board has failed to act as weeks and months have passed following Breslow's initial derogation of his obligations to the Company.  The Company has contractual and other rights and remedies that should have been exercised long ago but have not been. The Current Board has idled while Breslow holds $30 million that belongs to the Company. There is no justification for the Current Board's inaction.

9.      Plaintiffs bring this action in their capacity as Bolt stockholders to remedy Breslow's breaches of fiduciary duty.  Plaintiffs seek an order holding Breslow and the other defendant board members personally liable, jointly and severally, for the failure to remedy the Company's $30 million loss occasioned by Breslow's default on his obligation to the Company.  Plaintiffs further bring a breach of contract claim on the Company's behalf based on Breslow's failure to perform under his agreement with the Company relating to his loan, and an unjust enrichment claim on the Company's behalf based on Breslow's inequitable enrichment in the amount of $30 million and the Company's concomitant impoverishment.  Finally, Plaintiffs seek a declaration that Breslow removal of Bolt's three former directors constituted a separate breach of fiduciary duty and was invalid.

## PARTIES

10.     Plaintiffs are entities affiliated with Activant Capital Group, a private equity and venture capital firm headquartered in Greenwich, Connecticut.  Activant Ventures II, LP and Activant Ventures III, LP are holders of record of Bolt stock and have held their stock throughout the period addressed herein.  Activant Ventures Advisors II LLC, Activant Ventures Advisors III LLC are the general partners of these stockholders.

11.     Defendants Ryan Breslow is the Executive Chairman of Bolt's Board of Directors and the controlling stockholder of Bolt.  Until January 2022, Breslow was Bolt's Chief Executive Officer.

12.     Defendants Esther Wojcicki, Larrance Dopson, Brock Pierce and Maju Kuruvilla are the other members of the Board.  Kuruvilla is Bolt's Chief Executive Officer.  Breslow appointed Wojcicki and Dopson to Bolt's board in March 2023, immediately after removing two directors who opposed him.  Breslow appointed Pierce to Bolt's board in April 2023, contemporaneous with removing a third director who stood in his way.

13.     Nominal Defendant Bolt is a financial technology company.  It is incorporated in Delaware and headquartered in San Francisco, California.

## JURISDICTION

14.     This Court has subject matter jurisdiction over this action pursuant to 10 *Del. C.* §§ 341 and 6501.

15.     This Court has personal jurisdiction over the Defendants as directors of a Delaware corporation pursuant to 10 Del. C. §§ 3114(a).

16.     This Court has personal jurisdiction over nominal defendant Bolt, a Delaware corporation, pursuant to 10 Del. C. § 3111.

## FACTS

17.     Bolt was co-founded by 20-year-old Ryan Breslow in 2014.   Bolt's core business centers on an e-commerce product designed to provide one-click online checkout functionality.  Since 2016, Bolt has raised at least one billion dollars from institutional and other investors through several rounds of financing, making Breslow extraordinarily rich and famous in the process.   The success of Bolt has enabled Breslow to embark on various other business ventures including in the wellness, cryptocurrency, and lending spaces.

18.     Activant invested in Bolt as the lead investor on the Series B round of financing in November 2018.  Activant invested again in the Series C round in June 2020.

19.     In connection with these investments, Activant secured preferred representation on Bolt's board.  Steve Sarracino, an Activant founder and partner,

7

filled Activant's board seat.  Sarracino has substantial experience serving as a director on private company boards and working with founders and management to help drive companies forward.

20.    In or about August 2021, Activant agreed to convert its board seat from preferred to a common, in response to threats that a financing round being led by a close Breslow contact would not otherwise close. At that time, the Company was quickly running out of funds and in dire need of this financing, so Activant acquiesced to this financial extortion and agreed to relinquish its rights to Breslow to help sustain the Company. The putative premise for demanding Activant give up the Board seat was to give Breslow more flexibility and control in running Bolt as the CEO (it was certainly not to allow Breslow to use the Company and its coffers for personal interests and unrelated ventures). But by the time the Board structural changes became effective Breslow was out of management and focused elsewhere.

21.    Throughout his tenure at the Company, Breslow cultivated a public persona which grew with Bolt's success.  As time went on, it became increasingly apparent that Breslow's primary concern and focus was on building his personal brand and cult of personality, to which any duty to Bolt must yield.  In that regard, disagreements with Breslow, about matters big and small, engendered charges from him of disloyalty and lack of commitment to the mission.  This pattern would come to manifest in ways detrimental to the Company and its stockholders.

## A. **Breslow's JP Morgan Loan Guaranteed By Bolt**

22.     In November 2021, Breslow sought and obtained Board approval for a $30 million personal line of credit (the "Loan") from J.P. Morgan Private Bank ("JPM") to be guaranteed by Bolt, with his Bolt shares as collateral. By this point, Breslow's Bolt holdings had a paper value of over a billion dollars, so the Loan was well secured.

23.     In December 2021, in connection with the Loan, Bolt issued a Standby Letter of Credit and Side Letter ("LOC") for $30 million in favor of JPM as a guarantee for the Loan.  As a condition of the Loan, Bolt agreed to hold $31.5M (the Loan principal amount and a collateral fee), in restricted cash in an account at JPM for the duration of its guarantee, which by the terms of the LOC would expire on February 28, 2023.

24.     In support of the LOC, on or about December 23, 2021, Breslow entered into a letter agreement with Bolt (the "Breslow Letter Agreement").  Under the Breslow Letter Agreement, Breslow committed to sell Bolt stock in an amount sufficient to satisfy Breslow's outstanding Loan obligation in the event JPM exercised its right under the LOC to sweep Bolt's restricted cash. The Breslow Letter Agreement provided that, in the event Breslow breached, and did not, within 30 days of a sweep by JPM, sell his shares to cover the Company's loss, the Company had

the right to cancel enough of Breslow's Bolt stock to cover the amount collected by JPM from Bolt.

25.     With his execution of the Breslow Letter Agreement, Breslow also signed a Stock Pledge Agreement pledging certain of his shares of Bolt stock (the "Breslow Stock Pledge") to support his commitments under the Breslow Letter Agreement.

**B. Breslow's Troubles Go Public**

26.     The Company reached its pinnacle with the January 2022, Series E financing based on an $11 billion valuation. Breslow touted how the "$355 million" invested as part of this financing was "at ~30X our valuation ~30 months ago, and nearly double our valuation just three months ago." Breslow proclaimed that with this investment, in 2022, "we'll accelerate the rate of our product development and adoption, increase hiring of product and engineering talent, ramp up our strategic corporate investments, forge more win-win partnerships, launch Bolt in more international markets, and roll out more Conscious Culture initiatives to drive meaningful change at work."

27.     But after the Series E financing closed the cracks in Breslow's golden boy façade began to reveal themselves.

28.     Bloomberg reported that Breslow had blogged that BlackRock was lead on the Series E financing, which BlackRock then disputed, forcing Breslow to delete what he had written.

29. In late January 2022, Breslow vindictively attacked Stripe, a Bolt competitor, and Y Combinator, a startup accelerator that had passed on Bolt, along with other investors and market participants, calling them a "boys club" and "mob bosses" (among other things) on Twitter. He claimed these companies were out to get him, working together to destroy Bolt, but that Bolt would have the last laugh.

30.     Then, amidst the uproar, mockery and concern his tirade engendered, Breslow abruptly stepped down as Bolt's Chief Executive Officer. His departure stunned those who had just invested in the Series E financing and the market generally.  Breslow had given no indication of his plan to resign–which he belatedly claimed had been in the works–during the Series E fund-raising process.  Breslow claimed that stepping out of management would allow him focus "exclusively" on his "superpowers"—"culture, vision, landing company-defining deals, and fundraising."

31. Shortly after Breslow's resignation, the Company encountered serious turbulence.  In April 2022, Bolt announced a hiring freeze.  Then in May 2022, Bolt announced mass layoffs to "secure" the Company's "financial position, extend … runway, and reach profitability with the money … already raised."  These layoffs

struck hard at employees who Breslow had pitched on taking out Company loans to finance their stock options. These employees would now be forced to quickly repay these loans or lose their options.

32. Troublingly, Authentic Brands Group ("ABG"), a supposed core customer relationship that Breslow advertised mightily, sued Bolt because Bolt allegedly "utterly failed to deliver on the technological capabilities that it held itself out as possessing." Under Breslow, Bolt had made promises it could not keep and made representations as to its capabilities that ABG alleged were false. According to ABG, Bolt regularly "overstated the extent of its integration" with ABG to paint a falsely rosy picture. Bolt was never able to integrate with a key ABG brand, Brooks Brothers. But nonetheless touted the Brooks Brothers "relationship" to the market.

33. In May 2022, a New York Times's investigation appeared to confirm certain of ABG's allegations and reported that "Bolt's meteoric rise has been fueled at least in part by a pattern of stretching the truth," including as to the ABG relationship. According to the report, Breslow made highly speculative "revenue projections," including reliance on merchants Bolt signed to deals without verification of integration capabilities. Breslow touted significant partnerships that failed to materialize and acknowledged having made false and uncorrected statements regarding performance. For example, Breslow had Bolt cite ABG's total

revenue as a proxy for its own even though only two ABG companies ever used Bolt.

34. As time went on, having removed himself from day-to-day Bolt management, Breslow became increasingly erratic, paranoid, and vindictive. While Breslow claimed he was focused on developing customer relationships and additional fundraising, on information and belief, Breslow had become toxic and destructive to the Company with prospective customers and investors having lost trust and faith in him following the public events and incidents of early 2022.

35. Internally, there were repeated instances of Breslow demanding the immediate resignation of directors who disagreed with him or did something he did not like. Sarracino, for one, received multiple draft resignation letters at the direction of Breslow over the years as a form of intimidation and thinly veiled reminder that his board service was at Breslow's pleasure.

36. Breslow was also fixated on extracting compensation and remuneration from Bolt. He regularly attempted to renegotiate terms of settled contracts with the Company. What Breslow was owed and "deserved" was a never-ending topic of discussion between Breslow and Bolt's board. This continued full-bore even after Breslow resigned as Chief Executive Officer and was no longer a Bolt employee.

37. For example, in September 2022, as the Company navigated Breslow-induced challenges, Breslow pushed and pressured the Bolt board to waive

requirements around his "moonshot grants"[1] after the Company fell short of the agreed upon metrics and to enhance his grants and extend deadlines to meet milestones for their award.  The board managed to forestall a resolution of Breslow's demands at the time.

### C. <u>Breslow Undertakes to Avoid His Obligations to the Company</u>

38.    In November 2022, Breslow requested that Bolt grant an extension as part of an effort to avoid repaying the $30 million Loan that was to effectively come due in February 2023 upon expiration of the LOC and Bolt's guarantee.

39.    Following discussions between members of the Bolt board and Breslow, in December 2022, Breslow expressed his intent to act in the Company's best interests and satisfy his obligations to the Company by paying back what was outstanding on the Loan.  This would allow the Company access to its $30 million in restricted cash that collateralized its guarantee of the Loan.

40.    However, as was often the case, in early January 2023, Breslow reversed course.  Putting the Company's interests aside, Breslow decided to do what was best for himself and his own self-interests. He announced plans to default on the Loan, which would allow JPM to sweep $30 million of the Company's funds, and

---

[1] Moonshot grants are typically made available to founders and chief executive officers as significant incentive compensation tied to meeting aggressive and unlikely valuation or stock price thresholds.

then refuse to sell his shares and pay back the Company as required under the Breslow Letter Agreement.

41.     Breslow took this adversarial and self-interested position amid more layoffs at Bolt, with reports of an additional 10% workforce reduction announced in late January 2023. This brought the employee headcount down by about 50% year-over-year.

42.     These cuts were publicly reported as a response to concerns about the Company's financial position, with "quite a few" projects having failed to manifest and other customer deals experiencing delays.   Similar issues drove the prior employee reductions in the first half of 2022 that followed Breslow's resignation as CEO.

43.     Even so, in February 2023, with his repayment deadline approaching, Breslow reinforced that he would not be covering his debt, would not be selling his shares to cover the amounts he owed, and that he expected the Company to forebear on its exercise of remedies. Breslow's counsel asserted that Breslow would "go to war" and stunningly pronounced that Breslow could just replace the current directors, if they got in his way, with individuals who would follow his orders.

44.     In late February 2023, JPM informed the Company that it intended to declare a default and sweep $30 million in cash from Bolt's account unless something changed. Bolt's board and management took this warning seriously and

informed Breslow that he should immediately replace any cash that may be swept, including by selling his Bolt shares as provided for in the Breslow Letter Agreement.

45.    Breslow responded by again demanding that the Company forego legal remedies against him under the Breslow Letter Agreement and enter into a separate 24-month loan agreement with him.  Breslow's motivation was entirely selfish and in complete disregard of the Company's best interests, particularly considering the Company's need for cash and fact that Breslow no longer worked for Bolt. Accordingly, the Bolt board rejected his proposal. It properly determined that the parties had contracted around these issues and there was no good reason for the Company to waive its contractual rights.

46.    On February 28, 2023, with Breslow still refusing to satisfy his obligations, JPM swept Bolt's $30 million in cash.   Under the Breslow Letter Agreement, this triggered a 30-day period for Breslow to sell shares. The Bolt board was prepared to take the steps necessary to protect the Company, consistent with its fiduciary duties and Bolt's contracts with Breslow, if he did not make the Company whole.  Management agreed that it was in the Company's best interests to enforce its rights against Breslow and not acquiesce regardless of the pressure exerted and threats made by Breslow. The board and management made their positions known to Breslow.

47.     Upon being informed that the Company would not waive its contractual remedies to account for the $30 million loss occasioned by Breslow's default, Breslow quickly moved to the nuclear option as he had threatened to do on several prior occasions.  Breslow decided to formally replace directors who were opposing his self-interested efforts to avoid repaying the Company for the $30 million it had lost because of Breslow's default.

48.     On March 8, 2023, Breslow issued a letter to the Company and the law firm of Fenwick West directing the removal of 3/5 of the Bolt board–Arjin Sethi, Steve Sarracino and Brian Reinken—the three Bolt institutional investor representatives.   These directors had each sought to protect the Company by advocating for the exercise of the Company's rights under the Breslow Letter Agreement and the Breslow Stock Pledge.  Breslow announced that in place of these directors he would be adding with Larrence Dopson, a music producer and instrumentalist, and Esther Wojcicki, an educator and journalist.  Neither Dopson nor Wojcicki had any discernible financial technology or other pertinent board or investment experience.  Two weeks later Breslow identified Dopson as a member of the advisory board of his new venture "Love," a wellness and health company.

49.     The independent directors immediately protested Breslow's stated intention to remove them. They made clear to Breslow in writing that he was breaching his fiduciary duties by improperly attempting to compel the Bolt board to

excuse his default, have the Company accept responsibility for his repayment obligations and give him an additional $30 million 24-month loan. They further noted that Breslow's actions to extract a $30 million windfall for himself at the Company's expense, and his plan to remove directors who opposed his wrongful actions, were clear breaches of Breslow's fiduciary duty as Bolt's controlling shareholder and as a board member.

50.     Unmoved by these directors' response, Breslow formally effected the removal and replacement of Reinken and Sethi on March 15, 2023.  To avoid an immediate confrontation with Activant and the optics of removing all outside directors (all of whom were protesting his actions), Breslow temporarily withdrew his removal of Sarracino.

51.     Breslow disingenuously claimed that the removal and replacement of directors who stood up to him was "best for Bolt" and had nothing to do with his default on the Breslow Loan and avoiding the Company acting against him in response.  The absurdity of this claim is evident in who Breslow picked to replace the removed directors and what happened next.

52.     In mid-March, Breslow called Sarracino and praised him and his work for the Company. Among other things, Breslow told Sarracino he was "the smartest investor he had met" and had been "the best board member."  Presumably, Breslow thought that his unctuousness would result in Sarracino foregoing his fiduciary

obligations to the Company and acquiescing to Breslow's demands regarding a waiver of the Company's contractual remedies.

53.    Having eliminated some of the opposition on the board and envisioning (and hoping for) Sarracino's subservience, Breslow took steps to accomplish his desired result. On the morning of April 2, 2023, he directed counsel to prepare a unanimous written board consent relating to his debt and other financial remuneration.  Breslow plainly expected to force the Bolt board to rubber stamp his demands.  The written consent ordered by Breslow included ███████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████ By his proposed consent, Breslow also wanted ████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████

54.    That evening, Breslow announced that he was calling a meeting for the following day to "discuss some open issues" (i.e., his loan and the other financial benefits he wanted approved by consent).

55. Appropriately concerned by Breslow's apparent efforts to force his desired self-interested resolution on the Bolt board and the fact that at least two of the directors had been appointed to help make that happen, Sarracino emphasized to his fellow directors the need to secure "improved (proper) governance in exchange for a reasonable extension." He highlighted the importance of enhanced governance "as we have learned that Ryan is going to try to get additional economics that are not due - in essence treating Bolt like his personal piggy bank which we need to stop." Sarracino's efforts prevented Breslow from securing his self-interested unanimous consent at that time.

56. Discussions continued between the Company and Breslow and his advisors over the first two weeks of April. Breslow was adamantly against relinquishing any control over the Bolt board as part of a resolution of his obligations to the Company. In fact, he directed his counsel not to discuss governance issues with the Company at all.

57. It was also clear that Breslow had no interest in conducting arms-length negotiations with the Company or accepting a loan extension on market terms. Instead, Breslow evidenced a philosophy that Bolt was his Company, he deserved whatever financial concessions from the Company he desired, and he was in control and would not relinquish that control.

58.     Demonstrating their complete subservience to Breslow, the two new directors had no interest in or appetite for pushing back or withholding anything Breslow demanded. To them it was about making "Ryan" happy.   For example, on information and belief, Breslow gave Wojcicki talking points, which she presented to the Bolt board, and which Breslow then applauded, acting like it was Wojcicki's own independent thinking and analysis.

59.     By this point, six weeks had passed since JPM swept $30 million in Company cash in response to Breslow's default, Breslow's 30-day period to sell shares had expired, and the Company had allowed two more weeks to go by without exercising its contractual right to cancel shares under the Breslow Letter Agreement or take other legal action.

60.     Sarracino remained adamant that (a) any loan extension or new loan to Breslow should follow the establishment of a board structure that would allow for an actual independent and disinterested review of any such proposal (or any other proposal involving a benefit to Breslow), and (b) structural reforms be implemented to insulate the Bolt board from Breslow and to avoid a repeat of the summary dismissal of directors who scrutinized or challenged Breslow's self-dealing.   He also again made what should have been the non-controversial argument that any loan from the Company to Breslow be negotiated at arms-length and contain market-value terms.

21

61.     Breslow would not budge in response to Sarracino's proposals. Wojcicki and Dopson dutifully refused to approve the Company's cancellation of Breslow's shares–the contractual remedy for a Breslow default set forth in the Breslow Letter Agreement–or any other remedy as the Bolt board had contemplated prior to Breslow's initial purge. Instead, the new Breslow-appointed directors demonstrated their blind allegiance to Breslow by pushing for unconditional approval of a new loan without any benefit and only detriment to the Company.

62.     The new directors acted with complete disregard of their fiduciary duties to the Company and its stockholders. Ms. Wojcicki, by words and action, was inappropriately deferential to Breslow and his personal interests. She was openly more concerned with his needs than those of the Company. She naively expressed that "Bolt is Ryan's dream project and I assume that he doesn't want to hurt the company" and that "[i]t should not be Ryan against the company. At the moment, it is his needs vs Bolt which is wrong." She similarly wrote that she is in "favor" of doing whatever Breslow wants to keep him happy "because he is a genius and he loves the company." She posited that the Company should not "get into a fight with the founder."

63.     Dopson likewise did not exercise independent thinking and judgment when it came to Breslow and exercising the Company's remedies again his default

and resulting $30 million loss to the Company.  Like Wojcicki, Dopson advocated for whatever Breslow wanted.

64.    Wojcicki and Dopson did not meaningfully consider the Company's exercise of its contractual right to cancel Breslow's shares, other legal action, the impact on the Company of being out the $30 million Breslow had pocketed, or what it meant for the Company to further empower Breslow after his demonstrated willingness to wield that power only in furtherance of his own interests.

65.    Of course, it is not surprising that Wojcicki and Dobson would fall blindly in line with Breslow's wishes independent of their personal relationships and interest in pleasing Breslow.  Both directors were keenly aware that Breslow had removed two prior directors who had opposed him.  They clearly understood that their continued service on the Bolt board was entirely dependent on their support of Breslow's demands, even when those demands were antithetical to the Company's best interests.  Confirming this reality, Wojcicki and Dobson, through their conduct, demonstrated that they are completely dominated and controlled by Breslow.

66.    In continued effort to protect the Company consistent with his fiduciary duties, on April 12, 2023, Sarracino suggested that the Company begin the process of establishing a market price for the sale of Breslow's shares. He emphasized that "without a balanced board we are unable to make any changes to the pervious board's decision" (i.e., the Bolt Board prior to Breslow's wrongful removal and

23

replacement of two directors in March 2023) to not acquiesce to Breslow.  He lamented the directors being "under constant threat of termination" from Breslow "if you don't favor him economically."  Sarracino posited that this "is subservience which is not consistent with one's fiduciary duty. A dialogue with both parties willing to listen and compromise is fine, but not on offer here."

67.    Sarracino made explicit to all that something had to be done quickly to secure Bolt's $30 million that Breslow refused to return, and that directors' refusals to authorize action was a breach of fiduciary duties.

68.    Still, Wojcicki and Dopson would not press Breslow, and Breslow had no interest in working through matters in a way that protected the Company. Tellingly, based on information and belief, Breslow's lawyers who he had designated to negotiate knew nothing about the Company's board structure and governance and Breslow's strategic reconstitution of the Bolt board.

69.    With Sarracino insisting on compliance with Breslow's and the Board's fiduciary duties and refusing to cave to Breslow, Breslow made his final move.

70.    By letter dated April 14, 2023, Breslow informed the Company in writing of his removal of Sarracino and his replacement with his friend, Brock Pierce, a crypto billionaire and promoter and erstwhile presidential candidate.

71.    ███████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████

72.     At bottom, Breslow's removal, and replacement of Sarracino was calculated to ensure that he had locked up at least three members of the Bolt Board–a majority–to do his bidding.

73.     Over the course of six weeks, Breslow, the controlling shareholder and Executive Chairman of a Delaware corporation: (1) defaulted on an obligation causing $30 million of the Company's cash to be swept from its account by JPM, (2) elected not to sell shares to satisfy his obligation under the Breslow Letter Agreement to make the Company whole, leaving the Company short $30 million at a time when cash needs were acute, (3) pressured the Bolt board to renegotiate its contractual rights and remedies with no conceivable benefit to the Company, (4) summarily disposed of three directors because they attempted to honor their fiduciary duties to the Company by resisting and challenging Breslow's self-interested demands, and (5) replaced those directors with three individuals who knew what would happen if they protested (i.e. they would be removed) and otherwise demonstrated a willingness to carry out Breslow's demands without

resistance, including refraining from exercising the Company's contractual rights and remedies against Breslow even though that left Bolt in a $30 million cash deficit.

74.     Breslow has caused substantial harm to Bolt, including, but not limited to, the loss of $30 million in cash.  He has demonstrated an utter disregard for his fiduciary duties as a director and controlling shareholder of Bolt, favoring instead his own personal financial interests.

75.     At the same time, the members of the Current Board have breached and continue to breach their fiduciary duties of care and loyalty, including by knowingly, deliberately, and recklessly refusing to act on behalf of the Company in response to Breslow's default and steadfast refusal to cure.

76.     In response to the concerns raised by Activant regarding Breslow's conduct and the Board's inaction, ███████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

Moreover, based on information and belief, ████████████████████████



77.     In other words, with history as a guide, Breslow is highly unlikely to remedy his harm to the Company and instead is stringing along the entirely compliant Current Board.  In any event, the Current Board's conscious decision to refrain from enforcing the Company's remedies confers no conceivable benefit on Bolt.  Instead, the decision not to act by the hopelessly conflicted Current Board is inimical to the Company's best interests and cannot qualify as a valid and proper exercise of business judgment.

## DEMAND IS EXCUSED BECAUSE THE CURRENT BOARD CANNOT DISINTERESTEDLY OR INDEPENDENTLY CONSIDER A DEMAND

78.     Plaintiffs repeat and reallege the allegations of the above paragraphs as if fully set forth herein.

79.     Plaintiffs have not made a demand to the Company's current five-member Board of Directors to investigate or initiate the claims set forth herein.  For the reasons detailed above and as further set forth below, such a demand would be futile because a majority of the Current Board is interested and/or lacks independence. There is thus more than a reasonable doubt that a majority of the

Current Board could impartially consider whether it was in the Company's best interest to investigate or bring the claims asserted herein.

80.     The Current Board is comprised of five directors – Breslow, Wojcicki, Dopson, Pierce and Kuruvilla – all of whom are Defendants. Demand is excused because, as detailed below, directors comprising the majority of the Board either lack independence or are interested in any decision regarding a demand.

81.     **Defendant Breslow** stands on both sides of the transactions at issue and is receiving a material personal benefit from the Board's ongoing decision not to enforce the Company's contractual rights against him.  More specifically, Breslow benefitted materially from the Loan which resulted in a $30 million loss to the Company and its stockholders.   Additionally, Breslow is currently receiving a material benefit from the Board's inaction in exercising the Company's contractual right–under the Breslow Side Letter and Breslow Stock Pledge—to cancel his Bolt shares in response to Breslow's refusal to sell his Bolt stock to repay the Company. For these reasons, Breslow cannot impartially consider a demand because he is receiving a material personal benefit by maintaining the status quo and faces a substantial likelihood of personal liability by virtue of the claims asserted herein.

82.     **Defendant Wojcicki** was appointed to the Board by Breslow in March 2023 to fill the vacancy of a director who opposed Breslow's efforts to force the Board not to act in response to the Company's loss of $30 million resulting from

28

Breslow's default.  Because of the way she was installed on the Board, and having just witnesses the summary removal of her predecessor because of his opposition to Breslow, Wojcicki knows full well that if she opposes Breslow (or votes to initiate legal action against him), she too would be summarily removed.  Demonstrating her complete lack of independence, since her appointment to the Board, Wojcicki has failed to take any action to remedy the situation caused by Breslow's default.  To the contrary, while fully aware of her fiduciary duty to remedy the Company's $30 million loss, Wojcicki has inexplicably expressed her opposition to taking legal action against Breslow.  Instead, she has actively participated in the Board's acquiesce to Breslow's demands by failing to enforce the Company's contractual rights against Breslow contained in the Breslow Letter Agreement and Breslow Stock Pledge. This conscious and knowing failure to take action to remedy the Company's loss of $30 million caused by Breslow's default is a clear breach of Wojcicki's fiduciary duties, subjecting her to a substantial likelihood of personal liability, which further disqualifies her from passing on any demand.

83.    **Defendant Dopson** was appointed to the Board by Breslow in March 2023 to fill the vacancy of a second director who refused to bend to Breslow's demands that the Board not act in response to his default and the Company's resulting $30 million loss.  Like Wojcicki, Dopson knows beyond a doubt that if he votes in favor of acting against Breslow, he will suffer the same fate as his

predecessor—summary removal from the Board by Breslow, Bolt's controlling stockholder. Dopson has also been appointed by Breslow to another company, Love, controlled by Breslow, further evidencing his lack of independence. Also, like Wojcicki, Dopson has revealed his utter domination by Breslow by dutifully declining to take action to remedy the Company's $30 million loss caused by Breslow's default. Dopson's active participation in the Current Board's knowing and on-going decision not to exercise the Company's clear contractual rights against Breslow, which would remedy the Company's $30 million loss, is a garden-variety breach of his fiduciary duties. Dopson thus faces a substantial likelihood of personal liability, which further disqualifies him from passing on any demand.

84. **Defendant Pierce** was appointed to the Board by Breslow in April 2023 to fill the vacancy of a third director who opposed Breslow by pressing for the Company to exercise its contractual remedies in response to Breslow's default and JPM's sweep of $30 million of Bolt's cash. Like Wojcicki and Dopson, Pierce too knows that advocating in favor of legal action against Breslow would result in his immediate removal from the Board—the fate suffered by his predecessor. There is no doubt that Pierce is dominated and controlled by Breslow (just like Wojcicki and Dopson) because, since his appointment, Pierce has joined his fellow directors on the Current Board in sitting idle, notwithstanding the clear contractual remedies at the Company's disposal. There is no rational business reason for the Current Board

30

to defer taking legal action, particularly since Breslow is no longer in a management position at Bolt.   Pierce's active participation in the Current Board's conscious failure to exercise Bolt's contractual remedies against Breslow also subjects him to a substantial likelihood of personal liability, further disqualifying him from passing on any demand.

85.   In addition to serving on the Board, **Defendant Kuruvilla** is Bolt's Chief Executive Officer.  He therefore lacks independence from Breslow, Bolt's controlling stockholder, who received a material benefit from his default to the Company's $30 million detriment.  Kuruvilla also has actively participated in the Board's acquiesce to Breslow's demands by failing to act (either as Board member or CEO) to remedy the Company's loss of $30 million.  This clear breach of fiduciary duty subjects Kuruvilla to a substantial likelihood of personal liability, which also disqualifies him from passing on any demand.

86.   Because a majority of the Current Board (indeed, all the Current Board) (a) lacks independence from Breslow, the Company's controlling stockholder who received a material personal benefit from his unremedied $30 million default, and (b) faces a substantial likelihood of personal liability for their knowing and on-going failure to exercise the Company's clear contractual remedies, demand is excused as futile.

## COUNT I – CLAIM
(Breach of Fiduciary Duty Against Breslow)

87.     Plaintiffs repeat and reallege the allegations of the above paragraphs as if fully set forth herein.

88.     Breslow is a director and the controlling stockholder of Bolt.  In both capacities, Breslow owes Bolt's stockholders fiduciary duties of care and loyalty, including the duty to act in good faith.

89.     As more fully set forth above, Breslow breached his fiduciary duties by defaulting on his $30 million obligation and declining to sell his Bolt stock or otherwise reimburse the Company for its $30 million loss occasioned by Breslow's default.

90.     Breslow further breached his fiduciary duties by removing three directors who pressed to hold him accountable for his conduct and replacing those directors with three directors who he knew would support his self-interested demands and disregard their duties to Bolt and its stockholders. Breslow made known to these directors that their failure to support his self-interested demands would result in their removal from the Bolt board.

91.     The Company and its stockholders have been damaged because of Breslow's breaches of fiduciary duties in an amount to be determined at trial, which amount exceeds $30 million.

92.     Plaintiffs have no adequate remedy at law.

32

## COUNT II
(Breach of Fiduciary Duties Against All Defendants)

93.     Plaintiffs repeat and reallege the allegations of the above paragraphs as if fully set forth herein.

94.     As directors of Bolt, Defendants owe the Company's stockholders fiduciary duties of care and loyalty, including the duty to act in good faith.

95.     As more fully set forth above, Defendants breached (and are continuing to breach) their fiduciary duties by knowingly and intentionally failing to remedy the $30 million loss resulting from Breslow's non-payment of his obligations, including but not limited to by cancelling Breslow's shares and/or commencing legal action against him to recover the amount lost by the Company because of Breslow's default.   The Breslow Letter Agreement and Breslow Stock Pledge provide the Company with clear contractual rights and remedies against Breslow, there is no conceivable business justification for failing to exercise those rights, and Defendants are breaching their fiduciary duties (and not acting in good faith) by failing to act against Breslow.

96.     The Company and its stockholders have been damaged because of Defendants' breaches of fiduciary duties in an amount to be determined at trial, which amount exceeds $30 million.

97.     Plaintiffs have no adequate remedy at law.

## COUNT III

33

(Breach of Contract Against Breslow, In The Alternative)

98.    Plaintiffs repeat and reallege the allegations of the above paragraphs as if fully set forth herein.

99.    As more fully detailed above, Breslow entered into the Breslow Letter Agreement with Bolt.

100.    Under the Breslow Letter Agreement, in consideration for Bolt agreeing to guarantee the Loan, Breslow agreed that he would sell his Bolt shares in sufficient quantity to satisfy the amount due under the Loan and any related taxes, fees, withholding or other expenses, should Bolt become required to make payment or transfer something of value to JPM under its guarantee of the Loan.

101.    The Breslow Letter Agreement obligates Breslow to sell such shares within 30 days of Bolt making any payment or transfer to JPM under the guarantee.

102.    On or about February 28, 2023, after Breslow failed to pay amounts owing under the Loan, JPM swept $30 million in cash from a Bolt account to satisfy Breslow's outstanding debt.

103.    Following this action by JPM, Breslow had 30 days to sell Bolt shares or otherwise satisfy his obligation to Bolt under the Breslow Letter Agreement.

104.    Breslow failed to do so in breach of the Breslow Letter Agreement. Breslow has not otherwise paid Bolt $30 million to compensate Bolt for the amount swept by JPM.

105.   Breslow's breach has caused and continues to cause damages to Bolt.

## COUNT IV
### (Unjust Enrichment Against Breslow, In The Alternative)

106.   Plaintiffs repeat and reallege the allegations of the above paragraphs as if fully set forth herein.

107.   As more fully detailed above, Breslow wrongfully and unjustly used Company assets to secure a $30 million personal loan and then defaulted on that loan, causing the Company to suffer a concomitant loss of $30 million.

108.   As a result of Breslow's conduct, Breslow was unjustly enriched in the amount of $30 million and the Company was impoverished in the same amount.

109.   Plaintiffs have no adequate remedy at law.

## COUNT V
### (Declaratory Relief Pursuant to 10 *Del. C.* § 6501)

110.   Plaintiffs repeat and reallege the allegations of the above paragraphs as if fully set forth herein.

111.   In his capacity as Bolt's controlling stockholder, Breslow owes fiduciary duties of care, loyalty, and good faith to the Company and its stockholders.

112.   Breslow breached his duty as Bolt's controlling stockholder by removing Arjin Sethi, Brian Reinken and Steve Sarracino (the "Former Directors") from the Board to avoid the legal consequences of his default on his obligations to

the Company and the resulting $30 million loss suffered by the Company. As such, the removal of the Former Directors was improper, unjust, and inequitable.

113. Based on the foregoing, the Company is entitled to a declaration pursuant to 10 *Del. C.* § 6501 that the Former Directors were improperly and inequitably removed as Bolt directors.

114. Plaintiff has no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in Bolt's favor granting the following relief:

1. Declaring that Defendants breached their fiduciary duties to Bolt and its stockholders by intentionally failing to exercise the Company's contractual right to recover its $30 million from Breslow or otherwise exercising contractual remedies at the Company's disposal;

2. Awarding damages against Defendants, jointly and severally, for breaches of fiduciary duty in an amount to be established at trial, which amount currently exceeds of $30 million;

3. In the alternative, awarding damages against Breslow for breach of contract or unjust enrichment, in an amount to be determined at trial, which amount currently exceeds $30 million."

4. Declaring that Arjin Sethi, Brian Reinken and Steve Sarracino were improperly and inequitably removed from the Bolt board;

5. Awarding Plaintiffs their reasonable fees and expenses, including, but not limited to, legal fees and expenses, incurred in securing the above forms of relief for the benefit of the Company and its stockholders; and

6. Awarding such other relief as the Court deems just and proper.

36

DATED:  July 17, 2023

OF COUNSEL:

Christopher Clark
Jeffrey D. Rotenberg
**CLARK SMITH VILLAZOR LLP**
250 West 55th Street, 30th Floor
New York, NY 10019
(212) 582-4400
(347) 338-2532 (Fax)
clark@csvllp.com
jeffrey.rotenberg@csvllp.com
Benjamin.dozier@csvllp.com

**BERGER HARRIS LLP**

*/s/ Richard I. G. Jones, Jr.*
Richard I. G. Jones, Jr. (No. 3301)
Harry W. Shenton IV (No. 6919)
1105 North Market Street, 11th Floor
Wilmington, Delaware 19801
(302) 655-1140
rjones@bergerharris.com
hshenton@bergerharris.com

*Attorneys for Plaintiffs*